IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re: Federal Mogul Global, Inc., *et al.*,          (Bankruptcy Case No. 01-10578 (RTL))

     Debtors.

---

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS and ERIC D. GREEN, as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS, <br><br>    Plaintiffs, <br><br> v. <br><br> ASBESTOS PROPERTY DAMAGE COMMITTEE, <br><br>    Defendant. | Civil Action No. 05-59 JHR |

## OPINION OF BARBARA DOHMANN, Q.C.

     PLEASE TAKE NOTICE that the attached Opinion of Barbara Dohmann, Q.C. is filed on behalf of Plaintiffs the Official Committee of Asbestos Claimants (the "ACC") and the legal representative for future asbestos personal injury and wrongful death claimants (the "Futures Representative"), in anticipation of the Asbestos Claims Estimation Hearing (the "Hearing") scheduled to commence June 14, 2005. *See* Case Management Order [D.I. 17.].

Dated: Wilmington, Delaware
      April 26, 2005

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, New York 10022
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

CAPLIN & DRYSDALE, CHARTERED
Walter B. Slocombe
Nathan D. Finch
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

    -and-

CAMPBELL & LEVINE, LLC

Marla R. Eskin (No. 2989)
Kathleen J. Campbell (No. 4229)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 426-1900
Facsimile: (302) 426-9947

Attorneys for Official Committee of
Asbestos Claimants

YOUNG CONAWAY
STARGATT & TAYLOR LLP

James L. Patton, Jr. (No. 2202)
Edwin J. Harron (No. 3396)
Rolin Bissell (No. 4478)
Maribeth L. Minella (No. 4185)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Attorneys for Legal Representative for
Future Asbestos Claimants

**In re: Federal Mogul Global, Inc**

**OPINION OF BARBARA DOHMANN, Q.C.**

1. I am Barbara Dohmann, Q.C., of the Bar of England and Wales, having chambers at Blackstone House, Temple, London EC4Y 9BW, U.K. My *curriculum vitae* is attached as Annex 1 to this Report.

**The questions on which I have been asked to give my opinion**

2. I have been asked to advise whether the claims brought over the years and presently pending against Turner & Newall Limited ("T&N") and the other UK Debtors in the US by US residents (the "US T&N Asbestos Claims"), and which form the factual predicate upon which the experts will provide estimates of the present and future US liabilities of T&N and the other UK Debtors, state claims which would be recognized in the courts of England and in the insolvency proceedings of T&N and the other UK Debtors. In particular, I have been asked what law would govern the claims in any English proceeding both with respect to questions of liability and the quantum of damages.

3. In forming my opinion, I have been asked to assume that the facts in evidence at the estimation hearing with respect to the US T&N Asbestos Claims will be as set out in the set of assumptions attached as Annex 3 hereto. In summary, the assumed facts are that the US claimants are US residents who allege and can

1

prove suffering from an asbestos-related disease (i.e. an injury) manifested in the US, caused at least in part by their past exposures in the US to asbestos supplied by and/or contained within products manufactured and supplied by T&N and/or one of the other UK Debtors.

4. It is my opinion that the US T&N Asbestos Claims would be recognized in the courts of England and in the insolvency proceedings of T&N and the other UK Debtors, and that liability and quantum of damages for such claims would be assessed by reference to the law of the United States.

5. In showing how I reach this conclusion, it is necessary for me to consider and then answer several subsidiary questions, which I now set out:

**Question 1**: In the courts of England, what substantive law would be applied to a cause of action in tort, where (a) the defendant is resident in and manufactures products in England; (b) the defendant distributes the products in other countries, including the United States; and (c) the injury to the claimant, alleged to have been caused by the products and/or by the products containing asbestos fibres supplied by the defendant, occurred in the United States?

Answering this question in turn requires consideration of three subordinate questions, namely:

2

**Question 1A.** Is the choice of law applicable to the US T&N asbestos claims governed by the statutory provisions of the <u>Private International Law (Miscellaneous Provisions) Act 1995</u> (the "1995 Act") or by the common law?

**Question 1B.** What law applies (English or US) if the choice of law question is governed by the 1995 Act?

**Question 1C.** What law applies (English or US) if the choice of law question is governed by the common law?

**Question 2:** If English law is the substantive law to be applied in any of the above cases, would claims brought on the basis of the facts set forth in Subsidiary Question 1 above, and the assumptions annexed hereto, be recognised under the principles of that law?

**Question 3:** In the context of the facts set forth in Question 1 above, and the assumptions annexed hereto, by reference to which principles of law would the English Court determine, and quantify, the damages payable to the claimant?

**Question 3A.** What law applies to the quantum of damages under the 1995 Act?

**Question 3B.** What law applies to the quantum of damages if the common law applies?

**Question 4:** In an insolvency proceeding in England in which claims like those described in Question 1 above needed to be liquidated or estimated, would the questions raised in Questions 1, 2 and 3 above be answered differently?

6. In this Opinion, I shall, for convenience only, refer to "the United States" and "American law". As a matter of English private international law, the relevant law district will be that of a particular state, not that of the federation. I shall assume that this usage makes my meaning clear, even though the terminology may not be strictly accurate.

**Analysis of the legal issues: Question 1**

7. The first question is this: in the courts of England, what substantive law would be applied to a cause of action in tort, where (a) the defendant is resident in and manufactures products in England; (b) the defendant distributes the products and/or asbestos fibres in other countries, including the United States; and (c) the injury to the claimant, alleged to have been caused by the products and/or by products containing asbestos fibres supplied by the defendant, occurred in the United States?

8. Within the first issue, which is Question 1A, is whether the law applicable to the US T&N Asbestos Claims is that contained in the statutory provisions of the 1995 Act, or the common law.

4

9. The answer depends primarily on the identification of dates, for the English common law rules for choice of law were superseded by statutory rules with effect from May 1st, 1996. The precise way in which the change-over date takes effect is problematic, and depends on the proper interpretation of section 14(1) of the 1995 Act. It is unfortunate that the interpretation of section 14(1) is not free from doubt when it falls to be applied to a case in which the acts of the defendant took place before May 1st, 1996, but the injury done to the claimant occurred, or was manifest, only after May 1st, 1996.

