IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:  Federal Mogul Global, Inc., *et al.*,         (Bankruptcy Case No. 01-10578 (RTL))

       Debtors.

---

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF<br>ASBESTOS CLAIMANTS and<br>ERIC D. GREEN, as the<br>LEGAL REPRESENTATIVE FOR<br>FUTURE ASBESTOS CLAIMANTS, | )<br>)<br>)<br>)<br>)<br>) | |
|     Plaintiffs, | )<br>) | |
| v. | )<br>) | Civil Action No. 05-59 JHR |
| ASBESTOS PROPERTY<br>DAMAGE COMMITTEE, | )<br>)<br>)<br>) | |
|     Defendant. | ) | |

## **SUPPLEMENTAL REPORT OF DR. MARK A. PETERSON**

PLEASE TAKE NOTICE that the attached Supplemental Report of Dr. Mark A.

Peterson, dated April 26, 2005, is filed on behalf of Plaintiffs the Official Committee of Asbestos

Claimants (the "ACC") and the legal representative for future asbestos personal injury and

wrongful death claimants (the "Futures Representative"), in anticipation of the Asbestos Claims

Estimation Hearing (the "Hearing") scheduled to commence June 14, 2005.  *See* Case

Management Order [D.I. 17.].

Dated: Wilmington, Delaware
      April 26, 2005

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, New York 10022
Telephone:  (212) 319-7125
Facsimile:  (212) 644-6755


CAPLIN & DRYSDALE, CHARTERED
Walter B. Slocombe
Nathan D. Finch
One Thomas Circle, N.W.
Washington, DC 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

    -and-

CAMPBELL & LEVINE, LLC

Marla R. Eskin (No. 2989)
Kathleen J. Campbell (No. 4229)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947

Attorneys for Official Committee of
Asbestos Claimants

YOUNG CONAWAY
STARGATT & TAYLOR LLP

James L. Patton, Jr. (No. 2202)
Edwin J. Harron (No. 3396)
Rolin Bissell (No. 4478)
Maribeth L. Minella (No. 4185)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Attorneys for Legal Representative for
Future Asbestos Claimants

# Turner and Newall Projected Liabilities

# Supplemental Report

## Mark A. Peterson

## Legal Analysis Systems

## April 26, 2005

# Table of Contents

1. Introduction ........................................................................................................ 1
   1.1. Other Parties' Experts Predict Increases in U.S. Liabilities ............................ 1
   1.2. Summary of this Supplemental Report ........................................................... 2

2. Peterson Forecast Variations ............................................................................ 3
   2.1. T&N's Liability Assuming a Decrease in Future Claim Filings ......................... 3
   2.2. Three Alternative Hypotheses about Increases ............................................. 5
        2.2.1. Using T&N's Increase in Propensities to Sue ....................................... 5
        2.2.2. Alternative Forecasts Based on 2000-2001 Settlement Averages ......... 7
        2.2.3. Alternative Forecasts Based on Trends in Settlement Averages ............. 8

3. LAS's Preliminary Forecasts ............................................................................. 10
   3.1. October 2002 Memorandum ......................................................................... 10
   3.2. February 2004 Memorandum ....................................................................... 10

4. Comments on Report by EMB ........................................................................... 12
   4.1. EMB's Inappropriate Treatment of Propensities to Sue ............................... 12
        4.1.1. EMB's Artificially Low 2001 Propensities to Sue ................................ 12
        4.1.2. EMB's Artificially Low Trends for T&N Propensities to Sue ................. 13
        4.1.3. Adjusting for EMB's Inappropriate Propensities to Sue ....................... 14
   4.2. EMB's Inappropriate Treatment of Settlement Values .................................. 15
   4.3. Estimating the Effects of EMB's Differing Assumptions ................................ 15

5. Comments on Tillinghast Report ....................................................................... 17

6. T&N Liability Based on its Bankruptcy Plan ...................................................... 19

7. Rule 26 Disclosures and Signature ................................................................... 22

# Tables

Table 1: The Total Value of Pending and Future U.S. Claims Against T&N .................... 4

Table 2: The Present Value of Pending and Future U.S. Claims Against T&N .............. 4

Table 3: Alternative Rates of Increase in Propensities to Sue ..................................... 6

Table 4: The Present Value of Pending and Future U.S. Claims Against T&N ............. 7

Table 5: T&N Settlement Averages Prior To Bankruptcy (2000-01) ............................. 8

Table 6: Liabilities Using T&N's 2000 and 2001 Settlement Averages ......................... 8

Table 7: Increases in T&N Settlement Averages Prior To Bankruptcy .......................... 9

Table 8: Present Value of Liabilities Using Recent Settlement Increases ...................... 9

Table 9: Propensities to Sue T&N, by Disease: 2000-2001 (U.S.) ............................... 13

Table 10: Recalculation of Average Annual Increase in T&N's Propensities to Sue ..... 14

Table 11: Replication of EMB's Forecast of T&N Claims After October 1, 2001 ........... 14

Table 12: Present Value (PV) of Future Claims as of October 1, 2001 ......................... 16

Table 13: Categories and Average Values of TDP Categories ....................................... 19

Table 14: Number of Claims Qualifying for Each Category ........................................... 20

Table 15: Total Liability Under Bankruptcy TDP ........................................................... 21

Table 16: Present Value of Liability Under Bankruptcy TDP .......................................... 21

Table 17: Present Value of Payments to Claimants Qualifying for Each Category ....... 21

# 1. Introduction

There is broad recognition that defendants' asbestos liabilities have grown markedly in the United States since the start of the 2000s. Based on the expert reports submitted thus far, all experts and consultants in this case and in the United Kingdom insolvency litigation recognize that Turner & Newall's (T&N) asbestos liabilities in the U.S. had become markedly greater in the months preceding its October 1, 2001 bankruptcy petition and would continue to increase after that date.

## 1.1. Other Parties' Experts Predict Increases in U.S. Liabilities

EMB Consultancy LLP (EMB), consultants to Denton Wilde Sapte on behalf of the Administrators of T&N Limited, state: "We acknowledge a general observable increase in the propensity to sue and for the purpose of our best estimate projections have assumed that the propensity to sue will increase from its 2001 level" (EMB, "Review of Dr Peterson's Projections of Future U.S. and U.K. Asbestos Related Liabilities, TDP Values and CDP for Level 1 Claimants," 27 July 2004, p. 4). "Both Dr Peterson's and EMB's projections of the future filings against T&N assume that T&N filings will increase over their 2001 levels" (EMB, p. 26). EMB also observed that at the time of its bankruptcy T&N's payments in tort litigation were greater than had been its historic payments, almost all of which were as a member of the Center for Claims Resolution (CCR): "We acknowledge that ... settlement of claims through the tort system rather than the CCR facility will increase the average settlement of claims" (EMB, p. 5).

Tillinghast Towers Perrin (Tillinghast), consultants to counsel for T&N Pensions Trustee, state: "the asbestos litigation environment has changed significantly since the late 1990s. The number of claims has increased dramatically, and settlement amounts have also increased." (Tillinghast, "Report Analysis of T&N Ltd's Asbestos Liabilities September, 2004," pp. 5-6). Tillinghast notes "an increase in the propensity to sue in response to aggressive activities of some plaintiff attorneys" and that "(a)s an increasing number of asbestos defendants have declared themselves bankrupt, the remaining defendants have found themselves paying out more for claims because there are fewer co-defendants to share the liability" (Tillinghast, p. 6). In describing their methodology for forecasting T&N's liabilities, Mr. Michael Angelina, the author of the Tillinghast report states "my choice assumptions for numbers of expected future claims (mostly medium or high) reflects [stet] the increases in claims in recent years" (Tillinghast p. 13).

