IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re: Federal Mogul Global, Inc., *et al.*,        (Bankruptcy Case No. 01-10578 (RTL))

      Debtors.

---

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS and ERIC D. GREEN, as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS, <br><br> Plaintiffs, <br><br> v. <br><br> ASBESTOS PROPERTY DAMAGE COMMITTEE, <br><br> Defendant. | Civil Action No. 05-59 JHR |

## REBUTTAL REPORT OF LORETO T. TERSIGNI, CPA, CFE

PLEASE TAKE NOTICE that the attached rebuttal report of Loreto T. Tersigni, CPA, CFE, dated May 13, 2005, is filed on behalf of Plaintiffs the Official Committee of Asbestos Claimants (the "ACC") and the legal representative for future asbestos personal injury and wrongful death claimants (the "Futures Representative"), in anticipation of the Asbestos Claims Estimation Hearing (the "Hearing") scheduled to commence June 14, 2005. *See* Case Management Order [D.I. 17.].

Dated: Wilmington, Delaware
        May 13, 2005

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, New York 10022
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

        -and-

CAPLIN & DRYSDALE, CHARTERED
Walter B. Slocombe
Nathan D. Finch
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

        -and-

CAMPBELL & LEVINE, LLC

Marla R. Eskin (No. 2989)
Kathleen J. Campbell (No. 4229)
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 426-1900
Facsimile: (302) 426-9947

Attorneys for Official Committee of
Asbestos Claimants

YOUNG CONAWAY
STARGATT & TAYLOR LLP

James L. Patton, Jr. (No. 2202)
Edwin J. Harron (No. 3396)
Rolin Bissell (No. 4478)
Maribeth L. Minella (No. 4185)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Attorneys for Legal Representative for
Future Asbestos Claimants

59066.1001

# REPORT

### Prepared By

### Loreto T. Tersigni, CPA, CFE

*Prepared on behalf of the Official Committee
of Asbestos Personal Injury Claimants*

*In re: Federal-Mogul Global Inc., T&N Limited, et al.*

*United States Bankruptcy Court
For The District Of Delaware*

*May 13, 2005*

## PROFESSIONAL QUALIFICATIONS/PRIOR TESTIMONY/FEES

I am a certified public accountant and certified fraud examiner with more than thirty years of experience in the practice of public accountancy and financial consulting. During my career, I have been the partner-in-charge of providing audit, tax and management advisory services to a diversified client base including numerous publicly-owned manufacturing companies. I was also a member of the Technical Standards sub-committee of the Professional Ethics Division of the American Institute of Certified Public Accountants. Our committee was responsible for reviewing and analyzing practitioners' compliance with generally accepted accounting principles ("GAAP") and other professional standards. Exhibit 1 is a description of my professional qualifications and a listing of my prior testimony. Effective January 1, 2001, I formed and became the principal of L Tersigni Consulting P.C. ("LTC"), a firm providing financial advisory services in bankruptcy proceedings and complex litigation. In connection with the Federal-Mogul Corporation ("FM" or "Federal-Mogul") bankruptcy, the Official Committee of Asbestos Personal Injury Claimants ("ACC") retained me *nunc pro tunc* as of November 30, 2001 to provide financial and investment banking advisory services. Also, my firm is currently the financial advisor to various other asbestos creditor committees involving companies that have filed for reorganization under Chapter 11 of the Federal Bankruptcy Code.

Fees charged for services rendered are set forth in the fee applications regularly filed with the bankruptcy court and are based on our normal hourly rates as follows: $550 L. Tersigni, $515 senior managing director, $500 managing director, $390 director, $290 manager, $215 senior consultant. Our fees are not contingent on the outcome of this matter.

## SCOPE OF OPINIONS

I have been asked by counsel to the ACC ("Counsel") to render a rebuttal opinion regarding the appropriate discount rate to calculate the present value of the asbestos

liability of Turner & Newall, a FM subsidiary, as of October 1, 2001. I was asked to render this opinion in the event that Dr. Robin A. Cantor or some other expert opines that a risk-free discount rate is not the appropriate rate to discount the nominal future obligations of asbestos creditors to net present value.

In response to Dr. Cantor's brief discussion of the asbestos liabilities set forth in FM's December 31, 2000 10-K, I have also been asked by Counsel to provide an overview of Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ("FAS 5") and related interpretations, and to render an opinion as to whether contingent obligations (e.g. asbestos liabilities) reported in audited financial statements prepared in conformity with FAS 5 and related authoritative accounting pronouncements means that a company has determined an accurate estimate of its contingent liability from an economic perspective.

