IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re: Federal Mogul Global, Inc., *et al*          (Bankruptcy #01-10578)(RTL)

      Debtors.

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS and ERIC D. GREEN, as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS, <br><br> Plaintiffs, <br><br> v. <br><br> ASBESTOS PROPERTY DAMAGE COMMITTEE, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 05-59 JHR |

# REBUTTAL EXPERT REPORT

## OF DR. ROBIN A. CANTOR

**May 13, 2005**

## TABLE OF CONTENTS

I.    QUALIFICATIONS .................................................................................................... 1

II.   ASSIGNMENT........................................................................................................ 1

III.  SUMMARY OF FINDINGS AND OPINIONS............................................................. 2

A.    WHEN DR. PETERSON GROUNDS HIS SETTLEMENT VALUES IN ACTUAL T&N DATA, HE PRODUCES AN
ESTIMATE EASILY RECONCILED WITH MY ESTIMATE ...................................................................2
B.    DR. PETERSON'S MODEL FAILS TO EXPLAIN PAST T&N LIABILITY .......................................................3
C.    DR. PETERSON'S "INCREASING" WORLD IS REFUTED BY ACTUAL DATA...............................................4


IV.   BASES FOR OPINIONS............................................................................................. 7

A.    SETTLEMENT VALUES..........................................................................................................................7
B.    FILING RATES ...................................................................................................................................17
C.    CORRECTIONS TO THE SUPPLEMENTAL REPORT................................................................................23

ATTACHMENTS

## I. Qualifications

I am a Director in the Financial and Insurance Claims Services practice of Navigant Consulting, Inc. ("NCI"). I lead the Liability Estimation and Insurance Coverage Analysis practice, which helps companies and financial institutions better understand asbestos and other product liability exposures. I specialize in environmental and energy economics, statistics, risk management, and insurance claims analysis. Prior to joining NCI in September 2004, I was a Principal and Managing Director of the Environmental and Insurance Claims Practice of LECG, LLC. My responsibilities at LECG included conducting complex economic, statistical, and risk analysis for litigation support and expert testimony, as well as managing a staff of internal and external environmental professionals.

A more complete statement of my qualifications and my curriculum vita, including testimony, are contained in the supplemental expert report that I submitted in this matter on April 26, 2005.[1] My current billing rate for this engagement is $400/hour for analysis and testimony. Other NCI staff members have also worked with me on this matter and they have been billed at their normal and customary rates ranging from about $150 to $400.

## II. Assignment

I have been retained by Weil Gotshal & Manges LLP ("Counsel") on behalf of the Official Committee of the Asbestos Property Damage Claimants ("Committee") to use my professional judgment and generally accepted estimation methods to investigate the aggregate indemnity liability for pending and future bodily injury claims related to asbestos containing products sold and produced by T&N, Limited ("T&N"). I have been instructed by Counsel that my analysis is to be bounded by the scope of the claims as employed by the Disclosure Statement to determine a payment ratio for the class of creditors to which the Committee belongs. As a result, I have also been asked to consider the reliability of the analytical foundations of the ratio calculations as reported in the Disclosure Statement. As part of my review, I have considered the relevant 2002 through 2005 memoranda and reports of Dr. Peterson who has been retained by Caplin & Drysdale, U.S. Counsel for the Asbestos Claimants Committee. I have reviewed the Peterson studies and his deposition and I have been asked by Counsel to evaluate the findings and opinions contained therein.[2]

---

[1] Supplemental Expert Report of Dr. Robin A. Cantor (April 26, 2005) (hereafter, "Cantor Supplemental Report").

[2] Memorandum from Elihu Inselbuch, Nathan D. Finch, and Rita C. Tobin dated October 25, 2002. (hereafter "Oct. 2002 Inselbuch Memorandum"). Memorandum from Mark Peterson to Elihu Inselbuch and Julie Davis dated February 19, 2004 (hereafter "Feb. 2004 Peterson Memorandum"), Expert Report of Mark A. Peterson, November 29, 2004, "Turner & Newell, Inc. Projected Liabilities for Asbestos Personal Injury Claims." (hereafter "Peterson November 2004 Report"), and Supplemental Expert Report of Mark A. Peterson, April 26, 2004, "Turner and Newall Projected Liabilities Supplemental Report." (hereafter, "Peterson Supplemental Report")

A list of materials considered for this rebuttal report and the Cantor Supplemental Report is attached as Attachment R-A. I also have relied on my training and experience as an economist and claims analyst. To prepare this work, I have directed NCI staff to conduct certain analyses which are discussed in the context of my findings and conclusions. My opinions are based on my understanding of the information available to me as of the date of this report. I reserve the right to supplement or change my opinions if new information should become available.

## III. Summary of Findings and Opinions

### A. When Dr. Peterson Grounds His Settlement Values in Actual T&N Data, He Produces an Estimate Easily Reconciled With My Estimate

Dr. Peterson's estimate of the net present value of T&N's pending and future liability in his "non-increasing" scenario is $8.2 billion in 2001 dollars.[3] Dr. Peterson reports that his estimate of the net present value of T&N liability is $3.6 billion when he uses his observed 2000-2001 average settlement values.[4] Thus, his estimate more than doubles when he uses his preferred settlement values rather than his estimate of actual values as calculated from T&N's settlement history just preceding the bankruptcy filing.

Although Dr. Peterson is using a propensity to sue approach, and I use a propensity to compensate approach, the approaches are comparable if I use a death year equal to file year assumption[5] and use only the KPMG model for malignant incidence counts. In that case, the estimate for my method, using Dr. Peterson's 2000-2001 average settlement values, is $3.0 billion.[6] The remaining difference between the numbers is due to[7] (1) using a four-year versus two-year calibration window, (2) discount rates (5.50% versus 5.02%), (3) incidence models (KPMG versus Nicholson), and (4) differences in dismissal rates, allocation of unknowns, and claim counts by disease.

