IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:  Federal Mogul Global, Inc., *et al.*,          (Bankruptcy Case No. 01-10578 (RTL))

      Debtors.

---

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS and ERIC D. GREEN, as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS, <br><br>     Plaintiffs, <br><br> v. <br><br> ASBESTOS PROPERTY DAMAGE COMMITTEE, <br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 05-59 JHR |

**PLAINTIFFS' PRE-HEARING MEMORANDUM SUPPORTING
THEIR ESTIMATE OF T&N LIMITED'S AGGREGATE
ASBESTOS PERSONAL INJURY AND WRONGFUL DEATH LIABILITIES**

CAMPBELL & LEVINE, LLC
Marla R. Eskin (No. 2989)
Kathleen J. Campbell (No. 4229)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, New York 10022
Telephone:  (212) 319-7125
Facsimile:  (212) 644-6755

-and-

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Edwin J. Harron (No. 3396)
Rolin Bissell (No. 4478)
Maribeth L. Minella (No. 4185)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Attorneys for Legal Representative for
Future Asbestos Claimants

CAPLIN & DRYSDALE, CHARTERED
Walter B. Slocombe
Nathan D. Finch
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

Attorneys for Official Committee of
Asbestos Claimants

Dated: May 31, 2005
        Wilmington, Delaware

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 2

I.   LEGAL ISSUES................................................................................................. 3

    A.   The Need for and Utility of Estimating Aggregate Asbestos Personal
        Injury Liabilities.................................................................................... 3

    B.   Guidelines for Estimation ..................................................................... 6

    C.   Claims Against T&N Based on Exposure and Injury in the United States
        Would Be Evaluated In the U.K. Insolvency Proceedings on the Basis of
        U.S. Tort System Standards of Liability and Settlement Values.......................... 10

II.  PLAINTIFFS' EVIDENCE ................................................................................ 13

    A.   Paul Hanly, Former U.S. National Trial Counsel to T&N and  Andrea
        Crichton, U.K. Asbestos Claims Manager for T&N............................................ 13

    B.   English Law Expert, Barbara Dohmann, Queen's Counsel................................... 16

    C.   Medical Expert, Laura Welch, M.D........................................................ 16

    D.   Plaintiffs' Claims Estimation Expert, Mark Peterson, Ph.D., JD ........................ 17

III. ESTIMATION METHODOLOGY ........................................................................ 18

    A.   Dr. Peterson's Approach...................................................................... 18

    B.   Dr. Cantor's Approach Is Flawed .......................................................... 23

CONCLUSION....................................................................................................... 28

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Bittner v. Borne Chem. Co., Inc.,*
  691 F.2d 134 (3d Cir. 1982) ........................................................................7, 8

*Brints Cotton Marketing, Inc. v. Langston,*
  737 F.2d 1338 (5th Cir. 1984) ........................................................................7

*Butner v. United States,*
  440 U.S. 48 (1979)........................................................................................9

*Grogan v. Garner,*
  498 U.S. 279, 283-84 & n.9 (1991) ................................................................9

*In re Armstrong World Indus., Inc.,*
  Case No. 00-04471, slip op. at 43-44, Docket No. 6256
  (Bankr. D. Del. December 19, 2003)......................................................4, 7, 18

*In re Armstrong World Indus., Inc.,*
  No. 00-4471, 2005 U.S. Dist. LEXIS 2810, at *1 (D. Del. Feb. 23, 2005) .....4, 7, 18

*In re Baldwin-United Corp.,*
  55 B.R. 885 (Bankr. S.D. Ohio 1985)..............................................................7

*In re Celotex Corp.,*
  204 B.R. 586, 595 (Bankr. M.D. Fla. 1996) ...............................................4, 18

*In re Continental Airlines,*
  981 F.2d 1450 (5th Cir. 1993) ........................................................................7

*In re Eagle-Picher Indus.,*
  189 B.R. 681 (Bankr. S.D. Ohio 1995)......................................................4, 10, 18

*In re Federal Press Co.,*
  116 B.R. 650 (Bankr. N.D. Ind. 1989)..............................................................7

*In re G-I Holdings, Inc.,* No.01-30135 and 01-38790, 2005 Bankr.
  LEXIS 525, at *112-17 (Bankr. D.N.J. February 1, 2005)..................................4

*In re Lane,*
  68 B.R. 609 (Bankr. D. Haw. 1986) ................................................................7

*In re MacDonald,*
  128 B.R. 161 (Bankr. W.D. Tex. 1991)............................................................7

WP3:1115692.5                                                 59066.1001

*In re UNR Indus., Inc.*,
   45 B.R. 322 (N.D. Ill. 1984) .................................................................................. 4

*Nat'l Group for Communications and Computers, Ltd. v. Lucent Tech. Int'l, Inc.*,
   331 F. Supp. 2d 290 (D.N.J. 2004) ...................................................................... 10

*Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*,
   C.A. No. 04-00905, slip op. at 10,
   Docket No. 106 (D. Del. March 31, 2005) ............................................................ 4

*Raleigh v. Illinois Dep't of Revenue*,
   530 U.S. 15 (2000)................................................................................................. 9

*Universe Sales Co. Ltd. v. Silver Castle, Ltd.*,
   182 F.3d 1036 (9th Cir. 1999) ............................................................................ 10

*Vanston Bondholders Protective Comm. v. Green*,
   329 U.S. 156 (1946).............................................................................................. 9

## STATUTES

11 U.S.C. § 502(c) ....................................................................................................... 6

28 U.S.C. § 1411.......................................................................................................... 3

11 U.S.C. § 1129(a)(7)............................................................................................. 2, 5

11 U.S.C. § 1129(b)(2) ............................................................................................... 5

## RULES

Fed. R. Bankr. P. 9017............................................................................................... 10

Fed. R. Civ. P. 44.1 .................................................................................................... 10

## OTHER AUTHORITIES

4 COLLIER ON BANKRUPTCY ¶ 502.03[1][a]
   (15th ed. rev. 2004)............................................................................................... 9

Section 11(2), Private International Law (Miscellaneous Provisions) Act 1995;
   the Act came into force on 1 May 1996................................................................ 11

WP3:1115692.5
59066.1001

This pre-hearing memorandum is submitted on behalf of the Official Committee of Asbestos Claimants (the "ACC") and Eric D. Green, the legal representative for future asbestos-related personal injury and wrongful death claimants (the "Futures Representative" and together, the "Plaintiffs"), in anticipation of the Asbestos Claims Estimation Hearing (the "Hearing") scheduled to commence June 14, 2005. (*See* Case Management Order [D.I. 17].) This memorandum presents a preview of the factual and legal issues relevant to estimating the aggregate value of asbestos personal injury and wrongful death claims[1] brought both in the United States and in the United Kingdom against T&N Limited, a U.K. corporation, and its non-United States subsidiary companies (collectively, "T&N"[2]), and of the evidence Plaintiffs will present at the hearing.

