IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x
:
In re                                              :    Chapter 11
                                                   :
FEDERAL-MOGUL GLOBAL, INC., et al. :    Jointly Administered
T&N LIMITED, et al.,                               :
            Debtors.                               :
---------------------------------------------------x
                                                   :
THE OFFICIAL COMMITTEE OF                          :
ASBESTOS CLAIMANANTS and                           :
ERIC D. GREEN, as the                              :
LEGAL REPRESENTATIVE FOR                           :
FUTURE ASBESTOS CLAIMAINTS,                        :
                                                   :
            Plaintiffs,                            :
                                                   :
v.                                                 :    Case No. 05-00059 (JHR)
                                                   :
ASBESTOS PROPERTY                                  :
DAMAGE COMMITTEE,                                  :
                                                   :
            Defendant.                             :
                                                   :
---------------------------------------------------x

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE
PORTIONS OF EXPERT TESTIMONY OF MARK PETERSON**

FERRY, JOSEPH & PEARCE, P.A.
Theodore J. Tacconelli (No. 2678)
Rick S. Miller (No. 3418)
824 Market Street, Suite 904
Wilmington, DE 19899
Telephone: (302) 575-1555

-and-

WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock, Esquire
Michael P. Kessler, Esquire
Adam P. Strochak, Esquire
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Co-Counsel to the Official Committee
of Asbestos Property Damage Claimants

Dated: May 31, 2005

I. **INTRODUCTION**

The Official Committee of Asbestos Property Damage Claimants ("Property Damage Committee") moves *in limine* to exclude certain portions of the proposed testimony of Dr. Mark Peterson, the expert witness on claims estimation proffered by the Plan Proponents.[1] Specifically, Dr. Peterson should be precluded from presenting testimony which assumes that future asbestos personal injury claim values against the Federal-Mogul Global, Inc.'s subsidiary, Turner & Newall, can be derived from the trust distribution procedures (the "TDP") proposed in this case. Estimating claim values from the TDPs that Dr. Peterson himself concocted is not an accepted, or even logical, claims estimation methodology. Pursuant to Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), Peterson should be precluded from testifying about claim values derived from the TDP.

Additionally, Dr. Peterson should be precluded from speculating about hypothetical litigation developments based on purportedly new revelations of inflammatory documents and other information about T&N's history with asbestos. Such speculation is without empirical evidence and reflects no scientific reasoning or methodology to bolster his conclusions.

---

[1] The Plan Proponents consist of the Debtors, the Official Unsecured Creditors Committee, the Official Committee of Asbestos Claimants (the "ACC"), the Legal Representative of Future Claimants (the "FCR"), the Official Committee of Equity Security Holders, and JPMorgan Chase Bank, as administrative agent for holders of the Debtors' prepetition secured debt (the "Banks").

## II. **PRELIMINARY STATEMENT**

The Plan Proponents base their estimate upon the proffered expert testimony of Dr. Peterson, the consultant retained by the Official Committee of Asbestos Personal Injury Claimants (the "ACC"). However, Dr. Peterson's estimate is contrary to the very estimation methodology the ACC has urged upon this Court, and should therefore should be excluded.

Dr. Peterson calculated T&N's asbestos bodily injury liability in two ways. Initially, he derived the forecast value of claims from the company's pre-petition claims history. That estimate, first prepared in October 2002 and then revised downward in February 2004, forecast the total net present value of personal injury claims by U.S. residents against T&N (both pending and future) at $5.7 billion. However, in order to justify a proposed plan of reorganization for the Debtors which best served the Plan Proponents' interest, Dr. Peterson recalculated his estimate, deriving the forecast claim values from the TDP – amounts formulated by the ACC – instead of T&N's actual claims history. Using this reverse engineering, Dr. Peterson's estimate doubled to approximately $11 billion. Use of the TDP-derived claim values, however, is completely inappropriate as a basis for expert testimony. The TDP is the mechanism by which the asbestos bodily injury constituencies who will be paid from the trust have agreed, among themselves, to allocate the trust corpus. The TDP has no bearing on any estimate of the Debtors' actual liability. In an attempt to portray the TDP values as conservative, Peterson creates a "muddled amalgam" of speculation, improper derivation of claim values based on a convenience sample of data from other defendants in asbestos litigation, and his own *ipse dixit* reasoning to the effect that the TDP values are

reasonable estimates of claim values that could be anticipated outside of bankruptcy because: (1) the Plan Proponents agreed to them; and (2) they were based on Dr. Peterson's own recommendations. Accordingly, the Court should preclude all testimony based on Dr. Peterson's improper use of TDP-derived claim values and untestable speculation about the future.

