# EXHIBIT A

# Owens Corning and Fibreboard Projected Liabilities

# for Asbestos Personal Injury Claims As of October 2000

## Mark A. Peterson

## Legal Analysis Systems

## October 15, 2004

# Table of Contents

1. Overview of Report .................................................................................. 1

2. Dr. Peterson's Qualifications .................................................................. 1

3. Bases of OC's and Fibreboard's Asbestos Liabilities ................................ 2

4. Data for asbestos bodily injury claims .................................................... 7

5. Estimating Liabilities for Asbestos Bodily Injury Claims ........................... 7

6. Estimation of OC's Asbestos Liabilities, October 2000 ............................. 8
   6.1. Forecasted Indemnity for OC Claims Pending on October 5, 2000 ............ 8
        6.1.1. Calculations within Disease Categories ........................................ 8
        6.1.2. Imputation for Unknown Disease Claims ...................................... 9
        6.1.3. Calculation of Indemnity for Pending Claims ............................... 12
   6.2. Projections of Number And Timing of Future Claims ........................... 13
        6.2.1. The Incidence of Asbestos-Related Cancers ............................... 14
        6.2.2. Accuracy of Epidemiological Projections .................................... 15
        6.2.3. Propensities to Sue OC ............................................................ 17
        6.2.4. Projection of Future Nonmalignancy Claims ................................ 22
        6.2.5. Forecasted Number of Future Claims .......................................... 27
        6.2.6. Estimating Liability for Forecasted Future Claims ........................ 27

7. OC's Total Asbestos Liability, October 5, 2000 ...................................... 28

8. Estimation of Fibreboard's Asbestos Liabilities, October 2000 ................. 30
   8.1. Forecasted Indemnity for Fibreboard Claims Pending on October 5, 2000 ...... 30
        8.1.1. Calculations within Disease Categories ...................................... 31
        8.1.2. Imputation for Unknown Disease Claims .................................... 31
        8.1.3. Calculation of Indemnity for Pending Claims ............................. 33
   8.2. Projections of Number And Timing of Future Claims ........................... 35
        8.2.1. Propensities to Sue Fibreboard ................................................ 35
        8.2.2. Projection of Future Nonmalignancy Claims ................................ 40
        8.2.3. Forecasted Number of Future Claims .......................................... 44
        8.2.4. Estimating Liability for Forecasted Future Claims ........................ 44

9. Fibreboard's Total Asbestos Liability, October 2000 ................................ 45

10. Alternative Assumptions and Sensitivity Analyses ................................. 47
    10.1. Response to Credit Suisse First Boston Criticism ............................ 47
         10.1.1. Problems with the Friedman Report ........................................ 48
         10.1.2. Problems with the Gitlin Article ............................................ 52
         10.1.3. The Credit Suisse Motion Raises No Credible Forecasting Issues ........ 54
    10.2. Dr. Vasquez Forecasts for OC and Fibreboard ............................... 54
         10.2.1. Dr. Vasquez Ignores OC's and Fibreboard's Increased Claims
                 Filings ............................................................................... 56
         10.2.2. Dr. Vasquez's Incidence Model Further Reduces His Forecasts .......... 58
         10.2.3. Dr. Vasquez Inappropriately Values Future Claims by NSP Values ....... 59
         10.2.4. Dr. Vasquez Makes Arbitrary and Unsupported Reductions in His
                 Second Valuation Model ........................................................ 59
    10.3. Sensitivity Analyses .................................................................. 62
         10.3.1. Definition of Sensitivity Variations ........................................ 63

10.3.2. Sensitivity Analysis Results .................................................................. 65

11. Rule 26 Disclosures and Signature ........................................................ 71

APPENDIX A ................................................................................................. A-1

APPENDIX B ................................................................................................. B-1

## Figures

Figure 1: Annual 1990-2000 Settlement Averages for Mesothelioma ............................ 3

Figure 2: Claim Filings, 1990-2003 ............................................................... 4

Figure 3: Distribution of Indemnity Amounts for Pending Claims, by Disease ............. 13

Figure 4: Nicholson Cancer Projections ........................................................ 15

Figure 5: Epidemiological Projections Confirmed by SEER's Mesothelioma
Counts ........................................................................................ 16

Figure 6: Number of Cancer Filings Against OC ................................................ 19

Figure 7: Nicholson Meso Incidence Forecasts vs OC Actual Claims .......................... 20

Figure 8: Nicholson Meso Forecasts and OC Projections ...................................... 22

Figure 9: Annual Nonmalignant Claims ......................................................... 23

Figure 10: Comparison of Nonmalignant and Cancer Claim Counts ............................. 24

Figure 11: Actual And Projected Filings (No Increase) ...................................... 26

Figure 12: Actual And Projected Filings (Increases) ........................................ 27

Figure 13: Distribution of PV of Total Liability, by Disease: Future Increase Model ...... 30

Figure 14: Distribution of Indemnity Amounts for Pending Claims, by Disease ............ 34

Figure 15: Number of Cancer Filings Against Fibreboard ..................................... 37

Figure 16: Nicholson Meso Incidence Forecasts vs Fibreboard Actual Claims ............ 38

Figure 17: Nicholson Meso Forecasts vs Fibreboard Projections ............................. 40

Figure 18: Annual Nonmalignant Claims ........................................................ 41

Figure 19: Comparison of Nonmalignant and Cancer Claim Counts ............................ 42

Figure 20: Actual And Projected Filings (No Increase) ...................................... 43

Figure 21: Actual And Projected Filings (Increases) ........................................ 44

Figure 22: Distribution of PV of Total Liability, by Disease: Future Increase Model ...... 47

# Tables

Table 1: Trends in Disposition Amounts for OC and Three Other Defendants ................ 3

Table 2: Numbers and Amounts of Plaintiff Verdicts, By Year ......................................... 5

Table 3: Claim and Payment Distributions for Pending and Resolved Claims ................ 9

Table 4: Unknowns Are More Frequent Among Pending than Resolved Claims .......... 10

Table 5: OC Experience in Evaluating Alleged Disease, 1991-2000 Filings ................ 11

Table 6: Derived OC Transition Matrix for Pending Cases ............................................ 11

Table 7: Distributions of Pending and Resolved Claims After Allocation ..................... 11

Table 8: Number and Average Value of Pending Claims .............................................. 12

Table 9: Forecast of Indemnity for Pending Claims ...................................................... 12

Table 10: Number of Filings Against OC, By Filing Year and Disease .......................... 18

Table 11: Propensities to Sue OC, by Disease: 1990-2000 .......................................... 21

Table 12: Number of Forecasted Claims Filed After October 5, 2000 .......................... 27

Table 13: Forecast Indemnity for Future Claims after October 5, 2000 ........................ 28

Table 14: Present Value (PV) of Future Claims as of October 5, 2000 ......................... 28

Table 15: OC's Total Liability for Indemnity as of October 2000 ................................... 29

Table 16: PV of OC's Total Liability for Indemnity : October 5, 2000 ............................ 29

Table 17: October 5, 2000 Pending Claims .................................................................. 31

Table 18: Fibreboard Experience in Evaluating Alleged Disease, 1991-2000
   Filings ........................................................................................................................... 32

Table 19: Derived Fibreboard Transition Matrix for Pending Cases .............................. 32

Table 20: Distributions of Pending and Resolved Claims After Allocation .................... 33

Table 21: Number and Average Value of Pending Claims ............................................. 33

Table 22: Forecast of Indemnity for Pending Claims .................................................... 34

Table 23: Number of Filings Against Fibreboard, By Imputed Filing Year and
   Disease .......................................................................................................................... 36

Table 24: Propensities to Sue Fibreboard, by Disease: 1990-2000 .............................. 39

Table 25: Number of Forecasted Claims Filed After October 5, 2000 .......................... 44

Table 26: Forecast Indemnity for Future Claims after October 5, 2000 ........................ 45

Table 27: Present Value (PV) of Future Claims as of October 5, 2000 ......................... 45

