# EXHIBIT A

effect of this drop-out. Neither Dr. Friedman, nor Dr. Vasquez, nor Credit Suisse can deny the possibility that if these missing claims had been present the rate of impaired claims found by Dr. Friedman might have doubled.

### 10.1.1.4. Conclusions about Friedman Report

Because the claims in Dr. Friedman's study were not selected to be representative of all OC claims, but rather were selected to concentrate on certain medical professionals and on claims from three Texas law firms, results of Dr. Friedman's study cannot be applied to all OC claimants. Assertions by Credit Suisse in its motion and Dr. Vasquez in his liability forecast that Dr. Friedman's conclusions apply to all OC claims are wrong and misrepresent the results of the study. Credit Suisse and Dr. Vasquez could not even properly assert that Dr. Friedman's conclusions about the 1,691 claims apply to the 22,578 claims from which they were drawn.

For all of these reasons, the results of Dr. Friedman's study can be meaningfully applied only to the 1,691 unrepresentative cases that he directly examined. These results do not show any great surprises about asbestos claims or litigation. They certainly do not demonstrate "widespread fraud that drove Owens Corning into bankruptcy" (Credit Suisse motion. p. 6). Dr. Friedman found that most of the 1,691 claimants for whom he had data did not provide medical reports showing impairment, but most of these 1,691 claimants did not allege impairment in the first place according to OC's claims database. In fact, Dr. Friedman agreed with claimants' assertions of impairment in 70 percent of cases: Of 1,671 where we could assess both the claimants allegation and Dr. Friedman's conclusion, in 279 cases Dr. Friedman agreed with an allegation of impairment and in 882 cases he agreed with with plaintiff's failure to allege impairment. Dr. Friedman found impairment among 40 percent of claimants who claimed to have impaired asbestosis or pleural disease and among 5 percent of claimants who did not claim impairment. The low rate of impairment among claimants not asserting impairment is appropriate and not surprising. The 40 percent rate of impairment that Dr. Friedman found for claimants asserting impairment is also not surprising, given that OC concentrated Dr. Friedman's review on those medical facilities of which it was highly suspicious. There is no reason to believe that these low rates would apply to other, more credible facilities.

Furthermore, rather than demonstrating a capricious system of asbestos litigation, Dr. Friedman's study highlights how that litigation responds to issues of integrity of medical information. First, OC's resolutions of claims is generally consistent with the conclusions that Dr. Friedman reached after extensive review of the 1,691 claims. Among the claimants that Dr. Friedman found to have no impairment, 74% have received $1,000 or less. Among those claimants that Dr. Friedman found to have impairment 82 percent received more than $5,000 in settlement. Second, both asbestos defendants and plaintiffs' law firms respond to the problems of integrity that Dr. Friedman found among certain medical facilities. As Credit Suisse observed, OC quit accepting medical reports from two of the pulmonologists that were criticized by Dr. Friedman (Footnote 13, p. 15). The Manville Trust, the Fuller Austin Settlement Trust and presumably other asbestos defendants and trusts have similarly stopped accepting documentation from questionable facilities. Plaintiffs' law firms, in turn, have dropped the use of problematic medical laboratories and B-readers. Among the four pulmonary function facilities criticized by Dr. Friedman and identified above, no plaintiff has submitted a claim to the Manville Trust in the last three years supported by a report from Pulmonary Testing Services, only 43 have submitted reports from Respiratory Testing Services in the last seven years and only one claim has submitted a report from any of the four facilities in 2004. Law firms want their claims paid, they do not want disputes and refusals by asbestos defendants.

In summary, Credit Suisse, Dr. Vasquez and Dr. Friedman all misrepresent the generality and significance of Dr. Friedman's conclusions about the claims he examined. Dr. Friedman

incorrectly implies more generality to the cases that he examined as "a snapshot of claims filed in the 1990s" (p. 33 and p. 36) and incorrectly states that he "evaluated a representative sampling of claims alleging asbestos related diseases," but he did not understand the limited and biased source from which his data were drawn. He states "I had no involvement in the selection of cases .... The identify of all plaintiff firms was redacted from all documents and represented by an assigned code. I was blinded as to the identify of the law firms." (p. 2) Perhaps for this reason he stated incorrectly that his data, which in fact were almost entirely from three Texas law firms, were about "claims ... submitted by numerous different plaintiff firms from various geographic locations" (p.2).

### 10.1.2. Problems with the Gitlin Article

Credit Suisse also refers to an "explosive" study by Dr. Joseph Gitlin and others (Comparison of "B" Readers' Radiographic Interpretations of Chest Radiographs for Asbestos Related Changes," Academic Radiology 2004, 11: 843-856) (the "Gitlin article") that, in its view, casts doubt on the validity of medical documentation supporting many of the claims against OC. The Gitlin article was accompanied by a guest editorial that in its title alone suggests the possibility of widespread abuse (Janower, M. L. and L. Berlin, "B" Readers' Radiographic Interpretations in Asbestos Litigation: Is Something Rotten in the Courtroom?," Academic Radiology 2004, 11: 841-842). The basic article and accompanying editorial have been widely quoted and used by asbestos defendants to lobby against asbestos plaintiffs and to support the call for legislative reform.

In making these arguments, Credit Suisse ignores two vital pieces of information. First, Dr. Gitlin himself does not attempt to generalize beyond his sample to a general population, and explicitly says you cannot do that. Second, any attempts to generalize from his article to a general population would have no scientific basis.

The "Discussion" Section of Dr. Gitlin's article makes clear what can and cannot be learned from the study. Direct quotes are:

- "The authors had no basis for determining how this group of workers represented the universe of asbestos claimants"

- "Additional studies incorporating scientific sample selection and the use of demographic factors would be desirable in developing more objective measures for adjudication of individual claims."

- "Despite these limitations, the results of this study can contribute to the design of subsequent efforts to obtain reliable information about asbestosis, including the optimum number of consultant readers needed to to provide sufficient data points to support reasonable analysis and consultations."

So, Dr. Gitlin was focused on questions like how much interobserver variation there was in the interpretation of X-rays, what kinds of data gathering procedures one would need, and what sorts of statistical methods might be used to determine a given individual's status in the presence of multiple X-ray readings.

But the Gitlin article stops well short of drawing inferences about the population of asbestos claimants. It is Credit Suisse that has drawn those inferences. In doing so, Credit Suisse has ignored the fact that the article does not satisfy standards for generalization in the scientific literature. Credible scientific research must:

- start with the explicit identification of a target population to which the research conclusions would apply (e.g., the population of alive exposed workers, or claimants filing claims in

recent years, or claimants filing non-malignant claims in recent years),

- select a sample in a way that the relationship between the sample and target population is fully explained so that others can understand the sampling process, and

- use statistical methods to examine biases in the sample for which data are complete so that adjustments (e.g., reweighting) can be made if necessary in generalizing from the sample back to the target population

- subject sampled claims to unbiased analyses that do not predetermine results simply because of how claims were reviewed or who did the reviewing and then fully explain the review and who did it so that others can understand the analytic process.

None of this is done in the article. All that we know is that "the results presented in this article are based on a reading trial the authors conducted for a group of defense attorneys" suggesting that the research was done for partisan reasons rather than for objective science. How Dr. Gitlin's cases were selected and who reviewed them means everything--the study involves nothing other than these two processes which Dr. Gitlin fails to describe. In order to generalize to populations beyond the sampled claims, Dr. Gitlin would have to start, as he does not, by describing both the population of defense attorneys, the population of X-rays from which the sample was drawn and how the X-rays possessed by these defense lawyers are representative in some way to a broader population. Without such explanations, we must be skeptical about the generality of the examined X-rays: defense lawyers typically have X-rays for only a small and unrepresentative sample of all asbestos plaintiffs. Dr. Gitlin would then have to explain how the X-rays in his study were sampled from all X-rays possessed by these defense lawyers, a step that he again fails to explain. Again, we must be skeptical (the scientific method requires skepticism, an approach that is even more incumbent here given the interested sponsorship of the research and the high economic stakes of its conclusions). Here, where defense attorneys both sponsored the study and also supplied the sampled X-rays, Dr. Gitlin would have to make a compelling explanation of a fair, random selection process. Dr. Gitlin would need to rule out adverse selection procedures that have the effect of generating conclusions of interest to the sponsoring lawyers. For example, defense attorneys may have selected from the minority of asbestosis law suits that were rejected by courts or refused payments. Or, defense attorneys might have screened the X-rays to identify claims that a defense doctor had already assessed as having no X-ray evidence of asbestos-related disease. Because Dr. Gitlin's inferences about his sampled cases are so extreme (only 4.5% of the cases have ILO 1/0 or higher), these are the plausible hypotheses for the cases selected and reviewed here.

Having failed to explain how the sponsors of his research selected the claims that he examined, Dr. Gitlin then fails to describe who reviewed these claims. Credible past research has already shown enormous variability among B-readers in their conclusions about X-rays; Dr. Gitlin does not attempt to plow new ground here. See, for example, 'B-Readers' and Asbestos Medical Surveillance. Ducatman, Yand and Forman,. Journal of Occupational Medicine, Volume 20, pp. 644-647 (1988). B-readers who serve as litigation consultants for asbestos defendants differ markedly in their readings from those who serve as consultants for asbestos plaintiffs and both differ from those B-readers who do not participate in litigation. Again, without Dr. Gitlin's explanation about how his "test" B-readers were selected and what, if any, experience they have in asbestos litigation, we must be skeptical. If Dr. Gitlin's B-readers include consultants to asbestos defendants, the results are an expectable reflection of biases among such B-readers.

Established and reputable health services journals like the Journal of the American Medical Association or the New England Journal of Medicine determine the standards that have to be followed for publication. One cannot accept a series of medical cases with completely unknown origin as the basis for a study, as Credit Suisse would suggest. Credit Suisse has not done its own

analysis here, but has simply jumped on a partisan bandwagon of asbestos defendants who cite this study done on behalf of their lawyers.

### 10.1.3. The Credit Suisse Motion Raises No Credible Forecasting Issues

Nothing in Credit Suisse's motion raises issues affecting reasonable forecasting of the asbestos liabilities of OC or Fibreboard. Credit Suisse does not criticize my forecasts or assumptions either in this case or in my previous forecasts in other cases, but rather raises a straw man argument that falsely asserts that I make a forecasting assumption that I do not in fact make. Credit Suisse then relies on the Friedman report and Gitlin article, two studies that provide no reliable information about OC and Fibreboard asbestos claims, both to criticize my forecasts and also to argue for an expensive and unworkable process for reviewing detailed medical records for thousands of OC claims. Neither the Freidman report nor the Gitlin article either support their criticisms of my forecasts or evidence a need for Credit Suisse's expensive discovery process. Credit Suisse provides no useful comments about uncertainties in our forecasts and no help in identifying issues that would be appropriate for examination through sensitivity analyses.

### 10.2. Dr. Vasquez Forecasts for OC and Fibreboard

The undated "Forecast of Future Asbestos Claims and Idemnity: Owens Corning and Fibreboard" by Dr. Thomas E. Vasquez provides independent estimates of asbestos liabilities for each company. Dr. Vasquez employs the same basic forecasting approach that I have used in this report, the standard and widely used "Nicholson Method" so named because of its use of the signal epidemiological forecasts by Nicholson, Perkel and Selikoff to forecast future claim filings. While using the same basic method, Dr. Vasquez employs far different and often unsupported assumptions which individually and in combination serve to minimize his forecasts of future liabilities. I review some of Dr. Vasquez's significant assumptions in this Section and present sensitivity analyses of Dr. Vasquez's forecasts to show how each reduces Dr. Vasquez's forecasts.

Dr. Vasquez's forecasts have two basic problems: First, as I describe in detail below, he uses a series of unusual and questionable assumptions each of which has the effect of reducing his forecasted liability. The forecasts are not balanced but rather combine questionable assumptions that minimize estimated values of asbestos bodily injury claims. Second, Dr. Vasquez's forecasts of values for OC and and Fibreboard asbestos claims are muddled amalgams based sometimes on values in tort litigation and at other times values that might be paid by a bankruptcy trust created in these procedings.

Dr. Vasquez starts his valuation with amounts paid to asbestos claimants in the past by OC and Fibreboard as settlements in tort litigation, which would be an appropriate approach for estimating values of bankruptcy claims for asbestos bodily injuries if the approach had been implemented correctly. But Dr. Vasquez then subverts this approach by repeatedly replacing amounts actually paid by OC and Fibreboard in past tort litigation with his speculation about how claims would be paid by a trust created in these bankruptcy proceeding:

- Relying on the flawed Friedman study, Dr. Vasquez assumes that most claimants alleging asbestosis or pleural disease will have no impairment and will have values that he sets arbitrarily at $1,000 for OC and $700 for Fibreboard because "consistent with post-bankruptcy asbestos trusts, it was assumed that a nominal amount would be paid even to unimpaired claimants" (Vasquez, pp. 21 and 71).

