# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

OWENS CORNING, *et al.*,

v.

CREDIT SUISSE FIRST BOSTON, *et al.*

---

Civil Action

No. 04-905 (JPF)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF DR. FREDERICK C. DUNBAR

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Mary Beth Hogan
919 Third Avenue
New York, New York 10022
(212) 909-6000

SAUL EWING, LLP
Norman L. Pernick
222 Delaware Avenue
Post Office Box 1266
Wilmington, Delaware 19899

Charles O. Monk, II
100 South Charles Street
Baltimore, MD 21201-2773
(410) 332-8600

Attorneys for the Debtors and
Debtors-in-Possession

CAPLIN & DRYSDALE,
CHARTERED
Elihu Inselbuch
Peter Van N. Lockwood
Nathan D. Finch
399 Park Avenue
New York, NY 10022
(212) 319-7125

CAMPBELL & LEVINE
Marla Eskin (I.D. # 2989)
Chase Manhattan Center
15th Floor
1201 Market Street
Wilmington, DE 19899
(302) 426-1900

Attorneys for the Official
Committee of Asbestos
Claimants

KAYE SCHOLER LLP
Michael J. Crames
Jane W. Parver
425 Park Avenue
New York, New York 10022
(212) 836-8000

YOUNG, CONAWAY,
STARGATT & TAYLOR LLP
James L. Patton, Jr. (I.D. # 2202)
Sharon M. Zieg (ID # 4196)
The Brandywine Building
1000 West Street, 17th Floor
P.O Box 391
Wilmington, DE 19899-0391
(302) 571-6600

Attorneys for James J.
McMonagle, Legal
Representative for the Futures
Claimants

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................ 1

ARGUMENT ........................................................................... 4

I.    DR. DUNBAR'S TESTIMONY SHOULD BE EXCLUDED BECAUSE
      HIS ESTIMATION IS BASED UPON THE IMPROPER ASSUMPTION
      THAT OC'S ASBESTOS PERSONAL INJURY LIABILITY SHOULD
      BE VALUED USING ARBITRARY CRITERIA THAT HE CREATED
      AND BELIEVES SHOULD BE APPLIED IN BANKRUPTCY, NOT
      THE SUBSTANTIVE STATE LAW THAT APPLIED IN THE TORT
      SYSTEM IN WHICH OC FUNCTIONED PRE-BANKRUPTCY ......... 4

II.   DR. DUNBAR'S NONMALIGNANCY "PREVALENCE" MODEL AND
      ANY TESTIMONY BASED UPON IT SHOULD BE EXCLUDED ....... 11

      A.   Estimating the Prevalence of Asbestos-Related Disease Is Beyond
           the Scope of Dr. Dunbar's Qualifications ......................... 12

      B.   The Prevalence Model Should Be Excluded Because it Fails the
           Reliability Prong of the *Daubert* Test ........................... 15
           1.    Widespread Acceptance ....................................... 15
           2.    Testing ....................................................... 16
           3.    Peer Review and Publication ................................. 17
           4.    Error Rate .................................................... 18
           5.    Opinion Developed Solely For Litigation ..................... 18

      C.   The Prevalence Model Should Be Excluded Because The Bank Debt
           Holders Have Repeatedly Failed To Comply With The Court's Expert
           Disclosure Orders And Have Violated The Federal Rules ......... 19

      D.   The Prevalence Model Should Be Excluded Because its Use Violates
           the Court-Ordered Confidentiality Agreement in the *Falise* Litigation ... 21

III.  DR. DUNBAR'S TESTIMONY BASED ON THE MANVILLE
      TRUST AUDIT AND THE MENDELSOHN AND GOLDSTEIN
      REPORTS IN THE *FALISE* LITIGATION SHOULD BE
      EXCLUDED .................................................................. 23

      A.   Dr. Dunbar, an Economist, May Not Testify About Medical
           Reviews Performed by Non-Testifying Experts in Other Matters ... 25

Page

     B.    The Mendelsohn and Goldstein Reports Were Prepared for Litigation
           And Do Not Satisfy the Requirements of FRE 703 . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

Page(s)

*Allison v McGhan Medical Corp ,*
    184 F 3d 1300 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*America National Bank and Trust Co. of Chicago v. AXA Client Solutions, LLC,*
    2002 WL 1067696 (N.D. Ill. May 28, 2002) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Belofsky v General Electric Co ,*
    980 F. Supp. 818 (D.V.I. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bittner v Borne Chemical Co.,*
    691 F.2d 134 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Brumley v. Pfizer Inc.,*
    200 F.R D. 596 (S.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Coalition To Save Our Children v. State Board of Education of the State of Delaware,*
    90 F.3d 762 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Daubert v. Merrell Dow Pharm., Inc.,*
    43 F.3d 1311 (9th Cir.), *cert. denied,* 516 U.S. 869 (1995) . . . . . . .     . . . . . . 18

*Daubert v. Merrell Dow Pharm,. Inc.,*
    509 U.S. 579 (1993) . . . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . *passim*

*DEV Industrial v. Rockwell Graphic System, Inc.,*
    1992 WL 100908 (N.D Ill. May 4, 1992) . . . . . . . . . . . . . . . . . . . .  . . . . . . . . 22

*In re Diet Drugs Prod. Liability Litigation,*
    2000 WL 962545 (E.D. Pa. June 28, 2000) . . . . . . . . . .  . . . . . . . .  . . . . . . 15

*Dura Automotive System of Indiana, Inc. v. CTS Corp ,*
    285 F 3d 609 (7th Cir 2002) . . . . . . . . . . . . . . .  . . . . . . . . . . . .  . .  . . . . . . . 26, 27, 28

*In re Eagle-Picher Industrial,*
    189 B.R. 681 (Bankr. S.D. Ohio 1995) . . . . . . . . . . . . . . .  . . . . . . . . . . . . 6

*General Electric Co v Joiner,*
    522 U.S. 136 (1997) . . . . . .  . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . .  . . 30

Page(s)

*Grant v Chemrex, Inc*,
    1997 WL 223071 (N.D. Ill April 28, 1997) . . . . . . . . . . . . . . . . . . . . . . . .   27

*Grogan v. Garner*,
    498 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Ibarra v. Sunset Scavenger Co*,
    2003 WL 21244096 (N.D. Cal. May 21, 2003) . . . . . . . . . . . . . . . . . . . . . . .   22

*Kumho Tire Co, Ltd. v. Carmichael*,
    526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*In re Meyertech Corp*,
    831 F.2d 410 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Mitchell v. Gencorp, Inc*,
    165 F.3d 778 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*In re Paoli R.R. Yard PCB Litigation*,
    35 F.3d 717 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Quinter v. Volkswagen of America*,
    676 F.2d 969 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Raleigh v. Illinois Department of Revenue*,
    530 U.S. 15 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Rapp v. Singh*,
    152 F. Supp. 2d 694 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*Rowe Entertainment, Inc. v William Morris Agency, Inc.*,
    2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) . . . . . . . . . . . . . . . . . . . . .   29

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*,
    73 F.3d 546 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Soden v. Freightliner Corp.*,
    714 F.2d 498 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

*Soldo v Sandoz Pharm. Corp*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . .   15, 18

*TK-7 Corp v Estate of Barbouti*,
    993 F.2d 722 (10th Cir 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

Page(s)

*In re TMI Litigation,*
193 F.3d 613 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    *passim*

*In re TMI Litigation Cases Consolidated II,*
922 F Supp 997 (M.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

*United States v. Tran Trong Cuong,*
18 F.3d 1132 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27, 29

*In re Western Asbestos Co ,*
2004 WL 1944792 (N.D. Cal. April 16, 2004) . . . . . . . . . . . . . . . . . . . . . . .    6

*Whitehead v. Gateway Chevrolet,*
2004 WL 316413 (N.D. Ill. Feb. 2, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*Yates v. Applied Performance Technologies, Inc.,*
205 F.R.D. 497 (S.D. Ohio 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

## DOCKETED CASES

*In re Armstrong World Industries,*
Case No. 00-4471 (Bankr. D. Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . .    6

*In re Babcock & Wilcox Co ,*
Case No. 00-10992, slip op. at 48, Docket No. 6133 (Bankr. E.D. La. 2004) . .    6

*In re E.J. Bartells,*
Case No. 00-10390 (Bankr. W.D. Wash. 2000) . . . . . . . . . . . . . . . . . . . . . .    6

*Falise v Am. Tobacco Co.,*
99 CV 7392 (JBW) (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

*In re H.K. Porter,*
Case No. 91-20468 (Bankr. W.D Pa. 1991) . . . . . . . . . . . . . . . . . . . . . . . . .    6

*In re National Gypsum,*
Case No. 90-37213 (Bankr. N.D. Tex. 1990 ) . . . . . . . . . . . . . . . . . . . . . . . .    6

*In re Western Asbestos Co ,*
Case No. 02-46284 (Bankr. N.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . .    6, 27

Page(s)

## FEDERAL STATUTES

Federal Rules Of Civil Procedure 16(f)  . . . . . . . . . . . . . . . . . . . . .  . . . . . .  . . . . . . .    1

Federal Rules Of Civil Procedure 26(a)(2)(B)  . . . . . . . . . . . . . . . . . . . . .   . . . . . . .    1

Federal Rules Of Civil Procedure 37(c)(1)  . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . . . .    1

Federal Rules Of Evidence 702 and 703  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

## MISCELLANEOUS

Federal Judicial Center, *Reference Manual on Scientific Evidence*, 335 (2d ed. 2000)    12

Frederick C. Dunbar, *Estimating Future Claims* (1996)  . . . . . . . . . . . .  . .  . . . . .  .    16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OWENS CORNING, *et al.*,

v.

