# EXHIBIT C

## Mark A. Peterson, Ph.D.

1    Tweedale book out there too.  That's a very

2    available resource that plaintiffs' lawyers

3    could have used to put Turner & Newall in

4    front of the firing squad.

5        Q.   The Tweedale book was published in

6    2000, correct?

7        A.   It was published in hard copy in

8    2000 and paperback in 2001, that's correct.

9        Q.   How many copies in print, do you

10   know?

11       A.   I have no idea.  Enough.

12            (Discussion held off record.)

13            BY MR. STROCHAK:

14       Q.   The Tweedale book that you mention

15   in your report, isn't it true that that book

16   deals with circumstances in the United

17   Kingdom?

18       A.   Not exclusively.

19       Q.   Wouldn't you say that the majority

20   of information that is in the Tweedale book

21   pertains to circumstances in the United

22   Kingdom?

## Mark A. Peterson, Ph.D.

1      A.    I don't know if they ever ended.

2  The book certainly didn't say they ended.  And

3  that's another really awful fact for them, is

4  that they were doing certainly in the 1980s.

5  They were berating Manville for releasing

6  information.  I mean, my God, how bad do you

7  have to be?

8          MR. STROCHAK:  Let's go off the

9  record for a second.

10         (Pause.)

11         BY MR. STROCHAK:

12      Q.    Dr. Peterson, it's your view that

13  the publication of the Tweedale book would

14  have some effect on T&N's liability in the

15  tort system going forward; is that correct?

16      A.    Yes.

17      Q.    What have you done to quantify that

18  effect?

19      A.    You can't quantify something like

20  that.  I've talked with plaintiff's lawyers

21  who are aware of it and know its impact.  I

22  have talked with defense lawyers who have

## Mark A. Peterson, Ph.D.

Page 123

1   suppressed as a result of the circumstances

2   that you've pointed to?

3       A.   Well, no.  I talked about -- I've

4   talked about factors that are going to

5   increase the claiming rate, not suppress it.

6   None of the factors that I've talked about are

7   matters that suppress claiming.  They are

8   matters that will increase claiming.

9       Q.   And it's your opinion that the 1994

10  repository that was created in connection with

11  the Chase litigation is a factor that you view

12  as making it more likely that future claims

13  would increase; is that right?

14      A.   Absolutely.  It's a devastating

15  development.

16      Q.   In connection with any of those

17  documents that are in that repository have you

18  reviewed any of them?

19      A.   No.

20      Q.   You haven't reviewed any of them

21  yourself?

22      A.   No.

## Mark A. Peterson, Ph.D.

1    damages were available, they would return

2    larger verdicts because they were pissed off

3    at Turner & Newall.

4         Q.   And you haven't done any analysis

5    as to whether courts would exclude what you've

6    conceded to be is inflammatory evidence,

7    correct?

8              MR. BISSELL:  Objection to form.

9              MR. FINCH:  Object to form.

10             THE WITNESS:  That's a speculative

11   question.  I can't answer that.

12             BY MR. STROCHAK:

13        Q.   No, no.  I wasn't asking you to

14   speculate.  I was asking, have you done any

15   analysis to determine whether courts would

16   exclude what you've characterized as

17   inflammatory information?

18        A.   The exercise you've asked is so

19   far-fetched and speculative that I've not

20   engaged in such an exercise.

21        Q.   In fact, you couldn't do it, right?

22        A.   It wouldn't be meaningful because

## Mark A. Peterson, Ph.D.

1  efforts to obtain discovery into the basis for

2  the payments under pending claims and on

3  payments in the past as well as the bases for

4  the development of the trust distribution

5  settlement values was denied, and on that

6  basis I have no questions for this witness.

7        MR. FINCH:  I have one question of

8  Dr. Peterson.

9        EXAMINATION BY COUNSEL ON BEHALF OF

10       THE OFFICIAL COMMITTEE OF ASBESTOS

11             PERSONAL INJURY CLAIMANTS

12             BY MR. FINCH:

13       Q.   Dr. Peterson, is it possible -- is

14  it at all possible that the first time you

15  learned of the existence of the asbestos --

16  Magic Mineral to Deadly [sic] Dust, the

17  Tweedale book, was at a meeting that you and I

18  attended in December of 2002 with Paul Hanly

19  and Jane Conroy at Caplin & Drysdale's offices

20  in New York?

21       A.   That would have been when I

22  discovered it.  I don't know the name of -- I

Page 358

```
 1   tend not to be quantitative inferences, but
 2   they're consistent with the quantitative
 3   inferences.  And that's what you want to do.  If
 4   you see numbers that are going up or down, just
 5   to look at that without trying to do the
 6   qualitative understanding, what's going on, is
 7   kind of a -- it's a dangerous proposition.  And
 8   so you really want and try to understand the
 9   phenomenon, not only the numbers, but the
10   underlying phenomenon, and it's the two
11   together.
12        Q.    In analyzing what I've kind of
13   characterized as claimant side behavior or
14   plaintiff lawyer side behavior, have you spoken
15   with any particular members of the plaintiffs'
16   bar to get an understanding of their activities?
17        A.    About this period of time?
18        Q.    In specific, the 2000-2001 period,
19   yes.
20        A.    I've talked to plaintiffs' lawyers,
21   not infrequently -- I'm sure that over the
22   course of that period of time I've talked with
23   them some about this stuff.
24             I don't recall any specific
25   conversations.
```

Page 359

```
 1        Q.    Okay.  And apart from specific
 2   conversations, do you recall any specific people
 3   that you spoke with about claimant side behavior
 4   that may have affected the claiming rates
 5   against T&N during 2000-2001?
 6        A.    I don't remember that.  Who I might
 7   have.  I mean, as I say, I've had a lot of
 8   conversations with plaintiffs' lawyers.
 9        Q.    In general, your conversations, do
10   they include members of the asbestos claimants
11   committee in this case?
12        A.    Among others.  I actually didn't
13   even know who is on the committee here, so...
14        Q.    Name generally the people that you
15   would go to, at least in the first instance, for
16   information about plaintiff lawyer behavior.
17        A.    I don't -- I don't do this in a way
18   that I would if I were at Rand, and set up,
19   schedule interviews with people in order to
20   discuss topics.  In the course of a year I
21   probably talk with at least 20 plaintiffs --
22   asbestos plaintiffs' lawyers.  We talk about
23   lots of stuff.  We have a common interest in
24   asbestos litigation.  We have a common interest
25   in what's going on.  So who I might have talked
```