## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
                                                     :
In re                                                :   Chapter 11
                                                     :
FEDERAL-MOGUL GLOBAL, INC., et al. :                     Jointly Administered
T&N LIMITED, et al.,                                 :
                              Debtors.               :
-----------------------------------------------------x
                                                     :
THE OFFICIAL COMMITTEE OF                            :
ASBESTOS CLAIMANANTS and                            :
ERIC D. GREEN, as the                                :
LEGAL REPRESENTATIVE FOR                             :
FUTURE ASBESTOS CLAIMAINTS,                          :
                                                     :
                      Plaintiffs,                    :
                                                     :
v.                                                   :   Case No. 05-00059 (JHR)
                                                     :
ASBESTOS PROPERTY                                    :
DAMAGE COMMITTEE,                                    :
                                                     :
                      Defendant.                     :
                                                     :
-----------------------------------------------------x
```

## PRE-TRIAL MEMORANDUM OF THE OFFICIAL COMMITTEE
## OF ASBESTOS PROPERTY DAMAGE CLAIMANTS

FERRY, JOSEPH & PEARCE, P.A.
Theodore J. Tacconelli (No. 2678)
Rick S. Miller (No. 3418)
824 Market Street, Suite 904
Wilmington, DE 19899
Telephone: (302) 575-1555

-and-

WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock, Esquire
Michael P. Kessler, Esquire
Adam P. Strochak, Esquire
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Co-Counsel to the Official Committee
of Asbestos Property Damage Claimants

Dated: May 31, 2005

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

   A.   Background ......................................................................................... 1

   B.   Summary of Estimates ...................................................................... 4

   C.   The Plan of Reorganization ............................................................. 7

II.     LEGAL PRINCIPLES GOVERNING ESTIMATION ......................................... 9

   A.   Estimation Under Section 502(c) of the Bankruptcy Code ...................... 9

   B.   The Eagle-Picher Test........................................................................ 10

III.    T&N'S ASBESTOS CLAIMS HISTORY ......................................................... 14

IV.     THE ESTIMATES................................................................................................. 16

   A.   The Estimate of $2.5 Billion Proffered By the Property Damage
        Committee Is Appropriate............................................................................ 16

        1.   Dr. Cantor's Estimate Is Firmly Grounded in T&N's
             Extensive Claims History ........................................................... 16

        2.   Estimating Claim Values ............................................................. 17

        3.   Estimating the Number of Compensable Claims.......................... 18

   B.   Dr. Peterson's Forecast Is Not Credible .................................................. 20

        1.   Overview of Dr. Peterson's Forecast........................................... 20

        2.   Dr. Peterson's Forecast Claim Values Are Untenable................ 21

        3.   Dr. Peterson's Increasing Propensity To Sue Model Is
             Flawed............................................................................................. 24

   C.   Comparison of Cantor and Peterson Forecasts ......................................... 25

        1.   Compensability Rates Versus Claiming Rates ............................. 26

        2.   Dr. Peterson's Forecast Is Founded on Untested
             Speculation..................................................................................... 26

        3.   Punitive Damages Should Not Be Allowed.................................. 30

        4.   Dr. Peterson's Estimate Is Inconsistent With the Medical
             Evidence Demonstrating That Asbestos-Related Diseases
             Are Declining.................................................................................. 32

        5.   The Litigation Landscape Has Changed Since the Debtors
             Filed For Bankruptcy in 2001 ...................................................... 33

             a.   Aggregation of Claims...................................................... 34

# TABLE OF CONTENTS
## (continued)

**Page**

|   | b. | Payment to Unimpaired Claimants | 36 |
|   | c. | Mass Screenings and Suspect Medical Evidence | 37 |
| V. | CONCLUSION | | 40 |

# TABLE OF AUTHORITIES

## CASES

*3M Co. v. Johnson* , 895 So. 2d 151 (Miss. 2005)............................................................35

*A.G. Financial Service Center, Inc.*, 395 F.3d 410 (7th Cir. 2005)...................................31

*In re Asbestos Products Liability Litigation (No. VI), Civil Action No. MDL 875,*
    2002 WL. 32151574 (E.D. Pa. Jan. 8, 2002) (Admin. Order No. 8)...........................38

*Bittner v. Borne Chemical Co.*, 691 F.2d 134 (3d. Cir. 1982)...........................................10

*Casey v. GAF Corp.*, 828 A.2d 362 (Pa. Super. Ct. 2003) ................................................14

*In re Eagle-Picher Industries, Inc.*, 189 B.R. 681 (Bankr. S.D. Ohio 1995), *aff'd,*
    1996 U.S. Dist. LEXIS 22742 (S.D. Ohio 1996)................................................... passim

*Federal-Mogul Corp. v. The Center for Claims Resolution, Inc.*, adv. pro. no. 01-8885,
    chapter 11 case no. 01-10578 (AJW) (D. Del. March 28, 2002).........................14

*In re GAC Corp.*, 681 F.2d 1295 (11th Cir. 1982)............................................................31

*Harold's Auto Parts, Inc. v. Mangialardi*, 889 So.2d 493 (Miss. 2004)...........................35

*In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986) *aff'd in part,*
    *rev'd in part,* 78 B.R. 407 (Bankr. S.D.N.Y. 1987), *aff'd* 843 F.2d 636 (2d.
    Cir. 1988) ..................................................................................................................30, 31

*In re Joint E. & S. D. N.Y. Asbestos Litigation*, 237 F. Supp. 2d 297 ...............................39

*Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340 (3d Cir. 2002)......................................9

*Noble v. E.H. O'Neil Co.*, Civ. Action No. 98-0024 (Miss. Cir. Ct. Jan. 24, 2005) ..........36

*Owens Corning v. Credit Suisse First Boston,*, 322 B.R. 719 (D. Del. 2005)........... passim

*In re Thompson McKinnon Sec., Inc.*, 143 B.R. 612 (Bankr. S.D.N.Y. 1992)..................10

*Thornton v. A-Best Products*, Case No. CV-99-395724,
    (Cuyahoga Ct. of Common Pleas, Jan. 10, 2005).........................................37

*In re Trident Shipworks, Inc.*, 247 B.R. 513 (Bankr. M.D. Fla. 2000)..............................10

*West Gas Ohio Co. v. Public Utility Commission of Ohio*, 294 U.S. 79 (1935) ...............28

## STATUTES

11 U.S.C. 502(c) ..................................................................................................................9

2005 Leg., Reg. Sess. § 5(2) (Fla. 2005) ..........................................................................37

2005 Leg., Reg. Sess. § 3(23) (Fla. 2005)..........................................................................38

Ga. Code Ann. § 51-14-2(15) ............................................................................................38

Ga. Code Ann. § 51-14-3(b) ..............................................................................................37

Ohio Rev. Code Ann. § 2307.92(B) ............................................................................37, 38

S. Rep. No. 108-118 at 84 (2003) ...............................................................................37, 38

Tex. Civ. Prac. & Rem. Code Ann. §§ 90.002-09.003 ......................................................38

Tex. Civ. Prac. & Rem. Code Ann. § 90.007 .............................................................37, 38

Tex. Civ. Prac. & Rem. Code Ann. § 90.009 ....................................................................34

## MISCELLANEOUS

Report of Am. Bar Ass'n Comm'n on Asbestos Litig. at 7 (Feb. 2003) .............................15

Griffin B. Bell, *Asbestos Litigation & Tort Law: Trends, Ethics & Solutions:*
*Asbestos & the Sleeping Constitution,* 31 Pepp. L. Rev. 1 (2003) ...............................15

Stephen J. Carroll *et al., Asbestos Litigation* 38-39, RAND Institute for Civil
Justice (2005)..........................................................................................................35, 36

COLLIER ON BANKRUPTCY, ¶ 502.04 (15th ed. Revised) ....................................................11

Joseph N. Gitlin, *et al., Comparison of "B" Readers Interpretations of Chest*
*Radiographs For Asbestos Related Changes,* 11 J. Acad. Radiol. 843 (2004) ...........39

Jonathan D. Glater, *Civil Suits Over Silica in Texas Become a Criminal Matter in*
*New York,* New York Times, May 18, 2005................................................................39

Queena Sook Kim, *Asbestos Claims Continue to Mount – Did Broker of*
*Settlements Unwittingly Encourage More Plaintiffs' Suits?,* Wall St. J., Feb.
7, 2001 .......................................................................................................................15, 27

RAND Institute for Civil Justice, *Asbestos Litigation Costs and Compensation:*
*An Interim Report,* 21 (RAND 2002) ..........................................................................24

R.B. Reger, *et al., Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation*, 32 J. Occup. Med. 1088 (1990) ................................................................39

Victor E. Schwartz, *et al., Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) And Case Management Plans That Defer Claims Filed by the Non-Sick*, 31 Pepp. L. Rev. 271 (2003) .................................................................................................37

Paul Sherer, *New Credit Aids Federal-Mogul in Asbestos Battle*, Wall Street J., January 4, 2001 .........................................................................................36

Joseph E. Stiglitz, *et al., The Impact of Asbestos Liabilities on Workers in Bankrupt Firms*, Sebago Assocs. (2002) ....................................................36

Michael Strong, *Federal-Mogul Gets More Credit, Pulls Out of Asbestos Group*, Crain's Detroit Business, January 8, 2001 ..............................................27

Vera Titunik, *Chase's Case Turns to Dust*, The American Lawyer, Vol. XVIII, No. 4, May 1996 .............................................................................................29

Vera Titunik, *Chase Manhattan Bank Arms the English Plaintiffs' Bar*, The American Lawyer, Vol. XVIII, No. 4 (May 1996)......................................30

Geoffrey Tweedale, *Magic Mineral to Killer Dust: Turner& Newall and the Asbestos Hazard,* Oxford University Press (2000( .....................................29

Todd Woody, *Chase Man's Unlikely Heroics*, Mother Jones, Nov./Dec. 1993................29

## I.    INTRODUCTION

### A.    Background

The Official Committee of Asbestos Property Damage Claimants (the "Property Damage Committee")[1] submits this pre-trial brief in support of its position on estimation, pursuant to section 502(c) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), of the aggregate allowable amount of asbestos personal injury claims against debtor T&N Limited ("T&N").[2] An estimate of such claims is necessary to confirm a plan of reorganization for the Debtors.

