UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FEDERAL-MOGUL CORP., et al., | : | Adv. Pro. No. 01-8885 |
| | : | [LEAD DOCKET] |
| Plaintiffs, | : | |
| | : | (Bk. Case No. 01-10578 et al.) |
| v. | : | (Federal-Mogul) |
| | : | |
| THE CENTER FOR CLAIMS | : | |
| RESOLUTION, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| ARMSTRONG WORLD INDUSTRIES, | : | Adv. Pro. No. 01-01160 |
| INC., | : | (Bk. Case No. 00-4471 et al.) |
| | : | (Armstrong World Indus.) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE CENTER FOR CLAIMS | : | |
| RESOLUTION, INC., et al. | : | |
| | : | |
| Defendants. | : | |
| | : | |
| USG CORP. And UNITED | : | Adv. Pro. No. 01-08932 |
| STATES GYPSUM, | : | (Bk. Case No. 01-2094 et al.) |
| | : | (USG Corp.) |
| Plaintiffs, | : | |
| | : | |
| v. | : | O P I N I O N |
| | : | |
| THE CENTER FOR CLAIMS | : | |
| RESOLUTION, INC., et al. | : | |
| | : | |
| Defendants. | : | |

APPEARANCES:                LAURIE SEIBER SILVERSTEIN, ESQ.
                            W. HARDING DRANE, JR., ESQ.
                            MONICA LEIGH LOFTIN, ESQ.
                            POTTER ANDERSON & CORROON LLP

Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801
    -and-
MICHAEL P. RICHMAN, ESQ.
JEAN-MARIE L. ATAMIAN, ESQ.
ANTHONY J. DIANA, ESQ.
MAYER BROWN ROWE & MAW
1675 Broadway
New York, New York 10019
(Attorneys for Defendants the Center
  for Claims Resolution, Inc.)

RICHARD T. PETERS, ESQ.
RICHARD SEEGMAN, ESQ.
SIDLEY AUSTIN BROWN & WOOD LLP
555 West Fifth Street
Suite 4000
Los Angeles, CA 90013
    -and-
LARRY J. NYHAN, ESQ.
JAMES F. CONLAN, ESQ.
MELVILLE W. WASHBURN, ESQ.
SARA K. RANKIN, ESQ.
SIDLEY AUSTIN BROWN & WOOD LLP
10 South Dearborn Street
Chicago, IL 60603
    -and-
LAURA DAVIS JONES, ESQ.
JAMES E. O'NEILL, III, ESQ.
PACHULSKI, STANG, ZIEHL, YOUNG
 & JONES P.C.
919 North Market Street
16th Floor
Wilmington, DE 19899
(Attorneys for Plaintiffs Federal-Mogul)

DAVID A. HICKERSON, ESQ.
CHRISTINE P. HSU, ESQ.
GEORGE J. HAZEL, ESQ.
WEIL, GOTSHAL & MANGES LLP
1501 K. Street, N.W., Suite 100
Washington, DC 20005
    -and-
STEPHEN KAROTKIN, ESQ.
DEBRA A. DANDENEAU, ESQ.
WEIL, GOTSHAL & MANGES LLP

2

767 Fifth Avenue
New York, NY 10153
    -and-
MARK D. COLLINS, ESQ.
REBECCA L. BOOTH, ESQ.
RICHARDS, LAYTON & FINGER P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
(Attorneys for Plaintiff
  Armstrong World Industries, Inc.)

CHAD H. GETTLEMAN, ESQ.
BRAD A. BERISH, ESQ.
JASON J. DEJONKER, ESQ.
ADELMAN, GETTLEMAN, MERENS,
 BERISH & CARTER, LTD.
53 West Jackson Boulevard
Suite 1050
Chicago, IL 60604
    -and-
R. KARL HILL, ESQ.
SEITZ, VANOGTROP & GREEN P.A.
222 Delaware Avenue
Suite 1500, Box 68
Wilmington, DE 19899
(Attorneys for Defendant Safeco
  Insurance Co. of America)

JONATHAN B. ALTER, ESQ.
TANYA TYMCHENKO, ESQ.
BINGHAM MCCUTCHEN LLP
One State Street
Hartford, CT   06103
    -and-
NEAL J. LEVITSKY, ESQ.
L. JASON CORNELL, ESQ.
FOX, ROTHSCHILD, O'BRIEN
 & FRANKEL, LLP
824 Market Street
Suite 810, Box 2323
Wilmington, DE 19899
(Attorneys for Defendant Travelers
  Casualty & Surety Co. of America)

DAVID G. HEIMAN, ESQ.
KATHLEEN B. BURKE, ESQ.
RICHARD I. WERDER, JR., ESQ.
ERIKA VAN AUSDALL, ESQ.

JONES, DAY, REAVIS & POGUE
North Point
901 Lakeside Avenue
Cleveland, OH 44114
   -and-
PAUL E. HARNER, ESQ.
BRAD B. ERENS, ESQ.
JONES, DAY, REAVIS & POGUE
77 West Wacker
Chicago, IL 60601
    -and-
PAUL R. DEFILIPPO, ESQ.
WOLLMUTH, MAHER & DEUTSCH LLP
One Gateway Center
9th Floor
Newark, NJ 07102
   -and-
DANIEL J. DEFRANCESCHI, ESQ.
PAUL N. HEATH, ESQ.
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(Attorneys for Plaintiffs USG
  Corp. and United States Gypsum Co.)

JOHN F. MULLEN, ESQ.
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
    -and-
MARK E. FELGER, ESQ.
COZEN O'CONNOR
1201 North Market Street
Suite 1400
Chase Manhattan Centre
Wilmington, DE 19801
(Attorneys for Defendants National
  Fire Ins. Co. of Hartford
  and Continental Casualty Co.)

KENNETH PASQUALE, ESQ.
MOSHE SASSON, ESQ.
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(Attorneys for Intervenor The
  Official Committee of Unsecured

4

Creditors of USG Corp.)

PETER D. WOLFSON, ESQ.
ROBERT B. MILLNER, ESQ.
KEVIN P. KAMRACZEWSKI, ESQ.
SONNENSCHEIN NATH & ROSENTHAL
1221 Avenue of the Americas
New York, NY 10020
          -and-
CHARLENE D. DAVIS, ESQ.
ERIC M. SUTTY, ESQ.
THE BAYARD FIRM
222 Delaware Avenue
Suite 900
Wilmington, DE 19801
(Co-Counsel to the Official Committee
   Of Unsecured Creditors of Federal-
   Mogul Global, Inc., et al.)

This matter is opened before the Court upon the cross-motions for summary judgment of each of the so-called "Non-CCR Parties"[1] and the Center for Claims Resolution ("CCR") for partial summary judgment. The scope of the ruling sought will be treated below, but, in short, the parties seek a determination of whether the CCR may draw on certain surety bonds purporting to secure the

---

[1]    The Non-CCR parties are plaintiffs Federal-Mogul Corp., T&N Limited ("T&N"), Gasket Holding, Inc. ("GHI") and Ferodo America, Inc. ("Ferodo")(collectively with T&N and GHI "Federal-Mogul"); plaintiff in intervention, the Federal-Mogul Unsecured Creditors Committee; plaintiff Armstrong World Industries, Inc. ("AWI"); plaintiffs USG Corp. and United States Gypsum (collectively, "USG" and together with Federal-Mogul and AWI, the "Debtors"); plaintiff in intervention, the USG Unsecured Creditors Committee and defendants Gafeco Insurance Co. of America ("Safeco"), Travelers Casualty & Surety Co. of America ("Travelers"), and National Fire Insurance Co. of America and Continental Casualty Co. (collectively, "National Fire," and together with Travelers and Safeco, the "Sureties").

obligations of the Debtors, denominated the "Phase One" issues in
the Order of this Court dated June 12, 2002. The Court has decided
the motion upon the written submissions of the parties. For the
reasons set forth below, the Court will grant in part and deny in
part the motion of the CCR. The Court will deny the motions of the
Non-CCR Parties. The Order of the Court will set forth the
judgment of the Court that the CCR may draw on the bonds to the
extent the Debtors are liable to the CCR. No immediate draw upon
the bonds will be permitted at this time, however. The Court will
not Order that the Sureties remit any funds to the CCR until
additional questions concerning the extent of the Debtors'
obligations have been resolved later in these proceedings.

