Case 1:05-cv-00059-JHR   Document 49-2   Filed 06/01/2005   Page 1 of 19

2005 U.S. Dist. LEXIS 2810; 44 Bankr. Ct. Dec. 94

IN RE: ARMSTRONG WORLD INDUSTRIES, INC., ET AL., Debtors.

Chapter 11, No. 00-4471

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 2810; 44 Bankr. Ct. Dec. 94

February 23, 2005, Decided

**PRIOR HISTORY:** In re Armstrong World Indus., 106 Fed. Appx. 785, 2004 U.S. App. LEXIS 15011 (2004).

**DISPOSITION-1:** Confirmation of Debtors' Fourth Amended Plan of Reorganization, including any technical modifications denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Facing significant asbestos liabilities, debtor and two of its subsidiaries voluntarily commenced a Chapter 11 proceeding in the U.S. District Court for the District of Delaware. Acting upon debtor's fourth amended plan of reorganization, the bankruptcy court issued its proposed findings of fact and conclusions of law, along with a proposed confirmation order. The unsecured creditors then filed objections to the proposals with the district court.

**OVERVIEW:** The plan created 11 classes of claims and one class of equity interests. Under the plan, the unsecured creditors had claims amounting to approximately $ 1.651 billion, and would have received about 59.5 percent of their claims. The equity interest holders would have been issued new warrants, i.e., new common stock pursuant to a warrant agreement, valued at approximately $ 35 million to $ 40 million. The district court concluded that the distribution of the new warrants to the class of equity interest holders over the objection of the class of unsecured creditors violated the "fair and equitable" requirement of 11 U.S.C.S. § 1129(b)(2)(B)(ii), a codification of the absolute priority rule. The equity interest holders held a claim junior to that of the unsecured creditors. Under the plan, the equity interest holders would have received property of debtor by way of the new warrants because of their ownership interest in debtor. The unsecured creditors' allowed claims would not have been satisfied in full. Accordingly, the distribution of the new warrants to the equity interest holders under the plan violated § 1129(b)(2)(B)(ii). The plan, therefore, could not be confirmed.

**OUTCOME:** The district court denied confirmation of the fourth amended plan of reorganization.

**CORE TERMS:** equitable, lender, junior, reorganization plan, confirmation, asbestos, senior, reorganization, holder, conclusions of law, voted, FAIR Act, rebuttal, deadline, voting, sharing agreement, stockholders, memorandum, impaired, unfair discrimination, de novo, discriminate, appointed, unfairly, confirmed, waive, intervening, implicated, two-thirds, scheduled

**LexisNexis(TM) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals*

*Civil Procedure > Appeals > Standards of Review > De Novo Review*

*Civil Procedure > Appeals > Standards of Review > Issues of Fact & Law*

[HN1]A bankruptcy court's decision that a reorganization plan did not violate the absolute priority rule is a conclusion of law that must be reviewed de novo.

*Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation > Consensual & Nonconsensual Confirmation*

[HN2]A plan may be confirmed under either of two scenarios. One is consensually, provided all classes have accepted the plan or are not impaired. 11 U.S.C.S. § 1129(a). The other is nonconsensually, over the non-acceptance of an impaired class if all the requirements of 11 U.S.C.S. § 1129(a), except § 1129(a)(8), have been met and the plan does not discriminate unfairly and is fair and equitable. 11 U.S.C.S. § 1129(b). This latter approach, typically referred to as a "cramdown," is sometimes necessary in order to allow the debtor to override certain objections under appropriate

circumstances, which might otherwise allow a small minority to prevent confirmation of the plan.

***Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation > Consensual & Nonconsensual Confirmation***

[HN3]For a reorganization plan to be considered "fair and equitable" to a class of dissenting unsecured creditors, the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property. 11 U.S.C.S. § 1129(b)(2)(B)(ii).

***Governments > Legislation > Interpretation***

[HN4]It is well settled that the first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms.

***Governments > Legislation > Interpretation***

[HN5]The plain meaning rule of statutory interpretation has even greater force when applied to the text of the U.S. Bankruptcy Code.

***Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation > Consensual & Nonconsensual Confirmation***

[HN6]See 11 U.S.C.S. § 1129(b).

***Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation > Consensual & Nonconsensual Confirmation***

[HN7]A plan is not "fair and equitable" under 11 U.S.C.S. § 1129(b) if a class of creditors that is junior to the class of unsecured creditors receives debtor's property because of its ownership interest in the debtor while the allowed claims of the class of unsecured creditors have not been paid in full.

***Bankruptcy Law > Chapter 11 (Reorganization) > Plan Confirmation > Consensual & Nonconsensual Confirmation***

[HN8]A plan of reorganization should not be permitted to be crammed down where a senior class gives up value to a junior class while skipping over an intermediate or coequal class. Although the argument can be and has been made that senior creditors should be entitled to do what they want with their property, the lessons of history should suffice to impose a per se rule that precludes senior creditors from collaborating with junior creditors or equity owners at the expense of intervening classes.

***Bankruptcy Law > Practice & Proceedings > Proceedings Under Section 105***

[HN9]Although under 11 U.S.C.S. § 105(a) a bankruptcy court may exercise equitable power to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title, this power is not unfettered. 11 U.S.C.S. § 105(a). As the U.S. Court of Appeals for the Third Circuit has stated, the equitable powers authorized by § 105(a) are not without limitation, and courts have cautioned that this section does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.

**COUNSEL:** [*1] For Armstrong World Industries, Inc., Debtor: Deborah E. Spivack, Mark D. Collins, Rebecca L. Booth, Richards, Layton & Finger, Wilmington, DE; Joanne Bianco Wills, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE; Rebecca Lee Scalio; Sharon M Zieg, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Wells Fargo Bank Minnesota, N.A., as Indenture Trustee, Trustee: Kevin Gross, Rosenthal Monhait Gross & Goddess, Wilmington, DE.

Frank J. Perch III, U.S. Trustee, Office of the U.S. Trustee, Wilmington, DE.

For Unofficial Committee of Select Asbestos Claimants, Creditor Committee: Noel C. Burnham, Montgomery McCracken Walker & Rhoads LLp, Wilmington, DE.

For Official Committee of Asbestos-Related Property Damage Claimants, Creditor Committee: Denise Seastone Kraft, Edwards & Angell LLP, Wilmington, DE; Joanne Bianco Wills, Stephanie Ann Fox, Steven K. Kortanek, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE.

For Official Committee of Asbestos Claimants, Creditor Committee: Aileen F. Maguire, Campbell & Levine, Wilmington, DE.

**JUDGES:** EDUARDO C. ROBRENO, J.

**OPINIONBY:** Eduardo C. Robreno

**OPINION:** MEMORANDUM

EDUARDO C. ROBRENO, J. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n1 The Honorable Eduardo C. Robreno is a judge of the United States District Court for the Eastern District of Pennsylvania. On June 16, 2004, Chief Judge Anthony J. Scirica of the United States Court of Appeals for the Third Circuit designated Judge Robreno to sit on the United States District Court for the District of Delaware in the instant matter (doc. no. 6939).

- - - - - - - - - - - - - End Footnotes- - - - - - - - -

[*2]

This case involves the Chapter 11 bankruptcy of Armstrong World Industries, Inc. and two of its subsidiaries. The Court must determine whether the Fourth Amended Plan of Reorganization, which the Bankruptcy Court endorsed in its Proposed Findings of Fact and Conclusions of Law, should be confirmed.

