IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x

*In re*                                          :        Chapter 11 Case No.
                                                 :
ARMSTRONG WORLD INDUSTRIES,                      :        00-4471 (RJN)
INC., *et al.*,                                  :
                                                 :
                        Debtors.                 :        (Jointly Administered)
                                                 :        Re: Docket No. 6209

---------------------------------------------------------x

PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW REGARDING CONFIRMATION OF THE
FOURTH AMENDED PLAN OF REORGANIZATION
OF ARMSTRONG WORLD INDUSTRIES, INC., AS MODIFIED

Armstrong World Industries, Inc. ("*AWI*"), as debtor and debtor in

possession (the "*Debtor*"), having proposed and filed the Fourth Amended Plan of

Reorganization of Armstrong World Industries, Inc., dated May 23, 2003 (as modified by

the Modifications to the Fourth Amended Plan of Armstrong World Industries, Inc., dated

October 17, 2003 and the Additional Modifications to the Fourth Amended Plan of

Armstrong World Industries, Inc. filed on November 10, 2003 (collectively, the

"*Modifications*"), the "*Plan*"),[1] and the Disclosure Statement in respect of the Plan, dated

June 2, 2003 (the "*Disclosure Statement*"); and the procedures for solicitation and

tabulation of votes to accept or reject the Plan having been approved by the Bankruptcy

Court pursuant to an order dated April 21, 2003 (the "*Voting Procedures Order*"); and the

Disclosure Statement having been approved by the Bankruptcy Court pursuant to an order

dated June 4, 2003, as containing "adequate information" pursuant to section 1125 of the

Bankruptcy Code (the "*Disclosure Statement Order*"); and the Affidavit of Trumbull

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

6256
12/19/03

Associates LLC (f k a. Trumbull Services, LLC) ("*Trumbull*") Regarding Service by First Class Mail of the Solicitation Materials Related to the Plan Pursuant to the Disclosure Statement Order, dated July 1, 2003 (the "*Trumbull Affidavit of Mailing*"), having been filed with the Bankruptcy Court, and the Affidavit of Service of Voting Documents by Innisfree M&A Incorporated ("*Innisfree*"), dated June 25, 2003 (the "*Innisfree Affidavit of Mailing*" and, together with the Trumbull Affidavit of Mailing, the "*Affidavits of Mailing*"), having been filed with the Bankruptcy Court; and the certificate of publications of Kathy Kinsella of Kinsella Communications, Ltd. (the "*Certificate of Publications*") attesting to the publication of the Confirmation Hearing Publication Notice and the Asbestos Publication Notice (as hereinafter defined) in accordance with the Voting Procedures Order having been filed with the Bankruptcy Court; and the Certification of Votes Tabulated by Trumbull (the "*Trumbull Certification*") and the Certification of Votes Tabulated by Innisfree (the "*Innisfree Certification*" and, together with the Trumbull Certification, the "*Certifications of Votes*") having been filed with the Bankruptcy Court on November 7, 2003; and AWI having filed with the Bankruptcy Court the affidavits in support of confirmation of the Plan of (i) William C. Rodruan, Vice President and Controller of AWI (the "*Rodruan Affidavit*"), (ii) Daniel L. Aronson, a Director of Lazard Frères & Co. LLC, ("*Lazard*"), financial advisors to AWI (the "*Aronson Affidavit*"), and (iii) Dean M. Trafelet, the Future Claimants' Representative (the "*Trafelet Affidavit*" and, together with the Rodruan Affidavit and the Aronson Affidavit, the "*Affidavits in Support of Plan Confirmation*") (collectively, with the Affidavits of Mailing, the Certificate of Publications, and the Certifications of Votes, "*AWI's Confirmation Documents*"); and each of the Objections (as hereinafter defined)

having been resolved, overruled or withdrawn; and the Bankruptcy Court having conducted a hearing to consider confirmation of the Plan on November 17, 2003 (the "*Confirmation Hearing*"); and the Bankruptcy Court having reviewed and considered the Plan, the Exhibit Volume filed with the Bankruptcy Court on September 5, 2003 (as modified by the Modifications and as may be modified from time to time, the "*Exhibit Volume*"), AWI's Confirmation Documents, the Disclosure Statement, the Disclosure Statement Order, and the entire record of the Confirmation Hearing (including the testimony of Dr. Mark A. Peterson), and the Bankruptcy Court being familiar with the Plan and other relevant factors affecting AWI's chapter 11 case (the "*Chapter 11 Case*"); and the Bankruptcy Court having taken judicial notice of the entire record of the Chapter 11 Case since the Commencement Date; and the appearance of all interested parties having been duly noted in the record of the Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND, CONCLUDED, AND ADJUDGED, AS FOLLOWS:

## FINDINGS OF FACT[2]

### History of AWI's Involvement with Asbestos-Containing Products

1.    AWI's involvement in asbestos personal injury litigation relates primarily to its involvement in the high temperature insulation contracting business.

---

[2] The Findings of Fact and Conclusions of Law contained herein constitute proposed findings of fact and conclusions of law proposed to be adopted by the District Court and required to be entered pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*").

Throughout the early 1900's, AWI (then known as Armstrong Cork Company) manufactured, installed, and serviced low temperature primarily cork based products for cold storage insulation and pipe covering applications. In addition, as an adjunct to these cold storage contracting activities, from around 1910 to 1933, AWI manufactured various high temperature insulation products, including some that contained asbestos. These products have not been the subject of significant claims  (Disclosure Statement, p. 14, Docket No. 4801).

2.    Commencing in 1939, AWI expanded its low temperature insulation contracting business into high temperature contracting services.  AWI generally manufactured its own low temperature insulation materials for use in its contracting services, but did not manufacture the high temperature insulation materials used in its contracting operations.  Some of the high temperature products furnished and installed in the contracting operations contained asbestos.  (Disclosure Statement, p. 14, Docket No. 4801).

3.    As a part of overall organizational changes that took place in the late 1950's, AWI separated the insulation contracting business from the remainder of the company with the formation of a separate, independent subsidiary, Armstrong Contracting and Supply Corporation ("*ACandS*"). From January 1, 1958 through July 1969, ACandS operated as an independent subsidiary in the insulation contracting business.  During this period, AWI licensed certain trade names and trademarks to ACandS, which ACandS placed on certain insulation products manufactured by others.  In addition, from 1964 through 1969, another independent subsidiary of AWI, National Cork Company ("*NCC*"), operated an insulation contracting business. Other than two specific products, AWI did not

manufacture or sell any asbestos containing thermal insulation materials during this period. (Disclosure Statement, p. 14, Docket No. 4801).

4.     In August of 1969, a group of ACandS management employees formed a holding company and purchased the stock of ACandS from AWI. In connection with such sale, AWI assigned certain trade names to ACandS, but ACandS was not licensed to use, and did not use, AWI's trademark or the trade style "(A)rmstrong." ACandS continues to exist today and is now known as ACandS, Inc. (Disclosure Statement, p. 14, Docket No. 4801). On September 19, 2002, ACandS filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. *In re ACandS, Inc.*, Chapter 11 Case No. 02-12687 (RJN) (Bankr. D. Del.).

5.     AWI manufactured only two asbestos-containing insulation materials between 1939 and 1968 – LT Cork Covering and Armaspray. LT Cork Covering (1956-1959) was a cork product with a purchased paper wrapper that contained chrysotile asbestos  Armaspray (1966-1968) was an investigatory high temperature spray applied insulation material that contained less than 10% amosite asbestos and was sold only to ACandS for installation.  LT Cork Covering with the asbestos paper covering and Armaspray were not commercially successful products, and AWI had no involvement with asbestos containing insulation materials after AWI stopped making Armaspray in 1968. (Disclosure Statement, p. 14, Docket No. 4801).

6.     The Disclosure Statement lists the asbestos-containing insulation products sold and/or installed by AWI during various points of AWI's history from about 1910 to 1957 (and to a very limited extent from 1958 to 1969), or that are believed to have been used, installed, or sold by AWI's former subsidiaries ACandS (from 1958 to 1969)

and NCC (from 1964 to 1969). (Disclosure Statement, p. 14, Docket No. 4801). The information contained in the Disclosure Statement is not intended to be an exhaustive list, but is intended to identify those products that have been the most identified by claimants in the course of AWI's history and based upon information acquired about the activities of ACandS from 1958 to 1969 and NCC from 1964 to 1969. Such products were primarily (if not exclusively) used in the high temperature insulation contracting installation operations where AWI, ACandS, or NCC employed insulators. (Disclosure Statement, pp. 14-15, Docket No. 4801).

7.    In addition to the products listed in the Disclosure Statement, AWI, ACandS, or NCC may have used other asbestos-containing high temperature insulation products manufactured by other manufacturers in the course of their contract insulation installation activities, depending on the requirements of the particular contract involved. It is impossible to state with certainty what other specific asbestos-containing products might have been called for by these contracts. (Disclosure Statement, p. 16, Docket No. 4801)

8.    From 1932 until 1982, AWI manufactured various forms of resilient floor tiles, some of which contained encapsulated chrysotile asbestos. From 1954 until 1983, some of the sheet vinyl resilient floor coverings that AWI manufactured and sold were on an asbestos-containing backing material, which was designated as "Hydrocord." The chrysotile asbestos was bound into the Hydrocord backing by a latex binder, and, as installed, the backing was covered by a sheet vinyl floor covering that did not contain asbestos. (Disclosure Statement, p. 16, Docket No 4801).

