UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                          CASE NUMBER:

**THE BABCOCK & WILCOX COMPANY**                00-10992

    DEBTOR                                      SECTION "B"

Jointly Administered With

DIAMOND POWER INTERNATIONAL, INC.              00-10993
BABCOCK & WILCOX CONSTRUCTION CO., INC.        00-10994
AMERICON, INC.                                 00-10995

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
CORE MATTERS AND PROPOSED FINDINGS OF FACT,
CONCLUSIONS OF LAW AND RECOMMENDATIONS TO
THE DISTRICT COURT WITH RESPECT TO NON-CORE MATTERS**

Outline

I.      Introduction
II.     Background
        A. The Debtors
        B. Description of the Plan
III.    The Court has Jurisdiction to Enter Certain Insurance Related Findings
IV.     The Joint Plan Meets the Requirements of §1129
        A. The Plan complies with the applicable provisions of title 11, including the classification of claims under §1122 and the contents of the Plan under §1123
                1. Classification and Treatment
                2. Adequate Means for Implementation
        B. The Plan meets the requirements of §1129(a)(2), (4), and (5)
        C. The Plan meets the requirements of §1129(a)(7)-(10)
        D. The Plan satisfies the requirements of §1129(a)(11)
        E. Cram Down Requirements of §1129(b) have been satisfied
                1. Unfair Discrimination
                2. Fair and Equitable
V.      The Plan has Been Filed in Good Faith, and not by Means Forbidden by Law
        A. The Plan is a result of extensive negotiations and is not a collusive agreement between the Debtors, McDermott and plaintiff's lawyers
        B. The Insurer's Contractual Rights
                1. Anti-Assignment Clauses

11/9/04
6/33

        2. Anti-Assignment, Management of Claims, Cooperation and Consent Clauses
           Preemption Under Section 1123(a)(5).
    C.  Payment of Valid Claims

VI.    The Plan's Discharge and Injunctive Provisions Satisfy the Requirements of the
    Bankruptcy Code
    A.  Uncontested Matters
    B.  Contested Matters
    C.  Section 105 Injunction
        1. Identity of Interest
        2. Substantial Contribution
        3. Essential to Reorganization
        4. Acceptance of the Plan by Impacted Class
        5. Substantially Full Payment to Impacted Class
        6. Full Payment of Nonsettling Claimants

VII.    Executory Contracts
    A.  Insurance Policies
    B.  Coverage in Place Agreements

VIII.    Apollo Parks Issues
    A.  Background Facts
    B.  The Plan, as it relates to Apollo/Parks, is Proposed in Good Faith
    C.  The Plan does not violate the Price Anderson Act
    D.  The Court's jurisdiction to determine insurance related findings
    E.  Proposed Findings of Fact and Conclusions of Law that ANI has Forfeited
        Rights under the Policies, such as the Management of Claims, No Action, and
        Consent to Settlement Provisions
        1. Breach of Duty to Settle
        2. Breach of Duty to Defend
        3. Denial of Coverage
    F.  Reasonable Settlement

IX.    Other Objections
    A.  Lack of Notice
    B.  Objections Specific to Ace Companies

X.    Conclusion

## I.    **INTRODUCTION.**

This matter came before the court as a hearing on confirmation of the third amended joint

plan of reorganization as of June 25, 2003 with technical modifications as of October 1, 2004

proposed by the Debtors[1], the Asbestos Claimants' Committee, the Future Claimants'

---

[1]  See title for the names of the four debtors.

Representative, and McDermott Incorporated ("Plan"). Objections to the Plan were filed by various entities,[2] and a hearing on confirmation of the Plan was held on September 22 through 26, 2003, October 20 through 24, 2003, December 16 through 18, 2003 and January 5 through 9, 2004. Also heard was the Plan Proponents[3] motion to resolve Executory Contract Assumption Motion in conjunction with other insurance-related plan issues. The Plan Proponents assert that certain asbestos insurance settlement agreements are not executory contracts, and that the Debtors need not assume or reject them, or in the alternative, if they are determined to be executory, that the agreements can be assumed by the Debtors. The matter was heard in conjunction with other insurance-related matters at the hearing on confirmation. Since the hearings on confirmation, various settlements have been entered resolving certain objections and issues.[4]

---

[2] Objections were filed by a Certain Group of Law Firms; PMAC Ltd; Pulp & Paper of America, LLC; Babcock Wilcox Espanola, S.A.; American Nuclear Insurers and Mutual Atomic Energy Liability Underwriters ("ANI"); TIG and United States Fire Ins. Co.; Travelers Indemnity Co. and Travelers Casualty and Surety ("Travelers"); Maryland Ins. Co.; Ace Companies; Westchester Fire Ins. Co.; Certain Underwriters at Lloyds; as well as joinders in objections filed by Royal Indemnity Company, Maryland Ins. Company, and St. Paul Mercury Ins. Co.

[3] Plan Proponents are The Babcock & Wilcox Company, Diamond Power International, Inc., Americon, Inc., and Babcock & Wilcox Construction Company, Inc. (collectively ("Debtors"), McDermott Incorporated ("MI"), the Asbestos Claimants' Committee (the "ACC"), and the Future Asbestos-Related Claimants' Representative (the "FCR"). As to A/P Township matters, the Plan Proponents also include the A/P Claimants, the A/P FCR, ARCO, BWXT Services and McDermott International, Inc. ("MII"). A chart showing the corporate structure of MII, the parent of MI and related companies including the debtors appears as Exhibit 32.

[4] During the confirmation process, various settlements were concluded with CNA/Continental Insurance, p. 5417; and Affiliated/Appalachian, p. 5415. After the confirmation hearings, various settlements were approved with First State, p. 5804; AIG Member Cos., p. 5802; Associated International, p. 5803; Northwestern, p. 5824; Travelers Property Insurance Co., The Travelers Indemnity Co., The Travelers Insurance Co, The Travelers Indemnity Co.of Rhode Island and Travelers Casualty and Surety Co., p. 6065; Royal Indemnity Co, p. 6057; Arkwright, p. 6059; Mount McKinley Ins. Co, p. 6061; Prudential

This case is rapidly approaching the fifth anniversary of its filing date, February 22, 2000. The asbestos claimants, who for at least three years were strident adversaries of the debtors, are now in agreement on the joint plan before the court for confirmation. A number of the insurers, most of which are not creditors, continue to object. Other insurers have settled their differences and withdrawn, or are willing to withdraw, their objections if their pending motions for compromise are granted.[5] The Plan Proponents have been urging the court not to enter an opinion at this time, but instead to grant additional time for them to negotiate settlements with some of the remaining objecting insurers. Their plea for further delay falls on deaf ears because the court has the distinct feeling that:

1. This case has already lasted too long;

2. The professional fees and expenses have already been far too costly – $85,666,633 at last count, which only included charges through October 2003.[6] Such fees and expenses will probably exceed one hundred million dollars before this case is over – a far too expensive cost of reorganization.

3. The parties have only reached settlements, filed a joint plan or taken affirmative and constructive action among themselves when the court has insisted upon firm

Assurance Co., Ltd. and Pearl Assurance plc., p. 6068; Riverstone and The Riverstone Insurers, p. 6063. No ruling, proceeding or other matter in connection with the Plan or the Chapter 11 Reorganization Cases will impair, affect or modify any of the Plan Proponents' or Settling Asbestos Insurance Entities' rights or obligations under any Asbestos PI Insurance Settlement Agreements.

[5] *See* footnotes 2, 4.

[6] *See* Exhibit 2013, which also contains a future estimate of $7,085,000, but that only forecasted future invoices through March 2004.

deadlines. The clearest example is that Travelers and the Plan Proponents had

advised the court as early as February 2004 that they had a "settlement in

principle", but only filed settlement papers on September 21, 2004, because the court

had set that date as a strict deadline.

The time has come to move this case forward.

This opinion constitutes the court's findings of fact and conclusions of law regarding core matters and proposed findings of fact and conclusions of law and recommendations to the district court regarding non-core matters arising in connection with the Plan confirmation. In the alternative, to the extent that certain insurance-related issues are determined to be non-core, they are tendered as proposed findings of fact and conclusions of law. The court recommends that the Plan be confirmed.

## II.    BACKGROUND.

A. *The Debtors and other parties*. The Babcock & Wilcox Company ("B&W") was initially formed in 1877, as the manufacturer and marketer of water tube steam boilers. In 1978, J. Ray McDermott & Co, Inc. (now McDermott Incorporated) acquired B&W. [7] B&W and its subsidiaries design, engineer, manufacture, and service industrial boiler systems.[8] The boilers contain or are alleged to contain asbestos liners.

---

[7] Debtors Diamond Power International Inc. and Americon, Inc. are subsidiaries of B&W. Americon is a holding company for Babcock & Wilcox Construction Company, Inc., the other debtor. Joint Pre-Trial Order, 2 - 5.

[8] Joint Pretrial Order, 1-2.

In the late 1970's, asbestos-related personal injury claims were asserted against B&W.[9] By 1999, the number of claims filed against B&W had reached over 400,000.[10] The Debtors filed for relief under Chapter 11 of the Bankruptcy Code on February 22, 2000.

Following the filing, the official Asbestos Claimants' Committee was formed by the United States Trustee, and the court authorized the appointment of Eric D. Green, Esq. as the legal representative for the future asbestos-related claimants. For well over two years, the ACC and the FCR were for the most part allied but in opposition to the Debtors as to the handling of present and future asbestos claims.

In February, 2001 the court granted the Debtors' request that a mediator be appointed. Mr. Francis McGovern was appointed to mediate with the Debtors, the Debtors' owners or affiliates, the ACC and the FCR regarding the general financial terms of a plan of reorganization. On February 22, 2001, at the court's insistence, the Debtors filed their Disclosure Statement and Plan, which set forth the Debtor's proposal for a consensual plan of reorganization. Both the ACC and FCR initially did not agree to the Debtors' Plan, and it was not set for hearing. The plan was amended at least twice, in May and July, 2002.[11] In May, 2002, this court terminated the Debtors' exclusive period to file a plan of reorganization. Thereafter, in July, 2002, the ACC and the FCR filed their own Disclosure Statement and Plan.[12]

After much negotiation, the ACC, FCR and Debtors were able to resolve many of their

---

[9]  *Id.* at 7.

[10]  *Id.* at 9.

[11]  Pl. 3148, 3316.

[12]  Pl. 3320, 3321.

differences and agree upon a form of plan. On December 19, 2002, the Debtors, MI, ACC and FCR filed a Substantially Complete Form of Joint Disclosure Statement. On June 25, 2003, the Plan Proponents filed the Third Amended Joint Disclosure Statement and the Third Amended Joint Plan of Reorganization. On August 28, 2003, the Plan Proponents filed the Plan Supplement. Following approval of the Disclosure Statement, on July 10, 2003, the court entered an order approving the confirmation hearing notice and solicitation package and the manner of mailing these, as well as the procedures for voting and tabulation and procedures for allowing claims for voting purposes.

On August 15, 2003 Mr. Uddo was appointed the Apollo FCR, representing the interests of the Apollo/Parks ("A/P") future interest holders.[13] After his appointment, further negotiations with the settling parties took place, which resulted in the filing of technical amendments to the Plan and a revised A/P Settlement Agreement.[14] On November 12, 2003 and January 12, 2004, this Court approved the First and Second Sets of Technical Modifications to the Plan. Among other things, the modifications provide for: (1) the elimination of the Asbestos PD Trust and payment of Asbestos PD Claims and Indirect Asbestos PD Claims by the Reorganized Debtors based on the same payment percentage as previously contemplated to be paid on the claims by the trust; and (2) amendments to the Plan and Apollo/Parks related plan documents to reflect the agreement reached regarding the Apollo/Parks Township Claims. A Third Set of Technical Modifications to the Plan was approved on June 21, 2004, and a Fourth Set of Technical Modifications was approved on October 6, 2004.

---

[13]  Exhibit 3240.

