Trust its claims against ANI for reimbursement of prior defense costs incurred and paid by B&W arising from the *Hall* litigation in the amount of $1.44 million.

The Plan also provides for a set aside of $75 million (with a cap of $100 million) for the A/P Future Demand Holders. Mr. Basil Uddo, the A/P FCR, has exercised extensive due diligence review in the case. For example, he testified that, among other things, he reviewed the Plan and Disclosure Statement, the case record, the record in the *Hall* litigation and studies related to radiation exposure issues, as well as consulted with experts and others before concluding that the set aside was sufficient to satisfy A/P future claims. Although the A/P Trust Distribution Procedures remain to be negotiated between the parties and approved by the Court, based on the provisions of the Plan as amended on October 1, 2004, they will provide for the treatment of Apollo/Parks Township future demands in substantially similar fashion to A/P Present Claims.

6.    *Full Payment of Nonsettling Claimants.*

A.    <u>Asbestos.</u>  No evidence was put forth as to claimants who have not agreed to settle asbestos-related claims, or the payment to be made to these claimants. The Plan proposes to resolve all asbestos-related claims, and to pay those claims in accordance with procedures established under the TDPs. The Settlement Agreement between Debtors, MII, MI, the ACC and FCR proposes to settle disputes concerning the contents of the Plan, set up the asbestos trusts for the benefit of asbestos personal injury claimants and provide a mechanism for payment of the claims. To the extent claims are allowed, they will be paid in accordance with the trust in full.

B.    <u>Apollo/Parks.</u>  Mr. Nesser testified at the confirmation hearing that the *Hall* Claimants have agreed to settle their claims, and that other non-*Hall* claimants have claims estimated at $3

million or less. To the extent that the non-*Hall* claims are allowed, they will be paid under the A/P Trust in full.

In conclusion, the court finds that the requirements for issuance of the Apollo/Parks Township Channeling Injunction have been met. The Asbestos PI Channeling Injunction, the Apollo/Parks Channeling Injunction, the Asbestos PD Channeling Injunction and the Asbestos Insurance Entity Injunction are to be implemented in connection with this Plan, and the various trusts.[131] Upon confirmation and substantial consummation of the Plan, the Non-Debtor Affiliate Settlement Agreement and the Non-Debtor Affiliate Release shall be in full force and effect.

### VII.  EXECUTORY CONTRACTS

A.    Insurance Policies

---

[131] The Settling Asbestos Insurance entities, designated on the Plan Proponents' Schedule of Settling Asbestos Insurance Entities (and subject to the Plan Proponents' amendment until the Confirmation Date), are entitled to all of the benefits of the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Asbestos Insurance Entity Injunction. Accordingly, the Asbestos PI Channeling Injunction applies in full to the Settling Asbestos Insurance Entities with respect to Asbestos PI Trust Claims and the Asbestos PD Channeling Injunction applies in full to the Settling Asbestos Insurance Entities with respect to Class 7 Claims.

Consistent with Sections 7.3 and 7.4 of the Plan, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Asbestos Insurance Entity Injunction apply to (i) the B&W/AIG Insurer Misconduct Actions (as defined in the Settlement Agreement and Release between the Babcock Parties the ACC, the FCR and Certain AIG Member Companies, which was approved by this Court on June 16, 2004) and (ii) subject to this Court's approval of the Settlement Agreement and Release between the B&W/McDermott Parties, the ACC, the FCR and Travelers (the "Travelers Settlement Agreement"),which was filed for approval in the Court and which this Court is scheduled to consider on October 20, 2004, the B&W/Travelers Insurer Misconduct Actions (as defined in the Travelers Settlement Agreement).

Consistent with Sections 7.3 and 7.4 of the Plan, none of the Babcock Parties, with B&W/McDermott Parties, the ACC, the FCR and the Asbestos PI Trust (each as defined in the Asbestos PI Insurance Settlement Agreements) may seek to terminate, reduce, or limit the scope of the Asbestos PI Channeling Injunction with respect to any Settling Asbestos Insurance Entity after the Confirmation Order becomes a Final Order.

1. *Asbestos*. Section 7.2.6 of the Plan calls for the transfer of the Asbestos PI Insurance Rights to the Asbestos PI Trust. Section 8.1 of the Plan calls for assumption of all executory contracts and unexpired leases, not previously rejected. The parties apparently agree that the insurance policies are not executory contracts.[132] At issue is whether the settlement agreements with insurers, including the coverage in place agreement with London ("LSA") are executory contracts capable of assumption. Insurers contend that the settlements are executory contracts that cannot be assumed or assigned, because the settlements incorporate the terms of the policies, including anti-assignment provisions, and other provisions with which the Plan does not comply. The Plan Proponents contend that the settlements are like the policies – not executory.

Prior to filing, the Debtors had numerous insurance policies with various insurers, many of which were the subject of coverage-in-place agreements.[133] Prior to filing, the Debtor was current in its premiums on all policies covering asbestos-related liabilities. On many policies, the coverage period had already expired.[134] The Debtors' material obligation regarding the policies, i.e. the payment of premiums, had been satisfied for the policy period covered. Other duties, such as assistance and cooperation, are ancillary, and not material obligations. The only material obligation

---

[132] See Plan Proponents Post-Hearing Brief, at pg.25; Certain Underwriters Response Brief Regarding the Plan Proponents' Motion to Resolve Executory Contract Assumption Motion, at pg. 20 (LMI concur with the Plan Proponents that the overwhelming weight of authority establishes the non-executory nature of the Policies.")

[133] The insurance policies are found at Exhibits 34.001 through 34.240. The settlement agreements are found at Exhibits 0035, 0036, 36.001 through 36.022, and 0037.

[134] All applicable coverage periods for the London policies expired on or about April 1, 1987. Objection to Plan, P. 4726 at pg. 17.

of insurers remains the indemnity of the Debtors on the policies. As such, the asbestos policies are not executory contracts which can be assumed or rejected in the bankruptcy proceedings.[135]

       *2. Apollo/Parks.* ANI asserts that its policies governing coverage for nuclear energy hazards, unlike the asbestos related policies, are executory contracts. ANI asserts that the policies are executory because B&W has the continuing obligation to pay premiums and ANI has the continuing obligation to defend claims tendered under the Plan.

       Unexpired insurance policies are generally considered executory.[136] Where a debtor has the continuing obligation to pay premiums, and the insurer has the continuing obligation to provide coverage, a policy is considered to be executory.[137] Premium payments are considered to be bargained for consideration in an insurance policy.[138] Policies where the debtor has paid premiums for coverage periods that have expired are considered to be nonexecutory.[139]

---

[135] *In re Firearms Import and Export Corp.*, 131 B.R. 1009, 1013-14 (Bankr. S.D. Fla. 1991)(insurance policy was not executory where debtor had paid all premiums in full prepetition on coverage periods that had expired); *In re Placid Oil Co.*, 72 B.R. 135, 137-38 (Bankr. N.D. Tex. 1987)(premium agreement not executory because no performance is required by debtor, other than payment of money); *see also Ames Dept. Stores, Inc.*, 1995 WL 311764 at 3 (S.D.N.Y. May 18, 1995)("Courts considering insurance policies in which the policy periods have expired and the initial premiums have been paid routinely find that they are not executory contracts despite continuing obligations on the part of the insured.")(collecting cases).

[136] *In re Gamma Fishing Co.*, 70 B.R. 950, 951 (Bankr. S.D. Cal. 1987).

[137] *Id.*; *Counties Contracting and Const. Corp.*, 855 F.2d 1054, 1060 (3rd Cir. 1988).

[138] *In re Sudbury*, 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993).

[139] *See* footnote 132.

The parties have stipulated that a total of four policies were issued on the Apollo and Parks Township facilities, and that each policy was effective from the date of its issuance to the present.[140] Although the original policies were issued at various times from March 1958 to March 1975, yearly endorsements to the policies were issued, specifying the effective period for the endorsement.[141] Member companies participating in an ANI syndicate agree to pay a specified portion of insured losses, and receive the commensurate portion of the premiums.[142] ANI provided for each calendar year a premium endorsement specifying the advance, standard and reserve premium for the calendar year that the endorsement is effective, and an endorsement specifying changes in proportionate liability for subscribing companies in each calendar year.[143]  The parties have stipulated that all premiums required to be paid under the policies have been paid.[144]  The secondary  financial protection master policy ANI administers is a retrospective premium program.[145]

The Plan Proponents assert that the ANI policies are not executory because all premiums have already been paid for the insurance, citing four cases for that proposition.  The court notes, however, that three of the cases involved policies that had expired prior to the bankruptcy filing.[146]

---

[140]  Joint Pretrial Order on Issues Related to Apollo/Parks Township Matters, P. 5356, nos. 52 - 65.

[141]  Exhibits 3108 - 3111.

[142]  Exhibit 3127; section 2.3.2, page lxxiv.

[143]  For example, *see* Exhibit 3108, pg. 600.

[144]  *Id.* at 67.

[145]  Exhibit 3127, 2.3.3.3, page lxxix.

[146]  *In re CVA General Contractors, Inc.*, 267 B.R. 773, 778 (W.D. Tex. 2001)(when an insurance contract has been terminated prior to the date of the filing of the petition, there remains

Where the coverage period has expired prepetition, there remains no existing contract to assume or reject. The remaining case relied on by Plan Proponents involved a retrospective insurance policy, where debtor had paid the minium premium for the policy year, but on the filing date, had failed to pay retrospective premiums assessed after the policy year. [147] The court determined that the existence of a retrospective premium did not render the policy executory. The court does not find persuasive the cases where the policy at issue expired prepetition, or which considered retrospective insurance policies where the retrospective premium was unpaid on the petition date. Instead, an unexpired retrospective insurance policy is executory. [148] In this case, the coverage period of the ANI policies extends post-petition, and Debtors still owe an obligation to pay standard premiums for the policies.

