In Re: G-I HOLDINGS, INC. f/k/a GAF CORPORATION, et al., Debtors

Case Nos.: 01-30135 (RG) and 01-38790(RG), (Jointly Administered)

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

2005 Bankr. LEXIS 525

February 1, 2005, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** Debtor, an entity with more than 150,000 asbestos claims pending against it, sought an order establishing the method to estimate or liquidate the asbestos claims against it pursuant to 11 U.S.C.S. § 502(c). Creditors, the Official Committee of Asbestos Claimants (asbestos claimants), and the legal representative, a court-appointed fiduciary, sought an order approving a process estimating debtor's asbestos liability in the aggregate.

**OVERVIEW:** Debtor proposed liquidating the asbestos personal injury claims through the application of a medical matrix and specific liquidation procedures to each individual claim. The asbestos claimants and the legal representative proposed an aggregate method by which debtor's liability would be determined post-bankruptcy by a trust established under 11 U.S.C.S. § 524(g) in conjunction with a Chapter 11 plan. The court concluded that some form of estimation proceeding was required. It then found that the asbestos claimants possessed jury trial rights under the Seventh Amendment and federal law for purposes of liquidating their respective claims against debtor's bankruptcy estate. Debtor's proposed estimation procedure, which failed to provide the asbestos claimants with their jury trial right, was disapproved, and the court adopted a procedure estimating debtor's asbestos liability on an aggregate basis under 11 U.S.C.S. § 502(c), but without the mandatory imposition of a 11 U.S.C.S. § 524(g) trust. Under this procedure, the court would first estimate the claims of present asbestos claimants and then, later, in a separate estimation hearing, the claims of future demand holders.

**OUTCOME:** The estimation motion submitted by debtor was denied. The estimation motion submitted by the asbestos claimants and the legal representative was denied insofar as it sought the imposition of a mandatory trust. The court ordered a hearing to determine debtor's asbestos liability in the aggregate.

**CORE TERMS:** claimant, asbestos, estimation, personal injury, jury trial, matrix, estimate, liquidation, asbestos-related, personal injury tort, wrongful death, allowance, bankruptcy estate, aggregate, scheduled, holders, liquidate, bankruptcy case, exposure, lung cancer, non-malignant, peace, disallowance, mesothelioma, disease, non-core, pgs, settlement, multiplicity, estimating

**LexisNexis(TM) Headnotes**

*Bankruptcy Law > Creditor Claims & Objections > Claim Estimation*

[HN1]See 11 U.S.C.S. 502(c).

*Bankruptcy Law > Creditor Claims & Objections > Claim Estimation*

[HN2]In general, a bankruptcy court has discretion to determine the appropriate method of estimation in light of the particular circumstances of the bankruptcy case before it. As articulated by the U.S. Court of Appeals for the Third Circuit, the principal consideration in selecting an estimation procedure must be an accommodation to the underlying purposes of the Bankruptcy Code. Thus, to the greatest extent possible, a selected estimation procedure should not run counter to the efficient and expeditious administration of the bankruptcy estate.

*Bankruptcy Law > Creditor Claims & Objections > Claim Estimation*

[HN3]In estimating claims pursuant to 11 U.S.C.S. § 502(c), a bankruptcy court is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law. However, there are no other limitations on the court's authority to

evaluate the claim save those general principles which should inform all decisions made pursuant to the Bankruptcy Code.

***Bankruptcy Law > Creditor Claims & Objections > Claim Estimation***

[HN4]Before a court orders an estimation proceeding pursuant to 11 U.S.C.S. § 502(c), an initial determination must be made that liquidating the claim or claims would unduly delay the bankruptcy case.

***Civil Procedure > Jury Trials > Right to Jury Trial***

***Constitutional Law > Trial by Jury in Civil Actions***

[HN5]U.S. Const. amend. VII.

***Civil Procedure > Jury Trials > Right to Jury Trial***

***Constitutional Law > Trial by Jury in Civil Actions***

[HN6]The United States Supreme Court has consistently interpreted the phrase "suits at common law" in the Seventh Amendment to refer to suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.

***Civil Procedure > Jury Trials > Right to Jury Trial***

***Constitutional Law > Trial by Jury in Civil Actions***

[HN7]Generally, the notion of "legal rights" within the meaning of the Seventh Amendment pertains to actions seeking monetary damages against a defendant.

***Civil Procedure > Jury Trials > Right to Jury Trial***

***Constitutional Law > Trial by Jury in Civil Actions***

[HN8]In a just sense, the Seventh Amendment may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights.

***Civil Procedure > Jury Trials > Right to Jury Trial***

***Constitutional Law > Trial by Jury in Civil Actions***

[HN9]The cases are various in which the U.S. Supreme Court has either taken or refused jurisdiction, but one cannot adduce from them a plain and uniform rule by which to determine the question. The application of the principles upon which jurisdiction has been suggested or denied is various, both in England and in the United States, and it is difficult, if not impossible, to reconcile the cases. The subject is discussed at length in Pomeroy's Equity Jurisprudence. It is therein shown that the foundation of the jurisdiction, or perhaps the earliest exercise of it upon this ground, was in so-called "bills of peace," wherein one class of such bills the suit was brought to establish a general right between a single party and numerous other persons claiming distinct and individual interests. In any case where the facts bring it within the possible jurisdiction of the court, according to the view taken by it in regard to such facts, the decision must depend largely upon the question of the reasonable convenience of the remedy, its effectiveness, and the inadequacy of the remedy at law.

***Civil Procedure > Jury Trials > Right to Jury Trial***

***Constitutional Law > Trial by Jury in Civil Actions***

[HN10]Cases in sufficient number have been cited to show how divergent are the decisions on the question of jurisdiction. It is easy to say it rests upon the prevention of a multiplicity of suits, but to say whether a particular cases comes within the principle is sometimes a much more difficult task. Each case, if not brought directly within the principle of some preceding case, must be decided upon its own merits and upon a survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested and the result which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether within reasonable and fair grounds the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, and will be an actual convenience to all parties, and will not unreasonably overlook or obstruct the material interests of any. The single fact that a multiplicity of suits may be prevented by this assumption of jurisdiction is not in all cases enough to sustain it.

***Constitutional Law > Trial by Jury in Civil Actions***

[HN11]While Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders, Congress lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury. In short, legal claims are not magically converted into equitable issues by their presentation to a court of equity.

***Civil Procedure > Jury Trials > Right to Jury Trial***

Page 25

*Constitutional Law > Trial by Jury in Civil Actions*

[HN12]If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an U.S. Const. art. III court.

*Civil Procedure > Jury Trials > Right to Jury Trial*

*Constitutional Law > Trial by Jury in Civil Actions*

[HN13]28 U.S.C.S. § 1411(a) makes clear that nothing in Title 11 of the United States Code, such as filing a claim against the estate pursuant to 11 U.S.C.S. § 501, does not affect any right to trial by jury that an individual has under applicable non-bankruptcy law, such as the Seventh Amendment to the United States Constitution.

*Bankruptcy Law > Creditor Claims & Objections > Allowances & Objections*

[HN14]The allowance or disallowance of a claim is not identical to the liquidation of a claim for purposes of distribution.

