are: (1) disallowance of a claim based on the failure to meet the established medical criteria; and (2) the Scheduled Disease categorization assigned to the particular [*43] claimant's claim against the estate. n25

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n25 As previously noted, G-I Holdings clarified that claimants may appeal the CLC's decision with respect to both "the estimated amount of their claims and the classification requirements." (*Reply to Objection of Official Committee of Asbestos Claimants and Legal Demand Representative to Application of G-I Holdings for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Asbestos Claims*, pg. 8).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

The Committee and the Legal Representative argue that if during the discovery process disputed issues of fact arise with respect to a particular claimant's claim, for example, whether the claimant was exposed to a product containing asbestos manufactured by GAF or its predecessors, the individual personal injury claimant would be entitled to a trial by jury. (*Comm. Br*, pg. 14). Based upon the submissions and representations made to the Court by G-I Holdings, G-I Holdings confirms that under the Matrix and the Claims Liquidation Procedures, [*44] asbestos personal injury claimants would not have any rights to jury trial. Nevertheless, G-I Holdings argues the lack of a right to jury trial does not affect the viability of the Matrix and the Claims Liquidation Procedures because asbestos-related personal injury claimants have no right to jury trial in the context of the bankruptcy proceeding, In support of this position, G-I Holdings advances two principal arguments. First, G-I Holdings submits that the asbestos claimants have no constitutionally protected rights to jury trial under the Seventh Amendment to the United States Constitution. Second, G-I Holdings argues that the asbestos claimants have no statutory rights to jury trial through the complex interplay between 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 157(b), 28 U.S.C. § 1411(a), and § 502(c) of the Bankruptcy Code. These arguments will be discussed in turn.

### i. Whether Asbestos Claimants Have Jury Trial Rights Under The Seventh Amendment To The United States Constitution

The Seventh Amendment to the United States Constitution provides as follows:

[HN5]In Suits at common [*45] law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States than according to the rules of the common law.

[U.S. Const. amend. VII].

[HN6]The United States Supreme Court has consistently interpreted the phrase "Suits at common law" to refer to "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" Granfinanciera. S.A. v. Nordberg, 492 U.S. 33, 40-41, 106 L. Ed. 2d 26, 109 S. Ct. 2782 (1989) (citation omitted). [HN7]Generally, the notion of "legal rights" within the meaning of the Seventh Amendment pertains to actions seeking monetary damages against a defendant. See, e.g., Curtis v. Loether, 415 U.S. 189, 195-96, 39 L. Ed. 2d 260, 94 S. Ct. 1005 (1974) ("More important, the relief sought here -- actual and punitive damages -- is the traditional form of relief offered in the courts of law"); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 476-77, 8 L. Ed. 2d 44, 82 S. Ct. 894 (1962) (noting that a complaint seeking a money judgment "presents a claim which is unquestionably [*46] legal" in nature). Further, the "thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed in 1791." Loether, 415 U.S. at 192-93. Nonetheless, "it has long been settled that the right [to jury trial] extends beyond the common-law forms of action recognized at that time." Id. at 193. See also Parsons v. Bedford. Breedlove & Robesoa, 28 U.S. 433, 447, 7 L. Ed. 732 (1830) [HN8]("In a just sense, the [Seventh] Amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights").

During the hearing on both estimation motions, counsel for the Committee made clear that the asbestos claimants are seeking monetary damages against G-I Holdings. Therefore, the claims against the Company constitute lawsuits seeking the adjudication of "legal rights" under the Seventh Amendment. However,

through an exhaustive account of equity jurisdiction in England during the late 1700s and early 1800s, G-I Holdings argues that "the asbestos claims in [its] Chapter 11 case *could never* have been brought before a court [*47] of law in 1791 because no adequate remedy at law existed and equity *would have* asserted jurisdiction over these claims." (*G-I Br.*, pg. 36) (emphases added). Consequently, G-I Holdings maintains the asbestos claimants have no rights to jury trial that have been preserved by the Seventh Amendment to the United States Constitution. While the Court will not recount the course of equity jurisprudence in England during this time, it is necessary to summarize, and then address, the argument of G-I Holdings in this regard.

According to G-I Holdings, "mass torts, by definition, involve the claims of numerous plaintiffs against a defendant for injury caused as a result of that defendant's alleged negligent conduct." (*G-I Br.*, pg. 37). Prior to the fusion of the courts of law and equity in this country by statute in 1934, G-I Holdings notes that "it was impossible for a group of plaintiffs to have brought an action at law against a defendant for negligence." (*G-I Br.*, pg. 37). The only remedy available to address the situation, according to G-I Holdings, would be for a court of chancery to issue what was known as a "bill of peace." n26 Simply stated, a bill of peace provided [*48] for the consolidation of numerous actions before the Court of Chancery. See Zechariah Chafee, Jr., Bills of Peace with Multiple Parties, 45 Harv. L. Rev. 1297, 1297 (1932) (describing the utilization of a bill of peace in situations where "questions of law or fact which would otherwise be tried over and over can by this means be determined once for all in a single proceeding"). Consolidating multiple proceedings through an equitable bill of peace avoided the "multiplicity of suits" and "save[d] the parties from needless expense and vexation." Id.

- - - - - - - - - - - - - Footnotes - - - - - - - - - -

n26 G-I Holdings's argument in this regard stems primarily from a Harvard Law Review article published in 1932. See generally Zechariah Chafee, Jr., Bills of Peace with Multiple Parties, 45 Harv. L. Rev. 1297 (1932).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The need for an equitable bill of peace arose in situations that G-I Holdings analogizes to its present situation defending numerous asbestos-related personal injury claims. That is, the existence of several [*49] persons on one side of a controversy, and one person on the other side. n27 According to the author of the law review article, "each member of the multitude threatens litigation or is engaged in pending litigation with the adversary, and these parallel litigations involve one or more common questions of law or fact, or both. The multitude are not joint obligees or obligors, so that they can not join or be joined in one common-law writ." Id. Because the separate lawsuits could not be joined in the common law courts, G-I Holdings therefore argues that an inadequate remedy at law existed because a defendant "was remediless against the assertion of numerous actions as the courts of common law could not consolidate the actions." (*G-I Br.*, pg. 40). The argument by G-I Holdings proceeds that because an inadequate remedy at law existed to handle this multiplicity of suits, a bill of peace would have issued consolidating all of the claims in a court of chancery. G-I Holdings specifically avers as follows:

As the above analysis makes clear, *the only* tribunal available to resolve over 150,000 claims was the Court of Chancery. As the majority of asbestos personal injury actions [*50] pending against G-I [Holdings] are actions brought by a group of plaintiffs against G-I [Holdings] (and various other defendants) for damages caused by G-I Holdings's alleged negligent conduct, such actions *would have to have been* commenced in the Court of Chancery. Even if separate actions were brought, *equity would have issued* a bill of peace to avoid the need to simultaneously defend against multiple suits. *As such, no jury trial right would attach to cases involving damages arising from a defendant's alleged mass tort as the common law did not recognize such a claim.*

[(*G-I Br.*, pg. 45)(emphases added).]

- - - - - - - - - - - - - Footnotes - - - - - - - - - -

n27 In the law review article relied upon by G-I Holdings, the "several persons" (i.e., plaintiffs) are referred to as "the multitude" while the "one person" (i.e., defendant) is referred to as "the adversary." Chafee, supra, at 1297.

- - - - - - - - - - - - End Footnotes- - - - - - - - -

- - - - - -

Simply put, G-I Holdings overstates its legal conclusions on this issue. Indeed, while a bill of peace was an available mechanism for a court [*51] of equity to employ to address a multiplicity of suits against a common defendant, such an exercise of jurisdiction was not a certainty or an absolute, as G-I Holdings clearly argues, but rather one option that could have been utilized. Hypothetically, while 150,000 individual lawsuits against a single defendant might have been a fit case for a court of equity to assert jurisdiction through the issuance of a bill of peace, such issuance was not predestined. See Chafee, supra, at 1331-32 ("In short, there is no automatic solution for the administrative problem presented by multiple suits involving common questions. The two considerations emphasized in this article -- the strength of the jury trial policy and the relative complexity of the controversy -- are not rigid principles but only standards of judgment"). Moreover, the very authorities relied upon by G-I Holdings recognize this possibility and note that disagreement existed as to the exercise of equitable jurisdiction through a bill of peace when a multiplicity of similar lawsuits were filed against a common defendant.

The law review article upon which G-I Holdings heavily relies is espousing its own partial position [*52] on the exercise of equity jurisdiction through the issuance of a bill of peace. The author admits as much: "since the multiplicity of suits in all these cases confers equitable jurisdiction, *according to the view taken in this article,* the constitutional guarantee of a jury trial has no application." Chafee, supra, at 1324. Further, the author sets forth his central argument as follows:
Where the remedy at law is inadequate because of limitations upon the powers of a law court to consolidate parallel suits or the powers of a jury to decide them satisfactorily as a unit, equity *should have jurisdiction* to grant a bill of peace, as the only practical alternative to repeated trials, delay, and injustice. In such a situation, it should be immaterial that the basic issues are legal and not equitable. The fact that one such action unquestionably lies within the province of a jury is beside the point. The presence of multiple claims entirely changes the problem. The multiplicity of suits *should be enough* to create equitable jurisdiction. The equity court can then consider whether the complexity of the unified controversy is sufficiently small to bring it within the [*53] range of a jury, or sufficiently great to throw it outside the range even of equity so that the bill must be dismissed as multifarious.

[Id. at 1302 (emphases added)].

Finally, the author specifically concedes as follows: "this conclusion that multiplicity of suits alone is a ground of equitable jurisdiction, though recognized by considerable authority . . . is rejected in other decisions . . . . " Id. at 1303.

