IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re: Federal Mogul Global, Inc., *et al.*,

      Debtors.

(Bankruptcy Case No. 01-10578)(RTL)

---

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF<br>ASBESTOS CLAIMANTS and<br>ERIC D. GREEN, as the<br>LEGAL REPRESENTATIVE FOR<br>FUTURE ASBESTOS CLAIMANTS,<br><br>    Plaintiffs,<br><br>            v.<br><br>ASBESTOS PROPERTY<br>DAMAGE COMMITTEE,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 05-59 JHR |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS TO THE OFFICIAL COMMITTEE OF
ASBESTOS PROPERTY DAMAGE CLAIMANTS' MOTION TO EXCLUDE
<u>PORTIONS OF EXPERT TESTIMONY OF MARK PETERSON</u>**

CAMPBELL & LEVINE, LLC
Marla R. Eskin (No. 2989)
Kathleen J. Campbell (No. 4229)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 426-1900
Facsimile: (302) 426-9947

Attorneys for Official Committee of
Asbestos Claimants

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, New York 10022
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

-and-

CAPLIN & DRYSDALE, CHARTERED
Walter B. Slocombe
Nathan D. Finch
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................4

I.     A DAUBERT INQUIRY IS NOT WARRANTED HERE. ................................................4

II.    EVEN IF DAUBERT APPLIES, DR. PETERSON'S TESTIMONY
       EASILY MEETS ITS STANDARDS. ..........................................................................6

       A.    The TDP Values Dr. Peterson Relies on in His Expert Report
            Are Derived From T&N's Own Claims Resolution History. ...............................10

       B.    Dr. Peterson's Assessment of the Impact of the Tweedale Book is
            Consistent with His Widely Accepted and Daubert-Compliant Methodology. ......14

CONCLUSION.....................................................................................................................17

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

Allison v. McGhan,
   184 F.3d 1300 (11th Cir. 1999)..................................................................... 17

Coleman v. Dydula,
   139 F. Supp.2d 388 (W.D.N.Y. 2001) ........................................................ 17

Cummings v. Standard Register Co.,
   265 F.3d 56 (1st Cir. 2001)........................................................................... 17

Daubert v. Merrell Dow Pharm., Inc.,
   509 U.S. 579 (1993)................................................................................ passim

Elcock v. Kmart Corp.,
   233 F.3d 734 (3d Cir. 2000) ....................................................................... 7, 9

Groobert v. President & Dirs. of Georgetown Coll.,
   219 F. Supp.2d 1 (D.D.C. 2002) ..................................................................... 3

Huddell v. Levin,
   537 F.2d 726 (3rd Cir. 1976) ....................................................................... 15

In re Armstrong World Indus., Inc.,
   Case No. 00-4471 (RJN) (Bankr. D. Del. Dec. 19, 2003) ....................... 1, 5

In re Babcock & Wilcox Co.,
   Case No. 00-10992 (Bankr. E.D. La. Oct. 8, 2004)........................... 1, 5, 12

In re Dow Corning Corp.,
   237 B.R. 364 (Bankr. E.D. Mich. 1999) ..................................................... 16

In re Eagle-Picher Indus., Inc.,
   189 B.R. 681 (Bankr. S.D. Ohio 1995)................................................. passim

In re Linerboard Antitrust Litig.,
   203 F.R.D. 197 n.13 (E.D. Pa. 2001) ............................................................ 6

In re National Gypsum Co.,
   257 B.R. 184 (Bankr. N.D. Tex. 2000)....................................................... 1, 5

In re Western MacArthur Co.,
   No. 02-46284-T (Bankr. N.D. Cal. Feb. 3, 2004)....................................... 13

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999)................................................................................................. passim

Maiz v. Virani,
    253 F.3d 641 (11th Cir. 2001) ...................................................................... 17

Nemmers v. United States,
    681 F. Supp. 567 (C.D. Ill. 1988) ................................................................ 14

Oddi v. Ford Motor Co.,
    234 F.3d 136 (3d Cir. 2000) ........................................................................ 16

Recreational Dev. of Phoenix, Inc. v. City of Phoenix,
    220 F. Supp. 2d 1054 (D. Ariz. 2002),
    aff'd 2003 WL 22383511 (9th Cir. Oct 17, 2003)....................................... 8

Skidmore v. Precision Printing & Packaging, Inc.,
    188 F.3d 606 (5th Cir. 1999) ........................................................................ 6

United States v. L.E. Cooke Co., Inc.,
    991 F.2d 336 (6th Cir. 1993) ...................................................................... 17

Voilas v. General Motors Corp.,
    73 F. Supp.2d 452 (D.N.J. 1999).................................................................. 3

Walker v. Yellow Freight Sys., Inc.,
    No. Civ.A. 98-3565, 1999 WL 757022, at *1
    (E.D. La. Sept. 24, 1999). ............................................................................ 3

