# EXHIBIT C

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
In re                                    :    Chapter 11 Case No.
                                         :
ARMSTRONG WORLD INDUSTRIES,              :    00-4471 (RJN)
INC., et al.,                            :
                                         :
                    Debtors.             :    (Jointly Administered)
                                         :    Re: Docket No. 6209
-----------------------------------------------------------x
```

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS
### OF LAW REGARDING CONFIRMATION OF THE
### FOURTH AMENDED PLAN OF REORGANIZATION
### OF ARMSTRONG WORLD INDUSTRIES, INC., AS MODIFIED

Armstrong World Industries, Inc. (*"AWI"*), as debtor and debtor in possession (the *"Debtor"*), having proposed and filed the Fourth Amended Plan of Reorganization of Armstrong World Industries, Inc., dated May 23, 2003 (as modified by the Modifications to the Fourth Amended Plan of Armstrong World Industries, Inc., dated October 17, 2003 and the Additional Modifications to the Fourth Amended Plan of Armstrong World Industries, Inc. filed on November 10, 2003 (collectively, the *"Modifications"*), the *"Plan"*),[1] and the Disclosure Statement in respect of the Plan, dated June 2, 2003 (the *"Disclosure Statement"*); and the procedures for solicitation and tabulation of votes to accept or reject the Plan having been approved by the Bankruptcy Court pursuant to an order dated April 21, 2003 (the *"Voting Procedures Order"*); and the Disclosure Statement having been approved by the Bankruptcy Court pursuant to an order dated June 4, 2003, as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code (the *"Disclosure Statement Order"*); and the Affidavit of Trumbull

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

1

Associates LLC (f.k.a. Trumbull Services, LLC) (*"Trumbull"*) Regarding Service by First Class Mail of the Solicitation Materials Related to the Plan Pursuant to the Disclosure Statement Order, dated July 1, 2003 (the *"Trumbull Affidavit of Mailing"*), having been filed with the Bankruptcy Court, and the Affidavit of Service of Voting Documents by Innisfree M&A Incorporated (*"Innisfree"*), dated June 25, 2003 (the *"Innisfree Affidavit of Mailing"* and, together with the Trumbull Affidavit of Mailing, the *"Affidavits of Mailing"*), having been filed with the Bankruptcy Court; and the certificate of publications of Kathy Kinsella of Kinsella Communications, Ltd. (the *"Certificate of Publications"*) attesting to the publication of the Confirmation Hearing Publication Notice and the Asbestos Publication Notice (as hereinafter defined) in accordance with the Voting Procedures Order having been filed with the Bankruptcy Court; and the Certification of Votes Tabulated by Trumbull (the   *"Trumbull Certification"*) and the Certification of Votes Tabulated by Innisfree (the *"Innisfree Certification"* and, together with the Trumbull Certification, the *"Certifications of Votes"*) having been filed with the Bankruptcy Court on November 7, 2003; and AWI having filed with the Bankruptcy Court the affidavits in support of confirmation of the Plan of (i) William C. Rodruan, Vice President and Controller of AWI (the *"Rodruan Affidavit"*), (ii) Daniel L. Aronson, a Director of Lazard Frères & Co. LLC, (*"Lazard"*), financial advisors to AWI (the *"Aronson Affidavit"*), and (iii) Dean M. Trafelet, the Future Claimants' Representative (the *"Trafelet Affidavit"* and, together with the Rodruan Affidavit and the Aronson Affidavit, the *"Affidavits in Support of Plan Confirmation"*) (collectively, with the Affidavits of Mailing, the Certificate of Publications, and the Certifications of Votes, *"AWI's Confirmation Documents"*); and each of the Objections (as hereinafter defined)

2

having been resolved, overruled or withdrawn; and the Bankruptcy Court having conducted a hearing to consider confirmation of the Plan on November 17, 2003 (the *"Confirmation Hearing"*); and the Bankruptcy Court having reviewed and considered the Plan, the Exhibit Volume filed with the Bankruptcy Court on September 5, 2003 (as modified by the Modifications and as may be modified from time to time, the *"Exhibit Volume"*), AWI's Confirmation Documents, the Disclosure Statement, the Disclosure Statement Order, and the entire record of the Confirmation Hearing (including the testimony of Dr. Mark A. Peterson), and the Bankruptcy Court being familiar with the Plan and other relevant factors affecting AWI's chapter 11 case (the *"Chapter 11 Case"*); and the Bankruptcy Court having taken judicial notice of the entire record of the Chapter 11 Case since the Commencement Date; and the appearance of all interested parties having been duly noted in the record of the Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND, CONCLUDED, AND ADJUDGED, AS FOLLOWS:

## FINDINGS OF FACT[2]

### History of AWI's Involvement
### with Asbestos-Containing Products

1.      AWI's involvement in asbestos personal injury litigation relates primarily to its involvement in the high temperature insulation contracting business.

---

[2] The Findings of Fact and Conclusions of Law contained herein constitute proposed findings of fact and conclusions of law proposed to be adopted by the District Court and required to be entered pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*).

Throughout the early 1900's, AWI (then known as Armstrong Cork Company) manufactured, installed, and serviced low temperature primarily cork based products for cold storage insulation and pipe covering applications. In addition, as an adjunct to these cold storage contracting activities, from around 1910 to 1933, AWI manufactured various high temperature insulation products, including some that contained asbestos. These products have not been the subject of significant claims. (Disclosure Statement, p. 14, Docket No. 4801).

      2.     Commencing in 1939, AWI expanded its low temperature insulation contracting business into high temperature contracting services. AWI generally manufactured its own low temperature insulation materials for use in its contracting services, but did not manufacture the high temperature insulation materials used in its contracting operations. Some of the high temperature products furnished and installed in the contracting operations contained asbestos. (Disclosure Statement, p. 14, Docket No. 4801).

      3.     As a part of overall organizational changes that took place in the late 1950's, AWI separated the insulation contracting business from the remainder of the company with the formation of a separate, independent subsidiary, Armstrong Contracting and Supply Corporation ("*ACandS*"). From January 1, 1958 through July 1969, ACandS operated as an independent subsidiary in the insulation contracting business. During this period, AWI licensed certain trade names and trademarks to ACandS, which ACandS placed on certain insulation products manufactured by others. In addition, from 1964 through 1969, another independent subsidiary of AWI, National Cork Company ("*NCC*"), operated an insulation contracting business. Other than two specific products, AWI did not

manufacture or sell any asbestos containing thermal insulation materials during this period. (Disclosure Statement, p. 14, Docket No. 4801).

    4.  In August of 1969, a group of ACandS management employees formed a holding company and purchased the stock of ACandS from AWI. In connection with such sale, AWI assigned certain trade names to ACandS, but ACandS was not licensed to use, and did not use, AWI's trademark or the trade style "(A)rmstrong." ACandS continues to exist today and is now known as ACandS, Inc. (Disclosure Statement, p. 14, Docket No. 4801). On September 19, 2002, ACandS filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. *In re ACandS, Inc.*, Chapter 11 Case No. 02-12687 (RJN) (Bankr. D. Del.).

    5.  AWI manufactured only two asbestos-containing insulation materials between 1939 and 1968 – LT Cork Covering and Armaspray. LT Cork Covering (1956-1959) was a cork product with a purchased paper wrapper that contained chrysotile asbestos. Armaspray (1966-1968) was an investigatory high temperature spray applied insulation material that contained less than 10% amosite asbestos and was sold only to ACandS for installation. LT Cork Covering with the asbestos paper covering and Armaspray were not commercially successful products, and AWI had no involvement with asbestos containing insulation materials after AWI stopped making Armaspray in 1968. (Disclosure Statement, p. 14, Docket No. 4801).

    6.  The Disclosure Statement lists the asbestos-containing insulation products sold and/or installed by AWI during various points of AWI's history from about 1910 to 1957 (and to a very limited extent from 1958 to 1969), or that are believed to have been used, installed, or sold by AWI's former subsidiaries ACandS (from 1958 to 1969)

and NCC (from 1964 to 1969). (Disclosure Statement, p. 14, Docket No. 4801). The information contained in the Disclosure Statement is not intended to be an exhaustive list, but is intended to identify those products that have been the most identified by claimants in the course of AWI's history and based upon information acquired about the activities of ACandS from 1958 to 1969 and NCC from 1964 to 1969. Such products were primarily (if not exclusively) used in the high temperature insulation contracting installation operations where AWI, ACandS, or NCC employed insulators. (Disclosure Statement, pp. 14-15, Docket No. 4801).

7.     In addition to the products listed in the Disclosure Statement, AWI, ACandS, or NCC may have used other asbestos-containing high temperature insulation products manufactured by other manufacturers in the course of their contract insulation installation activities, depending on the requirements of the particular contract involved. It is impossible to state with certainty what other specific asbestos-containing products might have been called for by these contracts. (Disclosure Statement, p. 16, Docket No. 4801).

8.     From 1932 until 1982, AWI manufactured various forms of resilient floor tiles, some of which contained encapsulated chrysotile asbestos. From 1954 until 1983, some of the sheet vinyl resilient floor coverings that AWI manufactured and sold were on an asbestos-containing backing material, which was designated as "Hydrocord." The chrysotile asbestos was bound into the Hydrocord backing by a latex binder, and, as installed, the backing was covered by a sheet vinyl floor covering that did not contain asbestos. (Disclosure Statement, p. 16, Docket No. 4801).

9.     From the early 1950's until the late 1980's, AWI manufactured and sold gasket materials primarily intended for mechanical applications, including internal

combustion engines. Some of these gasket materials contained encapsulated asbestos fiber. As a general matter, this gasket material was not sold directly to end users but to secondary processors for the creation of prefabricated gaskets for resale. (Disclosure Statement, p. 16, Docket No. 4801).

        10.     All AWI-manufactured acoustical ceiling products never contained asbestos. AWI, however, sold a specialty asbestos cement ceiling board between the mid-1940's and the mid-1970's. This ceiling product, which was composed of asbestos containing Portland cement manufactured by both Keasbey & Mattison and National Gypsum Company, was slate-like in its appearance (which made it readily distinguishable from AWI's acoustical ceiling materials), was intended for use in high humidity areas, and was generally attached to the surface with furring strips and fasteners (and not a suspended grid system). (Disclosure Statement, p. 16, Docket No. 4801).

        11.     During the period between the mid-1930's and mid-1980's, some of the related adhesive products that AWI manufactured and sold for use in the installation of resilient floor tile or acoustical ceiling tile contained encapsulated chrysotile asbestos. (Disclosure Statement, p. 16, Docket No. 4801).

        12.     AWI manufactured two distinct roof deck systems: (1) Fluid Applied and (2) Travelon Weather Deck. Components of both systems contained asbestos. These were special-purpose systems that were distinguishable from traditional built-up roofing. Both roofing systems were unique and specially directed to a highly specialized segment of the roofing market. These products were not commercially successful and, therefore, were discontinued shortly after their introduction in the mid-1960's. (Disclosure Statement, p. 16, Docket No. 4801).

**Prepetition Asbestos-Related**
**Personal Injury Litigation Against AWI**

13.    Prior to the Commencement Date, AWI was named as a defendant in personal injury and wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products. Nearly all of the asbestos-related personal injury and wrongful death actions brought against AWI related to individuals who claim they were exposed to the asbestos-containing high temperature thermal insulation products used by AWI in its insulation contracting activities prior to 1958, or used by ACandS including in connection with ACandS's use of AWI's licensed trade name or trademarks after 1958. Many of these claims have involved allegations of negligence, strict liability, and breach of warranty, and some have alleged conspiracy or other claims that seek to make AWI responsible for the activities of ACandS. In some instances, asbestos-related personal injury claims have been asserted against AWI on account of its asbestos-containing gaskets or flooring materials. (Disclosure Statement, p. 17, Docket No. 4801).

14.    During the three-year period immediately prior to its December 6, 2000 chapter 11 filing, AWI paid over $500 million in settlement payments (including defense costs) on account of asbestos-related personal injury and wrongful death claims. As of September 30, 2000, approximately 173,000 asbestos-related personal injury and wrongful death claims were pending against AWI within the tort system in a multitude of jurisdictions. (Disclosure Statement, p. 17, Docket No. 4801).

**AWI's Asbestos Personal Injury Liability**

15.    AWI is a defendant in personal injury claims and property damage claims related to asbestos-containing products. Nearly all personal injury claims against

AWI seek general and punitive damages arising from alleged exposures, at various times, from World War II onward, to asbestos-containing products. Claims against AWI, which can involve allegations of negligence, strict liability, breach of warranty and conspiracy, primarily relate to AWI's involvement with asbestos-containing insulation products. In addition, other AWI products, such as gasket materials, have been named in some litigation. Claims may arise many years after first exposure to asbestos in light of the long latency period (up to 40 years or more) for asbestos-related injury. Before filing for bankruptcy protection on December 6, 2000, AWI was involved in all stages of claims resolution and litigation, including individual trials, consolidated trials and appeals.

16.     To handle the asbestos personal injury claims, in 1988 AWI became a member of the Center for Claims Resolution ("CCR"), a group of asbestos defendants who work together to defend and resolve asbestos claims. According to the Producer Agreement, a principal goal of the CCR is to "resolve meritorious asbestos-related claims in a fair and expeditious manner and, where necessary, defend asbestos-related claims efficiently and economically." It was AWI's goal in handling its asbestos liabilities to minimize the dollars it paid to asbestos personal injury claimants, "in keeping with what it felt its obligations were to people who had in fact been injured." (Deposition of Deborah K. Owen, at 120).[3]

17.     CCR resolved claims against its members, including AWI, by both entering into settlements of trial-listed cases with individual plaintiffs or groups of plaintiffs, or by resolving large numbers of claims at once through group settlements

---

[3]     Note that, on the transcript of Ms. Owen's deposition, she is mistakenly referred to throughout as "Barbara" Owen. Her proper name is Deborah K. Owen.

pursuant to the CCR's "Strategic Settlement Program." CCR would settle claims only if the plaintiff agreed to release all CCR members. The costs of each settlement or group settlement were divided among the CCR members under a complicated formula agreed to pursuant to the Producer Agreement.

18.    During the first nine months of 2000, the CCR received and verified approximately 45,300 claims naming AWI as a defendant compared to approximately 40,500 during the first nine months of 1999.

19.    According to its 10-Q for the quarter ended September 30, 2000, AWI made liability payments of $220.8 million to resolve asbestos claims during the 12 months preceding the end of this quarter.

20.    AWI included a reserve for asbestos liabilities to future claimants in its financial statements. The reserve was based on AWI's past claims resolution history which included how many claims had settled and the average settlement amount per claim. (Deborah Owen Deposition, at 126). The claims history and resultant liability was projected for six years into the future. AWI made no attempt in its financial statements to capture the total asbestos liability it might be facing. (Owen Deposition, at 126-127).

21.    To place a value on AWI's total asbestos personal injury liability as of the bankruptcy Petition Date, AWI and the Official Committee of Asbestos Personal Injury Claimants proffered the expert opinion testimony of Dr. Mark A. Peterson.

