# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                    CASE NUMBER:

**THE BABCOCK & WILCOX COMPANY**          **00-10992**

DEBTOR                                    SECTION "B"

Jointly Administered With

DIAMOND POWER INTERNATIONAL, INC.         00-10993
BABCOCK & WILCOX CONSTRUCTION CO., INC.   00-10994
AMERICON, INC.                            00-10995

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
CORE MATTERS AND PROPOSED FINDINGS OF FACT,
CONCLUSIONS OF LAW AND RECOMMENDATIONS TO
THE DISTRICT COURT WITH RESPECT TO NON-CORE MATTERS**

Outline

I.     Introduction
II.    Background
       A.  The Debtors
       B.  Description of the Plan
III.   The Court has Jurisdiction to Enter Certain Insurance Related Findings
IV.    The Joint Plan Meets the Requirements of §1129
       A.  The Plan complies with the applicable provisions of title 11, including the
       classification of claims under §1122 and the contents of the Plan under §1123
              1.  Classification and Treatment
              2.  Adequate Means for Implementation
       B.  The Plan meets the requirements of §1129(a)(2), (4), and (5)
       C.  The Plan meets the requirements of §1129(a)(7)-(10)
       D.  The Plan satisfies the requirements of §1129(a)(11)
       E.  Cram Down Requirements of §1129(b) have been satisfied
              1.  Unfair Discrimination
              2.  Fair and Equitable
V.     The Plan has Been Filed in Good Faith, and not by Means Forbidden by Law
       A.  The Plan is a result of extensive negotiations and is not a collusive agreement
       between the Debtors, McDermott and plaintiff's lawyers
       B.  The Insurer's Contractual Rights
              1.  Anti-Assignment Clauses

2. Anti-Assignment, Management of Claims, Cooperation and Consent Clauses Preemption Under Section 1123(a)(5).

C. Payment of Valid Claims

VI. The Plan's Discharge and Injunctive Provisions Satisfy the Requirements of the Bankruptcy Code

A. Uncontested Matters

B. Contested Matters

C. Section 105 Injunction

1. Identity of Interest

2. Substantial Contribution

3. Essential to Reorganization

4. Acceptance of the Plan by Impacted Class

5. Substantially Full Payment to Impacted Class

6. Full Payment of Nonsettling Claimants

VII. Executory Contracts

A. Insurance Policies

B. Coverage in Place Agreements

VIII. Apollo Parks Issues

A. Background Facts

B. The Plan, as it relates to Apollo/Parks, is Proposed in Good Faith

C. The Plan does not violate the Price Anderson Act

D. The Court's jurisdiction to determine insurance related findings

E. Proposed Findings of Fact and Conclusions of Law that ANI has Forfeited Rights under the Policies, such as the Management of Claims, No Action, and Consent to Settlement Provisions

1. Breach of Duty to Settle

2. Breach of Duty to Defend

3. Denial of Coverage

F. Reasonable Settlement

IX. Other Objections

A. Lack of Notice

B. Objections Specific to Ace Companies

X. Conclusion

## I.    **INTRODUCTION**.

This matter came before the court as a hearing on confirmation of the third amended joint plan of reorganization as of June 25, 2003 with technical modifications as of October 1, 2004 proposed by the Debtors[1], the Asbestos Claimants' Committee, the Future Claimants'

---

[1] See title for the names of the four debtors.

Representative, and McDermott Incorporated ("Plan").  Objections to the Plan were filed by various

entities,[2] and a hearing on confirmation of the Plan was held on September 22 through 26, 2003,

October 20 through 24, 2003, December 16 through 18, 2003 and January 5 through 9, 2004.  Also

heard was the Plan Proponents[3] motion to resolve Executory Contract Assumption Motion in

conjunction with other insurance-related plan issues.  The Plan Proponents assert that certain

asbestos insurance settlement agreements are not executory contracts, and that the Debtors need not

assume or reject them, or in the alternative, if they are determined to be executory, that the

agreements can be assumed by the Debtors.  The matter was heard in conjunction with other

insurance-related matters at the hearing on confirmation.  Since the hearings on confirmation,

various settlements have been entered  resolving certain objections and issues.[4]

---

[2]  Objections were filed by a Certain Group of  Law Firms; PMAC Ltd; Pulp & Paper of
America, LLC;  Babcock Wilcox Espanola, S.A.;  American Nuclear Insurers and Mutual
Atomic Energy Liability Underwriters ("ANI"); TIG and United States Fire Ins. Co.; Travelers
Indemnity Co. and Travelers Casualty and Surety ("Travelers"); Maryland Ins. Co.; Ace
Companies; Westchester Fire Ins. Co.; Certain Underwriters at Lloyds; as well as joinders in
objections filed by Royal Indemnity Company, Maryland Ins. Company, and St. Paul Mercury
Ins. Co.

[3]  Plan Proponents are The Babcock & Wilcox Company, Diamond Power International,
Inc., Americon, Inc., and Babcock & Wilcox Construction Company, Inc. (collectively
("Debtors"), McDermott Incorporated ("MI"), the Asbestos Claimants' Committee (the "ACC"),
and the Future Asbestos-Related Claimants' Representative (the "FCR").   As to A/P Township
matters, the Plan Proponents also include the A/P Claimants, the A/P FCR, ARCO, BWXT
Services and McDermott International, Inc. ("MII"). A chart showing the corporate structure of
MII, the parent of MI and related companies including the debtors appears as Exhibit 32.

[4]  During the confirmation process, various settlements were concluded with
CNA/Continental Insurance, p. 5417; and Affiliated/Appalachian, p. 5415.  After the
confirmation hearings, various settlements were approved with  First State, p. 5804; AIG
Member Cos., p. 5802; Associated International, p. 5803; and Northwestern, p. 5824.  On
September 21, 2004, a motion to approve settlement with Travelers Property Insurance Co., The
Travelers Indemnity Co., The Travelers Insurance Co, The Travelers Indemnity Co.of Rhode
Island and Travelers Casualty and Surety Co. was filed, p. 5911.  Additionally, on September 28,

This case is rapidly approaching the fifth anniversary of its filing date, February 22, 2000. The asbestos claimants, who for at least three years were strident adversaries of the debtors, are now in agreement on the joint plan before the court for confirmation. A number of the insurers, most of which are not creditors, continue to object. Other insurers have settled their differences and withdrawn, or are willing to withdraw, their objections if their pending motions for compromise are granted. [5] The Plan Proponents have been urging the court not to enter an opinion at this time, but instead to grant additional time for them to negotiate settlements with some of the remaining objecting insurers. Their plea for further delay falls on deaf ears because the court has the distinct feeling that:

1.  This case has already lasted too long;

2.  The professional fees and expenses have already been far too costly – $85,666,633 at last count, which only included charges thorough October 2003.[6] Such fees and expenses will probably exceed one hundred million dollars before this case is over – a far too expensive cost of reorganization.

3.  The parties have only reached settlements, filed a joint plan or taken affirmative and

---

2004, motions to approve settlements with Royal, p. 5928; Arkwright, p. 5926; and Mount McKinley Ins. Co, p. 5925 were filed. Hearings on the Traveler's, Royal, Arkwright, and Mt. McKinley settlements are scheduled for October 20, 2004. On October 1, 2004, a motion to approve a settlement with Prudential Assurance Co., Ltd. and Pearl Assurance plc. was filed, p. 5946. The Prudential/Pearl settlement was heard and approved on October 6, 2004. On October 6, 2004, a motion to settle with Riverstone and The Riverstone Insurers, p. 5956 was filed. This settlement will also be heard on October 20, 2004.

[5] *See* footnotes 2, 4.

[6] *See* Exhibit 2013, which also contains a future estimate of $7,085,000, but that only forecasted future invoices through March 2004.

constructive action among themselves when the court has insisted upon firm

deadlines.  The clearest example is that Travelers and the Plan Proponents had

advised  the court as early as February 2004 that they had a "settlement in

principle", but only  filed settlement papers on September 21, 2004, because the court

had set that date as a  strict deadline.

The time has come to move this case forward.

This opinion constitutes the court's findings of fact and conclusions of law regarding core

matters and proposed findings of fact and conclusions of law and recommendations to the district

court regarding non-core matters arising in connection with the Plan confirmation.   In the

alternative, to the extent that certain insurance-related issues are determined to be non-core, they are

tendered as proposed findings of fact and conclusions of law.  The court recommends that the Plan

be confirmed.


## II.    BACKGROUND.

A.  *The Debtors and other parties*.   The Babcock & Wilcox Company ("B&W") was

initially formed in 1877, as the manufacturer and marketer of water tube stream boilers.   In 1978,

J. Ray McDermott & Co, Inc (now McDermott Incorporated) acquired B&W. [7]  B&W and its

subsidiaries design, engineer, manufacture, and service industrial boiler systems.[8]   The boilers

contain or are alleged to contain asbestos liners.

--------

[7]  Debtors Diamond Power International Inc. and Americon, Inc. are subsidiaries of
B&W.  Americon is a holding company for Babcock & Wilcox Construction Company, Inc., the
other debtor.  Joint Pre-Trial Order, 2 - 5.

[8]  Joint Pretrial Order, 1-2.

In the late 1970's, asbestos-related personal injury claims were asserted against B&W.[9]  By 1999, the number of claims filed against B&W had reached over 400,000.[10]  The Debtors filed for relief under Chapter 11 of the Bankruptcy Code on February 22, 2000.

Following the filing, the official Asbestos Claimants' Committee was formed by the United States Trustee, and the court authorized the appointment of Eric D. Green, Esq. as the legal representative for the future asbestos-related claimants.  For well over two years, the ACC and the FCR were for the most part allied but in opposition to the Debtors as to the handling of present and future asbestos claims.

In February, 2001 the court granted the Debtors' request that a mediator be appointed.  Mr. Francis McGovern was appointed to mediate with the Debtors, the Debtors' owners or affiliates, the ACC and the FCR regarding the general financial terms of a plan of reorganization.        On February 22, 2001, at the court's insistence, the Debtors filed their Disclosure Statement and Plan, which set forth the Debtor's proposal for a consensual plan of reorganization.  Both the ACC and FCR initially did not agree to the Debtors' Plan, and it was not set for hearing.   The plan was amended at least twice, in May and July, 2002.[11]  In May, 2002, this court terminated the Debtors' exclusive period to file a plan of reorganization.  Thereafter, in July, 2002, the ACC filed its own Disclosure Statement and Plan.[12]

After much negotiation, the ACC, FCR and Debtors were able to resolve many of their

---

[9]  *Id*. at 7.

[10]  *Id*. at 9.

[11]  Pl. 3148, 3316.

[12]  Pl. 3320, 3321.

differences and agree upon a form of plan.  On December 19, 2002, the Debtors, MI, ACC and FCR filed a Substantially Complete Form of Joint Disclosure Statement.   On June 25, 2003, the Plan Proponents filed the Third Amended Joint Disclosure Statement and the Third Amended Joint Plan of Reorganization.  On August 28, 2003, the Plan Proponents filed the Plan Supplement.  Following approval of the Disclosure Statement, on July 10, 2003, the court entered an order approving the confirmation hearing notice and solicitation package and the manner of mailing these, as well as the procedures for voting and tabulation and procedures for allowing claims for voting purposes.

On August 15, 2003 Mr. Uddo was appointed the Apollo FCR, representing the interests of the Apollo/Parks ("A/P") future interest holders.[13]  After his appointment, further negotiations with the settling parties took place, which resulted in the filing of technical amendments to the Plan and a revised A/P Settlement Agreement.[14]  On November 12, 2003 and January 12, 2004, this Court approved the First and Second Sets of Technical Modifications to the Plan. Among other things, the modifications provide for: (1) the elimination of the Asbestos PD Trust and payment of Asbestos PD Claims and Indirect Asbestos PD Claims by the Reorganized Debtors based on the same payment percentage as previously contemplated to be paid on the claims by the trust; and (2) amendments to the Plan and Apollo/Parks related plan documents to reflect the agreement reached regarding the Apollo/Parks Township Claims.  A Third Set of Technical Modifications to the Plan was approved on June 21, 2004, and a Fourth Set of Technical Modifications was approved on October 6, 2004.

---

[13]  Exhibit 3240.

[14]  The term sheet for the revised settlement was filed on December 16, 2003.  Exhibit 3221.

B. *Description of the Plan*.    A brief summary of the Plan is necessary to adequately discuss classification and other issues that arose in connection with confirmation.  The Plan generally provides for eleven classes of claims, as follows:

| Classification | Description | Voting Status | Vote |
|---|---|---|---|
| Class 1 | Priority | Unimpaired | |
| Class 2 | Non-Priority Secured | Unimpaired | |
| Class 3 | Workers' Compensation | Unimpaired | |
| Class 4 | Unsecured Trade | Unimpaired | |
| Class 5 | General Unsecured | Impaired | Reject |
| Class 6 | Asbestos PI Trust | Impaired | Accept |
| Class 7 | Asbestos PD and Indirect Asbestos PD | Impaired | Accept |
| Class 8A | Apollo/Parks Township | Impaired | Accept |
| Class 8B | ARCO's Apollo/Parks | Impaired | Accept |
| Class 8C | ARCO's Environmental Remediation | Unimpaired | |
| Class 8D | Governmental Unit Environmental Remediation | Unimpaired | |
| Class 9 | Intercompany Claims | Unimpaired | |
| Class 10 | Affiliate Intercompany Claims | Unimpaired | |
| Class 11A | Equity Interests in B&W | Impaired | Accept |
| Class 11B | Equity Interests in Diamond | Unimpaired | |
| Class 11 C | Equity Interests in B&W Const. | Unimpaired | |
| Class 11D | Equity Interests in Americon | Unimpaired | |

The Plan calls for the creation of the Asbestos Personal Injury Trust.  All current and future asbestos personal-injury claims will be channeled to the Asbestos PI Trust, which will process the claims and pay all allowed claims pursuant to the Asbestos PI Trust Distribution Procedures ("TDP's").  The Asbestos PI Trust will be funded primarily by the transfer of (a) all the capital stock of B&W (valued at between $400 and $500 million); (b) insurance rights valued at as much as $1.15 billion; (c) 4.75 million shares of the common stock of MII or a related share price guaranty; (d) $92 million in promissory notes from MI; and (e) certain tax benefits.  In exchange, the Debtors and certain of their non-debtor affiliates will be granted the benefit of the Asbestos PI Channeling

-8-

Injunction, under which they will be forever released from liability on account of Asbestos PI Trust Claims.

Following mediation, the claimants in litigation with Apollo/Parks[15], B&W and Arco entered into the Apollo/Parks Township Settlement Agreement ("Settlement"). The Settlement is incorporated into the Plan, which provides for the Apollo/Parks Township Claims to be channeled to the Apollo/Parks Township Trust ("A/P Trust"), and the A/P Trust to process and pay allowed claims. The Settlement and Plan contemplates the following: (a) the claims of the *Hall* claimants will be allowed in the B&W bankruptcy case at $110 million; (b) Arco will make a cash payment to the *Hall* claimants of $27.5 million upon the receipt of releases from the *Hall* claimants, as well as other conditions as set forth in the Settlement; (c) B&W will make a $2.8 million cash payment to the A/P Trust; (d) B&W will assign to the A/P Trust its claims against ANI for reimbursement of prior defense costs incurred and paid by B&W arising from the *Hall* litigation in the amount of $1.44 million; (e) The Apollo/Parks Township Insurance Contributors and the Arco entities will make the Apollo/Parks Township Insurance Rights Assignment to the A/P Trust; (f) The A/P Trust will process and pay the *Hall* claimants claims, and process, adjudicate, settle or pay A/P future demands and the unliquidated A/P present claims pursuant to the Settlement , the A/P Trust Agreement and the A/P Trust Distribution Procedures; (g) a set aside of $75 million (with a cap of $100 million) will be made for A/P Future Demand Holders; (h) provision will be made for a "Standby Commitment" in favor of the A/P Future Demands holders.

---

[15] Known as the *Hall* claimants, for the lead plaintiff in the case against B&W, B&W Nuclear Environmental Services, Inc. and Arco pending in the United States District Court for the Western District of Pennsylvania, Civil Action No. 94-0951. Exhibit 3017.

### III.    THE COURT HAS JURISDICTION TO ENTER CERTAIN INSURANCE RELATED FINDINGS.

The Plan, at §7.13.1, provides that the Court shall make several insurance-related findings of fact and/or conclusions of law in connection with, and as a condition to, confirmation of the Plan.[16] Several insurers object that the court lacks jurisdiction to enter a final judgment adjudicating

---

[16]    These findings include the following:

"(p) The terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance contributor under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement;

(q) The terms of this Plan and the Asbestos Insurance Rights Assignment Agreement do not violate any obligation of the Debtors or any Insurance contributor under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Subject Asbestos Insurance Policy or Subject Asbestos Insurance Settlement Agreement;

(r) The Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment do not materially increase any insurers risk of providing coverage for asbestos-related liabilities under the relevant insurance policies as compared to the risk that was otherwise being borne by the insurers prior to the Effective Date;

* * *

(v) The Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Apollo/Parks Township Channeling Injunction are essential to this Plan and the Debtors' reorganization efforts;

* * *

(z) The duties and obligations of the Asbestos Insurance Entities under the Subject Asbestos Insurance Policies and Subject Asbestos Insurance Settlement Agreements are not impaired, altered, or diminished by (1) the discharge, release, and extinguishment of all obligations and liabilities of the Asbestos Protected Parties for and in respect of all Asbestos PI Trust Claims and Asbestos PD Trust Claims; (2) the assumption of responsibility or liability for all Asbestos Insurance Rights pursuant to this Plan and the Asbestos Insurance Rights and Asbestos PD Trust Claims; or (3) the assignment of the Asbestos Insurance Rights pursuant to this Plan and the Asbestos Insurance Rights Assignment Agreement;

* * *

(cc) The Asbestos PI Trust shall have the exclusive authority as of the Effective Date to defend

-10-

the rights of the parties under the policies.  They argue that questions regarding the coverage-in-place ("CIP") agreements and the insurance policies are already before the district court in various coverage actions, and that the insurers have requested jury trials in district court on their demands,[17] and by numerous and continuing objections in this court have attempted to reserve and protect their rights to jury trials.[18]

The bankruptcy jurisdiction of the district court is found in 28 U.S.C. §1334(b), which gives the district courts and adjunct bankruptcy courts jurisdiction of proceedings arising under title 11, arising in a case under title 11, or related to a case under title 11.  To determine whether such jurisdiction exists, "'it is necessary only to determine whether a matter is at least "related to" the bankruptcy.'"[19] Where bankruptcy jurisdiction is challenged, the result will turn on how broad or narrow "related to" jurisdiction is construed.

A proceeding is "related to" a bankruptcy proceeding if "'the outcome of that proceeding

---

all Asbestos PI Trust Claims involving Asbestos PI Insurance Rights; provided, however, that the Asbestos PI Trust may, in its sole discretion, afford any Entity, including any Asbestos Insurance Entity, the opportunity to participate in the resolution of any Asbestos PI Trust Claim;

    * * *

(ff) All of the Debtors' insurers who are affording insurance coverage that is the subject of the Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment, and the Apollo/Parks Township Insurers have been given notice and an opportunity to be heard."

[17]  Certain Underwriters at Lloyd's, London and Certain London Market Companies v. McDermott International, Inc., Case No. 03-2203; Certain Underwriters at Lloyd's, London and Certain London Market Companies v. The Babcock & Wilcox Co., Case No. 03-1192 (the "Declaratory Judgment Actions").

[18]  As to those insurers who filed proofs of claim, and consented to jurisdiction in the bankruptcy court, see page 11 *infra*.

[19]  *In re Walker*, 51 F.3d 562, 569 (5th Cir. 1995)(*quoting In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

could conceivably have any effect on the estate being administered in bankruptcy.'"[20] Stated another way, "'an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankruptcy estate.'"[21] Therefore, in order for bankruptcy jurisdiction to attach, the anticipated outcome of the action must (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect upon the administration of the estate.

Matters involving the confirmation of a plan arise under Title 11, and the court has jurisdiction to decide confirmation issues. Even if this confirmation proceeding necessarily involved a coverage issue, as asserted by insurers, suits involving insurance coverage are at least minimally related to a case under Chapter 11, because coverage will increase the estate.[22] At a minimum, the confirmation findings concerning the Debtors' insurance are at least "related to" to bankruptcy proceedings, and this court has jurisdiction to hear the matter.

The bankruptcy court's authority to enter final orders in matters before it is found in 28 U.S.C. §157, which permits the bankruptcy judge to hear and determine "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." Section 157(c)(1) permits a bankruptcy judge to hear a noncore proceeding that is related to a case under title 11, but specifies that the judge shall submit proposed findings of fact and conclusions of law to the district court, and the district judge, after de novo review and after considering the proposed findings and

---

[20] *Id.*

[21] *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999).

[22] *Travelers Indemnity Co. v Babcock and Wilcox, Co.,* Civ. Action 01-3387 (E.D. La. 2002).

conclusions, shall enter any final order or judgment regarding the matter. On core matters, the bankruptcy court may enter final orders.