10. Section 14 of the 1995 Act, in material part, reads as follows:

> *(1) Nothing in this Part applies to acts or omissions giving rise to a claim which occur before the commencement of this Part...*

11. No reported case has had to examine the problem of applying this provision to a claim which arises from acts or omissions taking place before May 1st, 1996, but with damage occurring or being discovered after that date. The leading academic authorities on the question diverge in their analysis. Dicey & Morris, <u>The Conflict of Laws</u> (13th edn, 2000) states, at p. 1515, that:

> *Part III thus has no retrospective effect and the reference to "acts or omissions" in section 14(1) would seem apt to indicate that the new choice of law rules will not apply where such acts or omissions which occur before the commencement date produce damage after that date.*

5

12. Cheshire & North, <u>Private International Law</u> (13th edn, 2000), at pp. 616-7, deals with the question in the following terms:

> *This must mean that if, for example, a car is defectively manufactured before the commencement of Part III but crashes, resulting in injury to the claimant, after the commencement of Part III, Part III will not apply.*

13. It continues:

> *In most cases there will be no difficulty in identifying the act or omission giving rise to a claim. But in some cases the events may involve two or more acts or an act and an omission. For example, there could be an act of defective manufacture of a product which is then sold with an omission to warn of its defective nature. The act occurs before the commencement of Part III, whereas the omission occurs after its commencement. Which is the one giving rise to a claim? It is submitted that the act or omission giving rise to the claim is the one on which the claimant bases the claim. If the claimant bases this on a failure to warn, Part III will apply; on the other hand, if the claim is based on negligent manufacture it will not do so. This is not what the Law Commissions intended. They recommended that the statutory rules should not apply in respect of anything occurring before the statute comes into force, and the Draft Bill attached to their Report was worded in such a way as to reflect this. However, different wording was adopted in Part III.*

14. The editor of <u>Halsbury's Laws of England</u>, Vol 8(3) (4th edition, Reissue, 2003) observes, at p. 367 n 3, that it is unclear whether the damage must precede May 1st, 1996 for the rules of the common law to apply. There is no guidance to be found in the extensive Parliamentary material which was generated during the examination of the Bill by the Special Public Bill Committee of the House of Lords.

15. If one takes a case in which the acts of the defendant which are complained of, and the occurrence of disease in the claimant, all took place before May 1st, 1996, there is no doubt that the 1995 Act will be inapplicable and the common law will apply. But in cases in which the manufacture of asbestos products, exposure to the asbestos in those products, and the inhalation of a fibre, took place before May 1st, 1996, but the manifestation of mesothelioma or other asbestos-related disease occurred after that date, it is unclear whether the Act will be held to apply. On the basis of the material currently available, it is not possible to give a confident or definitive answer. It is therefore necessary for me to set out the approach of the common law, and the approach which is prescribed by the 1995 Act.

16. The next issue, which is **Question 1B**, is to explain the choice of law if the question is governed by the 1995 Act.

17. If the claim is governed by the 1995 Act it is generally accepted that, notwithstanding some very unsatisfactory drafting in the Act itself, the statutory choice of law rules apply without regard to whether the tort was committed in

England or overseas. The general rule for choice of law is set out in section 11, which provides that:

> *(1) The general rule is that the applicable law is the law of the country in which the events constituting the tort or delict in question occur.*

> *(2) Where elements of those events occur in different countries, the applicable law under the general rule is to be taken as being-*
> *(a) for a cause of action in respect of personal injury caused to an individual or death resulting from personal injury, the law of the country where the individual was when he sustained the injury…*

Section 12 would allow the applicable law to be displaced in favour of the law of another country if, on comparing the connections which the claim has with the country identified by section 11 and those which it has with another country, it is substantially more appropriate to apply the law of that other country instead.

18. In the present context, section 11(2)(a) establishes that, as a general rule, the applicable law is that of the place where the victim was when he was injured. This will, on the assumptions I have been asked to make, be the law of the United States. On those assumptions, it is most improbable that section 12 would apply. It will follow that the law which will be applied to issues of substance will be American law.

19. The next issue, which is **Question 1C**, is the choice of law if the question is governed by the common law.

20. Under the common law rules for choice of law in tort, the starting point is to determine "where in substance the cause of action arose". The test was established by the Privy Council in <u>Distillers Co Ltd v Thompson</u> [1971] AC 458, in which case thalidomide had been manufactured in England, exported to and sold to the claimant in Australia, and used by her in Australia: the court concluded that, in substance, the tort took place in Australia.

21. If the answer to the "where in substance ?" question is that the cause of action arose in England, liability will be determined in every respect, and without exception, by English domestic law: <u>Metall & Rohstoff AG v Donaldson Lufkin & Jenrette Inc</u> [1990] 1 QB 391. But if the answer to this question is that the cause of action arose in an overseas country, <u>Boys v Chaplin</u> [1971] AC 356 decides that the questions of substance will in general be governed by a requirement of "double actionability". That is to say, the conduct complained of must be actionable as a tort according to English domestic law, and it must give rise to civil liability under the law of the place where the tort occurred, though it is not required that the causes of action be defined in identical terms. By way of modification of that general rule, the strict requirements of double actionability may be relaxed, removing the need to satisfy one or the other limb if the case, or a particular issue arising within it, has no real or substantial connection with one or the other of the legal systems concerned. This may be seen in <u>Boys v Chaplin</u> itself, where the foreign rule excluding general damages was disapplied, and in

Red Sea Insurance Ltd v Bouygues SA [1995] 1 AC 190, where a provision of the law of the forum, which would have precluded recovery by the claimants, was disapplied.

22. Assuming that the asbestos product was manufactured in England and supplied into the United States, that the claimant was exposed to it in the United States and sustained his damage there, I consider that the cause of action would be held to have arisen in the United States. The few authorities which elucidate the test spelled out in Distillers v Thompson have emphasized that one looks back over the whole of the factual history, and that the application of the test is not restricted or limited by the way (which may be self-serving) in which the claimant pleads the matters on which he bases his complaint. In most of the reported cases, the court was able to conclude that as the act of the defendant which represented the essence of his wrongdoing, and the damage to the claimant, were located in the same place, that was where the cause of action arose. There are very few cases in which the acts complained of were located all in one country and the entirety of the damage sustained by the claimant in another. In the one case in which this was the analysis, Metall & Rohstoff AG v Donaldson Lufkin & Jenrette Inc, the conclusion of the Court of Appeal was that the cause of action arose where the damage took place. In that particular case, the conclusion was reinforced by the fact that the acts complained of (a conspiracy to interfere with contractual rights, or an inducing of another to break his contract with the claimant) could have been undertaken anywhere, but the damage was inevitably going to take place in England, where the contracts were broken and payments were not received. In one respect the asbestos case with which I am concerned

10

does not fit into this pattern, for though the manufacturer made the product in and/or directed the distribution of its products and asbestos fibres from England, the damage resulting from it could have been sustained in any place in which the product was purchased and used. Even so, I take the view that the place of the damage is likely to be taken to be the dominant element in the application of the common law test. I would not be surprised if a court were to be influenced to reach this conclusion by section 11(2)(a) of the 1995 Act, even though it is strictly irrelevant to a case governed by the common law rules.