Dr. Robin Cantor of Navigant, consultants to the Official Committee of Property Damage Claimants, described T&N's litigation experience before its bankruptcy: "(f)inally, my analysis revealed that there were substantial changes in the historical patterns of claim numbers and values, especially for mesothelioma and asbestos claims, in 2001" (Navigant, "Expert Report of Dr. Robin A. Cantor," p. 3). In forecasting T&N's continuing payments, Navigant estimated that average mesothelioma values would double (96 percent increase) between 2002 and 2006, increasing by 14.4 percent per year over the five years (Cantor, p. 28).

The greatest expertise about T&N's liabilities as of its October 2001 bankruptcy filing perhaps is held by lawyers who defended T&N in its asbestos litigation who also noted the past and likely future increases in the company's asbestos liabilities and who have provided me with many of the reasons for these increases that I describe in my November 2004 expert report in this case (Legal Analysis Systems (LAS), "Turner and Newall Inc. Projected Liabilities for Asbestos Personal Injury Claims," November 29, 2004 (hereinafter referred to as "Peterson")).

Reasons for these past and expected continuing increases in T&N's asbestos liabilities are discussed in my November 2004 expert report previously submitted in this case (Peterson, Section 6.1.3., pp. 12-13) and in earlier, preliminary memoranda that have been provided to other

experts. (Peterson, "Turner & Newall Liabilities for U.K. and U.S. Claims," February 19, 2004). My expert report provides forecasts of T&N's U.S. asbestos liability that are based on my best estimates of the continuing increases in claims filings and average payment amounts. The expert report also presents a range of alternative estimates of such increases as part of my sensitivity analyses.

## 1.2. Summary of this Supplemental Report

Given the broad agreement that T&N's U.S. asbestos liabilities would continue to increase from past years, the primary disagreement among experts is in the amount of increase: how much would the number of future T&N claim filings increase and how much more would T&N have to pay on average to resolve asbestos claims. This supplemental report discusses alternative assumptions about the amounts of such increases and changes in T&N's U.S. asbestos liabilities.

First, I provide three alternative forecasts based on the analyses of my November 2004 expert report.

Second, I present several of my earlier forecasts that preceded my expert report and discuss why those forecasts are less appropriate than those presented in my expert report.

Third, I compare and comment on the forecasts described in reports for two consultants to parties in the T&N litigation in the United Kingdom: EMB's July 27, 2004 report for counsel to the Administrators of T&N Limited (Section 4), and Tillinghast's September 2004 report for counsel to the T&N Pensions Trustee (Section 5). I comment on each report's assumptions about future increases in T&N claims and average resolution costs and on the forecasting methods applied in those reports. I also present two alternatives to EMB's forecasts. The first corrects a methodological error in its calculation of T&N's propensities to sue in 2001. The second uses this correction and also calculates the past rate of increase in T&N's propensities from a more appropriate period for such calculation. Because Tillinghast provided sparse explanation of the assumptions for its 27 forecasts, I could not undertake any recalculations of those forecasts.

Finally, I forecast liabilities based on the Trust Distribution Procedures (TDP) in the proposed joint plan of reorganization (Section 6). These TDP forecasts differ from the forecasts of T&N's liability under the U.S. tort law process that is described in my expert report. Because the proposed TDP imposes stricter qualification requirements but pays greater amounts to qualifying claims than obtained under the tort process, this analysis of liabilities under the TDP assumes that there will be greater average payments made to fewer claimants than I assumed in the tort forecasts of my expert report.

## 2. Peterson Forecast Variations

My November 2004 expert report discussed ten different forecasts of T&N's liability for asbestos claims in the U.S., most of which involve alternative assumptions about the rates of increase in future claim filings or about the values of claims. In this section I produce summary tables for the principal sensitivity that I examined throughout my expert report, T&N's forecast liability assuming that its propensities to sue would not increase in the future. Next I discuss three other alternative forecasts that were not included in my expert report, but that use assumptions suggested by other experts' reports.

### 2.1. T&N's Liability Assuming a Decrease in Future Claim Filings

This section summarizes T&N's total liability for present and future claims assuming that its propensities to sue would not increase in the future. Forecast results presented here are taken from analyses and results that I presented in section 6.3 of my November 2004 expert report (Peterson, pp. 23-38).

My expert report discusses the assumption that T&N's propensities to sue would remain unchanged after its bankruptcy petition (i.e. the "No Increase" assumption), which implies that the number of claims filed against the company would decrease steadily in each future year (Peterson, pp. 27-32) as the incidence of asbestos related diseases decreases. I also discuss why this assumption is less plausible than the assumption that propensities to sue and claim filings against T&N would increase in future years, the "Increase" assumption (Ibid, p. 39 and pp. 8-9). As a sensitivity analysis (Ibid, pp. 56 and 60), my expert report provided parallel results for both the Increase and No Increase assumptions (Ibid, Tables 20-22, pp. 38-39) except for the final Tables 22 and 23 that add together T&N's liability for both pending and future claims (Ibid, p. 39). Those final two tables present results only for my preferred Increase model without including results for the less plausible No Increase assumption.

The tables below complete this sensitivity analysis, showing my forecast of total liabilities in the U.S. for pending and future T&N claims for both the No-Increase and Increase models. These reproduce Tables 23 and 24 from my expert report, adding forecasts for the No-Increase future model.

**Table 1:** The Total Value of Pending and Future U.S. Claims Against T&N

| Forecast Model | Disease | | | | Total |
|---|---|---|---|---|---|
| | Meso | Lung | Othe | Nonm | |
| No Increase | | | | | |
| Pending | $510 | $140 | $28 | $776 | $1,455 |
| Future | 6,714 | 1,015 | 166 | 5,748 | 13,644 |
| All Claims | $7,224 | $1,155 | $194 | $6,624 | $15,099 |
| Increase | | | | | |
| Pending | $510 | $140 | $28 | $776 | $1,455 |
| Future | 9,088 | 1,445 | 279 | 9,051 | 19,864 |
| All Claims | $9,598 | $1,585 | $307 | $9,827 | $21,319 |

Notes: Millions of nominal dollars in years paid. Pending claims are assumed to average 1.5 years to settlement. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5%.

**Table 2:** The Present Value of Pending and Future U.S. Claims Against T&N

| Forecast Model | Disease | | | | Total |
|---|---|---|---|---|---|
| | Meso | Lung | Othe | Nonm | |
| No Increase | | | | | |
| Pending | $474 | $130 | $26 | $721 | $1,352 |
| Future | 3,259 | 543 | $89 | $2,944 | $6,835 |
| All Claims | $3,633 | $673 | $115 | $3,665 | $8,187 |
| Increase | | | | | |
| Pending | $474 | $130 | $26 | $721 | $1,352 |
| Future | 4,324 | 753 | 144 | 4,503 | 9,724 |
| All Claims | $4,798 | $883 | $170 | $5,224 | $11,076 |

Notes: Millions of year 2001 dollars. Pending claims are assumed to average 1.5 years to settlement. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5%. Discount rate is 5.02%.

I add the forecast liability for the No Increase model to show what T&N's liability would be if its future claiming rate continued at the rates prior to its bankruptcy petition using the claim values from my expert report. As Tables 1 and 2 show, even if there were no future increase in future propensities to sue T&N, T&N's asbestos liabilities would reach $15 billion with a present value of $8.187 billion. These assumptions of unchanging future propensities to sue and declining counts of future claims are contrary to the broadly held expectations that T&N's liabilities would continue to grow and that T&N's future claim filings would increase over pre-bankruptcy levels. Given developments in T&N's asbestos litigation in recent years that caused T&N's litigation position to greatly erode (discussed in Section 6.1 of my expert report), claiming rates against T&N after September 2001 would most likely have continued the increases that had been

occurring in T&N claim filings before the company's bankruptcy petition.