In forming my opinions, I have reviewed the financial statements included in public filings of selected companies, authoritative valuation and accounting literature relating to the issues discussed in this report and I have relied on the analysis of Mark A. Peterson, Ph.D. in his November 29, 2004 report ("Peterson Report"). Exhibit 2 contains a list of the documents I reviewed in connection with the opinions expressed in this report.

## OPINION AND UNDERLYING BASIS

### Opinion I

### A RISK-FREE DISCOUNT RATE SHOULD BE USED TO CALCULATE THE PRESENT VALUE OF FM'S ASBESTOS LIABILITY.

#### Basis of Opinion

It is important to note, that as it relates to FM's bankruptcy proceeding, the discount rate is used to estimate the present or current value of asbestos claims that will arise over 40 years. This estimated present value, in turn, will be used to allocate the distributable value of FM's estates to its creditors.

Accordingly, to determine the appropriate discount rate, I reviewed the Peterson Report to understand the assumptions and methodology utilized by Dr. Peterson in projecting the nominal dollar asbestos liabilities of FM through the year 2041. Dr. Peterson used epidemiological studies and "propensity to sue" analyses to estimate the number and types of future claims to be filed against FM. He then assumed that the average settlement amounts that Federal-Mogul Corporation paid with respect to each type of claim during a base period would (after taking into account foreseeable trends in those settlement amounts) continue into the future and provide a basis for calculating nominal asbestos liabilities in future years; in doing so, he also incorporated a 2.5% annual inflation factor beginning in the first year following the base period. The historical settlement amounts reflect the results of negotiations between FM and asbestos claimants. Therefore, the future asbestos claims projected by Dr. Peterson implicitly include the financial impact of future settlement negotiations in nominal dollars. The only further justifiable discounting of these obligations would be to take into account the time value of money, which will convert the nominal dollars to present value.

Discounting the asbestos obligation for the time value of money eliminates the implied interest that is included in Dr. Peterson's nominal dollar projections. In essence, after applying the discount the asbestos liability is converted to a present or current value and is, therefore, stated at the economical equivalent value of the other unsecured creditors, i.e., the bank and bond debt.

The risk-free rate, as measured by the yield on United States Treasury obligations, is the discount rate that appropriately accounts for the time value of money, and is therefore the discount rate that should be used to determine the present value of FM's future asbestos liabilities.

The foregoing analysis is also supported by authoritative pronouncements promulgated by two independent rule-making bodies; the Securities and Exchange Commission ("SEC") and the American Institute of Certified Public Accountants ("AICPA"). *Staff*

_Accounting Bulletin No. 92 – Accounting and Disclosure related to Loss Contingencies_ _("SAB 92")_ was issued by the SEC in 1992 and sets forth the criteria for selection of a discount rate when calculating the amount of an environmental or product liability. The SEC concluded that the rate used to discount cash payments to satisfy an environmental liability should be the rate at which the liability could be settled in an arms-length transaction with a third party. However, the SEC further stated that such a rate should not exceed the interest rate on monetary assets that are essentially **_risk-free_**. This position was adopted by the senior technical body of the AICPA in October 1996 with the issuance of _Statement of Position 96-1 Environmental Liabilities_ _("SOP 96-1")_. SOP 96-1 states "…the guidance in Staff Accounting Bulletin (SAB) No. 92 with respect to the discount rate to be used – a rate that will produce an amount at which the environmental liability theoretically could be settled in an arm's-length transaction with a third party and should not exceed the interest rate on monetary assets that are essentially risk-free and have maturities comparable to that of the environmental liability – should be followed." Although SOP 96-1 does not refer specifically to asbestos liabilities, it is based on principles pertaining to contingent liabilities generally and, therefore, is an appropriate source of authoritative guidance to determine the methodology to apply in calculating the present value of asbestos liabilities.