---

[3] Peterson November 2004 Report at 39-40.

[4] Peterson Supplemental Report at 8.

[5] As explained in the Cantor Supplemental Report, a substantial proportion of the T&N claims records contain information on the death year of the claimant; thus, this assumption requires that I ignore actually observable data. Nonetheless, it is the most direct way to compare the Peterson and Cantor approaches, since Dr. Peterson essentially equates file year and death year in his analysis regardless of the data recorded for the claimant.

[6] Note that my estimate is $2.9 billion under all of the same assumptions but substituting the NCI proprietary mesothelioma incidence model for the KPMG counts.

[7] In each of the "choices" listed, the first choice corresponds to my method which is the same as the method used by Dr. Peterson before he submitted the November 2004 estimate, and the second choice corresponds to Dr. Peterson's November 2004 methodology.

Dr. Peterson's and my estimates are reasonably close ($3.0 versus $3.6 billion) when settlement values are grounded in the T&N claims history.[8]  I note that Dr. Peterson's 2002 and February 2004 estimates are also based upon this history.[9]  At some point between February and November 2004, however, he changes his methodology to use substantially higher settlement values with no corresponding reduction in the projected compensable claims.  My analysis shows there is substantial evidence to indicate that T&N would not have experienced the simultaneous dramatic increase in settlement values and high increases in claim counts as hypothesized by Dr. Peterson, especially in the context of non-malignant claims.

### B. Dr. Peterson's Model Fails to Explain Past T&N Liability

Dr. Peterson's model reflects propensity to sue, and from this starting point he projects T&N's future resolved claims.  Dr. Peterson's preferred model is calibrated to filings in 2000 and 2001 (annualized), which are the two highest years of filings in T&N's claims experience.[10]  Moreover, Dr. Peterson's values are poorly grounded in T&N's claim experience but rather reflect his experience with Trust Distribution Procedures ("TDPs"), and the particular experiences of his selection of other bankrupt and solvent companies.

It is therefore instructive to see how Dr. Peterson's model, with its memorialized foundation from 2000 and 2001 filings and TDP values, performs in an estimation of what is known.  I apply a standard validity test of a forecast model by using it to produce an estimate of history, or what is called a "backcast."  For this test, I use the Peterson and Cantor models to estimate a mid- and long-term backcast of T&N's actual indemnity costs.[11]  Exhibit 1 shows the five-year calculation and the comparison for all years from 1987 to 2001.  Using Dr. Peterson's model produces a mid-term backcast that is more than five times the actual

---

[8] If I instead keep all of the conditions of the $3.0 billion estimate, but use my base case assumptions about settlement values (and thereby allow for increasing average settlement values for mesothelioma) and the NCI proprietary mesothelioma incidence model, then the estimate becomes $3.4 billion.

[9] Oct. 2002 Inselbuch Memorandum at 3 and Feb. 2004 Peterson Memorandum at 19.  The Angelina and EMB reports provide further support for grounding estimates in the history of the defendant.  Mr. Angelina's low and medium estimates are consistent with these assumptions ($2.138 – 3.238 billion discounted 2002 dollars) as are EMB's historical average award models ($2.457 – 3.758 billion discounted 2003 dollars). *See,* Expert Report of Michael E. Angelina, September 2004, "Report: Analysis of T&N Ltd's Asbestos Liabilities" (hereafter "Angelina September 2004 Report") at 22 and Report of EMB, 27 July 2004, "Review of Dr. Peterson's Projections of Future US and UK Asbestos Related Liabilities, TDP Values and CDP, for Level I Claimants" (hereafter, "EMB Report") at 36.

[10] Due to the high proportion of unresolved claims in these years, they are likely to be the least reliable years in the T&N history for the purposes of understanding dismissal rates referenced to the file year.

[11] The forecasting models in this matter are essentially long-term forecast models not intended to give accurate results on an annual basis, but rather to produce reliable results of the mid- to long-term expectation of liability.  As a result, I select a five-year and all-year backcast period (1987-2001).  It is standard to examine the validity of a forecasting model by performing a backcast.  Typically, if the backcast data includes the estimation period, the model should do very well. *See,* for example, Armstrong, J. Scott *Long-Range Forecasting,* 2nd ed., John Wiley & Sons, New York. 1985. "...backcast validity provides a useful approach to the assessment of forecast validity..." at 344.

past liability, and an all-year backcast that is almost nine times the actual value.[12]  In contrast, my baseline model is only slightly above the five-year indemnity costs, and a little over twice the all-year cost.



### C. Dr. Peterson's "Increasing" World Is Refuted by Actual Data

My estimate in this matter is intended to forecast what T&N's going-forward liability would be in the world "but-for" the bankruptcy in 2001.  The Center for Claims Resolution ("CCR"), which resolved T&N's asbestos claims prior to the bankruptcy, ceased operations

---

[12] I computed the number of compensated claims in their year of settlement by calculating the two-year weighted average propensity to sue using Dr. Peterson's filing counts and Nicholson's projections. Next, I used Dr. Peterson's estimate of the percent paid and Dr. Peterson's assumption of a two-year lag between filing and settlement to determine how many claims would be paid according to each settlement year beginning in 1987. The estimate of the number of compensated claims was multiplied by Dr. Peterson's preferred settlement values. Note that the backcasts are in constant 2001 dollars. They have not been discounted to 1987 and 1997, respectively. Since Dr. Peterson's preferred discount rate (5.02%) is less than mine (5.5%) and less than the long-term rates published by OMB in 1987 and 1997, respectively, discounting to the initial year would only increase the error in his backcast relative to my estimate and relative to the actual discounted value of T&N historical indemnity costs.

in 2001; thus, a likely benchmark for T&N's claims resolution experience but for the bankruptcy is the tort system. Importantly, we have observations on the economics of asbestos claims and solvent companies resolving their asbestos liabilities within the context of the U.S. tort system from 2002 to 2005. My analysis shows that information from 2002 to 2005 indicates that T&N's claims filings would have dropped substantially by 2004, and that 2001 may have been the peak year for its filings but for the bankruptcy.[13] Moreover, there is additional information about state tort reform, defendant-plaintiff claim-value agreements,[14] and the economics of locating large numbers of new claimants[15] which also supports the conclusion that T&N's liability going forward would have improved relative to observations in 2000 and 2001.