This memorandum has four parts:

- an introduction;

- a discussion of three important legal issues presented in this case;

- a listing of witnesses Plaintiffs intend to present and a brief summary of their testimony; and

- an explanation of the basic principles of the estimation methodology used by Plaintiffs' estimation expert, and of the flaws in the methodology used by the expert proffered by the Defendant Property Damage Committee (the "PD Committee").

---

[1] All subsequent references to "asbestos personal injury claims" include death claims as well.

[2] The ACC's expert, Dr. Mark Peterson, analyzed the Asbestos Personal Injury Liabilities for T&N Limited and its United Kingdom subsidiaries. Dr. Peterson's analysis does not consider any Asbestos Personal Injury Liability for T&N's United States' subsidiaries, Gasket Holdings, Inc. ("GHI") or Ferodo America, Inc. ("Ferodo").

## INTRODUCTION

As Plaintiffs explained in their Report to the Court dated February 24, 2005 (D.I. 8), this estimation proceeding will serve two purposes: (1) it will enable this Court to resolve for U.S. bankruptcy purposes any objections to confirmation of the Third Amended Joint Plan of Reorganization (the "Plan") which are based in any way on an aggregate estimate of T&N's liability to pending and future U.S. and U.K. asbestos personal injury claimants; and (2) it will provide Mr. Justice David Richards ("Richards J.") of the English High Court with a fully developed legal and factual record that attempts to answer the questions raised in his communication to Bankruptcy Judge Raymond T. Lyons of December 22, 2004 and which could assist him in his own resolution of similar issues as they arise in the above-captioned debtors (the "Debtors") insolvency proceedings currently pending in the United Kingdom (the "U.K. Insolvency Proceedings").

As we show below, issues relating to (1) what methodology should be followed in conducting an estimation of T&N's liabilities to pending and future U.S. and U.K. asbestos personal injury claimants; (2) what constitutes a "valid" or "compensable" claim for purposes of U.S. and U.K. law; and (3) what aggregate value is to be placed on compensable claims, are issues which must be resolved to allow this Court to determine whether the proposed Plan is fair to all creditor groups and whether it satisfies the Bankruptcy Code's "best interest of creditors" test, 11 U.S.C. § 1129(a)(7). Obviously, the result here is not binding upon Richards J. However, to the extent that this Court's opinion and factual findings relating to the resolution of these issues for U.S. bankruptcy law purposes provide Richards J. with a better understanding of the factual and legal bases for the estimation result here, Plaintiffs believe that this Court's efforts could speed the resolution of the parallel administration proceedings of T&N Limited and its UK subsidiaries and avoid unnecessarily duplicative procedures in the United Kingdom.

## I. LEGAL ISSUES

This estimation hearing will raise three broad legal issues: *First*, why is estimation necessary? *Second*, what is the appropriate methodology to use in estimating present and future asbestos personal injury liability? *Third*, how would U.S.-based claims against T&N be valued in the U.K. Insolvency Proceedings?

### A. The Need for and Utility of Estimating Aggregate Asbestos Personal Injury Liabilities

A central reason for T&N's bankruptcy (and its corporate parent's, Federal Mogul's bankruptcy), is the mounting and ultimately overwhelming burden of asbestos personal injury claims against them that arise out of their manufacture, distribution, and use of asbestos-containing products over many years to which untold thousands of workers were exposed, in the United States, the United Kingdom, and elsewhere. Some 134,000 asbestos personal injury claims against T&N have been filed in the United States that remain unresolved; an additional 656 claims remain pending against T&N in the United Kingdom. As the evidence will show, tens of thousands of additional persons claiming injury from T&N's asbestos-containing products will file claims over the coming years.

If this Court were to attempt to liquidate every pending asbestos personal injury claim pursuant to 28 U.S.C. § 1411's preservation of the right to a trial by jury for personal injury claims, it would be forced to conduct thousands of jury trials. That task would take several decades – or longer – to accomplish. Moreover, it is obviously impossible to individually liquidate the vast stream of future claims that have not yet been presented because future injuries have not yet manifested.

Instead, this Court is called upon to estimate T&N's aggregate asbestos personal injury liability, as other courts in this and other circuits have done. *See, e.g., Owens Corning v.*

3

*Credit Suisse First Boston (In re Owens Corning)*, C.A. No. 04-00905, slip op. at 10, Docket No. 106 (D. Del. March 31, 2005); *In re G-I Holdings, Inc.*, No.01-30135 and 01-38790, 2005 Bankr. LEXIS 525, at *112-17 (Bankr. D.N.J. February 1, 2005) (ordering a two-stage hearing to estimate the debtors' asbestos liability in the aggregate); *In re Armstrong World Indus., Inc.*, Case No. 00-04471, slip op. at 43-44, Docket No. 6256 (Bankr. D. Del. December 19, 2003) (performing an estimation analysis for purposes of determining whether plan was fair to unsecured creditors as compared to asbestos personal injury claimants), *rev'd on other grounds*, No. 00-4471, 2005 U.S. Dist. LEXIS 2810, at *1 (D. Del. Feb. 23, 2005).[3]

This need for an estimation arises here because in order for the Debtors to emerge from bankruptcy and for creditors, both asbestos personal injury claimants and others, to begin to be paid, it is necessary to establish an estimated aggregate value of the present and future asbestos personal injury claims. More specifically, an estimate of T&N's aggregate liability for present and future asbestos personal injury liability claims is needed for at least three reasons if this case is to move forward to Plan Confirmation:

*First*, and most important, an estimate is necessary to provide a basis for measuring the relative amounts of asbestos personal injury claims on the one hand and, on the other, claims lodged by other groups of unsecured creditors, including those asserting asbestos-related property damage claims and other unsecured commercial claims.

The PD Committee has objected to the Plan, primarily on the assertion that the Plan allocates too much value to holders of claims against T&N for asbestos personal injury and

---

[3] The approach taken by the courts of this Circuit is consistent with the approach taken by the courts in other circuits. *See, e.g., In re Babcock & Wilcox Co.*, Case No. 00-10992, slip op. 48, Docket No. 6133 (Bankr. E.D. La. November 9, 2004) (estimating debtors' asbestos personal injury liability in context of confirming plan of reorganization); *In re Celotex Corp.*, 204 B.R. 586, 595 (Bankr. M.D. Fla. 1996) (estimating debtors' asbestos personal injury liability for voting purposes); *In re Eagle-Picher Indus.*, 189 B.R. 681, 684-86 (Bankr. S.D. Ohio 1995); *In re UNR Indus., Inc.*, 45 B.R. 322, 326 (N.D. Ill. 1984).

4

not enough value to holders of claims against T&N for property damage. (Objection of the Official Committee of Asbestos Property Damage Claimants to the Third Amended Joint Plan of Reorganization at ¶ 57.)[4] Estimation of asbestos personal injury claims will provide the basis to resolve this objection and to establish that the relative shares of the Debtors' assets to be allocated among the various creditor groups under the Plan do not discriminate unfairly as between the asbestos personal injury creditors and T&N's other general unsecured creditors.[5] *See* 11 U.S.C. § 1129(b)(2) (confirmation "cram down" requirement that a plan not discriminate unfairly with respect to each impaired class of claims or interests that has not accepted the plan).