### III. ARGUMENT

#### A. The Daubert Standard is Intended to Bar Unreliable Testimony.

The federal rules and Supreme Court case law interpreting them require the party offering expert evidence to demonstrate that it is both relevant and reliable. Fed. R. Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92 (1993). The Supreme Court's decision in *Daubert* held that Rule 702 of the Federal Rules of Evidence requires trial courts to exercise the role of gatekeeper in screening proffered expert testimony. 509 U.S. at 589. In *Kumho Tire Co.*, 526 U.S. 137, the Supreme Court clarified that the gate-keeping function applies not just to scientific testimony, but to *all* expert testimony. *Id.* at 141. Where a *Daubert* challenge is raised, the burden is upon the party proffering the expert to demonstrate by a preponderance of the evidence that the testimony presented by the expert passes *Daubert* muster. *Bourjaily v. United States*, 483 U.S. 171 (1987); *Kumho*, 526 U.S. at 147.

In discharging its gatekeeping role, the trial court must first ensure that the proposed expert is indeed qualified as an expert "by knowledge, skill, experience, training or education." Fed. R. Evid. 702. The court must then scrutinize the proffered testimony to ensure that "any and all scientific testimony or evidence admitted is not only

relevant, but reliable." *Daubert*, 509 U.S. at 589. An "expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Brown v. Southeastern Pennsylvania Transportation Authority (In re Paoli Railroad Yard PCB Litigation)*, 35 F.3d 717, 742 (3d Cir. 1994). The trial court must "make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 126.

Factors to be considered in a *Daubert* analysis, include but are not limited to the following:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Oddi v. Ford Motor Company*, 234 F.3d 136, 156 (3d Cir. 2000). These factors are merely useful signposts and a party seeking to exclude or admit testimony must do more than enumerate these factors and tally the number met or not met. *Heller v. Shaw Industries*, 167 F.3d 146, 153 (3d. Cir. 1999).

Importantly, it is the duty of the trial court to ensure that the conclusions offered by the expert logically follow from the data utilized. *General Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1996). In other words, courts should exclude opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert." *Id. Oddi*, 234 F.3d at 146. Ultimately, "an expert opinion must be based on reliable methodology and must

reliably flow from that methodology and the facts at issue." *Id.* In this instance, Dr. Peterson provides opinions that either do not flow from the data and methodology he proffers or fail to make use of any methodology or data whatsoever.

### B. Peterson Should Be Precluded From Offering Opinions Based On TDP Values.

In a recent report submitted in another bankruptcy case, Dr. Peterson criticized the methodologies of a claims estimation expert as "muddled amalgams based sometimes on values in tort litigation and at other times values that might be paid by a bankruptcy trust created in these proceedings." *See* Peterson, Mark A., Owens Corning and Fibreboard Projected Liabilities for Asbestos Personal Injury Claims as of October 2000, October 15, 2004 ("Peterson's OC Report") at 54 (attached as Exhibit A), *Owens Corning v. Credit Suisse First Boston*, No. 04-905, (D. Del.). Dr. Peterson's report here, however, relies on exactly what he condemned as a "muddled amalgam" of claim values; he has reached his estimate by using a portion of T&N's own claims history combined with the TDP values agreed upon by his own client.

Dr. Peterson bases his $11.1 billion estimate by multiplying the number of claims in each disease category forecasted by the value assigned to each category of claim in the TDP. The TDP values, however, are nothing more than the method by which Dr. Peterson's clients have agreed among themselves, with Peterson's own input, to allocate the value they will receive under the proposed plan of reorganization. Rather than perform testable expert analysis to reach a conclusion, therefore, Dr. Peterson takes his own conclusions as a starting point and through *ipse dixit* reasoning determines that his conclusions – reflected in the TDP – are reasonable. Thus, the TDP analysis should be excluded by the Court. *See Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,

350 F. Supp. 2d 582, 589-90 (D. Del. 2004) (excluding testimony projecting lost profits where expert based testimony on numbers in a sales plan created on behalf of his own client).