Table 28: Fibreboard's Total Liability for Indemnity as of October 2000 ....................... 46

Table 29: PV of Fibreboard's Total Liability for Indemnity October 5, 2000 .................. 46

Table 30: Cumulative Effect of Assumptions on Dr. Vasquez' Estimates of Filings
   and Liability .................................................................................................................... 56

Table 31: Alternative Lengths of Base Period for Sensitivity Analyses ......................... 63

Table 32: Propensity to Sue Alternatives ....................................................... 64

Table 33: Payment Value Change Calculations ............................................. 64

Table 34: Changes to Resolution Amounts if Ohio Legislation Expands
　　Nation-Wide .................................................................................................. 65

Table 35: Comparison of Epidemiological Models ......................................... 66

Table 36: Comparison of Base Period Effects ............................................... 66

Table 37: Effect of Propensity to Sue Alternatives ....................................... 67

Table 38: Effect of Assuming Increases in Values of Claims Above Inflation ................ 68

Table 39: Forecast Indemnity for Future Claims after October 5, 2000 ......................... 69

Table A1: Annual Indemnity and Defense Costs (Millions of Year 2000$) .................... A-1

Table A2: Forecasts of OC and Fibreboard Defense Costs (Billions of Year
　　2000$) ........................................................................................................... A-1

Table B1: Nicholson Epidemiological Projections ....................................... B-2

Table B2: KPMG Epidemiological Projections ............................................. B-2

Table B3: OC Forecasts as of October 5, 2000, Increasing Propensities to Sue ........ B-3

Table B4: OC Forecasts as of October 5, 2000, No Increase in Propensities to
　　Sue ................................................................................................................ B-4

Table B5: Fibreboard Forecasts as of October 5, 2000, Increasing Propensities to
　　Sue ................................................................................................................ B-5

Table B6: Fibreboard Forecasts as of October 5, 2000, No Increase in
　　Propensities to Sue .................................................................................... B-6

## 1. Overview of Report

This report summarizes results of analyses to estimate the liabilities of Owens Corning Corporation ("OC") and Fibreboard Corporation ("Fibreboard") for asbestos personal injury claims that had been filed and were unresolved ("pending claims") and claims that would be filed in the future ("future claims") as of the date of OC's bankruptcy petition, October 5, 2000. The report's estimates of the number of future asbestos claims and the indemnity values of OC's and Fibreboard's pending and future asbestos claims are all forecast based on assumptions that extend into the future the pattern of past claim filings and indemnity payments for the two companies. These estimates are based on forecasting methods first developed over twenty years ago for insurance companies that have been used regularly since then to derive forecasts of asbestos liabilities and that have become a standard method for making such forecasts. As described in the next section of this report, I have used these methods in engagements for a wide range of parties and have testified in court many times as to forecasts based on these methods.

The report first discusses Owen Corning's and Fibreboard's corporate activities that led to their asbestos liabilities and discusses the data and methods used to estimate liabilities for both companies. The report then presents estimates of Owens Corning's liability as of October 5, 2000 for pending and future claims. Next the report presents similar estimates for Fibreboard. The report then discusses alternative assumptions about matters affecting liability forecasts for OC and Fibreboard and presents sensitivity analyses that show how the liability estimates would change with changes in key assumptions used in the estimation analyses. The report includes an appendix estimating OC's and Fibreboard's likely costs for defending and administering asbestos claims and an appendix with selected tables of inputs and results.

Based on the analyses and information described in this report, it is my opinion that the present value of liability for asbestos bodily injury claims (pending and future) as of October 5, 2000 is at least $11 billion for OC and at least $7 billion for Fibreboard.

## 2. Dr. Peterson's Qualifications

For over twenty years I have studied, written about and participated as an expert in asbestos litigation and other mass tort litigation. I am a lawyer, a graduate of Harvard Law School and a recognized scholar on asbestos and other mass tort litigation. I have a doctorate in social psychology from the University of California, Los Angeles. For over twenty years I conducted research on asbestos and other mass tort litigation as a founding member of the RAND Corporation's Institute for Civil Justice. I have published many scholarly, peer-reviewed articles on asbestos litigation, mass torts, and workers compensation including articles on how asbestos and other mass tort claims arise, how the values of asbestos bodily injury claims are determined by medical and legal issues, evaluations of claims facilities used for paying asbestos and other mass tort claims, and other subjects related to asbestos litigation. I have taught courses on mass torts at UCLA Law School and the RAND Graduate Institute. My resume is attached to this report as Exhibit 1.

I am an expert on claim values, claims procedures and estimations of liabilities for fifteen asbestos trusts. I am a trustee of the Fuller Austin Settlement Trust, an asbestos trust, and a director of TSI, a nonprofit corporation that administers the trust distribution procedures for seven asbestos trusts. I have worked as an expert on asbestos litigation for judges, defendants, insurance companies, actuarial firms, other businesses, law firms and claimants' committees in bankruptcy.

I have worked for four U. S. District and Bankruptcy Courts as the Court's expert on how

asbestos claims are valued and on asbestos claims procedures and trusts. As the Special Advisor to U.S. District Court Judge Jack B. Weinstein and U.S. Bankruptcy Court Judge Burton Lifland I helped the courts and parties to restructure the Manville Trust, establishing the Manville Trust Distribution Procedures that became a model used in subsequent bankruptcy cases and by later-created trusts to process, evaluate and pay the hundreds of thousands of asbestos claims that they have received so far.

I have been an expert in more than twenty other bankruptcies and class actions in different cases working for parties with divergent interests: defendant asbestos companies, insurance companies, claimants' committees, and court-appointed representatives for future claimants. In each of these cases I have provided descriptions and quantitative forecasts of pending and future asbestos bodily injury claims using the standard forecasting methods that I describe and use in this report. I have testified in court twenty times about my forecasts of asbestos liabilities. My forecasts and analyses have been accepted and used as the court's basis for findings of aggregate asbestos liabilities in the bankruptcy proceedings of Eagle-Picher, National Gypsum, Babcock and Wilcox, Armstrong World Industries, Western Asbestos, H. K. Porter, E. J. Bartel, and Raymark.

I have been recognized by courts as an expert on all areas that I address in this report and the descriptions and analyses in this report come from my scholarship and work as an expert on asbestos litigation.

I have been retained by the Owens Corning Official Committee of Asbestos Personal Injury Claimants ("ACC") as an expert for purposes of estimating asbestos liabilities and providing testimony on those matters. This report has been prepared as part of that engagement.

## 3. Bases of OC's and Fibreboard's Asbestos Liabilities

OC manufactured and sold a variety of asbestos containing products between 1938 and the early 1990s including cements, mastics, roofing and other coating materials, but its primary asbestos containing product and the source of most of its claims arose from Kaylo, a solid pipe and block insulation material that was about 15 percent asbestos. Kaylo was made and sold by OC in every state, the District of Columbia and foreign countries between 1953 and 1973. Kaylo was distinctively marked and has been readily recalled by exposed workers. As a result of its wide distribution and ready identification, OC has received large numbers of asbestos claims and has paid the largest settlement values of any asbestos defendant (see, e.g. Figure 1).

Plaintiffs who assert claims against OC and Fibreboard typically allege one or more of the standard set of asbestos related diseases identified in Table 1. These diseases include three groups of cancers all of which have been shown to be caused by exposures to asbestos: malignant mesothelioma, a rare cancer of the pleural tissue surrounding the lungs and that separates the abdominal and chest cavities, whose only known cause is from exposure to asbestos; lung cancer; and several gastrointestinal cancers. A substantial majority of plaintiffs claimed a nonmalignant disease: either asbestosis, a disease characterized by scarring and fibrosis of the lung tissue, or pleural disease, involving scarring of the pleura resulting in pleural plaques and pleural thickening. Table 1 shows that the settlement averages paid by OC prior to its bankruptcy substantially exceeded those of three other major asbestos defendants who also sought bankruptcy protection during 2000 or 2001.