- In calculating historic payments, Dr. Vasquez disregards OC's compensatory damage trial verdicts "since future Owens Corning and Fibreboard claims will be settled through a settlement trust" which he assumes would not be subject to trial verdicts (Vasquez, p. 69).

• Dr. Vasquez forecasts administrative and defense costs that would be paid by an asbestos trust not what OC and Fibreboard would pay in continuing litigation (Vasquez, pp. 32 and 90).

It is not clear just what liabilities Dr. Vasquez attempts to forecast, those of an asbestos trust or those for OC and Fibreboard in a continuation of tort liability, although he states that he prepared his forecasts because "the forecast of indemnity for the two companies is required under Section 524(g) of the Bankruptcy Code" (p. 4), requirements placed on asbestos trusts to assure their ability to pay future claimants. In any event, Dr. Vasquez's forecasts do not seem intended to and do not in fact estimate the values of OC and Fibreboard asbestos bodily injury bankruptcy claims in terms of the civil laws and procedures that apply to those claims. His forecasts do not seem pertinent to the current estimation process.

Dr. Vasquez's report makes many assumptions that determine the amounts he forecasts as OC's and Fibreboard's liabilities for future asbestos claims. Some of these assumptions are troubling or implausible. Table 30 lists seven particular assumptions made by Dr. Vasquez that I discuss in this section. Table 30 also shows results of our sensitivity analyses that quantify the impact of each assumption on Dr. Vasquez's forecasts of liability for each company. We start by attempting to replicate the forecasts by Dr. Vasquez that use all of his assumptions and his "Method 2" disease payment values. We were able to closely replicate Dr. Vasquez's forecasts for OC (the first two rows of Table 30), producing identical forecasts for the present value. We did not precisely replicate his forecasts for Fibreboard, perhaps because we use a different, more recent database than that used by Dr. Vasquez. We reach slightly higher forecasted liability values, a difference that I adjust in the next paragraph in discussing the full results of the sensitivity analysis. We then change each of the seven problematic Vasquez assumptions one at a time, showing the cumulative effects of these changes on Table 30. For example, when we extend the base period that Dr. Vasquez uses to forecast future claim filings from the 1995-1998 period he uses to 1995-2000, the present value forecasts increase about 22 percent for OC ($3.9 billion / $3.2 billion = 1.22%) and about 19 percent for Fibreboard ($3.2 billion / $2.7 billion = 1.19%; we start with with our approximate replication of Dr. Vasquez's results before and after this sensitivity adjustment rather starting with his precise forecast results). When we change the second Vasquez assumption, changing his assumption of no increase in future propensities to an assumed increase, the effects of both of these changes now increase Dr. Vasquez's present value forecast for OC from the $3.2 billion he started with to $5.6 billion, an increase of 175 percent. We continue adding the effects of each changed assumptions to the previous changes showing the cumulative effects of all seven changes by the end of Table 30.

Table 30: Cumulative Effect of Assumptions on Dr. Vasquez' Estimates of Filings and Liability

| Ref Section | Condition | Liability | | Present Value | |
|---|---|---|---|---|---|
| | | OC | FB | OC | FB |
| | Vasquez "Method 2" Results | $6.9 | $5.1 | $3.2 | $2.3 |
| | LAS Replication of Vasquez Results | 7.1 | 6.0 | 3.2 | 2.7 |
| 10.2.1 | Include 1999-2000 in Base Period | 8.5 | 7.0 | 3.9 | 3.2 |
| 10.2.1 | Increase Propensity to Sue | 12.8 | 10.5 | 5.6 | 4.6 |
| 10.2.2 | Use Nicholson Epidemiology | 13.9 | 11.4 | 6.1 | 5.0 |
| 10.2.4 | Use Constant Dollars (2000$) | 14.5 | 11.7 | 6.4 | 5.1 |
| 10.2.4 | Restore Verdicts | 16.9 | 11.7 | 7.4 | 5.1 |
| 10.2.4 | Use Actual Settlement Values | 19.0 | 13.1 | 8.3 | 5.7 |
| 10.2.4 | Remove Age Adjustment | 20.6 | 14.2 | 8.8 | 6.1 |

Notes: Table shows alternative forecasts of the present value of liabilities for future claims in billions of year 2000 dollars. Discount rate is 6%. Inflation rate varies among the alternatives.

As Table 30 shows replacement of each of the seven Vasquez assumptions that I criticize below with more plausible assumptions has the effect of increasing the liability forecasts for each company (the changed assumption of restoring verdicts did not affect the Fibreboard forecast because that company had no recent verdicts). Together substitution of all seven Vasquez assumptions with alternatives that I show below to be more plausible results in a great increase Dr. Vasquez's forecasts. His present value forecast of future claims for OC increases from $3.2 billion to $8.8 billion. His present value forecast for Fibreboard increases from $2.3 billion to $5.2 billion, (obtained by increasing Dr. Vasquez's $2.3 billion forecast by 226 percent which is the percent increase we observe from our $2.7 approximate replication of his Fibreboard forecast to Fibreboard's $6.1 billion liability after the seven adjustments: $6.1 billion / $2.7 billion = 2.2593; 2.2593 x $2.3 billion = $5.196 billion). These differences represent changes in only seven of the troubling assumptions. Dr. Vasquez's forecasts would have increased further with more comprehensive changes.

### 10.2.1. Dr. Vasquez Ignores OC's and Fibreboard's Increased Claims Filings

Future forecasts should look to a company's history of past claims which provide information about the actual level of filings for each asbestos related disease and trends in such filings. Forecasters look to the most recent period of filings against a defendant under the assumption that conditions that will determine filings in the future are most similar to the most proximate time period, here the months and years immediately preceding OC's bankruptcy filing. For both OC and Fibreboard, claim filings had increased throughout the 1990s and over the five years preceding the petition date, reaching their highest level immediately before the bankruptcy (47,980 claims against OC in nine months of 2000, 55,439 annualized, Table 10, Section 6.2.3; 46,532 claims against Fibreboard in the same period, 54,272 annualized, Table 23, Section 8.2.1.). Only a one-year increase in filings in 1995 broke this overall trend and that increase was the result of the two nationwide class action of future claimants that shifted filings that would have otherwise occurred before and after 1995 into that year (see discussion in Section 6.2.3.). Both Dr. Vasquez and I testified about this process of "accelerated" claimings during the fairness hearing for Fibreboard's Ahearn class action, one of the two class actions that caused the 1995 increase for accelerated filings against OC and other defendants, and I presented data in the Babcock and Wilcox confirmation hearing about a similar acceleration of filings against that company in 1995.

Contrary to general practices in forecasting asbestos liabilities and his own forecasts in other cases, Dr. Vasquez did not use OC's and Fibreboard's most recent and timely experience in claim filings to forecast future claims, but rather used an earlier period, 1996-1998, during which annual filings against OC were only 71 percent of their most recent level during January 1999 through September 2000 (36,597 average annual filings during 1996-1998; 51,709 average annual filings 1999-September 2000: 36,597 / 51,709 = 70.8 percent) and Fibreboard's were only 68 percent of their most recent level (34,455 annual filings during 1996-98; 50,402 annual filings 1999-September 2000: 34,344 / 50,402 = 68.4 percent). As a result Dr. Vasquez forecasts that OC's and Fibreboard's future filings would start at only 70 percent of the annual level of filings for each averaged over the most recent five years preceding OC's bankruptcy petition. Then, although both companies were experiencing a continuing increase in filings, an increase which was and continues to be the experience of other asbestos defendants as well (Figure 2, Section 3.), Dr. Vasquez forecasts that the direction of future filings would change, sharply decreasing from his starting points that were already well below each company's actual claim filing experience at the time of its bankruptcy.

Dr. Vasquez rejected the most current data on OC's and Fibreboard's claim filings and his own practices in other cases arguing that the increased 1999 and 2000 filings were caused by the new NSP settlements that encouraged plaintiffs to accelerate their filings in order to be included in the initial NSP agreements. Dr. Vasquez offers no evidence at all to support his speculation that plaintiffs accelerated the timing of their filings or that the large 1999 and 2000 increase in OC filings resulted from accelerated filing of claims. The evidence is contrary. Asbestos claim filings increased broadly across many other asbestos defendants in these years (Figure 2, Section 3.), increases that could have nothing to do with the NSP settlement programs of OC and Fibreboard. The increased use of the internet, both among asbestos cancer victims and by plaintiffs' law firms seeking clients, contributed to the increased filings against OC, Fibreboard and other defendants.

In particular, Dr. Vasquez is not persuasive in arguing that the sharp increases in 1999-2000 cancer filings resulted from cancer victims' earlier, accelerated filings so that they could be included immediately in the NSP agreements. NSP qualification requirements and payment amounts were typically similar for initial and future cancer claimants, so there would be little reason for cancer claimants to speed their filings. Undoubtedly cancer claimants desired the earliest possible payment, but those desires were not generated or affected by the NSPs. Indeed because of their desire for early payments most cancer claimants typically file shortly after their diagnoses, which means there would have been little opportunity to observe the accelerated filings that Dr. Vasquez presumes. Consequently, empirical support for accelerated filings among asbestos claimants in other cases, the 1992-1993 increases in Fibreboard's filings before its Ahearn class action and the 1995 peak in filings against Babcock and Wilcox (similar to the 1995 peak for OC), found earlier filings primarily among victims of nonmalignant diseases rather than among cancer claimants.

Particularly for his forecasts of future cancer claims, Dr. Vasquez has provided no reason for rejecting OC's and Fibreboard's higher claim filings during 1999 and 2000 or for using only the lower filing levels from previous years  At the time of OC's bankruptcy petition, (1) claim filings for both OC and Fibreboard were much greater than Dr. Vasquez forecasts for the future, (2) filing trends for both companies were increasing at the time and (3) other, similar defendants found that asbestos claims continued to rise in number after the date of OC's bankruptcy filing. Reasonable forecasts of future asbestos claims carry into the future a company's experience at the time of its bankruptcy and, where possible, look to what has happened to similar companies since a debtor entered bankruptcy. Here, Dr. Vasquez should have forecast far more claims for the period immediately after OC's bankruptcy filing and he should have forecast a continuing

increase in claim filings against both OC and Fibreboard. Failing to make these assumptions, Dr. Vasquez's forecasts of future filings for OC and for Fibreboard are too low.

The first two adjustments of our sensitivity analyses assume, as Dr. Vasquez does not, continuation of OC's and Fibreboard's claim filing experience at the time of its bankruptcy filings. First we extend the period for calculating propensities to sue right up to the time of OC's banruptcy petition, adding 1.75 years during 1999 and the first nine months of 2000. Second, we assume that the rate in claims filings that OC and Fibreboard had experienced over the 1990s would continue and would not sharply reverse as Dr. Vasquez assumed.

### 10.2.2. Dr. Vasquez's Incidence Model Further Reduces His Forecasts

Another of Dr. Vasquez's assumptions that lower his forecast of the number of future claims is his choice of the epidemiological model that he uses in making his forecast. As Dr. Vasquez notes, forecasts of the incidences of asbestos related cancers that he uses in his liability forecasts were derived from an original peer-reviewed study by Nicholson, Perkel and Selikoff published in 1982. Ten years later Dr. Vasquez and his colleagues at KPMG-Peat Marwick derived another set of incidence forecasts based on the Nicholson study (the "KPMG" study). In making his liability forecasts for OC and Fibreboard, Dr. Vasquez could have used either the incidence forecasts that he and his colleagues derived or the original Nicholson incidence forecasts. Both are routinely used to forecast future asbestos liabilities and I have used both.

But the Nicholson forecasts are preferable for three reasons. First, Nicholson provides epidemiological forecasts for all cancers, mesothelioma, lung and other cancer sites. The KPMG incidence forecasts do not include asbestos-related deaths for other cancers. Second, Nicholson's study was conducted by medical doctors and epidemiologists and was peer reviewed. KPMG's is not. Third and most important, the Nicholson forecasts of mesothelioma deaths have been closely confirmed by the National Cancer Institute's SEER program, which Dr. Vasquez correctly notes is the test for validity of these models. KPMG's forecasts of mesothelioma deaths also compares well with the SEER data, but it does not predict the number of mesothelioma deaths as well as the Nicholson forecasts (Figure 5, Section 6.2.2.). KPMG's forecast model regularly undercounts the number of mesothelioma deaths among all Americans, male and female. Nicholson's forecasts correspond remarkably closely to the SEER data since their publication in 1982. Dr. Vasquez's report presents Figure 1 showing that the KPMG incidence forecast lies between the SEER count of all cancer deaths, male and female, and the SEER count only among males. The comparison with the "SEER-Male" data is not a proper test. Both Nicholson and, therefore, KPMG forecast cancer deaths among all workers occupationally exposed to asbestos, male or female making the SEER total count across gender the proper test of the models' validity. Further, Dr. Vasquez's comparison of his incidence forecasts to SEER in Figure 1 is misleading, since the KPMG model can be properly tested only for the years when it forecasts future mesothelioma deaths, the years after the 1992 development of the KPMG model. For prior years, KPMG was not predicting then unknown mesothelioma deaths, but rather was simply creating an equation that fit this already known data.