CREDIT SUISSE FIRST BOSTON, *et al.*

Civil Action

No. 04-905 (JPF)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY OF DR. FREDERICK C. DUNBAR

The Debtors, Asbestos Claimants' Committee ("ACC"), and James J. McMonagle,

the legal representative for future claimants (the "Futures' Representative," collectively, the "Plan

Proponents"), by and through their undersigned counsel, hereby submit this memorandum of law in

support of their motion *in limine*, pursuant to FEDERAL RULES OF CIVIL PROCEDURE 16(f), 26(a)

(2)(B) and 37(c)(1) and FEDERAL RULES OF EVIDENCE 702 and 703, to strike the reports[1] and

preclude the testimony of the Bank Debt Holders' estimation expert, Dr. Frederick C. Dunbar, in

connection with the hearing scheduled to begin on January 13, 2005.

### PRELIMINARY STATEMENT

Dr. Dunbar's testimony is inadmissible for numerous separate and independent

reasons.

---

[1]  Dr. Dunbar filed an expert report on October 15, 2004 (the "Dunbar Report"), attached as
Exhibit A to the Declaration of Sharon M. Zieg in Support of Motion *In Limine* To
Exclude Expert Testimony of Dr. Frederick C. Dunbar, dated January 5, 2005 ("Zieg
Decl."), a rebuttal report on November 15, 2004 (the "Dunbar Rebuttal Report"), attached
as Exhibit B to the Zieg Decl., a supplemental expert report on December 8, 2004 (the
"Dunbar Supplemental Report"), attached as Exhibit C to the Zieg Decl., and another
"supplement" on December 31, 2004, attached as Exhibit D to the Zieg Decl. (the
"December 30 Supplement").  Hereinafter, unless otherwise specified, "Ex. __" refers to
exhibits to the Zieg Decl.

As demonstrated in Point I, under *Daubert v. Merrell Dow Pharm,. Inc.*, 509 U.S. 579, 591 (1993), expert testimony is admissible only if it is relevant or "fits" the issue in dispute *See also In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999). As shown below, the issue to be determined at the estimation hearing is the amount and value of pending and future asbestos personal injury liabilities of Owens Corning ("OC") and its related debtors as if the claims were being brought against OC in the federal and state court system in which OC functioned prior to its bankruptcy. Dr. Dunbar, however, does not base his estimation on what OC would have had to pay had it not filed its Chapter 11 petition, but rather upon how much he believes the asbestos claims are or should be worth in bankruptcy, according to arbitrary medical and product identification criteria created by Dr. Dunbar, who is an economist -- not a medical doctor or lawyer, much less an asbestos litigator.

Because of that faulty assumption, Dr. Dunbar improperly excludes and devalues claims that he concedes would be compensable in the tort system in which OC defended itself before filing its Chapter 11 petition. Because Dr. Dunbar is not estimating what OC's liabilities actually would have been outside the bankruptcy context, his testimony does not "fit" the facts of this case and should therefore be excluded. *Daubert*, 509 U.S. at 591.

As demonstrated in Point II, expert testimony is admissible only if the expert has the qualifications to offer that testimony and if it is "reliable" under *Daubert*. Here, Dr. Dunbar has constructed an "epidemiologically-based" model for this litigation (what he refers to as a "prevalence" model) to forecast how many of the estimated exposed population of asbestos workers in the United States will develop a nonmalignant asbestos-related disease according to Dr. Dunbar's own medical criteria, which he then uses to predict how many claimants will file nonmalignant claims against OC in the future. By using his prevalence model to estimate future nonmalignancies, Dr. Dunbar improperly eliminates large numbers of nonmalignant claims from his estimate

As shown below, Dr. Dunbar's prevalence model should be excluded for several reasons. First, estimating the prevalence of asbestos-related disease is well beyond the scope of Dr. Dunbar's qualifications. Dr. Dunbar is an economist, not an epidemiologist, and has never published anything in a peer-reviewed journal on the epidemiology of asbestos-related disease. Nor did Dr. Dunbar rely on the advice of any medical experts in constructing his prevalence model.

Second, Dr. Dunbar's prevalence model also fails the reliability prong of *Daubert* because the reasoning or methodology underlying his model is not scientifically valid. It is well accepted (and Dr. Dunbar has himself acknowledged) that there is no published accepted dose-response function[2] that can be used to predict the occurrence of non-malignant changes to workers exposed to asbestos. Indeed, Dr. Nicholson, whose pioneering work has been used to forecast the incidence of mesothelioma and lung cancer in the population of workers exposed to asbestos in the United States, did not believe that such a dose/response model could be constructed for the prediction of nonmalignant asbestos-related disease. Moreover, Dr. Dunbar's prevalence model has never been subjected to the scrutiny of the scientific community because Dr. Dunbar has not published or otherwise subjected his model to peer review. Nor has Dr. Dunbar's model been tested.[3]

---

[2]    The likelihood that a person will contract a disease following exposure to asbestos is the product of a dose and response. The dose is the product of length of time and intensity of exposure to the substance. With respect to cancers, the response rate is the likelihood of asbestos-related mortality. The dose/response relationship for cancers therefore describes the probability of getting an asbestos-related malignancy given a particular dose  Report of Francine F. Rabinovitz, October 15, 2004, attached as Exhibit H to the Zieg Decl , at 11.

[3]    The prevalence model should also be excluded because the current version was first produced on December 8, eight weeks after the Court's orders required the disclosure of expert opinions in this case. Dr. Dunbar has since disavowed his early version of the model, saying that it was "off the shelf" and "not my model." Moreover, in creating the model, NERA improperly and intentionally used confidential data that it obtained under

As demonstrated in Point III, those aspects of Dr. Dunbar's testimony and opinions that rely upon a summary of the results of a medical audit of the Manville Trust and the reports of Drs. Sara Mendelsohn and David Goldstein in an unrelated litigation should be excluded as well. Neither Drs. Mendelsohn, Goldstein nor anyone involved in the 1995 Manville Trust audit has been designated to testify in this case. As the case law makes clear, Dr. Dunbar, who has no medical expertise, should not be permitted to testify about the work of experts in other fields who will not be testifying here. Nor should Dr. Dunbar be allowed to rely upon the Goldstein or Mendelsohn studies because those studies were prepared solely for the purpose of litigation and are not of a type that experts would reasonably rely upon.

## ARGUMENT

**I.     DR. DUNBAR'S TESTIMONY SHOULD BE EXCLUDED BECAUSE HIS ESTIMATION IS BASED UPON THE IMPROPER ASSUMPTION THAT OC'S ASBESTOS PERSONAL INJURY LIABILITY SHOULD BE VALUED USING ARBITRARY CRITERIA THAT HE CREATED AND BELIEVES SHOULD BE APPLIED IN BANKRUPTCY, NOT THE SUBSTANTIVE STATE LAW THAT APPLIED IN THE TORT SYSTEM IN WHICH OC FUNCTIONED PRE-BANKRUPTCY**

Under *Daubert*, 509 U.S. at 591, expert testimony is admissible only if it is relevant to the issue in dispute. The issue of relevance or "fit" depends upon "a connection between the expert opinion offered and the particular disputed factual issues in the case." *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999). Here, Dr. Dunbar's estimation does not fit the issue in dispute because he is not estimating OC's asbestos liability in accordance with the controlling legal principles, and

---

two confidentiality agreements in the *Falise v. Am. Tobacco Co.*, 99 CV 7392 (JBW) (E.D.N.Y.) litigation  The owners of that data have expressly refused permission for NERA to utilize that data in this litigation.

accordingly his estimation will not assist the Court in determining the amount of OC's asbestos liabilities.

It is axiomatic that federal courts sitting in bankruptcy must determine creditors' claims under applicable non-bankruptcy substantive law  *See Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000) (state law "governs the substance of claims"); *Grogan v Garner*, 498 U.S 279, 283 (1991) (holding that, while the issue of non-dischargeability is a matter of federal bankruptcy law, the "validity of a creditor's claim is determined by rules of state law"); *In re Meyertech Corp.*, 831 F.2d 410, 417-18 (3d Cir 1987) ("The crucial point to be made is that in the ordinary bankruptcy proceeding the great bulk of creditor claims are claims that have accrued under state law prior to bankruptcy . . . [t]he existence and validity of such claims recurringly depends on state law. Hence, the bankruptcy law is constantly enmeshed in state law questions").

This same rule of law applies in connection with estimation of claims in bankruptcy As the Third Circuit stated in *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 136, 138 (3d Cir 1982), in estimating a claim, the "bankruptcy court should be guided by the applicable state law" and is "bound by the legal rules which may govern the ultimate value of the claim "

In the context of estimating the amount of OC's pending and future personal injury asbestos liability, the requirement to apply the applicable non-bankruptcy law means that the estimation must approximate as reliably as possible the likely amounts that OC would, but for the bankruptcy, have had to pay to dispose of pending and future asbestos personal injury claims against it in the tort system. In a mass tort case such as this, with hundreds of thousands of pending claims and a need to take account of future claims as well, estimation from the Debtors' extensive claims history is the only practical course — and is fully authorized in law and established in practice in similar mass-tort bankruptcies.