At trial, the Property Damage Committee will offer expert testimony from Dr. Robin A. Cantor, a Ph.D. economist and the leader of the Liability Estimation practice at Navigant Consulting, Inc., that the appropriate value of all pending and future U.S. asbestos personal injury claims against T&N is approximately $2.5 billion (net present value).[3] The Property Damage Committee will demonstrate that Dr. Cantor's estimate is based on extensive empirical analysis of T&N's pre-bankruptcy claims history and is, as a matter of fact and law, the only appropriate estimate offered in this matter. In contrast, the estimate offered by the Asbestos Claimants Committee ("ACC") and the Future Claimants Representative ("FCR")

---

[1] The Property Damage Committee represents the interests of approximately 3,200 municipalities, school districts, hospitals, businesses, and individuals who own and operate buildings where asbestos-containing products manufactured and distributed by T&N or affiliated companies have been installed and who have filed proofs of claim for damages.

[2] T&N is a subsidiary of Federal-Mogul Global Inc. ("Federal-Mogul," together with its affiliated U.S. and U.K. debtors, the "Debtors"). Federal Mogul purchased 100% of T&N's stock in March 1998. Other subsidiaries of the Debtors may have asbestos liability, but they need not be estimated for purposes of these proceedings.

[3] The Property Damage Committee has not estimated the value of U.K. asbestos personal injury claims. The U.K. claims are only a small fraction of the U.S. claims, and will not significantly affect recoveries for property damage claimants.

ignores the claims history of this debtor and projects wildly inflated claim counts and soaring

claim values based on unsupportable speculation that, but for the bankruptcy, the world of

asbestos litigation would become an even less hospitable place for T&N than it already was.

Before turning to the substance of the estimates, we provide the following background

information to put these estimation proceedings in perspective.

The Debtors (including T&N) have proposed a plan of reorganization (the "Plan")

based upon an $11.1 billion (present value) estimate of the aggregate value of U.S. asbestos

personal injury claims – an estimate prepared by the consultant who works for the ACC in this

bankruptcy and at least a dozen others. The Plan allocates the reorganization value of the

Debtors among various creditor constituencies, but the allocation of value under the Plan bears

little or no relationship to the estimate of asbestos personal injury claims. Rather, the basic

purpose of the Plan's estimate of the value of asbestos personal injury claims is to derive the

cash recovery percentage for other unsecured creditors of T&N – including property damage

claimants.

The Plan's allocation of value is the result of a deal cut by certain creditor

constituencies in a process from which the Property Damage Committee was excluded. Thus,

joining the Debtors in proposing the Plan are the statutory Official Unsecured Creditors

Committee (the "UCC") (ostensibly representing the interests of all unsecured creditors, but in

practice controlled by distressed debt investors who purchased Federal Mogul bonds), the ACC

(representing the interests of current asbestos personal injury claimants), the FCR (representing

the interests of future asbestos personal injury claimants), the Official Committee of Equity

Security Holders (the "Equity Committee") (representing the interests of shareholders, who

would receive a distribution under the Plan), and JPMorgan Chase Bank, as administrative agent

for holders of the Debtors' prepetition secured debt (the "Banks"). Counterintuitively, under the structure of the proposed Plan, *all* of the "Plan Proponents," as they have dubbed themselves, stand to benefit from a *higher* estimate of asbestos personal injury claims.[4] This is because a higher estimate of asbestos personal injury claims will suppress the amount of cash the Debtors will need to satisfy the claims of property damage claimants and other unsecured creditors of T&N, thus raising the value of the new equity securities that will be distributed to most creditor constituencies and freeing cash flow to pay interest on the new debt that will be issued to the Banks.

Before and during the three and one-half years this bankruptcy has been pending, the Plan Proponents, and other representatives and fiduciaries for creditor interests including the Joint Administrators appointed in the United Kingdom administration proceedings (the "Administrators") and the Trustees of the T&N Pension Plan (the "Pension Trustees"), collectively have spent millions of dollars on asbestos personal injury claims estimation consultants. The Debtors, the UCC, the Equity Committee, the ACC, the FCR, the Administrators, the Pension Trustees, and the Property Damage Committee each have retained separate consulting firms which, in one form or another, have calculated estimates of T&N's asbestos personal injury liabilities. Notwithstanding all this expense, the six Plan Proponents will proffer only a single consultant to support the $11.1 billion estimate underlying the Plan – Mark Peterson, who devised it for the ACC. It is not surprising that no other party will offer expert testimony to corroborate Dr. Peterson's estimate. The Property Damage Committee believes that no other consultant retained in this case has estimated T&N's U.S. asbestos

---

[4] This agreement is known as the "Central Deal," and is described at pp. 7-9.

personal injury liabilities at anything near $11.1 billion and none would risk his or her professional credibility trying to justify that number.

## B.    Summary of Estimates

A comparison of the ACC's $11.1 billion estimate to other measures of T&N's asbestos liabilities shows how out of proportion it is to the company's history and to other more realistic estimates. As a starting point, in the 30 years prior to its bankruptcy in 2001, T&N paid a total of about $835 million (nominal amount) to resolve approximately 250,000 asbestos personal injury claims. Thus, in Dr. Peterson's world view, T&N's future would have to be more than 12 times worse than its past if we use the present value estimate of $11.1 billion, or 25 times worse if we use Dr. Peterson's nominal value estimate of $21.3 billion.

Similarly telling is the Debtors' own estimate of T&N's liabilities, as reported in publicly-filed financial statements. Working with a nationally-recognized economic consulting firm (National Economic Research Associates, Inc., or "NERA") in 2000, the Debtors estimated that T&N's total liability for pending and future asbestos personal injury claims (through 2012) would be $1.6 billion.[5] The Debtors have reported this estimate in their filings with the Securities and Exchange Commission in every year from 2000 through 2004. Indeed, the Debtors have continued to report it even long after they proposed the Plan, which incorporates the ACC's $11.1 billion estimate, and their Chief Financial Officer will testify at the estimation

---

[5] The estimate declined in subsequent years to $1.4 billion, which is the figure reported in the Debtors' most recent SEC filings. *See* Federal-Mogul Corporation, Form 10-Q, at 12 (September 30, 2004). This estimate is for claims through 2012. Although the estimates of the ACC and Property Damage Committee that will be presented at the hearing estimate claims through 2039 and 2054, respectively, comparison with the NERA estimate is useful because claims through 2012 represent a major portion of the total estimate on account of declining incidence of asbestos-related diseases in the later years of the forecast and the significant reduction in the current value of claims at the back end of the forecast period when they are discounted to present value.

hearing that this estimate of T&N's liabilities continues to be reasonable and at least as likely as any other estimate, albeit at the lower end of the range of possibilities. While the Debtors' SEC disclosures have caveats to the effect that their forecast contains uncertainty, they have never suggested that $1.4 billion wildly underestimates T&N's potential liability. The Court will not hear from NERA at the estimation hearing because the Debtors have resisted discovery of NERA's estimate on the basis of privilege (a position upheld in a prior ruling by Judge Lyons before withdrawal of the reference).

Other estimates – including ones derived by the ACC itself before agreement was reached on the Plan – further show how unrealistic the ACC's current $11.1 billion estimate is. Specifically, in 2002 and 2004, the ACC presented estimates ranging from $5.7 to $6.6 billion – estimates that the Property Damage Committee believes are methodologically flawed and excessive, but which are at least closer to the correct order of magnitude. During these proceedings, the Pension Trustees also performed their own estimate, which ranged from $2.1 to $5.5 billion. The Administrators also have analyzed this issue and have undertaken to replicate Dr. Peterson's original analysis for purposes of negotiations, arriving at $5.3 billion using essentially the same methodologies employed by Dr. Peterson before he doubled his estimate.

The chart that follows on p. 6 summarizes the estimates and makes patently obvious how extreme the ACC's $11.1 billion estimate is, and why it cannot credibly be relied upon:



\* The Pension Trustees' estimate actually ranges from $2.1 to $5.5 billion -- the $3.8 billion figure is the midpoint.
\*\* As noted above, the Administrators' estimate is merely an effort to replicate Dr. Peterson's methodology done for purposes of negotiations and therefore does not represent the final views of the Administrators.

Dr. Cantor's $2.5 billion estimate, which is squarely in the middle of the range of reasonable estimates, is based on T&N's own claims history during the four years preceding the chapter 11 filing. If anything, Dr. Cantor's estimate is conservative and likely overstates the allowable aggregate amount of T&N's present and future liabilities. This is because she makes no specific adjustment downward to reflect the substantial changes in the tort system that have occurred since 2001 – like recent legal reforms in states where a large portion of T&N's historic claims were filed and efforts to stop the sham medical screening processes which generated tens of thousands of dubious claims – all of which will have the effect of decreasing future claim values and claim counts.  (*See* pages 33-40, below.)

In contrast, Dr. Peterson's forecast abandons T&N's actual experience and forecasts unjustified and unsustainable growth in both claim values and claim counts, all based on nothing more than speculation that the future for T&N would have been far worse than the past. Indeed, Dr. Peterson repeats in this case many of the same errors and omissions that caused Judge Fullam to reject his estimate in the *Owens Corning* case as "extreme" and "too high." *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 725 (D. Del. 2005) (Fullam, Sr. J., E.D. Pa., sitting by designation). In that case, Judge Fullam rejected an estimate of $11 billion offered by Dr. Peterson and instead arrived at an estimate of $7.0 billion ($6.5 billion after reduction for $500 million in settled but not paid claims that were not included in Dr. Peterson's forecast). As we will demonstrate at trial, the Peterson $11.1 billion estimate in this case is so high, and so completely divorced from T&N's extensive claims history, that it lacks any credibility and should be flatly rejected. Instead, the Property Damage Committee urges the Court to accept Dr. Cantor's reasonable estimate of $2.5 billion.