## BACKGROUND

A thorough understanding of the relationships between the
parties is necessary to resolve this dispute. The CCR was formed
in 1988 by a number of corporations that either were or are
frequently named as co-defendants in asbestos personal injury
suits. The entity was incorporated in Delaware as a not-for-
profit corporation. The stated purpose was to "administer and
arrange for the evaluation, settlement, payment, and defense of
asbestos-related bodily injury claims." JA1632.[2] Instead of
stockholders, the CCR has member corporations. The Debtors

---

[2]    Page citations to the appendix submitted by the Non-CCR
parties are denominated "JA__." The CCR's appendix citations are
"CA__."

6

comprised three of the twenty-one member corporations in this action and, from 1990 onward, each of the Debtors had a representative on the five-member CCR board. CA1593.

The relationship of the CCR and its members was further governed by a document called the Producer Agreement. The version of this agreement that governs most of the period relevant to this proceeding became effective February 1, 1994. CA1. In the Producer Agreement, each CCR member appointed the CCR as its sole agent to settle asbestos claims and to make payments for those claims on its behalf. CA13. Liability for sums due under the settlements and for expenses were apportioned between the CCR members. These sums were billed to the members in accordance with certain Account Receivable Guidelines promulgated by the CCR. Membership in the CCR could be terminated by the member upon notice, by the CCR board for failure to pay amounts "due to or incurred by the Center on [the Member's] behalf," or, automatically, upon the filing of a bankruptcy petition. CA7.

In settling asbestos claims for its members, the CCR made use of a technique of wholesale settlement of claims. Under this technique, an agreement was reached between the CCR on behalf of its members and plaintiff law firms, presumably firms with a sufficient volume of claimants to give economies of scale. These agreements provide for varying amounts of recovery for claimants,

7

depending on the severity of an individual's illness, evidence of exposure to asbestos and other criteria. For the avoidance of confusion, the Court will refer to the agreements between the CCR and the plaintiffs' counsel as "settlement protocols," to distinguish them from settlement agreements with individual claimants. The protocols are, nonetheless, agreements, the scope and import of which will be discussed below.

The parties break the types of settlements into at least four discrete categories. One category is called by the parties "trial-list" settlements. These cover individual claimants whose cases have already been set for trial. Payment is usually in one lump sum. A second category concerns group settlements. This category in turn has two sub-groups. Some claimants had already retained the settling law firm when the protocol was negotiated. These claimants are referred to by the parties and in the relevant settlement protocols as "Present Claimants." Other claimants were purely hypothetical at the time the protocols were negotiated but were expected to retain the settling law firm in the future. These are called "Future Claimants." The law firm undertakes only to "strongly recommend" to its asbestos personal injury clients that they accept the recovery offered to them under the settlement.

The protocols provide that the plaintiffs' counsel will offer to the CCR and its members the opportunity to settle the

8

claims of Future Claimants on the same terms as the Present
Claimants.  It appears from the settlement protocols, that Future
Claimants are to be presented with a fully articulated scheme of
payments and claim evaluation when they first present themselves
at the law firm.  Plaintiffs' counsel are to offer the CCR the
opportunity, on a periodic basis, to settle whatever Future
Claims are have been made, e.g. semi-annually.  JA2258.

Thus a batch of claims submitted in February would be
payable the following August, assuming the claimants complied
with the requirements for documenting their claims.  In general,
the settlement protocols involve a series of set payments over a
period of time, for example the agreement beginning at JA2027
calls for payments from four to forty-eight million dollars semi-
annually from May 1999 to March 2003.

The settlement protocols explicitly state that the CCR is
settling the claims as the agent for the member companies.  The
plaintiffs' counsel represent that they are settling the cases as
agents for those persons who have (or who will in the future)
retain them.  Both Present Claimants and Future Claimants may
decline to accept the settlement negotiated for them.  If the
claimants do accept the settlement, and the firms represent in
the protocols that the vast majority of their clients will, then
the individual claimant need merely comply with the requirements
of the protocol for documentation of the claim and provide a

9

release for the settlement to be finalized and payment to be
forthcoming.

Should the claimant not consent, then that claimant is free
to continue on in the tort system. In that case, however, the
law firm undertakes not to prosecute the suit against a settling
CCR member except in accordance with requirements specified in
the agreement. These requirements are stringent, including
mandatory mediation and a substantial waiting period before
litigation can commence (or re-commence). Should a given number
of Present Claimants elect not to settle on the terms negotiated
between the CCR and their law firm, the CCR can unilaterally
terminate the agreement.

The record contains twenty-eight settlement protocols.
While they are not identical, twenty-four of them make specific
mention of the Producer Agreements with respect to each CCR-
member's obligation to pay. They contain the following language:

> Payments to Plaintiff Counsel by the CCR . . .
> shall be funded by the CCR member companies in
> accordance with the terms of the Producer
> Agreement . . . and each CCR member company shall
> be liable under this Settlement Agreement only for
> its individual share of such payments as
> determined under that Producer Agreement.

E.g., JA2036. These twenty-four protocols further provide that,
if the CCR fails to make a scheduled payment because a member had
failed to remit its share to the CCR, then the settling law firm
had the option of terminating the entire protocol or terminating

it only with respect to the defaulting CCR member. Such
terminations were to be prospective of course; claimants who had
already finalized their settlements were not affected. On the
other hand, the plaintiffs who had not been paid in full could
elect "to enforce the Defaulting CCR member Company's obligations
under this Settlement Agreement . . . ." E.g., JA2037.[1]

Under the Producer Agreement, members who were named as co-
defendants and who settled a particular claim as part of a
settlement protocol were called Participating Producers. The
protocols provide that plaintiffs would give releases not only to
Participating Producers, but also to other CCR members who had
not been named and were not the direct beneficiaries of that
particular settlement. In the event a Participating Producer
withdrew from the CCR, the Producer Agreement provided that
"notwithstanding termination of membership, a Participating
Producer shall continue to have and to honor all of the
obligations incurred by it hereunder or on its behalf as a member
prior to the effective date of its membership termination." CA8.

In early 1999, CCR members GAF Corporation and Asbestos
Claims Management Corporation began defaulting on their payments
under group settlements. On May 7, 1999, the CCR's board of
directors passed a resolution calling for the members to provide

---

[1]    An additional agreement contains the provision
regarding default, but omits the quoted language making reference
to the Producer Agreement. JA2153-54.

11

assurances of payment of settlement proceeds, which read in pertinent part:

> WHEREAS the Center has incurred substantial obligations on behalf of the Participating Producers with respect to group settlement agreements [protocols] involving deferred or long-term payouts of settlement dollars; and
>
> WHEREAS the Center is currently negotiating, and will continue to negotiate, on behalf of the Participating Producers additional group settlement agreements involving deferred or long-term payouts of settlement dollars; and
>
> WHEREAS the Center has determined it appropriate to subject the Participating Producers to additional measures to assure that the Center is sufficiently protected against the possibility that a Participating Producer may fail to meet its obligations to the Center, in whole or in part, with respect to such group settlements:

THEREFORE, it is hereby resolved that:

1. With respect to any and all group settlements involving deferred or long-term payout of settlement payments to settling claimants, each Participating Producer shall be required to provide adequate assurance of payments of any amounts estimated by the Center to be due to, or incurred by, the Center on such Participating Producer's behalf under any such settlement, either by advanced cash payments, letter of credit, or assignments of available, uncontested insurance proceeds satisfactory to the Center; by some combination of these means; or by such other means as may be deemed by the Center's Board of Directors to provide an equally adequate assurance of payments of a Participating Producer's obligations to the Center under such group settlements[.]