As the Third Circuit recognized in In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004), "for some time now, mounting asbestos liabilities have pushed otherwise viable companies into bankruptcy." Id. at 201. The instant case exemplifies this trend. Facing significant asbestos liabilities, Armstrong World Industries, Inc. and two of its wholly owned subsidiaries n2 ("AWI") voluntarily commenced a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware. Upon filing the petition, AWI became a debtor-in-possession ("Debtor"). To facilitate the administration of the case, the United States Trustee for the District of Delaware, pursuant to 11 U.S.C. § 1102(a), n3 appointed: (1) the Official Committee of Unsecured Creditors (the "Unsecured Creditors") (doc. no. 90); (2) the Official Committee [*3] of Asbestos Personal Injury Claimants ("Asbestos PI Claimants") (doc. no. 91); and (3) the Official Committee of Asbestos Property Damage Claimants (the "Asbestos PD Committee") (doc. no. 1075). n4 Upon application of the Debtor, the Bankruptcy Court appointed Dean M. Trafelet as the Future Claimants' Representative (doc. no. 2096).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n2 Nitram Liquidators, Inc. and Desseaux Corporation of North America, AWI's subsidiaries, also filed for bankruptcy.

n3 In part, Section 1102 (a) states:
(1) Except as provided in paragraph (3), as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

> (2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

> (3) On request of a party in interest in a case in which the debtor is a small business and for cause, the court may order that a committee of creditors not be appointed.

11 U.S.C. § 1102 (a).

[*4]

n4 Following the Global Asbestos Property Damage Settlement, which the Bankruptcy Court approved on August 25, 2003, the Asbestos PD Committee disbanded (doc. no. 5464).

- - - - - - - - - - - - - End Footnotes- - - - - - - - -

After extensive negotiations with the Committees and other interested parties, Debtor filed its Fourth Amended Plan of Reorganization (the "Fourth Amended Plan" or the "Plan") (doc. no. 4802) and Amended Disclosure Statement (doc. no. 4801). Under the Plan, eleven classes of claims and one class of equity interests were created. n5 The proposed

distributions of Debtor's property to three of these classes -- the Unsecured Creditors, the Asbestos PI Claimants, and the Equity Interest Holders -- are particularly relevant to the issues before the Court. Debtor estimates that the Unsecured Creditors, Class 6, have claims amounting to approximately $ 1.651 billion. Amended Disclosure Statement, Pt. V.A.8, at 46 (doc. no. 4801). Under the Plan, the Unsecured Creditors would recover about 59.5% of their claims. Id. The Asbestos PI Claimants, Class 7, have claims estimated at $ 3.146 billion and would recover approximately 20% of [*5] their claims under the Plan. Joint Response of Armstrong World Indus., Inc., the Asbestos PI Claimants' Comm., and the Future Claimants' Representative to the Objections of the Official Comm. of Unsecured Creditors to the Proposed Findings of Fact and Conclusions of Law ("Joint Response to Objections") PP 85, 87, 97 (doc. no. 6493). The Equity Interest Holders, Class 12, would be issued New Warrants n6 valued at approximately $ 35 million to $ 40 million. Amended Disclosure Statement, Pt. X, at 102 (doc. no. 4801).

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n5 The classes are:
Class 1: Priority Claims;

Class 2: Secured Claims;

Class 3: Convenience Claims;

Class 4: Asbestos Property Damage ("PD") Claims;

Class 5: COLI Claims;

Class 6: Unsecured Claims Other Than Convenience Claims;

Class 7: Asbestos Personal Injury ("PI") Claims;

Class 8: Environmental Claims;

Class 9: Affiliate Claims;

Class 10: Subsidiary Debt Guarantee Claims;

Class 11: Employee Benefit Claims; and

Class 12: Armstrong Worldwide Inc.'s Equity Interests in Armstrong World Industries.
Fourth Amended Plan of Reorganization ("Fourth Amended Plan"), Art. III, at 19-20 (doc. no. 4802).

[*6]

n6 According to the Amended Disclosure Statement, New Warrants are:
Warrants to purchase the New Common Stock pursuant to a warrant agreement substantially in the form of Exhibit 1.91 to the Plan on terms and conditions determined in a manner agreed to by Lazard and the financial consultants for the Asbestos PI Claimants' Committee, the Future Claimants'

Representative, and the Unsecured Creditors' Committee; provided, however, that such New Warrants (a) shall comprise 5% of the New Common Stock on a fully diluted basis determined as of the Effective Date, (b) shall have an exercise price equal to 125% of the Equity Value, and [(c)] shall have a term of seven years from the Effective Date.
Amended Disclosure Statement, Ex. A-13 (emphasis in original) (doc. no. 4801).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

A key to the Plan lies in the consent by the class of Asbestos PI Claimants to share a portion of its proposed distribution with the Equity Interest Holders. Under Articles 3.2(1) n7 and 10.1(b) n8 of the Plan, in pari material, if the Unsecured Creditors reject the Plan, the Asbestos PI Claimants will [*7] receive the New Warrants, but then will automatically waive the distribution, causing the Equity Interest Holders to secure the New Warrants. Fourth Amended Plan, Arts. 3.2(1) & 10.1(b), at 26, 45 (doc. no. 4802). The net

Page 7

result of the Asbestos PI Claimants' waiver is that the Equity Interest Holders (i.e., the old AWI shareholders) receive Debtor's property (i.e., the New Warrants) on account of their equity interests, although a senior class (i.e., the Unsecured Creditors) would not have full satisfaction of its allowed claims. It is the lawfulness of this arrangement that forms the central issue in the case.

-------------- Footnotes ---------
------

n7 In part, Article 3.2(1) of the Fourth Amended Reorganization Plan states:
On or as soon as practicable after the Effective Date, Reorganized AWI shall issue the New Warrants in respect of the Equity Interests in AWI as provided in section 7.24 hereof; provided, however, that, if Class 6 votes to reject the Plan, no distribution shall be made under the Plan from AWI's estate in respect of the Equity Interests in AWI but, in such event, Reorganized AWI shall issue the New Warrants as provided in section 7.24 hereof in respect of the Asbestos Personal Injury Claims and in accordance with section 10.1(b) hereof.
Fourth Amended Plan, Art. 3.2(1), at 26 (emphasis in original) (doc. no. 4802).

[*8]

n8 On its face, Article 3.2(1) states that it must be read in conjunction with Article 10.1(b). In relevant part, Article 10.1 (b) provides:
In addition, if Class 6 has voted to reject the Plan, the New Warrants shall be issued by Reorganized AWI on account of the Asbestos Personal Injury Claims; however, such claimants have waived on behalf of themselves and the Asbestos PI Trust any right to the New Warrants. The New Warrants shall be issued by Reorganized AWI to AWWD (or to Holdings as the successor to AWWD under the Holdings Plan of Liquidation), consistent with section 7.24 hereof (and shall never be issued or delivered to the Asbestos PI Trust), without any action being required of, or any direction by, the Asbestos PI Trust or the Asbestos PI Trustees in such regard.

Fourth Amended Plan, Art. 10.1(b), at 45 (doc. no. 4802).

------------ End Footnotes- ------- ------

The Court concludes that the distribution of New Warrants to the class of Equity Interest Holders over the objection of the class of Unsecured Creditors violates the "fair and equitable" requirement of 11 U.S.C. § 1129 (b) (2) (B) (ii) [*9] , a codification of the absolute priority rule. Thus, the Court must deny confirmation of the Plan.

I. PROCEDURAL HISTORY

The procedural history of this case is tortuous, even for a large Chapter 11 proceeding. The docket contains over 7,800 entries reflecting the complexity of the issues, the high stakes involved, the diligence of counsel, the efforts at a general settlement, the replacement of the presiding district court judge in the midst of the case, and, last but not least, the shifting political winds buffeting the parties. For perspective, the Court will rehearse some of the salient events of the case.