9.    From the early 1950's until the late 1980's, AWI manufactured and sold gasket materials primarily intended for mechanical applications, including internal

combustion engines. Some of these gasket materials contained encapsulated asbestos fiber. As a general matter, this gasket material was not sold directly to end users but to secondary processors for the creation of prefabricated gaskets for resale. (Disclosure Statement, p. 16, Docket No. 4801).

10. All AWI-manufactured acoustical ceiling products never contained asbestos. AWI, however, sold a specialty asbestos cement ceiling board between the mid-1940's and the mid-1970's. This ceiling product, which was composed of asbestos containing Portland cement manufactured by both Keasbey & Mattison and National Gypsum Company, was slate-like in its appearance (which made it readily distinguishable from AWI's acoustical ceiling materials), was intended for use in high humidity areas, and was generally attached to the surface with furring strips and fasteners (and not a suspended grid system). (Disclosure Statement, p. 16, Docket No. 4801).

11. During the period between the mid-1930's and mid-1980's, some of the related adhesive products that AWI manufactured and sold for use in the installation of resilient floor tile or acoustical ceiling tile contained encapsulated chrysotile asbestos (Disclosure Statement, p. 16, Docket No. 4801).

12. AWI manufactured two distinct roof deck systems: (1) Fluid Applied and (2) Travelon Weather Deck. Components of both systems contained asbestos. These were special-purpose systems that were distinguishable from traditional built-up roofing. Both roofing systems were unique and specially directed to a highly specialized segment of the roofing market. These products were not commercially successful and, therefore, were discontinued shortly after their introduction in the mid-1960's. (Disclosure Statement, p. 16, Docket No. 4801).

**Prepetition Asbestos-Related**
**Personal Injury Litigation Against AWI**

  13. Prior to the Commencement Date, AWI was named as a defendant in personal injury and wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products. Nearly all of the asbestos-related personal injury and wrongful death actions brought against AWI related to individuals who claim they were exposed to the asbestos-containing high temperature thermal insulation products used by AWI in its insulation contracting activities prior to 1958, or used by ACandS including in connection with ACandS's use of AWI's licensed trade name or trademarks after 1958. Many of these claims have involved allegations of negligence, strict liability, and breach of warranty, and some have alleged conspiracy or other claims that seek to make AWI responsible for the activities of ACandS. In some instances, asbestos-related personal injury claims have been asserted against AWI on account of its asbestos-containing gaskets or flooring materials. (Disclosure Statement, p. 17, Docket No. 4801).

  14. During the three-year period immediately prior to its December 6, 2000 chapter 11 filing, AWI paid over $500 million in settlement payments (including defense costs) on account of asbestos-related personal injury and wrongful death claims. As of September 30, 2000, approximately 173,000 asbestos-related personal injury and wrongful death claims were pending against AWI within the tort system in a multitude of jurisdictions. (Disclosure Statement, p. 17, Docket No. 4801).

**AWI's Asbestos Personal Injury Liability**

  15. AWI is a defendant in personal injury claims and property damage claims related to asbestos-containing products. Nearly all personal injury claims against

8

AWI seek general and punitive damages arising from alleged exposures, at various times, from World War II onward, to asbestos-containing products. Claims against AWI, which can involve allegations of negligence, strict liability, breach of warranty and conspiracy, primarily relate to AWI's involvement with asbestos-containing insulation products. In addition, other AWI products, such as gasket materials, have been named in some litigation. Claims may arise many years after first exposure to asbestos in light of the long latency period (up to 40 years or more) for asbestos-related injury. Before filing for bankruptcy protection on December 6, 2000, AWI was involved in all stages of claims resolution and litigation, including individual trials, consolidated trials and appeals.

16.    To handle the asbestos personal injury claims, in 1988 AWI became a member of the Center for Claims Resolution ("CCR"), a group of asbestos defendants who work together to defend and resolve asbestos claims  According to the Producer Agreement, a principal goal of the CCR is to "resolve meritorious asbestos-related claims in a fair and expeditious manner and, where necessary, defend asbestos-related claims efficiently and economically." It was AWI's goal in handling its asbestos liabilities to minimize the dollars it paid to asbestos personal injury claimants, "in keeping with what it felt its obligations were to people who had in fact been injured " (Deposition of Deborah K. Owen, at 120).[3]

17    CCR resolved claims against its members, including AWI, by both entering into settlements of trial-listed cases with individual plaintiffs or groups of plaintiffs, or by resolving large numbers of claims at once through group settlements

---

[3]    Note that, on the transcript of Ms. Owen's deposition, she is mistakenly referred to throughout as "Barbara" Owen. Her proper name is Deborah K. Owen.

pursuant to the CCR's "Strategic Settlement Program." CCR would settle claims only if the plaintiff agreed to release all CCR members. The costs of each settlement or group settlement were divided among the CCR members under a complicated formula agreed to pursuant to the Producer Agreement.

18.    During the first nine months of 2000, the CCR received and verified approximately 45,300 claims naming AWI as a defendant compared to approximately 40,500 during the first nine months of 1999.

19.    According to its 10-Q for the quarter ended September 30, 2000, AWI made liability payments of $220.8 million to resolve asbestos claims during the 12 months preceding the end of this quarter.

20.    AWI included a reserve for asbestos liabilities to future claimants in its financial statements. The reserve was based on AWI's past claims resolution history which included how many claims had settled and the average settlement amount per claim. (Deborah Owen Deposition, at 126).    The claims history and resultant liability was projected for six years into the future.    AWI made no attempt in its financial statements to capture the total asbestos liability it might be facing. (Owen Deposition, at 126-127).

21.    To place a value on AWI's total asbestos personal injury liability as of the bankruptcy Petition Date, AWI and the Official Committee of Asbestos Personal Injury Claimants proffered the expert opinion testimony of Dr. Mark A. Peterson.

22.    Dr. Peterson is an attorney with a Ph.D. in social psychology. He is associated with the Rand Institute where for over 20 years he has been involved in studying the tort claiming process. Dr. Peterson is an acknowledged expert in the field of mass tort valuation and has qualified on numerous occasions as an expert witness on the

valuation of current and the projection and valuation of expected future asbestos personal injury claims. He has qualified as an expert and testified on asbestos claims projections and valuation in over a dozen cases since 1993 including the Babcock & Wilcox, Fuller Austin, Eagle-Picher, National Gypsum, Celotex, Fibreboard, Hillsborough Holdings, and Western MacArthur proceedings, all cases in which the liabilities of an asbestos defendant were in dispute. In addition to his work as a testifying expert witness, Dr. Peterson has served as a consultant on asbestos claims projections and valuation of asbestos liabilities to asbestos defendants, insurance companies, 12 different asbestos settlement trusts, and several courts. He also serves as a Special Advisor to Judge Jack Weinstein, the United States District Court Judge who oversaw the litigation in which the Manville Trust was restructured. In all of these engagements, Dr. Peterson followed the same general methodology for valuing asbestos liabilities that he used in his analysis and testimony here.

23.    After confirming its reliability, Dr. Peterson used AWI's claims history database as a basis for his valuations and projections.[4] Dr. Peterson first valued AWI's liability for claims pending on the Bankruptcy Petition Date, grouping the pending claims into disease categories (mesothelioma, lung cancer, other cancer, non-malignant asbestos disease), discounting the total number of pending claims by the AWI historical percentage of claims dismissed without payment and then multiplying the remaining "likely to be paid" claims by the average resolution amount for each particular claim

---

[4]    As part of the claims settlement process, CCR kept hardcopy records and an electronic database (the "CCR database") containing information for each separate asbestos personal injury claim, including information concerning the claimant's identifying information, the dates of exposure, the asbestos-related medical condition the plaintiff complained of, the amount of any settlement, and when the file was closed.

category. Dr. Peterson arrived at a (nominal) valuation of the liability for the 165,048 pending cases as of December, 2000 of $837.9 million.

24.    Dr. Peterson's methodology for projecting future claims assumed that, absent evidence to the contrary, future claiming against AWI would broadly follow its well-established historical patterns, in terms of claims against AWI relative to the continuing incidence of asbestos-related cancers in the general population, the ratio of non-malignant to malignant claims, and with respect to amounts paid to resolve claims for different diseases. His methodology also took account of foreseeable changes in factors affected by non-epidemiological influences – including changes in the propensity to file against AWI, the ratio of non-malignant to malignant disease claims and the amounts paid to settle cases.

25.    To predict the ongoing incidence of asbestos-related cancers, Peterson used the seminal 1982 work of Drs. Nicholson, Perkel and Selikoff. Their studies analyzed the incidence of asbestos-related cancer deaths in a range of occupations, and projected the number of such deaths in the United States in future years. The Nicholson projections took into account differences in intensity of exposure in various occupations, and the resulting differential impact on incidence of disease.