[14]  The term sheet for the revised settlement was filed on December 16, 2003. Exhibit 3221.

B. *Description of the Plan.*    A brief summary of the Plan is necessary to adequately discuss classification and other issues that arose in connection with confirmation.  The Plan generally provides for eleven classes of claims, as follows:

| Classification | Description | Voting Status | Vote |
|---|---|---|---|
| Class 1 | Priority | Unimpaired | |
| Class 2 | Non-Priority Secured | Unimpaired | |
| Class 3 | Workers' Compensation | Unimpaired | |
| Class 4 | Unsecured Trade | Unimpaired | |
| Class 5 | General Unsecured | Impaired | Reject |
| Class 6 | Asbestos PI Trust | Impaired | Accept |
| Class 7 | Asbestos PD and Indirect Asbestos PD | Impaired | Accept |
| Class 8A | Apollo/Parks Township | Impaired | Accept |
| Class 8B | ARCO's Apollo/Parks | Impaired | Accept |
| Class 8C | ARCO's Environmental Remediation | Unimpaired | |
| Class 8D | Governmental Unit Environmental Remediation | Unimpaired | |
| Class 9 | Intercompany Claims | Unimpaired | |
| Class 10 | Affiliate Intercompany Claims | Unimpaired | |
| Class 11A | Equity Interests in B&W | Impaired | Accept |
| Class 11B | Equity Interests in Diamond | Unimpaired | |
| Class 11 C | Equity Interests in B&W Const. | Unimpaired | |
| Class 11D | Equity Interests in Americon | Unimpaired | |

The Plan calls for the creation of the Asbestos Personal Injury Trust.  All current and future asbestos personal-injury claims will be channeled to the Asbestos PI Trust, which will process the claims and pay all allowed claims pursuant to the Asbestos PI Trust Distribution Procedures ("TDP's").  The Asbestos PI Trust will be funded primarily by the transfer of (a) all the capital stock of B&W (valued at between $400 and $500 million); (b) insurance rights valued at as much as $1.15 billion; (c) 4.75 million shares of the common stock of MII or a related share price guaranty; (d) $92 million in promissory notes from MI; and (e) certain tax benefits.  In exchange, the Debtors and certain of their non-debtor affiliates will be granted the benefit of the Asbestos PI Channeling

Injunction, under which they will be forever released from liability on account of Asbestos PI Trust Claims.

Following mediation, the claimants in litigation involving the Apollo and Parks Township Facilities,[15] B&W and Arco entered into the Apollo/Parks Township Settlement Agreement ("Settlement"). The Settlement is incorporated into the Plan, which provides for the Apollo/Parks Township Claims to be channeled to the Apollo/Parks Township Trust ("A/P Trust"), and the A/P Trust to process and pay allowed claims. The Settlement and Plan contemplates the following: (a) the claims of the *Hall* claimants will be allowed in the B&W bankruptcy case at $110 million; (b) Arco will make a cash payment to the *Hall* claimants of $27.5 million upon the receipt of releases from the *Hall* claimants, as well as other conditions as set forth in the Settlement; (c) B&W will make a $2.8 million cash payment to the A/P Trust; (d) B&W will assign to the A/P Trust its claims against ANI for reimbursement of prior defense costs incurred and paid by B&W arising from the *Hall* litigation in the amount of $1.44 million; (e) The Apollo/Parks Township Insurance Contributors and the Arco entities will make the Apollo/Parks Township Insurance Rights Assignment to the A/P Trust; (f) The A/P Trust will process and pay the *Hall* claimants claims, and process, adjudicate, settle or pay A/P future demands and the unliquidated A/P present claims pursuant to the Settlement, the A/P Trust Agreement and the A/P Trust Distribution Procedures; and (g) a set aside of $75 million (with a cap of $100 million) will be made for A/P Future Demand Holders.

---

[15] Known as the *Hall* claimants, for the lead plaintiff in the case against B&W, B&W Nuclear Environmental Services, Inc. and Arco pending in the United States District Court for the Western District of Pennsylvania, Civil Action No. 94-0951. Exhibit 3017.

### III.    THE COURT HAS JURISDICTION TO ENTER CERTAIN INSURANCE RELATED FINDINGS.

The Plan, at §7.14.1, provides that the Court shall make several insurance-related findings

of fact and/or conclusions of law in connection with, and as a condition to, confirmation of the

Plan.[16] Several insurers object that the court lacks jurisdiction to enter a final judgment adjudicating

---

[16]  These findings include the following:
"(p) The terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance contributor under any consent-to-assignment of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement;

(q) The terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance Contributor under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement;

(r) The Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment do not materially increase any insurers risk of providing coverage for asbestos-related liabilities under the relevant insurance policies as compared to the risk that was otherwise being borne by the insurers prior to the Effective Date;

* * *

(v) The Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Apollo/Parks Township Channeling Injunction are essential to this Plan and the Debtors' reorganization efforts;

* * *

(z) The duties and obligations of the Asbestos Insurance Entities under the Subject Asbestos Insurance Policies and Subject Asbestos Insurance Settlement Agreements are not diminished, reduced or eliminated by (1) the discharge, release, and extinguishment of all the obligations and liabilities of the Asbestos Protected Parties (other than the Reorganized Debtors respecting Class 7 Claims) for and in respect of all Asbestos PI Trust Claims and Class 7 Claims; (2) the assumption of responsibility and liability for all Asbestos PI Trust Claims and Class 7 Claims; or (3) the assignment of the Asbestos Insurance Rights pursuant to this Plan and the Asbestos Insurance Rights Assignment Agreement;

* * *

(bb) The Asbestos PI Trust shall have the exclusive authority as of the Effective Date to defend

-10-

the rights of the parties under the policies. They argue that questions regarding the coverage-in-place ("CIP") agreements and the insurance policies are already before the district court in various coverage actions, and that the insurers have requested jury trials in district court on their demands,[17] and by numerous and continuing objections in this court have attempted to reserve and protect their rights to jury trials.[18]

The bankruptcy jurisdiction of the district court is found in 28 U.S.C. §1334(b), which gives the district courts and adjunct bankruptcy courts jurisdiction of proceedings arising under title 11, arising in a case under title 11, or related to a case under title 11. To determine whether such jurisdiction exists, "'it is necessary only to determine whether a matter is at least "related to" the bankruptcy.'"[19] Where bankruptcy jurisdiction is challenged, the result will turn on how broad or narrow "related to" jurisdiction is construed.

A proceeding is "related to" a bankruptcy proceeding if "the outcome of that proceeding

---

all Asbestos PI Trust Claims involving Asbestos PI Insurance Rights; provided, however, that the Asbestos PI Trust may, in its sole discretion, afford any Entity, including any Asbestos Insurance Entity, the opportunity to participate in the resolution of any Asbestos PI Trust Claim;

* * *

(ee) All of the Debtors' insurers who are affording insurance coverage that is the subject of the asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment, and the Apollo/Parks Township Insurers have been given notice and an opportunity to be heard."

[17]  Certain Underwriters at Lloyd's, London and Certain London Market Companies v. McDermott International, Inc., Case No. 03-2203; Certain Underwriters at Lloyd's, London and Certain London Market Companies v. The Babcock & Wilcox Co., Case No. 03-1192 (the "Declaratory Judgment Actions").

[18]  As to those insurers who filed proofs of claim, and consented to jurisdiction in the bankruptcy court, see page 15 *infra*.

[19]  *In re Walker*, 51 F.3d 562, 569 (5th Cir. 1995)(*quoting In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

-11-

could conceivably have any effect on the estate being administered in bankruptcy."[20] Stated another way, "'an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankruptcy estate."[21] Therefore, in order for bankruptcy jurisdiction to attach, the anticipated outcome of the action must (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect upon the administration of the estate.

Matters involving the confirmation of a plan arise under Title 11, and the court has jurisdiction to decide confirmation issues. Even if this confirmation proceeding necessarily involved a coverage issue, as asserted by insurers, suits involving insurance coverage are at least minimally related to a case under Chapter 11, because coverage will increase the estate.[22] At a minimum, the confirmation findings concerning the Debtors' insurance are at least "related to" bankruptcy proceedings, and this court has jurisdiction to hear the matter.

The bankruptcy court's authority to enter final orders in matters before it is found in 28 U.S.C. §157, which permits the bankruptcy judge to hear and determine "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." Section 157(c)(1) permits a bankruptcy judge to hear a noncore proceeding that is related to a case under title 11, but specifies that the judge shall submit proposed findings of fact and conclusions of law to the district court, and the district judge, after de novo review and after considering the proposed findings and

---

[20]  *Id.*

[21]  *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999).

[22]  *Travelers Indemnity Co. v Babcock and Wilcox, Co.*, Civ. Action 01-3387 (E.D. La. 2002).

conclusions, shall enter any final order or judgment regarding the matter. On core matters, the bankruptcy court may enter final orders.

A matter is core if it involves a right created by federal bankruptcy law, or is one which would only arise in bankruptcy.[23] Matters that arise under the Bankruptcy Code are also considered core.[24] A matter is non-core if it does not invoke substantive rights created by federal bankruptcy law and is one that could exist outside of bankruptcy.[25]

The Debtors argue that the Plan does not require a determination of the scope of insurance coverage, and that coverage issues will likely be decided in another forum. They argue that the findings are necessary to ensure that confirmation itself does not act to annul the Debtors' policies. In other words, the Debtors argue that sustaining the insurers' objection would make mere compliance with the Code requirements for confirmation a violation of the insurance contracts and relieve the insurers of obligations under the policies.

Other courts have noted, in a similar context, that "because of the significance insurance coverage issues often have in a bankruptcy proceeding, it is proper under certain circumstances for a bankruptcy court to adjudicate such matters."[26] In *Prudential*, a trustee charged with the liquidation of asbestos-related claims under a confirmed plan filed an adversary proceeding seeking a declaratory judgment to determine the trustee's rights under protection and indemnity policies.

---

[23]    *In re Wood*, 825 F.2d 90 (5th Cir. 1987).

[24]    *Liljeberg Enters. Inc. v. Lifemark Hosps. of La.*, 2000 WL 63307, at 3 (E.D. La. Jan. 21, 2000).

[25]    *Wood*, 825 F.2d at 97.

[26]    *In re Prudential Lines, Inc.*, 170 B.R. 222, 231 (S.D.N.Y. 1994).

-13-

The district court held that a declaratory judgment proceeding to resolve issues concerning coverage and indemnification under insurance policies was a "core" proceeding.[27]  Although the determination involved state law issues, that factor was not determinative given §157(b)(3)'s wording that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."  Instead, because the policies were property of the debtor's estate in a Chapter 11 proceeding with over 7,000 asbestos claims potentially covered by the policies filed against the estate,  the determination of policy provisions was "essential and inextricably tied to the administration of the estate."[28]

The court is not asked to determine a separate suit or adversary proceeding seeking a declaration that coverage is or is not available.  Instead, the inquiry concerns whether the Plan is capable of confirmation, a matter at the heart of the Chapter 11 provisions of the Bankruptcy Code. In connection with the Plan, the Debtors seek a declaration that confirmation of the Plan will not impair the ability of the §524(g) trusts to access insurance rights transferred to the trusts. Section 157(b)(2)(L) specifies that core matters include "confirmation of plans."  To the extent that a determination need be made of whether the Plan is capable of confirmation, or whether it is incapable of confirmation because its provisions run afoul of certain contractual rights of insurers, that determination is at the very heart of the function of the bankruptcy court, that is to determine whether the Plan is confirmable under the Bankruptcy Code.  To the extent that the confirmation

---

[27]  *Id.* at 229.