Generally, the mere obligation to pay money by one party to the contract is not enough to render that contract executory, absent some corresponding material obligation that is still owed by the other party.[149] Here, the Debtors owe the continuing obligation to pay premiums, and ANI owes

---

no existing contract, executory or otherwise, for the trustee to either assume or reject); *In re Firearms Import and Export Corp,* 131 B.R. 1009, 1013 (Bankr. S.D. Fla. 1991)(where liability coverages were for prepetition periods, on the filing of the petition, no existing contract is present for the debtor to assume and 365 was not applicable); *In re Sudbury,* 153 B.R. 776, 777 (Bankr. N.D. Ohio 1993)(each policy had expired or was terminated prior to the filing of the case; presence of Bankruptcy Clause in policy constituted agreement that indemnity obligation was not conditioned upon payment of retrospective premium, where deposit premium was paid in full).

[147] *Wisconsin Barge Line, Inc.,* 76 B.R. 695 (Bankr. E.D. Mo. 1987)(considering retrospective insurance policy).

[148] *Wheeling-Pittsburgh Steel Corp.,* 54 B.R. 772, 779 (Bankr. W.D. Pa. 1985), *aff'd* 67 B.R. 620 (W.D.Pa. 1986).

[149] *Lubrizol Enters., Inc., v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir. 1985).

a continuing obligation to provide coverage and to keep the policy in effect, which would render the policy executory.[150] The failure of the Debtors to pay premiums would permit ANI the right to cancel the policies.[151] The court finds that the ANI policies are executory contracts which the Debtors may assume under the Plan. The policies are continuing, and coverage periods have not expired, which would render the policies executory.[152]

ANI further objects that the policies may only be assumed in their entirety, and the Plan Proponents may not assume the benefits of the policies without also assuming provisions regarding consent to settlement and control of the defense of claims. For reasons put forth in more detail in the following sections dealing with the Apollo/Parks Township issues, this objection is overruled. Debtors may make a reasonable settlement in the Plan of the A/P claims.

B.    Coverage in Place Agreements

The insurers object that various settlement agreements are executory contracts which the Debtors may not assume. At issue are settlement agreements entered into by B&W after the primary policies governing asbestos-related liabilities with Travelers were nearing expiration.

In 1989, Travelers informed B&W that certain limits on primary insurance policies were nearing exhaustion, and that it would no longer handle claims for B&W. B&W then assumed the principal claims-handling responsibility for its asbestos claims, using a newly formed third-party

---

[150] *Counties Contracting and Const. Corp.*, 855 F.2d 1054, 1060 (3rd Cir. 1988); see also M. Ledwin, The Treatment of Retrospectively Rated Insurance Policies in Bankruptcy, 16 Bankr. Dev. J. 11, 29 (1999).

[151] Exhibit 3110, pg. 6 ("in the event of nonpayment of premium. . . this policy may be cancelled by the companies. .. )

[152] Exhibit 3110, Item 2 (Policy Period: Beginning at 12:01 on the 7th day of March, 1975 and continuing through the effective date of the cancellation or termination of this policy).

claims administrator, Worldwide. B&W then looked to its excess insurance carriers to provide coverage in place to fund asbestos claims.[153] B&W entered into agreements with excess insurers regarding the manner that the excess insurers' policies would provide coverage-in-place for B&W's asbestos products bodily injury claims.

One of the chief CIP documents is the LSA, agreed to on April 25, 1990.[154] London, and other insurers, argue that the settlement agreement is executory because the major undertaking for Debtors under the agreement is the management of claims and for London is to indemnify pursuant to special criteria established by the CIP, and these obligations are so substantial that a breach of either would defeat the purpose of the transaction. In addition, they argue that Judge Vance, in a January 4, 2002 opinion, treated the CIP as an executory contract,[155] and that her decision constitutes the law of the case.

Initially, the court notes that Judge Vance's decision of January 4, 2002 does not establish that the CIP is an executory contract. Instead, she was asked to decide whether the Debtors had anticipatorily repudiated the CIP by proposing to assign the management of claims to a claims-handling trust under the Plan. She held that "the provisions of the Plan do not express defendants' unequivocal intent to cease performance of the LSA."[156] Without an analysis of the executory or nonexecutory nature of the CIP, Judge Vance reasoned that the Code does not prohibit assignment

---

[153]  Testimony Mr. McKnight, September 22, 2003; Mr. Quinn, September 24, 2003.

[154]  Exhibit 36.003.

[155]  *Certain Underwriters at Lloyd's, London, et al v. Babcock & Wilcox Co, et al*, C.A. No. 01-1187, 2002 WL 22023 at 8 (E.D. La. Jan. 4, 2002).

[156]  *Id.* at 7.

of executory contracts and unexpired leases, and that the LSA "does not prohibit its assignment and appears to contemplate assignment."[157] In other words, a hypothetical scenario existed that would permit assignment. Because the Plan at that time did not provide unequivocally for assignment of the LSA to a trust, or which would exclude the Underwriters from claims management, she found that the defendants had not committed an anticipatory repudiation of the LSA that would absolve the insurers of obligations under the agreement. In short, Judge Vance was not asked to decide whether the LSA was an executory contract under 11 USC §365. Instead, she decided only that the Debtors did not commit an anticipatory breach of the LSA.

The Bankruptcy Code, at §365, provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."
In determining whether a contract is executory, the relevant inquiry is whether "if at the time of bankruptcy filing the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[158] Only the existence of a material obligation that would excuse the performance of the other party, and not merely ancillary, ministerial or other continuing duties, would render a contract executory.[159] A contract fully performed on one side prior to bankruptcy is not executory.[160] If either side has "substantially

---

[157] *Id.*

[158] *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994).

[159] *In re Sudbury, Inc.*, 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993).

[160] Resnick, *Bankruptcy Law Manual*, 8:41 (5th ed.).

performed" its side of the bargain, such that the party's failure to perform further would not excuse performance by the other party, then the contract is not executory.[161]

Generally, a material breach is one so substantial as to defeat the purpose of making the contract.[162] The breach must go to "the root of the agreement" for a party to terminate its obligations under the contract.[163]

No decision could be located specifically discussing the executory nature of CIP agreements. Courts generally construe continuing obligations in nonexecutory insurance policies where the coverage period has expired, such as notification and cooperation clauses, as ancillary obligations that are still in effect but which failure to perform would not be material and would not excuse the insurer from liability under the policy.[164]

Under the settlement agreements, B&W is made responsible for the management of claims.[165] The insurer parties agreed to the establishment of a coverage block and to indemnify B&W for claims and defense costs. Plan Proponents argue that the management of claims provision in the CIP is not material, that it was never specifically discussed, and was merely added with other standard

---

[161] *In re Texscan Corp.*, 976 F.2d 1269 (9th Cir. 1992).

[162] *Sinco, Inc. v. Metro-North Commuter Railroad Co.*, 133 F.Supp. 2d 308, 311 (S.D. N.Y. 2001). The LSA provides that it is governed by New York law. Other CIPs either do not contain a choice of law stipulation, or provide that laws of other states shall govern. For example, the CIP with Commercial Union specifies that it shall be governed by the law of Massachusetts. Exhibit 36.006 at pg. 13.

[163] *Id.*

[164] *Firearms*, 131 B.R. 1009, 1013-1014 (citing *In re Federal Press Co., Inc.*, 104 B.R. 56, 66 (Bankr. N.D. Ind. 1989)); *In re Sudbury, Inc.*, 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993)(debtor's duties under cooperation clause is ministerial).

[165] Exhibit 36.003, pg.3. Other settlements contain similar provisions.

provisions in an early draft, and remained in the CIP thereafter. Additionally, they argue that the management of claims provision in the CIP is analogous to assistance and cooperation clauses found in policies, and are not material obligations. This court agrees.

The CIPs were designed to state the manner by which the settling insurers' excess policies would provide coverage-in-place for B&W's asbestos products bodily injury claims. The insurers agreed to pay asbestos claims as they were asserted under a methodology that was to be agreed upon. Eldon Bolton, who acted as lead negotiator for McDermott in the negotiation of the LSA, testified that the negotiations leading up to the LSA centered on the "trigger of coverage", that is, which policies would be used for injuries arising based upon an agreed upon "trigger" of liability. The Debtors objective was to obtain a "triple trigger" and to increase access to coverage. He testified that once the trigger was achieved, he had no objections or comments to the management of claims provision of the agreement.[166] Letters between Mr. Bolton and Mr. Quinn, a New York attorney and London's chief negotiator, discussing the LSA do not contain any mention of this provision.[167]    In short, Bolton's testimony was that the trigger of coverage was extensively negotiated; however, the management of claims provision in the settlement was merely inserted without discussion.

Additionally, the course of conduct of the parties indicates that the management of claims provision is not a material provision, such that its breach would excuse the Underwriters' performance. The LSA specifies that "B&W/McDermott shall be responsible for the management

---

[166]  Deposition Eldon Bolton, pg. 48-49.