*Bankruptcy Law > Creditor Claims & Objections > Allowances & Objections*

*Civil Procedure > Jury Trials > Right to Jury Trial*

*Constitutional Law > Trial by Jury in Civil Actions*

[HN15]A jury trial is not required for an action at law if it is closely intertwined with claims allowance proceedings unique to bankruptcy law.

*Bankruptcy Law > Creditor Claims & Objections > Allowances & Objections*

*Civil Procedure > Jury Trials > Right to Jury Trial*

*Constitutional Law > Trial by Jury in Civil Actions*

[HN16]While the creditors of a bankruptcy estate cannot be divested of their jury trial right for determining the ultimate extent and value of their personal injuries for purposes of distribution, the creditors are not entitled to a jury trial in an estimation proceeding under 11 U.S.C.S. § 502(c) when the purpose of the proceeding is to determine the allowance or disallowance of claims against the bankruptcy estate.

*Civil Procedure > Jury Trials > Right to Jury Trial*

*Torts > Wrongful Death & Survival*

[HN17]See 28 U.S.C.S. § 1411.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

[HN18]See 28 U.S.C.S. § 157(b)(1), (2)(b).

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

[HN19]See 28 U.S.C.S. § 1334(a).

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

[HN20]See 28 U.S.C.S. § 1334(b).

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action*

[HN21]See 28 U.S.C.S. § 157(b)(5).

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN22]The extent of a bankruptcy court's jurisdiction is delineated in 28 U.S.C.S. § 157(b) and (c). Pursuant to § 157(b), the bankruptcy court may hear and determine all cases under Title 11 of the United States Code and all "core" proceedings arising under or arising in a case under Title 11. 28 U.S.C.S. § 157(b)(1). Conversely, if the pending matter is classified as a non-core proceeding that is otherwise related to a case under Title 11, jurisdiction is more limited in that a bankruptcy judge may hear but not determine the matter. If a proceeding is classified as "non-core," the bankruptcy court's role is to submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C.S. § 157(c)(1). In turn, the district court shall enter any final order or judgment after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

*Bankruptcy Law > Creditor Claims & Objections > Allowances & Objections*

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

[HN23]The claims allowance process, which is governed by 11 U.S.C.S. § 502, is unique to the bankruptcy forum. As such, it is generally accepted that this claims allowance process constitutes a core proceeding under 28 U.S.C.S. § 157(b)(2)(B).

*Bankruptcy Law > Creditor Claims & Objections > Allowances & Objections*

*Bankruptcy Law > Creditor Claims & Objections > Claim Estimation*

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

[HN24]Although the claims allowance process is specifically included as a core proceeding pursuant to 28 U.S.C.S. § 157(b)(2)(B) for the purposes of plan confirmation, the same cannot be said for the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in case under Title 11 of the United States Code. 28 U.S.C.S. § 157(b)(2)(B).

*Bankruptcy Law > Creditor Claims & Objections > Claim Estimation*

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

[HN25]A claim is "liquidated" for purposes of 28 U.S.C.S. § 157(b)(2)(B) when its value is capable of ready ascertainment, irrespective of whether the validity of the claim is in dispute.

*Bankruptcy Law > Creditor Claims & Objections > Allowances & Objections*

*Bankruptcy Law > Creditor Claims & Objections > Claim Estimation*

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

*Torts > Wrongful Death & Survival*

[HN26]28 U.S.C.S. § 157(b)(2)(B)'s conferring of jurisdiction over proceedings involving the allowance or disallowance of claims to the bankruptcy courts can be read in harmony with the Bankruptcy Code's coextensive proscription against a bankruptcy court's liquidation or estimation of personal injury tort or wrongful death claims. Although § 157(b)(2)(B) restricts a bankruptcy court's power to liquidate or estimate personal injury tort or wrongful death claims for purposes of distribution, it imposes no corollary restriction upon a bankruptcy court's ability to disallow such claims in the first instance if they are not sustainable at law. Allowing or disallowing claims is clearly a separate and distinct function from liquidating or estimating that claim. Had Congress meant to deny any jurisdiction whatsoever to the bankruptcy court to disallow claims based on the mantra of personal injury tort or wrongful death, it could have said so; but it did not. Simply because the underlying basis of the claim at issue sounds in personal injury tort or wrongful death does not deprive the bankruptcy courts of jurisdiction to make an initial determination on issues that are only tangentially related to the actual physical event causing the personal injury tort or wrongful death aspect of the claim.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action*

*Civil Procedure > Jury Trials > Right to Jury Trial*

*Torts > Wrongful Death & Survival*

[HN27]28 U.S.C.S. § 157(b)(5) guarantees that when a personal injury or wrongful death claimant is entitled to a jury trial, the trial will be conducted by the district court.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

*Civil Procedure > Jury Trials > Right to Jury Trial*

[HN28]The sole intent of 28 U.S.C.S. § 157(b)(2)(B) is to protect a personal injury claimant's right to trial if that right is shown to exist.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

[HN29]The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action*

*Torts > Wrongful Death & Survival*

[HN30]While 28 U.S.C.S. § 157(b)(5) requires the district court to order personal injury tort and wrongful death claims be tried in that court, § 157(b)(5) does not affect pretrial proceedings.

*Civil Procedure > Jurisdiction > Subject Matter*

*Jurisdiction > Jurisdiction Over Action*

*Civil Procedure > Jury Trials > Right to Jury Trial*

[HN31]If a personal injury claimant is entitled to the enumerated form of process--a trial--then 28 U.S.C.S. §§ 157(b)(5) and 1411(a) specify where that process is to take place--the district court.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction*

*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN32]Congressional intent is clear that the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final judgment or order shall emanate from the district court judge after considering the bankruptcy judge's proposed findings and conclusions under de novo review. § 28 U.S.C.S. § 157(c)(1). Thus, it is within the sole province of the bankruptcy court to submit proposed findings of fact and conclusions of law to the district court.

*Bankruptcy Law > Professional Services > Retention*

[HN33]See 11 U.S.C.S. § 327(a).

*Bankruptcy Law > Debtor Benefits, Duties & Eligibility > Effect of Discharge*

*Bankruptcy Law > Discharge*

[HN34]11 U.S.C.S. § 524(g) specifically authorizes the bankruptcy court to enter a sweeping injunction against any entity taking legal action to collect a claim or demand that is to be paid in whole or in part by a trust created through a qualifying plan of reorganization.