In Hale v. Allinson, 188 U.S. 56, 47 L. Ed. 380, 23 S. Ct. 244 (1903), the United States Supreme Court summarized the divergence of opinion on whether equity jurisdiction was available to prevent a multiplicity of lawsuits. The Supreme Court stated as follows:

[HN9]The cases are various in which the court has either taken or refused jurisdiction, but one cannot adduce from them a plain and uniform rule by which to determine the question. The application of the principles upon which jurisdiction has been suggested or denied has been various, both in England and in this country, and it is difficult, if not impossible, to reconcile the cases. The subject is discussed at length in 1 Pomeroy's Equity Jurisprudence, 2d ed. P. 318, §§ 243 et seq. n28 It is therein shown that [*54] the foundation of the jurisdiction, or perhaps the earliest exercise of it upon this ground, was in so-called 'bills of peace,' where in one class of such bills the suit was brought to establish a general right between a single party and numerous other persons claiming distinct and individual interests . . . . In any case where the facts bring it within the possible jurisdiction of the court, according to the view taken by it in regard to such facts, the decision must depend largely upon the question of the reasonable convenience of the remedy, its effectiveness, and the inadequacy of the remedy at law.

[Id. at 72].

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n28 In its brief, G-I Holdings also relies upon this source in support of its arguments.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

The Supreme Court continued its observations by stating the following:

> [HN10]Cases in sufficient number have been cited to show how divergent are the decisions on the question of jurisdiction. It is easy to say it rests upon the prevention of a multiplicity of suits, but to say whether [*55] a particular cases comes within the principle is sometimes a much more difficult task. Each case, if not brought directly within the principle of some preceding case, must, as we think, be decided upon its own merits and upon a survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested and the result which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether within reasonable and fair grounds the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, and will be an actual convenience to all parties, and will not unreasonably overlook or obstruct the material interests of any. *The single fact that a multiplicity of suits may be prevented by this assumption of jurisdiction is not in all cases enough to sustain it.*

> [Id. at 77-78 (emphasis added)].

Based upon the foregoing, this Court disagrees with the position held by G-I Holdings that the only tribunal available [*56] to resolve multiple mass tort claims in 1791 England was the Court of Chancery. In this instance, the Court agrees with the Committee, joined by the Legal Representative, that the claims held by the asbestos claimants are "legal in nature," and thus, they carry "with it the Seventh Amendment's guarantee of a jury trial." Granfinanciera, 492 U.S. at 55. [HN11]While Congress may "devise novel causes of action involving public rights free from the strictures of

the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders," Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury." Id. at 51-52. n29 In short, "legal claims are not magically converted into equitable issues by their presentation to a court of equity.'" Id. at 52 (quoting Ross v. Bernhard, 396 U.S. 531, 538, 24 L. Ed. 2d 729, 90 S. Ct. 733 (1970)). n30

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n29 The claims held by the asbestos claimants do not fall within the "public rights" exception to the Seventh Amendment's guarantee to a jury trial. See Granfinanciera, 492 U.S. at 54-55 [HN12]("If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court"). Here, neither a federal regulatory program is implicated nor are the asbestos-related personal injury claims against the federal government.

[*57]

n30 G-I Holdings relies upon Langenkamp v. Culp, 498 U.S. 42, 112 L. Ed. 2d 343, 111 S. Ct. 330 (1990), reh'g denied, 498 U.S. 1043, 112 L. Ed. 2d 709, 111 S. Ct. 721 (1991), for the proposition that where a claimant files a proof of claim against a debtor's bankruptcy estate, the claimant submits itself to the bankruptcy court's equitable jurisdiction "and there is certainly no constitutional jury trial right . . . . ."(*Response to Sur-reply of Official Committee of Asbestos Claimants and Legal Demand Representative to Application of G-I Holdings for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Asbestos Claims,* pg. 30). In Langenkamp, the Supreme Court was presented with the question of whether "creditors who submit a claim against a bankruptcy estate and are then sued by the trustee in bankruptcy to recover allegedly preferential monetary transfers are entitled to jury trial under the

Seventh Amendment." 498 U.S. at 42-43. The debtors in Langenkamp were "uninsured, nonbank financial institutions" and their creditors held "thrift and passbook savings certificates issued by debtors, which represented debtors' promise to repay moneys" which the creditors had invested. Id. at 43. Langenkamp, as trustee for the debtors, filed preference actions against the creditors based upon payments received by them immediately prior to the debtor's bankruptcy filing. Id. On appeal, the creditors argued an entitlement to a jury trial on the trustee's preference claims. Id. at 43-44. In holding that the creditors who filed claims against the estate were not entitled to jury trials, the Supreme Court stated as follows: "In Granfinanciera we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power. If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction. As such, there is no Seventh Amendment right to a jury trial. If a party does not submit a claim against the bankruptcy estate, however, the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer, In those circumstances the preference defendant is entitled to a jury trial. Accordingly, 'a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor has submitted a claim against the estate.' Respondents filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court. Consequently, they were not entitled to a jury trial on the trustee's preference action." Id. at 44-45 (internal citations omitted). Simply put,

this Court does not agree with G-I Holdings's argument with respect to the application of Langenkamp to the asbestos-bankruptcy setting. First Langenkamp did not deal with personal injury tort or wrongful death claimants, but rather with garden-variety creditors of a bankruptcy estate. More significantly, however, Congress certainly envisioned the different treatment of personal injury tort claimants from other types of creditors when it enacted 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 157(b)(5), and 28 U.S.C. § 1411(a). In other words, interpreting Langenkamp in the way G-I Holdings suggests would eviscerate and nullify these provisions specifically enacted by Congress to preserve the jury trial rights of personal injury tort and wrongful death claimants. [HN13]28 U.S.C. § 1411(a) makes clear that nothing in title 11, such as filing a claim against the estate pursuant to § 501 of the Code, does not affect any right to trial by jury that an individual has under applicable nonbankruptcy law, such as the Seventh Amendment to the United States Constitution.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*58]

As an additional argument, G-I Holdings contends the asbestos claimants also do not have jury trial rights based upon the following equitable principle: "where numerous creditors are proceeding against an allegedly limited fund, equity will assert jurisdiction and require all actions against the fund be consolidated to ensure equitable treatment among creditors and to prevent early exhaustion of the fund." (G-I Br., pg. 47). This argument is equally unavailing for at least two reasons. First, no concrete showing has been made that a "limited fund" exists. Although the Committee opines that G-I Holdings is in essence an insolvent entity, counsel for G-I Holdings submits that equity will exist in the Company after all rightful claims are paid. Second, the two main cases cited by G-I Holdings in support of this position are inapposite to the matter pending before the Court. See generally Hornor v. Henning, 93 U.S. 228, 23 L. Ed. 879 (1876); Stone v Chisolm, 113 U.S. 302, 28 L. Ed. 991, 5 S. Ct. 497 (1885).

In Hornor, the United States Supreme Court was called upon to interpret a Congressional statute authorizing the formation of corporations within the District of Columbia. With respect [*59] to the liability "of the stockholders and of the trustees who manage these corporations," the statute provided as follows: "'if the indebtedness of any company organized under this act shall at any time exceed the amount of its capital stock, the trustees of such company assenting thereto shall be personally and individually liable for such excess to the creditors of the company.'" Id. at 229 (citation omitted). The discrete issue before the Supreme Court concerned whether a single creditor of the corporation, among many, could assert a separate action at law solely for his or her own benefit and recover a judgment against the trustees. Id. at 230. The Supreme Court held, inter alia, that the trustees who agreed to "an increase of the indebtedness of the corporation beyond its capital stock are to be held guilty of a violation of their trust" and this liability "constitutes a fund for the benefit of all the creditors who are entitled to share in it, in proportion to the amount of their debts, so far as may be necessary to pay these debts." Id. at 232.

Based upon this dynamic, the Supreme Court concluded the "remedy for this violation of duty as trustees is in its nature [*60] appropriate to a court of chancery." Id. Proceeding in a court of equity, the Supreme Court opined, "avoids the injustice of many suits against defendants for the same liability, and the greater injustice of permitting one creditor to absorb all, or a very unequal portion, of the sum for which the trustees are liable." Id. See also Stone v. Chisolm, 113 U.S. 302, 306-09, 28 L. Ed. 991, 5 S. Ct. 497 (1885) (holding that a single action in equity is appropriate in a lawsuit against the directors of a corporation pursuant to statute when the debts of the corporation exceed the value of capital stock where the intent of the statute is that the directors' liability shall be for the "common benefit" of all interested parties).

G-I Holdings attempts to analogize these "limited fund" cases to this matter by arguing that since a limited fund of assets to pay asbestos claimants exists, equitable considerations militate in favor of consolidating the 150,000 individual actions into a single proceeding in equity, where jury trial rights did not traditionally exist. As noted, this analogy must fail for several reasons. First, unlike the Hornor and Chisolm decisions, the asbestos-related personal [*61] injury actions do not arise pursuant to an explicit statute governing the liability of trustees and directors of an insolvent company. Second, G-I Holdings does not stand in a position of trust in relation to the claimants alleging personal injuries due to asbestos exposure. Third, the numerous asbestos-related personal injury claims confronting G-I Holdings are not premised on the "same liability," that is, multiple personal liability based on a single occurrence (i.e., breach of a statutory formula).

Consequently, this Court concludes that the asbestos claimants do in fact possess jury trial rights under the Seventh Amendment to the United States Constitution for purposes of liquidating their respective claims against the G-I Holdings bankruptcy estate.