## Other Authorities

Fredrick D. Dunbar, Denise N. Martin & Phoebus J. Dhrymes,
    Estimating Future Claims: Case Studies from Mass Tort and Product Liability,
    at 1 (Andrews Professional Books 1996).................................................... 9

Geoffrey Tweedale,
    Magic Mineral to Killer Dust: Turner & Newall and the Asbestos Hazard
    (Oxford University Press 2000; paperback published in 2001)................. 4

William J. Nicholson, George Perkel & Irving J. Selikoff,
    Occupational Exposure to Asbestos: Population at Risk and Projected Mortality 1980-2030,
    3 American Journal of Industrial Medicine 259 (1982) ........................... 9

The Motion in Limine of the Official Committee of Asbestos Property Damage Claimants (the "**PD Committee**") to Exclude Portions of Expert Testimony of Mark Peterson (the "**PD Peterson Motion**[1]") is groundless and should be denied. Federal courts around the country, as well as the United States Senate Judiciary Committee and other institutions with a need to estimate asbestos personal injury liabilities, have repeatedly recognized Dr. Peterson as qualified to render an opinion – using the same methodological approach he has used here – on the magnitude of a company's liability for pending and projected future asbestos personal injury claims.[2] In any event, there can be no question that his work is based on generally accepted and reliable methodologies and that it is admissible under the standards of Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

## INTRODUCTION

Courts consistently accept expert testimony that, like the expert testimony of Dr. Peterson here, makes forecasts or projections. The methodology used by Dr. Peterson in the present matter is the same he has used in past cases where he had not only been qualified as an expert, but his estimation of the number and value of asbestos personal injury claims has been accepted. See, e.g., In re Eagle-Picher Indus., Inc., 189 B.R. 681, 686 (Bankr. S.D. Ohio 1995); In re National Gypsum Co., 257 B.R. 184, 198-99 (Bankr. N.D. Tex. 2000); In re Armstrong World Indus., Inc., Case No. 00-4471 (RJN), slip op. at 72-73 (Bankr. D. Del. Dec. 19, 2003) (Newsome, J.) (attached hereto as **Ex. C**); In re Babcock & Wilcox Co., Case No. 00-10992, slip op. at 47-49 (Bankr. E.D. La. Oct. 8, 2004) (attached hereto as **Ex. D**).

---

[1] The pages of the PD Peterson Motion are not numbered. The page references are for the Court's convenience, based on the cover page entitled "Memorandum in Support of Motion In Limine To Exclude Portions of Expert Testimony of Mark Peterson" as page 1.

[2] See, e.g., 11/29/04 Expert Report of Dr. Mark A. Peterson titled "Turner and Newall Inc. Projected Liabilities for Asbestos Personal Injury Claims, November 29, 2004." ("**Peterson Report**") (attached hereto as **Ex. A**); Curriculum Vitae of Mark A. Peterson ("**Peterson CV**") (attached hereto as **Ex. B**).

Dr. Peterson's Methodology. Dr. Peterson derives his valuation of Turner and

Newall, Ltd.'s ("**T&N**") liability for *present* asbestos personal injury claims, *i.e.*, those already

filed with the Debtor, by (1) examining the Debtor's pending claims database; (2) bringing to

bear his long experience and background research on T&N's asbestos liability including

discussions with its defense counsel, plaintiffs' lawyers, and representatives of the Center for

Claims Resolution (the "**CCR**"); (3) grouping the claims into categories of alleged disease; (4)

comparing the universe of pending claims to T&N's own past claims resolution history; (5)

ascertaining the average value for each category of resolved claim; and (6) multiplying the

number of pending claims for each category by the average resolution amount for each category.

See Peterson Report at 3, 18-19, 22; see also Plaintiffs' Pre-Hearing Memorandum Supporting

Their Estimate of T&N Limited's Aggregate Personal Injury and Wrongful Death Liabilities at

18-20 (filed May 31, 2005) (hereinafter "**Joint Estimation Brief**"). The result is the total

estimated liability for present claims.

In estimating *future* asbestos personal injury claims, *i.e.*, those that will be

asserted over the coming decades, Dr. Peterson starts by projecting the number of likely future

cancer claims based on validated epidemiological projections of the incidence of asbestos-related

cancers (*i.e.*, mesothelioma, lung cancer, and other cancers) and trends in the claiming rate for

such cancers against T&N and other asbestos defendants. See, e.g., Joint Estimation Brief at 20;

Tr. of 12/3/04 Peterson Dep. Vol. I at 36-37, 50-51, 60-62, 64-76 (attached hereto as **Ex. E**); see

also, e.g., In re Eagle-Picher Indus., 189 B.R. at 689, 690-92. Dr. Peterson then projects the

number of future claims for non-malignant diseases (principally asbestosis and pleural disease)

by analyzing the historic ratio of T&N claims for non-malignant asbestos-related diseases to

T&N cancer claims and foreseeable changes in claiming patterns. See Peterson Report at 33-36;

2

see also Joint Estimation Brief at 21-22. Once the number of future claims is established, the

methodology for determining their dollar value is similar to the methodology for valuing present

claims, except that the final results are adjusted for inflation and discounted by the risk-free rate

of return to take account of the time that will pass before payment.