22.    Dr. Peterson is an attorney with a Ph.D. in social psychology. He is associated with the Rand Institute where for over 20 years he has been involved in studying the tort claiming process. Dr. Peterson is an acknowledged expert in the field of mass tort valuation and has qualified on numerous occasions as an expert witness on the

valuation of current and the projection and valuation of expected future asbestos personal

injury claims. He has qualified as an expert and testified on asbestos claims projections

and valuation in over a dozen cases since 1993 including the Babcock & Wilcox, Fuller

Austin, Eagle-Picher, National Gypsum, Celotex, Fibreboard, Hillsborough Holdings, and

Western MacArthur proceedings, all cases in which the liabilities of an asbestos defendant

were in dispute. In addition to his work as a testifying expert witness, Dr. Peterson has

served as a consultant on asbestos claims projections and valuation of asbestos liabilities to

asbestos defendants, insurance companies, 12 different asbestos settlement trusts, and

several courts. He also serves as a Special Advisor to Judge Jack Weinstein, the United

States District Court Judge who oversaw the litigation in which the Manville Trust was

restructured. In all of these engagements, Dr. Peterson followed the same general

methodology for valuing asbestos liabilities that he used in his analysis and testimony here.

        23.     After confirming its reliability, Dr. Peterson used AWI's claims

history database as a basis for his valuations and projections.[4] Dr. Peterson first valued

AWI's liability for claims pending on the Bankruptcy Petition Date, grouping the pending

claims into disease categories (mesothelioma, lung cancer, other cancer, non-malignant

asbestos disease), discounting the total number of pending claims by the AWI historical

percentage of claims dismissed without payment and then multiplying the remaining

"likely to be paid" claims by the average resolution amount for each particular claim

---

[4]     As part of the claims settlement process, CCR kept hardcopy records and an
electronic database (the "CCR database") containing information for each separate
asbestos personal injury claim, including information concerning the claimant's identifying
information, the dates of exposure, the asbestos-related medical condition the plaintiff
complained of, the amount of any settlement, and when the file was closed.

category. Dr. Peterson arrived at a (nominal) valuation of the liability for the 165,048 pending cases as of December, 2000 of $837.9 million.

24.    Dr. Peterson's methodology for projecting future claims assumed that, absent evidence to the contrary, future claiming against AWI would broadly follow its well-established historical patterns, in terms of claims against AWI relative to the continuing incidence of asbestos-related cancers in the general population, the ratio of non-malignant to malignant claims, and with respect to amounts paid to resolve claims for different diseases. His methodology also took account of foreseeable changes in factors affected by non-epidemiological influences – including changes in the propensity to file against AWI, the ratio of non-malignant to malignant disease claims and the amounts paid to settle cases.

25.    To predict the ongoing incidence of asbestos-related cancers, Peterson used the seminal 1982 work of Drs. Nicholson, Perkel and Selikoff. Their studies analyzed the incidence of asbestos-related cancer deaths in a range of occupations, and projected the number of such deaths in the United States in future years. The Nicholson projections took into account differences in intensity of exposure in various occupations, and the resulting differential impact on incidence of disease.

26.    The Nicholson studies had predicted that, during the 1990's, the incidence of asbestos-related cancers would gradually peak and begin to go down slowly, until 2040. The accuracy of these projections of incidence for mesothelioma has been confirmed by data on actual mortality experience collected by the National Cancer Institute.    The close correspondence between predicted and actual incidence of

mesothelioma also validates the Nicholson projections for the other asbestos-related cancers.

27.    Dr. Peterson then measured the relationship between the overall incidence of asbestos-related cancer deaths and claims against AWI – the "propensity to sue." He found that during the most recent period annual claims against AWI alleging mesothelioma represented over 50 percent of the number of deaths from mesothelioma nationwide. Dr. Peterson testified that in his opinion this claiming ratio would increase for the next several years at the rate it had increased over the previous years (the "increasing" forecast). As a sensitivity analysis he also made a projection based upon the assumption that the propensity to sue AWI would remain at its 1999-2000 (the "no increase" forecast). It is Dr. Peterson's opinion that the "increasing propensity to sue" forecast is far more likely to occur and that the "no increase" forecast is unreasonably low. Dr. Peterson made a similar analysis, and similar alternate assumptions, for lung and other cancers.

28.    To project the number of future claims for non-malignant diseases, Dr. Peterson, following the practice of most who forecast asbestos claims, looked to the historical relationship of AWI's non-malignant claims to its cancer claims – the "non-malignant multiplier." In doing so, he considered AWI's historical experience of the relationship between the two types of claims. Dr. Peterson testified, and the Court finds, that the historical ratio of non-malignant claims to cancer claims for AWI has remained relatively constant over the past decade.

29.    Dr. Peterson's methodology for valuing AWI's asbestos personal injury liabilities followed generally accepted standards in the field of forecasting asbestos liabilities.

30.    To place a value on the financial liability AWI faced to resolve future claims, Dr. Peterson considered the cost at which AWI had been able to resolve similar claims in the past, and the percentage of claims that had been rejected without payment.    Although AWI's average claim resolution cost had increased markedly throughout the 1990's, Dr. Peterson assumed the future claim resolution costs would rise only at the rate of inflation – 2.5%.

31.    Dr. Peterson's valuation of AWI's liabilities for future asbestos claims as of December 2000 was a total nominal cost of $12.199 billion.

32.    As noted above, Dr. Peterson had arrived at a valuation of $837.9 million for the cost of resolving the 165,000 claims pending on December 6, 2000. To the sum of the amounts to resolve both pending and future claims he added the costs of defense, assumed to be equivalent to AWI's historical experience of 3.56% of liability. The resultant estimated undiscounted cost total was $13.540 billion.

33.    Larry Tersigni is a CPA with a background and expertise in audits of public companies, business valuation, advice to clients on potential acquisitions, accounting and solvency issues. Mr. Tersigni testified by Declaration, but was available for cross-examination. Mr. Tersigni testified that in his professional opinion, a risk-free rate of interest is the proper interest rate to use when discounting liabilities owed to involuntary creditors to present value. In addition to his own background, knowledge, training and experience, Mr. Tersigni also relied upon two authoritative accounting pronouncements in reaching his opinion that a risk-free rate of return should be applied: SEC Staff Accounting Bulletin No. 92 – Accounting and Disclosure related to Loss Contingencies, and AICPA Statement of Position 96-1.

34. Mr. Tersigni testified that risk free rates of return are associated with U.S. Government securities. He also testified that a risk-free rate that was comparable to the maturity of AWI's asbestos liability can be derived from the U.S. Treasury Yield Curve, which estimates the interest rates at which the Treasury could borrow money with maturities ranging from one year to thirty years. Based on his analysis and calculations involving the U.S. Treasury Yield Curve data, Mr. Tersigni opined that as of December 2000, 5.53% was the risk free rate of return that should be used to discount to present value AWI's asbestos liabilities that will be paid in future years.

35. The present value of the AWI asbestos liabilities projected by Dr. Mark Peterson as of December 2000, discounting by the risk-free interest rate of 5.53%, was $6.479 billion.

**Prepetition Asbestos-Related**
**Property Damage Litigation Against AWI**

36. Prior to the Commencement Date, AWI was named as a defendant in 273 property damages cases seeking recovery for damages allegedly caused by the presence of asbestos-containing materials in plaintiffs' premises. Such claims generally were not the result of AWI's insulation installation contracting activities. Instead, those that were actively pursued against AWI concerned primarily resilient floor covering products manufactured and sold by AWI prior to 1983. (Disclosure Statement, p. 25, Docket No. 4801).

**Events Leading to the**
**Commencement of AWI's Chapter 11 Case**

37. On October 5, 2000, Owens Corning ("*OC*") filed for chapter 11 protection to address its asbestos liabilities. *In re Owens Corning, et al.*, Chapter 11 Case No. 00-03837 (JKF) (Bankr. D. Del.). Following the OC filing, AWI was unable to obtain

a replacement credit facility with acceptable terms for its then-existing $450 million credit facility due to expire on October 19, 2000. OC's chapter 11 filing raised additional concerns about the possibility of increased settlement demands of asbestos plaintiffs given that, prior to its filing, OC had been a major defendant in asbestos litigation. (Rodruan Affidavit, at ¶ 5).

38.    On October 25, 2000, both Standard & Poors and Moody's Investors Services downgraded AWI's long-term debt rating, citing the reduction in committed credit facilities, prospects for weaker operating performance, and continued uncertainty surrounding AWI's asbestos personal injury liability as result of, among other things, OC's chapter 11 filing. (Rodruan Affidavit, at ¶ 6).

39.    After October 25, 2000, AWI was unable to issue commercial paper and, instead borrowed from its remaining $450 million credit facility. As of December 6, 2000, approximately $50 million of commercial paper was outstanding, and the entire $450 million credit facility had been drawn and was outstanding. (Rodruan Affidavit, at ¶ 7).

## Commencement of AWI's Chapter 11 Case

40.    On December 6, 2000 (the *"Commencement Date"*), AWI and two of its wholly-owned direct and indirect subsidiaries, Nitram Liquidators, Inc. and Desseaux Corporation of North America (collectively, the *"Debtors"*), each commenced a case under chapter 11 of the Bankruptcy Code. (Debtors' Chapter 11 Petitions, Docket No. 1).

41.    By previous order of the Bankruptcy Court, dated December 7, 2000, the chapter 11 cases of the Debtors are being jointly administered pursuant to Rule

1015 of the Federal Rules of Bankruptcy Procedure. (Debtors' Joint Administration Order, Docket No. 10).

42.     The Chapter 11 Case originally was assigned to the Honorable Joseph J. Farnan, Jr., a U.S. District Court Judge for the District of Delaware. During the fourth quarter of 2001, the U.S. Court of Appeals for the Third Circuit assigned U.S. District Court Judge Alfred M. Wolin of New Jersey to preside over the Chapter 11 Case in the District of Delaware. Judge Wolin also presides over other asbestos-related chapter 11 cases pending in the District of Delaware. Judge Wolin retained issues relating to asbestos personal injury claims and referred other asbestos-related issues and bankruptcy-related matters in the Chapter 11 Case to U.S. Bankruptcy Court Judge Randall J. Newsome.

43.     Since the Commencement Date, the Debtors have continued to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

44.     No trustee or examiner has been appointed in the Debtors' chapter 11 cases. On or about December 15, 2000, the United States Trustee for the District of Delaware (the "*U.S. Trustee*") appointed the Official Committee of Unsecured Creditors (the "*Unsecured Creditors Committee*"), and the Official Committee of Asbestos Claimants (the "*Asbestos PI Claimants' Committee*"). (Notice of Appointment of Unsecured Creditors' Committee, Docket No. 90; Notice of Appointment of the Asbestos PI Claimants' Committee, Docket No. 91).

45.     On or about July 19, 2001, the U.S. Trustee appointed the Official Committee of Asbestos Property Damage Claimants (the "*Asbestos PD Committee*").

(Notice of Appointment of Asbestos PD Committee, Docket No. 1075). The Asbestos PD Committee was disbanded as of September 18, 2003, pursuant to the terms of the Global Asbestos PD Settlement, which was approved by the Bankruptcy Court on August 25, 2003. (Order Approving Global Asbestos PD Settlement, Docket No. 5464).

46.     On or about March 1, 2002, the Bankruptcy Court entered an order approving the appointment of Dean M. Trafelet as the legal representative for AWI's future asbestos personal injury claimants (the *"Future Claimants' Representative,"* and together with the Unsecured Creditors' Committee and the Asbestos PI Claimants' Committee, the *"Committees"*). (Order Appointing Future Claimants' Representative, Docket No. 2096).

## Negotiation of the Plan

47.     Since the commencement of its Chapter 11 Case and promptly after achieving stabilization of its business operations, AWI engaged in extensive and continuing negotiations with the various constituents in the Chapter 11 Case in order to formulate a long-term business plan and, ultimately, to formulate, negotiate and propose a plan of reorganization. (Rodruan Affidavit, at ¶ 8).

48.     On August 29, 2002, AWI and the representatives of the Committees appeared at a status conference before the District Court. At such status conference, the District Court requested that AWI file a plan of reorganization within 45 days. (Rodruan Affidavit, at ¶ 9).

49.     Following such status conference, AWI focused its efforts, together with the Committees, on negotiating and working out the details of a comprehensive plan of reorganization that had the support of all the major constituencies in the Chapter 11

Case. These efforts involved substantial time and effort on the part of AWI, the Committees, and their respective professionals. (Rodruan Affidavit, at ¶ 10).

50.    On October 17, 2002, AWI and the representatives of the Committees appeared at a subsequent status conference before the District Court. At such status conference and after substantial negotiations, the parties reached agreement on the terms of a plan that had the support of the Committees. (Rodruan Affidavit, at ¶ 11). As a result of such agreement, on November 4, 2002, AWI filed the Plan of Reorganization of Armstrong World Industries, Inc. with the Bankruptcy Court (the *"Original Plan"*). (Docket No. 3313).

51.    On December 20, 2002, AWI filed the proposed disclosure statement with respect to the Original Plan. (Docket No. 3313).

52.    Subsequent to the filing of the Original Plan and proposed disclosure statement, AWI, the Committees and other parties in interest engaged in further negotiations in an effort to resolve a number of objections that arose in connection with approval of the disclosure statement, which resulted in AWI filing amended plans of reorganization on March 14, 2003 (the *"First Amended Plan"*), April 3, 2003 (the *"Second Amended Plan"*), and May 1, 2003 (the *"Third Amended Plan"*). (Docket No. 4241, No. 4414, and No. 4636, respectively).

53.    Hearings to consider the adequacy of the Disclosure Statement were conducted by the Bankruptcy Court on February 28, 2003, April 4, 2003, May 5, 2003, and May 30, 2003 (collectively, the *"Disclosure Statement Hearing"*).

54.    On May 23, 2003, AWI filed the Plan (Docket No. 4802) and the Disclosure Statement (Docket No. 4801) to, *inter alia*, address the comments made by the Bankruptcy Court at the Disclosure Statement Hearing and to make other agreed changes.

55.    A key feature of the Plan is the establishment of the Asbestos PI Trust, into which all present Asbestos Personal Injury Claims and future Demands against AWI will be channeled. From the commencement of AWI's case, no party has seriously disputed that the establishment of such a trust would be the cornerstone of any plan of reorganization in the Chapter 11 Case. Indeed, in order to obtain the benefit of a permanent channeling injunction with respect to Asbestos Personal Injury Claims and Demands, section 524(g) of the Bankruptcy Code requires that such Claims and Demands be channeled to a trust that meets the requirements set forth in such section.

## The Voting Procedures Order

56.    On April 21, 2003, by the Voting Procedures Order, the Bankruptcy Court approved (i) solicitation and tabulation procedures and (ii) the forms of ballots and master ballots (collectively, the *"Ballots"*) to be used in connection with the solicitation of votes to accept or reject the Plan (the *"Voting Procedures"*). (Voting Procedures Order, Docket No. 4564).

## The Disclosure Statement Order
## and Solicitation of Votes on the Plan

57.    On June 2, 2003, by the Disclosure Statement Order, the Bankruptcy Court, among other things, (i) found that sufficient and timely notice of the Disclosure Statement Hearing was given in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court and (ii) approved the Disclosure Statement as containing "adequate

information" within the meaning of section 1125 of the Bankruptcy Code. (Disclosure Statement Order, Docket No. 4885).