A matter is core if it involves a right created by federal bankruptcy law, or is one which would only arise in bankruptcy.[23] Matters that arise under the Bankruptcy Code are also considered core.[24] A matter is non-core if it does not invoke substantive right created by federal bankruptcy law and is one that could exist outside of bankruptcy.[25]

The Debtors argue that the Plan does not require a determination of the scope of insurance coverage, and that coverage issues will likely be decided in another forum. They argue that the findings are necessary to ensure that confirmation itself does not act to annul the Debtors' policies. In other words, the Debtors argue that sustaining the insurers' objection would make mere compliance with the Code requirements for confirmation a violation of the insurance contracts and relieve the insurers of obligations under the policies.

Other courts have noted, in a similar context, that "because of the significance insurance coverage issues often have in a bankruptcy proceeding, it is proper under certain circumstances for a bankruptcy court to adjudicate such matters."[26] In *Prudential*, a trustee charged with the liquidation of asbestos-related claims under a confirmed plan filed an adversary proceeding seeking a declaratory judgment to determine the trustee's rights under protection and indemnity policies.

---

[23] *In re Wood*, 825 F.2d 90 (5th Cir. 1987)

[24] *Liljeberg Enters. Inc. v. Lifemark Hosps. of La.*, 2000 WL 63307, at 3 (E.D. La. Jan. 21, 2000).

[25] *Wood*, 825 F.2d at 97.

[26] *In re Prudential Lines, Inc.*, 170 B.R. 222, 231 (S.D.N.Y. 1994).

-13-

The district court held that a declaratory judgment proceeding to resolve issues concerning coverage and indemnification under insurance policies was a "core" proceeding.[27]  Although the determination involved state law issues, that factor was not determinative given §157(b)(3)'s wording that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."  Instead, because the policies were property of the debtor's estate in a Chapter 11 proceeding with over 7,000 asbestos claims potentially covered by the policies filed against the estate,  the determination of policy provisions was "essential and inextricably tied to the administration of the estate."[28]

The court is not asked to determine a separate suit or adversary proceeding seeking a declaration that coverage is or is not available.  Instead, the inquiry concerns whether the Plan is capable of confirmation, a matter at the heart of the Chapter 11 provisions of the Bankruptcy Code. In connection with the Plan, the Debtors seek a declaration that confirmation of the Plan will not impair the ability of the §524(g) trusts to access insurance rights transferred to the trusts.  Section 157(b)(2)(L) specifies that core matters include "confirmation of plans."  To the extent that a determination need be made of whether the Plan is capable of confirmation, or whether it is incapable of confirmation because its provisions run afoul of certain contractual rights of insurers, that determination is at the very heart of the function of the bankruptcy court, that is to determine whether the Plan is confirmable under the Bankruptcy Code.  To the extent that the confirmation

---

[27]  *Id*. at 229.

[28]  *Id*.; *see also Asbestosis Claimants v. American Steamship Owners Mutual Protection and Indem. Assoc*., 197 F.3d 632, 638 (2d Cir. 1999)("resolving disputes relating to major insurance contracts are bound to have a significant impact on the administration of the estate" and are core).

involves issues regarding the workings of a §524(g) injunction, that too is a core matter. Similarly, §365 expressly provides for the assumption or rejection of executory contracts, and a determination of whether an agreement is executory is a core bankruptcy function, as it arises under the Bankruptcy Code. Section 1123 governing the contents of a plan, provides that a plan must provide adequate means for its implementation, including but not limited to, curing or waiving of any defaults.[29]  In order to determine confirmation, a core matter, the court must necessarily make determinations of whether insurance rights may be transferred to a trust to be established under §524(g), whether the Plan meets the requirements of §524, whether the Bankruptcy Code preempts certain contract provisions and whether the Plan provides adequate means for its implementation under §1123(a)(5).

Various insurers who have objected to confirmation have filed proofs of claim in this bankruptcy proceeding.[30]  Generally,  the filing of a proof of claim constitutes consent to the jurisdiction of the Bankruptcy Court.[31]  Additionally, the filing of a claim invokes the core jurisdiction of the court under §157(b)(2)(B), (c).   As to insurers who have filed claims in the bankruptcy proceeding, core jurisdiction exists on issues relating to the insurers claims and objections to the Plan.

This is not a trial on coverage, and the court is not determining whether coverage exists

---

[29]  11 USC 1123(a)(5)(G).

[30]  These insurers include: Continental Company (P. 4491); TIG Insurance (P. 4499); American Home Ins.  (P. 4516); Century Indemnity Ins. (P.4518); Westchester Fire Ins. Co. (P. 4519); and Ace USA Companies (P. 4520).

[31]  *In re Baudoin*, 981 F.2d 736 (5th Cir. 1993); *see Katchen v. Landy*, 382 U.S. 323 (1966); *Pan American World Airways, Inc. v. Evergreen Int'l Airlines, Inc.*, 132 B.R. 4 (SDNY 1991).

under any particular policy. It is a trial on the confirmation of the Plan, and whether the Plan can be confirmed and the Debtors can proceed under the Plan. What the insurers argue is that the Plan may not implicate the insurers or policies of insurance, the largest single asset of the estate, without violating terms of the insurance contracts, thereby raising a coverage issue, which this court cannot finally determine. The insurers argue that confirmation of any plan funded by insurance will vitiate the policies and relieve the insurers of any obligation to make payments under the policies. The Debtors are put in a position that they cannot go forward on confirmation, as required by the Bankruptcy Code and Rules, because the act of formulating a plan involving insurance will breach obligations due under the policies. Likewise, they cannot simply wait for the coverage determinations to be made by the district court.[32] The act of going forward with confirmation of the plan cannot, of itself, be restrained by allegations that confirmation involves insurance issues, that cannot be determined in this proceeding. The court finds that it has core jurisdiction to make insurance-related findings. To the extent that the district court may determine that certain issues are non-core, then the findings are made as proposed findings of fact and conclusions of law.

## IV.    THE JOINT PLAN MEETS THE REQUIREMENTS OF §1129.

The court finds that the Plan meets the requirements of confirmation under 11 U.S.C. §1129. On all core matters, the court finds that confirmation is appropriate. On non-core matters, the court

---

[32]   The coverage actions were filed in 2003, three years after the filing of the Debtors' Chapter 11. The Bankruptcy Code requires that a plan be filed within 120 days of the petition date in order to maintain the exclusive period. This court has not only terminated exclusivity, but ordered that confirmation proceedings be commenced in September 2004. The Debtors thus lacked the option of simply waiting for the coverage matters to be decided by the district court prior to confirmation.

recommends that the district court enter an order confirming the plan.

      A. <u>The Plan complies with the applicable provisions of title 11, including the classification of claims under §1122 and the contents of the plan under §1123.</u>

The court finds that the Plan adequately designates classes of claims and interests, and adequately specifies the classes of claims or interests that are not impaired under the Plan, and specifies the treatment of claims or interests that are impaired under the Plan.

      1. *Classification and Treatment*.  Certain law firms[33] object to the classification of claims made by the Plan under §1122.  They object that their clients settled asbestos-related personal injury tort or wrongful death claims and thus should not be included in Class 6, which also includes disallowed settled claims and unliquidated or contingent claims for personal injury tort and wrongful death claims.  The objectors argue that the allowed, settled claims are substantially similar to other non-tort claims in Classes 4 or 5 of the Plan, which will receive payment in full, yet are classified with unliquidated claims in Class 6, which will receive only a partial payment.  They make three arguments: (1) settled claims are treated differently from unliquidated claims in the same class, in violation of §§1123(a)(4) and 1129(a)(1); (2) settled claims are not "substantially similar" to other Class 6 claims, and they cannot be classified together; (3) the current Class 6 classification is meant to disenfranchise and discriminate against settled claims, and constitutes improper gerrymandering.

      The classification objection made by Certain Law Firms is not new.  The arguments regarding separate classification and gerrymandering were raised previously as objections to the

---

[33]  The law firms consist of Levy, Phillips & Konigsberg, LLP; Greitzer & Locks, and The Law Offices of Peter G. Angelos, P.C., and represent approximately 1,177 claimants who settled claims for asbestos-related personal injury tort or wrongful death claims with the Debtor prior to the filing of the Debtors' Chapter 11 petition.

Disclosure Statement, and rejected by the court.[34]  Instead, the court found previously, and finds now, that the claims in Class 6 are substantially similar claims. Both the settled claims and the unliquidated personal injury and wrongful death claims are unsecured claims with common priority and rights against the estate, both are based on injuries or death claims stemming from alleged asbestos exposure, both will be paid from the pool of insurance rights.

The *Greystone* case [35] does not mandate separate classification as Certain Law Firms argue. Instead, the case prohibits separate classification of similar claims where a valid business purpose is lacking, or where the separate classification is meant to disenfranchise a dissenting class of creditors.

In this case, the Plan placed unsecured trade claims in Class 4, and unsecured general claims in Class 5.  Mr. David Keller, President and COO of B&W, testified at trial regarding the Plan's classification of claims, and testified as to the importance to the company of the ability to pay trade claims.  He testified that the Debtors' reputation and future business success depends on the Debtors following through with representations made in this proceeding that the trade claims would be paid in full. Given the small amount of the trade claims, which are approximately $3.5 million, and the large size of the Debtors' contracts, the loss of future contracts would result in a revenue reduction greatly in excess of the amount needed to pay trade claims in full.  As such, the court finds that a legitimate business justification exists for paying trade claims in full, and separate classification of Class 4 unsecured trade claims is appropriate.

---

[34]  *See* Reasons for Order dated April 4, 2003, Pl. 4101.

[35]  *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991), *cert. denied*, 506 U.S. 821 (1992).

The court also rejects the contention that settled claims in Class 6 are treated differently than other claims in the class. The Plan provides that all unsecured claims for personal injury caused by alleged exposure to asbestos in Class 6 will be paid in accordance with the provisions of the TDP. Similar claims will receive similar treatment under the TDPs. The claims will not be paid in full; however, the unrebutted testimony at trial was that as to the Debtors and their customers and suppliers, no business reason exists to pay asbestos personal injury claims in full.[36]

Other objectors have argued that Class 3 claims for workers compensation, as well as Class 4 and Class 5 claims, should not be separately classified. Class 3 consists of workers compensation claims. Mr. Keller testified at trial that these unsecured claims are paid in the ordinary course through the state workers' compensation system. Additionally, business reasons exist for the Debtors to pay its injured employees, justifying separate classification of the workers compensation claims, and payment in full. The court finds that the unsecured workers compensation claims are dissimilar to trade or other unsecured claims[37], and separate classification of Class 3 claims is appropriate.

Class 5 consists of general unsecured claims. Mr. Keller testified that this class included a disputed unsecured claim of the IRS, disputed miscellaneous legal claims, and the disputed claims of excess insurance carriers for recoupment of amounts previously paid to B&W. The claims are all disputed by the Debtors, are speculative in nature, and the Debtors estimate that the amount needed to pay these claims will not exceed $1 million. The Class 5 claims will receive a percentage payment on the allowed claims, similar to the treatment of Classes 6 and 7. The court finds that the

---

[36]  Tr. David Keller, September 24, 2003.

[37]  *In re U. S. Truck Co., Inc.*, 42 B.R. 790, 794 (Bankr. E.D. Mich. 1984).

-19-

separate classification of Class 5 unsecured claims is appropriate.

2.  *Adequate Means for Implementation*.  Section 1123(a)(5) requires that a plan provide adequate means for its implementation.  As discussed above, the Plan provides for creation of the Asbestos PI Trust and the A/P Trust.  Both trusts will be funded by, among other things, assignment of rights to the proceeds of B&W's insurance coverage.  This insurance coverage is substantial, and is valued as high as $1.15 billion for the Asbestos PI Trust, and for the insurance rights assignment to the AP Trust.  The Plan provides for the creation of Trust Distribution Procedures governing the payment of trust claims.  The other implementation procedures described in detail in the Plan are more than adequate to satisfy the requirements of §1123(a)(5).

B.  The Plan meets the requirements of §§1129(a)(2), (4), and (5).

No objections have been received that the Plan violates the provisions of §§1129(a)(2), (4) and (5).  The court finds that the Plan Proponents have complied with the Code provisions.  The Plan describes both impaired and unimpaired classes, and adequately describes their treatment.  The Court , on July 10, 2003, approved the confirmation hearing notice, and provided procedures for the mailing of the solicitation packages and approval of the voting agent.  Adequate notice was provided to creditors and parties in interest by the notice and procedures requirements approved by this Court.  The court further finds that payments made under the Plan are reasonable, and the Plan complies with 1129(a)(4).

The Plan Proponents have made disclosures required by 1129(a)(5).  The Plan Proponents have identified the officers and directors who will serve the reorganized Debtors, and the appointment of the officers and directors is consistent with the interests of the creditors, equity security holders and public policy.  The Plan Proponents have also identified the individuals who

-20-

will serve as Trustees of the Asbestos PI Trust, as well as their affiliations. Various objectors have questioned whether the Trustees are fair and impartial, citing alleged ties of some of the proposed trustees to the asbestos plaintiffs bar. The court finds that the Trustees have been adequately disclosed, and that appointment of the Trustees is consistent with the requirements of §1129(a)(5). Insiders who will be employed or retained by the Debtors, as well as their compensation, have been disclosed, as required by §1129(a)(5)(B).

Although strong objections to the Plan Proponents refusal to name at this time the trustees of the A/P Trust – even though they had named the trustees of the Asbestos Trust – were raised by certain insurers, the court does not consider that as a bar to confirmation. The court does not read §1129(a)(5) as requiring the names and identity of those individuals and finds nothing in the trust provisions of §524(g)(1)(B) that requires the information.

Section 1129(a)(6) regarding regulatory commissions and rate changes is not applicable to these Debtors.

C.    The Plan meets the requirements of §§1129(a)(7)-(10).

Subsection 1129(a)(7) requires that each holder of an impaired claim or interest either has accepted the Plan, or will receive an amount equal or greater than in a Chapter 7 liquidation. Section 1129(a)(8) provides for each class to accept the Plan or that the class not be impaired under the Plan. All impaired classes have voted on the Plan. All impaired classes, except Class 5, have voted to accept the Plan, by casting votes in favor of the Plan exceeding two-thirds of the amount of voting claims and one-half the number of voting claims in each class required for acceptance under 11 USC 1126(c). Class 11 equity shareholders have approved the Plan by vote exceeding two-thirds of the amount of shares who voted for the Plan, as required by 11 USC 1126(d). The Plan accordingly

meets the requirements of §1129(a)(10), that an impaired non-insider class vote to accept the Plan.

The non-accepting class, Class 5, will receive under the Plan an amount equal to or greater than what would be received in a Chapter 7 liquidation.  At the confirmation hearing, the Plan Proponents presented the testimony of Pamela Zilly, an investment banker with the Blackstone Group, L.P.  Her testimony was that the total assets available under the Plan for payment of claims are between $1.46 billion and $2.25 billion.  After adjustment for allocations for cash or liquidation uses, between $1.2 billion and $1.97 billion in net assets is available for distribution under the Plan. In contrast, the Chapter 7 liquidation value of the Debtors assets was placed at between $584 million and $1 billion.[38] A greater return to creditors under the Plan is possible because of the contributions of various McDermott entities, including the promissory note of $92 million, and 4.75 million shares of McDermott International Inc. stock.  The Court finds that under the Plan, each impaired class will receive or retain a claim or interest in property of value that is not less than the amount they would have received or retained in a Chapter 7 liquidation of the Debtors.  Instead, it is clear that they will receive more under the Plan than from a liquidation, so the requirements of §1129(a)(7) have been satisfied.

No dispute exists that the Plan meets the requirements of §1129(a)(9).

D.   The Plan satisfies the requirements of §1129(a)(11).

Section 1129(a)(11) requires that confirmation of a plan is not likely to be followed by the liquidation , or  further financial reorganization, of the debtor, unless such is proposed in the plan. In other words, for a plan to be confirmed, it must be "feasible."[39]  The debtor must prove a plan's

---

[38]  Exhibit 17.

[39]  *T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 801 (5th Cir. 1997).

feasibility by a preponderance of the evidence.[40]  A plan is feasible where it offers "'a reasonable probability of success,"[41] and where "the debtor can realistically carry out its plan."[42]

In proving a reasonable probability of success, the bankruptcy court "need not require a guarantee of success. ... , [o]nly a reasonable assurance of commercial viability is required."[43]  In *T-H New Orleans Limited Partnership*, feasibility was shown where the debtor demonstrated that it was able to service the debt with an infusion of capital, and presented evidence regarding the past and present earning power of the debtor, the ability of management and the economic picture for similar businesses in the area. [44]  Projections of future revenue are appropriate "where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive."[45]

Mr. Keller testified at confirmation regarding the Debtors' business prospects. Mr. Keller testified that the Debtors have excellent prospects for exit financing with Citibank and Fleet, who have provided term sheets for exit financing.  In addition, the ACC has negotiated with other banks for financing.  In the post-confirmation period, the Debtors prospects for getting and performing contracts are good.  He testified that in the post-petition period, the Debtors' income had

---

[40]  *Id.*

[41]  *Id, citing In re Landing Assoc., Ltd*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993).

[42]  *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989).

[43]  *T-H New Orleans*, 116 F.3d at 801 (citations omitted).

[44]  *Id.*

[45]  *Id., citing In re Lakeside Global II. Ltd*., 116 B.R. 499, 508 n. 20 (Bankr. S.D. Tex. 1989).

-23-

increased by 33%, and the Debtors have become financially stronger in comparison to their competitors.    He also testified that the Debtors have made tentative offers of post-confirmation employment to himself and to Richard Rimels, the current head of B&W Canada, and that he has confidence in the future management of Debtors.  The Plan also makes provisions for the transition of B&W to a stand-alone company, and contemplates a transition period whereby McDermott will continue to provide critical services pursuant to a transition agreement.  Mr. Keller's opinion was that the transition period was adequate, and B&W would be able to function as a stand-alone company at the end of the transition period.

The court finds that B&W has sustained its burden of proving feasibility under §1129(a)(11). Additionally, the Plan satisfies the requirements of §1129(a)(12), in that it provides for all fees payable under 28 USC §1930 to be paid, and all retiree benefits to be satisfied. No objection has been received under §§1129(a)(12) and (13), and the court finds that these sections have been satisfied.

E.    Cram Down Requirements of §1129(b) have been satisfied.

Only Class 5, consisting of general unsecured claims, and an impaired class, has voted against the Plan.  The Plan may nonetheless be confirmed if it meets the requirements of §1129(b), that is, that all requirements other than §1129(b)(8) that each impaired class has accepted the plan or is not impaired by the plan, where "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." [46] If these requirements are met, the Plan may be confirmed despite the rejection of an impaired class.  Class 5 consists of general unsecured claims, including a disputed tax claim,

---

[46] 11 U.S.C. 1129(b)(1).

-24-

insurer's disputed claims for indemnity, and certain disputed claims for damages. Each claim contained in Class 5 has been objected to, and certain of the insurer's claims have been estimated for voting purposes at $1.00 each.

1. *Unfair Discrimination*.

Unfair discrimination has been found where similar claims are treated differently without a reasonable basis for the disparate treatment, or if a class of claims receives consideration of a value that is greater than the amount of its allowed claim.[47] A plan that unfairly singles out a claim for nonuniform treatment violates §1129(b). One court, after making an exhaustive analysis of unfair discrimination, stated a four-part test to determine whether discrimination is fair: (1) whether the discrimination is supported by a reasonable basis; (2) the extent of good faith behind the proposal, (3) the degree to which the debtor can confirm a plan without such discrimination, (4) the treatment of the classes discriminated against.[48]

Various objections have been made that the Plan unfairly discriminates against Class 5, which will receive a pro rata distribution, and Class 4 (trade creditors), which will receive payment in full. At the confirmation hearing, testimony was heard from Mr. Keller about the importance of paying trade creditors. Not only had the representation been made to the creditors from the inception of the case that they would be paid in full, the vendors are suppliers to the business, ones with claims that are not disputed or suspect. Additionally, the failure to pay trade claims in full may

---

[47] *In re Kennedy*, 158 B.R. 589, 599 (Bankr. D. N. J. 1993); *In re Johns-Manville Corp.*, 68 B.R. at 636.

[48] *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989); *see In re Rochem, Ltd.*, 58 B.R. 641 (Bankr. D. N.J. 1985).

cause the loss of future contracts, contracts in size that could easily eclipse the $3.5 million to be paid trade creditors. By contrast, Class 5 consists of disputed and unliquidated claims of various creditors, including the insurers claims to recover sums paid under excess insurance policies under an indemnity theory, which have been valued at $1.00 for voting purposes, disputed ongoing lawsuits and a contested tax claim which the Debtors believe has been paid by the McDermott consolidated tax group. These claims have all been the subject of objections, and in the business judgment of B&W, have been determined to be lacking in merit. No business justification exists to pay the highly disputed claims in full. A business justification does exist, however, to pay trade claims, i.e., the relationships are important to the continued operation of the business and its reputation.[49] The court finds that a reasonable basis exists for payment in full of trade claims, that the debtors have satisfied the requirements of §1129(b), and the Plan does not unfairly discriminate.

    2.  *Fair and Equitable*.