23. If therefore the "acts or omissions giving rise to a claim" occurred before May 1st 1996 and the cause of action arose in substance in the United States, the claim will need to satisfy the double actionability test. It must give rise to liability under domestic English law as a tort, and it must give rise to civil liability under the law of the United States. It is not necessary that the cause of action be formulated in identical terms under the two legal systems, as long as the claim is doubly actionable: that is, it is actionable in both legal systems. As to the proposition that one or the other of these two limbs could be disapplied on the footing that there is no real connection with one or the other of the two legal systems in question, this will be impossible where there exist substantial connections with England and with the United States. It follows that if the claim is governed by the common law rules for choice of law, the substantive issues of liability will be governed by English and American law according to a rule of double actionability. I shall deal separately with the issue of how damages would be assessed when the substantive claim is subject to this rule of double actionability. I will deal below

with the elements which require to be proved under English law to establish a cause of action for damage resulting from asbestos exposure.

## Analysis of the legal issues: Question 2

24. The second question is this: If English law is the substantive law to be applied in any of the above cases, would claims brought on the basis of the facts set out in Question 1 above, and the assumptions annexed hereto, be recognized under the principles of that law? The answer is that they would.

25. In order to demonstrate the grounds on which this answer is supported, it is proper for me to set out the elements of a cause of action which need to be proved in order to recover damages for losses caused by asbestos exposure (in its various ways) and resultant illness.

26. The ordinary principles of liability for negligence: breach of duty, causation, loss, and the burden of proof lying on the claimant, have been applied but also in one respect modified in the context of asbestos exposure.

27. The basic principles can be seen in Holtby v Brigham & Cowan (Hull) Ltd [2000] ICR 1086. In that case the claimant had been exposed to asbestos over the years of his employment with various employers, and had contracted asbestosis, or fibrosis of the lungs. The Court of Appeal considered the principles which applied to the issue of causation in a case in which the cause of the illness was a cumulative one and the illness was a degenerative one. The court's conclusion

was that the onus lay on the claimant to prove that the defendant's exposure made a material contribution to his disease, but (by a majority) that once he had done that, the employer was responsible only for the fraction of the disease which corresponded to the portion of exposure which took place in that employment. The division of responsibility on a time exposure basis was approved by the court as a sensible way to deal with the question.

28. It is well recognised under English law that the duty upon manufacturers and suppliers of asbestos products extends beyond duties owed to their employees. The Court of Appeal accepted, in Margereson v J W Roberts Ltd (unreported, April 2nd, 1996), that a duty of care could be owed to individuals who lived in the vicinity of an asbestos factory and who received their exposure to asbestos simply by living outside the factory walls.

29. It has also been established that family members of employees exposed to asbestos dust in their employment can recover damages from the employer: see the decision in Maguire v Harland & Wolff plc [2005] EWCA Civ 1. And in its very recent decision in Grieves v F T Everard & Sons and British Uralite plc [2005] EWHC 88 (QB), the High Court held that damages were recoverable by claimants who had been diagnosed with pleural plaques, even though they had no other physical injury.

30. In the context of mesothelioma, the application of the principles which require proof of causation, but permit this to be made by proof of time exposure, is arguably inappropriate by reason of the aetiology of that disease. In Fairchild v

Glenhaven Funeral Services Ltd [2003] 1 AC 32, the House of Lords addressed this issue of legal policy and held that it was right to modify the traditional principles of causation and proof as they applied in the context of mesothelioma. The claimants in that litigation had been exposed to asbestos over a long period during which they had had several employments. The House of Lords was unanimous in holding that, if it could be proved that any or each employer's failure of duty had materially increased the risk of disease, this was sufficient to establish causation against that employer or those employers. It was therefore necessary to prove, on a balance of probability, only that the employer or employers had, in breach of their duty to the claimant, materially increased the claimant's risk of injury.

31. Though the claims in Fairchild arose from the relationship of employer and employee, the same principles would apply to a claimant suffering from mesothelioma, who faced asbestos exposure from more than one source of asbestos otherwise than as an employee.

32. Apart from the issue of proof of causation in relation to mesothelioma, the ordinary principles which require the claimant to prove that there was a duty of care, breach of that duty of care, and damage resulting from the breach, apply to asbestos injuries as they apply elsewhere in the law of tort.

33. It is worth noting that the particular problem of proving causation in a mesothelioma case, which was considered by the House of Lords in Fairchild, would not be expected to arise where a claimant has lung cancer, if it can be

14

proved that each period of exposure materially contributed to the actual injury. In that case, the ordinary principles of liability would apply and it would be expected that each defendant whose wrong was an efficient cause of the injury would be liable to the claimant on a joint and several basis.

**Analysis of the legal issues: Question 3**

34. The third question is this: In the context of the facts set out in Question 1 above, and the assumptions annexed hereto, by reference to which principles of law would the English Court determine, and quantify, the damages payable to the claimant?

35. As a matter of the domestic law of England on damages for personal injury, a distinction is drawn between special damages and general damages. The former category covers those kinds of loss, such as loss of earnings, medical expenses, costs of nursing care, and so on, where the loss is pecuniary and can be quantified on the basis of arithmetical principles, subject to rules about remoteness. The latter category covers pain, suffering, loss of amenity, and so forth, where the loss is not pecuniary and assessment has to be undertaken instead by reference to precedent, and tariff, and judicial guidelines. But for the purposes of the conflict of laws, it is necessary to draw a different distinction.

36. English law distinguishes between (on the one hand) questions of remoteness and the heads of damage which may be recovered in proceedings, and (on the other) questions of measure or quantification of damages. So the question of

whether a claimant may recover damages for a particular head of general or of special damages, such as pain and suffering, the cost of medical treatment, loss of earnings, shortening of life expectancy, and so on, is a question of substance, governed by the choice of law rule set out in either section 11 of the 1995 Act or the common law choice of law rules, as the case may be, according to the principles described above. But how much money should be ordered to be paid by the defendant in respect of any of the recoverable heads of damage is a matter of quantification, of putting a value on the particular right or interest. It is this latter process which I am now addressing.

37. The common law rules of the conflict of laws on the quantification of damages are in a state of development or transition. I shall first explain how this comes to be so, and I will then answer the question of how quantification of damages would be undertaken in the separate contexts of claims governed by the common law rules for choice of law, and claims governed by the choice of law rules in the 1995 Act.