## 2.2. Three Alternative Hypotheses about Increases

In this section I discuss three additional sensitivity analyses based on assumptions suggested by the EMB or Tillinghast reports. Each sensitivity analysis is based on the analyses of my November 2004 expert report, varying one the following assumptions:

- Increasing propensities to sue with increases equal to rates of actual increases observed from T&N's own past claims experience rather than the general rates of increase that I used in my expert report.

- No increase in T&N's average cost to resolve claims over its costs in 2000-2001, its last year in CCR and first months outside of CCR;

- Increases in T&N's average cost to resolve claims based mostly on its actual rates of increase as a CCR member.

The first of these variations results in rates of increases in future propensities which are greater than those assumed in my report and which produce greater liability forecasts. The forecasts of my expert report are more conservative than liabilities forecast that would be obtained by extending into the future T&N's actual past rates of increase in propensities to sue.

The second and third of the alternatives are unlikely. Their estimates of T&N's claim values at the time of its bankruptcy are inconsistent with the circumstances of T&N's asbestos litigation that I describe in Section 6.1 of my expert report (Ibid, pp. 8-13).

### 2.2.1. Using T&N's Increase in Propensities to Sue

Many factors--T&N's own past claims experience, the effects of important asbestos litigation events in late 2001, the expectations of other analysts (the EMB and Tillinghast analyses of T&N liabilities), the expectations of T&N's lawyers who defended its asbestos claims, the actual experiences of asbestos defendants who continued to receive claims after T&N entered bankruptcy in October 2001--all suggest that propensities to sue T&N and T&N's claim filings would continue to increase after September 2001, but they do not provide specific estimates of the amounts of such increase. In my November 2004 expert report I estimated this rate of future increase conservatively as the rate observed generally among asbestos defendants in the late 1990s derived specifically from claims filing data for the Manville and UNR Trusts.

In contrast, EMB looked to T&N's own past claims experience to estimate the continuing rate of increase in its propensities to sue. In this section I present three alternative estimates of increase in propensities to sue that we derived from rates of past increases in propensities to sue T&N.

Filings against T&N and other CCR members were suppressed between 1993 and late 1997 when plaintiffs law firms withheld filings while the Georgine class action was sub judice. After the Supreme Court overturned the Georgine settlements, T&N's filings increased sharply in late 1997 and 1998 as law firms filed claims that had been withheld while Georgine was still unresolved. By 2000 and 2001 these Georgine effects had largely past. As EMB, Tillinghast and others have recognized, the increased filings against T&N during 2000 and 2001 reflected, rather, the beginning impacts of the bankruptcy filings in 2000 and 2001, the expanding entrepreneurism of plaintiffs law firms and other factors that represented real increases in propensities to sue.

Because the timing of T&N's claim filings were affected by its membership in CCR, we calculated rates of increases in T&N's past propensities over three different periods (Table 3). All three of our alternative forecasts look to the rates of increase through 2000 and 2001 but use different starting points from which to measure the rates of increase. I compare these alternatives with the rates of increase used for the General Increase and No-Increase models of my November

2004 report.

**Table 3:** Alternative Rates of Increase in Propensities to Sue

| No. | Period | Meso | Lung | Othc | Nonm |
|-----|--------|------|------|------|------|
| 1. | 93-99 vs 00-01 | 2.090 | 2.007 | 1.745 | 1.265 |
| 2. | 97-98 vs 00-01 | 1.554 | 1.568 | 1.323 | 1.272 |
| 3. | 97-99 vs 00-01 | 1.509 | 1.556 | 1.354 | 1.182 |
| 4. | General Increase | 1.392 | 1.490 | 1.791 | 1.113 |
| 5. | No increase | 1.000 | 1.000 | 1.000 | 1.000 |

To forecast T&N's future liabilities under each of these models we assumed that propensities to sue would increase gradually over five years between 2002 and 2006. We forecast no change for the first forecast future year (2002) followed by increases over each of the next four years (2003 through 2006), with the increase in each year equal to one fourth of the full rates of increase shown on Table 3. By 2006 propensities to sue T&N would reach the multiple of its propensities to sue during 2000-2001 for each disease times the rates of increase shown on Table 3.

Table 4 shows forecast present values of future liability using these alternative rates of propensity to sue increases. Results for the No-Increase and General-Increase models are presented for comparison.

**Table 4:** The Present Value of Pending and Future U.S. Claims Against T&N

| No. | Forecast Model | Disease | | | | Total |
|-----|----------------|---------|------|------|------|-------|
|     |                | Meso | Lung | Othc | Nonm | |
| 1.  | 93-99 vs 00-01 | | | | | |
|     | Pending | $474 | $130 | $26 | $721 | $1,352 |
|     | Future | 6,222 | 974 | 141 | 6,571 | 13,908 |
|     | All Claims | $6,696 | $1,104 | $167 | $7,292 | $15,260 |
| 2.  | 97-98 vs 00-01 | | | | | |
|     | Pending | $474 | $130 | $26 | $721 | $1,352 |
|     | Future | 4,765 | 786 | 111 | 5,168 | 10,830 |
|     | All Claims | $5,239 | $916 | $137 | $5,889 | $12,182 |
| 3.  | 97-99 vs 00-01 | | | | | |
|     | Pending | $474 | $130 | $26 | $721 | $1,352 |
|     | Future | 4,642 | 781 | 114 | 4,790 | 10,327 |
|     | All Claims | $5,116 | $911 | $140 | $5,511 | $11,679 |
| 4.  | General | | | | | |
|     | Pending | $474 | $130 | $26 | $721 | $1,352 |
|     | Future | 4,324 | 753 | 144 | 4,503 | 9,724 |
|     | All Claims | $4,798 | $883 | $170 | $5,224 | $11,076 |
| 5.  | No Increase | | | | | |
|     | Pending | $474 | $130 | $26 | $721 | $1,352 |
|     | Future | 3,259 | $543 | $89 | $2,944 | $6,835 |
|     | All Claims | $3,633 | $673 | $115 | $3,665 | $8,187 |

Notes: Millions of year 2001 dollars. Pending claims are assumed to average 1.5 years to settlement. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5%. Discount rate is 5.02%.

Table 4 shows that the rates of increase in my expert report, the General Increase, are conservative. We would have forecast greater liability if we had forecast future T&N claim filings based on its own past rates of increase in claim filings rather than our general measure of increased propensities to sue.

## 2.2.2. Alternative Forecasts Based on 2000-2001 Settlement Averages

For reasons discussed in my expert report, the amounts that T&N could be expected to pay to resolve pending and future claims cannot be forecast solely from its past claims experience (Peterson, Sections 6.13-6.14, pp. 12-18). T&N resolved claims into 2001 as a member of the CCR, which provided T&N with tactical advantages and administrative savings that it no longer had after CCR disbanded in January 2001. After CCR disbanded, T&N could no longer expect to resolve claims in amounts as low as it had within CCR. In the eight months between leaving CCR and filing for bankruptcy protection, T&N's mesothelioma settlement averages increased dramatically. In the same time period, T&N resolved relatively few atypical claims for other diseases, mostly claims that T&N's lawyers felt presented little liability risk for the company. Again, T&N's resolutions for these claims provide little guidance as to the value of the remaining, pending claims and those that would be filed in the future. For these reasons, I had used other sources of information described in my report in addition to data on T&N's historic resolutions to estimate the values of claims that were pending and would be filed after its bankruptcy (Peterson, pp. 12-18).