As discussed more fully below, Judge Randall Newsome, in connection with his order confirming the Armstrong World Industries, Inc. ("Armstrong" or "AWI") plan of reorganization, agreed that a risk free rate should be used in computing the present value of Armstrong's asbestos liability. Judge Newsome's Findings of Fact included the following:

- Based on the expert testimony, the appropriate discount rate to be applied in computing the present value of future asbestos liabilities is the risk-free rate.[1]
- The risk-free rate of return is the return on United States Treasury obligations. The United States Treasury yield curve can be used to determine the risk-free rate associated with future obligations. With respect to Armstrong's asbestos

---

[1] Armstrong Findings of Fact and Conclusions of Law, paragraph 33.

liabilities, 5.53% was the appropriate risk-free rate of return to be used to discount Armstrong's asbestos liabilities to their present value as of December 2000.[2]

As noted above, the appropriate risk-free rate to be applied to a given future asbestos liability is the yield on a United States Treasury obligation (as of the measurement date) that matures in the same year that the projected asbestos liability arises. Rather than computing a separate risk-free rate for each projected asbestos liability, I adopted a simplifying assumption that allowed me to calculate just one risk-free rate for the measurement dates under consideration. I treated the stream of projected nominal asbestos payments (as calculated by Dr. Peterson) as a single payment and calculated the average life of that payment stream.[3] I then determined the yield on a United States Treasury obligation that had a comparable maturity[4] (see Exhibit 3). Based on this analysis, I concluded that a 5.02% risk-free rate should be used to calculate the present value of FM's asbestos obligations as of October 1, 2001.

## Overview of FAS 5

FAS 5 was issued in 1975 by the Financial Accounting Standards Board, the senior rule making body responsible for promulgating GAAP. FAS 5 provides guidance regarding the accounting and disclosures for contingencies required in the preparation of financial statements that are purported to be prepared in accordance with GAAP.

FAS 5 addresses the required accounting and disclosures for contingencies including both "gain contingencies" and "loss contingencies." In this report, I confine the discussion to the accounting treatment of loss contingencies. Paragraph 1 of FAS 5 defines a loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to possible … loss… to an enterprise that will ultimately be resolved when

---

[2] *Id.,* at paragraph 34.
[3] The average life is computed as follows: (1) for each year in the projection period, multiplying the nominal asbestos payment for the year by the number of years after the measurement date that such payment arises; (2) adding the results obtained in (1) above, and (3) dividing the total obtained in (2) by the total nominal asbestos payment for all future periods.
[4] Such rates were determined through an interpolation of the interest rates on the Treasury yield curve, as provided by the Treasury Management database for October 1, 2001.

one or more future events occur or fail to occur.  Resolution of the uncertainty may confirm the loss or impairment of an asset or the incurrence of a liability."

The first issue to be addressed in determining the appropriate accounting treatment for a loss contingency is the determination of the degree of likelihood that a future event will confirm the loss.  Paragraph 3 of FAS 5 divides this probability range into three categories:  (1) "probable," (2) "reasonably possible," and (3) "remote."  "Probable" refers to circumstances where the future event or events are likely to occur.  "Remote" comprises situations in which the chance of the future event or events occurring is slight.  "Reasonably possible" encompasses those circumstances where the chance of the future event or events occurring is more than remote but less than likely.

For those loss contingencies that fall within the probable category, the accounting treatment depends upon whether the amount of the loss can be reasonably estimated.  Paragraph 8 of FAS 5 provides that an estimated loss from a loss contingency shall be accrued as a charge to the income statement with a corresponding liability reported on the balance sheet if the following conditions are met:
   a.  Information available prior to the issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and
   b.  The amount of loss can be reasonably estimated.
Under such circumstances, Paragraph 9 of FAS 5 states that disclosure of the nature of the accrual, and under some circumstances the amount of the accrual, may be necessary for the financial statements not to be misleading.

Paragraph 10 of FAS 5 provides that, if one or both of the conditions set forth in the preceding paragraph are not met and the probability of loss is considered either probable or reasonably possible, then an accrual is not appropriate but financial statement disclosure of the loss contingency is required.  The disclosure should contain a description of the loss contingency and the range of possible loss, or include a statement that an estimate of the loss cannot be made.

In general, remote loss contingencies are neither accrued nor disclosed under FAS 5. Subsequent to the issuance of FAS 5, confusion existed as to whether the "reasonably estimated" condition relating to a loss contingency could be satisfied with a range of values or otherwise required a point estimate. In 1976, the Financial Accounting Standards Board issued FIN-14 to clarify this issue.

Under Paragraph 2 of FIN-14, when a loss contingency is deemed to be probable and a reasonable estimate can be made of the range of loss, then the FAS 5 requirements for accrual of a loss have been met. Paragraph 3 of FIN-14 further provides that:

> When some amount within the range appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. In addition, paragraph 9 of [FAS 5] may require disclosure of the nature and, in some circumstances, the amount accrued, and paragraph 10 requires disclosure of the nature of the contingency and the additional exposure to loss if there is at least a reasonable possibility of loss in excess of the amount accrued.