In contrast, Dr. Peterson has used the information in 2000 and 2001 to lock T&N into a resolution experience that never improves in his model and, under his "increasing" scenario, may deteriorate substantially. He apparently believes that had it not filed for bankruptcy, T&N would have faced a mid-term future of continuing high levels of asbestos filings and much higher settlement values.[16]

Dr. Peterson's view is not supported by actual T&N data and the observable recent history of solvent asbestos defendants and asbestos filings more generally. For example, in his increasing model, the total filings in 2004 are 50,956, which is more than 10% *greater* than the actual filings in 2000 and in 2001.[17] My analysis shows that this was not the experience of solvent companies with publicly reported data. Rather, in 2004 solvent companies with publicly reported data typically experienced a 13 to 83% *decline* in their filings over 2001. These declines are even more dramatic when 2004 is compared to 2002 or 2003. In addition, claims filed with the Manville and H.K. Porter trusts also show similar declining filing patterns.

Overall, the claims data indicates that filings were substantially lower in 2004 than in previous recent years for nearly all companies that remained solvent. Moreover, the available data indicates dismissal rates typically about 75%, which substantially exceeds the

---

[13] Angelina September 2004 Report at 16.

[14] These agreements, known as "matrix" agreements, are intended to standardize the values for claims by disease. *See,* for example, RAND Institute for Civil Justice, "Asbestos Litigation," 2005 at 129. (hereafter "RAND Report 2005")

[15] As a matter of economics, the declining incidence of asbestos-related diseases and the increasing costs of locating and representing plaintiffs should diminish the count of new claims. In the 2000-2002 period, it is possible and economically rational that competitive plaintiff law firms would have "over harvested" claimants in anticipation of the proposed federal legislation. A declining supply of yet undiscovered claimants (due to over harvesting and reduced incidence) and a deteriorating legal environment (due to state tort reform) would have worsened the economics of pursuing new claims.

[16] Peterson November 2004 Report at 8. Dr. Peterson claims that the coincident events of the dissolution of the CCR, the publication of Geoffrey Tweedale's book (see footnote 34), and the bankruptcy filings of seven major asbestos defendants would lead to increases in filings and settlement values for T&N.

[17] His estimate is below the annualized estimate for 2001 but the annualized rate presumes that the filing rate for the first three quarters of 2001 persists for the fourth quarter. If the filing rates in the first three quarters were elevated by news of a pending bankruptcy, then it would be improper to extrapolate these rates to annualize the data.

approximately 10% rate that T&N was achieving under the CCR. In combination, these factors suggest a substantially declining level of future compensable claims for T&N relative to its experience just before the bankruptcy.[18]

Dr. Peterson's preferred settlement values also reflect a dramatically deteriorating experience for T&N. Exhibit 2 compares Dr. Peterson's preferred weighted average resolution values for pending claims and filings after 2001 with the values he calculates as the T&N four-year average.[19] Dr. Peterson is apparently arguing that if T&N had remained solvent in 2002, the expected value per nonmalignant claim (positive and zero-pay claims) would have been 249% greater than the actual weighted average value for the previous four years. In my analysis below, I show that this aspect of the Dr. Peterson's estimation approach has no basis in T&N data or any other reasonable benchmark.

**Exhibit 2: Comparison of Dr. Peterson's Resolved Values To His Future Values**

| Disease | Weighted Average 1998-2001 | Future Resolved Value | Ratio |
|---|---|---|---|
| Mesothelioma | $ 67,133 | $ 163,711 | 244% |
| Lung Cancer | 12,654 | 27,630 | 218% |
| Other Cancer | 5,676 | 13,170 | 232% |
| Non-Malignant | 2,509 | 6,242 | 249% |

Sources:
February 2004 Peterson Memorandum at 15.
Peterson November 2004 Report at 19.

---

[18] Mr. Angelina and others have suggested that dismissal rates and settlement values are positively related (Angelina September 2004 Report at 10). The rationale is based upon paring down the number of compensable claims to a set that are more meritorious than the larger resolved population. However, this is a simplistic theory with many confounding factors, such as law firms involved, variation in the quality of the claims population, filing characteristics, etc. Thus, it is an empirical question whether dismissal rates and average settlement values are positively correlated. I have tested whether dismissal rates referenced in the file year are correlated with settlement values referenced in the expense year. I find that I cannot reject that they are uncorrelated for the T&N data for each disease and overall at the .05 level of significance. (Significance is a measure of the chance that a relationship (or correlation) would be rejected by the statistical test when the relationship truly exists in the data. In the preceding test, I am tolerating the standard 5% chance that this error might occur.) Thus, the evidence indicates that settlement values do not appear to be correlated with dismissal rates. The settlement year field for dismissed claims in the T&N Claims Database is insufficiently populated for me to investigate the correlation between dismissal rates referenced in the resolution year and settlement values.

[19] I have presented the comparison in Exhibit 2 based upon resolution values because apparently Dr. Peterson does not report his four-year average settlement value.