  *Second*, an estimate of T&N's present and future asbestos personal injury liability is required to determine whether the Plan satisfies the "best interest of creditors" test. The best interest test requires that a plan of reorganization provides an objecting creditor at least as much value as he would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7). Without an estimate of T&N's aggregate liability to holders of asbestos personal injury claims, it is impossible to determine what portion of T&N's assets would be available in a liquidation to other creditors, including any objecting creditor.

  *Third,* in this case a special requirement for an estimate arises from the pendency of the U.K. Insolvency Proceedings. As a practical matter, the results of a chapter 7 liquidation of T&N in this proceeding would be determined by the outcome of the U.K. Insolvency Proceedings, because a substantial part of T&N's assets are located in the United Kingdom and would be liquidated and allocated among creditors in accordance with U.K. law as part of the U.K. insolvency process. Thus, application of the "best interest" test for U.S. law purposes

---

[4]  The PD Committee's objection to the Plan was filed with the bankruptcy court on November 4, 2004.

[5]  The claims of the commercial creditors are in general valued at their face amounts. Separate proceedings are underway that will result in a value being assigned to asbestos property damage claims.

    

requires this Court to estimate the amount at which asbestos personal injury claims against T&N would be valued in the U.K. Insolvency Proceedings. The evidence and legal analysis that Plaintiffs will present will show that tort claims (including asbestos personal injury claims) arising in the United States would be expected to be valued in the U.K. Insolvency Proceedings according to U.S. standards applicable to substantive issues of liability and damages.[6]

### B.    Guidelines for Estimation

The Bankruptcy Code provides a procedure for this circumstance where fixing or liquidating claims would unduly delay the administration of a chapter 11 case. Section 502(c) of the Bankruptcy Code empowers, and, indeed, requires, the Court here to estimate the asbestos personal injury claims in the aggregate. *See* 11 U.S.C. § 502(c).

A section 502(c) estimation is not a finding of the exact amount of any claim, nor is it a determination that any particular individual will receive a distribution on that claim, nor is it even a decision as to the standards individual claimants must meet in order to receive any distribution. That will be the function of the section 524(g) trust that – all parties agree – will be established as part of the ultimate plan of reorganization to receive, evaluate, and resolve individual claims now and in the future on the basis of procedures to be approved by the Court.

Although the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure are silent as to how a court should go about estimation, case law makes it clear that a court has broad discretion to conduct an estimation using the method befitting the circumstances, subject

---

[6] While Richards J., the judge presiding over the U.K. Insolvency Proceedings has, naturally, made clear that he has ultimate authority over any determinations in those proceedings, he has also indicated that he will take the findings of the U.S. courts into account in his decision. In particular, he said, "I have no doubt at all that the decision of the [U.S.] court following that Estimation Hearing will be a very important decision so far as this Court is concerned, and it will be very carefully examined if and when this Court has to grapple with the issues of English law which arise in relation to the asbestos claims." (May 13, 2005 U.K. Hr'g Tr. at 51.) Accordingly, another function of the estimation this Court will make, and of the record developed in the Hearing, will be to assist the English judge to better understand the basis for the estimation and the proceedings before this Court as they may be relevant to his own determinations.

6

only to the constraint that, in adopting its methodology, the court is bound by the legal rules

which govern the ultimate value of a claim. *See Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134,

135 (3d Cir. 1982) (stating that Congress intended that estimation procedures would be

undertaken using a method best suited to the particular contingencies at issue); *Brints Cotton

Marketing, Inc. v. Langston*, 737 F.2d 1338, 1341 (5th Cir. 1984) (same). *See also In re

MacDonald*, 128 B.R. 161, 165 (Bankr. W.D. Tex. 1991) (recognizing that flexibility must be

the watchword in bankruptcy cases, the Fifth Circuit stated that, in the estimation process the

bankruptcy court should use whatever method is best suited to the circumstances); *In re Federal

Press Co.,* 116 B.R. 650, 663 (Bankr. N.D. Ind. 1989); *In re Baldwin-United Corp.*, 55 B.R. 885,

898 (Bankr. S.D. Ohio 1985); *In re Lane*, 68 B.R. 609, 612 (Bankr. D. Haw. 1986).[7]

Estimation, as its name connotes, is not an exact science. *See Owens Corning v.

Credit Suisse First Boston (In re Owens Corning),* C.A. No. 04-00905, slip op. 9-10, Docket No.

106 (D. Del. March 31, 2005) (court preferred "to avoid mathematical calculations since

mathematical precision cannot be achieved in the prediction being undertaken, it is important

that we not pretend to have achieved mathematical accuracy"); *In re Armstrong World Indus.,

Inc.,* Case No. 00-04471, slip op. 45, Docket No. 6256 (Bankr. D. Del. December 19, 2003)

(estimating future claims is more an imprecise art than a science and the best anyone can do is

try to find an estimate that is not unreasonable); *In re Federal Press Co.*, 116 B.R. at 653

(finding that the "estimation of a claim within the meaning of 28 U.S.C. §§ 157 and 502(c) does

not require that a bankruptcy judge be 'clairvoyant'"). The objective is to assess the "probable

value" of claims. *Federal Press, supra*; *see also Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134,

---

[7] It is a measure of the flexibility afforded a court performing an estimation under section 502(c) that any alleged errors in an estimate in the methodology used to estimate a claim will generally be reviewed for an abuse of discretion only. *See In re Continental Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993).

135 (3d Cir. 1982) (estimation requires only "sufficient evidence on which to base a reasonable estimate").

Plaintiffs believe that the best, and indeed the only, valid basis from which to value the 130,000 unliquidated asbestos personal injury and death claims that were pending against T&N in the United States on the bankruptcy petition date, and the tens of thousands of claims that will be filed in the future, is by reference to the claims compensation criteria and values established by T&N's pre-petition resolution of over 250,000 similar individual asbestos personal injury and death claims, after taking into account both the historical trends in claims filing rates and claim values as well as events that were reasonably foreseeable as of the bankruptcy petition date. The 250,000 resolved claims were brought against T&N in all 50 states and various territories of the United States and in the United Kingdom, were litigated in both U.S. (state and federal) and U.K. courts, and were resolved either through trials or at values that the company and the claimants agreed were acceptable for a consensual resolution. The best evidence of the value for pending and future asbestos personal injury claims brought against T&N in the United States is by reference to the claims payment criteria and values estimated by T&N's claims history in the United States and, similarly, the best evidence of the value of pending and future asbestos personal injury claims brought against T&N in the United Kingdom is by reference to the claims payment criteria and values established by T&N's claims history in the United Kingdom.