Moreover, the TDP numbers are inconsistent with T&N's historical claim values – they sharply escalate from historical claim values that T&N was paying pre-petition, based on Dr. Peterson's speculation about what will happen in the future. In this respect, Dr. Peterson's TDP methodology is inconsistent with the ACC's previously expressed theory of this case, and therefore should be excluded. *See Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 (8th Cir. 2003) (upholding district court's exclusion of plaintiff's expert testimony under *Daubert* as excessively speculative and inconsistent with plaintiff's theory of case). Specifically, the Property Damage Committee sought a establish a bar date for asbestos personal injury claims pursuant to Federal Rule of Bankruptcy Procedure 3003(3)(c) to test the validity, value and merit of claims against T&N. Such a requirement would have allowed all parties to measure how many pending claims exist (rather than speculate) and to assess the value of those claims. The ACC argued that it was unnecessary to collect this data and value pending claims because the Court could rely on T&N's "extensive claims history." Objection and Response of The Official Committee of Asbestos Claimants to the Motion of the Official Committee of Asbestos Property Damage Claimants Pursuant to Bankruptcy Rule 3003(c)(3) for Order Fixing Final Date for Filing Proofs of Asbestos Claims and Approving Notices and Publication Procedures Related Thereto, *In re Federal Mogul, Inc.* et al., Chapter 11 Case No. 01-10578, September 24, 2001 (Bankr. D. Del.). The ACC further argued that:

> there are only two possible quantum of data from which to estimate the liability to present and future claimants: (1) the numbers of types of claims filed over Debtors' twenty-five year history of similar asbestos personal injury cases in the tort system and the values of these cases . . . (2) whatever numbers of claims might be filed in response to a Bar Date Order, which have never been evaluated, litigated, or reduced to any liquidated value.

(*Id.* at 29.) The ACC argued that the first "quantum of data" – the historic value of cases – was the correct one upon which to rely. It argued that trying to predict current jury claim values would be impossible. *Id.*

To bolster its argument, the ACC relied heavily on the decision of the bankruptcy court in *Eagle Picher*, which it said "best outlines the general considerations that should enter into the estimation of a debtor's aggregate asbestos liability." ACC Bar Date Opposition at 28. In particular, the ACC cited *Eagle-Picher*'s statement that "valuation of claims should be based upon claim resolution values for claims close to the filing date of the bankruptcy case." *Id. citing Eagle-Picher*, 189 B.R. at 690-91. Having staked out that position, the ACC's expert cannot adopt an approach which ignores pre-bankruptcy historical claim values in favor of values established in a post trust. Moreover, *Eagle-Picher* expressly rejected the suggestion that claims could be estimated based upon the value they might receive through some bankruptcy mechanism, such as a 524(g) trust. 189 B.R. at 683. Therefore, Dr. Peterson's reliance on the TDP values is improper and to the extent his testimony relies on the TDP it should be stricken.[2]

---

[2] We also note that the asbestos creditors committee in *Owens Corning* moved to exclude the testimony of another party's expert on the basis that the expert sought to "estimat[] the value which claimants might take in satisfaction of their claims through some bankruptcy mechanism such as a trust of the sort provided for at § 524(g), and as contemplated in the present plan." *Memorandum of Law in Support of Motion in Limine*

C.  **Dr. Peterson's Testimony About The Supposed Impact of Certain Documents on T&N's Future Litigation History Should Be Excluded.**

Dr. Peterson seeks support for his inflated TDP values by speculating about massive increases in claiming rates and claim values in a hypothetical world where T&N was not in bankruptcy after 2001. In doing so, he ignores the certainties of what has happened since 2001 (*i.e.* extensive state statutory and judicial reforms in the area of asbestos litigation) in favor of what he believes *might* have happened. In particular, Dr. Peterson speculates that the 2000 publication of a book by Geoffrey Tweedale (the "Tweedale book") about T&N's corporate conduct with regard to asbestos would have made T&N a bigger target for plaintiffs after 2001. *See* Expert Report of Dr. Mark Peterson at 3, 4, 6, 9 and 12. Dr. Peterson's uses this theory as the basis for justifying his assumptions that there would be more claims against T&N, and they would be more expensive for T&N to resolve.

    1.  Dr. Peterson's Testimony Should Be Excluded Because It Lacks A Reliable Methodology.

Dr. Peterson's proposed testimony on this issue fails essential elements of the *Daubert* test. For example, *Daubert* requires the "existence and maintenance of standards controlling" the use of an expert's methodology. 509 U.S. at 595. But Dr. Peterson failed to even review the documents which the Tweedale book is based upon. Deposition of Dr. Mark Peterson, Vol. I. at p. 123 (Deposition excerpts attached as Exhibit C). And, Dr. Peterson had "no idea" of how many copies of the Tweedale were actually in print. *Id.* at 112. Moreover, while Dr. Peterson boasts of regular