**Table 1:** Trends in Disposition Amounts for OC and Three Other Defendants

| Settle Year | Meso | | | | Lung | | | | Othc | | | | Nonm | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Armstr | B&W | T&N | OC | Armstr | B&W | T&N | OC | Armstr | B&W | T&N | OC | Armstr | B&W | T&N | OC |
| 1990 | $9,479 | $8,550 | $3,714 | $59,682 | $4,779 | $4,203 | $1,735 | $25,332 | $2,402 | $3,617 | $915 | $13,596 | $1,423 | $2,985 | $564 | $10,294 |
| 1991 | 19,691 | 11,054 | 8,221 | 73,887 | 8,534 | 6,065 | 3,368 | 30,730 | 3,808 | 5,355 | 1,574 | 6,729 | 2,262 | 3,284 | 940 | 7,669 |
| 1992 | 24,251 | 19,323 | 16,183 | 80,757 | 12,603 | 7,146 | 7,344 | 33,716 | 7,617 | 4,859 | 4,296 | 15,736 | 3,873 | 3,300 | 2,004 | 8,507 |
| 1993 | 25,833 | 33,993 | 22,009 | 63,769 | 10,776 | 13,788 | 9,056 | 29,867 | 4,952 | 9,415 | 4,238 | 14,533 | 2,769 | 4,183 | 2,215 | 9,062 |
| 1994 | 24,510 | 42,022 | 21,154 | 64,278 | 9,942 | 13,613 | 6,721 | 26,864 | 5,152 | 10,240 | 3,238 | 15,890 | 2,662 | 4,216 | 1,915 | 8,268 |
| 1995 | 27,606 | 52,129 | 26,720 | 74,382 | 10,754 | 16,990 | 8,004 | 27,509 | 6,636 | 11,141 | 3,615 | 13,427 | 2,599 | 4,675 | 1,461 | 6,794 |
| 1996 | 31,857 | 54,708 | 22,290 | 95,467 | 9,842 | 18,809 | 6,218 | 26,300 | 4,993 | 13,208 | 2,592 | 13,449 | 3,095 | 4,907 | 1,721 | 8,077 |
| 1997 | 34,597 | 59,484 | 24,568 | 126,942 | 11,891 | 20,431 | 7,853 | 24,228 | 6,032 | 11,066 | 3,327 | 9,614 | 3,600 | 4,517 | 2,528 | 7,676 |
| 1998 | 44,017 | 62,889 | 26,217 | 132,430 | 11,697 | 25,314 | 6,676 | 32,120 | 5,382 | 15,721 | 2,845 | 14,252 | 1,798 | 4,960 | 1,054 | 8,598 |
| 1999 | 52,374 | 70,899 | 35,963 | 149,310 | 11,522 | 20,774 | 7,068 | 41,253 | 5,836 | 12,500 | 3,161 | 18,327 | 3,054 | 5,973 | 1,885 | 6,250 |
| 2000 | 87,557 | 67,829 | 54,142 | 195,055 | 16,033 | 24,359 | 9,969 | 45,567 | 6,705 | 11,534 | 4,370 | 13,542 | 3,575 | 4,508 | 2,317 | 6,282 |

Note: Payments are adjusted for inflation using actual historic CPI and stated in year 2000 dollars. From publicly available data. OC entries exclude verdicts.

Like other major asbestos defendants, OC saw substantial increases during the 1990s both in the amount that it had to pay to resolve asbestos claims, particularly for cancers, (Figure 1) and in the number of new asbestos claims that it faced (Figure 2).

**Figure 1:** Annual 1990-2000 Settlement Averages for Mesothelioma



**Figure 2:** Claim Filings, 1990-2003



OC's approach to its asbestos liabilities changed over time. Between 1985 and 1988 OC was a member of the Asbestos Claims Facility (ACF), a consortium of asbestos defendants and their insurers formed to provide common administration and defense of asbestos claims. The ACF disbanded in 1988 and most defendants who had been members of ACF formed a new consortium, the Center for Claims Resolution (CCR). OC did not join the CCR, but rather addressed its asbestos liabilities independently. OC was known for its aggressive defense against asbestos bodily injury claims. It tried to deflect liability to other asbestos manufacturers by widely distributing an exhibit book of packaging, trademarks and trade names of asbestos-containing products manufactured by others so that plaintiffs lawyers could show the book to their clients and add other manufacturers as defendants. As part of this aggressiveness OC tried more asbestos law suits than any other defendant, a strategy that backfired after defense costs totaled a half billion dollars in just three years (1990-1992) and 1,000 plaintiffs obtained compensatory verdicts totaling $714 million between 1988 and 1999, plus another $207 million in punitive damages (Table 2).

**Table 2:** Numbers and Amounts of Plaintiff Verdicts, By Year

| Verdict Year | Number of Verdicts | | OC Verdict Amounts | | |
|---|---|---|---|---|---|
| | Compens | Punit | Compens | Punit | Total |
| 1988 | 12 | 0 | $0.6 | $0.0 | $0.6 |
| 1989 | 55 | 5 | 21.2 | 7.2 | 28.3 |
| 1990 | 69 | 45 | 15.0 | 14.1 | 29.1 |
| 1991 | 111 | 2 | 136.5 | 5.2 | 141.8 |
| 1992 | 88 | 4 | 34.7 | 6.9 | 41.6 |
| 1993 | 156 | 37 | 90.6 | 29.2 | 119.8 |
| 1994 | 259 | 44 | 132.1 | 53.0 | 185.1 |
| 1995 | 134 | 22 | 94.6 | 29.8 | 124.4 |
| 1996 | 228 | 9 | 68.2 | 10.9 | 79.1 |
| 1997 | 119 | 19 | 83.4 | 50.2 | 133.7 |
| 1998 | 77 | 1 | 36.4 | 0.4 | 36.7 |
| 1999 | 4 | 1 | 1.0 | 0.3 | 1.3 |
| Total | 1,312 | 189 | $714.3 | $207.2 | $921.5 |

Note: Dollar amounts in millions of dollars adjusted for inflation and shown as year 2000 dollars. Amounts represent OC's share of verdict. The table does not include 61 plaintiffs who received verdicts but for whom OC's share was zero dollars.

Source: "Owens Corning Reorganization OC Verdicts" Data Extracted: 09/10/2004, Owens Corning Corporation.

In the late 1990s OC turned to its National Settlement Program (NSP) to try to limit and control its asbestos litigation. Beginning in 1998 OC negotiated inventory settlements with several plaintiffs' law firms that had litigated effectively against the company, then added new agreements so that by 2000 OC had NSP agreements with law firms representing most plaintiffs who had filed past claims against OC. The NSP agreements established amounts that OC would pay for each disease, the timing of payments and criteria for payment for clients of the law firm who accepted the NSP agreement (terms that differed among law firms). Although the NSP agreements ran between OC and law firms, not individual claimants, most pending claimants accepted the NSP terms. While OC was better able to control its asbestos litigation through the NSP agreements and, importantly, halt the hemorrhage of adverse trial verdicts, this new strategy did not prevent the company's bankruptcy. By October 2000 OC had paid or faced the prospect to paying "239,337 Initial Claims that had been settled or that were subject to settlement under the NSP" plus another 42,000 pending claims that were not in the NSP (Report of Mark W. Mayer on Owens Corning's Pre-Petition Asbestos Personal Injury and Wrongful Death Claims, May 21, 2002, pp.3-4) and had little assurance that the NSP would let it control future costs of asbestos litigation.

The NSP agreements established terms for paying future plaintiffs represented by the law firm but could not bind future claimants. Under the NSP agreements, plaintiffs' law firms agreed to recommend that clients who retained the firm in the future accept terms of the NSP agreement, but the NSP agreement committed neither the law firm nor its future clients to the agreement. OC agreed that future claimants could be processed outside of the NSP agreements and OC's only recourse, should too many future claimants reject the NSP, was to abrogate NSP agreements. Moreover the NSP agreements left uncertain the amounts to be paid to future clients, which were fixed only for claims filed through 2003 and could then be renegotiated. The most critical contractual term--how much OC would pay and how much claimants would receive--remained

unspecified.

Fibreboard Corporation, which was acquired as a subsidiary by OC in 1997, had its own liability for asbestos containing cements, pipe coverings and other insulation products that it manufactured and sold between 1930 and 1973. Fibreboard's asbestos litigation history since 1990 is more complicated than OC's. In the early 1990s Fibreboard reached two related class action settlements. In one, Fibreboard entered into a settlement (the Ahearn settlement) with its insurance carriers and a class of future claimants which provided a $1.5 billion trust to pay future asbestos claims that would be channelled to the trust by an injunction. The other class action settlement (the Rudd settlement) was a "back-up" agreement that created a $2 billion fund for the payment of asbestos claims, but which would only become effective in the event that the Ahearn settlement was rejected by the courts. The Rudd settlement, unlike Ahearn, did not preclude future claimants from suing Fibreboard and did not cap Fibreboard's liability (I testified about future forecasts of Fibreboard's asbestos liabilities during the 1993 Ahearn fairness hearing as an expert for Fibreboard's settling insurance companies). From the time of the filing of the Ahearn class action and settlement in 1993 until the U.S. Supreme Court rejected that settlement in June 1999, Fibreboard was protected from asbestos claims by an injunction entered in the Ahearn litigation. Following the Supreme Court decision, Fibreboard received over 200,000 asbestos claims in two years, including many claims that had accrued during the six year stay in claim filings. As a result of the Ahearn class action, Fibreboard resolved few claims during the mid-1990s. Only exigent claims, mostly for mesothelioma, or claims that had reached the trial docket against other defendants were resolved under the provisions of the Ahearn class action agreement.

After it lost the protection of the Ahearn injunction, Fibreboard also began participating in the NSP. The terms and effects of this program were similar to those for OC, although claims values were typically 60 percent of the OC values. Again, the NSP was not a solution to Fibreboard's asbestos liability. First, the NSP established a large immediate liquidated obligation for asbestos claims. At the time of OC's bankruptcy petition Fibreboard had paid 61,679 NSP claims, but faced another 146,170 NSP claims including 41,717 that had already been approved for $222 million of payments. (Report of Mark W. Mayer on Fibreboard Corporation's Pre-Petition Asbestos Personal Injury and Wrongful Death Claims, May 21, 2002, p. 5). Second, like OC and for the same reasons, Fibreboard had little assurance that the NSP would let it control future claims.

OC and Fibreboard, like the other companies whose claims experiences are shown on Figures 1 and 2, filed for bankruptcy in 2000. OC's and Fibreboard's bankruptcy petitions protected them from the continuing increases both in claims filings and in average payments that were the continuing experience of other asbestos defendants who, unlike OC and Fibreboard, continued in asbestos litigation after October 5, 2000. Had OC and Fibreboard not filed for bankruptcy protection their filings and payment levels would likely have continued to increase, a matter that must be reflected in forecasts of post-petition and future claim filings and liabilities against the two companies.

## 4. Data for asbestos bodily injury claims

We received OC's primary data files, its "Oracle" database, on August 2, 2002. This is the primary database for our analyses. The Oracle data were derived from OC's earlier "iCMS" database, which was maintained until July 2001 and then shut down. The Oracle database reflected substantial work by OC to clean up and derive consistent variables. It included information on alleged disease, current claim status, claim value, and amounts paid. OC identified duplicate claims that were filed by the same claimant attaching a claimant identification variable that allowed us to consolidate information across duplicated claims.

Our analysis in this report is based on individual claimants, some of whom filed more than one claim. Using information provided in the Oracle database we consolidated the information from duplicate claims into a single record for each claimant who made duplicate filings. In rare instances we observed claimants with "come-back" claims, who first filed a claim for asbestosis or pleural disease and later filed a second claim for an asbestos-related cancer. In such cases we retained data for just the cancer claims, conservative step that eliminated fewer than 1,000 claims.

Before receiving the Oracle database we had received the iCMS in January 2002. iCMS included some information not on the Oracle database (including evaluated disease, filing state, filing year) which we linked to the Oracle data to use the additional information where necessary.

## 5. Estimating Liabilities for Asbestos Bodily Injury Claims

Forecasts of asbestos liabilities are needed and have become commonplace in many different circumstances. Asbestos defendants estimate their present and likely future liabilities both for their own corporate planning and also as part of financial reporting. Insurance companies forecast asbestos liabilities to create reserves for specific insureds. Insurance rating organizations forecast liabilities of insurance companies. Financial analysts forecast liabilities of specific asbestos defendants and insurance companies. Businesses forecast liabilities of other companies that face asbestos liabilities in order to determine whether or not to engage in business activities with the companies that face such liabilities. Asbestos trusts are required to forecast their liabilities in order to determine how much money must be reserved for future claimants and what amount can be paid to claimants with presently pending claims, forecasts that are required by the U. S. Bankruptcy Code. Parties to bankruptcy proceedings forecast liabilities in order to draft reorganization plans and disclosure statements. Bankruptcy courts estimate the asbestos liabilities of debtors. Other courts estimate the asbestos liabilities of particular defendants in the course of class action, insurance coverage or other litigation.

These forecasts have been done in many ways, with highly varying quality and credibility. Credible forecasts of an asbestos defendant's liability must look together at several sources of information. First, forecasts must draw upon data about the defendant's past and current experience with asbestos claims--counts of claim filings, distributions of asbestos diseases, resolutions of claims both with and without payment, trends for all of these elements of liability. The forecast should consider developments and the state of asbestos litigation at the time of the forecast and reasonable expectations about future developments. The forecast must reflect the epidemiology of asbestos related diseases, the incidence of asbestos related disease both past trends and reasonable forecasts of future trends as well as expected trends in filings of claims for those diseases and trends in the amounts paid to indemnify those claimants.

## 6. Estimation of OC's Asbestos Liabilities, October 2000

For each company its asbestos liability is a sum of its liability for pending claims and its liability for future claims (we report estimates of OC's and Fibreboard's costs for administering and defense in Appendix A). I describe the steps of the liability analysis for OC in the following sections leading to the forecast of OC's total liability for present and future asbestos bodily injury claims. Then in Sections 8 and 9 I apply those same methods to forecast asbestos liabilities for Fibreboard.

### 6.1. Forecasted Indemnity for OC Claims Pending on October 5, 2000

On October 5, 2000 when it filed for bankruptcy protection OC had 180,842 pending asbestos bodily injury claims. The following formula is the basis for estimating the total indemnity that OC would pay to resolve these pending claims:

Number of Claims  x  Average Resolution Cost = Forecast Indemnity

Here, counts of claims are drawn from OC's database and average resolution costs are based on OC's historic experience in resolving claims. The average claim resolution cost used in valuing the liabilities in this report are the mean per claim costs to resolve all claims including both claims that are resolved without payment as well as those that receive an indemnity payment. This is the mathematical equivalent of multiplying the average settlement for claims that receive payment times the percent of claims that have received payment (Table 3). As a hypothetical example, if the average settlement for claims that received a payment is $10,000 and 85 percent of all resolved claims receive a payment, then the average claim resolution cost is $8,500.

#### 6.1.1. Calculations within Disease Categories

For better precision, the formula above should be carried out separately for each asbestos disease. For OC and for every asbestos defendant settlement values and resolution costs vary among different asbestos related diseases (Table 3). OC paid far more on average to resolve mesothelioma claims than any other disease. Resolution costs differed among all other diseases. Because the mix of diseases among pending claims may differ from the mix of diseases among claims previously resolved by OC, we cannot assume that OC's overall historic average resolution cost among all claims will be appropriate for estimating the average value of pending claims. For example, if mesothelioma claims represent a greater percentage of pending than resolved claims, then use of OC's overall historic average would underestimate the company's liability for pending claims. By applying the formula above separately for claims within each disease category, we control for differences in disease distributions between pending and resolved claims.

**Table 3:** Claim and Payment Distributions for Pending and Resolved Claims

| Description | Disease | | | | | Total |
|---|---|---|---|---|---|---|
| | **Meso** | **Lung** | **Othc** | **Nonm** | **Unsp** | |
| Number Pending | 3,817 | 7,947 | 3,148 | 142,607 | 23,323 | 180,842 |
| Number Resolved | 11,061 | 18,581 | 6,259 | 238,133 | 59,388 | 333,422 |
| Avg Settlement | $208,358 | $43,920 | $19,133 | $7,573 | $8,114 | NA |
| Percent Paid | 89.011 | 93.086 | 91.314 | 93.492 | 18.075 | NA |
| Avg Resolution | $185,462 | $40,883 | $17,471 | $7,080 | $1,467 | NA |

Note: Average resolution amounts are expressed in year 2000 dollars and calculated across all claims resolved (both with and without payment) that were filed after 1990 and resolved between 1996 and 2000. Average settlements are calculated only among claimants who received some payment. Percent paid represents the percent of resolved claims that results in some payment. Average resolution is the product of average settlement times percent paid.

### 6.1.2. Imputation for Unknown Disease Claims

To use information about disease from the OC database we must impute specific diseases for some recently filed claims and pending claims that have no specific disease noted in OC's claims database. In many states plaintiffs' complaints need allege only general descriptions of disease, such as "asbestos related disease" or "asbestos lung disease" without alleging a specific type of disease. As a result defendants, including OC and Fibreboard, frequently do not know the specific disease for many claims for some time until the disease is identified through discovery or discussion with the claimant's lawyer.

Specific diseases are unknown for about 30 percent of claims filed in the last year but the percent of claims with unknown disease decreases as OC learned specific diseases among claims filed in earlier years. Across claims filed in all years OC's database categorizes disease as unspecified for only 16 percent of claims, a very low rate of unspecified claims among asbestos defendants that is indicative of the high quality of OC's data.

As is common among asbestos defendants, OC never identified specific diseases among some claims that it resolved. As Table 3 shows, OC resolved 59,388 claims for which the OC database categorized claimants' disease either as "unknown" or "none." Again like other defendants, OC made payments in only a small fraction of those claims that were resolved where it did not know a specific disease category and paid modest amounts to resolve those claims, a $1,467 average in 1996-2000 across claims closed with payment and without.

To be consistent with OC's historic experience, we assume that the company will resolve some of its pending claims without determining a specific disease for those claims. We assume further that pending claims resolved without specified diseases will receive no payment (a conservative assumption since history shows a $1,467 average cost to resolve such claims). Based on OC's experience for claims resolved since 1998 when the percent of claims resolved without a specified disease fell to 4.5 percent, we assume that OC will determine specified diseases for 95.5 percent of pending claims and 4.5 percent will have have an unspecified category. Although we expect that only 4.5 percent of pending claims will have unspecified diseases by the time that those claims are resolved by OC, the OC database currently lacks specific diseases for 12.9 percent of pending claims (Table 4).

**Table 4:** Unknowns Are More Frequent Among Pending than Resolved Claims

| Claim Status | Percent of Claims | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| Number Pending | 2.1 | 4.4 | 1.7 | 78.9 | 12.9 | 180,842 |
| Resolved 1998-2000 | 2.8 | 4.7 | 1.4 | 86.5 | 4.5 | 100,295 |

While OC's experience shows that most of the unspecified diseases in its database would change to specific diseases in time, its data cannot reflect both knowledge that would be gained in the future. Therefore we must estimate how many claims in the OC database with unspecified disease would come to have a specific disease and what would be the diseases among these now unspecified disease claims. In making this estimate, we do not assume that every claim will have a specified disease. We do not change the unspecified disease categories among resolved claims. Again we assume that 4.5 percent of pending claims will always have unspecified disease categories.

We used OC's own claims experience both to impute diseases when unspecified and also to adjust the diseases claimed by plaintiffs. Through litigation OC made its own assessment of what disease, if any, was presented by each claim both among claims when the disease was initially unspecified and among claims where the plaintiff alleged a disease. Because it is likely that the amount paid by OC for each claim is more closely related to its assessment of disease than to the plaintiff's allegation, we base our forecasts of future claims on OC's disease assessments rather than plaintiffs' allegations.

We used two data fields in OC's claims database to derive a transition matrix that we use both to impute diseases when unspecified and also to estimate OC's determinations of disease from data about plaintiffs' allegations. For 193,008 claims, the database shows both the plaintiff's alleged disease and OC's determined disease. From these 193,008 claims we derived a cross tabulation of the categories of diseases as alleged by plaintiffs to the categories as determined by OC.

We use this cross tabulation as a matrix to transform both unspecified and alleged disease categories in the OC database to the OC determined disease category that we use for the forecasts. Table 5 shows this cross tabulation that summarizes OC's experience for claims filed after 1990. Most claims stay in the alleged category, but the net effect of OC's disease determinations is to maintain or increase the number of claims in each specific disease category. Claims for which the OC database provides no specific alleged disease (i.e. "none" and "unknown") split about equally between those that OC determined as nonmalignant claims and that remain unspecified, although OC determined that 3 percent were cancer claims.

**Table 5:** OC Experience in Evaluating Alleged Disease, 1991-2000 Filings

| Alleged Disease | Evaluated Disease | | | | | Tot |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| Meso | 5,606 | 92 | 7 | 106 | 118 | 5,929 |
| Lung | 27 | 8,630 | 55 | 245 | 140 | 9,097 |
| Othc | 7 | 56 | 2,117 | 233 | 33 | 2,446 |
| Nonm | 77 | 620 | 355 | 128,814 | 2,010 | 131,876 |
| None | 0 | 1 | 1 | 57 | 175 | 234 |
| Unkn | 201 | 797 | 333 | 21,650 | 20,445 | 43,426 |
| Total | 5,918 | 10,196 | 2,868 | 151,105 | 22,921 | 193,008 |

While this was the experience in the 1990's as a whole, we looked to the recent experience of OC regarding the fraction of closed claims allocated to unspecified disease to calibrate this transition matrix. During 1998 or later, OC was allocating just 4.5 percent of unknowns to unspecified disease. We reduced the contribution proportionately to the unspecified disease category for every claimed disease, producing the following transition matrix (Table 6).

**Table 6:** Derived OC Transition Matrix for Pending Cases

| Alleged Disease | Evaluated Disease | | | | | Tot |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| Meso | 95.6 | 1.6 | 0.1 | 1.8 | 0.9 | 100.0 |
| Lung | 0.3 | 95.7 | 0.6 | 2.7 | 0.7 | 100.0 |
| Othc | 0.3 | 2.3 | 87.2 | 9.6 | 0.6 | 100.0 |
| Nonm | 0.1 | 0.5 | 0.3 | 98.5 | 0.7 | 100.0 |
| None | 0.0 | 1.1 | 1.1 | 63.9 | 33.8 | 100.0 |
| Unkn | 0.7 | 2.7 | 1.1 | 74.1 | 21.3 | 100.0 |

Note: Based on cross tabulation of Table 5 calibrated to produce 4.5 percent unspecified among pending claimants equaling OC's experience for claims resolved during 1998-2000.

We then transitioned all open claims using this matrix. The resulting distributions of open and closed claims are compared in Table 7.

**Table 7:** Distributions of Pending and Resolved Claims After Allocation

| Claim Status | Percent of Claims | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| Number Pending | 2.2 | 4.9 | 1.9 | 86.5 | 4.5 | 180,842 |
| Resolved 1998-2000 | 2.8 | 4.7 | 1.4 | 86.5 | 4.5 | 100,295 |

### 6.1.3. Calculation of Indemnity for Pending Claims

Table 8, below, shows the number of pending claims in each disease category after imputation of diseases along with OC's average resolution cost for each disease during the period 1996 to October 2000 among claims filed after 1990. The resolution cost is the average payment by OC calculated across all claims resolved by OC during the five year period, averaging across both claims that received payment and those that were resolved without payment. The Unspecified ("Unsp") disease category includes claims that were categorized either as "unknown" or "none" in the OC claims database. These claims were conservatively assumed to have no value even though those OC paid $1,467 on average to resolve such claims.

**Table 8:** Number and Average Value of Pending Claims

| Description | Disease | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| Realloc Number Pending | 3,911 | 8,909 | 3,409 | 156,433 | 8,181 | 180,842 |
| Avg Resolution | $185,462 | $40,883 | $17,471 | $7,080 | $0 | NA |

Notes: After imputation of diseases. Average resolution amounts are expressed in year 2000 dollars and calculated across all claims resolved by OC (both with and without payment) that were filed after 1990 and resolved between 1996 and 2000.

We use these numbers and values to complete the formula for deriving the values of pending claims as shown in Table 9. As that table shows, OC's liability for the indemnity of claims pending on October 5, 2000 was $2.26 billion in year 2000 dollars--the conservative value of asbestos bodily injury claims that were pending against OC at the time of its bankruptcy petition.

**Table 9:** Forecast of Indemnity for Pending Claims

| Disease | Number of Reallocated Claims | Average Resolution | Indemnity ($millions) |
|---|---|---|---|
| Meso | 3,911 | $185,462 | $725.3 |
| Lung | 8,909 | 40,883 | 364.2 |
| Othc | 3,409 | 17,471 | 59.6 |
| Nonm | 156,433 | 7,080 | 1,107.5 |
| None | 8,181 | 0 | 0.0 |
| Total | 180,842 | NA | $2,256.6 |

Note: Average resolution amounts and indemnity are expressed in year 2000 dollars. Average resolution amounts are calculated across all resolved claims (both with and without payment).

Figure 3 compares graphically the total value of claims for each type of asbestos disease.

**Figure 3:** Distribution of Indemnity Amounts for Pending Claims, by Disease



Our calculations of OC's expected indemnity for pending claims include all claims that are categorized as open in the OC claims database. These include both unliquidated claims and claims that have been liquidated but that have not been paid in full. OC has disaggregated these two groups of claims calculating that there are 64,411 unpaid liquidated claims that have a total liquidated value between $679 million and $695 million of which $102 million has already been paid and that there are 117,350 unliquidated pending claims which OC estimates have a total value between $844 million and $1.15 billion (Report of Mark W. Mayer on Owens Corning's Pre-Petition Asbestos Personal Injury and Wrongful Death Claims, May 21, 2002, p.3). We have not attempted to disaggregate these two groups of pending claims which together represent OC's expected indemnity payments for claims that have been filed but not yet fully resolved. Our estimates of the total values of all pending claims, liquidated or unliquidated is 30 percent above the upper end of OC's range for the sum of liabilities for unpaid-liquidated and unliquidated claims ($2.257 billion / $1.736 = 1.30), but OC's analysis is based on questionable assumptions. OC inappropriately uses Dr. Friedman's study of an unrepresentative sample of OC claims (Section 10.1, below) to estimate severity among nonmalignant claims and OC uses values of asbestos claims that are substantially lower than its actual resolutions of similar claims just before it filed for bankruptcy protection (OC also used unreliable valuation assumptions made by its consultant Dr. Vasquez. See Section 10.2.4).

## 6.2. Projections of Number And Timing of Future Claims

The number, timing and types of future claims will depend upon the number of people in each future year who develop diseases that are asbestos-related (the incidence of diseases) and the fraction of those people who will pursue claims (the propensity to sue).

This Section describes how forecasts of the incidence of asbestos-related cancer deaths and historic data on the number of cancer claims filed against OC can be used together to calculate the historic propensity to sue OC for cancer and then to forecast future cancer claims.

### 6.2.1. The Incidence of Asbestos-Related Cancers

Medical research by epidemiologists provides projections of the incidence of asbestos-related cancers. Projections differ among epidemiologists, but most agree on the relative changes in cancer deaths over time--increasing until late in the twentieth century followed by a slow decrease in the following years. Because of this general agreement on changes over time, projections of future claims will be generally similar even when based on differing projections of disease incidence.

Figure 4 shows epidemiological projections of the annual number of deaths between 1967 and 2027 from each of three asbestos-related cancers--mesothelioma, lung cancer and other (primarily gastro- intestinal) cancers--among workers exposed before 1980 in major asbestos-using industries. The figure represents the results of work by Nicholson, Perkel and Selikoff (1982) which is generally recognized as the most comprehensive and reliable forecast of asbestos-related cancer deaths (Appendix B, Table B1). The peak year of forecasted deaths differs among the three types of cancers because the latency periods, i.e. the time from first asbestos exposure to the occurrences of cancer, differ among the three diseases. Because the latency period is longest for mesothelioma, the risk of that disease increases for a longer period and the incidence of mesothelioma peaks later than for other asbestos-related cancers. The patterns of asbestos diseases among exposed workers and, therefore, the patterns of legal claims, have been changing over time as the relative incidences of each type of cancer have changed. In past years lung cancer has been the most frequent cancer among occupationally exposed workers and the most frequently claimed cancer. However, in the future workers will face equivalent risks for mesothelioma and lung cancer.

**Figure 4:** Nicholson Cancer Projections



### 6.2.2. Accuracy of Epidemiological Projections

Epidemiologists' projections, like those of Nicholson, et. al., have their own uncertainties, but can be tested by comparing projections for past years with data on mesothelioma deaths in those same years collected by the National Cancer Institute's SEER (Surveillance, Epidemiology and End Results) cancer registry. The SEER program collects comprehensive data on the incidence, treatment and end results (including deaths) for all types of cancers at fourteen different sites in the United States. SEER generates cancer rates from these sites that can then be used to estimate the incidence of each type of cancer for the United States as a whole. The SEER program is highly sophisticated and recognized as the state of the art for such programs throughout the world and its results are widely used in medical research and planning.

Because SEER collects data continually, its results include estimates of the annual national incidence of each type of cancer over many years. The annual SEER estimates of the national incidence of mesothelioma provide a means to test epidemiological forecasts of mesothelioma deaths. Because asbestos is the only recognized cause of mesothelioma, epidemiologists' forecasts of asbestos-related mesothelioma deaths should tend to correspond to the annual SEER national incidence estimates for all mesotheliomas. While the SEER national incidence measures are themselves estimates based on the sample of SEER sites with their own uncertainties, over many years an accurate epidemiological forecast of mesothelioma deaths should track trends in the SEER estimates of actual mesothelioma deaths.

In fact, as Figure 5 shows, the Nicholson et. al. forecasts correspond remarkably well to SEER estimates of actual mesothelioma deaths. Nicholson and his colleagues published their forecasts in 1982. Since then and through the most recent years of data, the Nicholson forecasts closely

track the SEER estimates of annual mesothelioma deaths.

Because lung cancer and the other asbestos-related cancers have causes other than asbestos exposure, the SEER estimates of those cancer deaths will exceed and cannot be used to test the epidemiological forecasts for those other cancers. But because Nicholson's forecasts for all types of cancers are based on the same methods and the same estimates of the number of exposed workers and the extent of their asbestos exposures, the strong confirmation of Nicholson's forecast for mesothelioma provides confidence for Nicholson's epidemiological forecasts for each type of cancer.

**Figure 5:** Epidemiological Projections Confirmed by SEER's Mesothelioma Counts



Figure 5 also shows a second forecast of asbestos-related mesothelioma deaths made by analysts at KPMG-Peat Marwick in 1992 as part of their work as experts in the bankruptcy proceedings of National Gypsum. Dr. Thomas Vasquez and his colleagues at KPMG-Peat Marwick attempted to update the 1982 forecasts made by Nicholson, et. al., using more recent U.S. Labor Department statistics on the populations of workers in asbestos exposed industries, more recently formulated medical models of the risk of mesothelioma and lung cancer from asbestos exposure and several alternative assumptions (KPMG's annual forecasts are reproduced in Appendix B, Table B2). As Figure 5 illustrates, the KPMG forecasts are very similar to those made by Nicholson et. al. a decade previously and, as a result, claims forecasts that are based on the two alternative epidemiological forecasts are only slightly different. Figure 5 also shows that between the two, the original Nicholson more closely fits the SEER estimates of actual mesothelioma deaths and, therefore, provides a superior basis for forecasting future asbestos claims.

### 6.2.3. Propensities to Sue OC

Data and forecasts of the incidence of asbestos-related diseases describe the potential for liability against OC. As long as asbestos-related cancers occur, it is likely that some claims will be filed. Data on OC's past claims show how much of this potential for asbestos cancer claims was directed against the company: Among all the potential asbestos-related cancer claims in the country what fraction resulted in OC claims? OC's claims data also show trends in claiming against the company, whether the level of claiming had increased, decreased or stabilized in recent years.

Table 10 shows the annual number of asbestos bodily injury claims filed against OC for each type of asbestos related disease after the imputation of diseases, as described above. OC's claims increased steadily from the early 1990s reaching a peak in 2000 when the company received 41,604 claims during the nine months preceding its bankruptcy, an annualized rate of over 55,000 claims. The large number of 1995 filings does not contradict the conclusion that OC's claims have been increasing steadily prior to its bankruptcy petition. Increased filings in that year resulted from two large, national class actions of future asbestos claims against members of the Center for Claims Resolution (CCR) and against Fibreboard Corporation that were negotiated and filed during 1992-1993. Almost all defendants (other than CCR members and Fibreboard who had injunctive protection from filings) saw greater filings in 1995 than during the preceding or following years for reasons related to the CCR's Georgine class action and Fibreboard's Ahearn class action. Filings in 1995 were increased by the notoriety of each class action, the extensive national notice campaigns for each and acceleration of claims filings when lawyers first sped-up filings against CCR members and Fibreboard and then later against OC and other defendants.

**Table 10:** Number of Filings Against OC, By Filing Year and Disease

| Filing Year | Disease | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| Unkn | 306 | 526 | 155 | 7,747 | 2,307 | 11,040 |
| 1971 | 0 | 1 | 0 | 3 | 2 | 6 |
| 1972 | 0 | 0 | 0 | 2 | 0 | 2 |
| 1973 | 2 | 3 | 0 | 5 | 0 | 10 |
| 1974 | 4 | 0 | 0 | 13 | 2 | 19 |
| 1975 | 2 | 5 | 2 | 42 | 3 | 54 |
| 1976 | 13 | 10 | 2 | 151 | 16 | 192 |
| 1977 | 18 | 26 | 5 | 307 | 26 | 382 |
| 1978 | 42 | 38 | 17 | 612 | 86 | 795 |
| 1979 | 100 | 161 | 92 | 1,580 | 201 | 2,134 |
| 1980 | 209 | 330 | 279 | 3,671 | 512 | 5,001 |
| 1981 | 260 | 365 | 204 | 4,199 | 331 | 5,359 |
| 1982 | 209 | 306 | 185 | 3,895 | 284 | 4,878 |
| 1983 | 277 | 334 | 138 | 3,810 | 333 | 4,893 |
| 1984 | 332 | 440 | 199 | 4,595 | 283 | 5,848 |
| 1985 | 414 | 724 | 267 | 8,045 | 746 | 10,196 |
| 1986 | 519 | 1,163 | 434 | 14,176 | 1,118 | 17,409 |
| 1987 | 749 | 1,728 | 685 | 15,012 | 1,705 | 19,879 |
| 1988 | 554 | 1,250 | 433 | 17,011 | 1,753 | 21,001 |
| 1989 | 717 | 1,632 | 424 | 17,512 | 1,736 | 22,021 |
| 1990 | 830 | 1,640 | 521 | 17,183 | 1,023 | 21,197 |
| 1991 | 720 | 1,403 | 443 | 16,405 | 1,538 | 20,509 |
| 1992 | 721 | 1,485 | 506 | 23,707 | 1,978 | 28,396 |
| 1993 | 671 | 1,267 | 403 | 21,600 | 5,876 | 29,818 |
| 1994 | 940 | 1,731 | 530 | 22,269 | 3,946 | 29,416 |
| 1995 | 1,061 | 2,369 | 902 | 40,184 | 9,957 | 54,472 |
| 1996 | 976 | 1,670 | 521 | 27,350 | 5,445 | 35,963 |
| 1997 | 900 | 1,528 | 493 | 24,959 | 10,938 | 38,818 |
| 1998 | 991 | 1,479 | 561 | 25,002 | 6,970 | 35,003 |
| 1999 | 1,132 | 2,075 | 677 | 39,965 | 4,115 | 47,963 |
| 2000 | 1,304 | 1,801 | 590 | 33,555 | 4,340 | 41,590 |
| [Ann00] | 1,739 | 2,401 | 787 | 44,740 | 5,787 | 55,454 |
| Total | 14,973 | 27,490 | 9,668 | 394,567 | 67,570 | 514,264 |

Notes: After allocation to disease categories. Entries for 2000 are filings through October 5, 2000. Annualized filings for 2000 are shown in the "Ann00" row. Totals are based on 2000 filings through October 5. The unspecified category ("Unsp") includes both of OC's categories "none" and "unknown."

Figure 6 provides graphic representations of the increasing trends in OC filings for each of the three types of cancers (data annualized in 2000). OC's trend in annual pattern of claim filings is shared with other asbestos defendants: (1) steady increases in claims since the early 1990s; (2) biggest increases in the most recent years; and (3) interruption by an unusually large number of claim filings in 1995.

**Figure 6:** Number of Cancer Filings Against OC



Forecasts of future mesothelioma claim filings are based on a calculation of the relationship between past claims to the past incidence of the disease. This calculation, known as the "propensity to sue", is derived by dividing the number of claims for mesothelioma in a year by the number of mesothelioma deaths projected for that same year, and establishes the historic claiming rate for mesothelioma against OC. Propensities to sue OC for lung cancer and for other cancers are calculated similarly, by dividing the number of claims for each type of cancer in a year by the Nicholson forecast of the number of asbestos-related deaths from that cancer in the same year.

Figure 7 compares Nicholson's forecast of mesothelioma deaths between 1990 and 2000 with the number of mesothelioma claims filed against OC in those years (2000 annualized).

**Figure 7:** Nicholson Meso Incidence Forecasts vs OC Actual Claims



Table 11 below shows the annual propensities to sue calculated for each of the three types of asbestos-related cancers for each year since 1990. From the early 1990s propensities to sue increased steadily for each cancer (taking into account the exceptional nature of 1995 filings) as the number of cancer filings increased. This pattern is shown again and again among asbestos defendants (again with the exception of Fibreboard and CCR members who were protected by injunctions related to their two class actions).

We used OC's claims experience during the almost five year period from January 1996 through September 2000 to forecast future claims that would be filed against OC after October 5, 2000. This 4.75 year "base period" represents OC's most current claims experience, the years immediately preceding OC's petition date that marks the beginning of the forecast period.

Reasonable forecasts of future OC claims must take two matters into account: (1) the most recent level of claiming shown by the propensities to sue during years preceding OC's bankruptcy filing and (2) the fact that cancer filings and propensities to sue had increased across recent for each cancer, sharply in 2000. Together these matters not only establish a starting point for forecasting future OC cancer claims based on the most recent propensity to sue, but also suggest that propensities to sue OC would likely continue their increase, exceeding the levels of the base period.

**Table 11:** Propensities to Sue OC, by Disease: 1990-2000

| Filing Year | Type of Cancer | | |
|---|---|---|---|
| | Meso | Lung | Othc |
| 1990 | 31.8 | 29.9 | 34.9 |
| 1991 | 26.9 | 25.5 | 29.6 |
| 1992 | 26.2 | 27.0 | 33.8 |
| 1993 | 24.0 | 23.3 | 27.2 |
| 1994 | 33.2 | 32.0 | 36.1 |
| 1995 | 36.8 | 44.2 | 62.1 |
| 1996 | 33.4 | 31.5 | 36.2 |
| 1997 | 30.3 | 29.1 | 34.6 |
| 1998 | 33.2 | 28.7 | 40.2 |
| 1999 | 37.7 | 41.2 | 49.6 |
| 2000 | 57.5 | 48.8 | 58.9 |

The number of claims forecast for each type of cancer in each future year is derived by multiplying the number of deaths projected by Nicholson for that year by the likely propensity to sue for that cancer. The calculations that are used first to derive propensities to sue and second to forecast future claims based on these propensities to sue are stated below:

Calculation of Propensity to Sue:

```
     Number of Claims
    ---------------- = Propensity to Sue
        Incidence
```

Forecasting Future Claims from Propensity to Sue:

```
Propensity X Incidence in = Projected Claims
   to Sue      Future Year      in Future Year
```

We forecast the number of OC cancer filings for the first future year, the year following its petition for bankruptcy protection, using the propensities to sue from the base period. In other words we assume that the percent of cancer victims who would have filed claims against OC immediately after its bankruptcy would have been the same as the percent in the five years preceding its bankruptcy. Again, this is a conservative assumption. Rather than starting our forecasts at the level of OC claim filings in 2000, the most recent year, we start at the lower level derived from OC's experience over the last five years.

We have two alternative models to forecast future claims:

- One model, the "Increasing" model, assumes that the increase in propensities that we observed in OC claims prior to the bankruptcy would have continued for five more years and then the propensities to sue would increase no further but would remain for all further years at the level reached in the fifth future year. The rates of increase in the propensity to sue would be the same as rates of increase in those measures observed generally among asbestos defendants during the 1990s. This model is the most plausible in that it represents continuation of the increasing claims that OC had experienced up to the date of its bankruptcy petition.

- The second model, the "No Increase" model, assumes that propensities to sue in all future years would remain at the levels of OC's propensities to sue during the base period. Because this model does not accurately reflect OC's experience of increasing claims at the time of its bankruptcy petition, it is not plausible. It is provided only as an illustration showing what would be OC's future liability if the level of its future claims could have been frozen at the levels during the five years prior to its bankruptcy, an implausible proposition.

Figure 8 illustrates the forecast for mesothelioma claims, showing (a) the Nicholson forecast of nationwide mesothelioma deaths for all years from 1990 through 2039 (Nicholson's forecasts stop in 2030, but we extrapolated them forward through 2039), (b) annual mesothelioma claims against OC through 2000 and (c) the two alternative forecasts of future mesothelioma claims through year 2039. Illustrations of forecasts for lung cancer and other cancer claims would be similar to those in Figure 8.

**Figure 8:** Nicholson Meso Forecasts and OC Projections



### 6.2.4. Projection of Future Nonmalignancy Claims

The trend in annual filings of nonmalignant claims against OC is similar to its trends for cancer claims (Table 10). Figure 9 shows annual filings of nonmalignant claims against OC since 1980 (annualized for 2000). To facilitate comparison of trends in cancer and nonmalignant claim filings, Figure 10 shows annual filings in each year from 1980 through 2000 using different scales for cancer claims and for nonmalignant claims. As Figure 10 demonstrates, throughout twenty years of its asbestos litigation the trends in annual filings of cancer and nonmalignant claims filed against OC have been almost identical, both year by year and as trends across the twenty years. While there is some year to year variation in trends for cancer and nonmalignant claim filings,

trends for both types of diseases are highly similar since 1980.

**Figure 9:** Annual Nonmalignant Claims



**Figure 10:** Comparison of Nonmalignant and Cancer Claim Counts



To forecast the number of nonmalignant claims that will be filed against OC in future years we do not use the same method that we use to forecast OC's future cancer claims. First, there are no published, peer-reviewed epidemiological projections for the incidence of nonmalignant asbestos-related diseases that have been validated by actual data on incidence as have the Nicholson cancer forecasts. Second, the disease processes for asbestos related cancers and asbestos related nonmalignant diseases differ. Unlike the asbestos related cancers, which become known to victims abruptly through the rapid onset of symptoms and diagnoses, nonmalignant diseases are insidious. Asbestosis and pleural diseases are progressive diseases that develop gradually over time with the accumulation of scarring of the lungs or pleura. Because dyspnea (shortness of breath) and other effects of these diseases typically increase slowly over time, victims of these diseases may be unaware of the earliest onset of symptoms or may attribute breathing problems to their increasing age or other possible causes. So unlike the asbestos related cancers, which become known to victims by a signal event--the diagnosis of a grave disease--that will be most likely to trigger claim filing, victims of nonmalignant asbestos diseases may become aware of their diseases gradually or they may be made aware by a medical diagnosis of asbestosis or pleural disease that could be made early or later in the progression of the disease. Consequently, filings of claims for asbestosis and pleural disease cannot be predicted from epidemiological evidence in the same manner as can filings of asbestos related cancers.

But in fact filing trends for nonmalignant and malignant asbestos claims are proportionally related because those filings are generated by similar sets of social, institutional and behavioral determinants. As Figure 10 demonstrates filings of asbestos nonmalignant claims in a year can be predicted well from filings of cancer claims. This close correspondence of filings of cancer and nonmalignant claims is one of the most striking patterns in asbestos litigation, not only for OC

but for other asbestos defendants as well. We use this stable relationship between cancer and nonmalignant claims filings to project future nonmalignancy claims based on the historic ratio of nonmalignancy to cancer claims against OC. We call the ratio of nonmalignant to cancer claims the "nonmalignant multiplier." In our forecasts for OC, we calculate the nonmalignant multiplier over the same 4.75 year base period ending September 2000 that we used to forecast future cancer claims, calculating the ratio of nonmalignant claim filings to cancer claim filings during those years. We then estimate the number of nonmalignancy claims that will be filed in a future year by multiplying our projection of cancer claims for that year by the nonmalignant multiplier or ratio of nonmalignant to cancer claims.

Again the projection for the first year after OC's bankruptcy starts with an assumption that the ratio of filings between nonmalignancy and cancer claims will continue to be the same as during the base period. Historically during the base period the number of nonmalignancy claims filed against OC has been approximately nine times as many as cancer filings. This means that initially nonmalignancy claims will be about nine times the number of cancer claims, i.e. 90% of all filings.

We then use two alternative assumptions about how this ratio of nonmalignancy cancer claims will change over time, assumptions that correspond to our two alternative assumptions about future changes in propensities to sue for cancer. The "Increasing" assumption, which is used together with the "Increasing" model of propensities to sue for cancers, assumes that the ratio of nonmalignancy to cancer claims will increase slightly over the next five years and by the end of five years will be about 11% greater than the ratio during the base period. Thereafter, the ratio of nonmalignancy to cancer claims will remain unchanged. This 11% increase represents the general experience among asbestos defendants during the 1990s and was calculated from the actual filing experience of the Manville Trust and the UNR Trust. The second, "No Increase" assumption, which accompanies the "No Increase" model of propensities to sue for cancers, assumes that the ratio of nonmalignant to cancer claims observed during the base period will remain unchanged in all future years.

Figure 11 and Figure 12 illustrate these alternative models of future nonmalignant claims. Both figures show the number of claims filed against OC annually prior to the bankruptcy separated into cancer and nonmalignant claims: cancer claims appear at the bottom and nonmalignant claims appear above. For purposes of illustration Figure 11 shows the implausible "No Increase" model, with no future increase in either the propensity to sue or the nonmalignant multiplier. Figure 12 shows the preferred "Increase model," with increases between 2002 and 2005 in the cancer propensities to sue and the nonmalignant multiplier.