Dr. Vasquez ran and reported OC and Fibreboard forecasts based only on the KPMG incidence model. Because both the Nicholson and KPMG incidence models are well established and appropriate bases for forecasting asbestos claims, it is most useful to run and report forecasts using each of the two incidence models so that courts and parties can understand how the liability forecasts are affected by use of one or the other model. My routine practice is to run and report both models and we present both in our sensitivity analyses (Section 10.3). As I typically find among asbestos forecasts, use of the Nicholson model would have increased forecasts of OC's and Fibreboard's future liability by 10 percent compared to use of the KPMG incidence model. The number of future claims forecasted with the Nicholson model would be about 5 percent

greater than using the KPMG incidence forecasts and, consequently, defense costs would also be about 5 percent greater (forecasted liabilities increase more than forecasted claims because the Nicholson incidence model produces a slightly different distribution of diseases with a relative increase in the high-valued mesothelioma claims). Because of its stronger empirical confirmation the Nicholson incidence model should be regarded as the preferred basis for forecasting future asbestos claims that provides the better forecasts of liabilities for such claims.

Our third change in our sensitivity analysis of Dr. Vasquez forecasts uses the Nicholson epidemiological forecast of incidence of asbestos related cancers instead of the KPMG incidence forecasts.

### 10.2.3. Dr. Vasquez Inappropriately Values Future Claims by NSP Values

For one of his two alternative valuation models, Dr. Vasquez values future OC and Fibreboard claims based on averages from NSP agreements. These NSP agreements are inapplicable to future claimants. Future claimants are not a party to these agreements. Values of their claims cannot be determined by agreements to which they are not party. Moreover, by their terms the NSPs are indefinite and do not specify values that would apply to future claimants who might choose to accept those agreements.

Dr. Vasquez recognizes the inapplicability of the NSP agreements to future claimants. Although the NSPs would provide no payment for nonmalignant claimants who do not meet the NSP definitions of impairment, Dr. Vasquez nevertheless recognizes that future nonmalignant claims must be given values whether or not the NSPs provide for payment. Dr. Vasquez assigns arbitrary values for nonmalignant claims that do not meet NSP requirements, $1,000 for claims against OC and $700 for claims against Fibreboard.

### 10.2.4. Dr. Vasquez Makes Arbitrary and Unsupported Reductions in His Second Valuation Model

The derivation of the "Six Year Historical Averages" used in Dr. Vasquez's second valuation model is obscured by contradictions. Dr. Vasquez's report states that this second valuation model is based only on non-NSP settlements since 1995, but further documentation from Dr. Vasquez's company, ARPC, indicate that these "Historic Average Indemnity Amounts" were calculated across all settlements both under the NSPs and outside the NSPs. Second, Dr. Vasquez could not have calculated "Six Year Historical Averages" for Fibreboard as he claims. Fibreboard participated in few settlements between 1995 and late 1999 because the Ahearn injunction allowed only settlements of exigent cancer and trial calendar claims in those years. Dr. Vasquez provides data indicating many Fibreboard settlements, including many nonmalignant settlements, during the 1995-1999 period while the injunction was in place, but these settlement dates cannot be accurate. Apparently Dr. Vasquez treated Fibreboard settlements like Fibreboard filings, attributing to Fibreboard the dates on which OC settled with each plaintiff who also have a Fibreboard claims even though Fibreboard could only have settled these claims in late 1999 and 2000 after the injunction was lifted. Claims that Fibreboard actually settled during 1999 and 2000 cannot be regarded as having settled in prior years even if OC's settlements occurred earlier.

These changes in Fibreboard settlement dates call attention to one particular omission in Dr. Vasquez's calculations of historic averages, his failure to adjust for inflation that occurred between 1995 and 2000. Because of inflation the value of the dollar was changing over the six year period; a 1995 dollar was different in real value from a 2000 dollar just as the value of U.S. dollars differ from Canadian or Panamanian dollars. Just as one cannot meaningfully average values of payments made in different currencies, U.S., Canadian or Panamanian dollars, one cannot meaningfully average 1995 settlement dollars with settlements achieved in other years when the U.S. dollar had different values. Rather, the dollar settlements for each year must be

adjusted for inflation so that they are then expressed in the same monetary unit, all in year 2000 dollars for example. Because Dr. Vasquez failed to make this inflation adjustment, his multiyear averages underestimate the actual multiyear averages in terms of current (i.e. now inflated) dollars. Dr. Vasquez's use of the dates when OC settled claims to replace Fibreboard's actual settlement dates prevents meaningful adjustments for inflation.

Our fourth change in our sensitivity analysis of Dr. Vasquez's forecast adjusted for inflation during the periods used to derive the historic settlement averages for each company and stated these derived averages in year 2000 dollars, the year of OC's bankruptcy petition.

As I describe next, Dr. Vasquez made several other problematic assumptions that lowered his estimate of the values of asbestos claims against OC and Fibreboard and, therefore, lowered his forecasts of company's liability for future asbestos claims. First, in calculating the values of past resolutions for each company Dr. Vasquez excluded verdicts, justifying these exclusions because "future Owens Corning and Fibreboard claims will be settled through a settlement trust" (p. 69). This step renders Dr. Vasquez's calculations inappropriate as estimates in bankruptcy of the aggregate values of asbestos claims against each company.

As for all creditors, the values of asbestos bodily injury claims in bankruptcy are determined by their values under applicable civil law. Just as bankruptcy creditors who hold contract claims against OC will have the values of their claims determined by contract laws that obtain outside of bankruptcy, asbestos injury creditors must have the values of their claims determined under tort laws relevant to their claim. Both OC and Fibreboard have extensive histories of how they have resolved past claims under the relevant tort laws and these histories provide means for estimating the values of present and future asbestos claims. OC's historic liability for asbestos injury claims includes both the amounts that it paid in settlements and the amounts it paid as the result of trial verdicts (because of Ahearn Fiberboard has no recent history of trials). Particularly given OC's years of using an aggressive litigation strategy, its liability and, conversely, the average historic values of OC asbestos claim must be calculated from the total of both settlements and verdicts. Because OC paid substantial amounts in verdicts to asbestos injury claimants, Dr. Vasquez significantly underestimates OC's asbestos liabilities and the average values of asbestos claims by excluding verdicts from his calculations.

Our fifth change in our sensitivity analysis of Dr. Vasquez's forecast included both OC's settlements and its verdicts in calculating the company's historic level of payments to asbestos claimants.

Next in calculating OC's historic payment averages Dr. Vasquez decreased the actual settlement amounts paid to almost all claimants by one-eighth, because (a few) different plaintiffs had received verdicts for punitive damages against OC. Dr. Vasquez assumed that punitive damage awards should not be included in calculating the historic payment levels he used for his forecasts. But Dr. Vasquez did not simply omit the actual amounts that OC paid in punitive damages in calculating its historic payments levels. Rather he estimated that 12.5 percent of all past OC settlements represented a "punitive component" of those settlements that should be excluded in calculating the average values of claims, even though that claimant had not received a punitive damage award or settlement. There are multiple problems with this reduction. Dr. Vasquez gives absolutely no rationale or reason why one-eighth of the amounts paid by OC to hundreds of thousands of settling claimants should be disregarded because a few, different plaintiffs were paid punitive damages. He gives no rationale or reason why future claimants should have the estimated values of their claims reduced below the amounts actually paid in the past to settle claims that did not involve any punitive damage award, because some other plaintiffs in the past were paid punitive damages. Dr. Vasquez does not simply exclude the actual amount of punitive damages paid to past plaintiffs in calculating the average values of future claims, he further

reduces the historic settlements paid by OC by another 12.5 percent in order to exclude what he claims is the "punitive component" of past settlements.

Dr. Vasquez's derivation of the 12.5 percent reduction comes from a misuse of multiple regression analysis. Dr. Vasquez claims to have identified seven states which "historically ... did not award punitive damages" (p. 155). He does not report how he identified these states: Were they the only states in which he believes no punitive damages were in fact awarded against OC (which would be historically inaccurate)? Does he represent that the seven states are the only states in which laws do not permit punitive damages for asbestos claims? If so, how did he identify these states? What expertise does Dr. Vasquez have to assess the nature of punitive damage laws across states? He is an economist not a lawyer or legal scholar. Dr. Vasquez then ran a multiple regression analysis that attempted to determine how much of the variation in settlement payments to different claimants was determined by a series of variables taking into account the effects on settlements of all other variables in the analysis. Among these were "dummy" variables that separated Dr. Vasquez's seven non-punitive damage states from the other 43 states that he apparently concluded did award punitive damages. The multiple regression analyses found that for each type of disease settlements differed between his non-punitive damage states and the other states, with lower settlements in the non-punitive damage states. From this Dr. Vasquez concluded that these differences in settlements between the two groups of states occurred solely because of the availability of punitive damages in some states but not the others and he reduced the values of settlements in the 43 punitive damage states to the levels of settlements in the 7 states he believes are non-punitive damage states.

There are numerous problems with this analysis. First, we do not know the basis of Dr. Vasquez's identification of punitive damage and non-punitive damage states; he has given no explanation that his identification of states makes sense. Second, Dr. Vasquez has not demonstrated that punitive damages were awarded in each of his punitive damage states. He treats Wyoming, for example, as a punitive damage state, but he has not demonstrated that punitive damages were ever awarded against OC or any asbestos defendant in Wyoming. If no punitive damages have been awarded there, why would OC settlements with Wyoming plaintiffs have been inflated because punitive damages might have been awarded in other states with different laws, different judges and different juries? Third, Dr. Vasquez does not take timing into account. If punitive damages have any effect on settlements values of other cases, those effects would occur only after punitive damages were awarded. Fourth and most obviously, Dr. Vasquez's analysis is extremely aggressive in concluding that all differences in settlement values between his two groups of states are attributable to whether or not the state "historically ... award(ed) punitive damages." Dr. Vasquez's seven non-punitive damage states include Massachusetts, Nebraska and New Hampshire--states that have low settlement values for reasons wholly unrelated to the availability of punitive damages. Asbestos claims in Massachusetts, for example, have had low settlement values because plaintiffs can rarely get trial settings. The values of asbestos settlements are closely tied to the pendency of trial. In states where trials are readily available, values are greater. In states like Massachusetts where plaintiffs have little chance in getting to trial, defendants can force lower settle values. Essentially, Dr. Vasquez's analysis is an example of naive misuse of multiple regression analyses, in which he observes some differences in settlement values between two groups of states and then assumes that those differences resulted from only the one factor that he is examining in his analysis, the one of the many ways in which the groups of states differ. This conclusion is unsound as a scientific and statistical inference.

Dr. Vasquez takes this unsound analysis to drop historic OC settlement averages by 12.5 percent and then goes further, extending this 12.5 percent reduction to historic Fibreboard settlements even though there have been no recent trials in which punitive damages have been awarded to any Fibreboard plaintiff.

Our sixth change in our sensitivity analysis of Dr. Vasquez's forecast used actual historic settlement values for OC and Fibreboard, restoring the 12.5 percent "punitive component" reduction that Dr. Vasquez had made to historic settlement values.

Dr. Vasquez also progressively reduces the values of future claims, assuming that settlement values will decrease for future claimants who are older and who will tend to have been exposed in later years. This reduction is unsupported. Dr. Vasquez merely states without referencing any supporting evidence that "historically, both of these factors reduce average settlement amounts" (Vasquez, p. 74). The regression analyses that Dr. Vasquez used to calculate his "punitive component" do not support his assertion. And again the history of asbestos litigation contradicts Dr. Vasquez: as asbestos plaintiffs ages and exposures years have increased over the past decade, the settlements they received have increased, not decreased (Table 1 and Figure 1, p. 3). Dr. Vasquez makes this reduction by lowering his measure of future monetary inflation from the expected 2.5 percent to 2.0 percent. This adjustment takes effect immediately, so that claimants will who fill in 2005 will have their claims valued in amounts that are 2.5 percent less than Dr. Vasquez's calculation of the current values of claims. Claimants filing in 2010 will receive 5.1 percent less.

Our seventh change in our sensitivity analysis of Dr. Vasquez's forecast used the Congressional Budget Office forecast of a future inflation rate of 2.5 percent, restoring the 0.5% reduction that Dr. Vasquez made.

## 10.3. Sensitivity Analyses

Forecasts of asbestos liabilities are inherently uncertain. While our forecasts have strong bases--epidemiological forecasts of asbestos diseases that have been tested and confirmed by twenty years of SEER counts of mesothelioma deaths, OC's and Fibreboard's own recent claims history--forecasts of OC's and Fibreboard's future liability would differ somewhat if we had made different assumptions about epidemiology, propensities to sue, or payment amounts in future years. This Section examines how forecasts would have differed under different assumptions.

This process of studying how predictions change with changes in key assumptions is known as sensitivity analysis and is a primary way for examining and understanding scientific forecasting. In this Section, we report on the results of systematically varying five types of parameters:

- The choice of epidemiological projections: Nicholson vs. KPMG (see below for a discussion of the KPMG model);

- Alternative base periods for determining propensities to sue and the values of asbestos claims;

- Use of propensities to sue that increase and those with no increase. Alternative assumptions about rates of decline for nonmalignancy claims;

- Use of dollar amounts that change according to the experiences of other defendants;

- Changes in filings and settlements that would result if national legislation were passed that would treat most nonmalignant claims as noncompensable.

We first define these alternatives, then we present some results from systematically varying them. Since each of these sensitivities affect only our forecasts of future claims, our analyses and reported results present the alternative forecasts of future liabilities based on the alternative assumptions examined in the sensitivity analyses.

We conclude our sensitivity analyses conclude by considering how OC's and Fibreboard's liabilities would change if the companies were to undertake a radically different strategy, replacing their historic methods of addressing asbestos liability with an aggressive strategy of refusing to settle disputed cases and trying those cases to verdict.

### 10.3.1. Definition of Sensitivity Variations

### 10.3.1.1. Alternative Epidemiological Models

In 1992 the consulting firm KPMG-Peat Marwick adjusted the Nicholson epidemiological forecasts as part of their engagement in the bankruptcy proceedings of National Gypsum. KPMG retained most of elements of the Nicholson forecasts but used more recent Labor Department data and alternative medical models to estimate the probabilities of mesothelioma and lung cancer. As shown in Figure 5, above, the KPMG forecasts are a reasonable, although less preferable alternative to the original Nicholson forecasts of asbestos related cancer deaths. The Nicholson forecasts are preferable because they have been more closely confirmed by subsequent SEER data on annual mesothelioma deaths. To examine the effects of using the specific Nicholson epidemiological forecasts of future cancer deaths, we also forecast future claims and liabilities using the KPMG forecasts.

### 10.3.1.2. Alternative Base Period Variations

For our forecasts we calculated propensities to sue over the five years (actually, 4.75 years) ending October 2000 and also used OC's settlements over the same period to estimate the values of pending and future claims. Fibreboard's settlements were constrained to 1999 and 2000, the only period during that time when they were settling claims because of the Ahearn injunction. We have described the reasons for selecting these periods in previous sections of the report.

To see how these choices of base periods might have affected our forecasts, we made alternative forecasts using shorter base and dollar valuation periods, as shown in Table 31.

**Table 31:** Alternative Lengths of Base Period for Sensitivity Analyses

|  | Years for Propensities | | Years for $Valuation | |
|---|---|---|---|---|
| Company | Selected | Short | Selected | Short |
| OC | 1996-2000 | 1999-2000 | 1996-2000 | 1999-2000 |
| Fibreboard | 1996-2000 | 1999-2000 | 1999-2000 | 1999-2000 |

Note: The shorter valuation period for Fibreboard reflects that only exigent and trial calendar settlements were being made by Fibreboard prior to the lifting of the Ahearn injunction in 1999.

### 10.3.1.3. Propensity to Sue Variations

Throughout this report we have presented forecasts for two alternative assumptions about future propensities to sue: (1) that propensities to sue would increase for five years in the future and would remain unchanged thereafter and (2) that propensities to sue would remain at the level of the base period for all future years. Of these, the increasing model is far more plausible, reflecting both the history of claims experience against OC and Fibreboard as well as among other asbestos defendants in recent years and also the likely increase in claims against OC and Fibreboard resulting from the bankruptcy filings by other major asbestos defendants during 2000 and 2001.

Our sensitivity analyses test a third and fourth alternative. The third is that cancer propensities to sue will increase but the nonmalignant multiplier will remain steady. The fourth is that cancer propensities to sue will increase but that the nonmalignant multiplier will decline to 90 percent of its present value in five years.

Table 32 shows the propensity to sue multipliers for each of the four alternatives.

**Table 32:** Propensity to Sue Alternatives

| Filing Year | Meso | | | | Lung | | | | Othc | | | | Nonm | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Alt1 | Alt2 | Alt3 | Alt4 | Alt1 | Alt2 | Alt3 | Alt4 | Alt1 | Alt2 | Alt3 | Alt4 | Alt1 | Alt2 | Alt3 | Alt4 |
| 2001 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 | 1.000 |
| 2002 | 1.000 | 1.098 | 1.098 | 1.098 | 1.000 | 1.123 | 1.123 | 1.123 | 1.000 | 1.198 | 1.198 | 1.198 | 1.000 | 1.028 | 1.000 | 0.975 |
| 2003 | 1.000 | 1.196 | 1.196 | 1.196 | 1.000 | 1.245 | 1.245 | 1.245 | 1.000 | 1.396 | 1.396 | 1.396 | 1.000 | 1.056 | 1.000 | 0.950 |
| 2004 | 1.000 | 1.294 | 1.294 | 1.294 | 1.000 | 1.368 | 1.368 | 1.368 | 1.000 | 1.593 | 1.593 | 1.593 | 1.000 | 1.085 | 1.000 | 0.925 |
| 2005 | 1.000 | 1.392 | 1.392 | 1.392 | 1.000 | 1.490 | 1.490 | 1.490 | 1.000 | 1.791 | 1.791 | 1.791 | 1.000 | 1.113 | 1.000 | 0.900 |
| 2006 | 1.000 | 1.392 | 1.392 | 1.392 | 1.000 | 1.490 | 1.490 | 1.490 | 1.000 | 1.791 | 1.791 | 1.791 | 1.000 | 1.113 | 1.000 | 0.900 |
| 2029 | 1.000 | 1.392 | 1.392 | 1.392 | 1.000 | 1.490 | 1.490 | 1.490 | 1.000 | 1.791 | 1.791 | 1.791 | 1.000 | 1.113 | 1.000 | 0.900 |

### 10.3.1.4. Changing Dollar Amounts Variations

Figure 1 shows average settlement amounts during the 1990s for three defendants with publicly available data: Armstrong, Babcock and Wilcox, and Turner and Newall. We computed averages for the three-year intervals 1995-1997 and 1998-2000, and examined their rates of change between those intervals (Table 33). Mesothelioma settlement costs uniformly went up, from 23 to 81 percent. Lung cancer settlements went up for two defendants and dipped slightly for a third. Other cancer and nonmalignant settlement amounts went slightly down.

We adopted a changing settlement costs variation as part of our sensitivity analysis, using as multipliers the averages of the percent increases or decreases for each disease, as shown in the last columns of Table 33. We assume these multiples will change in even steps from 1.0 to their final values from 2001 through 2004.

**Table 33:** Payment Value Change Calculations

| Defendant | SetYear Range | Average Settlement Value | | | | Change Ratio | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Meso | Lung | Othc | Nonm | Meso | Lung | Othc | Nonm |
| Armstrong | 1995-1997 | $34,584 | $11,545 | $6,502 | $3,202 | | | | |
| Armstrong | 1998-2000 | 62,477 | 13,191 | 6,098 | 2,802 | 1.81 | 1.14 | 0.94 | 0.88 |
| B&W | 1995-1997 | 57,828 | 19,789 | 12,284 | 4,761 | | | | |
| B&W | 1998-2000 | 70,887 | 24,193 | 14,173 | 5,846 | 1.23 | 1.22 | 1.15 | 1.23 |
| Turner-Newall | 1995-1997 | 40,104 | 13,220 | 7,080 | 3,806 | | | | |
| Turner-Newall | 1998-2000 | 63,335 | 12,438 | 5,689 | 2,816 | 1.58 | 0.94 | 0.80 | 0.74 |
| Overall Change | | | | | | 1.54 | 1.10 | 0.96 | 0.95 |

### 10.3.1.5. Tort Reform Variation

Ohio recently passed legislation which will prevent unimpaired nonmalignancies from getting compensated in that state. We estimate that this change in Ohio would only slightly reduce OC's and Fibreboard's overall liability.

Some have speculated about national legislation similar to Ohio's. We employ a variation here that assumes similar legislation on a national level. We assume first that 60 percent of the nonmalignant claims will get zero value (claims will still be filed, so our forecasts of the number of filings will not change--certain claims will just not be paid). Because the legislation is intended to eliminate the least severe nonmalignant claims, we assume that will affect the 60 percent of nonmalignants who previously received the lowest values, i.e. the 60th percentile and

below. Those nonmalignant claimants who continue to receive compensation are the claimants who were in the top 40 percent of historic settlement values among nonmalignant claimants. We also assume an attorney behavioral change will occur: without the lesser-valued nonmalignant claims, attorneys will devote more money and effort on the cancer claims and so resolution values for cancers will increase by 10 percent. The net change in resolution amounts is described in Table 34. We apply these resolution amounts to our base forecasts below.

**Table 34:** Changes to Resolution Amounts if Ohio Legislation Expands Nation-Wide

| Company | Disease | Average $Resolution | Net Change | Adjusted $Resolution |
|---------|---------|---------------------|------------|----------------------|
| OC | Meso | $185.462 | +10.0% | $204.008 |
| OC | Lung | 40.883 | +10.0% | 44.971 |
| OC | Othc | 17.471 | +10.0% | 19.218 |
| OC | Nonm | 7.080 | -21.8% | 5.537 |
| Fibreboard | Meso | $130.229 | +10.0% | $143.252 |
| Fibreboard | Lung | 28.175 | +10.0% | 30.992 |
| Fibreboard | Othc | 13.252 | +10.0% | 14.577 |
| Fibreboard | Nonm | 4.206 | -38.2% | 2.603 |

Notes: Nonmalignant resolution averages decrease because 60 percent of nonmalignant claimants who historically received the lowest settlement values would now receive no payment. This results in an average resolution that is 22 percent lower for OC and 38 percent lower for Fibreboard.

### 10.3.2. Sensitivity Analysis Results

### 10.3.2.1. Alternative Epidemiological Model Results

Because the KPMG epidemiological models forecast a more rapid decline in the incidence of asbestos related cancers in future years, forecasts based on that model produce fewer future claims than forecasts based on use of the Nicholson epidemiological model. This can be seen by in Table 35. The number of filings is reduced by about 5.5 percent. Liability and present value declines are around 8 percent.

**Table 35:** Comparison of Epidemiological Models

| Company | Outcome | Epidemiological Model | | KPMG Percent Decline |
|---------|---------|-----------|------|---------|
| | | Nicholson | KPMG | |
| OC | Filings | 946,777 | 895,227 | 5.4% |
| OC | Liability | $20.9 | $19.2 | 8.1% |
| OC | PV | $9.0 | $8.3 | 7.8% |
| Fibreboard | Filings | 1,025,823 | 968,849 | 5.6% |
| Fibreboard | Liability | $14.9 | $13.6 | 8.7% |
| Fibreboard | PV | $6.4 | $5.9 | 7.8% |

Notes: Table shows alternative forecasts of the present value of liabilities for future claims in billions of year 2000 dollars. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5% per year. Discount rate is 6%.

### 10.3.2.2. Alternative Base Period Results

As shown in Table 36, total liability forecast increase by about 33 percent for OC and 25 percent for Fibreboard from use of a shorter propensity to sue base period, which increases the forecasted number of OC and Fibreboard filings. The shorter base period for historic resolution values had a small negative effect for OC: the absence of verdicts for OC in 1999 and 2000 led to a drop in mesothelioma resolution values, and nonmalignant values declined during this period as well. We used only one base period to calculate historic settlement values of Fibreboard, 1999-2000, because the Ahearn injunction limited settlements during 1996-1998.

**Table 36:** Comparison of Base Period Effects

| Company | Outcome | 1996-2000 P2Sue | | 1999-2000 P2Sue Short | |
|---------|---------|-------------|-------------|-------------|-------------|
| | | 1996-2000 $ | 1999-2000 $ | 1996-2000 $ | 1999-2000 $ |
| OC | Filings | 946,777 | 946,777 | 1,264,555 | 1,264,555 |
| OC | Liability | $20.9 | $20.0 | $26.9 | $25.6 |
| OC | PV | $9.0 | $8.5 | $11.5 | $10.9 |
| Fibreboard | Filings | NA | 1,025,823 | NA | 1,284,767 |
| Fibreboard | Liability | NA | $14.9 | NA | $18.5 |
| Fibreboard | PV | NA | $6.4 | NA | $7.9 |

Notes: Table shows alternative forecasts of the present value of liabilities for future claims in billions of year 2000 dollars. Future claims are assumed to settle 2 years after filing. Indemnity is inflation adjusted at 2.5% per year. Discount rate is 6%.

### 10.3.2.3. Propensity to Sue Results

These alternatives present a sensitivity test about what will happen with future propensities to sue. Because of the importance of assumptions about propensities to sue and their uncertainty, we chose to present the results for two alternatives throughout the report above, the Increasing model that best forecasts future claims and the No Increase models that does not present a likely forecast but is presented solely for illustration to show the number of future claims should the levels of OC and Fibreboard claiming levels be frozen at their rates before the bankruptcy. We include

forecasts using these and two additional alternatives in Table 37, Alternative 3 that increases propensities for cancers (like the preferred model) and assumes no increases for nonmalignancies and Alternative 4 that increases propensities for cancers (like the preferred model) and assumes decreases for nonmalignancies.

**Table 37:** Effect of Propensity to Sue Alternatives

| Company | Outcome | Disease | No Inc | Increase | Alt3 | Alt4 |
|---------|---------|---------|--------|----------|------|------|
| OC | Filings | Meso | 25,206 | 33,856 | 33,856 | 33,856 |
| OC | Filings | Lung | 26,942 | 37,921 | 37,921 | 37,921 |
| OC | Filings | Othc | 8,926 | 14,796 | 14,796 | 14,796 |
| OC | Filings | Nonm | 551,626 | 860,204 | 782,008 | 713,014 |
| OC | Filings | Total | 612,700 | 946,777 | 868,581 | 799,587 |
| OC | Liability | Meso | $7.0 | $9.4 | $9.4 | $9.4 |
| OC | Liability | Lung | 1.6 | 2.2 | 2.2 | 2.2 |
| OC | Liability | Othc | 0.2 | 0.4 | 0.4 | 0.4 |
| OC | Liability | Nonm | 5.6 | 8.9 | 8.1 | 7.3 |
| OC | Liability | Total | $14.4 | $20.9 | $20.1 | $19.4 |
| OC | PV | Meso | $2.9 | $3.9 | $3.9 | $3.9 |
| OC | PV | Lung | 0.7 | 1.0 | 1.0 | 1.0 |
| OC | PV | Othc | 0.1 | 0.2 | 0.2 | 0.2 |
| OC | PV | Nonm | 2.5 | 3.9 | 3.5 | 3.2 |
| OC | PV | Total | $6.3 | $9.0 | $8.6 | $8.3 |
| Fibreboard | Filings | Meso | 27,568 | 37,033 | 37,033 | 37,033 |
| Fibreboard | Filings | Lung | 28,699 | 40,402 | 40,402 | 40,402 |
| Fibreboard | Filings | Othc | 9,152 | 15,167 | 15,167 | 15,167 |
| Fibreboard | Filings | Nonm | 599,341 | 933,221 | 848,368 | 773,506 |
| Fibreboard | Filings | Total | 664,760 | 1,025,823 | 940,970 | 866,108 |
| Fibreboard | Liability | Meso | $5.3 | $7.3 | $7.3 | $7.3 |
| Fibreboard | Liability | Lung | 1.1 | 1.6 | 1.6 | 1.6 |
| Fibreboard | Liability | Othc | 0.2 | 0.3 | 0.3 | 0.3 |
| Fibreboard | Liability | Nonm | 3.6 | 5.7 | 5.2 | 4.7 |
| Fibreboard | Liability | Total | $10.3 | $14.9 | $14.4 | $13.9 |
| Fibreboard | PV | Meso | $2.3 | $3.0 | $3.0 | $3.0 |
| Fibreboard | PV | Lung | 0.5 | 0.7 | 0.7 | 0.7 |
| Fibreboard | PV | Othc | 0.1 | 0.1 | 0.1 | 0.1 |
| Fibreboard | PV | Nonm | 1.6 | 2.5 | 2.3 | 2.1 |
| Fibreboard | PV | Total | $4.5 | $6.4 | $6.1 | $6.0 |

Notes: Table shows alternative forecasts of the number of future claims, nominal liabilities for future claims in billions of dollars of the year when paid and the present values of future claims in of liabilities for future claims in billions of year 2000 dollars. Indemnity is inflation adjusted at 2.5%. Discount rate is 6%. No_Inc=no increase; Increase=1990s increase for Manville and UNR, the most likely forecast; Alt3=1990s increase for cancers only; Alt4=1990s increase for cancers with a 10% drop in nonmalignants.

These alternatives show that the main effect is between no increase and increases in the cancer propensity to sue. Variations in the numbers of nonmalignant claims seems only to have minor

effects.

### 10.3.2.4. Changing Dollar Amount Results

Table 48 shows the effects of assuming that dollar amounts will change from 2001 to 2004, up or down depending on disease, based on generally observed changes in settlement averages paid by defendants over the recent three year periods with midpoints 1996 and 1999. These alternatives show that when we assume that OC's and Fibreboard's future resolution averages will continue to follow these recent trends total liability and PV estimates increase by about 20 to 25 percent.

**Table 38:** Effect of Assuming Increases in Values of Claims Above Inflation

| Company | Outcome | Disease | $No Change | $Change |
|---------|---------|---------|-----------|---------|
| OC | Liability | Meso | $9.4 | $14.3 |
| OC | Liability | Lung | 2.2 | 2.4 |
| OC | Liability | Othc | 0.4 | 0.4 |
| OC | Liability | Nonm | 8.9 | 8.5 |
| OC | Liability | Total | $20.9 | $25.6 |
| OC | PV | Meso | $3.9 | $5.8 |
| OC | PV | Lung | 1.0 | 1.1 |
| OC | PV | Othc | 0.2 | 0.2 |
| OC | PV | Nonm | 3.9 | 3.7 |
| OC | PV | Total | $9.0 | $10.8 |
| Fibreboard | Liability | Meso | $7.3 | $11.0 |
| Fibreboard | Liability | Lung | 1.6 | 1.8 |
| Fibreboard | Liability | Othc | 0.3 | 0.3 |
| Fibreboard | Liability | Nonm | 5.7 | 5.5 |
| Fibreboard | Liability | Total | $14.9 | $18.5 |
| Fibreboard | PV | Meso | $3.0 | $4.5 |
| Fibreboard | PV | Lung | 0.7 | 0.8 |
| Fibreboard | PV | Othc | 0.1 | 0.1 |
| Fibreboard | PV | Nonm | 2.5 | 2.4 |
| Fibreboard | PV | Total | $6.4 | $7.8 |

Notes: Table shows alternative forecasts of the nominal liabilities for future claims in billions of dollars of the year when paid and the present values of future claims in of liabilities for future claims in billions of year 2000 dollars. Indemnity is inflation adjusted at 2.5%. Discount rate is 6%. $Change model is based on 1990s increase for Manville and UNR settlements.

### 10.3.2.5. Tort Reform Results

The results in Table 39 estimate the value that we forecast, given the dollar values shown in Table 34, which reflect our assumption of average resolution amounts if national legislation were to be adopted that precluded compensation to nonmalignant claimants who do not meet medical standards. The base model results are take from tables in Sections 6 and 9. The national legislation models assume 60 percent of the nonmalignant claimants would not be paid, but that average payments to cancer claimants would increase. These changes reduce forecasted liabilities by about 5 percent for OC, 9 percent for Fibreboard.

**Table 39:** Forecast Indemnity for Future Claims after October 5, 2000

| Company | Outcome | Variation | Disease | | | | Total |
|---------|---------|-----------|------|------|------|------|-------|
| | | | Meso | Lung | Othc | Nonm | |
| OC | Liability | Base Model | $9.4 | $2.2 | $0.4 | $8.9 | $20.9 |
| OC | Liability | Natl Legis | 10.3 | 2.4 | 0.4 | 7.0 | 20.1 |
| OC | PV | Base Model | $3.9 | $1.0 | $0.2 | $3.9 | $9.0 |
| OC | PV | Natl Legis | 4.3 | 1.1 | 0.2 | 3.1 | 8.7 |
| Fibreboard | Liability | Base Model | $7.3 | $1.6 | $0.3 | $5.7 | $14.9 |
| Fibreboard | Liability | Natl Legis | 8.0 | 1.8 | 0.3 | 3.5 | 13.6 |
| Fibreboard | PV | Base Model | $3.0 | $0.7 | $0.1 | $2.5 | $6.4 |
| Fibreboard | PV | Natl Legis | 3.3 | 0.8 | 0.1 | 1.5 | 5.7 |

Notes: Table shows alternative forecasts of the nominal liabilities for future claims in billions of dollars of the year when paid and the present values of future claims in in liabilities for future claims in billions of year 2000 dollars. Indemnity is inflation adjusted at 2.5%. Discount rate is 6%.

## 10.3.2.6. Liability That Would Result from Aggressive Litigation

The final sensitivity analysis considered how much OC would have to pay were it to reject its settlement strategy and resort solely to litigation, aggressively pursuing pretrial dismissals of law suits and then trying those law suits that survived its motions to dismiss. This strategy has sometimes been asserted by debtors or creditor groups in bankruptcies of asbestos manufacturers. Credit Suisse asserts a version of this strategy in this case by arguing the the court should mandate extensive discovery for a sample of claims followed by litigation about medical issues in those cases with its hope that many claims would be dismissed. Whatever the success in eliminating some asbestos claims, the strategy proposed by Credit Suisse and similar proposals in other bankruptcies would still require valuation of claims that survived aggressive pretrial litigation over the qualification of claims. Historic settlement values could not be used to value these surviving claims, both because claims that survive aggressive pretrial litigation will be stronger than average settled claims and also because these surviving claims will have answered all liability challenges in contrast to settled claims where issues of liability were uncertain and compromised. The surviving claims could only be valued through trials of damages issues or else estimated by looking to values that have been placed historically on claims that have prevailed in litigation about liability, i.e. the amounts of past verdicts.

To understand how pursuit of an aggressive litigation strategy would effect estimation of OC and Fibreboard asbestos bodily injury claims, I estimated how much OC might have to pay pending asbestos claimants as the result of employing such a strategy. I made the exceptionally conservative assumption that OC could eliminate 90 percent of its pending claims through aggressive challenges to the medical conditions and great success in its legal challenges. I have no reason to expect such success extraordinary success under an aggressive litigation strategy, but use the 90 percent rate to illustrate what would be an exceptionally good outcome of OC under the strategy. This would still leave OC with 18,084 pending asbestos claims that now have legally verified injuries and liability, claims that are analogous to plaintiffs who won the first stage of a bifurcated trial with the amount of damages being the only remaining issue.

To determine values of such claims we looked to OC's actual trial history. The average verdict received by the 1,373 plaintiffs against OC in trials since 1988 is $544,607 in year 2000 dollars

(an average of $1,100,887 among cancer claims and $272,465 among nonmalignancy claims). But to provide an even more conservative analysis, we used OC's $297,842 average verdict over all 2,397 plaintiffs in trials with verdicts, both verdicts won by OC and those won by the plaintiff (an average of $688,654 among cancer claims and $140,375 among nonmalignancy claims). This results in an estimated liability of $5.4 billion in year 2000 dollars (18,084 x $297,842 = $5,386,174,728).

Even if the OC could be successful in eliminating 94.3 percent of all of its pending claims (assumed 90 percent pretrial plus another 4.3 percent based on OC's historic percent of trials with verdicts of OC) through aggressive litigation like that proposed by Credit Suisse it would face liability of $5.4 billion simply for claims that were pending against OC at the time of its bankruptcy petition. Under these conservative assumptions OC's liability would increase 2.5 times over its liability based on the practices it actually used to resolve asbestos claims prior to the bankruptcy. We forecast that OC faces a $2.4 billion liability to pending claims based on its historic practices (Table 15). An aggressive litigation posture would add almost $3 billion more.

## 11. Rule 26 Disclosures and Signature

DATA CONSIDERED: In reaching the opinions and conclusions set forth in this Report, I have considered the following information: my background, training, experience and knowledge of the asbestos litigation developed over the past 20 years, the items of data explicitly identified in the report, the reports, articles and documents specifically identified in the report, publicly available sources of information concerning inflation rates, publicly available documents about Owens Corning and Fibreboard, various settlement agreements between Owens Corning and law firms representing asbestos plaintiffs, various settlement agreements between Fibreboard and law firms representing asbestos plaintiffs, the materials stored on the eight cdroms produced to the parties in connection with this report, discount rates provided to me by Loreto Tersigni, CPA, and a summary table prepared by counsel for Owens Corning showing the calculations of annual indemnity and defense/administrative costs.

EXHIBITS: The exhibits which summarize my opinions are included in the graphics and tables in the report and in the appendices to the report.

QUALIFICATIONS: My qualifications to perform this analysis and provide expert testimony are set forth in my C.V., a copy of which is attached as Exhibit 1.

PUBLICATIONS: Any publications I have authored within the past ten years are set forth in my C.V.

COMPENSATION: My compensation for services rendered in this case is set forth in the fee applications Legal Analysis Systems files on a regular basis with the Bankruptcy Court. At present, my hourly rate is $600.

PRIOR TESTIMONY: A listing of all cases in which I have testified as an expert at either trial or deposition within the past four years is attached as Exhibit 2.

I reserve the right to modify this report as new information becomes available between now and the time of trial. I anticipate that I will review the expert witness reports of opposing expert(s) and offer my opinions about their analyses and conclusions in rebuttal testimony.


                                            /s/ Mark A. Peterson
                                    _____
                                        Mark A. Peterson, J.D., Ph.D.
                                        LEGAL ANALYSIS SYSTEMS

# Appendix A - OC and Fibreboard Defense Costs

By its bankruptcy petition date, OC and its insurers had spent $5.1 billion on indemnity defense of asbestos bodily injury claims (nominal).  Over all years of its asbestos litigation, costs to administer and defend these claims amounted to $28 dollars for every $100 spent on indemnity. OC became more efficient as it shifted from a strategy of aggressive litigation to a strategy of large block settlements.  Table A1 lists OC's total costs for indemnity and defense for the last five years preceding its bankruptcy.  During this period OC's defense costs fell to 13.9 percent of its indemnity costs.

**Table A1:** Annual Indemnity and Defense Costs
(Millions of Year 2000$)

| Year | Total Indemnity | Total Defense |
|------|-----------------|---------------|
| 1996 | $234.013 | $52.932 |
| 1997 | 259.499 | 56.771 |
| 1998 | 385.631 | 82.760 |
| 1999 | 797.557 | 86.935 |
| 2000 | 631.254 | 41.443 |
| Total | $2,307.954 | $320.841 |

To forecast future defense costs for OC and Fibreboard, we assume that this ratio will continue. We forecast defense costs by multiplying our forecasts of indemnity costs of present and future claims for each company by .139.   Table A2 shows both our forecasts of total indemnity costs for each company and our forecasts of defense costs.

**Table A2:** Forecasts of OC and Fibreboard Defense Costs
(Billions of Year 2000$)

| Outcome | OC | | Fibreboard | |
|---------|-----------|---------|-----------|---------|
| | Indemnity | Defense | Indemnity | Defense |
| Nominal | $23.3 | $3.24 | $16.2 | $2.25 |
| Present Value | 11.1 | 1.54 | 7.5 | 1.04 |

# Appendix B - Year by Disease Projections

This appendix provides the year by disease projections of Nicholson and KPMG (cancer incidences) and LAS (OC and Fibreboard filings as of October 5, 2000).

**Table B1:** Nicholson Epidemiological Projections

| Death Year | Disease | | | Total Cancers | Death Year | Disease | | | Total Cancers |
|---|---|---|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | | | Meso | Lung | Othc | |
| 1970 | 1,010 | 2,909 | 963 | 4,882 | 2005 | 3,023 | 4,230 | 1,143 | 8,396 |
| 1971 | 1,046 | 3,098 | 998 | 5,142 | 2006 | 3,011 | 4,075 | 1,099 | 8,185 |
| 1972 | 1,082 | 3,286 | 1,034 | 5,402 | 2007 | 2,999 | 3,921 | 1,055 | 7,975 |
| 1973 | 1,151 | 3,502 | 1,065 | 5,718 | 2008 | 2,931 | 3,734 | 1,006 | 7,672 |
| 1974 | 1,219 | 3,719 | 1,096 | 6,034 | 2009 | 2,864 | 3,547 | 958 | 7,369 |
| 1975 | 1,288 | 3,935 | 1,128 | 6,351 | 2010 | 2,796 | 3,361 | 909 | 7,066 |
| 1976 | 1,356 | 4,152 | 1,159 | 6,667 | 2011 | 2,729 | 3,174 | 861 | 6,763 |
| 1977 | 1,425 | 4,368 | 1,190 | 6,983 | 2012 | 2,661 | 2,987 | 812 | 6,460 |
| 1978 | 1,495 | 4,505 | 1,227 | 7,228 | 2013 | 2,545 | 2,811 | 762 | 6,119 |
| 1979 | 1,565 | 4,643 | 1,264 | 7,472 | 2014 | 2,429 | 2,635 | 713 | 5,778 |
| 1980 | 1,635 | 4,780 | 1,302 | 7,717 | 2015 | 2,314 | 2,460 | 663 | 5,436 |
| 1981 | 1,705 | 4,918 | 1,339 | 7,961 | 2016 | 2,198 | 2,284 | 614 | 5,095 |
| 1982 | 1,775 | 5,055 | 1,376 | 8,206 | 2017 | 2,082 | 2,108 | 564 | 4,754 |
| 1983 | 1,900 | 5,138 | 1,400 | 8,438 | 2018 | 1,965 | 1,937 | 519 | 4,421 |
| 1984 | 2,024 | 5,222 | 1,424 | 8,670 | 2019 | 1,847 | 1,766 | 474 | 4,088 |
| 1985 | 2,149 | 5,305 | 1,447 | 8,901 | 2020 | 1,730 | 1,596 | 430 | 3,755 |
| 1986 | 2,273 | 5,389 | 1,471 | 9,133 | 2021 | 1,612 | 1,425 | 385 | 3,422 |
| 1987 | 2,398 | 5,472 | 1,495 | 9,365 | 2022 | 1,495 | 1,254 | 340 | 3,089 |
| 1988 | 2,468 | 5,477 | 1,495 | 9,440 | 2023 | 1,379 | 1,132 | 307 | 2,819 |
| 1989 | 2,538 | 5,482 | 1,495 | 9,515 | 2024 | 1,264 | 1,011 | 274 | 2,549 |
| 1990 | 2,608 | 5,487 | 1,494 | 9,589 | 2025 | 1,148 | 889 | 242 | 2,279 |
| 1991 | 2,678 | 5,492 | 1,494 | 9,664 | 2026 | 1,033 | 768 | 209 | 2,009 |
| 1992 | 2,748 | 5,497 | 1,494 | 9,739 | 2027 | 917 | 646 | 176 | 1,739 |
| 1993 | 2,792 | 5,449 | 1,480 | 9,722 | 2028 | 827 | 575 | 157 | 1,558 |
| 1994 | 2,836 | 5,402 | 1,466 | 9,705 | 2029 | 740 | 508 | 138 | 1,386 |
| 1995 | 2,881 | 5,354 | 1,453 | 9,687 | 2030 | 657 | 446 | 122 | 1,225 |
| 1996 | 2,925 | 5,307 | 1,439 | 9,670 | 2031 | 579 | 388 | 105 | 1,072 |
| 1997 | 2,969 | 5,259 | 1,425 | 9,653 | 2032 | 507 | 336 | 92 | 935 |
| 1998 | 2,987 | 5,146 | 1,395 | 9,528 | 2033 | 443 | 316 | 79 | 837 |
| 1999 | 3,005 | 5,033 | 1,365 | 9,403 | 2034 | 383 | 246 | 67 | 696 |
| 2000 | 3,024 | 4,919 | 1,334 | 9,277 | 2035 | 332 | 208 | 57 | 596 |
| 2001 | 3,042 | 4,806 | 1,304 | 9,152 | 2036 | 282 | 174 | 47 | 503 |
| 2002 | 3,060 | 4,693 | 1,274 | 9,027 | 2037 | 240 | 144 | 38 | 423 |
| 2003 | 3,048 | 4,539 | 1,230 | 8,817 | 2038 | 201 | 117 | 32 | 351 |
| 2004 | 3,036 | 4,384 | 1,186 | 8,606 | 2039 | 169 | 94 | 26 | 290 |

Note: Nicholson's projections run through 2030. LAS extended those to 2039 using the year by disease rates of decline derived from the KPMG projections, below.

**Table B2:** KPMG Epidemiological Projections

| Death Year | Meso | Disease Lung | Othc | Total Cancers | Death Year | Meso | Disease Lung | Othc | Total Cancers |
|---|---|---|---|---|---|---|---|---|---|
| 1970 | 861 | 3,234 | 1,196 | 5,291 | 2005 | 2,347 | 3,638 | 990 | 6,975 |
| 1971 | 931 | 3,592 | 1,130 | 5,653 | 2006 | 2,294 | 3,474 | 945 | 6,713 |
| 1972 | 1,003 | 3,721 | 1,171 | 5,895 | 2007 | 2,234 | 3,311 | 900 | 6,445 |
| 1973 | 1,079 | 3,846 | 1,211 | 6,136 | 2008 | 2,173 | 3,149 | 857 | 6,179 |
| 1974 | 1,157 | 3,974 | 1,251 | 6,382 | 2009 | 2,105 | 2,989 | 813 | 5,907 |
| 1975 | 1,237 | 4,147 | 1,305 | 6,689 | 2010 | 2,034 | 2,831 | 769 | 5,634 |
| 1976 | 1,308 | 4,278 | 1,165 | 6,751 | 2011 | 1,960 | 2,674 | 728 | 5,362 |
| 1977 | 1,386 | 4,428 | 1,204 | 7,018 | 2012 | 1,880 | 2,520 | 686 | 5,086 |
| 1978 | 1,465 | 4,577 | 1,246 | 7,288 | 2013 | 1,798 | 2,371 | 644 | 4,813 |
| 1979 | 1,545 | 4,728 | 1,287 | 7,560 | 2014 | 1,713 | 2,224 | 604 | 4,541 |
| 1980 | 1,628 | 4,897 | 1,333 | 7,858 | 2015 | 1,627 | 2,083 | 566 | 4,276 |
| 1981 | 1,708 | 5,042 | 1,371 | 8,121 | 2016 | 1,538 | 1,942 | 528 | 4,008 |
| 1982 | 1,789 | 5,158 | 1,403 | 8,350 | 2017 | 1,447 | 1,808 | 492 | 3,747 |
| 1983 | 1,869 | 5,261 | 1,432 | 8,562 | 2018 | 1,357 | 1,677 | 457 | 3,491 |
| 1984 | 1,949 | 5,338 | 1,452 | 8,739 | 2019 | 1,269 | 1,553 | 422 | 3,244 |
| 1985 | 2,030 | 5,401 | 1,469 | 8,900 | 2020 | 1,180 | 1,434 | 390 | 3,004 |
| 1986 | 2,102 | 5,431 | 1,478 | 9,011 | 2021 | 1,094 | 1,317 | 358 | 2,769 |
| 1987 | 2,173 | 5,441 | 1,480 | 9,094 | 2022 | 1,009 | 1,206 | 328 | 2,543 |
| 1988 | 2,242 | 5,441 | 1,480 | 9,163 | 2023 | 928 | 1,101 | 300 | 2,329 |
| 1989 | 2,306 | 5,433 | 1,478 | 9,217 | 2024 | 850 | 998 | 272 | 2,120 |
| 1990 | 2,367 | 5,410 | 1,472 | 9,249 | 2025 | 775 | 902 | 245 | 1,922 |
| 1991 | 2,418 | 5,362 | 1,458 | 9,238 | 2026 | 703 | 811 | 221 | 1,735 |
| 1992 | 2,459 | 5,293 | 1,440 | 9,192 | 2027 | 634 | 724 | 197 | 1,555 |
| 1993 | 2,493 | 5,218 | 1,420 | 9,131 | 2028 | 571 | 643 | ·175 | 1,389 |
| 1994 | 2,521 | 5,135 | 1,397 | 9,053 | 2029 | 510 | 567 | 154 | 1,231 |
| 1995 | 2,538 | 5,037 | 1,370 | 8,945 | 2030 | 452 | 497 | 136 | 1,085 |
| 1996 | 2,546 | 4,928 | 1,341 | 8,815 | 2031 | 398 | 431 | 117 | 946 |
| 1997 | 2,547 | 4,807 | 1,307 | 8,661 | 2032 | 348 | 373 | 101 | 822 |
| 1998 | 2,543 | 4,682 | 1,273 | 8,498 | 2033 | 303 | 346 | 87 | 736 |
| 1999 | 2,534 | 4,550 | 1,238 | 8,322 | 2034 | 262 | 271 | 74 | 607 |
| 2000 | 2,522 | 4,414 | 1,201 | 8,137 | 2035 | 226 | 228 | 62 | 516 |
| 2001 | 2,497 | 4,265 | 1,159 | 7,921 | 2036 | 192 | 190 | 51 | 433 |
| 2002 | 2,469 | 4,110 | 1,117 | 7,696 | 2037 | 163 | 157 | 42 | 362 |
| 2003 | 2,433 | 3,955 | 1,076 | 7,464 | 2038 | 136 | 127 | 35 | 298 |
| 2004 | 2,393 | 3,798 | 1,033 | 7,224 | 2039 | 114 | 102 | 28 | 244 |

**Table B3:** OC Forecasts as of October 5, 2000,
Increasing Propensities to Sue

| Filing Year | OC | | | | | Fibreboard | | | | |
| | Meso | Lung | Othc | Nonm | Total | Meso | Lung | Othc | Nonm | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| [2000] | 285 | 423 | 141 | 7,657 | 8,505 | 311 | 450 | 144 | 8,296 | 9,202 |
| 2001 | 1,138 | 1,690 | 562 | 30,629 | 34,020 | 1,245 | 1,801 | 576 | 33,186 | 36,807 |
| 2002 | 1,259 | 1,844 | 655 | 34,903 | 38,661 | 1,377 | 1,965 | 671 | 37,804 | 41,817 |
| 2003 | 1,366 | 1,978 | 737 | 38,945 | 43,026 | 1,494 | 2,107 | 755 | 42,172 | 46,528 |
| 2004 | 1,472 | 2,099 | 811 | 42,941 | 47,323 | 1,610 | 2,236 | 831 | 46,492 | 51,189 |
| 2005 | 1,577 | 2,206 | 878 | 46,874 | 51,535 | 1,725 | 2,350 | 900 | 50,747 | 55,722 |
| 2006 | 1,570 | 2,126 | 844 | 45,661 | 50,201 | 1,718 | 2,265 | 866 | 49,449 | 54,298 |
| 2007 | 1,564 | 2,045 | 811 | 44,449 | 48,869 | 1,711 | 2,179 | 831 | 48,151 | 52,872 |
| 2008 | 1,529 | 1,948 | 773 | 42,739 | 46,989 | 1,672 | 2,075 | 793 | 46,308 | 50,848 |
| 2009 | 1,494 | 1,850 | 736 | 41,029 | 45,109 | 1,634 | 1,971 | 755 | 44,466 | 48,826 |
| 2010 | 1,458 | 1,753 | 699 | 39,319 | 43,229 | 1,595 | 1,867 | 716 | 42,623 | 46,801 |
| 2011 | 1,423 | 1,655 | 661 | 37,609 | 41,348 | 1,556 | 1,764 | 678 | 40,780 | 44,778 |
| 2012 | 1,388 | 1,558 | 624 | 35,899 | 39,469 | 1,518 | 1,660 | 640 | 38,938 | 42,756 |
| 2013 | 1,327 | 1,466 | 586 | 33,987 | 37,366 | 1,452 | 1,562 | 601 | 36,869 | 40,484 |
| 2014 | 1,267 | 1,375 | 548 | 32,074 | 35,264 | 1,386 | 1,464 | 562 | 34,800 | 38,212 |
| 2015 | 1,207 | 1,283 | 510 | 30,161 | 33,161 | 1,320 | 1,367 | 522 | 32,732 | 35,941 |
| 2016 | 1,146 | 1,191 | 471 | 28,248 | 31,056 | 1,254 | 1,269 | 483 | 30,663 | 33,669 |
| 2017 | 1,086 | 1,099 | 433 | 26,335 | 28,953 | 1,188 | 1,171 | 444 | 28,594 | 31,397 |
| 2018 | 1,025 | 1,010 | 399 | 24,478 | 26,912 | 1,121 | 1,076 | 409 | 26,583 | 29,189 |
| 2019 | 963 | 921 | 365 | 22,620 | 24,869 | 1,054 | 982 | 374 | 24,572 | 26,982 |
| 2020 | 902 | 832 | 330 | 20,762 | 22,826 | 987 | 887 | 338 | 22,561 | 24,773 |
| 2021 | 841 | 743 | 296 | 18,904 | 20,784 | 920 | 792 | 303 | 20,549 | 22,564 |
| 2022 | 780 | 654 | 261 | 17,046 | 18,741 | 853 | 697 | 268 | 18,538 | 20,356 |
| 2023 | 719 | 591 | 236 | 15,549 | 17,095 | 787 | 629 | 242 | 16,913 | 18,571 |
| 2024 | 659 | 527 | 211 | 14,051 | 15,448 | 721 | 562 | 216 | 15,287 | 16,786 |
| 2025 | 599 | 464 | 186 | 12,553 | 13,802 | 655 | 494 | 190 | 13,662 | 15,001 |
| 2026 | 539 | 400 | 160 | 11,056 | 12,155 | 589 | 427 | 164 | 12,037 | 13,217 |
| 2027 | 478 | 337 | 135 | 9,558 | 10,508 | 523 | 359 | 139 | 10,411 | 11,432 |
| 2028 | 431 | 300 | 120 | 8,563 | 9,414 | 472 | 319 | 123 | 9,329 | 10,243 |
| 2029 | 386 | 265 | 106 | 7,609 | 8,366 | 422 | 282 | 108 | 8,290 | 9,102 |
| 2030 | 343 | 233 | 94 | 6,729 | 7,399 | 375 | 248 | 96 | 7,332 | 8,051 |
| 2031 | 302 | 202 | 81 | 5,884 | 6,469 | 330 | 215 | 83 | 6,412 | 7,040 |
| 2032 | 264 | 175 | 70 | 5,132 | 5,641 | 289 | 187 | 72 | 5,593 | 6,141 |
| 2033 | 231 | 165 | 60 | 4,588 | 5,044 | 252 | 176 | 62 | 4,999 | 5,489 |
| 2034 | 200 | 128 | 52 | 3,820 | 4,200 | 219 | 137 | 53 | 4,164 | 4,573 |
| 2035 | 173 | 109 | 43 | 3,268 | 3,593 | 189 | 116 | 45 | 3,564 | 3,914 |
| 2036 | 147 | 91 | 36 | 2,753 | 3,027 | 161 | 97 | 37 | 3,003 | 3,298 |
| 2037 | 125 | 75 | 30 | 2,315 | 2,545 | 137 | 80 | 30 | 2,525 | 2,772 |
| 2038 | 105 | 61 | 25 | 1,922 | 2,113 | 115 | 65 | 26 | 2,097 | 2,303 |
| 2039 | 88 | 49 | 20 | 1,585 | 1,742 | 96 | 52 | 21 | 1,730 | 1,899 |
| Total | 33,856 | 37,921 | 14,796 | 860,204 | 946,777 | 37,033 | 40,402 | 15,167 | 933,221 | 1,025,823 |

Note: The entries for 2000 are for 1/4 of a year.

**Table B4:** OC Forecasts as of October 5, 2000,
No Increase in Propensities to Sue

| Filing Year | OC | | | | | Fibreboard | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Total | Meso | Lung | Othc | Nonm | Total |
| [2000] | 285 | 423 | 141 | 7,657 | 8,505 | 311 | 450 | 144 | 8,296 | 9,202 |
| 2001 | 1,138 | 1,690 | 562 | 30,629 | 34,020 | 1,245 | 1,801 | 576 | 33,186 | 36,807 |
| 2002 | 1,147 | 1,643 | 547 | 30,132 | 33,469 | 1,254 | 1,750 | 560 | 32,657 | 36,221 |
| 2003 | 1,142 | 1,589 | 528 | 29,433 | 32,692 | 1,249 | 1,693 | 541 | 31,907 | 35,390 |
| 2004 | 1,137 | 1,535 | 509 | 28,734 | 31,915 | 1,244 | 1,635 | 522 | 31,158 | 34,559 |
| 2005 | 1,133 | 1,481 | 490 | 28,035 | 31,139 | 1,239 | 1,577 | 503 | 30,408 | 33,727 |
| 2006 | 1,128 | 1,427 | 471 | 27,335 | 30,361 | 1,234 | 1,520 | 483 | 29,658 | 32,895 |
| 2007 | 1,124 | 1,373 | 453 | 26,636 | 29,586 | 1,229 | 1,462 | 464 | 28,908 | 32,063 |
| 2008 | 1,098 | 1,307 | 432 | 25,628 | 28,465 | 1,201 | 1,393 | 443 | 27,820 | 30,857 |
| 2009 | 1,073 | 1,242 | 411 | 24,621 | 27,347 | 1,174 | 1,323 | 421 | 26,732 | 29,650 |
| 2010 | 1,048 | 1,176 | 390 | 23,613 | 26,227 | 1,146 | 1,253 | 400 | 25,644 | 28,443 |
| 2011 | 1,022 | 1,111 | 369 | 22,605 | 25,107 | 1,118 | 1,184 | 379 | 24,556 | 27,237 |
| 2012 | 997 | 1,046 | 348 | 21,597 | 23,988 | 1,090 | 1,114 | 357 | 23,468 | 26,029 |
| 2013 | 954 | 984 | 327 | 20,457 | 22,722 | 1,043 | 1,048 | 335 | 22,233 | 24,659 |
| 2014 | 910 | 923 | 306 | 19,317 | 21,456 | 996 | 983 | 314 | 20,998 | 23,291 |
| 2015 | 867 | 861 | 285 | 18,177 | 20,190 | 948 | 917 | 292 | 19,763 | 21,920 |
| 2016 | 823 | 799 | 263 | 17,037 | 18,922 | 901 | 852 | 270 | 18,527 | 20,550 |
| 2017 | 780 | 738 | 242 | 15,897 | 17,657 | 853 | 786 | 248 | 17,292 | 19,179 |
| 2018 | 736 | 678 | 223 | 14,786 | 16,423 | 805 | 722 | 228 | 16,087 | 17,842 |
| 2019 | 692 | 618 | 204 | 13,675 | 15,189 | 757 | 659 | 209 | 14,882 | 16,507 |
| 2020 | 648 | 559 | 184 | 12,564 | 13,955 | 709 | 595 | 189 | 13,677 | 15,170 |
| 2021 | 604 | 499 | 165 | 11,453 | 12,721 | 661 | 531 | 169 | 12,472 | 13,833 |
| 2022 | 560 | 439 | 146 | 10,342 | 11,487 | 613 | 468 | 150 | 11,268 | 12,499 |
| 2023 | 517 | 396 | 132 | 9,440 | 10,485 | 565 | 422 | 135 | 10,286 | 11,408 |
| 2024 | 474 | 354 | 118 | 8,537 | 9,483 | 518 | 377 | 121 | 9,304 | 10,320 |
| 2025 | 430 | 311 | 104 | 7,634 | 8,479 | 471 | 332 | 106 | 8,323 | 9,232 |
| 2026 | 387 | 269 | 90 | 6,731 | 7,477 | 423 | 286 | 92 | 7,341 | 8,142 |
| 2027 | 344 | 226 | 76 | 5,828 | 6,474 | 376 | 241 | 77 | 6,359 | 7,053 |
| 2028 | 310 | 201 | 67 | 5,224 | 5,802 | 339 | 214 | 69 | 5,700 | 6,322 |
| 2029 | 277 | 178 | 59 | 4,644 | 5,158 | 303 | 189 | 61 | 5,068 | 5,621 |
| 2030 | 246 | 156 | 52 | 4,107 | 4,561 | 269 | 166 | 54 | 4,483 | 4,972 |
| 2031 | 217 | 136 | 45 | 3,593 | 3,991 | 237 | 145 | 46 | 3,923 | 4,351 |
| 2032 | 190 | 118 | 39 | 3,135 | 3,482 | 208 | 125 | 40 | 3,422 | 3,795 |
| 2033 | 166 | 111 | 34 | 2,802 | 3,113 | 181 | 118 | 35 | 3,059 | 3,393 |
| 2034 | 144 | 86 | 29 | 2,335 | 2,594 | 157 | 92 | 30 | 2,550 | 2,829 |
| 2035 | 124 | 73 | 24 | 2,000 | 2,221 | 136 | 78 | 25 | 2,184 | 2,423 |
| 2036 | 106 | 61 | 20 | 1,686 | 1,873 | 116 | 65 | 21 | 1,842 | 2,044 |
| 2037 | 90 | 51 | 16 | 1,419 | 1,576 | 98 | 54 | 17 | 1,550 | 1,719 |
| 2038 | 75 | 41 | 14 | 1,178 | 1,308 | 82 | 44 | 14 | 1,287 | 1,427 |
| 2039 | 63 | 33 | 11 | 973 | 1,080 | 69 | 35 | 12 | 1,063 | 1,179 |
| Total | 25,206 | 26,942 | 8,926 | 551,626 | 612,700 | 27,568 | 28,699 | 9,152 | 599,341 | 664,760 |

Note: The entries for 2000 are for 1/4 of a year.

**Table B5:** Fibreboard Forecasts as of October 5, 2000,
Increasing Propensities to Sue

| Filing Year | OC | | | | | Fibreboard | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Total | Meso | Lung | Othc | Nonm | Total |
| [2000] | 275 | 412 | 137 | 7,444 | 8,268 | 301 | 439 | 140 | 8,065 | 8,945 |
| 2001 | 1,100 | 1,649 | 547 | 29,776 | 33,072 | 1,203 | 1,757 | 562 | 32,260 | 35,782 |
| 2002 | 1,201 | 1,789 | 634 | 33,665 | 37,289 | 1,314 | 1,906 | 650 | 36,459 | 40,329 |
| 2003 | 1,298 | 1,925 | 716 | 37,599 | 41,538 | 1,419 | 2,051 | 734 | 40,706 | 44,910 |
| 2004 | 1,389 | 2,044 | 789 | 41,377 | 45,599 | 1,519 | 2,178 | 809 | 44,788 | 49,294 |
| 2005 | 1,472 | 2,145 | 853 | 44,959 | 49,429 | 1,610 | 2,286 | 875 | 48,658 | 53,429 |
| 2006 | 1,439 | 2,049 | 815 | 43,262 | 47,565 | 1,573 | 2,183 | 835 | 46,831 | 51,422 |
| 2007 | 1,401 | 1,953 | 776 | 41,527 | 45,657 | 1,532 | 2,080 | 795 | 44,961 | 49,368 |
| 2008 | 1,363 | 1,857 | 739 | 39,809 | 43,768 | 1,490 | 1,978 | 757 | 43,108 | 47,333 |
| 2009 | 1,320 | 1,763 | 701 | 38,050 | 41,834 | 1,444 | 1,878 | 719 | 41,210 | 45,251 |
| 2010 | 1,276 | 1,669 | 663 | 36,283 | 39,891 | 1,395 | 1,779 | 680 | 39,305 | 43,159 |
| 2011 | 1,229 | 1,577 | 628 | 34,530 | 37,964 | 1,344 | 1,680 | 643 | 37,411 | 41,078 |
| 2012 | 1,179 | 1,486 | 591 | 32,748 | 36,004 | 1,289 | 1,583 | 606 | 35,486 | 38,964 |
| 2013 | 1,128 | 1,398 | 555 | 30,983 | 34,064 | 1,233 | 1,490 | 569 | 33,579 | 36,871 |
| 2014 | 1,074 | 1,312 | 521 | 29,229 | 32,136 | 1,175 | 1,397 | 534 | 31,681 | 34,787 |
| 2015 | 1,020 | 1,228 | 488 | 27,521 | 30,257 | 1,116 | 1,309 | 500 | 29,834 | 32,759 |
| 2016 | 964 | 1,145 | 455 | 25,794 | 28,358 | 1,055 | 1,220 | 467 | 27,965 | 30,707 |
| 2017 | 907 | 1,066 | 424 | 24,113 | 26,510 | 992 | 1,136 | 435 | 26,145 | 28,708 |
| 2018 | 851 | 989 | 394 | 22,465 | 24,699 | 931 | 1,054 | 404 | 24,360 | 26,749 |
| 2019 | 796 | 916 | 364 | 20,872 | 22,948 | 870 | 976 | 373 | 22,634 | 24,853 |
| 2020 | 740 | 846 | 336 | 19,327 | 21,249 | 809 | 901 | 345 | 20,961 | 23,016 |
| 2021 | 686 | 777 | 309 | 17,813 | 19,585 | 750 | 827 | 316 | 19,321 | 21,214 |
| 2022 | 633 | 711 | 283 | 16,359 | 17,986 | 692 | 758 | 290 | 17,744 | 19,484 |
| 2023 | 582 | 649 | 259 | 14,983 | 16,473 | 636 | 692 | 265 | 16,252 | 17,845 |
| 2024 | 533 | 589 | 234 | 13,637 | 14,993 | 583 | 627 | 240 | 14,794 | 16,244 |
| 2025 | 486 | 532 | 211 | 12,361 | 13,590 | 532 | 567 | 217 | 13,411 | 14,727 |
| 2026 | 441 | 478 | 191 | 11,159 | 12,269 | 482 | 510 | 195 | 12,108 | 13,295 |
| 2027 | 398 | 427 | 170 | 10,000 | 10,995 | 435 | 455 | 174 | 10,851 | 11,915 |
| 2028 | 358 | 379 | 151 | 8,931 | 9,819 | 392 | 404 | 155 | 9,693 | 10,644 |
| 2029 | 320 | 334 | 133 | 7,914 | 8,701 | 350 | 356 | 136 | 8,590 | 9,432 |
| 2030 | 283 | 293 | 117 | 6,977 | 7,670 | 310 | 312 | 120 | 7,573 | 8,315 |
| 2031 | 250 | 254 | 101 | 6,080 | 6,685 | 273 | 271 | 103 | 6,601 | 7,248 |
| 2032 | 218 | 220 | 87 | 5,282 | 5,807 | 239 | 234 | 89 | 5,735 | 6,297 |
| 2033 | 190 | 204 | 75 | 4,717 | 5,186 | 208 | 217 | 77 | 5,121 | 5,623 |
| 2034 | 164 | 160 | 64 | 3,901 | 4,289 | 180 | 170 | 65 | 4,237 | 4,652 |
| 2035 | 142 | 134 | 53 | 3,315 | 3,644 | 155 | 143 | 55 | 3,601 | 3,954 |
| 2036 | 120 | 112 | 44 | 2,780 | 3,056 | 132 | 119 | 45 | 3,021 | 3,317 |
| 2037 | 102 | 93 | 36 | 2,323 | 2,554 | 112 | 99 | 37 | 2,525 | 2,773 |
| 2038 | 85 | 75 | 30 | 1,914 | 2,104 | 93 | 80 | 31 | 2,081 | 2,285 |
| 2039 | 71 | 60 | 24 | 1,567 | 1,722 | 78 | 64 | 25 | 1,704 | 1,871 |
| Total | 29,484 | 37,699 | 14,698 | 813,346 | 895,227 | 32,246 | 40,166 | 15,067 | 881,370 | 968,849 |

Note: The entries for 2000 are for 1/4 of a year.

**Table B6:** Fibreboard Forecasts as of October 5, 2000,
No Increase in Propensities to Sue

| Filing Year | OC | | | | | Fibreboard | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Total | Meso | Lung | Othc | Nonm | Total |
| [2000] | 275 | 412 | 137 | 7,444 | 8,268 | 301 | 439 | 140 | 8,065 | 8,945 |
| 2001 | 1,100 | 1,649 | 547 | 29,776 | 33,072 | 1,203 | 1,757 | 562 | 32,260 | 35,782 |
| 2002 | 1,086 | 1,578 | 524 | 28,791 | 31,979 | 1,187 | 1,681 | 537 | 31,200 | 34,605 |
| 2003 | 1,070 | 1,518 | 505 | 27,937 | 31,030 | 1,170 | 1,618 | 517 | 30,280 | 33,585 |
| 2004 | 1,052 | 1,458 | 484 | 27,051 | 30,045 | 1,151 | 1,554 | 497 | 29,326 | 32,528 |
| 2005 | 1,032 | 1,397 | 464 | 26,132 | 29,025 | 1,129 | 1,488 | 476 | 28,334 | 31,427 |
| 2006 | 1,009 | 1,334 | 443 | 25,162 | 27,948 | 1,103 | 1,421 | 454 | 27,288 | 30,266 |
| 2007 | 982 | 1,271 | 422 | 24,167 | 26,842 | 1,074 | 1,354 | 433 | 26,215 | 29,076 |
| 2008 | 955 | 1,209 | 402 | 23,181 | 25,747 | 1,045 | 1,288 | 412 | 25,150 | 27,895 |
| 2009 | 926 | 1,148 | 381 | 22,170 | 24,625 | 1,012 | 1,223 | 391 | 24,056 | 26,682 |
| 2010 | 894 | 1,087 | 361 | 21,154 | 23,496 | 978 | 1,158 | 370 | 22,958 | 25,464 |
| 2011 | 862 | 1,027 | 341 | 20,142 | 22,372 | 943 | 1,094 | 350 | 21,863 | 24,250 |
| 2012 | 827 | 967 | 322 | 19,112 | 21,228 | 904 | 1,031 | 330 | 20,748 | 23,013 |
| 2013 | 791 | 910 | 302 | 18,092 | 20,095 | 865 | 970 | 310 | 19,644 | 21,789 |
| 2014 | 753 | 854 | 283 | 17,075 | 18,965 | 824 | 910 | 290 | 18,542 | 20,566 |
| 2015 | 715 | 800 | 265 | 16,083 | 17,863 | 782 | 852 | 272 | 17,467 | 19,373 |
| 2016 | 676 | 746 | 248 | 15,080 | 16,750 | 740 | 794 | 254 | 16,379 | 18,167 |
| 2017 | 636 | 694 | 231 | 14,101 | 15,662 | 696 | 740 | 237 | 15,318 | 16,991 |
| 2018 | 597 | 644 | 214 | 13,141 | 14,596 | 653 | 686 | 220 | 14,276 | 15,835 |
| 2019 | 558 | 596 | 198 | 12,213 | 13,565 | 610 | 635 | 203 | 13,270 | 14,718 |
| 2020 | 519 | 551 | 183 | 11,312 | 12,565 | 567 | 587 | 188 | 12,291 | 13,633 |
| 2021 | 481 | 506 | 168 | 10,429 | 11,584 | 526 | 539 | 172 | 11,332 | 12,569 |
| 2022 | 444 | 463 | 154 | 9,579 | 10,640 | 485 | 493 | 158 | 10,410 | 11,546 |
| 2023 | 408 | 423 | 141 | 8,775 | 9,747 | 446 | 450 | 144 | 9,536 | 10,576 |
| 2024 | 374 | 383 | 128 | 7,989 | 8,874 | 409 | 408 | 131 | 8,683 | 9,631 |
| 2025 | 341 | 346 | 115 | 7,244 | 8,046 | 373 | 369 | 118 | 7,874 | 8,734 |
| 2026 | 309 | 311 | 104 | 6,541 | 7,265 | 338 | 332 | 106 | 7,110 | 7,886 |
| 2027 | 279 | 278 | 92 | 5,863 | 6,512 | 305 | 296 | 95 | 6,374 | 7,070 |
| 2028 | 251 | 247 | 82 | 5,239 | 5,819 | 275 | 263 | 84 | 5,696 | 6,318 |
| 2029 | 224 | 218 | 72 | 4,644 | 5,158 | 245 | 232 | 74 | 5,050 | 5,601 |
| 2030 | 199 | 191 | 64 | 4,095 | 4,549 | 217 | 203 | 65 | 4,453 | 4,938 |
| 2031 | 175 | 165 | 55 | 3,571 | 3,966 | 191 | 176 | 56 | 3,884 | 4,307 |
| 2032 | 153 | 143 | 47 | 3,104 | 3,447 | 167 | 153 | 49 | 3,376 | 3,745 |
| 2033 | 133 | 133 | 41 | 2,772 | 3,079 | 146 | 142 | 42 | 3,015 | 3,345 |
| 2034 | 115 | 104 | 35 | 2,294 | 2,548 | 126 | 111 | 36 | 2,496 | 2,769 |
| 2035 | 99 | 88 | 29 | 1,951 | 2,167 | 109 | 93 | 30 | 2,123 | 2,355 |
| 2036 | 84 | 73 | 24 | 1,637 | 1,818 | 92 | 78 | 25 | 1,783 | 1,978 |
| 2037 | 72 | 60 | 20 | 1,370 | 1,522 | 78 | 64 | 20 | 1,491 | 1,653 |
| 2038 | 60 | 49 | 16 | 1,129 | 1,254 | 65 | 52 | 17 | 1,229 | 1,363 |
| 2039 | 50 | 39 | 13 | 925 | 1,027 | 55 | 42 | 13 | 1,008 | 1,118 |
| Total | 21,566 | 26,070 | 8,657 | 508,467 | 564,760 | 23,585 | 27,776 | 8,878 | 551,853 | 612,092 |

Note: The entries for 2000 are for 1/4 of a year.