Thus, courts have repeatedly estimated the value of present and future asbestos claims in asbestos bankruptcy cases based on the debtor's pre-petition claims history as it existed in the tort system under substantive state law. *See In re Eagle-Picher Indus.*, 189 B.R. 681, 683 (Bankr S.D. Ohio 1995) (stating that the "Bankruptcy Code at § 502(c) makes it clear that we are estimating claims, and the term 'claim' is defined in the Bankruptcy Code at § 101(5)(A) for present purposes as a 'right to payment.' And turning again to § 502(c)(1), it is 'contingent or unliquidated' claims, the value of which we are estimating. This is to be distinguished from estimating the value which claimants might take in satisfaction of their claims through some bankruptcy mechanism such as a trust of the sort provided for at § 524(g), and as contemplated in the present plan."); *In re Babcock & Wilcox Co.*, Case No. 00-10992, slip op. at 48, Docket No. 6133 (Bankr. E.D. La. 2004); *In re Armstrong World Industries*, Case No. 00-4471 (Bankr. D. Del. 2000); *In re E.J. Bartells*, Case No. 00-10390 (Bankr. W.D. Wash. 2000); *In re H K. Porter*, Case No. 91-20468 (Bankr. W D. Pa. 1991); *In re National Gypsum*, Case No. 90-37213 (Bankr. N.D. Tex. 1990).[4]

It is these legal principles that the experts of the ACC and Futures' Representative have used to arrive at their estimations. Using OC's historical claims database and adjusting based on foreseeable trends, Dr. Peterson and Dr. Rabinovitz estimate OC's present and future liability as if OC had remained in the pre-bankruptcy tort system.

---

[4]   In *In re Western Asbestos Co.*, the debtors' claim experience was insufficient to serve as the basis for estimation because the debtors had entered into "stand still" agreements with the major asbestos plaintiffs' firms. The court, therefore, held that the asbestos claims estimation should be based on the claim history of other similarly situated companies in the industry *See Memorandum of Decision After Confirmation Hearing*, February 3, 2004, at 55-57; *In re Western Asbestos Co.*, Case No. 02-46284 (Bankr. N.D. Cal.), attached as Exhibit GG to the Zieg Decl.; *In re Western Asbestos Co.*, 2004 WL 1944792 (N.D. Cal. April 16, 2004) (District Court Plan Confirmation Order), attached as Exhibit W to the Zieg Decl.

In contrast, Dr. Dunbar does not base his estimation on what OC would have had to pay had it not filed its Chapter 11 petition, but rather upon how much he believes the asbestos claims are or should be worth in bankruptcy based on arbitrary criteria that Dr. Dunbar has created. The fundamental basis upon which Dr. Dunbar's estimation rests is his assumption that he is estimating "the value of *allowable* personal injury claims resulting from exposure to OC products containing asbestos," which he defines as "[c]laims that will be liquidated in the process set by the Bankruptcy Court." *See* Dunbar Tr. at 59[5]; Ex. A at 1, 4. Accordingly, the criterion that he used to evaluate whether a claim is valid is not whether the claim would be compensable in the federal and state court system in which OC functioned prior to filing its Chapter 11 petition. As Dr. Dunbar testified:

> [t]he allowable claim is a claim that is allowed in the course of a bankruptcy liquidation process, which would be a federal process. It's a tort system process, but it's not the same tort system which has generated the claims in the past. Because they've been generated in different types of case disposition methods in state courts.

Ex. E at 253; *see also id.* at 63-64, 69, 254.

Indeed, even if estimating "allowable" claims were the proper inquiry, which it is not, the "medical criteria" and "product identification" standards that Dr. Dunbar uses to determine an "allowable" claim are of his own invention and arbitrary. Dr. Dunbar not only fails to base his analysis on whether claimants would be entitled to compensation under the pre-bankruptcy tort system, but his analysis does not even value the claims for a bankruptcy trust. *See id* at 75 ("Q: You're not assuming a trust? A: I'm assuming some resolution process. And it could be a set of trusts. It could be another type of resolution process"); *id.* at 88 ("My understanding is that a Court can create a trust of its own design, based on what it views will work, and can try to prevent designs

---

[5]    Excerpts from the deposition of Dr. Frederick C. Dunbar are attached as Exhibit E to the Zieg Decl.

that don't work, and it can impose a channeling injunction even outside the 524(g) context"); *id.* at 262.

Dr. Dunbar's flawed assumption causes him to exclude or devalue claims that were and are compensable based on OC's historic experience. For example, in estimating non-malignant claims, he does not provide any value for what he calls "unimpaired" claimants, whose injuries have not resulted in serious loss of lung function, even though such claims were and are compensable in the pre-bankruptcy tort system in which OC defended itself. *See, e.g., id.* at 62-65, 69, 87, 258-62. As Dr. Dunbar explained, the reason those claims are given no value is that his estimation uses "criteria that might be adopted in a claims resolution process to be established by the Court." *Id.* at 62.[6] Dr. Dunbar's assumption also causes him to ignore OC's history, which demonstrates that "impairment" as defined by Dr. Dunbar was not and is not a pre-condition for compensation in the pre-bankruptcy tort system. *See, e.g., id.* at 63-64, 69.

Similarly, because Dr. Dunbar's estimation is not intended to value OC's asbestos liabilities in the pre-bankruptcy tort system, he values claims based on OC's historical settlement averages but excludes jury verdicts and what he considers to be the portion of every settlement attributable to punitive damages, regardless of whether a claim was settled within days of its being filed or on the courthouse steps on the eve of trial. *See id.* at 73-75, 78-79.

Dr. Dunbar's flawed assumption also is the basis on which he corrects various "distortions" that he perceives are created from the "pressures associated with operating in the tort system." Ex. A at 6, 17. Thus, Dr. Dunbar, an economist, utilizes his own medical criteria to

---

[6]     Indeed, Dr. Dunbar testified that if the "claims resolution process were to provide a simple value for unimpaired claimants, then it's an easy thing to determine what the effect on the forecast would be." Ex. E at 87. In other words, Dr. Dunbar's estimation is dependent on the criteria that are to be used in his "claims distribution process."

determine which claims he believes are entitled to compensation from OC. *Id.* at 18. Dr. Dunbar excludes from his estimation large percentages of non-malignant claims and a significant fraction of lung cancer claims which, according to him, rely on inaccurate or fraudulent medical evidence. But in the pre-bankruptcy tort system most, if not all, state courts would allow a jury to compensate the plaintiff based on evidence that Dr. Dunbar treats as automatically invalidating a claim, and it was OC's policy to settle only those cases in which the claimant could produce evidence sufficient to get to a jury.

Finally, Dr. Dunbar excludes from his estimation a large percentage of claimants who, according to him, could not produce evidence of exposure to OC's asbestos-containing products. He thereby ignores not only fundamental problems with his firm's "deposition study,"[7] but the wide

---

[7]     In particular, in his initial report, NERA estimated that only "48.6% of claimants who allege exposure to OC have made a valid product identification." *See* Ex. A at 14. To arrive at this estimate, NERA analyzed depositions that it acquired involving claimants that matched OC's historical claims database. From a sample of 1410 depositions that it put on a database, NERA electronically searched for instances in which deponents alleged exposure to OC products, and found that only 48.6% had a valid mention of OC. *Id.* at 16-17. Based on this deposition study, Dr. Dunbar reduced historical claims against OC by the percentage of "invalid" product identification, which then reduced the historic claims filing rate -- on which Dr. Dunbar relies to forecast future claims -- by over 50%. *Id.* at 20.

The many flaws of Dr. Dunbar's product identification analysis, including NERA's failure to account for the multiple ways in which plaintiffs proved product identification in the tort system, are set forth in the Supplemental Report of Mark A. Peterson, December 6, 2004 (pp. 1-6) and the Rebuttal Report of Dr. Francine F. Rabinovitz, December 5, 2004, attached respectively as Ex. F and Ex. G to the Zieg Decl. NERA's analysis did not even attempt to account for job sites identified by deponents that were known to contain OC asbestos-containing products. Indeed, after reviewing the 724 (of 1410 total) depositions that according to NERA evidenced invalid product identification, Dr. Rabinovitz found that 79% contained valid OC job site matches (resulting in total valid product identification of 89%, without taking into account any other factors that plaintiffs use to prove product identification, or the fact that over 50% of the "invalid" depositions occurred after OC filed for bankruptcy and all litigation against it was stayed. *See* Exhibits EE and FF to the Zieg Decl.

range of other evidence that he now concedes courts in the pre-bankruptcy tort system routinely

accepted as sufficient for juries to decide that plaintiffs were exposed to OC's products  *See* Ex. E

at 15-21 [8]

In short, Dr. Dunbar's estimation does not attempt to predict what OC would have

had to pay in the pre-bankruptcy tort system in which OC operated.  Because Dr. Dunbar is not

estimating what OC's liabilities would have been in the tort system, his testimony does not "fit" the

facts of this case, and should therefore be excluded. *See Daubert*, 509 U.S. at 591; *TMI Litig.*, 193

F.3d at 710-11 (3d Cir. 1999) (affirming exclusion of expert testimony where the fact at issue was

whether radiation caused higher mortality rates, but the expert's study "was a mortality study only,

and not an analysis of an association between dose [of radiation] and mortality"); *Rapp v. Singh*, 152

F. Supp. 2d 694, 706 (E.D. Pa. 2001) (excluding experts whose testimony went only to the

mechanics of the accident, while the issue before the court was whether the vehicle should have had

a vertical attachment); *Belofsky v. Gen. Elec. Co.*, 980 F. Supp. 818, 823 (D.V.I. 1997) (finding "no

fit between [expert's] technique and the facts of this case" where expert's test and opinion were

---

After being criticized for the initial product identification analysis, Dr. Dunbar attempted to correct one of the deficiencies and account for job site matches. That increased the percentage of valid product identification to 68%. *See* Ex. C at 5.

[8] Dr. Dunbar has now disavowed any reliance on another part of his original analysis, which also was based on his flawed estimation assumption. In his initial report (Ex. A at 17), Dr. Dunbar stated that NERA was working with Prof. Michelle White on a study of OC's historic claims database that would examine the effect that "distortions" in the tort system, such as "forum shopping, consolidation and experiments in conducting trials," had on OC's historic settlement amounts, and that NERA would supplement its report when that study was complete. Ex. A at 17. Dr. Dunbar's original intent to correct for these so-called "tort system distortions" stems from his mistaken belief that he is not estimating OC's liability as it existed pre-bankruptcy  Notwithstanding his report, Dr. Dunbar has now testified that he is not relying on Prof. White's study and never knew that she was conducting a study of OC's claims database with NERA. *See* Ex. E at 228

based on an assumption that had "nothing to do with plaintiff's claim that the door closed by itself on her thumb").

## II.    DR. DUNBAR'S NONMALIGNANCY "PREVALENCE" MODEL AND ANY TESTIMONY BASED UPON IT SHOULD BE EXCLUDED

One of the basic steps in Dr. Dunbar's estimation analysis is the use of an "epidemiologically-based" model developed by NERA to forecast how many of the estimated surviving exposed population of asbestos workers in the United States will develop evidence of nonmalignant asbestos-related disease, according to Dr. Dunbar's own definitions of what medical criteria should be used to make a diagnosis of asbestosis. Dr. Dunbar uses his model to reduce radically the estimated number of future nonmalignant claims to be filed by OC workers. He does this in two ways. First, after making various adjustments to OC's historical claims to reflect his own definition of an allowable claim, he calculates a filing rate (or propensity to sue OC) by comparing the greatly reduced number of nonmalignant historical claims filed against OC with the total incidence of nonmalignant disease that his prevalence model predicted would have been incurred by all exposed asbestos workers during that same period of time. After deriving his historical claiming rate for nonmalignant claims, he then applies that claiming rate to each future year, based again on the prediction of the incidence of nonmalignant disease in those future years according to his prevalence model. The end result is that Dr. Dunbar eliminates large numbers of nonmalignant claims from his estimate.

The model used in Dr. Dunbar's first report was one "pulled off the shelf" by "one of the [other] econometricians on [his] staff." Ex. E at 272. At the conclusion of his deposition, in testimony elicited by his own counsel, Dr. Dunbar completely disavowed his first prevalence model *See id* ("I'm not really using that dose-response model because it's not really my model") In the face of criticism from Drs. Peterson and Rabinovitz in their supplemental and rebuttal reports that

his prevalence model lacked any scientific validity (*see* Ex. F at 13-16; Ex. G at 9-11), Dr. Dunbar

attempted to create a completely new prevalence model to predict non-malignancies, changing the

equations that he used to predict nonmalignancies, changing the basis for estimating a dose-response

function[9] and adding a smoking adjustment. But Dr. Dunbar's new model is no better than his first.

It does not rely on any input from individuals with medical expertise. Indeed, while Dr. Dunbar

indicated that between October 15 and December 8, he or his staff had brief conversations with three

doctors (*see id.* at 233-37), he stated that in creating his new model he did *not* rely on anything that

was said by these doctors. *See id.* at 235-36. As a result, Dr. Dunbar's new prevalence model is,

once again, a model created by economists who have no medical training.

   As shown below, there are numerous problems with Dr. Dunbar's use of a

"prevalence" model to estimate future nonmalignant claims, which mandate its exclusion

  A.  **Estimating the Prevalence of Asbestos-Related Disease Is Beyond the Scope of Dr. Dunbar's Qualifications**

   Epidemiology is the branch of science that studies the incidence and cause of disease.

Federal Judicial Center, *Reference Manual on Scientific Evidence*, 335 (2d ed. 2000). Like an

epidemiological study, Dr. Dunbar's prevalence model is designed to estimate the incidence of

nonmalignant disease in a given exposed population. Specifically, "using Dr. Irving Selikoff's

sample of asbestos-exposed workers," the model "estimate[s] how many surviving workers would

develop (minimal) evidence of asbestos exposure (i.e., either an ILO reading of 1/0 or greater and

or a pleural change), along with impairment as measured by a Forced Vital Capacity ('FVC') < 80%

the expected level." Ex. A at 18. But Dr. Dunbar is an economist, not an epidemiologist He has

---

9  Dr Dunbar's new prevalence model estimates dose based on occupation and duration of exposure, rather than relying upon OSHA's assumed average intensity of exposure *See* Ex. E. at 238.

never taken any courses in epidemiology, and has never published anything in a peer-reviewed journal on the epidemiology of asbestos-related disease. Ex. E at 50-53.

Nor does Dr. Dunbar have any medical training. *See* Ex. A at 2. No one else on the NERA team that created the prevalence model has any medical background, either. Ex. E at 234. Furthermore, there is no indication that Dr. Dunbar sought the guidance or review of medical experts in creating his prevalence model. While stating in his December 8 report that he "refined" his prevalence model after "consultation with medical experts," Dr. Dunbar expressly testified that he had not "relied" on any medical doctors in developing the second model. *Id.* at 235-36. Indeed, Dr. Dunbar testified that he had a single telephone conversation with Dr. Diem about the model, but could not remember how long the call was, whether Dr. Diem was provided with written material in connection with the call, or whether NERA had any notes of the conversation. Dr. Dunbar testified that his staff spoke to two other doctors, Drs. Miller and Weill, but he did not know the length of those conversations, how many times they spoke, whether there were any notes or memos of those conversations, or whether any written materials were provided to the doctors. *Id.* at 234-37. Indeed, Dr. Weill's expert report in this case makes no mention of Dr. Dunbar's prevalence model.

Notably, Drs. Selikoff and Nicholson, who since 1962 had worked with two local unions of insulation workers in the New York-New Jersey metropolitan areas and published numerous studies about disease rates among these workers, never used their data to develop a dose/response model to predict the incidence of nonmalignant diseases. *See* Ex. G at 13-14; Ex. F at 24. Indeed, even Dr. Nicholson, who developed the path-breaking epidemiologically based model for predicting the incidence of certain asbestos-related cancers in the exposed population, and provided the data used by Dr. Dunbar in this case, has stated that it is not possible to create an

epidemiological model to predict non-malignancies from the data he used to predict malignancies from asbestos exposure in the general population. *See* Ex G at 13-14.[10]

Despite his lack of medical training, in developing his model Dr. Dunbar made important medical judgments as to what criteria should be used to establish a diagnosis of asbestosis. Thus, while Dr. Dunbar states that the "overwhelming opinion in the epidemiological literature is that a diagnosis of asbestosis should be based on multiple criteria, not just ILO classification of an x-ray exam" (*see* Ex. A, Appendix 3 at 4), he chose just two of these many criteria in constructing this model. Ex. E at 239. And Dr. Dunbar's conclusion on another medical issue — that a finding of functional impairment is required for diagnosis of non-malignant asbestos-related disease — is contrary to standards promulgated by medical experts at the American Thoracic Society. *See* Ex. G at 16.

An expert's testimony is limited to the "relevant discipline" in which he has been qualified. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149 (1999). There is no basis to find that an economist is qualified either to conduct a study regarding the prevalence of a disease or to decide on the medical data that should be used to make such a prediction. For that reason alone, Dr. Dunbar's prevalence model should be excluded.

---

[10]    By contrast, as set forth in the expert reports of all three estimation experts, based on the results of work by Drs. Nicholson, Perkel and Selikoff, there are well accepted epidemiologically-based forecasts for predicting the annual number of deaths of exposed workers for mesothelioma and lung cancers caused by asbestos exposure. *See* Report of Mark A. Peterson, October 15, 2004, attached as Ex. H to the Zieg Decl., at 14; Report of Francine F. Rabinovitz, October 15, 2004, attached as Ex. I to the Zieg Decl., at 7-8; Ex. A at 18-19. Moreover, those cancer projections can be tested against data collected by the National Cancer Institute's SEER (Surveillance, Epidemiology and End Results) cancer registry, which has validated those projections over a 20-year history. There is no similar registry to test Dr. Dunbar's prevalence model for nonmalignant asbestos disease.

B.     **The Prevalence Model Should Be Excluded Because it Fails the Reliability Prong of the _Daubert_ Test**

_Daubert_ requires federal courts to determine whether expert testimony is not only relevant but reliable — "whether the reasoning or methodology underlying the testimony is scientifically valid." 509 U.S. at 592-93. The Supreme Court pointed out that the "primary locus" of the obligation to screen expert testimony is FRE 702, which requires that expert testimony must consist of "scientific, technical, or other specialized knowledge." _Id._ at 589. _Daubert_ explained that, "to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation — _i.e._, 'good grounds,' based on what is known." _Id._ at 590.

In _Daubert_, the Supreme Court listed four non-exclusive factors that trial courts should consider when deciding whether proposed expert testimony is scientifically reliable: (1) whether the expert's theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the theory has "[w]idespread acceptance." _Id._ at 593-94. As shown below, Dr. Dunbar's prevalence model does not satisfy any of these factors.

1.     **Widespread Acceptance**

As the Supreme Court held in _Daubert_, a theory "which has been able to attract only minimal support within the [scientific] community . . . may properly be viewed with skepticism." _Daubert_, 509 U.S. at 594 (citations omitted). Thus, "widespread acceptance" remains "an important factor" in determining admissibility. _Id. See Soldo v. Sandoz Pharm. Corp._, 244 F Supp 2d 434, 569 (W.D. Pa. 2003) (testimony inadmissible because, _inter alia_, "Dr Kulig's opinions are not generally accepted in the relevant scientific community"); _In re Diet Drugs Prod. Liab Litig._, 2000

WL 962545, *11 (E.D. Pa. June 28, 2000) (excluding expert opinions because, *inter alia*, they were "not generally accepted within the scientific community").[11]

Dr. Dunbar has made no showing that the methodology used to generate his prevalence model is generally accepted. Indeed, there is *no* generally accepted prevalence model for nonmalignant asbestos disease — Dr. Dunbar has stated that NERA developed the model because "no published, accepted dose/response function governing the occurrence of non-malignant changes currently exists." Ex A, Appendix 3 at 3. When confronted with that statement from his own report, Dr. Dunbar "disagreed with the statement," "didn't know how it got into his report" and claimed that it "looked like a very old sentence." Ex. E at 185. But others in the field, including Dr. Nicholson, also have stated that there is no published, accepted dose/response function governing the occurrence of non-malignant changes. Ex. H at 24; Ex. I at 11

　　　2.　**Testing**

Whether a theory "can be (and has been) tested" is a "key" part of the *Daubert* analysis. *Daubert*, 509 U.S. at 593. The scientific method involves testing hypotheses "'to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'" *Id*. Dr. Dunbar's "off the shelf" prevalence model which he presented in his first report was not tested. While Dr. Dunbar now claims that the new prevalence model that he developed between October 15 and December 8 has been tested and produces estimates that are consistent with the findings of the Mount Sinai and Tulane studies (*see* Ex. C at 10), the cited references do not in fact contain any information regarding either the Mount Sinai and Tulane

---

[11]　Dr. Dunbar himself has acknowledged that one aspect of whether scientific expert testimony should be allowed is "whether it has attracted widespread acceptance within a relevant scientific community." Frederick C. Dunbar, Estimating Future Claims (1996), relevant excerpts of which are attached as Ex. J to the Zieg Decl., at 69.

16

studies, and instead simply report the results of his December 8 model. Moreover, Dr. Dunbar does not consider differences in the mathematical form of the models (including variables) estimated in the Mount Sinai and Tulane studies, or differences in the data sets used to make the estimates. In short, Dr. Dunbar failed to test his results against either the Mount Sinai or the Tulane studies.

Dr. Dunbar's prevalence model has many other methodological flaws, discussed in the Rabinovitz Rebuttal Report, Ex. G at 15-18. These include a failure to show that the Selikoff insulator data is applicable to people exposed to OC's major asbestos product, Kaylo, and a failure to consider the effect of alternative definitions of disabled and non-disabled non-malignant disease.

Accordingly, the prevalence model fails to satisfy the "key" testing prong of the *Daubert* standard. 509 U.S. at 593.

### 3.    Peer Review and Publication[12]

As the Supreme Court has explained, the "scrutiny of the scientific community" that results from "peer review and publication" "is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593. *Accord, In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). The case law recognizes that the lack of "normal scientific scrutiny through peer review and publication" is a significant sign that an expert opinion is unreliable. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir.), *cert. denied*, 516 U.S. 869 (1995). *Accord, Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 784 (10th Cir. 1999) (affirming exclusion of plaintiffs' causation experts who "fail[ed] to

---

[12]    While experience can sometimes substitute for peer review as a means for qualifying an expert, Dr. Dunbar does not have the necessary medical experience to allow him to create an epidemiologically-based model for predicting the prevalence of non-malignant asbestos-related disease.

subject their opinions to peer review . . . [and] missed the opportunity to have other scientists review their work and warn them of possible flaws in their methodology").

Dr. Dunbar's prevalence model has not received such scrutiny. As discussed below, NERA has had the data underlying this model since 2000, but still has not published or otherwise subjected the model to peer review. By contrast, the Nicholson/Selikoff model was published in a peer-reviewed journal. *See* Exhibit DD to the Zieg Decl. Thus, the prevalence model does not satisfy this *Daubert* factor, either.

### 4.    Error Rate

Because Dr. Dunbar's prevalence model is untestable, it is impossible to determine whether there is any rate of error associated with it. Accordingly, this element of *Daubert* is not satisfied, either. *See, e.g., Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1321 (11th Cir. 1999) ("Because the untested theories of Allison's experts are not generally accepted . . . they obviously have a high potential rate of error"); *Soldo*, 244 F. Supp. 2d at 569 ("because Dr. Kulig's opinions are not based on a valid scientific methodology, neither the Court nor anyone else can reliably determine the known or potential rate of error"); *Brumley v. Pfizer Inc.*, 200 F.R.D. 596, 602 (S.D. Tex. 2001) (because expert's opinion that Viagra causes heart attacks failed the first two *Daubert* factors, "the Court cannot assess the 'known rate of error' for a theory that has no empirical foundation").

### 5.    Opinion Developed Solely For Litigation

Yet another reliability factor is the "'non-judicial uses to which the method has been put'" (*TMI Litig.*, 193 F.3d at 665), *i.e.*, whether the opinions grow out of research that the expert has "conducted independent of the litigation." *Daubert*, 43 F.3d at 1317. Because NERA developed the prevalence model based upon data that it obtained in connection with the *Falise* litigation, and

further refined that model in connection with this litigation (*see* December 14 letter, attached as Ex

K to the Zieg Decl.), that *Daubert* factor also weighs against the admissibility of the model

In sum, Dr. Dunbar's prevalence model entirely fails the *Daubert* reliability test

**C.  The Prevalence Model Should Be Excluded Because The Bank Debt Holders Have Repeatedly Failed To Comply With The Court's Expert Disclosure Orders And Have Violated The Federal Rules**

This Court's August 19 and October 12 Orders required expert reports and the "data

and written information that the expert relied upon or considered" to be served "by October 15,

2004." *See* Exs. L and M to the Zieg Decl. Under the October 12 Order, a party may "supplement

such disclosures at least five (5) business days before an expert's deposition." Ex. M  But nothing

in that Order permits a party to file the substantive results of studies that it is performing *after* the

date set by the Court for filing written expert reports.

The Bank Debt Holders repeatedly violated the Court's Orders with respect to the

production of Dr. Dunbar's prevalence model. First, NERA did not produce the Selikoff data or the

prevalence model on October 15.  On November 23, 2004, after repeated requests by the Plan

Proponents, counsel for the Bank Debt Holders finally produced a redacted file of the data and the

prevalence model.

After the Plan Proponents' experts filed reports criticizing Dr. Dunbar's prevalence

model, on December 8 Dr. Dunbar filed his "supplemental report," which contained a new

prevalence model that replaced the one used in his original report. Dr. Dunbar concedes that the

"supplemental" report utilizes a different mathematical equation than he used in the first report  He

testified that he replaced the old model because it wasn't his own -- it was "pulled off the shelf" by

"one of the [other] econometricians on [his] staff." Ex. E at 272; *cf.* Ex. A, Appendix 3 at 5 *with*

Ex. C, Appendix A at 3  Moreover, while the original model attempted to create a dose-response

function by estimating the dose to which the subjects in the Selikoff study were exposed, by assuming an average intensity of exposure according to "OSHA decisions regarding permitted intensities of asbestos exposure levels" (Ex. A, Appendix 3 at 4 n. 8), the new model attempts to create a dose-response function by relying instead on occupation and duration of exposure to estimate "dose." *See* Ex. E at 238.

The Bank Debt Holders' failure to produce the data and the original prevalence model until November 22, as well as the substitution of the new model on December 8, almost two months after the October 15 cut-off date for expert reports, are violations of this Court's Orders and the Federal Rules. Nor can the Bank Debt Holders argue that they have not violated their disclosure obligations because the October 12, 2004 Order allows "supplementation" of the original report up to five days before the expert is deposed. The second prevalence model does not "supplement" the first -- it is a wholesale replacement of the original model. The parties certainly never intended that an expert would be allowed to completely change substantive results of his report after the October 15, 2004 deadline, and the governing law does not permit Dr. Dunbar to do so. *See Sierra Club, Lone Star Chapter v Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996), "supplemental disclosures . . . are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *See also In re TMI Litig. Cases Consol. II*, 922 F. Supp. 997, 1007 (M.D. Pa. 1996) (striking supplemental reports). The Plan Proponents have been prejudiced by these disclosure violations, and the Court should, therefore, exclude Dr. Dunbar's prevalence model and any testimony concerning the model at the estimation hearing. *See Coalition*

*To Save Our Children v. State Bd. of Educ. of the State of Delaware*, 90 F 3d 762, 775 (3d Cir.

1996); *see also TMI Litig.*, 193 F.3d at 721-22 (affirming exclusion of expert testimony).[13]

   **D.    The Prevalence Model Should Be Excluded Because its Use Violates the Court-Ordered Confidentiality Agreement in the _Falise_ Litigation**

         The Third Circuit has held that a party is liable for civil contempt if it violates a

protective or confidentiality order. *See Quinter v. Volkswagen of Am.*, 676 F.2d 969, 973-74 (3d Cir.

1982) (upholding a civil contempt fine against an expert witness who provided material covered by

a protective order to another attorney in another case against the defendant); *Am. Nat'l Bank and

Trust Co. of Chicago v. AXA Client Solutions, LLC*, 2002 WL 1067696, at *5 (N.D. Ill. May 28,

2002) (ordering party to pay other parties' attorney's fees and expenses where party violated

confidentiality order by using highly confidential documents for unrelated business purposes),

attached as Exhibit X to the Zieg Decl.

---

[13]    For the same reasons, Dr. Dunbar's "Supplemental" Report and the December 30 further
        supplement should be excluded.   The Dunbar "Supplemental Report" was filed on
        December 8, 2004, more than seven weeks after expert reports were required to be filed.
        Incredibly, on December 31, the Bank Debt Holders served another supplement.
        Dr. Dunbar's "Supplemental" Report is a massive, substantive revision of his original
        report. Most of the report contains new analyses that in many cases are a total
        substitution for NERA's original analysis including, among other things, changes in the
        mathematical formula and dose-response function in Dr. Dunbar's prevalence model,
        Ex. C at 8-11, using claim filing rates over the period 1996-2000, instead of the 1996-98
        period (*id.* at 11-12), changes in the allocations of unknown claims (*id.* at 12), changes in
        the percentage of asbestotics that are considered impaired from 100% to 41% (*id.* at 13),
        and the calculation of inflation and discount rates (*id.* at 14-15). Additionally, the
        December 30 Supplement contains four statistical studies that were not included in any of
        the three prior Dunbar reports. Because the Dunbar Supplemental Report and the
        December 31 Supplement were filed more than 7 and 10 weeks, respectively, after the
        Court's October 15 cut-off date for serving expert reports, the Bank Debt Holders have
        violated this Court's Orders and the Federal Rules. Accordingly, the Court should strike
        all portions of Dr. Dunbar's Supplemental Report (other than section II) and preclude any
        testimony based on those portions. *See Coalition To Save Our Children*, 90 F 3d at 775
        (affirming exclusion of expert testimony where party failed to comply with the disclosure
        rules governing expert reports); *TMI Litig.*, 193 F.3d at 721-22 (affirming exclusion of
        expert testimony where plaintiff attempted to "supplement" reports)

Moreover, where a party uses information in a pleading in violation of a confidentiality order, courts have frequently struck that portion of the pleading that relies upon the improperly used information. *See, e.g., Whitehead v. Gateway Chevrolet*, 2004 WL 316413, at *4-5 (N.D. Ill. Feb. 2, 2004) (striking portions of the complaint which relied upon confidential information obtained in another litigation in violation of protective order), attached as Exhibit Y to the Zieg Decl.; *Ibarra v. Sunset Scavenger Co.*, 2003 WL 21244096, at *10 (N.D. Cal. May 21, 2003), attached as Exhibit Z to the Zieg Decl.; *Yates v. Applied Performance Technologies, Inc.*, 205 F.R.D. 497, 501 (S.D. Ohio 2002) (striking all portions of plaintiff's brief which relied upon confidential information that violated protective order entered in state court action); *DEV Indus. v Rockwell Graphic Sys., Inc.*, 1992 WL 100908, at *2 (N.D. Ill. May 4, 1992), attached as Exhibit AA to the Zieg Decl.

To create NERA's "prevalence model," Dr. Dunbar used a database of employment data, questionnaire data and medical tests of approximately 2000 insulators exposed to asbestos in the workplace, who were studied by Dr. Selikoff from 1981-83. *See* Ex. A, Appendix 3 at 3.[14] NERA received that database from Mount Sinai Medical Center in connection with the *Falise* litigation, pursuant to the terms of a "Confidentiality Order" dated January 14, 2000 and a later confidentiality agreement, dated May 30, 2000. Under both the Confidentiality Order and the

---

[14]    Despite this Court's August 19, 2004 and October 12, 2004 Orders requiring the production of expert reports and backup materials by October 15, 2004, NERA did not produce the backup files that referenced the Selikoff data or the prevalence model at the time it served the Dunbar Report on October 15. After repeated requests by the Plan Proponents, on November 11, 2004, counsel for the Bank Debt Holders responded that the data and model could not be produced without entering into a separate confidentiality agreement because they were confidential and proprietary. *See* Ex. P. On November 22, 2004, after negotiating the terms of that separate confidentiality agreement, NERA informed the Plan Proponents that it could not turn over the Selikoff data because Mount Sinai objected to its release. *See* Email, attached as Ex. Q to the Zieg Decl.

confidentiality agreement, NERA and other parties were permitted to use the Selikoff data only in connection with the *Falise* litigation. *See* Ex. N to the Zieg Decl. ¶ 18, Ex. O to the Zieg Decl. ¶ 7 Moreover, under ¶ 28 of the Confidentiality Order, "[w]ithin sixty (60) days after" the action was concluded, the confidential material was to be "returned to the Designating Party or, at the sole option of the Designating Party, destroyed." *See also* Ex. N ¶ 28; Ex. O ¶ 8.

On November 23, 2004, after being told by Mount Sinai that it would not consent to the use of the Selikoff data, NERA nevertheless produced a redacted version of the data to the Plan Proponents. *See* Email, attached as Ex. R to the Zieg Decl. On December 14, 2004, Mount Sinai learned that NERA was continuing to use the confidential Selikoff data, and sent a letter to NERA "demand[ing] that you [NERA] cease and desist any further use of the confidential information and immediately recall and return to us any and all documents, electronic data and derivative materials." Ex. K. As far as we are aware, there has been no modification of the *Falise* Confidentiality Order, and Mount Sinai is still insisting that NERA cease all use of the Selikoff data upon which it based its prevalence model.

In light of NERA's blatant disregard of the *Falise* Confidentiality Order, this Court should strike the portion of the Dunbar Report that relies upon the Selikoff data. Indeed, this is the only appropriate result, because the Plan Proponents cannot properly analyze data that has been produced in violation of a valid court order and confidentiality agreement.

## III.    DR. DUNBAR'S TESTIMONY BASED ON THE MANVILLE TRUST AUDIT AND THE MENDELSOHN AND GOLDSTEIN REPORTS IN THE *FALISE* LITIGATION SHOULD BE EXCLUDED

Dr. Dunbar's opinions are based in part on: (1) a summary of the results of the Manville Trust audit in a memorandum from Mark Lederer to Elihu Inselbuch dated April 24,

1998,[15] and (2) reports by Drs. Sara Mendelsohn and David Goldstein in an unrelated litigation involving the Manville Trust and the tobacco companies (the "*Falise*" litigation), *see* Ex. A at 10-13; Ex. E at 230).[16]

In his estimation, Dr. Dunbar uses the results of the Manville Trust audit to reduce drastically the number of historical nonmalignant claims filed against OC based on Dr. Dunbar's medical criteria for what constitutes an allowable claim. Ex. A at 20-21. The effect of making these adjustments to OC's historical claims is to reduce the historical claiming rate for nonmalignant claims and, using this greatly reduced claiming rate, to produce an estimate of future nonmalignancies that is significantly lower than the estimates of Drs. Peterson and Rabinovitz. Dr. Dunbar also uses the results of the Goldstein and Mendelsohn reviews to support his assertion that "claims paid by OC and other asbestos defendants lacked evidence of asbestos-related injuries" (*see id.* at 7), and that many claimants who filed claims against OC and were subsequently paid had no asbestos-related disease. *Id.* at 7-13.[17]

---

[15]    The Manville Trust audit summarized in the Lederer memo, attached as Ex. S to the Zieg Decl., which began in 1995, used consultant B-readers to evaluate X-rays to "confirm or reject the diagnosing physician's diagnosis" in "a sample of claims that identified one of 13 'high volume' doctors who were associated with a large proportion of the claims either prior to 1995 or in the period after 1994." Ex. A at 11. In his memo, Mr. Lederer sets forth his analysis of the audit's "cumulative results and trends," using methods that he acknowledges "are new and have not been replicated." Ex. S at 1, 4

[16]    The Goldstein study involved his review of medical documents for 89 lung cancer claims filed against the Manville Trust to determine "whether the claims contained evidence to support a diagnosis" that the cancer "was caused by asbestos-exposure and not another type of exposure." Ex. A at 12. Similarly, the Mendelsohn study was based on a review of medical documents for 87 asbestosis and disabling asbestosis claims filed against the Manville Trust "to assess whether the [claimants] indeed had clinical asbestosis." *Id*

[17]    While Dr. Dunbar's report makes specific reference to the Goldstein and Mendelsohn studies (*see* Ex A pp. 8, and 12-13) and cites both the Mendelsohn and Goldstein Reports (*see id* at 12 nn.30 and 32), Dr. Dunbar and his counsel have now represented that he did not rely on either study, but rather relied on the sample of claims from the two studies. Ex. E. at 230-31 It was not until November 19, more than four weeks after NERA was

For the following reasons, testimony by Dr. Dunbar based on these sources should be excluded.

### A. Dr. Dunbar, an Economist, May Not Testify About Medical Reviews Performed by Non-Testifying Experts in Other Matters

As discussed above, Dr. Dunbar is an economist who has no medical expertise. Yet, he proposes to testify about the Manville Trust "X-ray audit program" and two reviews of "medical documents" by medical experts, Drs. Goldstein and Mendelsohn, of claims drawn from the Manville Trust Ex. A at 11, 12. Dr. Dunbar was not involved in those reviews, and they were not performed in this case. Moreover, Dr. Dunbar does not say that he has even reviewed the 1995 Manville Trust audit; all of his citations on this point are to a letter *summarizing* that audit. *Id* at 11-12.

Neither Dr. Goldstein, Dr. Mendelsohn, nor anyone involved with the 1995 Manville Trust audit has been designated to testify in this case. If Dr. Dunbar were allowed to testify about the medical reviews conducted by those individuals, the Bank Debt Holders would effectively be able to introduce through Dr. Dunbar the opinions of experts that were offered in other matters.

---

required to turn over the backup materials to Dr. Dunbar's report, that NERA finally produced two spreadsheets relating to these two studies, which contain little information about the studies other than a claim number, a diagnosis and audit result in the case of Mendelsohn and a claim number and columns marked "no evidence" and "bwdis" in the case of Goldstein. *See* Spreadsheets, attached as Ex. T to the Zieg Decl. The problem with Dr. Dunbar's approach is two-fold. First, his assertion that he is not relying on the results of the Goldstein and Mendelsohn studies to support his position that OC paid claims that had no asbestos-related disease is not accurate, because Dr. Dunbar used the results of those studies and then matched those two samples against the OC database to determine (i) whether any of the individuals in those two samples also asserted claims against OC; and (ii) whether OC paid any of the claims that the two studies determined had no asbestos-related disease according to these doctors' own criteria. Second, because Drs. Mendelsohn and Goldstein are non-testifying experts, there is no way for the Plan Proponents to cross-examine those doctors as to how they selected their samples or what medical criteria they used to determine whether claimants had lung cancer (Goldstein) or clinical asbestosis (Mendelsohn) In short, Dr. Dunbar is trying to slip the results of those two studies in through the back door

Those experts cannot be cross-examined by the Plan Proponents regarding their methodology because they will not be testifying in this case.

Courts have repeatedly rejected such attempts to import opinions of non-testifying experts through the testimony of another expert who has not examined their methodology. For example, in *TMI Litig.*, 193 F.3d at 714-15, the Third Circuit affirmed exclusion of the testimony of a nuclear science and health physics expert who "relied on the opinions of plaintiffs' other dose experts and assumed the correctness of each expert's proposition" without "assessing the validity of the other experts' assumptions." That approach, the Court of Appeals held, "demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results." *Id.* at 716. Here, Dr. Dunbar also has not assessed — and is not qualified to assess — the validity of the 1995 Manville Trust audit or the Mendelsohn or Goldstein reports.

Similarly, *Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002), held that a testifying expert may not be used to set forth the opinions of non-testifying experts in areas beyond the witness' expertise. The expert at issue in *Dura* was a hydrogeologist who was "not an expert in mathematical models of groundwater flow," and relied upon groundwater flow models prepared by other employees of his firm. *Id.* at 611-12. In affirming exclusion of the expert testimony, the Court of Appeals explained that:

> The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science.

*Id.* at 614. That reasoning applies *a fortiori* in this case because Dr. Dunbar is not merely in a "different specialty" than Drs. Goldstein, Mendelsohn, and the Manville Trust auditors, but in an

entirely different field. *Accord, TK-7 Corp v Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (financial expert could not rely upon sales figure report prepared by non-testifying expert when the witness had no expertise in the area; "Dr. Boswell's lack of familiarity with the methods and the reasons underlying Werber's projections virtually precluded any assessment of the validity of the projections through cross-examination of Dr. Boswell"); *Grant v Chemrex, Inc*, 1997 WL 223071, *8 (N.D. Ill. April 28, 1997) ("To allow Dr. Epstein [a cancer specialist] to introduce the findings of Todd [an industrial hygienist estimating exposure levels] as true, and rely on those findings in forming his own opinion on causation would allow the plaintiff to circumvent the rules of evidence by admitting Todd's conclusions — conclusions Dr. Epstein is unable to evaluate the accuracy and reliability of — through the back door"), attached as Exhibit BB to the Zieg Decl.

In another asbestos bankruptcy matter, *In re Western Asbestos Co.*, No. 02-46284 T (Bankr. N.D. Cal. Dec. 4, 2003) (attached as Ex. U to the Zieg Decl.), the court struck the testimony of a pulmonary specialist, Dr. Crapo, who relied upon pulmonary function tests taken by two non-testifying experts, Dr. Crapo's brother and his brother's colleague.[18] The court, finding *Dura* to be persuasive, struck Dr. Crapo's testimony to the extent it was based upon work by these other experts who were outside his specific area of expertise and could not be cross-examined:

> The work performed by Dr. Crapo's brother was outside Dr. Crapo's expertise. The work was not ministerial in nature. It required the exercise of professional judgment. *See Dura Automotive Systems*, 285 F.3d at 612. Moreover, the work was performed to be used in this litigation. It did not constitute the pre-existing work of an expert that had been peer reviewed and upon which another expert in a different field would customarily rely. *See United States v. Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th Cir. 1994). Finally, the issue

---

[18]    Dr. Crapo's written statement to a Senate committee considering asbestos legislation, dated June 4, 2003, attached as Ex. V to the Zieg Decl., identifies him as a "pulmonary specialist." *See* http://judiciary.senate.gov/print_testimony.cfm?id=777&wit_id=2185

> to which the work pertained is a contested issue in this case. *Dura Automotive Systems*, 285 F.3d at 613.

Ex. U at 4.

The factors considered by the *Western Asbestos* court that weighed in favor of striking the contested testimony also are present here. First, the work performed by Drs. Goldstein and Mendelsohn and the Manville Trust auditors is far outside Dr. Dunbar's expertise. Second, the work was not ministerial in nature, but required the exercise of professional judgment. Third, as discussed below, the Mendelsohn and Goldstein reports were prepared specifically for litigation. Finally, the work pertains to a central contested issue in this case.

Thus, as in *Western Asbestos* and the other cases cited above, Dr. Dunbar should not be permitted to testify about the work of experts who have not been designated to testify in this case. Allowing such testimony about studies whose authors are not subject to cross-examination would violate the Plan Proponents' rights to fundamental fairness and due process. Indeed, the rationale of the cases cited above applies even more strongly on this motion. Unlike the experts whose testimony was excluded in those cases, Dr. Dunbar is relying upon work that was performed by other experts with different expertise in *another matter*.

### B. The Mendelsohn and Goldstein Reports Were Prepared for Litigation And Do Not Satisfy the Requirements of FRE 703

Testimony by Dr. Dunbar relating to the Mendelsohn and Goldstein reports also should be excluded for the separate and independent reason that those reports are not the type of information that an expert may reasonably rely upon, as required by Federal Rule of Evidence 703. That rule provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. **If of a type reasonably relied upon by experts in the particular field in forming opinions or**

> **inferences upon the subject,** the facts or data need not be admissible
> in evidence in order for the opinion or inference to be admitted. Facts
> or data that are otherwise inadmissible shall not be disclosed to the
> jury by the proponent of the opinion or inference unless the court
> determines that their probative value in assisting the jury to evaluate
> the expert's opinion substantially outweighs their prejudicial effect.

(Emphasis added.) One of the reasons this rule was enacted was to eliminate the difficulty of authenticating reports and other data that is reasonably relied upon in "the practice of the experts themselves when not in court." FRE 703, Advisory Comm. Notes to 1972 Proposed Rules.

Courts have held that reports prepared for litigation do not satisfy FRE 703 because they are not the type of information on which experts would rely in forming an opinion. For example, in *U.S. v. Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th Cir. 1994), the Court of Appeals held that a prosecution expert could not base his testimony on the forensic opinion of another doctor that was prepared at the request of the prosecution, stating that: "Reports specifically prepared for purposes of litigation are not, by definition, 'of a type reasonably relied upon by experts in the particular field.'" *Accord, Soden v. Freightliner Corp.*, 714 F.2d 498, 503 (5th Cir. 1983) (district court did not abuse its discretion in excluding expert opinion based on accident statistics prepared in anticipation of litigation, based on information received from a sister company, which were "not part of a published study"); *Rowe Entm't, Inc v. William Morris Agency, Inc.*, 2003 WL 22124991, *3 (S.D.N.Y. Sept. 15, 2003) ("any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply"; granting motion to exclude expert testimony), attached as Exhibit CC to the Zieg Decl.

The Mendelsohn and Goldstein reports were prepared solely for the purpose of litigation between the Manville Trust and tobacco companies, and are therefore "by definition" documents that are not "'of a type reasonably relied upon by experts in the particular field.'" *Tran Trong Cuong*, 18 F.3d at 1143. Such non-peer reviewed, litigation-driven studies are not

information of the type reasonably relied upon by experts "when not in court." FRE 703, Advisory
Comm. Notes to 1972 Proposed Rules. Moreover, there is a real possibility of bias in those studies,
particularly when the Plan Proponents have no opportunity to cross-examine their authors. For these
reasons, Dr. Dunbar's proposed testimony based on the litigation opinions of other experts is
inadmissible under Rule 703.[19]

## CONCLUSION

For all of the reasons set forth above, Dr. Dunbar should be precluded from testifying

at the estimation hearing.

---

[19]    Dr. Dunbar's testimony based on the Manville Trust Audit and the Goldstein and
Mendelsohn studies should also be excluded because it is unreliable under *Daubert*.
With respect to the Manville Trust audit, Dr. Dunbar is seeking to apply conclusions from
that audit to OC claimants in a way that the Manville Trust did not even apply the audit to
its own claimants. With respect to the Goldstein and Mendelsohn studies, Dr. Dunbar
offers no citation or analysis to show that the relatively small number of lung cancer and
asbestosis claims reviewed by Drs. Goldstein and Mendelsohn in connection with the
*Falise* litigation were representative of similar claims submitted to the Manville Trust, let
alone that they are representative of such claims submitted against OC. In short, no
details are provided that would enable the Court to draw any conclusion from the
Goldstein and Mendelsohn studies applicable to OC that is supported by anything other
than "the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146
(1997). Under *Daubert*, that is insufficient.

Dated: Wilmington, Delaware
     January 5, 2005

By: _____

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Mary Beth Hogan
919 Third Avenue
New York, New York  10022
phone (212) 909-6000
fax (212) 909-6836

KAYE SCHOLER LLP
Michael J. Crames
Jane W. Parver
425 Park Avenue
New York, New York  10022
phone (212) 836-8000
fax (212) 836-8689

SAUL EWING, LLP
Norman L. Pernick
222 Delaware Avenue
Post Office Box 1266
Wilmington, Delaware  19899

YOUNG, CONAWAY,
STARGATT & TAYLOR LLP
James L. Patton, Jr. (I.D. # 2202)
Sharon M. Zieg (ID # 4196)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
phone (302) 571-6600
fax (302) 571-1253

Charles O. Monk, II
100 South Charles Street
Baltimore, MD 21201-2773
phone (410) 332-8600
fax (410) 332 8870

Attorneys for James J. McMonagle, Legal
Representative for Future Claimants

Attorneys for the Debtors and
Debtors-in-Possession

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
Peter Van N. Lockwood
Nathan D. Finch
399 Park Avenue
New York, NY 10022
phone (212) 319-7125
fax (212) 644-6755

CAMPBELL & LEVINE
Marla Eskin  (I.D. # 2989)
Chase Manhattan Center
15th Floor
1201 Market Street
Wilmington, DE 19899
phone (302) 426-1900
fax (302) 426 9947

Attorneys for the Official
Committee of Asbestos Claimants

31

# EXHIBIT

# 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

OWENS CORNING, *et al.*,                    Civil Action

v.                                          No. 04-905 (JPF)

CREDIT SUISSE FIRST BOSTON, *et al.*

---

### DECLARATION OF SHARON M. ZIEG IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF DR. FREDERICK C. DUNBAR

SHARON M. ZIEG declares under penalty of perjury:

1.    I am associated with Young, Conaway, Stargatt & Taylor LLP, counsel to James J. McMonagle, the legal representative for future claimants, in the above-captioned litigation. I submit this declaration in support of the Motion *In Limine* to Exclude Expert Testimony of Dr. Frederick C. Dunbar.

2.    Submitted herewith as Exhibit A is a true and correct copy of the Expert Report of Frederick C. Dunbar, dated October 15, 2004.

3.    Submitted herewith as Exhibit B is a true and correct copy of the Rebuttal Report of Frederick C. Dunbar, dated November 15, 2004.

4.    Submitted herewith as Exhibit C is a true and correct copy of the Supplemental Expert Report of Frederick C. Dunbar, dated December 8, 2004.

5.    Submitted herewith as Exhibit D is a true and correct copy of a supplement to the Expert Reports of Frederick C. Dunbar, dated December 30, 2004.

6.    Submitted herewith as Exhibit E is a true and correct copy of excerpts from the deposition of Dr. Frederick C. Dunbar, dated December 15, 2004.

7.    Submitted herewith as Exhibit F is a true and correct copy of the Supplemental Report Addressing Testimony of Frederick C. Dunbar of Mark A. Peterson, dated December 6, 2004.

8.    Submitted herewith as Exhibit G is a true and correct copy of Rebuttal Report of Dr. Francine F. Rabinovitz, dated December 5, 2004.

9.    Submitted herewith as Exhibit H is a true and correct copy of the Owens Corning and Firbreboard Projected Liabilities for Asbestos Personal Injury Claims by Mark A. Peterson, dated October 15, 2004.

10.    Submitted herewith as Exhibit I is a true and correct copy of the Hamilton, Rabinovitz & Alschuler, Inc., Estimated Number and Value of Pending and Future Asbestos Personal Injury Claims Against the Owens Corning Corporation Report, dated October 15, 2004

11.    Submitted herewith as Exhibit J is a true and correct copy of excerpts of Frederick C Dunbar, Estimating Future Claims (1996).

12.    Submitted herewith as Exhibit K is a true and correct copy of a letter from Sally Strauss to Paul Hinton, dated December 14, 2004.

13.    Submitted herewith as Exhibit L is a true and correct copy of the Order, U.S. Bankruptcy Court for the District of Delaware, dated August 19, 2004

14    Submitted herewith as Exhibit M is a true and correct copy of the Stipulation and Protective Order Regarding Expert Discovery, U.S. Bankruptcy Court for the District of Delaware, dated October 12, 2004.

15.    Submitted herewith as Exhibit N is a true and correct copy of the Confidentiality Order in *Falise v. Am Tobacco Co.*, 99 CV 7392 (JBW) (E.D N.Y.), dated January 14, 2000

16.    Submitted herewith as Exhibit O is a true and correct copy of the Confidentiality Agreement Regarding Selikoff Center Records, dated May 30, 2000

17    Submitted herewith as Exhibit P is a true and correct copy of letter from Michael R. Hoernlein to Michael Lynn, dated November 11, 2004

18.    Submitted herewith as Exhibit Q is a true and correct copy of an email from Paul Hinton to Michael Lynn, dated November 22, 2004.

19.    Submitted herewith as Exhibit R is a true and correct copy of an email from Paul Hinton to Michael Lynn, dated November 23, 2004.

20.    Submitted herewith as Exhibit S is a true and correct copy of a letter from Mark E. Lederer to Elihu Inselbuch, Esq, dated April 24, 1998.

21.    Submitted herewith as Exhibit T is a true and correct copy of the Goldstein Worksheet.xls and Mendelsohn.xls Spreadsheets.

22.    Submitted herewith as Exhibit U is a true and correct copy of *In re Western Asbestos Co*, No. 02-46284 T (Bankr. N.D. Cal. Dec. 4, 2003).

23.    Submitted herewith as Exhibit V is a true and correct copy of Dr. James D. Crapo's Testimony before the United States Senate Committee on the Judiciary, dated June 4, 2003.

24.    Submitted herewith as Exhibit W is a true and correct copy of *In re Western Asbestos Co*, 2004 WL 1944792 (N.D. Cal. April 16, 2004).

25.    Submitted herewith as Exhibit X is a true and correct copy of *Am. Nat'l Bank and Trust Co of Chicago v AXA Client Solutions, LLC*, 2002 WL 1067696 (N.D. Ill. May 28, 2002).

26.    Submitted herewith as Exhibit Y is a true and correct copy of *Whitehead v Gateway Chevrolet*, 2004 WL 316413 (N.D Ill. Feb. 2, 2004).

27.    Submitted herewith as Exhibit Z is a true and correct copy of *Ibarra v Sunset Scavenger Co.*, 2003 WL 21244096 (N.D. Cal. May 21, 2003).

28.    Submitted herewith as Exhibit AA is a true and correct copy of *DEV Indus v Rockwell Graphic Sys., Inc.*, 1992 WL 100908 (N.D. Ill. May 4, 1992).

29.    Submitted herewith as Exhibit BB is a true and correct copy of *Grant v. Chemrex, Inc.*, 1997 WL 22307 (N.D. Ill. April 28, 1997).

30.    Submitted herewith as Exhibit CC is a true and correct copy of *Rowe Entm't, Inc. v William Morris Agency, Inc.*, 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003).

31.    Submitted herewith as Exhibit DD is a true and correct copy of Irving J Sekilkoff, *Occupational Exposure to Asbestos. Population at Risk and Projected Mortality - 1980-2030*, 3 AM. J. INDUS. MED., 259, 259-268 (1982).

32.    Submitted herewith as Exhibit EE is a true and correct copy of Summary Results of Deposition Review by Dr. Francine F. Rabinovitz, dated December 9, 2004.

33.    Submitted herewith as Exhibit FF is a true and correct copy of Depositions Matching OC NSP Asbestos Job Site List and/or OC Product ID

34.    Submitted herewith as Exhibit GG is a true and correct copy of *In re Western Asbestos Co.*, No. 02-46284 T (Bankr. N.D. Cal. Feb 3, 2004).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Wilmington, Delaware
       January 5, 2005

Sharon M. Zieg