## C.    The Plan of Reorganization

As described above, the ACC's inflated estimate is incorporated into the Plan. The basis for the Plan is what has been colloquially referred to as the "Central Deal." The Central Deal allocates 50.1% of Reorganized Federal-Mogul equity (no cash) to the proposed asbestos personal injury trust and 49.9% of the equity to the Federal-Mogul note holders. This allocation of equity remains the same whether the estimate of asbestos personal injury claims is $11 billion or any other number. So why is there a need to estimate asbestos liability and why is it so important to the Plan? While the Central Deal allocated the equity value among the note holders and asbestos personal injury claimants, it left open the question of recoveries for claims of other unsecured creditors of T&N, such as property damage claimants. Recoveries provided by the Plan to other credit constituencies will be paid in cash and the estimate of the "tort

system" value of the asbestos personal injury claims is the most important variable in determining the recovery that property damage claimants and other unsecured creditors will receive.

The Plan Proponents filled in this variable by calculating the percentage recovery that asbestos personal injury claimants would receive from the trust and paying property damage claimants the same percentage dividend in cash. As the representatives of the future holders of the new equity, the UCC, the ACC, the FCR, and the Equity Committee have a direct interest in reducing the amount of cash the Debtors will have to pay other unsecured creditors of T&N upon their reorganization. In furtherance of this scheme, they colluded to manipulate the Plan such that the other unsecured creditors could only recover a low percentage of cash on their claims. This was done by radically inflating the estimate of the aggregate value of the asbestos personal injury claims to $11.1 billion.

Once the value of the personal injury claims was engineered to be $11.1 billion, the recovery for personal injury creditors of T&N can be expressed as the ratio of the value they will receive (79% of the value of the 50.1% of total new equity going to the trust) to the total value of personal injury claims estimated to be asserted against the trust. This yields "Distribution Ratio 1"[6] and "Distribution Ratio 2"[7] under the Plan, which is the measure of what

---

[6] T&N Distribution Ratio 1 is defined by the Plan as a ratio where the numerator is equal to 79% of the value of the Reorganized Federal-Mogul Class B Common Stock -- which is the percentage of such stock accorded to the section 524(g) trust created with respect to the Asbestos Personal Injury Claims against T&N -- and the denominator is the tort system value (as determined by the Asbestos Personal Injury Trust Distribution Procedures) of the Asbestos Personal Injury Claims against T&N, which, in the Plan, is the Peterson Estimate of $11 billion. To the extent the $11 billion estimate is reduced and the numerator remains unchanged, T&N Distribution Ratio 1 will increase and concomitantly the cash distribution to non-asbestos personal injury claimants will increase.

[7] Distribution Ratio 2 is defined by the Plan as a ratio where the numerator is the value of T&N's assets (as determined at the Confirmation Hearing), and the denominator is the sum of the tort

property damage claimants and other unsecured creditors will receive. Because the aggregate value of asbestos personal injury claims forms the denominator of the Distribution Ratios, a higher asbestos personal injury claims estimate yields a lower recovery for non-asbestos personal injury creditors. For instance, the $11.1 billion estimate yields a recovery for non-asbestos personal injury claimants of only 7.2 percent, or $0.072 per dollar of allowed claim. In contrast, had the Plan Proponents used the Debtors' latest reported estimate of $1.4 billion, the recovery for property damage claimants and other unsecured creditors would be approximately 58 percent.[8] Thus, the estimate of personal injury claims has a material and dramatic impact on the Plan recoveries of *all* unsecured creditors.

## II.    LEGAL PRINCIPLES GOVERNING ESTIMATION

### A.    Estimation Under Section 502(c) of the Bankruptcy Code

Estimation of claims in bankruptcy is governed by section 502(c) of the Bankruptcy Code, which provides a mechanism for the mandatory estimation of "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. 502(c); *see also Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 347 (3d Cir. 2002) ("The object of [an estimation] proceeding is to establish the estimated value of a creditor's [contingent or unliquidated] claim for purposes of formulating a reorganization plan."). Pursuant to section 502(c), estimation should be for the purpose of

---

system value of the Asbestos Personal Injury Claims against T&N (as determined by the Asbestos Personal Injury Trust Distribution Procedures) and the allowed amount of other claims against T&N, including Affiliate Claims. As with T&N Distribution Ratio 1, if the $11 billion estimate of asbestos personal injury claims against T&N is reduced, the cash distribution to non-asbestos personal injury claimants will increase.

[8] This example is provided for illustrative purposes only. The Property Damage Committee believes the Plan is unconfirmable for reasons separate and apart from the flaws in its estimate of the value of asbestos personal injury claims.

"allowance," which, according to a noted bankruptcy treatise, means "that the essence of section 502(c) is that all claims against the debtor be converted into dollar amounts." *See* 4 COLLIER ON BANKRUPTCY, ¶ 502.04 (15th ed. rev.). It is undisputed that the PI Claims are contingent and unliquidated, and that liquidation of each such claim by trial would unduly delay administration of the estates. Here, the Court is not estimating the recovery of any particular asbestos personal injury claimant, but rather is estimating the aggregate allowable amount of all such claims.

The Bankruptcy Code is silent as to the method or manner in which contingent or unliquidated claims are to be estimated. *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d. Cir. 1982). Thus, this Court has discretion to determine the appropriate method based upon the circumstances of the particular case before it. *In re Trident Shipworks, Inc.*, 247 B.R. 513, 514 (Bankr. M.D. Fla. 2000); *see also In re Thompson McKinnon Sec., Inc.*, 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992). There is no binding precedent for how the Court must conduct an estimate of pending and future asbestos claims. Indeed, the United States Court of Appeals for the Third Circuit has held that a district court has wide latitude in determining what evidence to consider and what methods to apply. *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir. 1982). The court held in *Bittner* that:

> The Code [and] the Rules of Bankruptcy Procedure . . . are silent as to the manner in which contingent or unliquidated claims are to be estimated. Despite the lack of express direction on the matter, we are persuaded that Congress intended the procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue.

*Id.* at 135-36.

## B.    The Eagle-Picher Test

The basic methodology for estimating T&N's asbestos liability is not complicated. The exercise requires: (1) determination of the value of claims for each type of

disease,[9] (2) determination of the numbers of pending claims, and anticipated future demands of

each disease type that will likely be entitled to compensation, (3) multiplication of the value for

each disease by the number of projected compensable claims, and (4) adjustment upward for

inflation to the date of anticipated payment, and then a discounting of the inflated amount back

to present value. *See In re Eagle-Picher Industries, Inc.*, 189 B.R. 681 (Bankr. S.D. Ohio 1995),

*aff'd*, 1996 U.S. Dist. LEXIS 22742 (S.D. Ohio 1996).

> *Eagle-Picher* established a basic principle for determining values for pending

claims, finding that values should be based upon the closed prepetition claims in the debtor's

claims database:

> In valuation, the only sound approach is, if possible, to begin with
> what is known. To begin without utilizing information known
> about these debtors and their history in the handling of claims
> which have been asserted against them in the past, and their
> disposition, is to ignore a valuable experiential resource. Debtors
> have a database containing detailed information about each of the
> closed claims. From the database it is possible to associate with
> each claim characteristics such as occupation of the claimant,
> nature of the disease, the amount which was paid to the claimant,
> as well as the number of other factors, as particularly identified by
> Peterson. Because much of the same information is known about
> the open prepetition claims, though, of course, not the settlement
> amount, it is possible to ascertain with some degree of accuracy
> what the settlement figures for those claims would be had they
> been resolved prepetition.

189 B.R. at 686. As to future claims, the *Eagle-Picher* court set forth seven considerations that

should inform the estimate:

> (1) The estimate should be primarily based upon the history of *this
> company*, particularly because there was no definitive showing of
> another or other company's production of a product line identical

---

[9] The categories of diseases are: (1) mesothelioma; (2) lung cancer; (3) other cancers; (4)
asbestosis; and (5) pleural disease. Dr. Peterson lumps the two latter categories together and
describes them as "nonmalignant disease."

to that of debtors. This consideration does not, however, rule out
the desirability of considering trends general to the industry,
particularly regarding the rate of filing claims.

(2) The total number of claims to be expected should be estimated.

(3) The estimation of claims should categorize them by disease and
occupation, as well as other factors.

(4) Valuation of claims should be based upon settlement values for
claims close to the filing date of the bankruptcy case.

(5) A reasonable rate for indemnity increase with time must be
determined so that a future value of filing date indemnity values
can be comparable.

(6) A lag time gleaned from the tort system must be determined in
order that there be accuracy in projecting future values.

(7) A discount rate must then be applied to bring the future
nominal value of claims back to the filing date.

*Id*. at 690-691 (emphasis added).

The touchstone for any estimate in this case is the claims history of T&N. The

ACC and the FCR advocate exactly this point. Specifically, the ACC and the FCR argued, in

their pre-hearing brief that the best methodology for projection of future claims is based on

"[t]he fundamental principle . . . that T&N's recent experiences and extensive history of

resolving similar asbestos cases is the only proper basis from which to estimate its liability, both

for pending and future filings." The Official Committee of Asbestos Claimants' And The Legal

Representative For Future Asbestos Claimants' Joint Pre-Hearing Brief On Estimating The

Value Of Asbestos Personal Injury Claims Against T&N Limited, Et Al., *In re Federal Mogul,

Inc.* et al., Chapter 11 Case No. 01-10578 (Bankr. D. Del.), December 6, 2004, at p. 6. But while

the ACC concedes that any estimate must be based on T&N's claims history, the estimate it

offers in this case bears no resemblance to that history.

In the recent *Owens Corning* case, the district court elaborated on certain of the factors outlined in *Eagle-Picher*. For example, the *Owens Corning* opinion specifically holds that future claim values should be estimated on the basis of what such claims "would have been worth in the tort system *as it existed on the petition date*." 322 B.R. at 722 (emphasis added). Adjustments to these values may be appropriate where past results have been skewed by factors which affected historic claim resolutions but which can and should be avoided in the future, including: (1) venue shopping; (2) mass screening that triggered thousands of claims by persons who had never experienced adverse symptoms; (3) erroneous x-ray interpretations by biased plaintiff doctors; (4) overpayment to unimpaired claimants; (5) grouping more serious injuries with unimpaired claimants for trial, resulting in higher verdicts or settlements for the latter; (6) overvaluation of less meritorious cases through global settlements; and (7) increased verdicts and settlements caused by the assessment, or threat, of punitive damages. 322 B.R. at 723.[10]

As discussed below, the Property Damage Committee's base case estimate is extremely conservative (*i.e.* likely overstates T&N's liability) because it does not make adjustments for any of the factors discussed by Judge Fullam in *Owens Corning*. Dr. Cantor's estimate of $2.5 billion includes no specific deduction for punitive damages, no specific deduction for the historic payment of unimpaired claimants who are not likely to be compensated under emerging state law reforms, and no specific adjustment for dubious claims generated in mass screenings by plaintiff-biased x-ray readers. Furthermore, Dr. Cantor's base case estimate includes an increase in mesothelioma values, another conservative assumption. At trial, the Property Damage Committee will demonstrate that Dr. Cantor's estimate is the only one that reasonably approximates T&N's liability as a matter of law and fact.

---

[10] In *Owens Corning*, the asbestos claimants committee and its expert, Dr. Peterson, opposed any

## III. T&N'S ASBESTOS CLAIMS HISTORY

Because T&N's claims history is the starting point for estimation, a brief description of that history is necessary. In 1988, T&N and other asbestos defendants formed a collective entity to deal with asbestos litigation known as the Center for Claims Resolution (the "CCR"). The CCR was a nonprofit corporation which acted as a "claims handling facility" for its approximately twenty-one members. The CCR members operated under a document known as the "Producer Agreement," entered into in 1988 and later amended as of February 1, 1994, a copy of which will be offered into evidence at the estimation hearing.[11] Under the Producer Agreement, each member designated CCR "as its sole agent to administer and arrange on its behalf for the evaluation, settlement, payment or defense of all asbestos-related claims against" such member. Producer Agreement §IV, ¶ 1. The CCR would enter into a mass inventory settlement[12] with plaintiffs' attorneys whereby each CCR member contributed to the settlement and got a release even if individual plaintiffs could not demonstrate exposure to each CCR members' products. Each member of the CCR, including T&N, explicitly authorized CCR to calculate and allocate the percentage share and costs of settlement attributable to each member. *Id.* at § 89, ¶ 2. The CCR's allocation formula was complex and was based on each members' historical indemnity costs. While the original formula was set in 1988 and a new formula calculated in 1994, the Producer Agreement permitted the CCR (by vote of its members) to

---

adjustment to historical claim values.

[11] Details of the operation of the CCR have been set forth in numerous court decisions including *Casey v. GAF Corp.*, 828 A.2d 362, 364 (Pa. Super. Ct. 2003) and *Federal-Mogul Corp. v. The Center for Claims Resolution, Inc.*, adv. pro. no. 01-8885, chapter 11 case no. 01-10578 (AJW) (D. Del. March 28, 2002).

[12] A mass inventory settlement was where the settlement would be between the CCR and hundreds, if not thousands, of plaintiffs represented by the same law firm.

change an individual company's allocation of settlement liability. Between 1989-1995, for example, T&N's share of CCR's total costs ranged from 14.8% to 12.72%.

In 2000, CCR underwent structural changes as it and its member companies faced a dramatic and, as we will demonstrate at trial, unsustainable increase in claim filings, particularly claims by individuals with no impairment alleging nonmalignant diseases. As described below, asbestos litigation in the late 1990s and into 2001 bore no relation to the level of disease manifestation. As the American Bar Association stated in 2003, "by virtually all accounts, contemporary asbestos litigation is no longer driven solely, or even primarily, by the occurrence of disabling asbestos-related diseases." Report of Am. Bar Ass'n Comm'n on Asbestos Litig. at 7 (Feb. 2003) ("ABA Report"). Former United States Court of Appeals Judge and United States Attorney General Griffin Bell wrote that "[a]sbestos litigation now stands as the only part of our tort system in which people who can show no real physical injury are routinely allowed to recover." Griffin B. Bell, *Asbestos Litigation & Tort Law: Trends, Ethics & Solutions: Asbestos & the Sleeping Constitution*, 31 Pepp. L. Rev. 1 (2003). Fortunately, many of these abuses have been reigned in over the past two years. As we demonstrate below, however, to understand T&N's asbestos claims history it is necessary to be familiar with the abuses that pervaded the system which produced that history.

Ultimately, T&N revoked the CCR's ability to act as its agent in settling claims. The Debtors were unhappy with CCR's standards for settling claims and believed it was "time to change" that strategy. Queena Sook Kim, *Asbestos Claims Continue to Mount – Did Broker of Settlements Unwittingly Encourage More Plaintiffs' Suits?*, Wall St. J., Feb. 7, 2001, at B1. Shortly thereafter, the Debtors (including T&N) filed their chapter 11 cases.

## IV.    THE ESTIMATES

### A.    The Estimate of $2.5 Billion Proffered By the Property Damage Committee Is Appropriate

#### 1.    Dr. Cantor's Estimate Is Firmly Grounded in T&N's Extensive Claims History

Dr. Cantor, the Property Damage Committee's expert, has a Ph.D. in economics and has been a teacher, economist, and consultant for more than 20 years, specializing in liability claims analysis, environmental and energy economics, statistical modeling, and risk management. She has served previously as the Program Director for Decision, Risk, and Management Sciences, a research program of the National Science Foundation. She currently serves as a Director of the Financial Insurance & Claims Services Practice of Navigant Consulting, Inc., a publicly-traded consulting firm, and leads Navigant's Liability Estimation & Insurance Coverage Analysis practice.

Dr. Cantor's base case estimate is reported in her Supplemental Expert Report, filed with the Court on April 26, 2005. To develop her estimate, Dr. Cantor analyzed T&N's claims database and found, after removing duplicate records, that it contained 383,790 claim records, of which 108,240 represented pending claims and 275,550 represented closed claims. The base case estimate of $2.5 billion is firmly grounded in this history of over a quarter million resolved claims and uses the most recent 1998-2001 period as the starting point for analysis of claim values and compensability rates.

The estimate consists of three components. Pending claims are all actual claims that were recorded in the database prior to T&N's October 1, 2001, bankruptcy filing, but not yet resolved as of that date. Future claims are those forecast to arise from October 1, 2001 through the end of year 2054. Thus, the "future" for purposes of the estimate includes a three and one-half year period (Oct. 2001 to May 2005) for which the actual experience of the tort system is

known. Dr. Cantor forecasts there will be almost 373,000 compensable future claims during the period 2001-2054. Finally, Dr. Cantor also values claims that were settled but either not yet documented or not yet paid as of the bankruptcy petition date. Taking these three categories of claims into account, Dr. Cantor's base case estimate of the net present value of all claims is:

| | |
|---|---|
| Pending Claims: | $0.42 billion |
| Future Claims: | $1.925 billion |
| Settled Claims: | $0.14 billion |
| Total: | $2.485 billion |

Supplemental Expert Report of Robin A. Cantor ("Cantor Supp. Report"), April 26, 2005, at p. 40.

## 2.    Estimating Claim Values

A critical aspect of any forecast is the value assigned to both pending and future claims. Dr. Cantor valued pending claims calculating the historic weighted average of settlement values over the four years preceding T&N's bankruptcy – a period characterized by stability in claim values for all diseases except mesothelioma. Recognizing that mesothelioma claim values did increase in the years leading up to the bankruptcy, for purposes of assigning value to future claims, Dr. Cantor assumed an 18.3% annual increase in claim value for mesothelioma for the first five years of her forecast period (based upon the rolling four-year weighted averages from 1996-2001). Thus, in Dr. Cantor's base case estimate, mesothelioma values step up from $68,886 in the first year to $159,886 in year five, as shown in Table 1, below.

**Table 1**      **Claim Values (First Five Years of Forecast Compared to 1998-2001)**

| Year | Mesotheliom a | Lung Cancer | Other Cancers | Asbestosis | Pleural Disease |
|------|------|------|------|------|------|
| 1998-2001 (actual) | $68,886 | $13,011 | $5,664 | $2,600 | $915 |
| 2002 (forecast) | $81,502 | $13,011 | $5,664 | $2,600 | $915 |
| 2003 (forecast) | $96,456 | $13,011 | $5,664 | $2,600 | $915 |
| 2004 (forecast) | $114,153 | $13,011 | $5,664 | $2,600 | $915 |
| 2005 (forecast) | $135,098 | $13,011 | $5,664 | $2,600 | $915 |
| **2006-2054 (forecast)** | $159,886 | $13,011 | $5,664 | $2,600 | $915 |

The increase in mesothelioma values is a conservative assumption in light of the general rule that future claim values should be estimated on the basis of what they "would have been worth in the tort system as it existed on the petition date." *Owens Corning*, 322 B.R. at 722.[13]  Because historical information on claim values for other diseases showed no increasing trend, and in some cases showed decreasing trends, Dr. Cantor held values for all claims other than mesothelioma constant through her 54-year forecast (except for annual increases for inflation).

### 3.    Estimating the Number of Compensable Claims

To determine the number of compensated claims, Dr. Cantor employs established forecasting methodologies.  Starting with pending claims, Dr. Cantor calculates the average rate at which claims were dismissed with no payment during the 1998-2001 base period.  Although there are modest differences by disease, Dr. Cantor found overall that about 10% of all claims against T&N were dismissed with no payment, for an acceptance rate of about 90%.  Cantor

---

[13] Dr. Cantor performed a sensitivity analysis to illustrate the effect of eliminating the increase in mesothelioma values.  Cantor Supp. Report at pp. 43-44.  If mesothelioma values are held constant through the forecast period at the weighted average for 1998-2001, the forecast for

Supp. Report at pp. 33-34. The evidence at trial will show that Dr. Cantor's dismissal rates are

slightly lower than Dr. Peterson's, and her acceptance rates consequently are somewhat higher,

again illustrating that her estimate is conservative. The number of pending, compensable claims

is determined by multiplying the total number of pending claims by the calculated historical

acceptance rate. Dr. Cantor's estimate thus provides compensation for 96,650 of the 108,240

claims pending as of the petition date. *Id.* at p. 38.

       To predict the number of future compensable claims, Dr. Cantor relies on models

that utilize accepted, peer-reviewed epidemiological studies to predict the number of annual

deaths from three categories of malignant diseases (mesothelioma, lung cancer, and other

cancers) caused by asbestos exposure. To do this, Dr. Cantor compares the number of

compensated T&N claimants who died from each of these three disease categories during the

1998-2001 base period to the number of such deaths anticipated by the epidemiological forecasts

for the same period.[14] This yields a ratio described as the "propensity to compensate." To

---

future claims is reduced from $1.92 billion to $1.33 billion, reducing the total estimate from
$2.48 to $1.89 billion. *Id.* at p. 45.

[14] The logic of Dr. Cantor's methodology is indisputable. Because the epidemiological models
of disease incidence predict the number of deaths per year, logic compels that they should be
compared to the number of compensated claimants who actually died in the same year for
purposes of accurately calculating the propensity to compensate. Because the T&N database
does not have death year information for every claimant, Dr. Cantor had to look for that
information from other sources (the database maintained by the Manville Trust) or, where no
information was available, impute a death year based on a set of ordered rules and assumptions
about the relationship of filing date to death date. Dr. Cantor's methodology is explained in
detail in her Supplemental Report; the Property Damage Committee is confident the Court will
find it logical and compelling. Indeed, the evidence will show that only approximately 18
percent of claimants alleging malignant disease and who are relevant for the compensability
analysis have data indicating that they died in the same year that they filed. But because Dr.
Peterson ignores year of death and persists in comparing the number of claims *filed* in any
particular year to the epidemiological forecasts of the number of deaths in that year (thus
comparing apples to oranges), Dr. Cantor has performed a sensitivity analysis showing the effect
on her estimate of simply assuming that file year equals death year for all claims where actual

illustrate with round numbers for ease of analysis, if T&N compensated 2,000 mesothelioma

claimants who died in the year 1999, and the epidemiological forecast predicted that 3,000

people likely would have died from mesothelioma during that year on account of exposure to

asbestos, then the propensity to compensate is two-thirds, or 66.7%. Dr. Cantor then projects

into the future the calculated historical propensity to compensate for the 1998-2001 base period,

multiplying it by the future epidemiological forecast of the total number of anticipated deaths for

each disease category. The result is an estimate of the likely number of compensated claims, for

malignant diseases, for every year of the 54-year forecast period. Cantor Supp. Report at pp. 20-

26. To forecast the number of compensated, nonmalignant disease claims, Dr. Cantor uses a

methodology substantially identical to Dr. Peterson's. She calculates the historical ratio of

compensable asbestosis claims to compensable malignant claims (12.9 to 1) and the historical

ratio of compensable pleural claims to compensable malignant claims (0.2 to 1), then multiplies

those ratios to the forecast number of compensable malignant claims. *Id.* at pp. 26-28. Using

this methodology, Dr. Cantor forecasts in her base case estimate that T&N would compensate

almost 342,000 asbestosis claims and more than 4,500 pleural disease claims between 2001 and

2054. *Id.* at p. 39.

**B.    Dr. Peterson's Forecast Is Not Credible**

**1.    Overview of Dr. Peterson's Forecast**

In contrast to Dr. Cantor's qualifications as an economist, the ACC's Dr. Peterson

is trained as a lawyer and social psychologist. While Dr. Cantor regularly is called upon to

prepare forecasts of asbestos claims and numerous other types of forecasts, Dr. Peterson does

substantially all of his work in the area of asbestos estimation and is retained regularly as an

---

death year information was not available. This results in an increase of only $300 million to her
forecast. Cantor Supp. Report at p. 43.

expert/advocate on claims estimation by asbestos claimants committees. Dr. Peterson reliably produces the highest estimates among all parties in case after case, including the recent *Owens Corning* case where Judge Fullam rejected his $11 billion forecast and instead estimated Owens Corning's total liability at $7.0 billion. Judge Fullam specifically rejected Dr. Peterson's forecast of spiraling increases in claiming rates over the already extraordinarily high rates observed in the years preceding Owens Corning's October 2000 bankruptcy filing, finding that he had improperly forecast an aberrational surge in claims into the future and "failed adequately to take into account the changes in the asbestos litigation landscape which have already occurred and which will likely continue." 322 B.R. at 725. The evidence in this case similarly will show that Dr. Peterson's estimate here is not credible.

As Dr. Cantor does, Dr. Peterson estimates pending claims separately from future claims. Dr. Peterson's estimate of pending claims is $1.352 billion at present value. Thus, he values 134,235 pending claims at $930 million more than Dr. Cantor's estimate of $420 million. Given that both forecasters have similar counts of pending claims, and calculate similar dismissal rates, the difference can be explained only by the claim values assigned. The difference as to future claims is even more stark. Dr. Peterson's preferred forecast, which is based on increasing claim values and claiming rates, is $9.724 billion at present value, $7.8 billion more than Dr. Cantor's estimate. We demonstrate in the following subsection that Dr. Peterson's claim values bear no relation to T&N's actual claims history and are so methodologically flawed that they cast profound doubt on his entire estimate.

## 2. Dr. Peterson's Forecast Claim Values Are Untenable

Contrary to the instruction of *Eagle-Picher*, the ACC's estimate ignores the claims history of this company, deriving claim values instead from the scheduled values established in the trust distribution procedures. As the evidence at trial will show, however, the

TDPs are nothing more than a set of values agreed upon by the ACC and the FCR, based on Dr. Peterson's own recommendations. The *Eagle-Picher* case forecloses use of TDP values as a method of estimating claims, and a simple example illustrates why TDP values have no place in claims estimation. Assume a trust with $500,000 in assets and five disputed claims to pay. The TDPs for this hypothetical trust could provide that each claim will be valued at $200,000, for a total of $1 million. This would result in a 50 percent recovery, with each claimant receiving $100,000 in value. The same hypothetical trust, however, could provide that each claim will be valued at $1 million. This would result in only a 10 percent recovery, but each claimant would still receive the same $100,000 payment. The potential for manipulation here is self evident, particularly where the TDP schedule values are set by representatives of the claimants who will recover from the trust, and who have a self-interest in setting claim values as high as possible in order to drive down the distribution ratios for other creditors under the Plan because doing so will increase the value of the stock that the trust will receive.

      To be sure, in getting to his TDP-derived claim values, Dr. Peterson does make a *post hoc* attempt to get to the same place by other means. But the analysis he uses is methodologically flawed and inconsistent with the considerations set forth in *Eagle-Picher* and must therefore be rejected. In his attempt to justify steeply increasing claim values, Dr. Peterson relies selectively on claims data from other defendants, including Armstrong World Industries, Owens Corning, and Babcock & Wilcox. Peterson's use of this convenience sample of claims data from other bankruptcy cases with no "definitive showing" that the products made or distributed by these companies were "identical" to those made and distributed by T&N, directly contravenes the determination in *Eagle-Picher* that the claim estimate should be based "primarily on the history of *this company*." *Eagle-Picher*, 189 B.R. at 690 (emphasis added). Even more

remarkably, in using his convenience sample of ostensibly comparable companies, Dr. Peterson omits all reference to data from two other Federal-Mogul subsidiaries – Ferrodo and Flexitalic – to which he had access and which flatly contradict his assumptions of increasing claim values. Dr. Peterson's use of a convenience sample of data from a handful of companies that happens to support his thesis about increasing claim values is the worst kind of junk science and the Court should reject it.

Dr. Peterson compounds his errors by basing his claim values for all diseases on mesothelioma values. There is no disagreement that T&N's settlement values for mesothelioma claims were rising. But, as the evidence at trial will demonstrate, the actual values for lung cancer, other cancer, and nonmalignant diseases, as observed in the data, were essentially flat or declining. Peterson ignores this, instead choosing to tie the values for the other diseases to the rising mesothelioma values. This is the most elementary of statistical shenanigans. And if that error were not sufficient, Peterson compounds it even further by using data from *other companies* to calculate the claim value comparison between mesothelioma and other diseases rather than look at T&N's own data, which would have provided much lower ratios. Table 2, which compares Peterson's forecast disease values to the values actually experienced by T&N in 2001, as calculated by Dr. Cantor, illustrates how out of touch his forecast is with historical settlement values:

**Table 2      Peterson Claim Values (Forecast v. 2001 Actual)**

| Year | Mesothelioma | Lung Cancer | Other Cancers | Asbestosis | Pleural |
|------|-------------|-------------|---------------|------------|---------|
| 2001 (actual as calculated by Navigant) | $102,361 | $13,065 | $3,937 | $1,526 | $1,021 |
| Settlement in 2001 $ | $200,000 | $32,000 | $14,750 | $7,000 | $7,000 |

| Difference | +95% | +145% | +275% | +359% | +586% |
|---|---|---|---|---|---|

At trial, the Property Damage Committee will show that Dr. Peterson arrived at his TDP-derived values only after performing two other forecasts that used different methodologies and which estimated total liabilities for T&N at about half the $11.1 billion forecast. Furthermore, Dr. Peterson's own analyses show that the use of T&N actual, historical claim values – even with an unreasonably short two-year base period – results in an estimate of $3.6 billion at present value for pending and future claims combined. Supplemental Report of Dr. Mark A. Peterson, filed April 26, 2005, at p.8.

### 3.    Dr. Peterson's Increasing Propensity To Sue Model Is Flawed

The evidence will show that Dr. Peterson's forecast of future claim counts suffers from as many or more infirmities as does his calculation of claim values. As a starting point, Dr. Peterson uses an unreasonably short two-year base period in calculating propensity to sue. This exaggerates the effect of higher claiming rates observed in the period immediately preceding T&N's bankruptcy filing, a time when many defendants saw increased numbers of claims. The Property Damage Committee will show at trial that the increases in claiming rates against T&N, and against other defendants, in past years was not an expression of additional manifestations of disease or sustainable increases in claiming rates; it was the result of gross abuses of the litigation system, including aggregation of cases in plaintiff-friendly jurisdictions, ever-increasing numbers of unimpaired claimants, and rampant use of questionable (if not outright fraudulent) lawyer-sponsored medical screening techniques. *See, e.g.*, RAND Institute for Civil Justice, *Asbestos Litigation Costs and Compensation: An Interim Report*, 21 (RAND 2002) (the "*RAND Report*") ("In sum, it appears that a large and growing proportion of the claims entering

the system in recent years were submitted by individuals who have not incurred an injury that affects their ability to perform activities of daily living."); Debtors' Informational Brief, at 11-13, filed October 2, 2001 (noting that despite the fact that any meaningful workplace exposure to asbestos long ago ceased, the flow of cases continues unabated due to, *inter alia*, the aggregation of impaired and unimpaired claims, mass screening programs, and claims based on questionable diagnostic techniques, and other abuses of the tort system.).

        Starting with propensities to sue measured during a peak of claiming activity, Dr. Peterson then ramps up the number of claims even further by projecting still more increases in claiming rates over the first five years of his forecast period. To illustrate, Dr. Peterson's estimate has the annual rate of nonmalignant claims filing increasing from the 39,000 actually filed in 2000 to over 56,000 projected by 2006. These claiming rates are completely unsustainable and certainly would fall off as defendants challenge sham diagnoses of asbestos-related diseases from irresponsible doctors hired by law firms for the specific purpose of generating inventories of plaintiffs. *See* pp. 37-40, below.

        As Judge Fullam rejected Dr. Peterson's increasing propensity to sue model in *Owens Corning*, so too should the Court reject it here.

## C.    **Comparison of Cantor and Peterson Forecasts**

        While there are many small differences in the methodologies and assumptions employed by Drs. Cantor and Peterson, just two fundamental differences account for the vast majority of the spread between Dr. Cantor's reasonable $2.5 billion estimate and Dr. Peterson's unsupportable $11.1 billion. The first of these is that Dr. Peterson relies heavily on the unstable variable of claim filings as the basis for his forecast, in contrast to Dr. Cantor's reliance on the more stable measure of compensability rates. The second is Dr. Peterson's stunning departure from T&N's actual claims history in deriving his wildly escalating claim values and his reliance

on untested speculation at T&N's future outside of the CCR as the justification for doing so. In subsection 5, we discuss these two fundamental differences. We then discuss alternate reasons why Dr. Peterson's estimate is unrealistic.

### 1.    Compensability Rates Versus Claiming Rates

In projecting T&N's future, Dr. Cantor takes her signals from the numbers of claims the company actually compensated in the past, finding that number relatively stable over time. Compensated claims is an appropriate measure because it reflects the number of claims that actually got paid – that is, claims that were presented by plaintiffs, evaluated by the company, and resolved – and takes account of behavior on both the plaintiff side and the defense side.

Dr. Peterson, in sharp contrast, takes his signals from claim filings. He sees substantially increasing claim filings in the years preceding bankruptcy and conforms his model to fit his theory that there was a permanent change in the level of claims T&N would need to compensate. The problem with his method, however, is that it looks at only one side of the behavior equation – the plaintiff side. What he fails to account for is the possibility that dramatically increased claiming activity does not necessarily mean an increase in liability of similar magnitude. The Property Damage Committee will illuminate this fundamental error in forecasting with extensive evidence showing that historic claim filing rates bear little relation to T&N's future liability.

### 2.    Dr. Peterson's Forecast Is Founded on Untested Speculation

The basic premise of the ACC's forecast of increasing claim values and claiming rates is that T&N would have fared much worse in asbestos litigation after dissolution of the CCR. Dr. Peterson's prediction of significantly increased liability is not based on any empirical analysis, but rather is grounded in speculation about three alleged facets of the post-CCR world:

(1) loss of the shield of CCR's liability-sharing mechanism would have resulted in more liability for T&N; (2) publication in 2000 of a muckraking book on T&N's history would have spurred the plaintiffs' bar to more aggressively pursue as a target defendant; and (3) bankruptcies of various co-defendants would have resulted in more liability for T&N, if we were to pretend that it were solvent.

Dr. Peterson purports to rely on conversations with T&N's defense counsel to support his theory that the end of the CCR inevitably meant increasing liability for T&N. The Property Damage Committee, however, will present extensive evidence at trial showing that Dr. Peterson's increasing-liability theories are factually incorrect and economically unsound. This evidence will include the testimony of company witnesses themselves that they saw the end of the CCR as a potential opportunity to better control liabilities, as well as documents and testimony about the operation of the CCR demonstrating that plaintiffs had every incentive to pursue T&N aggressively even when it was in the CCR. *See, e.g.*, Queena Sook Kim, *Asbestos Claims Continue to Mount – Did Broker of Settlements Unwittingly Encourage More Plaintiffs' Suits?*, Wall St. J., Feb. 7, 2001, at B1 (reporting statements from various parties to the effect that the CCR actually may have encouraged higher filing rates); Michael Strong, *Federal-Mogul Gets More Credit, Pulls Out of Asbestos Group*, Crain's Detroit Business, January 8, 2001 at 4 (noting that after Federal-Mogul withdrew from the CCR it presented a new asbestos strategy to its banks and persuaded them to extend Federal-Mogul $550 million in new credit). Furthermore, we will offer expert testimony based on empirical analysis and basic economic theory showing that the behaviors Dr. Peterson purports to predict are neither borne out by experience nor economically rational.

In evaluating Dr. Peterson's untested supposition and speculation about T&N's future, it will be useful to recall that the "future" for purposes of the estimate begins in the fall of 2001. We thus have three and one-half years of actual data against which Dr. Peterson's projections of the future can be measured and their accuracy tested. As Justice Cardozo wrote: "prophecy, however honest, is generally a poor substitute for experience . . . . We have said of an attempt . . . to give prophecy the first place and experience the second that 'elaborate calculations which are at war with realities are of no avail.'" *West Gas Ohio Co. v. Public Util. Comm'n of Ohio*, 294 U.S. 79, 82 (1935) (citations omitted). Justice Cardozo continued with words applicable here: "A forecast gives us one rate. A survey gives another. To prefer the forecast to the survey is an arbitrary judgment." *Id.* While Dr. Peterson tries to predict the future with a forecast based on stale, anecdotal information, Dr. Cantor actually surveyed the data available since the fall of 2001 and will offer testimony at trial showing that Dr. Peterson's forecast simply was dead wrong. The evidence will show:

- After leaving the CCR, T&N actually paid less, on average, to settle lung cancer, other cancer, and nonmalignant claims than it did before leaving the CCR, and the data on mesothelioma claims is far too sparse to permit any conclusion that there is a trend of increasing values in post-CCR settlements. Cantor Supp. Report at pp. 18-19.

- Industry-wide claiming rates and claim values showed declining trends between 2001 and the present. Rebuttal Report of Dr. Robin A. Cantor at pp. 18-22. This holds true for asbestos companies that were former CCR members as well as those that were not.

- Claims recorded by the Manville and H.K. Porter trusts decreased sharply in 2004 and remain far lower in 2005 than they were in 2001. Cantor Rebuttal Report at p. 19.

Dr. Cantor's empirical analyses rebut any contention that the demise of the CCR or the bankruptcies of other defendants would have had any significant effect on T&N.[15]

Even more speculative and unrealistic is Dr. Peterson's contention that the 2000 publication of *Magic Mineral to Killer Dust: Turner & Newall and the Asbestos Hazard,* by Geoffrey Tweedale, would have increased claim filings and claim values because it highlighted bad T&N "corporate conduct" documents. Most importantly, the *Magic Mineral* book did not contain any new information about the T&N documents when it was published. This information was reported in the popular press as early as 1993 after the documents were produced by T&N to Chase Manhattan Bank in litigation over asbestos property damage claims, *see* Todd Woody, *Chase Man's Unlikely Heroics,* Mother Jones, Nov./Dec. 1993, and the trove of allegedly inflammatory corporate documents was made available to plaintiffs lawyers in the United States at that time. *Id.* The Woody article went on to predict that while "T&N has mostly been able to avoid being dragged into American courts, where substantial asbestos-related settlements have been awarded to victims suffering from mesothelioma and other diseases . . . the documents uncovered by Chase attorneys may change all that." *Id.* That article even quoted a plaintiffs' lawyer stating that, while T&N "had dodged the bullet in the past," the publication of these documents would change T&N's future liability. *Id.* The existence of these documents received even wider attention via a 1996 *American Lawyer* article which described

---

[15] Texas – the forum in which the highest percentage of claims against T&N are pending – passed a law in 2003 that permitted liability to be apportioned to third parties such as bankrupt entities, thus alleviating any impact of T&N's competitors' bankruptcies in that jurisdiction.

the T&N documents in detail. Vera Titunik, *Chase's Case Turns to Dust*, The American

Lawyer, Vol. XVIII, No. 4 (May 1996). Another *American Lawyer* article from the mid-1990s

shows that Chase shared the T&N documents freely with plaintiffs' attorneys and made them

available to interested parties through a computerized document imaging system, and that the

documents were publicly available in England in the House of Commons Library. Vera Titunik,

*Chase Manhattan Bank Arms the English Plaintiffs' Bar*, The American Lawyer, Vol. XVIII,

No. 4 (May 1996). Dr. Peterson's predictions of doom for T&N based on the documents

discussed in the *Magic Mineral* book are thus nothing more than recycled prophecies from more

than a decade ago. Any effect these document might have on T&N's ability to manage its

asbestos liabilities is fairly reflected in the 250,000 or so historic claim resolutions and that is

precisely why the claims database is the best predictor of the future.

### 3. Punitive Damages Should Not Be Allowed

Dr. Peterson's heavy reliance on the *Magic Mineral* book as evidence of

increasing claim values can only mean that he is forecasting increases due to the inflammatory

impact of corporate documents and allegations of corporate misconduct. In other words, his

model is built on the assumption that fact finders would assess higher damage awards against

T&N to punish it for alleged bad conduct. As a matter of law and equity, the estimation of

T&N's pending and future asbestos liability cannot permissibly incorporate punitive damages.

Abundant precedent establishes that punitive damages should not be payable to unsecured

creditors in a bankruptcy case if compensatory creditor claims are not paid in full. *See, e.g. In

re Johns-Manville Corp.*, 68 B.R. 618, 627-28 (Bankr. S.D.N.Y. 1986) *aff'd in part, rev'd in

part,* 78 B.R. 407 (Bankr. S.D.N.Y. 1987), *aff'd* 843 F.2d 636 (2d. Cir. 1988) (holding that "it is

well within the equitable power granted by §105 of the Code to preclude, by means of the

injunction, recovery of punitive damages in this reorganization" since "allowing such a [punitive

damage] claim would ill serve the policy of such awards."). Under the Plan in this case, as in *Johns-Manville*, asbestos-related personal injury claims will be channeled to and paid by a trust, not by the reorganized debtor. Because the purpose of punitive damages "is to punish tortfeasors and deter them from their wrongful conduct," and "[t]he Trust is not, by any stretch of the imagination, a target to be deterred from wrongful conduct," recovery of punitive damages by personal injury claimants in this case would serve no legitimate purpose. *Id.* at 627; *see also In re GAC Corp.*, 681 F.2d 1295, 1301 (11th Cir. 1982).[16] As Judge Fullam recently noted in holding that punitive damages should not be included in the calculation to estimate asbestos personal injury liability: "as a practical matter, it seems highly doubtful that, in today's tort system, punitive damages would be allowed in any substantial amount, in most jurisdictions, to deter tortious conduct which ended more than twenty years ago." *Owens Corning*, 322 B.R. at 724.

Punitive damages are also inappropriate under the so-called "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code. *Owens Corning*, 719 B.R. at 723. Section 726(a)(4) of the Bankruptcy Code subordinates the payment in a chapter 7 liquidation of "any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim. . . ." until *all* other secured and unsecured claims are paid in full.

---

[16] This is not to say that punitive damages are *never* allowable in chapter 11; rather, they are unavailable when the facts of a case mandate their disallowance under equitable principles. For example, the Seventh Circuit has recently stated in dicta that there is not a "federal bar" to punitive damages in chapter 11. *See A.G. Financial Service Center, Inc.*, 395 F.3d 410, 411 (7th Cir. 2005). The *A.G. Financial* court indicated, however, that the subordination of punitive damages is "open to independent consideration under the terms of the Bankruptcy Code," and that it should be dealt with on a case-by-case basis. *Id.*

Section 1129(a)(7) mandates that any holder of a claim who votes against confirmation of a chapter 11 plan must receive or retain under such plan "not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title." Punitive damages would be subordinated to claims for compensatory damages in a chapter 7 liquidation. Because the Plan here must satisfy the best interests test, the Court is well within its discretion to consider the degree to which an estimate of asbestos personal injury includes punitive damages and reduce it accordingly.

Dr. Peterson's estimate's reliance on increased punitive damages collapses under the weight of the very Plan proposed in this case, which bars asbestos claimants from recovering punitive damages against the proposed trust. *See* Federal-Mogul Form of Asbestos Personal Injury Trust Distribution Procedures, Section VII.4. The proposed Trust Distribution Procedures state that in determining the value of any claim, punitive damages "shall not be considered or allowed, notwithstanding their availability in the tort system." *Id.* Given that the current TDP values exceed historical claim values in part because of Dr. Peterson's assumption that punitive damages against T&N would increase, the proposed TDP is inherently self-contradictory.

Dr. Cantor has analyzed the effect of punitive damage awards on claim values and concluded that there is a positive correlation between the long-term trend in punitive damage awards in asbestos cases and the long-term trend in T&N settlement averages. Cantor Supp. Report at 31-33. While she finds a correlation between the two, she makes no deduction for any punitive component of T&N's historic or projected resolution costs, illustrating once again how conservative her estimate is. Because, as we have demonstrated above, punitive damages should not be included when assessing the aggregate, allowable amount of asbestos personal injury claims, Dr. Cantor's estimate likely substantially overstates T&N's liability.

### 4.    Dr. Peterson's Estimate Is Inconsistent With the Medical Evidence Demonstrating That Asbestos-Related Diseases Are Declining

Medical evidence demonstrates that future asbestos liability should be lower than in the past. "As workplace exposures [to asbestos] have been substantially reduced in the last several decades, asbestos-related health effects have become less prevalent." *See* Comments on the Report of Dr. Laura S. Welch, M.D. by Dr. Hans Weill, M.D., filed May 12, 2005 (the "Weill Report"). As Dr. Weill will testify, there has been a "markedly diminishing number of new cases of asbestosis" during the past few decades. *Id.* This downward trend will continue as more time passes from the period in which people were exposed to harmful doses of asbestos. Furthermore, the declining incidence of asbestosis means a declining risk of lung cancer due to asbestos. Finally, Dr. Weill will testify that incidence of mesothelioma, the most serious and costly asbestos-related disease, reached its peak in the early to mid 1990s and has declined since then – a trend that will continue. Thus, the medical evidence establishes that the future should be better, not worse, than the past.

### 5.    The Litigation Landscape Has Changed Since the Debtors Filed For Bankruptcy in 2001

The ACC's $11.1 billon estimate in this case views 2001 as a mere jumping-off point from which circumstances would have only gotten worse for T&N. Judge Fullam rejected precisely that view in *Owens Corning*, noting the substantial changes in the tort system since 2001. In fact, Judge Fullam rejected Dr. Peterson's estimate, noting that he "failed adequately to take into account the changes in the asbestos litigation landscape which have already occurred and which will likely continue." 322 B.R. at 725.

The Debtors actually detailed the factors which led to escalating claim rates and claim values up until 2001 that drove them into bankruptcy in their "informational brief," filed the day these chapter 11 cases began. Debtors' Informational Brief at 12-14, *In re Federal*

*Mogul, Inc.* et al., Chapter 11 Case No. 01-10578, October 1, 2001 (Bankr. D. Del.) ("Debtors' Informational Brief"). The Debtors described asbestos litigation as a relentless cycle of a huge volume of claims asserted mainly by people with no diagnosable injury and who relied on suspect medical evidence. This volume mandated that the Debtors settle even the weakest cases, which in turn, increased incentives for plaintiffs to file even more claims. In particular, the Debtors identified three specific distortions of the litigation system that contributed to its asbestos liability: 1) consolidations of claims of the uninjured with the more seriously injured; 2) claims by unimpaired claimants; and 3) claims generated by mass screenings using dubious medical evidence. These abuses have been redressed in the past four years, particularly in states where a high percent of claims against T&N were pending or had been resolved.

### a.    **Aggregation of Claims**

As the Debtors represented to the Bankruptcy Court, the volume of asbestos cases caused state courts to consolidate hundreds or even thousands of cases together for a single trial. (Debtors' Informational Brief at 13.) Claimants with different diseases, different jobs and different work histories were joined together, making it much harder for companies like T&N to defend themselves. The Debtors observed that when unimpaired claimants were grouped with impaired claimants for trial it gave "the so-called unimpaired 'sympathy by association' in front of a jury." *Id.* According to the Debtors, "as a result, aggregation 'makes it more likely that a defendant will be found liable and results in significantly higher damage awards. Aggregation therefore has increased the pressure to settle claims brought by individuals who have suffered no injury or who do not currently have significant impairment." *Id.* at 12; *see also Owens Corning,* 322 B.R. at 723 (where cases were aggregated, "the presence of serious cases tended to result in higher verdicts or settlements for the 'unimpaired' cases").

The issue of consolidations has been dealt with, particularly in jurisdictions in which T&N was often sued. In the past month, Texas abolished consolidations via recent legislation after permitting them throughout the 1990s. S.B. 15, 79th Leg., Reg. Sess. § 2 (Tex. 2005) (to be codified at Tex. Civ. Prac. & Rem. Code Ann. § 90.009). This is particularly significant because Texas accounted for at least 20% of all open claims against T&N, and 11.6% of all closed claims. As discussed below, barring consolidations was one of only a series of wide-ranging reforms of asbestos litigation recently enacted by the Texas legislature.

Mississippi also historically had a high number of consolidations, *see* Stephen J. Carroll *et al.*, *Asbestos Litigation* 38-39, RAND Institute for Civil Justice (2005) (hereinafter "Carroll, *Asbestos Litigation*"), because that state permitted virtually all claims to be joined together.[17] As Dr. Cantor will testify, at least 10.25% of all closed claims and 5.7% of open claims against T&N were filed in Mississippi. Cantor Supp. Report at 28. Problems in that jurisdiction were exacerbated because Mississippi was a magnet for forum-shoppers; under Mississippi rules "plaintiffs from outside the state who wished to join litigation could do so under the provisions of a unique mass joinder rule, Miss. R.C.P. 20, that required only that a single plaintiff meet state venue requirements. *Id.* at 29. The Mississippi Supreme Court has shut down these abuses. In *3M Co. v. Johnson,* it held that a trial court had improperly joined together the cases of plaintiffs working in "different occupations, for different employers, at different times . . . [with] unique medical histories, work histories, differing exposures and *differing diagnoses*," and reversed verdicts totaling $150 million in favor of six plaintiffs against seven defendants. 895 So.2d 151, 158-59 (Miss. 2005) (emphasis added). Mississippi also

---

[17] Mississippi was the second largest forum for asbestos suits – between 1998 and 2000, 18% of all asbestos suits were filed there, up from only 5% between 1993-1997. Carroll, *Asbestos Litigation*, 62.

closed its doors to out-of-state plaintiffs who took advantage of its loose joinder rules. *See Harold's Auto Parts, Inc. v. Mangialardi*, 889 So.2d 493,495 (Miss. 2004) (reversing the joinder of cases of plaintiffs with no connection to Mississippi, and terming the practice a "perversion of the judicial system.")[18]

### b.    **Payment to Unimpaired Claimants**

Claims from unimpaired individuals also inflated payments and claiming rates – in 2001, Federal-Mogul's then-Chairman and Chief Executive Robert S. Miller stated that approximately 90% of its asbestos payments went to claimants with no ill effects from asbestos exposure. Paul Sherer, *New Credit Aids Federal-Mogul in Asbestos Battle*, Wall Street J., January 4, 2001 at A 10.[19] The Debtors' acknowledgement that unimpaired claimants drove up litigation costs and that 90% of its payments went to claimants who were not sick is consistent with studies that "have found fractions of unimpaired claimants ranging from two-thirds up to 90% of all current claimants," as of 2002. Carroll, *Asbestos Litigation* at 76. The RAND Corporation concluded that "based on the available data . . . a large and growing proportion of the claims entering the system in recent years was submitted by individuals who had not at the time of the claim filing suffered an injury that had as yet affected their ability to perform the activities of daily living." *Id.*

---

[18] For example, a Mississippi trial court recently dismissed the claims of thousands of Alabama residents who failed to allege exposure to asbestos products in Mississippi. *Noble v. E.H. O'Neil Co.*, Civ. Action No. 98-0024 (Miss. Cir. Ct. Jan. 24, 2005).

[19] Payments to unimpaired claimants did not just hurt the Debtors. President Clinton's former Chairman of the Council of Economic Advisors has demonstrated how payments to unimpaired claimants have devastated scores of companies, their workers and communities by forcing lay-offs and plant closures. *See* Joseph E. Stiglitz, *et al.*, *The Impact of Asbestos Liabilities on Workers in Bankrupt Firms*, Sebago Assocs. (2002) (http://www.asbestossolution.org/stiglitz_report.pdf).

In recent months, however, Ohio, Texas, Florida and Georgia have passed statutes which bar plaintiffs from recovering damages if they cannot prove impairment.[20] This applies to both pending and future causes of action and is an enormously significant change from the asbestos litigation system in the 1990s.[21] Despite this, Dr. Peterson assumes that claiming rates will continue to spiral upward from 2001, when those states permitted recovery by unimpaired plaintiffs, rather than remain flat or decrease.

### c.    Mass Screenings and Suspect Medical Evidence

The Debtors also noted that their claims settlement history was distorted because aggregations and unimpaired claims which "encouraged additional [claims] filings." Debtors' Informational Brief at 13. These claims were largely a product of "mass screening programs [which] have fostered huge numbers of claims by those who are unimpaired." *Id.* In a submission to another federal court, a leading plaintiffs' attorney noted that Manville Personal Injury Trust estimated in 2002 that "90% of the Trust's last 200,000 claims have come from attorney-sponsored X-ray screening programs . . . and 91% of all claims allege only nonmalignant asbestos 'disease,' and these cases receive 76% of all Trust funds." S. Rep. No.

---

[20] Georgia: H.B. 416, 2005-2006 Gen. Assem., Reg. Sess. § 1 (Ga. 2005) (to be codified at Ga. Code Ann. § 51-14-3(b)); Florida: H.B. 1019, 2005 Leg., Reg. Sess. § 5(2) (Fla. 2005); Texas: S.B. 15, 79th Leg., Reg. Sess. § 2 (Tex. 2005) (to be codified at Tex. Civ. Prac. & Rem. Code Ann. § 90.007); Ohio: H.B. 292, 125th Gen. Assem. § 1 (Ohio 2004) (to be codified at Ohio Rev. Code Ann. § 2307.92(B)); *but see Thornton v. A-Best Products*, Case No. CV-99-395724 (Cuyahoga Ct. of Common Pleas, Jan. 10, 2005) (trial court held statute unconstitutional as applied retroactively to existing claims).

[21] Additionally, a number of federal courts and states have recently effectively eliminated compensation for unimpaired nonmalignant plaintiffs, placing their cases on pleural registries, which tolls those cases unless and until some manifestation of impairment occurs. *See* Victor E. Schwartz, *et al.*, *Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) And Case Management Plans That Defer Claims Filed by the Non-Sick*, 31 Pepp. L. Rev. 271 (2003) (cataloging numerous jurisdictions which have "inactive dockets" and pleural registries).

108-118 at 84 (2003) (citing letter from Steven Kazan to the Hon. Jack B. Weinstein, dated July 23, 2002).

The state statutes referred to above will curtail the use of "mass-screened" evidence, a major driver of the asbestos litigation mess in 2001. Again, this emphasizes the folly of Dr. Peterson's use of 2001 as a jumping off point, rather than recognizing that 2001 represented an aberration. For example, the Ohio statute requires that evidence supporting an asbestos-related impairment must be made by a treating physician who has or had a doctor-patient relationship with the claimant. *See* Ohio H.B. 292, 125th Ohio Gen. Assemb. 19-20 (2004). The other statutes have similar provisions.[22] These statutes also prohibit the use of medical reports from doctors who spend more than 25% of their professional practice time providing consulting or expert service in connection with actual or potential tort actions. *Id.* It bears noting that when Dr. Peterson's estimate was rejected by Judge Fullam in *Owens Corning* for failing to take into account changes in asbestos litigation, legislatures in Texas, Florida and Georgia had not yet even adopted these new laws.

Moreover, in 2002, United States District Judge Weiner, who oversees the federal asbestos multidistrict litigation, took the step of dismissing, without prejudice, all claims that resulted from mass asbestos screenings. *In re Asbestos Prods. Liab. Litig. (No. VI)*, Civil Action No. MDL 875, 2002 WL 32151574 at *1-2 (E.D. Pa. Jan. 8, 2002) (Admin. Order No. 8) (the "MDL Order 8"). Plaintiffs in federal court can only revive their claims by producing evidence of impairment or evidence not generated through mass screening techniques. MDL Order 8 at 2.

---

[22] H.B. 416, 2005-2006 Gen. Assem., Reg. Sess. § 1 (Ga. 2005) (to be codified at Ga. Code Ann. § 51-14-2(15)); *See* H.B. 1019, 2005 Leg., Reg. Sess. § 3(23) (Fla. 2005); *See* S.B. 15, 79th Leg., Reg. Sess. § 2 (Tex. 2005) (to be codified at Tex. Civ. Prac. & Rem. Code Ann. §§ 90.002-09.003, 09.007).

The Debtors also identified the fact that mass screenings relied upon suspect medical evidence, stating in their information brief that: "[l]arge numbers of claims are generated based on questionable diagnostic techniques." (Debtors' Informational Brief at 14.) In 2002, Judge Weinstein noted that "a number of studies have shown that some plaintiffs' doctors consistently over-diagnose asbestos-related conditions," *In re Joint E. & S. D. N.Y. Asbestos Litig.*, 237 F. Supp. 2d 297, 309, and more recently, Judge Fullam observed that certain pro-plaintiff medical experts "were so biased that their readings were simply unreliable." *Owens Corning v. Credit Suisse First Boston*, 719 B.R. at 723. Last year, a team from Johns Hopkins Medical Institutions published a study showing that among a cohort in which plaintiffs-selected B-readers found 96% of the chest X-rays consistent with asbestosis, the Johns Hopkins researchers found only 4.5% of the same set of cases positive. Joseph N. Gitlin, *et al.*, *Comparison of "B" Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 (2004). The difference between the readings from neutral B-readers and those selected by asbestos law firms could not be explained by sheer coincidence.[23]

The disturbing practices of plaintiff-selected medical experts are apparently the subject of an ongoing federal criminal investigation. A grand jury in Manhattan is investigating potential crimes by doctors who submitted high numbers of diagnoses in silica and asbestos cases. Jonathan D. Glater, *Civil Suits Over Silica in Texas Become a Criminal Matter in New York*, New York Times, May 18, 2005, at C5. The United States District Judge overseeing the

---

[23] Another study by different radiologists who were given no information as to the source of X-rays evaluated 439 chest radiographs of individuals who claimed a compensable asbestos-related disease. R.B. Reger, *et al.*, *Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation*, 32 J. Occup. Med. 1088 (1990) (the "Reger Study"). The review of those X-rays found a likely prevalence of asbestos-related conditions in between eleven and sixteen people—or 2.5 to 3.5%. *Id.* This study found that actual incidence of asbestos-related disease was *40-fold* lower than plaintiffs' experts originally found.

silicosis multidistrict litigation has observed that the practices used in those cases (by doctors who are among the most prolific experts in asbestos cases) raise "great red flags of fraud." *Id.*

\*\*\*\*

In sum, the changes in the asbestos litigation system since 2001 demonstrate that Dr. Peterson's estimate, which assumes that things would get far worse for T&N rather than improve, is unreliable. It bears emphasis that these changes would, in all likelihood, support a far lower estimate than the one Dr. Cantor submitted. However, out of an abundance of caution her estimate assumes that claim values would continue to increase for mesothelioma and stay consistent with historical weighted averages for other claims and that T&N would continue to compensate the same rate of claimants generally consistent with past trends rather than escalating from 2001.

## V.    CONCLUSION

For the foregoing reasons, and based upon the evidence it will adduce at trial, the Property Damage Committee submits that the count should estimate the aggregate value of T&N's pending and future U.S. asbestos personal injury claims as $2.5 billion.

Dated: May 31, 2005                         Respectfully Submitted,

                                            FERRY, JOSEPH & PEARCE, P.A.

                                            /s/ Theodore J. Tacconelli
                                            Theodore J. Tacconelli (No. 2678)
                                            Rick S. Miller (No. 3418)
                                            824 Market Street, Suite 904
                                            Wilmington, DE 19899
                                            Telephone: (302) 575-1555

                                            LOCAL COUNSEL TO THE OFFICIAL
                                            COMMITTEE OF ASBESTOS PROPERTY
                                            DAMAGE CLAIMANTS

                                            -and-

WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock, Esquire
Michael P. Kessler, Esquire
Adam P. Strochak, Esquire
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF ASBESTOS PROPERTY
DAMAGE CLAIMANTS