. . . .

JA1759.    Two months later, in July 1999, an additional

12

resolution was passed, similar in many respects but narrowing the approved class of assurances that would be deemed adequate.

> Such assurance of payment shall be made by advanced cash payments to be placed in appropriate settlement trust accounts; by bank letters of credit satisfactory to the Center; or by assignments of available uncontested insurance proceeds satisfactory to the Center; or by some combination of these means.

JA1765.

Pursuant to these resolutions the three Debtors obtained the first of a series of payments assurances that culminated in the performance bonds that are the subject of this litigation. Travelers, Safeco and National Fire/CNA issued four bonds to the various Federal-Mogul entities, totaling $225,000,000. The bonds issued jointly to T&N Limited, Gasket Holdings Incorporated and Ferodo America, Inc., JA1384-94, contains language common to all of the bonds at issue here.

The principals and the Sureties state that they "are firmly bound unto the Center for Claims Resolution . . . as the Obligee . . . in the above maximum penal sum . . . ." JA1384. The bond recites the role of the CCR as agent of the principals and that the CCR "entered into group settlements of asbestos related claims which entail long term extended payouts during the next several years." JA1384. The fourth "whereas" clause recites the May 12, and July 7, 1999, resolutions of the CCR board calling for payment assurance. Id. The bond then states that "if the

Principals pay, when due, their obligations to the CCR for all

extended payout settlements as described above and all other

obligations owed by any Principal to the CCR . . . then this bond

shall be null and void, otherwise to remain in full force and

effect for the term hereof . . . . JA 1385.

Should the principal fail to make payment of an

"Obligation," within ten days of notice issued by the CCR, the

CCR may give notice to the principals and the surety. The bond

requires the surety to remit the unpaid amount within ten days of

the notice. The bond states that "The Obligee's Demand to the

Surety of the amount due, either as security or for payment or

for reimbursement, shall be absolute proof of the existence and

extent of the liability of the Principals and the Surety to the

Obligee hereunder." JA1386. Should the surety give notice that

the bond will be cancelled for non-payment of the premium, the

bond gives the CCR the option of demanding the entire penal

amount and holding the proceeds as security against unaccrued

obligations, applying the funds to the obligations as they become

due, and refunding to the  any unexhausted funds when the

obligations have been retired. Id.

The bonds contain some idiosyncracies worth noting. First,

The Federal-Mogul bonds expressly contemplate the withdrawal from

the CCR of those entities no later than March 31, 2001. The bond

represents that the CCR will continue to negotiate settlements on

14

their behalf up until the date of the withdrawal and that CCR
rules require a withdrawing member to post assurances of payment
of outstanding obligations effective the date of withdrawal.
JA1385.

The bond issued to USG is in the amount of $60,277,000.
and is dated January 29, 2001. The bond issued to AWI was
executed March 28, 2000, for approximately $36,000,000. Together
with the Federal-Mogul bonds, the face amount of the bonds total
$321,277,000.[4]  Of course, each Debtor signed indemnity
agreements with its Sureties. The Federal-Mogul entities granted
liens on their assets in favor of the Sureties to secure their
indemnity obligations. USG's indemnity obligation was secured by
a letter of credit. AWI's indemnity obligation is unsecured.

In November 2000, the CCR board passed two resolutions.
Citing the CCR's difficulties in getting former-members GAF
Corporation and the Asbestos Claims Management Corporation to pay
their share of the settlement obligations, the first resolution
provided that these companies' shares would be re-billed to the
members of the CCR still in good standing. The second has been
characterized by the non-CCR parties as broadening the scope of
the payment assurance requirements contained in the two 1999

---

[4]     In the interest of completeness, the Court notes that
the penal amounts were to be reduced in accordance with a
schedule set forth in the bonds. This step down has been the
subject of pendente lite stipulations between the parties and are
not directly relevant to this motion.

resolutions.  In summary, it requires the members to make their
payment assurances applicable to all obligations of that member
to the CCR, expressly including obligations arising under
settlement protocols either in the future and for which those
payment assurances were previously provided or required.  JA1781,
1782.

Effective February 1, 2001, the members of the CCR entered
into a new agreement, denominated the Members' Agreement,
amending the Producers' Agreement of 1994.  The primary
modification was that settlements made after January 2001 were to
be "unbundled;" that is, made on behalf of the members
individually and not as part of group settlements.  The
obligations under pre-February 2001 settlements were kept in
place.

On December 6, 2000, AWI filed its bankruptcy petition.  In
June 2001, USG filed for chapter 11 protection.  In October 1,
2001, Federal-Mogul filed its petition.

The CCR sent notice to Federal-Mogul on October 16, 2001,
that certain amounts payable under the Producer Agreement were
overdue.  JA1504.  On November 16, 2002, the CCR made demand on
the Sureties for payment on the bonds.  JA1520.  On December 12,
2001, the CCR gave a second notice to Federal-Mogul purporting to
accelerate its obligations pursuant to the CCR Accounts
Receivable Guidelines and the Producer Agreement to include

16

amounts for asbestos-related claims that "otherwise will become
due at any time in the future." JA1528.

The CCR's first overdue notice to USG was dated July 6,
2001. A second was issued November 19, and a third, on December
11, 2001, purported to accelerate USG's future obligations.
JA1545 46, JA1547-55, JA1550-59. AWI's situation was slightly
different. Similar to the other bonds, the AWI bond provided
that if it were cancelled without an acceptable replacement being
obtained within thirty days, the CCR could make demand for the
full amount, less amounts already paid. On October 27, 2000, the
gave notice that it would cancel the AWI bond effective February
28, 2001. The CCR demanded the full penal sum on February 6,
2001, after AWI's petition was filed.

ISSUE

These cross-motions for summary judgment are directed to the
Phase One Issues outlined in the Court's Order of June 12, 2002.
That Order provides that the Phase One Issues are:

> 1. Whether the bonds that are the subject of
> this litigation (the "Bonds") and any related
> agreements of the parties, as interpreted and
> constructed by this Court, give to the Center
> for Claims Resolution ("CCR") a present right
> upon satisfaction of any conditions set forth
> in the Bonds (including without limitation
> proper demand) to draw upon and receive the
> proceeds of the Bonds for the purposes set
> forth therein without further interference
> from and superior to any right of the debtors
> or any creditor of the estates in bankruptcy.

> 2. Whether the Bonds and the parties' related

17

agreements do not give the CCR the right to
draw upon or receive the proceeds of the
Bonds as set forth in the immediately
preceding sub-paragraph, for such reasons as
the parties may advance, including without
limitation that the Bonds and the proceeds
thereof are property of the debtors' estates
in bankruptcy.

3.    Whether, as a result of the debtors'
bankruptcies, Title 11 of the United States
Code and/or related equitable doctrine(s)
provide grounds to bar the CCR from drawing
upon or receiving the proceeds of the Bonds,
regardless of the Court's interpretation and
construction of the Bonds and the parties'
related agreements[.]

### DISCUSSION

1.    <u>The Legal Standard</u>

The standard for awarding summary judgment is well known to

counsel and will not be treated in detail here.  Federal Rule of

Civil Procedure 56 states that "judgment shall be rendered

forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment

as a matter of law."  Rule 56 is made applicable to this

proceeding by Federal Rule of Bankruptcy Procedure 7056.

As all parties have recognized in their briefs, the parties'

differences regarding the effect of the bonds are essentially

contract disputes.  "[T]he fundamental object in interpreting a

contract is to ascertain the intent of the parties."  <u>Compass</u>

Tech., Inc. v. Tseng Labs., Inc., 71 F.3d 1125, 1131 (3d Cir.
1995); see also Fineman v. Armstrong World Indus., Inc., 980 F.2d
171, 215-216 (3d Cir. 1992) (task of the court "to interpret the
language of the settlement agreement in conformance with the
intention of the parties at the time of contracting"), cert.
denied, 507 U.S. 921 (1993).  The Third Circuit has held that
"[s]ummary judgment may be granted based on the interpretation of
a contract only if the contract is so clear that it can be read
only one way."  Battaglia v. McKendry, 233 F.3d 720, 721 (3d Cir.
2000) (citations omitted).  If the parties' "intent can be
cleanly extracted from the clear and unambiguous words that the
parties have used, it is equally conventional wisdom that they
are held to those words contained in the contract."  Compass
Tech., 71 F.3d at 1131.  It is a familiar principle of law that
unambiguous contract terms are enforceable as a matter of law and
are, therefore, appropriate for summary judgment.  Tamarind
Resort Assocs. v. Government of the Virgin Islands, 138 F.3d 107,
110 (3d Cir. 1998).

On the other hand, if the contractual terms are facially
ambiguous, then "the court should hear the evidence presented by
both parties and then decide whether there are objective indicia
that, from the linguistic reference point of the parties, the
terms of the contract are susceptible of different meanings."
Compass Tech., 71 F.3d at 1131 (citations omitted).  The

determination that the contract terms are ambiguous is one for the Court. <u>Local Union No. 1992, IBEW v. The Okonite Co.</u>, 189 F.3d 339, 341 (3d Cir. 1999). In making this determination, the court "must consider the words of the contract, the alternative meaning proffered by the challenging party, and the nature of the evidence that party could provide." <u>Id.</u> at 1132. "If the contract as a whole is susceptible to more than one reading, the fact finder resolves the matter," but if "it is unambiguous and can be interpreted only one way, the court interprets the contract as a matter of law." <u>Pacitti ex rel. Pacitti v. Macy's</u>, 193 F.3d 766, 773 (3d Cir. 1999).

The "basic federal rule" is that state law governs the substance of claims notwithstanding the involvement of a party in bankruptcy. <u>Raliegh v. Illinois Dep't of Revenue</u>, 530 U.S. 15, 20 (2000). The Delaware courts apply the test of the <u>Restatement (Second) of Conflict of Laws</u> which provides that the law of the state with the most significant relationship to the parties shall govern. <u>Cannon v. Dorr-Oliver, Inc.</u>, 394 A.2d 1160, 1166 (Del. 1978). Beyond an emphasis on Delaware case law in the parties' briefs, none of them has provided guidance to the Court as to which state's law should govern. At bottom, this dispute between the CCR, its members and their Sureties, turns on the interpretation of corporate documents and the nature of the CCR, a Delaware corporation. Therefore, that state has the

greater interest in the dispute.

However, the lack of reference to Delaware choice of law
rules by the parties suggests that there is no conflict between
Delaware's law and that of other states with regard to surety and
guaranty.  Moreover, there is a dearth of case law in any
jurisdiction for the precise points at issue in this case.
Therefore, the Court will be guided by the persuasive authority
of the several jurisdictions cited by the parties and discovered
by the Court's own research.

2.    <u>**The Sureties' Obligation to the CCR on the Bonds**</u>

It is the purpose of a performance bond to create certainty
in a commercial transaction against the risk of a debtor's
unwillingness or inability to pay a debt when due.  To that end,
parties usually draft the language of such bonds in clear, even
stark terms.  The bonds at the center of this dispute are no
exception.  For the purpose of deciding the narrow issues set
forth as Phase One issues in the Court's prior Order, the Court
finds that the terms of the USG and Federal-Mogul bonds, the
related CCR agreements and the protocols are not ambiguous,
neither facially nor with reference to extrinsic evidence.
Consequently, there has been no need to consult the voluminous
parole evidence submitted by the parties.  The AWI bond presents
a slightly different situation, and will be addressed separately
in this Opinion.

Turning first to the USG and Federal-Mogul bonds, the Court notes that each of the USG and Federal-Mogul bonds clearly state that the CCR is the obligee. The Sureties' obligation to pay is triggered by a principal's failure to pay an "Obligation" within ten days of notice. "Obligations" is defined in the agreement as "the Principal's . . . obligations to the CCR for all extended payout settlements as described above and all other obligations owed by any Principal to the CCR . . . including the above referenced obligations as of the effective date of withdrawal . . . ." JA1385. The phrase "extended payout settlements" is not explicitly defined in the bond, but it unambiguously incorporates earlier references to the CCR-negotiated group settlements, as captured _inter alia_ in the clause "WHEREAS the CCR on behalf of its members entered into group settlements of asbestos related claims which entail long term extended payouts during the next several years." JA1384.

It appears beyond reasonable argument that on their face the bonds give the CCR the right to draw upon them in the event the principals fail to remit their share of the settlement payments. Indeed, the language of the bonds leaves no room for doubt regarding their purpose.

The non-CCR parties raise a number of arguments why the CCR should be prevented from drawing on the bonds. They fall into three general categories. The first is that the conditions set

forth in the bonds before the CCR may draw upon them have not been satisfied. The second is that the Debtors have no obligations to the CCR for the bond proceeds to make good. Where the principal has no duty to pay, the non-CCR parties argue, a surety has no obligation to respond. Third, the non-CCR parties contend that permitting a draw on the bonds would violate bankruptcy law principles by creating a preferred class of asbestos claimants and failing to protect assets of the estate -- the bonds. To prevent this, the non-CCR parties argue that the Court should extend the protection of the automatic stay of 11 U.S.C. § 362(a) or enjoin any further action against the Sureties for the bond proceeds under 11 U.S.C. § 105(a).

The non-CCR parties point out that notice of default to the Debtors is a condition explicit in the bonds before the CCR may make a demand on the Sureties. The CCR gave such notices, but it did so after the Debtors had filed their chapter 11 petitions. The non-CCR parties contend that these notices violated the automatic stay and must therefore be considered void.

The Court rejects this argument. Certainly the Court must broadly construe the protections afforded bankrupts under the section 362(a) stay. However, the courts have recognized a distinction between communications informing the debtor that a debt is due and communications that have a coercive or harassing element aimed at compelling payment. The Third Circuit has held

23

that mere communication from a creditor to a debtor that does not
threaten any immediate action to collect a debt does not violate
the automatic stay.  Brown v. Pennsylvania State Employees Credit
Union, 851 F.2d 81, 86 (3d Cir. 1988); see also Morgan Guarantee
Trust Co. of N.Y. v. American Savs. & Loan Ass'n, 804 F.2d 1487,
1491 (9th Cir. 1986)("language and purposes of section 362(a) do
not bar mere requests for payment unless some element of coercion
or harassment is involved").  Following Brown, it is clear that
not every action taken by a creditor in relation to a debtor will
violate the automatic stay.  In re Sechuan City, Inc., 96 B.R. 37
(E.D. Pa. 1989); In re Spaulding, 116 B.R. 567 (Bankr. S.D. Ohio
1990).

The language in the letters sent to the Debtors in this case
was crafted to avoid any suggestion that the automatic stay was
violated.  The letters expressly state that they are not demands
for payment, that they are being sent only to comply with the
bond terms, and/or that the CCR intends to look to the Sureties
for payment.  Nor are these letters part of a pattern of
communications that might collectively be construed to have a
coercive or harassing influence on the Debtors.  Cf. Spaulding,
116 B.R. at 570-71 ("Letters that are isolated and informational
are less likely to result in violations of the automatic stay
than are letters that are repetitive and request payment.").

Lastly, the Court must acknowledge that the fundamental

24

purpose of a performance bond is to provide security to a
creditor against nonpayment, including non-payment due to the
debtor's bankruptcy.    Restatement (Third) of Suretyship &
Guarantee (hereinafter "Rest. 3d") § 34 cmt. b.   The CCR points
out that many if not all such performance bonds require notice to
the debtor of default on the obligation as a prerequisite to
drawing on the bonds.   To hold that such a notice would be
ineffective against a bankrupt debtor would seriously undermine
the efficacy of this common commercial device.   The Court holds
that the notice of default letters sent by the CCR did not
violate the automatic stay of section 362(a) and that this
condition of drawing on the bonds was fulfilled.

The Court turns next to the non-CCR parties' contention that
the Debtors are not in default on any obligation that the bond
actually secures.   They argue that the CCR settled the cases as a
disclosed agent for its members.  Consequently, they maintain,
the CCR incurred no direct obligation under the settlement
agreements; the only obligation created by the agreements is the
obligation of the Debtors to the claimants.  Yet the bonds
clearly state that it is the CCR that is the obligee.  How, the
non-CCR parties ask, can a surety be made to pay a third party
when its principal has no obligation to pay that party?  Indeed,
they complain that it is not even clear that, if the CCR were
successful in drawing on the bonds, the CCR would legally be

25

required to pay the proceeds to the claimants.

While the Court agrees with some of its premises, the argument as a whole ultimately fails. It is true that the CCR negotiated and executed the settlement protocols as the disclosed agent of the CCR member companies. The CCR's constituent documents and the settlement protocols themselves make frequent and clear reference to the fact that the CCR is acting on behalf of its members. The agreements at the fulcrum of this entire structure, the agreements that are the foundation of the protocols, the CCR and all of its subsidiary agreements, are the agreements formed between the claimants themselves and the CCR member companies.

That the CCR has no direct obligation to the individual claimants does not mean, however, that the Debtors have no obligation to the CCR. Moreover, the extent of the Debtors' obligation to the CCR may be co-extensive with the Debtors' obligations to the claimants. In other words, while the Debtors' primary duty is to the claimants to make the required payments, the Court is satisfied that they also have a duty to the CCR to make those payments. It is performance of that second duty that the bonds secured.

The non-CCR parties' argument that the CCR has no stake in the payment of funds due under the protocols assumes that the CCR acted as a mere broker for each company individually. The CCR is

26

clearly more than that. While formally a corporation, the CCR has many features of a joint venture or partnership. For example, the 1994 Producer Agreement provides that the CCR was not to settle any asbestos claim for less than all of the members. CA12. The unambiguous tenor of the certificate of incorporation and the Producer Agreement is that the CCR represents a collective effort by its members to deal with their asbestos liability.

One could argue that the CCR has a discrete corporate identity in which the members' obligations to each other reside. Conversely, one could say that the obligations of each member run to each other member, regardless of any intermediary function of the CCR. Whichever analysis one adopts, there can be no dispute that the CCR members promised to the CCR and/or to each other to pay their share of the settlement obligations. Indeed, the settlement protocols state that "Payments to Plaintiff Counsel by the CCR . . . shall be funded by the CCR member companies in accordance with the terms of the Producer Agreement." JA2253. That the claimant was the ultimate recipient of the funds makes no difference to whether the CCR can enforce the inter-member agreement.

By entering into the CCR, each member gave consideration sufficient to support their joint, reciprocal promises. As noted, the CCR was bound to settle only on behalf of all the

27

members together. Non-payment by one member gave the claimant
the right to void the agreement as to all of the members. E.g.,
JA2543 (in event of default by one member "Plaintiff Counsel
shall have, with respect to any and all Plaintiffs whose claims
have not been paid in full by the CCR under this Agreement . . .
the option of either (a) continuing the settlement as to the non-
Defaulting CCR member companies; or (b) declaring this Settlement
Agreement null and void as against all CCR member companies").
Perhaps most importantly, each member agreed to forego any claim
of contribution or indemnity against the other. CA18-19.

Consequently, the Debtors' attempt to terminate the agency
of the CCR had no effect on their obligation to pay the
settlement funds to it for settlements that were already binding
against the Debtors. With respect to collecting and disbursing
an individual member's settlement funds, the CCR was either
acting as the agent of all of the non-defaulting CCR members or
as the agent of the collective whole. The various documents
already cited and the Accounts Receivable Guidelines establish
unambiguously that the CCR's role as the banker of the collective
enterprise was envisioned and agreed to by all of the parties
prior to the Debtors' default. Each CCR member had an interest
in seeing that each other member's contributions were paid to the
claimants. Thus, the CCR acted as agent for all of them when it
demanded payment from any single member and paid that money over

to satisfy that member's obligations.

As an alternative argument, the Court agrees with the CCR that the agency granted to it by each of the Debtors was irrevocable with respect to carrying out the Debtors' obligations under the settlement agreements. The type of agency involved here falls comfortably within the definition of an agency granted as security, known also in the law as a power coupled with an interest. "A power given as security is a power to affect the legal relations of its creator that is created in the form of a manifestation of actual authority and held for the benefit of the holder or a third person." Restatement (Third) of Agency § 3.12 (Tent. Draft No. 2, 2001). In this case the third persons are numerous; they are the claimants and the other members of the CCR.

It is black letter law that such a power cannot be revoked by the grantor. Id. § 3.13(2)(b). The Third Circuit discussed this type of agency in Guarantee Fund of Republic of Finland v. Hyatt Corp., 95 F.3d 291, 300-01 (3d Cir. 1996). The panel wrote that

> if an agent has an interest in the subject matter
> of the agency, as where it engages in a joint
> enterprise or invests in a business in which
> another supplies the subject matter, a power given
> it by the other to protect such interest is a
> power given as a security. In any of these
> circumstances, a power given as a security cannot
> be terminated at the whim of the power giver.

Id. at 300. In Guarantee Fund, the Court of Appeals emphasized

that the agent itself must have a proprietary interest in the <u>res</u> of the agency for the agency to have been granted as security. <u>Id.</u> at 301.  This is no impediment to finding a power granted as security in this case, because the CCR and its non-defaulting members clearly had an interest in the performance of the agency, separate and apart from the interest of the claimants themselves.

The non-CCR parties argue that the status of the Debtors as chapter 11 bankrupts bars the CCR from drawing on the bonds.  Citing the Sureties' indemnification claims against the Debtors, the non-CCR parties argue that a claim against the bonds is in reality a claim against the Debtors and therefore inimical to the policies underlying the Bankruptcy Code.  The non-CCR parties cite a line of cases extending the benefit of the automatic stay to indemnities of a Debtor, under the so-called unusual circumstances doctrine.

"'It is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the chapter 11 debtor.'"  <u>McCartney v. Integra Nat'l Bank North</u>, 106 F.3d 506, 510 (3d Cir. 1997) (quoting <u>Maritime Elec. Co. v. United Jersey Bank</u>, 959 F.2d 1194, 1205 (3d Cir. 1991)) (further citation omitted).  The purpose of this rule is obvious.  Creditors require guarantees precisely because their debtor may become insolvent.  That is the risk a

30

surety agrees to undergo and for which it accepts a premium. All
sureties will have a claim of indemnification against the debtor.
If the filing of a bankruptcy petition had the effect of blocking
the creditor's claim against the surety, the creditor would
forfeit a valuable, bargained-for right and the common
performance bond would be a far less valuable tool of commerce
than traditionally supposed. See Rest. 3d § 34(a)(1) & cmt. b.
In short, the courts will act "to insure that creditors obtain
'the protection they sought and received when they required a
third party to guaranty the debt.'" McCartney, 106 F.3d at 510
(quoting Credit Alliance Corp. v. Williams, 851 F.2d 119, 121 (3d
Cir. 1988)).

The Court acknowledges that the unusual circumstances
doctrine, relied upon by the non-CCR parties, creates an
exception to the above rule. Under this exception, the benefit
of the automatic stay can be extended to non-debtor third parties
"there is such identity between the debtor and the third- party
defendant that the debtor may be said to be the real party
defendant and that a judgment against the third-party defendant
will in effect be a judgment or finding against the debtor."
A.H. Robbins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir.),
cert. denied, 479 U.S. 876 (1986). It may also apply where
prosecution of a claim against a third party would unreasonably
interfere with the reorganization of the debtor.

31

This Court has explored whether an indemnity agreement would create a sufficient link between a non-debtor-indemnities and a debtor-indemnitor to bring a claim against the non-debtor within the bankruptcy jurisdiction of the court as related to the bankruptcy proceeding.  In re Federal-Mogul, Inc., 282 B.R. 301 (D. Del.), appeal dismissed mandamus denied, 300 F.3d 368 (3d Cir. 2002), cert. denied, 123 S. Ct. 884 (2003); In re Federal-Mogul, Inc. (Motion of Carquest Corporation et alia.), Case No. 01-10578, Dckt. No. 2223 (D. Del., Feb. 28, 2003).  The Robbins case, cited prominently by the non-CCR parties, has twice been distinguished by this Court from cases involving a bare right of indemnification on the ground that in Robbins the non-debtors were corporate insiders of the debtor and thus the identity of them to the debtor was far closer than the case at bar.

Several of the cases cited by the non-CCR parties suffer from this same point of distinction.  Eastern Air Lines, Inc. v. Rolleston, 111 B.R. 423 (Bankr. S.D.N.Y. 1990), First Nat'l Bank of Louisville v. Kanawha Trace Dev. Partners, 87 B.R. 892 (Bankr. E.D. Va. 1988) and Seybolt v. Bio Energy fo Lincoln, Inc., 38 B.R. 123 (Bankr. D. Mass. 1984), all involved injunctions of suits against a debtor's indemnities, but in each case the indemnities was in some way related to the debtor.  The problem with the non-CCR parties' reliance on these cases in support of their "unusual circumstances" argument is that the non-CCR

parties' circumstances are simply not unusual.  There is no
identity between the Sureties and the Debtors beyond that of a
garden variety surety-indemnitor relationship.

In _Maxicare Health Plans, Inc. v. Centinela Mammoth Hosp._,
105 B.R. 937 (Bankr. C.D. Cal. 1989), also cited by the non-CCR
parties, the court enjoined claims by medical providers against
members of a bankrupt HMO on the ground that the claims would
interfere with the reorganization.  The court reasoned that
direct billing of the members would "have a chilling if not
crippling effect on Maxicare's ability to compete for new members
and re-enrollments" and thus interfere with the debtor's
reorganization.  _Id._ at 943-44.  No comparable argument can be
made here, however.  _Maxicare_ involved the debtor's ongoing
relationship with some 400,000 customers necessary to its
viability as a reorganized company.  Here we have a handful of
Sureties whose relationships to the Debtors were founded on the
very risk of which they now complain -- that the Debtors might
default on their obligations.

The Court finds that payment on the bonds and any consequent
indemnity claim will not have a sufficiently deleterious effect
on the reorganization of the Debtors, and certainly no effect
that would justify setting aside the Sureties' obligations to the
CCR.  The parties point out that a draw on the bonds by the CCR
would convert asbestos claims by individuals into commercial debt

33

by the Sureties.  This hardly qualifies as an interference with the reorganization.  Nor does the fact that the Sureties' indemnity claim against Federal-Mogul is secured change the balance.  That additional secured claimants will be competing for a fixed pool of assets does not equate with interference with the reorganization.  Finally, the Court does not agree with the non-CCR parties' argument that permitting a draw on the bonds will violate the bankruptcy principle that claimants be treated equally.  The fact is that those claimants who perfected their settlements under one of the CCR protocols are not similarly situated to other claimants.  They are the beneficiaries of a secured agreement between the CCR and its members.

More importantly, in no case cited by the parties has a court barred an action against a commercial surety unrelated to the debtor who voluntarily and for a consideration guaranteed the debtor's performance.  In the cases cited by the non-CCR parties one might discount the significance of the various facts pointing to "identity" between the indemnities and the debtor.  Even if these points of distinction did not matter, and even if the law were that a guarantor with a right of indemnification against a bankrupt debtor cannot be sued, the Court would find an exception where the guarantor-indemnities is a commercial surety.

The Court holds, therefore, that the Sureties must honor their obligations to the CCR as the obligee on the bonds and pay

34

such sums as may be determined to be due to the CCR by the
Debtors. While the claimants are the ultimate recipients of the
funds, the CCR too has an interest in the payment of these funds.
The agreements of the parties are unambiguous that the Debtors
promised to pay this money to the CCR for distribution under the
settlement agreements. The CCR has averred that the Debtors are
in default on their payments to the CCR. Notice has been given
as required by the bonds. Because the agreements of the parties
unambiguously set forth the obligations, and because all
conditions for payment have been satisfied, the Sureties must
respond.

3.    **The Extent of the Sureties' Obligation**

The extent to which the Sureties must respond remains to be
decided, however. There are disputes among the parties over the
extent of the Debtors' arrears. The non-CCR parties have
objected to the CCR's purported acceleration of the Debtors'
interests. The unusual nature of the settlement protocols pose
interesting questions of when the obligations actually accrued
and of the implications of that timing in relation to the filing
of the Debtors' chapter 11 petitions. Some of these issues are
plainly not Phase One issues. However, because some of these
issues go to the CCR's legal rights to the bond proceeds and
because they have been briefed as part of these Phase One summary
judgment motions, the Court will address them here.

Judge Vance, writing in <u>Rovida v. Babcock & Wilcox</u>, 2002 WL
1874836 (E.D. La., Aug. 13, 2002), analyzed the terms of a
settlement protocol similar to the ones at issue here.  Applying
Pennsylvania law, Judge Vance found that there was no enforceable
settlement agreement between the claimant and the debtor until
the claimant had manifested his assent to the terms contained in
a settlement protocol between the plaintiffs' counsel and the
debtor.

> The 1987 protocol is a generic settlement proposal
> that covered thousands of current and future
> claimants represented by appellant's attorneys.
> Although the letter stated that appellant's
> counsel agreed on behalf of his client to accept
> Debtor's offer, there is no indication from the
> letter that Mr. Rovida assented to the terms of
> the proposal in 1987.

<u>Id.</u> at *4.

The Court concurs with Judge Vance's understanding of these
settlement protocols, which are typical of the asbestos bar.  The
protocols are perfectly clear that no individual is required to
accept the terms negotiated by plaintiffs' counsel.  Indeed, it
is apparent that Future Claimants were unknown to the plaintiffs'
counsel at the execution of the protocol.

It is true that the protocols were binding between the CCR,
its members and the plaintiffs' counsel and each of them made
certain promises to each other that were enforceable on the date
of execution.  Those are not the agreements that at issue,
however.  The agreements that drive this dispute are the

36

agreements by the CCR members to pay money in return for a
relinquishment of asbestos claims. Although the Debtors may have
bound themselves to enter into such agreements in the future,
these agreements were plainly not formed when the settlement
protocols were executed.

On the contrary, plaintiffs' counsel only agreed to
"strongly recommend" to their clients that they accept the terms
in the settlement protocol. The protocols typically stated that
"the parties recognize that the decision whether to participate
in this agreement rests with the individual Present Plaintiff and
that a certain number of Present Plaintiffs may decline to
participate." E.g., JA2565. Future plaintiffs were dealt with
elsewhere in the agreements. As to them, plaintiffs' counsel
agreed to "offer the CCR and each of its current member companies
that are parties to this Agreement the opportunity to settle all
future asbestos-related claims . . . on terms that are consistent
with the terms of this Agreement." E.g., JA2568.

Even if a claimant decided to accept the terms of the
settlement agreement and, with respect to Future Claimants, the
CCR decided to take the "opportunity" offered by counsel to
settle their claims, the settlement was not final until a number
of requirements were satisfied by the claimants. As noted, these
generally had to do with documenting their exposure and medical
condition and providing a release in the form negotiated between

37

counsel and the CCR.  No funds were payable on any claim until
the release was provided.  JA2605.

As Judge Vance found, the release is an unequivocal
manifestation of acceptance on the part of the claimant.  2002 WL
1874836, at *5.  In the <u>Babcock & Wilcox</u> matter, the issue was
whether the claimant had a claim based on a pre-petition
settlement or merely an unliquidated tort claim.  Once the
petition is filed, a chapter 11 debtor is disabled from
compromising claims against it except as provided in the
Bankruptcy Code.  11 U.S.C. §§ 1106, 1107; Bankr. R. 9019.  The
same calculus governs here.  If a settlement between the
individual and the Debtor CCR member was not consummated prior to
its bankruptcy, no settlement was ever formed.

For Present Claimants, that consummation required providing
the necessary documentation.  For Future Claimants, there was the
additional requirement that the CCR and its member companies have
agreed to accept their claims.  The implication of these facts
for the dispute at bar are clear.  If the principal had no
liability on a settlement agreement (because it was not
consummated pre-petition), then neither does the surety with
respect to that settlement agreement.

Settlements consummated prior to the Debtors' petition dates
but after a particular Debtor withdrew from the CCR are governed
not by bankruptcy law, but by the contracts between the parties.

38

With respect to Present Claimants, the settlement protocols bind
the members of the CCR to plaintiffs' counsel to hold open an
irrevocable offer of settlement with respect to Present
Claimants.  The terms of the settlement protocols leave no room
for argument that the only act necessary to create a binding
obligation between a claimant and the CCR members was for the
claimant to agree to the settlement terms and supply the
necessary documentation.  The Debtors' attempt to terminate the
CCR's agency with respect to these offers was ineffective for the
reasons discussed in the preceding section.

     With respect to Future Claimants, the outcome is more
complex.  By stating that plaintiffs' counsel will merely offer
the CCR the "opportunity" to settle claims on the same terms as
the Present Claimants, the protocols make it clear that no
irrevocable offer was on the table.  As time passed, batches of
these Future Claimants presumably were presented and accepted by
the CCR on behalf of its members.  Once Future Claimants were
accepted by the CCR, those claimants were in the same position as
Present Claimants.  The protocol stated that if the CCR took the
opportunity to settle Future Claims, then those claims would be
settled under the same terms as Present Claims. Thus, the CCR's
acceptance of the opportunity to settle any given batch of future
claims created, like for Present Claimants, an irrevocable offer
by the CCR that could be accepted and made binding by the

individual claimant's compliance with the protocol requirements.

However, like non-complying Present Claimants, accepted but non-complying Future Claimants lost their opportunity to create a binding obligation against the CCR members when the petition was filed. Finally, persons whose claims had never been presented to the CCR by the petition date never had even an offer that they could accept.

This ruling will have an impact on another issue: the CCR's purported acceleration of the Debtors' obligations. There is no question that post-petition attempts to accelerate a debt are classed as acts attempting to collect that debt and, therefore, violate the automatic stay of section 362. In re Hechinger Investment Co., 2001 WL 1820320, *4 (D. Del., Jan. 29, 2001); see also First Bank Investors' Trust v. Tarkio College, 129 F.3d 471, 476 (8th Cir. 1997). The Court rejects the CCR's arguments that the acceleration notices were in reality directed only to the non-debtor Sureties. Again, the Sureties are liable only to the extent their principals are liable. Only if the Debtors' obligations were accelerated could the CCR make a demand on the Sureties for the accelerated amount.

The CCR correctly argues as a matter of basic doctrine that a bankruptcy petition itself has the effect of accelerating unliquidated and unmatured claims against the debtor. In re Loewen Group Int'l, Inc., 274 B.R. 427, 438 (D. Del. 2002).

However, this principle of bankruptcy law in turn depends upon the definition of a claim in the bankruptcy court under 11 U.S.C. § 104(5) to include unliquidated and unmatured rights to payment. Loewen Group, 274 B.R. at 438; In re Texaco, Inc., 73 B.R. 960, 965-66 (Bankr. S.D.N.Y. 1987) (citing Sen. Rep. No. 989, 954th Cong., 2d Sess. 63 (1978); H.R. Rep. No. 595, 9th Cong. 1st Sess. 353 (1977), U.S.C.C.&A.N. 1978 p. 5489, 6309)).

But the fact that a claim may be treated as accelerated for the purposes of allowance in the bankruptcy proceeding does not mean that it is accelerated for the purposes of making a demand upon the debtor's surety. The rights and duties of the obligee and a surety are those set forth in their contracts and non-bankruptcy law, not the Bankruptcy Code. If notice of acceleration is required, and that notice is barred by the automatic stay, then the principal's debt cannot be accelerated post-petition for the purposes of drawing on the bond.[9]

Finally, the CCR argues that the phrase at paragraph 2 of the bonds providing that their demand "shall be absolute proof of

---

[9]    The Court acknowledges that this finding may affect only a small amount of the liability at issue here in light of the other rulings of law in this Opinion.  It may be that the CCR's acceleration demands only included sums for settlements that the Court has now found were never perfected and that the Debtors' will, as a result, never owe.  Obligations that do not exist cannot be accelerated.  On the other hand, it may be that funds owed to claimants under fully realized settlements were not yet due, but are now included in the accelerated amount.  These questions must be resolved in Phase Two proceedings.

the existence and extent of the liability of the Principal and
the Surety" precludes any dispute over the amount of its demand
on the Sureties. CA295 (T&N et al. Bond ¶ 2). In effect, the
CCR contends that it is entitled to draw the full amount of the
bond now, regardless of how much is owed it by the Debtors. Of
course, the CCR does not claim that it would be entitled to an
unjust enrichment in excess of the Debtors obligations, but
claims that it should be permitted to hold the excess funds,
collecting interest on them, until the Debtors' liability is
satisfied. Any excess would then be returned to the Sureties.
CCR Opp. Brf. at 9 & n. 4.

The Court has no quarrel with the proposition that a surety
may waive defenses to payment, including discharge of the
principal's obligation, in the contract creating the surety's
obligation. Rest. 3d, § 48. On the other hand, the basic rule
of surety law is that a surety can only be compelled to pay to
the extent its principal is bound to pay, GE Capital Mortgage
Servs. v. Pinnacle Mortgage, 897 F. Supp. 842 (E.D. Pa.),
reconsideration granted on other grounds, 897 F. Supp. 854 (E.D.
Pa. 1995), because surety bonds incorporate the debtor's contract
and the liability will be co-extensive. Marilyn Klinger et al.,
Contract Performance Bonds in The Law of Suretyship 81, 99
(Edward G. Gallagher ed., 2d ed. 2000).

The Court would hesitate before disregarding the "absolute

42

proof" clause in the bond based on a distinction between defenses
to payment or failure of the underlying obligation. However,
even if one classifies the lack of underlying obligation as a
defense to payment, it is not clear that the language of the bond
would effectively waive it. Generally, "[s]ome indication that
suretyship rights are being foregone is required; thus a
statement to the effect that the duty of the secondary obligor is
absolute or unconditional is ordinarily not sufficient to
indicate that the secondary obligor is agreeing to forego
discharges based on suretyship status." Rest. 3d § 48 cmt. d;
see Langeveld v. LRZH. Corp., 74 N.J. 45, 53-54 (1977)
(unconditional guarantee language does not waive defense of
impairment of collateral). Indeed, the Third Circuit has held
that a surety may raise the lack of the principal's obligation
even where the surety is bound by an enforceable confession of
judgment. F.D.I.C. v. DeGlau, 207 F.3d 153, 175 (3d Cir. 2000).

One may conceive of a commercially reasonable way in which
the CCR's reading of the bond might work. An initial default
might create sufficient uncertainty of later payments for the
obligee to wish an increased level of security. That security
might well take the form of the entire penal sum of the bond,
even though the amount actually in default is small. That right
could be spelled out in the bond.

However, except for the phrase "[t]he Obligee's Demand to

43

the Surety of the amount due, <u>either as security</u> or for payment or for reimbursement . . . . ," there is no textual support for the CCR's position. In paragraph 5, the bond provides for just such a procedure as urged by the CCR under this paragraph; where the bond is cancelled, the CCR is explicitly given the right to draw the entire proceeds and apply them to obligations of the Debtors as they become due. CA295 (T&N <u>et al.</u> Bond ¶ 5). That paragraph 2 contains no such language undermines the CCR's contention that it is supposed to work in the same way as paragraph 5. Conversely, the reference to "security" in describing a demand in paragraph two could plausibly be read to refer to a demand on a cancelled bond under paragraph 5.

On the contrary, paragraph two provides that the CCR shall provide an affidavit to the Surety and that the Surety will pay the amount set forth therein. The form of affidavit, which is attached to the bond, states that the CCR has made demand on the principal for amounts that are "due and remain[] due." The Surety's obligation is linked to that of the principal with the following: "Obligee hereby makes demand under the Bond for $[total amount presently due from the Surety] in respect of such failure to pay." CA299. Plainly, there is no right to draw on the total amount of the penal bond in this language.

Even if it were otherwise, the Court would exercise its equitable powers and those granted by 11 U.S.C. § 105 to prevent

44

such a result.  The Court has discounted the claim of the non-CCR
parties that any draw on the bonds would interfere with the
reorganization of the Debtors.  It is a different matter where
the CCR proposes to call the entire penal amount of the bonds
regardless of whether that amount exceeds the legitimate
obligations of the Debtors as principals.  For the CCR to hold
substantial funds in escrow, generating in turn substantial
indemnity claims against the Debtors, only to have an unknown
portion of the indemnity claims discharged later when the excess
funds are refunded, would create needless uncertainty and
administrative complexity.

     Any claim of the CCR that it is entitled to the additional
security of holding cash collateral while the Debtors'
obligations are sorted out by the Court strains credulity.  There
has been no claim that the Sureties will not be able cover
whatever amount is due under the bonds, and the CCR may
affirmatively rely on the strong arm of the Court for its
security to see that it is ultimately paid what it is owed under
the bonds.  The CCR suggests that it is entitled to be earning
interest on the bond proceeds while the amount of its entitlement
is litigated.  But the CCR's claim to pre-judgment interest is
not ripe for decision and may be adjudicated at a more
appropriate time.

     The papers before the Court raise a host of other disputes

45

over what types of obligations the bond proceeds may be drawn.
These include: amounts that were unpaid by other members when
they withdrew and which the CCR re-billed to its continuing
members; administrative costs incurred by the CCR and their
allocation to the Debtors; payment for so-called "unbundled"
settlements entered into after February 2001; and alleged
overcharges by the CCR. For the reasons already noted, it could
be argued that the Court has already strayed a short distance
beyond the scope of the Phase One issues set forth in its prior
Orders. The balance of these issues, all of which go to the
extent rather than the fact of the CCR's rights to draw upon the
bonds will be left for further proceedings.

Certain facts have been noted by the parties as well. There
was an additional resolution passed by the CCR board in May 2000.
Group settlement protocols negotiated after the CCR board
resolutions in 1999 differ in several respects from those
negotiated prior to those dates. While the parties have argued
that these facts have material implications for the dispute
between them, the Court has not found it necessary to rely upon
those facts for the limited ruling it makes today. The
importance of these facts, and others, will also be explored in
subsequent Opinions of the Court.

4.    **The AWI Bond**

The Court's findings above will also affect the CCR's claim

to the AWI bond.  However, the CCR's claim against the AWI bond
is not triggered by a general right of reimbursement for
settlement funds.  In AWI's case, the Surety cancelled the bond.
Under a provision of the AWI bond similar to paragraph five of
the Federal-Mogul and USG bonds cited above, the CCR was entitled
to draw the entire amount of the bond upon cancellation and hold
the proceeds as collateral against future obligations.

Beyond this point, the waters become murky.  The AWI bond
states that the CCR board resolved that members would be required
to provide assurances of payment of the "Deferred Payment
Settlement Obligations, as defined in the Agreement."  Likewise,
it also states that the bond will be discharged if the principal
pays "Deferred Payment Settlements, as defined in the Agreement."
 Astonishingly, no party can point to any such "Agreement" in
which these obligations is defined.  It is conceded that this was
due to a scrivenor's error.

AWI argues, with some force, that a bond that omits a clear
statement of the obligation it is supposed to secure omits an
essential term and cannot be enforced.  The CCR says that the
omitted term can be supplied by reading the bond as a whole.  It
is true that the bond refers to the group settlements negotiated
by the CCR and to the May 12, 1999, board resolution.  The
exclusive focus of that resolution was the problem of assuring
payment of CCR members' obligations anticipated under the

47

protocols. It is difficult to entertain any serious doubt that, as a general proposition, the bonds were intended to secure amounts due pursuant to the settlement protocols and agreements with individual claimants.

However, AWI objects to a list of items that it claims the bonds do not cover. These include payments for any settlement pre-dating May 12, 1999, trial list settlements, administrative expenses, settlement amounts re-billed from other defaulting members, and other items as delineated in the AWI brief. Some of these objections are resolved by this Opinion. For example, it is now the law of the case that any settlement that was not documented by the date of the chapter 11 petition cannot be considered an obligation of the Debtor and therefore is not covered by the bond. Other questions are still open, however. Certainly it would be far easier to answer these questions if it were possible to determine as a matter of law what is and what is not a covered obligation.

The CCR maintains that none of these issues matter in the short run because it has an unequivocal right to draw the entire amount of the bond, subject to refund depending on the extent of the liability to be determined later. AWI represents, however, that it made payments to the CCR until shortly before it filed for bankruptcy. If one accepts AWI's arguments as to the number of items the bond does <u>not</u> cover, then the amount of covered

48

liability the CCR may ultimately be entitled to receive from the Sureties may be comparatively small. For the reasons already expressed in relation to the Federal-Mogul and USG bonds, the Court would exercise its equitable and bankruptcy powers to prevent a large draw on a penal bond where the bulk of the funds would only be returned later.

The situation is a difficult one. The Court would be most reluctant to uphold a forfeiture of a valuable, bargained-for right on the ground of a scrivenor's error. Yet the Court finds that the briefing is insufficient to fully explore the issue of the omitted term sufficiently to permit the Court to rule with confidence on the competing motions for summary judgment. AWI devotes only two pages of its brief to the problem. The CCR addresses it largely in a footnote.

Therefore, the Court will reserve judgment on the Phase One issues for the AWI bond and order an additional round of briefing. The parties will address the following issues: 1) whether the bond is unenforceable due to an omitted term; 2) if the bond is enforceable, how the Court should determine the intent of the parties with respect to what obligations of the principal were to be secured by the bond; 3) with reference to the previous question 2, whether and what parole evidence should guide the Court. AWI and Safeco Surety Company of America will each submit a brief of no more than twenty pages within thirty

49

days of the date of this Opinion. The CCR will submit a response brief of thirty pages within ten days of service upon them of those papers.

## CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part the CCR's motion for summary judgment. The non-CCR parties' motion for summary judgment will be denied. The Order filed with this Opinion shall provide as the judgment of the Court with respect to the Phase One issues that the CCR has the right to draw upon the bonds that are the subject of this litigation to cover the obligations of Federal-Mogul and USG to the CCR as set forth in this Opinion and to the extent to be determined by further proceedings and Orders of this Court. Pending such further Orders, the Sureties shall not be required to remit any funds. The Court will reserve its judgment with respect to the AWI bond, pending further briefing as outlined in the Opinion.

An appropriate Order is attached.

Dated March 28 2002

_____
ALFRED M. WOLIN, U.S.D.J.

50