As previously noted, AWI voluntarily commenced a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware on December 6, 2000 (doc. no. 1). Shortly thereafter, the United States Trustee for the District of Delaware appointed the Unsecured Creditors Committee, the Asbestos PI Claimants Committee, and the Asbestos PD Committee, which was later disbanded. Additionally, upon application of the Debtor, the Bankruptcy Court appointed Dean M. Trafelet as the Future Claimants' Representative.

On November 27, 2001, The Honorable Edward R. [*10] Becker, then Chief Judge of the United States Court of Appeals for the Third Circuit, assigned AWI's Chapter 11 proceeding, along with four related asbestos cases, to The Honorable Alfred M. Wolin of the United States District Court for the District of New Jersey to streamline the management of these cases (doc. no. 1617). In the order, then Chief Judge Becker reasoned that:
These bankruptcy cases, which carry with them tens of thousands [of] asbestos claims, need to be consolidated before a single judge so that a coordinated plan for management can be developed and implemented. It is contemplated that Judge Wolin will assign a portion of

these cases to various bankruptcy judges sitting in the District of Delaware so they may assist in moving these matters forward.
(doc. no. 1617). Judge Wolin referred the AWI case to The Honorable Randall J. Newsome of the United States Bankruptcy Court for the Northern District of California, who was sitting by designation (doc. no. 1658).

On May 23, 2003, after extensive negotiations with the various creditors and several attempts at drafting an unobjectionable reorganization plan and disclosure statement, Debtor filed its Fourth [*11] Amended Plan of Reorganization and Amended Disclosure Statement, both of which were supported, at least initially, by the Unsecured Creditors and the other major players. n9 Thereafter, the Bankruptcy Court approved the Amended Disclosure Statement and established notice, voting, and objections procedures for confirmation of the Plan (doc. nos. 4564 & 4885).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n9 The original Plan of Reorganization (doc. no. 3313) was filed on November 4, 2002, followed by the filing of a Disclosure Statement (doc. no. 3688) on December 20, 2002. Debtor filed its First Amended Plan of Reorganization (doc. no. 4241) and Amended Disclosure Statement (doc. no. 4240) on March 14, 2003. Shortly thereafter, Debtor filed its Second Amended Plan of Reorganization (doc. no. 4414) on April 3, 2003. A Third Amended Plan of Reorganization (doc. no. 4636) and Amended Disclosure Statement (doc. no. 4635) were filed on May 1, 2003.

- - - - - - - - - - - - End Footnotes- - - - - - - -

After the [Bankruptcy Court established the voting deadline, the Unsecured Creditors began to have reservations [*12] about the Plan. In 2003, the United States Senate Judiciary Committee approved the Fairness in Asbestos Injury Resolution Act (the "FAIR Act"), designed to provide an "exclusive administrative forum for addressing asbestos claims." Patrick M. Hanlon, Asbestos Litigation in the 21st Century/Asbestos Legislation: Federal and State, SJ031 A.L. I.-A.B.A. 549, 557 (2003). The FAIR Act "would create a no-fault, administrative compensation system for asbestos claims that would replace civil litigation in the state and federal courts. A claims process under the supervision of the United States Court of Federal Claims would determine eligibility for compensation, and eligible claimants would be paid from a Fund financed by contributions from insurers and from defendant companies." Id. at 556.

The Unsecured Creditors apparently believed that passage of the FAIR Act would benefit both Debtor and the Unsecured Creditors. Consequently, the Unsecured Creditors solicited Debtor to agree to extend the voting deadline and to adjourn the Confirmation Hearing, in deference to the legislative process. At Debtor's request, n10 the Bankruptcy Court extended the final voting deadline to October 31, 2003, but [*13] ordered that all other court-imposed deadlines, including the Confirmation Hearing date, remain unchanged (doc. nos. 5688 & 5797). To date, the FAIR Act has not been enacted. While both the parties' perceptions of whether legislation would help or hinder their respective positions and of the likelihood that the legislation would be enacted may have influenced their decision to support or oppose the Plan, these political calculations have no bearing on the legal issues before the Court.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n10 Initially, the Unsecured Creditors asked Debtor to consent to a voting extension and an adjournment of the Confirmation Hearing. Debtor agreed only to the voting deadline extension and, accordingly, moved the Bankruptcy Court for that extension (doc nos. 5409 & 5779).

- - - - - - - - - - - - End Footnotes- - - - - - - -

On September 22, 2003, having changed their minds as to the bona fides of the Plan and based on their calculus that the FAIR Act would be passed, the Unsecured Creditors filed timely objections (the "Conditional Objections") to the Plan (doc. no. 5630). In their [*14] objections, the Unsecured Creditors argued that (1) the Plan should not be confirmed until Congress determined the fate of the FAIR Act, and (2) Debtor could meet neither the "cramdown" requirements of Section 1129 (b) nor the "best interests" test under Section 1129 (a) (7). n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

- - - - - -

n11 Besides the Unsecured Creditors, sixteen other parties filed objections to the Plan by the deadline. These objections were later withdrawn.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

By the October 31, 2003 voting deadline, all the impaired classes -- the Convenience Claims (Class 3), the Unsecured Claims Other Than Convenience Claims (Class 6), the Asbestos PI Claims (Class 7), and the Equity Interests (Class 12) n12 -- voted on the Plan. n13 Classes, 3 and 7 accepted the Plan while Class 6, the Unsecured Creditors, rejected the Plan. n14 Although Class 12, the Equity Interest Holders, voted to accept the Plan, a provision of the Plan rescinds Class 12's acceptance if Class 6 rejects the Plan. Fourth Amended Plan, Art. 3.2(1)(iii), at 26 (doc. no. 4802). n15

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n12 The Equity Interest Holders (Class 12) are junior to the Unsecured Creditors (Class 6) and the Asbestos PI Claimants (Class 7), both of which hold the same priority.

[*15]

n13 As Section 1126 (c) prescribes,
[a] class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.
11 U.S.C. § 1126(c).

n14 The impaired classes voted as follows.
. Class 3: A majority of the Class 3 claim holders in number (98.68%) voted to accept the Plan. More than two-thirds in amount of the Class 3 claims (98.24%) voted to accept the Plan.

. Class 6: Although a majority of the Class 6 claim holders in number (88.03%) voted to accept the Plan, less than two-thirds in amount of the Class 6 claims (23.21%) voted to accept the Plan.

. Class 7: A majority of the Class 7 claim holders in number (98.23%) voted to accept the Plan. More than two-thirds in amount of the Class 7 claims (98.31%) voted to accept the Plan.

. Class 12: Class 12 consists of one shareholder. The Class 12 claim holder accepted the Plan, although this acceptance was rescinded under Article 3.2(1)(iii) of the Plan.

Supplemental Certification of Daniel McSwigan of Trumbull Assocs., LLC with Respect to the Tabulation of Votes on the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc. (doc. no. 6013).

[*16]

n15 On November 12, 2003, the Unsecured Creditors filed a Memorandum of Law in Opposition to Confirmation of the Fourth Amended Plan of Reorganization (doc. no. 6027), as a supplement to their previously filed Conditional Objections. This supplemental memorandum, inter alia, spelled out in greater detail the Unsecured Creditors' Section 1129(b) objections to the Plan. Debtor moved to strike the Unsecured Creditors' memorandum as untimely (doc. no. 6056). The Bankruptcy Court granted the motion on untimeliness grounds, but further noted that the objections in the memorandum had no merit (doc. no. 6360).

This Court need not determine whether the Bankruptcy Court's striking of the supplemental memorandum has legal significance. The Unsecured Creditors' objections to the Plan based on the

absolute priority rule were preserved in their Conditional Objections. Moreover, at the Confirmation Hearing, the Bankruptcy Court considered evidence and the parties' legal arguments concerning the absolute priority rule, and then ruled on the issue.

Two other parties also objected to the Plan after the court-imposed deadline. One of the parties withdrew its objection; the Bankruptcy Court disposed of the other party's objection at the Confirmation Hearing.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*17]

Before the Confirmation Hearing, the Unsecured Creditors asked both the District Court and Bankruptcy Court, on several occasions, to stay the Confirmation Hearing for numerous reasons. Each request was unsuccessful. n16 Despite the Unsecured Creditors' resistance, the Bankruptcy Court presided over the Confirmation Hearing on November 17 and 18, 2003.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n16 First, during an Omnibus Hearing on October 31, 2003, the Unsecured Creditors asked the Bankruptcy Court to postpone the Confirmation Hearing pending the passage of the FAIR Act (doc. no. 5985). The Bankruptcy Court denied this request.

Then, on November 5, 2003, due to a motion to recuse District Court Judge Wolin that was filed by creditors in another asbestos bankruptcy case, Judge Wolin adjourned any hearing or other proceeding before him. (doc. no. 5975). Judge Wolin stated "that this Order shall not effect any proceeding scheduled to go forward before the Bankruptcy Court except to the extent this Court was scheduled to sit jointly with the Bankruptcy Judge on any matter." (doc. no. 5975). Apparently, all parties in the instant case had agreed that the District Court and Bankruptcy Court should sit jointly at the Confirmation Hearing, in part because the District Court would need to evaluate, i.e., "issue or affirm," the channeling injunction set forth in the Plan,

as prescribed by 11 U.S.C. § 524 (g) (3) (A). Although no order from either the District Court or Bankruptcy Court was issued stating that a joint proceeding must be held, the parties contend that both Courts consented to this procedure.

Also on November 5, 2003, the Unsecured Creditors requested the Bankruptcy Court, during a conference call, to adjourn the Confirmation Hearing in light of Judge Wolin's order, which they believed stayed the Confirmation Hearing. The Bankruptcy Court denied the request. Then, on November 7, 2003, the Unsecured Creditors requested Judge Wolin to issue an order for Debtor and all interested parties to show cause why the Confirmation Hearing should not be adjourned (doc. no. 5999). Judge Wolin never ruled on this motion.

On November 10, 2003, the Unsecured Creditors moved the Bankruptcy Court to continue the Confirmation Hearing, arguing that they, along with their expert, had insufficient time between the voting and the Confirmation Hearing to prepare objections and evidence regarding the asbestos liability estimation analysis (doc. no. 6007). The Bankruptcy Court denied this motion (doc. no. 6026).

Finally, at the commencement of the Confirmation Hearing on November 17, 2003, the Unsecured Creditors once again requested the Bankruptcy Court to continue the Confirmation Hearing. Confirmation Hr'g, Nov. 17, 2003, Tr. 55 (doc. no. 6165). The Bankruptcy Court denied this request. Id.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*18]

At the outset of the Confirmation Hearing, the Bankruptcy Court identified the issues before it: (1) whether the Plan unfairly discriminates against the Unsecured Creditors because of inflated present and future asbestos personal injury liabilities, resulting in a greater recovery for the Asbestos PI Claimants than for the Unsecured Creditors, and (2) whether the issuance

of New Warrants to the Asbestos PI Claimants, who waive this distribution under the Plan, is a violation of Section 1145 and/or Section 1129(b) (2) (B) (ii) of the Bankruptcy Code. Confirmation Hr'g, Nov. 17, 2003, Tr. 44-45 (doc. no. 6165). During the Confirmation Hearing, the parties offered evidence and argument on these, as well as other, issues. n17

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n17 Although the Court denies confirmation of the Plan based solely on 11 U.S.C. § 1129(b) (2) (B) (ii), some troubling issues should be mentioned.

First, the Bankruptcy Court, sitting alone, conducted the Confirmation Hearing. See supra note 16. This appears to be contrary to the agreement of the parties and, ostensibly, the initial consent of both the District Court and Bankruptcy Court. However, neither Court entered an order requiring a joint proceeding. After creditors from another asbestos bankruptcy case filed a motion to recuse Judge Wolin, see supra note 16, Judge Wolin stayed all proceedings before the District Court, but allowed "any proceeding scheduled to go forward before the Bankruptcy Court [to proceed] except to the extent [Judge Wolin] was scheduled to silt jointly with the Bankruptcy Judge on any matter." (doc. 5975). Given these circumstances, it is unclear whether the Bankruptcy Court should have held the Confirmation Hearing without authorization from the District Court.

Second, the Bankruptcy Court struck the rebuttal report of the Unsecured Creditors' expert, who was to provide testimony at the Confirmation Hearing about asbestos liability valuation in support of the Unsecured Creditors' "unfair discrimination" arguments under 11 U.S.C. § 1129(b).

To the extent that the rebuttal report was stricken as untimely, the Bankruptcy Court did not apply the factors articulated by the Third Circuit in the seminal case of Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977), overruled on other grounds, Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir. 1985)), for determining whether a witness's proposed testimony should be excluded due to a party's noncompliance with discovery time frames. See Confirmation Hr'g, Nov. 17, 2003, Tr. 45-52 (doc. no. 6165).

To the extent that the rebuttal report was stricken as "totally unhelpful," partly due to the expert's qualifications, see Confirmation Hr'g, Nov. 17, 2003, Tr. 52 (doc. no. 6165), the Bankruptcy Court may have deprived the Unsecured Creditors of "sufficient process for defending their evidentiary submissions" by not holding an in limine hearing in accordance with Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), before deciding to exclude the rebuttal report. Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417-18 (3d Cir. 1999).

Although no provision in the scheduling order seemed to allow for the filing of this type of rebuttal report, the Bankruptcy Court may have abused its discretion in excluding the testimony proffered in the rebuttal report, given the apparent lack of compliance with Pennypack and Padillas.

Third, the Unsecured Creditors moved the Bankruptcy Court for a continuance of the Confirmation Hearing until December 12, 2003 or a later date, stating that they had insufficient time between their rejection of the Plan and the Confirmation Hearing to prepare objections and evidence regarding the asbestos liability estimation analysis (doc. no. 6007). The Bankruptcy Court denied the motion without explaining its reasoning (doc. no. 6026). Although the decision to grant or deny a continuance is properly left to the sound discretion of the trial court, Sutherland Paper Co. v. Grant Paper Box Co., 183 F.2d 926, 931 (3d Cir. 1950), it appears that the Bankruptcy Court did not exercise any discretion (or at least did not state the basis for its exercise of discretion) in denying the Unsecured Creditors' motion.

Fourth, the Bankruptcy Court expressly stated at the outset of the Confirmation Hearing that only two questions of fact would be considered: (1) whether the Plan unfairly discriminates against the Unsecured Creditors because of inflated present and future asbestos personal injury liabilities, resulting in a greater recovery for the Asbestos PI Claimants than for the Unsecured Creditors, and (2) whether the issuance of New Warrants to the Asbestos PI Claimants, who waive this distribution under the Plan, is a violation of Section 1145 and/or Section 1129(b) (2) (B) (ii) of the Bankruptcy Code. Confirmation Hr'g, Nov. 17, 2003, Tr. 44-45 (doc. no. 6165). However, testimony at the Confirmation Hearing ranged far beyond these two issues. For example, testimony that the Bankruptcy Court had expressly excluded before the Confirmation Hearing, e.g., testimony regarding the FAIR Act, made its way into the hearing. Confirmation Hr'g, Nov. 18, 2003, Tr. 16-36 (doc. no. 6166). Moreover, while the rebuttal report of the Unsecured Creditors' proposed expert witness was precluded, nonetheless, she was allowed to take the stand as a rebuttal witness, but not allowed to testify as to all matters contained in her rebuttal report. Confirmation Hr'g, Nov. 17, 2003, Tr. 45-52 (doc. no. 6165); Nov. 18, 2003, Tr. 16-36 (doc. no. 6166).

In light of the Court's ruling in the instant matter, the Court need not decide now whether any of these confusing circumstances, alone or in combination, denied due process to the Unsecured Creditors.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*19]

On December 19, 2003, the Bankruptcy Court issued its Proposed Findings of Fact and Conclusions of Law (doc. no. 6255), along with the Proposed Confirmation Order (doc. no. 6256). In response, the Unsecured Creditors filed objections to the proposals with the District Court (doc. no. 6290). Thereafter, Debtor, the Asbestos PI Claimants, and the Future Claimants' Representative filed a joint response to the Unsecured Creditors' objections (doc. no. 6493). On December 15, 2004, this Court held a hearing on the objections (doc. no. 7666).

Now, this Court must decide whether to affirm the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law.

II. STANDARD OF REVIEW

Whether the New Warrants can be distributed to the Equity Interest Holders under Section 1129(b)(2)(B)(ii) is a pure question of law. Steelcase Inc. v. Johnston (In re Johnston), 21 F.3d 323, 328-29 (9th Cir. 1994) (recognizing [HN1]a bankruptcy court's decision that a reorganization plan did not violate the absolute priority rule is a conclusion of law that must be reviewed de novo). There being no relevant facts in dispute, n18 the Court will conduct a de novo review. n19 Because the Plan violates the requirements of [*20] Section 1129 (b) (2) (B) (ii) and unequivocally fails on that basis alone, the Court need not review other aspects of the Plan.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n18 At the Objections Hearing, which was held on December 15, 2004, the parties conceded that no facts are in dispute involving whether the Plan violates the absolute priority rule. Objections Hr'g, Dec. 15, 2004, Tr. 89, 113-14 (doc. no. 7666).

n19 Whether a bankruptcy court engaged in a "core" or "non-core" proceeding is determinative of the standard of review a district court must undertake. District courts have appellate jurisdiction over a bankruptcy court's final orders in "core proceedings." 28 U.S.C. §§ 157 (b) (1), 158 (a). Confirmation of a plan is a "core proceeding." 28 U.S.C. § 157 (b) (2) (L). In core proceedings, the district court serves as the appellate court, reviewing the bankruptcy court's findings of fact for clear error and conclusions of law de novo. Fed. R. Bankr. P. 8013; see also In re Anes, 195 F.3d 177, 180 (3d Cir. 1999) ("In core matters, the District Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law de

novo.").

Alternatively, under Rule 9033(d) of the Federal Rules of Bankruptcy Procedure, a district court must review de novo the bankruptcy court's proposed findings of fact and conclusions of law in "non-core proceedings." Fed. Rule. of Bankr. P. 9033(d); see also 28 U.S.C. § 157 (c) (1) ("In such [a non-core] proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.").

In the instant matter, the parties have agreed that the Court must engage in a de novo review to determine whether the Plan complies with Section 1129 (b) (2) (B) (ii). Unsecured Creditors' Objections to Proposed Findings of Fact and Conclusions of Law P 16 (doc. no. 6290); Joint Response to Objections P 11 (doc. no. 6493).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*21]

## III. CONFIRMATION OF A REORGANIZATION PLAN UNDER 11 U.S.C. § 1129

Confirmation of a reorganization plan breathes new life into a debtor. This significant step affords the debtor a "fresh start" by relieving the debtor of certain pre-petition obligations and altering its financial and legal relationships with its creditors. Given the substantial consequences these rearrangements will have on the debtor, the creditors, and other parties in interest, Congress -- not surprisingly -- has provided explicit requirements that a proposed plan must meet for confirmation. The congressional calculus embodied in the Bankruptcy Code for confirmation of a Chapter 11 reorganization plan is the product of long experience with reorganization legislation and hard-fought battles over policy judgments. Therefore, unless these congressionally mandated requirements are satisfied, a court may not place its imprimatur on a reorganization plan.

[HN2]A plan may be confirmed under either of two scenarios. One is consensually, provided all classes have accepted the plan or are not impaired. 11 U.S.C. § 1129(a). The other is non-consensually, over the non-acceptance [*22] of an impaired class if all the requirements of 11 U.S.C. § 1129(a), except paragraph (8), have been met and the plan "does not discriminate unfairly" and is "fair and equitable." 11 U.S.C. § 1129(b). This latter approach, typically referred to as a "cramdown," is sometimes necessary in order to allow the debtor to override certain objections under appropriate circumstances, which might otherwise allow a small minority to prevent confirmation of the plan. See generally Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133 (1979).

In the present case, there is little doubt that the Plan satisfies all the requirements of Section 1129 (a), except paragraph (8). n20 Therefore, because there is at least one dissenting class and the Plan fails to meet the requirements of Section 1129 (b) (2) (B) (ii), the Court must deny confirmation of the Plan.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n20 Although the Unsecured Creditors have objected, pro forma, to some of the Section 1129 (a) requirements, the gist of the instant litigation revolves around whether the Plan satisfies 11 U.S.C. § 1129 (b) (2) (B) (ii). Hence, for purposes of deciding the instant matter, the Court will assume that the Section 1129 (a) requirements, except for paragraph (8), are met, in any event.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - -

[*23]

## IV. SECTION 1129 (b) (2) (B) (ii) IS ROOTED IN THE JUDICIALLY CRAFTED ABSOLUTE PRIORITY RULE

A. Origins of the Absolute Priority Rule

The principles underpinning Section 1129 (b)'s "fair and equitable" requirement are rooted in the judicially

Page 14

created absolute priority rule. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 444, 143 L. Ed. 2d 607, 119 S. Ct. 1411 (1999) (stating that the absolute priority rule is a "creature [] of law antedating the current Bankruptcy Code"); Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 437 n.2, 32 L. Ed. 2d 195, 92 S. Ct. 1678 (1972) (Douglas, J., dissenting) (discussing the history of the absolute priority rule). The Supreme Court first articulated and applied the absolute priority rule, originally referred to as the "fixed principle," in Northern Pacific Railway v. Boyd, 228 U.S. 482, 57 L. Ed. 931, 33 S. Ct. 554 (1913), which involved a corporate reorganization in an equity receivership. n21 Id. at 507. In Boyd, a general unsecured creditor in a railway company's reorganization was not fully compensated, but the "old" stockholders received property in the reorganized entity. Id. at 501. The [*24] Supreme Court stated:

> If purposely or unintentionally a single creditor was not paid, or provided for in the reorganization, [that creditor] could assert [its] superior rights against the subordinate interests of the old stockholders in the property transferred to the new company.... Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor, [is] invalid.

Id. at 504.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n21 The Supreme Court acknowledged that the rulings in two preceding cases, Railroad Co. v. Howard, 74 U.S. (7 Wall.) 392, 19 L. Ed. 117 (1868), and Louisville Trust Co. v. Louisville, N.A. & C. Ry., 174 U.S. 674, 43 L. Ed. 1130, 19 S. Ct. 827 (1899), reflected a "fixed principle" rationale, without formally announcing the rule. Boyd, 228 U.S. at 505.

- - - - - - - - - - - - End Footnotes- - - - - - - -

In what would lead to the coining of the expression "fixed principle," the Supreme Court wrote: "In cases like this, the question must be decided according to [*25] a fixed principle, not leaving the rights of the creditors to depend upon the balancing of evidence as to whether, on the day of sale, the property was insufficient to pay prior encumbrances." Id. at 507 (emphasis added). And with that, the "fixed principle" -- now known as the absolute priority rule -- was established. Through the early 1900s, the Supreme Court continued to apply this principle in equity receivership cases. See Kan. City Terminal Ry. v. Cent. Union Trust Co., 271 U.S. 445, 453-55, 70 L. Ed. 1028, 46 S. Ct. 549 (1926); Kan. City S. Ry. v. Guardian Trust Co., 240 U.S. 166, 172, 60 L. Ed. 579, 36 S. Ct. 334 (1916). Moreover, the Supreme Court reinforced the importance of the "fixed principle," recognizing that this basic tenet should be strictly applied. Kan. City Terminal Ry., 271 U.S. at 454 ("The fixed principle' . . . declares [that] the character of reorganization agreements must be determined, and to it there should be rigid adherence.").

B. Bankruptcy Act of 1898

In 1934, Congress enacted Section 77B of the Bankruptcy Act of 1898, which governed bankruptcy reorganizations. Section 77B(f) introduced the words "fair and equitable" [*26] to bankruptcy nomenclature. See Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 114-15, 84 L. Ed. 110, 60 S. Ct. 1 (1939). In part, Section 77B(f) stated that "after hearing such objections as may be made to the [reorganization] plan, the judge shall confirm the plan if satisfied that (1) it is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders and is feasible." n22 Bankruptcy Act of 1898 § 77B(f) (1) (repealed 1938), Act of June 7, 1934, ch. 424, Pub. L. 296, 48 Stat. 911, 919 (1934); see also 7 Collier on Bankruptcy P 1129LH at 186 n.33 (15th ed. rev. 2002). "The reason for such a limitation was the danger inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply turn out to be too good a deal for the debtor's owners." 203 N. LaSalle St. P'ship, 526 U.S. at 444.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n22 The successor to Section 77B, Chapter X of the Chandler Act, was enacted in 1938. See 203 N. LaSalle St. P'ship, 526 U.S. at 444.

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*27]

The relationship between the judicially created "fixed principle" doctrine and Section 77B(f)'s "fair and equitable" standard was enunciated by the Supreme Court in Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 84 L. Ed. 110, 60 S. Ct. 1 (1939). There, the Supreme Court held that the "fixed principle" doctrine is "firmly imbedded in [Section] 77B," thereby determining that a "fair and equitable" reorganization plan must meet the requirements of the "fixed principle," i.e., the absolute priority rule. Id. at 118-19; cf. 203 N. LaSalle St. P'ship, 526 U.S. at 448 ("Any argument from drafting history has to account for the fact that the Code does not codify any authoritative pre-Code version of the absolute priority rule.").

C. Bankruptcy Code of 1978 n23

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n23 "The [absolute priority] rule had its genesis in judicial construction of the undefined requirement of the early bankruptcy statute that reorganization plans be fair and equitable.' The rule has since gained express statutory force, and was incorporated into Chapter 11 of the Bankruptcy Code adopted in 1978. Under current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections (absent certain conditions not relevant here) if it fails to comply with the absolute priority rule." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202, 99 L. Ed. 2d 169, 108 S. Ct. 963 (1988) (internal citations omitted).

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*28]

In an effort to modernize bankruptcy law, Congress enacted the Bankruptcy Code of 1978. United States v. Ron Pair Enters., 489 U.S. 235, 240-41, 103 L. Ed. 2d 290, 109 S. Ct. 1026 (1989). Under 11 U.S.C. § 1129 (b) (2) (B) (ii), Congress codified a modified version of the absolute priority rule. Richard Maloy, A Primer on Cramdown -- How and Why It Works, 16 St. Thomas L. Rev. 1, 34 (2003) ("Congress did not codify the Absolute Priority Rule in the form it had developed, which would prohibit any favoritism of claims and interests of higher priority, but rather an Absolute Priority Rule which would apply only if a prior, but impaired, class objected to the plan and a claim junior to that of the objecting party receives property under the plan. It would not be applied if all classes accepted it.") (footnotes omitted); cf. In re PWS Holding Corp., 228 F.3d 224, 237 (3d Cir. 2000) ("This provision, [11 U.S.C. § 1129 (b) (2) (B) (ii) ], is the absolute priority rule.'"). [HN3]For a reorganization plan to be considered "fair and equitable" to a class of dissenting unsecured creditors, "the holder of any claim or interest [*29] that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b) (2) (B) (ii). Whether the Plan complies with this specific provision in the Bankruptcy Code is at issue in this case.

V. THE FOURTH AMENDED PLAN OF REORGANIZATION VIOLATES THE PROVISIONS OF 11 U.S.C. § 1129(b)(2)(B)(ii)

The Court must determine whether distribution to the Equity Interest Holders of New Warrants -- a distribution that the Asbestos PI Claimants would allegedly receive under the Plan, but to which they have agreed to surrender to the Equity Interest Holders -- violates 11 U.S.C. § 1129 (b) (2) (B) (ii) when the higher-priority class of Unsecured Creditors objects to the distribution n24 and its allowed claims have not been paid in full under the Plan.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n24 The Bankruptcy Court approved the New Warrants distribution under the Plan, in part by finding that the Unsecured Creditors waived their right to oppose the arrangement. In its Proposed Conclusions of Law, the Bankruptcy Court stated:
The Unsecured Creditors' Committee made a knowing waiver of a known right to object to [the New Warrants] arrangement when they entered into a consensual plan encompassing it. One cannot simply agree to provisions that might otherwise be suspect and then assert that they are illegal.
Proposed Findings of Fact and Conclusions of Law at P 72 (doc. no. 6255) (emphasis added). This Court disagrees. By participating in negotiations with Debtor and other interested parties to create a workable reorganization plan, the

Unsecured Creditors did not explicitly or implicitly waive their right to object to the Plan at a later time. Even if the Unsecured Creditors changed their minds based on political calculus that the FAIR Act would be passed, this was their prerogative. In the absence of bad faith, which was not alleged here, and particularly in light of the changed circumstances, until a party consents and the consent is final, that party may walk away from the table for a good or bad reason or no reason at all. "To hold that an interested party . . . waives its right to object to a plan by its participation in matters preliminary to the confirmation process would severely limit the flexibility of counsel in representing a client during the Chapter 11 process." In re Huckabee Auto Co., 33 B.R. 141, 149 (Bankr. M.D. Ga. 1981).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*30]

A. The Plain Meaning Rule

[HN4]"It is well settled that the first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." United States v. Cooper, 396 F.3d 308, 310 (3d Cir. 2005) (internal quotations and citations omitted). "Where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'" Ron Pair Enters., 489 U.S. at 241 (quoting Caminetti v. United States, 242 U.S. 470, 485, 61 L. Ed. 442, 37 S. Ct. 192 (1917)); see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 10, 147 L. Ed. 2d 1, 120 S. Ct. 1942 (2000) ("Where the meaning of the Bankruptcy Code's text is itself clear . . . its operation is unimpeded by contrary . . . prior practice.") (quoting BFP v. Resolution Trust Corp., 511 U.S. 531, 546, 128 L. Ed. 2d 556, 114 S. Ct. 1757 (1994)); In re Fegeley, 118 F.3d 979, 983 (3d Cir. 1997) ("We must interpret provisions of the Bankruptcy Code according to the plain meaning of [the] individual provision as long as the provision's language is unambiguous.") (internal quotation and [*31] citation omitted).

[HN5]The plain meaning rule has even greater force when applied to the text of the Bankruptcy Code:

Initially, it is worth recalling that Congress worked on the formulation of the Code for nearly a decade. It was intended to modernize the bankruptcy laws, and as a result made significant changes in both the substantive and procedural laws of bankruptcy . . . In such a substantial overhaul of the system, it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute. The task of resolving the dispute over the meaning [of a statute] begins where all such inquiries must begin: with the language of the statute itself.

Ron Pair Enters., 489 U.S. at 240-41 (internal citations omitted) (emphasis added).

In part, Section 1129 (b) provides:
(1) [HN6]The court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and [*32] equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> * * *
>
> (B) With respect to a class of unsecured claims --
>
> * * *
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b).

Therefore, [HN7]a plan is not "fair and equitable" if a class of creditors that is junior to the class of unsecured creditors receives debtor's property because of its ownership interest in the debtor while the allowed claims of the class of unsecured creditors have not been paid in full. Applying these plain requirements to the instant case, it is clear that (1) the Equity Interest

Page 17

Holders hold a claim junior to the Unsecured Creditors; (2) under the Plan, the Equity Interest Holders will receive property of Debtor (by way of New Warrants) because of their ownership interest in Debtor; and (3) the Unsecured Creditors' [*33] allowed claims will not be satisfied in full. Under these circumstances, the Plan violates 11 U.S.C. § 1129 (b) (2) (B) (ii) and is not "fair and equitable" with respect to the Unsecured Creditors.

B. Legislative Intent

Even if the plain meaning of Section 1129 (b) (2) (B) (ii) were not evident, the available legislative history demonstrates that Congress did not intend for the Bankruptcy Code to allow a senior class to sacrifice its distribution to a junior class when a dissenting intervening class had not been fully compensated. Congress anticipated, but ultimately rejected, this possibility.

The Senate Report written prior to the Bankruptcy Code's enactment proposed that a senior creditor be permitted to alter its distribution for the benefit of stockholders under the "fair and equitable" doctrine. n25 S. Rep. No. 95-989, at 127 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5913. Later, Representative Don Edwards and Senator Dennis DeConcini -- key legislators of the Bankruptcy Code -- explicitly rejected this example. Both Representative Edwards and Senator DeConcini stated that "contrary to the example contained in the Senate report, a senior [*34] class will not be able to give up value to a junior class over the dissent of an intervening class unless the intervening class receives the full amount, as opposed to value, of its claims or interests." 124 Cong. Rec. S. 34007 (Oct. 5, 1978) (remarks of Sen. DeConcini); 124 Cong. Rec. H. 32408 (Sept. 28, 1978) (remarks of Rep. Edwards).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n25 The Senate Report stated:
Under paragraph (9)(A), if a class of claims or interests has not accepted the plan, the court will confirm the plan if, for the dissenting class and any class of equal rank, the negotiated plan provides in value no less than under a plan that is fair and equitable. Such review and determination are not required for any other classes that accepted the plan. Paragraph (9) (A) would permit a senior creditor to adjust his participation for the benefit of stockholders. In such a case, junior creditors, who have not been satisfied in full, may not object if, absent the "give up," they are receiving all that a fair and equitable plan would give them.
S. Rep. No. 95-989, at 127 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5913.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*35]

Reliance upon statements made by Representative Edwards and Senator DeConcini for a determination of congressional intent is particularly appropriate given the recognition by the Supreme Court that "because of the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator DeConcini, we have treated [Representative Edwards's and Senator DeConcini's] floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent." Begier v. I.R.S., 496 U.S. 53, 64 n.5, 110 L. Ed. 2d 46, 110 S. Ct. 2258 (1990).

C. Cases That Do Not Strictly Apply Section 1129 (b) (2) (B) (ii) Are Distinguishable or Wrongly Decided

Debtor contends that, notwithstanding the text of Section 1129 (b) (2) (B) (ii), the Asbestos PI Claimants may share their proposed distribution with the Equity Interest Holders without violating the absolute priority rule. To support this contention, Debtor relies on Official, Unsecured Creditors' Committee v. Stern (In re SPM Manufacturing Corp.), 984 F.2d 1305 (1st Cir. 1993). Because SPM and its progeny have been misread, n26 a full recitation of SPM's facts and the First Circuit's [*36] rationale is in order.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n26 Some courts have read SPM to apply as well to the question of "unfair discrimination." In re Exide Techs., 303 B.R. 48, 77 (Bankr. D. Del. 2003) ("Although SPM was not decided in the context of a chapter 11 plan, courts subsequently have approved chapter 11 plans that included such reallocations.") (emphasis in original); see, e.g., In re Genesis Health Ventures, Inc., 266 B.R.

591, 612 (Bankr. D. Del. 2001) (citing to SPM in support of its "unfair discrimination" analysis).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In SPM, a secured lender entered into a "sharing agreement" with general unsecured creditors to share in the proceeds that would result from a debtor's reorganization. Id. at 1308. The apparent purpose of the agreement was to obtain the cooperation of, the unsecured creditors in the debtor's reorganization which, given that the secured lender had a perfected, first security interest in the debtor's assets, n27 would not have inured to the benefit of the unsecured [*37] creditors. Id. at 1307-08. The reorganization did not work. Id. at 1308-09. Instead, the case was converted to a Chapter 7 proceeding, and the debtor's assets were liquidated. Id.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n27 The secured lender held a perfected, first security interest with the exception of certain real estate, which is not relevant to this discussion. SPM, 984 F.2d at 1307.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The secured lender and the unsecured creditors then sought to compel the Chapter 7 trustee to distribute proceeds from the sale of debtor's assets in accordance with the sharing agreement. Id. at 1309. The sharing agreement provided for the distribution of proceeds from the sale of the debtor's assets to the unsecured creditors, ahead of the priority tax creditors in apparent contravention of the Bankruptcy Code's statutory scheme for distribution. Id. at 1309-12. The bankruptcy court disagreed and, relying upon its equitable powers under 11 U.S.C. § 105(a), ordered the trustee [*38] to distribute the portion of the proceeds due to the unsecured creditors under the sharing agreement in accordance with the distribution scheme embodied by the Bankruptcy Code, i.e., priority tax creditors should be paid ahead of the unsecured creditors. SPM, 984 F.2d at 1309-10. After the district court affirmed the bankruptcy court's decision, the Court of Appeals reversed. Id. at 1310-15.

The question before the First Circuit, which is relevant here, was "whether an order compelling [the secured lender] to pay [to the trustee] from monies realized under its secured interest the amount required by the [Sharing] Agreement to be paid to [the unsecured creditors] is within the equitable powers of the bankruptcy court." Id. at 1311. The Court answered this question in the negative. Id. at 1312-15.

First, the Court recognized that the secured lender was entitled to the entire proceeds of the debtor's assets under its lien, whether or not there was a sharing agreement. Id. at 1312. "Because [the secured lender's] claim absorbed all of [the company's] assets, there was nothing left for any [*39] other creditor in this case." Id. "The syphoning' of the money to general, unsecured creditors came entirely from the [distribution] belonging to the [secured lender], to which no one else had any claim of right under the Bankruptcy Code." Id.

Second, the secured lender only shared its proceeds after the estate property had been distributed. Id. Hence, the sharing agreement had no effect on distributions to other creditors. Id. Even without the agreement between the secured lender and the unsecured creditors, the secured lender would have received the entire allotted distribution under the reorganization plan while the tax creditors would have received nothing. Id. at 1312-13. "While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors [from property of the estate], creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors." Id. at 1313 (internal citation omitted).

SPM is inapposite to the instant case for several reasons. First, the distribution in SPM occurred in a Chapter 7 proceeding, [*40] where the sweep of 11 U.S.C. § 1129 (b) (2) (B) (ii) does not reach. Moreover, the unsecured creditors in SPM, rather than being deprived of a distribution, were receiving a distribution ahead of priority. Therefore, the teachings of the absolute priority rule -- which prevents a junior class from receiving a distribution ahead of the unsecured creditor class -- are not applicable.

Second, the secured lender in SPM held a perfected, first security interest in all of the debtor's assets, with the exception of certain real estate. Although the agreement between the secured lender and the unsecured creditors implicated property of the estate, n28 the property was not subject to distribution under the Bankruptcy Code's priority scheme. n29 In re Darnell, 834 F.2d 1263, 1265 (6th Cir. 1987) (Chapter

Page 19

7 proceeding) ("In bankruptcy, a debtor's assets in the hands of the trustee are subject to all liens and encumbrances existing at the date of the bankruptcy (and which are not otherwise invalidated by law). . . . Accordingly, as a general rule, if a lien is perfected, it must be satisfied out of the asset (s) it encumbers before any proceeds [*41] of the asset (s) are available to unsecured claimants, including those having priority. . . ."); see also SPM, 984 F.2d at 1312 (citing In re Darnell, 834 F.2d at 1265). In fact, as the First Circuit recognized, the distribution scheme under the Bankruptcy Code, 11 U.S.C. § 726, is not implicated "until all valid liens on the property are satisfied." SPM, 984 F.2d at 1312.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n28 Under 11 U.S.C. § 541, property of the estate is defined as, inter alia, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); United States v. Whiting Pools, Inc., 462 U.S. 198, 203, 76 L. Ed. 2d 515, 103 S. Ct. 2309 (1983).

n29 Section 726 of the Bankruptcy Code prescribes the priorities for distribution of a debtor's property. 11 U.S.C. § 726.

- - - - - - - - - - - - End Footnotes- - - - - - - -

Third, rather than viewing a distribution of the debtor's property [*42] in contravention to the Bankruptcy Code's distribution scheme, the sharing agreement approved in SPM may be more properly construed as an ordinary "carve out," n30 i.e., "an agreement by a party secured by all or some of the assets of the estate to allow some portion of its lien proceeds to be paid to others [to secure their cooperation or to compensate priorities as part of cash collateral agreements]." In re White Glove, Inc., 1998 Bankr. LEXIS 1303, Nos. 98-12493, 98-12494, 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998). Unlike the Debtor in the instant case, the secured lender in SPM had a substantive right to dispose of its property, including the right to share the proceeds subject to its lien with other classes.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

N30 In addition to a "carve out," the Bankruptcy Code permits distribution of the debtor's property contrary to the priority scheme of Section 726 when a holder of a particular claim or interest agrees to less favorable treatment under a reorganization plan. 11 U.S.C. § 1123(a)(4). Under this section, a reorganization plan shall "provide the same, treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Id.

Additionally, a "surcharge" of property subject to a creditor's lien is permitted under certain circumstances. See, e.g. Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.), 255 F.3d 1061, 1067 (9th Cir. 2001). A "surcharge" allows the trustee to recover "administrative expenses from the collateral of a secured creditor if: (i) the expenses are necessary' to preserve or dispose of the collateral, (ii) they are reasonable' and (iii) the incurrence of expenses provided a benefit' to the secured creditor.'" In re Nuclear Imaging Sys., Inc., 270 B.R. 365, 371 (Bankr. E.D. Pa. 2001) (quoting, in part, L. King, 4 Collier on Bankruptcy, P 506.05 at 506-122).

Neither of these scenarios is implicated in the instant matter.

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*43]

Debtor also points to In re WorldCom, Inc., No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003), a case where the bankruptcy court approved voluntary distributions from one class of creditors to another under a reorganization plan. Id. at *179-80. Unlike the instant case, In re WorldCom did not involve the distribution of the debtor's property to any class of interests junior to the unsecured creditors on account of the junior creditors' equity interests in the debtor. Id. at *180 ("No Class of Claims or Equity Interests that is junior to WorldCom General Unsecured Claims and MCI Pre-merger Claims will receive any property under the Plan on account of such Claims or Equity Interests."). Therefore, the absolute

Page 20

priority was not implicated. Id.

Also distinguishable on the facts is In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001), where apparently a distribution to management (on account of its equity interest) was "carved out" voluntarily from the senior lender's liens. Id. at 616-18. Although the bankruptcy court recognized that this aspect of the plan "might indeed be violative [*44] of the absolute priority rule," Id. at 617, to the extent that the distribution to the junior class involved debtor's property subject to the senior lenders' liens, the principles underpinning the absolute priority rule were not offended. Id. at 617-18.

Nor is In re MCorp Fin., Inc., 160. B.R. 941 (S.D. Tex. 1993) factually apposite. In that case, the district court approved a plan that provided for the use of proceeds from the distribution to senior creditors -- and with the consent of the senior creditors -- to fund settlement of pre-petition litigation between the debtor and a third party. Id. at 948, 960. The instant case, of course, does not involve settlement of pre-petition litigation between the Asbestos PI Claimants and the Equity Interest Holders.

In any event, to the extent that In re WorldCom, In re Genesis Health Ventures, and In re MCorp Financial read SPM to stand for the unconditional proposition that "creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including sharing them with other creditors, so long as recoveries received under the plan by other creditors [*45] are not impacted," In re WorldCom, 2003 Bankr. LEXIS 1401, at *179, without adherence to the strictures of 11 U.S.C. § 1129(b) (2) (B) (ii), that contention is flatly rejected here. See generally Kenneth N. Klee, Adjusting Chapter 11: Fine Tuning the Plan Process, 69 Am. Bankr. L.J. 551, 570-71 (1995) [HN8]("[A] plan should not be permitted to be crammed down where a senior class gives up value to a junior class while skipping over an intermediate or co-equal class. Although the argument can be and has been made that senior creditors should be entitled to do what they want with their property, the lessons of history should suffice to impose a per se rule that precludes senior creditors from collaborating with junior creditors or equity owners at the expense of intervening classes.") (footnotes omitted); In re Snyders Drug Stores, Inc., 307 B.R. 889, 896 n.11 (Bankr. N.D. Ohio 2004) (discussing unfair discrimination under Section 1129 (b)) ("The agreement at issue [in SPM] was not proposed as part of the plan of reorganization, but was instead in the nature of a partial assignment or subordination agreement [*46] that was not subject to the Code's confirmation requirements. Also, the property to be distributed was not property of the estate."); In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850, 865 (Bankr. S.D. Tex. 2001) (discussing unfair discrimination under Section 1129(b)) ("To accept [the secured lender's] argument that [it] can, without any reference to fairness, decide which creditors get paid and how much those creditors get paid, is to reject the historical foundation of equity receiverships and to read the § 1129(b) requirements out of the Code. . . . To accept that argument is simply to start down a slippery slope that does great violence to history and to positive law.").

Bluntly put, no amount of legal creativity or counsel's incantation to general notions of equity n31 or to any supposed policy favoring reorganizations over liquidation supports judicial rewriting of the Bankruptcy Code. Accordingly, the New Warrants distribution to the Equity Interest Holders under the Fourth Amended Reorganization Plan violates 11 U.S.C. § 1129 (b) (2) (B) (ii). The Plan, therefore, cannot be confirmed.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n31 [HN9]Although under Section 105 (a) of the Bankruptcy Code a bankruptcy court may exercise equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," this power is not unfettered. 11 U.S.C. § 105 (a). As the Third Circuit recently reminded us in In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004), "the equitable powers authorized by § 105 (a) are not without limitation, and courts have cautioned that this section does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." Id. at 236 (internal quotations and citation omitted).

- - - - - - - - - - - - End Footnotes - - - - - - - - -

[*47]

## VI. CONCLUSION

For the reasons set forth above, the Court denies confirmation of the Fourth Amended Plan of Reorganization.

## ORDER

**AND NOW,** this **23rd** day of **February, 2005,** it is hereby **ORDERED** that confirmation of Debtors' Fourth Amended Plan of Reorganization (doc. no. 4802), including any technical modifications made thereto, is **DENIED.**

**IT IS FURTHER ORDERED** that counsel for Debtors shall serve a copy of this Order and the accompanying Memorandum on all interested parties.

**AND IT IS SO ORDERED.**

**EDUARDO C. ROBRENO, J.**