26.    The Nicholson studies had predicted that, during the 1990's, the incidence of asbestos-related cancers would gradually peak and begin to go down slowly, until 2040. The accuracy of these projections of incidence for mesothelioma has been confirmed by data on actual mortality experience collected by the National Cancer Institute.    The close correspondence between predicted and actual incidence of

mesothelioma also validates the Nicholson projections for the other asbestos-related cancers.

27.    Dr. Peterson then measured the relationship between the overall incidence of asbestos-related cancer deaths and claims against AWI – the "propensity to sue." He found that during the most recent period annual claims against AWI alleging mesothelioma represented over 50 percent of the number of deaths from mesothelioma nationwide. Dr. Peterson testified that in his opinion this claiming ratio would increase for the next several years at the rate it had increased over the previous years (the "increasing" forecast). As a sensitivity analysis he also made a projection based upon the assumption that the propensity to sue AWI would remain at its 1999-2000 (the "no increase" forecast). It is Dr. Peterson's opinion that the "increasing propensity to sue" forecast is far more likely to occur and that the "no increase" forecast is unreasonably low. Dr. Peterson made a similar analysis, and similar alternate assumptions, for lung and other cancers.

28.    To project the number of future claims for non-malignant diseases, Dr. Peterson, following the practice of most who forecast asbestos claims, looked to the historical relationship of AWI's non-malignant claims to its cancer claims – the "non-malignant multiplier." In doing so, he considered AWI's historical experience of the relationship between the two types of claims. Dr. Peterson testified, and the Court finds, that the historical ratio of non-malignant claims to cancer claims for AWI has remained relatively constant over the past decade.

29.    Dr. Peterson's methodology for valuing AWI's asbestos personal injury liabilities followed generally accepted standards in the field of forecasting asbestos liabilities.

30.    To place a value on the financial liability AWI faced to resolve future claims, Dr Peterson considered the cost at which AWI had been able to resolve similar claims in the past, and the percentage of claims that had been rejected without payment.    Although AWI's average claim resolution cost had increased markedly throughout the 1990's, Dr. Peterson assumed the future claim resolution costs would rise only at the rate of inflation – 2.5%.

31.    Dr. Peterson's valuation of AWI's liabilities for future asbestos claims as of December 2000 was a total nominal cost of $12.199 billion.

32.    As noted above, Dr. Peterson had arrived at a valuation of $837.9 million for the cost of resolving the 165,000 claims pending on December 6, 2000. To the sum of the amounts to resolve both pending and future claims he added the costs of defense, assumed to be equivalent to AWI's historical experience of 3.56% of liability. The resultant estimated undiscounted cost total was $13.540 billion.

33.    Larry Tersigni is a CPA with a background and expertise in audits of public companies, business valuation, advice to clients on potential acquisitions, accounting and solvency issues. Mr. Tersigni testified by Declaration, but was available for cross-examination. Mr. Tersigni testified that in his professional opinion, a risk-free rate of interest is the proper interest rate to use when discounting liabilities owed to involuntary creditors to present value. In addition to his own background, knowledge, training and experience, Mr. Tersigni also relied upon two authoritative accounting pronouncements in reaching his opinion that a risk-free rate of return should be applied: SEC Staff Accounting Bulletin No. 92 – Accounting and Disclosure related to Loss Contingencies, and AICPA Statement of Position 96-1.

34.    Mr. Tersigni testified that risk free rates of return are associated with U.S. Government securities. He also testified that a risk-free rate that was comparable to the maturity of AWI's asbestos liability can be derived from the U.S. Treasury Yield Curve, which estimates the interest rates at which the Treasury could borrow money with maturities ranging from one year to thirty years. Based on his analysis and calculations involving the U.S. Treasury Yield Curve data, Mr. Tersigni opined that as of December 2000, 5.53% was the risk free rate of return that should be used to discount to present value AWI's asbestos liabilities that will be paid in future years.

35.    The present value of the AWI asbestos liabilities projected by Dr. Mark Peterson as of December 2000, discounting by the risk-free interest rate of 5.53%, was $6.479 billion.

**Prepetition Asbestos-Related**
**Property Damage Litigation Against AWI**

36.    Prior to the Commencement Date, AWI was named as a defendant in 273 property damages cases seeking recovery for damages allegedly caused by the presence of asbestos-containing materials in plaintiffs' premises. Such claims generally were not the result of AWI's insulation installation contracting activities. Instead, those that were actively pursued against AWI concerned primarily resilient floor covering products manufactured and sold by AWI prior to 1983. (Disclosure Statement, p. 25, Docket No. 4801).

**Events Leading to the**
**Commencement of AWI's Chapter 11 Case**

37.    On October 5, 2000, Owens Corning ("*OC*") filed for chapter 11 protection to address its asbestos liabilities. *In re Owens Corning, et al.*, Chapter 11 Case No. 00-03837 (JKF) (Bankr. D. Del.). Following the OC filing, AWI was unable to obtain

a replacement credit facility with acceptable terms for its then-existing $450 million credit facility due to expire on October 19, 2000. OC's chapter 11 filing raised additional concerns about the possibility of increased settlement demands of asbestos plaintiffs given that, prior to its filing, OC had been a major defendant in asbestos litigation. (Rodruan Affidavit, at ¶ 5).

38.    On October 25, 2000, both Standard & Poors and Moody's Investors Services downgraded AWI's long-term debt rating, citing the reduction in committed credit facilities, prospects for weaker operating performance, and continued uncertainty surrounding AWI's asbestos personal injury liability as result of, among other things, OC's chapter 11 filing. (Rodruan Affidavit, at ¶ 6).

39.    After October 25, 2000, AWI was unable to issue commercial paper and, instead borrowed from its remaining $450 million credit facility. As of December 6, 2000, approximately $50 million of commercial paper was outstanding, and the entire $450 million credit facility had been drawn and was outstanding. (Rodruan Affidavit, at ¶ 7)

**Commencement of AWI's Chapter 11 Case**

40.    On December 6, 2000 (the "*Commencement Date*"), AWI and two of its wholly-owned direct and indirect subsidiaries, Nitram Liquidators, Inc. and Desseaux Corporation of North America (collectively, the "*Debtors*"), each commenced a case under chapter 11 of the Bankruptcy Code. (Debtors' Chapter 11 Petitions, Docket No. 1).

41.    By previous order of the Bankruptcy Court, dated December 7, 2000, the chapter 11 cases of the Debtors are being jointly administered pursuant to Rule

1015 of the Federal Rules of Bankruptcy Procedure. (Debtors' Joint Administration Order, Docket No. 10).

42.    The Chapter 11 Case originally was assigned to the Honorable Joseph J. Farnan, Jr., a U S. District Court Judge for the District of Delaware. During the fourth quarter of 2001, the U.S. Court of Appeals for the Third Circuit assigned U.S District Court Judge Alfred M. Wolin of New Jersey to preside over the Chapter 11 Case in the District of Delaware. Judge Wolin also presides over other asbestos-related chapter 11 cases pending in the District of Delaware. Judge Wolin retained issues relating to asbestos personal injury claims and referred other asbestos-related issues and bankruptcy-related matters in the Chapter 11 Case to U.S. Bankruptcy Court Judge Randall J. Newsome.

43.    Since the Commencement Date, the Debtors have continued to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

44.    No trustee or examiner has been appointed in the Debtors' chapter 11 cases. On or about December 15, 2000, the United States Trustee for the District of Delaware (the *"U.S. Trustee"*) appointed the Official Committee of Unsecured Creditors (the *"Unsecured Creditors Committee"*), and the Official Committee of Asbestos Claimants (the *"Asbestos PI Claimants' Committee"*). (Notice of Appointment of Unsecured Creditors' Committee, Docket No. 90; Notice of Appointment of the Asbestos PI Claimants' Committee, Docket No. 91).

45.    On or about July 19, 2001, the U S. Trustee appointed the Official Committee of Asbestos Property Damage Claimants (the *"Asbestos PD Committee"*).

17

(Notice of Appointment of Asbestos PD Committee, Docket No 1075). The Asbestos PD Committee was disbanded as of September 18, 2003, pursuant to the terms of the Global Asbestos PD Settlement, which was approved by the Bankruptcy Court on August 25, 2003. (Order Approving Global Asbestos PD Settlement, Docket No. 5464).

46.   On or about March 1, 2002, the Bankruptcy Court entered an order approving the appointment of Dean M. Trafelet as the legal representative for AWI's future asbestos personal injury claimants (the "*Future Claimants' Representative*," and together with the Unsecured Creditors' Committee and the Asbestos PI Claimants' Committee, the "*Committees*"). (Order Appointing Future Claimants' Representative, Docket No. 2096).

### Negotiation of the Plan

47   Since the commencement of its Chapter 11 Case and promptly after achieving stabilization of its business operations, AWI engaged in extensive and continuing negotiations with the various constituents in the Chapter 11 Case in order to formulate a long-term business plan and, ultimately, to formulate, negotiate and propose a plan of reorganization. (Rodruan Affidavit, at ¶ 8).

48.   On August 29, 2002, AWI and the representatives of the Committees appeared at a status conference before the District Court. At such status conference, the District Court requested that AWI file a plan of reorganization within 45 days. (Rodruan Affidavit, at ¶ 9).

49.   Following such status conference, AWI focused its efforts, together with the Committees, on negotiating and working out the details of a comprehensive plan of reorganization that had the support of all the major constituencies in the Chapter 11

Case. These efforts involved substantial time and effort on the part of AWI, the Committees, and their respective professionals. (Rodruan Affidavit, at ¶ 10).

50.    On October 17, 2002, AWI and the representatives of the Committees appeared at a subsequent status conference before the District Court. At such status conference and after substantial negotiations, the parties reached agreement on the terms of a plan that had the support of the Committees. (Rodruan Affidavit, at ¶ 11). As a result of such agreement, on November 4, 2002, AWI filed the Plan of Reorganization of Armstrong World Industries, Inc. with the Bankruptcy Court (the *"Original Plan"*). (Docket No. 3313).

51.    On December 20, 2002, AWI filed the proposed disclosure statement with respect to the Original Plan. (Docket No. 3313).

52.    Subsequent to the filing of the Original Plan and proposed disclosure statement, AWI, the Committees and other parties in interest engaged in further negotiations in an effort to resolve a number of objections that arose in connection with approval of the disclosure statement, which resulted in AWI filing amended plans of reorganization on March 14, 2003 (the *"First Amended Plan"*), April 3, 2003 (the *"Second Amended Plan"*), and May 1, 2003 (the *"Third Amended Plan"*). (Docket No. 4241, No 4414, and No. 4636, respectively).

53.    Hearings to consider the adequacy of the Disclosure Statement were conducted by the Bankruptcy Court on February 28, 2003, April 4, 2003, May 5, 2003, and May 30, 2003 (collectively, the *"Disclosure Statement Hearing"*).

54.    On May 23, 2003, AWI filed the Plan (Docket No. 4802) and the Disclosure Statement (Docket No. 4801) to, *inter alia*, address the comments made by the Bankruptcy Court at the Disclosure Statement Hearing and to make other agreed changes.

55.    A key feature of the Plan is the establishment of the Asbestos PI Trust, into which all present Asbestos Personal Injury Claims and future Demands against AWI will be channeled. From the commencement of AWI's case, no party has seriously disputed that the establishment of such a trust would be the cornerstone of any plan of reorganization in the Chapter 11 Case. Indeed, in order to obtain the benefit of a permanent channeling injunction with respect to Asbestos Personal Injury Claims and Demands, section 524(g) of the Bankruptcy Code requires that such Claims and Demands be channeled to a trust that meets the requirements set forth in such section.

## The Voting Procedures Order

56.    On April 21, 2003, by the Voting Procedures Order, the Bankruptcy Court approved (i) solicitation and tabulation procedures and (ii) the forms of ballots and master ballots (collectively, the *"Ballots"*) to be used in connection with the solicitation of votes to accept or reject the Plan (the *"Voting Procedures"*). (Voting Procedures Order, Docket No. 4564).

## The Disclosure Statement Order
## and Solicitation of Votes on the Plan

57.    On June 2, 2003, by the Disclosure Statement Order, the Bankruptcy Court, among other things, (i) found that sufficient and timely notice of the Disclosure Statement Hearing was given in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court and (ii) approved the Disclosure Statement as containing "adequate

information" within the meaning of section 1125 of the Bankruptcy Code. (Disclosure Statement Order, Docket No. 4885).

58.    The Disclosure Statement Order and the Voting Procedures established the record date for determining creditors entitled to vote on the Plan (the *"Voting Record Date"*) as June 4, 2003.

59.    The Disclosure Statement Order authorized and directed Trumbull and Innisfree (collectively, the *"Voting Agents"*), on behalf of AWI, to solicit acceptances and rejections of the Plan in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and in accordance with the procedures set forth in the Disclosure Statement Order and the Voting Procedures. (Disclosure Statement Order, Docket No. 4885).

60.    In compliance with the Disclosure Statement Order and the Voting Procedures, AWI caused to be transmitted by first class mail, postage prepaid, to (i) each holder of a Claim against AWI listed in the schedules as of the Voting Record Date, (ii) each holder of a Claim represented by a proof of claim filed against AWI, (iii) each Entity listed on the schedules as a party to an executory contract or an unexpired lease with AWI and any Entity listed as a party to any contract listed on Exhibit "8.1," "8.2" or "8.4" to the Plan, (iv) each holder of a Claim held by a Lender (as such term is defined in the Voting Procedures) as of the Voting Record Date, (v) each holder of record of the Equity Interests in AWI, (vi) all holders of Debt Security Claims and the holders of equity securities issued by Armstrong Holdings, Inc. (*"Holdings Equity Securities"*), in accordance with the procedures set forth in section 3.g of the Voting Procedures, and (vii) all known holders of Asbestos Personal Injury Claims and Indirect PI Trust Claims, in

accordance with the procedures set forth in section 4 of the Voting Procedures, the following: (a) a copy of the Disclosure Statement and all exhibits thereto, including, without limitation, the Plan annexed thereto as Exhibit "A" and the Disclosure Statement Order annexed thereto as Exhibit "B;" (b) the Notice of (i) Approval of Disclosure Statement, (ii) Establishment of Record Date for Voting Purposes, (iii) Hearing to Consider Confirmation of the Plan, (iv) Procedures for Objecting to Confirmation of the Plan, and (vi) Procedures and Deadline for Voting on the Plan (the *"Confirmation Hearing Notice"*); and (c) if such holder was entitled, pursuant to the Disclosure Statement Order, to vote, an appropriate Ballot for each class in which such holder was entitled to vote and a pre-addressed return envelope for each such Ballot (collectively, a *"Solicitation Package"*) (Trumbull Affidavit of Mailing, at ¶ 3).

61.    Pursuant to the Disclosure Statement Order, AWI was required to complete such transmittal on or before June 20, 2003 (except with respect to holders of Holdings Equity Securities as described below), and such transmittal was timely completed in accordance with the requirements of the Disclosure Statement Order.    (Trumbull Affidavit of Mailing, at ¶ 2; Innisfree Affidavit of Mailing, at ¶ 3).

62.    Pursuant to the terms of the Disclosure Statement Order, AWI was authorized and directed to cause a Solicitation Package to be served on the holders of Holdings Equity Securities by August 22, 2003. The record date for determining the holders of Holdings Equity Securities entitled to receive Solicitation Packages was set as August 15, 2003 (the *"Holdings Record Date"*) (Rodman Affidavit, at ¶ 11).

63.    In accordance with the Disclosure Statement Order, AWI caused to be transmitted by first class mail, postage prepaid, a Solicitation Package (without a Ballot)

to all holders of Holdings Equity Securities as of the Holdings Record Date, by August 22, 2003. (Trumbull Affidavit of Mailing, at ¶ 4).

64.    The Disclosure Statement Order authorized and directed AWI to provide or cause to be provided notice by publication (the *"Confirmation Hearing Publication Notice"*) of the approval of the Disclosure Statement, the Voting Deadline, the time and place of the Confirmation Hearing, the time and date by which objections to confirmation of the Plan were required to be filed, and other pertinent information. (Disclosure Statement Order, Docket No. 4885).

65    The Confirmation Hearing Publication Notice was published (i) twice in *The New York Times, The Wall Street Journal* and *USA Today* (weekday editions of the national edition), and (ii) once in each of the newspapers and trade publications set forth on Exhibits "E" and "F" to the Disclosure Statement Order, on the dates set forth next to the name of each such publication as set forth in paragraph 6 to the Certificate of Publications, in accordance with the Disclosure Statement Order.    (Certificate of Publications, Docket No. 5309).

66.    The Disclosure Statement Order authorized and directed AWI to provide or cause to be provided notice by publication to all unknown holders of Asbestos Personal Injury Claims (the *"Asbestos Publication Notice"*) of the Voting Deadline, the Objection Deadline and other pertinent information relating to the Confirmation Hearing and the solicitation of votes on the Plan. (Disclosure Statement Order, Docket No. 4885).

67.    The Asbestos Publication Notice was published once in each of the publications listed in paragraph 5 to the Certificate of Publications on the dates set forth next to the name of each such publication. (Certificate of Publication, Docket No. 5309).

68.    AWI's publication of the Confirmation Hearing Publication Notice and the Asbestos Publication Notice complied in all material respects with the requirements of the Disclosure Statement Order and the Voting Procedures.

69.    Written requests for Solicitation Packages were received from each of the persons or entities listed on Exhibit "A" to the Trumbull Certification, and Trumbull mailed by first-class mail, postage-prepaid, a Solicitation Package to each of the persons or entities listed on Exhibit "A" on or about the date specified next to the name of each such person or entity. (Trumbull Certification, at ¶ 7).

70.    AWI's distribution of the Solicitation Packages complied with the requirements of the Disclosure Statement Order.

71.    The Disclosure Statement Order (i) established the date and time by which all Ballots were required to be completed, executed, marked and actually received by the Voting Agents in order to be counted as timely acceptances or rejections of the Plan (the "*Original Voting Deadline*") as September 22, 2003, at 5:00 p.m., Wilmington, Delaware time; (ii) established September 22, 2003, at 4:00 p.m., Wilmington, Delaware time, as the date and time for filing objections to confirmation of the Plan (the "*Objection Deadline*"); (iii) established October 24, 2003, at 4:00 p.m., Wilmington, Delaware time, as the last date and time for AWI, the DIP Lenders, the Prepetition Lenders, and the Committees to file responses to objections to confirmation (the "*Reply Deadline*"); and (iv) scheduled the Confirmation Hearing to commence on November 17, 2003.

72.    By order of the Bankruptcy Court dated September 24, 2003, the Original Voting Deadline was extended to 5:00 p.m., Wilmington, Delaware time, on October 17, 2003. (Order Extending Voting Deadline, Docket No. 5688). Thereafter, by

order of the Bankruptcy Court dated October 11, 2003, the Original Voting Deadline was further extended to 5:00 p.m., Wilmington, Delaware time, on October 31, 2003 (the "*Voting Deadline*"). (Second Order Extending Voting Deadline, Docket No. 5797).

### Filing of the Exhibit Volume

73.    In accordance with Article I.B of the Plan, on September 5, 2003, AWI filed with the Bankruptcy Court the Exhibit Volume, which includes draft forms of (i) the Amended and Restated Articles of Incorporation, (ii) the Amended and Restated By-Laws, (iii) the Asbestos PI Trust Agreement, (iv) the Asbestos PI Trust Distribution Procedures, (v) the Claims Settlement Guidelines, (vi) the New Long-Term Incentive Plan, (vii) the New Warrants, (viii) the Plan Note Indentures, (ix) the Stockholder and Registration Rights Agreement, (x) a list identifying the individuals appointed as Asbestos PI Trustees, (xi) a list identifying the proposed Board of Directors of Reorganized AWI, and (xii) lists of (a) any executory contracts and unexpired leases to be assumed pursuant to the Plan, (b) any executory contracts and unexpired leases to be rejected pursuant to the Plan, and (c) previously listed executory contracts no longer considered executory, and (xiii) Management Agreements that AWI intends to enter into in connection with consummation of the Plan (of which there are none). (Exhibit Volume, Docket No. 5508).

### Classification of Claims and Equity Interests Under the Plan

74.    The Plan designates the following classes of Claims and Equity Interests:

| Class 1 | - | Priority Claims |
| Class 2 | - | Secured Claims |
| Class 3 | - | Convenience Claims |
| Class 4 | - | Asbestos Property Damage Claims |
| Class 5 | - | COLI Claims |
| Class 6 | - | Unsecured Claims other than Convenience Claims |

| Class 7 | - | Asbestos Personal Injury Claims |
| Class 8 | - | Environmental Claims |
| Class 9 | - | Affiliate Claims |
| Class 10 | - | Subsidiary Debt Guarantee Claims |
| Class 11 | - | Employee Benefit Claims |
| Class 12 | - | Equity Interests |

(Plan, Article II).

75.    The Plan defines a "Convenience Claim" as an Unsecured Claim (other than a Debt Security Claim) in the amount of $10,000 or less or that is reduced to $10,000 at the election of the Claimant. A holder of an Allowed Convenience Claim will be paid 75% of the Allowed Amount of its Allowed Convenience Claim in cash on the later of the Effective Date and as soon as practicable after such Convenience Claim becomes Allowed. (Plan, Section 1.48). AWI estimates that approximately 2,050 holders of Unsecured Claims either have Convenience Claims or have elected to have their Unsecured Claims treated as Convenience Claims. (Rodruan Affidavit, at ¶ 13). The treatment of such claims as Convenience Claims enables AWI to avoid having to keep track of such Claims for purposes of making Distributions on each Distribution Date and to avoid having to issue small amounts of New Common Stock and Plan Notes (if issued) to such holders. (Rodruan Affidavit, at ¶ 13). Accordingly, the designation of a class of Convenience Claims (Class 3) is reasonable and necessary for administrative convenience. (Plan, Article II; Rodruan Affidavit, at ¶ 13)

76.    All Claims within each class are substantially similar to the other Claims in that class, and the class of Equity Interests (Class 12) consists of a single holder of Equity Interests. (Plan, Article II; Rodruan Affidavit, at ¶ 14).

77.    The classification scheme was not proposed to create a consenting impaired class or to manipulate class voting. (Plan, Article II; Rodruan Affidavit, at ¶ 14).

The Voting

78.     Section 3.1 of the Plan identifies each of the following Classes as unimpaired under the Plan: Class 1 (Priority Claims), Class 2 (Secured Claims), Class 4 (Asbestos Property Damage Claims), Class 5 (COLI Claims), Class 9 (Affiliate Claims), Class 10 (Subsidiary Debt Guarantee Claims), and Class 11 (Employee Benefit Claims). Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in these Classes, and, therefore, these Classes, are conclusively presumed to have accepted the Plan.

79.     Because of the Global Asbestos PD Settlement and the disallowance of other Asbestos Property Damage Claims, Class 4 no longer has any Claims in it. Moreover, because no Environmental Claims currently exist, Class 8 has no Claims in it. (Rodruan Affidavit, at ¶ 12).

80.     The Voting Agents have made a final determination of the validity of, and tabulation respecting, all acceptances and rejections of the Plan by the impaired Classes of Claims and Equity Interests entitled to vote on the Plan, and the Certifications of Votes set forth such results, including the amount and number of Claims of each Class voting to accept or reject the Plan. The following summarizes, by each impaired Class, the voting on the Plan:

| Class | $ / % voting to Accept | $ / % voting to Reject | # / % voting to Accept | # / % voting to Reject |
|-------|------------------------|------------------------|------------------------|------------------------|
| Class 3 | 2,291,751/98.24% | 41,029/1.76% | 747/98.68% | 10/1.32% |
| Class 6 | 266,151,238/23.21% | 880,433,654/76.79% | 1,646/88.03% | 224/11.98% |
| Class 7 | 3,614,589,300/98.31% | 62,114,300/1.69% | 297,338/98.23% | 5,351/1.77% |
| Class 12 | 40,255,499/100% | _____ | 1/100% | _____ |

Accordingly, each of impaired Classes 3 and 7 has accepted the Plan by at least two-thirds in amount and a majority in number of the Claims in each such Class actually voting. Class 6 has failed to accept the Plan because less than two-thirds in amount of Claims in Class 6 actually voting on the Plan voted to accept the Plan. Class 12 has accepted the Plan by at least two-thirds of the Equity Interests in Class 12 held by the holder of such Equity Interests that has voted on the Plan. Nevertheless, pursuant to Section 3.2(l)(iii) of the Plan, because Class 6 did not vote to accept the Plan, Class 12 is deemed to have rejected the Plan.

81.    Class 7 (Asbestos Personal Injury Claims) has voted by at least 75 percent (75%) of those voting in favor of the Plan.

82.    The determination of the Voting Agents with respect to the voting on the Plan validly and correctly sets forth the tabulation of votes, as required by the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order.

**Modifications to the Plan**

83.    On October 17, 2003 and November 10, 2003, AWI filed the Modifications. Among other things, the Modifications (i) reflect the incorporation of the Term B Loan concept as part of AWI's exit financing facility, (ii) clarify that, with respect to the 144A Offering, (a) if the 144A Offering Proceeds are less than the amounts required under the terms of the Plan, AWI will issue securities substantially similar to the 144A Debt Securities, and (b) the 144A Offering Proceeds are carved out of the definition of Available Cash under the Plan, (iii) reflect an agreement that AWI will not issue any floating rate notes unless such notes are issued on terms and conditions that are mutually

satisfactory to AWI and the Committees, (iv) provide for modifications to the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, which, among other things, preserve the ability of holders of Indirect PI Trust Claims to prove their Claims against the Asbestos PI Trust, and (v) correct technical errors with respect to the agreements listed on Exhibits "8.1," "8.2," and "8.4" to the Plan.

        84.    Notice of the proposed Modifications was provided to the United States Trustee, the attorneys for the Committees, the attorneys for the Debtors' Prepetition Lenders, and all parties on the Debtors' Core Group Service List and All Notices List in these cases pursuant to the Court Order Establishing Case Management Procedures and Hearing Schedule, dated February 11, 2002  The Modifications do not adversely affect the treatment of the Claim of any creditor or the Equity Interests of any equity security holder who has not accepted in writing the Modifications.

## Objections to Confirmation of the Plan

        85.    By the Objection Deadline, objections to confirmation of the Plan (collectively, the "*Objections*") were filed by the following parties:

- ACE USA Insurers (Docket No 5633)

- Amchem Products, Inc., Certainteed Corp., Dana Corp., I.U. North America, Inc., Maremont Corp., National Service Industries, Inc., Nosroc Corp., Pfizer Inc., Quigley Co., Inc., and Union Carbide Corp. (the "*CCR Members*")

- California Franchise Tax Board

- Center for Claims Resolution ("*CCR*")

- Directly Affiliated Local Union 461, AFL-CIO ("*DALU 461*")

- E.F.P. Floor Products Fussboeden GbmH, St. Johann in Tirol (Austria) ("*EFP*")

- Georgia Department of Natural Resources

- John Crane, Inc

- Liberty Property Holdings, L.P.

- Unsecured Creditors' Committee (Conditional Objection)

- Safeco Insurance Company of America ("*Safeco*")

- Solutia Inc.

- Travelers Indemnity Company and Travelers Casualty and Surety Company ("*Travelers*")

- United States

- United States Department of Labor

- United States Gypsum Co. ("*USG*")

- U.S. Trustee

After the Objection Deadline, objections were filed by Liberty Mutual Insurance Company ("*Liberty Mutual*") and Bank One Trust Company, N.A., as indenture trustee ("*Bank One*"). In addition, after the Objection Deadline, on November 12, 2003, the Unsecured Creditors' Committee filed a Memorandum of Law of the Official Committee of Unsecured Creditors in Opposition to Confirmation of the Debtors' Fourth Amended Plan of Reorganization (the "November 12 Objection"). In response to a motion by AWI, dated November 14, 2003, seeking entry of an order pursuant to Bankruptcy Rules 9006 and 3020 striking certain objections contained in the November 12 Objection, the Bankruptcy Court entered a separate order striking certain objections contained in the November 12 Objection. The objections by Liberty Mutual and Bank One, and the remaining objections in the November 12 Objection are included within the scope of the term "Objections" as used herein.

86.    In accordance with the Disclosure Statement Order, AWI filed a reply to the Objections (the "*Reply*") by the Reply Deadline and served the Reply on all entities required to be served so that such entities actually received the Reply by the Reply Deadline.

87.    The Objections of the ACE USA Insurers, Liberty Property Holdings, L.P., the U.S. Trustee, the California Franchise Tax Board, the CCR Members, CCR, DALU 461, EFP, Georgia Department of Natural Resources, John Crane, Inc., Safeco, Solutia Inc., Travelers, the United States, the United States Department of Labor, Liberty Mutual, and USG have been withdrawn. The Objections of the Unsecured Creditors' Committee and Bank One have been overruled. Accordingly, all of the Objections have been withdrawn, overruled, satisfied by consent, modification and/or amendment to the Plan, or otherwise resolved.

### The Asbestos PI
### Permanent Channeling Injunction

88.    The Plan establishes the Asbestos PI Trust, to which all Asbestos Personal Injury Claims are being channeled.

89.    The identities of the proposed trustees of the Asbestos PI Trust were disclosed (i) in Exhibit 7.2 of the Exhibit Volume and (ii) at the Confirmation Hearing, and are as follows: Paul Knutti, Anne Ferazzi, Thomas Tully, Lewis Sifford, and Harry Huge. (Trafelet Affidavit, at ¶ 23). The identities of the proposed members of the Trustees' Advisory Committee (the "*TAC*") were disclosed at the Confirmation Hearing and are as follows: John D. Cooney, Russell W. Budd, Steven Kazan, Joseph F. Rice, and Perry Weitz. (Trafelet Affidavit, at ¶ 25).

90.    With respect to any Asbestos Personal Injury Claim that is allowed by the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, such allowance shall establish the amount of legal liability against the Asbestos PI Trust in the amount of the liquidated value of such Claim, as determined in accordance with the Asbestos PI Trust Distribution Procedures.

91.    The Asbestos PI Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos PI Trust.

92    Section 1.93 of the Plan sets forth the identities of the PI Protected Parties. Pursuant to Section 1.93(i)(iv) of the Plan, Travelers Casualty & Surety Co., Century Indemnity Co., Central National Insurance Company of Omaha, and International Insurance Company, shall be entitled to protection as PI Protected Parties. The identity of each PI Protected Party is readily identifiable (by name or as part of an identifiable group) from the terms of the Plan and the Asbestos PI Permanent Channeling Injunction (which is contained and set forth in the Confirmation Order). Specifically, the Asbestos PI Permanent Channeling Injunction provides that it covers the following parties:

      a. AWI;

      b. Reorganized AWI;

      c Holdings;

      d. AWWD;

      e. any Affiliate;

      f. Interface Solutions, Inc , a corporation organized under the laws of Pennsylvania, but only to the extent that Interface Solutions, Inc. is alleged to be directly or indirectly liable for the conduct

of, Claims against, or Demands on AWI, Reorganized AWI, or the Asbestos PI Trust on account of Asbestos Personal Injury Claims;

g. any Entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of AWI, Reorganized AWI, or the Asbestos PI Trust (but only to the extent that liability is asserted to exist by reason of it becoming such a transferee or successor);

h. any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to Reorganized AWI or the Asbestos PI Trust or to a successor to, or transferee of, any assets of AWI, Reorganized AWI or the Asbestos PI Trust (but only to the extent that liability is asserted to exist by reason of such Entity becoming such a lender or to the extent of any pledge of assets made in connection with such a loan is sought to be upset or impaired); and

i. any Entity to the extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on AWI, Reorganized AWI or the Asbestos PI Trust on account of Asbestos Personal Injury Claims by reason of one or more of the following:

　　(i)　　such Entity's ownership of a financial interest in AWI, Reorganized AWI, a past or present affiliate of

AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), or a predecessor in interest of AWI or Reorganized AWI;

(ii)   such Entity's involvement in the management of AWI, AWWD, Holdings, an Affiliate, Reorganized AWI, or any predecessor in interest of AWI or Reorganized AWI;

(iii)   such Entity's service as an officer, director, or employee of AWI, Reorganized AWI, AWWD, Holdings, an Affiliate, any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc f/k/a Armstrong Contracting and Supply Corp.), any predecessor in interest of AWI or Reorganized AWI, or any Entity that owns or at any time has owned a financial interest in AWI or Reorganized AWI, any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), or any predecessor in interest of AWI or Reorganized AWI.

(iv)   such Entity's provision of insurance to (a) AWI, (b) Reorganized AWI, (c) any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.),

(d) any predecessor in interest of AWI or Reorganized AWI, or (e) any Entity that owns or at any time has owned a financial interest in AWI or Reorganized AWI, any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), or any predecessor in interest of AWI or Reorganized AWI, but only to the extent that AWI, Reorganized AWI, or the Asbestos PI Trust enters into a settlement with such Entity that is approved by the Bankruptcy Court and expressly provides that such Entity shall be entitled to the protection of the Asbestos PI Permanent Channeling Injunction as a PI Protected Party; or

(v)    such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of AWI, AWWD, Holdings, an Affiliate, Reorganized AWI, any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), any predecessor in interest of AWI or Reorganized AWI, or any Entity that owns or at any time has owned a financial

interest in AWI or Reorganized AWI, any past or
present affiliate of AWI or Reorganized AWI (other
than ACandS, Inc. f/k/a Armstrong Contracting and
Supply Corp.), or any predecessor in interest of AWI
or Reorganized AWI.

93.    In light of the benefits provided, or to be provided, to the Asbestos
PI Trust on behalf of each PI Protected Party, the Asbestos PI Permanent Channeling
Injunction is fair and equitable with respect to the persons that might subsequently assert
Asbestos Personal Injury Claims against any PI Protected Party.   (Trafelet Affidavit, at
¶ 8).

94.    At the time of the order for relief with respect to AWI, AWI had
been named as a defendant in personal injury, wrongful death, and property damage
actions seeking recovery for damages allegedly caused by the presence of, or exposure to,
asbestos or asbestos-containing products.  (Rodman Affidavit, at ¶ 4)

95.    The Asbestos PI Trust, as of the Effective Date, will assume the
liabilities of AWI with respect to Asbestos Personal Injury Claims.  (Section 1.4 of the
Asbestos PI Trust Agreement, Exhibit Volume, Docket No. 5510, Tab 3).   Upon such
assumption, Reorganized AWI shall have no liability for any Asbestos Personal Injury
Claim.

96.    Pursuant to Section 10.1 of the Plan, on the later of the Effective
Date and the date by which all the Asbestos PI Trustees have executed the Asbestos PI
Trust Agreement, AWI will transfer to the Asbestos PI Trust the Asbestos PI Insurance
Asset and additional consideration, pursuant to the formula set forth in Section 10.1 of the

Plan, consisting of New Common Stock, Available Cash, and Plan Notes and/or 144A Offering Proceeds. Accordingly, the Asbestos PI Trust will be funded in whole or in part by securities of Reorganized AWI and by the obligation of Reorganized AWI to make future payments, including dividends.

97.    Pursuant to Section 10.1 of the Plan, the Asbestos PI Trust will own, as of the Effective Date, 65.57% of the New Common Stock of Reorganized AWI Accordingly, the Asbestos PI Trust is to own, or by the exercise of rights granted under the Plan would be entitled to own if specified contingencies occur, a majority of the voting shares of Reorganized AWI.

98.    AWI is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos PI Permanent Channeling Injunction. (Testimony of Dr. Mark A. Peterson).

99.    The actual amounts, numbers, and timing of the future Demands cannot be determined. (Testimony of Dr. Mark A. Peterson).

100.    Pursuit of the Demands referenced in Section 7.15(a)(x) of the Plan outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

101.    The terms of the Asbestos PI Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement. (Plan, Docket No. 4802 Sections 1.21, 7.1; Disclosure Statement, Docket No. 4801, pp. 86-89).

102.    The Plan establishes, in Class 7 (Asbestos Personal Injury Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos PI Trust.

103.    The Future Claimants' Representative was appointed as part of the proceedings leading to issuance of the Asbestos PI Permanent Channeling Injunction for the purpose of protecting the rights of persons that might subsequently assert unknown Asbestos Personal Injury Claims and Demands that are addressed in the Asbestos PI Permanent Channeling Injunction and transferred to the Asbestos PI Trust.  The Future Claimants' Representative has fulfilled his duties, responsibilities, and obligations as the future representative in accordance with section 524(g) of the Bankruptcy Code.  (Trafelet Affidavit, ¶ 8).

104.    Identifying each PI Protected Party in the Asbestos PI Permanent Channeling Injunction is fair and equitable with respect to persons that might subsequently assert Demands against each such PI Protected Party, in light of the benefits provided, or to be provided, to the Asbestos PI Trust by or on behalf of any such PI Protected Party. (Trafelet Affidavit, at ¶ 14).

105.    As set forth in the voting summary provided above, and in the Trumbull Certification, Class 7 (Asbestos Personal Injury Claims) has voted, by at least 75 percent (75%) of those voting, in favor of the Plan.

106.    Pursuant to court orders or otherwise, the Asbestos PI Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial

position to pay, Asbestos Personal Injury Claims and Demands that involve similar claims in substantially the same manner. (Trafelet Affidavit, at ¶ 11).

107.    The Bankruptcy Court, subject to the affirmance or entry of an order by the District Court, has jurisdiction to enter the Asbestos PI Permanent Channeling Injunction under section 524(g) of the Bankruptcy Code and sections 1334(a), (b), and (d) of title 28 of the United States Code.

108.    Sections 105(a) and 524(g) of the Bankruptcy Code permit approval and entry of the Asbestos PI Permanent Channeling Injunction, especially where, as here, such injunction is essential to the formulation and implementation of the Plan as provided in section 1123(a)(5) of the Bankruptcy Code, confers material benefits on AWI's estate, is in the best interests of holders of Claims against AWI, and complies in all respects with the requirements of section 524(g) of the Bankruptcy Code.

## The Claims Trading Injunction

109.    Section 1.40 of the Plan provides for the Claims Trading Injunction, which will permanently and forever stay, restrain, and enjoin any Entity from, directly or indirectly, purchasing, selling, transferring, assigning, conveying, pledging, or otherwise acquiring or disposing of any Asbestos Personal Injury Claim. The Claims Trading Injunction, however, will not apply to (i) the transfer of an Asbestos Personal Injury Claim to the holder of an Indirect PI Trust Claim solely as a result of such holder's satisfaction of such Asbestos Personal Injury Claim or (ii) the transfer of an Asbestos Personal Injury Claim by will or under the laws of descent and distribution. The Claims Trading Injunction will also provide that any action taken in violation thereof will be void *ab initio*.

Discharge, Exculpation and Indemnification Provisions

110.    Section 11.2 of the Plan provides that the rights afforded in the Plan
and the treatment of all Claims and Equity Interests therein shall be in exchange for and in
complete satisfaction, discharge, and release of all Claims and Equity Interests of any
nature whatsoever, including any interest accrued thereon from and after the
Commencement Date, against AWI, or its estate, assets, properties, or interests in property.
Except as otherwise provided therein, on the Effective Date, all Claims against and Equity
Interests in AWI shall be satisfied, discharged, and released in full. Reorganized AWI
shall not be responsible for any obligations of AWI except those expressly assumed by
Reorganized AWI in the Plan. All Entities shall be precluded and forever barred from
asserting against AWI, Reorganized AWI, their successors or assigns, or their assets,
properties, or interests in property any other or further Claims based upon any act or
omission, transaction, or other activity of any kind or nature that occurred prior to the
Effective Date, whether or not the facts of or legal bases therefor were known or existed
prior to the Effective Date.

111.    Section 11.6 of the Plan provides that none of Reorganized AWI,
any of the members of the Asbestos PI Claimants' Committee, the Future Claimants'
Representative, any of the members of the Unsecured Creditors' Committee, any members
of the Asbestos PD Committee, AWWD, Holdings, or any of their officers, directors,
employees, or agents shall have or incur any liability to any Entity for any act or omission
in connection with or arising out of the Chapter 11 Case, including, without limitation, the
commencement of the Chapter 11 Case, the negotiation of the Plan, pursuit of confirmation
of the Plan, the consummation of the Plan, or the administration of the Plan or the property

to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Plan. (Plan, Docket No. 4802, Section 11.6).

112    Section 8.6 of the Plan provides that the obligations of AWI to indemnify and reimburse persons who are or were directors, officers, or employees of Holdings, AWWD, or AWI on the Commencement Date or at any time thereafter against and for any obligations (including, without limitation, fees and expenses incurred by the board of directors of Holdings, or the members thereof, in connection with the Chapter 11 Case) pursuant to articles of incorporation, codes of regulations, bylaws, applicable state law, or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date. In furtherance of the foregoing, Reorganized AWI will maintain insurance for the benefit of such directors, officers, or employees at levels no less favorable than those existing as of the date of entry of the Confirmation Order for a period of no less than four years following the Effective Date. (Plan, Docket No. 4802, Section 8.6).

113.    The discharge, exculpation and indemnification provisions of the Plan were negotiated at arm's-length and are integral to the Plan. Without such provisions. the Plan would not have been agreed to by the parties in interest. (Rodruan Affidavit, at ¶ 6).

"Best Interest" Test

114.  Under the Plan, Claims or Equity Interests in Classes 3, 6, 7, 8, and 12 are impaired  (Plan, Article II). Consequently, each holder of a Claim or Equity Interest in such Classes must either accept the Plan or receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if AWI were liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(7).

115.  The Claims in Classes 1, 2, 4, 5, 9, 10 and 11 are unimpaired under the Plan. (Plan, Section II). Consequently, each holder of a Claim in each of such Classes is conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. 11 U.S.C. § 1126(f). The "best interest" test is, accordingly, not applicable to the recoveries of such Classes.

116.  The liquidation analysis set forth in the Disclosure Statement accompanying the Plan (the *"Original Liquidation Analysis"*) was prepared by Lazard, AWI's financial advisor, in conjunction with AWI's management. (Aronson Affidavit, at ¶ 7; Disclosure Statement, Exhibit "E")

117.  In the Original Liquidation Analysis, AWI used, as its estimate for liability on account of Asbestos Personal Injury Claims, the extrapolated value of Asbestos Personal Injury Claims as reflected in the agreed upon allocation of value of Reorganized AWI set forth in the Plan, net of the prepetition book value of the Asbestos PI Insurance Asset (Aronson Affidavit, at ¶ 8). Use of this figure yielded a liability amount for Asbestos Personal Injury Claims of $3,078,432,000. The Disclosure Statement expressly noted, though, that "[t]he Asbestos Personal Injury Claimants' Committee and the Future Claimants' Representative believe that the actual value of Asbestos Personal Injury Claims

would be higher than the assumed value used in the Liquidation Analysis." Using these reduced liability figures, as well as the financial results for AWI as of September 30, 2002, the Original Liquidation Analysis estimated that, in a chapter 7 liquidation of AWI, holders of Unsecured Claims and Asbestos Personal Injury Claims would receive a recovery equal to approximately 25.6% on account of such Claims, and the holder of the Equity Interests in AWI would receive no recovery on account of such Equity Interests. (Disclosure Statement, Exhibit "E," Docket No. 4801).

118.    At the Confirmation Hearing, AWI presented the testimony of Dr. Mark A. Peterson, the asbestos claims expert for the Asbestos PI Claimants' Committee, regarding his view of the estimated range of liability of AWI for Asbestos Personal Injury Claims. Dr. Peterson testified that he estimates the liability for Asbestos Personal Injury Claims to be at least $4.689 billion (assuming no future increase) and more likely $6.479 billion (assuming future increase). Net of the book value of the Asbestos PI Insurance Asset and using Dr. Peterson's estimated range of AWI's liability for Asbestos Personal Claims, AWI's estimated liability for Asbestos Personal Injury Claims in a chapter 7 liquidation would be at least $4.5779 billion.

119.    Lazard updated the Liquidation Analysis using Dr. Peterson's estimated range of liability for Asbestos Personal Injury Claims, as well as AWI's financial results for the period ending September 30, 2003 (the "*Revised Liquidation Analysis*"). (Aronson Affidavit, Exhibit "A"). Under the Revised Liquidation Analysis and using the asbestos liability estimate that Dr. Peterson believes is most reasonable, Lazard concluded in the Revised Liquidation Analysis that the recovery for holders of Unsecured Claims and Asbestos Personal Injury Claims in a chapter 7 liquidation of AWI

would be 15.1%   (Aronson Affidavit, at ¶ 9).  Even using the lowest liability estimate in
Dr. Peterson's analysis (which Dr. Peterson does not believe is reasonable), the recovery
for holders of Unsecured Claims and Asbestos Personal Injury Claims in a chapter 7
liquidation of AWI would be 19 4%.  (Aronson Affidavit, at ¶ 9).

      120.   Each of the holders of Convenience Claims in Class 3 will be paid
75% of the Allowed Amount of its Allowed Convenience Claim, in cash, on the later of
the Effective Date and the date such Convenience Claim is Allowed.  Each of the holders
of Unsecured Claims other than Convenience Claims in Class 6 will receive a combination
of New Common Stock, Available Cash, and Plan Notes and/or 144A Offering Proceeds
having a value that was estimated at the time of the Disclosure Statement of approximately
59.5% of the amount of such Allowed Unsecured Claim.  Asbestos Personal Injury Claims
in Class 7 will be determined and paid pursuant to the terms, provisions, and procedures of
the Asbestos PI Trust, which set forth an Initial Payment Percentage of 20% of the amount
of an Allowed Asbestos Personal Injury Claim.  Although the Plan creates an impaired
class, Class 8, for Environmental Claims, no such Claims currently exist.  Because Class 6
voted to reject the Plan, Class 12 (although it, in fact, voted to accept the Plan) is deemed
to have rejected the Plan and will not be receiving or retaining any property under the Plan
because the Distribution of the New Warrants will be deemed to have been made to the
Asbestos PI Trust, which will give such portion of its Distribution to the holder of the
Equity Interests in Class 12.  Because the recovery to the holders of Claims in Classes 3, 6
and 7 and to the holder of the Equity Interests in Class 12 of the Plan under the Revised
Liquidation Analysis is less than such creditors will receive under the Plan, each such
entity that did not accept the Plan will receive at least as much under the Plan as it would

receive in a chapter 7 liquidation of AWI Therefore, the Plan satisfies the "best interest" test of section 1129(a)(7) of the Bankruptcy Code as to all such holders.

Feasibility of the Plan

121.    Cash flow projections for Reorganized AWI are set forth in Exhibit "C" to the Disclosure Statement accompanying the Plan (the "*Original Projections*"). At the Confirmation Hearing, AWI presented projections, which set forth lower estimates of future cash flow than are contained in the Original Projections (the "*Revised Projections*"). (Rodruan Affidavit, Exhibit "A"). The Revised Projections are supported by reasonable assumptions and, therefore, are a reasonable estimate of Reorganized AWI's future performance. (Rodruan Affidavit, at ¶ 25; Aronson Affidavit, at ¶ 9).

122.    AWI estimates that it will have cash on hand of at least $414 million as of the Effective Date from which to pay Allowed Administrative Expenses, Allowed Priority Claims, and Allowed Priority Tax Claims. (Rodruan Affidavit, at ¶ 27).

123.    On the Effective Date, Reorganized AWI will obtain financing from a syndicate of banks, including Bank of America N.A., Banc of America Securities LLC, JPMorgan Chase Bank and J.P. Morgan Securities Inc. (collectively, the "*Exit Lenders*"), pursuant to which the Exit Lenders will provide exit financing of up to $600 million to Reorganized AWI and certain of its subsidiaries on terms and conditions substantially the same as those that are set forth in the commitment letter executed by the Exit Lenders and AWI and approved by Court order dated October 23, 2003 (the "*Commitment Letter*"). (Rodruan Affidavit, at ¶ 5; Docket No. 5890).

124.    Under the Commitment Letter, AWI will have $600 million of credit available on and after the Effective Date, of which AWI estimates that $40 million will be

used to replace letters of credit issued under the DIP Credit Facility, $366 million will be
drawn to fund payments required under the Plan, and $194 million will be undrawn.
(Rodruan Affidavit, at ¶ 6). Moreover, because the liability for all Asbestos Personal
Injury Claims will be channeled to the Asbestos PI Trust, and all Unsecured Claims other
than Convenience Claims will be resolved and paid their *pro rata* share of a fixed amount
of Reorganization Consideration, Reorganized AWI's capital structure will be significantly
improved.

   125. Based on the Revised Projections, the cash expected to be available
under the credit agreement expected to be executed among the Exit Lenders and
Reorganized AWI (the "*Credit Agreement*") in connection with the Commitment Letter,
and the estimated amount of cash on hand, Reorganized AWI will have the financing
necessary to (i) replace the existing letters of credit outstanding under the DIP Credit
Facility, (ii) satisfy its obligation to make the payments required to be made on the
Effective Date (including, without limitation, Allowed Administrative Expenses, Allowed
Priority Claims, and Allowed Priority Tax Claims), (iii) continue its operations for at least
the next five years and (iv) meet its obligations under the Plan, including its obligations to
the Exit Lenders under the Credit Agreement, and thereafter have the ability to pay off or
refinance its obligations on a long-term basis. (Rodruan Affidavit, ¶ 7).

   126. Additionally, the contribution of the Asbestos PI Insurance Asset
and other value being transferred to the Asbestos PI Trust pursuant to the Plan ensures that
the Asbestos PI Trust will have sufficient capital upon the Effective Date to expeditiously
begin processing Asbestos Personal Injury Claims and otherwise meet its financial

commitments. Accordingly, the Plan meets the feasibility test of section 1129(a)(11) of the Bankruptcy Code.

### Treatment of
### Class 6 Under the Plan

127. The allowed amount of the Unsecured Claims in Class 6 of the Plan is not likely to exceed $1.651 billion. The estimated value of the assets being distributed to the Asbestos PI Trust under the Plan (including the New Warrants) is estimated to be approximately $1.884 billion as of the Effective Date, and the estimated value, as of the Effective Date, of the assets being distributed to holders of Allowed Unsecured Claims in Class 6 is approximately $989.1 million. (Rodruan Affidavit, at ¶ 31). Because the liability for Asbestos Personal Injury Claims exceeds $3.144 billion, the Plan does not discriminate unfairly against Class 6.

128. The Unsecured Creditors' Committee objected to the Plan, arguing that the Plan unfairly discriminates against the holders of Claims in Class 6 of the Plan because the values assigned to the number and amount of future asbestos claims is too high. Although the Court ruled that certain objections to the plan raised by the Unsecured Creditors' Committee in the November 12 Objection were untimely, objections as to unfair discrimination were properly preserved in the September 22, 2003, conditional objection of the Unsecured Creditors' Committee.

129. At the Confirmation Hearing, notwithstanding the fact that the Plan was negotiated between the Unsecured Creditors' Committee and the other major constituents in the case, the Unsecured Creditors' Committee asserted that the values assigned to the number and amount of future asbestos claims is too high, and, therefore, that the Plan unfairly discriminates against Class 6 by providing the holders of Unsecured

Claims in Class 6 with a disproportionately small recovery. The Court agrees with the analysis in *Genesis Health Ventures, Inc*, 266 B.R. 591, 599 (Bankr. D. Del. 2001), where the initial burden of production and the ultimate burden of persuasion regarding unfair discrimination was assigned to the debtor, but the court shifted the burden to the objecting creditor once the debtor had met its burden of production. AWI has met its burden of production on this point based upon the testimony and report of Dr. Mark A. Peterson. The Court initially notes agreement with Judge Brown in *In re Babcock & Wilcox Co*, 274 B.R. 230, (Bankr. E.D. La. 2002), that estimating future claims is more an imprecise art than a science, and that the best anyone can do is to try to find an estimate that is not unreasonable. Significantly, Judge Brown did not accept Dr. Peterson's claim estimation for Babcock in the fraudulent transfer litigation before him, choosing the internal company estimate instead that another expert, Dr. Dunbar, vouched for. But he stated and reiterated on more than one occasion in his opinion his view that he would not be bound by this estimate in subsequent disputes, and that he might well accept Dr. Peterson's estimate under different circumstances. Judge Brown also found nothing inherently wrong with Dr. Peterson's methodology which in most respects was identical to his methodology in this case.

130.    Dr. Peterson testified candidly and forthrightly that future claims and estimates are frequently wrong and that his estimates have been wrong in the past, usually on the low side if not always. Not only are his credentials and past experience in the field of mass tort valuations particularly impressive, but the Court finds it of key importance that his forecast in both the *Manville* case, where he was serving as the court's expert at that time, and the *National Gypsum* case, have been reasonably accurate. And

that testimony is uncontroverted. There is just no substitute for success. Based upon Dr. Peterson's testimony and a thorough review of his report, the range of claim amount is supported by a preponderance of the evidence.

131.    Upon AWI's satisfaction of the initial burden of production as to the estimation of future asbestos liabilities, the burden shifted to the Unsecured Creditors' Committee, the objectors. Notwithstanding having spent over $300,000 during the nearly three years this case has been pending, and notwithstanding having the same data available to it, the Unsecured Creditors' Committee's expert has not been able to produce a report that suggests an appropriate claim amount. Instead, as was the case in *Babcock & Wilcox*, the Unsecured Creditors' Committee's expert, Dr. Letitia Chambers, attempts to raise red flags about the Peterson methodology. By way of example only, Dr. Chambers disagreed with Dr. Peterson's estimate of 150,000 cases involving asbestos claims being brought against AWI between now and 2040, but gave no cogent basis for her disagreement. Severe asbestosis may be a disappearing disease, but we are a long way from knowing what level exposure to asbestos can trigger cancer. Likewise, although Dr. Chambers pointed to studies that suggest there may be other causes for mesothelioma, there is no definitive study that overturns the Peterson view that the only known cause of mesothelioma is exposure to asbestos. Dr. Chambers argues with Dr. Peterson's use of the 7-1 ratio for predicting the number of nonmalignancies going forward, but offered no viable alternative other than her unsupported view that the ratio ought to be lower. And again, while severe asbestosis may be disappearing there was nothing presented to support the assertion that claims of asbestos related injuries are going to disappear any time soon. Finally, Dr. Chambers criticizes Dr. Peterson's use of the CCR data because the CCR