[28]  *Id.*; *see also Asbestosis Claimants v. American Steamship Owners Mutual Protection and Indem. Assoc.*, 197 F.3d 632, 638 (2d Cir. 1999)("resolving disputes relating to major insurance contracts are bound to have a significant impact on the administration of the estate" and are core).

involves issues regarding the workings of a §524(g) injunction, that too is a core matter. Similarly, §365 expressly provides for the assumption or rejection of executory contracts, and a determination of whether an agreement is executory is a core bankruptcy function, as it arises under the Bankruptcy Code. Section 1123 governing the contents of a plan, provides that a plan must provide adequate means for its implementation, including but not limited to, curing or waiving of any defaults.[29]  In order to determine confirmation, a core matter, the court must necessarily make determinations of whether insurance rights may be transferred to a trust to be established under §524(g), whether the Plan meets the requirements of §524, whether the Bankruptcy Code preempts certain contract provisions and whether the Plan provides adequate means for its implementation under §1123(a)(5).

Various insurers who have objected to confirmation have filed proofs of claim in this bankruptcy proceeding.[30]  Generally, the filing of a proof of claim constitutes consent to the jurisdiction of the Bankruptcy Court.[31]  Additionally, the filing of a claim invokes the core jurisdiction of the court under §157(b)(2)(B), (C).  As to insurers who have filed claims in the bankruptcy proceeding, core jurisdiction exists on issues relating to the insurers claims and objections to the Plan.

This is not a trial on coverage, and the court is not determining whether coverage exists

---

[29]  11 USC 1123(a)(5)(G).

[30]  These insurers include: Continental Company (P. 4491); TIG Insurance (P. 4499); American Home Ins. (P. 4516); Century Indemnity Ins. (P.4518); Westchester Fire Ins. Co. (P. 4519); and Ace USA Companies (P. 4520).

[31]  *In re Baudoin*, 981 F.2d 736 (5th Cir. 1993); *see Katchen v. Landy*, 382 U.S. 323 (1966); *Pan American World Airways, Inc. v. Evergreen Int'l Airlines, Inc.*, 132 B.R. 4 (SDNY 1991).

under any particular policy. It is a trial on the confirmation of the Plan, and whether the Plan can be confirmed and the Debtors can proceed under the Plan. What the insurers argue is that the Plan may not implicate the insurers or policies of insurance, the largest single asset of the estate, without violating terms of the insurance contracts, thereby raising a coverage issue, which this court cannot finally determine. The insurers argue that confirmation of any plan funded by insurance will vitiate the policies and relieve the insurers of any obligation to make payments under the policies. The Debtors are put in a position that they cannot go forward on confirmation, as required by the Bankruptcy Code and Rules, because the act of formulating a plan involving insurance will breach obligations due under the policies. Likewise, they cannot simply wait for the coverage determinations to be made by the district court.[32] The act of going forward with confirmation of the plan cannot, of itself, be restrained by allegations that confirmation involves insurance issues, that cannot be determined in this proceeding. The court finds that it has core jurisdiction to make insurance-related findings. To the extent that the district court may determine that certain issues are non-core, then the findings are made as proposed findings of fact and conclusions of law.

## IV.    THE JOINT PLAN MEETS THE REQUIREMENTS OF §1129.

The court finds that the Plan meets the requirements of confirmation under 11 U.S.C. §1129. On all core matters, the court finds that confirmation is appropriate. On non-core matters, the court

---

[32] The coverage actions were filed in 2003, three years after the filing of the Debtors' Chapter 11. The Bankruptcy Code requires that a plan be filed within 120 days of the petition date in order to maintain the exclusive period. This court has not only terminated exclusivity, but ordered that confirmation proceedings be commenced in September 2004. The Debtors thus lacked the option of simply waiting for the coverage matters to be decided by the district court prior to confirmation.

-16-

recommends that the district court enter an order confirming the plan.

A. The Plan complies with the applicable provisions of title 11, including the classification of claims under §1122 and the contents of the plan under §1123.

The court finds that the Plan adequately designates classes of claims and interests, adequately specifies the classes of claims or interests that are not impaired under the Plan, and specifies the treatment of claims or interests that are impaired under the Plan.

1. *Classification and Treatment.* Certain law firms[33] object to the classification of claims made by the Plan under §1122. They object that their clients settled asbestos-related personal injury tort or wrongful death claims and thus should not be included in Class 6, which also includes disallowed settled claims and unliquidated or contingent claims for personal injury tort and wrongful death claims. The objectors argue that the allowed, settled claims are substantially similar to other non-tort claims in Classes 4 or 5 of the Plan, which will receive payment in full, yet are classified with unliquidated claims in Class 6, which will receive only a partial payment. They make three arguments: (1) settled claims are treated differently from unliquidated claims in the same class, in violation of §§1123(a)(4) and 1129(a)(1); (2) settled claims are not "substantially similar" to other Class 6 claims, and they cannot be classified together; (3) the current Class 6 classification is meant to disenfranchise and discriminate against settled claims, and constitutes improper gerrymandering.

The classification objection made by Certain Law Firms is not new. The arguments regarding separate classification and gerrymandering were raised previously as objections to the

---

[33] The law firms consist of Levy, Phillips & Konigsberg, LLP; Greitzer & Locks, and The Law Offices of Peter G. Angelos, P.C., and represent approximately 1,177 claimants who settled claims for asbestos-related personal injury tort or wrongful death claims with the Debtor prior to the filing of the Debtors' Chapter 11 petition.

Disclosure Statement, and rejected by the court.[34]  Instead, the court found previously, and finds

now, that the claims in Class 6 are substantially similar claims. Both the settled claims and the

unliquidated personal injury and wrongful death claims are unsecured claims with common priority

and rights against the estate, both are based on injuries or death claims stemming from alleged

asbestos exposure, both will be paid from the pool of insurance rights.

The *Greystone* case [35] does not mandate separate classification as Certain Law Firms argue.

Instead, the case prohibits separate classification of similar claims where a valid business purpose

is lacking, or where the separate classification is meant to disenfranchise a dissenting class of

creditors.

In this case, the Plan placed unsecured trade claims in Class 4, and unsecured general claims

in Class 5. Mr. David Keller, President and COO of B&W, testified at trial regarding the Plan's

classification of claims, and testified as to the importance to the company of the ability to pay trade

claims. He testified that the Debtors' reputation and future business success depends on the Debtors

following through with representations made in this proceeding that the trade claims would be paid

in full. Given the small amount of the trade claims, which are approximately $3.5 million, and the

large size of the Debtors' contracts, the loss of future contracts would result in a revenue reduction

greatly in excess of the amount needed to pay trade claims in full.  As such, the court finds that a

legitimate business justification exists for paying trade claims in full, and separate classification of

Class 4 unsecured trade claims is appropriate.

---

[34]  *See* Reasons for Order dated April 4, 2003, Pl. 4101.

[35]  *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991), *cert. denied*, 506 U.S. 821 (1992).

The court also rejects the contention that settled claims in Class 6 are treated differently than other claims in the class. The Plan provides that all unsecured claims for personal injury caused by alleged exposure to asbestos in Class 6 will be paid in accordance with the provisions of the TDP. Similar claims will receive similar treatment under the TDPs. The claims will not be paid in full; however, the unrebutted testimony at trial was that as to the Debtors and their customers and suppliers, no business reason exists to pay asbestos personal injury claims in full.[36]

Other objectors have argued that Class 3 claims for workers compensation, as well as Class 4 and Class 5 claims, should not be separately classified. Class 3 consists of workers compensation claims. Mr. Keller testified at trial that these unsecured claims are paid in the ordinary course through the state workers' compensation system. Additionally, business reasons exist for the Debtors to pay its injured employees, justifying separate classification of the workers compensation claims, and payment in full. The court finds that the unsecured workers compensation claims are dissimilar to trade or other unsecured claims,[37] and separate classification of Class 3 claims is appropriate.

Class 5 consists of general unsecured claims. Mr. Keller testified that this class included a disputed unsecured claim of the IRS, disputed miscellaneous legal claims, and the disputed claims of excess insurance carriers for recoupment of amounts previously paid to B&W. The claims are all disputed by the Debtors, are speculative in nature, and the Debtors estimate that the amount needed to pay these claims will not exceed $1 million. The Class 5 claims will receive a percentage payment on the allowed claims, similar to the treatment of Classes 6 and 7. The court finds that the

---

[36] Tr. David Keller, September 24, 2003.

[37] *In re U. S. Truck Co., Inc.*, 42 B.R. 790, 794 (Bankr. E.D. Mich. 1984).

-19-

separate classification of Class 5 unsecured claims is appropriate.

2. *Adequate Means for Implementation.* Section 1123(a)(5) requires that a plan provide adequate means for its implementation. As discussed above, the Plan provides for creation of the Asbestos PI Trust and the A/P Trust. Both trusts will be funded by, among other things, assignment of rights to the proceeds of B&W's insurance coverage. This insurance coverage is substantial, and is valued as high as $1.15 billion for the Asbestos PI Trust, and for the insurance rights assignment to the A/P Trust. The Plan provides for the creation of Trust Distribution Procedures governing the payment of trust claims. The other implementation procedures described in detail in the Plan are more than adequate to satisfy the requirements of §1123(a)(5).

B. The Plan meets the requirements of §§1129(a)(2), (4), and (5).

No objections have been received that the Plan violates the provisions of §§1129(a)(2), (4) and (5). The court finds that the Plan Proponents have complied with the Code provisions. The Plan describes both impaired and unimpaired classes, and adequately describes their treatment. The Court, on July 10, 2003, approved the confirmation hearing notice, and provided procedures for the mailing of the solicitation packages and approval of the voting agent. Adequate notice was provided to creditors and parties in interest by the notice and procedures requirements approved by this Court. The court further finds that payments made under the Plan are reasonable, and the Plan complies with 1129(a)(4).

The Plan Proponents have made disclosures required by 1129(a)(5). The Plan Proponents have identified the officers and directors who will serve the reorganized Debtors, and the appointment of the officers and directors is consistent with the interests of the creditors, equity security holders and public policy. The Plan Proponents have also identified the individuals who

-20-

will serve as Trustees of the Asbestos PI Trust, as well as their affiliations. Various objectors have questioned whether the Trustees are fair and impartial, citing alleged ties of some of the proposed trustees to the asbestos plaintiffs bar. The court finds that the Trustees have been adequately disclosed, and that appointment of the Trustees is consistent with the requirements of §1129(a)(5). Insiders who will be employed or retained by the Debtors, as well as their compensation, have been disclosed, as required by §1129(a)(5)(B).

Although strong objections to the Plan Proponents refusal to name at this time the trustees of the A/P Trust – even though they had named the trustees of the Asbestos Trust – were raised by certain insurers, the court does not consider that as a bar to confirmation. The court does not read §1129(a)(5) as requiring the names and identity of those individuals and finds nothing in the trust provisions of §524(g)(1)(B) that requires the information.

Section 1129(a)(6) regarding regulatory commissions and rate changes is not applicable to these Debtors.

C.  The Plan meets the requirements of §§1129(a)(7)-(10).

Subsection 1129(a)(7) requires that each holder of an impaired claim or interest either has accepted the Plan, or will receive an amount equal or greater than in a Chapter 7 liquidation. Section 1129(a)(8) provides for each class to accept the Plan or that the class not be impaired under the Plan. All impaired classes have voted on the Plan. All impaired classes, except Class 5, have voted to accept the Plan, by casting votes in favor of the Plan exceeding two-thirds of the amount of voting claims and one-half the number of voting claims in each class required for acceptance under 11 USC 1126(c). Class 11 equity shareholders have approved the Plan by vote exceeding two-thirds of the amount of shares who voted for the Plan, as required by 11 USC 1126(d). The Plan accordingly

-21-

meets the requirements of §1129(a)(10), that an impaired non-insider class vote to accept the Plan.

The non-accepting class, Class 5, will receive under the Plan an amount equal to or greater than what would be received in a Chapter 7 liquidation. At the confirmation hearing, the Plan Proponents presented the testimony of Pamela Zilly, an investment banker with the Blackstone Group, L.P. Her testimony was that the total assets available under the Plan for payment of claims are between $1.46 billion and $2.25 billion. After adjustment for allocations for cash or liquidation uses, between $1.2 billion and $1.97 billion in net assets is available for distribution under the Plan. In contrast, the Chapter 7 liquidation value of the Debtors assets was placed at between $584 million and $1 billion.[38] A greater return to creditors under the Plan is possible because of the contributions of various McDermott entities, including the promissory note of $92 million, and 4.75 million shares of McDermott International Inc. stock. The Court finds that under the Plan, each impaired class will receive or retain a claim or interest in property of value that is not less than the amount they would have received or retained in a Chapter 7 liquidation of the Debtors. Instead, it is clear that they will receive more under the Plan than from a liquidation, so the requirements of §1129(a)(7) have been satisfied.

No dispute exists that the Plan meets the requirements of §1129(a)(9).

D.  The Plan satisfies the requirements of §1129(a)(11).

Section 1129(a)(11) requires that confirmation of a plan is not likely to be followed by the liquidation, or further financial reorganization, of the debtor, unless such is proposed in the plan. In other words, for a plan to be confirmed, it must be "feasible."[39] The debtor must prove a plan's

---

[38]  Exhibit 17.

[39]  *T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 801 (5th Cir. 1997).

feasibility by a preponderance of the evidence.[40] A plan is feasible where it offers "'a reasonable probability of success,'"[41] and where "the debtor can realistically carry out its plan."[42]

In proving a reasonable probability of success, the bankruptcy court "need not require a guarantee of success. . . ., [o]nly a reasonable assurance of commercial viability is required."[43] In *T-H New Orleans Limited Partnership*, feasibility was shown where the debtor demonstrated that it was able to service the debt with an infusion of capital, and presented evidence regarding the past and present earning power of the debtor, the ability of management and the economic picture for similar businesses in the area.[44] Projections of future revenue are appropriate "where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive."[45]

Mr. Keller testified at confirmation regarding the Debtors' business prospects. Mr. Keller testified that the Debtors have excellent prospects for exit financing with Citibank and Fleet, who have provided term sheets for exit financing. In addition, the ACC has negotiated with other banks for financing. In the post-confirmation period, the Debtors prospects for getting and performing contracts are good. He testified that in the post-petition period, the Debtors' income had

---

[40] *Id.*

[41] *Id, citing In re Landing Assoc., Ltd*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993).

[42] *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989).

[43] *T-H New Orleans*, 116 F.3d at 801 (citations omitted).

[44] *Id.*

[45] *Id., citing In re Lakeside Global II. Ltd.*, 116 B.R. 499, 508 n. 20 (Bankr. S.D. Tex. 1989).

increased by 33%, and the Debtors have become financially stronger in comparison to their competitors.    He also testified that the Debtors have made tentative offers of post-confirmation employment to himself and to Richard Rimels, the current head of B&W Canada, and that he has confidence in the future management of Debtors.  The Plan also makes provisions for the transition of B&W to a stand-alone company, and contemplates a transition period whereby McDermott will continue to provide critical services pursuant to a transition agreement.  Mr. Keller's opinion was that the transition period was adequate, and B&W would be able to function as a stand-alone company at the end of the transition period.

The court finds that B&W has sustained its burden of proving feasibility under §1129(a)(11). Additionally, the Plan satisfies the requirements of §1129(a)(12), in that it provides for all fees payable under 28 USC §1930 to be paid, and all retiree benefits to be satisfied.  No objection has been received under §§1129(a)(12) and (13), and the court finds that these sections have been satisfied.

E.     <u>Cram Down Requirements of §1129(b) have been satisfied.</u>

Only Class 5, consisting of general unsecured claims, and an impaired class, has voted against the Plan.  The Plan may nonetheless be confirmed if it meets the requirements of §1129(b), that is, that all requirements other than §1129(b)(8) that each impaired class has accepted the plan or is not impaired by the plan, where "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." [46]  If these requirements are met, the Plan may be confirmed despite the rejection of an impaired class.  Class 5 consists of general unsecured claims, including a disputed tax claim,

---

[46]   11 U.S.C. 1129(b)(1).

insurer's disputed claims for indemnity, and certain disputed claims for damages. Each claim contained in Class 5 has been objected to, and certain of the insurer's claims have been estimated for voting purposes at $1.00 each.

    1. *Unfair Discrimination.*

    Unfair discrimination has been found where similar claims are treated differently without a reasonable basis for the disparate treatment, or if a class of claims receives consideration of a value that is greater than the amount of its allowed claim.[47] A plan that unfairly singles out a claim for nonuniform treatment violates §1129(b). One court, after making an exhaustive analysis of unfair discrimination, stated a four-part test to determine whether discrimination is fair: (1) whether the discrimination is supported by a reasonable basis; (2) the extent of good faith behind the proposal, (3) the degree to which the debtor can confirm a plan without such discrimination, (4) the treatment of the classes discriminated against.[48]

    Various objections have been made that the Plan unfairly discriminates against Class 5, which will receive a pro rata distribution, and Class 4 (trade creditors), which will receive payment in full. At the confirmation hearing, testimony was heard from Mr. Keller about the importance of paying trade creditors. Not only had the representation been made to the creditors from the inception of the case that they would be paid in full, the vendors are suppliers to the business, ones with claims that are not disputed or suspect. Additionally, the failure to pay trade claims in full may

---

    [47] *In re Kennedy*, 158 B.R. 589, 599 (Bankr. D. N. J. 1993); *In re Johns-Manville Corp.*, 68 B.R. at 636.

    [48] *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989); *see In re Rochem, Ltd.*, 58 B.R. 641 (Bankr. D. N.J. 1985).

-25-

cause the loss of future contracts, contracts in size that could easily eclipse the $3.5 million to be

paid trade creditors. By contrast, Class 5 consists of disputed and unliquidated claims of various

creditors, including the insurers claims to recover sums paid under excess insurance policies under

an indemnity theory, which have been valued at $1.00 for voting purposes, disputed ongoing

lawsuits and a contested tax claim which the Debtors believe has been paid by the McDermott

consolidated tax group. These claims have all been the subject of objections, and in the business

judgment of B&W, have been determined to be lacking in merit. No business justification exists

to pay the highly disputed claims in full. A business justification does exist, however, to pay trade

claims, i.e., the relationships are important to the continued operation of the business and its

reputation.[49] The court finds that a reasonable basis exists for payment in full of trade claims, that

the debtors have satisfied the requirements of §1129(b), and the Plan does not unfairly discriminate.

    2. *Fair and Equitable.*

    "The 'fair and equitable' requirement provides for an absolute rule of priority among

creditors and stockholders in reorganization plans, placing secured creditors' rights first, those of

unsecured next, and subordinating the interests of stockholders."[50] The Code defines treatment that

is fair and equitable to various classes of claims. For unsecured creditors, such as the objecting

Class 5 creditors, fair and equitable means:

> (B) with respect to a class of unsecured claims–
> (i) the plan provides that each holder of a claim of such class receive or retain on account of
> such claim property of a value, as of the effective date of the plan, equal to the allowed

---

[49] *In re Rochem, Ltd.*, 58 B.R. 641, 643 (Bankr. D. N.J. 1985)(payment of trade claims in full and only partial payment of disputed tort claims not discriminatory, as reasonable basis existed for the treatment).

[50] *In re Lakeside Global II. Ltd.*, 116 B.R. 499, 511 (Bankr. S.D. Tex. 1989).

amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.[51]

In other words, in order to confirm a plan over a dissenting class of unsecured creditors, the plan must pay the dissenting unsecured creditors the allowed amount of the claims or leave nothing to junior claimants or interest holders. The Plan does not provide that Class 5 allowed claims be paid in full, therefore, the inquiry becomes whether junior claimants or interest holders will receive or retain any property.

Various class 5 claimants have objected that the plan is not fair and equitable because it does not propose to pay Class 5 claims in full but equity holders in class 11 B -D retain their stock holdings. These objections lack merit. The Plan provides that all of B&W's equity interests will be transferred to the Asbestos PI trust. Notably, Section 7.2.3 provides that on the Plan's effective date, BWICO will cause the Asbestos PI Trust to become the holder of record of all the outstanding shares of the Capital Stock of B&W. B&W will retain its stock in subsidiary corporations, however, the stock will really belong to the Asbestos PI Trust by way of the BWICO transfer. The value of the stock of B&W and its subsidiaries will be used to pay Class 5, 6 and 7 claims. The Court finds that the absolute priority objection is not well taken, because the retention by B&W of its subsidiary's stock is a means to facilitate the ultimate transfer of the value of the stock to the trust, for the benefit of creditors. This is not an instance where B&W's owners, or in this case, it's parent corporation, is retaining anything of value. To the contrary, they are giving up not only the stock in B&W (which includes the stock of the B&W subsidiaries), but also a $92 million note, some

---

[51]  11 U.S.C. 1129(b)(2)(B).

stock of MII and/or a stock price guaranty and certain tax benefits.

## V.    THE PLAN HAS BEEN FILED IN GOOD FAITH, AND NOT BY MEANS FORBIDDEN BY LAW.

Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means

forbidden by law. Various insurance companies have filed objections to the Plan, ranging from

frivolous objections that the trust to resolve radiation claims "will accomplish nothing less than

insurance fraud",[52] and that the plan proponents have "made collusive efforts to defraud [insurers]"[53]

to the more palatable but serious charge that the Plan provisions are in violation of the rights of

insurers under their contracts and settlements with the Debtors, that the Debtors have settled

meritless claims, and that the management of the Asbestos Trust is predicated on a conflict of

interests.

The good faith requirement is "viewed in light of the totality of the circumstances

surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy

Code is to give debtors a reasonable opportunity to make a fresh start."[54]  "Where the plan is

proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success,

the good faith requirement of §1129(a)(3) is satisfied."[55] The debtor bears the burden of proving that

the plan was filed in good faith by a preponderance of the evidence.[56]  The good faith requirement

---

[52]  Objection of American Nuclear Insurer, Pl. 4716.

[53]  Objection of Travelers, Pl. 4722.

[54]  *T-H New Orleans Ltd Partnership*, 116 F.3d at 802.

[55]  *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[56]  *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1165 (5th Cir. 1993).

is satisfied even where "the plan may not be one which the creditors would themselves design and indeed may not be confirmable."[57]

The court finds that the Debtors have sustained their burden of proof that the Plan is filed in good faith, and that the Plan was proposed with a legitimate and honest purpose to reorganize and has a reasonable hope of success. Various insurers arguments to the contrary will be addressed in turn.

A.  <u>The Plan is a result of extensive negotiations and is not a collusive agreement between the Debtors, McDermott and plaintiff's lawyers.</u>

Various of the Debtors' insurers have objected that the Plan is not filed in good faith because, in essence, it is merely a collusive agreement with plaintiff's attorneys designed to pay meritless claims. The Plan Proponents predictably respond that the Plan is the result of extensive arms-length negotiations and the system of paying claims is actually stricter than the system that existed pre-petition.

The Debtors' bankruptcy case was filed on February 22, 2000. Mr. Nesser, general counsel of B&W and MII, testified that a dual track was followed post-petition, that of settling with various constituencies, while also pursuing the "Litigation Protocol" to contest asbestos personal injury claims. Mr. Nesser testified that in the spring of 2000, the Debtors had settlement discussions with plaintiffs' lawyers. Throughout 2000, the Debtors also pursued discussions with London. In 2001, an adversary proceeding was initiated seeking a declaratory judgment regarding $600 million in assets that had been transferred from B&W to its parent corporations during a 1998 corporate

---

[57] *Id.* at 1167.

restructuring.[58]  About the same time, various insurers, including London, brought insurance-coverage litigation before the district court.[59]

Mr. Nesser testified that negotiations with constituencies began soon after the Debtors' filing, and continued during the course of the transfers litigation and litigation with insurers. In 2001, the Debtors asked that a mediator be appointed, in part because they felt that negotiations were not fruitful.  Eventually, Professor Francis McGovern was appointed as mediator.[60]

In early 2002, several events occurred that helped in the Debtors' negotiation strategy. In January 2002, Judge Vance rendered a decision in favor of B&W in the London declaratory judgment action.  The next month, in February 2002, this court entered a decision denying the transfer complaint.[61]  In May, 2002, this court also entered an order terminating the Debtors' exclusive period to file a plan of reorganization.

In May, 2002, B&W filed a draft plan, but continued to negotiate with constituencies, including London.  Following the termination of exclusivity, the ACC and the FCR filed their own Disclosure Statement and Plan.  By August, 2002, the Debtors announced that an agreement in

---

[58]  Adv. No. 01-1155.

[59]  "London" includes Certain Underwriters at Lloyd's, London and Certain London Market Companies.  Various suits are pending before the United States District Court for the Eastern District of Louisiana by London Market Insurers and Traveler's Insurance Co. including (i) *Traveler's Ins. Co. et. al. v. McDermott Inc., McDermott Int'l, Babcock & Wilcox Co., Diamond Power Int'l, Inc., Babcock & Wilcox Constr. Co., and Americon, Inc.*, Nos. 01-3218 c/w 01-3387, United States District Court, Eastern District of Louisiana, (ii) *Certain Underwriters at Lloyd's v. McDermott Int'l, Inc.*, Case No. 01-0912 and *(iii) Certain Underwriters at Lloyd's London, et al. v. Babcock & Wilcox Co.*, et al., Case No. 01-1187.  *See also* footnote 17.

[60]  Pl. 1682.

[61]  *In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D.La. 2002).

principle had been reached regarding the terms of the ultimate plan. Professor Green testified that concessions made by the FCR and ACC to the amount of the contribution to be made by MII to the Asbestos PI Trust enabled a resolution in principle to be achieved and an amended plan was filed by the Debtors in December 2002. Finally, in June, 2003, the Joint Plan was filed by various constituencies, including the ACC, FCR and McDermott, Inc. [62] Each of the Debtors' plans contained different treatment of asbestos claims, reflecting the negotiations underway at the time of filing. Various insurers object because the Joint Plan contains provisions more generous to claimants than the original plan, and argue that such indicates a lack of good faith.

Rather than indicate that good faith is lacking, the case history indicates that negotiations with constituencies was protracted, extensive and hard fought. A great deal of negotiation and litigation took place before an agreement in principle could be reached with any constituency. Ultimately, the Debtors were able to craft a plan agreeable to the ACC and FCR, which represent the major creditors in the case. Rather than indicate a lack of good faith, the Debtors' actions indicate a dogged determination to settle with its major constituencies on the best terms possible, and under a plan capable of confirmation.

The court finds it significant that prior plans submitted to the court never came on for confirmation. Instead, the plans were modified, amended and/or withdrawn prior to any confirmation hearing. Bankruptcy Code §1127(a) expressly provides for modification of a plan prior to confirmation, so long as it meets the requirements of §§1122- 1123. Plans are frequently modified during the confirmation process, including situations where settlements are incorporated into the plan and objections withdrawn. While the Litigation Protocol may have originally formed

---

[62] Pl. No. 1694, 3148, 3320.

the Debtors' strategy in the initial phases of the bankruptcy proceedings, it is not binding on the Debtors for the duration of the case. Instead, the debtor is free to negotiate, and the Code promotes, settlements with creditor bodies.    The modifications and amendments to the Plan, and the abandonment by the Debtors of the Litigation Protocol, do not indicate a lack of good faith. Instead, they are the result of the usual negotiations leading to confirmation of a plan in many, if not most, Chapter 11s. In this case, these were hard-fought negotiations with the ACC and FCR, two bodies that vigorously objected to the original plan and the Litigation Protocol.

Insurers also object that the Plan is not filed in good faith because they were deliberately and collusively excluded from the negotiations and formation of the Plan and other agreements. Mr. Nesser testified that negotiations were underway with London from the outset of the case, and continued even after the agreement in principle was announced with the ACC and FCR. There was much argument but no evidence to the contrary.

B.    The Insurer's Contractual Rights

Various insurers object that the Plan may not rewrite the contracts of insurance, without the consent of the parties. They argue that the Plan may not change provisions of the policies, including the claims management function, the anti-assignment clause, reporting requirements, the requirement to pay only meritorious claims, to pay claims only as they come due, and to assist in the defense, investigation and settlement of claims. Stated another way, they object that the Plan Proponents colluded against insurers to formulate a plan designed to force insurers to pay non-meritorious claims, without the insurer's participation and control over defense and settlement of the claims.

-32-

1. Anti-Assignment Clauses.

Insurers argue that the Plan, among other things,  may not require the assignment of insurance rights because the insurance policies and/or settlement agreements with Debtors specify that any assignment must be consented to in writing by the insurer. They also argue that insurance rights are only assignable without the insurer's consent where vested and the amount of loss has been fixed by a settlement of the claim or an adverse judgment which has been paid by the Debtors. The Plan Proponents respond (i) the Plan only assigns insurance rights, and does not implicate any anti-policy-assignment clause; (ii) a substantial portion of the  remaining insurance coverage is subject to settlement agreements that do not contain restrictions on assignment; and (iii) the assignment does not increase the insurers' risk.

The Plan does not purport to assign the insurance policies. Only insurance rights, including rights, interests, claims, demands or entitlements to a policy's proceeds and the right to pursue the proceeds are transferred to the trusts. As a general rule, contracts are freely assignable. An exception exists where the parties provide an express prohibition on an assignment. A general stipulation in a policy prohibiting assignment except with the insurer's consent is valid only as to assignments that occur prior to a loss.[63]   The prohibition of an assignment without the consent of the insurer is not effective as to an assignment of a policy or right under a policy after the event has

---

[63]  *Geddes & Moss Undertaking & Embalming Co. v. Metropolitan Life Ins. Co.*, 167 So.2d 209, 210 (La. Ct. App. 1936)(distinction is made between assignment of policy before and after loss, assignment after loss is permitted); *International Rediscount Corp. v Hartford Acc. and Indemnity Co.*, 425 F. Supp. 669, 673 (D. Del. 1977)(assignment of policy prohibited only assignment of insurance contract before loss); *see also* 3 Couch on Insurance, 35:7 (3rd ed. 1995); 44 Am. Jr. 2d Insurance 787.

occurred by which liability under the policy is fastened upon the insurer.[64]

The anti-assignment clause in the various B&W policies states: "Assignment of interest under this Contract shall not bind the Underwriters until their consent is entered hereon."[65] In construing a nearly identical provision, one court has held that the provision prohibits only the assignment of the insurance contract before loss.[66] The court reasoned that the purpose of a general anti-assignment clause is to protect the insurer against the possibility of increased risks attached to a change in the identity of the insured if the policy were assigned before the insured-against loss had occurred.[67] That rationale is lacking where the assignment only applies to a right to proceed against the insurer after loss. After loss, the assignee simply stands in the shoes of the assignor, subject to valid defenses against the original insured.[68]

Objectors assert that a "loss" does not occur under the policies, and the right to payment for loss may not be assigned, until the happening of the occurrence and a determination of pecuniary injury resulting from the occurrence has fixed the amount of the loss. The weight of authority is otherwise. In *Ocean Acc. & Guarantee Corp. v. Southwestern Bell Tele. Co.*,[69] relied upon by

---

[64] *Time Fin. Corp. v. Johnson Trucking Co.*, 458 P.2d 873 (Utah 1969).

[65] Exhibits 34.001 through 34.240. For example, see Exhibit 34.232, Policy No. A&PH-11611, paragraph O, pg. 24.

[66] *International Rediscount Corp. v. Hartford Acc. and Ind. Co.*, 425 F. Supp. 669, 673 (D. Del. 1977).

[67] *Id.* at 672.

[68] *Id.* at 673, citing *Georgia Co-Operative Fire Ass'n v. Borchardt & Co.*, 51 S.E. 429, 430 (Ga. 1905). Withholding consent in order to defeat the claim of an assignee on an assignment made after loss "would be a mere act of caprice or bad faith."

[69] 100 F.2d 441 (8th Cir. 1939).

London, the court held that after a loss occurs, a policy is assignable despite the presence of an anti-assignment clause. In a contract for indemnity against liability, the liability of the insurer arose immediately upon the happening of an accident. In such case, the liability, loss and cause of action arise simultaneously when the accident occurs, and not when judgment is rendered. [70] Rather than supporting London's argument, the case provides that assignment may occur after loss, the loss occurring at the time of the insured-against accident, and not judgment fixing liability.

In the case of *Continental Cas. Co. v. Diversified Industries, Inc.*,[71] the court similarly construed a general prohibition against assignment without consent under Pennsylvania law as applying to assignments before loss only.[72] In *Continental*, the insurance policy contained an anti-assignment clause nearly identical to the one contained in the B&W policies. The court held that because the injury that would potentially place liability upon the insurer, in this case environmental damage from the storage of contaminants, occurred prior to the assignment, the assignment occurred after loss and was valid.[73] The assignment did not increase the amount of risk the insurer would face, but merely changed the name of the party to whom any payment could be made. Rather than measure loss from the time of judgment or other determination of damages for injury, the court

---

[70]   *Id.* at 447.

[71]   884 F. Supp. 937 (E.D. Pa. 1995).

[72]   *Continental*, 884 F. Supp. at 947 (noting that "great weight of authority"holds a general provision prohibiting assignment without consent applies to assignments before loss only.); *see A C and S*, 2004 WL 1354283 (Bankr. D. Del. Jan. 26, 2004)(commercial general liability policies could be assigned in their entirety to asbestos trust under Pennsylvania law, notwithstanding anti-assignment provision, because loss that gave rise to liability had already occurred).

[73]   *Id.* at 948.

-35-

looked at whether the assignment occurred after the injury occurred.

As opposed to the policies, nothing contained in the CIPs or settlement agreements with the insurers prohibits an assignment of insurance rights. Most of the settlement agreements contain similar language.[74] Nothing contained within the settlement agreements acts to restrict transfer. Instead, the settlement language that they were made binding upon the parties "and their respective successors and assigns" appears to contemplate assignment.[75] Additionally, B&W utilized an agent, Worldwide, to handle and fulfill its claims management duties prior to filing of the petitions. Delegation of B&W's duties to an agent would also indicate that assignment was contemplated under the agreements.

Accordingly, the court finds that the Plan assigns to the trusts the Insurance Rights, including the right to receive insurance proceeds under various insurance policies and settlement agreements, and not the policies themselves. The Plan does not violate obligations of the Debtors or Insurance Contributor under any consent-to-assignment clause of any Subject Insurance Policy, A/P policy, Subject Asbestos Insurance Settlement Agreement or A/P Township Settlement Agreement. The assignment of the right to collect on B&W's coverage obligations does not materially increase the insurers' risk because the asbestos-related exposures and injuries relevant to asbestos claims have taken place years prior to the assignment.

    2. Anti-Assignment, Management of Claims, Cooperation and Consent Clauses.

      a) *Preemption under Section 1123(a)(5).* Plan Proponents argue that (i) §1123(a)(5)

---

[74] Exhibits 36.001 to 36.022.

[75] *Certain Underwriters at Lloyds v. McDermott Int'l, Inc.*, 2002 WL 22023 (E.D. La. 2002).

expressly provides for adequate means for a plan's implementation "notwithstanding any otherwise applicable nonbankruptcy law" and preempts nonbankruptcy law to the contrary, such as the anti-assignment clause and other contractual provisions including management of claims, cooperation and consent to settlement provisions, (ii) the interpretation of contract rights the insurers promote would impliedly thwart the purpose of the channeling injunction found in 524(g); and (iii) both bankruptcy and insurance law prohibit the insurers from reaping a windfall if their coverage obligations were lessened by the Plan's implementation of 524(g).

Section 524(g) provides for an injunction to supplement a discharge in asbestos cases where certain requirements are met. Those requirements include that a trust be established and assigned substantial assets for the benefit of asbestos claimants and provide for matrices so that similar present and future claims are treated substantially the same. Plan Proponents argue that the Plan merely complies with the requirements of §524(g). They also argue that the insurers' allegation that the Plan breaches the policies and they no longer have obligations under the policies would permit the insurers to escape payment in any asbestos case where §524(g) is implemented and insurance is a major asset of the estate. In short, they argue that acceptance of the insurers' argument would render §524(g) meaningless.

Plan Proponents cite various cases for the proposition that §1123(a)(5) preempts any nonbankruptcy laws that impair the implementation of a plan. Unlike other provisions in the Code which have been interpreted as merely enabling statutes, the language of §1123(a)(5) that "notwithstanding any otherwise applicable nonbankruptcy law" constitutes an explicit express

Congressional intent to supercede state law restrictions on the transfer of estate property.[76] As the Fourth Circuit has said,

> ". . . §1123(a)(5) is an empowering statute. As stated by Collier: 'The alternatives set forth in §1123(a)(5) are self executing. That is, the plan may propose such actions notwithstanding nonbankruptcy law or agreements.' Section 1123(a)(5)(D) then does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate."[77]

Insurers argue that the scope of the preemption found in §1123(a)(5) is limited only to "otherwise applicable non-bankruptcy laws 'relating to financial condition'" as stated in §1142(a), as the recent case of *Pacific Gas & Elec. Co. v. Cal. ex. rel. Cal. Dept. Of Toxic Substances Control,*[78] has so held. The *PG&E* case acknowledges that §1123(a)(5) provides for express preemption of nonbankruptcy laws, but held that the preemption is narrow in scope, applying only to nonbankruptcy laws relating to financial condition.[79] In so holding, the court noted that §1123 is derived from a similar provision found in §1142 which authorizes the implementation of a plan "notwithstanding any otherwise applicable nonbankruptcy law, rule or regulation relating to financial condition."[80] As noted by one author, it is unclear what, if any, nonbankruptcy laws would be preempted under the narrow ruling of the Ninth Circuit.[81]

---

[76] *In re FCX, Inc.,* 853 F.2d 1149, 1154 (4th Cir. 1988); *cf. Integrated Solutions v. Service Support,* 124 F.3d 487, 493 (3rd Cir. 1997).

[77] *FCX,* 853 F.2d at 1155.

[78] 350 F.3d 932 (9th Cir. 2003)

[79] *Id.* at 937.

[80] *Id.* at 942.

[81] 23 Am. Bankr. Inst. J. 32, 33 (2004).

This court holds that *PG&E* is distinguishable. *PG&E* involved the transfer of a large public utility under a plan that obviated the need for approval or compliance with the applicable state public utility regulation provisions. The B&W case does not involve the public regulation of a utility, instead it concerns implementation of §§524(g) and 105(a) injunctions in a case involving asbestos and radiation injury claims. Public health and safety issues are not implicated by the preemption, and a presumption against preemption is not present because state police powers are not implicated.[82] Instead, only contractual provisions restricting, among other things, the assignment of insurance, management of claims and consent to settlement are implicated.

Additionally, the weight of authority is in accord that §1123(a)(5) preempts contrary state law or contract provisions if such provisions are necessary to the implementation of a plan.[83] Cases that have considered the issue have uniformly held that §1123(a)(5) expressly preempts nonbankruptcy laws, and *PG&E* is the only case to read the preemption narrowly, to apply only to nonbankruptcy laws relating to financial condition. *PG &E* is in the minority, and reads into §1123(a)(5) a requirement not found in the text of the provision.

This court also disagrees with the Ninth Circuit in *PG&E* in adding the words "relating to

---

[82]  *In re Pacific Gas & Elec. Co.*, 283 B.R. 41, 47 (N.D. Cal. 2002), *rev'd*, 350 F.3d 932 (9th Cir. 2004)(noting that preemption issues are particularly acute in public utility cases because no other debtor is subject to as much regulation).

[83]  *In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988)(1123(a)(5) authorized the release of collateral securing a claim in satisfaction of the claim despite bylaw provision requiring board approval); *In re Entz-White Lumber & Supply Co.*, 850 F.2d 1338 (9th Cir. 1988)(1123(a)(5) permitted cure of default without paying contract default interest); *In re Public Service Co.*, 108 B.R. 854 (D. N. H. 1989)(1123(a)(5) permitted transfer of electric utility despite lack of state regulatory approval); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 61 (Bankr. S.D.N.Y. 1990)("Court finds that its jurisdiction and power over the debtor's estate takes precedence over the authority vested in the OTS under Title 12.")

financial condition" to §1123(a)(5).  The Ninth Circuit's reading into the §1123(a)(5) the words "relating to financial condition" ignored the rules of statutory interpretation found in other cases that where a statute's language is plain, the function of the court is to enforce it in accordance with its terms[84] and that a statute should be read to give effect to the whole, and not render superfluous any other portion of the same law.[85] The "notwithstanding" language appears in the introductory portion of §1123(a) and under any fair reading applies to all subsections thereunder.  Adding the "relating to financial condition" language creates real doubt and confusion as to its limitation applying to subsection (a)(5)(C), (I), (J), and (a)(6) - (7) and would in many instances render these subsections meaningless.

The structure of the Plan contemplates that, among other things,  insurance rights will be assigned to the various trusts, that matrices will be established providing for the payment of allowed claims, and an injunction issued.  The implementation of section 524(g) provides support for the argument that Congress intended to permit the transfers contemplated by the Plan in asbestos cases. This conclusion is buttressed by the provision in each policy of insurance, mandated by state law, that the bankruptcy or insolvency of the Assureds shall not relieve the insurer of the obligation to pay claims under the policy.

---

[84]  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 103 L.Ed.2d 290 (1989)("...where...the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'").

[85]  *Kawaauhau v. Geiger*, 118 S.Ct. 974, 523 U.S. 57, 140 L.ed. 2d 90 (1998)(Court is "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."), *quoting Mackey v. Lanier Collection Agency & Service Inc.*, 486 U.S. 825, 83, 108 S.Ct. 2182, 2189, 100 L.Ed. 2d 836 (1988).

A contrary conclusion would allow insurers an absolute veto of a plan of any reorganization that involved an insured with asbestosis liability because of the anti-assignment clauses found in policies. Such an interpretation would allow insurers to gut the reorganization and channeling injunction provisions specifically provided for in §524(g). No law has been cited by the insurers to support such a proposition. Authority does exist, however, to support the proposition that §524(g) was adopted to foster reorganization.[86] This conclusion is also in accord with the asbestos insurers' practice in this proceeding, as discussed in more detail in the next section, of permitting B&W to oversee the claims management process.

    C.    Payment of Valid Claims.

London and other insurers object that the Plan is not filed in good faith because it proposes to pay meritless claims, not within the coverage of the insurers policies. Plan Proponents respond that the insurers must act reasonably with respect to a policyholder's settlement of asbestos-related liabilities, that the TDP's criteria for payment of claims are similar to or more stringent than the pre-petition settlement criteria used to settle over 300,000 claims against B&W from late 1970 to February 2000.

The history of the claims management process is significant and bears describing in detail. Initially, B&W looked to Travelers, its insurer with primary general liability coverage, for defense and indemnity. In the 1970's, B&W began receiving asbestos injury claims, which it tendered to Travelers. In the early 1980's, Travelers and B&W developed a "bulk settlement" strategy to settle

---

[86] The House Report states that section 524(g) was added to establish a procedure for dealing with reorganizations involving future personal injury claims against the debtor based on exposure to asbestos-containing products. The section is modeled on the trust/injunction in the Johns-Manville bankruptcy case and the UNR bankruptcy proceeding. HR Rep. 103-834, 103rd Cong., 2nd Sess 8-12 (Oct. 4, 1994); 140 Cong. Rec. H10765 (Oct. 4, 1994).

the asbestos injury claims asserted against B&W. Mr. McKnight testified that, while he was employed by Travelers, this primary insurer played a key role in developing the strategy and supported the strategy.[87] Under the settlement strategy, protocols were developed to settle claims for a low per-claim amount where the asbestos injury claimant could demonstrate: (a) exposure to asbestos allegedly associated with a B&W boiler and (b) an asbestos-related medical condition. Mr. McKnight testified that if the claimant could provide information sufficient to survive a summary judgment motion, allowing the claim to go to a jury, the claim could be settled under the protocols developed. Claims were settled under the protocols until 1989, when Traveler's informed B&W that the products bodily injury aggregate limits under its post-1937 primary insurance policies were approaching exhaustion.

After 1989, B&W through Worldwide, assumed principal claims-handling responsibility for asbestos injury claims. Mr. McKnight joined Worldwide, a third-party claims administrator, and continued to apply the settlement methodology developed by Travelers to B&W claims until the petition date.

After 1989, B&W looked to its excess insurers to provide coverage in place to fund the asbestos injury claims. On or about April 25, 1990, B&W and London Market Insurers agreed to the London Settlement Agreement ("LSA")[88], which set forth the manner in which the excess insurers' policies would provide coverage-in-place for B&W's asbestos products bodily injury claims. The LSA was the first B&W CIP agreement with excess insurers, and many other CIP's were executed with other excess insurers by B&W in the following years. All the CIP's contained

---

[87]  Testimony, September 22, 2003.

[88]  Exhibit 37.

similar provisions. The CIP's agreed to a "trigger of coverage," for allocation of coverage, for the management of claims and other provisions.

Under the management of claims provision, B&W was given the responsibility for the defense and management of asbestos claims. B&W, through its agent Worldwide, settled the asbestos claims, and then allocated settlement payments and administrative costs to the excess insurers using the agreed upon allocation method. B&W and Worldwide continued the same settlement strategy that was initiated with Travelers.

Mr. McKnight testified that, while at Worldwide, he employed the same exposure and medical criteria as used while he was at Travelers. He testified that items that a claimant needed to present for a claim to be settled were:

(1) Evidence that the claimant worked in a facility containing a B&W boiler. Exposure documentation included an affidavit from the claimant or a letter from his attorney listing the claimant's places of employment;

(2) Medical documentation of an alleged asbestos-related disease or condition. Generally, a doctor's report stating that the claimant had symptoms "consistent with" an asbestos-related disease or condition was satisfactory. B&W accepted an ILO reading of "1/0" to establish a claim of asbestosis.

The evidence shows that the settlement strategy was communicated to London.[89] Mr. Quinn, the New York attorney for London, stated that London supported the strategy.[90] Worldwide would keep excess insurers apprised of the claims handling procedures and

---

[89] Exhibit 96.

[90] Testimony, September 24, 2003.

-43-

criteria by, among other things, providing memos to London's counsel notifying them of new or revised settlement protocols, [91] and providing Quarterly Reports notifying the excess insurers of settlements reached.[92]  The excess insurers also performed periodic audits of Worldwide's claims handling procedures.[93] The results of the audits were acceptable, as Worldwide continued to process claims using the settlement strategy.[94]  In 1997, Worldwide paid $200 million in claims, in 1998 it paid $220 million and in 1999 it paid $270 million in claims, none of which were rejected by insurers.

Under the Plan, certain TDPs have been developed by the FCR, the ACC, and the Debtors. Mr. Green, the Asbestos FCR, testified that the TDPs are consistent with, or stricter, than the pre-petition claims settlement criteria employed by Worldwide, and agreed to by their insurers.  The court finds it significant that Mr. Green has critically examined the TDPs, because his interest is in assuring the payment of future claimants, and the Plan has only limited resources for paying both present and future claims.  In addition, Dr. Florence testified that his analysis of the TDPs shows them to be more stringent than B&W's pre-petition settlement strategy.[95] Also, the testimony at trial shows that the TDPs are consistent with or more stringent than criteria used in other asbestos cases to evaluate claims, including the Celotex Trust, Manville Trust, Eagle Picher Trust and UNR Trust.[96]

---

[91]  Exhibits 123, 124, 135, 143.

[92]  Exhibits 165.27 – 165. 40.

[93]  Exhibits 40, 94, 221.

[94]  Exhibit 47.

[95]  Exhibit 169c.

[96]  Exhibit 169, App. B, 1-12.

Dr. Peterson testified that under the TDPs, the Debtors would pay less than they would had they remained in the tort system.[97]

London and other insurers argue that the TDPs provide for payment of invalid claims because (i) the Debtor has stated such claims were invalid in earlier pleadings, which have now been withdrawn or abandoned by the Debtors, (ii) the TDPs do not follow the American Thoracic Society ("ATS") or ABA Guidelines for criteria in the diagnosis of asbestosis and provide for payment of claims despite the lack of an "asbestos marker."

The Litigation Protocol proposed by the Debtor early in this bankruptcy proceeding was a departure from the Debtors' insurer-approved, prior procedure for handling asbestos injury claims, that of settlement upon meeting certain somewhat loose criteria. The Litigation Protocol represented an aggressive response to asbestos injury claims -- one which the Debtors have since abandoned in favor of the negotiated Plan.[98]    It is not unusual for Debtors to change litigation strategy in connection with a Chapter 11 proceeding.  Likewise, if the court were to hold every party to aggressive assertions made in pleadings in advance of litigation, there could never be a settlement of the litigation. Accordingly, the court finds that the Debtors' abandonment of their initial strategy to contest claims does not indicate a lack of good faith.

---

[97] Exhibit 166, Table 18.

[98] The Litigation Protocol was a proposal for disposing without jury trials of more than 200,000 asbestos personal injury claims in the district court by obtaining summary judgments in certain prototype cases and applying those rulings (supposedly in Debtors' favor) to all of the claims. The court should note that Debtors' counsel did not freely and willingly abandon this litigation strategy. Instead, after a couple of years this court indicated it was not willing to allow the reorganization to remain pending during the long period of time necessary to carry out the litigation strategy in the district court. See background on page 6 - 7 supra as to this court's insistence that at least an outline or tentative plan be filed in 2001, and the termination of the exclusivity period which ultimately resulted in the filing of a joint plan in July, 2003.

-45-

The TDP's are not as stringent as the insurers would like. They are, however, more stringent than the standards employed by the Debtors, and approved by the insurers, prior to bankruptcy. They are also consistent with standards employed by various other courts in the handling of asbestos injury claims under trust procedures.[99] The insurers have not made a showing that the criteria which they want have been accepted by any other bankruptcy court dealing with an asbestos trust. Rather than providing for the payment of "invalid claims," the Plan is the result of a negotiated settlement proposing to pay claimants in a fashion consistent with past practices approved by insurers, and consistent with practices found reasonable by other courts considering the asbestos liabilities of Debtors. The court finds that the Plan and associated documents satisfy the requirements of §1129(a)(3).

## VI.    THE PLAN'S DISCHARGE AND INJUNCTIVE PROVISIONS SATISFY THE REQUIREMENTS OF THE BANKRUPTCY CODE.

The Plan provides for the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction to be issued in connection with its Trusts, under §524 and the Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction under §105(a). These injunctions, and the related Plan discharge provisions, satisfy the requirements of the Bankruptcy Code.

Section 524 generally provides for the effects of discharge, and 524(g) provides for an injunction to supplement the injunctive effect of a discharge. The Plan has met all requirements of §524(g).

A. Uncontested matters.

---

[99]  These include the Celotex Trust, Manville Trust, Eagle Pitcher Trust and UNR Trust. Exhibit 169, App. B, 1-12.

-46-

The parties do not contest that the Plan meets the requirements of several sections, including §§524(g)(2)(B)(i)(I) - (IV),[100] 524(g)(2)(B)(ii)(II)[101], (IV)(aa),[102] and 524(g)(2)(B)(ii)(V).[103]  Other provisions of §524(g) are not disputed, although uncontested facts were not entered in connection with these sections.  These include 524(g)(2)(B)(ii)(I), that the debtors will be subject to substantial future demands for payment arising from their asbestos-related activities and (III), that the pursuit of the Asbestos PI Trust Claims outside the Plan will threaten the Plan's purpose to deal equitably with asbestos claims and future demands.

Dr. Peterson and Dr. Florence, experts retained by the ACC and FCR, were recognized by the court as experts in valuation.  Dr. Peterson estimated the Debtors' present and future claims.  His methodology assumed that, absent evidence to the contrary, future claims would broadly follow historical patterns with respect to: (1) claims against B&W relative to the continuing incidence of asbestos-related cancers in the general population; (2) the ratio of non-malignant to malignant claims, and (3) amounts paid to settle claims for different diseases.[104]  His methodology also factored in foreseeable changes in factors affected by non-epidemiological influences, including (1) changes in the propensity to file against B&W, (2) the ratio of non-malignant to malignant disease claims, and (3) the amounts paid to settle cases.

Dr. Peterson testified that if B&W had remained in the tort system, its total present and

---

[100]  Pretrial Order, Uncontested Facts 31, 32, 34, 35.

[101]  Pretrial Order, Uncontested Fact 39.

[102]  Pretrial Order, Uncontested Facts 39, 40.

[103]  Pretrial Order, Uncontested Facts, 13, 38.

[104]  Peterson testimony, October 22, 2003; Exhibit 166.

future asbestos-related liability would range between $7.099 billion and $9.043 billion.[105]  Dr. Peterson also estimated the number and value of future claims that would be filed against the Asbestos PI Trust. Under the Plan TDPs, he testified that B&W's asbestos-related liabilities would be between $5.2 billion and $7.8 billion.[106]

Dr. Florence testified that utilizing several scenarios, based upon B&W's historical experience, B&W and its insurers would have faced significant asbestos-related personal injury claims had B&W not filed for bankruptcy: (1) $491 million in 2000; (2) between $793 million and $1.44 billion in 2001; (3) between $1.091 billion and $2.259 billion in 2002, and (4) between $1.39 billion and $3.041 billion in 2003.[107]

The expert testimony of John C. Butler was also offered by the ACC as to when B&W's coverage for its remaining products liability policies would have been exhausted had B&W not filed for bankruptcy. Using the liability scenarios offered by Dr. Petersen and Dr. Florence, Mr. Butler testified that B&W's nearly $1.2 billion in remaining products coverage would have been completely exhausted by the end of the year 2004 if B&W had not filed for bankruptcy.[108]

The court finds that the experts are credible,[109] and that Plan Proponents have demonstrated

---

[105]  Exhibit 166, at Table 15.

[106]  Id., Table 18.

[107]  Exhibit 169b.

[108]  Exhibit 188.

[109]  The insurers argue that the testimony of Dr. Peterson and Dr. Florence should not be accepted because this court rejected their testimony in the avoidance action by holding that B&W was not insolvent at the time. *See In re Babcock & Wilcox Co.*, 274 B.R. 230, 254 (Bankr.

that the Debtors would be subject to substantial future demands for asbestos related claims. The Plan Proponents have also demonstrated to the court's satisfaction that the pursuit of such demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with claims and future demands. The Plan provides a mechanism to channel claims to the trust, have each claim rated in accordance with the TDPs and for claims to be paid in accordance with a proposed schedule. Absent such a mechanism, claims would be paid on a first come, first serve basis, with the likelihood that insurance coverages would be exhausted within a short time, leaving little or nothing to pay later filed claims. Additionally, the Court finds that the Plan meets the requirements of the Code on all uncontested matters relating to the §524(g) injunction.

      B.  Contested matters.

      Certain Insurers have objected that §524(g)(2)(B)(i)(II) requires funding by the contribution of securities and future payments, which the Plan does not clearly do. [110]   The Plan provides for the funding of the Asbestos PI Trust by the transfer of, among other things, all of the capital stock of B&W, which will be accomplished by a transfer from BWICO. It follows that if the Trust is the holder of all of the shares of B&W it will receive all dividends paid by B&W and its subsidiaries.

---

E.D.La. 2002). This argument has no validity because:
      1) the evaluations were as of a different time and for a different purpose;
      2) only the figures and not the import of their testimony has changed. That is, they felt B&W was insolvent in 1998 because of future claims. Now they testify the enormity of the claims is greater and presumably B&W is even more insolvent.

[110] "Certain Insurers" includes a large group of insurers, including TIG, Mt. McKinley Insurance Company and Federal Insurance Company. B&W contends that this section is uncontested, and that uncontested fact no. 32 covers this provision.

Thus, claims allowed by the Trust will be paid from the earnings or the proceeds from any sale of those shares.[111] The court finds that the Plan satisfies the requirements of §524(g)(2)(B)(i)(II).

Certain Insurers also object that the 75% majority voting requirements of §524(g)(2)(B)(ii)(IV)(bb) have not been satisfied. Class 6, consisting of the holders of Asbestos PI Trust Claims, voted in favor of the Plan by amounts and numbers sufficient to satisfy the requirements of this section.[112]

Certain Insurers also object that the requirements of §524(g)(2)(B)(ii)(V) are not met because examination of the Trust Documents "[m]ake it impossible to determine whether the Trusts will ever be able to operate through the 'mechanisms' as required" by the section. Additionally, London insurers objects that the Plan violates the provision that present and future claims be treated in substantially the same manner because it proposes to pay meritless claims of present claimants, leaving little for future claimants, and because the Plan will vitiate insurance coverage through its illegal treatment of the insurers' contracts.

The Plan provides, at Section 3.2.6.2 and 5.4 for the Asbestos PI Trust to process and allow or disallow claims in accordance with the provisions of the Asbestos PI Trust Distribution Procedures. A mechanism exists for the trust to process claims and determine the amount, if any, that will be paid. The Asbestos PI Trust will be funded from several sources as discussed, including an assignment of rights to insurance coverage, all of the equity of B&W and additional contributions from McDermott. This funding will provide up to $1.152 billion in insurance rights, and capital

---

[111] It is not at all unlikely that B&W will, in the future, be a profitable company as it is now profitable if asbestos and nuclear claims no longer burden the company.

[112] Class 6 voted in favor of the Plan 89.4% by number and 88.4% by dollar amount.

stock and other assets worth between $680 - $780 million.[113] As discussed elsewhere in this opinion, the Plan and TDP's are more stringent than the settlement strategy previously employed by Worldwide in processing asbestos claims, and are consistent with the provisions approved in other bankruptcy cases. The FCR who is charged with the obligation of protecting the interest of the future claimants, has analyzed the Plan and TDPs, is a joint proponent of the Plan, and testified quite strongly in favor of the Plan. The court will not presume – as the insurers ask the court to do without any evidence – that the FCR has not performed, or will not perform in the future, his fiduciary obligations.

The court finds that the Plan provides sufficient funding to the Asbestos PI Trust, and that the Asbestos PI Trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner. Thus, it satisfies the requirements of §524(g)(2)(B)(ii)(V). The Asbestos PI Trust will operate through mechanisms, such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and value of Asbestos PI Trust Claims, or other comparable mechanisms that provide reasonable assurance that it will value and pay similar claims in substantially the same manner.

In addition to other requirements, §524(g)(4)(B) requires that the court appoint a legal representative to protect the rights of future claim holders and that the court determine that the injunction with respect to future claims is fair and equitable to the future claim holders. As already mentioned, the court has appointed Eric D. Green, Esq. as the legal representative for the future

---

[113]  Exhibit 17.

asbestos-related claims holders. Mr. Green is well experienced in these kinds of matters.[114] Mr. Green has engaged in numerous discussions with the Debtors regarding the treatment of future claimants in the Plan, and taken actions needed to protect the rights of future claimants. Among other things, Mr. Green has retained Dr. Thomas Florence and other advisors to examine the availability of insurance to pay claims, to provide claims projection and trust distribution analysis, to examine the Debtors' asbestos-related liabilities and other issues relating to the future claims. All of this expert knowledge supports Mr. Green's informed and experienced opinion to support the Plan as a plan proponent. The court finds that the requirements of §524(g)(4)(B) have been satisfied.

C.    Section 105 Injunction.

The Plan provides for the Apollo/Parks Township Channeling Injunction, which will enjoin Apollo/Parks claimants from pursuing claims against the Debtors, certain of their affiliates and subsidiaries, the MII Indemnified Parties and ARCO.[115] The Plan Proponents base this provision upon §1123(b)(6), which permits any "appropriate provision" that is not inconsistent with other provisions of the Code, and §105 of the Bankruptcy Code, which permits the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

---

[114] Mr. Green testified that he has served as special master in both federal and state asbestos cases in Massachusetts, as well as in federal asbestos suits in Connecticut. He has also served as consultant to the post-confirmation trustees in the Johns Manville bankruptcy proceeding. He has served as futures representative in several asbestos bankruptcies, including the Fuller Austin case in Delaware, the Federal Mogul case in New Jersey and the Halliburton/Dresser bankruptcy proceedings.

[115] Plan, sections 1.1.9, 1.1.25, 7.10.

Also, §524(g)(1)(A) specifically provides for "an injunction . . . to supplement the injunctive effect of a discharge. . . . "

The Plan Proponents seek issuance of the Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction under §105, as well as §524(g).    A discussion of the evidence supporting §524(g) appears above, and will not be repeated in this section. To the extent applicable, it is incorporated herein.

Case law has provided several factors for consideration prior to issuance of a third-party injunction, including:

> "(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and ; (7) The bankruptcy court made a record of specific factual findings that support its conclusions."[116]

Each factor will be discussed in turn.

1.    *Identity of Interest.*

A. <u>Asbestos</u>.    Plan Proponents seek issuance of the Asbestos PI Channeling Injunction, Asbestos PD Channeling Injunction and Asbestos Insurance Entity Injunction against Debtors and other third parties that are Asbestos Protected Parties.  The court finds that an identity of interest

---

[116] *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002), *citing In re A.H. Robins Co.*, 880 F.2d 694, 701 - 702 (4th Cir. 1989); *In re Johns-Manville*, 837 F.2d 89, 92-94 (2nd Cir. 1988); *In re Continental Airlines*, 203 F.3d at 214.

exists between Debtors and the Asbestos Protected Parties. The Asbestos Protected Parties include MII, the ultimate parent, MI the parent of B&W, non-debtor subsidiaries of the Debtors and affiliate corporations of the Debtors. Under numerous policies, B&W and all "wholly owned, or financially controlled or affiliated companies" are the named assured.[117] Lawsuits filed also name MII as a party, with claims derivative of B&W's alleged asbestos liability. MI and MII are making substantial contributions to the Plan, and their willingness to do so is dependant upon a final resolution of liability for the derivative asbestos liability claims.

B. Apollo/Parks.    The court finds that an identity of interests exists between the Debtors and third parties, including ARCO, MII and the non-debtor affiliates and subsidiaries to support issuance of the Apollo/Parks Township Channeling Injunction. Mr. Nesser testified that B&W purchased Nuclear Materials and Equipment Corporation ("NUMEC") from ARCO in 1971.[118] NUMEC had operated the Apollo and the Parks facilities from approximately 1957 to 1967,[119] and NUMEC's assets were eventually transferred to a wholly owned subsidiary of ARCO, also named NUMEC. Among other things, ARCO is contractually bound under an assumption of liability and agreement to indemnify B&W which exists in the Stock Purchase and Assumption Agreements related to the transaction.[120]

---

[117] For example, see Exhibits 34.072 - 34.080.

[118] A/P Uncontested Facts, No. 6. Pl. 5356.

[119] A/P Uncontested Facts, No. 2 - 4. Pl. 5356.

[120] Exhibit 3015. Agreement between Atlantic Richfield Co. as owner of capital stock of Nuclear Materials and Equipment Corporation and the purchaser, The Babcock & Wilcox Company. A/P Uncontested Facts, No. 7, Pl. 5356.

Additionally, ARCO and B&W are both named insureds under the A/P Policies.[121] Because these entities share a pool of insurance related to the A/P claims, their interests are aligned, and an identity of interests exists between the entities. Likewise, the B&W affiliates and subsidiaries, including MII, share an identity of interest. Each may share liability for nuclear hazard risks at the Apollo and Parks facilities, and their interests are aligned. The court finds that an identity of interests exists among the Debtors, the Asbestos Protected Parties, and the Apollo/Parks Township Protected Parties such that a claim asserted against any of the Asbestos Protected Parties or the Apollo/Parks Township Protected Parties gives rise to a claim against the Debtors, including by the operation of the law of indemnity and/or contribution.

2.    *Substantial Contribution.*

A.  <u>Asbestos</u>. Section 7.2 of the Plan provides for funding of the Asbestos PI Trust, with: (i) BWICO (an indirect wholly owned subsidiary of MII), which now owns the stock of B&W, will cause the trust to become the holder of all outstanding Capital Stock of B&W; (ii) additional McDermott contributions including 4.75 million shares of common stock of MII (the ultimate parent of B&W) and a $92 million promissory note by MI; (iii) assignment of the asbestos insurance rights; and (v) transfer of certain of tax benefits of the Debtors. MI and MII's contributions to the trusts are substantial, and consist of both shares and promissory notes. According to the Blackstone Liquidation Analysis, the various McDermott contributions are in the range of $680 to 780 million. MII and certain of its subsidiaries are also assigning their Asbestos PI Insurance Rights, plus intellectual property rights to the Asbestos PI Trust. The court finds that the contributions of $400-500 million in B&W stock, $123.1 million for the MII stock, McDermott guarantee and promissory

---

[121]   A/P Uncontested Facts, No. 68

notes and $160 million for the tax benefits are substantial contributions to the Plan and the reorganization.[122]

B. Apollo/Parks. The Plan, at §7.6.5, provides for the funding of the A/P Township Trust. Contributions are made on the Effective Date to the Trust, as follows: (i) Insurance Contributors shall make the A/P Township Insurance Rights Assignment; (ii) the Debtors shall make the A/P Township Payment of $2.8 million and assign $1.4 million of rights to reimbursement of defense costs; and (iii) ARCO shall make a $27.5 million cash contribution and an assignment of insurance rights. Mr. Nesser testified, in connection with the formation of the Plan and settlement, that ARCO's contribution was to be substantial. It will be paid directly to the A/P Claimants with the A/P Trust receiving a setoff of the cash payment amount, and forms an integral part of the settlement of the A/P Claims. The Court finds that ARCO's contribution to the Plan, in the form of cash contributions and insurance rights assigned, are substantial assets of the Plan and the reorganization, and will serve to reduce the amount that the A/P Claimants will eventually be paid through the A/P Trust. The contribution of the Debtors' Apollo/Parks Township Payment and the Debtors' Apollo/Park Township Insurance Rights Assignment are substantial contributions to the reorganization.

3.    *Essential to Reorganization.*

A. Asbestos. The testimony at confirmation was that B&W was subject to voluminous personal-injury claims alleging exposure to asbestos from B&W boilers. During the 1980's and 1990's, B&W carried out a settlement strategy in which it consensually resolved all claims by claimants who made minimal showing of alleged exposure and injury. A total of more than $1.5

---

[122] Ms. Zilly expert report, Exhibit 17.

billion was paid to claimants by B&W's insurers, resolving more than 300,000 pre-petition claims.
By late 1999, however, there was an increase in both the number and the cost of asbestos claims.
By 1999, the number of claims filed against B&W had reached over 400,000.[123] By the claims bar
date, approximately 222,000 primary asbestos-related personal injury and 60,000 secondary
exposure proofs of claim were filed in this case.[124] The Debtors are likely to be subject to substantial
future demands arising out of the same or similar conduct or events that gave rise to the asbestos
personal injury trust claims and asbestos property damage claims, addressed by the various asbestos
channeling injunctions. Pursuit of these demands outside of the reorganization and procedures set
forth in the Plan will threaten the Plan's purpose to deal equitably with asbestos personal injury and
property damage claims. The court finds that the Asbestos Insurance Entity Injunction, the Asbestos
PI Channeling Injunction and the Asbestos PD Channeling Injunction are essential to the Plan and
the reorganization.

    B. Apollo/Parks. As will be discussed in more detail in connection with the discussion of
the nature of the A/P Claims, the defendants' claims in the *Hall* litigation pending in Pennsylvania
present a substantial litigation risk. A "test trial" in the *Hall* litigation involving only eight of the
500 claimants resulted in an adverse jury verdict of $36.7 million.[125] Although the trial court
eventually granted a new trial, a substantial risk remains on retrial that a similar result may be found.
Resolution of the *Hall* claims and future claims by channeling them to the A/P Trust will result in
a resolution of all the claims, and payment of the claims from the A/P Trust, and will permit the

---

[123]    Joint Pre-Trial Order, Uncontested Facts No. 9.

[124]    *Id*. at No. 14.

[125]    A/P Uncontested Facts, No. 96, 97. Pl. 5356.

Debtor to emerge from bankruptcy free from past and potential future claims relating to the Apollo and Parks facilities, and also free from significant litigation expenses related to the *Hall* claims.[126] Absent the injunction found in the Plan, after more than a decade of litigation the A/P Claims will remain unresolved, with the Debtor facing significant future litigation and its attendant expense. Moreover, a condition to incurrence of the Effective Date of the Plan, and to ARCO's contribution of cash and the insurance rights assignment, is that the A/P Channeling Injunction is in effect. The court finds that the injunction is essential to the Plan and the Debtors' reorganization.

4.      *Acceptance of the Plan by Impacted Class.*

A.  Asbestos.  The Plan provides for payment of the asbestos personal injury claims as Class 6 claims, and for payment of asbestos property damage and indirect asbestos property damage claims as Class 7 claims. These classes have voted in favor of the Plan. The holders of Class 6 claims voted in favor of the Plan 89.4% by number and 88.4% by dollar value.[127] The holders of Class 7 claims voted 100% in favor of the Plan.[128] The court finds that the requirement of acceptance by the impacted class has been met.

B.  Apollo/Parks.  The Plan provides for payment of the A/P Claims as Class 8A Claims. Class 8A has voted overwhelmingly in favor of the Plan, with affirmative votes received by over

---

[126] As of November 1, 2003, ANI, through its counsel reported that the total transaction costs expended in the defense of the *Hall* action are $24.02 million. A/P Uncontested Fact No. 120. Defense costs erode the limits of the Facility Form Policies. A/P Uncontested Fact No. 66. That is, for every dollar spent on defense there is one dollar less available for claimants from the applicable insurance.

[127] Exhibit 2006.

[128] Exhibit 16.

99% of the class members.[129]  Moreover, the Apollo Future Claims Representative supports the Apollo/Parks Settlement Agreement. The court finds that the requirement of acceptance of the Plan by the impacted class has been met.

5.    *Substantially Full Payment to Impacted Classes.*

A. Asbestos.  The Plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction.  Contributions to the asbestos personal injury trust is discussed above.  Like the A/P Trust, trust distribution procedures have been promulgated to govern the trust's operations.  Under the Plan, claims will be channeled to the trust, each claim rated in accordance with established TDPs, and paid in accordance with a proposed schedule.

B. Apollo/Parks.  The Plan provides for payment of the A/P Claimants and Future Claimants as Class 8A Claims, and for adoption of Trust Distribution Procedures to govern the workings of the A/P Trust.  The A/P Settlement will settle the *Hall* claims, which comprise the bulk of the A/P present claims, in the amount of $110 million.  Both ARCO and the Insurance Contributors will make the Apollo/Parks Township Insurance Rights Assignment.  The parties have stipulated to the face amounts and limits of various insurance policies applicable to both the Apollo and Parks facilities over time, and these limits are sufficient to cover the *Hall* settlement amount.[130]

In addition, ARCO will make a cash payment to the *Hall* claimants of $27.5 million upon the receipt of releases from the *Hall* claimants, as well as other conditions as set forth in the Settlement.  B&W will make a $2.8 million cash payment to the A/P Trust and assign to the A/P

---

[129]    Tabulation of Votes and Affidavit of Michelle Dalsin Zeller.

[130]    A/P Uncontested Facts, Nos. 62, 63.  Pl. 5356.