[167]  Exhibits 97 - 100, 102 , 104 - 106, 108.

of the Claims."[168] The testimony established that Worldwide undertook the management of claims for the Debtors. Worldwide employed among others, David McKnight a former employee of Travelers, who had handled B&W asbestos claims while at Travelers. The testimony was that Worldwide was given near complete discretion in handling claims,[169] and that settlement in excess of given dollar amounts would not constitute a breach.[170]

The conduct of the parties indicates that they never considered the management of claims clause to be central to their agreement, such that a breach would be material. Moreover, the management of claims provision in the CIPs merely provides for the parties to agree in the future to procedures for, among other things, the negotiation of new settlement agreements with plaintiffs' counsel and other claims handling matters. That the LSA does not set out those procedures was confirmed by Mr. Quinn's testimony.[171] Therefore, it cannot be said that the management of claims clause constituted the "root of the agreement" such that Underwriters may terminate the agreement if the clause were breached. Other than claims management, which is more in the nature of an incidental continuing obligation, and which was performed by Worldwide pre-petition, no material obligations are due by Debtors under the CIPs that would constitute a material breach if not

---

[168]  Exhibit 36.0003, pg. 3.

[169]  Exhibit 121; Thomas Quinn testimony Sept. 24, 2003; Louis Burkart testimony Sept. 23, 2003.

[170]  Thomas Quinn testimony, Sept. 24, 2003; *see also Certain Underwriters*, 2002 WL 22023 at 7 (failure of B&W to notify underwriters of settlements in excess of $100,000 would not breach the LSA).

[171]  Thomas Quinn testimony, Sept. 24, 2003.

performed. Accordingly, the CIPs are not executory contracts that must be assumed or rejected by the Debtors.

### VIII.    APOLLO/PARKS ISSUES

A.    Background Facts.

The Apollo Facility and the Parks Township Facility are nuclear power facilities located in Pennsylvania. In 1971, B&W purchased from ARCO all of the shares of the companies owning the facilities. Under the purchase agreement with B&W, ARCO agreed to indemnify B&W for certain liabilities, including claims arising out of "all liabilities, obligations and debts" of the predecessor company that predated the sale. The Apollo Facility produced high-enriched uranium ("HEU") from 1957 to 1978, and low-enriched uranium ("LEU") from 1964 to 1983. The Parks Township Facility produced specialty metal products,[172] plutonium-238, plutonium based fuel plates and other products using radioactive materials at various times from 1961 to the mid-1970's. Additionally, from the mid-1960's, the Parks Township Facility stored or disposed of radioactive waste materials and buried solid radioactive wastes in a forty acre area known as the Shallow Landfill Disposal Area.

ANI[173] has provided coverage to B&W and ARCO as insureds for nuclear energy hazards at the Apollo Facility since March, 1958 and at the Parks Township Facility since June 1960, under four policies issued to cover the facilities. As of February 15, 1979, aggregate limits available under

---

[172]  These products included hafnium, beryllium, titanium, and zirconium. Uncontested Facts, No. 35. P. 5356.

[173]  Formerly known as Nuclear Energy Liability Insurance Association and Mutual Atomic Energy Liability Underwriters.

its policies at both facilities totaled $320 million.  The parties have stipulated that defense costs erode the limits of the ANI policies, and that all required premiums have been paid on the policies.[174]

The buildings at the Apollo Facility have been demolished, and the Nuclear Regulatory Commissions ("NRC") released the facility for unrestricted use in the mid-1990's.  The buildings at the Parks Township Facility were demolished between the mid-1990's and 2000. The Army Corps of Engineers continues site assessment activity at the Parks Facility, and remediation has not yet been determined.

*The Hall Litigation.*

On June 7, 1994, five individuals and three putative class representatives filed a complaint against B&W and ARCO in the United States District Court for the Western District of Pennsylvania ("*Hall* action").[175]  The plaintiffs in the action assert bodily injury and property damage claims as a result of radioactive, hazardous and toxic emissions from both facilities.[176]
The bodily injury claims include a variety of cancer claims, including leukemia, throat cancer, breast cancer, and other cancers, which have led to the death of certain claimants.[177]

---

[174]  Uncontested Facts Nos. 66, 67. Pl. 5356.

[175]  *Hall v. Babcock & Wilcox Co.*, Civ. Action No. 94-0951, United States District Court, Western District of Pennsylvania. The complaint has been amended, and now includes 500 plaintiffs with 383 claims.

[176]  Exhibit 3017.

[177]  All but 19 of the 235 wrongful death and personal injury claims involve some form of cancer.

B&W and ARCO tendered the *Hall* action to ANI in June, 1994.[178] ANI accepted the tender with a reservation of rights to deny coverage with respect to, among other things, any punitive damages and liability as a result of injunctive relief for medical monitoring damages.[179] In June, 1994, ANI appointed the law firm of Pepper Hamilton to represent both B&W and ARCO in the *Hall* action.

In August 1998, the federal district court in Pennsylvania held a trial of eight representative "test case" plaintiffs in the *Hall* action. On September 17, the jury in the *Hall* action rendered a verdict in favor of the eight test plaintiffs of compensatory damages in the amount of $33.7 million jointly against B&W and ARCO and $2.8 million solely against B&W.[180] Trial on the punitive damages phase was continued, and B&W entered into an agreement with Baron & Budd, plaintiffs' lawyers, to settle the punitive damage claims of all claimants in the *Hall* action for $8 million.[181] ANI has not paid any part of the punitive damages settlement.

The defendants filed a motion for Judgment NOV, which was denied on June 29, 1999.[182] The court, however, did grant a motion for new trial, based primarily upon the plaintiffs' failure to disclose to defendants two exhibits prior to trial.[183]

---

[178] Uncontested Facts 81, 82. Pl. 5356.

[179] Exhibits 3021, 3168.

[180] Exhibit 3040.

[181] Exhibit 3186.

[182] Exhibit 3072.

[183] *Id.*

After the jury verdict, multiple suits were filed both by B&W and ANI regarding the *Hall* action. In November 1998, ANI filed a declaratory judgment action against B&W and ARCO in the New York state court, seeking a determination of available policy limits and arguing an "emission" trigger of coverage, one that required identification of the moment when exposure to radioactive material resulted in bodily injury.[184] The New York suit was dismissed on *forum non conveniens* grounds. In the fall of 1999, both B&W and ANI filed coverage actions in the Pennsylvania state court, which were consolidated.[185] In April 2001, the Pennsylvania state court rendered an opinion in the coverage actions that the date of manifestation, and not emission, is the applicable trigger on the ANI policies, and that ANI had the duty to pay for independent defense counsel to represent and defend the separate interests of B&W and ARCO in the *Hall* action.[186] To date, ANI has not paid the costs of B&W's independent counsel.

B.    The Plan, as it relates to Apollo/Parks, is Proposed in Good Faith

ANI objects that the Plan represents a collusive agreement by Debtors and the attorneys for the Apollo/Parks claimants to defraud ANI and guarantee payment of meritless claims. ANI objects that no Apollo/Parks claimant has ever obtained either a judgment or settlement of compensatory damages, after nearly ten years of litigation. They argue that despite the lack of any adverse judgment against ANI's insureds, the Plan provides for payment of over $110 million in policy proceeds, without permitting ANI to control the defense of claims.

---

[184]    Exhibit 3055.

[185]    *B&W v. ANI*, No. 99-11498, Court of Common Pleas of Allegheny County, PA and *ANI v. B&W and ARCO*, No. 99-16227, Court of Common Pleas of Allegheny County, PA..

[186]    Uncontested Facts, Nos. 127 - 129. Pl. 5356; Exhibit 3094.

-75-

Much of the discussion regarding the good faith of the Debtors is made above, and will not be repeated here. Mr. Nesser testified that after the petition was filed, B&W, ARCO and the *Hall* Claimants agreed in March of 2003 to involve a mediator to assist in reaching an agreement on the *Hall* claims, and Mr. McGovern, the court-appointed mediator was engaged. In March 2003, a mediation session was conducted in Washington, D.C., attended by *Hall* claimants counsel, an ANI representative and counsel, and B&W. ANI's counsel included both its bankruptcy counsel, and its attorney from the Pepper Hamilton law firm, who participated in the *Hall* action.[187] The Pepper Hamilton attorney provided an updated valuation analysis of the *Hall* claims, which reflected a value in the range of $76 to $90 million.[188] After negotiation, the *Hall* claimants, B&W and ARCO reached an agreement, memorialized by the Apollo/Parks Township Settlement Agreement, and incorporated into the Plan.

On August 15, 2003 Mr. Uddo was appointed the Apollo FCR, representing the interests of the Apollo/Parks future interest holders.[189] After his appointment, further negotiations with the settling parties took place, which resulted in the filing of technical amendments to the Plan and a revised A/P Settlement Agreement.[190] Mr. Uddo retained experts, including epidemiologists and biostatisticians, as well as other professionals to assist in evaluating the claims of A/P future demand holders, the Debtors' assets and the Plan. As a result, the A/P settlement has been revised to permit

---

[187]  Exhibit 3100.

[188]  Exhibit 3102.

[189]  Exhibit 3240.

[190]  The term sheet for the revised settlement was filed on December 16, 2003. Exhibit 3221.

Mr. Uddo to participate in the development of the A/P TDPs and to set aside $75 million, with a cap of $100 million, for the A/P future demand holders. Under the settlement, the A/P Claims are liquidated and allowed. The eight test claims in the *Hall* action were allowed in the total amount of $13.5 million, an amount less than the jury verdict.[191] The remaining *Hall* claims were placed into four categories, which were rated based upon certain criteria, including the strength of the evidence regarding the cancer and nuclear exposure, the length and duration of exposure, the claimants' age, special damage characteristics, and whether the claim was within the applicable limitations period. The Plan provides for a total of up to $210 million to be paid under the A/P Settlement to A/P claimants.

ANI has not produced any credible evidence of collusion. While ANI complains that the Plan Proponents negotiated the Plan among themselves to the exclusion of ANI, it is undisputed that ANI and its counsel attended at least one mediation session during the bankruptcy proceedings regarding the *Hall* claims. While ANI ultimately did not settle with the Plan Proponents, and opposes the Plan, that alone is insufficient to deny confirmation on the basis of lack of good faith.

The court finds that the Plan is proposed with the legitimate and honest purpose to reorganize, has a reasonable chance of success, and is made in good faith. It is not surprising that ANI desires to continue litigating the A/P claims – the litigation costs erode the coverage limits. The *Hall* action alone has cost over $24 million in attorneys' fees without resulting in resolution of any of the plaintiffs' claims.[192] Litigation of each claim of the over 500 *Hall* claimants may cost many times the $24 million in attorneys' fees already spent. Although the jury verdict in the *Hall*

---

[191]  Exhibit 3186.

[192]  Exhibit 3064; Uncontested Fact, 120, Pl. 5356.

action was ultimately vacated, and a new trial granted, the jury verdict was in excess of $36 million in compensatory damages alone for only eight test cases. It seems reasonable that many times that amount of damages may ultimately be awarded by a jury if all or most of the 500 claimants ultimately go to trial.

Rather than a collusive arrangement, the Plan represents a negotiated solution to the expensive and protracted litigation that has been filed against the Debtors. Other than ANI, the A/P portion of the Plan is supported by all major A/P constituencies. The Plan and the A/P settlement were the result of extensive arms-length negotiations. ANI participated in settlement negotiations, however, did not agree to the settlement. The A/P FCR – who has an interest in ensuring that valid claims be paid to preserve limited resources for his claimants, who are at present unknown -- has conducted due diligence and negotiated a satisfactory resolution of the futures claims with the settling parties. The Plan and the A/P settlement are filed in good faith, are not the result of collusion, and are sufficient to satisfy the requirements of §1129(a)(3).

C.    The Plan does not violate the Price Anderson Act.

ANI objects to confirmation of the Plan because it asserts that the Plan violates provisions of the Price Anderson Act, 42 U.S.C. §2210, et. seq. ANI asserts that, under the Act, the exclusive jurisdiction and venue over public liability claims is in the district where the nuclear incident is alleged to have occurred, i.e., the Western District of Pennsylvania. It also asserts that payment of claims under the Plan would undermine the purpose of the Act to provide and preserve financial protection for valid claims.

The Price Anderson Act ("Act") is found at 42 U.S.C. §2210, et. seq. The Act was enacted to meet two basic objectives:

"(1)    Remove the deterrent to private sector participation in atomic energy presented by
the threat of potentially enormous liability claims in the event of a catastrophic
nuclear accident.

(2)    Ensure that adequate funds are available to the public to satisfy liability claims if
such an accident were to occur."[193]

The Act effectively channels the obligation to pay compensation for damages so that a claimant need not sue each party involved as owner, designer or engineer of the facility, but can bring the claim against the reactor licensee.[194]  The Act provides that with respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident took place shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy.[195]  Section 2210(n)(2) also permits actions pending in state court to be removed to the appropriate federal court venue.  It is this section that ANI asserts provides authority that jurisdiction and venue over all nuclear related claims must be in the U.S. district court where the reactor is located, and therefore, the Trust structure as contained in the Plan is proposed by a means forbidden by law and cannot be confirmed.  ANI objects that the Plan provides that the *Hall* action is to be dismissed in favor of resolution of the claims by the Trust, and that the Trust will likely settle and pay claims through use of the TDPs, rather than litigate the claims through the *Hall* action pending in the Western District of Pennsylvania.  It argues that the

---

[193]   Exhibit 3127, Part 1, xii.

[194]   *Id.* at xiii.

[195]   42 U.S.C. 2210(n)(2).

settlement strategy will violate the policy of the Act to provide and preserve financial protection for valid claims.

The Act is construed as creating an exclusive federal cause of action for torts arising out of nuclear incidents.[196] The consequence is that "no state cause of action based upon public liability exists."[197] However, although jurisdiction and venue over public liability actions is now vested in the federal courts, nothing in the Act prohibits confirmation of a Plan under the Bankruptcy Code which provides for the settlement of claims based upon public liability. Likewise, nothing in the Act indicates that Congress intended to preempt bankruptcy law

in cases involving claims based upon public liability. The Act provides for consolidation of public injury cases arising from a nuclear incident in a single federal district court located where the incident occurred. Congress sought, by this provision, to "effect uniformity, equity, and efficiency in the disposition of public liability claims. . . . [and] ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, and assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident."[198] The purpose of the venue and jurisdiction provisions is to provide uniformity, and to promote efficiency and not, as ANI claims, to preclude the settlement of claims or to ensure that litigation of claims take place in the district where the incident occurred.

---

[196] *Acuna v. Brown & Root, Inc.*, 200 F.3d 335 (5th Cir. 2000), *cert. denied* 522 U.S. 1229.

[197] *In re TMI Litigation Cases Consolidated, II*, 940 F.2d 832, 854 (3d Cir. 1991).

[198] *Id.* at 856, citing H.R. Rep. No. 104, 100th Cong., 1st Sess., pt. 3, at 18 (1987).

The court notes that the ANI policies explicitly recognize that settlement, rather than litigation, of a claim may occur. For instance, section I of the policies permits payments on behalf of the insured and provides that the "companies may make such investigation, negotiation and settlement of any claim or suit as they deem expedient." [199] Nothing in the Act mandates that a Plan involving public liability claims specify that the claims will be litigated subject to the venue provisions of the Act, to the exclusion of the bankruptcy court. ANI's argument that the Plan cannot be confirmed because it violates the "public policy" of the Act is not well taken.

Likewise, nothing in the Act provides that the Plan cannot be confirmed because "it abrogates the applicable federal law regarding *how* the claims must be adjudicated."[200] ANI asserts that the Act required that Third Circuit precedent concerning the elements and standard of proof of a public liability claim be applied, which the Plan fails to do. ANI fails, however, to specifically demonstrate how the Plan does not meet the standard of proof for claims, other than to assert that the Trust, and not the Debtor or ANI, will ultimately handle claims. Other than broad assertions that the Trust mechanism will violate the public policy behind the "compensation scheme" found in the Act, ANI has failed to articulate any specific provision of the Act that has been violated by the Plan. As such, the Court finds that the Plan does not violate the Price Anderson Act.

D.    The Court's jurisdiction to determine the insurance related findings.

---

[199]   Exhibit 3110, pg. 3, section I. The Conditions to the policies provides for a limit of liability where "payments in settlement of claims and in satisfaction of judgements" against the insureds for losses meets certain amounts. Exhibit 3110, pg. 4.

[200]   Post Trial Brief of ANI, p. 13.

ANI objects that the bankruptcy court lacks the jurisdiction to make insurance-related findings requested by the Plan Proponents.[201]    For the reasons expressed in the previous

_____

[201]    ANI asserts that the insurance related findings are found at Plan section 7.14.1, and include:

(s) The terms of this Plan, the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement do not violate any obligation of the Insurance Contributors or ARCO under any consent-to-assignment provision of any Apollo/Parks Township Insurance Policy;

(t) The Apollo/Parks Township Insurance Rights Assignment does not materially increase the risk of the Apollo/Parks Township Insurers of providing coverage for liabilities under the Apollo/Parks Township Insurance Policies as compared to the risk that was otherwise being borne by the Apollo/Parks Township Insurers prior to the Effective Date.

(u) The terms of this Plan, the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement do not violate any obligation of the Insurance Contributors or ARCO under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Apollo/Parks Township Insurance Policy.

(v) The Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Apollo/Parks Township Channeling Injunction are essential to this Plan and the Debtors' reorganization efforts;

(w) An identity of interests exists among the Debtors, the Asbestos Protected Parties, and the Apollo/Parks Township Protected Parties such that a claim asserted against any of the Asbestos Protected Parties or the Apollo/Parks Township Protected Parties gives rise to a claim against the Debtors, including by the operation of the law of indemnity and/or contribution;

(y) The duties and obligations of the Apollo/Parks Township Insurers under the Apollo/Parks Township Insurance Policies are not diminished, reduced or eliminated by (1) the discharge, release, and extinguishment of all obligations and liabilities of the Debtors, the Reorganized Debtors, and ARCO for and in respect of all Apollo/Parks Township Claims; (2) the assumption of responsibility and liability for all Apollo/Parks Township Claims by the Apollo/Parks Township Trust; or (3) the assignment of the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement;

(aa) The contribution of the Debtors' Apollo/Parks Township Payment and the Debtors' Apollo/Parks Township Insurance Rights Assignment, and the contribution of ARCO's Apollo/Parks Township Rights Assignment and the ARCO Release Payment are substantial assets of this Plan and the reorganization;

discussion of jurisdiction relating to the asbestos-related findings of fact, and except as stated otherwise, this court finds that it has jurisdiction to determine and enter findings and conclusions regarding confirmation of the Plan, including transfers of insurance rights to the trust established pursuant to §105 for radiation related claims, the function of the Apollo/Parks Township Trusts and related injunctions, and whether policies are executory contracts which may be assumed by the Debtors.

At issue also at confirmation was the question of whether the Plan Proponents could enter into a settlement of radiation claims due to the breaches of the policy by ANI in the conduct of the *Hall* and other litigation. Breach of contract actions are based upon state law. A determination that the insurer has breached obligations due under a policy to the insured is at heart a state law breach

---

(dd) The Apollo/Parks Township Trust, as of the Effective Date, will irrevocably assume the liabilities, obligations, and responsibilities of the Debtors and all other Apollo/Parks Township Protected Parties with respect to the Apollo/Parks Township Claims;

(ee) All of the Debtors' insurers who are affording insurance coverage that is the subject of the Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment, and the Apollo/Parks Township Insurers have been given notice and an opportunity to be heard;

(ff) Upon confirmation and consummation of the Plan, the Apollo/Parks Township Trust shall have substantially the same rights to indemnity and other rights related to the Apollo/Parks Township Claims and Debtors' Apollo/Parks Township Insurance Rights subject to the Debtors' Apollo/Parks Township Insurance Carveout, as those afforded to the Debtors immediately prior to the Effective Date, and shall have substantially the same rights to indemnity and other rights related to ARCO's Apollo/Parks Township Insurance Rights subject to the ARCO Carveout, as those afforded the ARCO Entities immediately prior to the Effective Date, and such rights shall be deemed to be transferred to the Apollo/Parks Township Trust and deemed vested in the Apollo/Parks Township Trust upon the occurrence of the Apollo/Parks Township Insurance Rights Assignment. With respect to the rights that are transferred to the Apollo/Parks Township Trust, such rights shall be so vested free and clear of all liens, security interests, and other Claims, or cause of action, except as otherwise provided for in this Plan;

-83-

of contract issue. It is not an issue that invokes substantive rights created by federal bankruptcy law. Instead, the issue is one that invokes state law, and could exist outside of bankruptcy. It is thus a non-core matter in which this court may enter proposed findings of fact and conclusions of law. Accordingly, the following section dealing with the propriety of the settlement of radiation claims are made as proposed findings of fact and conclusions of law.

      E.    <u>Proposed Findings of Fact and Conclusions of Law That ANI has Forfeited Rights under the Policies, such as the Management of Claims, No Action or Consent to Settlement Provisions.</u>

    B&W contends that because ANI has breached its duty to settle and to defend and has disclaimed coverage for the A/P claims, that B&W may enter into a reasonable settlement of the A/P claims despite language in the policies that would give ANI the right to control the defense and settlement of the claims. Each contention will be discussed.

    1. *Breach of Duty to Settle.* Plan Proponents contend that ANI has the duty of good faith and fair dealing under the insurance contracts, accordingly ANI has the affirmative duty to both negotiate and accept reasonable settlement offers. They contend that notwithstanding the $36.7 million adverse test trial verdict, ANI has never initiated settlement discussions, has rejected all settlement offers, has refused to negotiate with claimants and refused to authorize any counterproposal in response to settlement demands.

    ANI responds that, under Pennsylvania law, the insurer has no absolute duty to settle a case within policy limits. Instead, because ANI conducted an extensive evaluation of the claims and determined the claims had no scientific or legal merit, it was reasonable for ANI to defend the case

rather than settle. Therefore, it is argued that ANI did not act in bad faith in determining to defend, rather than settle, the *Hall* action.

Generally, insurance law recognizes that the covenant of good faith and fair dealing implied in the insurance contract provides the insurer with a duty to settle within policy limits on objectively reasonable terms.[202]  The duty stems from the insurer's exclusive control over settlement negotiations, "plus the inevitable conflict between the insurer's interest to pay as little as possible and the insured's interest not to suffer an excess judgment."[203]  A strong case against an insured on the issue of damages and liability tends to show the insurer's rejection of an offer to settle was negligent or in bad faith.[204]  Similarly, the insurer's rejection of advice of investigators, adjusters, or legal counsel of an opportunity to settle a claim within the policy limits may constitute evidence of negligence or bad faith in failing to compromise.[205]  The effect of the insurer's good faith refusal to settle is that the liability of the insurer remains measured by the terms of the policy, and the insured is not relieved of compliance with policy provisions.[206]  However, the wrongful refusal by

---

[202]  14 Couch on Insurance, section 203.12, 14 (3d ed. 1999).

[203]  *Id.* at 203.13.

[204]  *Id.* at 203.29; *see also Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223 (Pa. Super. 1957)(where little possibility of verdict or settlement within policy limits, decision not to settle must be based on insurer's bona fide belief predicated upon all circumstances of case, that it has good possibility of winning suit).

[205]  14 Couch on Insurance, section 203.31 (3d ed. 1999).

[206]  *Id.* at 203.34.

the insurer to settle operates to release the insured from all provisions of the policy that otherwise give the control of the matter to the insurer.[207]

Pennsylvania law provides that, under an insurance contract, the insurer undertakes three obligations: (1) to indemnify against liability covered under the policy; (2) to defend all claims that potentially come within coverage of the policy; and (3) a fiduciary responsibility towards the insured and an obligation to act in good faith and with due care in representing the interests of its insured when handling third party claims brought against the insured.[208]  The duty to act in good faith in representing the interests of its insured compels the insurer to accord the insured's interests "the same faithful consideration it gives its own interests."[209]  A decision not to settle involves an objective consideration of all factors bearing on the advisability of a settlement, including consideration of anticipated range of an adverse verdict, strengths and weaknesses of evidence, history of similar cases in the area, the relative appearance of persuasiveness, and the appeal of claimant, witnesses and the insured at trial.[210]  The insurer does not have an absolute duty to settle a claim merely because a judgment against the insured may exceed the policy limits.[211]  By the same token, where there is little possibility of a verdict within policy limits, the decision to litigate must be based on a reasonable assessment of the circumstances of the case and a real and substantial

---

[207]   *Id.* at 203.38.

[208]   *The Birth Center v. St. Paul Cos., Inc.,* 727 A.2d 1144, 1155 (Pa. Super. Ct. 1999)(and cases cited therein).

[209]   *Id.* at 1155.

[210]   *Id.* (*citing Shearer v. Reed,* 428 A.2d 635, 638 (Pa. Super. 1981).

[211]   *Id.* at 1156 (*citing Cowden v. Aetna Cas. & Sur. Co.,* 134 A.2d 223, 229 (Pa. Super. Ct. 1957).

chance of a verdict in favor of the insured.[212]  Therefore, the "insurer's right under the policy to litigate or settle a claim against the insured is not a right to risk the insured's financial well-being unless there is both a real and a substantial chance of a finding of nonliability."[213]

Through the course of the *Hall* action, B&W and ARCO have made numerous requests that ANI settle the matter. The parties have stipulated here that after the jury's verdict in the *Hall* matter, both B&W and ARCO requested that ANI settle the matter.[214]  The testimony and evidence in this proceeding indicates that B&W and ARCO requested, before the jury verdict, during jury deliberations and after the verdict, that ANI settle the matter for amounts within the policy coverage that plaintiffs had offered as settlement.[215]  ANI did not respond to the settlement demands made during jury deliberations and did not settle the *Hall* action.  Indeed, McDermott's general counsel informed ANI that "ANI's refusal to negotiate is unreasonable and in bad faith in view of, among other things, the nature of plaintiffs' claims, ANI's control of the defense of B&W, and the damages to which B&W is exposed."[216]

On September 17, 1998, the jury in the *Hall* action rendered a verdict in the amount of $36.7 million for the initial eight test cases. Mr. Nesser testified that, at that time, B&W was concerned that it would be exposed to uninsured losses over the policy limits should all the then remaining 100 claims be tried. Additionally, after the jury verdict, ANI informed the Debtors that its position was

---

[212]  *Id.*

[213]  *Id.* at 1156.

[214]  Joint Pretrial Order, Pl. 5356, Nos. 102, 107, 108, 113.

[215]  Exhibits 3035, 3036, 3037, 3038, 3043, 3049, 3050, 3051, 3053, 3073, 3082

[216]  Exhibit 3037.

that the limits of liability remaining in the A/P policies was insufficient to pay the jury award or any future liability.[217]  B&W learned for the first time that ANI took the position that the A/P policy limits were at the lowest limits of liability.  Indeed, on November 22, 1998, ANI wrote that the costs of litigation incurred by ANI and assessed against the policies "ha[d] already exhausted the limits available at both facilities for bodily injury and property damage caused by the nuclear energy hazard prior to July 12, 1968."[218]  Given ANI's position, B&W reasonably could assume that it would be exposed to payment of all claims in the *Hall* action.

On November 4, 1998, B&W, ARCO, ANI and the *Hall* claimants' counsel attended a mediation session held before a Judge Gibbons, a retired judge of the federal Third Circuit in an attempt to resolve the *Hall* claims.[219]  ANI did not agree to settle the *Hall* claims, and on November 19, 1998, sent correspondence indicating that it would withdraw from any further mediation before Judge Gibbons because the policy holders would not negotiate the policy limits applicable to the *Hall* claims.[220]

Both the testimony and the evidence reflect that ANI's stated reason for refusal to settle was because settlement in this case would provide incentive for plaintiffs to bring other actions against ANI's insureds.[221]  Case law provides that a refusal to settle based upon a self-serving agenda permits an inference that the insurer has failed to consider all facts and circumstances in considering

---

[217]  Exhibit 3046.

[218]  Exhibit 3064.

[219]  Pretrial Order, P. 5356, Uncontested Facts Nos. 103, 105, 106.

[220]  Exhibit 3055.

[221]  Exhibits 3043, 3049.

a settlement proposal.[222]   ANI contends that its refusal to consider settlement is based upon its understanding that the claims lack scientific merit and that Third Circuit precedent requires evidence of exposure to radiation at least in excess of background levels. Although a new trial was granted in the *Hall* action, it is uncontested that a jury rendered a verdict in favor of the initial test claimants. It is also undisputed that B&W and ARCO made repeated demands of its insurer to settle the claims for amounts within the policy limits, all of which were either not responded to by ANI, or which ANI refused to consider. At the same time, ANI's initial reaction to the jury verdict was to assert that policy limits had been exhausted and that B&W was exposed to uninsured liability on the claims. Since that initial assertion, and after litigation, the Pennsylvania court has determined that ANI's theory of coverage is not valid. To date, any progress in the case, including a determination of the trigger of coverage and whether B&W is entitled to separate counsel, comes only after litigation.

The facts and circumstances of the *Hall* action indicate that ANI's duty to settle has been triggered. The plaintiffs have made settlement offers within the limits of the policies, and the defendants in the *Hall* action have repeatedly requested that settlement offers be considered, and a settlement be entered in the matter. The *Hall* case involves significant litigation risks. The record indicates that claimants include those who have died of cancer. The initial test trial resulted in a jury verdict of $36.7 million in favor of only eight of the over 100 claimants. Although a new trial has been granted in the action, it remains true that the test trial resulted in a substantial jury verdict in favor of the plaintiffs. If the verdict amounts were extrapolated over 100 claims, a significant risk

---

[222] *Birth Center*, 727 A.2d at 1156 (Insurers stated reason in not settling that it tries all bad baby cases "indicates an agenda on the part of the insurer that is self-serving").

-89-

exists that B&W will be exposed to liability in excess of policy limits, especially when attorney's fees and other transaction costs that reduce the policy limits is considered, and that these fees, at the end of 1998, exceeded $12 million, and currently exceed $24 million.[223]  Even after a jury verdict, ANI has not considered any settlement proposals, choosing instead to litigate.

ANI also has taken the position after the test trial that policy limits are exhausted, exposing B&W to significant uninsured liability.  This position ultimately proved to be unavailing; however, B&W has had to expend significant sums in litigating the coverage matter.   ANI argues that no basis exists in Pennsylvania law to strip an insurer of the right to defend claims because it refuses to settle.  Instead, it argues that Pa. Cons. Stat. §8371 provides the exclusive remedy for bad faith conduct by an insurer is damages, and no remedy is found in the statute of the forfeiture of the right to defend.   Section 8371 was promulgated by the Pennsylvania legislature in 1990, and created a new cause of action under state law for "bad faith."[224]  The statute provides that if an insurer has acted in bad faith toward the insured, the court may award interest on the claim, award punitive damages and assess court costs and attorneys' fees.[225]  The courts have consistently held that §8371 creates a separate and independent cause of action.[226]  A "claim brought under §8371 is a cause of action which is separate and distinct from the underlying contract claim."[227]  Because § 8371 was

---

[223]  Exhibit 3064.  The total transaction cost expended in defense of the *Hall* action as of November 1, 2003 is $24.02 million.  Joint Pretrial Order, Uncontested Fact No. 120, Pl. 5356.

[224]  *March v. Paradise Mut. Ins. Co.*, 646 A.2d 1254, 1256 (Pa. Super. Ct. 1994).

[225]  42 Pa. C.S. 8371.

[226]  *March*, 646 A.2d at 1256 (and cases cited therein).

[227]  *Id.*

"promulgated to provide additional relief to insureds and to discourage bad faith practices of insurance companies, we would be reluctant to impose any limitations of claims brought under §8371 which do not appear in the plain language of the statute."[228] The Pennsylvania Supreme Court has interpreted §8371 as an additional remedy that does not preempt common law rights.[229] The statute was not intended to alter prior law, and nothing in the statute prevents the court from granting remedies not mentioned in the statute that it previously had the power to award.[230] Instead, "[t]he statute does not reference the common law, does not explicitly reject it, and the application of the statute is not inconsistent with the common law. Accordingly, the [common law] remedy survives."[231] ANI's argument that §8371 provides an exclusive remedy is not well taken, and is overruled.

In conclusion, this court recommends that the district court find that sufficient evidence has been produced to support the Plan Proponents' allegation that ANI has breached its duty to settle. It further recommends a finding that the settlement of the *Hall* claims contained in the Plan does not violate the ANI policies.

2. *Breach of Duty to Defend.* Plan Proponents contend that ANI has breached its duty to insureds to defend by failing to appoint separate counsel for ARCO and B&W even after it was evident that serious conflicts of interest existed between the two. ANI asserts that the appointment of Pepper Hamilton as joint defense counsel for B&W and ARCO was not in bad faith, that ANI

---

[228] *Id.*

[229] *Birth Center,* 787 A.2d at 402-403.

[230] *Id.* at 404.

[231] *Id.* at 407.

-91-

accepted the tender of the defense under a reservation of rights, and that no support exists for the proposition that an insurer that accepts the tender of claims and appoints defense counsel has forfeited its right to defend claims.

Generally, policies will contain a provision by which the insurer obligates itself to defend the insured against all actions covered under the policy. The insurer's unjustified refusal to defend exposes it to a finding that it has breached its duty to defend, and that it has breached the insurance contract. The result is that the insurer may be estopped from disputing coverage, may incur liability and lose its rights under the policy such as to prohibit settlement by the insured, to control the defense and to require the insureds compliance with other policy provisions.[232] Even then, however, a settlement reached by the insured, after the insurer's unjustified refusal to defend, must be reasonable and entered in good faith.[233]

Plan Proponents rely on the case of *Apalucci v. Agora Syndicate, Inc.*,[234] as support for the proposition that the insurer's failure to defend results in loss of rights under the policy to protect it from claims of its insured or third parties injured by the insured. In *Apalucci*, the Third Circuit court held that an insurer's refusal to defend constituted a breach of contract, and the insured lost its right to enforce a "no action clause" in the policy despite the lack of an actual trial. In that case, an injured minor who was served alcoholic beverages at a club, sued the club for negligence. By the time the suit was filed, the club had ceased business and its owner could not be found. A default judgment was eventually entered against the club, and the injured minor made a demand against the

---

[232] 14 Couch on Insurance, 202.4 (4th ed. 1999).

[233] *Id.* at 202.9

[234] 145 F.3d 630 (3d Cir. 1998).

club's insurer for payment. The club owner had notified the insurer of the claim, but the insurer was unable to locate the owner and denied coverage based upon the owner's failure to assist and cooperate in the defense of claims, as required by the policy. The insurer responded to the claimant's suit to collect the judgment by denying any obligation and asserted that the claimant lacked standing to sue for bad faith breach of the duty to provide coverage and defense to the club, and the club's breach of the policy by failing to cooperate.

The Third Circuit held that, despite the provision in the policy requiring an "actual trial" prior to bringing suit against the insurer under the policy, the essence of the clause did not require a trial, but "whether the insured suffered a bona fide and fixed money judgment."[235] Instead, the "actual trial" provision depended upon the insurer defending the insured in good faith, and the insurer had failed to do so in this case. The refusal to defend, "cut at the very root of the mutual obligation, [it] put an end to its right to demand further compliance with the . . . term of the contract."[236] Instead, "when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure."[237] Because the insurer permitted a default to be entered against the insured, it could not complain that the default was not a "trial" to which the "no action" clause would apply, and a third party beneficiary may sue the insurer directly to collect and enforce the default.

---

[235]  *Id.* at 633.

[236]  *Id.* (quoting *St. Louis Dressed Beef & Provision Co. v. Maryland Cas. Co.*, 201 U.S. 173, 181 (1906).

[237]  *Id.* at 634.

In this case, Plan Proponents argue that while ANI appointed counsel in the *Hall* action, it nonetheless effectively failed to defend B&W by appointing a joint defense counsel with a conflict of interest, and by arguing an "emission" theory of coverage that would effectively nullify coverage. ANI originally appointed the Pepper Hamilton law firm to defend both B&W and ARCO in the *Hall* action. Both B&W and ARCO expressed a desire to retain separate counsel, notified ANI that the reservation of rights raised a conflict of interest,[238] and expressed concern regarding the firm's relationship with ANI. Nevertheless, the litigation proceeded with a single joint defense counsel which, as it developed, was unable to make certain arguments because of conflicts. For example, the joint defense counsel was unable to pursue a cross claim that B&W wished to file against ARCO for indemnity for discharges occurring while ARCO's subsidiary was the licensee of the facilities, because of the conflict that it would pose.[239] It also became clear during the course of the trial that Pepper Hamilton could not advise ANI regarding settlement demands because of the "claims asserted inter se by the insurer and the insured."[240] ANI filed suit seeking, among other things, to enjoin B&W from retaining independent counsel in the *Hall* action.[241] In fact, the Pennsylvania federal court, in coverage litigation between ANI and B&W, found that ANI must provide separate counsel to each insured in the defense of the *Hall* action.[242]

---

[238] Exhibit 3025, 3026, 3030.

[239] Exhibit 3043.

[240] Exhibit 3076.

[241] Exhibit 3088 ("on their tenth cause of action, enjoining B&W from continuing to retain K&L as counsel in the defense of the *Hall* action.")

[242] Exhibit 3096, at pg. 38 ("Furthermore, as long as the plaintiffs are raising claims against both B&W and ARCO and the trial court may be using verdict forms which require the

Nonetheless, ANI has refused in the past, and continues to refuse, to pay for the independent counsel which B&W retained in the litigation.[243] Instead, ANI has expressed to Pepper Hamilton a desire to restore common counsel.[244]

Pennsylvania law provides that the duty to defend includes the duty to provide independent counsel when a potential conflict of interest exists between co-defendants.[245] An insurer's denial of the obligation to defend or indemnify the insured constitutes a breach of the insurer's duty to act in good faith and a repudiation of the insurance contract, permitting the insured to negotiate a settlement, so long as it is fair and reasonable.[246]

In conclusion, this court recommends that the district court find that sufficient evidence has been produced to support the Plan Proponents allegation that ANI has breached the duty to defend.

3.  *Denial of Coverage.*  Plan Proponents assert that ANI breached its insurance policy by filing declaratory judgment actions in Pennsylvania and New York, following the adverse jury verdict against insureds in the *Hall* action, seeking a declaration that the policies carried the lowest limit of liability based upon its "emission" trigger of coverage. They assert that the legal maneuver effectively denied coverage for losses under the policies, because ANI asserted that defense costs

---

jury to make separate findings as to the responsibilities of B&W and ARCO for the plaintiffs' injuries, it is not possible for a single law firm to represent B&W and ARCO."). This decision was affirmed on appeal in November 2002, and the Pennsylvania Supreme Court denied further review. Pretrial Order, Uncontested Facts Nos. 128, 129.

[243]  Exhibits 3086, 3087.

[244]  Exhibit 3114.

[245]  *Bituminous Ins. Cos. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 427 F. Supp. 539, 555 (E.D. Pa. 1976).

[246]  *Alfiero v. Berks Mut. Leasing Co.*, 500 A.2d 169, 172 (Pa. 1985).

had eroded the entire value of the coverage.[247]  ANI contends that it did not deny coverage, but instead merely exercised its legal right to adjudicate a legitimate coverage dispute in court.  It contends that the dispute over the trigger of coverage was one of first impression under nuclear energy liability policies.

At the time that ANI put forth its "emission" trigger theory, applicable Pennsylvania law provided that "manifestation" was an applicable trigger of coverage.  In the case of *J.H. France Refractories Co. v. Allstate Ins. Co.,* [248] the Pennsylvania Supreme court held that policy limits in effect when the manifestation of injury occurred were applicable.

Despite knowledge of the *J.H. France* decision,[249] ANI initiated two coverage actions, one in New York and the other in Pennsylvania.  In the Pennsylvania action, filed in October 1999, ANI requested a declaration that "plaintiffs ANI and MAELU are relieved from all liability to B&W under the Facility Form Policies and/or the S&T Form Policies with respect to the *Hall* action,"[250] by reason of B&W's alleged breach of good faith by refusing to authorize joint defense counsel to file a motion to certify an appeal, and by instructing the firm of Kirkpatrick and Lockhart to act on its behalf in the *Hall* action.  The Pennsylvania court ultimately held that B&W was entitled to independent counsel, and that, because the CGL policy in the *J.H. France* case was almost identical

---

[247]  Exhibit 3046, 3054, 3064.

[248]  626 A.2d 502 (Pa. 1993).

[249]  Exhibit 3049.  In a letter to ANI dated Nov. 2, 1998, ARCO writes: "In *J.H. France Refractories Co. v. Van Brunt Co.,* 534 Pa. 29, 626 A.2d 502 (1993), the Pennsylvania Supreme Court decided that bodily injury of this sort triggered all policies in effect during any stage of the pathogenesis, including exposure, progression or manifestation of the disease."

[250]  Exhibit 3088.

to the language in the ANI policies, *J.H. France's* interpretation of the policies would govern interpretation of the ANI policies, making the more expansive manifestation trigger applicable to the *Hall* action.[251]

Generally, once an insurer denies coverage, the insured is released from policy provisions governing cooperation and settlement, as well as other provisions.[252] Case law also recognizes that a prolonged silence, or refusal to answer an insured's request for coverage or a coverage position may constitute the equivalent of a denial of coverage.[253] It seems equally clear to this court that an action for a declaration that there is no coverage has the same effect.

This court recommends that the district court make a finding that ANI effectively denied coverage to its insured, thereby releasing the insured from policy provisions that ANI argues prohibits the settlement contained in the Plan.

F.    Reasonable Settlement.

Under Pennsylvania law, once the insurer breaches its contract, an insured may negotiate a reasonable settlement with the injured party "so long as it was done in good faith and the settlement was fair and reasonable."[254] The good faith of the Plan Proponents is discussed elsewhere in this opinion, and will not be repeated. The Settlement Agreement provides for settlement of A/P claims for the amount of $110 million, with up to a $100 million set aside for future claimants. The court

---

[251] Exhibit 3094, pgs. 17 - 20.

[252] 1 Insurance Claims and Disputes 4th section 3:10 (Sept. 2003).

[253] *Id.* (citing *Sarnafil, Inc. v. Peerless Ins. Co.*, 636 N.E.2d 247, 253-53 (Mass. 1994); *Best Place v. Penn Am. Ins. Co.*, 920 P. 2d 334, 352-53 (Haw. 1996)).

[254] *Alfiero*, 500 A.2d at 172.

finds the settlement is fair and reasonable. The settlement is in an amount within the policies' coverage. Pepper Hamilton, joint defense counsel in the *Hall* action, has prepared a range of settlement values, and the settlement is not out of line with these figures.[255] Mr. Baron, one of the leading attorneys representing plaintiffs in this type of case, testified that his estimate of the potential value in the tort system of all the radiation cases, considering the number of claims and the jury verdict in the test case, would approach $1 billion.[256] The settlement amount uses figures for the test claimants that: (i) are significantly lower than the jury verdicts in the test cases, (ii) are in amounts close to the pre-bankruptcy settlement offers made by plaintiffs counsel, and (iii) are in line with the *Hall* counsel's settlement figures, which are significantly lower than plaintiffs' counsels estimate of the potential value of the cases.

At trial, the Plan Proponents provided a detailed explanation for the settlement value and the amounts paid to claimants. The values for the eight cases where jury verdicts were initially rendered, were settled for 32% to 42% of the jury verdict. The remaining claims were placed in four categories, based upon five criteria, including:

> 1. The strength of the evidence regarding the relationship of the type of cancer asserted to the nuclear exposure;
> 2. The location where each person was exposed, the duration of the exposure, and the years of exposure;
> 3. The age of the individual, with the claims of younger cancer victims accorded more value than those of relatively older claimants;

---

[255] Exhibit 3076. In July, 1999, counsel recommended a settlement value of between $38 to $63 million on the personal injury claims, based upon certain assumptions, plus a small amount for the 178 property damage claims and medical monitoring claims. Mr. Nesser testified that this value was subsequently updated, in March 2003, to a range of $70 to $90 million. Exhibit 3102.

[256] Baron testimony, January 5, 2004.

4. Special characteristics in the damage claims, such as plaintiffs who had
sustained significant medical expenses or plaintiffs with large families;
5. Whether the particular claim was within the statute of limitations period,
and if not, the strength of the claimants' arguments regarding tolling.

The court finds that the settlement values are reasonable, based upon fair assumptions for

the reasonable value of claims considering a number of various criteria, and comport with state law

regarding fair and reasonable settlement.

ANI is not prejudiced by the settlement. The settlement will liquidate and allow the *Hall*

claims;    however, the Plan Proponents argue that ANI's rights regarding coverage are not

prejudiced by the settlement.[257] Instead, the Plan provides that insurance rights will be transferred

to the A/P Trust, and claimants state that the Trust will take those rights for what they are. If it is

ultimately determined that no coverage exists, then the Trust will not recover. Because ANI retains

its right to contest coverage, it is not prejudiced by the settlement.

The settlement also comports with bankruptcy standards regarding settlement, and will be

approved. Under Bankruptcy Rule 9019 and applicable law, in order for a settlement to be approved

by a bankruptcy court, it must be "fair and equitable and in the best interest of the estate." [258] The

factors a court considers in evaluating whether a settlement is fair and equitable include:

1. The probability of success in the litigation, with due consideration for the uncertainty in
fact and law;
2. The complexity and likely duration of the litigation and any attendant expense,
inconvenience and delay;
3. The best interests of the creditors with proper deference to their reasonable views;
4. The extent to which the settlement is truly the product of arms-length bargaining, and not
of fraud or collusion;

---

[257]  Trial Brief of the Apollo/Parks Township Releasors, pg. 37. Pl. 5358.

[258]  *Matter of Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997).

-99-

5.  All other factors bearing on the wisdom of the compromise.[259]

1.  *Probability of Success.* Under the settlement, the *Hall* action will be dismissed, and the *Hall* claimants will be paid in accordance with a matrix established under the trust. The *Hall* action has been pending since 1994. In that time, defense costs have exceeded $24 million. In 1998, a jury in a test trial of eight claims in the *Hall* action rendered a verdict against B&W and ARCO in the amount of $36.7 million.  Although a new trial was ultimately granted, as pointed out by Plan Proponents, a significant risk still exists in the case of an adverse judgment. At the test trial, the *Hall* plaintiffs were permitted to have their experts testify that the plaintiffs' injuries were caused by emissions from the A/P facilities. While defendants sought to have this testimony excluded, the court has stated that sufficient admissible evidence of causation has been presented, and would likely permit the experts' testimony on retrial.  ANI asserts that it has a strong case on retrial, that it has retained highly qualified experts who can rebut allegations that claimants' injuries were caused by emissions from the facilities, and that the dose of radiation that plaintiffs' experts estimate the plaintiffs had received is insufficient to increase the risk of disease.[260] Consideration of a settlement does not require the court to conduct a mini-trial to determine the probable outcome of claims compromised.[261] Instead, the court considers relevant facts and law to enable it to make an informed and intelligent decision.[262] Given that a test trial has already resulted in jury verdicts in favor of the test plaintiffs, and that on retrial the trial court may permit plaintiffs' experts to testify regarding

---

[259]  *Id.* at 356.

[260]  ANI Post Trial Brief, pgs. 29-30.

[261]  *Cajun*, 119 F.3d at 356.

[262]  *Id.*

whether the plaintiffs' injuries were caused by emissions from the A/P facilities, the court finds that this factor weighs in favor of approval of the settlement. In short, there is a substantial probability that the plaintiffs will again be successful in the *Hall* action.

2. *Complexity, Expense and Likely Duration of Litigation.* As recited above, the *Hall* action has been pending for ten years, and not a single claim has been resolved. In that time, the defense costs have exceeded $24 million. There are now over 500 claimants involved in the litigation, and the defense costs are likely to increase exponentially if the litigation continues. The defense costs reduce the policy limits, and if permitted to escalate, will ultimately reduce any recovery in the case.

The likely duration of the litigation is uncertain; however, given the time spent already in the case, it is likely to last for several more years. Any appeal of the *Hall* verdict would add at least a year, and probably more, to the expected duration of the case.

Both parties acknowledge the complexity of the case. It involves issues regarding radiation exposure including highly complex medical and scientific evidence and the effect of the Price Anderson Act. The case involves 500 plaintiffs, personal injury and property damage claims. A trial is likely to be complex, expensive and time consuming. Given the complexity, expense and likely duration of the litigation, settlement is advisable.

3. *The Best Interests of the Creditors.* In considering whether a settlement is fair and equitable, the court must consider the reasonable views of a majority of the creditors.[263] The settlement is supported by all creditors and by the A/P Futures Representative. Over 99% of the present A/P claimants voted in favor of the Plan. ANI is the only party that has objected to the A/P settlement, and ANI is not a creditor of the estate. The A/P Futures Representative, as well as

---

[263] *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995).

retained experts and professionals, have conducted due diligence into the reasonableness of the settlement as it affects future claimants, and concluded that the settlement is in the best interests of the future claimants. This factor also favors approval of the settlement.

4.  *Arms-Length Bargaining.* The settlement is the result of extensive negotiations, commencing in November, 1998, with the parties involved in the *Hall* action. In March 2003, after the filing of Debtors' bankruptcy petitions, mediation was again commenced between the *Hall* claimants, B&W and ANI to attempt to resolve the *Hall* claims. Mr. Francis McGovern, the court-appointed mediator, participated in the mediation.[264] ANI was represented by its bankruptcy counsel, as well as by an attorney from Pepper Hamilton, the firm which conducted the joint defense of the *Hall* action. Mr. Nesser testified that, at this time, Pepper Hamilton provided an updated analysis of the settlement value of the *Hall* action, reflecting values between $70 and $90 million.[265] Mr. Baron testified that thousands of hours were spent in negotiations, resulting in the settlement agreement.

Thereafter, the A/P Futures Representative was appointed, and was given an opportunity to examine the agreement and the fairness of the settlement and the Plan to future claimants. Due diligence was conducted by the A/P Futures Representative, and further negotiations occurred. These negotiations resulted in the filing of an Amended Settlement Agreement, incorporating revisions requested by the Futures Representative. These revisions include granting the FCR the right to participate in the drafting of the A/P Trust Distribution Procedures, and to provide a set aside of $75 million (with a cap of $100 million) for the future claimants.

---

[264] Exhibit 3099.

[265] Testimony John Nesser, Jan. 7, 2004; Exhibit 3102.

-102-

The court finds that the A/P settlement is not the result of fraud or collusion, but is the result of arms-length bargaining. As such, it will approve the settlement.

## IX. OTHER OBJECTIONS

A.    Lack of Notice.

Maryland Ins. Co. and Federal Insurance Co. object that they were not provided notice in time for filing objections to the Plan and Disclosure Statement. Plan Proponents assert, and the record reflects, that sufficient notice of the bankruptcy filing was provided to each insurer. Maryland was informed through its designated agent of the initial petition filed in 2000,[266] had notice of, and actually participated in, discovery prior to the confirmation hearing, and filed an objection to the Plan.[267] The record reflects that Maryland had notice of, and participated in objections to the confirmation of the Plan. As such, its objection of lack of notice is not well taken, and is overruled.

Similarly, Federal Insurance objects that it lacked notice of the Plan. The record reflects a different story. It shows that Federal, in January 2003, filed two proofs of claim in the bankruptcy proceedings.[268] Federal knew of the bankruptcy proceedings at least by January 2003. It certainly knew of the bankruptcy proceedings and plan confirmation when B&W sent it notice of the Plan filing in May, 2003.[269] Federal's objection of lack of notice is similarly overruled.

B.    Objections Specific to Ace Companies

_____

[266] Exhibit 15.

[267] Exhibit 4735.

[268] Proofs of Claim 0350968 and 0350945.

[269] Exhibit 15, BW 10020012 - 41. BW 10020036 indicates that on May 22, 2003, B&W notified "Jeff Golden, Federal Insurance Company, c/o Chubb Ins. Group, 2000 W. Loop South, Suite 1800, Houston, TX 77027" of the filing of the Plan.

-103-

Ace contends that its insurance policies are unique, i.e., that its policies are backed by various forms of security and a third party guarantee under a High Deductible Program and/or Captive Program. Ace provided primary general liability, workers' compensation and automobile liability insurance to B&W, MII and their affiliates, backed by forms of security and a third party guaranty by MII, as well as excess policies where no security was required. Additionally, some general liability policies are fronting policies reinsured largely by a wholly owned captive of MII, i.e., by Creole Insurance Co., Ltd. ("Creole"). Ace objects that the Plan cannot eliminate, alter or impair Ace's rights to the collateral, security, reinsurance and guarantee, and that the Plan does so because it: (1) impairs Ace's recourse against the Captive reinsurers and MII to access reinsurance and the third party collateral; (2) provides for the Captive Program to be dismantled and restructured, divides the Third Party Collateral held by Ace and releases the MII guaranty; (3) reassigns fronting policies secured by Creole[270] collateral and channels asbestos claims to the asbestos trust, and enjoins Ace from recourse against the Creole Reinsurance and Creole collateral.

Plan Proponents agree that the collateral posted to the High Deductible Program or to the Captive Program is not property of the estate, but assert that the channeling injunction may protect property of affiliated third parties who make substantial contributions to the trust.

Section 524(g)(1)(A) specifically permits the court to issue an injunction "to supplement the injunctive effect of a discharge under this section." Under §524(g)(4)(A)(i), the injunction is valid and enforceable against all entities that it addresses. Moreover, notwithstanding the provisions of §524(e), which prohibits a discharge from affecting the liability of a third party or third party property, the channeling injunction "may bar any action directed against a third party who is

---

[270]  Creole is a captive insurance subsidiary of MII.

-104-

identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor . . . " that arise by its ownership of a financial interest in the debtor, the third party's management of the debtor, the third party's provision of insurance to the debtor or a related party, or the third party's financial transaction or corporate restructuring of the debtor or a related party.

Notwithstanding the general prohibition of a third party's release contained in §524(e) of the Bankruptcy Code, §524(g)(4)(A)(i) relating to asbestos channeling injunctions specifically permits a third party to be the beneficiary of an injunction, so long as the conditions and requirements of the section are met. The Plan provides for the Debtors and the MII Indemnified Parties to be subject to the protections of the channeling injunction.

Plan Proponents agree that certain of Ace's claims, including claims for indemnity against MII Indemnified Parties and Creole Insurance Co. will be channeled to the Asbestos PI Trust, but assert that this is permitted by §524(g). This court agrees. While it is premature at this point to determine the effect of implementation of the channeling injunction, the relief sought by the Plan is likely within the protection found in §524(g). The Plan provides that the Asbestos PI Channeling Injunction will enjoin Ace from proceeding against MII or the collateral pledged by MII under its agreements with Ace. This is permitted by the terms of §524(g)(4)(A)(ii), which permits the channeling injunction to bar actions against an identifiable third party directly or indirectly liable for claims against the debtor.[271] MII is such a party as an owner or ultimate parent of the Debtors.

---

[271] *In re Combustion*, 295 B.R. 459, 482 (Bankr. D. Del. 2003)("To the extent that [nondebtors] are sued as a result of their prior affiliation with Debtor or other relationship with Debtor as provided in 524(g)(4), the channeling injunction is properly applied to them.").

-105-

Similarly, Creole as the captive insurer of B&W, is a third party that provided insurance to the Debtor or a related party under the section.

## X. CONCLUSION

For the reasons expressed in the foregoing opinion, the Court recommends that the Plan be confirmed. The Plan requires that numerous findings of fact be made in connection with confirmation. To the extent that findings are required for confirmation, they are adopted.

As to non-core maters and in accordance with Bankruptcy Rule 9033:

Within 10 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection. A party may respond to another party's objections within 10 days after being served with a copy thereof. A party objecting to the bankruptcy judge's proposed findings or conclusions shall arrange promptly for the transcription of the record, or such portions of it as all parties may agree upon or the bankruptcy judge deems sufficient, unless the district judge orders otherwise.

New Orleans, Louisiana, November 9, 2004.

*J. A. Brown*

Jerry A. Brown
U.S. Bankruptcy Judge

-106-