**COUNSEL:** [*1] For Riker, Danzig, Scherer, Hyland & Perretti, LLP, G-I Holdings, Inc., Debtor: Dennis J. O'Grady, Esq., Mark E. Hall, Esq., Headquarters Plaza, Morristown, New Jersey

For Weil, Gotshal & Manges, LLP, G-I Holdings, Inc., Debtor: Martin J. Bienenstock, Esq., Kathryn L. Turner Esq., Philip M. Abelson, Esq., New York, New York

For Weil, Gotshal & Manges, LLP, G-I Holdings, Inc., Debtor: Ralph I. Miller, Esq., Debra L. Goldstein, Esq., Dallas, Texas

For Lowenstein Sandler, P.C., Official Committee of Asbestos Claimants: Jeffrey D. Prol, Esq., Roseland, New Jersey

For Caplin & Drysdale, Chartered, Official Committee of Asbestos Claimants: Trevor W. Swett, III, Esq., Max C. Heerman, Esq., One Thomas Circle, N.W., Washington, DC

For Saiber, Schlesinger, Satz & Goldstein, L.L.C., C. Judson Hamlin, the Legal Representative of Present and Future Holders of Asbestos-Related Demands: David R. Gross, Esq., One Gateway Center, Newark, New Jersey

For Keating, Muething & Klekamp, P.L.L., C. Judson Hamlin, the Legal Representative of Present and Future Holders of Asbestos-Related Demands: Kevin E. Irwin, Esq., Michael L. Scheier, Esq., Daniel J. Donnellom, Esq., Cincinnati, [*2] Ohio

For Office of the Attorney General, State of Illinois, Chief, Asbestos Litigation for the State of Illinois: Marilyn A. Kueper, Esq., Springfield, Illinois

**JUDGES:** ROSEMARY GAMBARDELLA, CHIEF JUDGE, UNITED STATES BANKRUPTCY COURT

**OPINIONBY:** ROSEMARY GAMBARDELLA

**OPINION:** OPINION

**ROSEMARY GAMBARDELLA. CHIEF JUDGE**

Presently before the Court in this mass tort bankruptcy case are two independent motions filed by adverse parties proposing divergent methodologies for estimating asbestos personal injury claims pursuant to § 502(c) of the Bankruptcy Code. First is a motion filed by the Debtor, G-I Holdings, Inc. (hereinafter "G-I Holdings"), seeking an order "establishing the method to liquidate its asbestos claims" pursuant to § 502(c) of the Code; second is a motion filed by the Official Committee of Asbestos Claimants (hereinafter the "Committee") seeking an order from the Court approving a process that would estimate G-I Holdings's "asbestos liability in the aggregate." The motion filed by G-I Holdings has been objected to by the Committee as well as the Legal Representative of Present and Future Holders of Asbestos-Related Demands (hereinafter the "Legal [*3] Representative"). In turn, the motion filed by the Committee has been objected to by G-I Holdings. This Court conducted a hearing with respect to the competing motions on January 15, 2004, at which time the Court reserved its decision.

Page 28

The following constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052. See Fed. R. Bankr. P. 7052 (West 2004). Pursuant to 28 U.S.C. § 157, this matter is a core proceeding. See 28 U.S.C. § 157(b)(2)(A) (West 2004). Further, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. See 28 U.S.C. § 1334 (West 2004). Finally, venue is proper pursuant to 28 U.S.C. § 1409(a) (West 2004).

### I. Parties Involved In This Motion And Procedural History

On January 5, 2001, G-I Holdings filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On [*4] August 3, 2001, ACI, Inc., a subsidiary of G-I Holdings, filed a voluntary Chapter 11 petition. On October 10, 2001, this Court entered an Order directing the joint administration of the G-I Holdings and ACI, Inc. bankruptcy cases. Since the filing of its bankruptcy petition, G-I Holdings has been operating its business as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. See 11 U.S.C. § 1107(a) (West 2004); see also 11 U.S.C. § 1108 (West 2004). G-I Holdings is the successor-in-interest to GAF Corporation (hereinafter "GAF"), an entity named in approximately 500,000 asbestos actions. The Committee submits that as successor-in-interest to GAF, G-I Holdings remains liable for approximately 150,000 asbestos lawsuits filed, but unresolved, as of the petition date and for unknown numbers of asbestos claims that will be filed in the future. Moreover, Building Materials Corporation of America (hereinafter "BMCA"), a leading manufacturer of roofing and building products, is an indirect subsidiary of G-I Holdings, and is also the primary operating subsidiary and principal asset of G-I Holdings. n1 Established [*5] in 1994, BMCA received substantially all the assets of GAF's roofing products business and expressly assumed $ 204 million of asbestos liability, with G-I Holdings indemnifying BMCA against any additional asbestos liability. In re G-I Holdings, Inc., 313 B.R. 612, 621 (Bankr. D.N.J. 2004). n2

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 BMCA is not a debtor in this bankruptcy case.

n2 Although BMCA claims to have never manufactured any products containing asbestos, the Company has been named as an additional defendant in more than one thousand asbestos bodily injury lawsuits against GAF since September of 2000. In re G-I Holdings, Inc., 313 B.R. at 621.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

The Committee is an official committee of creditors appointed on January 22, 2001 by the United States Trustee pursuant to § 1102(a) of the Bankruptcy Code to represent those individuals who allegedly suffered injuries related to the exposure to asbestos from products manufactured by the predecessors of G-I Holdings. See 11 U.S.C. § 1102 [*6] (a) (West 2004). n3 Further, the Legal Representative, C. Judson Hamlin, is a fiduciary appointed by the Court to represent persons who hold present and future asbestos-related claims against G-I Holdings.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Section 1102(a)(1) of the Bankruptcy Code provides in relevant part as follows: "as soon as practicable after the order for relief under Chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate." 11 U.S.C. § 1102(a) (West 2004).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

On June 19, 2002, G-I Holdings filed the present motion, which it describes as an application for an order "pursuant to 11 U.S.C. § 502(c) establishing method to liquidate asbestos claims." On June 25, 2002, G-I Holdings filed a companion motion to "fix a final date for filing proofs of claim," which the parties refer to as the [*7] "Bar Date Motion." Even before G-I Holdings filed the motion seeking approval of its estimation or liquidation of claims procedure, n4 the Committee moved on May 23, 2002 to withdraw the

reference for all proceedings relating to claims estimation in the G-I Holdings bankruptcy case. Similarly, on August 13, 2002, the Legal Representative also moved to withdraw the reference with respect to G-I Holdings's Bar Date Motion and Estimation Motion. On August 30, 2002, the Committee filed its objection to the Estimation Motion, and on September 13, 2002, the Legal Representative filed its own objection to the Estimation Motion. The United States District Court for the District of New Jersey denied the motions to withdraw the reference on May 13, 2003 in a reported decision, Official Committee of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 295 B.R. 211 (D.N.J. 2003).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n4 For reasons that will be addressed below, the parties strongly differ as to the characterization of the motion filed by G-I Holdings. While G-I Holdings submits that its motion seeks claims estimation pursuant to § 502(c) of the Bankruptcy Code, the Committee and Legal Representative assert that the motion is an improper attempt to *liquidate,* rather than estimate, claims under the Code. Nevertheless, for purposes of clarity the Court will refer to the present motion as the "Estimation Motion."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*8]
Before turning to the substance of the Estimation Motion filed by G-I Holdings, it is important to reiterate the conclusions reached by the District Court in denying the motions to withdraw the reference because it frames the parameters for this Opinion. In deciding that the competing estimation proposals are better suited for this Court to address in the first instance, The Honorable William G. Bassler, U.S.D.J., concluded as follows:

The Committee's proposal aims to estimate G-I Holdings' aggregate asbestos liability for purposes of determining voting shares in the chapter 11 plan confirmation process. This is a core proceeding that should be determined by the Bankruptcy Court. On the other hand, G-I Holdings' proposal is a novel estimation approach that attempts to estimate the value of individual asbestos claims, which results in an effective liquidation of those claims. It is unclear if the determination of whether G-I Holdings' proposal ought to be followed is a core or non-core proceeding. Initially, the core/non-core determination ought to be made by the Bankruptcy Court.

> Given its understanding of the facts and issue in this case, and knowledge of the chapter [*9] 11 reorganization process, the Bankruptcy Court should attempt the estimation proceeding in the first instance. If the Bankruptcy Court determines that the estimation is a core proceeding, then it may conduct the proceeding and enter a final order. To the extent that the determination is a non-core proceeding under 28 U.S.C. § 157(b)(2)(B), the Bankruptcy Court can recommend the estimation method to this Court pursuant to 28 U.S.C. § 157(c).
>
> Both the Bankruptcy Court and this Court are equally qualified to conduct the estimation proceeding, however, judicial economy considerations indicate that the bankruptcy court may be more appropriate . . . . As indicated above, the proposal recommended by the Committee will not require this Court's final approval because the Committee is seeking a determination of G-I Holdings' total asbestos liability and not a method to liquidate claims. Only G-I Holdings' method maybe non-core, requiring entry of a final order by this Court. Judicial economy is therefore better served by having the Bankruptcy Court retain jurisdiction of the estimation motions.

[In re G-I Holdings, Inc., 295 B.R. at 218-20 [*10] (internal citations omitted)].

Accordingly, both estimation motions are properly before this Court.

As an additional aside, it should also be noted that the Bar Date Motion is not under consideration by the Court at this time. On September 10, 2004, counsel for G-I Holdings forwarded a letter to the Court proposing that an estimation hearing occur prior to the entry of any bar date in an effort to expedite the bankruptcy case and avoid unnecessary expense to the estate. This position was reiterated by counsel for G-I Holdings during a subsequent hearing before the Court on September 21, 2004, wherein the parties agreed to

Page 30

suspend the determination of the Bar Date Motion indefinitely. Nonetheless, the Court recognizes that G-I Holdings's Bar Date Motion remains outstanding and will be decided on a future date, as necessary. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n5 In conjunction with the Bar Date Motion is the application by G-I Holdings to approve its proposed proofs of claims forms. Objections have been filed by various parties to the forms proposed by G-I Holdings. When the Bar Date Motion is heard by the Court, G-I Holdings will be permitted to respond to any objections that have been filed. At oral argument on January 15, 2004, however, it was determined that any property damage claims asserted against the estate by the State of Illinois will be filed utilizing the official bankruptcy proof of claim form.

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*11]

## II. The Estimation Procedure Proposed By G-I Holdings

In support of its Estimation Motion, G-I Holdings has proposed what it describes as a "statutory, equitable, and logical approach" to addressing the current "asbestos-litigation crisis" plaguing the federal courts. More specifically, G-I Holdings has proposed a detailed and intricate scheme whereby all asbestos personal injury claims asserted against its estate be liquidated through the application of a medical matrix (hereinafter the "Matrix") which it has developed. According to G-I Holdings, the Matrix and the associated Asbestos Personal Injury Claims Liquidation Procedures (hereinafter "Claims Liquidation Procedures") "provide an expeditious method for resolving the asbestos personal injury claims confronting [the estate]." The following paragraphs describe the Matrix and the Claims Liquidation Procedures proposed by G-I Holdings in support of its Estimation Motion. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n6 The Matrix and the Claims Liquidation Procedures are attached as Exhibit "B" to the *Application of G-I Holdings Inc. for Order Pursuant to 11 U.S. C. § 502(c) Establishing Method to Liquidate Asbestos Claims* (hereinafter *"G-I Application"*).

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*12]

At the heart of the Matrix and the Claims Liquidation Procedures is a "Claims Liquidation Committee" (hereinafter "CLC") which would be charged with the responsibility of administering the claims procedures established by G-I Holdings. According to G-I Holdings, the CLC would "consist of no less than three members, with such qualifications as the Bankruptcy Court shall deem appropriate and necessary." The members of the CLC "shall be appointed by G-I Holdings," subject to approval by the Court. n7 G-I Holdings has clarified, however, that while it possesses the ability to propose members of the CLC to the Court, the Court will have the power to ultimately appoint the CLC members. Based upon specific documents submitted by each asbestos claimant, the CLC would be responsible for determining whether the claimant has an allowed claim against the estate.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n7 Section 2.3 of the Claims Liquidation Procedures also specifies that in the event "of the departure of a Committee member from the CLC, a replacement shall be selected by the remaining Committee members and submitted to the Court for approval."

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*13]

More particularly, Section 3.1 of the Claims Liquidation Procedures states that in order to have an allowed claim based upon an asbestos-related injury, each claimant must provide the CLC with "sufficient evidence" n8 that the claimant:

(a) was occupationally exposed to GAF Asbestos Products, n9 which occurred while the Exposed Person n10 was carrying out job responsibilities (or for a spouse or household member, secondary to such exposure), on a regular basis, over some period of time

Page 31

on a work site, plant or vessel where GAF Asbestos Products were used, in proximity to where and during the time when the exposed person actually worked; and

(b) suffers from a medical condition which meets the criteria of at least one of the Scheduled Disease Categories defined in Section 3.3 hereof.

-------------- Footnotes ---------
------

n8 The Claims Liquidation Procedures do not specify what would constitute "sufficient evidence" nor do they describe the process of how such a conclusion is reached.

n9 Section 1.9 of the Claims Liquidation Procedures defines "GAF Asbestos Products" as "asbestos or asbestos-containing products manufactured and/or distributed under the 'GAF' and 'Ruberoid' brand names."

[*14]

n10 Section 1.7 of the Claims Liquidation Procedures defines "Exposed Person" as "an individual who has been exposed to asbestos or asbestos-containing products marketed or sold under the GAF or Ruberoid brand name."

------------ End Footnotes--------
------

Section 3.2 of the Claims Liquidation Procedures creates the following seven separate Scheduled Disease Categories: 1) Mesothelioma (Category I); 2) Lung Cancer I: With Non-Malignant I Disease (Category II); 3) Lung Cancer II A: Non-Smoking (Category III); 4) Lung Cancer II B: Smoking (Category IV); 5) Other Cancer With Non-Malignant I Disease (Category V); 6) Non-Malignant I: With Impairment (Category VI); and 7) Non-Malignant II: Without Impairment (Category VET). With respect to each Scheduled Disease Category, the Matrix and the Claims Liquidation Procedures set forth a predetermined Scheduled Allowed Amount n11 as compensation to any individual with "sufficient evidence" of exposure to asbestos products manufactured by GAF or G-I Holdings. The Scheduled Allowed Amounts are as follows:

Category I - Mesothelioma: $ 35,560

Category II - Lung Cancer I: With Non-Malignant [*15] I Disease: $ 17,281

Category III - Lung Cancer II A: Non-Smoking $ 11,521

Category IV - Lung Cancer IIB: Smoking: $ 5,760

Category V - Other Cancer With Non-Malignant I Disease: $ 9,148

Category VI - Non-Malignant I: With Impairment: $ 2,911

Category VII - Non-Malignant II: Without Impairment $ 0

-------------- Footnotes ---------
------

n11 Section 1.15 of the Claims Liquidation Procedures defines "Scheduled Allowed Amount" as the "range of allowed amounts set by these Claims Procedures for each Scheduled Disease category, which are based on settlement amounts in the tort system for claims filed in federal courts."

------------ End Footnotes--------
------

According to Section 3.3 of the Claims Liquidation Procedures, in order for a claim based upon a Scheduled Disease in Categories I-VI to be allowed, it must meet the occupational exposure requirements contained within Section 3.1 (a) and "must include a statement signed by a Qualified Physician n12 stating that the Exposed Person has been diagnosed with a Scheduled Disease meeting the criteria of one of the Scheduled [*16] Disease Categories . . . "In turn, Section 3.3(a) -- (g) sets forth the criteria for establishing one of the Scheduled Disease Categories, and contains very specific requirements that a particular claimant must satisfy before the claim may be allowed under the Matrix. By way of example, with respect to potential Category III (Lung Cancer II A - Non-smoking) claimants, a particular claimant must establish the following: 1) diagnosis by a Qualified Physician of a malignant primary bronchiogenic tumor of any cell type caused or contributed to by exposure to

Page 32

asbestos; 2) evidence of occupational exposure to asbestos as specified in Section 3.1 (a) for the following minimum exposure periods: (A) five (5) exposure years for insulators, shipyard workers, workers in manufacturing plants handling raw asbestos, boilermakers, shipfitters, steamfitters, or other trades performing similar functions; or (B) ten (10) exposure years for utility and power house workers, secondary manufacturing workers, or other trades performing similar functions; (C) fifteen (15) exposure years for general construction, maintenance workers, chemical and refinery workers, marine engine room personnel and other personnel [*17] on vessels, stationery engineers and firemen, railroad engine repair workers, or other trades performing similar functions; 3) documentation that at least twelve (12) years elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis of an asbestos-related injury; and 4) has not smoked cigarettes or used any other tobacco products for at least fifteen (15) years. n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n12 Section 1.14 of the Claims Liquidation Procedures defines "Qualified Physician" as a "physician currently licensed to practice medicine in the District of Columbia or in one or more of the States, Commonwealths or territories of the United States of America or in Canada: (a) Who is certified in one of the relevant specialties by the relevant medical specialty board to make diagnosis or other medical judgment for certain types of asbestos-related diseases, all as listed below: (1) Oncologist -- American Board of Internal Medicine or equivalent Canadian specialty board with a sub-specialty of medical oncology -- cancer; (2) Pathologist -- American Board of Pathology or equivalent Canadian specialty board -- cancer or non-malignant diseases or conditions; (3) Pulmonary Specialist -- American Board of Internal Medicine or equivalent Canadian specialty board with a sub-specialty of pulmonary disease -- cancer or non-malignant diseases or conditions; (4) Radiologist -- American Board of Radiology or equivalent Canadian specialty board - cancer or non-malignant diseases or conditions; and (b) Who is the Exposed Person's primary physician, or to whom the Exposed Person was referred by his or her primary physician."

[*18]

n13 The Claims Liquidation Procedures also specify the criteria for satisfying claims falling within Categories I, II, IV, V, VI, and VII.

- - - - - - - - - - - - End Footnotes - - - - - - - - - - - - -

In the event a particular claimant presents "sufficient evidence" of a Scheduled Disease or Condition satisfying Categories I - VI, in accordance with Section 3.2(c) the CLC will offer to liquidate each valid asbestos personal injury claim and any associated derivative claims based on the Scheduled Allowed Amount for the claimant's disease or condition. However, the Scheduled Allowed Amount for each category is subject to adjustment based upon the particular claimant's age pursuant to Section 3.2(c)(1). That is, claimants fifty-five years of age and younger receive +1% of the Scheduled Allowed Amount for each year of age under fifty-six. Claimants between fifty-six and seventy years of age receive the Scheduled Allowed Amount without any upward or downward adjustment, and claimants seventy-one years of age and older receive -1% of the Scheduled Allowed Amount for each year of age over seventy. In addition, Section 3.2(c)(2) provides that the Scheduled Allowed [*19] Amount is also subject to adjustment based upon the particular claimant's number of dependents. Claimants with no dependents receive -5% of the Scheduled Allowed Amount, claimants with one dependent receive the Scheduled Allowed Amount with no upward or downward adjustment, claimants with two dependents receive +5% of the Scheduled Allowed Amount, and claimants with more than two dependents receive +5% of the Scheduled Allowed Amount for each additional dependent.

Further, claims felling within Category VII (Non-Malignant II: Without Impairment) have a Scheduled Allowed Amount of $ 0. However, Section 3.2(c) n14 of the Claims Liquidation Procedures expressly tolls the statute of limitations for Category VII claims "until such time as the Claimant is diagnosed with an injury meeting the criteria set forth in Categories I through V." In addition, Section 3.1(d) of the Claims

Liquidation Procedures specifically provides that "no more than the Scheduled Allowed Amount for each Scheduled Disease Category, as adjusted for age and number of Dependents shall be paid in aggregate for the Exposed Person's claim and any other claims (such as loss of consortium) derived therefrom."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n14 A typographical error exists in the Claims Liquidation Procedures drafted by G-I Holdings. This section should actually be listed as 3.2(f).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*20]

Section 3.4(a) of the Claims Liquidation Procedures establishes a priority scheme for processing and liquidating claims. All asbestos personal injury claims will be processed and liquidated in the following order: (1) Claims against G-I Holdings or GAF Corporation which were due and payable under judgments or settlements entered into by the Center for Claims Resolution (CCR) or GAF Corporation but not paid as of January 5, 2001, for such Claimants who elect to file with the CLC pursuant to these procedures rather than pursue payment under the judgment or settlement;

(2) Claims whose holders had filed claims or lawsuits against G-I Holdings or GAF Corporation prior to January 5, 2001, including those with CCR settlements which were not due and payable as of January 5, 2001, for such Claimants who elect to file with the CLC pursuant to these procedures rather than pursue payment under the judgment or settlement;

(3) Claims whose holders had not filed claims or lawsuits against G-I Holdings or GAF Corporation prior to January 5, 2001 but who filed claims with the Bankruptcy Court before [the Bar Date]; and

(4) Claims not described in subparagraph (1), (2), or (3) [*21] above.

Moreover, Section 3.4(b) institutes the following manner of ordering particular claims within the groups established pursuant to Section 3.4(a):

Claims within each of groups (1) through (4) shall be ordered for processing first by seriousness of disease categories, and within each category, on a first-in-first-out (FIFO) basis. A Claimant's position in the FIFO queue will be determined by the date of receipt of a fully completed proof of claim form signed by hand by the Claimant or his or her authorized representative. n15

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n15 Section 3.5 of the Claims Liquidation Procedures also provides for the payment of claims on an "exigent" and "extreme hardship" basis at any time, irrespective of the priority scheme established in Section 3.4. In order to qualify for "exigent health" treatment, a claimant must submit a declaration by a physician who has recently examined the claimant that states "there is substantial medical doubt that the Claimant will survive beyond six (6) months" from the date of the declaration. To qualify for "extreme hardship treatment," a claimant must demonstrate that he or she needs a liquidated claim "on an immediate basis"; however, it remains "in the sole and absolute discretion" of the CLC whether an individual qualifies for "extreme hardship" treatment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*22]

Other provisions of the Claims Liquidation Procedures are as follows. Section 4.3 provides that in order to be *eligible* for liquidation of an allowed claim, a claimant must (a) submit a fully completed proof of claim by a future bar date set by the Court; and (b) respond to any request by the CLC for additional information within ninety (90) days. If a claimant fails to meet these deadlines, the claim shall be disallowed automatically "if a claimant required to provide claims information fails to do so within these periods, unless the claimant demonstrates to the satisfaction of the CLC, in its sole and absolute discretion, that such failure should be excused." A disallowed claim, however, can be refiled, albeit with a condition. The first-in-first-out date and date of filing the claim will be determined by the date of the refiling, and not by the date of the originally filed claim. Thus, a refiled claim could arguably lose

its priority under Section 3.4 of the Claims Liquidation Procedures. Further, Section 4.4 governs the treatment of any withdrawn claim, and provides as follows: "[a] Claimant can withdraw a claim upon written notice to the CLC and file another claim subsequently, [*23] but any such claim filed after withdrawal shall be given a FIFO date based upon such subsequent filing."

Section 5.1 of the Claims Liquidation Procedures provides that in order for a claimant to *establish* an allowable asbestos personal injury claim, the claimant must: a) be an Exposed Person who demonstrates that he or she meets the requirements of Section 3.1, and (b) submit a medical report from a Qualified Physician that (i) results from a physical examination by that physician and (ii) contains a diagnosis of an asbestos-related injury that meets the criteria of one of the Scheduled Disease categories set forth in Section 3.3. The Claims Liquidation Procedures reserve the CLC's right to audit any medical evidence, and the CLC may require submission of "x-rays, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the Asbestos Personal Injury Claim, and shall require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable."

Further, Section 5.6 of the Claims Liquidation Procedures states that the CLC [*24] "shall" conduct random audits of the medical information submitted by claimants to ensure the veracity and reliability of the information. The auditing process affords the CLC the right to independently review "x-rays, tissue samples or other laboratory tests, review of complete pulmonary function test data," and require a claimant to submit to an independent medical examination, In the event the CLC's audit reveals that invalid information n16 has been provided to the CLC, the CLC
may penalize any Claimant or Claimant's attorney by disallowing the Asbestos Personal Injury Claims or seeking sanctions from the District Court including, but not limited to, requiring the source of the invalid information to pay the costs associated with the audit and any future audits, reordering the priority of liquidation of the affected Claimants' Asbestos Personal Injury Claims, raising the level of security of additional information submitted from the same source or sources, or prosecuting the Claimant or the Claimant's attorney for presenting a fraudulent Asbestos Personal Injury Claim in violation of 18 U.S.C. § 152.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n16 The Claims Liquidation Procedures do not specify what would constitute "invalid information" nor do they specify how such a conclusion is made and who makes the determination whether submitted information is indeed "invalid."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*25]

Pursuant to Section 5.2 of the Claims Liquidation Procedures, the CLC reserves the right to impose a "reasonable" filing fee, n17 refundable at the discretion of the CLC, to be paid by all claimants whose claims impose an exceptional cost, n18 "such as claims of exposure to GAF Asbestos Products that are inconsistent with the timing and location of claims previously paid or claims whose medical or exposure evidence is from a source that provided invalid or unreliable evidence in claims previously audited by the CLC." Section 5.3 of the Claims Liquidation Procedures disallows punitive damages to claimants in determining any entitlement to a Scheduled Allowed Amount. n19

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n17 The Claims Liquidation Procedures, however, fail to define what constitutes a "reasonable" filing fee.

n18 The Claims Liquidation Procedures also do not define what constitutes an "exceptional cost."

n19 G-I Holdings seeks to disallow any claims for punitive damages on the theory that "asbestos has not been used since 1980 and punitive damages would serve no valid purpose." (*G-I Application,* pg. 15).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*26]

Moreover, and especially significant to the Estimation Motion is Section 5.5 of the Claims Liquidation Procedures which is captioned, "Contested Claims Decisions." Section 5.5 provides as follows in its

entirety:
Contesting Claims Decisions. The only issues which shall be subject to contest by holders of Asbestos Personal Injury Claims are:

> (1) Disallowance of a claim on the basis of failure to meet medical or exposure criteria, or
>
> (2) The categorization assigned to the claimant's Asbestos Personal Injury Claim. n20
>
> (3) Article III Review. Claimants may choose review of the CLC's decisions by an Article III court. No allowed amount shall be overturned unless the CLC's decision is shown to have been arbitrary or capricious.

Consequently, by operation of Section 5.5, the Committee and the Legal Representative argue that the Matrix and the Claims Liquidation Procedures do not provide asbestos claimants with a right to a jury trial if they are dissatisfied with their allowed claim. The only mechanism for a claimant to challenge an allowed claim is through the process set forth in Section 5.5 of the Claims Liquidation Procedures. n21

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - -

> n20 In its reply brief, G-I Holdings clarified that claimants may appeal the CLC's decision with respect to both "the estimated amount of their claims and the classification requirements." (*Reply to Objection of Official Committee of Asbestos Claimants and Legal Demand Representative to Application of G-I Holdings for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Asbestos Claims,* pg. 8).

[*27]

> n21 The Matrix and the Claims Liquidation Procedures also contain a provision regarding the tolling of applicable statutes of limitations. Section 5.7 provides as follows: "in all cases, statutes of limitations or similar limitations periods shall be deemed to have been tolled as of January 5, 2001. Any claims whose statutory period for filing would have otherwise expired on or after January 5, 2001 shall be deemed to have an extension of that filing time. In addition, for purposes of determining the validity of an Asbestos Personal Injury Claim, any applicable statute of limitations shall be deemed to have been extended for a period of sixty (60) days beyond its normal limit. This extension shall have no application, however, to any applicable claims bar date set by an order of the Bankruptcy Court."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In its application to the Court in support of the Matrix and the Claims Liquidation Procedures, G-I Holdings states that these procedures provide a process "whereby legitimate claims are identified based upon well accepted medical and occupational health criteria, and compensated at monetary levels [*28] derived from federal court experience and based on the principles . . . of the non-recognition [of claims] of the 'unsick,' 'subclinical,' or 'exposure-only' plaintiffs." (*Memorandum of Law in Support of Application of G-I Holdings Inc. for Order Pursuant to 11 U. S. C. § 502(c) Establishing Method to Liquidate Asbestos Claims,* pg. 4)(hereinafter *"G-I Br"*). According to G-I Holdings, the reliance upon solely federal claims figures in the liquidation of asbestos personal injury claims is because "federal court asbestos litigation, unlike state court litigation, has not permitted the massive filing and bundling of asbestos claims (sick with non-sick claims) and the associated *in terrorem* effect of multiple punitive damages awards." (*G-I Br.,* pg. 4).

That is, G-I Holdings seeks an estimation process so as to liquidate each individual claim under § 502(c) of the Bankruptcy Code. By relying upon figures from the federal tort system, G-I Holdings's methodology is attempting to circumvent two self-described "inequities" inherent in the state court tort system. First, relying on federal tort claims amounts avoids the problem [*29] described by G-I Holdings as "bundling," whereby an asbestos defendant "is compelled to agree to payments to unsick claimants as a condition to settling claims of persons with malignant diseases, including mesothelioma." (*G-I Br.,* pg. 5). Second, G-I Holdings maintains that utilizing federal tort claims figures, as opposed to state tort law figures, averts the problem it characterizes as the "law of large numbers." G-I Holdings describes the "law of large

numbers" as follows:

When confronted with batches of 1000 claims, even if most claims had no merit or were not linked to G-I [Holdings], it was economically less expensive for G-I [Holdings] to pay $ x thousand per claim than to spend $ x + y thousand per claim to have meritless claims dismissed. This is what makes mass tort claims a deadly force. Outside bankruptcy, defendants must pay regardless of merit. The federal courts at least partially addressed this problem by not enabling claims of unsick claimants to participate until they were sick. n22

[(*G-I Br.*, pg. 5)].

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n22 With respect to the problems of "bundling" claims and the "law of large numbers," G-I Holdings further explains as follows: "prior to the commencement of its Chapter 11 case, G-I [Holdings] and other asbestos defendants settled most claims. Those settlements were driven largely by two factors. First plaintiffs' attorneys refused to settle claims for mesothelioma victims unless G-I [Holdings] agreed to pay material amounts for claimants who were much less sick or not physically impaired at all. This way, G-I [Holdings] had to pay more for the bulk of the claims than it would have paid on the merits. Second, the volume of claims and the cost of having any claim dismissed (no matter how unmeritorious) created a dynamic under which G-I [Holdings] was economically motivated and compelled to settle each claim for less than its defense expense. Thus, if defending against a claim would cost $ 15,000 to prove its lack of merit in the tort system, G-I [Holdings] would pay an amount less than $ 15,000 in settlement even if the claim had no merit. This is the consequence of the 'Law of Large Numbers' that makes the mass tort business so lucrative and inexorable. When 1000 claims at a time are filed against G-I [Holdings] or any defendant in the tort system outside bankruptcy, G-I [Holdings] cannot afford to pay the defense cost of $ 15,000 and higher per claim. That would cost $ 15 million ($ 15,000 x 1000 claims) and more for every 1000 claims, and plaintiffs would normally settle for less than the defense cost per claim. This way plaintiffs and their attorneys earned say $ 7 million ($ 7,000 x 1000 claims) for every thousand claims and G-I [Holdings] saved $ 8 million on every thousand claims, In sum and substance, the volume of claims and their associated defense cost drove settlement payments, not their merits." (*G-I Br.*, pgs. 11-12) (emphasis in original).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*30]

As a result of the "bundling" and "law of large numbers" dilemmas feeding asbestos personal injury defendants, G-I Holdings asks this Court to require proof that each claimant has been exposed to, and harmed by, an asbestos product of a G-I Holdings's predecessor so as to prevent the payment of meritless claims. As articulated by counsel for G-I Holdings, it has assigned federal claim values to the Matrix and the Claims Liquidation Procedures because these values "most accurately reflect the values *that should be received by asbestos claimants." (G-I Br.*, pg. 10) (emphasis added). G-I Holdings favors the use of federal tort claims values because according to G-I Holdings, "federal courts do not allow to the same extent as state courts, the bundling of claims . . . , the practice of which grossly distorts the values *that should be assigned to asbestos claims" (G-I Br.*, pg. 10) (emphasis added).

G-I Holdings submits that the Matrix and the companion Claims Liquidation Procedures will save the Company from incurring "massive fees and expenses" associated with litigating individual claims in the state tort system. According to G-I Holdings, it incurred fees of $ 30 million [*31] in year 2000 alone in defending against asbestos personal injury claims in the state tort system. (*G-I Br.*, pgs. 18 and 25). G-I Holdings estimates the Company will save approximately $ 28.5 million per year if the Matrix and the Claims Liquidation Procedures are approved by the Court as the method of estimating claims in this case. (*G-I Application*, pg. 6). In contrast, requiring G-I Holdings to litigate every asbestos personal injury claim would create an enormous expense for the bankruptcy estate.

The Committee and the Legal Representative oppose the Matrix and the Claims Liquidation Procedures

proposed by G-I Holdings. Rather than attempt to estimate each individual claim against G-I Holdings one by one, the Committee proposes a methodology that would estimate the Company's asbestos liabilities in the aggregate. Instead of utilizing a fixed period of time as a guide to estimating asbestos liabilities, as G-I Holdings suggests by using figures from federal tort cases resolved between 1997 and 1999, the Committee proposes "a statistical estimation of [G-I Holdings's] present and future asbestos liabilities based on projections from [the Company's] overall claim-resolution [*32] history." (*Response of the Official Committee of Asbestos Claimants to Debtors' (I) Application for an Order Establishing a Method for Liquidating Asbestos Claims and (II) Motion for Order Fixing Final Date for Filing Proofs of Claim,* pg. 1)(hereinafter *"Comm. Br."*). Once this is accomplished, the Committee submits that "amounts payable to individual claimants would then be determined, post-bankruptcy, by a trust established under 11 U.S.C. § 524(g)" in conjunction with a Chapter 11 plan. (*Comm. Br.,* pg. 1). In accordance with the Committee's proposed methodology, asbestos claimants who are dissatisfied with the trust's liability determinations under relevant "trust distribution procedures" (hereinafter "TOP") incorporated therein, would be entitled to jury trials in the tort system. n23

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n23 With respect to the appropriate standard for determining allowed claim amounts, the parties have presented the affidavits of several experts. The Committee has submitted the affidavit of Mark Peterson, J.D., Ph.D., who criticizes the Matrix and the Claims Liquidation Procedures and advocates the use of a § 524(g) trust. G-I Holdings submitted the affidavit of Letitia Chambers, Ed.D., who helped develop the Matrix and the Claims Liquidation Procedures and submits that the liquidation of asbestos claims is best served by looking to federal court procedures and the resulting amounts awarded or agreed to in settlement Finally, the Legal Representative has offered the affidavit of Timothy Wyant, Ph.D., who also criticizes the Matrix and the Claims Liquidation Procedures.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*33]

Moreover, rather than constituting a true "estimation" of contingent claims as provided for in § 502(c) of the Code, the Committee argues the Matrix and the Claims Liquidation Procedures actually amount to an improper liquidation of all personal injury claims for the purpose of determining actual distributions to persons whose claims are allowed. The Committee summarizes its overall objections to the Matrix and the Claims Liquidation Procedures as follows:

On the merits, Debtors' liquidation proposal is unprecedented. Debtors cast aside established Bankruptcy Code procedure and concoct a fanciful system where by a committee appointed by G-I [Holdings] would liquidate several hundred thousand personal injury claims according to a fixed "matrix" supposedly derived from "federal tort claim" values. Debtors' goal is to have most claims "estimated at $ 0" and thus disallowed, solely on the basis of the proof-of-claim form, without any evidentiary proceedings. G-I [Holdings's] proposal contains no mechanism for discharging its enormous liability to future asbestos claimants, yet it makes no effort to show that the reorganized debtor would have assets sufficient to pay future [*34] claims. The Debtors' claim-by-claim liquidation scheme would take years to carry out, and it could not possibly result in a feasible and confirmable plan. In order to adopt this scheme, this Court would have to: 1) ignore Supreme Court precedent establishing the principle that substantive state law governs individual claims determinations in bankruptcy; 2) do away with statutory provisions guaranteeing personal injury claimants a right to [a] jury trial on the merits of their claims; and 3) ignore 11 U.S.C. § 524(g), the mechanism Congress envisioned for the payment of future asbestos claims, which provides for the creation of a trust to operate post-bankruptcy and pay all asbestos personal injury claims into the future.

[(*Comm. Br,* pgs. 2-3)].

The Legal Representative joins in the legal arguments asserted by the Committee against the adoption of the Matrix and the Claims Liquidation Procedures. The thrust of the Legal Representative's position "is to emphasize the indispensability of a § 524(g) channeling injunction to any confirmable plan of reorganization that will emerge from this bankruptcy case." (*The Legal Representative's Brief in* [*35]

Opposition to (1) Debtor's Application for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Claims and (2) Debtor's Motion for Order Fixing Final Bar Date for Filing Proofs of Claim and Approving Notices and Publication Procedures, pg. 2) (hereinafter "Legal Rep. Br"). Further, the Legal Representative also argues that G-I Holdings's "scheme unconstitutionally disregards claimants' jury trial rights and irrationally values claims at a fraction of historical amounts." (Legal Rep. Br., pg. 2).

Against this very general background the Court will turn to its legal analysis, and detail the particular arguments and counter-arguments raised by the parties with respect to the competing estimation methodologies.

### III. Discussion

Although the parties have strong disagreements, they do agree that an estimation of G-I Holdings's asbestos liability is required based on the complexity and sheer volume of present and future asbestos-related personal injury claims confronting the bankruptcy estate. The starting point for the estimation of claims against a bankruptcy estate is 11 U.S.C. § 502(c) which provides as [*36] follows:

[HN1]There shall be estimated for purpose of allowance under this section --
(1) any contingent or unliquidated claim, n24 the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

> (2) any right to payment arising from a right to an equitable remedy for breach of performance.

[11 U.S.C. § 502(c) (West 2004)].

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n24 Section 101(5) of the Bankruptcy Code in part defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5) (West 2004). It cannot be disputed that the Committee's constituency, holders of present claims, satisfies the definition for claims under § 101(5) of the Code. With respect to the constituency represented by the Legal Representative, whether the future demand holders possess "claims" in accordance with § 101(5) is certainly debatable. Nonetheless, it is clear that once a defendant files for bankruptcy in an effort to shed or affect its asbestos-related liabilities, future demand holders must be addressed in the reorganization process. See In re Amatex Corp., 755 F.2d 1034, 1042 (3d Cir. 1985) (noting that the "failure to provide for future claimants in a reorganization might fatally undermine any such plan as well as prejudice the position of future claimants").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*37]

While the Bankruptcy Code certainly envisions an estimation proceeding, the Code is "silent as to the manner in which contingent or unliquidated claims are to be estimated." Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982). [HN2]In general, a bankruptcy court has discretion to determine the appropriate method of estimation in light of the particular circumstances of the bankruptcy case before it. In re Trident Shipworks, Inc., 247 B.R. 513, 514 (Bankr. M.D. Fla. 2000); see also In re Thomson McKinnon Sec. Inc., 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992) ("In estimating [a] claim, the bankruptcy court should use whatever method is best suited for the circumstances") (citation omitted). As articulated by the Third Circuit Court of Appeals, the principal consideration in selecting an estimation procedure "must be an accommodation to the underlying purposes of the Code." Bittner, 691 F.2d at 135. Thus, to the greatest extent possible, a selected estimation procedure should not run counter to the efficient and expeditious administration of the bankruptcy estate. Id. at 135-36. [HN3]In estimating claims [*38] pursuant to § 502(c), a bankruptcy court "is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law." Id. at 135. However, "there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code." Id. at 136.

Section 502(c) of the Bankruptcy Code is drafted in mandatory terms. That is, any contingent or unliquidated claim "shall" be estimated so long as the "liquidation" of the particular claim would "unduly delay the administration of the case." 11 U.S.C. § 502(c) (West 2004). Consequently, [HN4]before a court orders an estimation proceeding, an initial determination must be made that liquidating the claim or claims would unduly delay the bankruptcy case. Id. See also O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.), 981 F.2d 1450, 1461 (5th Cir. 1993) ("In order for the estimation process of § 502(c) to apply, a [*39] claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice"); Apex Oil Co. v. Stinnes Interoil, Inc. (Hire Apex Oil Co.), 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989) ("The duty to estimate is not mandatory until the court determines that liquidation of the claim outside of the bankruptcy court would unduly delay the bankruptcy proceeding").

At present, G-I Holdings has more than 150,000 asbestos claims pending against it, with the prospect of several hundred thousand more asbestos-related personal injury claims being filed in the future. As G-I Holdings itself submits, if it "were required to litigate each and every asbestos personal injury claim asserted against it, it would take years, actually lifetimes, before these claims would be liquidated." (G-I Br., pg. 3). The Committee agrees with this observation. Given this very real assessment of the enormity of litigation facing G-I Holdings, requiring the Company to first liquidate each and every asbestos-related personal injury claim outside of the bankruptcy context would undoubtedly cause undue delay in the administration of the bankruptcy case and could [*40] possibly be the death knell for the successful reorganization of this debtor. Therefore, some form of estimation proceeding is required.

Having reached this conclusion, however, the Court is next faced with the critical task of selecting an appropriate estimation process or methodology that also comports with the requirements of Bittner; namely, one that adheres to the legal rules that govern the ultimate value of the claim and that also promotes the efficient and expedient administration of the G-I Holdings's bankruptcy estate. Significantly, the parties agree that neither a debtor nor its personal injury claimants have a right to jury trial in an estimation proceeding conducted under § 502(c) of the Bankruptcy Code. See, e.g., In re Standard Insulations, Inc., 138 B.R. 947, 951 (Bankr. W.D. Mo. 1992) ("The court concludes from the statutory language [of 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 157(b)(5), and 28 U.S.C. § 1411(a)] that jury trials are not required for personal injury claims at the claims allowance stage"). While the parties agree on this nuanced point, the [*41] most contentious issue between the parties is whether the individual asbestos-related personal injury claimants, taken collectively, have any jury trial rights within the context of the bankruptcy proceeding.

On this issue, the Committee and the Legal Representative both argue the Matrix and the Claims Liquidation Procedures, by "proposing to *liquidate* personal injury claims individually, disallowing most of them and liquidating the rest at fixed values set forth in its 'medical matrix,'" implicates and strips the asbestos-related personal injury claimants of their rights to jury trial. (*Comm. Br.*, pg. 36)(emphasis in original), In contrast, the Committee argues that its estimation process, by not disallowing any claims or fixing G-I Holdings's liability with respect to any particular claim, does not implicate the claimants' rights to jury trial. Instead, "determinations as to the validity and value of claims will be made post-bankruptcy by a § 524(g) trust, and claimants dissatisfied with the trust's determinations would ultimately [be] entitled to jury trials in the tort system." (*Comm. Br.*, pg. 37). In addressing this issue, the Court will also present the competing [*42] arguments raised by the respective parties.

A. The Arguments Of G-I Holdings With Respect To The Existence Of Jury Trial Rights

The pivotal objection lodged against the Matrix and the Claims Liquidation Procedures by the Committee and the Legal Representative is that these estimation procedures do not afford asbestos claimants any right to jury trial. The Committee and the Legal Representative submit the Company's "liquidation-by-estimation scheme" would violate asbestos claimants' rights because it would determine final values for individual claims, for purposes of distribution under the reorganization plan, without affording claimants any right to jury trial. (*Comm. Br.*, pg. 37). Indeed, G-I Holdings readily admits that its proposed estimation procedures are for purposes of setting final monetary distribution amounts to asbestos claimants. As noted, Section 5.5 of the Claims Liquidation Procedures provides that "the only issues which shall be subject to contest by holders of Asbestos Personal Injury Claims"