Nevertheless, bankruptcy court jurisdiction over the claims allowance process is distinct from liquidation for purposes of distribution. In re Standard Insulations, Inc., 138 B.R. 947, 953 (Bankr. W.D. Mo. 1992). [HN14]The allowance or disallowance of a claim is not identical to the liquidation of a claim for purposes of distribution. Id. at 954. [HN15]A jury trial is not required for an action at law [*62] "if it is closely intertwined with claims allowance proceedings unique to bankruptcy law." Id. at 952. In other words, [HN16]while creditors of a bankruptcy estate cannot be divested of their jury trial right for determining the ultimate extent and value of their personal injuries for purposes of distribution, creditors are not entitled to a jury trial in an estimation proceeding under § 502(c) when the purpose of the proceeding is to determine the allowance or disallowance of claims against the bankruptcy estate.

## ii. Whether The Asbestos Claimants Have Jury Trial Rights Arising By Statute

In a separate argument, G-I Holdings asserts that not only do the asbestos claimants not have jury trial rights for purposes of estimation, they also do not possess jury trial rights for purposes of distribution. (G-I Br., pg. 30). As previously noted, G-I Holdings argues that the asbestos claimants have no statutory rights to jury trial based upon the intricate interplay between 28 U.S.C. § 1411(a), 28 U.S.C. § 157(b)(2)(B), 28 U.S.C. § 157(b)(5), and § 502(c) of the Bankruptcy Code [*63] . Before turning to the specific arguments raised by G-I Holdings in this regard, it is first necessary to note the precise language of the statutory sections under consideration.

First, 28 U.S.C. § 1411 provides as follows:

(a) [HN17]Except as provided in subsection (b) of this

section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.

(b) The district court may order the issues arising under section 303 of title 11 to be tried without a jury. n31

[28 U.S.C. § 1411 (West 2004)].

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n31 Section 303 of the Bankruptcy Code governs the commencement of and outlines procedures in an involuntary title 11 case.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Second, 28 U.S.C. § 157(b) addresses the jurisdictional parameters of bankruptcy courts and provides in relevant part as follows:
(b)(1) [HN18]Bankruptcy judges may [*64] hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to --
(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purpose of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11.
[28 U.S.C. § 157(b)(1) and (b)(2)(B) (West 2004)]. n32

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n32 The argument advanced by G-I Holdings also implicates 28 U.S.C. § 1334(a) and (b). Section 1334(a) provides as follows: [HN19]"except as provided in

subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11." See 28 U.S.C. § 1334(a) (West 2004). Section 1334(b) provides as follows: [HN20]"notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." See 28 U.S.C. § 1334(b) (West 2004).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*65]

Third, 28 U.S.C. § 157(b)(5) provides as follows: [HN21]The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

[28 U.S.C. § 157(b)(5) (West 2004)].

Based on its own interpretation of these statutory provisions, G-I Holdings submits that "even if this court were to decide asbestos personal injury claimants have a right to a jury trial with respect to their claims . . . 28 U.S.C. § 1411 (a) does not preserve that right when a debtor seeks to estimate for purposes of distribution its asbestos personal injury claims." (*Response to Sur-reply of Official Committee of Asbestos Claimants and Legal Demand Representative to Application of G-I Holdings for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Asbestos Claims,* pgs. 37-38)(hereinafter *"G-I Sur-reply Br"*). According to G-I Holdings, Congress specifically [*66] "carved out estimation for purposes of distribution" from the reach of 28 U.S.C. § 1411(a). The statutory "carve-out," G-I Holdings contends, arises by operation of 28 U.S.C. § 157(b)(2)(B). (*G-I Sur-reply Br.,* pgs. 37-38). As G-I Holdings submits, "by enacting 28 U.S.C. § 157(b)(2)(B), Congress showed it had no intention of allowing jury trials when courts need to estimate personal injury and wrongful death actions for distribution purposes." (*Reply to Objection of Official Committee of Asbestos Claimants*

*and Legal Demand Representative to Application of G-I Holdings for Order Pursuant to 11 U.S. C. § 502 (c) Establishing Method to Liquidate Asbestos Claims,* pg. 47) (hereinafter *"G-I Reply Br."*)(emphasis in original).

The argument advanced by G-I Holdings proceeds as follows:

28 U.S.C. § 1411, by its terms, does not have any language granting jury trials. Rather, it only prevents title 11 of the United States Code and Chapter 87 of title 28 of the United States Code from taking away any jury trial right a personal injury claimant has. 28 U.S.C. § 157 [*67] (b)(2)(B) is in Chapter 6 of title 28 and expressly provides for estimation of personal injury claims for distribution purposes. Therefore, § 1411 does not negate Congress' provision in Chapter 6 of title 28 for estimation of personal injury claims for distribution purposes.

[(*G-I Br.,* pg.7).]

Thus, because § 157(b)(2)(B) is in a separate chapter (Chapter 6) of title 28 from § 1411(a) (Chapter 87), G-I Holdings maintains that § 1411(a) "does not bar 28 U.S.C. § 157(b)(2)(B) from creating or recognizing the court's power to estimate personal injury and wrongful death claims for distribution purposes without a jury." (*G-I Br.,* pg. 30). In addition, G-I Holdings argues as follows:

Accordingly, Congress' enactment of 28 U.S.C. § 157(b)(2)(B) by itself shows Congress did not intend asbestos claimants to have jury trial rights when their claims are estimated for distribution purposes . . . . This conclusion is further supported by the language of 28 U.S.C. § 1411 which prevents title 11 of the United States Code from depriving asbestos claimants of jury trials, but does not prevent Chapter [*68] 6 of title 28 of the United States Code (the chapter containing § 157(b)(2)(B)) from depriving a litigant of a jury trial.

[*G-I Br.,* pg. 31].

Further, G-I Holdings reconciles these two statutory provisions in the following manner:

Accordingly, G-I [Holdings] pointed out that the estimation of personal injury and wrongful death claims referred to in 28 U.S.C. § 157(b)(2)(B) is in Chapter 6 of title 28, not Chapter 87. It defies common sense and any valid rule of statutory construction to interpret section 1411 to overrule a simultaneously enacted statute (28 U.S.C. § 157(b)(2)(B)) which provides for estimation of personal injury and wrongful death claims for distribution purposes. The only

sensible interpretation reconciles the two provisions. Namely, section 1411 prevents title 11 from depriving individuals of jury trial rights they could have outside bankruptcy, except when it interferes with estimation. Otherwise, section 157(b)(2)(B)'s reference to the estimation of personal injury and wrongful death claims for distribution purposes, is a reference to something that cannot occur.

[(*G-I Reply Br.,* pgs. [*69] 39-40)].

In response to G-I Holdings's arguments, the Committee contends that § 157(b)(2)(B) is merely a "definitional provision" which, contrary to the contentions of G-I Holdings, does not provide for the estimation of personal injury and wrongful death claims for distribution purposes. (*Sur-reply of the Official Committee of Asbestos Claimants to Debtors' Application for an Order Establishing a Method for Liquidating Asbestos Claims and to Debtors' Motion for Order Fixing Final Date for Filing Proofs of Claim,* pg. 37) (hereinafter *"Comm. Sur-reply Br"*). Instead, the Committee avers that estimation is provided for by § 502(c) of the Code, and since § 502(c) is within title 11, 28 U.S.C. § 1411 operates to preserve and protect the asbestos claimants' rights to jury trial. (*Comm. Sur-reply Br.,* pg. 37). Therefore, according to the Committee's interpretation, § 157(b)(2)(B) does not affect its constituency's right to jury trial as guaranteed by 28 U.S.C. § 1411.

The Legal Representative concurs with the Committee's position on this issue, and advances the following four arguments in favor of the interpretation that [*70] 28 U.S.C. § 1411(a) acts to preserve all tort claimants' jury trial rights:

First, despite [G-I Holdings's] references to "estimation" and to 28 U.S.C. § 157(b)(2)(B) in its application, [G-I Holdings] does not in fact propose any sort of estimation at all. Because, by [G-I Holdings's] own admission, the process it proposes is not an estimation, it necessarily falls outside of 28 U.S.C. § 157(b)(2)(B). Thus, [G-I Holdings] cannot argue that § 1411 (a) does not preserve jury trial rights of present and future claimants.

> Second, even assuming that [G-I Holdings] was proposing an estimation of claims, the estimation would have to proceed under 11 U.S.C. § 502(c), which is clearly part of and contained in title 11. The process [G-I Holdings] proposes would therefore be a proceeding felling within the plain

language of § 1411 (a), which preserves a claimant's right to a jury trial.

Third, even though § 157(b)(2)(B), as a jurisdictional provision, is not technically part of title 11, this section literally has no utility outside of title 11. In fact, the estimation [*71] process referenced in § 157(b)(2)(B) relates solely to proceedings that occur under title 11 relating to the restructuring of debtor-creditor relations. As § 157(b)(2)(B) can only apply in the context of title 11, [G-I Holdings] cannot credibly argue that § 157(b)(2)(B) works to divest present and future claimants of their statutory right to a jury trial in bankruptcy.

Fourth, in keeping with the tenets of basic statutory construction, §§ 157(b) and 1411 (a) must be read *in pari materia* to guarantee the right to a jury trial in an Article III court . . . .

[(*Legal Rep. Br.*, pgs. 25-26)].

[HN22]The extent of a bankruptcy court's jurisdiction is delineated in 28 U.S.C. § 157(b) and (c). See generally 28 U.S.C. § 157(b) and (c) (West 2004). n33 Pursuant to § 157(b), the bankruptcy court "may hear and determine all cases under title 11" and all "core" proceedings arising under or arising in a case under title 11. 28 U.S.C. § 157(b)(1) (West 2004). Conversely, "if the pending matter is classified as a non-core proceeding 'that is otherwise related to [a] case under title 11,' jurisdiction [*72] is more limited in that a bankruptcy judge 'may hear' but not determine the matter." In re Dow Corning Corp., 215 B.R. 346, 351 (Bankr. E.D. Mich. 1997) (quoting 28 U.S.C. § 157(c) (West 2004)). If a proceeding is classified as "non-core," the bankruptcy court's role is to "submit proposed findings of fact and conclusions of law to the district court." 28 U.S.C. § 157(c)(1) (West 2004). In turn, the district court "shall" enter any final order or judgment "after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." Id.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n33 28 U.S.C. § 157(a) permits the district court to refer cases and proceedings to the bankruptcy court. This statutory section provides as follows: "each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a) (West 2004).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*73]

[HN23]The claims allowance process, which is governed by § 502 of the Bankruptcy Code, is unique to the bankruptcy forum. In re Dow Corning Corp., 215 B.R. at 352. As such, it is generally accepted that this claims allowance process constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(B). Id. See also Pepper v. Litton, 308 U.S. 295, 304, 84 L. Ed. 281, 60 S. Ct. 238 (1939) (holding that the jurisdiction of the bankruptcy court is exclusive of all other courts with respect to the allowance and disallowance of claims); Southeastern Sprinkler Co. v. Mevertech Corp. (In re Mevertech Corp.), 831 F.2d 410, 417 (3d Cir. 1987) (noting that the process of allowance or disallowance of claims against the estate is a core proceeding); Buena Vista Television v. Adelphia Communications Corp. (In re Adelphia Communications Corp.), 307 B.R. 404, 418 (Bankr. S.D.N.Y. 2004) ("'Because nothing is more directly at the core of bankruptcy administration . . . than the qualification of all liabilities of the debtor, the bankruptcy court[']s determination whether to allow or disallow a claim is a core function") (citation [*74] omitted).

[HN24]Although the claims allowance process is specifically included as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) *for the purposes of plan confirmation,* the same cannot be said for the "liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate *for purposes of distribution* in case under title 11." 28 U.S.C. § 157(b)(2)(B) (West 2004) (emphases added). That is, if this Court approves an estimation proceeding with the aim of determining voting shares in the Chapter 11 plan confirmation process, such a proceeding falls within the core jurisdiction of this Court. See 28 U.S.C. § 157(b)(2)(B) (West 2004); In re G-I Holdings, Inc., 295 B.R. at 218. If, on the other hand, this Court approves an estimation proceeding with the intended goal of liquidating

contingent or unliquidated personal injury tort or wrongful death claims against the estate for distributional purposes, as G-I Holdings proposes, such a proceeding would fall within the non-core "related to" jurisdiction of the Court. See In re Combustion Eng'g, Inc., 391 F.3d 190, 225 (3d Cir. 2004) [*75] ("Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings") (citing Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 162 (3d Cir. 2004)). In such a case, and in accordance with the directives of the District Court, this Court would conduct the estimation proceeding in the first instance and thereafter would submit proposed findings of fact and conclusions of law to the District Court for the entry of a final order, all in accordance with 28 U.S.C. § 157(c). See 28 U.S.C. § 157(c) (West 2004).

The conclusion that the claims allowance or estimation process is separate and distinct from the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims for purposes of distribution only serves to further complicate the issue. If the Court were to approve an estimation proceeding for purposes of plan confirmation and thereafter during the estimation process disallows a particular [*76] claim or estimates the claim at $ 0, does this by definition constitute a "liquidation" of the particular claim? "Courts that have addressed this issue have developed two general approaches, giving the exception a broader or narrower scope depending on the meaning they attribute to "liquidation or estimation" as provided for in 28 U.S.C. § 157(b)(2)(B). See In re UAL Corp., 310 B.R. 373, 379-83 (Bankr. N.D. Ill. 2004) (describing the two approaches adopted by courts on this issue).

On one hand, courts interpreting the § 157(b)(2)(B) exception broadly "start with the proposition that *any disallowance* of a personal injury claim is a liquidation." Id. at 379 (emphasis added). For example, in In re Schepps Food Stores, Inc., 169 B.R. 374, 377 (Bankr. S.D. Tex. 1994), the Bankruptcy Court for the Southern District of Texas held the § 157(b)(2)(B) personal injury exclusion prevented the court from disallowing a claim based on a state statute of limitations defense "because to do so would effectively liquidate the claim for purposes of distribution." Moreover, in In re UNR Industries, Inc., 74 B.R. 146, 148(D.N.D. Ill. 1987), [*77] the United States District Court for the Northern District of Illinois held that the

bankruptcy court could not decide a summary judgment motion with respect to a creditor's claim against the bankruptcy estate because a resolution against the creditor could serve to finally adjudicate the creditor's claim on the merits for purposes of distribution. In so holding, the district court stated as follows:

> UNR [the debtor] repeatedly assures the court it seeks to disallow the Martin claim only to confirm a plan. However, despite UNR's stated intention, the motion itself directly impacts Martin's personal injury claim. An absolute defense will be tested against Martin's claim. If a court grants UNR summary judgment, Martin's claim will be disallowed and he will be denied a distribution from the estate. That final judgment would be a far cry from merely estimating the value of an asserted claim in order to produce a workable reorganization plan. True, a decision also will help UNR confirm a plan by assessing the viability of UNR's defense. However, UNR cannot limit a decision's scope by fiat. Rather, the judgment will have the dual effect of helping to confirm a plan *and* binding [*78] UNR and Martin for the purposes of distribution. Otherwise, the decision would be a purely advisory opinion on the merits of the contract specification defense.

[74 B.R. at 148 (emphasis in original)].

In contrast to this broad view of the personal injury exception, courts interpreting the exclusion narrowly hold the phrase "liquidation or estimation" as involving only a determination of the amount of a claim, and not a determination of the legal validity or enforceability of the claim. See In re UAL Corp., 310 B.R. at 379; In re Dow Corning Corp., 215 B.R at 356 ("[A] liquidated debt is one that 'has been made certain as to amount due by agreement of the parties or by operation of law' and that 'the concept of a liquidated debt relates to the amount of liability, not the existence of liability'") (quoting United States v. Verdunn, 89 F.3d 799, 802 (11th Cir. 1996)). Courts utilizing this narrow interpretation, then, adhere to a subtle distinction and hold that [HN25]a claim is liquidated when its value is capable of ready ascertainment, irrespective of whether the validity of the claim is in dispute. 215 B.R. at 359. [*79] For example, in In re Standard Insulations, Inc.,

the United States Bankruptcy Court for the Western District of Missouri held it had jurisdiction to conduct a threshold inquiry on the limited issue of whether personal injury claimants had allowable claims as a matter of law, so long as the court stopped short of liquidating the claims it deemed allowable. 138 B.R. at 950-51.

In reaching this conclusion, the court in In re Standard Insulations, Inc., stated as follows: "from the plain language of § 157, the bankruptcy court's jurisdiction to reduce a personal injury claim to a dollar value is limited, but it does not appear that § 157(b)(2)(B) is intended to limit the authority to determine the validity of claims against the estate." Id. at 954. Therefore, if a particular claim is not allowed as a matter of law, then there is no need for it to be liquidated or estimated. Id. (citing In re Chateaugay Corp., 111 B.R. 67, 75 (Bankr. S.D.N.Y. 1990), aff'd, 130 B.R. 403 (S.D.N.Y. 1991)). The court in In re Chateaugay Corp., summarized the narrow reading of the § 157(b)(2)(B) exclusionary clause in this manner: [*80] [HN26]Section 157(b)(2)(B)'s conferring of jurisdiction over proceedings involving the allowance or disallowance of claims to the bankruptcy courts can be read in harmony with the Code's coextensive proscription against a bankruptcy court's liquidation or estimation of personal injury tort or wrongful death claims. Although § 157(b)(2)(B) restricts a bankruptcy court's power to liquidate or estimate personal injury tort or wrongful death claims for purposes of distribution, it imposes no corollary restriction upon a bankruptcy court's ability to *disallow* such claims in the first instance if they are not sustainable at law. Allowing or disallowing claims is clearly a separate and distinct function from liquidating or estimating that claim. Had Congress meant to deny any jurisdiction whatsoever to the bankruptcy court to disallow claims based on the mantra of personal injury tort or wrongful death, it could have said so; but it did not . . . .

> Simply because the underlying basis of the claim at issue sounds in personal injury tort or wrongful death does *not* deprive the bankruptcy courts of jurisdiction to make an initial determination on issues that are only tangentially related [*81] to the actual physical event causing the personal injury tort or wrongful death aspect of the claim.

[111 B.R. at 73-74, 75-76 (emphases in

original)].

After reviewing the divergent approaches to the § 157(b)(2)(B) exclusionary clause, this Court believes the narrow reading is most appropriate to adopt in this matter. The narrower interpretation of the personal injury exclusion "advances the efficient resolution of claims and avoids placing unnecessary burdens on the district court." In re UAL Corp., 310 B.R. at 381. Having the bankruptcy court determine the validity of a claim as a matter of law during the allowance phase will prevent the district court from being inundated with hundreds, if not thousands, of additional motions and jury trials. Id. at 381 (quoting In re Schepps Food Stores, Inc., 169 B.R. at 378 n.5). "The toll of such a backlog on the district court[], the litigants, and the timely administration of bankruptcy cases is not a pleasant thought," especially in a case involving mass tort personal injury claims. In re Schepps Food Stores, Inc., 169 B.R. at 378 n.5.

Second, [*82] interpreting the personal injury exclusion narrowly -- thus removing from bankruptcy court jurisdiction disputes over the valuation of claims against the estate but not disputes over their legal validity -- is consistent with other related jurisdictional provisions contained within title 28. In re UAL Corp., 310 B.R. at 381. 28 U.S.C. § 157(b)(5) explicitly provides for and requires "that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending . . . . " 28 U.S.C. § 157(b)(5) (West 2004). [HN27]Section 157(b)(5) guarantees that when a personal injury or wrongful death claimant is entitled to a jury trial, the trial will be conducted by the district court. In re Dow Corning Corp., 215 B.R. at 360. Further, and as previously noted, 28 U.S.C. § 1411(a) provides that title 11 does "not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim." 28 U.S.C. § 1411(a) (West 2004). n34

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n34 As an additional justification for adopting the more narrow approach to the § 157(b)(2)(B) exclusion, nothing in the legislative history indicates that the personal injury jurisdictional provisions "were intended to limit bankruptcy court jurisdiction over personal injury claims beyond removing the trial of those claims to the district court." In re UAL Corp., 310

B.R. at 382.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*83]

Far from being an academic digression, the competing estimation motions require this Court to synthesize § 502(c), § 157(b)(2)(B), § 157(b)(5), and § 1411(a). For the following reasons, this Court disagrees with G-I Holdings's conclusion that § 157(b)(2)(B) deprives asbestos claimants of jury trial rights because this section is contained within Chapter 6 of title 28 of the United States Code, and not Chapter 87 of title 28. Rather, these admittedly complex provisions can be harmonized without offending the guarantees of jury trial contained within the Seventh Amendment to the United States Constitution and § 1411(a).

Section 502(c) of the Bankruptcy Code serves as the catalyst for the estimation process by mandating estimation for purposes of allowance when liquidating any contingent claims would unduly delay the administration of the case. See 11 U.S.C. § 502(c) (West 2004). The § 157(b)(2)(B) personal injury exclusion prevents a bankruptcy court from addressing only certain aspects of the claims allowance process, namely, fixing the value of a claim for purposes of distribution. It does not limit a bankruptcy court's ability [*84] to address substantive issues regarding the validity of claims against the estate as a matter of law. Thus, as the court recognized in In re Dow Corning Corp., [HN28]"the sole intent of the exclusionary clause is to protect a personal injury claimant's right to trial if that right is shown to exist." 215 B.R. at 360. Significantly, then, should G-I Holdings challenge the legal validity of any claim or class of claims during the estimation proceeding, which this Court will decide, any such claims challenge may constitute a core proceeding or possibly a non-core related to proceeding under 28 U.S.C. § 157(c)(1) to the extent that the object on would result in the disallowance of any particular claim. See In re Combustion Eng'g, Inc., 391 F.3d at 226 [HN29]("The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy* . . . . An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) [*85] and which in any way impacts upon

the handling and administration of the bankrupt estate") (quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original). See also In re UAL Corp., 310 B.R. at 383 (noting that even if a claim objection challenging the legal validity of a personal injury claim were not within the core jurisdiction of a bankruptcy court, a bankruptcy court "would nevertheless have non-core jurisdiction to consider the objection under § 157(c)(1), based on the objection being 'related to' the debtors' bankruptcy cases"). In such a case, this Court would hear the claims objection in the first instance and then submit proposed findings of fact and conclusions of law to the District Court for the District Court to review *de novo* and enter a final order. See 28 U.S.C. § 157(c)(1) (West 2004) (providing that in a non-core proceeding, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions [*86] and after reviewing de novo those matters to which any party has timely and specifically objected). [HN30]While 28 U.S.C. § 157(b)(5) requires the district court to order personal injury tort and wrongful death claims to be tried in that court, § 157(b)(5) does not affect pretrial proceedings. In re UAL Corp., 310 B.R. at 383; 28 U.S.C. § 157(b)(5) (West 2004). Consequently, this Court has jurisdiction to determine any claims objections that G-I Holdings may assert during the course of the estimation proceedings. The only question at that time would be whether this Court could enter a final order or propose findings of fact and conclusions of law to the District Court.

Further, if a bankruptcy court determines that a personal injury tort or wrongful death claim is allowable as a matter of law, § 157(b)(2)(B) prevents the bankruptcy court from valuing the claim. At this juncture, § 157(b)(5) and § 1411 (a) direct where such a valuation is to take place and by what procedure -- a jury trial in the district court. In re Dow Corning Corp., 215 B.R. at 360 [HN31]("If a personal injury claimant is entitled to the enumerated [*87] form of process -- a trial -- then [§ 157(b)(5) and § 1411(a)] specify where that process is to take place -- the district court"). "Of course, neither § 1411(a) nor § 157(b)(5) means that a personal injury claim must be tried." Id. For example, the summary judgment process "will serve to weed out those claims which do not prevent a genuine issue of material fact, and for which the debtor is entitled to judgment as a matter of law." Id. By placing this

responsibility with the bankruptcy court in the first instance, the debtor will be able to dispense with those claims that it believes are meritless in a somewhat expeditious fashion, which in turn will lessen the financial burden upon the debtor and prevent G-I Holdings from experiencing what it describes as the "law of large numbers" and "bundling."

G-I Holdings's interpretation that § 157(b)(2)(B) can prevent a personal injury tort claimant from having a jury trial appears irreconcilable against § 157(b)(5) which affirmatively acknowledges that any jury trial must be adjudicated by the district court. Section 157(b)(5) was enacted at the same time as § 157(b)(2)(B), and it is doubtful that Congress would enact such [*88] conflicting provisions -- one intended to deprive asbestos-related personal injury claimants of jury trials during an estimation process for purposes of distribution, and one specially recognizing the possibility of a jury trial for a personal injury tort or wrongful death claim. Section 157(b)(5) "unequivocally states that the forum for *trying* a personal injury tort or wrongful death claim is limited to the district court." In re Chateaugay Corp., 111 B.R. at 76 (emphasis in original). On the other hand, "there is no such proscription for summarily disposing of claims which have no basis in law, for instance, pursuant to 12(b)(6) or 56 of the Federal Rules of Civil Procedure . . . where a trial would not be necessary." Id. Therefore, a finding that a particular claim is subject to disallowance as a matter of law "is not tantamount to a determination on the merits of the personal injury tort or wrongful death claim." Id. To the contrary, however, "a threshold finding that the claim is sustainable as a matter of law leaves it open for trial elsewhere for 'liquidation or estimation' for purposes of distribution." Id. at 76-77. As previously [*89] noted, depending upon the nature of the claim objection filed by G-I Holdings in the future, such an objection could fall within the ambit of this Court's core jurisdiction; but at the very least, even if not a core proceeding, this Court would still properly have jurisdiction over the objection as a non-core matter related to the bankruptcy case. In re UAL Corp., 310 B.R. at 383.

Based upon this Court's conclusions that the asbestos claimants have not been deprived of their constitutional or statutory rights, or both, to jury trial, this Court will exercise its discretion and not approve the Matrix and the Claims Liquidation Procedures proposed by G-I Holdings based upon their failure to provide the asbestos claimants with this significant right.

Moreover, in addition to the absence of a provision providing for jury trial rights, other justifications exist for disapproving of the Matrix and the Claims Liquidation Procedures.

**B. Procedural Deficiencies Inherent In The Matrix And The Claims Liquidation Procedures Proposed By G-I Holdings**

**i. The Claims Liquidation Committee**

Section 2.1 of the Claims Liquidation Procedures provides that the "Claims Liquidation [*90] Committee" "shall be appointed by G-I Holdings and approved by the Bankruptcy Court." While the Code is silent as to the manner in which unliquidated or contingent claims should be estimated, G-I Holdings has not cited any persuasive authority permitting a bankruptcy court to delegate this authority to a non-judicial entity. n35 To the extent G-I Holdings advocates a process to actually liquidate, rather than estimate, its asbestos liability, as previously noted such a process would constitute a non-core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). In such cases, [HN32]congressional intent is clear "*the bankruptcy judge* shall submit proposed findings of fact and conclusions of law to the district court," and any final judgment or order shall emanate from the district court judge "after considering *the bankruptcy judge's* proposed findings and conclusions" under de novo review. See § 28 U.S.C. § 157(c)(1)(West 2004) (emphases added). Thus, it is within the sole province of the bankruptcy court to submit proposed findings of fact and conclusions of law to the district court.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n35 In fact, Federal Rule of Bankruptcy Procedure 9031 explicitly precludes the bankruptcy court from appointing special masters in cases and proceedings under title 11. See Fed. R. Bankr. P. 9031 (West 2004) ("Rule 53 F.R. Civ.P does not apply in cases under the Code").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*91]

Even if, assuming *arguendo,* the bankruptcy court has the ability to create such a committee and then delegate significant responsibility to this non-judicial entity pre-confirmation, any conclusions reached by this body

would still be subject to de novo review by the district court in accordance with 28 U.S.C. § 157(c). However, the Claims Liquidation Procedures proposed by G-I Holdings offend this jurisdictional process in two ways. First, Section 5.5 of the Claims Liquidation Procedures explicitly states that any decision by the CLC with respect to a particular claimant's allowed amount "shall not be overturned unless" the Article III court determines the CLC's decision was "arbitrary or capricious." Simply put, this Court cannot approve an estimation or liquidation procedure that displaces a standard of review established by Congress. Second, and equally troubling, is that Section 5.5 of the Claims Liquidation Procedures only permits two discrete conclusions of the CLC to be objected to and reviewed; namely, (1) a finding of disallowance based on the failure to satisfy medical criteria and (2) the Scheduled Disease category assigned to a pretrial claimant. [*92]

G-I Holdings apparently recognizes the foregoing deficiencies because its stance on the process creating the CLC shifted from its initial application to its reply brief. In the "Application of G-I Holdings Inc. for Order Pursuant to 11 U.S.C. § 502(c) Establishing Method to Liquidate Asbestos Claims," G-I Holdings states as follows: "the Matrix provides for the appointment of a Claims Liquidation Committee ("CLC") comprised of 3 members approved by the Bankruptcy Court after notice and hearing." (*G-I Application,* pg. 6). However, in its reply brief, G-I Holdings submits the CLC is appointed not by the bankruptcy court, but by the district court. On this issue, G-I Holdings states the following:

In addition, contrary to the Committee's assertions, the Claims Liquidation Committee will not be appointed by G-I [Holdings] or the Bankruptcy Court, but by the District Court who (if reference withdrawal is denied) will review the Bankruptcy Court's decision de novo or treat it as proposed findings of fact or conclusions of law. While G-I [Holdings] proposes the candidates, the District Court determines who can serve. Contrary to the Committee's assertions, [*93] the District Court has the ability to appoint a committee, special master or other entity to assist in the liquidation of asbestos claims.

[(*G-I Reply Brief,* pg. 12)].

This shift in position highlights the deficiency in the Claims Liquidation Procedures and underscores this Court's inability to appoint a special, non-judicial entity for liquidating asbestos-related personal injury and wrongful death claims prior to confirmation of a plan of reorganization.

## ii. The Limitation For Individuals "Occupationally Exposed To GAF Asbestos Products"

As counsel for the Committee noted during the hearing on the motions to establish the procedures for estimation, Section 3.l(a) of the Claims Liquidation Procedures limits allowed claims to claimants who were "occupationally" exposed to GAF Asbestos Products (or for a spouse or household member of the claimant, secondary to such exposure). This delineation excludes classes of asbestos-related personal injury tort claimants who did not work with asbestos products or lived with individuals who worked with asbestos products, but who were nevertheless exposed to and damaged by GAF Asbestos Products through such means as roof insulation, [*94] floor tiling, or wallboard in their homes. Whether such categories of claimants are entitled to recovery under state products liability law is debatable. Nonetheless, this Court is loath to approve a process that disregards these claimants and arguably prevents future recovery.

## iii Ambiguities Inherent In The Terminology Of The Claims Liquidation Procedures

Several provisions in the Matrix and the Claims Liquidation Procedures are vague and inexact, which could conceivably result in confusion, dispute, abuse, and further delay were these procedures approved by the Court. By way of example, Section 3.1 of the Matrix and the Claims Liquidation Procedures stipulates that in order for an individual to have an allowed claim, the claimant must have been "occupationally" exposed to GAF Asbestos Products over "some period of time" on a "regular basis." However, the procedures fail to define what constitutes a "regular basis" and what time interval satisfies "some period of time." n36 Thus, if an employee worked every other weekend installing asbestos laden insulation for several months, would this employee have a potentially allowable claim under Section 3.1? It is certainly easy to [*95] imagine that such uncertainties can only create additional litigation and engender further delay in the administration of this bankruptcy case.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n36 As the Committee contends, it may be possible for an individual to contract mesothelioma from an incidental exposure to asbestos.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Further, Section 5.2 of the Matrix and the Claims Liquidation Committee
may impose a reasonable filing fee (which may be refundable or non-refundable at the CLC's discretion) to be paid by all Claimants or any subset of Claimants whose claims impose an exceptional cost, such as claims of exposure to GAF Asbestos Products that are inconsistent with the timing and location of claims previously paid or claims whose medical or exposure evidence is from a source that provided invalid or unreliable evidence in claims previously audited by the CLC.

However, Section 5.2 fails to define what a "reasonable" filing fee would be and what would constitute an "exceptional cost." For example, a [*96] "reasonable" filing fee of $2,000 might dissuade a personal injury tort claimant from pursuing legitimate claims against the bankruptcy estate. By way of final example, Section 3.6 of the Claims Liquidation Procedures provides as follows: "nothing in these Claims Procedures shall preclude the [Claims Liquidation Committee] from contracting with a vendor or another asbestos claims resolution organization to provide services to the [Claims Liquidation Committee], so long as decisions about the validity, allowability, and amount of claims are based upon he [sic] provisions of these Claims Procedures." However, the section does not specify what "services" the contemplated asbestos claims resolution organization will provide to the bankruptcy estate, and it is possible that such an organization falls within the parameters of § 327 of the Bankruptcy Code, n37 which would require this Court's prior approval as a condition precedent to G-I Holdings retaining any professional claims resolution organization. The record before the Court is silent on whether such an organization falls under § 327 of the Code. Further, unlike the provision for the establishment of [*97] the Claims Liquidation Committee, Section 3.6 does not afford either this Court or the District Court with sufficient input in the retention of such an organization.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n37 Section 327(a) of the Code states as follows: [HN33]"except as otherwise provided in this section, the trustee, with

the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, *or other professional persons,* that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a) (West 2004) (emphasis added).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## C. The Treatment Of Future Holders Of Asbestos-Related Demands

G-I Holdings has designated Scheduled Disease Category VII as "Non-Malignant II: Without Impairment" and set the Scheduled Allowed Amount at $ 0 for individuals felling within this category. Colloquially referred to as "exposure-only plaintiffs," these individuals demonstrate exposure [*98] to asbestos, but are currently physically unimpaired, as defined by G-I Holdings. In accordance with the Matrix and the Claims Liquidation Procedures, Category VII claimants do not receive currently allowable claim amounts, but are permitted to file subsequent claims showing physical impairment. (*G-I Br.,* pg. 12). That is, "the statute of limitations for claimants falling into this category . . . will be tolled until such time as the claimant develops an impaired non-malignant disease or asbestos-related malignancy." (*G-I Br.,* pgs. 22-23).

Several distinct objections to the treatment of Category VII claimants have been raised by the Committee and the Legal Representative. First, the Committee submits that G-I Holdings's "scheme for tolling the statute of limitations is impractical and unjust." (*Comm. Br.,* pg. 26). The Committee argues that in order to qualify for tolling, Category VII claimants "would be required to file extremely detailed proofs of claim, accompanied by massive documentation about their medical condition, the duration and intensity of their exposure to asbestos, and proof of their exposure to G-I [Holdings's] products. And they would have to do this, [*99] knowing full well that [the] 'Claims Liquidation Committee' would automatically liquidate their claims at zero." (*Comm. Br.,* pg. 26). According to the Committee, "it is utterly unreasonable to expect tens of thousands of claimants to spend several million man-hours and incur massive costs in marshaling all this information when they have absolutely no incentive to

do so. [G-I Holdings's] proposed tolling of the statute of limitations is nothing but an empty gesture." (*Comm. Br.,* pg. 26).

Second, the Committee maintains that without a § 524(g) n38 trust funded in advance to pay future claims, "there will be no entity wife enough resources to ensure future claimants a recovery." (*Comm. Br.,* pg. 26). Without a funded § 524(g) trust to pay future claimants, the Committee opines that "those claims would necessarily be litigated in the tort system -- the very state courts that G-I [Holdings] asserts have yielded plaintiffs outrageously large verdicts." (*Comm. Br.,* pg. 27). Consequently, the Committee views G-I Holdings's "scheme" for paying future claims as an inevitable "return trip to bankruptcy court by a reorganized debtor alleging, as G-I [Holdings] alleged [*100] in its petition, that it has been overwhelmed by the cost of defending asbestos claims in the tort system." (*Comm. Br.,* pg. 27).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n38 [HN34]Section 524(g) of the Bankruptcy Code specifically authorizes "the bankruptcy court to enter a sweeping injunction against any entity taking legal action to collect a claim or demand that is to be paid in whole or in part by a trust created through a qualifying plan of reorganization." 4 Collier on Bankruptcy P 524.07[1] (15th ed. rev. 2003).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Committee summarizes the thrust of its objections to the proposed treatment of future claimants as follows:
Stripped to its essentials, [G-I Holdings's] plan for future asbestos claimants is a scheme for disenfranchising them. By placing enormous burdens and traps for the unwary in their path, G-I [Holdings] hopes that most future claimants will simply drop through the cracks. And those future claimants who surmounted these obstacles would find that there was no entity with enough money to pay [*101] them. Without a credible methodology for dealing with future asbestos claims, [G-I Holdings's] liquidation proposal totally collapses, because no reorganization plan based on that proposal could ever be confirmed as "feasible."

The only practical way to handle future asbestos claims is the procedure that the Committee has proposed to the district court -- estimating those claims by projection from G-I [Holdings's] [overall] claims-resolution history, and funding a § 524(g) trust to pay future claims as they mature. In amending § 524(g) in 1994, Congress intended to address the unique situation faced by asbestos debtors and their creditors, specifically envisioning that the bankruptcy plan would set aside funds to provide for future claimants. Congress sought, in other words, to ensure adequate protection for future asbestos claimants in precisely the circumstances presently before the Court. A § 524(g) trust is the mechanism that Congress designed for this purpose, and it is the only mechanism that could possibly work.

[(*Comm. Br.,* pgs. 27-28)].

By and large, the objections raised by the Legal Representative to the treatment of future claimants echo those [*102] of the Committee. According to the Legal Representative, the imposition of a § 524(g) trust is indispensable to any confirmable plan of reorganization. (*Legal Rep. Br.,* pg. 9). As presented by the Legal Representative, it is only in conjunction with a § 524(g) trust "that the court can reasonably assure that a plan complies with the Bankruptcy Code's confirmation requirements and that the resulting victims' trust is properly funded and structured to pay present and future claimants equally, thus satisfying the § 524(g) requirements and justifying the protections afforded by the channeling injunction." (*Legal Rep. Br.,* Pg- 8).

G-I Holdings sets forth several responses to the objections lodged by the Committee and the Legal Representative. First, G-I Holdings contends that future asbestos-related personal injury liabilities, if any, need not be addressed at this time because it is "not proposing a Chapter 11 plan and is not seeking to bind future claims at this stage of its case through [the] imposition of a permanent injunction." (*G-I Reply Br.,* pg. 21). Second, G-I Holdings suggests that whether a § 524(g) trust is necessary "will depend on the outcome of G-I [Holdings's] [*103] complaint seeking a declaratory judgment that BMCA has no successor liability for G-I [Holdings's] asbestos claims." (*G-I Reply Br.,* pg. 21). n39 According to G-I Holdings, if

the District Court of New Jersey determines that Building Materials Corporation of America has no successor liability, "a § 524(g) injunction will be unnecessary and none of § 524(g)'s other elements will be necessary." n40 (*G-I Reply Br.,* pg. 21). Third, G-I Holdings submits that based upon its interpretation of a decision rendered by the United States Bankruptcy Court for the District of Delaware, Official Committee of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.), 281 B.R. 852 (Bankr. D. Del. 2000), the universe of future demand holders may be greatly contracted, and "it is highly unlikely any legal demands have not already ripened into claims." (*G-I Reply Br.,* pg. 22). The consequence of this, according to G-I Holdings, would be that "all asbestos liability will be dischargeable and a § 524(g) injunction may be unnecessary under this scenario." (*G-I Reply Br.,* pg. 22).

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n39 This successor liability action is currently pending in the District Court of New Jersey. Established in 1994, Building Materials Corporation of America ("BMCA") received substantially all the assets of GAF's roofing products business and expressly assumed $ 204 million of asbestos liability, with G-I Holdings indemnifying BMCA against any additional asbestos liability. Notwithstanding that BMCA claims to have never manufactured any products containing asbestos, the Company has been named as an additional defendant in more than one thousand asbestos bodily injury lawsuits against GAF since September, 2000. The claims filed by asbestos-related personal injury tort claimants against BMCA are premised upon theories of successor liability or alter ego.

[*104]

n40 As a corollary, counsel for G-I Holdings has suggested that if meritless claims are removed from the liquidation or estimation process, a § 524(g) trust will not be needed because the reorganized debtor will have sufficient funds to pay its asbestos liabilities while retaining equity for the shareholders of the Company.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Although G-I Holdings argues that any ruling on the estimation motions is premature with respect to future claimants because it is not proposing a Chapter 11 plan "and is not seeking to bind future claims at this stage of its case through imposition of a permanent injunction," it is clear that G-I Holdings believes the liquidation procedures outlined in the Matrix and the Claims Liquidation Procedures can also be applied to holders of future demands. (*G-I Reply Br.,* pgs. 21-22) ("Whatever method is ordered by the Court to liquidate asbestos claims can also be used to liquidate legal demands (if any), as long as the allowed claim amounts are adjusted for deflation and inflation").

Without question, the treatment of future demand holders for personal injuries due to exposure [*105] to asbestos, assuming they possess valid claims, is a sensitive, but significant issue. However, because the Court is exercising its discretion and rejecting the Matrix and the Claims Liquidation Procedures proposed by G-I Holdings, it need not address the multiple objections raised by the Committee and the Legal Representative at this time. Nevertheless, and as more fully detailed below, the Court will need to address the treatment of future demand holders once a concrete estimation process has been established by the Court.

**D. The Estimation Procedure Proposed By The Committee**

As previously noted, the Committee proposes a procedure to estimate G-I Holdings's asbestos liability on an aggregate basis. More specifically, the Committee's approach would be to estimate the value of present and future asbestos claims and then incorporate a § 524(g) trust into the plan of reorganization with the amounts necessary to pay such claims. (*Comm. Br.,* pgs. 8-9). Further, the Committee contends that any estimation procedure approved by the Court should be premised "on projections from [G-I Holdings's] overall claims-resolution history" rather than a discrete period of time as espoused [*106] by G-I Holdings.

In a supplemental submission to the Court, the Committee has refined its approach to the estimation procedure it has proposed. The Committee currently advocates for an estimation process "structured for the limited purpose of testing [G-I Holdings's] solvency."

*(Supplemental Submission of the Official Committee of Asbestos Claimants in Opposition to the Debtor's Bar Date and Estimation Motions,* pg. 21) (hereinafter *"Comm. Supp. Br"*). The first step in the Committee's proposed estimation procedure would be for the Court to "take into account only the gravest asbestos injuries, *i.e.,* mesothelioma and lung cancer." (*Comm. Supp. Br.,* pg. 21). This method would "focus on the approximately 14,500 cases already pending against [G-I Holdings] on behalf of persons who suffer from mesothelioma and lung cancer, rather than the more than 275,000 claims that would be filed under a general bar date." (*Comm. Supp. Br.,* pgs. 21 -22). Proceeding in this manner, according to the Committee, is an expeditious way to test G-I Holdings's solvency, and if the most grievous present claims render the Company insolvent, long and protracted proceedings with respect to **[\*107]** the future demand holders can be avoided.

The Committee summarizes its procedure as follows:
In such a solvency proceeding, the Committee would present expert testimony valuing the pending claims for those malignant conditions and forecasting and valuing future claims of the same kind. The valuations and forecasts would be based on the Debtor's own claims database. A sensible discovery plan would permit all sides to develop the relevant issues. The Committee's experts, and any witnesses proffered by other parties in interest, would be subject to discovery depositions and cross-examination in live testimony before the Court. The hearing would likely consume no more than two days of Court time after a period of 90 to 120 days for the parties' preparation.

> This proposal accommodates most of the concerns that underlie [G-I Holdings's] ill-conceived liquidation-by-matrix proposal, while considerably narrowing the issues. As only mesothelioma and lung cancer claims would be taken into account, the so-called "unimpaired claims" that [G-I Holdings's] program is dedicated to weeding out would not need to be addressed. Nor would there be any need for the Court to wade into **[\*108]** the medical and scientific issues posed by [G-I Holdings's] allowance criteria purporting to disqualify claims for other kinds of cancer .
> . . .

> The streamlined estimation procedure we urge would be free of all the legal and practical defects that bedevil the Debtor's proposal. Because our proposal would be designed solely to test the Debtor's solvency, not to determine actual distributions to individual claimants, it would not violate anyone's jury-trial or due-process rights. Because our proposal would be based on real-world settlements and judgments, it would comport with the requirement that state law govern the valuation of tort claims in bankruptcy. Indeed, under our estimation proposal, the Court would not have to resolve *any* of the troublesome issues [such as whether claims for nonmalignant asbestosis or pleural disease may properly be "estimated" at zero dollars]. If [G-I Holdings] is insolvent based on mesothelioma and lung cancer claims alone, it has no legitimate stake in litigating those questions. The bankruptcy would be resolved by a creditors' plan of reorganization, in keeping with the essential purpose of Chapter 11.

> [(*Comm. Supp. Br.,* pg. **[\*109]** 21-22) (emphasis in original)].

This Court agrees that the estimation proceeding pursuant to § 502(c) of the Code should estimate the asbestos liability of G-I Holdings in the aggregate. n41 However, the estimation proceeding envisioned by the Court, and as more fully described below, will not be to simply "test" the solvency of G-I Holdings. G-I Holdings should be afforded an opportunity to review the claims against the estate and object to those claims that it believes are illegitimate or dispensable as a matter of law. Further, the Court rejects the argument set forth by the Legal Representative to mandate the imposition of a § 524(g) trust at this time. At this stage in the case, the Court will not force G-I Holdings to implement a § 524(g) trust in its plan of reorganization when it has sufficient reason to believe that it can effectively reorganize without such a remedy, particularly if, as the Company suggests, it proves successful in the successor liability action pending in the District Court. Therefore, in its present incarnation, the Committee's estimation motion is also rejected insofar as it seeks the mandatory imposition of a § 524(g) trust to be incorporated **[\*110]** into any plan of reorganization. This conclusion finally leads the Court to describe the type of estimation proceeding which should be established in this case.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n41 During oral arguments on November 24, 2004 and December 9, 2004, counsel for G-I Holdings recognized the possibility the Court would order that the estimation of asbestos liability proceed in the aggregate. If so, counsel for G-I Holdings reserved its right "to provide the Court [with] a pleading to that effect." (*Transcript of Hearing dated December 9, 2004,* page 48, lines 2-3). Further, counsel for G-I Holdings requested that the Court not rule "on the merits of the actual method this Court will use to estimate aggregate liability by preventing us from putting the facts in front of you." (*Transcript of Hearing dated December 9, 2004,* page 49, lines 22-25). The Court will honor G-I Holdings's counsel's request and permit G-I Holdings, along with the Committee and the Legal Representative, to submit pleadings with respect to the methodology it believes the Court should utilize in estimating its asbestos liability in the aggregate.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*111]

### E. The Estimation Proceeding Envisioned By The Court

Before turning to the estimation procedures which this Court believes are most appropriate, it is significant to highlight the incredible tension and dilemma plaguing bankruptcy courts in mass-tort, asbestos-related bankruptcy cases such as this one. With only a finite amount of money available to pay claims, the competition for payment from the assets of the bankruptcy estate is more than an academic question. In re USG Corp., 290 B.R. 223, 224 (Bankr. D. Del. 2003). On one hand, thousands of innocent individuals may have been legitimately harmed by the products manufactured by the Company's predecessors, and these individuals should at the very least be afforded the opportunity to seek compensation for their damages. On the other hand is the real possibility that a once viable company will become extinct (with its own attendant repercussions such as loss of jobs, loss of

business for third-party suppliers, and loss of shareholder equity) based upon the insurmountable personal injury claims facing the estate.

As a result, perhaps quite expectably, the proper mode of valuing a debtor's asbestos liability [*112] "reveals a fundamental, perhaps *the* fundamental divide between" the relevant constituencies. Id. (emphasis in original). Given this dynamic, a court endeavors to provide a "framework within which the parties can litigate those differences to a court-imposed result or compromise them based upon the parties' expectation of a predictable outcome." Id. at 225. In situations where liabilities exceed the assets of a bankruptcy estate, a court will "assist the parties in apportioning the remaining assets among the legitimate claimants." Id. As G-I Holdings argues, and as this Court agrees, if a debtor maintains that a portion of its creditors "are not legitimate and that, properly analyzed, claims against it do not exceed its assets, the Court must assist as well." Id. Therefore, while a court will protect those who have been truly harmed, a bankruptcy court should also, "within the constraints of the law, reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation." Id. At the same time, however, a court should also provide for the expeditious and efficient administration of a bankruptcy case, and permit legitimate asbestos-related [*113] personal injury tort claimants to receive compensation sooner rather than later.

Approving the Matrix and the Claims Liquidation Procedures would not, in this Court's view, successfully balance the parties' competing interests. If history is any indication, a decision approving the Matrix and the Claims Liquidation Procedures (irrespective of the other problems discussed earlier) would immediately be appealed by the Committee and the Legal Representative, which in turn would engender further litigation and delay. Even if G-I Holdings's proposed estimation procedures are approved on appeal, it would unquestionably take several more years before the proposed CLC could be fully functional and prepared to review claims. Once operational, the extensive individual claims review process espoused by G-I Holdings would consume several more years to carry out, and as the Committee notes, still may not result in a confirmable plan of reorganization. It is hard to imagine how such extensive, additional delay could benefit either the asbestos-related personal injury claimants or the Company.

Deciding to conduct the estimation proceeding in the aggregate still does not resolve every difficult [*114] issue. n42 Simply put, several approaches can be adopted to estimate the Company's asbestos liability in the aggregate; namely: 1) estimate in the first instance only present mesothelioma and lung cancer claimants; 2) estimate all present asbestos claimants first, leaving future demand holders for a subsequent estimation hearing; or 3) estimate all present and future asbestos claimants in one proceeding. In adopting one approach, a Court must choose what it believes to be the best course, balancing all competing interests. G-I Holdings believes that the legitimate asbestos claims should approximate several hundred million dollars, thus leaving sufficient equity for the Company's shareholders. In contrast, the Committee claims the present mesothelioma and lung cancer claimants, by themselves, would most probably render the Company insolvent.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

N42 Once the precise estimation procedure and methodology are determined, and prior to the estimation hearing, the Court may need to resolve two additional issues, if necessary: 1) whether G-I Holdings can place a statutory cap on damages under § 502(c) of the Code; and 2) whether the estimation of claims should be based upon G-I Holdings's overall claims-resolution history, as the Committee submits, or whether it is possible to estimate claims based upon the average value of federal tort claims asserted against GAF settled or tried from 1997 through 1999 (inflated to present dollars), as G-I Holdings contends. The second issue has been extensively briefed by the parties and has also been addressed by the parties' respective experts. As previously indicated, the Committee objects to the utilization of claim amounts based upon the average value of federal tort claims settled or tried by GAF from 1997 through 1999. They submit that G-I Holdings is improperly attempting to "*federalize* the liquidation of asbestos claims in bankruptcy, replacing substantive state tort law with federal common law as the rule of decision." (*Comm. Br.,* pg. 18)(emphasis in original).

As stated, G-I Holdings maintains that adopting figures from federal cases is appropriate because "the federal system prevents bundling." (*G-I Reply Br.,* pg. 28). Further, G-I Holdings avers that "while the parties agree state substantive law governs allowability of asbestos claims," the parties "differ on what state substantive law includes." (*G-I Sur-reply Br.,* pg. 11). In this regard, G-I Holdings states the following: "[the parties] agree state substantive law provides the elements of a cause of action or a claim under state law. G-I [Holdings] submits that is the totality of the applicability of state law in the claims allowance process under title 11. Conversely, the Committee and the Legal Representative contend all of the procedural and negotiating dynamics that bear on settlements outside bankruptcy must be replicated in bankruptcy. Indeed, they could not otherwise use non-bankruptcy settlement amounts absent that premise. In short, the Committee is wrong for at least two independent reasons. First the Committee's position violates the United States Supreme Court's seminal holding in <u>Erie Railroad Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938)</u> and its progeny. Namely, federal courts applying state substantive law must apply federal procedural law even when the federal procedural law yields different results than state procedural law. Second, the Committee's position is at odds with logic and common sense because it effectively overrides the benefits conferred by the bankruptcy power allowing courts to estimate claims for distribution purposes. G-I [Holdings] has previously explained the arithmetic of mass torts, which G-I [Holdings] calls the Law of Large Numbers, In brief, if a defendant is served with 1000 complaints alleging damage from asbestos, the defendant may believe 990 complaints should be dismissed for reasons such as plaintiff was not exposed to defendant's products or plaintiff has no injury, etc. If, however, the cost of taking discovery and moving to dismiss is $ 20,000 per complaint, the defense cost would be $ 20 million ($ 20,000 x 1,000).

Therefore, if plaintiffs offer to settle for $ 12,000 per complaint or $ 12 million, defendant has an economic motivation to pay the money even if most plaintiffs lack meritorious claims. Enter estimation. If each claimant must submit proof of exposure to G-I [Holdings's] products and the process for determining which claims are allowable costs a few dollars per claim (or even $ 1,000 to, say, $ 7,000 per claim), G-I [Holdings's] estate would not settle for $ 12,000 per complaint. The Committee, however, maintains G-I [Holdings's] estate must allow claims in accordance with pre-bankruptcy economics and thereby contends post-bankruptcy economics and efficiencies of estimation must be ignored." (*G-I Sur-reply Br.,* pgs. 11-12). Because the Court is rejecting the Matrix and the Claims Liquidation Procedures as proposed by G-I Holdings, these issues need not be decided by the Court at this time. However, to the extent G-I Holdings renews these arguments once the precise estimation procedure is selected and approved by the Court, then the Court will decide these issues at that appropriate time.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*115]

In attempting to balance these competing interests, this Court will order that the estimation proceed in the aggregate as to all present asbestos claimants, leaving aside future demand holders for a second estimation hearing, as necessary. Thus, and as will be more specifically determined at a future hearing to be scheduled, discovery may be exchanged between G-I Holdings and the Committee's constituency. More specifically, the estimation hearing with respect to all present claimants will proceed in at least two phases. n43 The first phase of the estimation proceeding will estimate in the aggregate all of G-I Holdings's asbestos liability solely with respect to claimants suffering from mesothelioma and lung cancer. G-I Holdings will be afforded the opportunity to object to claims. After this first phase, the estimation hearing will proceed to the second phase which would estimate all remaining present claimants in the aggregate. After this second phase, the Court would order a subsequent hearing to estimate in the aggregate holders of future demands.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n43 Determinations such as the: 1) parameters of discovery; 2) medical methodology to be utilized; 3) classification of medical impairments; 4) proof of claim forms; 5) use of expert testimony; 6) deadlines for the completion of discovery; 7) manner in which objections to claims will be presented; and 8) standard for deriving allowed claim amounts will be made at a future hearing.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*116]

In deciding to proceed in this manner, the Court is persuaded by the rationale expressed by the Bankruptcy Court for the District of Delaware in In re USG Corp., 290 B.R. 223 (Bankr. D. Del. 2003), Wolin, U.S.D.J.) That is, if G-I Holdings is rendered insolvent by the present cancer claimants alone, "existing equity will get nothing under any plan of reorganization." Id. at 226. Under this scenario, G-I Holdings "will have no stake, and presumably no interest in pressing for the elimination of the majority of the claims" it argues are meritless. Id. This would prevent hard-fought, expensive litigation over the proper treatment of non-malignant claimants and future demand holders. Accordingly, "it is far more practical to estimate the universe of cancer claimants by themselves [initially] than to undergo a merit-based estimation of all of the tort claimants." Id.

As the court in In re USG Corp., noted:
Unlike for many of the so-called "unimpaired," pathology reports or autopsy reports will exist to substantiate the harm suffered by the cancer claimants. Doctors' reports will usually be from treating physicians, not from persons [*117] engaged in mass screenings, a practice found so objectionable by the debtors. By focusing on those claimants who have indisputably been damaged, the Court need not, at this juncture of the case, delve into the troubled and occasionally metaphysical controversy of the so-called "unimpaired" class of claimants.

[Id. at 226-27].

Agreeing with this rationale, in the first stage the Court

will estimate in the aggregate only present mesothelioma and lung cancer claimants. However, in an effort to expedite this reorganization process and provide swifter compensation to those claimants legitimately impaired due to asbestos exposure, discovery should continue between the parties with respect to non-malignant present claimants. During the first stage G-I Holdings will be permitted to present any relevant defenses and can attack any medical evidence submitted by the Committee in the estimation proceeding. Moreover, G-I Holdings will be permitted to move for summary judgment on certain issues on a claims-wide consolidated basis pursuant to Federal Rule of Bankruptcy Procedure 7042. See Fed. R. Bankr. P. 7042 [*118] (West 2004). n44 As already indicated, the Court shall schedule a hearing date in the near future for the parties to address the mechanics of estimating G-I Holdings's asbestos liability in the aggregate pursuant to § 502(c) of the Code.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n44 Federal Rule of Bankruptcy Procedure 7042 incorporates Rule 42 of the Federal Rules of Civil Procedure which provides in relevant part as follows: "when actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Fed. R. Civ. P. 42(a) (West 2004).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## IV. Conclusion

Based upon the foregoing, the estimation motion submitted by G-I Holdings advocating its Matrix and Claims Liquidation Procedures is [*119] hereby denied. The estimation motion filed by the Committee is also denied insofar as it seeks the imposition of a mandatory trust under § 524(g) of the Bankruptcy Code. A hearing shall be conducted estimating G-I Holdings's asbestos liability in the aggregate in accordance with this Opinion.

An Order shall be submitted in accordance with this Opinion.

ROSEMARY GAMBARDELLA, CHIEF JUDGE

UNITED STATES BANKRUPTCY COURT

Dated: February 1, 2005