In his analysis, Dr. Peterson looks to known data, including epidemiological

projections of incidence of asbestos-related cancers and T&N's past history of claims received

and resolution costs for resolving similar claims. See Joint Estimation Brief at 21-22. He also

examines trends in the amounts necessary to resolve claims both for the Debtor and comparable

companies and in claiming behavior and dispositions. Id. These methods are standard

forecasting approaches and have been used for years by defendants, insurers, claimants

committees, asbestos settlement trusts and legislators. See Peterson Report at 1.

Dr. Peterson's methodology is akin to that employed by an economist who testifies

in a wrongful death case regarding the projected amount of a victim's lost future earnings based

upon recent earnings history and work-life expectancy. See, e.g., Groobert v. President & Dirs.

of Georgetown Coll., 219 F. Supp.2d 1, 11 (D.D.C. 2002); Walker v. Yellow Freight Sys., Inc.,

No. Civ.A. 98-3565, 1999 WL 757022, at *8-*9 (E.D. La. Sept. 24, 1999) (attached hereto as

**Ex. F**). An expert who testifies regarding a company's expected future pension liabilities also

employs a methodology very similar to Dr. Peterson's. See, e.g., Voilas v. General Motors

Corp., 73 F. Supp.2d 452, 461-63, 468 (D.N.J. 1999). In both instances, such testimony is

routinely admitted and relied on.

In its motion to exclude portions of Dr. Peterson's testimony as unreliable, the PD

Committee complains that: (1) Dr. Peterson has derived his claim values from the trust

distribution procedures (the "**TDP**"), which, they claim, is "not an accepted" methodology (PD

3

Peterson Motion at 2-3, 6-8); and (2) in his report, Dr. Peterson allegedly "speculates" about hypothetical future litigation developments based on the impact of the book <u>Magic Mineral to Killer Dust: Turner & Newall and the Asbestos Hazard</u> by Geoffrey Tweedale (Oxford University Press 2000; paperback published in 2001) ("the **Tweedale Book**") (PD Peterson Motion at 2, 9-12).   The PD Committee's contention that Dr. Peterson's values set forth in his Expert Report are "derived from" the TDP, PD Peterson Motion at 2, is simply wrong.  Rather, the values he uses here are his best – conservative – estimate of resolution costs had T&N remained in the tort system, as we explain in pages 10-12 below.  At bottom, the PD Committee's criticisms of some aspects of Dr. Peterson's work are matters for cross-examination, and they go, at most, to the *weight* of his testimony – not its *admissibility*. Accordingly, the Official Committee of Asbestos Claimants' (the "**ACC**") respectfully submits that the PD Peterson Motion should be denied.

**ARGUMENT**

**I.    A <u>DAUBERT</u> INQUIRY IS NOT WARRANTED HERE.**

As the Supreme Court made clear in <u>Kumho Tire Co.</u>, the objective of "<u>Daubert</u>'s gatekeeping requirement . . . is to ensure the reliability and relevancy of expert testimony." 526 U.S. at 152. On the question of *reliability*, <u>Daubert</u>'s principles "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom *the same level of intellectual rigor that characterizes the practice of an expert in the relevant field*." <u>Id.</u> (emphasis added). As for *relevance*, <u>Daubert</u> implements Fed. R. Evid. 702, which "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." <u>Id.</u> at 149 (quoting <u>Daubert</u>, 509 U.S. at 592). Scrutiny of these two elements of a witness's testimony, however, is not automatic.  A <u>Daubert</u> inquiry is appropriate only where an expert's testimony, or its "factual basis, data, principles, methods, or . . . application" has been

4

"called sufficiently into question." Id. at 149 . No such challenge to Dr. Peterson's testimony can be mounted here, and, accordingly, a Daubert inquiry is not triggered by the PD Committee's critiques.

As the PD Committee itself must admit, courts around the country have repeatedly recognized Dr. Peterson's qualifications as an expert in projecting and valuing asbestos claims and found that his methodology was sufficiently reliable to allow him to testify to his expert opinions on asbestos liability valuations for purposes of confirming Chapter 11 plans, making solvency determinations, and resolving insurance disputes. See generally Peterson CV; Tr. of 12/3/04 Peterson Dep. Vol. I at 84-88 (attached hereto as **Ex. G**). Dr. Peterson's testimony as an acknowledged expert in the field of mass tort valuation, and the methodology he uses here, have been accepted as reliable by courts in numerous asbestos related cases over the past decade, including the Eagle-Picher, National Gypsum, Armstrong, Babcock & Wilcox, Celotex, and Raytech bankruptcies, and the Fibreboard class action proceedings. See, e.g., In re Eagle-Picher Indus., 189 B.R. at 686; In re National Gypsum, 257 B.R. at 198-99; In re Armstrong World Indus., Case No. 00-4471 (RJN), slip op. at 72-73 (Bankr. D. Del. Dec. 19, 2003) (Newsome, J.) (attached hereto as **Ex. C**); In re Babcock & Wilcox Co., Case No. 00-10992, slip op. at 47-49 (Bankr. E.D. La. Oct. 8, 2004) (attached hereto as **Ex. D**).

In addition to his work as a testifying expert witness, Dr. Peterson has served as an expert consultant on asbestos claims and liabilities to asbestos settlement trusts, three insurance companies, several asbestos defendants, and federal courts (including serving as a Special Advisor to Judge Jack Weinstein, the United States District Court Judge who oversaw the litigation in which the Manville Trust was restructured). As the Special Advisor to Judge Weinstein, Dr. Peterson provided input and advice to the Rule 706 Panel of Experts chosen by

5

the Manville Court to project the number of claims expected to be filed against the Manville Trust.

Moreover, as recently as April 2005, in the context of the congressional debate over the Fairness in Asbestos Injury Resolution Act of 2005 (S. 852), the United States Senate Judiciary Committee requested that Dr. Peterson testify before it about his projections of future asbestos claims and the cost to resolve such claims. Numerous entities in the business of paying asbestos personal injury claims, including insurance companies such as Continental and Chubb, several asbestos defendants, and a dozen § 524(g) asbestos settlement trusts, have also made financial decisions involving hundreds of millions – or even billions – of dollars based on Dr. Peterson's projections of the number and value of future asbestos claims. Those projections have used the same basic methodology he has employed here, adapting it in each situation to the specifics of the particular case.

An expert's testimony can be excluded altogether only if it "amount[s] to the sort of 'junk science' Daubert blocks." Skidmore v. Precision Printing & Packaging, Inc., 188 F.3d 606, 618 (5th Cir. 1999); see also In re Linerboard Antitrust Litig., 203 F.R.D. 197, 217 n.13 (E.D. Pa. 2001). Given the fact that numerous courts have already admitted Dr. Peterson's testimony and agreed with his methodology, his testimony should readily be admitted here; the Court need not embark on a full-blown Daubert analysis.

## II.    EVEN IF DAUBERT APPLIES, DR. PETERSON'S TESTIMONY EASILY MEETS ITS STANDARDS.

Even assuming *arguendo* that Dr. Peterson's testimony has been called sufficiently into question so as to trigger a Daubert challenge, there can be no serious doubt that his opinions meet the standards of Daubert and its progeny. As noted above, in Kumho Tire Co., the Supreme Court made clear that the seminal question under Daubert's reliability prong is

whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152; see also Elcock v. Kmart Corp., 233 F.3d 734, 746 (3d Cir. 2000) (highlighting importance of ensuring that expert employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field).

      The PD Committee attempts to show that Dr. Peterson did not use requisite level of intellectual rigor by referring to his deposition testimony that the discussions with others in the field that were a factor in his conclusion that the Tweedale Book, among other things, made it likely that claims against T&N would increase in the future (Tr. of 5/26/05 Peterson Dep. Vol. II at 358-59) (attached as **Ex. H**.) The PD Committee claims he "conceded that the methodology he used in interviewing plaintiffs' lawyers for his report was not the systematic methodology he would have used when he worked as an academic for the RAND corporation." PD Peterson Motion at 10. Specifically, the PD Committee refers the Court to pages 358-59 of Dr. Peterson's deposition. Id. The PD Committee fundamentally mischaracterizes Dr. Peterson's deposition testimony. The referenced text states,

> Q.    Name generally the people that you would go to, at least in the first instance, for information about plaintiff lawyer behavior.

> A.    *I don't – I don't do this in a way that I would if I were at Rand, and set up, schedule interviews with people in order to discuss topics.* In the course of a year I probably talk with at least 20 plaintiffs – asbestos plaintiffs' lawyers. We talk about lots of stuff. We have a common interest in asbestos litigation. We have a common interest in what's going on. So who I might have talked to about this, I don't know. There's no – I wouldn't set out to say okay, I'm going to talk with Bob Steinberg about what's happening with regard to the claim level. The things that you discuss in the course of meetings and being with people.

> Q.    So is it fair to say that it's more informal rather than systematic; is that correct?

A.    I think that's fair.

Tr. of 5/26/05 Peterson Dep. Vol. II at 359-60 (emphasis added) (attached hereto as **Ex. H**).  In

any event, Dr. Peterson's understanding of foreseeable influences on T&N's asbestos liability

was not based on mere anecdotal interviews, as the PD Committee suggests.[3]  Rather, the basis

of Dr. Peterson's understanding is his extensive asbestos litigation experience, coupled with

discussions he had with plaintiff and defense attorneys.  As Dr. Peterson stated in his deposition

immediately preceding the text referenced by the PD Committee:

> We spent a lot of time in my prior deposition talking about attempts to disentangle
> the effects of simultaneously-occurring events,[4] and there's just no real way to do
> it.  You can't do a quasi-experiment because all of these things are happening at
> the same time.  So I don't think there's a way to do that.  You really have to – *all*
> *of these observations are based upon my knowledge and participation in asbestos*
> *litigation, and talking with Turner & Newall's defense lawyers; talking with other*
> *defense lawyers; talking with plaintiffs' lawyers, and kind of knowing what was*
> *going on generally.*
>
> *So all of those observations are primarily – they're more qualitative than*
> *quantitative.  It's the kind of thing you learn in doing Rand research and in doing*
> *interviews and case studies.  It's that nature.  So they tend not to be quantitative*
> *inferences, but they're consistent with the quantitative inferences.  And that's*
> *what you want to do.  If you see numbers that are going up or down, just to look*
> *at that without trying to do the qualitative understanding, what's going on, is kind*
> *of a – it's a dangerous proposition.  And so you really want and try to understand*

---

[3] To support this proposition, the PD Committee cites to <u>Recreational Dev. of Phoenix, Inc. v.</u>
<u>City of Phoenix</u>, 220 F. Supp. 2d 1054 (D. Ariz. 2002), aff'd 2003 WL 22383511 (9th Cir. Oct
17, 2003) (attached hereto as **Ex. I**).  In that case, the court rejected the plaintiff's expert who
purported to show patrons of an Arizona sex club (*i.e.*, "swingers") engaged in safer sexual
practices than non-swingers based exclusively on non-formal interviews with non-patron
swingers and other club owners.  In addition, the court found that, while the expert had a Ph.D.,
his expert report did not identify the nature or location of his doctoral training or the basis of his
knowledge; and the plaintiff's failed to establish a link between his knowledge and the subjects
addressed in his report.  It is ludicrous for the PD Committee to suggest that this case provides
any support for excluding the testimony of Dr. Peterson's opinions, whose knowledge,
experience and participation in asbestos litigation and analysis are undisputed.

[4] This is a reference to Dr. Peterson's prior deposition testimony that the publication of the
Tweedale Book occurred "concurrently with a number of other major and really catastrophic
developments that would have greatly driven up the [asbestos] liability [of T&N]."  Tr. of
12/3/04 Peterson Dep. Vol. I at 115-17 (attached hereto as **Ex. J**).

8

> *the phenomenon, not only the numbers, but the underlying phenomenon, and it's the two together.*

Tr. of 5/26/05 Peterson Dep. Vol. II at 357-58 (emphasis added) (attached hereto as **Ex. H**.)

Here, Dr. Peterson uses a well-defined and accepted model for forecasting asbestos claims. The methodology that Dr. Peterson uses in forecasting future claims is described at some length in a treatise on projecting and valuing future claims written by an expert who routinely testifies *against* asbestos claimants' interests.) Fredrick D. Dunbar, Denise N. Martin & Phoebus J. Dhrymes, Estimating Future Claims: Case Studies from Mass Tort and Product Liability, at 1-8, 119-121, 144, 158-159 (Andrews Professional Books 1996 (attached hereto as **Ex. K**). Dr. Peterson's opinion here is derived from the historical claims resolution experience of T&N, as well as from peer-reviewed and published studies concerning the projected incidence of asbestos cancers in the United States. See, e.g., Tr. of 12/3/04 Peterson Dep. Vol. I at 64-67 (attached hereto as **Ex. E**); Tr. of 5/26/05 Peterson Dep. Vol. II at 366-67, 413 (attached hereto as **Ex. L**); William J. Nicholson, George Perkel & Irving J. Selikoff, Occupational Exposure to Asbestos: Population at Risk and Projected Mortality 1980-2030, 3 American Journal of Industrial Medicine 259 (1982) (attached hereto as **Ex. M**). His methodology is not a mechanical forward projection of past trends; it takes account of what he has learned about likely future trends and the significance of past event from many years of experience and contacts within the community of professionals concerned with the topic. See Elcock, 233 F.3d at 741 (The basis for specialized knowledge under Federal Rule of Evidence 702 "can be practical experience as well as academic training and credentials," a policy which "extends to the substantive as well as the formal qualifications of experts.").

And of course, he has been as rigorous and meticulous in this case as he has been in the numerous prior instances where his forecasts have been submitted to, approved of, and

relied upon by other courts. The notion that portions of his testimony somehow fail <u>Daubert</u>'s "gate-keeping" function is thus utterly specious.

A.    **The TDP Values Dr. Peterson Relies on in His Expert Report Are Derived From T&N's Own Claims Resolution History.**

      The PD Committee's assertion that the "TDP values…are nothing more than the method by which Dr. Peterson's clients have agreed among themselves, with [Dr.] Peterson's own input, to allocate the value they will receive under the proposed plan of reorganization," <u>see</u> PD Peterson Motion at 6, is simply false and demonstrates a fundamental misunderstanding both about what Dr. Peterson has done here and about the source and determination of TDP values.

      The PD Committee's contention that Dr. Peterson's values set forth in his Expert Report are "derived from" the TDP, PD Peterson Motion at 2, is wrong. Rather, the values he uses here are his best – conservative – estimate of resolution costs had T&N remained in the tort system. As he does in every case in which he serves as an expert witness, Dr. Peterson, in the T&N case, started his analysis – not with the TDP numbers – but with the historical settlement averages for T&N, and then analyzed the trends in those averages and the factors that were driving them before coming up with an estimate of what the average cost to T&N would be for it to resolve each personal injury asbestos claim had it remained subject to the tort system and had it not filed for bankruptcy protection. <u>See</u> Tr. of 12/3/04 Peterson Dep. Vol. I at 34 (attached hereto as **Ex. N**); Tr. of 5/26/05 Peterson Dep. Vol. II at 413 (attached hereto as **Ex. L**).

      In making this determination, Dr. Peterson took into account not only T&N's own settlement history but also related trends, along with the factors driving those trends, including all of the following: (1) the fact that T&N's mesothelioma settlement averages had *tripled* in the three years preceding bankruptcy; (2) T&N's loss of protection as a member of the CCR; (3) the publication of the Tweedale Book detailing T&N's adverse corporate history with asbestos; (4)

WP3:1119559.1

the effect of the bankruptcies of other major defendants on T&N's liability; (5) repeated

interviews with T&N asbestos defense counsel and CCR representatives who explained the

trends in the settlement averages and the impact of these events on T&N; and (6) the historic

ratios of mesothelioma settlement averages to other types of disease claims for T&N and

multiple asbestos personal injury defendants. See also Joint Estimation Brief at 18-20. Using all

this information, Dr. Peterson derived a series of estimates of the average claims resolution cost,

one of which was the "average" values that are set forth in the TDP for the Plan, one of the three

sets of payment amounts set forth in the Plan. See Peterson Report at 16-18; Tr. of 12/3/04

Peterson Dep. Vol. I at 41-42, 49-52, 55-57 (attached hereto as **Ex. O**).

      The PD Committee objects to the use of values that are also the TDP average

values. But the TDP average values were themselves derived from T&N's own past claims

resolution history based upon recommendations from Dr. Peterson about the likely current values

for T&N claims given its past settlement history and trends and the factors driving those trends.

See Peterson Report at 12-16. Dr. Peterson, far from simply taking the TDP values as applicable

automatically to the estimation, derives values for settling the various diseases from the basic

data available to him. The TDP values fall within a range of estimated settlement averages so

analyzed by Dr. Peterson. The values that were used in his "preferred" forecast of T&N's

asbestos liability were selected as equal to the TDP average values not only because these values

are based upon T&N's history and trends, but also because the values are at the conservative

(low) end of the range of settlement averages he derives as illustrating the range of reasonable

likely costs for the resolution of future T&N asbestos claims. See Peterson Report at 12-18; Tr.

of 12/3/04 Peterson Dep. Vol. I at 37, 40 (attached hereto as **Ex. P**).

11

Both in reaching the estimated values now and earlier in advising on the TDP values, Dr. Peterson is seeking to answer *the same basic question* – what would the tort system require T&N to pay to resolve the asbestos claims – present and future – against it. Since the questions he is asked is essentially the same in both contexts, it is logical that the answers are also essentially the same.

Importantly for the PD Committee's contention that this is an unacceptable methodology, Dr. Peterson was accepted by the court in both the <u>Babcock & Wilcox</u> and <u>Western MacArthur</u> cases as an expert and, pursuant thereto, offered testimony that a debtor's TDP or matrix values are reasonable estimates of the likely claim settlement values for purposes of making estimates of the cost to resolve pending and future asbestos claims.

In the <u>Babcock & Wilcox</u> confirmation hearing, Dr. Peterson offered testimony concerning the reasonableness of the claims qualification criteria and settlement values in the debtor's TDP and opined that the debtor's aggregate asbestos liability would be *lower* if the TDP criteria and values were implemented by the court than if the debtor continued its pre-petition claims handling practices. This testimony was accepted by the court over the objections of numerous insurers and the court recommended that the plan be confirmed.[5] <u>See In re Babcock & Wilcox Co.</u>, Case No. 00-10992, slip op. at 47-49 (Bankr. E.D. La. Oct. 6, 2004) (attached hereto as **Ex. D**).

In <u>Western MacArthur</u>, Dr. Peterson derived estimates of the current cost to resolve the debtor's claims based upon comparable companies' settlement histories, because the

---

[5] Although the <u>Babcock</u> court placed a portion of its discussion of Dr. Peterson's testimony in the "Uncontested Matters" section of the opinion, in fact the insurers did contest Dr. Peterson's analysis and testimony, as is apparent from footnote 109 of the <u>Babcock</u> opinion. <u>See In re Babcock & Wilcox Co.</u>, Case No. 00-10992, slip op. at 49 n.109 (Bankr. E.D. La. Oct. 6, 2004) (attached hereto as **Ex. D**).

debtor had no recent settlement history, and testified that the values in the debtor's matrix (*e.g.*, its TDP) were reasonable estimates of its current cost to settle claims. The Court accepted this testimony and confirmed the plan over the objections of numerous insurance companies. See In re Western MacArthur Co., No. 02-46284-T, slip op. at 55-57, 62 (Bankr. N.D. Cal. Feb. 3, 2004) (attached hereto as **Ex. Q**).

In both cases, Dr. Peterson's testimony was accepted and reorganization plans approved over the objections of numerous insurance companies to values in the matrix or TDP. There, as here, Dr. Peterson testified that the TDP numbers were reasonable not because they were the TDP numbers, but because they represented his best estimate of likely costs to resolve claims for that debtor based on the evidence available to him and his knowledge experience and expertise. This is exactly what he will testify to here.

Moreover, these methods – despite the PD Committee's assertions to the contrary – are fully consistent with the ACC's "previously expressed theory of the case." PD Peterson Motion at 7; see ACC Opposition to PD Committee's Bar Date Motion at 25-30 (filed in the Bankruptcy Court Sept. 21, 2004). By this assertion the PD Committee seems to mean that an opinion that claiming rates and values will increase in the future is inconsistent with past ACC arguments, in opposing the PD Committee's efforts to launch new data-gathering exercises via a bar date, that debtor's past claims history provided a sufficient basis for estimation. See PD Peterson Motion at 7-8. Far from being inconsistent, the ACC's position in the bar date controversy and now are entirely congruent: Since the issue is how the Debtors would have fared in the tort system if they had stayed in it, the best basic source of data is their actual extensive experience in that system, but that foundation is not the sole or absolute measure, but rather the base subject to adjustment for foreseeable future trends and changes in relevant conditions.

13

Accordingly, Dr. Peterson's use of TDP values here, as derived from T&N's claims resolution history and illustrative of the current estimate of settlement values for each type of disease claim, is perfectly proper under the legally accepted estimation methodology set forth in <u>Eagle-Picher</u> and elsewhere. <u>E.g.</u>, 189 B.R. at 686, 690-91.

### B.    Dr. Peterson's Assessment of the Impact of the Tweedale Book is Consistent with His Widely Accepted and Daubert-Compliant Methodology.

The PD Committee's complaints about Dr. Peterson's "unsupported speculation" about the impact of the Tweedale Book on the future asbestos liability of T&N are mere sound and fury. The issue here is the impact of the Tweedale Book, published in 2000, that recounted in vivid detail, T&N's role – and its culpability – in its work with asbestos. Dr. Peterson, based on his contacts with people representing both sides in T&N's asbestos cases, takes the position that the publication of the book is one of many factors that would likely increase both the numbers of T&N claims and their costs because it would draw additional attention to T&N's unsavory record, and because its collection of T&N exhibits into one easily accessible place would make the plaintiff's case easier to try. The PD Committee questions this position, on the ground that the Tweedale Book merely recounted facts already known. Here again, the PD Committee is attempting to convert an unconvincing argument on the weight to be given Dr. Peterson's testimony into a claim that it should be excluded altogether. To re-state the obvious, <u>Daubert</u> does not require that the opposing party agree with the testimony proffered, only that it is relevant and reliable – not that is impossible to make points against it.

Experts routinely predict future occurrences and such predictions are admitted as expert testimony as long as they derive from the application of the expert's specialized knowledge. <u>See, e.g.</u>, <u>Nemmers v. United States</u>, 681 F. Supp. 567, 577 (C.D. Ill. 1988) ("Where the testimony of a qualified economist includes proof of past economic trends, known

14

economic facts, and generally accepted economic theory as to probable future economic trends, his or her testimony as to future movement of wages over an extended period of time is well founded and admissible."). As in the instant case, the resolution of significant legal issues often requires the informed prediction of future circumstances. In fact, testimony about future or "but for" worlds based on specialized knowledge actually serves to *prevent* "unsupported speculation" by the finder of fact. Cf., e.g., Huddell v. Levin, 537 F.2d 726, 743 (3rd Cir. 1976) ("To reduce the possibility of undue conjecture on the part of the jury, plaintiff should also have an opportunity to offer expert economic testimony on the question to provide them with informed guidelines in their deliberations.").

Here, far from "unsupported speculation," Dr. Peterson has considered observable facts in light of his undisputedly extensive expert knowledge of factors affecting asbestos personal injury claims to reach reasoned conclusions as to the likely trend of future claims. See supra Part I. Specifically, Dr. Peterson observed that the Tweedale Book collected in readily-accessible form the documentary record that T&N's own counsel believed posed serious problems for the company, that T&N experienced increasing claiming rates during 2000-2001 and at the same time experienced a multitude of "major and really catastrophic events," that included the publication of the Tweedale Book.[6] Based on his expert knowledge and experience, Dr. Peterson concluded that the upward trend – as a result of a number of factors of which the Tweedale Book was one, but that also included termination of the CCR and the bankruptcies of several major asbestos defendants – would continue the increase into the future. Tr. of 5/26/05 Peterson Dep. Vol. I at 116 (attached hereto as **Ex. J**).

---

[6] The evidence, including testimony from Paul Hanly, the former U.S. National Trial Counsel for T&N, will show that the Tweedale Book, along with the underlying documents referenced in the book, was expected to adversely effect the future asbestos personal injury litigation against T&N.

15

Dr. Peterson has done exactly what the <u>Kumho Tire Co.</u> Court said experts do: "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" 526 U.S. at 148-49 (citation omitted). In doing so, Dr. Peterson has acted in perfect accord with the methodologies used in his field. His expert testimony thus easily meets the test for reliability. See <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136, 145 (3d Cir. 2000) ("This standard [for admissibility of expert testimony] is not intended to be a high one . . . .").

Moreover, it is axiomatic that "[t]rained experts commonly extrapolate from existing data." <u>In re Dow Corning Corp.</u>, 237 B.R. 364, 367, 369 & n.4 (Bankr. E.D. Mich. 1999) (wherein another expert, Dr. Frederick Dunbar, provided opinion on the sufficiency of a litigation fund to satisfy anticipated claims). Thus, "[a]ccountants routinely estimate expenses that are expected to occur in the future so that reserve funds can be established in advance." <u>Id.</u> at 368. And courts routinely allow economists and accountants to offer expert opinions concerning projections of future lost earnings in personal injury cases, future lost profits of businesses, future pension obligations and other future expenses.

The PD Committee is free to attempt to rebut Dr. Peterson's testimony, and they have proffered an alleged expert to do that. Their motion to exclude Dr. Peterson's testimony is nothing more than an assertion that they think it is unconvincing. But this is irrelevant under <u>Daubert</u> and <u>Kumho Tire Co.</u> The relevant inquiry is not whether the expert's forecast proves correct, much less whether an opponent regards it as beyond dispute, but whether in making the projections the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co.</u>, 526 U.S. at 152. Clearly that standard is met here.

16

## CONCLUSION

"A district court's gatekeeper role under <u>Daubert</u> 'is not intended to supplant the adversary system or the role of the jury.'" <u>Maiz v. Virani</u>, 253 F.3d 641, 666 (11th Cir. 2001) (quoting <u>Allison v. McGhan</u>, 184 F.3d 1300, 1311 (11th Cir. 1999)). The mere fact that another party disagrees with a proffered expert's conclusion – or attacks his analysis or methodology – is not enough to prevail on a <u>Daubert</u> inquiry. <u>See, e.g.</u>, <u>Coleman v. Dydula</u>, 139 F. Supp.2d 388, 395 (W.D.N.Y. 2001). <u>See also, e.g.</u>, <u>United States v. L.E. Cooke Co., Inc.</u>, 991 F.2d 336, 342 (6th Cir. 1993). Courts have therefore repeatedly held, in analogous circumstances, that the proper means of challenging the assumptions of experts who make estimates is through cross-examination. <u>See, e.g.</u>, <u>Cummings v. Standard Register Co.</u>, 265 F.3d 56, 65 (1st Cir. 2001) ("[W]hatever shortcomings existed in [the expert]'s calculations went to the weight, not the admissibility, of the testimony."); <u>Maiz</u>, 253 F.3d at 669 (finding district court did not err in admitting expert testimony where objections to testimony went to "weight and sufficiency . . . rather than to . . . admissibility"). Here, too, the PD Committee's criticisms do not rise to the level of a viable <u>Daubert</u> challenge and should be reserved for cross-examination and closing argument.

For the foregoing reasons, the ACC respectfully requests that this Court deny the PD Committee's Motion to Exclude Portions of Expert Testimony of Mark Peterson.

17

Respectfully submitted,

Dated: Wilmington, Delaware
     June 8, 2005

CAMPBELL & LEVINE, LLC                  CAPLIN & DRYSDALE, CHARTERED
                                            Elihu Inselbuch

*Kathleen Campbell (mwr)*

Marla R. Eskin (No. 2989)              399 Park Avenue
Kathleen J. Campbell (No. 4229)     New York, New York 10022
800 N. King Street, Suite 300      Telephone: (212) 319-7125
Wilmington, Delaware 19801       Facsimile: (212) 644-6755
Telephone: (302) 426-1900
Facsimile: (302) 426-9947

                                            -and-

Attorneys for Official Committee of    CAPLIN & DRYSDALE, CHARTERED
Asbestos Claimants                           Walter B. Slocombe
                                          Nathan D. Finch
                                          One Thomas Circle, N.W.
                                          Washington, DC 20005
                                          Telephone: (202) 862-5000
                                          Facsimile: (202) 429-3301

18