58.    The Disclosure Statement Order and the Voting Procedures established the record date for determining creditors entitled to vote on the Plan (the "*Voting Record Date*") as June 4, 2003.

59.    The Disclosure Statement Order authorized and directed Trumbull and Innisfree (collectively, the "*Voting Agents*"), on behalf of AWI, to solicit acceptances and rejections of the Plan in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and in accordance with the procedures set forth in the Disclosure Statement Order and the Voting Procedures. (Disclosure Statement Order, Docket No. 4885).

60.    In compliance with the Disclosure Statement Order and the Voting Procedures, AWI caused to be transmitted by first class mail, postage prepaid, to (i) each holder of a Claim against AWI listed in the schedules as of the Voting Record Date, (ii) each holder of a Claim represented by a proof of claim filed against AWI, (iii) each Entity listed on the schedules as a party to an executory contract or an unexpired lease with AWI and any Entity listed as a party to any contract listed on Exhibit "8.1," "8.2" or "8.4" to the Plan, (iv) each holder of a Claim held by a Lender (as such term is defined in the Voting Procedures) as of the Voting Record Date, (v) each holder of record of the Equity Interests in AWI, (vi) all holders of Debt Security Claims and the holders of equity securities issued by Armstrong Holdings, Inc. ("*Holdings Equity Securities*"), in accordance with the procedures set forth in section 3.g of the Voting Procedures, and (vii) all known holders of Asbestos Personal Injury Claims and Indirect PI Trust Claims, in

accordance with the procedures set forth in section 4 of the Voting Procedures, the following: (a) a copy of the Disclosure Statement and all exhibits thereto, including, without limitation, the Plan annexed thereto as Exhibit "A" and the Disclosure Statement Order annexed thereto as Exhibit "B;" (b) the Notice of (i) Approval of Disclosure Statement, (ii) Establishment of Record Date for Voting Purposes, (iii) Hearing to Consider Confirmation of the Plan, (iv) Procedures for Objecting to Confirmation of the Plan, and (vi) Procedures and Deadline for Voting on the Plan (the "*Confirmation Hearing Notice*"); and (c) if such holder was entitled, pursuant to the Disclosure Statement Order, to vote, an appropriate Ballot for each class in which such holder was entitled to vote and a pre-addressed return envelope for each such Ballot (collectively, a "*Solicitation Package*"). (Trumbull Affidavit of Mailing, at ¶ 3).

61.    Pursuant to the Disclosure Statement Order, AWI was required to complete such transmittal on or before June 20, 2003 (except with respect to holders of Holdings Equity Securities as described below), and such transmittal was timely completed in accordance with the requirements of the Disclosure Statement Order. (Trumbull Affidavit of Mailing, at ¶ 2; Innisfree Affidavit of Mailing, at ¶ 3).

62.    Pursuant to the terms of the Disclosure Statement Order, AWI was authorized and directed to cause a Solicitation Package to be served on the holders of Holdings Equity Securities by August 22, 2003. The record date for determining the holders of Holdings Equity Securities entitled to receive Solicitation Packages was set as August 15, 2003 (the "*Holdings Record Date*") (Rodruan Affidavit, at ¶ 11).

63.    In accordance with the Disclosure Statement Order, AWI caused to be transmitted by first class mail, postage prepaid, a Solicitation Package (without a Ballot)

to all holders of Holdings Equity Securities as of the Holdings Record Date, by August 22, 2003. (Trumbull Affidavit of Mailing, at ¶ 4).

64.    The Disclosure Statement Order authorized and directed AWI to provide or cause to be provided notice by publication (the *"Confirmation Hearing Publication Notice"*) of the approval of the Disclosure Statement, the Voting Deadline, the time and place of the Confirmation Hearing, the time and date by which objections to confirmation of the Plan were required to be filed, and other pertinent information. (Disclosure Statement Order, Docket No. 4885).

65.    The Confirmation Hearing Publication Notice was published (i) twice in *The New York Times, The Wall Street Journal* and *USA Today* (weekday editions of the national edition), and (ii) once in each of the newspapers and trade publications set forth on Exhibits "E" and "F" to the Disclosure Statement Order, on the dates set forth next to the name of each such publication as set forth in paragraph 6 to the Certificate of Publications, in accordance with the Disclosure Statement Order.    (Certificate of Publications, Docket No. 5309).

66.    The Disclosure Statement Order authorized and directed AWI to provide or cause to be provided notice by publication to all unknown holders of Asbestos Personal Injury Claims (the *"Asbestos Publication Notice"*) of the Voting Deadline, the Objection Deadline and other pertinent information relating to the Confirmation Hearing and the solicitation of votes on the Plan. (Disclosure Statement Order, Docket No. 4885).

67.    The Asbestos Publication Notice was published once in each of the publications listed in paragraph 5 to the Certificate of Publications on the dates set forth next to the name of each such publication. (Certificate of Publication, Docket No. 5309).

68.    AWI's publication of the Confirmation Hearing Publication Notice and the Asbestos Publication Notice complied in all material respects with the requirements of the Disclosure Statement Order and the Voting Procedures.

69.    Written requests for Solicitation Packages were received from each of the persons or entities listed on Exhibit "A" to the Trumbull Certification, and Trumbull mailed by first-class mail, postage-prepaid, a Solicitation Package to each of the persons or entities listed on Exhibit "A" on or about the date specified next to the name of each such person or entity. (Trumbull Certification, at ¶ 7).

70.    AWI's distribution of the Solicitation Packages complied with the requirements of the Disclosure Statement Order.

71.    The Disclosure Statement Order (i) established the date and time by which all Ballots were required to be completed, executed, marked and actually received by the Voting Agents in order to be counted as timely acceptances or rejections of the Plan (the "*Original Voting Deadline*") as September 22, 2003, at 5:00 p.m., Wilmington, Delaware time; (ii) established September 22, 2003, at 4:00 p.m., Wilmington, Delaware time, as the date and time for filing objections to confirmation of the Plan (the "*Objection Deadline*"); (iii) established October 24, 2003, at 4:00 p.m., Wilmington, Delaware time, as the last date and time for AWI, the DIP Lenders, the Prepetition Lenders, and the Committees to file responses to objections to confirmation (the "*Reply Deadline*"); and (iv) scheduled the Confirmation Hearing to commence on November 17, 2003.

72.    By order of the Bankruptcy Court dated September 24, 2003, the Original Voting Deadline was extended to 5:00 p.m., Wilmington, Delaware time, on October 17, 2003. (Order Extending Voting Deadline, Docket No. 5688). Thereafter, by

order of the Bankruptcy Court dated October 11, 2003, the Original Voting Deadline was further extended to 5:00 p.m., Wilmington, Delaware time, on October 31, 2003 (the "*Voting Deadline*"). (Second Order Extending Voting Deadline, Docket No. 5797).

## Filing of the Exhibit Volume

73.    In accordance with Article I.B of the Plan, on September 5, 2003, AWI filed with the Bankruptcy Court the Exhibit Volume, which includes draft forms of (i) the Amended and Restated Articles of Incorporation, (ii) the Amended and Restated By-Laws, (iii) the Asbestos PI Trust Agreement, (iv) the Asbestos PI Trust Distribution Procedures, (v) the Claims Settlement Guidelines, (vi) the New Long-Term Incentive Plan, (vii) the New Warrants, (viii) the Plan Note Indentures, (ix) the Stockholder and Registration Rights Agreement, (x) a list identifying the individuals appointed as Asbestos PI Trustees, (xi) a list identifying the proposed Board of Directors of Reorganized AWI, and (xii) lists of (a) any executory contracts and unexpired leases to be assumed pursuant to the Plan, (b) any executory contracts and unexpired leases to be rejected pursuant to the Plan, and (c) previously listed executory contracts no longer considered executory, and (xiii) Management Agreements that AWI intends to enter into in connection with consummation of the Plan (of which there are none). (Exhibit Volume, Docket No. 5508).

## Classification of Claims and Equity Interests Under the Plan

74.    The Plan designates the following classes of Claims and Equity Interests:

| | | |
|---|---|---|
| Class 1 | - | Priority Claims |
| Class 2 | - | Secured Claims |
| Class 3 | - | Convenience Claims |
| Class 4 | - | Asbestos Property Damage Claims |
| Class 5 | - | COLI Claims |
| Class 6 | - | Unsecured Claims other than Convenience Claims |

| Class 7  | - | Asbestos Personal Injury Claims  |
| Class 8  | - | Environmental Claims             |
| Class 9  | - | Affiliate Claims                 |
| Class 10 | - | Subsidiary Debt Guarantee Claims |
| Class 11 | - | Employee Benefit Claims          |
| Class 12 | - | Equity Interests                 |

(Plan, Article II).

75.     The Plan defines a "Convenience Claim" as an Unsecured Claim (other than a Debt Security Claim) in the amount of $10,000 or less or that is reduced to $10,000 at the election of the Claimant. A holder of an Allowed Convenience Claim will be paid 75% of the Allowed Amount of its Allowed Convenience Claim in cash on the later of the Effective Date and as soon as practicable after such Convenience Claim becomes Allowed. (Plan, Section 1.48). AWI estimates that approximately 2,050 holders of Unsecured Claims either have Convenience Claims or have elected to have their Unsecured Claims treated as Convenience Claims. (Rodruan Affidavit, at ¶ 13). The treatment of such claims as Convenience Claims enables AWI to avoid having to keep track of such Claims for purposes of making Distributions on each Distribution Date and to avoid having to issue small amounts of New Common Stock and Plan Notes (if issued) to such holders. (Rodruan Affidavit, at ¶ 13). Accordingly, the designation of a class of Convenience Claims (Class 3) is reasonable and necessary for administrative convenience. (Plan, Article II; Rodruan Affidavit, at ¶ 13).

76.     All Claims within each class are substantially similar to the other Claims in that class, and the class of Equity Interests (Class 12) consists of a single holder of Equity Interests. (Plan, Article II; Rodruan Affidavit, at ¶ 14).

77.     The classification scheme was not proposed to create a consenting impaired class or to manipulate class voting. (Plan, Article II; Rodruan Affidavit, at ¶ 14).

RLF1-2682289-1

26

**The Voting**

78.     Section 3.1 of the Plan identifies each of the following Classes as
unimpaired under the Plan: Class 1 (Priority Claims), Class 2 (Secured Claims), Class 4
(Asbestos Property Damage Claims), Class 5 (COLI Claims), Class 9 (Affiliate Claims),
Class 10 (Subsidiary Debt Guarantee Claims), and Class 11 (Employee Benefit Claims).
Pursuant to section 1126(f) of the Bankruptcy Code, the holders of Claims in these
Classes, and, therefore, these Classes, are conclusively presumed to have accepted the
Plan.

79.     Because of the Global Asbestos PD Settlement and the disallowance
of other Asbestos Property Damage Claims, Class 4 no longer has any Claims in it.
Moreover, because no Environmental Claims currently exist, Class 8 has no Claims in it.
(Rodruan Affidavit, at ¶ 12).

80.     The Voting Agents have made a final determination of the validity
of, and tabulation respecting, all acceptances and rejections of the Plan by the impaired
Classes of Claims and Equity Interests entitled to vote on the Plan, and the Certifications
of Votes set forth such results, including the amount and number of Claims of each Class
voting to accept or reject the Plan. The following summarizes, by each impaired Class, the
voting on the Plan:

| Class | $ / % voting to Accept | $ / % voting to Reject | # / % voting to Accept | # / % voting to Reject |
|-------|------------------------|------------------------|------------------------|------------------------|
| Class 3 | 2,291,751/98.24% | 41,029/1.76% | 747/98.68% | 10/1.32% |
| Class 6 | 266,151,238/23.21% | 880,433,654/76.79% | 1,646/88.03% | 224/11.98% |
| Class 7 | 3,614,589,300/98.31% | 62,114,300/1.69% | 297,338/98.23% | 5,351/1.77% |
| Class 12 | 40,255,499/100% | _____ | 1/100% | _____ |

Accordingly, each of impaired Classes 3 and 7 has accepted the Plan by at least two-thirds in amount and a majority in number of the Claims in each such Class actually voting. Class 6 has failed to accept the Plan because less than two-thirds in amount of Claims in Class 6 actually voting on the Plan voted to accept the Plan. Class 12 has accepted the Plan by at least two-thirds of the Equity Interests in Class 12 held by the holder of such Equity Interests that has voted on the Plan. Nevertheless, pursuant to Section 3.2(l)(iii) of the Plan, because Class 6 did not vote to accept the Plan, Class 12 is deemed to have rejected the Plan.

        81.     Class 7 (Asbestos Personal Injury Claims) has voted by at least 75 percent (75%) of those voting in favor of the Plan.

        82.     The determination of the Voting Agents with respect to the voting on the Plan validly and correctly sets forth the tabulation of votes, as required by the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order.

**Modifications to the Plan**

        83.     On October 17, 2003 and November 10, 2003, AWI filed the Modifications. Among other things, the Modifications (i) reflect the incorporation of the Term B Loan concept as part of AWI's exit financing facility, (ii) clarify that, with respect to the 144A Offering, (a) if the 144A Offering Proceeds are less than the amounts required under the terms of the Plan, AWI will issue securities substantially similar to the 144A Debt Securities, and (b) the 144A Offering Proceeds are carved out of the definition of Available Cash under the Plan, (iii) reflect an agreement that AWI will not issue any floating rate notes unless such notes are issued on terms and conditions that are mutually

28

satisfactory to AWI and the Committees, (iv) provide for modifications to the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, which, among other things, preserve the ability of holders of Indirect PI Trust Claims to prove their Claims against the Asbestos PI Trust, and (v) correct technical errors with respect to the agreements listed on Exhibits "8.1," "8.2," and "8.4" to the Plan.

        84.    Notice of the proposed Modifications was provided to the United States Trustee, the attorneys for the Committees, the attorneys for the Debtors' Prepetition Lenders, and all parties on the Debtors' Core Group Service List and All Notices List in these cases pursuant to the Court Order Establishing Case Management Procedures and Hearing Schedule, dated February 11, 2002. The Modifications do not adversely affect the treatment of the Claim of any creditor or the Equity Interests of any equity security holder who has not accepted in writing the Modifications.

### Objections to Confirmation of the Plan

        85.    By the Objection Deadline, objections to confirmation of the Plan (collectively, the "*Objections*") were filed by the following parties:

- ACE USA Insurers (Docket No. 5633)

- Amchem Products, Inc., Certainteed Corp., Dana Corp., I.U. North America, Inc., Maremont Corp., National Service Industries, Inc., Nosroc Corp., Pfizer Inc., Quigley Co., Inc., and Union Carbide Corp. (the "*CCR Members*")

- California Franchise Tax Board

- Center for Claims Resolution ("*CCR*")

- Directly Affiliated Local Union 461, AFL-CIO ("*DALU 461*")

- E.F.P. Floor Products Fussboeden GbmH, St. Johann in Tirol (Austria) ("*EFP*")

- Georgia Department of Natural Resources

29

- John Crane, Inc.

- Liberty Property Holdings, L.P.

- Unsecured Creditors' Committee (Conditional Objection)

- Safeco Insurance Company of America (*"Safeco"*)

- Solutia Inc.

- Travelers Indemnity Company and Travelers Casualty and Surety Company (*"Travelers"*)

- United States

- United States Department of Labor

- United States Gypsum Co. (*"USG"*)

- U.S. Trustee

After the Objection Deadline, objections were filed by Liberty Mutual Insurance Company (*"Liberty Mutual"*) and Bank One Trust Company, N.A., as indenture trustee (*"Bank One"*). In addition, after the Objection Deadline, on November 12, 2003, the Unsecured Creditors' Committee filed a Memorandum of Law of the Official Committee of Unsecured Creditors in Opposition to Confirmation of the Debtors' Fourth Amended Plan of Reorganization (the "November 12 Objection"). In response to a motion by AWI, dated November 14, 2003, seeking entry of an order pursuant to Bankruptcy Rules 9006 and 3020 striking certain objections contained in the November 12 Objection, the Bankruptcy Court entered a separate order striking certain objections contained in the November 12 Objection. The objections by Liberty Mutual and Bank One, and the remaining objections in the November 12 Objection are included within the scope of the term "Objections" as used herein.

86.    In accordance with the Disclosure Statement Order, AWI filed a reply to the Objections (the "*Reply*") by the Reply Deadline and served the Reply on all entities required to be served so that such entities actually received the Reply by the Reply Deadline.

87.    The Objections of the ACE USA Insurers, Liberty Property Holdings, L.P., the U.S. Trustee, the California Franchise Tax Board, the CCR Members, CCR, DALU 461, EFP, Georgia Department of Natural Resources, John Crane, Inc., Safeco, Solutia Inc., Travelers, the United States, the United States Department of Labor, Liberty Mutual, and USG have been withdrawn. The Objections of the Unsecured Creditors' Committee and Bank One have been overruled. Accordingly, all of the Objections have been withdrawn, overruled, satisfied by consent, modification and/or amendment to the Plan, or otherwise resolved.

## The Asbestos PI
## Permanent Channeling Injunction

88.    The Plan establishes the Asbestos PI Trust, to which all Asbestos Personal Injury Claims are being channeled.

89.    The identities of the proposed trustees of the Asbestos PI Trust were disclosed (i) in Exhibit 7.2 of the Exhibit Volume and (ii) at the Confirmation Hearing, and are as follows: Paul Knutti, Anne Ferazzi, Thomas Tully, Lewis Sifford, and Harry Huge. (Trafelet Affidavit, at ¶ 23). The identities of the proposed members of the Trustees' Advisory Committee (the "*TAC*") were disclosed at the Confirmation Hearing and are as follows: John D. Cooney, Russell W. Budd, Steven Kazan, Joseph F. Rice, and Perry Weitz. (Trafelet Affidavit, at ¶ 25).

90.     With respect to any Asbestos Personal Injury Claim that is allowed by the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, such allowance shall establish the amount of legal liability against the Asbestos PI Trust in the amount of the liquidated value of such Claim, as determined in accordance with the Asbestos PI Trust Distribution Procedures.

91.     The Asbestos PI Permanent Channeling Injunction is to be implemented in connection with the Plan and the Asbestos PI Trust.

92.     Section 1.93 of the Plan sets forth the identities of the PI Protected Parties. Pursuant to Section 1.93(i)(iv) of the Plan, Travelers Casualty & Surety Co., Century Indemnity Co., Central National Insurance Company of Omaha, and International Insurance Company, shall be entitled to protection as PI Protected Parties. The identity of each PI Protected Party is readily identifiable (by name or as part of an identifiable group) from the terms of the Plan and the Asbestos PI Permanent Channeling Injunction (which is contained and set forth in the Confirmation Order). Specifically, the Asbestos PI Permanent Channeling Injunction provides that it covers the following parties:

     a.  AWI;

     b.  Reorganized AWI;

     c.  Holdings;

     d.  AWWD;

     e.  any Affiliate;

     f.  Interface Solutions, Inc., a corporation organized under the laws of Pennsylvania, but only to the extent that Interface Solutions, Inc. is alleged to be directly or indirectly liable for the conduct

of, Claims against, or Demands on AWI, Reorganized AWI, or the Asbestos PI Trust on account of Asbestos Personal Injury Claims;

g.  any Entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor to, any assets of AWI, Reorganized AWI, or the Asbestos PI Trust (but only to the extent that liability is asserted to exist by reason of it becoming such a transferee or successor);

h.  any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to Reorganized AWI or the Asbestos PI Trust or to a successor to, or transferee of, any assets of AWI, Reorganized AWI or the Asbestos PI Trust (but only to the extent that liability is asserted to exist by reason of such Entity becoming such a lender or to the extent of any pledge of assets made in connection with such a loan is sought to be upset or impaired); and

i.  any Entity to the extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on AWI, Reorganized AWI or the Asbestos PI Trust on account of Asbestos Personal Injury Claims by reason of one or more of the following:

(i)    such Entity's ownership of a financial interest in AWI, Reorganized AWI, a past or present affiliate of

AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), or a predecessor in interest of AWI or Reorganized AWI;

(ii)    such Entity's involvement in the management of AWI, AWWD, Holdings, an Affiliate, Reorganized AWI, or any predecessor in interest of AWI or Reorganized AWI;

(iii)    such Entity's service as an officer, director, or employee of AWI, Reorganized AWI, AWWD, Holdings, an Affiliate, any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), any predecessor in interest of AWI or Reorganized AWI, or any Entity that owns or at any time has owned a financial interest in AWI or Reorganized AWI, any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), or any predecessor in interest of AWI or Reorganized AWI.

(iv)    such Entity's provision of insurance to (a) AWI, (b) Reorganized AWI, (c) any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.),

(d) any predecessor in interest of AWI or Reorganized AWI, or (e) any Entity that owns or at any time has owned a financial interest in AWI or Reorganized AWI, any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), or any predecessor in interest of AWI or Reorganized AWI, but only to the extent that AWI, Reorganized AWI, or the Asbestos PI Trust enters into a settlement with such Entity that is approved by the Bankruptcy Court and expressly provides that such Entity shall be entitled to the protection of the Asbestos PI Permanent Channeling Injunction as a PI Protected Party; or

(v)    such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of AWI, AWWD, Holdings, an Affiliate, Reorganized AWI, any past or present affiliate of AWI or Reorganized AWI (other than ACandS, Inc. f/k/a Armstrong Contracting and Supply Corp.), any predecessor in interest of AWI or Reorganized AWI, or any Entity that owns or at any time has owned a financial

> interest in AWI or Reorganized AWI, any past or
> present affiliate of AWI or Reorganized AWI (other
> than ACandS, Inc. f/k/a Armstrong Contracting and
> Supply Corp.), or any predecessor in interest of AWI
> or Reorganized AWI.

93.    In light of the benefits provided, or to be provided, to the Asbestos PI Trust on behalf of each PI Protected Party, the Asbestos PI Permanent Channeling Injunction is fair and equitable with respect to the persons that might subsequently assert Asbestos Personal Injury Claims against any PI Protected Party. (Trafelet Affidavit, at ¶ 8).

94.    At the time of the order for relief with respect to AWI, AWI had been named as a defendant in personal injury, wrongful death, and property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products. (Rodruan Affidavit, at ¶ 4).

95.    The Asbestos PI Trust, as of the Effective Date, will assume the liabilities of AWI with respect to Asbestos Personal Injury Claims. (Section 1.4 of the Asbestos PI Trust Agreement, Exhibit Volume, Docket No. 5510, Tab 3). Upon such assumption, Reorganized AWI shall have no liability for any Asbestos Personal Injury Claim.

96.    Pursuant to Section 10.1 of the Plan, on the later of the Effective Date and the date by which all the Asbestos PI Trustees have executed the Asbestos PI Trust Agreement, AWI will transfer to the Asbestos PI Trust the Asbestos PI Insurance Asset and additional consideration, pursuant to the formula set forth in Section 10.1 of the

Plan, consisting of New Common Stock, Available Cash, and Plan Notes and/or 144A Offering Proceeds. Accordingly, the Asbestos PI Trust will be funded in whole or in part by securities of Reorganized AWI and by the obligation of Reorganized AWI to make future payments, including dividends.

97.    Pursuant to Section 10.1 of the Plan, the Asbestos PI Trust will own, as of the Effective Date, 65.57% of the New Common Stock of Reorganized AWI. Accordingly, the Asbestos PI Trust is to own, or by the exercise of rights granted under the Plan would be entitled to own if specified contingencies occur, a majority of the voting shares of Reorganized AWI.

98.    AWI is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos PI Permanent Channeling Injunction. (Testimony of Dr. Mark A. Peterson).

99.    The actual amounts, numbers, and timing of the future Demands cannot be determined. (Testimony of Dr. Mark A. Peterson).

100.   Pursuit of the Demands referenced in Section 7.15(a)(x) of the Plan outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

101.   The terms of the Asbestos PI Permanent Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement. (Plan, Docket No. 4802 Sections 1.21, 7.1; Disclosure Statement, Docket No. 4801, pp. 86-89).

102.    The Plan establishes, in Class 7 (Asbestos Personal Injury Claims), a separate class of the claimants whose Claims are to be addressed by the Asbestos PI Trust.

103.    The Future Claimants' Representative was appointed as part of the proceedings leading to issuance of the Asbestos PI Permanent Channeling Injunction for the purpose of protecting the rights of persons that might subsequently assert unknown Asbestos Personal Injury Claims and Demands that are addressed in the Asbestos PI Permanent Channeling Injunction and transferred to the Asbestos PI Trust. The Future Claimants' Representative has fulfilled his duties, responsibilities, and obligations as the future representative in accordance with section 524(g) of the Bankruptcy Code. (Trafelet Affidavit, ¶ 8).

104.    Identifying each PI Protected Party in the Asbestos PI Permanent Channeling Injunction is fair and equitable with respect to persons that might subsequently assert Demands against each such PI Protected Party, in light of the benefits provided, or to be provided, to the Asbestos PI Trust by or on behalf of any such PI Protected Party. (Trafelet Affidavit, at ¶ 14).

105.    As set forth in the voting summary provided above, and in the Trumbull Certification, Class 7 (Asbestos Personal Injury Claims) has voted, by at least 75 percent (75%) of those voting, in favor of the Plan.

106.    Pursuant to court orders or otherwise, the Asbestos PI Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial

position to pay, Asbestos Personal Injury Claims and Demands that involve similar claims in substantially the same manner. (Trafelet Affidavit, at ¶ 11).

107.    The Bankruptcy Court, subject to the affirmance or entry of an order by the District Court, has jurisdiction to enter the Asbestos PI Permanent Channeling Injunction under section 524(g) of the Bankruptcy Code and sections 1334(a), (b), and (d) of title 28 of the United States Code.

108.    Sections 105(a) and 524(g) of the Bankruptcy Code permit approval and entry of the Asbestos PI Permanent Channeling Injunction, especially where, as here, such injunction is essential to the formulation and implementation of the Plan as provided in section 1123(a)(5) of the Bankruptcy Code, confers material benefits on AWI's estate, is in the best interests of holders of Claims against AWI, and complies in all respects with the requirements of section 524(g) of the Bankruptcy Code.

## The Claims Trading Injunction

109.    Section 1.40 of the Plan provides for the Claims Trading Injunction, which will permanently and forever stay, restrain, and enjoin any Entity from, directly or indirectly, purchasing, selling, transferring, assigning, conveying, pledging, or otherwise acquiring or disposing of any Asbestos Personal Injury Claim. The Claims Trading Injunction, however, will not apply to (i) the transfer of an Asbestos Personal Injury Claim to the holder of an Indirect PI Trust Claim solely as a result of such holder's satisfaction of such Asbestos Personal Injury Claim or (ii) the transfer of an Asbestos Personal Injury Claim by will or under the laws of descent and distribution. The Claims Trading Injunction will also provide that any action taken in violation thereof will be void *ab initio*.

■

## Discharge, Exculpation and Indemnification Provisions

110.    Section 11.2 of the Plan provides that the rights afforded in the Plan and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Commencement Date, against AWI, or its estate, assets, properties, or interests in property. Except as otherwise provided therein, on the Effective Date, all Claims against and Equity Interests in AWI shall be satisfied, discharged, and released in full. Reorganized AWI shall not be responsible for any obligations of AWI except those expressly assumed by Reorganized AWI in the Plan. All Entities shall be precluded and forever barred from asserting against AWI, Reorganized AWI, their successors or assigns, or their assets, properties, or interests in property any other or further Claims based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

111.    Section 11.6 of the Plan provides that none of Reorganized AWI, any of the members of the Asbestos PI Claimants' Committee, the Future Claimants' Representative, any of the members of the Unsecured Creditors' Committee, any members of the Asbestos PD Committee, AWWD, Holdings, or any of their officers, directors, employees, or agents shall have or incur any liability to any Entity for any act or omission in connection with or arising out of the Chapter 11 Case, including, without limitation, the commencement of the Chapter 11 Case, the negotiation of the Plan, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property

to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Plan. (Plan, Docket No. 4802, Section 11.6).

112.    Section 8.6 of the Plan provides that the obligations of AWI to indemnify and reimburse persons who are or were directors, officers, or employees of Holdings, AWWD, or AWI on the Commencement Date or at any time thereafter against and for any obligations (including, without limitation, fees and expenses incurred by the board of directors of Holdings, or the members thereof, in connection with the Chapter 11 Case) pursuant to articles of incorporation, codes of regulations, bylaws, applicable state law, or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date. In furtherance of the foregoing, Reorganized AWI will maintain insurance for the benefit of such directors, officers, or employees at levels no less favorable than those existing as of the date of entry of the Confirmation Order for a period of no less than four years following the Effective Date. (Plan, Docket No. 4802, Section 8.6).

113.    The discharge, exculpation and indemnification provisions of the Plan were negotiated at arm's-length and are integral to the Plan. Without such provisions, the Plan would not have been agreed to by the parties in interest. (Rodruan Affidavit, at ¶ 6).

## "Best Interest" Test

114.    Under the Plan, Claims or Equity Interests in Classes 3, 6, 7, 8, and 12 are impaired.  (Plan, Article II).  Consequently, each holder of a Claim or Equity Interest in such Classes must either accept the Plan or receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if AWI were liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(7).

115.    The Claims in Classes 1, 2, 4, 5, 9, 10 and 11 are unimpaired under the Plan. (Plan, Section II).  Consequently, each holder of a Claim in each of such Classes is conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  11 U.S.C. § 1126(f).  The "best interest" test is, accordingly, not applicable to the recoveries of such Classes.

116.    The liquidation analysis set forth in the Disclosure Statement accompanying the Plan (the *"Original Liquidation Analysis"*) was prepared by Lazard, AWI's financial advisor, in conjunction with AWI's management. (Aronson Affidavit, at ¶ 7; Disclosure Statement, Exhibit "E").

117.    In the Original Liquidation Analysis, AWI used, as its estimate for liability on account of Asbestos Personal Injury Claims, the extrapolated value of Asbestos Personal Injury Claims as reflected in the agreed upon allocation of value of Reorganized AWI set forth in the Plan, net of the prepetition book value of the Asbestos PI Insurance Asset (Aronson Affidavit, at ¶ 8).  Use of this figure yielded a liability amount for Asbestos Personal Injury Claims of $3,078,432,000. The Disclosure Statement expressly noted, though, that "[t]he Asbestos Personal Injury Claimants' Committee and the Future Claimants' Representative believe that the actual value of Asbestos Personal Injury Claims

would be higher than the assumed value used in the Liquidation Analysis." Using these reduced liability figures, as well as the financial results for AWI as of September 30, 2002, the Original Liquidation Analysis estimated that, in a chapter 7 liquidation of AWI, holders of Unsecured Claims and Asbestos Personal Injury Claims would receive a recovery equal to approximately 25.6% on account of such Claims, and the holder of the Equity Interests in AWI would receive no recovery on account of such Equity Interests. (Disclosure Statement, Exhibit "E," Docket No. 4801).

118.    At the Confirmation Hearing, AWI presented the testimony of Dr. Mark A. Peterson, the asbestos claims expert for the Asbestos PI Claimants' Committee, regarding his view of the estimated range of liability of AWI for Asbestos Personal Injury Claims. Dr. Peterson testified that he estimates the liability for Asbestos Personal Injury Claims to be at least $4.689 billion (assuming no future increase) and more likely $6.479 billion (assuming future increase). Net of the book value of the Asbestos PI Insurance Asset and using Dr. Peterson's estimated range of AWI's liability for Asbestos Personal Claims, AWI's estimated liability for Asbestos Personal Injury Claims in a chapter 7 liquidation would be at least $4.5779 billion.

119.    Lazard updated the Liquidation Analysis using Dr. Peterson's estimated range of liability for Asbestos Personal Injury Claims, as well as AWI's financial results for the period ending September 30, 2003 (the "*Revised Liquidation Analysis*"). (Aronson Affidavit, Exhibit "A"). Under the Revised Liquidation Analysis and using the asbestos liability estimate that Dr. Peterson believes is most reasonable, Lazard concluded in the Revised Liquidation Analysis that the recovery for holders of Unsecured Claims and Asbestos Personal Injury Claims in a chapter 7 liquidation of AWI

43

would be 15.1%. (Aronson Affidavit, at ¶ 9). Even using the lowest liability estimate in Dr. Peterson's analysis (which Dr. Peterson does not believe is reasonable), the recovery for holders of Unsecured Claims and Asbestos Personal Injury Claims in a chapter 7 liquidation of AWI would be 19.4%. (Aronson Affidavit, at ¶ 9).

           120.   Each of the holders of Convenience Claims in Class 3 will be paid 75% of the Allowed Amount of its Allowed Convenience Claim, in cash, on the later of the Effective Date and the date such Convenience Claim is Allowed. Each of the holders of Unsecured Claims other than Convenience Claims in Class 6 will receive a combination of New Common Stock, Available Cash, and Plan Notes and/or 144A Offering Proceeds having a value that was estimated at the time of the Disclosure Statement of approximately 59.5% of the amount of such Allowed Unsecured Claim. Asbestos Personal Injury Claims in Class 7 will be determined and paid pursuant to the terms, provisions, and procedures of the Asbestos PI Trust, which set forth an Initial Payment Percentage of 20% of the amount of an Allowed Asbestos Personal Injury Claim. Although the Plan creates an impaired class, Class 8, for Environmental Claims, no such Claims currently exist. Because Class 6 voted to reject the Plan, Class 12 (although it, in fact, voted to accept the Plan) is deemed to have rejected the Plan and will not be receiving or retaining any property under the Plan because the Distribution of the New Warrants will be deemed to have been made to the Asbestos PI Trust, which will give such portion of its Distribution to the holder of the Equity Interests in Class 12. Because the recovery to the holders of Claims in Classes 3, 6 and 7 and to the holder of the Equity Interests in Class 12 of the Plan under the Revised Liquidation Analysis is less than such creditors will receive under the Plan, each such entity that did not accept the Plan will receive at least as much under the Plan as it would

receive in a chapter 7 liquidation of AWI. Therefore, the Plan satisfies the "best interest" test of section 1129(a)(7) of the Bankruptcy Code as to all such holders.

## Feasibility of the Plan

121.    Cash flow projections for Reorganized AWI are set forth in Exhibit "C" to the Disclosure Statement accompanying the Plan (the "*Original Projections*"). At the Confirmation Hearing, AWI presented projections, which set forth lower estimates of future cash flow than are contained in the Original Projections (the "*Revised Projections*"). (Rodruan Affidavit, Exhibit "A"). The Revised Projections are supported by reasonable assumptions and, therefore, are a reasonable estimate of Reorganized AWI's future performance. (Rodruan Affidavit, at ¶ 25; Aronson Affidavit, at ¶ 9).

122.    AWI estimates that it will have cash on hand of at least $414 million as of the Effective Date from which to pay Allowed Administrative Expenses, Allowed Priority Claims, and Allowed Priority Tax Claims. (Rodruan Affidavit, at ¶ 27).

123.    On the Effective Date, Reorganized AWI will obtain financing from a syndicate of banks, including Bank of America N.A., Banc of America Securities LLC, JPMorgan Chase Bank and J.P. Morgan Securities Inc. (collectively, the "*Exit Lenders*"), pursuant to which the Exit Lenders will provide exit financing of up to $600 million to Reorganized AWI and certain of its subsidiaries on terms and conditions substantially the same as those that are set forth in the commitment letter executed by the Exit Lenders and AWI and approved by Court order dated October 23, 2003 (the "*Commitment Letter*"). (Rodruan Affidavit, at ¶ 5; Docket No. 5890).

124.    Under the Commitment Letter, AWI will have $600 million of credit available on and after the Effective Date, of which AWI estimates that $40 million will be

used to replace letters of credit issued under the DIP Credit Facility, $366 million will be drawn to fund payments required under the Plan, and $194 million will be undrawn. (Rodruan Affidavit, at ¶ 6). Moreover, because the liability for all Asbestos Personal Injury Claims will be channeled to the Asbestos PI Trust, and all Unsecured Claims other than Convenience Claims will be resolved and paid their *pro rata* share of a fixed amount of Reorganization Consideration, Reorganized AWI's capital structure will be significantly improved.

125.    Based on the Revised Projections, the cash expected to be available under the credit agreement expected to be executed among the Exit Lenders and Reorganized AWI (the *"Credit Agreement"*) in connection with the Commitment Letter, and the estimated amount of cash on hand, Reorganized AWI will have the financing necessary to (i) replace the existing letters of credit outstanding under the DIP Credit Facility, (ii) satisfy its obligation to make the payments required to be made on the Effective Date (including, without limitation, Allowed Administrative Expenses, Allowed Priority Claims, and Allowed Priority Tax Claims), (iii) continue its operations for at least the next five years and (iv) meet its obligations under the Plan, including its obligations to the Exit Lenders under the Credit Agreement, and thereafter have the ability to pay off or refinance its obligations on a long-term basis. (Rodruan Affidavit, ¶ 7).

126.    Additionally, the contribution of the Asbestos PI Insurance Asset and other value being transferred to the Asbestos PI Trust pursuant to the Plan ensures that the Asbestos PI Trust will have sufficient capital upon the Effective Date to expeditiously begin processing Asbestos Personal Injury Claims and otherwise meet its financial

commitments. Accordingly, the Plan meets the feasibility test of section 1129(a)(11) of the Bankruptcy Code.

### Treatment of
### Class 6 Under the Plan

127.    The allowed amount of the Unsecured Claims in Class 6 of the Plan is not likely to exceed $1.651 billion. The estimated value of the assets being distributed to the Asbestos PI Trust under the Plan (including the New Warrants) is estimated to be approximately $1.884 billion as of the Effective Date, and the estimated value, as of the Effective Date, of the assets being distributed to holders of Allowed Unsecured Claims in Class 6 is approximately $989.1 million. (Rodruan Affidavit, at ¶ 31). Because the liability for Asbestos Personal Injury Claims exceeds $3.144 billion, the Plan does not discriminate unfairly against Class 6.

128.    The Unsecured Creditors' Committee objected to the Plan, arguing that the Plan unfairly discriminates against the holders of Claims in Class 6 of the Plan because the values assigned to the number and amount of future asbestos claims is too high. Although the Court ruled that certain objections to the plan raised by the Unsecured Creditors' Committee in the November 12 Objection were untimely, objections as to unfair discrimination were properly preserved in the September 22, 2003, conditional objection of the Unsecured Creditors' Committee.

129.    At the Confirmation Hearing, notwithstanding the fact that the Plan was negotiated between the Unsecured Creditors' Committee and the other major constituents in the case, the Unsecured Creditors' Committee asserted that the values assigned to the number and amount of future asbestos claims is too high, and, therefore, that the Plan unfairly discriminates against Class 6 by providing the holders of Unsecured

Claims in Class 6 with a disproportionately small recovery. The Court agrees with the analysis in *Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001), where the initial burden of production and the ultimate burden of persuasion regarding unfair discrimination was assigned to the debtor, but the court shifted the burden to the objecting creditor once the debtor had met its burden of production. AWI has met its burden of production on this point based upon the testimony and report of Dr. Mark A. Peterson. The Court initially notes agreement with Judge Brown in *In re Babcock & Wilcox Co.*, 274 B.R. 230, (Bankr. E.D. La. 2002), that estimating future claims is more an imprecise art than a science, and that the best anyone can do is to try to find an estimate that is not unreasonable. Significantly, Judge Brown did not accept Dr. Peterson's claim estimation for Babcock in the fraudulent transfer litigation before him, choosing the internal company estimate instead that another expert, Dr. Dunbar, vouched for. But he stated and reiterated on more than one occasion in his opinion his view that he would not be bound by this estimate in subsequent disputes, and that he might well accept Dr. Peterson's estimate under different circumstances. Judge Brown also found nothing inherently wrong with Dr. Peterson's methodology which in most respects was identical to his methodology in this case.

130.    Dr. Peterson testified candidly and forthrightly that future claims and estimates are frequently wrong and that his estimates have been wrong in the past, usually on the low side if not always. Not only are his credentials and past experience in the field of mass tort valuations particularly impressive, but the Court finds it of key importance that his forecast in both the *Manville* case, where he was serving as the court's expert at that time, and the *National Gypsum* case, have been reasonably accurate. And

that testimony is uncontroverted. There is just no substitute for success. Based upon Dr.
Peterson's testimony and a thorough review of his report, the range of claim amount is
supported by a preponderance of the evidence.

        131.    Upon AWI's satisfaction of the initial burden of production as to the
estimation of future asbestos liabilities, the burden shifted to the Unsecured Creditors'
Committee, the objectors. Notwithstanding having spent over $300,000 during the nearly
three years this case has been pending, and notwithstanding having the same data available
to it, the Unsecured Creditors' Committee's expert has not been able to produce a report
that suggests an appropriate claim amount. Instead, as was the case in *Babcock & Wilcox*,
the Unsecured Creditors' Committee's expert, Dr. Letitia Chambers, attempts to raise red
flags about the Peterson methodology. By way of example only, Dr. Chambers disagreed
with Dr. Peterson's estimate of 150,000 cases involving asbestos claims being brought
against AWI between now and 2040, but gave no cogent basis for her disagreement.
Severe asbestosis may be a disappearing disease, but we are a long way from knowing
what level exposure to asbestos can trigger cancer. Likewise, although Dr. Chambers
pointed to studies that suggest there may be other causes for mesothelioma, there is no
definitive study that overturns the Peterson view that the only known cause of
mesothelioma is exposure to asbestos. Dr. Chambers argues with Dr. Peterson's use of the
7-1 ratio for predicting the number of nonmalignancies going forward, but offered no
viable alternative other than her unsupported view that the ratio ought to be lower. And
again, while severe asbestosis may be disappearing there was nothing presented to support
the assertion that claims of asbestos related injuries are going to disappear any time soon.
Finally, Dr. Chambers criticizes Dr. Peterson's use of the CCR data because the CCR

           **49**

never required product identification. This criticism, however, ignores a couple of important facts. First, although the Asbestos PI Trust Distribution Procedures do contemplate requiring some evidence of exposure to an AWI product, the threshold of proof required appears to be exceedingly low. The production of a hearsay affidavit from a relative of a deceased, for example, may suffice. Further, it is silly to suggest as Dr. Chambers's view apparently requires, that the Asbestos PI Trustees conduct mini-trials on product identification for the hundreds of thousands of claims that undoubtedly will be submitted. Second, the Court agrees with Dr. Peterson that it is impossible to know which exposure to which product containing which kind of asbestos caused the injuries in question. That probably explains why the evidentiary requirements for Asbestos Personal Injury Claims have been so low, and thus why there are so many and thus why so many companies have had to seek chapter 11 relief to deal with them.

132.    In the final analysis, the emperor has no clothes. Dr. Chambers has no written report to evaluate nor provides any range of numbers and offers nothing but a facile and superficial critique of the Peterson report. Accordingly, the burden of production has not been met by the Unsecured Creditors' Committee, and AWI has persuaded the Court that the range of claims numbers offered by Dr. Peterson is supported by the preponderance of the evidence. Since Dr. Peterson's estimate is far above the $3.1 billion threshold that might put more money in the unsecured creditors pockets, no unfair discrimination exists here since the unsecured creditors will receive a guarantee of 59 cents on the dollar, as opposed to an estimate of some 19 cents on the dollar to Asbestos Personal Injury Claims.

**The Provisions Governing**
**Distributions Under the Plan**
**Are Fair and Reasonable**

133.    Sections 7.7, 7.8, and 7.11 of the Plan contain provisions governing

distributions under the Plan, and such provisions are fair and reasonable.

**Miscellaneous**

134.    To the extent any of the foregoing findings of fact constitute

conclusions of law, they are adopted as such.

## CONCLUSIONS OF LAW

**Jurisdiction and Venue**

1.    The Bankruptcy Court has jurisdiction over the Chapter 11 Case and

to confirm the Plan pursuant to 28 U.S.C. [§]§ 1334 and 157.

2.    Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C.

§ 157(b). Because, however, the Plan incorporates the Asbestos PI Permanent Channeling

Injunction and requests that certain findings be made relating to Asbestos Personal Injury

Claims and as required by section 524(g) of the Bankruptcy Code, the Bankruptcy Court is

hereby proposing findings of fact and conclusions of law and making a recommendation

regarding confirmation of the Plan and issuance of the Asbestos PI Permanent Channeling

Injunction for consideration by the District Court.

3.    Venue of the Chapter 11 Case in this district was proper as of the

Commencement Date and continues to be proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    AWI is an entity qualified to be a debtor under section 109 of the

Bankruptcy Code, and AWI is a proper proponent of the Plan under section 1121(a) of the

Bankruptcy Code.

**Burden of Proof**

5.    AWI has satisfied its burden of producing evidence that the Plan complies with sections 1129(a), 1129(b), 1129(d), and 524(g) of the Bankruptcy Code.

**Solicitation**

6.    All persons required to receive notice of the Confirmation Hearing have received proper, timely and adequate notice in accordance with the Disclosure Statement Order and have had an opportunity to appear and be heard with respect thereto.

7.    AWI has solicited and tabulated votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order.

8.    Following the dissemination of the Solicitation Packages as provided for in the Disclosure Statement Order, the Voting Agents properly assisted AWI in soliciting votes for the Plan from the impaired classes of Claims and Equity Interests and appropriately solicited the votes of the impaired classes of Claims and Equity Interests in good faith and in a manner consistent with the Bankruptcy Code.

9.    The Plan was voted on by all Classes of impaired Claims that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order (except Class 8, which contains no Claims).

**The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code**

10.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code. The Plan satisfies all the applicable provisions of the Bankruptcy Code, and, as required by Bankruptcy Rule 3016(a), the Plan is dated and identifies AWI as the proponent of the Plan. Moreover, the

Plan and Disclosure Statement describe the Asbestos PI Permanent Channeling Injunction, including the identities of the PI Protected Parties, and the Claims Trading Injunction specifically and in conspicuous bold language, in compliance with the requirements of Bankruptcy Rule 3016(c).

### A. Due and Proper Notice of the Disclosure Statement Hearing and the Confirmation Hearing Was Given to All Parties in Interest

11.    The Bankruptcy Court has taken judicial notice of the Affidavits of Mailing, the Certifications of Voting and the Certificate of Publications, and finds and concludes that (a) AWI complied in all material respects with Bankruptcy Rules 2002 and 3017(a) in providing notice of the Disclosure Statement Hearing in the method and manner as prescribed therein, and (b) AWI complied in all material respects with the Disclosure Statement Order in providing notice of the Confirmation Hearing in the method and manner as prescribed in the Disclosure Statement Order. All Entities entitled and required to receive notice of the Disclosure Statement Hearing and the Confirmation Hearing pursuant to the Bankruptcy Code, applicable non-bankruptcy law, and the orders of the Bankruptcy Court have received due, proper, timely and adequate notice of such hearings and have had an opportunity to appear at and be heard at such hearings. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1957).

### B. The Plan Satisfies the Requirements of Section 1123(a)(1) of the Bankruptcy Code

12.    Section 1123(a)(1) of the Bankruptcy Code provides that a plan must designate classes of claims and interests. Section 3.1 of the Plan adequately and properly classifies all Claims and Equity Interests required to be so classified and, accordingly, satisfies section 1123(a)(1) of the Bankruptcy Code.    Classes of

Administrative Expenses and Priority Tax Claims are not required to be designated pursuant to section 1123(a)(1) of the Bankruptcy Code.

C.    **The Plan Satisfies the Requirements of Section 1122 of the Bankruptcy Code**

13.    Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class. A classification structure satisfies section 1122 of the Bankruptcy Code when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar. *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987); *In re U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir. 1986); *In re LeBlanc*, 622 F.2d 872, 879 (5th Cir. 1986).

14.    The Bankruptcy Code does not require that all claims with equal priority be classified in the same class. Consequently, it is appropriate to classify Asbestos Personal Injury Claims (including Indirect PI Trust Claims) in a separate class from Unsecured Claims. Because all Asbestos Personal Injury Claims in Class 7 (including Indirect PI Trust Claims) relate, directly or indirectly, to AWI's liability for asbestos-related personal injury and wrongful death claims, whether arising under tort law (as is the case with direct Asbestos Personal Injury Claims and may be the case with Indirect PI Trust Claims) or under contract (as may be the case with certain direct Asbestos Personal Injury Claims and certain Indirect PI Trust Claims), a reasonable basis exists for the classification of the Asbestos Personal Injury Claims together in a single class. Moreover, section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code requires that the Plan establish a separate class or classes of the Claimants whose Claims are to be addressed by the Asbestos PI Trust.

15.    In accordance with section 1122(a) of the Bankruptcy Code, Section 3.1 of the Plan separately classifies Claims against and Equity Interests in AWI together with Claims against or Equity Interests that are substantially similar to the other Claims or Equity Interests of such class.    The Plan, therefore, satisfies section 1122(a) of the Bankruptcy Code.

16.    Section 1122(b) of the Bankruptcy Code provides that a plan may designate a separate class of claims consisting of unsecured claims that are less than or reduced to an amount the court approves as reasonable and necessary for administrative convenience.    Section 3.2(c) of the Plan provides treatment for holders of Convenience Claims.  The convenience class established in Section 3.2(c) of the Plan is reasonable and necessary for administrative convenience and, therefore, the classification of Convenience Claims in Section 3.2(c) satisfies section 1122(b) of the Bankruptcy Code.

D.    **The Plan Satisfies the Requirements of Section 1123(a)(2) of the Bankruptcy Code**

17.    Section 1123(a)(2) of the Bankruptcy Code provides that a plan must specify any class of claims or interests that is not impaired under the Plan.  Pursuant to Section 3.1 of the Plan, each of Classes 3, 6, 7, 8, and 12 is identified as impaired, and each of Classes 1, 2, 4, 5, 9, 10, and 11 is identified as unimpaired.  Accordingly, the Plan satisfies section 1123(a)(2) of the Bankruptcy Code.

E.    **The Plan Satisfies the Requirements of Section 1123(a)(3) of the Bankruptcy Code**

18.    Section 1123(a)(3) of the Bankruptcy Code provides that a plan must specify the treatment of each impaired class of claims and equity interests.  Article III of the Plan specifies the treatment of each impaired class of Claims and Equity Interests. Accordingly, the Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

F.    **The Plan Satisfies the Requirements
of Section 1123(a)(4) of the Bankruptcy Code**

19.    Section 1123(a)(4) of the Bankruptcy Code requires a plan to provide the same treatment for each claim or interest of a particular class, unless the holder of the claim or interest agrees to less favorable treatment of such particular claim or interest. The Plan provides the same treatment for each Claim or Equity Interest in each class. Accordingly, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

G.    **The Plan Satisfies the Requirements of
Section 1123(a)(5) of the Bankruptcy Code**

20.    Section 1123(a)(5) of the Bankruptcy Code provides that a plan must provide adequate means of implementation of the plan. The various provisions of the Plan provide adequate means for implementation of the Plan. Without limiting the foregoing, Article VII of the Plan provides for, among other things, (i) the creation of the Asbestos PI Trust, (ii) the adoption of the Amended and Restated Articles of Incorporation and Amended and Restated By-Laws by Reorganized AWI, (iiii) the effectuation of the corporate reorganization transactions set forth in Section 7.23 of the Plan and the entry into the exit financing facility, (iv) the listing of the New Common Stock, (v) the adoption of the Stockholder and Registration Rights Agreement and the New Long-Term Incentive Plan, (vi) the distribution of property of AWI's estate to the creditors entitled to receive Distributions under the Plan and the Distribution to the Asbestos PI Trust, and (vii) the funding of the payments due on the Effective Date. In addition, Article VIII of the Plan provides for, *inter alia*, the assumption and rejection of various contracts and unexpired leases of AWI, and Article X of the Plan provides for the creation and funding of the Asbestos PI Trust. Accordingly, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

H.    **The Plan Satisfies the Requirements of
Section 1123(a)(6) of the Bankruptcy Code**

21.    Section 1123(a)(6) of the Bankruptcy Code requires a plan to
provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of
any corporation to which the debtor transfers all or any part of the debtor's estate or with
which the debtor has merged or consolidated, of a provision prohibiting the issuance of
non-voting equity securities. In furtherance of Section 7.4 of the Plan, the Amended and
Restated Articles of Incorporation of Reorganized AWI contain provisions prohibiting the
issuance of non-voting equity securities. (Exhibit Volume, Tab 1). In addition, although
the New Warrants are considered "equity securities" under section 101(16) of the
Bankruptcy Code, section 1123(a)(6) does not require that the Amended and Restated
Articles of Incorporation provide voting rights for the New Warrants because such voting
rights may be obtained by the exercise of the New Warrants, upon which the holder will
receive New Common Stock. *In re First Bancorporation of Texas, Inc.*, 1995 WL 710914,
*4 (Bankr. N.D. Tex. 1995). Accordingly, the Plan satisfies section 1123(a)(6) of the
Bankruptcy Code.

22.    Section 1123(a)(6) is not applicable to the Asbestos PI Trust
because (i) the Asbestos PI Trust does not have a corporate charter, and (ii) the Asbestos PI
Trust is not a corporation to which AWI or Reorganized AWI is transferring, or has
transferred, all or any part of its estate (within the meaning of section 1123(a)(6) of the
Bankruptcy Code) or with which AWI or Reorganized AWI has merged or consolidated or
will merge or consolidate.

I.    **The Plan Satisfies the Requirements of**
      **Section 1123(a)(7) of the Bankruptcy Code**

23.    Section 1123(a)(7) of the Bankruptcy Code requires that the manner
of selection of any director, officer or trustee of the reorganized debtor, or any successor to
such officer, director or trustee, be consistent with the interests of creditors and equity
security holders and with public policy. In furtherance of Section 7.21 of the Plan, AWI
has the identities of those persons who will serve, on the Effective Date, as officers of
Reorganized AWI. (Rodruan Affidavit, at ¶ 21).

24.    On the Effective Date, the board of directors of Reorganized AWI
will consist of those persons identified in Exhibit "7.21" of the Exhibit Volume (Exhibit
Volume, Tab 11). Following the Effective Date, and subject to the provisions of any
existing employment agreements and the requirements of applicable non-bankruptcy law,
the officers of Reorganized AWI immediately prior to the Effective Date will serve as the
officers of Reorganized AWI. The continuation in office of such individuals is consistent
with the interests of creditors and with public policy. (Rodruan Affidavit, at ¶ 8).
Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

25.    Although section 1123(a)(7) of the Bankruptcy Code does not apply
to either the Asbestos PI Trustees or the members of the TAC established under the
Asbestos PI Trust Agreement, AWI has disclosed the identities of the Asbestos PI Trustees
and the members of the TAC, as well as the role of the Future Claimants' Representative
under the Asbestos PI Trust Agreement.

J.    **Section 1123(b)(2) of the Bankruptcy Code:**
**The Rejection and Assumption of Executory**
**Contracts and Unexpired Leases**
**Are in the Best Interests of AWI's Estate**

26.    Pursuant to section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the rejection or assumption and assignment of any executory contract or unexpired lease of the debtor not previously rejected under section 365 of the Bankruptcy Code.

27.    Under section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease if (i) outstanding defaults under the contract or lease have been cured under section 365(b)(1) of the Bankruptcy Code, and (ii) the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications. *See, e.g., Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 53 (Bankr. D. Del. 2001).

28.    Section 8.1 of the Plan provides for the assumption of the executory contracts listed on Exhibit "8.1" to the Plan. The assumption of executory contracts and unexpired leases pursuant to Section 8.1 of the Plan, subject to the occurrence of the Effective Date, (i) is in the best interests of AWI, its estate, and creditors, (ii) is based upon and within AWI's sound business judgement, (iii) is necessary to the implementation of the Plan, and (iv) satisfies the requirements of section 365(a) of the Bankruptcy Code.

29.    Exhibit "8.2" to the Plan sets forth contracts and leases that, to the extent they constitute executory contracts and unexpired leases, AWI wishes to reject, subject to the occurrence of and effective as of the Effective Date. Included on Exhibit "8.2" is AWI's contract with Liberty Property Holdings, L.P., with respect to AWI's

obligation to provide utility service to Liberty Property Holdings, L.P. Such obligation constitutes an executory contract that may be rejected under section 365(a) of the Bankruptcy Code.

30.    Courts have uniformly deferred to the business judgment of the debtor to determine whether the rejection of an executory contract or unexpired lease by the debtor is appropriate under section 365(a) of the Bankruptcy Code.  *See N.L.R.B. v. Bildisco,* 465 U.S. 513, 523 (1984); *Sharon Steel,* 872 F.2d at 39-40; *Glenstone Lodge, Inc. v. Buckhead Am. Corp. (In re Buckhead Am. Corp.),* 180 B.R. 83, 88 (D. Del. 1995); *In re III Enterprises, Inc. V,* 163 B.R. 453, 469 (Bankr. E.D. Pa.), *aff'd sub nom, Pueblo Chem., Inc. v. III Enter., Inc. V,* 169 B.R. 551 (E.D. Pa. 1994); *In re Patterson,* 119 B.R. 59, 60 (E.D. Pa. 1990); *Pinnacle Brands,* 259 B.R. at 53.  To the extent that sound business reasons justify the debtor's rejection of a particular lease or contract, rejection should be approved.

31.    The rejection of the executory contracts and unexpired leases set forth in Section 8.2 of the Plan, subject to the occurrence of and effective as of the Effective Date, (i) is in the best interests of AWI, its estate and creditors, (ii) is based upon and within AWI's sound business judgement, (iii) is necessary to the implementation of the Plan, and (iv) satisfies the requirements of section 365(a) of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1123(b)(2) of the Bankruptcy Code.

### K.    The Plan Satisfies Section 1123(b)(3) of the Bankruptcy Code

32.    Section 1123(b)(3)A) of the Bankruptcy Code permits a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor

60

or to the estate." Section 5.2 of the Plan provides for the amendment of the Claims Settlement Guidelines as set forth on Exhibit "I.39" to the Plan. Such amendment is (i) fair and reasonable, (ii) in the best interests of AWI, its estate, and its creditors, and (iii) necessary to the implementation of the Plan. To the extent applicable, Section 5.2 of the Plan complies with section 1123(b)(3)(A) of the Bankruptcy Code.

33.    Section 1123(b)(3)(B) of the Bankruptcy Code provides that a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest." Section 11.3 of the Plan provides that any rights, claims, or causes of action accruing to AWI pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including, without express or implied limitation, any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, and (except as provided in Articles X and XI of the Plan) any rights to, claims or causes of action for recovery under any policies of insurance issued to or on behalf of AWI shall remain assets of AWI's estate and, on the Effective Date, shall be transferred to Reorganized AWI. Reorganized AWI shall be deemed the appointed representative to, and may, pursue, litigate, and compromise and settle any such rights, claims, or causes of action, as appropriate, in accordance with what is in the best interests of and for the benefit of Reorganized AWI. Such section is (i) fair and reasonable, (ii) in the best interests of AWI, its estate, and its creditors, (iii) necessary to the implementation of the Plan, and (iv) complies with section 1123(b)(3)(B) of the Bankruptcy Code.

34.    Accordingly, the Plan satisfies section 1123(b)(3) of the Bankruptcy Code.

L.   **The Transfers of Properties Under the Plan
     Are Governed by the Exemptions Provided
     in Section 1146(c) of the Bankruptcy Code**

35.    Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without express or implied limitation, any liens granted in connection with the exit finance facility referred to in Section 7.16(g) of the Plan, shall not be subject to any stamp, or other similar tax. *See Baltimore County, Md. v. Hechinger Liquidation Trust (In re Hechinger Inv. Co. of Delaware Inc.),* 335 F.3d 243, 252-53 (3d Cir. 2003); *In re GST Telecom, Inc.,* 2002 WL 442233 (D. Del. 2002).

**AWI Has Satisfied Section
1129(a)(2) of the Bankruptcy Code**

36.    Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply with all of the applicable provisions of the Bankruptcy Code. AWI has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code. Specifically, (i) AWI is a proper debtor under section 109 of the Bankruptcy Code, (ii) AWI has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court, (iii) AWI has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Voting Procedures, and the Disclosure Statement Order in transmitting the Plan, the Disclosure Statement, the Ballots, and related documents and notices and in soliciting and tabulating votes on the Plan, and (iv) AWI has

complied with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, applicable non-bankruptcy law, the local Bankruptcy Rules and the specific rules of the Bankruptcy Court throughout the Chapter 11 Case.

37.    AWI has complied with the operating guidelines and financial reporting requirements enacted by the United States Trustee by (i) timely filing all operating reports and financial statements and (ii) maintaining and providing proof of insurance.

38.    AWI has paid all statutory fees required to be paid during the Chapter 11 Case and has filed all fee statements required to be filed.

39.    AWI has timely filed with the Court all schedules, lists of executory contracts, and statements of financial affairs.

40.    Sufficient and timely notice of the Confirmation Hearing and all other hearings in the Chapter 11 Case has been given to holders of Claims and Equity Interests and all other parties in interest to whom notice was required to have been given.

41.    The solicitation of votes was made following approval and dissemination of the Disclosure Statement to holders of Claims and Equity Interests in classes that are impaired and entitled to vote and was made in good faith and in compliance with the provisions of the Bankruptcy Code and the Bankruptcy Rules. The Ballots of holders of Claims were properly solicited and tabulated.

42.    AWI has complied with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court and has fulfilled all of the obligations and duties owed to its estate and creditors as required by and set forth in

sections 1107 and 1108 of the Bankruptcy Code. Accordingly, AWI has satisfied section 1129(a)(2) of the Bankruptcy Code.

### The Plan Satisfies the Requirements of
### Section 1129(a)(3) of the Bankruptcy Code

43.     Section 1129(a)(3) of the Bankruptcy Code states that a plan must be proposed in good faith and not by any means forbidden by law. *See Solow v. PPI Enters.(U.S.) (In re PPI Enters.(U.S.))*, 324 F.3d 197, 211-12 (3d Cir. 2002); *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000), *citing In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986) (*quoting In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)); *In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir. 1999); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001).

44.     The Bankruptcy Court has examined the totality of the circumstances surrounding the formulation of the Plan. The Plan is based on extensive good faith arm's length negotiations between and among AWI and the Committees, which represent constituencies having very different, and in many instances, competing interests in the Chapter 11 Case. The Plan (including the agreements set forth in the Exhibit Volume) was negotiated with the participation of the Committees, including representatives of the largest plaintiffs' asbestos firms in the country, and reflects the culmination of such efforts and the substantial input of each representative group. The Plan has been proposed with the legitimate and honest purpose of reorganizing AWI's business and affairs, restructuring its asbestos-related liability, and maximizing the value available for distribution to creditors.     Further, the discharge, exculpation and indemnification provided in Sections 11.2, 11.6 and 8.6 of the Plan have been agreed to in good faith and are consistent with sections 105 and 1129 of the Bankruptcy Code. Thus,

AWI has complied with the "good faith and not by any means forbidden by law" requirement of section 1129(a)(3) of the Bankruptcy Code.

## The Plan Satisfies the Requirements of
## Section 1129(a)(4) of the Bankruptcy Code

45.    Section 1129(a)(4) of the Bankruptcy Code requires that all payments made or to be made by the plan proponent, by the debtor or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, have been approved by, or are subject to the approval of, the court as reasonable.

46.    All payments made by AWI out of the ordinary course of business have been approved by the Bankruptcy Court, and all payments made or to be made to professionals retained by order of the Bankruptcy Court will be, as set forth in Section 2.2 of the Plan, subject to review and approval by the Bankruptcy Court upon final application under section 330, 331 or 503(b) of the Bankruptcy Code. Accordingly, the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

## The Plan Satisfies the Requirements of
## Section 1129(a)(5) of the Bankruptcy Code

47.    Section 1129(a)(5) of the Bankruptcy Code requires the proponent of a plan of reorganization to disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and to show that the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy. Section 1129(a)(5) of the Bankruptcy Code also requires the proponent of a plan of reorganization to disclose the identity of any insider

that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider.

48.    AWI has disclosed in the Disclosure Statement, the Exhibit Volume, and through evidence presented at the Confirmation Hearing the identities and nature of compensation of those persons who will serve, on the Effective Date of the Plan, as directors and officers of Reorganized AWI.   Moreover, although the identities of the Asbestos PI Trustees are not required to be disclosed, AWI has also disclosed the identities of the Asbestos PI Trustees in the Exhibit Volume and the members of the TAC through evidence presented at the Confirmation Hearing.  *See In re Eagle-Picher Indus., Inc.*, 1996 U.S. Dist. LEXIS 17160, *29-30 (S.D. Ohio 1996) ("The trustees of the § 524(g) trust in this case are not subject to the statutory provision . . . They are not directors, officers or voting trustees of the debtor.").   Based on, among other things, the experience, education and/or particular skills of each and the manner of selection of each and any successors thereto, the appointment or continuation in office of such individuals is consistent with the interests of creditors and with public policy.   (Rodruan Affidavit, at ¶¶ 18-22; Trafelet Affidavit, at ¶ 24).  Accordingly, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

## Section 1129(a)(6) of the Bankruptcy Code Is Not Applicable to the Plan

49.    Section 1129(a)(6) of the Bankruptcy Code requires a debtor to obtain the approval of any governmental regulatory commission, with jurisdiction over the debtor, with respect to any rate changes provided for in the debtor's plan of reorganization. The Plan does not provide for any changes in rates that require regulatory approval of any

governmental agency. Section 1129(a)(6) of the Bankruptcy Code is accordingly not
applicable.

### The Plan Satisfies the Requirements of
### Section 1129(a)(7) of the Bankruptcy Code

50. Section 1129(a)(7) of the Bankruptcy Code requires each creditor or
equity interest holder in an impaired class to accept the plan of reorganization or receive or
retain under such plan on account of such claim or interest property of a value, as of the
effective date of such plan, that is not less than the amount that such holder would receive
or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

51. Based upon the Proposed Findings of Fact contained herein, the
Revised Liquidation Analysis, and the sworn statements made in the Aronson Affidavit,
the Plan satisfies the "best interest" test under section 1129(a)(7) of the Bankruptcy Code.

### The Plan Does Not Satisfy the Requirements
### of Section 1129(a)(8) of the Bankruptcy Code

52. Section 1129(a)(8) of the Bankruptcy Code requires that, with
respect to each class of claims or interests under a plan, such class either has accepted the
plan or is not impaired under the plan. According to the Trumbull Certification, all classes
of impaired Claims that were entitled to vote on the Plan, other than Class 6 (General
Unsecured Claims other than Convenience Claims), have voted to accept the Plan. The
Claims in each of Classes 1, 2, 4, 5, 9, 10 and 11 are unimpaired under the Plan and,
pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired Claims in such
classes are deemed to have accepted the Plan. Although Class 12 (Equity Interests) voted
to accept the Plan, because Class 6 rejected the Plan, Class 12 is deemed to have rejected
the Plan pursuant to Section 3.2(l)(iii) of the Plan. Although the Plan does not comply
with section 1129(a)(8) of the Bankruptcy Code because of the rejection of the Plan by

67

Class 6 and the deemed rejection of the Plan by Class 12, as set forth below, the Plan can

be confirmed because the treatment provided to holders of Claims in Class 6 and the holder

of the Equity Interests in Class 12 complies with the requirements of section 1129(b) of the

Bankruptcy Code.

### The Plan Satisfies the Requirements of
### Section 1129(a)(9) of the Bankruptcy Code

53.    Section 1129(a)(9) of the Bankruptcy Code provides for certain

mandatory treatment of claims entitled to priority under the Bankruptcy Code.

54.    As required by section 1129(a)(9)(A) of the Bankruptcy Code,

Section 2.1 of the Plan provides that each holder of an Allowed Administrative Expense

shall be paid on account of such Allowed Claim, in full, in cash, on the Effective Date of

the Plan; *provided, however,* that Administrative Expenses of the type specified in Section

1.1(c)(i) of the Plan shall be assumed and paid by Reorganized AWI in accordance with

the terms and conditions of the particular transactions and any agreements relating thereto.

In addition, pursuant to Section 2.2 of the Plan, all payments made or to be made (as

Administrative Expenses) to professionals retained by orders of the Court will be subject to

review and approval by the Bankruptcy Court upon final application under section 330,

331 or 503(b) of the Bankruptcy Code.

55.    Consistent with section 1129(a)(9)(B) of the Bankruptcy Code,

Section 3.2 of the Plan provides that each holder of an Allowed Priority Claim shall be

paid the Allowed Amount of its Allowed Priority Claim, in full, in cash, in an amount

equal to such Claim, on the later of the Effective Date and as soon as reasonably

practicable after the date such Claim becomes Allowed.

56.     Consistent with section 1129(a)(9)(C) of the Bankruptcy Code,

Section 2.4 of the Plan provides that each holder of an Allowed Priority Tax Claim shall be

paid the Allowed Amount of its Allowed Priority Tax Claim either (a) in full, in cash, on

the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes

Allowed, and (iii) the date such Allowed Priority Tax Claim is payable under applicable

non-bankruptcy law or (b) upon such other terms as may be mutually agreed upon between

each holder of a Priority Tax Claim and Reorganized AWI.

57.     AWI has sufficient cash to fund payments of Allowed

Administrative Expenses, Allowed Priority Claims, and Allowed Priority Tax Claims.

Accordingly, the Plan satisfies section 1129(a)(9) of the Bankruptcy Code.

## The Plan Satisfies the Requirements of
## Section 1129(a)(10) of the Bankruptcy Code

58.     Section 1129(a)(10) of the Bankruptcy Code provides that at least

one impaired class of claims must accept a plan of reorganization, determined without

including any acceptance of such plan by any insider.

59.     The Plan satisfies section 1129(a)(10) of the Bankruptcy Code

because Classes 3 and 7, which are impaired classes, have voted to accept the Plan by the

requisite majorities. Because Classes 3 and 7 contain no insiders (Rodruan Affidavit, at

¶ 12), at least one impaired class entitled to vote on the Plan has voted to accept the Plan

by the requisite majorities, determined without including any acceptance of the Plan by

insiders.

## The Plan Satisfies the Requirements of
## Section 1129(a)(11) of the Bankruptcy Code

60.     Section 1129(a)(11) of the Bankruptcy Code requires that a plan be

feasible and that the debtor or its successor under such plan would not likely require

liquidation or further financial reorganization, except as provided under such plan. *See In re NII Holdings*, 288 B.R. 356, 364 (D. Del. 2002); *In re Am. Family Enters.*, 256 B.R. 377, 404-05 (D.N.J. 2000); *Corestates Bank, N.A. v. United Chem. Tech., Inc.*, 202 B.R. 33, 41-42 (E.D. Pa. 1996); *Moody v. Sec. Pacific Bus. Credit, Inc.*, 85 B.R. 319, 346 (W.D. Pa. 1988), *citing Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978)).

61. As set forth above in the Findings of Fact, Reorganized AWI will be able to satisfy its obligations under the Plan after confirmation. AWI has carefully structured the Plan and the Asbestos PI Trust to provide appropriate mechanisms and funding to consummate the Plan with a high degree of certainty that Reorganized AWI will be able to meet its obligations under the Plan.

62. Thus, based upon the Findings of Fact and the Conclusions of Law contained herein, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code, and Reorganized AWI will not likely require liquidation or further financial reorganization after confirmation.

### The Plan Satisfies the Requirements of
### Section 1129(a)(12) of the Bankruptcy Code

63. Section 1129(a)(12) of the Bankruptcy Code requires that all fees payable under section 1930 of title 28 of the United States Code, as determined by the court at the hearing on confirmation of the plan, either have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

64. Section 11.1 of the Plan provides for the payment on the Effective Date (or as soon as practicable thereafter) of all fees payable under section 1930 of title 28 of the United States Code. All post-consummation fees that are due and payable will be

paid by Reorganized AWI until the Chapter 11 Case is closed pursuant to section 350(a) of the Bankruptcy Code.    Accordingly, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

**The Plan Satisfies the Requirements of**
**Section 1129(a)(13) of the Bankruptcy Code**

65.    Section 1129(a)(13) of the Bankruptcy Code requires the continuation of payment of all retiree benefits, at the level established pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

66.    Section 8.7 of the Plan provides that, on and after the Effective Date, Reorganized AWI shall continue to pay all retiree benefits (within the meaning of section 1114 of the Bankruptcy Code) for the duration of the period AWI has obligated itself to provide such benefits.    Accordingly, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

**Section 1129(b) of the**
**Bankruptcy Code Is Satisfied**

67.    Section 1129(b)(1) of the Bankruptcy Code requires that a plan of reorganization not discriminate unfairly against classes of claims or equity interests that have rejected or are deemed to have rejected the plan. Class 6 has rejected the Plan and, as a result of such rejection, Class 12 is deemed to have rejected the Plan. The Plan does not discriminate unfairly against Class 6 because all holders of Allowed Unsecured Claims in Class 6 are receiving at least the same percentage recovery under the Plan as holders of Asbestos Personal Injury Claims in Class 7 of the Plan, and the Plan does not allocate a materially greater risk to Class 6 in connection with the proposed distribution. *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 611 (Bankr. D. Del. 2001). In addition, no

holder of a Claim in Class 6 or the Equity Interests in Class 12 will receive or retain any property under the Plan on account of such junior Claims or Equity Interests, and no class of Claims senior to Class 6 or to Class 12 is receiving more than full payment on account of such Claims.

68.    The Plan does not discriminate unfairly against Class 6 by providing a disproportionately small recovery in comparison with the values assigned to the number and amount of future Asbestos Personal Injury Claims in Class 7. Notwithstanding that the Plan was negotiated between the Unsecured Creditors' Committee and the other major constituents in the case, AWI has satisfied the initial burden of production and the ultimate burden of persuasion as to the estimated values assigned to the number and amount of future Asbestos Personal Injury Claims based upon the testimony and report of Dr. Mark A. Peterson. *In re Genesis Health Ventures, Inc.*, 266 B.R. at 599. The Court concluded that estimating future claims is more an imprecise art than a science, and that the best anyone can do is to try to find an estimate that is not unreasonable. *See In re Babcock & Wilcox Co.*, 274 B.R. 230, 262 (Bankr. E.D. La. 2002) (noting that any estimation of future claims is problematical, and the best that can be done is to try to find an estimate that is not unreasonable).

69.    Based upon the testimony and report of Dr. Peterson, the burden of production shifts to the Unsecured Creditors' Committee, the objector. *See In re Genesis Health Ventures, Inc.*, 266 B.R. at 599 (in the context of unfair discrimination, the court shifted the burden to the objecting creditor once the debtor had satisfied its initial burden of production). At the Confirmation Hearing, the Unsecured Creditors' Committee offered the testimony of Dr. Letitia Chambers, who attempted to raise concerns regarding Dr.

Peterson's methodology. However, Dr. Chambers failed to provide any cogent basis for her disagreements, offering nothing but a facile and superficial critique of Dr. Peterson's report. Because the Unsecured Creditors' Committee failed to offer any written report evaluating or providing a range of numbers for projected future claims, the burden of production has not been met. *See In re Genesis Health Ventures, Inc.*, 266 B.R. at 599. Moreover, based upon Dr. Peterson's testimony and a thorough review of his report, the Court concluded that the range of claim amount projected by Dr. Peterson was supported by a preponderance of the evidence.

70.    The Unsecured Creditors' Committee asserts that that the Plan unfairly discriminates under section 1129(b)(1) of the Bankruptcy Code because the Plan calls for a payout of $1.8 billion to the Asbestos PI Trust, and AWI will only be required to pay between $520 and $805 million if certain legislation is passed by Congress in its present form. Accordingly, the Unsecured Creditors' Committee argues that AWI should be required to wait anywhere between three and fourteen months before seeking confirmation, providing full recovery to Class 6 rather than only 59 to 60 cents on the dollar under the Plan. For the reasons stated on the record of the Confirmation Hearing, the Court cannot base a finding of fact on the sheerest of speculation regarding the prospects for passage of legislation, much less legislation that has only been reported out of committee. Therefore, the Unsecured Creditors' Committee's argument in this regard is summarily rejected.

71.    Section 1129(b)(2) of the Bankruptcy Code requires that a plan of reorganization be fair and equitable against classes of claims or equity interests that have rejected or are deemed to have rejected the plan. Although the holder of Equity Interests

will receive the New Warrants as a result of the rejection of the Plan by Class 6, the New Warrants will be deemed to have been distributed on account of Asbestos Personal Injury Claims, the holders of which, by their acceptance of the Plan, have agreed to give to the holder of the Equity Interests. Accordingly, the allocation by the holders of Asbestos Personal Injury Claims of the portion of their distribution represented by the New Warrants, to which they otherwise would have been entitled (based upon the relative values of Unsecured Claims in Class 6 and Asbestos Personal Injury Claims in Class 7) is permissible and does not violate section 1129(b)(2) of the Bankruptcy Code. *In re Genesis Health Ventures, Inc.*, 266 B.R. at 612. *See also In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1983); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003) (enhanced value received by holders of Class 6B Claims on account of contributions from other classes is not a treatment of such claims under the plan and does not constitute unfair discrimination).

72.    The Unsecured Creditors' Committee asserts that the absolute priority rule of section 1129(b)(2) of the Bankruptcy Code has been violated because the Plan, which they negotiated and agreed to, calls for the Warrants to be issued to holders of Equity Interests unless Class 6 rejects the Plan, in which case the Warrants would be issued to Class 7, which, according to the terms of the Plan, would decline them, and they would end up back in the holding company and then be distributed to the holder of the Equity Interests. As to these Plan provisions, the Unsecured Creditors' Committee made a knowing waiver of a known right to object to this arrangement when they entered into a consensual plan encompassing it. One cannot simply agree to provisions that might otherwise be suspect and then assert that they are illegal. That kind of conduct is too sharp

even for a bankruptcy case. Secondly, even if there was no waiver, the agreement stands on no different footing than the agreements in *In re SPM Mfg. Corp.*, 984 F.2d at 1305, and *In re Genesis Health Ventures, Inc.*, 266 B.R. at 612.  Furthermore, to the extent that giving the Warrants initially to Class 7 might discriminate against Class 6, no unfair discrimination exists.  The Warrants are only valued at $45 million, a mere pittance compared to the $4.689 to $6.479 billion in Asbestos Personal Injury Claims that are expected.  It is hard to see how getting such a small amount of value to such a huge class of tort claims who will receive only one-third of the recovery on their claims that the other unsecured creditors will receive, could ever amount to unfair discrimination.  Given the nature of the Asbestos Personal Injury Claims, the need for 75 percent (75%) agreement to the Plan in order to obtain the benefits of section 524(g) of the Bankruptcy Code, the inability to obtain confirmation without such an agreement, and the tiny amount of discrimination involved, vesting the initial rights to the Warrants in Class 7 rather than Class 6, easily meets the four part test of *In re Ambanc La Mesa Ltd. P'ship*, 115 3d 650 (9th Cir. 1997), and similar formulations of the test, as well as the two part test in *In re Genesis Health Ventures*, 266 B.R. at 611. *See Liberty Nat'l Enter. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc Le Mesa Ltd. P'ship)*, 115 F.3d. 650, 656 (9th Cir. 1997) (discrimination between classes must satisfy four criteria to be considered fair under 1129(b): (1) the discrimination must be supported by a reasonable basis; (2) the debtor could not confirm or consummate the Plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of discrimination is directly related to the basis or rationale for the discrimination); *In re Genesis Health Ventures, Inc.*, 266 B.R. at 611 (there is a rebuttable presumption of unfair discrimination where there is

(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution). Having reached that conclusion it follows that Class 7 could do whatever it wants with the Warrants including letting the holding company issuer give them to old Equity Interests.

73.    For the foregoing reasons, the Plan satisfies section 1129(b) of the Bankruptcy Code in that it does not discriminate unfairly and is fair and equitable with respect to the class of Claim and Equity Interests that is impaired under, and has rejected or is deemed to have rejected, the Plan.

### The Plan Satisfies the Requirements of Section 1129(d) of the Bankruptcy Code

74.    Section 1129(d) of the Bankruptcy Code provides that, on request of a governmental unit, the court may not confirm a plan if its principal purpose is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, as amended.  The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933, as amended, and there has been no objection to the Plan by any governmental unit alleging any such avoidance.  (Rodruan Affidavit, at ¶ 8).  Accordingly, the Plan satisfies section 1129(d) of the Bankruptcy Code.

**The Modifications Satisfy the Requirements
of Section 1127 of the Bankruptcy Code
and Rule 3019 of the Bankruptcy Rules**

75.     The Modifications do not adversely change the treatment of the

Claim of any creditor. To the contrary, the Modifications clarify certain provisions of the

Plan and preserve the Plan, as negotiated, and the rights of all parties as set forth therein.

76.     The Modifications comply in all respects with section 1127 of the

Bankruptcy Code, Bankruptcy Rule 3019, and all other provisions of the Bankruptcy Code.

Sufficient and adequate notice of the Modifications was provided, and no additional

disclosure or notice is required with respect to the Modifications.

**The Asbestos PI Channeling
Injunction and the Establishment of
the Asbestos PI Trust Comply with
Section 524(g) of the Bankruptcy Code**

77.     The Plan and its Exhibits are a fair, equitable and reasonable

resolution of the liabilities of AWI for Asbestos Personal Injury Claims.

78.     The Asbestos PI Trust satisfies the requirements for a trust under

section 524(g) of the Bankruptcy Code.

79.     The Asbestos PI Permanent Channeling Injunction is consistent with

sections 105(a), 524(g), and 1129 of the Bankruptcy Code and other applicable provisions

of the Bankruptcy Code, and the Asbestos PI Permanent Channeling Injunction is in the

best interests of AWI's estate. *See A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 1002-

03 (4th Cir.), *cert. denied,* 479 U.S. 876 (1986); *In re Johns-Manville Corp.,* 801 F.2d 60,

63-64 (2d Cir. 1986). *See also, In re Am. Family Enters.,* 256 B.R. 377, 391 (D.N.J.

2000); *In re Eagle-Picher Indus., Inc.,* 1996 U.S. Dist. LEXIS 17160, *26-28 (S.D. Ohio

1996). Because Indirect PI Trust Claims, including those arising under contract, relate to

direct Asbestos Personal Injury Claims, they are appropriately channeled to the Asbestos PI Trust and have historically been channeled to trusts established in connection with asbestos related chapter 11 cases. *See, e.g., In re Forty-Eight Insulations,* 115 F.3d 1294 (7th Cir. 1997); *In re Prudential Lines, Inc.,* 59 F.3d 327 (2d Cir. 1995); *In re Combustion Eng'g Inc.,* 295 B.R. 459 (D. Del. 2003); *In re The Babcock & Wilcox Co., et al.,* 2001 U.S. Dist. LEXIS 9660, \*22 (E.D. La. 2001); *In re Eagle-Picher Indus., Inc.,* 1996 U.S. Dist. LEXIS 17160, \*26-28 (S.D. Ohio 1996).

80.    Moreover, in addition to the protection afforded the debtor or transferees or successors of the debtor under the plan, section 524(g)(4) sets forth the broad categories of third parties who, if alleged to be directly or indirectly liable for Asbestos Personal Injury Claims, may be beneficiaries of the Asbestos PI Permanent Channeling Injunction. Generally, these categories include the following:

(i) a party owning a financial ownership interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor (11 U.S.C. § 524(g)(4)(A)(ii)(I));

(ii) a party who has been involved as an officer, director or employee of the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor (11 U.S.C. § 524(g)(4)(A)(ii)(II));

(iii) an insurer of the debtor or a past or present affiliate of the debtor, or a predecessor in interest of the debtor (11 U.S.C. § 524(g)(4)(A)(ii)(III)); and

(iv) third parties who have had involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition of, the debtor or a related party, including but not limited to involvement

in providing financing (debt or equity) or advice to an entity involved in such a transaction or acquiring or selling a financial interest in an entity as part of such a transaction (11 U.S.C. § 524(g)(4)(A)(ii)(IV)).

81.    Each of the PI Protected Parties falls within one or more of these categories, or is a representative, Affiliate or subsidiary of an Entity covered by these categories, and is therefore entitled to the protection of the Asbestos PI Permanent Channeling Injunction under section 524(g) of the Bankruptcy Code.

## The Claims Trading Injunction Is Permissible
## Under Section 105(a) of the Bankruptcy Code

82.    The Claims Trading Injunction is needed so that the beneficial interests in the Asbestos PI Trust are not considered "securities" under the federal securities laws. Without the Claims Trading Injunction, AWI might not be permitted to create a trust for the benefit of the holders of Asbestos Personal Injury Claims. The Claims Trading Injunction, therefore, forms an integral part of AWI's reorganization and the Plan.

83.    The Court has jurisdiction to enter the Claims Trading Injunction under sections 1334(a), (b), and (d) of title 28 of the United States Code.

84.    Section 105(a) of the Bankruptcy Code permits approval and entry of the Claims Trading Injunction, especially where, as here, such injunction is essential to the formulation and implementation of the Plan as provided in section 1123(a)(5) of the Bankruptcy Code, confers material benefits on AWI's estate, and is in the best interests of holders of Claims against AWI.

85.    The Claims Trading Injunction is consistent with sections 105 and 1129 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, and the Claims Trading Injunction is in the best interests of AWI's estate. *See Celotex Corp. v.*

*Edwards*, 514 U.S. 300, 310-311 (1995); *In re Dow Corning Corp.*, 280 F.3d 648, 656-58

(6th Cir. 2002); *In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 701-02 (3d Cir. 1989);

*A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1002-03 (4th Cir.), *cert. denied*, 479 U.S.

876 (1986); *In re Johns-Manville Corp.*, 801 F.2d 60, 63-64 (2d Cir. 1986); *In re

Combustion Eng'g Inc.*, 295 B.R. 459 (D. Del. 2003); *In re Asbestos Claims Mgmt. Corp.*,

294 B.R. 663 (N.D. Tex. 2003);*In re Eagle-Picher Indus., Inc.*, 1996 U.S. Dist. LEXIS

17160, *68 (S.D. Ohio 1996).

### The Discharge, Exculpation and Indemnity
### Provisions Are Consistent with Sections 105
### and Other Provisions of the Bankruptcy Code

86.     The Bankruptcy Court has jurisdiction to approve the provisions in

Sections 11.2 (Discharge of AWI), 11.6 (Exculpation), and 8.6 (Indemnification) of the

Plan pursuant to sections 1334(a), (b) and (d) of title 28 of the United States Code.

87.     Given the circumstances, the Plan's discharge provisions, including

the Asbestos PI Permanent Channeling Injunction, are proper. Section 105(a) of the

Bankruptcy Code empowers the court and permits court approval of the discharge,

exculpation and indemnification provisions where, as here, such provisions are essential to

the formulation and implementation of the Plan and confer material benefits on AWI, its

estate and creditors. On the basis of the Affidavits in Support of Confirmation and the

record presented at the Confirmation Hearing, the Bankruptcy Court finds and concludes

that it has jurisdiction to approve the discharge, exculpation and indemnification

provisions set forth in the Plan and that such provisions of the Plan are consistent with

sections 105 and 1129 of the Bankruptcy Code and other applicable provisions of the

Bankruptcy Code and are in the best interests of AWI's estate and creditors. *See In re

PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000); *In re Continental Airlines*, 203 F.3d 203

(3d Cir. 2000); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1002-03 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986); *In re Combustion Eng'g Inc.*, 295 B.R. 459, 483-87 (D. Del. 2003); *In re Am. Family Enters.*, 256 B.R. 377, 406-07 (D.N.J. 2000); *In re Allegheny, Health, Educ., & Research Found.*, 252 B.R. 309, 331 (W.D. Pa. 1999); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001).

### The New Common Stock, the New Warrants, and the Plan Notes Are Exempt from Registration Pursuant to Section 1145 of the Bankruptcy Code

88.    Under section 1145 of the Bankruptcy Code, the New Common Stock, the New Warrants, and the Plan Notes will be freely tradeable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and compliance with any rules and regulations of the Securities Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (ii) the restrictions, if any, on the transferability of such securities and instruments; and (iii) applicable regulatory approval. The issuance of New Common Stock, the New Warrants, and the Plan Notes are or were in exchange for Claims against, or Equity Interests in, AWI, or principally in such exchange and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

89.    The exemption from the requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration of the offer, issuance, exchange or transfer of a security provided for in the Plan or registration or licensing of an issuer of, underwriter of, or broker dealer in, such security is authorized by section 1145 of the Bankruptcy Code and is applicable to the extent set forth in the Plan.

The New Common Stock, the New Warrants, and the Plan Notes are exempt from registration pursuant to section 1145 of the Bankruptcy Code and are freely tradeable by the holders thereof except to the extent a holder is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code. For the purposes of section 1145(d) of the Bankruptcy Code, Class 7 is not an "underwriter" as defined in Section 2(11) of the Securities Act of 1933.

## The Plan Provides for
## Proper Retention of Jurisdiction

90.     The Bankruptcy Court or the District Court, as provided in Article IX of the Plan, may retain jurisdiction over the matters set forth in Section 9.2 of the Plan and the Confirmation Order as ultimately entered by the Bankruptcy Court and District Court.

## Effect of Confirmation

91.     The Plan and its provisions shall be binding upon AWI, Reorganized AWI, the Disbursing Agent, any entity acquiring or receiving property or a distribution under the Plan, and any holder of a Claim against or Equity Interest in AWI, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder or entity has accepted the Plan.

92.     Pursuant to Section 11.7 of the Plan, except as otherwise provided in the Plan, upon the Effective Date, title to all property of AWI's estate shall vest in Reorganized AWI free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and all such Claims, Equity Interests, Encumbrances, and other interests shall be extinguished. From and after the Effective Date, Reorganized AWI may operate its business and may use, acquire, and dispose of property, and compromise or settle any Claims and Equity Interests without the supervision of or approval by the Bankruptcy

Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

## Miscellaneous

93.    To the extent any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

## Conclusion

These Proposed Findings of Fact and Conclusions of Law shall serve to support the entry of the Proposed Confirmation Order and issuance of the Asbestos PI Permanent Channeling Injunction and the Claims Trading Injunction in the Confirmation Order.

Dated:

Wilmington, Delaware
December ___, 2003

THE HONORABLE RANDALL J. NEWSOME
United States Bankruptcy Judge