    "The 'fair and equitable' requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders."[50] The Code defines treatment that is fair and equitable to various classes of claims. For unsecured creditors, such as the objecting Class 5 creditors, fair and equitable means:

> (B) with respect to a class of unsecured claims–
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed

---

    [49]  *In re Rochem, Ltd.*, 58 B.R. 641, 643 (Bankr. D. N.J. 1985)(payment of trade claims in full and only partial payment of disputed tort claims not discriminatory, as reasonable basis existed for the treatment).

    [50]  *In re Lakeside Global II. Ltd.,* 116 B.R. 499, 511 (Bankr. S.D. Tex. 1989).

-26-

amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.[51]

In other words, in order to confirm a plan over a dissenting class of unsecured creditors, the plan must pay the dissenting unsecured creditors the allowed amount of the claims or leave nothing to junior claimants or interest holders. The Plan does not provide that Class 5 allowed claims be paid in full, therefore, the inquiry becomes whether junior claimants or interest holders will receive or retain any property.

Various class 5 claimants have objected that the plan is not fair and equitable because it does not propose to pay Class 5 claims in full but equity holders in class 11 B -D retain their stock holdings. These objections lack merit. The Plan provides that all of B&W's equity interests will be transferred to the Asbestos PI trust. Notably, Section 7.2.3 provides that on the Plan's effective date, BWICO will cause the Asbestos PI Trust to become the holder of record of all the outstanding shares of the Capital Stock of B&W. B&W will retain its stock in subsidiary corporations, however, the stock will really belong to the Asbestos PI Trust by way of the BWICO transfer. The value of the stock of B& W and its subsidiaries will be used to pay Class 5, 6 and 7 claims. The Court finds that the absolute priority objection is not well taken, because the retention of B&W of its subsidiary's stock is a means to facilitate the ultimate transfer of the value of the stock to the trust, for the benefit of creditors. This is not an instance where B&W's owners, or in this case, it's parent corporation, is retaining anything of value. To the contrary, they are giving up not only the stock in B&W (which includes the stock of the B&W subsidiaries), but also a $92 million note, some

---

[51]   11 U.S.C. 1129(b)(2)(B).

stock of MII and/or a stock price guaranty and certain tax benefits.

### V.    THE PLAN HAS BEEN FILED IN GOOD FAITH, AND NOT BY MEANS FORBIDDEN BY LAW.

Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law.  Various insurance companies have filed objections to the Plan, ranging from frivolous objections that the trust to resolve radiation claims "will accomplish nothing less than insurance fraud",[52] and that the plan proponents have "made collusive efforts to defraud [insurers]"[53] to the more palatable but serious charge that the Plan provisions are in violation of the rights of insurers under their contracts and settlements with the Debtors, that the Debtors have settled meritless claims, and that the management of the Asbestos Trust is predicated on a conflict of interests.

The good faith requirement is "viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[54]  "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of §1129(a)(3) is satisfied."[55] The debtor bears the burden of proving that the plan was filed in good faith by a preponderance of the evidence.[56]  The good faith requirement

---

[52]    Objection of American Nuclear Insurer, Pl. 4716.

[53]    Objection of Travelers, Pl. 4722.

[54]    *T-H New Orleans Ltd Partnership*, 116 F.3d at 802.

[55]    *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[56]    *In re Briscoe Enter., Ltd., II,* 994 F.2d 1160, 1165 (5th Cir. 1993).

-28-

is satisfied even where "the plan may not be one which the creditors would themselves design and indeed may not be confirmable."[57]

The court finds that the Debtors have sustained their burden of proof that the Plan is filed in good faith, and that the Plan was proposed with a legitimate and honest purpose to reorganize and has a reasonable hope of success. Various insurers arguments to the contrary will be addressed in turn.

A    The Plan is a result of extensive negotiations and is not a collusive agreement between the Debtors, McDermott and plaintiff's lawyers.

Various of the Debtors' insurers have objected that the Plan is not filed in good faith because, in essence, it is merely a collusive agreement with plaintiff's attorneys designed to pay meritless claims. The Plan Proponents predictably respond that the Plan is the result of extensive arms-length negotiations and the system of paying claims is actually stricter than the system that existed pre-petition.

The Debtors' bankruptcy case was filed on February 22, 2000. Mr. Nesser, general counsel of B&W and MII, testified that a dual track was followed post-petition, that of settling with various constituencies, while also pursuing the "Litigation Protocol" to contest asbestos personal injury claims. Mr. Nesser testified that in the spring of 2000, the Debtors had settlement discussions with plaintiffs' lawyers. Throughout 2000, the Debtors also pursued discussions with London. In 2001, an adversary proceeding was initiated seeking a declaratory judgment regarding $600 million in assets that had been transferred from B&W to its parent corporations during a 1998 corporate

---

[57] *Id*. at 1167.

restructuring.[58]  About the same time, various insurers, including London, brought insurance-coverage litigation before  the district court.[59]

Mr. Nesser testified that negotiations with constituencies began soon after the Debtors' filing, and continued during the course of the transfers litigation and litigation with insurers. In 2001, the Debtors asked that a mediator be appointed, in part because they felt that negotiations were not fruitful.  Eventually, Professor Francis McGovern was appointed as mediator.[60]

In early 2002, several events occurred that helped in the Debtors' negotiation strategy. In January 2002, Judge Vance rendered a decision in favor of B&W in the London declaratory judgment action.  The next month, in February 2002, this court entered a decision denying the transfer complaint.[61]  In May, 2002, this court also entered an order terminating the Debtors' exclusive period to file a plan of reorganization.

In May, 2002, B&W filed a draft plan, but continued to negotiate with constituencies, including London.    Following the termination of exclusivity, the ACC filed its own Disclosure Statement and Plan.  By August, 2002, the Debtors announced that an agreement in principle had

---

[58]  Adv. No. 01-1155.

[59]  "London" includes Certain Underwriters at Lloyd's, London and Certain London Market Companies.  Various suits are pending before the United States District Court for the Eastern District of Louisiana by London Market Insurers and Traveler's Insurance Co. including *(i) Traveler's Ins. Co. et. al. v. McDermott Inc., McDermott Int'l, Babcock & Wilcox Co., Diamond Power Int'l, Inc., Babcock & Wilcox Constr. Co., and Americon, Inc*., Nos. 01-3218 c/w 01-3387, United States District Court, Eastern District of Louisiana, (ii)  *Certain Underwriters at Lloyd's v. McDermott Int'l, Inc.,* Case No. 01-0912 and *(iii) Certain Underwriters at Lloyd's London, et al. v. Babcock & Wilcox Co.*, et al., Case No. 01-1187.  *See also* footnote 17.

[60]  Pl. 1682.

[61]  *In re Babcock & Wilcox Co.*, 274 B.R. 230 (Bankr. E.D.La. 2002).

been reached regarding the terms of the ultimate plan. Professor Green testified that concessions made by the FCR and ACC to the amount of the contribution to be made by MII to the Asbestos PI Trust enabled a resolution in principle to be achieved and an amended plan was filed by the Debtors in December 2002. Finally, in June, 2003, the Joint Plan was filed by various constituencies, including the ACC, FCR and McDermott, Inc. [62] Each of the Debtors' plans contained different treatment of asbestosis claims, reflecting the negotiations underway at the time of filing. Various insurers object because the Joint Plan contains provisions more generous to claimants than the original plan, and argue that such indicates a lack of good faith.

Rather than indicate that good faith is lacking, the case history indicates that negotiations with constituencies was protracted, extensive and hard fought. A great deal of negotiation and litigation took place before an agreement in principle could be reached with any constituency. Ultimately, the Debtors were able to craft a plan agreeable to the ACC and FCR, which represent the major creditors in the case. Rather than indicate a lack of good faith, the Debtors' actions indicate a dogged determination to settle with its major constituencies on the best terms possible, and under a plan capable of confirmation.

The court finds it significant that prior plans submitted to the court never came on for confirmation. Instead, the plans were modified, amended and/or withdrawn prior to any confirmation hearing. Bankruptcy Code §1127(a) expressly provides for modification of a plan prior to confirmation, so long as it meets the requirements of §§1122- 1123. Plans are frequently modified during the confirmation process, including situations where settlements are incorporated into the plan and objections withdrawn. While the Litigation Protocol may have originally formed

---

[62] Pl. No. 1694, 3148, 3320.

the Debtors' strategy in the initial phases of the bankruptcy proceedings, it is not binding on the Debtors for the duration of the case. Instead, the debtor is free to negotiate, and the Code promotes, settlements with creditor bodies. The modifications and amendments to the Plan, and the abandonment by the Debtors of the Litigation Protocol, do not indicate a lack of good faith. Instead, they are the result of the usual negotiations leading to confirmation of a plan in many, if not most, Chapter 11s. In this case, these were hard-fought negotiations with the ACC and FCR, two bodies that vigorously objected to the original plan and the Litigation Protocol.

Insurers also object that the Plan is not filed in good faith because they were deliberately and collusively excluded from the negotiations and formation of the Plan and other agreements. Mr. Nesser testified that negotiations were underway with London from the outset of the case, and continued even after the agreement in principle was announced with the ACC and FCR. There was much argument but no evidence to the contrary.

      B.      The Insurer's Contractual Rights

Various insurers object that the Plan may not rewrite the contracts of insurance, without the consent of the parties. They argue that the Plan may not change provisions of the policies, including the claims management function, the anti-assignment clause, reporting requirements, the requirement to pay only meritorious claims, to pay claims only as they come due, and to assist in the defense, investigation and settlement of claims. Stated another way, they object that the Plan Proponents colluded against insurers to formulate a plan designed to force insurers to pay non-meritorious claims, without the insurer's participation and control over defense and settlement of the claims.

-32-

1.  Anti-Assignment Clauses.

Insurers argue that the Plan, among other things, may not require the assignment of insurance rights because the insurance policies and/or settlement agreements with Debtors specifies that any assignment must be consented to in writing by the insurer. They also argue that insurance rights are only assignable without the insurer's consent where vested and the amount of loss has been fixed by a settlement of the claim or an adverse judgment which has been paid by the Debtors. The Plan Proponents respond (i) the Plan only assigns insurance rights, and does not implicate any anti-policy-assignment clause; (ii) all remaining insurance coverage is subject to settlement agreements that do not contain restrictions on assignment; and (iii) the assignment does not increase the insurers' risk.

The Plan does not purport to assign the insurance policies. Only insurance rights, including rights, interests, claims, demands or entitlements to a policy's proceeds and the right to pursue the proceeds are transferred to the trusts. As a general rule, contracts are freely assignable. An exception exists where the parties provide an express prohibition on an assignment. A general stipulation in a policy prohibiting assignment except with the insurer's consent is valid only as to assignments that occur prior to a loss.[63]   The prohibition of an assignment without the consent of the insurer is not effective as to an assignment of a policy or right under a policy after the event has

---

[63]   *Geddes & Moss Undertaking & Embalming Co. v. Metropolitan Life Ins. Co.*, 167 So.2d 209, 210 (La. Ct. App. 1936)(distinction is made between assignment of policy before and after loss, assignment after loss is permitted); *International Rediscount Corp. v Hartford Acc. and Indemnity Co.,* 425 F. Supp. 669, 673 (D. Del. 1977)(assignment of policy prohibited only assignment of insurance contract before loss); *see also* 3 Couch on Insurance, 35:7 (3rd ed. 1995); 44 Am. Jr. 2d Insurance 787.

-33-

occurred by which liability under the policy is fastened upon the insurer.[64]

The anti-assignment clause in the various B&W policies states: "Assignment of interest under this Contract shall not bind the Underwriters until their consent is entered hereon."[65]  In construing a nearly identical provision, one court has held that the provision prohibits only the assignment of the insurance contract before loss. [66]  The court reasoned that the purpose of a general anti-assignment clause is to protect the insurer against the possibility of increased risks attached to a change in the identity of the insured if the policy were assigned before the insured-against loss had occurred.[67]  That rationale is lacking where the assignment only applies to a right to proceed against the insurer after loss.  After loss, the assignee simply stands in the shoes of the assignor, subject to valid defenses against the original insured.[68]

Objectors assert that a "loss" does not occur under the policies, and the right to payment for loss may not be assigned, until the happening of the occurrence and a determination of pecuniary injury resulting from the occurrence has fixed the amount of the loss.   The weight of authority is otherwise.  In *Ocean Acc. & Guarantee Corp. v. Southwestern Bell Tele. Co.*, [69] relied upon by

---

[64]  *Time Fin. Corp. v. Johnson Trucking Co.*, 458 P.2d 873 (Utah 1969).

[65]  Exhibits 34.001 through 34.240.  For example, see Exhibit 34.232, Policy No. A&PH-11611, paragraph O, pg. 24.

[66]  *International Rediscount Corp. v. Hartford Acc. and Ind. Co.*, 425 F. Supp. 669, 673 (D. Del. 1977).

[67]  *Id.* at 672.

[68]  *Id. at* 673, *citing Georgia Co-Operative Fire Ass'n v. Borchardt & Co.*, 51 S.E. 429, 430 (Ga. 1905).  Withholding consent in order to defeat the claim of an assignee on an assignment made after loss "would be a mere act of caprice or bad faith."

[69]  100 F.2d 441 (8th Cir. 1939).

London, the court held that after a loss occurs, a policy is assignable despite the presence of an anti-assignment clause. In a contract for indemnity against liability, the liability of the insurer arose immediately upon the happening of an accident. In such case, the liability, loss and cause of action arise simultaneously when the accident occurs, and not when judgment is rendered. [70] Rather than supporting London's argument, the case provides that assignment may occur after loss, the loss occurring at the time of the insured against accident, and not judgment fixing liability.

In the case of *Continental Cas. Co. v. Diversified Industries, Inc.*,[71] the court similarly construed a general prohibition against assignment without consent under Pennsylvania law as applying to assignments before loss only.[72] In *Continental*, the insurance policy contained an anti-assignment clause nearly identical to the one contained in the B&W policies. The court held that because the injury that would potentially place liability upon the insurer, in this case environmental damage from the storage of contaminants, occurred prior to the assignment, the assignment occurred after loss and was valid.[73] The assignment did not increase the amount of risk the insurer would face, but merely changed the name of the party to whom any payment could be made. Rather than measure loss from the time of judgment or other determination of damages for injury, the court

---

[70] *Id*. at 447.

[71] 884 F. Supp. 937 (E.D. Pa. 1995).

[72] *Continental*, 884 F. Supp. at 947 (noting that "great weight of authority"holds a general provision prohibiting assignment without consent applies to assignments before loss only.); *see A C and S*, 2004 WL 1354283 (Bankr. D. Del. Jan. 26, 2004)(commercial general liability policies could be assigned in their entirety to asbestos trust under Pennsylvania law, notwithstanding anti-assignment provision, because loss that gave rise to liability had already occurred).

[73] *Id*. at 948.

-35-

looked at whether the assignment occurred after the injury occurred.

As opposed to the policies, nothing contained in the CIPs or settlement agreements with the insurers prohibits an assignment of insurance rights. Most of the settlement agreements contain similar language.[74] Nothing contained within the settlement agreements acts to restrict transfer. Instead, the settlement language that they were made binding upon the parties "and their respective successors and assigns" appears to contemplate assignment.[75] Additionally, B&W utilized an agent, Worldwide, to handle and fulfill its claims management duties prior to filing of the petitions. Delegation of B&W's duties to an agent would also indicate that assignment was contemplated under the agreements.

Accordingly, the court finds that the Plan assigns to the trusts the Insurance Rights, including the right to receive insurance proceeds under various insurance policies and settlement agreements, and not the policies themselves. The Plan does not violate obligations of the Debtors or Insurance Contributor under any consent to assignment clause of any Subject Insurance Policy, A/P policy, Subject Asbestos Insurance Settlement Agreement or A/P Township Settlement Agreement. The assignment of the right to collect on B&W's coverage obligations does not materially increase the insurers' risk because the asbestos-related exposures and injuries relevant to asbestos claims have taken place years prior to the assignment.

    2.  <u>Anti-Assignment, Management of Claims, Cooperation and Consent Clauses</u>.

       a)  *Preemption under Section 1123(a)(5).*  Plan Proponents argue that (i) §1123(a)(5)

---

[74]  Exhibits 36.001 to 36.022.

[75]  *Certain Underwriters at Lloyds v. McDermott Int'l, Inc.*, 2002 WL 22023 (E.D. La. 2002).

expressly provides for adequate means for a plan's implementation "notwithstanding any otherwise applicable nonbankruptcy law" and preempts nonbankruptcy law to the contrary, such as the anti-assignment clause and other contractual provisions including management of claims, cooperation and consent to settlement provisions and (ii) the interpretation of contract rights the insurers' promote would impliedly thwart the purpose of the channeling injunction found in 524(g); (iii) both bankruptcy and insurance law prohibit the insurers from reaping a windfall if their coverage obligations were lessened by the Plan's implementation of 524(g).

Section 524(g) provides for an injunction to supplement a discharge in asbestos cases where certain requirements are met. Those requirements include that a trust be established and assigned substantial assets for the benefit of asbestos claimants and provide for matrices so that similar present and future claims are treated substantially the same. Plan Proponents argue that the Plan merely complies with the requirements of §524(g). They also argue that the insurers' allegation that the Plan breaches the policies and they no longer have obligations under the policies would permit the insurers' to escape payment in any asbestos case where §524(g) is implemented and insurance is a major asset of the estate. In short, they argue that acceptance of the insurers' argument would render §524(g) meaningless.

Plan Proponents cite various cases for the proposition that §1123(a)(5) preempts any nonbankruptcy laws that impair the implementation of a plan. Unlike other provisions in the Code which have been interpreted as merely enabling statutes, the language of §1123(a)(5) that "notwithstanding any otherwise applicable nonbankruptcy law" constitutes an explicit express

Congressional intent to supercede state law restrictions on the transfer of estate property.[76] As the Fourth Circuit has said,

> ". . . §1123(a)(5) is an empowering statute. As stated by Collier: 'The alternatives set forth in §1123(a)(5) are self executing. That is, the plan may propose such actions notwithstanding nonbankruptcy law or agreements.' Section 1123(a)(5)(D) then does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate."[77]

Insurers argue that the scope of the preemption found in §1123(a)(5) is limited only to "otherwise applicable non-bankruptcy laws 'relating to financial condition'" as stated in §1142(a), as the recent case of *Pacific Gas & Elec. Co. v. Cal. ex. rel. Cal. Dept. Of Toxic Substances Control,*[78] has so held. The *PG&E* case acknowledges that §1123(a)(5) provides for express preemption of nonbankruptcy laws, but held that the preemption is narrow in scope, applying only to nonbankruptcy laws relating to financial condition.[79] In so holding, the court noted that §1123 is derived from a similar provision found in §1142 which authorizes the implementation of a plan "notwithstanding any otherwise applicable nonbankruptcy law, rule or regulation relating to financial condition."[80] As noted by one author, it is unclear what, if any, nonbankruptcy laws would be preempted under the narrow ruling of the Ninth Circuit.[81]

---

[76] *In re FCS, Inc.*, 853 F.2d 1149, 1154 (4th Cir. 1988); *cf. Integrated Solutions v. Service Support*, 124 F.3d 487, 493 (3rd Cir. 1997).

[77] *FCS*, 853 F.2d at 1155.

[78] 350 F.3d 932 (9th Cir. 2003)

[79] *Id.* at 937.

[80] *Id.* at 942.

[81] 23 Am. Bankr. Inst. J. 32, 33 (2004).

This court holds that *PG&E* is distinguishable.  *PG&E* involved the transfer of a large public utility under a plan that obviated the need for approval or compliance with the applicable state public utility regulation provisions.  The B&W case does not involve the public regulation of a utility, instead it concerns implementation of a §§524(g) and 105(a) injunctions in a case involving asbestos and radiation injury claims.  Public health and safety issues are not implicated by the preemption, and a presumption against preemption is not present because state police powers are not implicated.[82]  Instead, only contractual provisions restricting, among other things, the assignment of insurance, management of claims and consent to settlement are implicated.

Additionally, the weight of authority is in accord that §1123(a)(5) preempts contrary state law or contract provisions if such provisions are necessary to the implementation of a plan.[83]  Cases that have considered the issue have uniformly held that §1123(a)(5) expressly preempts nonbankruptcy laws, and *PG&E* is the only case to read the preemption narrowly, to apply only to nonbankruptcy laws relating to financial condition.  *PG &E* is in the minority, and reads into §1123(a)(5) a requirement not found in the text of the provision.

This court also disagrees with the Ninth Circuit in *PG&E* in adding the words "relating to

_____

[82]  *In re Pacific Gas & Elec. Co.*, 283 B.R. 41, 47 (N.D. Cal. 2002), *rev'd*, 350 F.3d 932 (9th Cir. 2004)(noting that preemption issues are particularly acute in public utility cases because no other debtor is subject to as much regulation).

[83]  *Universal Cooperatives, Inc. v. FCS, Inc.,* 853 F.2d 1149 (4th Cir. 1988)(1123(a)(5) authorized the release of collateral securing a claim in satisfaction of the claim despite bylaw provision requiring board approval); *In re Entz-White Lumber & Supply Co.*, 850 F.2d 1338 (9th Cir. 1988)(1123(a)(5) permitted cure of default without paying contract default interest); *In re Public Service Co.*, 108 B.R. 854 (D. N. H. 1989)(1123(a)(5) permitted transfer of electric utility despite lack of state regulatory approval); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 61 (Bankr. S.D.N.Y. 1990)("Court finds that its jurisdiction and power over the debtor's estate takes precedence over the authority vested in the OTS under Title 12.")

financial condition" to §1123(a)(5).   The Ninth Circuit's reading into the §1123(a)(5) the words "relating to financial condition" ignored the rules of statutory interpretation found in other cases that where a statute's language is plain, the function of the court is to enforce it in accordance with its terms[84] and that a statute should be read to give effect to the whole, and not render superfluous any other portion of the same law.[85]  The "notwithstanding" language appears in the introductory portion of §1123(a) and under any fair reading applies to all subsections thereunder.  Adding the "relating to financial condition" language creates real doubt and confusion as to its limitation applying to subsection (a)(5)(C), (I), (J), and (a)(6) - (7) and would in many instances render these subsections meaningless.

The structure of the Plan contemplates that, among other things,  insurance rights will be assigned to the various trusts, that matrices will be established providing for the payment of allowed claims, and an injunction issued.  The implementation of section 524(g) provides support for the argument that Congress intended to permit the transfers contemplated by the Plan in asbestos cases. This conclusion is buttressed by the provision in each policy of insurance, mandated by state law, that the bankruptcy or insolvency of the Assureds shall not relieve the insurer of the obligation to pay claims under the policy.

---

[84]   *United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 103 L.Ed.2d 290 (1989)("...where...the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'").

[85]   *Kawaauhau v. Geiger*, 118 S.Ct. 974, 523 U.S. 57, 140 Led. 2d 90 (1998)(Court is "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."), *quoting Mackey v. Lanier Collection Agency & Service Inc.*, 486 U.S. 825, 83, 108 S.Ct. 2182, 2189, 100 L.Ed. 2d 836 (1988).

-40-

A contrary conclusion would allow insurers an absolute veto of a plan of any reorganization that involved an insured with asbestosis liability because of the anti-assignment clauses found in policies. Such an interpretation would allow insurers to gut the reorganization and channeling injunction provisions specifically provided for in §524(g). No law has been cited by the insurers to support such a proposition. Authority does exist, however, to support the proposition that §524(g) was adopted to foster reorganization.[86] This conclusion is also in accord with the asbestos insurers practice in this proceeding, as discussed in more detail in the next section, of permitting B&W to oversee the claims management process.

C.    Payment of Valid Claims.

London and other insurers object that the Plan is not filed in good faith because it proposes to pay meritless claims, not within the coverage of the insurers policies. Plan Proponents respond that the insurers must act reasonably with respect to a policyholder's settlement of asbestos-related liabilities, that the TDP's criteria for payment of claims are similar to or more stringent than the pre-petition settlement criteria used to settle over 300,000 claims against B&W from late 1970 to February 2000.

The history of the claims management process is significant and bears describing in detail. Initially, B&W looked to Travelers, its insurer with primary general liability coverage, for defense and indemnity. In the 1970's, B&W began receiving asbestos injury claims, which it tendered to Travelers. In the early 1980's, Travelers and B&W developed a "bulk settlement" strategy to settle

---

[86] The House Report states that section 524(g) was added to establish a procedure for dealing with reorganizations involving future personal injury claims against the debtor based on exposure to asbestos-containing products. The section is modeled on the trust/injunction in the Johns-Manville bankruptcy case and the UNR bankruptcy proceeding. HR Rep. 103-834, 103rd Cong., 2nd Sess 8-12 (Oct. 4, 1994); 140 Cong. Rec. H10765 (Oct. 4, 1994).

the asbestos injury claims asserted against B&W. Mr. McKnight testified that, while he was employed by Travelers, this primary insurer played a key role in developing the strategy and supported the strategy.[87]  Under the settlement strategy, protocols were developed to settle claims for a low per-claim amount where the asbestos injury claimant could demonstrate: (a) exposure to asbestos allegedly associated with a B&W boiler and (b) an asbestos-related medical condition.  Mr. McKnight testified that if the claimant could provide information sufficient to survive a summary judgment motion, allowing the claim to go to a jury, the claim could be settled under the protocols developed.  Claims were settled under the protocols until 1989, when Traveler's informed B&W that the products bodily injury aggregate limits under its post-1937 primary insurance policies were approaching exhaustion.

After 1989, B&W through Worldwide, assumed principal claims-handling responsibility for asbestos injury claims.  Mr. McKnight joined Worldwide, a third-party claims administrator, and continued to apply the settlement methodology developed by Travelers to B&W claims until  the petition date.

After 1989, B&W looked to its excess insurers to provide coverage in place to fund the asbestos injury claims.  On or about April 25, 1990, B&W and London Market Insurers agreed to the London Settlement Agreement ("LSA")[88], which set forth the manner in which the excess insurers' policies would provide coverage-in-place for B&W's asbestos products bodily injury claims.  The LSA was the first B&W CIP agreement with excess insurers, and many other CIP's were executed with other excess insurers by B&W in the following years.   All the CIP's contained

---

[87]  Testimony, September 22, 2003.

[88]  Exhibit 37.

similar provisions.  The CIP's agreed to a "trigger of coverage," for allocation of coverage, for the management of claims and other provisions.

Under the management of claims provision, B&W was given the responsibility for the defense and management of asbestos claims.  B&W, through its agent Worldwide, settled the asbestos claims, and then allocated settlement payments and administrative costs to the excess insurers using the agreed upon allocation method.    B&W and Worldwide continued the same settlement strategy that was initiated with Travelers.

 Mr. McKnight testified that, while at Worldwide, he employed the same exposure and medical criteria as used while he was at Travelers. He testified that items that a claimant needed to present for a claim to be settled were:

(1)   Evidence that the claimant worked in a facility containing a B&W boiler.  Exposure documentation included an affidavit from the claimant or a letter from his attorney listing the claimant's places of employment;

(2) Medical documentation of an alleged asbestos-related disease or condition. Generally, a doctor's report stating that the claimant had symptoms "consistent with" an asbestos-related disease or condition was satisfactory.  B&W accepted an  ILO reading of "1/0" to establish a claim of asbestosis.

The evidence shows that the settlement strategy was communicated to London.[89]

Mr. Quinn, the New York attorney for London, stated that London supported the strategy.[90]

Worldwide would keep excess insurers apprised of the claims handling procedures and

---

[89]  Exhibit 96.

[90]  Testimony, September 24, 2003.

criteria by, among other things, providing memos to London's counsel notifying them of new or revised settlement protocols, [91] and providing Quarterly Reports notifying the excess insurers of settlements reached.[92]   The excess insurers also performed periodic audits of Worldwide's claims handling procedures.[93] The results of the audits were acceptable, as Worldwide continued to process claims using the settlement strategy.[94]  In 1997, Worldwide paid $200 million in claims, in 1998 it paid $220 million and in 1999 it paid $270 million in claims, none of which were rejected by insurers.

Under the Plan, certain TDPs have been developed by the FCR, the ACC, and the Debtors. Mr. Green, the Asbestos FCR, testified that the TDPs are consistent with, or stricter, than the pre-petition claims settlement criteria employed by Worldwide, and agreed to by their insurers.  The court finds it significant that Mr. Green has critically examined the TDPs, because his interest is in assuring the payment of future claimants, and the Plan has only limited resources for paying claims, both present and future claims.  In addition, Dr. Florence testified that his analysis of the TDPs shows them to be more stringent than B&W's pre-petition settlement strategy.[95] Also, the testimony at trial shows that the TDPs are consistent with or more stringent than criteria used in other asbestos cases to evaluate claims, including the Celotex Trust, Manville Trust, Eagle Picher Trust and UNR

_____

[91]  Exhibits 123, 124, 135, 143.

[92]  Exhibits 165.27 - 165. 40.

[93]  Exhibits 40, 94, 221.

[94]  Exhibit 47.

[95]  Exhibit 169c.

Trust.[96] Dr. Peterson testified that under the TDPs, the Debtors would pay less than they would had they remained in the tort system.[97]

London and other insurers argue that the TDPs provide for payment of invalid claims because (i) the Debtor has stated such claims were invalid in earlier pleadings, which have now been withdrawn or abandoned by the Debtors, (ii) the TDPs do not follow the American Thoracic Society ("ATS") or ABA Guidelines for criteria in the diagnosis of asbestosis and provide for payment of claims despite the lack of an "asbestos marker."

The Litigation Protocol proposed by the Debtor early in this bankruptcy proceeding was a departure from the Debtors' insurer approved prior procedure for handling asbestos injury claims, that of settlement upon meeting certain somewhat loose criteria. The Litigation Protocol represented an aggressive response to asbestos injury claims -- one which the Debtors have since abandoned in favor of the negotiated Plan.[98]    It is not unusual for Debtors to change litigation strategy in connection with a Chapter 11 proceeding.   Likewise, if the court were to hold every party to aggressive assertions made in pleadings in advance of litigation, there could never be a settlement of the litigation.  Accordingly, the court finds that the Debtors' abandonment of their initial strategy

---

[96]  Exhibit 169, App. B, 1-12.

[97]  Exhibit 166, Table 18.

[98]  The Litigation Protocol was a proposal for disposing without jury trials of more than 200,000 asbestos personal injury claims in the district court by obtaining summary judgments in certain prototype cases and applying those rulings (supposedly in Debtors' favor) to all of the claims.  The court should note that Debtors' counsel did not freely and willingly abandon this litigation strategy.  Instead, after a couple of years this court indicated it was not willing to allow the reorganization to remain pending during the long period of time necessary to carry out the litigation strategy in the district court.  See background on page 5 - 6 supra as to this court's insistence that at least an outline or tentative plan be filed in 1991, and the termination of the exclusivity period which ultimately resulted in the filing of a joint plan in July, 2003.

to contest claims does not indicate a lack of good faith.

The TDP's are not as stringent as the insurers would like.  They are, however, more stringent than the standards employed by the Debtors, and approved by the insurers, prior to bankruptcy.  They are also consistent with standards employed by various other courts in the handling of asbestos injury claims under trust procedures.[99]  The insurers have not made a showing that the criteria which they want have been accepted by any other bankruptcy court dealing with an asbestos trust.  Rather than providing for the payment of "invalid claims," the Plan is the result of a negotiated settlement proposing to pay claimants in a fashion consistent with past practices approved by insurers, and consistent with practices found reasonable by other courts considering the asbestos liabilities of Debtors.  The court finds that the Plan and associated documents satisfy the requirements of §1129(a)(3).

## VI.    THE PLAN'S DISCHARGE AND INJUNCTIVE PROVISIONS SATISFY THE REQUIREMENTS OF THE BANKRUPTCY CODE.

The Plan provides for the Asbestos PI Channeling Injunction and the Asbestos Insurance Entity Injunction to be issued in connection with its Trusts, under §524 and the Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction under §105(a).  These injunctions, and the related Plan discharge provisions, satisfy the requirements of the Bankruptcy Code.

Section 524 generally provides for the effects of discharge, and 524(g) provides for an injunction to supplement the injunctive effect of a discharge.  The Plan has met all requirements of §524(g).

---

[99]  These include the Celotex Trust, Manville Trust, Eagle Pitcher Trust and UNR Trust. Exhibit 169, App. B, 1-12.

-46-

A. <u>Uncontested matters.</u>

The parties do not contest that the Plan meets the requirements of several sections, including

§§524(g)(2)(B)(i)(I) - (IV),[100] 524(g)(2)(B)(ii)(II)[101], (IV)(aa),[102] and 524(g)(2)(B)(ii)(V).[103]   Other

provisions of §524(g) are not disputed, although uncontested facts were not entered in connection

with these sections.   These include 524(g)(2)(B)(ii)(I), that the debtors will be subject to substantial

future demands for payment arising from their asbestos-related activities and (III), that the pursuit

of the Asbestos PI Trust Claims outside the Plan will threaten the Plan's purpose to deal equitably

with asbestos claims and future demands.

Dr. Peterson and Dr. Florence, experts retained by the ACC and FCR, were recognized by

the court as experts in valuation.   Dr. Peterson estimated the Debtors' present and future claims.   His

methodology assumed that, absent evidence to the contrary, future claims would broadly follow

historical patterns with respect to: (1) claims against B&W relative to the continuing incidence of

asbestos-related cancers in the general population; (2) the ratio of non-malignant to malignant

claims, and (3) amounts paid to settle claims for different diseases.[104] His methodology also factored

in foreseeable changes in factors affected by non-epidemiological influences, including (1) changes

in the propensity to file against B&W, (2) the ratio of non-malignant to malignant disease claims,

and (3) the amounts paid to settle cases.

---

[100]   Pretrial Order, Uncontested Facts 31, 32, 34, 35.

[101]   Pretrial Order, Uncontested Fact 39.

[102]   Pretrial Order, Uncontested Facts 39, 40.

[103]   Pretrial Order, Uncontested Facts, 13, 38.

[104]   Peterson testimony, October 22, 2003; Exhibit 166.

-47-

Dr. Peterson testified that if B&W had remained in the tort system, its total present and future asbestos-related liability would range between $7.099 billion and $9.043 billion.[105]  Dr. Peterson also estimated the number and value of future claims that would be filed against the Asbestos PI Trust.  Under the Plan TDPs, he testified that B&W's asbestos-related liabilities would be between $5.2 billion and $7.8 billion.[106]

Dr. Florence testified that utilizing several scenarios, based upon B&W's historical experience, B&W and its insurers would have faced significant asbestos-related personal injury claims had B&W not filed for bankruptcy: (1) $491 million in 2000; (2) between $793 million and $1.44 billion in 2001; (3) between $1.091 billion and $2.259 billion in 2002, and (4) between $1.39 billion and $3.041 billion in 2003.[107]

The expert testimony of John C. Butler was also offered by the ACC as to when B&W's coverage for its remaining products liability policies would have been exhausted had B&W not filed for bankruptcy.  Using the liability scenarios offered by Dr. Petersen and Dr. Florence, Mr. Butler testified that B&W's nearly $1.2 billion in remaining products coverage would have been completely exhausted by the end of the year 2004 if B&W had not filed for bankruptcy.[108]

---

[105]  Exhibit 166, at Table 15.

[106]  Id., Table 18.

[107]  Exhibit 169b.

[108]  Exhibit 188.

The court finds that the experts are credible[109], and that Plan Proponents have demonstrated that the Debtors would be subject to substantial future demands for asbestos related claims.    The Plan Proponents have also demonstrated to the court's satisfaction that the pursuit of such demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with claims and future demands.    The Plan provides a mechanism to channel claims to the trust, have each claim rated in accordance with the TDPs and for claims to be paid in accordance with a proposed schedule.  Absent such a mechanism, claims would be paid on a first come, first serve basis, with the likelihood that insurance coverages would be exhausted within a short time, leaving little or nothing to pay later filed claims.  Additionally, the Court finds that the Plan meets the requirements of the Code on all uncontested matters relating to the §524(g) injunction.

    B.    Contested matters.

    Certain Insurers have objected that §524(g)(2)(B)(i)(II) requires funding by the contribution of securities and future payments, which the Plan does not clearly do.[110]    The Plan provides for the funding of the Asbestos PI Trust by the transfer of, among other things, all of the capital stock of B&W, which will be accomplished by a transfer from BWICO.  It follows that if the Trust is the

---

[109]    The insurers argue that the testimony of Dr. Peterson and Dr. Florence should not be accepted because this court rejected their testimony in the avoidance action by holding that B&W was not insolvent at the time.  *See In re Babcock & Wilcox Co.*, 274 B.R. 230, 254 (Bankr. E.D.La. 2002). This argument has no validity because:
    1) the evaluations were as of a different time and for a different purpose;
    2) only the figures and not the import of their testimony has changed.  That is, they felt B&W was insolvent in 1998 because of future claims.  Now they testify the enormity of the claims is greater and presumably B&W is even more insolvent.

[110]    "Certain Insurers" includes a large group of insurers, including TIG, Mt. McKinley Insurance Company and Federal Insurance Company.  B&W contends that this section is uncontested, and that uncontested fact no. 32 covers this provision.

-49-

holder of all of the shares of B&W it will receive all dividends paid by B&W and its subsidiaries. Thus, claims allowed by the Trust will be paid from the earnings or the proceeds from any sale of those shares.[111] The court finds that the Plan satisfies the requirements of §524(g)(2)(B)(i)(II).

Certain Insurers also object that the 75% majority voting requirements of §524(g)(2)(B)(ii)(IV)(bb) have not been satisfied. Class 6, consisting of the holders of Asbestos PI Trust Claims voted in favor of the Plan by amounts and numbers sufficient to satisfy the requirements of this section.[112]

Certain Insurers also object that the requirements of §524(g)(2)(B)(ii)(V) are not met because examination of the Trust Documents "[m]ake it impossible to determine whether the Trusts will ever be able to operate through the 'mechanisms' as required" by the section. Additionally, London insurers objects that the Plan violates the provision that present and future claims be treated in substantially the same manner because it proposes to pay meritless claims of present claimants, leaving little for future claimants, and because the Plan will vitiate insurance coverage through its illegal treatment of the insurers' contracts.

The Plan provides, at Section 3.2.6.2 and 5.4 for the Asbestos PI Trust to process and allow or disallow claims in accordance with the provisions of the Asbestos PI Trust Distribution Procedures. A mechanism exists for the trust to process claims and determine the amount, if any, that will be paid. The Asbestos PI Trust will be funded from several sources as discussed, including an assignment of rights to insurance coverage, all of the equity of B&W and additional contributions

---

[111]  It is not at all unlikely that B&W will, in the future, be a profitable company as it is now profitable if asbestos and nuclear claims no longer burden the company.

[112]  Class 6 voted in favor of the Plan 89.4% by number and 88.4% by dollar amount.

from McDermott.  This funding will provide up to $1.152 billion in insurance rights, and capital stock and other assets worth between $680 - $780 million.[113]  As discussed elsewhere in this opinion, the Plan and TDP's are more stringent than the settlement strategy previously employed by Worldwide in processing asbestos claims, and are consistent with the provisions approved in other bankruptcy cases.  The FCR who is charged with the obligation of protecting the interest of the future claimants,  has analyzed the Plan and TDPs,  is a joint proponent of the Plan, and testified quite strongly in favor of the Plan.  The court will not presume – as the insurers ask the court to do without any evidence – that the FCR has not performed, or will not perform in the future, his fiduciary obligations.

The court finds that the Plan provides sufficient funding to the Asbestos PI Trust, and that the Asbestos PI Trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.  Thus, it satisfies the requirements of §524(g)(2)(B)(ii)(V) .  The Asbestos PI Trust will operate through mechanisms, such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and value of Asbestos PI Trust Claims, or other comparable mechanisms that provide reasonable assurance that it will value and pay similar claims in substantially the same manner.

In addition to other requirements, §524(g)(4)(B) requires that the court appoint a legal representative to protect the rights of future claim holders and that the court determine that the injunction with respect to future claims is fair and equitable to the future claim holders.  As already mentioned, the court has appointed Eric D. Green, Esq. as the legal representative for the future

---

[113]  Exhibit 17.

asbestos related claims holders. Mr. Green is well experienced in these kinds of matters.[114] Mr. Green has engaged in numerous discussions with the Debtors regarding the treatment of future claimants in the Plan, and taken actions needed to protect the rights of future claimants. Among other things, Mr. Green has retained Dr. Thomas Florence and other advisors to examine the availability of insurance to pay claims, to provide claims projection and trust distribution analysis, to examine the Debtors' asbestos-related liabilities and other issues relating to the future claims. All of this expert knowledge supports Mr. Green's informed and experienced opinion to support the Plan as a plan proponent. The court finds that the requirements of §524(g)(4)(B) have been satisfied.

C.    Section 105 Injunction.

The Plan provides for the Apollo/Parks Township Channeling Injunction, which will enjoin Apollo/Parks claimants from pursuing claims against the Debtors, certain of their affiliates and subsidiaries, the MII Indemnified Parties and ARCO.[115] The Plan Proponents base this provision upon §1123(b)(6), which permits any "appropriate provision" that is not inconsistent with other provisions of the Code, and §105 of the Bankruptcy Code, which permits the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

---

[114] Mr. Green testified that he has served as special master in both federal and state asbestos cases in Massachusetts, as well as in federal asbestos suits in Connecticut. He has also served as consultant to the post-confirmation trustees in the Johns Manville bankruptcy proceeding. He has served as futures representative in several asbestos bankruptcies, including the Fuller Austin case in Delaware, the Federal Mobil case in New Jersey and the Halliburton/Dresser bankruptcy proceedings.

[115] Plan, sections 1.1.9, 1.1.25, 7.10.

Also, §524(g)(1)(A) specifically provides for "an injunction . . . to supplement the injunctive effect of a discharge. . . . "

The Plan Proponents seek issuance of the Asbestos PI Channeling Injunction and Asbestos Insurance Entity Injunction under §105, as well as §524(g).    A discussion of the evidence supporting §524(g) appears above, and will not be repeated in this section.  To the extent applicable, it is incorporated herein.

 Case law has provided several factors for consideration prior to issuance of a third-party injunction, including:

> "(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and ; (7) The bankruptcy court made a record of specific factual findings that support its conclusions."[116]

Each factor will be discussed in turn.

1.    *Identity of Interest*.

A.  <u>Asbestos</u>.    Plan Proponents seek issuance of the Asbestos PI Channeling Injunction, Asbestos PD Channeling Injunction and Asbestos Insurance Entity Injunction against Debtors and other third parties that are Asbestos Protected Parties.   The court finds that an identity of interest

---

[116] *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002), *citing In re A.H. Robins Co.*, 880 F.2d 694, 701 - 702 (4th Cir. 1989); *In re Johns-Manville*, 837 F.2d 89, 92-94 (2nd Cir. 1988); *In re Continental Airlines,* 203 F.3d at 214.

exists between Debtors and the Asbestos Protected Parties.  The Asbestos Protected Parties are either MII, the ultimate parent, MI the parent of B&W, non-debtor subsidiaries of Debtors or affiliate corporations of Debtors.  Under numerous policies, B&W and all "wholly owned, or financially controlled or affiliated companies" are the named assured.[117]  Lawsuits filed also name MII as a party, with claims derivative of B&W's alleged asbestos liability.  MI and MII are making substantial contributions to the Plan, and their willingness to do so is dependant upon a final resolution of liability for the derivative asbestos liability claims.

B. Apollo/Parks.        The court finds that an identity of interests exists between the Debtors and third parties, including ARCO, MII  and the non-debtor affiliates and subsidiaries to support issuance of the Apollo/Parks Township Channeling Injunction.  Mr. Nesser testified that B&W purchased Nuclear Materials and Equipment Corporation ("NUMEC") from ARCO in 1971.[118] NUMEC had operated the Apollo and the Parks facilities from approximately 1957 to 1967, [119] and NUMEC's assets were eventually transferred to a wholly owned subsidiary of ARCO, also named NUMEC.  Among other things, ARCO is contractually bound under an assumption of liability and agreement to indemnify B&W which exists in the Stock Purchase and Assumption Agreements related to the transaction.[120]

_____

[117]  For example, see Exhibits 34.072 - 34.080.

[118]  A/P Uncontested Facts, No. 6.  Pl. 5356.

[119]  A/P Uncontested Facts, No. 2 - 4. Pl. 5356.

[120]  Exhibit 3015.  Agreement between Atlantic Richfield Co. as owner of capital stock of Nuclear Materials and Equipment Corporation and the purchaser, The Babcock & Wilcox Company.  A/P Uncontested Facts, No. 7, Pl. 5356.

Additionally, ARCO and B&W are both named insureds under the A/P Policies.[121]  Because these entities share a pool of insurance related to the A/P claims, their interests are aligned, and an identity of interests exists between the entities.  Likewise, the B&W affiliates and subsidiaries, including MII, share an identity of interest.  Each may share liability for nuclear hazard risks at the Apollo and Parks facilities, and their interests are aligned.  The court finds that an identity of interests exists among the Debtors, the Asbestos Protected Parties, and the Apollo/Parks Township Protected Parties such that a claim asserted against any of the Asbestos Protected Parties or the Apollo/Parks Township Protected Parties gives rise to a claim against the Debtors, including by the operation of the law of indemnity and/or contribution.

2.    *Substantial Contribution*.

A.    <u>Asbestos</u>.   Section 7.2 of the Plan provides for funding of the Asbestos PI Trust, with: (i) BWICO (an indirect wholly owned subsidiary of MII), which now owns the stock of B&W,  will cause the trust to become the holder of all outstanding Capital Stock of B&W; (ii) additional McDermott contributions including 4.75 million shares of common stock of MII (the ultimate parent of B&W) and a $92 million promissory note by MI; (iii) assignment of the asbestos insurance rights; and (v) transfer of certain of tax benefits of the Debtors.   MI and MII's contributions to the trusts are substantial, and consist of both shares and promissory notes.   According to the Blackstone Liquidation Analysis, the various McDermott contributions are in the range of $680 to 780 million. MII and certain of its subsidiaries are also assigning their Asbestos PI Insurance Rights, plus intellectual property rights to the Asbestos PI Trust.  The court finds that the contributions of $400-500 million in B&W stock, $123.1 million for the MII stock, McDermott guarantee and promissory

---

[121]    A/P Uncontested Facts, No. 68

notes and $160 million for the tax benefits are substantial contributions to the Plan and the reorganization.[122]

B. Apollo/Parks.    The Plan, at §7.6.5, provides for the funding of the A/P Township Trust. Contributions are made on the Effective Date to the Trust, as follows: (i) Insurance Contributors shall make the A/P Township Insurance Rights Assignment; (ii) the Debtors shall make the A/P Township Payment of $2.8 million and assign $1.4 million of rights to reimbursement of defense costs; and (iii) ARCO shall make a $27.5 million cash contribution and an assignment of insurance rights.   Mr. Nesser testified, in connection with the formation of the Plan and settlement, that ARCO's contribution was to be  substantial.  It will be paid directly to the A/P Claimants with the A/P Trust receiving a setoff of the cash payment amount, and forms an integral part of the settlement of the A/P Claims. The Court finds that ARCO's contribution to the Plan, in the form of cash contributions and insurance rights assigned, are substantial assets of the Plan and the reorganization, and will serve to reduce the amount that the A/P Claimants will eventually be paid through the A/P Trust.   The contribution of the Debtors' Apollo/Parks Township Payment and the Debtors' Apollo/Park Township Insurance Rights Assignment are substantial contributions to the reorganization.

3.    *Essential to Reorganization*.

A.    Asbestos.  The testimony at confirmation was that B&W was subject to voluminous personal-injury claims alleging exposure to asbestos from B&W boilers.  During the 1980's and 1990's, B&W carried out a settlement strategy in which it consensually resolved all claims by claimants who made minimal showing of alleged exposure and injury.  A total of more than $1.5

---

[122]   Ms. Zilly expert report, Exhibit 17.

billion was paid to claimants by B&W's insurers, resolving more than 300,000 pre-petition claims. By late 1999, however, there was an increase in both the number and the cost of asbestos claims. By 1999, the number of claims filed against B&W had reached over 400,000.[123]  By the claims bar date, approximately 222,000 primary asbestos-related personal injury and 60,000 secondary exposure proofs of claim were filed in this case.[124]  The Debtors are likely to be subject to substantial future demands arising out of the same or similar conduct or events that gave rise to the asbestos personal injury and property damage trust claims, addressed by the various asbestos channeling injunctions.   Pursuit of these demands outside of the reorganization and procedures set forth in the Plan will threaten the Plan's purpose to deal equitably with asbestos personal injury and property damage claims.   The court finds that the Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction are essential to the Plan and the reorganization.

B. Apollo/Parks.  As will be discussed in more detail in connection with the discussion of the nature of the A/P Claims, the defendants' claims in the *Hall* litigation pending in Pennsylvania present a substantial litigation risk.  A "test trial" in the *Hall* litigation involving only eight of the 500 claimants resulted in an adverse jury verdict of $36.7 million.[125]  Although the trial court eventually granted a new trial, a substantial risk remains on retrial that a similar result may be found. Resolution of the *Hall* claims and future claims by channeling them to the A/P Trust will result in a resolution of all the claims, and payment of the claims from the A/P Trust, and will permit the

---

[123]  Joint Pre-Trial Order, Uncontested Facts No. 9.

[124]  *Id*. at No. 14.

[125]  A/P Uncontested Facts, No. 96, 97.  Pl. 5356.

Debtor to emerge from bankruptcy free from past and potential future claims relating to the Apollo and Parks facilities, and also free from significant litigation expenses related to the *Hall* claims.[126] Absent the injunction found in the Plan, after more than a decade of litigation the A/P Claims will remain unresolved, with the Debtor facing significant future litigation and its attendant expense. Moreover, a condition to incurrence of the Effective Date of the Plan, and to ARCO's contribution of cash and the insurance rights assignment, is that the A/P Channeling Injunction is in effect. The court finds that the injunction is essential to the Plan and the Debtors' reorganization.

4.    *Acceptance of the Plan by Impacted Class.*

A.  Asbestos.  The Plan provides for payment of the asbestos personal injury claims as Class 6 claims, and for payment of asbestos property damage and indirect asbestos property damage claims as Class 7 claims.  These classes have voted in favor of the Plan.  The holders of Class 6 claims voted in favor of the Plan 89.4% by number and 88.4% by dollar value.[127]  The holders of Class 7 claims voted 100% in favor of the Plan.[128]  The court finds that the requirement of acceptance by the impacted class has been met.

B.  Apollo/Parks.  The Plan provides for payment of the A/P Claims as Class 8A Claims. Class 8A has voted overwhelmingly in favor of the Plan, with affirmative votes received by over

---

[126]   As of November 1, 2003, ANI, through its counsel reported that the total transaction costs expended in the defense of the *Hall* action are $24.02 million.  A/P Uncontested Fact No. 120.  Defense costs erode the limits of the Facility Form Policies.  A/P Uncontested Fact No. 66. That is, for every dollar spent on defense there is one dollar less available for claimants from the applicable insurance.

[127]   Exhibit 2006.

[128]   Exhibit 16.

99% of the class members.[129]  Moreover, the Apollo Future Claims Representative supports the Apollo/Parks Settlement Agreement.  The court finds that the requirement of acceptance of the Plan by the impacted class has been met.

5.    *Substantially Full Payment to Impacted Classes*.

A. Asbestos.   The Plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction.  Contributions to the asbestos personal injury trust is discussed above.  Like the A/P Trust, trust distribution procedures have been promulgated to govern the trust's operations.  Under the Plan, claims will be channeled to the trust, each claim rated in accordance with established TDPs, and paid in accordance with a proposed schedule.

B. Apollo/Parks.  The Plan provides for payment of the A/P Claimants and Future Claimants as Class 8A  Claims, and for adoption of Trust Distribution Procedures to govern the workings of the A/P Trust.  The A/P Settlement will settle the *Hall* claims, which comprise the bulk of the A/P present claims, in the amount of $110 million.  Both Arco and the Insurance Contributors will make the Apollo/Parks Township Insurance Rights Assignment.  The parties have stipulated to the face amounts and limits of various insurance policies applicable to both the Apollo and Parks facilities over time, and these limits are sufficient to cover the *Hall* settlement amount.[130]

In addition,  Arco will make a cash payment to the *Hall* claimants of $27.5 million upon the receipt of releases from the *Hall* claimants, as well as other conditions as set forth in the Settlement. B&W will make a $2.8 million cash payment to the A/P Trust and  assign to the A/P Trust its claims

---

[129]    Tabulation of Votes and Affidavit of Michelle Dalsin Zeller.

[130]    A/P Uncontested Facts, Nos. 62, 63.  Pl. 5356.

against ANI for reimbursement of prior defense costs incurred and paid by B&W arising from the *Hall* litigation in the amount of $1.44 million.

The Plan also provides for a set aside of $75 million (with a cap of $100 million) for the A/P Future Demand Holders and a "Standby Commitment" in favor of the A/P Future Demands holders. Mr. Basil Uddo, the A/P FCR, has exercised extensive due diligence review in the case. For example, he testified that, among other things, he reviewed the Plan and Disclosure Statement, the case record, the record in the *Hall* litigation and studies related to radiation exposure issues, as well as consulted with experts and others before concluding that the set aside was sufficient to satisfy A/P future claims. Although the A/P Trust Distribution Procedures remain to be negotiated between the parties and approved by the Court, based on the provisions of the Plan as amended on October 1, 2004, they will provide for the treatment of Apollo/Parks Township future demands in substantially similar fashion to A/P Present Claims.

6.    *Full Payment of Nonsettling Claimants.*

A.    <u>Asbestos.</u>  No evidence was put forth as to claimants who have not agreed to settle asbestos-related claims, or the payment to be made to these claimants. The Plan proposes to resolve all asbestos-related claims, and to pay those claims in accordance with procedures established under the TDPs. The Settlement Agreement between Debtors, MII, MI, the ACC and FCR proposes to settle disputes concerning the contents of the Plan, set up the asbestos trusts for the benefit of asbestos personal injury claimants and provide a mechanism for payment of the claims. To the extent claims are allowed, they will be paid in accordance with the trust in full.

B.    <u>Apollo/Parks.</u>  Mr. Nesser testified at the confirmation hearing that the *Hall* Claimants have agreed to settle their claims, and that other non-*Hall* claimants have claims estimated at $3

million or less.  To the extent that the non-*Hall* claims are allowed, they will be paid under the A/P Trust in full.

In conclusion, the court finds that the requirements for issuance of the Apollo/Parks Township Channeling Injunction have been met.  The Asbestos PI Channeling Injunction,  the Apollo/Parks Channeling Injunction and the Asbestos Insurance Entity Injunction are to be implemented in connection with this Plan, and the various trusts.  Upon confirmation and substantial consummation of the Plan, the Non-Debtor Affiliate Settlement Agreement and the Non-Debtor Affiliate Release shall be in full force and effect.

.       **VII.    <u>EXECUTORY CONTRACTS</u>**

A.       <u>Insurance Policies</u>

1.  *Asbestosis*.  Section 7.2.6 of the Plan calls for the transfer of the Asbestos PI Insurance Rights to the Asbestos PI Trust.  Section 8.1 of the Plan calls for assumption of all executory contracts and unexpired leases, not previously rejected.  The parties apparently agree that the insurance policies are not executory contracts.[131]  At issue is whether the settlement agreements with insurers, including the coverage in place agreement with London ("LSA") is an executory contract capable of assumption.  Insurers contend that the settlements are executory contracts that cannot be assumed or assigned, because the settlements incorporate the terms of the policies, including anti-assignment provisions, and other provisions with which the Plan does not comply. The Plan Proponents contend that the settlements are like the policies – not executory.

_____

[131]  See Plan Proponents Post-Hearing Brief, at pg.25; Certain Underwriters Response Brief Regarding the Plan Proponents' Motion to Resolve Executory Contract Assumption Motion, at pg. 20 (LMI concur with the Plan Proponents that the overwhelming weight of authority establishes the non-executory nature of the Policies.")

Prior to filing, the Debtors had numerous insurance policies with various insurers, many of which were the subject of coverage-in-place agreements.[132]  Prior to filing, the Debtor was current in its premiums on all policies covering asbestos-related liabilities.  On many policies, the coverage period had already expired.[133]   The Debtors' material obligation regarding the policies, i.e. the payment of premiums, had been satisfied for the policy period covered.  Other duties, such as assistance and cooperation, are ancillary, and not material obligations. The only material obligation of insurers remains the indemnity of the Debtors on the policies.  As such, the asbestos policies are not executory contracts which can be assumed or rejected in the bankruptcy proceedings.[134]

    *2. Apollo/Parks.*  ANI asserts that its policies governing coverage for nuclear energy hazards, unlike the asbestos related policies, are executory contracts.  ANI asserts that the policies are executory because B&W has the continuing obligation to pay premiums and ANI has the continuing obligation to defend claims tendered under the Plan.

---

[132]  The insurance policies are found at Exhibits 34.001 through 34.240.  The settlement agreements are found at Exhibits 0035, 0036, 36.001 through 36.022, and 0037.

[133]  All applicable coverage periods for the London policies expired on or about April 1, 1987.  Objection to Plan, P. 4726 at pg. 17.

[134]  *In re Firearms Import and Export Corp.*, 131 B.R. 1009, 1013-14 (Bankr. S.D. Fla. 1991)(insurance policy was not executory where debtor had paid all premiums in full prepetition on coverage periods that had expired); *In re Placid Oil Co.*, 72 B.R. 135, 137-38 (Bankr. N.D. Tex. 1987)(premium agreement not executory because no performance is required by debtor, other than payment of money); *see also Ames Dept. Stores, Inc.*, 1995 WL 311764 at 3 (S.D.N.Y. May 18, 1995)("Courts considering insurance policies in which the policy periods have expired and the initial premiums have been paid routinely find that they are not executory contracts despite continuing obligations on the part of the insured.")(collecting cases).

Unexpired insurance policies are generally considered executory.[135]  Where a debtor has the continuing obligation to pay premiums, and the insurer has the continuing obligation to provide coverage, a policy is considered to be executory.[136]  Premium payments are considered to be bargained for consideration in an insurance policy.[137]  Policies where the debtor has paid premiums for coverage periods that have expired are considered to be nonexecutory.[138]

The parties have stipulated that a total of four policies were issued on the Apollo and Parks Township facilities, and that each policy was effective from the date of its issuance to the present.[139]  Although the original policies were issued at various times from March 1958 to March, 1975, yearly endorsements to the policies were issued, specifying the effective period for the endorsement.[140]  Member companies participating in an ANI syndicate agree to pay a specified portion of insured losses, and receive the commensurate portion of the premiums.[141] ANI provided for each calendar year a premium endorsement specifying the advance, standard and reserve premium for the calendar year that the endorsement is effective, and an endorsement specifying changes in proportionate

---

[135]  *In re Gamma Fishing Co.*, 70 B.R. 950, 951 (Bankr. S.D. Cal. 1987).

[136]  *Id.*; *Counties Contracting and Const. Corp.*, 855 F.2d 1054, 1060 (3rd Cir. 1988).

[137]  *In re Sudbury*, 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993).

[138]  *See* footnote 132.

[139]  Joint Pretrial Order on Issues Related to Apollo/Parks Township Matters, P. 5356, nos. 52 - 65.

[140]  Exhibits 3108 - 3111.

[141]  Exhibit 3127; section 2.3.2, page lxxiv.

liability for subscribing companies in each calendar year.[142]  The parties have stipulated that all premiums required to be paid under the policies have been paid.[143]  The secondary financial protection master policy ANI administers is a retrospective premium program.[144]

The Plan Proponents assert that the ANI policies are not executory because all premiums have already been paid for the insurance, citing four cases for that proposition.  The court notes, however, that three of the cases involved policies that had expired prior to the bankruptcy filing.[145]  Where the coverage period has expired prepetition, there remains no existing contract to assume or reject.  The remaining case relied on by Plan Proponents involved a retrospective insurance policy, where debtor had paid the minium premium for the policy year, but on the filing date, had failed to pay retrospective premiums assessed after the policy year.[146]  The court determined that the existence of a retrospective premium did not render the policy executory.  The court does not find persuasive the cases where the policy at issue expired prepetition, or which considered retrospective

---

[142]  For example, *see* Exhibit 3108, pg. 600.

[143]  *Id*. at 67.

[144]  Exhibit 3127, 2.3.3.3, page lxxix.

[145]  *In re CVA General Contractors, Inc*., 267 B.R. 773, 778 (W.D. Tex. 2001)(when an insurance contract has been terminated prior to the date of the filing of the petition, there remains no existing contract, executory or otherwise, for the trustee to either assume or reject);  *In re Firearms Import and Export Corp,* 131 B.R. 1009, 1013 (Bankr. S.D. Fla. 1991)(where liability coverages were for prepetition periods, on the filing of the petition, no existing contract is present for the debtor to assume and 365 was not applicable); *In re Sudbury*, 153 B.R. 776, 777 (Bankr. N.D. Ohio 1993)(each policy had expired or was terminated prior to the filing of the case; presence of Bankruptcy Clause in policy constituted agreement that indemnity obligation was not conditioned upon payment of retrospective premium, where deposit premium was paid in full).

[146]  *Wisconsin Barge Line, Inc*., 76 B.R. 695 (Bankr. E.D. Mo. 1987)(considering retrospective insurance policy).

insurance policies where the retrospective premium was unpaid on the petition date.  Instead, an unexpired retrospective insurance policy is executory. [147]  In this case, the coverage period of the ANI policies extends post-petition, and Debtors still owe an obligation to pay standard premiums for the policies.

Generally, the mere obligation to pay money by one party to the contract is not enough to render that contract executory, absent some corresponding material obligation that is still owed by the other party.[148] Here, the Debtors owe the continuing obligation to pay premiums, and ANI owes a continuing obligation to provide coverage and to keep the policy in effect, which would render the policy executory.[149] The failure of the Debtors to pay premiums would permit ANI the right to cancel the policies.[150]  The court finds that the ANI policies are executory contracts which the Debtors may assume under the Plan.  The policies are continuing, and coverage periods have not expired, which would render the policies executory.[151]

ANI further objects that the policies may only be assumed in their entirety, and the Plan Proponents may not assume the benefits of the policies without also assuming provisions regarding

---

[147]  *Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 772, 779 (Bankr. W.D. Pa. 1985), *aff'd* 67 B.R. 620 (W.D.Pa. 1986).

[148]  *Lubrizol Enters., Inc., v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985).

[149]  *Counties Contracting and Const. Corp.*, 855 F.2d 1054, 1060 (3rd Cir. 1988); see also M. Ledwin, The Treatment of Retrospectively Rated Insurance Policies in Bankruptcy, 16 Bankr. Dev. J. 11, 29 (1999).

[150]  Exhibit 3110, pg. 6 ("in the event of nonpayment of premium. . . this policy may be cancelled by the companies. .. )

[151]  Exhibit 3110, Item 2 (Policy Period: Beginning at 12:01 on the 7th day of March, 1975 and continuing through the effective date of the cancellation or termination of this policy).

consent to settlement and control of the defense of claims.  For reasons put forth in more detail in the following sections dealing with the Apollo/Parks Township issues, this objection is overruled. Debtors may make a reasonable settlement in the Plan of the A/P claims.

      B.     <u>Coverage in Place Agreements</u>

The insurers object that various settlement agreements are executory contracts which the Debtors may not assume.  At issue are settlement agreements entered into by B&W after the primary policies governing asbestos-related liabilities with Travelers were nearing expiration.

In 1989, Travelers informed B&W that certain limits on primary insurance policies were nearing exhaustion, and that it would no longer handle claims for B&W.  B&W then assumed the principal claims-handling responsibility for its asbestos claims, using a newly formed third-party claims administrator, Worldwide.  B&W then looked to its excess insurance carriers to provide coverage in place to fund asbestos claims.[152]  B&W entered into agreements with excess insurers regarding the manner that the excess insurers' policies would provide coverage-in-place for B&W's asbestos products bodily injury claims.

One of the chief CIP documents is the LSA, agreed to on April 25, 1990.[153]  London, and other insurers, argue that the settlement agreement is executory because the major undertaking for Debtors under the agreement is the management of claims and for London is to indemnify pursuant to special criteria established by the CIP, and these obligations are so substantial that a breach of either would defeat the purpose of the transaction.  In addition, they argue that Judge Vance, in a

---

[152]  Testimony Mr. McKnight, September 22, 2003; Mr. Quinn, September 24, 2003.

[153]  Exhibit 36.003.

January 4, 2002 opinion, treated the CIP as an executory contract,[154] and that her decision constitutes the law of the case.

Initially, the court notes that Judge Vance's decision of January 4, 2002 does not establish that the CIP is an executory contract. Instead, she was asked to decide whether the Debtors had anticipatorily repudiated the CIP by proposing to assign the management of claims to a claims-handling trust under the Plan. She held that "the provisions of the Plan do not express defendants' unequivocal intent to cease performance of the LSA."[155] Without an analysis of the executory or nonexecutory nature of the CIP, Judge Vance reasoned that the Code does not prohibit assignment of executory contracts and unexpired leases, and that the LSA "does not prohibit its assignment and appears to contemplate assignment."[156] In other words, a hypothetical scenario existed that would permit assignment. Because the Plan at that time did not provide unequivocally for assignment of the LSA to a trust, or which would exclude the Underwriters from claims management, she found that the defendants had not committed an anticipatory repudiation of the LSA that would absolve the insurers of obligations under the agreement. In short, Judge Vance was not asked to decide whether the LSA was an executory contract under 11 USC §365. Instead, she decided only that the Debtors did not commit an anticipatory breach of the LSA.

The Bankruptcy Code, at §365, provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

---

[154] *Certain Underwriters at Lloyd's, London, et al v. Babcock & Wilcox Co, et al*, C.A. No. 01-1187, 2002 WL 22023 at 8 (E.D. La. Jan. 4, 2002).

[155] *Id*. at 7.

[156] *Id.*

-67-

In determining whether a contract is executory, the relevant inquiry is whether "if at the time of bankruptcy filing the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[157]  Only the existence of a material obligations that would excuse the performance of the other party, and not merely ancillary, ministerial or other continuing duties, would render a contract executory.[158]  A contract fully performed on one side prior to bankruptcy is not executory.[159]  If either side has "substantially performed" its side of the bargain, such that the party's failure to perform further would not excuse performance by the other party, then the contract is not executory.[160]

Generally, a material breach is one so substantial as to defeat the purpose of making the contract.[161]  The breach must go to "the root of the agreement" for a party to terminate its obligations under the contract.[162]

No decision could be located specifically discussing the executory nature of CIP agreements.  Courts generally construe continuing obligations in nonexecutory  insurance policies where the coverage period has expired, such as notification and cooperation clauses, as ancillary obligations

---

[157]  *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994).

[158]  *In re Sudbury, Inc.,* 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993).

[159]  Resnick, *Bankruptcy Law Manual*, 8:41 (5th ed.).

[160]  *In re Texscan Corp.*, 976 F.2d 1269 (9th Cir. 1992).

[161]  *Sinco, Inc. v. Metro-North Commuter Railroad Co.*, 133 F.Supp. 2d 308, 311 (S.D. N.Y. 2001).  The LSA provides that it is governed by New York law.  Other CIPs either do not contain a choice of law stipulation, or provide that laws of other states shall govern.  For example, the CIP with Commercial Union specifies that it shall be governed by the law of Massachusetts.  Exhibit 36.006 at pg.13.

[162]  *Id.*

that are still in effect but which failure to perform would not be material and would not excuse the insurer from liability under the policy.[163]

Under the settlement agreements, B&W is made responsible for the management of claims.[164] The insurer parties agreed to the establishment of a coverage block and to indemnify B&W for claims and defense costs. Plan Proponents argue that the management of claims provision in the CIP is not material, that it was never specifically discussed, and was merely added with other standard provisions in an early draft, and remained in the CIP thereafter. Additionally, they argue that the management of claims provision in the CIP is analogous to assistance and cooperation clauses found in policies, and are not material obligations. This court agrees.

The CIPs were designed to state the manner by which the settling insurers' excess policies would provide coverage-in-place for B&W's asbestos products bodily injury claims. The insurers agreed to pay asbestos claims as they were asserted under a methodology that was to be agreed upon. Eldon Bolton, who acted as lead negotiator for McDermott in the negotiation of the LSA, testified that the negotiations leading up to the LSA centered on the "trigger of coverage", that is, which policies would be used for injuries arising based upon an agreed upon "trigger" of liability. The Debtors objective was to obtain a "triple trigger" and to increase access to coverage. He testified that once the trigger was achieved, he had no objections or comments to the management of claims provision of the agreement.[165] Letters between Mr. Bolton and Mr. Quinn, a New York

---

[163] *Firearms,* 131 B.R. 1009, 1013-1014 (citing *In re Federal Press Co., Inc*., 104 B.R. 56, 66 (Bankr. N.D. Ind. 1989)); *In re Sudbury, Inc*., 153 B.R. 776, 779 (Bankr. N.D. Ohio 1993)(debtor's duties under cooperation clause is ministerial).

[164] Exhibit 36.003, pg.3. Other settlements contain similar provisions.

[165] Deposition Eldon Bolton, pg. 48-49.

-69-

attorney and London's chief negotiator, discussing the LSA do not contain any mention of this provision.[166]    In short, Bolton's testimony was that the trigger of coverage was extensively negotiated; however, the management of claims provision in the settlement was merely inserted without discussion.

Additionally, the course of conduct of the parties indicates that the management of claims provision is not a material provision, such that its breach would excuse the Underwriters' performance.  The LSA specifies that "B&W/McDermott shall be responsible for the management of the Claims."[167]  The testimony established that Worldwide undertook the management of claims for the Debtors.  Worldwide employed among others, David McKnight a  former employee of Travelers, who had handled B&W asbestos claims while at Travelers. The testimony was that Worldwide was given near complete discretion in handling claims,[168] and that settlement in excess of given dollar amounts would not constitute a breach.[169]

The conduct of the  parties indicates that they never considered the management of claims clause to be central to their agreement, such that a breach would be material.  Moreover, the management of claims provision in the CIPs merely provides for the parties to agree in the future to procedures for, among other things, the negotiation of new settlement agreements with plaintiffs'

---

[166]   Exhibits 97 - 100, 102 , 104 - 106, 108.

[167]   Exhibit 36.0003, pg. 3.

[168]   Exhibit 121; Thomas Quinn testimony Sept. 24, 2003; Louis Burkart testimony Sept. 23, 2003.

[169]   Thomas Quinn testimony, Sept. 24, 2003; *see also Certain Underwriters*, 2002 WL 22023 at 7 (failure of B&W to notify underwriters of settlements in excess of $100,000 would not breach the LSA).

counsel and other claims handling matters.  That the LSA does not set out those procedures  was confirmed by Mr. Quinn's testimony.[170]  Therefore, it cannot be said that the management of claims clause constituted the "root of the agreement" such that Underwriters may terminate the agreement if the clause were breached.  Other than claims management, which is more in the nature of an incidental continuing obligation, and which was performed by Worldwide pre-petition, no material obligations are due by Debtors under the CIPs that would constitute a material breach if not performed.  Accordingly, the CIPs are not executory contracts that must be assumed or rejected by the Debtors.

## VIII.   APOLLO PARKS ISSUES

### A.   Background Facts.

The Apollo Facility and the Parks Township Facility are nuclear power facilities located in Pennsylvania.  In 1971, B&W purchased from ARCO all of the shares of the companies owning the facilities.  Under the purchase agreement with B&W, ARCO agreed to indemnify B&W for certain liabilities, including claims arising out of "all liabilities, obligations and debts" of the predecessor company that predated the sale.  The Apollo Facility produced high-enriched uranium ("HEU") from 1957 to 1978, and low-enriched uranium ("LEU") from 1964 to 1983.  The Parks Township Facility produced specialty metal products,[171] plutonium-238, plutonium based fuel plates and other products using radioactive materials at various times from  1961 to the mid-1970's.  Additionally, from the

---

[170]   Thomas Quinn testimony, Sept. 24, 2003.

[171]   These products included hafnium, beryllium, titanium, and zirconium.  Uncontested Facts, No. 35. P. 5356.

mid-1960's, the Parks Township Facility stored or disposed of radioactive waste materials and buried solid radioactive wastes in a forty acre area known as the Shallow Landfill Disposal Area.

ANI[172] has provided coverage to B&W and ARCO as insureds for nuclear energy hazards at the Apollo Facility since March, 1958 and at the Parks Township Facility since June 1960, under four policies issued to cover the facilities. As of February 15, 1979, aggregate limits available under its policies at both facilities totaled $320 million. The parties have stipulated that defense costs erode the limits of the ANI policies, and that all required premiums have been paid on the policies.[173]

The buildings at the Apollo Facility have been demolished, and the Nuclear Regulatory Commissions ("NRC') released the facility for unrestricted use in the mid-1990's. The buildings at the Parks Township Facility were demolished between the mid-1990's and 2000. The Army Corps of Engineers continues site assessment activity at the Parks Facility, and remediation has not yet been determined.

*The Hall Litigation*.

On June 7, 1994, five individuals and three putative class representatives filed a complaint against B&W and ARCO in the United States District Court for the Western District of Pennsylvania

---

[172]    Formerly known as Nuclear Energy Liability Insurance Association and Mutual Atomic Energy Liability Underwriters.

[173]    Uncontested Facts Nos. 66, 67. Pl. 5356.

("*Hall* action").[174]  The plaintiffs in the action assert bodily injury and property damage claims as

a result of radioactive, hazardous and toxic emissions from both facilities.[175]

The bodily injury claims include a variety of cancer claims, including leukemia, throat cancer, breast

cancer, and other cancers, which have led to the death of certain claimants.[176]

B&W and ARCO tendered the *Hall* action to ANI in June, 1994.[177]  ANI accepted the tender

with a reservation of rights to deny coverage with respect to, among other things, any punitive

damages and liability as a result of injunctive relief for medical monitoring damages.[178]

In June, 1994, ANI appointed the law firm of Pepper Hamilton to represent both B&W and ARCO

in the *Hall* action.

In August, 1998, the federal district court in Pennsylvania held a trial of eight representative

"test case" plaintiffs in the *Hall* action.  On September 17, the jury in the *Hall* action rendered a

verdict in favor of the eight test plaintiffs of compensatory damages in the amount of $33.7 million

jointly against B&W and ARCO and $2.8 million solely against B&W.[179]  Trial on the punitive

damages phase was continued, and B&W entered into an agreement with Baron & Budd, plaintiffs'

---

[174] *Hall v. Babcock & Wilcox Co.*, Civ. Action No. 94-0951, United States District Court, Western District of Pennsylvania. The complaint has been amended, and now includes 500 plaintiffs with 383 claims.

[175] Exhibit 3017.

[176] All but 19 of the 235 wrongful death and personal injury claims involve some form of cancer.

[177] Uncontested Facts 81, 82. Pl. 5356.

[178] Exhibits 3021, 3168.

[179] Exhibit 3040.

lawyers, to settle the punitive damage claims of all claimants in the *Hall* action for $8 million.[180] ANI has not paid any part of the punitive damages settlement.

The defendants filed a motion for Judgment NOV, which was denied on June 29, 1999.[181] The court, however, did grant a motion for new trial, based primarily upon the plaintiffs' failure to disclose to defendants two exhibits prior to trial.[182]

After the jury verdict, multiple suits were filed both by B&W and ANI regarding the *Hall* action. In November, 1998, ANI filed a declaratory judgment action against B&W and ARCO in the New York state court, seeking a determination of available policy limits and arguing an "emission" trigger of coverage, one that required identification of the moment when exposure to radioactive material resulted in bodily injury.[183] The New York suit was dismissed on *forum non conveniens* grounds. In the fall of 1999, both B&W and ANI filed coverage actions in the Pennsylvania state court, which were consolidated.[184] In April 2001, the Pennsylvania state court rendered an opinion in the coverage actions that the date of manifestation, and not emission, is the applicable trigger on the ANI policies, and that ANI had the duty to pay for independent defense

---

[180]  Exhibit 3186.

[181]  Exhibit 3072.

[182]  *Id*.

[183]  Exhibit 3055.

[184]  *B&W v. ANI*, No. 99-11498, Court of Common Pleas of Allegheny County, PA and *ANI v. B&W and ARCO*, No. 99-16227, Court of Common Pleas of Allegheny County, PA..

counsel to represent and defend the separate interests of B&W and ARCO in the *Hall* action.[185]  To date, ANI has not paid the costs of B&W's independent counsel.

        B.        <u>The Plan, as it relates to Apollo/Parks, is Proposed in Good Faith</u>

ANI objects that the Plan represents a collusive agreement by Debtors and the attorneys for the Apollo/Parks claimants to defraud ANI and guarantee payment of meritless claims.  ANI objects that no Apollo/Parks claimant has ever obtained either a judgment or settlement of compensatory damages, after nearly ten years of litigation.  They argue that despite the lack of any adverse judgment against ANI's insureds, the Plan provides for payment of over $110 million in policy proceeds, without permitting ANI to control the defense of claims.

Much of the discussion regarding the good faith of the Debtors is made above, and will not be repeated here.  Mr. Nesser testified that after the petition was filed, B&W, ARCO and the *Hall* Claimants agreed in March of 2003 to involve a mediator to assist in reaching an agreement on the *Hall* claims, and Mr. McGovern, the court-appointed mediator was engaged.  In March, 2003, a mediation session was conducted in Washington, D.C., attended by *Hall* claimants counsel, an ANI representative and counsel, and B&W.  ANI's counsel included both its bankruptcy counsel, and its attorney from the Pepper Hamilton law firm, who participated in the *Hall* action.[186]  The Pepper Hamilton attorney provided an updated valuation analysis of the *Hall* claims, which reflected a value in the range of $76 to $90 million.[187]    After negotiation, the *Hall* claimants, B&W and ARCO

---

[185]  Uncontested Facts, Nos. 127 - 129. Pl. 5356; Exhibit 3094.

[186]  Exhibit 3100.

[187]  Exhibit 3102.

reached an agreement, memorialized by the Apollo/Parks Township Settlement Agreement, and incorporated into the Plan.

On August 15, 2003 Mr. Uddo was appointed the Apollo FCR, representing the interests of the Apollo/Parks future interest holders.[188]  After his appointment, further negotiations with the settling parties took place, which resulted in the filing of technical amendments to the Plan and a revised A/P Settlement Agreement.[189]  Mr. Uddo retained experts, including epidemiologists and biostatisticians, as well as other professionals to assist in evaluating the claims of A/P future demand holders, the Debtors' assets and the Plan.  As a result, the A/P settlement has been revised to permit Mr. Uddo to participate in the development of the A/P TDPs;  to set aside $75 million, with a cap of $100 million, for the A/P future demand holders, and for a "Standby Commitment" to be issued.

Under the settlement, the A/P Claims are liquidated and allowed.   The eight test claims in the *Hall* action were allowed in the total amount of $13.5 million, an amount less than the jury verdict.[190]  The remaining *Hall* claims were placed into four categories, which were rated based upon certain criteria, including the strength of the evidence regarding the cancer and nuclear exposure, the length and duration of exposure, the claimants' age, special damage characteristics, and whether the claim was within the applicable limitations period.  The Plan provides for a total of up to $210 million to be paid under the A/P Settlement to A/P claimants.

---

[188]  Exhibit 3240.

[189]  The term sheet for the revised settlement was filed on December 16, 2003.  Exhibit 3221.

[190]  Exhibit 3186.

ANI has not produced any credible evidence of collusion. While ANI complains that the Plan Proponents negotiated the Plan among themselves to the exclusion of ANI, it is undisputed that ANI and its counsel attended at least one mediation session during the bankruptcy proceedings regarding the *Hall* claims. While ANI ultimately did not settle with the Plan Proponents, and opposes the Plan, that alone is insufficient to deny confirmation on the basis of lack of good faith.

The court finds that the Plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable chance of success, and is made in good faith. It is not surprising that ANI desires to continue litigating the A/P claims – the litigation costs erode the coverage limits. The *Hall* action alone has cost over $24 million in attorneys' fees without resulting in resolution of any of the plaintiffs' claims.[191] Litigation of each claim of the over 500 *Hall* claimants may cost many times the $24 million in attorneys' fees already spent. Although the jury verdict in the *Hall* action was ultimately vacated, and a new trial granted, the jury verdict was in excess of $36 million in compensatory damages alone for only eight test cases. It seems reasonable that many times that amount of damages may ultimately be awarded by a jury if all or most of the 500 claimants ultimately go to trial.

Rather than a collusive arrangement, the Plan represents a negotiated solution to the expensive and protracted litigation that has been filed against the Debtors. Other than ANI, the A/P portions of the Plan is supported by all major A/P constituencies. The Plan and the A/P settlement were the result of extensive arms-length negotiations. ANI participated in settlement negotiations, however, did not agree to the settlement. The A/P FCR – who has an interest in ensuring that valid claims be paid to preserve limited resources for his claimants, who are at present unknown -- has

---

[191] Exhibit 3064; Uncontested Fact, 120, Pl. 5356.

conducted due diligence and negotiated a satisfactory resolution of the futures claims with the settling parties. The Plan and the A/P settlement are filed in good faith, are not the result of collusion, and are sufficient to satisfy the requirements of §1129(a)(3).

C.    The Plan does not violate the Price Anderson Act.

ANI objects to confirmation of the Plan because it asserts that the Plan violates provisions of the Price Anderson Act, 42 U.S.C. §2210, *et. seq*. ANI asserts that, under the Act, the exclusive jurisdiction and venue over public liability claims is in the district where the nuclear incident is alleged to have occurred, i.e., the Western District of Pennsylvania. It also asserts that payment of claims under the Plan would undermine the purpose of the Act to provide and preserve financial protection for valid claims.

The Price Anderson Act ("Act") is found at 42 U.S.C. §2210, et. seq. The Act was enacted to meet two basic objectives:

"(1)    Remove the deterrent to private sector participation in atomic energy presented by the threat of potentially enormous liability claims in the event of a catastrophic nuclear accident.

(2)    Ensure that adequate funds are available to the public to satisfy liability claims if such an accident were to occur."[192]

The Act effectively channels the obligation to pay compensation for damages so that a claimant need not sue each party involved as owner, designer or engineer of the facility, but can bring the claim against the reactor licensee.[193] The Act provides that with respect to any public liability action

---

[192]    Exhibit 3127, Part 1, xii.

[193]    *Id.* at xiii.

arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident took place shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy.[194]  Section 2210(n)(2) also permits actions pending in state court to be removed to the appropriate federal court venue.  It is this section that ANI asserts provides authority that jurisdiction and venue over all nuclear related claims must be in the U.S. district court where the reactor is located, and therefore, the Trust structure as contained in the  Plan is proposed by a means forbidden by law and cannot be confirmed.  ANI objects that the Plan provides that the *Hall* action is to be dismissed in favor of resolution of the claims by the Trust, and that the Trust will likely settle and pay claims through use of the TDPs, rather than litigate the claims through the *Hall* action pending in the Western District of Pennsylvania.  It argues that the settlement strategy will violate the policy of the Act to provide and preserve financial protection for valid claims.

The Act is construed as creating an exclusive federal cause of action for torts arising out of nuclear incidents.[195]  The consequence is that "no state cause of action based upon public liability exists."[196]  However, although jurisdiction and venue over public liability actions is now vested in the federal courts, nothing in the Act prohibits confirmation of a Plan under the Bankruptcy Code which provides for the settlement of claims based upon public liability.  Likewise, nothing in the Act indicates that Congress intended to preempt bankruptcy law

---

[194]  42 U.S.C. 2210(n)(2).

[195]  *Acuna v. Brown & Root, Inc*., 200 F.3d 335 (5th Cir. 2000), *cert. denied* 522 U.S. 1229.

[196]  *In re TMI Litigation Cases Consolidated, II,* 940 F.2d 832, 854 (3d Cir. 1991).

in cases involving claims based upon public liability. The Act provides for consolidation of public injury cases arising from a nuclear incident in a single federal district court located where the incident occurred. Congress sought, by this provision, to "effect uniformity, equity, and efficiency in the disposition of public liability claims. . . . [and] ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, and assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident."[197] The purpose of the venue and jurisdiction provisions is to provide uniformity, and to promote efficiency and not, as ANI claims, to preclude the settlement of claims or to ensure that litigation of claims take place in the district where the incident occurred.

The court notes that the ANI policies explicitly recognize that settlement, rather than litigation, of a claim may occur. For instance, section I of the policies permits payments on behalf of the insured and provides that the "companies may make such investigation, negotiation and settlement of any claim or suit as they deem expedient." [198] Nothing in the Act mandates that a Plan involving public liability claims specify that the claims will be litigated subject to the venue provisions of the Act, to the exclusion of the bankruptcy court. ANI's argument that the Plan cannot be confirmed because it violates the "public policy" of the Act is not well taken.

---

[197]  *Id*. at 856, citing H.R. Rep. No. 104, 100th Cong., 1st Sess., pt. 3, at 18 (1987).

[198]  Exhibit 3110, pg. 3, section I. The Conditions to the policies provides for a limit of liability where "payments in settlement of claims and in satisfaction of judgements" against the insureds for losses meets certain amounts. Exhibit 3110, pg. 4.

Likewise, nothing in the Act provides that the Plan cannot be confirmed because "it abrogates the applicable federal law regarding *how* the claims must be adjudicated."[199]  ANI asserts that the Act required that Third Circuit precedent concerning the elements and standard of proof of a public liability claim  be applied, which the Plan fails to do.  ANI  fails, however, to specifically demonstrate how the Plan does not meet the standard of proof for claims, other than to assert that the Trust, and not the Debtor or ANI,  will ultimately handle claims.   Other than broad assertions that the Trust mechanism will violate the public policy behind or the  "compensation scheme" found in the Act, ANI has failed to articulate any specific provision of the Act that has been violated by the Plan.  As such, the Court finds that the Plan does not violate the Price Anderson Act.

D.    The Court's jurisdiction to determine the insurance related findings.

ANI objects that the bankruptcy court lacks the jurisdiction to make insurance-related findings requested  by  the  Plan  Proponents.[200]    For  the  reasons  expressed  in  the  previous

---

[199]  Post Trial Brief of ANI, p. 13.

[200]  ANI asserts that the insurance related findings are found at Plan section 7.14.1,  and include:

(s) The terms of this Plan, the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement do not violate any obligation of the Insurance Contributors or ARCO under any consent-to-assignment provision of any Apollo/Parks Township Insurance Policy;

(t) The Apollo/Parks Township Insurance Rights Assignment does not materially increase the risk of the Apollo/Parks Township Insurers of providing coverage for liabilities under the Apollo/Parks Township Insurance Policies as compared to the risk that was otherwise being borne by the Apollo/Parks Township Insurers prior to the Effective Date.

(u) The terms or this Plan, the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement do not violate any obligation of the Insurance Contributors or ARCO under any consent-to-settlement, cooperation, management-of-claims, or no-action provision of any Apollo/Parks Township Insurance Policy.

(v) The Asbestos Insurance Entity Injunction, the Asbestos PI Channeling Injunction, the Asbestos PD Channeling Injunction, and the Apollo/Parks Township Channeling Injunction are essential to this Plan and the Debtors' reorganization efforts;

(w) An identity of interests exists among the Debtors, the Asbestos Protected Parties, and the Apollo/Parks Township Protected Parties such that a claim asserted against any of the Asbestos Protected Parties or the Apollo/Parks Township Protected Parties gives rise to a claim against the Debtors, including by the operation of the law of indemnity and/or contribution;

(y) The duties and obligations of the Apollo/Parks Township Insurers under the Apollo/Parks Township Insurance Policies are not diminished, reduced or eliminated by (1) the discharge, release, and extinguishment of all obligations and liabilities of the Debtors, the Reorganized Debtors, and ARCO for and in respect of all Apollo/Parks Township Claims; (2) the assumption of responsibility and liability for all Apollo/Parks Township Claims by the Apollo/Parks Township Trust; or (3) the assignment of the Apollo/Parks Township Settlement Agreement, and the Apollo/Parks Township Insurance Rights Assignment Agreement;

(aa) The contribution of the Debtors' Apollo/Parks Township Payment and the Debtors' Apollo/Parks Township Insurance Rights Assignment, and the contribution of ARCO's Apollo/Parks Township Rights Assignment and the ARCO Release Payment are substantial assets of this Plan and the reorganization;

(dd) The Apollo/Parks Township Trust, as of the Effective Date, will irrevocably assume the liabilities, obligations, and responsibilities of the Debtors and all other Apollo/Parks Township Protected Parties with respect to the Apollo/Parks Township Claims.

(ee) All of the Debtors' insurers who are affording insurance coverage that is the subject of the Asbestos PI Insurance Rights Assignment and the Asbestos PD Insurance Rights Assignment, and the Apollo/Parks Township Insurers have been given notice and an opportunity to be heard;

(ff) Upon confirmation and consummation of the Plan, the Apollo/Parks Township Trust shall have substantially the same rights to indemnity and other rights related to the Apollo/Parks Township Claims and Debtors' Apollo/Parks Township Insurance Rights subject to the Debtors' Apollo/Parks Township Insurance Carveout, as those afforded to the Debtors immediately prior to the Effective Date, and shall have substantially the same rights to indemnity and other rights related to ARCO's Apollo/Parks Township Insurance Rights subject to the ARCO Carveout, as those afforded the ARCO Entities immediately prior tot he Effective Date, and such rights shall be deemed to be transferred to the Apollo/Parks Township Trust and deemed vested in the Apollo/Parks Township Trust upon the occurrence of the Apollo/Parks Township Insurance Rights Assignment.  With respect to the rights that are transferred to the Apollo/Parks Township Trust, such rights shall be so vested free and clear of all liens, security interests, and other Claims, or cause of action, except as otherwise provided for in this Plan;

discussion of jurisdiction relating to the asbestos-related findings of fact, and except as stated otherwise, this court finds that it has jurisdiction to determine and enter findings and conclusions regarding confirmation of the Plan, including transfers of insurance rights to the trust established pursuant to §105 for radiation related claims, the function of the Apollo/Parks Township Trusts and related injunctions, and whether policies are executory contracts which may be assumed by the Debtors.

At issue also at confirmation was the question of whether the Plan Proponents could enter into a settlement of radiation claims due to the breaches of the policy by ANI in the conduct of the *Hall* and other litigation. Breach of contract actions are based upon state law. A determination that the insurer has breached obligations due under a policy to the insured is at heart a state law breach of contract issue. It is not an issue that invokes substantive rights created by federal bankruptcy law. Instead, the issue is one that invokes state law, and could exist outside of bankruptcy. It is thus a non-core matter in which this court may enter proposed findings of fact and conclusions of law. Accordingly, the following section dealing with the propriety of the settlement of radiation claims are made as proposed findings of fact and conclusions of law.

    E.    <u>Proposed Findings of Fact and Conclusions of Law That ANI has Forfeited Rights under the Policies, such as the Management of Claims, No Action or Consent to Settlement Provisions.</u>

B&W contends that because ANI has breached its duty to settle and to defend and has disclaimed coverage for the A/P claims, that B&W may enter into a reasonable settlement of the A/P

claims despite language in the policies that would give ANI the right to control the defense and settlement of the claims. Each contention will be discussed.

1. *Breach of Duty to Settle.*    Plan Proponents contend that ANI has the duty of good faith and fair dealing under the insurance contracts, accordingly ANI has the affirmative duty to both negotiate and accept reasonable settlement offers. They contend that notwithstanding the $36.7 million adverse test trial verdict, ANI has never initiated settlement discussions, has rejected all settlement offers, has refused to negotiated with claimants and refused to authorize any counterproposal in response to settlement demands.

ANI responds that, under Pennsylvania law, the insurer has no absolute duty to settle a case within policy limits. Instead, because ANI conducted an extensive evaluation of the claims and determined the claims had no scientific or legal merit, it was reasonable for ANI to defend the case rather than settle. Therefore, it is argued that ANI did not act in bad faith in determining to defend, rather than settle, the *Hall* action.

Generally, insurance law recognizes that the covenant of good faith and fair dealing implied in the insurance contract provides the insurer with a duty to settle within policy limits on objectively reasonable terms.[201]    The duty stems from the insurer's exclusive control over settlement negotiations, "plus the inevitable conflict between the insurer's interest to pay as little as possible and the insured's interest not to suffer an excess judgment."[202] A strong case against an insured on the issue of damages and liability tends to show the insurer's rejection of an offer to settle was

---

[201]   14 Couch on Insurance, section 203.12, 14 (3d ed. 1999).

[202]   *Id*. at 203.13.

-84-

negligent or in bad faith.[203]  Similarly, the insurer's rejection of advise of investigators, adjusters, or legal counsel of an opportunity to settle a claim within the policy limits may constitute evidence of negligence or bad faith in failing to compromise.[204]  The effect of the insurer's good faith refusal to settle is that the liability of the insurer remains measured by the terms of the policy, and the insured is not relieved of compliance with policy provisions.[205]  However, the wrongful refusal by the insurer to settle operates to release the insured from all provisions of the policy that otherwise give the control of the matter to the insurer.[206]

Pennsylvania law provides that, under an insurance contract, the insurer undertakes three obligations: (1) to indemnify against liability covered under the policy, (2) to defend all claims that potentially come within coverage of the policy, and (3) a fiduciary responsibility towards the insured and an obligation to act in good faith and with due care in representing the interests of its insured when handling third party claims brought against the insured.[207]  The duty to act in good faith in representing the interests of its insured compels the insurer to accord the insured's interests "the same faithful consideration it gives its own interests."[208]  A decision not to settle involves an

---

[203]  *Id*. at 203.29; *see also Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223 (Pa. Super. 1957)(where little possibility of verdict or settlement within policy limits, decision not to settle must be based on insurer's bona fide belief predicated upon all circumstances of case, that it has good possibility of winning suit).

[204]  14 Couch on Insurance, section 203.31 (3d ed. 1999).

[205]  *Id*. at 203.34.

[206]  *Id*. at 203.38.

[207]  *The Birth Center v. St. Paul Cos., Inc*., 727 A.2d 1144, 1155 (Pa. Super. Ct. 1999)(and cases cited therein).

[208]  *Id*. at 1155.

objective consideration of all factors bearing on the advisability of a settlement, including consideration of anticipated range of an adverse verdict, strengths and weaknesses of evidence, history of similar cases in the area, the relative appearance of persuasiveness, and the appeal of claimant, witnesses and the insured at trial.[209]  The insurer does not have an absolute duty to settle a claim merely because a judgment against the insured may exceed the policy limits.[210]  By the same token, where there is little possibility of a verdict within policy limits, the decision to litigate must be based on a reasonable assessment of the circumstances of the case and a real and substantial chance of a verdict in favor of the insured.[211]  Therefore, the "insurer's right under the policy to litigate or settle a claim against the insured is not a right to risk the insured's financial well-being unless there is both a real and a substantial chance of a finding of nonliability."[212]

Through the course of the *Hall* action, B&W and ARCO have made numerous requests that ANI settle the matter. The parties have stipulated here that after the jury's verdict in the *Hall* matter, both B&W and ARCO requested that ANI settle the matter.[213]  The testimony and evidence in this proceeding indicates that B&W and ARCO requested, before the jury verdict, during jury deliberations and after the verdict, that ANI settle the matter for amounts within the policy coverage

---

[209]  *Id.* (*citing Shearer v. Reed*, 428 A.2d 635, 638 (Pa. Super. 1981).

[210]  *Id.* at 1156 (*citing Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223, 229 (Pa. Super. Ct. 1957).

[211]  *Id.*

[212]  *Id.* at 1156.

[213]  Joint Pretrial Order, Pl. 5356, Nos. 102, 107, 108, 113.

that plaintiffs had offered as settlement.[214]   ANI did not respond to the settlement demands made during jury deliberations and did not settle the *Hall* action.  Indeed, McDermott's general counsel informed ANI that "ANI's refusal to negotiate is unreasonable and in bad faith in view of, among other things, the nature of plaintiffs' claims, ANI's control of the defense of B&W, and the damages to which B&W is exposed."[215]

On September 17, 1998, the jury in the *Hall* action rendered a verdict in the amount of $36.7 million for the initial eight test cases.  Mr. Nesser testified that, at that time, B&W was concerned that it would be exposed to uninsured losses over the policy limits should all the then remaining 100 claims be tried. Additionally, after the jury verdict, ANI informed the Debtors that its position was that the limits of liability remaining in the A/P policies was insufficient to pay the jury award or any future liability.[216]   B&W learned for the first time that ANI took the position that the A/P policy limits were at the lowest limits of liability.  Indeed, on November 22, 1998, ANI wrote that the costs of litigation incurred by ANI and assessed against the policies "ha[d] already exhausted the limits available at both facilities for bodily injury and property damage caused by the nuclear energy hazard prior to July 12, 1968."[217]   Given ANI's position, B&W reasonable could assume that it would be exposed to payment of all claims in the *Hall* action.

On November 4, 1998, B&W, ARCO, ANI and the *Hall* claimants' counsel attended a mediation session held before a Judge Gibbons, a retired judge of the federal Third Circuit in an

---

[214]   Exhibits 3035, 3036, 3037, 3038, 3043, 3049, 3050, 3051, 3053, 3073, 3082

[215]   Exhibit 3037.

[216]   Exhibit 3046.

[217]   Exhibit 3064.

attempt to resolve the *Hall* claims.[218]  ANI did not agree to settle the *Hall* claims, and on November 19, 1998, sent correspondence indicating that it would withdraw from any further mediation before Judge Gibbons because the policy holders would not negotiate the policy limits applicable to the *Hall* claims.[219]

Both the testimony and the evidence reflect that ANI's stated reason for refusal to settle was because settlement in this case would provide incentive for plaintiffs to bring other actions against ANI's insureds.[220]  Case law provides that a refusal to settle based upon a self-serving agenda permits an inference that the insurer has failed to consider all facts and circumstances in considering a settlement proposal.[221]  ANI contends that its refusal to consider settlement is based upon its understanding that the claims lack scientific merit and that Third Circuit precedent requires evidence of exposure to radiation at least in excess of background levels.  Although a new trial was granted in the *Hall* action, it is uncontested that a jury rendered a verdict in favor of the initial test claimants. It is also undisputed that B&W and ARCO made repeated demands of its insurer to settle the claims for amounts within the policy limits, all of which were either not responded to by ANI, or which ANI refused to consider.  At the same time, ANI's initial reaction to the jury verdict was to assert that policy limits had been exhausted and that B&W was exposed to uninsured liability on the claims.  Since that initial assertion, and after litigation, the Pennsylvania court has determined that

---

[218]  Pretrial Order, P. 5356, Uncontested Facts Nos.103, 105, 106.

[219]  Exhibit 3055.

[220]  Exhibits 3043, 3049.

[221]  *Birth Center*, 727 A.2d at 1156 (Insurers stated reason in not settling that it tries all bad baby cases "indicates an agenda on the part of the insurer that is self-serving").

ANI's theory of coverage is not valid. To date, any progress in the case, including a determination of the trigger of coverage and whether B&W is entitled to separate counsel, comes only after litigation.

The facts and circumstances of the *Hall* action indicate that ANI's duty to settle has been triggered. The plaintiffs have made settlement offers within the limits of the policies, and the defendants in the *Hall* action have repeatedly requested that settlement offers be considered, and a settlement be entered in the matter. The *Hall* case involves significant litigation risks. The record indicates that claimants include those who have died of cancer. The initial test trial resulted in a jury verdict of $36.7 million in favor of only eight of the over 100 claimants. Although a new trial has been granted in the action, it remains true that the test trial resulted in a substantial jury verdict in favor of the plaintiffs. If the verdict amounts were extrapolated over 100 claims, a significant risk exists that B&W will be exposed to liability in excess of policy limits, especially when attorney's fees and other transaction costs that reduce the policy limits is considered, and that these fees, at the end of 1998, exceeded $12 million, and currently exceed $24 million.[222] Even after a jury verdict, ANI has not considered any settlement proposals, choosing instead to litigate.

ANI also has taken the position after the test trial that policy limits are exhausted, exposing B&W to significant uninsured liability. This position ultimately proved to be unavailing; however, B&W has had to expend significant sums in litigating the coverage matter. ANI argues that no basis exists in Pennsylvania law to strip an insurer of the right to defend claims because it refuses to settle. Instead, it argues that Pa. Cons. Stat. §8371 provides the exclusive remedy for bad faith

---

[222] Exhibit 3064. The total transaction cost expended in defense of the *Hall* action as of November 1, 2003 is $24.02 million. Joint Pretrial Order, Uncontested Fact No. 120, Pl. 5356.

conduct by an insurer is damages, and no remedy is found in the statute of the forfeiture of the right to defend.   Section 8371 was promulgated by the Pennsylvania legislature in 1990, and created a new cause of action under state law for "bad faith."[223]   The statute provides that if an insurer has acted in bad faith toward the insured, the court may award interest on the claim, award punitive damages and assess court costs and attorney fees.[224]   The courts have consistently held that §8371 creates a separate and independent cause of action.[225]   A "claim brought under §8371 is a cause of action which is separate and distinct from the underlying contract claim."[226]   Because § 8371 was "promulgated to provide additional relief to insureds and to discourage bad faith practices of insurance companies, we would be reluctant to impose any limitations of claims brought under §8371 which do not appear in the plain language of the statute."[227]   The Pennsylvania Supreme Court has interpreted §8371 as an additional remedy that does not preempt common law rights.[228]   The statute was not intended to alter prior law, and nothing in the statute prevents the court from granting remedies not mentioned in the statute that it previously had the power to award.[229]   Instead, because "[t]he statute does not reference the common law, does not explicitly reject it, and the application of the statute is not inconsistent with the common law.   Accordingly, the [common law] remedy

---

[223]   *March v. Paradise Mut. Ins. Co.*, 646 A.2d 1254, 1256 (Pa. Super. Ct. 1994).

[224]   42 Pa. C.S. 8371.

[225]   *March*, 646 A.2d at 1256 (and cases cited therein).

[226]   *Id*.

[227]   *Id.*

[228]   *Birth Center,* 787 A.2d at 402-403.

[229]   *Id*. at 404.

survives."[230]   ANI's argument that §8371 provides an exclusive remedy is not well taken, and is overruled.

In conclusion, this court recommends that the district court find that sufficient evidence has been produced to support the Plan Proponents allegation that ANI has breached its duty to settle. It further recommends a finding that the settlement of the *Hall* claims contained in the Plan does not violate the ANI policies.

2. *Breach of Duty to Defend*.  Plan Proponents contend that ANI has breached its duty to insureds to defend by failing to appoint separate counsel for ARCO and B&W even after it was evident that serious conflicts of interest existed between the two.   ANI asserts that the appointment of Pepper Hamilton as joint defense counsel for B&W and ARCO was not in bad faith, that ANI accepted the tender of the defense under a reservation of rights, and that no support exists for the proposition that an insurer that accepts the tender of claims and appoints defense counsel has forfeited its right to defend claims.

Generally, policies will contain a provision by which the insurer obligates itself to defend the insured against all actions covered under the policy.  The insurer's unjustified refusal to defend exposes it to a finding that it has breached its duty to defend, and that it has breached the insurance contract.  The result is that the insurer may be estopped from disputing coverage, may incur liability and lose its rights under the policy such as to prohibit settlement by the insured,  control the defense and to require the insureds compliance with other policy provisions.[231]   Even then, however, a

---

[230]  *Id*. at 407.

[231]  14 Couch on Insurance, 202.4 (4th ed. 1999).

settlement reached by the insured, after the insurer's unjustified refusal to defend, must be reasonable and entered in good faith.[232]

Plan Proponents rely on the case of *Apalucci v. Agora Syndicate, Inc.*,[233] as support for the proposition that the insurer's failure to defend results in loss of rights under the policy to protect it from claims of its insured or third parties injured by the insured.  In *Apalucc*i, the Third Circuit court held that an insurer's refusal to defend constituted a breach of contract, and the insured lost its right to enforce a  "no action clause" in the policy despite the lack of an actual trial.    In that case, an injured minor who was served alcoholic beverages at a club, sued the club for negligence.  By the time the suit was filed, the club had ceased business and its owner could not be found.  A default judgment was eventually entered against the club, and the injured minor made a demand against the club's insurer for payment.  The club owner had notified the insurer of the claim, but the insurer was unable to locate the owner and denied coverage based upon the owner's failure to assist and cooperate in the defense of claims, as required by the policy.  The insurer responded to the claimant's suit to collect the judgment by denying any obligation and asserted that the claimant lacked standing to sue for bad faith breach of the duty to provide coverage and defense to the club, and the club's breach of the policy by failing to cooperate.

The Third Circuit held that, despite the provision in the policy requiring an "actual trial" prior to bringing suit against the insurer under the policy, the essence of the clause did not require a trial, but "whether the insured suffered a bona fide and fixed money judgment."[234]

---

[232]  *Id*. at 202.9

[233]  145 F.3d 630 (3d Cir. 1998).

[234]  *Id.* at 633.

Instead, the "actual trial" provision depended upon the insurer defending the insured in good faith, and the insurer had failed to do so in this case. The refusal to defend, "cut at the very root of the mutual obligation, [it] put an end to its right to demand further compliance with the . . . term of the contract."[235] Instead, "when one party to a contract unilaterally prevents the performance of a condition upon which his own liability depends, the culpable party may not then capitalize on that failure."[236] Because the insurer permitted a default to be entered against the insured, it could not complain that the default was not a "trial" to which the "no action" clause would apply, and a third party beneficiary may sue the insurer directly to collect and enforce the default.

In this case, Plan Proponents argue that while ANI appointed counsel in the *Hall* action, it nonetheless effectively failed to defend B&W by appointing a joint defense counsel with a conflict of interest, and by arguing an "emission" theory of coverage that would effectively nullify coverage. ANI originally appointed the Pepper, Hamilton law firm to defend both B&W and ARCO in the *Hall* action. Both B&W and ARCO expressed a desire to retain separate counsel, and notified ANI that the reservation of rights raised a conflict of interest,[237] and expressed concern regarding the firm's relationship with ANI. Nevertheless, the litigation proceeded with a single joint defense counsel which, as it developed, was unable to make certain arguments because of conflicts. For example, the joint defense counsel was unable to pursue a cross claim that B&W wished to file against ARCO for indemnity for discharges occurring while ARCO's subsidiary was the licensee of the facilities,

---

[235] *Id. (quoting St. Louis Dressed Beef & Provision Co. v. Maryland Cas. Co*., 201 U.S. 173, 181 (1906).

[236] *Id.* at 634.

[237] Exhibit 3025, 3026, 3030.

because of the conflict that it would pose.[238]  It also became clear during the course of the trial that Pepper Hamilton could not advise ANI regarding settlement demands because of the "claims asserted inter se by the insurer and the insured."[239]  ANI filed suit seeking, among other things, to enjoin B&W from retaining independent counsel in the *Hall* action.[240] In fact, the Pennsylvania federal court, in coverage litigation between ANI and B&W, found that ANI must provide separate counsel to each insured in the defense of the *Hall* action.[241]

Nonetheless, ANI has refused in the past, and continues to refuse, to pay for the independent counsel which B&W retained in the litigation.[242]  Instead, ANI has expressed to Pepper Hamilton a desire to restore common counsel.[243]

Pennsylvania law provides that the duty to defend includes the duty to provide independent counsel when a potential conflict of interest exists between co-defendants.[244] An insurer's denial of

---

[238]  Exhibit 3043.

[239]  Exhibit 3076.

[240]  Exhibit 3088 ("on their tenth cause of action, enjoining B&W from continuing to retain K&L as counsel in the defense of the *Hall* action.")

[241]  Exhibit 3096, at pg. 38 ("Furthermore, as long as the plaintiffs are raising claims against both B&W and ARCO and the trial court may be using verdict forms which require the jury to make separate findings as to the responsibilities of B&W and ARCO for the plaintiffs' injuries, it is not possible for a single law firm to represent B&W and ARCO."). This decision was affirmed on appeal in November 2002, and the Pennsylvania Supreme Court denied further review.  Pretrial Order, Uncontested Facts Nos. 128, 129.

[242]  Exhibits 3086, 3087.

[243]  Exhibit 3114.

[244]  *Bituminous Ins. Cos. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 427 F. Supp. 539, 555 (E.D. Pa. 1976).

the obligation to defend or indemnify the insured constitutes a breach of the insurer's duty to act in good faith and a repudiation of the insurance contract, permitting the insured to negotiate a settlement, so long as it is fair and reasonable.[245]

In conclusion, this court recommends that the district court find that sufficient evidence has been produced to support the Plan Proponents allegation that ANI has breached the duty to defend.

3.  *Denial of Coverage*.  Plan Proponents assert that ANI breached its insurance policy by filing declaratory judgment actions in Pennsylvania and New York, following the adverse jury verdict against insureds in the *Hall* action, seeking a declaration that the policies carried the lowest limit of liability based upon its "emission" trigger of coverage.  They assert that the legal maneuver effectively denied coverage for losses under the policies, because ANI asserted that defense costs had eroded the entire value of the coverage.[246]  ANI contends that it did not deny coverage, but instead merely exercised its legal right to adjudicate a legitimate coverage dispute in court.  It contends that the dispute over the trigger of coverage was one of first impression under nuclear energy liability policies.

At the time that ANI put forth its "emission" trigger theory, applicable Pennsylvania law provided that "manifestation" was an applicable trigger of coverage.  In the case of *J.H. France Refractories Co. v. Allstate Ins. Co.,* [247] the Pennsylvania Supreme court held that policy limits in effect when the manifestation of injury occurred were applicable.

---

[245]  *Alfiero v. Berks Mut. Leasing Co.*, 500 A.2d 169, 172 (Pa. 1985).

[246]  Exhibit 3046, 3054, 3064.

[247]  626 A.2d 502 (Pa. 1993).

-95-

Despite knowledge of the *J.H. France* decision,[248] ANI initiated two coverage actions, one in New York and the other in Pennsylvania. In the Pennsylvania action, filed in October 1999, ANI requested a declaration that "plaintiffs ANI and MAELU are relieved from all liability to B&W under the Facility Form Policies and/or the S&T Form Policies with respect to the *Hall* action,"[249] by reason of B&W's alleged breach of good faith by refusing to authorize joint defense counsel to file a motion to certify an appeal, and by instructing the firm of Kirkpatrick and Lockhart to act on its behalf in the *Hall* action. The Pennsylvania court ultimately held that B&W was entitled to independent counsel, and that, because the CGL policy in the *J.H. France* case was almost identical to the language in the ANI policies, that *J.H. France's* interpretation of the policies would govern interpretation of the ANI policies, making the more expansive manifestation trigger applicable to the *Hall* action.[250]

Generally, once an insurer denies coverage, the insured is released from policy provisions governing cooperation and settlement, as well as other provisions.[251] Case law also recognizes that a prolonged silence, or refusal to answer an insured's request for coverage or a coverage position

---

[248] Exhibit 3049. In a letter to ANI dated Nov. 2, 1998, ARCO writes: "In *J.H. France Refractories Co. v. Van Brunt Co.*, 534 Pa. 29, 626 A.2d 502 (1993), the Pennsylvania Supreme Court decided that bodily injury of this sort triggered all policies in effect during any stage of the pathogenesis, including exposure, progression or manifestation of the disease."

[249] Exhibit 3088.

[250] Exhibit 3094, pgs. 17 - 20.

[251] 1 Insurance Claims and Disputes 4th section 3:10 (Sept. 2003).

may constitute the equivalent of a denial of coverage.[252]  It seems equally clear to this court that an action for a declaration that there is no coverage has the same effect.

This court recommends that the district court make a finding that ANI effectively denied coverage to its insured, thereby releasing the insured from policy provisions that ANI argues prohibits the settlement contained in the Plan.

F.    Reasonable Settlement.

Under Pennsylvania law, once the insurer breaches its contract, an insured may negotiate a reasonable settlement with the injured party "so long as it was done is good faith and the settlement was fair and reasonable."[253]   The good faith of the Plan Proponents is discussed elsewhere in this opinion, and will not be repeated.  The Settlement Agreement provides for settlement of A/P claims for the amount of $110 million, with up to a $100 million set aside for future claimants.  The court finds the settlement is fair and reasonable.   The settlement is in an amount within the policies coverages.  Pepper Hamilton, joint defense counsel in the *Hall* action, has prepared a range of settlement values, and the settlement is not out of line with these figures.[254] Mr. Baron, one of the leading attorneys representing plaintiffs in this type of case,  testified that his estimate of the potential  value in the tort system of all the radiation cases, considering the number of claims and

---

[252] *Id.* (*citing Sarnafil, Inc. v. Peerless Ins. CO,* 636 N.E.2d 247, 253-53 (Mass. 1994); *Best Place v. Penn Am. Ins. Co.*, 920 P. 2d 334, 352-53 (Haw. 1996)).

[253] *Alfiero*, 500 A.2d at 172.

[254] Exhibit 3076.  In July, 1999, counsel recommended a settlement value of between $38 to $63 million on the personal injury claims, based upon certain assumptions, plus a small amount for the 178 property damage claims and medical monitoring claims.  Mr. Nesser testified that this value was subsequently updated, in March 2003, to a range of $70 to $90 million. Exhibit 3102.

the jury verdict in the test case, would approach $1 billion.[255] The settlement amount uses figures for the test claimants that are significantly lower than the jury verdicts in the test cases, are in amounts close to the pre-bankruptcy settlement offers made by plaintiffs counsel, and in line with the *Hall* counsel's settlement figures, which are significantly lower than plaintiffs' counsels estimate of the potential value of the cases.

At trial, the Plan Proponents provided a detailed explanation for the settlement value and the amounts paid to claimants. The values for the eight cases where jury verdicts were initially rendered, were settled for 32% to 42% of the jury verdict. The remaining claims were placed in four categories, based upon five criteria, including:

> 1. The strength of the evidence regarding the relationship of the type of cancer asserted to the nuclear exposure;
> 2. The location where each person was exposed, the duration of the exposure, and the years of exposure;
> 3. The age of the individual, with the claims of younger cancer victims accorded more value than those of relatively older claimants;
> 4. Special characteristics in the damage claims, such as plaintiffs who had sustained significant medical expenses or plaintiffs with large families;
> 5. Whether the particular claim was within the statute of limitations period, and if not, the strength of the claimants' arguments regarding tolling.

The court finds that the settlement values are reasonable, and based upon fair assumptions for the reasonable value of claims considering a number of various criteria, and comports with state law regarding fair and reasonable settlement.

ANI is not prejudiced by the settlement. The settlement will liquidate and allow the *Hall* claims; however, the Plan Proponents argue that ANI's rights regarding coverage are not

---

[255] Baron testimony, January 5, 2004.

-98-

prejudiced by the settlement.[256]  Instead, the Plan provides that insurance rights will be transferred

to the A/P Trust, and claimants state that the Trust will take those rights for what they are.  If it is

ultimately determined that no coverage exists, then the Trust will not recover.  Because ANI retains

its right to contest coverage, it is not prejudiced by the settlement.

The settlement also comports with bankruptcy standards regarding settlement, and will be

approved.  Under Bankruptcy Rule 9019 and applicable law, in order for a settlement to be approved

by a bankruptcy court, it must be "fair and equitable and in the best interest of the estate." [257]  The

factors a court considers in evaluating whether a settlement is fair and equitable include:

> 1.  The probability of success in the litigation, with due consideration for the uncertainty in
> fact and law;
> 2.  The complexity and likely duration of the litigation and any attendant expense,
> inconvenience and delay;
> 3.  The best interests of the creditors with proper deference to their reasonable views;
> 4.  The extent to which the settlement is truly the product of arms-length bargaining, and not
> of fraud or collusion
> 5.  All other factors bearing on the wisdom of the compromise.[258]

1.  *Probability of Success*.  Under the settlement, the *Hall* action will be dismissed, and the

*Hall* claimants will be paid in accordance with a matrix established under the trust.  The *Hall* action

has been pending since 1994.  In that time, defense costs have exceeded $24 million.  In 1998, a jury

in a test trial of eight claims in the *Hall* action rendered a verdict against B&W and ARCO in the

amount of $36.7 million.   Although a new trial was ultimately granted, as pointed out by Plan

Proponents, a significant risk still exists in the case of an adverse judgment.  At the test trial, the *Hall*

---

[256]  Trial Brief of the Apollo/Parks Township Releasors, pg. 37.  Pl. 5358.

[257]  *Matter of Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997).

[258]  *Id*. at 356.

plaintiffs were permitted to have their experts testify that the plaintiffs' injuries were caused by emissions from the A/P facilities. While defendants sought to have this testimony excluded, the court has stated that sufficient admissible evidence of causation has been presented, and would likely permit the experts testimony on retrial. ANI asserts that it has a strong case on retrial, that it has retained highly qualified experts who can rebut allegations that claimants' injuries were caused by emissions from the facilities, and that the dose of radiation that plaintiffs' experts estimate the plaintiffs had received is insufficient to increase the risk of disease.[259] Consideration of a settlement does not require the court to conduct a mini-trial to determine the probable outcome of claims compromised.[260] Instead, the court considers relevant facts and law to enable it to make an informed and intelligent decision.[261] Given that a test trial has already resulted in jury verdicts in favor of the test plaintiffs, and that on retrial the trial court may permit plaintiffs' experts to testify regarding whether the plaintiffs' injuries were caused by emissions from the A/P facilities, the court finds that this factor weighs in favor of approval of the settlement. In short, there is a substantial probability that the plaintiffs will again be successful in the *Hall* action.

    2. *Complexity, Expense and Likely Duration of Litigation.* As recited above, the *Hall* action has been pending for ten years, and not a single claim has been resolved. In that time, the defense costs have exceeded $24 million. There are now over 500 claimants involved in the litigation, and the defense costs are likely to increase exponentially if the litigation continues. The defense costs reduce the policy limits, and if permitted to escalate, will ultimately reduce any recovery in the case.

---

[259]  ANI Post Trial Brief, pgs. 29-30.

[260]  *Cajun*, 119 F.3d at 356.

[261]  *Id*.

The likely duration of the litigation is uncertain; however, given the time spent already in the case, it is likely to last for several more years. Any appeal of the *Hall* verdict would add at least a year, and probably more, to the expected duration of the case.

Both parties acknowledge the complexity of the case. It involves issues regarding radiation exposure including highly complex medical and scientific evidence and the effect of the Price Anderson Act. The case involves 500 plaintiffs, personal injury and property damage claims. Trial is likely to be complex, expensive and time consuming. Given the complexity, expense and likely duration of the litigation, settlement is advisable.

*3. The Best Interests of the Creditors*. In considering whether a settlement is fair and equitable, the court must consider the reasonable views of a majority of the creditors.[262] The settlement is supported by all creditors and by the A/P Futures Representative. Over 99% of the present A/P claimants voted in favor of the Plan. ANI is the only party that has objected to the A/P settlement, and ANI is not a creditor of the estate. The A/P Futures Representative, as well as retained experts and professionals, have conducted due diligence into the reasonableness of the settlement as it affects future claimants, and concluded that the settlement is in the best interests of the future claimants. This factor also favors approval of the settlement.

*4. Arms-Length Bargaining*. The settlement is the result of extensive negotiations, commencing in November, 1998, with the parties involved in the *Hall* action. In March 2003, after the filing of Debtors' bankruptcy petitions, mediation was again commenced between the *Hall* claimants, B&W and ANI to attempt to resolve the *Hall* claims. Mr. Francis McGovern, the court-

---

[262]    *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995).

appointed mediator, participated in the mediation.[263]  ANI was represented by its bankruptcy counsel, as well as by an attorney from Pepper Hamilton, the firm which conducted the joint defense of the *Hall* action.  Mr. Nesser testified that, at this time, Pepper Hamilton provided an updated analysis of the settlement value of the *Hall* action, reflecting values between $70 and $90 million.[264]  Mr. Baron testified that thousands of hours were spent in negotiations, resulting in the settlement agreement.

Thereafter, the A/P Futures Representative was appointed, and was given an opportunity to examine the agreement and the fairness of the settlement and the Plan to future claimants.  Due diligence was conducted by the A/P Futures Representative, and further negotiations occurred.  These negotiations resulted in the filing of an Amended Settlement Agreement, incorporating revisions requested by the Futures Representative.  These revisions include granting the FCR the right to participate in the drafting of the A/P Trust Distribution Procedures, and to provide a set aside of $75 million (with a cap of $100 million) for the future claimants.

The court finds that the A/P settlement is not the result of fraud or collusion, but is the result of arms-length bargaining.  As such, it will approve the settlement.

## IX. <u>OTHER OBJECTIONS</u>

A.  <u>Lack of Notice</u>.

Maryland Ins. Co. and Federal Insurance Co. object that they were not provided notice in time for filing objections to the Plan and Disclosure Statement.  Plan Proponents assert, and the record reflects, that sufficient notice of the bankruptcy filing was provided to each insurer.  Maryland was

---

[263]  Exhibit 3099.

[264]  Testimony John Nesser, Jan. 7, 2004; Exhibit 3102.

informed through its designated agent of the initial petition filed in 2000,[265] and had notice of, and actually participated in discovery prior to the confirmation hearing, and filed an objection to the Plan.[266] The record reflects that Maryland had notice of, and participated in objections to the confirmation of the Plan. As such, its objection of lack of notice is not well taken, and is overruled.

Similarly, Federal Insurance objects that it lacked notice of the Plan. The record reflects a different story. It shows that Federal, in January 2003, filed two proofs of claim in the bankruptcy proceedings.[267] Federal knew of the bankruptcy proceedings at least by January 2003. It certainly knew of the bankruptcy proceedings and plan confirmation when B&W sent it notice of the Plan filing in May, 2003.[268] Federal's objection of lack of notice is similarly overruled.

B.      Objections Specific to Ace Companies

Ace contends that its insurance policies are unique; i.e., that its policies are backed by various forms of security and a third party guarantee under a High Deductible Program and/or Captive Program. Ace provided primary general liability, workers' compensation and automobile liability insurance to B&W, MII and their affiliates, backed by forms of security and a third party guaranty by MII, as well as excess policies where no security was required. Additionally, some general liability policies are fronting policies reinsured largely by a wholly owned captive of MII, i.e., by Creole Insurance Co., Ltd. ("Creole"). Ace objects that the Plan cannot eliminate, alter or impair

---

[265]  Exhibit 15.

[266]  Exhibit 4735.

[267]  Proofs of Claim 0350968 and 0350945.

[268]  Exhibit 15, BW 10020012 - 41. BW 10020036 indicates that on May 22, 2003, B&W notified "Jeff Golden, Federal Insurance Company, c/o Chubb Ins. Group, 2000 W. Loop South, Suite 1800, Houston, TX 77027" of the filing of the Plan.

Ace's rights to the collateral, security, reinsurance and guarantee, and that the Plan does so because it: (1) impairs Ace's recourse against the Captive reinsurers and MII to access reinsurance and the third party collateral; (2) provides for the Captive Program to be dismantled and restructured, divides the Third Party Collateral held by Ace and releases the MII guaranty; (3) reassigns fronting policies secured by Creole[269] collateral and channels asbestos claims to the asbestos trust, and enjoins Ace from recourse against the Creole Reinsurance and Creole collateral.

Plan Proponents agree that the collateral posted to the High Deductible Program or to the Captive Program is not property of the estate, but assert that the channeling injunction may protect property of affiliated third parties who make substantial contributions to the trust.

Section 524(g)(1)(A) specifically permits the court to issue an injunction "to supplement the injunctive effect of a discharge under this section." Under §524(g)(4)(A)(i), the injunction is valid and enforceable against all entities that it addresses. Moreover, notwithstanding the provisions of 524(e), which prohibits discharge from affecting the liability of a third party or third party property, the channeling injunction "may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor. . . " that arise by its ownership of a financial interest in the debtor; the third party's management of the debtor; the third party's provision of insurance to the debtor or a related party, or the third party' financial transaction or corporate restructuring of the debtor or a related party.

Notwithstanding the general prohibition of a third party's release contained in §524(e) of the Bankruptcy Code, §524(g)(4)(A)(i) relating to asbestos channeling injunctions specifically permits

---

[269]  Creole is a captive insurance subsidiary of MII.

a third party to be the beneficiary of an injunction, so long as the conditions and requirements of the section are met. The Plan provides for the Debtors and the MII Indemnified Parties to be subject to the protections of the channeling injunction.

Plan Proponents agree that certain of Ace's claims, including claims for indemnity against MII Indemnified Parties and Creole Insurance Co. will be channeled to the Asbestos PI Trust, but assert that this is permitted by §524(g). This court agrees. While it is premature at this point to determine the effect of implementation of the channeling injunction, the relief sought by the Plan is likely within the protection found in §524(g). The Plan provides that the Asbestos PI Channeling Injunction will enjoin Ace from proceeding against MII or the collateral pledged by MII under its agreements with Ace. This is permitted by the terms of §§524(g)(4)(A)(ii), which permits the channeling injunction to bar actions against an identifiable third party directly or indirectly liable for claims against the debtor.[270] MII is such a party as an owner or ultimate parent of the Debtors. Similarly, Creole as the captive insurer of B&W, is a third party that provided insurance to the Debtor or a related party under the section.

## X. CONCLUSION

For the reasons expressed in the foregoing opinion, the Court recommends that the Plan be confirmed. In accordance with Bankruptcy Rule 9033:

> Within 10 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection. A party may respond to another party's objections within 10 days after being served with a copy thereof. A party objecting to the bankruptcy

---

[270] *In re Combustion*, 295 B.R. 459, 482 (Bankr. D. Del. 2003)("To the extent that [nondebtors] are sued as a result of their prior affiliation with Debtor or other relationship with Debtor as provided in 524(g)(4), the channeling injunction is properly applied to them.").

judge's proposed findings or conclusions shall arrange promptly for the transcription of the record, or such portions of it as all parties may agree upon or the bankruptcy judge deems sufficient, unless the district judge orders otherwise.

The Plan requires that numerous findings of fact be made in connection with confirmation. To the extent that findings are required for confirmation, they are adopted. The Debtors are directed to submit a draft order.

New Orleans, Louisiana, October 8, 2004.

_J. A. Brown_
Jerry A. Brown
U.S. Bankruptcy Judge

-106-