38. The starting point is therefore to address **Question 3B.** In answer to it, one may say that the tradition of English law has been to see the quantification of damages as being a procedural matter. As such it was always held to be governed by the law of the forum, that is, English domestic law. And until 2004 there was, for practical purposes, no contradictory authority, though there was a persistent academic view that it was inappropriate to subject rights, ascertained (in part) by reference to foreign law, to quantification in the English measure. As a matter of judicial authority, the proposition that quantification was governed by

English domestic law was established by the High Court in D'Almeida Araujo Lda v Becker & Co Ltd [1953] 2 QB 329. This was accepted by the Court of Appeal in Boys v Chaplin [1968] 2 QB 1. It was referred to with agreement, or at least without dissent, by all of the members of the House of Lords in Boys v Chaplin [1971] AC 356 (Lord Hodson at p. 378G; Lord Guest at p. 381H; Lord Donovan at p. 383H, by reference to the judgment of Lord Upjohn in the court below and whose view is at pp. 32-33; Lord Wilberforce at p. 392H; Lord Pearson at p. 394F). And the High Court duly confirmed that this was the law in Coupland v Arabian Gulf Petroleum Co [1983] 1 WLR 1136 at p. 1149: the judgment was affirmed on appeal without reference to this particular point. The leading academic authorities simply confirmed this interpretation of the law. This left little scope for a court below the House of Lords to challenge the proposition that quantification is, as a matter of the common law, a procedural matter to which English domestic law is applied. It is now necessary to deal with the answer to **Question 3A**, before returning to complete the analysis of **Question 3B**.

39. So far as **Question 3A** is concerned, the effect of section 14 of the Private International Law (Miscellaneous Provisions) Act 1995 appeared to be to preserve the rule of the common law conflict of laws that quantification of damages would be a procedural matter, governed by English law. Section 14 says, in material part:

> (2) *Nothing in this Part affects any rules of law (including rules of private international law) except those abolished by section 10 above.*

*(3) Without prejudice to the generality of subsection (2) above, nothing in this Part: (a) …*

*(b) affects any rules of evidence, pleading or practice or authorises questions of procedure in any proceedings to be determined otherwise than in accordance with the law of the forum.*

40. But the recent decision of the Court of Appeal in <u>Harding v Wealands</u> [2004] EWCA Civ 1735 has complicated the issue. In a claim arising out of a traffic accident in New South Wales, and applying the choice of law rules in the 1995 Act, it held that the issues of substance were governed by the law of New South Wales. By the time the case came to trial, liability had been admitted, and only the issue of quantification arose for decision. This was an issue because statute law of New South Wales restricted the amount of damages recoverable for general damages to A$309,000. English law imposed no such limitation.

41. By a majority of two to one, the Court of Appeal applied the law of New South Wales to cap the damages, that is, to limit the quantification in the New South Wales measure. The majority judgments do not make it completely clear whether they base their conclusion on the fact that the claim fell within the scope of the 1995 Act, and that this was the reason for a new approach. Arden LJ appears to indicate this at [52], but arguably takes a different and wider view at [65], where she appears to consider that the common law rule was misunderstood or wrong. In the judgment of Sir William Aldous, it is easier to see at [103], that he was interpreting the law as laid down by the 1995 Act, rather than purporting to revise the common law. But he also seemed to criticise the width of the proposition that,

at common law, quantification was a procedural matter. The Court of Appeal gave leave to appeal to the House of Lords. In the ordinary course of things, the case may be expected to come on for hearing in the second half of 2005.

42. According to the English doctrine of *stare decisis*, the Court of Appeal is bound by its own decisions, and it is therefore difficult to see how the majority in Harding v Wealands could properly have considered that they were at liberty to depart from the clear decision of that court in Boys v Chaplin, still less to depart from the clear view of the House of Lords in the same case. Given all that, it was unexpected that the majority of the Court of Appeal in Harding felt able to express the view that quantification should be held, as a matter of common law, as being no longer governed by English domestic law. If the issue were to come before a judge of the High Court tomorrow and he were required to assume, as he would be required to assume, that the decisions of the Court of Appeal were consistent with each other, he would have to regard Harding as being restricted to cases to which the 1995 Act applies, and as inapplicable to the common law.

43. But the House of Lords is free to depart from its previous decisions. It is therefore necessary to analyse how the Lords will view the approach to quantification within the common law conflict of laws rules for choice of law in tort. My view is that it will depart from the common law as hitherto understood, and will accept that, in principle, quantification is a matter for the law of the place where the cause of action arose.

44. My reasons are as follows. First, it would be difficult to justify taking one approach under the 1995 Act but another at common law. I consider that the Lords will hold

that quantification in cases governed by the 1995 Act will be regarded as a matter of substance, and will align the common law with that conclusion. Secondly, if there are cases in which quantification by reference to foreign law will lead to a result which shocks the conscience of the court (because the quantification is far too high, or far too low), recourse to the doctrine of public policy to substitute the rule of English law will provide a perfectly sufficient safeguard. Thirdly, the rule that quantification is for the *lex fori* has probably outlived its usefulness. Thirty years ago, in <u>Miliangos v George Frank Ltd</u> [1976] AC 443, the House of Lords swept away a well-established rule of procedural law, that an English court could give judgment only in sterling (and, incidentally, strongly criticised the Court of Appeal for its decision in <u>Schorsch Meier GmbH v Hennin</u> [1975] QB 416, which had held that it had the right to make this change to the common law rule). The sterling rule had become a source of injustice, in particular when it meant that a claim which had really arisen in a foreign currency led to a judgment for a sum diminished by the depreciation in the value of sterling. The House of Lords therefore abandoned the previous rule. A similar argument will presumably be made in Harding: if a claim is governed by a foreign law, it makes no obvious sense to quantify it by reference to English law. Fourthly, and though only of persuasive influence, the more recent views of the High Court of Australia (the final court of Appeal in Australia), in <u>John Pfeiffer Pty Ltd v Rogerson</u> (2000) 203 CLR 503, and <u>Régie Nationale des Usines Renault SA v Zhang</u> (2003) 210 CLR 491 (notwithstanding the reservation in paragraph 76 of the judgment), support the view that the law of the forum should not be used to quantify damages. This must add weight to the argument that quantification should be governed by the law which governs substantive liability. Subject to one point which I examine

below, it would follow that where, by application of the rule on double actionability, both English and American law govern substantive liability, the law of the place where the tort occurred should have the upper hand for quantification.

45. As against these arguments, two substantial contrary points must be acknowledged. First, if a tort claim is truly governed by a rule of double actionability, the logic of double actionability might appear to be that quantification should be done by both laws. This is, of course, an impossible outcome. But given the prominent role which English domestic law has on the issue of choice of law within the rule of double actionability for issues of substance, it is less surprising that it should be applied at the stage of quantifying that substantive liability. On the other hand, if one accepts that, even if there is a substantive requirement of double actionability, it remains true that only one law can govern quantification, and one cannot avoid the conclusion that there is then a choice of law to be made. Secondly, section 13 of the 1995 Act provides that an overseas tort of defamation remains governed by the rule of double actionability, even where the tort is committed after May 1st, 1996. Defamation was excluded from the new choice of law regime because Parliament was unwilling to sacrifice the ability of English domestic law to control claims alleging defamation. The double actionability rule prevents an English court having to give judgment in a defamation case in a way which contradicts English domestic law, especially in the field of freedom of the press and freedom of expression. It would be consistent with this Parliamentary intention that quantification in successful defamation claims should not be undertaken by foreign law; and if it is true for

defamation, it may be argued that other torts to which double actionability applies will have to be dealt with in the same way.

46. Having said all that, the tide is running against the excessive operation of English domestic law, under the guise of being the law which governs issues of procedure, into cases which are governed by a foreign substantive law. The proposition that the issue of quantification of damages is procedural and must therefore be governed by English law is an unattractive line of argument, as the majority in Harding v Wealands has demonstrated. Likewise, the role of the *lex fori* within the rule of double actionability was criticised in so sustained a fashion that it was substantially abrogated by legislation. The application of the *lex fori* to the quantification of damages is not designed to produce a result which reflects the view of the law which was used to determine that the defendant was civilly liable, and is not tailored to the particular circumstances of the claimant unless he or she happens to be resident in the forum.

47. This leads me to take the view that the House of Lords will seek to limit the role played by English law in cases in which the tort was, in substance, committed in America. So far as **Question 3B** is concerned, I do not believe that the House of Lords will approve the view that quantification is, as a matter of the common law conflict of laws, still to be regarded as a matter of procedure for English domestic law alone. They will say instead that it is to be governed by the law of the place where the tort occurred, subject to the application of English law on grounds of public policy if the foreign rules on quantification diverge to too great a degree from those of English law. If this is correct, the answer to Question 3A, namely

which law applies to quantification in the context of torts governed by the 1995 Act, where the role of English law has been diminished by force of statute, will be even clearer. But as matters stand pending this decision, this is at present a prediction.

**Analysis of the legal issues: Question 4**

48. The fourth question is this: in an insolvency proceeding in England in which claims like those described in Subsidiary Question 1 above needed to be liquidated or estimated, would the questions raised in Subsidiary Questions 1, 2 and 3 above be answered differently?

49. The answer is no.

50. So far as English insolvency is concerned, the liquidator will admit to proof all debts (liquidated and unliquidated) in respect of obligations existing at the date of the liquidation. If therefore there is a claim in tort, the claimant may have it admitted to proof. If there is any dispute about it, as to liability or quantum or both, the liquidator exercises a function which is said to be quasi-judicial, and he or she determines the existence and quantum of liability as though he or she were sitting as an English judge.

51. If the claim were pending before an American court at the date of the insolvency, this would make no difference to the process of admission to proof. It is still a claim in respect of a tort, which will be assessed by the English liquidator in the

same way as if it had not been the subject of pending American proceedings. Of course, if the claim had been pursued to judgment by the date of the insolvency the liquidator must, if the conditions for the recognition of the judgment under English private international law rules are satisfied, recognise the debt created by the foreign judgment, at least where the defendant has participated in the proceedings. This is because a foreign judgment which is recognised in English law gives rise to a fresh obligation, which may form the basis of a claim submitted to proof. But until there is judgment there is, in English eyes, no obligation; and the fact that a claim is the subject of pending proceedings will therefore have no legal significance.

52. It may be wondered whether, if the claim was pending and the foreign court then proceeds to give judgment, this would be taken as a re-valuation of the claim so that, as if with the benefit of hindsight, the claim in tort will be re-assessed as having the value of the judgment, rather than the value which the English liquidator would have placed on it at the date of liquidation. This will not happen. It is true that English law does accept a measure of hindsight to adjust the quantum of a claim which has been admitted to proof: Wight v Eckhardt Marine GmbH [2004] 1 AC 147, at p. 157. But there is a sharp distinction between hindsight being used to re-evaluate the quantum of an unliquidated claim, and the substitution of one obligation (that under the law of tort) by another (as constituted by the foreign judgment). This falls outside any understanding of the hindsight principle.

**General matters in relation to this report**

53. **DATA CONSIDERED:** In reaching the opinions and conclusions set forth in this Report, I have considered the following information: my background, training, experience and knowledge of the laws of the United Kingdom developed over the past 34 years in which I have stood as a member of the Bar, the case authorities, texts and statutes referenced in the Report and set forth in Annex 2, and the Assumptions set forth in Annex 3 to this Report. I have seen the Inter-Court Communication Protocol, and I have contributed to the Agreed List of Issues as sent from Richards J to Judge Lyons. I have also seen the asbestos estimation reports prepared by Mark Peterson (dated 16 October 2002, 19 February 2004 and 29 November 2004), EMB (dated 27 July 2004), Tillinghast (dated September 2004), and Robin Cantor (dated 30 November 2004).

54. I have been assisted in preparing this Report by one of my fellow members of Blackstone Chambers, Adrian Briggs. Professor Briggs is also a Professor of Private International Law at Oxford University and is the Assistant Editor of Dicey and Morris, The Conflict of Laws (13th edn, 2000) and a co-editor of the Conflict of Laws section of Halsbury's Laws (vol 8(1), reissue 1996).

55. **EXHIBITS:** I have not prepared any exhibits at present but reserve the right to make exhibits from portions of my Report for trial presentation purposes.

56. **QUALIFICATIONS:** My qualifications to perform this analysis and provide expert testimony are set forth in my CV, which is attached as Annex 1 to this report.

57. **PUBLICATIONS:** The only piece that I have written that has been published in the last ten years covering issues of substantive, academic law is a chapter for the Festschrift for Professor Schlosser (April 2005), entitled "Forum non-conveniens and counter-suit injunctions", which I co-authored with Professor Briggs.

58. **COMPENSATION:** To date, I have billed 26.25 hours in relation to the preparation of this opinion. My compensation for services rendered has been £17,450. I expect to spend further time in relation to matters arising out of this opinion, including work in relation to any deposition and at the hearing itself. Professor Briggs, who has been assisting me, has charged £8,275 for assisting in the preparation of this opinion.

59. **PRIOR TESTIMONY:** There have been no cases in which I have testified as an expert at either trial or deposition within the past four years.

60. Because discovery is still ongoing, I reserve the right to modify this report as new information becomes available between now and the time of trial. I anticipate that I will review the expert witness reports of other expert(s) and if requested offer opinions about their analyses and conclusions in a rebuttal report.

BARBARA DOHMANN, Q.C.

**Annex 1**

**Curriculum Vitae of Barbara Dohmann QC**

| | |
|---|---|
| **Called to Bar:** | 1971 |
| **Appointed Queen's Counsel:** | 1987 |
| **Degrees:** | Mainz and Paris (languages and economics) |
| **Languages:** | Fluent in German and French<br>Good knowledge of Spanish.<br>Working knowledge of Italian |

**Areas of Practice:**

Banking;   Insurance   and   Reinsurance;   Commercial   Arbitration (domestic/international);  Commercial  Fraud  (civil);  Company  Law;  Regulatory Tribunals;  Entertainment and Media/Intellectual Property;  Financial Services; Partnership; Private International Law; Professional Negligence.

**Professional experience:**

Barbara Dohmann QC is a barrister with experience in a wide variety of areas of civil law.  She appears regularly in the Appellates Courts, High Court 1st instance (in both the Chancery Division and the Commercial Court, Queen's Bench Division), arbitrations (as both Arbitrator and Counsel) as well as at regulatory and disciplinary tribunals. Miss Dohmann also has extensive experience in appearing before foreign courts in very large commercial disputes, including Bermuda, Singapore, Brunei and Grand Cayman, and currently in Nassau (Bahamas).

**Practice Areas:**

1.   **Banking and General Commercial**

Miss Dohmann regularly advises and acts in international banking disputes many of which do not lead to court proceedings. She has acted for clients in disputes arising from take-overs and acquisitions, including Argyll v Guinness and  GE Capital v Bankers Trust & Others;   Fyffe plc v. Geest plc, and confidential others.

**Cases include:**

Re Oracle Fund Limited.  Case proceeding in the Bahamas raising important issues of banking, regulation, fund management and company law.

<u>Alfred Billes v Bank of Bermuda Limited</u>. Case dealing with issues of banking and civil fraud in Grand Cayman.

<u>Law Debenture Trust Corporation Ltd v Lexington Insurance Co & Others</u> [2002] EWCA Civ 1824 (Commercial Court and Court of Appeal 11.11.02). Issues included banking, professional negligence and insurance/reinsurance.

<u>Brown & anr v Bennett & ors</u>. Court of Appeal (Civil Division) 1.12.98 Strike out. (whether defendants obtained claimant's business dishonestly). Chancery Division, decided 18.10.00, no case to answer. Wasted costs application (2002) 1 WLR 713

<u>Bank Handlowy v Bank of New York</u> (unreported) 8th December 1999. Court of Appeal (application relating to proposed privatisation of a major Polish Bank).

<u>Henry Ansbacher & Co Ltd. v Binks Stern</u>, [1998] PNLR 221; [1998] Lloyd's Rep. Banking 1. Court of Appeal (successful fraud claim by bank against solicitors of client).

<u>Morgan Stanley UK Group v. Puglisi</u> Queen's Bench Division Commercial Court) 29.01.98 (Financial Services Act 1986 s 62(1) (whether PERLS transaction with private customer was off-exchange margined transaction in derivative instrument.)

<u>Lordsvale Finance plc v. Bank of Zambia</u> (1996) QB 752 (default interest not a penalty).


2.   **Commercial Arbitration**

*Miss Dohmann has appeared in many large international/domestic arbitrations. Given client confidentiality, little can be disclosed beyond the fact that the subject matters include oil trading (e.g. dispute between a state oil company and a private trading company), a North sea oil drilling contract, the true construction of a bare boat charter, alleged breaches of charter parties, commodity trading (e.g. at the London Metal Exchange) and many insurance and reinsurance disputes (see below at paragraph 5).*


3.   **Financial Services**

*Miss Dohmann has specialised in financial services for most of her career, having acted for and against Self-Regulating Organisations, in relation to investigations, disciplinary proceedings, judicial review, appeals and advice. She has been involved in many of the major regulatory cases which have arisen in the last 10 years instructed by the Regulators, including the SIB, SFA, IMRO, PIA and now FSA. She has acted in Bank of England, Stock Exchange, Lloyd's and DTI investigations, making written submissions and representing clients before inspectors or tribunals.*

28

4.    **Insurance and Re-Insurance**

Miss Dohmann has acted for and against insurance companies and Lloyds Syndicates, and for Lloyds names, in cases relating to the following areas:

(a) Conflict of laws: proper law of Lloyd's marine policy <u>Amin Rasheed Shipping Corporation v Kuwait Insurance Co.</u> (1984) AC 50; <u>Credit Lyonnais v New Hampshire Ins Co</u> [1997] 1 Lloyd's Reps 191; [1997] 1 LCLR 1 (whilst sitting as deputy judge in Commercial Court),

(b) true construction of policies; coverage disputes,

(c) non-disclosure/misrepresentation by insured, materiality disputes,

(d) fraudulent claims,

(e) insurable interest,

(f) fortuity,

(g) sham re-insurance,

(h) illegality of policies; lack of authorisation of insurer,

(i) negligent underwriting : claims by Lloyd's names,

(j) regulation of insurance markets,

(k) liability of insurance brokers,

(l) allocation of insurance claims between (i) years (ii) different insurers,

(m) limitation: <u>Sheldon v Outhwaite</u> [1996] 1 AC 102 (dealing with professional negligence limitation and deliberate concealment by a Lloyd's Underwriting Agency).

**Cases include:**

<u>Law Debenture Trust Corporation Ltd v Lexington Insurance Co & Others</u> (Commercial Court and Court of Appeal 11.11.02) (See above).

<u>CNA Insurance Company (Europe) Limited v Servico International Ltd</u>

<u>Manulife v Chubb 2002</u> (reinsurance arbitration)

<u>AXA v. Weavers</u> (reinsurance arbitration)

<u>Allianz & Others v Chubb 2001</u> (reinsurance arbitration)

<u>Sovereign v M&G 2001</u> (reinsurance arbitration)

Kingscroft Insurance Co Ltd & ors v Nissan Fire & Marine Insurance Co Ltd [1999] Lloyd's Rep. IR 603, (Commercial Court), Moore-Bick J. 29th July 1999. (whether quota share reinsurers of an underwriting pool became parties to facility quota share reinsurance treaties;    effect of provisional notices of cancellation, renewals of treaties).

Kennecott Utah Copper Corp & ors v Cornhill Insurance plc & ors [2000] Lloyd's Rep. IR 179 (Commercial  Court) Langley J. 12th October 1999 (construction of policy wording and endorsements:  whether a newly built plant damaged by explosion had attached to an operational insurance policy).

Novelli SPA v. Watkins Court of Appeal.    26.11.96 (whether defendant insurers were prejudiced by reason of the extended period during which they had to reserve in their books their proportion of the unreinsured loss).


5.    **Private International Law**

Miss Dohmann has acted and advised in many cases where litigation was proceeding in a number of jurisdictions, she has appeared as an expert witness and has given expert opinions on English law to Courts in several European countries and in the United States of America.


**Cases include:**

The Trustees of the Beaverbrook Foundation (2004)

British American Tobacco (Investments) Ltd v United States of America: [2004] EWCA Civ 1064 Court of Appeal 30.7.04

United States of America (Claimant) v (1) Philip Morris Inc & Ors (Defendants) (2) British American Tobacco (Investments) Ltd (Intervener) (2003)  QBD (Commercial Court)  (Moore-Bick J) 10.12.2003.

Mukta Gheewala & Ors v Mahesh Gheewala & Ors 2003 (Privy Council – on appeal from the Court of Appeal in Jersey)

M/S Alghanim Industries Inc & others v Skandia International Insurance Corp & Others 2001

Naz Smyth v Abdul Behbehani & Maha Behbehani (Court of Appeal).  The Times, 7 April 1999 (principles applicable to the grant of negative declarations and a stay of proceedings on the grounds of forum non conveniens).

Lubbe & ors v Cape plc [1998] CLC 1559 (Court of Appeal); and also Pill LJ, Aldous LJ, Tuckey LJ  29th November 1999 (forum non conveniens, forum created by offer to submit, reverse forum shopping).  See also [2000] 1 WLR 1545.

30

General DEP Crude Oil Marketing v AVIA Mineraleol A.G. – Arbitration 3.11.98

Sedigep Ltd. v The Administrators of Polly Peck [1997] 2 BCLC 630 (jurisdiction dispute involving the Mozambique Rule and s.30 of the Civil Jurisdiction and Judgments Act 1982).

Simon Engineering v Butte Mining PLC QB, (Commercial Court) [1996] 1 Lloyd's Reports 91 (counter suit injunction, whilst sitting as a deputy judge).

Continental Bank SA v. Aekos Compania Naviera S.A. (1994) 1 Lloyd's Rep 505, Court of Appeal (Article 17 and anti-suit injunction).

Owens Bank v Bracco [1992] 2 AC 443. Miss Dohmann represented Bracco at all levels, including the House of Lords (whether a foreign judgment obtained by fraud can be enforced in England) and on the reference to the European Court on points arising under the 1968 Brussels Convention.

Kurz v Stella Musical [1992] Ch 196. (interpretation of Art 17 of the 1968 Brussels Convention).

(See also the cases at 4a above)


6.    **Intellectual Property & Entertainment**

British Broadcasting Corporation v Talksport Ltd  2001 FSR 53 (The Times 29.6.00).

Columbia Tristar Home Video (International) Inc v Polygram Film International BV, (Court of Appeal) Stuart-Smith LJ, Otten LJ, Potter LJ) 8th February 2000 (construction of film/video financing agreement).

Hadley and Others v Kemp [1999] EMLR 589 (Chancery Division), Park J. 30th April 1999. (Instructed on behalf of Gary Kemp and his publishing company; successfully resisted all contract and copyright claims brought by former members of the group "Spandau Ballet").

Miss Dohmann has since acted for, amongst others, Vangelis and Oasis.

Miss Dohmann is currently dealing with a copyright tribunal reference and other confidential work for artists and companies.


**Other cases include:**

Kohn v Meehan & Pettmond Inv Ltd [2003] All ER(D)315

Al-Abbas v Al-Dabbagh (CA 21.11.2002) – freezing orders made in favour of intervening solicitors set aside.

Plant & Anr v Plant & Anr [2002] EWHC 2283 (Ch)

BMT Salvage Ltd & Ors v The Salvage Association (unreported, Chancery Division)

MRI International v Dawling Kindersley Holdings (Commercial Court)

London Underground v Transport for London [2002] EWHC 1260 (legal professional privilege)

JFS (UK) Ltd & anr v. Dwr Cymru Cyf (Court of Appeal 18.9.98) (meaning of original set-off or counterclaim - Limitation Act 1980 s 35(3)).

**Professional bodies and appointments:**

1997-1999 Treasurer, 1999-2001 Chairman of the Commercial Bar Association (COMBAR); Member of the General Council of the Bar; Member of the Legal Services Committee of the Bar Council.

Committee Member of COMBAR, of the European Circuit and of the London Common Law & Commercial Bar Association (LCLCBA).

Recorder (from 1990) and Deputy High Court Judge (from 1994) in the Commercial Court, Queen's Bench and Chancery Division until 2002.  She has acted also as Arbitrator and as Mediator in commercial disputes.

Member of Learned Society for International Procedure Law (working with Professor Schlosser, the reporter/commentator to the Brussels Convention).

Founding Member of the Chancellor's Forum of the University of the Arts and previous Member of the Court of Governors, London Institute Higher Education Corporation.

**Annex 2**

**List of authorities**

**Case authorities**

Distillers Co Ltd v Thompson [1971] AC 458

Metall & Rohstoff AG v Donaldson Lufkin & Jenrette Inc [1990] 1 QB 391

Boys v Chaplin [1971] AC 356

Red Sea Insurance Ltd v Bouygues SA [1995] 1 AC 190

D'Almeida Araujo Lda v Becker & Co Ltd [1953] 2 QB 329

Boys v Chaplin [1968] 2 QB 1

Coupland v Arabian Gulf Petroleum Co [1983] 1 WLR 1136

Harding v Wealands [2004] EWCA Civ 1735

Miliangos v George Frank Ltd [1976] AC 443

Schorsch Meier GmbH v Hennin [1975] QB 416

John Pfeiffer Pty Ltd v Rogerson (2000) 203 CLR 503

Régie Nationale des Usines Renault SA v Zhang (2003) 210 CLR 491

Wight v Eckhardt Marine GmbH [2004] 1 AC 147

Holtby v Brigham & Cowan (Hull) Ltd [2000] ICR 1086

Maguire v Harland & Wolff plc [2005] EWCA Civ 1

Grieves v F T Everard & Sons and British Uralite plc [2005] EWHC 88 (QB)

Margereson v J W Roberts Ltd (unreported, April 2nd, 1996)

Fairchild v Glenhaven Funeral Services Ltd [2003] 1 AC 32


**Statute**

Private International Law (Miscellaneous Provisions) Act 1995


**Texts**

Dicey & Morris, The Conflict of Laws (13th edn), p1515.

Cheshire & North, <u>Private International Law</u> (13th edn, 2000), pp616-7.

<u>Halsbury's Laws of England</u>, Vol 8(3) (4th edition, Reissue, 2003), para 367, note 3.

**Annex 3**

**Assumptions for questions on English Choice of Law issues**

*Background*

Turner & Newall Limited and its UK subsidiaries (collectively "T&N") have been subject to asbestos-related claims in US courts brought by US claimants (the "US Claims").

Up until the date on which T&N, together with the other companies in the Federal Mogul group, filed for protection under Chapter 11 of the US Bankruptcy Code, such claims were actively dealt with by T&N in the US. In some cases, the claims were settled and compensation payments made to the claimants.

In the context of those Chapter 11 proceedings, and in the UK administration proceedings involving T&N, certain questions now arise in relation to how pending and future US asbestos-related claims against T&N ought to be valued.

UK Counsel has been asked to provide an opinion on four questions related to relevant English law. This note sets out the specific assumptions that ought to be made by Counsel about the US Claims in order to answer those questions.

*Assumptions*

1. To the extent that US Claims have been pursued by the claimants to settlement or judgment, they have, in almost all cases, been brought by claimants who allege exposure to asbestos-containing products manufactured and/or supplied by T&N. In most cases, the US Claims are brought by persons who claim they were exposed to T&N's products, or to products containing asbestos fibres supplied by T&N, in the course of their employment in the US, although they were not employees of T&N.

2. Where a claimant in a US Claim alleges that they were exposed to products manufactured and/or supplied by T&N, the cause of action relied upon is usually breach of duty to warn, or a similar theory of liability under US law.

3. To the extent that US claims were settled by T&N, the claimants were paid damages only where the claimant was able to demonstrate, with evidence:

    (a) the likelihood of exposure to asbestos-containing products manufactured or supplied by T&N; and

    (b) a recognised asbestos-related illness.

4. Some US claimants have asserted claims against T&N (defined above as both the UK parent and the UK subsidiaries) based not upon allegations that they were exposed to asbestos-containing products manufactured or supplied by T&N, but based upon assertions that T&N is liable under derivative theories of liability, such as:

(a)    liability based on T&N's actions as a "conspirator" in the industry, under "conspiracy" or "concert of action" theories; or

(b)    liability under veil-piercing, alter ego, agency or similar derivative liability theories, seeking to hold T&N responsible as a parent company for the actions of its former US (Keasbey & Mattison) or Canadian (Bell Asbestos Mines, Atlas Asbestos) subsidiaries.

T&N never made payments to claimants based on allegations of conspiracy theories of liability.

Although prior to the late 1980s T&N paid some claims alleging exposure to Keasbey & Mattison asbestos-containing products where the claimant's theory of liability was based solely on veil-piercing or similar derivative liability allegations, after the late 1980s claimants obtained proof that T&N supplied the asbestos fibre in Keasbey's products, and thus began alleging that T&N was directly responsible as the manufacturer or supplier of the asbestos components in the Keasbey products. Thus, for claims asserted after 1990, T&N settled such claims based on its exposure for direct liability as a fiber supplier in the chain of distribution, not based on veil-piercing allegations. With respect to the Canadian subsidiaries (Bell Asbestos Mines, Atlas Asbestos), although T&N did pay nuisance value settlements for a small number of claims where the claimants asserted only veil piercing theories, these claims represented less than 1 percent of the total dollars paid to United States claimants by T&N. Other than in these two situations, T&N did not make payments to claimants seeking to hold it responsible for the acts of its

North American subsidiaries based on veil-piercing, agency or similar derivative theories of liability.

5.    In the United States, the typical asbestos personal injury claimant was exposed to, and could prove exposure to, the asbestos-containing products of a substantial number of different asbestos defendants. This resulted in each claimant naming many different asbestos defendants in a typical lawsuit. The asbestos defendants, including T&N, in turn when sued typically would assert counter-claims or cross-claims against one another for contribution and indemnity. In practice, claimants would receive a portion of their total settlement payments (or verdict awards in the rare cases which went to verdict) from each of the defendants named in the lawsuit. The portion of the overall settlement borne by each defendant in a typical case would reflect such factors as the location of the work sites where the claimant alleged exposure, the employment history of the claimant, the presence or absence of a defendant's products at any particular worksite during any relevant period and, accordingly, the relative responsibility of each defendant for the claimant's asbestos exposure as compared with the "liability share" of the other defendants named in the lawsuit.

*Center for Claims Resolution*

T&N was a member of the Center for Claims Resolution ("CCR"), which operated from 1988 to January 2001. The CCR was a group of twenty asbestos defendants which sought, as a group, to simplify and address the liability sharing process in a

manner that would lower the claims resolution costs for each of them, both on an individual case basis and in the aggregate. Members of the CCR joined the CCR and remained members because they believed its joint operations both substantially reduced their individual costs of defense by utilizing a single defense counsel in place of twenty separate counsel and obtained significant discounts in settling cases, through the CCR's ability to negotiate bulk resolutions.

In evaluating claims for payment, once a claimant tendered to the CCR and its counsel sufficient proof that he had an asbestos-related disease and exposure to the products of at least one of the CCR defendants, the CCR members would not require additional proof of exposure to each and every defendants' products before attempting to settle the case with the claimant. Instead, the CCR members as a group would attempt to settle with the claimant for an aggregate dollar figure which represented the total liability of all CCR members (the CCR Settlement Payment). If there was a settlement, then each CCR member named in the law suit would contribute a portion of the CCR Settlement Payment for that claim based on a formula previously agreed to by the CCR members. This formula sought to allocate overall among CCR members their comparative shares of responsibility.

This policy of "cross-subsidization" in which all CCR members who were named in a law suit paid into the settlement of that claim (whether or not the claimant had yet provided evidence of exposure to the products of that member) was designed to allocate fairly overall the costs of claims in proportion to the CCR defendant's liability. The CCR chose not to require evidence of exposures to products of every CCR member that a claimant named in his/her law suit, because the CCR did not

want to undertake an expensive and internally divisive determination, and then assess evidence, about the relative responsibility among its members. As a result of this policy, T&N probably paid some claimants it would not have paid if it had remained outside the CCR, i.e. claims where T&N was named in a law suit but the claimant may not have had sufficient evidence of T&N's liability. But in turn T&N paid far less on average toward each settled claim, because other members contributed to the settlement of claims where T&N would have liability even in cases where those other members might have paid nothing if they had remained outside of the CCR; and T&N paid far less in the aggregate because the cost savings and reduced settlement amounts more than offset the cost of paying claims T&N would not have paid outside the CCR. CCR members believed that this cross-subsidization policy netted out, reflecting approximately what each member would have paid had contribution issues been thoroughly pursued, but it resulted in every member paying lower amounts in settlement, both on a case by case basis and in the aggregate, than they would have paid had they remained outside the CCR.

The CCR data for T&N, together with the data for T&N reflecting T&N's asbestos claims resolutions during the period from the dissolution of the CCR in January 2001 through the commencement of the insolvency proceedings in October 2001, and the experience of other CCR members in the tort system after the dissolution of the CCR, provides the starting pointing for the experts estimating both the number of meritorious unresolved claims already asserted and future claims yet to be asserted together with the proper quantum of their damages.