While I conclude that we should not use T&N's past resolutions as the sole basis for forecasting what it would pay to resolve claims at and after its bankruptcy, the analyses in this section show that forecasts of T&N's liabilities are great even when based solely on T&N's resolutions within CCR and during the nine months between CCR and its petition date.

Table 5 shows the average settlement amount paid by T&N within each disease category during 2000 and 2001, its last year in CCR and the few months after it left CCR.

**Table 5:** T&N Settlement Averages Prior To Bankruptcy (2000-01)

| Meso | Lung | Othe | Nonm |
|------|------|------|------|
| $98,267 | $15,038 | $6,216 | $2,338 |

Notes: Average settlement amounts are expressed in Year 2001 dollars.

If we use the values in Table 5, ignoring the fact that T&N's settlement averages had been continuing to increase at the time of its bankruptcy filing, we obtain lower forecast liabilities than provided in my expert report. These forecasts, using the settlement averages in Table 5, are overly conservative, ignoring not only all of the litigation factors that were increasing T&N's liability at the time of its bankruptcy petition (Peterson, Section 6.1.3., pp. 12-13), but also ignoring the trends of increasing settlement averages that characterized T&N's settlements up to the time of its bankruptcy petition. While I do not regard the values on Table 5 as reasonable bases for forecasting T&N's liability at the time of its bankruptcy petition, Table 6 shows calculations of T&N's liability based on these settlement values, a present value of $4.9 billion for the Increase model and $3.6 billion for the No Increase model.

**Table 6:** Liabilities Using T&N's 2000 and 2001 Settlement Averages

| Period | Increase | No Increase |
|--------|----------|-------------|
| Pending | $578 | $578 |
| Future | 4,278 | 3,044 |
| Total | $4,856 | $3,622 |

Notes: Millions of year 2001 dollars. Pending claims are assumed to average 1.5 years to settlement. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5%. Discount rate is 5.02%.

## 2.2.3. Alternative Forecasts Based on Trends in Settlement Averages

Another alternative for the estimates of current T&N settlement values accepts that settlement values in late 2001 were greater than the averages paid by T&N prior to its bankruptcy, but uses different rates of increase from those used in my expert report. For this alternative we assume that within the bankruptcy the values of T&N claims equal its average payments during 2000 and 2001 increased by the amounts of recent increases in T&N's settlement averages for each disease.

The third row of Table 7 shows the amount of change in average settlements from 1997-1998 to 2000-2001: increases for cancer claims and a decrease among nonmalignant claims. As discussed in my November 2004 expert report, the changes in T&N settlement averages over this five year period represent the most recent of long term overall increases in average cancer settlements for

T&N, trends that also obtain for other asbestos defendants (Peterson, Section 6.1.1, pp. 9-11).

T&N's settlement experience at the time of its bankruptcy is represented both by the level of settlements at the time of its bankruptcy (the averages shown on Table 5) and the fact that its settlement averages had been trending up for cancers and down for nonmalignant claims. In forecasting T&N's asbestos liability based on its settlement data we accept that these trends would continue and, therefore, multiply the amounts of T&N's most recent settlements times the rates of increase in its settlements over the past five years. The last line in Table 7 shows the products of these calculations, our estimates of the amounts that T&N would pay to settle pending and future asbestos claims.

Table 7: Increases in T&N Settlement Averages Prior To Bankruptcy

| Quantity | Period | Disease | | | |
|---|---|---|---|---|---|
| | | **Meso** | **Lung** | **Othr** | **Nonm** |
| Average | 2000-01 | $98,267 | $15,038 | $6,216 | $2,338 |
| Average | 1997-98 | $45,974 | $12,701 | $5,848 | $2,682 |
| Change | 2000-01 ÷ 1997-98 | 2.137 | 1.184 | 1.063 | 0.872 |
| Forecast Averages | | $210,040 | $17,806 | $6,608 | $2,038 |

Notes: Average settlement amounts are expressed in Year 2001 dollars.

The present value of T&N's liability (Table 8) for pending and future claims using the forecast averages from Table 7 is $7.5 billion for the Increase model for future claims and $5.7 billion for the No Increase model.

Table 8: Present Value of Liabilities Using Recent Settlement Increases

| Period | Increase | No Increase |
|---|---|---|
| Pending | $838 | $838 |
| Future | 6,704 | 4,890 |
| Total | $7,542 | $5,728 |

Notes: Millions of year 2001 dollars. Pending claims are assumed to average 1.5 years to settlement. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5%. Discount rate is 5.02%.

### 3. LAS's Preliminary Forecasts

We prepared for Committee counsel two earlier memoranda on T&N's asbestos liabilities which were circulated to some parties for purposes of discussing resolution of the U.S. bankruptcy and U.K. insolvency litigations. Both of these sets of analyses were preliminary and limited. As we continued to work in this case we obtained additional information about T&N's liability in the U.S., which lead to the forecasts of my November 2004 expert report.

### 3.1. October 2002 Memorandum

On October 16, 2002 I prepared and sent to Committee counsel a preliminary memorandum estimating liabilities in the U.S. for four Federal Mogul companies, including T&N (Peterson, "Liabilities of Federal Mogul Entities," October 16, 2002 (hereinafter "Peterson-2002")). As I describe in my second, February 19, 2004 memorandum to Committee counsel, the October 2002 analysis was a quick, preliminary look at T&N's U.S. liabilities based data that had been available for only a week:

> Our earlier forecasts, provided in a memorandum dated October 16, 2002, were based on rapid analysis of data we received October 8, 2002. We received a more comprehensive dataset of U.S. T&N claims on February 6, 2003 and since then have had time to study both datasets and discuss data issues with with Jean Malone at ARPC. We have also made several refinements to our forecasting methods since October 2002. (Peterson, "Turner & Newall Liabilities for U.K. and U.S. Claims," February 19, 2004, pp. 9 to 11 (hereinafter "Peterson-2004")).

By October 2002 we had only limited discussions with T&N's lawyers who defended asbestos claims, limited research on T&N's liabilities and scant opportunity to examine the complex Federal Moguls claims database. We performed simple quantitative analyses that did not necessarily reflect the impacts of the many factors that influenced T&N's liability as of October 2001. Rather, Committee counsel requested that we provide a quick and rough analyses for preliminary discussions with Committee members and other creditors and our research results were treated and represented as a quick and very preliminary analysis. Excerpts of this memorandum were included in an October 25, 2002 memorandum by Elihu Inselbuch, counsel for the Committee, and described as:

> "a very preliminary estimate by Dr. Mark A. Peterson of the magnitude of Federal Mogul's present and future asbestos liabilities, based on the claims information provided to date."

We no longer use the claims October 8, 2002 database that was the basis for my October 2002. That database was incomplete, in particular it contain incomplete information about T&N's settlements during 2000 and 2001, years that are critical for forecasting T&N's asbestos liabilities at the time of its October 2001 bankruptcy petition. The October 2002 data included less than half of settlements of cancer claims that are in the later database used for my November 2004 report. While this was the only data available to us in October 2002, forecasts based on such incomplete data cannot be regarded now as meaningful.

### 3.2. February 2004 Memorandum

My February 18, 2004 memorandum to counsel "revisit(ed) our earlier forecasts based on updated data and improvements in both our understanding of the data and our forecasting methods" (Peterson-2004, p. 1). The February 2004 memorandum describes elements of the second T&N database that we received in February 2003 which we used both for the analysis of that memorandum and for my November 2004 expert report. This second database was more complete than the earlier database, which it rendered obsolete. The February 2004 memorandum also incorporated six technical improvements for the forecasts (Peterson-2004, pp. 9 to 11).

The February 2004 analyses differed from my November 2004 expert report in three primary ways. Two of these differences related to forecasts of future claim filings, which were greater in the February 2004 analysis (for the General increasing model 1,160,880 compared to 1,088,440 for the November 2004 expert report; for the No-Increase model 730,700 compared to 706,779 for the November 2004 expert report). First, the February analysis made a technical error in failing to annualize the nine months of 2001 claim filings, which was corrected in my expert report. Second, the February 2004 forecast a greater number of future nonmalignant claim filings because it was based on a nonmalignant multiplier calculated from 2000 and 2001 filings. Because nonmalignant claims increased disproportionately in 2001, my November 2004 expert report used data only for 2000 in calculating the nonmalignant multiplier. As part of the sensitivity analysis for my expert report, I included a forecast that calculated the nonmalignant multiplier across both 2000 and 2001.

The third difference related to estimates of T&N settlement values that were used to forecast liabilities for both pending and future claims. The February 2004 forecasts of T&N's tort liability was intended as an update of the October 2002 analysis and used the same basic approaches as the earlier analysis. Thus, like the earlier analysis, the February 2004 used T&N's historic settlement averages to value claims as of the October 2001 petition date while recognizing that this approach under-estimated T&N's asbestos liability:

> Our use of T&N's historic resolution costs places conservatively low values on its liabilities for pending claims. As we did in October 2002, we use T&N's resolutions over the multi-year period 1998-2001 as the basis for valuing pending claims even though T&N's average costs to resolve claims had increased over this period. It is unlikely that T&N would have been able to continue to resolve its asbestos liabilities for the amounts that it paid as a CCR member. T&N would have had to pay considerably more on average to resolve claims in the future both because it lost the negotiating and tactical advantages that it had as a CCR member and also because it would have faced sharply increased demands and settlement expectations as other asbestos defendants entered bankruptcy in 2000 and 2001. These changes would have been particularly sharp for T&N because of its history in manufacturing and selling many and particularly dangerous asbestos products. Even CCR members who did not have the burdens of T&N's particular corporate history saw their settlement values increase by multiples in the the early 2000s after leaving CCR. T&N would likely have had to pay even greater increases (Peterson-2004, p. 15).

As I describe in my November expert report, the forecasts in that report use information in addition to T&N's historic settlements in order to reflect that "T&N would likely have had to pay even greater increases" than are reflected in historic data, as I noted in the February 2004 memorandum (Ibid). The November expert report was based on more thorough considerations of the factors that had increased values of claims against T&N by the time of its October 2001 petition date. The November expert report quantified the increases in values, a step necessary for forecasting T&N's actual liability, as the February 2004 noted, but a step that was not attempted in that memorandum. Rather, the February 2004 memorandum observed that the proposed T&N TDP values more closely quantified current T&N claim values:

> The TDP also provides claim values that exceed the historic average settlement amounts paid by T&N as a CCR member. These increases reflect the greater quality of claims that will be paid under the TDP, claims that meet the more rigorous claims requirements of the TDP. The TDP values also attempt in part to reflect the greater amounts that T&N would have had to pay as of the date of its bankruptcy filing, both because the company no longer had the advantages and protections of CCR membership and also because plaintiffs would have looked to T&N for far higher payments as a highly culpable defendant remaining after bankruptcy proceedings removed most other major asbestos defendants (Peterson-2004, p. 18).

## 4. Comments on Report by EMB

EMB Consultancy LLP (EMB) prepared a report dated July 27, 2004 that reviewed my then-available projections of T&N's liabilities for future asbestos bodily injury claims in both the U.S. and U.K. and that commented on the TDPs for both countries. EMB has not provided a report commenting on my expert report of November 2004. EMB's work was prepared for Denton Wilde Sapte counsel to the U.K. administrators of T&N.

EMB accepted as reasonable my method for forecasting future claims in each country (EMB, p. 16), my use of the Nicholson epidemiological forecasts of asbestos disease for both the U.S. (EMB,p. 17) and U.K. (EMB,pp. 38-39) and my forecasts of the number of future U.K. claims (EMB,p. 37) and liabilities in the U.K. (which were within 1 percent of EMB's forecasts using a different method, EMB, pp. 40-41).

However, EMB disagreed with some of the "actual parameterization of the various stages" for my forecasts of U.S. liability (EMB,p. 16). Using my general forecasting approach but different parameter estimates of the values of future asbestos claims and the rates of increase in future claim filings EMB forecast U.S. tort liabilities as $5.3 billion (present valued; EMB, p. 15). EMB summarized its conclusions:

> "We believe that Dr. Peterson's projection of U.S.-wide future number of asbestos claims is reasonable based on the information available. However, we believe that based on the information we have seen Dr Peterson's projection of the future propensity to sue is overstated. We acknowledge a general observable increase in the propensity to sue and for the purposes of our best estimate projections have assumed that the propensity to sue will increase from its 2001 level at the average rate observed over the past 15 years for all future years until it ultimately reaches the level projected by Dr Peterson" (EMB, p. 4).

Here, I review and critique key differences in EMB's assumptions compared to mine, and I attempt to quantify the magnitude of the effects.

### 4.1. EMB's Inappropriate Treatment of Propensities to Sue

There are two problem areas in EMB's models for propensity to sue. First, EMB failed to annualize 2001 filings in order to obtain what should have been a full year's propensity to sue. Second, EMB observed that there had been "dramatic increase in the propensity to sue over that historically observed" for all three cancers, but it developed a time trend that minimized this increase.

#### 4.1.1. EMB's Artificially Low 2001 Propensities to Sue

EMB treated claims filed between January and October 1, 2001 as if they represented an entire year's claiming rather than a partial, three-quarters of a year. To make the 2001 propensities to sue comparable to other full years EMB should have annualized 2001 filings. Instead, EMB inappropriately calculated T&N's 2001 propensity to sue as the quotient obtained by dividing claims filed over a nine month period by asbestos deaths over a twelve month period. EMB compounds this problem by using T&N's 2001 propensities to sue as the starting point from which it forecasts future claims. Consequently EMB's error is critical; forecasts for all future years are reduced because of EMB's miscalculation of 2001 propensities to sue.

EMB should have annualized the nine months of 2001 filings by multiplying the claims filed over the nine months times 1.33 (12 months / 9 months = 1.33). If EMB had made this adjustment, its calculations of year 2001 propensities to sue would have increased by about one third (compare rows 1 and 2 in Table 9, below) and all of EMB's future projections for counts of claims and total dollar liabilities. would have increased by about one-third. Further, the annualized 2001 propensities are consistent with 2000's filing rates (compare rows 2 and 3 of Table 9).

**Table 9:** Propensities to Sue T&N, by Disease: 2000-2001 (U.S.)

| Status | Filing Year | Type of Cancer | | |
|---|---|---|---|---|
| | | Meso | Lung | Othe |
| Unannualized | 2001 | 30.9 | 24.4 | 37.0 |
| Annualized | 2001 | 41.2 | 32.5 | 49.3 |
| NA | 2000 | 45.0 | 39.4 | 44.1 |

## 4.1.2. EMB's Artificially Low Trends for T&N Propensities to Sue

EMB estimated that future propensities to sue would increase annually over T&N's 2001 levels by an annual rate of .75 percent, an estimate that EMB derived from its analysis of T&N claim filings between 1985 and 2001 (pp. 23-25). There are two problems with this calculation by EMB. First, it should have used 2001 propensities based on annualized T&N's nine months of claims during that year, which would have increased the rate of growth. Second, EMB should not have included the earliest years, during the 1980s, in its calculation.

Between 1985 and 1988 T&N joined two different consortia of asbestos defendants, the Asbestos Claims Facility (ACF) in 1985 and then the CCR in 1988 right after the ACF disbanded. T&N's entry into both of those facilities distorted its claim filings. In each facility, T&N became responsible not only for law suits in which it had been named as a defendant but in addition law suits that had not included T&N as a defendant but had named another member of the ACF or CCR. Thus, in the earlier years of each facility T&N inherited many new claims solely because the claims had been filed previously against other facility members. Total claims filings in these years that included these bonus filings cannot be compared to filings in later years where its data reflected only new claims that were actually filed against T&N as a defendant, but EMB uses such a comparison to derive EMB's annual rate of increase in propensities to sue. Because T&N's filing data during the earliest years before 1990 had been artificially inflated, EMB derives an artificially low estimate of the rates of growth in propensities to sue T&N. Moreover, asbestos litigation in the U.S. has gone through so many generations of changes since the late 1980s, that comparison of claim filing rates during the 1980s provides little information about likely future filing trends against T&N. EMB should have begun its comparison with years later than those of the late 1980s.

To address these issues we recalculated the annual rate of increase in T&N's propensities to sue annualizing 2001 claims and beginning with year 1990 rather than 1985. As EMB had apparently done, we fit a multiple regression line to propensities to sue for these years, 1990 through 2001 annualized. With these modifications, our analysis shows that T&N's cancer propensities to sue increased at annual rates greater than the 0.75 percent rate derived by EMB. Further, while EMB apparently did not calculate the rate of change in the nonmalignant multiplier and assumed no such increase (EMB, p. 25), we found an annual average increase of .56 percent for that parameter

Table 10: Recalculation of Average Annual Increase in T&N's Propensities to Sue

| Disease | EMB Calculation | Recalculation |
|---------|-----------------|---------------|
| Mesothelioma | +0.75% | +2.14% |
| Lung cancer | +0.75 | +1.74 |
| Other cancer | +0.75 | +2.70 |
| Nonmalignant | +0.00 | +0.56 |

For each disease, levels of increase in propensities to sue T&N are far greater when they are based on the proper, annualized claim filings for 2001 and without using T&N's artificially inflated filings during the late 1980s.

### 4.1.3. Adjusting for EMB's Inappropriate Propensities to Sue

We apply these increases to EMB's methods for forecasting the increase in future T&N claim filings. To replicate EMB's methods, we used T&N's 2001 filings as the starting point for future propensities to sue and extend the past T&N trend lines into the future, additively increasing the propensity to sue and the nonmalignant multiplier each year by the percentages shown above. EMB continued these increases until their forecast of future filings intersected that LAS forecasts that we produced. In replicating EMB's methods, we simply halted the annual increases after five years.

We carried out the replications in two steps which are shown on Table 11. As a first step we annualized T&N's propensities to sue for 2001. We estimate that this increased the number of forecast future claims by 35 percent. EMB does not report its forecast of the number of future claims, but we have estimated this, replicating EMB's method without annualizing 2001 claims and using a 0.75 annual increase from 2001 filings in future years. Row 1 of Table 11 shows our attempt to replicate EMB's forecasting approach. Row 2 annualizes 2001 claims but uses T&N's historic increases from 1985 through 2001. Row 3 both annualized 2001 propensities and calculated the rates of increase over the more appropriate period of 1990 through 2001. Together these produced a 78 percent increase in forecast future claims (Table 11: compare row 1 with row 3).

Table 11: Replication of EMB's Forecast of T&N Claims After October 1, 2001

| Status | Basis of Trend | Disease | | | | Total |
|--------|----------------|---------|------|------|------|-------|
| | | Meso | Lung | Othc | Nonm | |
| No Annualization | 1985-2001 | 21,680 | 19,517 | 7,693 | 498,050 | 546,940 |
| Annualization | 1985-2001 | 29,220 | 26,413 | 10,418 | 672,871 | 738,922 |
| Annualization | 1990-2001 | 33,252 | 28,965 | 12,077 | 900,266 | 974,560 |

These are large adjustments, but it is difficult to appreciate their direct effect on EMB's liability forecast, because EMB does not provide its estimate of the number of projected filings. EMB does, however, provide estimates of total liability. In section 4.3. below we assess the effects of the above alternative assumptions on future liability.

## 4.2. EMB's Inappropriate Treatment of Settlement Values

To estimate the values of future asbestos claims, EMB used its calculations of the amounts paid by T&N to resolve claims during 2000 and 2001, interpreting narrowly its

> "understanding ... that the TDP amounts should be based on the historically observed settlements prior to bankruptcy with no adjustment for inflation or other subsequent events" (Section 6.6.1, p. 29).

EMB recognized that this assumption was problematic, stating

> "The methods used for projecting claim amounts based on the historical average awards adjusted for claim inflation assume that the historical awards derived from past data give a reasonable picture of how claims will settle in the future. This assumption may be invalid where there has been or will be a change in the legal environment" (Section 3.4.4, pp.8-9).

More pointedly, the values of asbestos claims against a defendant filing bankruptcy may not be accurately reflected by the amounts that the defendant was paying to resolve claims when it entered bankruptcy. Frequently, companies on the verge of bankruptcy are able to resolve their obligations for less than their face amount. Creditors are willing to take less than the full value of their claims in order to get immediate payment and to avoid the delay and possible hair-cut in payments through bankruptcy. This pattern is true for asbestos claims as it is for claims by other creditors. Again and again insolvent asbestos defendants facing bankruptcy obtained settlements at far lower value than they had obtained in previous years.

Consequently, an asbestos defendant's historical awards may not adequately represent the values of asbestos claims at the time of its bankruptcy. In cases where claim values had been suppressed by an asbestos defendant's insolvency and its exploitation of that insolvency in settlements, parties and courts have looked to other sources in order to establish those values. TDPs in confirmed plans use estimates of the actual values of claims in amounts that exceed what the companies were paying in settlements prior to their bankruptcy petitions (see, e.g. confirmed plans for Celotex and Carey Canada; Fuller Austin Insulation Company; Raytech; and Manville Trust's 1995 TDPs). Experts, parties and courts have looked to additional sources to estimate claims values where a defendant's settlement history cannot be used to estimate the values of claims at the time of bankruptcy filing (see, e.g. Manville Trust 2002 TDP; reports, testimony and TDP for the confirmed plan for Western Asbestos, Western Mac Arthur and Mac Arthur).

T&N's claims resolutions during 2000 and 2001, the years used by EMB to calculate historic claim values, do not represent the values of asbestos claims at the time of T&N's bankruptcy petition. EMB recognizes that T&N's settlements within CCR, all of its settlements during 2000 and into 2001, underestimate the values of asbestos claims against T&N in 2001 after it lost the protections of CCR membership: "We acknowledge that ... settlement of claims through the tort system rather than the CCR facility will increase the average settlement of claims" (p. 5). My November 2004 expert report discusses other reasons why T&N's 2000 and 2001 settlements underestimate the values of asbestos claims at the time of its bankruptcy petition. Because EMB completed its report in July 2004, the discussion in my November 2004 report was unavailable to EMB in preparing its report.

## 4.3. Estimating the Effects of EMB's Differing Assumptions

In this section we apply our adjustments to EMB's propensity to sue assumptions (i.e. correcting EMB's failure to annualize 2001 as well as EMB's trends in propensity to sue based on pre-1990 filings) in order to understand how those adjustments would affect EMB's overall forecast of T&N asbestos liabilities. Again, because EMB did not report the values that it used to forecast U.S. liabilities for T&N, we have attempted to replicate EMB's analysis. We started with T&N's

U.S. resolution averages during the years 2000 and 2001, predicted pending and future liability, and then rescaled total liability (by 1.16) to obtain estimates comparable to EMB's present value liability estimate of $5.341 billion. Our replication reproduced the $5.341 billion reported by EMB and it estimated liabilities that EMB may have found for each type of asbestos related disease (row 1, Table 12). We then held liabilities for pending claims constant, but increased future liabilities for each disease based on the amounts of increase in claims when we annualize T&N's 2001 propensities to sue (obtained by the ratios of claims by disease reported in row 2 of Table 11 to row 1 of Table 11). This analysis estimated that EMB's forecast of U.S. liabilities for T&N would have been $6.865 billion if it had simply annualized year 2001 filings. Finally we estimated that EMB's liability forecast would have been $7.883 billion had it both annualized 2001 claims and more appropriately calculated rates of increase in T&N's propensities to sue by looking at years 1990 through 2001 (annualized). This adjustment was also based on ratios drawn from Table 11, comparing forecast filings in row 3 with those in row 1.

**Table 12:** Present Value (PV) of Future Claims as of October 1, 2001

| Status | Basis of Trend | Disease | | | | Total |
|---|---|---|---|---|---|---|
| | | Meso | Lung | Othe | Nonm | |
| No Annualization | 1985-2001 | $3,858 | $362 | $57 | $1,065 | $5,341 |
| Annualization | 1985-2001 | 4,987 | 458 | 72 | 1,348 | 6,865 |
| Annualization | 1990-2001 | 5,591 | 494 | 81 | 1,717 | 7,883 |

Notes: Millions of 2001 dollars.

With the adjustments to EMB's forecast of the number of future claims, its forecasts of T&N's liabilities are much closer to our forecast of $11.1 billion (Peterson, Table 24, p. 40), now 71 percent of our forecast ($7,883 / $11,076 = 71.1%). This 29 percent difference results in part from EMB's use of a higher discount rate, 5.5 percent compared to our 5.02 percent, which lowers its forecast of T&N liabilities. Most of the remaining difference results from the lower claims values that EMB uses, based upon its use of T&N's resolutions during 2000 and 2001 despite EMB's recognition that those values do not reflect the amounts that T&N would have had to pay in and after October 2001 to resolve claims outside of the CCR.

## 5. Comments on Tillinghast Report

Tillinghast's report presents 27 alternative liability forecasts that combine (a) five variations about the number of future claims that are described as: "Low", "Medium"," Medium +"," High"," High +"; with (b) three more variations about future claims described as "additional nonmalignant loadings" for "3-year", "5-year", and "no"; and (c) three variations of "historic pay settlements" low, medium and high: and (d) three variations of "expected increase in future pay settlements" again, low, medium and high. These variants are not well specified, explained or supported by analysis.

Tillinghast accepts that T&N's claim filings might increase in the future, noting that "asbestos litigation environment has changed significantly since the late 1990s. The number of claims has increased dramatically" (Tillinghast, p. 6). Mr. Angelina, the author of the Tillinghast study, states that "my choice assumptions for numbers of expected future claims (mostly medium or high)" reflects the increase in claims in recent years" (Tillinghast, p. 13). Tillinghast likens its High assumption to my Increase model for future claims: "The high filing scenario, assumes that asbestos litigation will worsen, causing an increase in the propensity to sue for all diseases. This assumption is somewhat consistent with Dr. Peterson's high assumption where he assumes that the propensity to sue will increase" (Tillinghast, p. 11).

Tillinghast does not report the number of future claims that it forecasts under any of its models. It provides a very general description of its forecasting methods, which appear to be similar to the standard methods that we use, but that compared T&N's past claims experience to an "industry benchmark" of claim filings rather than Nicholson's or other epidemiological models. Tillinghast's report does not specify what this "industry benchmark" is or how it was derived other than to say it is "industry asbestos claims filings" based in some unspecified way on Stallard and Manton's research on Manville claims (Tillinghast, p.13). The lack of description about this basic component of Tillinghast's forecasting methods prevents me from analyzing their approach, but their description does raise three concerns: First, there is no direct empirical evidence of all "industry claims filings." I know of no data base that is a complete list of all asbestos claims filed at any point in time. It seems unlikely that such a complete list could be compiled, given the large number of asbestos defendants. Second, the Stallard and Manton report does not attempt to provide a count or forecast of all filed claims. Rather, it describes forecast models of the incidence of asbestos related disease, not claims, and then forecasts claims only for Manville, forecasts that have proved to be far too low. So it is unclear if Tillinghast bases its forecasts on Stallard and Manton's epidemiological forecasts or on some unidentified database of claims that supposedly represents the universe of all asbestos claims. Third, the Tillinghast assumption that T&N historically had "90% of industry asbestos claims" is incorrect. T&N did not have even 90% of all CCR claims. Even the Manville Trust, which is regarded as having the most claims of any single defendant, receives only about two-thirds of the total number of claims filed against ten asbestos defendants and trusts at any point in time.

However they are made, Tillinghast's forecasts of future T&N asbestos claims apparently were not greatly different from the forecasts in my expert report. Not only does the Tillinghast report describe at least some of its forecasts as using assumptions "somewhat consistent with Dr. Peterson's high assumption where he assumes that the propensity to sue will increase" (Tillinghast, p. 11), but also Tillinghast does not report differences in their and my numbers of future claims as a primary basis for disagreement about T&N's liabilities (Tillinghast, p. 9).

Tillinghast's primary disagreement with my forecasts arise are based on the different values that we use. Like EMB, Tillinghast uses data on T&N's past settlement amounts in forecasting the company's asbestos liabilities. Unlike EMB which based its forecast on T&N's settlements during 2000 and 2001, Tillinghast uses the longer 1998-2001 period, adding earlier years when

T&N's settlements, as a CCR member, were lower, as Tillinghast recognizes (Tillinghast, p. 10). This longer period has two problems. First it is based primarily on T&N's resolutions within CCR, which EMB and others recognize as inappropriate to T&N's liability in 2001, outside of CCR. Second, the long period of years ignores the increases in T&N's settlements since 1998, increases that Tillinghast recognizes within its report (Tillinghast, pp. 5-6).

Tillinghast's report adds nothing to EMB's discussion of the reasons for its reliance solely on T&N's historic settlements for determining how much the company would have to pay to resolve claims in and after October 2001 outside of CCR. Tillinghast's report recognizes that "settlement values may also be influenced by events" (p. 5) and it finds it "worth mentioning that that the asbestos litigation environment has changed significantly since the late 1990's ... and settlement values have also increased" (pp. 5-6), although Tillinghast uses T&N's settlement data from before the significant changes that it cites.

Tillinghast cites several asbestos litigation environment changes since the late 1990s that it concludes increased settlement values, stating specifically that "the increase in severity has been driven by the insolvency of the corporate defendants involved. As an increased number of asbestos defendants have declared themselves bankrupt, the remaining solvent defendants have found themselves paying out more for claims because there are fewer co-defendants to share the liability" (Tillinghast, p. 6). Yet Tillinghast does not apply this conclusion to its forecast. It does not adjust its calculation of the historic T&N settlement values to recognize that by late 2001 T&N's expected settlement payments had increased greatly because of the bankruptcies of major asbestos defendants, because of the other matters that it cited in its report (Tillinghast, p.6), and because of the factors that I discussed at length in my expert report.

## 6. T&N Liability Based on its Bankruptcy Plan

The proposed Joint Plan of Reorganization establishes a T&N Trust and Trust Distribution Procedures (TDP) that the Trust would use to process, evaluate, liquidate and pay pending and future asbestos bodily injury claims. If this proposed plan is confirmed, the TDP would determine what claims are compensable and the values of those claims. In this section, we estimate the Trust's liability for pending and future claims based on the TDP. These estimates of liability under the TDP start with the same number of pending and future claims that we projected in my previous expert report where we determined how those claims would have been valued based on tort litigation that T&N faced as of its bankruptcy petition date. In other words, we rely upon and incorporate our prior discussions of the number, characteristics and times of filing of pending and future claims discussed above and assume that claims processed under the TDP would be identical to those processed by tort litigation.

The TDP establishes eight categories of exposure and medical criteria that claims must meet in order to qualify for each category and the values of claims within the category. The TDP establishes for each category maximum values, "scheduled values" which can be elected by claimants who meet the category's criteria (one lung cancer claim has no scheduled value that can be so elected) and the average value for claims in that category. We assume, as does the TDP, that on average claims in each category will be valued by the Trust at the average values established for each category. Table 13 shows the eight categories and the average values for each.

Table 13: Categories and Average Values of TDP Categories

| Disease Category | Average Value |
|---|---|
| Mesothelioma | $250,000 |
| Lung Cancer | |
|   Level VII | $60,000 |
|   Level VI | $12,000 |
| Other Cancer | $19,500 |
| Nonmalignancy | |
|   Level IV | $54,500 |
|   Level III | $13,500 |
|   Level II | $5,800 |
| Cash Discount | $400 |

To estimate T&N's TDP liability, we assume that the Trust would have precisely the same pending and future claims as T&N would have received in tort litigation. We forecast the TDP liability for both of our alternative models of future T&N claim filings.

To forecast T&N's liability under the TDP we need to estimate how many claims would qualify for payment under each of the eight TDP categories. Before allocating claims among the TDP categories we first estimated and then eliminated a percent of claims that would not qualify for any indemnity from T&N, assuming that this would be the same percent of claims that were closed without payment by T&N prior to its bankruptcy.

After eliminating this fraction of claims that we assume would qualify for no compensation, we then allocated remaining claims to the relevant claim categories based on assumptions about the

percent of claims who meet the criteria required for each TDP category. In other words, in applying the requirements of the TDP we eliminated additional claims that we assume would not be able to comply with those requirements. For example, the TDP requires for most categories that claimants show that their diagnoses were based on a physical examination. Based on experiences of existing trusts that have similar requirements, we assumed that 25 percent of nonmalignant claimants would be unable to meet this requirement and we eliminated those claims.

Among claimants who we assume would qualify for a payment, we assumed that some would qualify for other, less serious diseases than claimants' allege. For example, lung cancer claimants qualify for the higher paying Category VII only by providing medical documentation both of lung cancer and either asbestosis or pleural disease, as well as evidence showing that they had "significant occupational exposure" to asbestos, a term defined in the bankruptcy plan that requires a showing of regular work proximate to asbestos over a significant period of time. Some lung cancer claimants who do not satisfy these requirements may qualify under the criteria of the lower-paying lung cancer Category VI; some may qualify only for the lowest paying Category I; and others might qualify for no payment under the TDP. We allocated lung cancer claimants among each of these possible categories and similarly allocated claimants alleging each of the other asbestos related diseases to the relevant TDP categories. Table 14 shows our estimates of the number of pending and future claimants who would qualify for the seven categories for each of our three alternative models of the number of future claims.

**Table 14: Number of Claims Qualifying for Each Category**

| Disease Category | General Increase | No Increase |
|---|---|---|
| Mesothelioma | 34,938 | 26,717 |
| Lung Cancer | | |
| Level VII | 16,914 | 12,649 |
| Level VI | 12,106 | 9,017 |
| Other Cancer | 3,552 | 2,332 |
| Nonmalignancy | | |
| Level IV | 3,208 | 2,196 |
| Level III | 124,440 | 90,667 |
| Level II | 609,805 | 422,036 |
| Cash Discount | 94,548 | 62,050 |
| Total | 899,511 | 627,664 |

Note: Total claims are fewer than LAS forecasts because we exclude a percent of claims equal to the percent T&N resolved without payment prior to its bankruptcy.

In order to estimate liability under the TDP for each alternative set of assumptions we multiplied the TDP average values for each category by the number of claims in the category and summed the products across every category. Table 15 shows our estimates of T&N's total TDP liability for each alternative forecast.

**Table 15:** Total Liability Under Bankruptcy TDP

| General Increase | No Increase |
|---|---|
| $15,802 | $11,806 |

Note: Amounts are in millions of dollars of year paid.

Table 16 shows the present value of these liabilities, using the same 5.02 percent discount rate that we used to forecast T&N's tort liabilities.

**Table 16:** Present Value of Liability Under Bankruptcy TDP

| General Increase | No Increase |
|---|---|
| $10,116 | $7,903 |

Note: Amounts are in millions of dollars and are present valued to 2001 using a 5.02% discount rate.

Finally, Table 17 shows how the net present value of liability is allocated among the various TDP groups. The table shows both our estimate of the money that will be paid to claimants in each of the TDP categories and the percentage distribution of liabilities across the categories

**Table 17:** Present Value of Payments to Claimants Qualifying for Each Category

| Disease Category | Total Payments | | Percentage Distribution | |
|---|---|---|---|---|
| | General Increase | No Increase | General Increase | No Increase |
| Mesothelioma | $5,428 | $4,328 | 53.7 | 54.8 |
| Lung Cancer | | | | |
| Level VII | 707 | 559 | 7.0 | 7.1 |
| Level VI | 100 | 79 | 1.0 | 1.0 |
| Other Cancer | 48 | 34 | .5 | .4 |
| Nonmalignancy | | | | |
| Level IV | 117 | 86 | 1.2 | 1.1 |
| Level III | 1,296 | 1,013 | 12.8 | 12.8 |
| Level II | 2,399 | 1,790 | 23.7 | 22.6 |
| Cash Discount | 21 | 14 | .2 | .2 |
| Total | $10,116 | $7,903 | 100.0 | 100.0 |

Note: Amounts are in millions of dollars and are present-valued to 2001 using a 5.02% discount rate.

## 7. Rule 26 Disclosures and Signature

DATA CONSIDERED: In reaching the opinions and conclusions set forth in this Report, I have considered, in addition to the data considered in my original November 2004 report and my knowledge of the asbestos litigation developed over the past 20 years, the items of data explicitly identified in this report, the reports, articles and documents specifically identified in the report, publicly available sources of information concerning inflation rates, publicly available documents about T&N, the claims databases referenced in the report, discount rates provided to me by L. Tersigni, Consulting.

EXHIBITS: The exhibits which summarize my opinions are included in the graphics and tables in the report and in the appendices to the report.

QUALIFICATIONS: My qualifications to perform this analysis and provide expert testimony are set forth in my C.V., a copy of which is attached as Exhibit 1 to my November 2004 report.

PUBLICATIONS: Any publications I have authored within the past ten years are set forth in my C.V.

COMPENSATION: My compensation for services rendered in this case is set forth in the fee applications Legal Analysis Systems files on a regular basis with the Bankruptcy Court. At present, my hourly rate is $600.

PRIOR TESTIMONY: A listing of all cases in which I have testified as an expert at either trial or deposition within the past four years was attached as Exhibit 2 to my November 2004 expert report. In addition, since November 2004 I have testified by deposition in this matter, in the Owens Corning Bankruptcy proceedings and in the Special Electric bankruptcy proceedings and at trial in the Owens Corning Bankruptcy.

I reserve the right to modify this report as new information becomes available between now and the time of trial. I anticipate that I will review the expert witness reports of opposing expert(s) and offer my opinions about their analyses and conclusions in rebuttal testimony.

/s/ Mark A. Peterson

Mark A. Peterson, J.D., Ph.D.
LEGAL ANALYSIS SYSTEMS