For example, Armstrong filed its Chapter 11 petition on December 6, 2000, which stayed further payments on its asbestos obligation. In its annual report on Form 10-K for the year 2000, Armstrong described its asbestos liability as follows:

> As of September 30, 2000, AWI's estimate of its asbestos-related liability that was probable and estimable through 2006 ranged from $758.8 million to $1,363.3 million. AWI concluded that no amount within that range was more likely than any other and, therefore, reflected $758.8 million as a liability in the condensed consolidated financial statements in accordance with generally accepted accounting principles. Due to the increased uncertainty created as a result of the Filing, no change has been made to the previously recorded liability except to record payments of $68.2 million against that accrual in October and November 2000. The balance at December 31, 2000 is $690.6 million. It is reasonably possible, however, that the actual liability could be significantly higher than the recorded liability.[5]

---

[5] Armstrong Annual Report on Form 10-K for 2000, p. 13.

## Opinion II

### ASBESTOS LIABILITES REPORTED IN CONFORMITY WITH GAAP ARE NOT NECESSARILY AN ACCURATE ESTIMATE OF A CONTINGENT LIABILITY FROM AN ECONOMIC PERSPECTIVE.

#### Basis of Opinion

The Armstrong example cited above, demonstrates that contingent liabilities that are reported in financial statements to comply with GAAP are not necessarily an accurate estimate of the amount of such liabilities from an economic perspective. Moreover, in implementing the requirements of FAS 5 as it relates to asbestos liabilities, companies have used a variety of methods for calculating the amount of the liability to report in GAAP financial statements. Some companies have chosen to merely disclose the nature and status of asbestos claims without providing an estimate of the amount of or range of loss. Other companies have only included existing asbestos claims in calculating their estimated asbestos obligation for GAAP purposes and have not estimated liabilities related to future claims, while yet other companies include the existing asbestos claims but only include future claims for a relatively short future period, e.g. 7-8 years.

Consequently, it is not uncommon for companies that have prepared and issued financial statements in accordance with GAAP to subsequently increase the estimates of their asbestos obligations. Indeed, in several instances, asbestos manufacturers that had prepared and issued GAAP financial statements with unqualified auditors' opinions found themselves filing for bankruptcy protection within a year after issuing such GAAP financial statements. These companies cited that a major reason for filing for bankruptcy was the rising number of new asbestos claims and the cost of resolving those asbestos liabilities. The following examples discuss the GAAP financial reporting of asbestos liabilities by several large manufacturing companies that have filed bankruptcy due to the magnitude of their asbestos liabilities despite the fact that their balance sheets reflected estimates of asbestos liabilities in accordance with GAAP.

Armstrong World Industries, Inc.

Armstrong is a manufacturer of flooring and ceiling products that filed for bankruptcy on December 6, 2000. For the year ended December 31, 1999, Armstrong issued its audited financial statements which reflected an asbestos liability totaling approximately $682 million on its balance sheet. Armstrong's independent auditors' completed their audit on of Armstrong's 1999 financial statements on February 2, 2000 and rendered an unqualified opinion; which means that the Company's 1999 financial statements were prepared in accordance with GAAP. Moreover, there was no reference in the auditors' report of an uncertainty regarding Armstrong's ability to continue to operate as a going concern. However, only eight months after the date of this audit report Armstrong estimated that its asbestos liability was in the range of $759 million to $1,363 million. Armstrong concluded that no amount within the range was more likely than any other and, therefore, reflected the low end of the range, $759 million, as a liability in its financial statements as permitted under GAAP. However, the Company also stated it was reasonably possible that the actual liability could be significantly higher. Indeed, Armstrong filed for bankruptcy shortly thereafter and disclosed in its 2000 year end audited financial statements that the principal factors that lead to a decision to file for bankruptcy were the escalating number of new claims, the cost of settling claims and liquidity concerns regarding the bankruptcy filing of another asbestos manufacturer. The auditors again rendered an unqualified opinion on Armstrong's year-end audited financial statements for 2000 meaning that the financial statements were prepared in accordance with GAAP even though the Company acknowledged that the actual asbestos liability could be significantly higher than the amount reported in its balance sheet at December 31, 2000. In recognition of this uncertainty the auditors included an emphasis paragraph in their audit report indicating that a significant uncertainty existed as to the Company's ability to continue to operate as a going concern.

An excerpt of Armstrong's disclosure of its asbestos liability in its 2000 Annual 10-K was set forth earlier in this report. It is worthwhile to compare this disclosure with the requirements of FAS 5 and FIN-14 discussed earlier in this report. First, the company only made an estimate of its asbestos liability through the year 2006. This is permissible

under GAAP if a company concludes that it cannot provide a reasonable estimate of a contingent liability beyond a certain date. However, given the long-tailed period associated with asbestos claims, limiting the estimation period to 2006 could result in excluding significant numbers of claims from the estimate. Moreover, Armstrong only reflected the low end of the asbestos liability range in its December 2000 balance sheet again as permitted by GAAP but acknowledged that the actual liability could be significantly higher. Indeed, the independent auditors' in recognition that the actual asbestos liability could be significantly higher than the amount recorded added an emphasis paragraph in their 2000 audit report which stated that "The filing under Chapter 11 and the resulting increased uncertainty regarding the Company's potential asbestos liabilities, as discussed in Note 27 of the consolidated financial statements, raise substantial doubt about the Company's ability to continue as a going concern. The accompanying consolidated financial statement and financial statement schedule do not include any adjustments that might result form the outcome of these uncertainties."

Finally, in December, 2003, Bankruptcy Judge Randall Newsome accepted and signed the "Proposed Findings of Fact and Conclusions of Law Regarding Confirmation of the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc., as Modified" ("Armstrong Findings of Fact and Conclusions of Law"), which included the following facts and conclusions with respect to Armstrong's asbestos liabilities:

- The present value of Armstrong's asbestos liabilities projected by Dr. Mark Peterson as of December 2000, using the 5.53% discount rate, was $6.479 billion.[6]

- Dr. Peterson estimated Armstrong's asbestos liabilities to be at least $4.689 billion (assuming no future increase) and more likely $6.479 billion (assuming future increase).[7]

- Based upon Dr. Peterson's testimony and a thorough review of his report, the range of asbestos claims set forth above was supported by a preponderance of the evidence.[8]

---

[6] *Id.*, at paragraph 35.
[7] *Id.*, at paragraph 118.

Obviously, the Court determined that Armstrong's asbestos liability was significantly higher than any amount previously reported by the Company in its audited financial statements which were prepared in accordance with GAAP.

McDermott International / Babcock & Wilcox Company

McDermott International, Inc. ("McDermott") is the parent company of the McDermott group of companies.  At the end of 1999, McDermott operated in four business segments, including the power generation business through its subsidiary Babcock & Wilcox ("B&W").

For the year ended March 31, 1999, McDermott issued its audited financial statements which reflected an asbestos liability totaling approximately $1.562 billion on its balance sheet.  McDermott's independent auditors' completed their audit on of McDermott's 1999 financial statements on May 14, 1999 and rendered an unqualified opinion.  Here again, the issuance of an unqualified opinion means that the Company's 1999 financial statements were prepared in accordance with GAAP.  Also, there was no reference in the auditors' report of an uncertainty regarding McDermott's or B&W's ability to continue to operate as a going concern.

However on February 22, 2000, roughly nine months after the issuance of its 1999 audit report, B&W filed for bankruptcy and disclosed that it had done so as a means to determine and comprehensively resolve all pending and future asbestos liability claims against the Company.  On the day prior to filing for bankruptcy B&W recorded and estimated its asbestos liability of approximately $1.3 billion which its auditors had previously concluded was determined in accordance with GAAP.

In October, 2004, Bankruptcy Judge Jerry A. Brown accepted and signed the "Findings of Fact and Conclusions of Law Regarding Core Matters and Proposed Findings of Fact, Conclusions of Law and Recommendations to the District Court with Respect to Non-

---

[8] *Id.,* at paragraph 130.

Core Matters" ("B&W Findings of Fact and Conclusions of Law"), which included the following facts and conclusions with respect to B&W's asbestos liabilities:

- B&W's total present and future asbestos-related liability would range between $7.099 billion and $9.043 billion.[9]
- The court finds that the Plan Proponents have demonstrated that the Debtor would be subject to substantial future demands for asbestos related claims.[10]

Obviously, the Court determined that B&W's asbestos liability was significantly higher than any amount previously reported by the Company in its audited financial statements which were prepared in accordance with GAAP.

Federal Mogul Corporation

Federal-Mogul is a leading supplier of vehicular parts, components and systems to the automotive, small engine and industrial markets. At December 31, 2000, Federal-Mogul reflected an asbestos liability of $1.8 billion in its audited financial statements of which approximately $1.6 billion related to its T&N subsidiaries. Federal Mogul disclosed that this estimate was based on future claims that were expected to be paid over the next twelve years and that there was no assurance that the T&N companies would not be subject to material additional liabilities related to asbestos for the period covered.

Moreover, with regard to the ultimate liability for all pending and future claims the Company stated that it does not believe it can "…reasonably determine the ultimate liability as the level of uncertainty is too great to provide for reasonable estimation of the number of future claims, the nature of such claims and the cost to resolve them. As additional experience is gained regarding claims or other new information becomes available regarding the potential liability, the Company will reassess its potential liability and revise the estimates as appropriate. Accordingly it is reasonably possible that the ultimate losses from asbestos-related claims will be greater than amounts recorded."

---

[9] B&W Findings of Fact and Conclusions of Law, page 48.
[10] *Id.*, at page 49.

Here again, Federal Mogul's independent auditors rendered an unqualified opinion dated February 1, 2001 which stated that the financial statements were prepared in accordance with GAAP. Neither the financial statements nor the audit report contained a statement regarding uncertainty about Federal Mogul's ability to continue to operate as a going concern. Nevertheless, on October 1, 2001, roughly eight months after the date of the audit report, Federal Mogul filed for bankruptcy stating that the restructuring proceeding was undertaken to resolve the Company's asbestos-related litigation.

Owens Corning ("OC")

Owens Corning serves consumers and industrial customers with building materials systems and composite systems. OC filed for bankruptcy on October 5, 2000. For the year ended December 31, 2000, OC issued its audited financial statements which reflected an asbestos liability totaling approximately $3.5 billion of which $2.2 billion related to OC asbestos liabilities and $1.3 billion to Fibreboard.

In its 2002 financial statements OC disclosed that the range of its total asbestos obligation was in the range of $5.9 to $16 billion of which $3.6 billion and $10.7 billion, respectively related to OC's asbestos liability excluding Fibreboard. OC reflected an asbestos liability of $5.9 billion in its balance sheet on December 31, 2002 and disclosed that it "...believes that its reserve for asbestos claims represents at least a minimum in a range of possible outcomes of the plan negotiation process as to the amount of its total liability for asbestos-related claims against it as determined through the Chapter 11 process." OC continued to reflect an asbestos reserve of $5.9 billion in its December 31, 2003 and 2004 year end balance sheet.

In January 2005, an estimation hearing was conducted before United States District Court Judge John P. Fullam, Sr. At the estimation hearing four estimates were put into evidence as to OC's actual projected asbestos liability at the petition date. At the hearing the estimated liabilities, excluding Fibreboard, were as follows:

| | |
|---|---|
| Dr. Dunbar (NERA) | $2.1 billion[11] |
| Dr. Vasquez | $6.5 to $6.8 billion[12] |
| Dr. Rabinovitz | $8.2 to $10.7 billion[13] |
| Dr. Peterson | $8.4 to $11.1 billion[14] |

In March 2005, the District Court issued a Memorandum and Order estimating the total amount of contingent and unliquidated asbestos claims against Owens Corning, excluding Fibreboard, at $7.0 billion. As a result, OC in its March 31, 2005 quarterly report, filed with the Securities and Exchange Commission, increased the asbestos reserve reported in its balance by $3.4 billion and, thereby, increased its total asbestos reserve, including Fibreboard, from $5.9 billion to $10.2 billion.

These are just a few examples of companies that issued financial statements that stated the contingent liabilities were presented in compliance with GAAP, yet filed for bankruptcy protection shortly thereafter because their contingent liabilities greatly exceeded their earlier estimates.

In conclusion, for the reasons discussed above, the estimated asbestos liability reported in financial statements that are prepared in accordance with GAAP are often not necessarily an accurate estimate of a company's actual asbestos liability.

---

**Respectfully Submitted:**

---

**Loreto T. Tersigni, CPA, CFE**

---

[11] Memorandum and Order issued by Judge J. Fullam, Sr. dated March 31, 2005.
[12] Memorandum and Order issued by Judge J. Fullam, Sr. dated March 31, 2005.
[13] Estimated Number and Value of Pending and Future Asbestos Person Injury Claims Against the Owens Corning Corporation issued by Dr. Rabinovitz dated October 15, 2004, at page 16.
[14] Owens Corning and Fibreboard Projected Liabilities for Asbestos Personal Injury Claims as of October 2000 issued by Dr. Peterson dated October 15, 2004, at page 29.

# EXHIBIT 1

## Professional Qualifications and Prior Testimony of

## Loreto T. Tersigni, CPA, CFE

## BACKGROUND

Mr. Tersigni has more than 30 years of experience in providing financial, valuation and management consulting services to a diversified client base. He is experienced in all facets of accounting and auditing and has been the partner-in-charge of audits of companies in a variety of industries including manufacturing, distribution, real estate and construction.

Mr. Tersigni has a broad range of technical skills and experience including all facets of financial reporting to the Securities and Exchange Commission. His experience includes forensic accounting and valuation services in connection with litigation consulting engagements. He has also testified in federal and state courts and at arbitrations in connection with financial matters including solvency, valuation, fraudulent transfers as well as numerous financial, accounting and audit issues. Mr. Tersigni is presently the financial advisor to the Asbestos Claimants' Committee in connection with numerous Chapter 11 proceedings.

## EDUCATION

- St. John's University - MBA, Taxation (1973)
- New York Institute of Technology - BS, Accounting (1969)

## PROFESSIONAL MEMBERSHIPS AND CERTIFICATIONS

- Certified Public Accountant, New York (1973) and Connecticut (1984)
- Certified Fraud Examiner
- American Institute of Certified Public Accountants
- AICPA Professional Ethics Division, Technical Standards Subcommittee (1992-1996)
- New York and Connecticut State Societies of Certified Public Accountants
- NYSSCPA – Professional Ethics Committee
- Member, Panel of Arbitrators – American Arbitration Association
- Institute of Business Appraisers
- Association of Insolvency Accountants

# EXHIBIT 1

## Professional Qualifications and Prior Testimony of

## Loreto T. Tersigni, CPA, CFE

### PUBLICATIONS (1987 – March 1998)

- **The Balance Sheet and Income Statement**, Practicing Law Institute, Accounting and Finance For Lawyers, August 1997, 1998, 1999.

- **Accounting for Deferred Income Taxes**, Practicing Law Institute, Basics of Accounting and Finance, August 1998.

- **Communications with Prior Auditor,** Practicing Law Institute, Accountants' Liability.

- **The CPA's Role in Arbitration**, The Legal Pad, Grant Thornton Litigation Services Group, April 1991.

- **How CPAs Assist in Evaluating LBOs**, The Legal Pad, Grant Thornton Litigation Services Group, July 1990.

- **Professional Standards for Litigation Services Provided by CPAs**, The Legal Pad, Grant Thornton Litigation Services Group, January 1990.

### DEPOSITIONS AND TRIAL TESTIMONY (2000 – 2005)

- **In re:  Owens Corning, et al. Case Nos. 00-3837 to 3854,** Deposition and Trial Testimony: U.S. District Court, District of Delaware, 2005.

- **In re: Congoleum Corporation et. Al.**; No. 03-03-51524 - KCF: Deposition Testimony: U.S. Bankruptcy Court, District of New Jersey, 2004.

- **In re:  Armstrong World Industries, Inc., et al. Case No. 00-4471,** Testimony by Declaration: U.S. Bankruptcy Court, District of Delaware, 2003.

- **In re: Armstrong World Industries, Inc. v. Center for Claims Resolution, Inc.**; No. 00-4471 (RJN): Deposition Testimony: U.S. Bankruptcy Court, District of Delaware, 2003.

- **In re: Minton v. Levine**; National Association of Securities Dealers. Testimony at Arbitration, 2003.

- **In re:  Federal – Mogul Global, Inc. T&N Limited, et al. Case No. 01-10578,** Trial Testimony; United States Bankruptcy Court for the District of Delaware, 2002.

- **In re:  The Babcock & Wilcox Company, et al., Adversary Proceeding No- 01-1155,** Deposition and Trial Testimony: United States Bankruptcy Court for the Eastern District of Louisiana, 2001

# EXHIBIT 1

### Professional Qualifications and Prior Testimony of

### Loreto T. Tersigni, CPA, CFE

- **In the Matter of James P. McCurdy, CPA, Administrative Proceeding File No. 3-10509:**  Trial Testimony:  U.S. Securities and Exchange Commission Administrative Proceeding, 2001.

- **Richard A. Lippe et al., as Trustee for Keene Creditors Trust v. Bairnco Corporation, Kaydon Corporation et al.,** No. 96 CIV 7600: Deposition Testimony: U.S. District Court, Southern District of New York, 2002 and 2001.

## EMPLOYMENT HISTORY

- January 1, 2001 to Present – L Tersigni Consulting P.C.

- January 1999 to December 31, 2000 - Goldstein Golub Kessler LLP

- May 1992 to January 1999 - Altschuler Melvoin and Glasser LLP

- February 1970 to May 1992 - Grant Thornton

## DESCRIPTION OF GOLDSTEIN GOLUB KESSLER LLP

Goldstein Golub Kessler LLP is one of the largest and highly regarded CPA firms in the country, ranked in the "Top Ten" in New York.

Since it was founded in 1964, GGK has been dedicated to serving a diversified client base, whether they are large, multi-divisional corporations or entrepreneurial ventures by providing a full range of audit, accounting, tax and management consulting services.

## DESCRIPTION OF ALTSCHULER MELVOIN AND GLASSER LLP

Altschuler Melvoin and Glasser LLP ("AM&G"), founded in 1923, is one of the nation's leading certified public accounting and consulting firms.  Headquartered in Chicago, AM&G is dedicated to serving privately held, owner-operated companies.  AM&G provides a full-range of accounting, audit, tax and business advisory services to a diversified client base.

**EXHIBIT 2**

# Federal-Mogul
## Documents Reviewed

1       FAS 5: Accounting for Contingencies

2       FIN 14: Reasonable Estimation of the Amount of a Loss

3       SOP 96-1: Environmental Remediation Liabilities

4       SAB 92: Accounting and Disclosure related to Loss Contingencies

5       US Treasury Yield Curve Data for 2001

6       Federal-Mogul Projected Liabilities for Asbestos Personal Injury Claims as of
        October 2001, issued by Dr. Mark Peterson dated November 29, 2004

7       Dr. Robin A. Cantor's Supplemental Expert Report dated April 26, 2005
8       Estimated Number and Value of Pending and Future Asbestos Person Injury
        Claims Against the Owens Corning Corporation issued by Dr. Rabinovitz dated
        October 15, 2004

9       Armstrong: 10-K For the Year ended December 31, 1999

10      Armstrong: 10-K For the Year Ended December 31, 2000
11      Armstrong: Proposed Findings of Fact and Conclusions of Law Regarding
        Confirmation of the Fourth Amended Plan of Reorganization of Armstrong World
        Industries, Inc., as Modified by The Honorable Randall J. Newsome dated
        December 19, 2003

12      Federal-Mogul: 10-K For the Year Ended December 31, 2000

13      Federal-Mogul: 10-K For the Year Ended December 31, 2001

14      Federal-Mogul: 10-K For the Year Ended December 31, 2004

15      McDermott International: 10-K For the Year Ended March 31, 1999

16      McDermott International: 10-K For the Year Ended December 31, 2000

17      Owens Corning: 10-K For the Year Ended December 31, 2000

18      Owens Corning: 10-K For the Year Ended December 31, 2002

19      Owens Corning: 10-K For the Year Ended December 31, 2004

20      Owens Corning: 10-Q For the Quarter Ended March 31, 2005
21      Judge Fullam's Memorandum and Order in the Owens Corning Hearing dated
        March 31, 2005
22      Babcock & Wilcox Company: Findings of Fact and Conclusions of Law
        Regarding Core Matters and Proposed Findings of Fact, Conclusions of Law and
        Recommendations to the District Court with Respect to Non-Core Matters by The
        Honorable Jerry A. Brown dated October 8, 2004

EXHIBIT 3

**Federal-Mogul**
**Summary of US Treasury Yield Curve**
As of October 1, 2001



**Treasury Yield Curve**

Average life [1] of 15.65 years at 5.02%

Rate (%)

Years to maturity

| Years to maturity | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 5 | 7 | 10 | 20 | 30 |
| October 1, 2001 | 2.47% | 2.82% | 3.18% | 3.90% | 4.33% | 4.55% | 5.39% | 5.38% |

Source: US Treasury Management Database

Represents the US Treasury Bill, Note and Bond Yield History from the Board of Governors, Federal Reserve System

[1] The average life is computed as follows: (1) for each year in the projection period, multiplying the nominal asbestos payment for the year by the number of years after the measurement date that such payment arises; (2) adding the results obtained in (1) above, and (3) dividing the total obtained in (2) by the total nominal asbestos payment for all future periods.