One argument that Dr. Peterson uses to support his increasing view of the non-mesothelioma settlement values is observable trends in T&N and other companies' data.[20] Dr. Peterson, however, fails to test his hypotheses about trends even when he has the data to do so. Thus, he never investigates the statistical reliability of his findings and conclusions. In my analysis below, I use Dr. Peterson's data for T&N's average settlement values and show that his findings on trends between 1997 and 2001 are unreliable. I use data from his selected sample of other companies and show that his findings for increasing trends for lung cancer, other cancer, and nonmalignant settlement values are unreliable. Finally, I use Dr. Peterson's average settlement data for Owens Corning ("OC") and T&N and show that his conclusion about the closing gap between them is unreliable.

My analysis and Dr. Peterson's own numbers indicate that there is little or no statistically reliable basis to assume increasing trends for the average settlement values for T&N's lung cancer, other cancer and non-malignant claims. Moreover, among the asbestos-related disease types, non-malignant claims have received increasing scrutiny at the state level which in turn should reduce the expected value of such claims going forward.[21] In combination, actual T&N experience and the changes in state law should lower the expected values of non-malignant claims, and not lead to the dramatic increases envisioned by Dr. Peterson.

## IV.  Bases for Opinions

### A.  Settlement Values

There is substantial empirical data indicating that Dr. Peterson's preferred settlement values overstate what T&N was likely to pay under the tort system but for the bankruptcy. First, as shown in Exhibit 3, my analysis of the claims data shows that, while there is some evidence of increasing settlement values in the years just preceding the bankruptcy for mesothelioma, there is no such evidence for the other diseases.

---

[20] Peterson November 2004 Report at 17.

[21] In Attachment R-B, I summarize the enacted and proposed state legislation relevant to claims and values.



In contrast, Dr. Peterson asserts that values are increasing for all malignant diseases, but he fails to account properly for the variability in the data.[22] Dr. Peterson apparently reaches his conclusions on annual point estimates rather than the full data set of settlement values.[23] Exhibit 4 compares Dr. Peterson's calculated average values for T&N by malignant disease with my calculations in the period used for his trend analysis.[24]

---

[22] Peterson Supplemental Report at 9.

[23] Simply measuring a trend from one point estimate to another does not imply that the result is statistically reliable. Dr. Peterson's Other Cancer result is clearly just above 1 (no trend) and the observed annual variability leads to a conclusion of no reliable trend. (Peterson Supplemental Report at 9)

[24] Peterson Supplemental Report at 9.

**Exhibit 4: Comparison of Estimated Average Settlement Amount for Malignant Diseases: 1997 - 2001**







**Sources:**
NCI T&N Claims Database.
Peterson November 2004 Report.

I have examined the claim-level settlement values for malignant diseases from 1997 through 2000 and tested whether there is a reliable increasing trend.[25] The results are reported in Exhibit 5. Again, only the values for mesothelioma show a statistically significant

---

[25] I fit a linear regression model to estimate the percentage increase in values over time by disease for settlements that occurred in expense years 1997 through 2000. Note, I have not used the data for 2001 because Dr. Peterson and I do not agree on the average settlement values for that year.

increasing trend. There is too much variation in the claim data for the other malignant diseases to support Dr. Peterson's conclusions. The nonmalignant values actually show a significantly decreasing trend. Moreover, using Dr. Peterson's estimates of settlement values and properly accounting for variability in the annual averages for 1997 through 2001, leads to the conclusion that there is no reliable linear trend for lung cancer and other cancer.[26]

## Exhibit 5: Linear Trend in Claims Level Settlement by Disease

| Disease | Direction | Statistically Significant | Observations |
|---|---|---|---|
| Mesothelioma | Positive | Yes | 2,717 |
| Lung Cancer | Positive | No | 3,999 |
| Other Cancer | Negative | No | 1,320 |
| Nonmalignant | Negative | Yes | 62,003 |

Source: NCI T&N Claims Database, 1997 - 2000 data.

Dr. Peterson also relies upon information in Appendix B in the Peterson November 2004 Report to project how settlement values for lung cancer and other cancer would escalate relative to the increases he predicts for mesothelioma.[27] I used the data from Dr. Peterson's Appendix B to investigate what, if any, trends are evident for lung cancer, other cancer and nonmalignant settlement values. Exhibit 6 shows the indexed values for nonmalignant settlements.[28] In each of the panels in the exhibit, I show the indexed value changes for a company. Looking across all companies it is clear that there is no generally increasing pattern; rather there is substantial variation across the patterns. Using the pooled data across companies, I find that there is no reliable increasing trend for any of the diseases based on Dr. Peterson's data.[29]

---

[26] I tested for a linear trend in each disease with Dr. Peterson's averages and cannot reject that the trend is zero at the .05 level of significance.

[27] Peterson November 2004 Report at 15.

[28] An indexed value simply controls for scale effects across the data. In this analysis, for each company, each value is divided by the value in 1997, so that the first observation is one and subsequent observations are measured relative to one. The Consumer Price Index is an example of how temporal changes are indexed.

[29] I collected the average settlement data in Dr. Peterson's Appendix B and normalized the values by using a natural logarithm transformation. I then consolidated the transformed series from each of the 8 defendants to fit a linear regression model to estimate the percentage increase in values over time by disease. The result for each disease model indicates that there is no statistically significant time trend in average settlement values for the data provided in Dr. Peterson's November 2004 Report Appendix B.



Exhibit 6: Average Non-Malignant Settlement Values for Eight Defendants

Source: Peterson November 2004 Report - Appendix B.

Based upon his conclusions about proportions and increasing trends, Dr. Peterson projects future average settlement values for pending and future claims that are substantially above the historical experience of T&N.  Exhibit 7 shows that Dr. Peterson's preferred average

settlement values are not less than 144% of any annual average value in the 1998 through 2001 period.

**Exhibit 7: Average Settlement Values 1998-2001 Compared to Dr. Peterson's Proposed Future Average Settlement Value**

| Year | Meso | Lung Cancer | Other Cancer | Non-Malignant |
|---|---|---|---|---|
| 1998 | $    46,608 | $    12,425 | $    5,744 | $    2,446 |
| 1999 | 60,936 | 12,179 | 5,792 | 3,085 |
| 2000 | 86,606 | 14,350 | 6,395 | 3,227 |
| 2001 | 138,939 | 18,956 | 4,590 | 1,296 |
| Dr. Peterson Estimated Settlement Average | $    200,000 | $    32,000 | $    14,000 | $    7,000 |
| **Ratio** | **144%** | **169%** | **219%** | **217%** |

Sources:
Average settlement values by disease and year are from the Peterson November 2004 Report at 10.
Peterson Estimated Settlement Average are as in the Peterson Supplemental Report at 17.
Note: Ratio is the Peterson Future Value divided by the highest annual average value observed in 1998 - 2001.

Dr. Peterson's theory that T&N would fare far worse outside the "protection" of the CCR is also not supported by the available evidence.[30] In my earlier report, I showed that this was certainly not the case for average T&N settlement values from April 2001 through September 2001.[31] It is also instructive to look at T&N's actual monthly settlement values. Exhibit 8 shows that overall, the highest monthly averages are located in the first three months of 2001, and that for the last six months, during which T&N did not have the "protection" of the CCR, the mesothelioma and nonmalignant values were quite modest relative to the first six months.[32]

---

[30] Peterson November 2004 Report at 12-13.

[31] Cantor Supplemental Report at 18-19.

[32] I have tested whether there is a difference in the averages between the October 2000–March 2001 and the April 2001–September 2001 periods. I found I can reject that there is no difference at the .05 level of significance. In practical terms, the test reveals that the six-month average value declined after T&N was out of the CCR.

**Exhibit 8: Settlement Values by Disease and by Period**

| Expense Year/Month | Mesothelioma | Lung Cancer | Other Cancer | Non-Malignant |
|---|---|---|---|---|
| October 2000 | $91,160 | $18,245 | $7,795 | $3,130 |
| November 2000 | 66,666 | 14,678 | 8,327 | 3,643 |
| December 2000 | 100,642 | 11,811 | 5,808 | 3,385 |
| January 2001 | 123,338 | 14,989 | 5,329 | 1,652 |
| February 2001 | 143,174 | 10,450 | 3,957 | 2,077 |
| March 2001 | 167,959 | 17,464 | 4,085 | 2,962 |
| April 2001 | 41,453 | 16,114 | 3,211 | 524 |
| May 2001 | 62,162 | 6,262 | 2,907 | 1,700 |
| June 2001 | 70,241 | 13,226 | 5,036 | 1,857 |
| July 2001 | 77,886 | 9,650 | 3,563 | 2,311 |
| August 2001 | 59,523 | 14,735 | 3,020 | 2,147 |
| September 2001 | 118,460 | 10,385 | 3,077 | 1,887 |

Source: NCI T&N Claims Database.

Note: Settlement amounts are adjusted to 2001 dollars using the Consumer Price Index.

Moreover, contrary to Dr. Peterson's claims about the CCR, the facility was not universally viewed as providing protection in the form of reduced liability to its members. In 2001, a *Wall Street Journal* article reported that some members perceived that the CCR had increased their exposure to asbestos claims and that they would have been better served by a more aggressive defense strategy:

> In an unfortunate twist, an organization set up to broker settlements for asbestos makers may have inadvertently encouraged attorneys to file even more claims… "[W]ith the benefit of hindsight, we can see that it's a kind of 'Field of Dreams' strategy," says David Bernick, an attorney who specializes in tort reform. "If you build a field, the players will come."…Federal-Mogul said it would go another route. The company says it will fight claims of unimpaired plaintiffs and those who can't prove exposure to its products. CCR's 'strategy has been heretofore to settle these early, way before they might go to litigation,' says Federal-Mogul chief financial officer, Mike Lynch. "We think the time is to change that strategy."[33]

---

[33] Kim, Queena Sook, "As Asbestos Claims Continue to Grow, Broker of Settlements Reduces its Role," *The Wall Street Journal*, February 7, 2001.

Dr. Peterson also claims that the release of the book, *Magic Mineral to Killer Dust: Turner & Newall and the Asbestos Hazard*, in 2000 would act to increase claims brought against T&N.[34] Yet, even the book's author acknowledges that information about the T&N documents was widely reported by the news media by 1996.[35] I would expect that the transmission of such information would be efficient and fully incorporated into the economics facing plaintiffs and their counsel in the first wave of widely disseminated releases or fairly soon afterward. Thus, the impact of repeating the disclosure through the publication of the Tweedale book in 2000 is likely to be marginal.

Similarly, Dr. Peterson uses historical data through 2000 and asserts that "the size of Owens Corning's settlements now provide a measure of what T&N's future settlements are likely to become."[36] Apparently, Dr. Peterson believes that the differences between T&N's annual average settlement values and OC's values were closing in the years before the OC bankruptcy. The data reported by Dr. Peterson, however, fails to support this finding. I examined Dr. Peterson's data from 1992 to 2000 and find that T&N's average settlement values are significantly less than those of OC for all diseases.[37] I also tested whether the ratios of T&N's annual average settlement values to OC's annual average values were statistically different in the 1998-2000 period from earlier years. I found they were not.[38] Moreover, an examination of the ratios of filings and average settlement amounts suggests that T&N was actually becoming less like Owens Corning after 1997. Exhibits 9 and 10 show that for mesothelioma and non-malignant claims, respectively, the T&N to OC filing ratio and the value ratio were similar before 1998.[39] After 1998, the gap between the filing ratio and the value ratio widens, suggesting that although T&N claims were increasing relative to OC's claims, T&N's average settlement value ratios were not changing in a

---

[34] Tweedale, Geoffrey, Magic Mineral to Killer Dust: Turner & Newall and the Asbestos Hazard, Oxford University Press, 2000.

[35] See Tweedale at 267, "… O'Conner immediately began sending large bundles of key T & N documents to the media, lawyers, doctors, victims' support groups, and historians. His action—which would have been impossible in Britain, where court records are given absolute protection—ensured that this time the archive hit the headlines…" There is also evidence that T&N was a visible defendant in the U.S. as early as 1993 when news and legal trade publications reported on the T&N documents. These reports indicate that Chase Manhattan made the documents available to numerous plaintiffs' counsel including Kazan. It is very unlikely that these law firms would need a reminder in 2000 about the value of the documents for their cases. *See*, for examples, Woody, Todd "Asbestos Bar May Have a New Deep Pocket" *The Recorder* July 13, 1993 ("Chase Manhattan Bank's Wall Street headquarters is allegedly contaminated with T&N asbestos. During an ongoing six-year suit against the company, bank attorneys have uncovered scores of apparently incriminating documents, including some they have provided Kazan and other plaintiffs lawyers.") *and* Woody, Todd "Chase Man's unlikely heroics" *MotherJones* November/December 1993 Issue.

[36] Peterson November 2004 Report at 9.

[37] Using Dr. Peterson's T&N and OC settlement averages provided in the Peterson November 2004 Report at 10, I performed a nonparametric statistical test to determine whether or not there was a difference in the average settlement values for the 2 defendants. The results of the test indicate that for each disease, I could reject that there is no difference in settlement averages at the .05 level of significance.

[38] Using a standard statistical test, I found I could not reject that the ratios in the 1992-1997 period were the same as those in the 1998-2000 period at the .05 level of significance.

[39] A similar pattern can be observed for lung cancer and other cancer.

comparable way. For the most recent data (1998-2000), the increases in the average values are statistically distinct from the increases in the filings.[40] Contrary to Dr. Peterson's arguments, when the two dimensions that he identifies are properly considered, the evidence suggests that T&N was becoming *less* like OC over time.



Exhibit 9: T&N Filings and Mesothelioma Expense as a Ratio of OC

Sources: Peterson OC Report at 18.
Peterson November 2004 Report at 28.

---

[40] I performed a statistical test on the gap between the filings ratio and the values ratio across all diseases and found that the 1998-2000 data was significantly larger than the gap in all previous years.



Exhibit 10: T&N Filings and Non-Malignant Expense as a Ratio of OC

Sources: Peterson OC Report at 18.
Peterson November 2004 Report at 28.

In discussing important influences that are likely to have affected T&N after 2001, Dr. Peterson places substantial emphasis on the growing list of bankruptcies and how it might affect T&N's share of settlements.[41]  Bankruptcies, however, are only one of many factors that would have affected T&N's settlement values after 2001.  State tort reform has also advanced markedly since 2001, with eleven states enacting or proposing legislation since 2001, and many of the changes are expected to reduce average settlement values.  For example, limitations on punitive awards, restrictions on joint and several liability, and limitation on non-economic damages are contained in a number of the new laws.[42]  Due to its very limited market share in the U.S., a solvent T&N would have been a defendant in a position to benefit from these reforms.  Moreover, to the extent that the reforms lower expectations about jury verdicts, it is not necessary for these reforms to have benefited T&N directly for there to be an effect on average T&N settlement values.  As noted by the recent RAND report:

---

[41] Peterson November 2004 Report at 10.
[42] Attachment R-B contains a review of the enacted or proposed state reforms with provisions relevant to claim numbers or values.

Predictions of jury trial outcomes shape settlements in ordinary and mass tort litigation. Parties estimate expected value from previous jury verdicts in similar cases. Because few cases go to trial, cases that reach verdict are not likely to be representative of the typical lawsuit. How attorneys adjust settlement values to reflect this selection bias is not well understood. But it is widely assumed that trends in settlement values of cases reflect trends in jury awards (perhaps with some lag).[43]

### B.  Filing Rates

Dr. Peterson presents data to demonstrate that cancer filings against T&N have continued to increase even after the effect of the Georgine decision.[44]  Dr. Peterson indicates that the Georgine effect is largely isolated to 1997 and 1998.[45]  Dr. Peterson's analysis, however, apparently is based upon the T&N data after he has reallocated the claims with unknown disease.  It is important to note that almost half the unknown claims occur in 2000 and 2001. The transition matrix, however, for reallocating unknown claims is based upon claims where the plaintiff disease was unspecified but the CCR disease was known.[46]  I have examined this data and find that about two-thirds of the known data used in Dr. Peterson's transition method was filed before 1994.  The transition of the unknowns from 2000 and 2001 therefore largely depends on a claim composition from an earlier period.  To the extent that the true, but unobservable claim composition differs from the transition pattern, the reallocation will distort the true pattern of the cancer claims.  For example, if the true pattern had a higher proportion of nonmalignant claims and a correspondingly lower proportion of malignant claims in 2000 and 2001, then Dr. Peterson's reallocation of the unspecified disease claims would distort the true pattern of malignant claims filed over time by elevating the count in year 2000 and 2001.  It is therefore instructive to examine the data before any reallocation to investigate whether there are in fact the time trends hypothesized by Dr. Peterson.  Exhibit 11 shows the malignant disease data by quarter after the match to Manville data but before any reallocation with a transition matrix.  The data does indicate the jump in the number of claims in the 1997-1998 period that Dr. Peterson relates to Georgine.  After that jump, however, there is no statistical evidence of a time trend.[47]

---

[43] RAND Report 2005 at 49 (references omitted).

[44] Peterson November 2004 Report at 29.

[45] Peterson November 2004 Report at 30-31.

[46] Peterson November 2004 Report at 21.

[47] I tested each disease and the overall count and found no linear time trend at the .05 level of significance.



Exhibit 11: T&N Quarterly Claim Filings - Malignant Diseases

Source: NCI T&N Claims Database.

Moreover, even if the true, but unobservable T&N malignant claims did exhibit an increasing trend before 2001, Dr. Peterson has ignored other readily available data that suggests that 2000 or 2001 may have been a peak year for malignant claim filings. Data from the Manville and the H.K. Porter trusts, shown in Exhibit 12, show peaks counts in these years for malignant claims.[48] The data also show a dramatic decline in nonmalignant filings and by 2004, a ratio of nonmalignant to malignant claims that is substantially reduced from the ratio in 2001.[49]

---

[48] The Manville Trust data is a standard reference for investigating claims patterns. *See*, for example, Glater, Jonathan D. "Asbestos Claims Decline, but Questions Rise," *The New York Times*, April 6, 2005. ("The drop in claims against the Manville Personal Injury Settlement Trust, which lawyers said was a reliable indicator of a decline in asbestos claims over all, comes as some divisions have emerged among businesses over legislation that would set up a compensation system for claimants outside the court system.")

[49] I tested whether the decline from the peak year data was statistically reliable. I find a decline in both the malignant and nonmalignant claim count at the .05 level of significance. I also tested whether the decline in the nonmalignant to malignant ratio was significant. I find again a negative decline at the .05 level of significance.

## Exhibit 12: Manville and H.K. Porter Trust Filings

### Manville Filings

| Year | Malignant | Non-Malignant | Non-Malignant/ Malignant Ratio |
|------|-----------|---------------|-------------------------------|
| 1997 | 3,487 | 23,205 | 6.65 |
| 1998 | 3,744 | 29,045 | 7.76 |
| 1999 | 4,958 | 44,632 | 9.00 |
| 2000 | 5,570 | 58,060 | 10.42 |
| 2001 | 4,513 | 53,447 | 11.84 |
| 2002 | 4,403 | 48,773 | 11.08 |
| 2003 | 5,238 | 21,457 | 4.10 |
| 2004 | 1,803 | 4,551 | 2.52 |

### H.K. Porter Trust Filings

| Year | Malignant | Non-Malignant | Non-Malignant/ Malignant Ratio |
|------|-----------|---------------|-------------------------------|
| 2001 | 17,054 | 135,814 | 7.96 |
| 2002 | 8,203 | 65,951 | 8.04 |
| 2003 | 4,320 | 39,344 | 9.11 |
| 2004 | 4,840 | 22,327 | 4.61 |

Sources:

Manville Trust asbestos claims database September 2004.

Status Reports of the Trustee for the H.K. Porter Asbestos Trust

dated April 1, 2003 and March 30, 2005.

Note: Manville 2004 data has been annualized.

Evidence from publicly available solvent defendant data reinforces the patterns seen in the Manville and H.K. Porter data. I collected 10K reports filed with the Securities Exchange Commission ("SEC") for 113 companies solvent at least for some portion of the 2001 to 2004 period.[50] There were 25 companies with relevant asbestos claims data. Exhibit 12

---

[50] These firms were identified by a list created from research done by William Kerr for the Financial Institutions for Asbestos Reform, "Reducing the Asbestos Litigation Penalty: An Economic Benefit of Asbestos Reform Legislation" October 16, 2003, a listing of 100 firms from a Lazard Freres presentation, Report of Robert Kost for the Mealey's Conference, Wall Street Forum: Asbestos, "Solvent Companies with Asbestos Liabilities," April 20, 2004. Six additional firms were added after review of the initial composite list of 107. Of the 113 firms identified, 25 reported asbestos claims data in their 10Ks to the SEC. While this is not a random sample of all defendants, this sample was designed to use the best

Page 19

shows that from 2001 to 2004, the weighted average decline in the filed claims is 43%.[51]  In fact, claims declined in 2004 from 2003 levels for all but three of the companies.  I also note that Union Carbide, a former CCR member, experienced a 52% decline in its 2004 filings over 2003.[52]  In addition, non-U.S. firms apparently experienced a similar decline:

> International companies with exposure to asbestos personal injury litigation in the United States recently issued their fourth-quarter and 2004 annual reports, with many of the foreign companies reporting that asbestos claims against them and their U.S. subsidiaries in the U.S. judicial system have decreased since last year.[53]

---

information available to me to find all defendants of a financially meaningful size reporting asbestos claims information in their 10Ks.

[51] I tested whether this decline is statistically significant across all firms at the .05 level.  The estimated annual decline using a linear trend and controlling for company claim volume is 13% per year, and this result is statistically significant.  The estimated annual decline from 2002 to 2004 is also significant and is 25% per year.

[52] Importantly, these declines are much larger than what would be expected from the incidence curves for the asbestos related diseases.  For example, in the 2001-2004 period, the Nicholson counts decline by 2% per year.

[53] "Foreign Companies Report on 2004 New, Pending Claims In U.S. Litigation System" Mealey's International Asbestos Liability Report No. 9, February 23, 2005.

## Exhibit 13: New Claims Filed, 2001 - 2004

| Company | New Claims Filed | | | | Percentage Change in New Claims Filed From 2004 to Base Year | | |
|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2001 | 2002 | 2003 |
| Ameren Corporation | N/A | N/A | 178 | 266 | N/A | N/A | 49% |
| American Biltrite Inc. | 189 | 528 | N/A | N/A | N/A | N/A | N/A |
| American International Group | 739 | 959 | 669 | N/A | N/A | N/A | N/A |
| American Standard Companies | N/A | 45,404 | 26,295 | 12,059 | N/A | -73% | -54% |
| Ashland, Inc. | 52 | 45 | 66 | 29 | -44% | -36% | -56% |
| BNSF Railway Company | N/A | N/A | 1,023 | 712 | N/A | N/A | -30% |
| Congoleum[1] | 5,404 | 10,472 | 6,246 | N/A | N/A | N/A | N/A |
| Crane | 10,985 | 49,429 | 19,115 | 18,932 | 72% | -62% | -1% |
| Crown Cork and Seal | 53,000 | 36,000 | 36,000 | 13,000 | -75% | -64% | -64% |
| Cytec Industries Inc. | N/A | 17,511 | 7,648 | 4,532 | N/A | -74% | -41% |
| Entrx Corporation[2] | 725 | 590 | 351 | 265 | -63% | -55% | -25% |
| General Cable Corp.[3] | 3,463 | 850 | 4,321 | 591 | -83% | -30% | -86% |
| Georgia Pacific Corp. | 39,700 | 41,700 | 39,000 | 26,500 | -33% | -36% | -32% |
| Goodyear Tire & Rubber Co. | 17,100 | 38,900 | 26,700 | 12,700 | -26% | -67% | -52% |
| Hercules | N/A | 11,000 | 16,885 | 8,305 | N/A | -25% | -51% |
| Honeywell International | N/A | 10,000 | 25,765 | 10,504 | N/A | 5% | -59% |
| Jacuzzi Brands, Inc.[3] | N/A | 31,000 | 32,400 | 25,000 | N/A | -19% | -23% |
| Lincoln Electric | 900 | 1,187 | 1,711 | 312 | -65% | -74% | -82% |
| Owens-Illinois Group, Inc. | 31,000 | 21,000 | 26,000 | 15,000 | -52% | -29% | -42% |
| RPM International | 600 | 1,029 | 2,064 | 4,581 | 244% | 345% | 122% |
| Union Carbide Corp.[1,3] | 73,806 | 121,916 | 122,586 | 58,240 | -21% | -52% | -52% |
| Union Pacific | N/A | 547 | 1,612 | 474 | N/A | -13% | -71% |
| United States Steel Corp. | 1,679 | 842 | 2,856 | 1,464 | -13% | 74% | -49% |
| Viacom | 60,000 | 49,400 | 36,990 | 16,060 | -73% | -67% | -57% |
| York International Corporation | N/A | N/A | 144 | 227 | N/A | N/A | 58% |
| **Weighted Average of Change in New Claims Filed from 2004 to Base Year** | | | | | -43% | -51% | -46% |

Source: Company 10-Ks.

Notes:

[1] CCR member company.

[2] Formerly the Metalclad Corporation.

[3] Claims are for company subsidiary(ies).

Company data also provides a basis for expectations about T&N's dismissal rates in the 2001-2004 period. While the number of companies reporting information on actual settlement and dismissals is limited, Exhibit 14 shows that the rates are typically much

higher than the approximately 10% achieved by T&N and the CCR.  The median dismissal rate for this sample is 75%.[54]

| Company | Claims Dismissed | | | | Claims Settled | | | | Dismissal Rate | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2001 | 2002 | 2003 | 2004 | 2001 | 2002 | 2003 | 2004 |
| Ashland, Inc. | 1 | 37 | 21 | 24 | 2 | 15 | 7 | 7 | 33% | 71% | 75% | 77% |
| Ameren Corporation[1] | N/A | N/A | 67 | 100 | N/A | N/A | 31 | 57 | - | - | 68% | 64% |
| American Biltrite Inc. | 40 | 97 | N/A | N/A | 15 | 11 | N/A | N/A | 73% | 90% | - | - |
| American International Group[2] | 739 | 392 | 194 | 461 | 124 | 154 | 86 | 84 | 86% | 72% | 69% | 85% |
| American Standard Companies | N/A | 758 | 6,516 | 2,479 | N/A | 431 | 430 | 812 | - | 64% | 94% | 75% |
| BorgWarner, Inc. | N/A | N/A | 4,391 | 3,807 | N/A | N/A | 273 | 255 | - | - | - | 94% |
| Congoleum | 206 | 810 | 450 | N/A | 40 | 69 | 66 | N/A | 84% | 92% | 87% | - |
| Crane | 199 | 272 | 664 | 1,523 | 66 | 11,299 | 3,883 | 1,038 | 75% | 2% | 15% | 59% |
| Entrx Corporation[3] | 162 | 382 | 311 | 311 | 158 | 229 | 175 | 97 | 51% | 63% | 64% | 76% |
| Lincoln Electric | N/A | 1,616 | 1,406 | 850 | N/A | 99 | 49 | 57 | - | 94% | 97% | 94% |
| United States Steel Corp. | N/A | 2,662 | 2,038 | N/A | N/A | 1,135 | 83 | N/A | - | 70% | 96% | - |
| Median | 75% | | | | | | | | | | | |

Exhibit 54: Claims Dismissed and Settled, 2001-2004

Source: Company 10-Ks.

Notes:

[1] Claims are against Ameren and Ameren Companies UE, CIPS, Genco, CILCO.

[2] The data for 2004 is for the nine month period ending on September 30, 2004.

[3] Formerly the Metalclad Corporation.

In combination, the trust data and the solvent company data indicate that claims have declined substantially at the national and company-specific levels. Dr. Peterson has argued that T&N is similar to a number of company and trust benchmarks; indeed, he has not argued that it was unique. Therefore, we should expect that changes and performance levels observed for many companies since 2001 are conditions that might apply to T&N. As a result, there is very little support for Dr. Peterson's increasing scenario when actual (and observable) data from 2001 through 2004 so clearly indicates otherwise. In addition, Dr. Peterson's maintained assumption about 10% dismissal rates in his increasing scenario is substantially at variance with the observed performance of solvent companies.

---

[54] The median is a standard measure of central tendency.  It measures the value which is exceeded by 50% of the data in the sample.  Although this is not a random sample, it is the best available public information from the review of the 113 companies with 10K information on their asbestos claims.

Page 22