Based upon their expert witness reports and deposition testimony, both the expert for the ACC, Dr. Mark Peterson, and the expert for the PD Committee, Dr. Robin Cantor, agree with this general proposition. Both experts hold the view that T&N's past claims resolution history is the proper evidentiary basis from which to begin in order to estimate T&N's liability

8

for pending and future asbestos personal injury claims. To be sure, the two experts differ greatly

on the number of projected future claims, the values that would be paid to compensable claims,

as well as the impact on the number of future T&N claims and future claim values after the

dissolution of the Center for Claims Resolution ("CCR").[8] However, in general terms they

followed the same basic methodology by estimating T&N's liability to pending and future

asbestos claimants based on extrapolation from T&N's past claims history.

      The fundamental principle is that T&N's extensive history of resolving similar

asbestos personal injury claims provides a sound basis from which to estimate its future liability

for such claims, taking into account foreseeable future trends. This approach reflects the

governing legal standard enunciated by the United States Supreme Court – namely, that the

substantive rights of creditors in bankruptcy are determined by state law. *See Raleigh v. Illinois*

*Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Grogan v. Garner*, 498 U.S. 279, 283-84 & n.9

(1991) ("We hold that bankruptcy does not alter the burden imposed by substantive state law.");

*Butner v. United States*, 440 U.S. 48, 55 (1979); *Vanston Bondholders Protective Comm. v.*

*Green*, 329 U.S. 156, 161 (1946); *see also* 4 COLLIER ON BANKRUPTCY ¶ 502.03[1][a] (15th ed.

rev. 2004) ("In determining the amount of a claim, the court is guided by otherwise applicable

state or federal law…"). It follows that estimation here must seek to measure the present and

future asbestos personal injury liabilities T&N would face under the tort laws of the various

jurisdictions as they actually exist, as if T&N were not in bankruptcy, and as if asbestos claims

against T&N were still in the U.S. and the U.K. tort systems.[9]

---

[8] The CCR and its predecessor, the Asbestos Claims Facility ("ACF"), were groups of asbestos product manufacturers set up to handle claims against their members on a group basis, sharing costs of defense and settlement, reaching common settlements, and engaging in joint claims handling operations.

[9] The estimate is as of the date the debtor commenced bankruptcy proceedings. *See Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*, C.A. No. 04-00905, slip op. 3, Docket No. 106 (D. Del. March 31,

**C.    Claims Against T&N Based on Exposure and Injury in the United States Would Be Evaluated In the U.K. Insolvency Proceedings on the Basis of U.S. Tort System Standards of Liability and Settlement Values**

As discussed above, estimation in this case must include a determination of how the U.S.-based claims would be valued in the U.K. Insolvency Proceedings that, in turn, requires an analysis of relevant English law on the treatment of tort claims arising outside the United Kingdom. A determination by this Court of the values that would be assigned in England to the U.S.-based claims is necessary because a substantial part of T&N's assets are in the United Kingdom. In a liquidation under chapter 7, the only value available to the asbestos personal injury and other U.S. claimants against T&N would, as a practical matter, be whatever they were able to obtain through the U.K. Insolvency Proceedings.

Pursuant to Fed. R. Bankr. P. 9017, Fed. R. Civ. P. 44.1 applies to cases that involve a determination of foreign law. That rule states that "the court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *See Nat'l Group for Communications and Computers, Ltd. v. Lucent Tech. Int'l, Inc.*, 331 F. Supp. 2d. 290, 294 (D.N.J. 2004) (stating that courts may rely upon: submissions from the parties, expert witnesses, and material that could be inadmissible at trial when determining foreign law); *Universe Sales Co. Ltd. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir. 1999) ("Pursuant to Rule 44.1, courts may ascertain foreign law through numerous means, including expert testimony accompanied by extracts from foreign legal materials, which has been and will likely continue to be the basic mode for proving foreign law.").

---

2005) ("Claims are to be valued as of the petition date."); *In re Eagle Picher Indus., Inc.*, 189 B.R. 681, 690 (Bankr. S.D. Ohio 1995) (same).

59066.1001

To value unliquidated tort claims, such as the asbestos personal injury claims in the present cases, the U.K. Administrators of T&N must determine, as a matter of English law (1) that the claim, if proven, would result in the defendants' liability, and (2) the amounts that would be awarded for any meritorious claims (*See* "Issues of English Law and Procedure Governing the Assessment of Asbestos Liabilities in Insolvency Proceedings") (Transmitted to the Bankruptcy Court by Mr. Justice Richards, Dec. 22, 2004) at ¶ 3.2.7 and ¶ 3.3.12).

Plaintiffs will present testimony, and a detailed written legal analysis by Barbara Dohmann, QC, showing that in the U.K. Insolvency Proceedings U.S. law would be applied to substantive issues of liability and damages. Her conclusions, in summary fashion, are these:

Liability. Under English insolvency law (analogous to the rule under bankruptcy law in the United States) the validity of a claim asserted in an insolvency proceeding is determined in accordance with applicable non-insolvency law. (*See id.* at ¶ 3.4.3.) In the case of conduct occurring in a foreign country, there is a choice of law question as to what country's law determines whether the conduct gives rise to liability. Under a 1995 statute that sets present-day English choice-of-law principles regarding the liability for alleged tortious conduct overseas, the law of the country where the individual was when he sustained the injury will generally apply in an English court.[10]

There is some question whether the statute would apply to the tort claims at issue here, because, while the injuries did not manifest themselves until after the effective date of the statute (May 1, 1996), the exposure to T&N's asbestos-containing products occurred before that date. If the 1995 Act does not apply, the liability test will be determined by the common law rule of "double actionability." That rule holds that an event occurring in a foreign country will

---

[10]  Section 11(2), Private International Law (Miscellaneous Provisions) Act 1995(the "1995 Act"); the Act came into force on 1 May 1996.

give rise to liability under English law if the conduct underlying the claim was actionable under *both* English law and the law of the other country. In the case of T&N's U.S.-based asbestos personal injury claims, this common law test, if applicable, would be met because, as will be shown by the testimony, the T&N conduct at issue would generally give rise to liability under English tort law, just as it does under U.S. law.

<ins>Damages.</ins> From the English law point of view, the question regarding whether U.S. or English law would apply to determine the monetary value of U.S.-based asbestos personal injury claims depends upon whether the question is considered one of substance, in which case U.S. law would apply, or one of procedure, in which case English law would apply under the English general doctrine that forum law applies as to procedure even when foreign law applies as to substance. As Ms. Dohmann will show in her report and testimony, in the recent decision of the English Court of Appeal in *Harding v. Wealands* [2004] EWCA Civ. 1735, the Court in effect held, in a case decided under the 1995 Act, that the amount of damages is a substantive question governed by the law of the jurisdiction where the injury occurred. [11] This holding should not, as she will explain, remain limited to cases governed by the 1995 Act, but should become broader in its application insofar as it explicitly departed from the prior common law rule that the amount (or "quantum") of damages is a procedural matter and therefore governed by forum (i.e., English) law. If *Harding* is upheld and expanded by the House of Lords (which should hear the case later this year), U.S. law should apply in the U.K. Insolvency Proceedings to determine the amount of damages in respect of the U.S.-based asbestos personal injury claims.

---

[11] The specific issue addressed in *Harding* was the damages that could be awarded in an English trial asserting liability from an automobile accident that occurred in New South Wales, Australia. The law of New South Wales imposed a statutory cap and other limits on damages; English law imposed no such limits. The court held, by a 2-to-1 majority, that the limits set by the law of New South Wales would be applied.

12

As indicated above, the Court of Appeal's ruling in *Harding* is now on appeal to the House of Lords (the ultimate appellate court in Britain, and in that sense the British equivalent of the United States Supreme Court). As Ms. Dohmann will testify, in her opinion the House of Lords is likely to affirm the *Harding* decision. Ms. Dohmann will also testify that, if the House of Lords limits its ruling in *Harding* to 1995 Act cases, the House of Lords is likely to adopt a similar ruling on cases not governed by the 1995 Act when the question is presented by the T&N case itself.

Accordingly, this Court should find that U.S. claims against T&N would be valued for U.K. insolvency purposes under the law of the United States jurisdictions where the injuries occurred, not under English law, regardless of whether it is regarded as governed by the choice of law rules set forth in the 1995 statute or by common law principles.

## II. PLAINTIFFS' EVIDENCE

At the hearing, Plaintiffs will present evidence that a reasonable estimate of the asbestos personal injury claims (both present and future) against T&N, as of October 2001, the date of its chapter 11 filing, is within the range of $8.2 to $11.0 billion for claims brought in the United States and an additional £229 million (approximately $400 million) for claims brought in the United Kingdom. This range estimates the present value of the amounts T&N would have paid over the next four decades to resolve asbestos personal injury claims in the U.S. and U.K. tort systems if it had not filed for bankruptcy. In their case-in-chief, Plaintiffs will present testimony from the following witnesses:

### A.    Paul Hanly, Former U.S. National Trial Counsel to T&N and Andrea Crichton, U.K. Asbestos Claims Manager for T&N

Plaintiffs will introduce the testimony of Paul Hanly, T&N's former lead trial counsel in the United States, and Andrea Crichton, T&N's U.K. asbestos claims manager, to

13

describe the nature of the causes of action for the claims brought by asbestos personal injury

claimants against T&N and T&N's experience in resolving those claims in the United States and

in the United Kingdom, respectively. Mr. Hanly and Ms. Crichton had lead responsibility in

connection with the efforts of T&N to defend and resolve asbestos personal injury claims over

the last two decades. Consequently, they have extensive personal knowledge of T&N's claims

history and its procedures and strategies for resolving claims. Together, their testimony will

explain the nature of the claims filed against T&N in the United States and in the United

Kingdom, the factual and legal bases for its liability in the respective jurisdictions, the strategies

T&N employed in defending itself and in resolving claims—both as a "stand-alone" defendant

and as a member of the ACF and CCR—evidence of the proof a claimant was required to

present in order to be compensated, and the values T&N paid in settlement. In broad outline,

their testimony will show that although there are obvious differences in the U.S. and U.K.

judicial systems, the bases of T&N's liability for asbestos personal injury claims asserted by the

vast majority of plaintiffs against T&N were the same in both the United States and the United

Kingdom: namely, that T&N was responsible for asbestos-related injuries caused by exposure to

its asbestos-containing products, or for injuries caused by exposure to the asbestos fiber it

supplied to its subsidiaries.

       <u>Paul Hanly</u>. Mr. Hanly served as National Trial Counsel for T&N from

the early 1980s until it filed for bankruptcy protection in October 2001. In this capacity, he

supervised and conducted T& N's defense of asbestos litigation throughout the United States in

the years preceding T&N's bankruptcy. He will describe T&N's history of litigating and

resolving claims in the U.S. tort system. He will describe the products and activities that gave

rise to T&N's liability for asbestos personal injury claims and the vulnerabilities created for it by

14

documents in its files that showed its early knowledge of the dangers of its asbestos-containing products. He will explain, as well as other factors affecting T&N's claims handling procedures and policies, that before settling a U.S.-based claim, T&N required sufficient evidence from a plaintiff of exposure to asbestos and of asbestos-related disease such that the plaintiff's evidence was likely sufficient to get his case to the trier of fact. T&N's basic approach was to settle all such cases to avoid the risks of going to trial. He will recount T&N's experience in the courts, its record of successes and failures, trends in claims activity, and the strategies T&N used to defend itself.

Mr. Hanly will explain why T&N entered, and remained in, the ACF and the CCR, and the benefits it believed it gained by doing so, as well as its experience as a "stand-alone" defendant. Specifically, he will testify that T&N's counsel and management believed that, under these sharing arrangements, T&N paid far less in the aggregate than it would have paid if it had handled claims on an entirely separate basis. He will also explain the reasons that T&N eventually withdrew from CCR and its experience after that withdrawal, when it experienced a significant increase in the number of asbestos personal injury claims asserted against it and a sharp rise in mesothelioma settlement costs, which ultimately caused T&N (along with the Federal Mogul group of companies) to file voluntary petitions for relief under the Bankruptcy Code.

Ms. Andrea Crichton. For more than 15 years, Ms. Crichton assisted T&N's Group Solicitor (equivalent to its general counsel) with all asbestos-related litigation in the United Kingdom. Ms. Crichton is familiar with T&N's litigation history in the United Kingdom and she is also knowledgeable about T&N's history in the U.S. tort system. Ms. Crichton's testimony will describe the nature of the allegations made in the asbestos personal

15

injury claims compensated by T&N in the United Kingdom as well T&N's history of handling

asbestos personal injury claims, both in formal court filings and informal submissions, within the

U.K. tort system. Ms. Crichton's testimony will show that, much like cases in the United States,

the vast majority of asbestos personal injury claims against T&N lodged in the United Kingdom

were settled. Ms. Crichton will explain that, like U.S. residents, U.K. claimants had to

demonstrate exposure to a T&N asbestos-containing product and present evidence of a

compensable asbestos-related disease in order to be entitled to compensation from T&N.

### B.    English Law Expert, Barbara Dohmann, Queen's Counsel

Plaintiffs will present the testimony of an experienced English barrister, Barbara

Dohmann, Q.C., to establish the choice of law for liability and for damages that would apply if

T&N's asbestos personal injury liability for claims based on events in the United States were

considered by a U.K. Court. She will explain that in her opinion, under English law, U.S.

principles for both liability and amount of damages would be applied to such claims. In

particular, she will describe the basic elements for a defendant to be liable under English law for

injuries allegedly caused by its asbestos-containing products. It will be shown that these are

comparable to the elements under American law–namely, evidence of exposure to the

defendant's products and evidence of diagnosis of asbestos related disease. Her testimony will

be supported by the detailed written legal analysis contained in her expert report, which will be

introduced in evidence.

### C.    Medical Expert, Laura Welch, M.D.

Plaintiffs will present expert testimony of a medical doctor, Laura Welch, M.D.,

to explain and support the testimony of Mr. Hanly and Ms. Crichton, and the assumptions

regarding medical issues that have been used by Plaintiffs' valuation expert. Dr. Welch is a

physician with board certification in both occupational environmental medicine and internal

medicine, and experience teaching at distinguished medical schools. She has extensive clinical experience in the diagnosis and treatment of asbestos-related diseases, and in the design of programs for those purposes. Dr. Welch's testimony will address, *inter alia*, the various diseases caused by exposure to asbestos, the standards for diagnosis of those diseases, and the medical harms suffered by the victims of such diseases, both malignant and non-malignant, and she will testify that significant asbestos-related diseases can be present in patients even where standard lung function tests or x-rays appear to be normal.

### D.    Plaintiffs' Claims Estimation Expert, Mark Peterson, Ph.D., JD

The Plaintiffs' valuation expert is Dr. Mark Peterson, a lawyer and behavioral scientist by training who is a nationally recognized expert on the valuation of asbestos personal injury liabilities. Dr. Peterson has experience as an expert witness in bankruptcy estimation proceedings and has projected asbestos personal injury liabilities in other contexts, including for trusts, defendants, insurers, and courts. Dr. Peterson will present the bases for his conclusion that the present value of T&N's U.S. claims is within the range of $8.2 to $11.0 billion, and that the liability for U.K. claims is an additional £229 million (approximately $400 million). Dr. Peterson may also testify as a rebuttal witness to the flaws in the methodology used, and results reached, by Dr. Robin Cantor, who has submitted an estimation report on behalf of the PD Committee.

17

## III. ESTIMATION METHODOLOGY

### A.    Dr. Peterson's Approach

The methodology that underlies the estimate that Dr. Peterson will present is one that is well developed and that has been applied and presented to courts in numerous legal proceedings involving debtors that, like T&N, faced many tens of thousands of claims for personal injury.[12] This methodology utilizes data drawn from the T&N's pre-petition claims experience (both within the CCR and afterwards as a "stand-alone" defendant), epidemiological projections of the incidence of asbestos-related cancers, and foreseeable trends and patterns in claiming behavior and settlement costs. This methodology is not a mechanical extrapolation of past history. The historical data provide a starting point, but adjustments are made for changes that can reasonably be expected in the future, and for anomalies in the historical patterns.

Although the details in estimating T&N's aggregate asbestos personal injury liability are complicated, the propositions underlying the estimate are basic: T&N's aggregate asbestos personal injury liability is the sum of (a) the estimated liability for claims pending but unresolved on the Petition Date plus (b) the present value of the estimated liability for claims that can be expected to be filed in the years thereafter.

As of the bankruptcy petition date, there were approximately 134,000 claims pending against T&N that had not been resolved by settlement or judgment. Dr. Peterson started

---

[12] *See, e.g., Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*, C.A. No. 04-00905, slip op., Docket No. 106 (D. Del. March 31, 2005); *In re Babcock & Wilcox Co.*, Case No. 00-10992, slip op. 48, Docket No. 6133 (Bankr. E.D. La. November 9, 2004) (estimating the debtors' asbestos personal injury liability in context of confirming plan of reorganization); *In re Armstrong World Indus., Inc.,* Case No. 00-04471, slip op. 72-74, Docket No. 6256 (Bankr. D. Del. December 19, 2003) (performing an estimation analysis for purposes of determining whether plan was fair to unsecured creditors as compared to asbestos personal injury claimants), *rev'd on other grounds In re Armstrong World Indus., Inc.,* No. 00-4471, 2005 U.S. Dist. LEXIS 2810, at *1 (D. Del. Feb. 23, 2005); *In re Celotex Corp.*, 204 B.R. 586, 595 (Bankr. M.D. Fla. 1996) (estimating debtors' asbestos personal injury liability for voting purposes); *In re Eagle-Picher Indus.*, 189 B.R. 681, 684-86 (Bankr. S.D. Ohio 1995) (performing estimation analysis to determine proper allocation of plan funding assets as between general unsecured creditors and a personal injury trust).

his analysis by examining T&N's database of pending claims[13] and grouping the claims into

categories of alleged disease (mesothelioma, lung cancer, other cancer, and non-malignant

disease). (Dr. Peterson's November 2004 Report at 3.) Next, he compared this universe of

pending claims to records of claims that T&N has previously resolved by settlement or court

judgment, taking into account those resolved without payment as a result of rejection,

withdrawal, or abandonment. (Dr. Peterson's November 2004 Report at 18-19.)

Using these data, he determined the value of pending claims. As he does in every

case, Dr. Peterson started with the historical settlement averages for T&N in the most recent

years before it filed for bankruptcy protection, and analyzed the trends in those averages and the

factors that were driving these trends. Using this information he estimated what the average cost

to T&N would be for it to resolve each asbestos claim had it not filed for bankruptcy protection.

In making this determination, Dr. Peterson based his valuation on empirical data about T&N's

past settlement payments and projections for increasing settlement payments (including the fact

that T&N's own mesothelioma settlement averages tripled in the three years preceding the

commencement of these cases), the factors driving those trends, T&N's loss of protection as a

member of CCR, the publication of a book detailing T&N's adverse corporate history with

asbestos, the effect of the bankruptcies of other major defendants on T&N's liability, and the

historic ratios of mesothelioma settlement averages to other types of disease claims across

multiple defendants. (Dr. Peterson's November Report at 12.)

Using all of this information, Dr. Peterson derived a series of estimates of the

average claims resolution cost for each type of claim, which takes into account both the T&N's

---

[13] T&N, like other asbestos defendants, kept computerized databases of their resolved and pending claims, which show characteristics like the nature of the disease claimed, dates of asbestos exposure, and amount of settlement or judgment. CCR maintained similar databases for claims against T&N during the period CCR operated.

historical rate of claims rejection and amounts paid to resolve similar claims.[14] He then took the number of pending claims for each category and multiplied the resulting numbers by the average resolution amount for each category. The product is the total estimated liability for present claims, here, $1.4 billion. (Dr. Peterson's November 2004 Report at 22.) Dr. Peterson followed a similar approach to value the 656 claims pending in the United Kingdom, reaching a result of £14 million (approximately $25 million).

In estimating the value of future claims, Dr. Peterson started by projecting the number of likely future cancer claims, based on scientific and well-recognized epidemiological projections of the incidence of asbestos-related cancers (mesothelioma, lung cancer, and other cancers) and the trends in the claiming rate for such cancers against T&N and other defendants. The starting point is the seminal 1982 study (the "Nicholson Study") conducted by researchers at Mt. Sinai Hospital that projected the number of mesothelioma and other types of cancer deaths attributable to asbestos exposure from the years 1982 through 2029. These mesothelioma projections have proven to be remarkably accurate when compared to the actual incidence of mesothelioma death in the United States as calculated by the National Cancer Institute's SEER program.

Once the number of asbestos-related cancers is determined using the epidemiological projections, it is then possible to ascertain the percentage of those people who actually filed (or will file) a claim against T&N (for whatever reason) during the year in question. This percentage, called the "claiming rate" or "propensity to sue" is calculated by dividing the number of people who actually filed a claim against T&N for asbestos-related

---

[14] Dr. Peterson's preferred forecast uses the average values that are set forth in the 11 U.S.C. § 524(g) trust's distribution procedures (the "TDP") in the Plan. These values were derived from T&N's own past claims resolution history and are intended to be the best and most current estimate of the settlement values for each type of disease claim had T&N not filed for bankruptcy.

20

cancer in a particular year by the number of asbestos-related cancer deaths predicted by the epidemiological model for that same year. For example, if in the year 2000 there were 2,800 mesothelioma deaths in the United States, and T&N received 1,400 mesothelioma claims in that year, the "claiming rate" or "propensity to sue" against T&N for mesothelioma for that year was 50 percent.

Thus, to determine the likely number of asbestos-related cancer claims that will be filed against T&N in years beyond October 2001, Dr. Peterson takes the projected number of asbestos-related cancer deaths in each future year and multiplies that by an assumed "claiming rate" based upon the historical claiming rate against T&N in the two years leading up to the date T&N commenced its bankruptcy proceedings. Dr. Peterson calculated the historical propensity to sue T&N in the two years immediately prior to its bankruptcy petition (the "calibration period") and then made two projections of future cancer claims based two alternate assumptions: – a "flat propensity" projection which assumes that the claiming rate will not rise any higher than it was in the years 2000-2001, and an "increasing propensity" projection, which assumes that the propensity to sue T&N will continue to increase for an additional five years in accordance with the historical pattern of the increasing trend in claim filings observed in the years immediately prior to its bankruptcy before leveling off thereafter.

Because there are no epidemiological studies that predict the incidence of non-cancer asbestos related disease (e.g., asbestosis, pleural disease) in the U.S. population, Dr. Peterson uses the relatively stable historical relationships between the number of cancer claims and the number of non-malignancy claims filed against T&N to project the number of future non-malignant (i.e., asbestosis and pleural disease) claims. (Dr. Peterson's November 2004 Report at 33-36.) Once the number of future claims has been established, the methodology

21

for determining their dollar value is exactly the same as the methodology for valuing present claims – valuing the projected future claims by looking to a known data set, namely, T&N's past resolution costs for resolving similar claims, as adjusted for the applicable trends in the amounts necessary to resolve claims.

The result is a year-by-year projection of the claims and resolution costs that T&N would face in the coming years if it were not in bankruptcy. That stream of future costs is then reduced to net present value by application of a risk-free rate of return, in this case, 5.02 percent. (Dr. Peterson's November 2004 Report at 40.) Applying these techniques – which have been employed not only in many asbestos bankruptcy cases, but by insurers, other section 524(g) trusts, governments, courts, researchers and others that have a need to project future compensation costs – Dr. Peterson has projected that the overall net present value of T&N's liability for asbestos personal injury claims (both present and future) to those claimants residing in the United States is between $8.2 billion (assuming a flat propensity to sue) and $11 billion (assuming an increasing propensity).[15]  (Dr. Peterson's November 2004 Report at 40.)

In addition to his two principal forecasts, Dr. Peterson also conducted a number of alternative projections ("sensitivity analyses") which provide estimates of T&N's liability for U.S. claims if various assumptions were changed such as using lower settlement averages than those used in the two principal forecasts, using lower percentages for claims receiving payment (assuming that only 70 percent of future claims would be paid instead of T&N's historical average of 90 percent) and using alternative assumptions based on the passage of legislation in every state modeled on Ohio's medical criteria legislation for asbestos claims.

---

[15]  Such estimation would not, of course, entitle any individual claimant to payment, either from the estate or the post-bankruptcy trust established under 11 U.S.C. § 524(g). That determination would be made by the trustees, based on review of each individual's claim.

To value the claims against T&N that are pending in the United Kingdom and which will be filed in the future in the United Kingdom, Dr. Peterson adapted his standard methodology to T&N's U.K. experience. In other words, Dr. Peterson projected T&N's future liability for U.K. claims based on its past claims experience in the United Kingdom, taking into account the much lower historical claiming rate against T&N in the United Kingdom than in the United States, the U.K. average values for resolved claims, and the fact that the asbestos related disease incidence in the United Kingdom is expected to peak approximately 10 years later than in the United States. Dr. Peterson estimated that T&N's liability for present and future claims brought against it in the United Kingdom by U.K. claimants would be £229 million ($400 million).

## B.    Dr. Cantor's Approach Is Flawed

Although Dr. Cantor applies a conceptually similar approach to Dr. Peterson's estimate, she reaches a drastically lower estimate, for two principal reasons:

*First*, Dr. Cantor uses a flawed and downwardly biased approach to calculate the number of future claims that will be filed against T&N and ultimately paid.

*Second*, Dr. Cantor's calculation of the "settlement averages" used to value T&N's pending and future claims ignores not only T&N's recent historical settlement averages and the increasing trends in T&N's settlement averages but also the reasons for those trends. We highlight below the two major flaws in Dr. Cantor's estimation.

### 1.    Projection of Future Claims

Like Dr. Peterson, Dr. Cantor compares historical malignancy filings with population deaths during her calibration period (1998 to 2001) to estimate asbestos claimants' propensity to sue T&N. Unlike Dr. Peterson, who first projects the total number of future claims filed and then subtracts out the claims that are likely to be dismissed with no payment

based on T&N's claims history, Dr. Cantor first projects the number of future "compensable"

claims" by taking the "dismissal rate" into account before calculating the projection of future

claims.  If this were the only difference between the two approaches, their future compensable

claim counts should be approximately the same, because Dr. Cantor does not differ significantly

from Dr. Peterson in her calculation of T&N's historic percentage of claims receiving a positive

settlement:

| Claim Type (Disease Alleged) | Peterson Calculation of Percent Receiving Payment | Cantor Calculation of Percent Receiving Payment |
|---|---|---|
| Mesothelioma | 86.6% | 90.2% |
| Lung Cancer | 91.4% | 92.4% |
| Other Cancer | 94.5% | 94.0% |
| Asbestosis | 94.3% | 95.5% |
| Pleural Disease | 94.3% | 97.1% |

(Peterson November 2004 Report at 19; Cantor April 2005 Report at 34.)

   Instead, Dr. Cantor drastically reduces her projection of future "compensable"

claims by (1) using a flawed "death-year" approach to counting the claims filed in the calibration

period that are likely to be compensated, which ignores over 30 percent of the cancer claims

already on file; and (2) relying on her own "epidemiological" projection of future U.S.-based

asbestos related cancer deaths that she has no expertise to create[16], that has never been peer

reviewed, tested, or adequately explained, and which excludes from the calculation claims

brought by workers in several industries exposed to asbestos-containing products, even though

T&N, either directly through its own products or through its supply of asbestos fibers to its

Keasbey & Mattison subsidiary, undoubtedly exposed persons in these industries to asbestos.

These two approaches, when combined, have the corresponding effect of lowering the annual

projection of future cancer claims by almost 40 percent from T&N's historical levels in the years

---

[16] Dr. Cantor is neither a medical doctor nor an epidemiologist.

immediately preceding the bankruptcy petition date. There is no basis in the disease incidence or claiming history for such a reduction.

In essence, rather than simply counting the number of claims filed against T&N in a particular year and then projecting that filing pattern forward as Dr. Peterson does, Dr. Cantor instead goes through a complicated fiction which imputes a year of death to all the claimants in her calibration period based in part on using the date when claims were paid a proxy for date of death, despite the fact that there is no correlation between the two and claim payment date is on average two years or more later than date of death. Dr. Cantor attempts to justify her methodology by alleging that because relevant epidemiological data (i.e., the incidence rate) is founded in death rates, her constructed proxy for death year is methodologically consistent. Yet, this unsupported manipulation of measuring from an estimated "death year" rather than an actual "file year" has a deep and depressing impact on Dr. Cantor's estimates of the number of future claims T&N is likely to face. In calculating her future number of compensable claims by "death year," Dr. Cantor ignores and treats as if they do not exist over 30 percent of the cancer claims actually on file against T&N because she assumes the claimants have not "died" in the calibration period, yet at the same time fails to adjust for claims that will be filed in the future against T&N for deaths that have already occurred in the calibration period. Her death count thus ignores deaths that have already occurred during her calibration period among those who would file claims in the future against T&N, claims that her methodology would require to forecast and add to her calibration period to be logically consistent. Instead, she ignores such deaths, which results in a much lower forecast of future "compensable" claims.

The key issue here is not a forecast of when claimants against T&N will die, but rather an estimation of the value of future claims T&N would have paid in the tort system had it

25

not commenced these cases. Putting to one side the details of Dr. Cantor's "compensability-death year" convention and the epidemiological model she relies upon, the implausibility of her results is made clear from two simple observations:

First, in the years 2000 to 2001 an average of 1,300 new mesothelioma claims were actually filed against T&N (up from an average of 900 new claims per year in 1998 to 1999). Historically, T&N compensated about 85 to 90 percent of the mesothelioma claims filed against it, and indeed Dr. Cantor projects that over 85 percent of the pending mesothelioma will be compensated. Yet her estimate of the future claims is based on a projection that only 660 "compensable" mesothelioma claims will be filed in 2002, a reduction in compensable claims filed of over 40 percent from the 2000 to 2001 claim filing levels, and that the mesothelioma filings will drop off drastically thereafter. As we will show at trial, there is simply no basis for such a reduction in cancer claim filings to be found in either T&N's claims history, the incidence of mesothelioma in the United States, or based on events which have happened in asbestos litigation since 2001.

Second, and more broadly, from 1995 to 2000, the number of new asbestos claims filed against T&N rose steadily from 18,000 in 1995 to 45,000 in 2000; in 2001, up to the commencement of its bankruptcy cases, asbestos personal injury claims were being filed at an annual rate of almost 60,000 a year. (Peterson November 2004 Report at 6-7.) And as noted above, over its entire history, T&N paid approximately 90 percent of the 250,000 claims it resolved before it filed for bankruptcy protection.[17] Despite this history, Dr. Cantor's projection is that in 2002 compensable claims would immediately fall to 21,698 – barely one-third of the

---

[17] As set forth in the table in the text above, Dr. Cantor recognizes that T&N dismissed without payment a low percentage of claims, and projects that T&N will have to pay money to resolve approximately 90% of the currently pending claims. (Cantor Report at 16; Cantor Supplemental Report at 34.)

2001 rate and fewer than they had been in any year since 1997 – and decline steadily thereafter.[18] (Cantor Report at 33-34.) That notion is totally removed from common sense and is unreasonable.

2.    Claim Values

After projecting an implausibly low number of future compensable claims, Dr. Cantor compounds her errors by applying unrealistically low values to the claims that she projects will receive compensation. For example, Dr. Cantor projects that T&N will be able to resolve all pending mesothelioma claims for less than $70,000 each, when in actual fact T&N paid an average of $159,000 plus for the claims it settled and paid in 2001. Her projections for future mesothelioma settlement averages are similarly rosy and vastly understate T&N's liability by using a "rolling four year average" to compute the future claim settlement averages she uses in her forecast as opposed to using the more recent average values for the claims actually settled in 2000 and 2001. Moreover, unlike Dr. Peterson, who in addition to basing his average claim resolution amounts on the observable trends in T&N's settlement averages also had extensive conversations with T&N's outside counsel to understand the reasons behind those trends, Dr. Cantor's forecasted values are at odds with the experience of T&N's outside defense counsel that T&N's liability exposure was greatly increased after it left CCR. As the Court will hear from Mr. Hanly and Dr. Peterson, T&N was and would have continued to be a prime "target defendant" for asbestos plaintiffs after it left CCR had it not filed for bankruptcy protection, and its settlement averages were rising and would have continued to rise. Dr. Cantor's projections

---

[18]  The drastic decline cannot be explained by any difference between claims filed and claims paid, since Dr. Cantor's own analysis assumes that 85-95 percent of all claims received will eventually receive payment. (Cantor Report at Exhibits 13 and 24.)

by contrast assume that T&N would be able to resolve claims at prices far lower than what its experience and history would indicate.

Although it is impossible to determine with precision the isolated impact on her estimates of each of the aggressively optimistic settlement averages as compared to her implausibly low projections of future claims, the combined effect on her estimate is at least five billion dollars (when compared with Dr. Peterson's "No Increase" forecast) and could be substantially greater.

## CONCLUSION

For all of the foregoing reasons, together with the proof that Plaintiffs will present at Hearing, the Court should find that the aggregate value of T&N's liability for present and future U.S. asbestos personal injury claims liability is between $8.2 and $11.0 billion, that its liability for present and future U.K. asbestos personal injury claims is an additional £229 million, and that an English court would apply the laws of the United States to both the evaluation of liability and the measure of damages for claims brought by persons who were exposed in the United States to T&N's asbestos and asbestos-containing products and who suffered asbestos-related diseases in the United States as a result of that exposure.

28

CAMPBELL & LEVINE, LLC

__/s/ Marla R. Eskin__
Marla R. Eskin (No. 2989)
Kathleen J. Campbell (No. 4229)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947

-and-


CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, New York 10022
Telephone:  (212) 319-7125
Facsimile:  (212) 644-6755

-and-

CAPLIN & DRYSDALE, CHARTERED
Walter B. Slocombe
Nathan D. Finch
One Thomas Circle, N.W.
Washington, DC 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

Attorneys for Official Committee of
Asbestos Claimants

Dated:  May 31, 2005
          Wilmington, Delaware

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Edwin J. Harron (No. 3396)
Rolin Bissell (No. 4478)
Maribeth L. Minella (No. 4185)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

Attorneys for Legal Representative for
Future Asbestos Claimants

29

59066.1001