---

to Exclude Expert Testimony of *Dr. Frederick C. Dunbar* at 6, Owens Corning v. Credit Suisse First Boston, No. 04-905 (D. Del.) (Attached as Exhibit B). That is precisely the method Dr. Peterson has adopted here.

conversations with plaintiffs' lawyers, he acknowledged that he had never even heard of the Tweedale book until December 2002 – more than two years after its publication – when he learned of its existence from a former defense counsel for T&N. *Id.* at 282. Nevertheless, Dr. Peterson contends that the book was a "very available resource" to plaintiffs' lawyers once it was published in 2000. *Id.* at 112. When questioned in deposition about his methods of gathering information about these issues Dr. Peterson admitted that his opinions were formed during casual conversations on a wide range of topics with various attorneys and was not based on a rigorous scientific or technical inquiry. *See* Deposition of Mark Peterson Vol. II at 358-359. Dr. Peterson specifically conceded that the methodology he used in interviewing plaintiffs' lawyers for his report was not the systematic methodology he would have used when he worked as an academic for the RAND corporation. *Id.* Thus, his unsupported speculation is impermissible because it fails the *Daubert* requirement that an expert report have a controlled methodology. *See Recreational Developments of Phoenix, Inc. v. City of Phoenix*, 220 F. Supp. 2d 1054, 1061 (D. Ariz. 2002) (excluding expert report that relied on anecdotal interviews rather than on a formal sampling technique), *aff'd*, 2003 WL 222383511 (9th Cir. Oct. 17, 2003).

Finally, Dr. Peterson's speculation about the impact of the Tweedale book ignores the fact that the documents in question have been the subject of numerous reports in the popular press and in legal periodicals for more than a decade. *See* Todd Woody, *Chase Man's Unlikely Heroics*, Mother Jones, Nov./Dec. 1993; Vera Titunik, *Chase's Case Turns to Dust*, The American Lawyer, Vol. XVIII, No. 4 (May 1996); Vera Titunik, *Chase Manhattan Bank Arms the English Plaintiffs' Bar*, Vol. XVIII, No. 4 (May 1996).

These articles established no later than 1996, the existence, substance, and location of the documents that Tweedale later wrote about, and Dr. Peterson speculates would have been "devastating" (Peterson Dep. Vol. I at 123) for T&N after 2001. Dr. Peterson has put forth no evidence that (despite their availability) these documents had any impact on T&N between 1996 and 2001. Instead of evaluating whether the documents played a role in claiming rates and claiming values between 1993 and 2001 Dr. Peterson piles on the speculation. He hypothesizes that the documents had little or no impact because T&N was "shielded" from their impact due to its membership in the CCR. This, too, is simply speculation. Dr. Peterson presents no data from the approximately nine months after T&N left the CCR in 2001 to prove his theorem.

Dr. Peterson's attempt to create a parade of horribles that would have befallen T&N is not verifiable science based on any acceptable methodology. Indeed, Dr. Peterson himself acknowledges that "you can't quantify" the effect of the documents. *Id.* at 115. The best Dr. Peterson offered as to the documents was that he "suspect[s]" that they would make juries more likely to return larger verdicts against T&N because "they were pissed off" at the company. *Id.* at 126. This is a statement of subjective belief, not something which can be proven or disproven. Moreover, there is no way to establish an error rate for Dr. Peterson's speculation – another reason his testimony on the issue of the Tweedale book must be excluded. *Daubert*, 509 U.S. at 593. Because an "expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation," such testimony is not permitted and should be stricken. *Brown v. Southeastern Pennsylvania Transportation Authority (In re Paoli Railroad Yard PCB Litigation)*, 35 F.3d 717, 742 (3d Cir. 1994).

\*\*\*\*

In sum, as one court noted in excluding expert witness testimony, "[a] certain amount of speculation is necessary, an even greater amount is permissible (and goes to the weight of the testimony), but too much is fatal to admission." *Group Health Plan v. Philip Morris USA, Inc.*, 344 F. 3d 753, 760 (8th Cir. 2003) (citations omitted); *see* . Dr. Peterson's proposed testimony on the supposed impact of the Tweedale book is "too much" speculation to be admissible.

## CONCLUSION

WHEREFORE the Property Damage Committee respectfully requests entry of an order granting the relief requested herein, and such other and further relief as is just.

Dated: Wilmington, Delaware
       May 31, 2005

FERRY, JOSEPH & PEARCE, P.A.

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
Rick S. Miller (No. 3418)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE  19899
(302) 575-1555

LOCAL COUNSEL TO THE OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

-and-

WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock
Michael P. Kessler
Adam P. Strochak
Peter M. Friedman
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS