# EXHIBIT E

1

1    UNITED STATES BANKRUPTCY COURT

2       FOR THE DISTRICT OF DELAWARE

3

4    _ _ _ _ _ _ _ _ _ _ X

5   In re:          :Chapter 11

6   FEDERAL-MOGUL GLOBAL, :Case No. 01-1-578 (RTL)

7   INC., et al.,     :Jointly Administered

8      Debtors.    :

9    _ _ _ _ _ _ _ _ _ _ X

10

11

12

13     Deposition of Mark A. Peterson, Ph.D.

14          Washington, D.C.

15        Friday, December 3, 2004

16

17

18

19

20   Pages 1 - 288

21   Job No.: 164539

22   Reported by:  Deborah Larson Hommer, RPR

35

1    A.  I have a problem with your word

2    "start."  It's ambiguous.  I start my analysis

3    with the values on page 57.  The values on

4    page 57 were derived from the scheduled values

5    adjusted for inflation.  Now, "start" can

6    apply -- your word "start" can go to either of

7    those places.

8         Actually, I don't even start there,

9    though.  I start with the analyses that are in

10   section 6.1 of my report.  There is an

11   extensive discussion where I talk about

12   estimating what the current values of the

13   liabilities of Turner & Newall are.  And I

14   derive on page 15 three alternative estimates

15   of what those current values are.  And I truly

16   start with those, and then I look to the

17   scheduled values as a conservative alternative

18   to those values.

19         So if you want to get to the

20   start -- I mean, I start with the data that's

21   in the Turner & Newall's database, and I start

22   with the experience of other -- of Turner &

36

1  Newall and other companies with regard to the

2  relative values of disease claims for

3  different diseases. I start with a

4  consideration of all the factors that are

5  affecting the liabilities, and I end up with

6  all -- in that calculation, as a matter of

7  both convenience and conservatism, using the

8  scheduled values.

9     Q.  If I were going to try and create a

10  mathematical formula to derive your forecast

11  numbers in Table 39, page 57 of your report,

12  what does that formula look like -- or

13  equation, if you want to call it an equation?

14     A.  That's a more precise question.

15  Page 16, Table 7 of scheduled values for the

16  TDP. Page 17, Table 8 is the scheduled value

17  for mesothelioma and other cancers. The lung

18  cancer and nonmalignant values there represent

19  the weighted averages of the lung cancer

20  claimants that would be in the two lung cancer

21  categories, the nonmalignant claimants in

22  three categories. So Table 8 is derived from

37

1   Table 7, plus assumptions about the

2   distributions of the number of claimants that

3   would be in the two lung cancer and three

4   nonmalignant categories.

5       You take those numbers on Table 8

6   and you adjust for the actual inflation

7   between 2001 and 2004.  When you've made that

8   adjustment for inflation, you then obtain the

9   results that are shown on page 57, 39 that you

10  asked me about -- Table 39.

11      Q.  And the first thing you pointed me

12  to in that equation was the scheduled TDP

13  values on Table 7, page 16 of your report?

14      A.  The first step in the specific

15  quantification of those numbers begins with

16  Table 7, page 16.  But that's just the end of

17  a lot of steps used in estimating what the

18  current values are.  And it is the end of --

19  because it's a number that has been already

20  provided and agreed to and accepted by the

21  plan proponents, and it's a conservative

22  estimate of the current values.

38

1    Q.  Your view is it's conservative?

2    A.  I can only speak for myself here.

3    Q.  That's your opinion, right?

4    A.  It's my opinion.

5    Q.  Let me just go through and make

6    sure I have a general understanding of the

7    methodology that you've used to make your

8    estimate here.  I understand that a

9    fundamental step in your analysis is to figure

10   out the value for the claims.  You have to

11   assign a value for the claims, correct?

12       A.  The only thing that troubles me

13   about your question is "fundamental."  I don't

14   know what you mean by "fundamental" in this

15   context.  It is a step in the calculation, but

16   I don't know how to use the word

17   "fundamental."

18       Q.  That's fine.  I'm not trying to use

19   the word in any particular way.  I'm just

20   trying to make sure I understand the basic

21   steps in the method here.  So you have to

22   derive a value for the claims, correct?

49

1   of increase on page 14.  But in the text above

2   Table 4 it identifies the rate of increase of

3   2.14 which is simply taken by -- derived by

4   taking the 2000/2001 average settlement and

5   dividing by the 1997/'98 settlement.  That

6   generates 2.14.  We then multiply the

7   2000/2001 average by 2.14, and that generates

8   a $210,000 figure.

9        Q.  So you generate an estimate of

10  the -- you call it the current settlement

11  value of T&N mesothelioma claims as 210,000,

12  plus a little bit, right?

13       A.  Yes.

14       Q.  And then you do not perform a

15  similar calculation for other diseases,

16  correct?

17       A.  That's correct.

18       Q.  Instead, you use a ratio to

19  determine your average settlement values for

20  other diseases, right?

21       A.  We use several alternative ratios,

22  yes.

50

1    Q.  And those ratios are ratios of

2  payments for other diseases to the average

3  mesothelioma settlement values, correct?

4    MR. FINCH:  Object to form.  I

5  think --

6    THE WITNESS:  Yes, let me be

7  specific.  For lung cancer -- if you look on

8  Table 5, page 15, it gives ratios for eight

9  different asbestos defendants.  And in each

10  case for each of those defendants those

11  numbers are derived by dividing the average

12  settlement for that company for the diseases

13  identified in the columns on Table 5 by the

14  average settlement for mesothelioma for that

15  defendant.  And that generates those eight

16  ratios.

17    BY MR. STROCHAK:

18    Q.  And what you've done here is you've

19  generated a ratio that links the payments or

20  the anticipated settlement values for other

21  diseases to mesothelioma, right?

22    A.  Yes.  It reflects the relative size

51

1   of settlements for diseases other than

2   mesothelioma relative to what the mesothelioma

3   settlements are for each of the eight

4   defendants, yes.

5       Q.  And after you go through that

6   exercise of calculating those values, which I

7   think are reported in Table 6 of your report;

8   is that right?

9       A.  For using -- it has three specific

10  calculations based on ratios from Babcock &

11  Wilcox, from Owens Corning and then what's

12  essentially kind of a modal or a median

13  approximation typical -- which also are

14  numbers that are tossed about generally by

15  people that do work like I do and work with

16  trusts and generally are familiar with what

17  the -- what payments are being made for

18  asbestos claims.

19          This notion of ratios is a commonly

20  used concept and it has been used in the past

21  and is used by people that deal with asbestos

22  claims in order to kind of understand what's

52

1  been happening with regard to the payments.

2    Q.  I don't understand what you said.

3  You said something about numbers being tossed

4  around.  I didn't understand that part of your

5  answer.  What were you referring to when you

6  said something was tossed around?

7    A.  I'm sorry.  That's a flip

8  statement.  Ratios like this are frequently

9  discussed by the subcommunity of people who

10  deal with arcane issues, such as what are the

11  values of asbestos claims -- people like

12  experts, judges, trust representatives,

13  plaintiffs' lawyers.  They attend to and are

14  interested in what are the relative payments

15  made to each of the disease categories.

16      And so it's a subject matter of

17  some discussion, and it's a subject matter --

18  it's a calculation that has been used by

19  courts and experts in other circumstances to

20  set up trust distribution procedures, among

21  other things, to estimate liabilities in

22  bankruptcies and so on.

59

1  dollars, yes.

2      Q.  That's a much better way of saying

3  it than I did.

4          And that gives you your average

5  resolution cost in 2001 dollars, which then

6  goes into your calculations, right?

7      A.  That's right.

8      Q.  So now we've, I think at least at

9  the 50,000-foot level, covered your basic

10  calculation of claim value.  But in order to

11  derive an estimate, you also have to figure

12  out how many claims you've got, right?

13      A.  Yes.

14      Q.  And then you go through a whole

15  series of calculations to figure out how many

16  claims can be anticipated in the future,

17  right?

18      A.  Well, you also have to deal with

19  the pending claims, of course, because every

20  one of the pending claims is here today and

21  needs to be paid or not paid depending upon --

22  some percentage of them will get -- will be

60

1  dismissed; some will get paid.

2      Q.  So with respect to the pending

3  claims, you have an issue with -- certain

4  claims in the database have no disease

5  specified, correct?

6      A.  Some do, that's correct.

7      Q.  And you have --

8      A.  Some have no specified diseases.

9      Q.  Then you have to do an imputation

10  to figure out what diseases should be

11  attributed to those claims, right?

12      A.  Both for the pending claims and for

13  the claims that have been resolved, yes.  You

14  need to make the imputation for all of the

15  claims that are going to figure into the

16  analysis.

17      Q.  And so for pending claims, you do

18  your disease imputation.  You figure out,

19  then, how many claims of each disease you

20  have, right?

21      A.  Well, you have some -- for most

22  claims, you have it, you count it.  For those

61

1   that have an unspecified disease -- most of

2   the claims that have an unspecified disease,

3   we impute a disease for them.  But we

4   retain -- a relatively small percentage -- I

5   think it's 2 or 3 percent of the claims -- we

6   continue to treat as having unspecified.  And

7   that's a fraction that's the same as,

8   historically, the percent of claims that were

9   resolved with having an unspecified disease.

10   Those claims don't get much money, so -- they

11   have everything treated as its own category.

12      Q.  But the basic process is to get all

13   your claims that you see in the database --

14   that is, all the pending claims that you see

15   in the database -- to get them into four

16   separate buckets, so to speak, of diseases.

17   You've got mesothelioma, lung cancer, other

18   cancer and nonmalignant claims, correct?

19      A.  With the one addendum to your

20   question that we do retain a small fraction in

21   the unspecified disease.  So it's five

22   categories, of which -- and all five are given

62

1  values for the pending claims, although the

2  value of unspecified claims is zero.

3       For forecasting future claims, we

4  do not forecast a number of unspecified

5  claims, so that -- the implication of that is

6  that there will be some additional claims

7  filed against this defendant that will have an

8  unspecified disease, and those claims would

9  likely involve some defense and administrative

10  costs, which -- we're ignoring that subject

11  entirely in this report.

12       So there will be a few additional

13  claims, but since they have no value, we have

14  not bothered to calculate that number for

15  purposes of estimating the indemnity costs for

16  this.

17     Q.  And then you multiply your -- for

18  the number of pending claims you find in each

19  disease, you multiply that by your calculated

20  average resolution cost, correct?

21     A.  That's the next step, yes.

22     Q.  And that yields an indemnity cost

63

1  for each disease, correct?

2    A.  It has a total cost of

3  indemnification in nominal dollars for each of

4  the four disease categories, yes -- for each

5  of the four disease categories that get any

6  money.

7    Q.  And then how do you adjust the

8  nominal dollar claim -- or let me ask you, do

9  you make an adjustment to the nominal dollar

10  amounts?

11    A.  Yes.

12    Q.  And what adjustment is that?

13    A.  I believe we assume that half of

14  the pending claims would be resolved -- would

15  have been resolved in 2002 and half in 2003.

16  So we give them an inflation -- we use the

17  actual inflation in those two years to adjust

18  those payments, to increase them to get the

19  real values in each of those two years.  And

20  then when we do present value calculations, of

21  course we present value them back to 2001

22  dollars.

64

1    Q.  And that gives you your estimate

2  for the pending claims, correct?

3    A.  Yes.  I mean -- yes, it does, and

4  they're shown later in this section.

5    Q.  Now, on the future claims, starting

6  with the malignant claims, you calculate an

7  incidence rate for each disease, correct?

8    A.  No.

9    Q.  How do you start with that?  How do

10  you start on the futures?

11    A.  We accept the incidence rates that

12  were estimated by Nicholson, Perkel,

13  P-e-r-k-e-l, and Selikoff, S-e-l-i-k-o-f-f, in

14  their 1982 publication where they make

15  epidemiological forecasts of asbestos-related

16  cancer deaths in -- year by year.  So we don't

17  do a calculation.

18    Q.  You just take the Nicholson

19  numbers?

20    A.  We take published confirmed --

21  empirically confirmed forecasts of incidence

22  of disease, yes.

65

1    Q.  And incidents is -- that is, the

2   Nicholson incidence forecasts are forecasts of

3   the number of people who will die from each of

4   these categories of diseases in a particular

5   year; is that right?

6    A.  Well, not quite.  It's the number

7   of people who will die because of their

8   occupational exposure to asbestos.  There are

9   clearly going to be many more lung cancer

10   deaths than lung cancer deaths caused by

11   asbestos in a year.

12        And also the Nicholson number,

13   again -- it's called Nicholson for shorthand.

14   I will use that term.  The Nicholson numbers

15   are a bit conservative because they exclude

16   two categories of persons who will die from

17   asbestos-related cancers.  One category is

18   that there are occupational -- there are

19   industries that they didn't consider, and so

20   there is a broader category of industries

21   where there were occupational exposures to

22   asbestos.  The Manville trust has kind of

66

1   maintained some data with regard to the claims

2   they received from what they call the

3   Nicholson industries and the other industries,

4   and there are a nontrivial number of cancers

5   that arise in that group.

6        And secondly, the Nicholson

7   epidemiological forecasts were based on

8   exposures through 1979. People continue,

9   unfortunately, to be exposed to asbestos

10  today. There are people who are going to be

11  exposed to asbestos today who will die from

12  asbestos-related cancers in future years.

13  That number, fortunately, is likely to be much

14  smaller than the deaths that arose and will

15  arise from exposures prior to 1980, but there

16  will be some.

17       So in both of those respects, the

18  Nicholson forecasts are likely a bit

19  conservative, but probably not greatly

20  undercounted. And that may be more likely to

21  be apparent 10, 15 years in the future when

22  some of these, you know, later-arising

67

1    exposures begin to manifest --

2        Q.  So starting with the incidence

3    of -- and I appreciate your correction that

4    it's really -- it's incremental deaths due to

5    asbestos exposure, not total deaths due to

6    these diseases.  But starting with the

7    forecast incidence rates of incremental deaths

8    due to asbestos exposure, you then calculate

9    what you call propensity to sue, correct?

10       A.  We use the Nicholson incidence

11   estimates and calculate propensities to sue.

12       Q.  And what you do is -- to calculate

13   propensity to sue, again, at the 50,000-foot

14   level -- and feel free to add as much detail

15   as you would like to this -- you compare the

16   number of filings that you see in the T&N

17   database for a particular period to the

18   Nicholson incidence numbers for that

19   particular period for the same disease; is

20   that right as a general conceptual framework?

21       A.  Yes.

22       Q.  So your calculation of propensity

68

1  to sue is a comparison of filings in a given

2  year to incidence in a given year, right?

3      A.  Yes.  Of course it's filings

4  subject to the -- yes.  And I will -- yes,

5  that's correct.

6      Q.  And then once you have your

7  propensity to sue -- that is, once you've

8  calculated what you view as the historical

9  propensity to sue, you have two models in your

10  report, one forecasting future propensity to

11  sue on an increasing basis, and one

12  forecasting future propensity to sue on what I

13  will call a flat basis; is that a fair

14  characterization?

15      A.  Yes, where the flat basis is using

16  the -- essentially the weighted average

17  propensity to sue for the two years we used to

18  calculate, 2000 and 2001 -- actually, the

19  21 months we used to calculate in 2000 and

20  2001.

21      Q.  That's your base period --

22      A.  That's the base period.

69

1    Q.  -- the 21 months?

2    A.  I'm sorry.  I talked over you.

3  That's correct.

4    Q.  I do the same.  I'm sorry.

5        So once you've now derived your

6  projections of propensity to sue, you multiply

7  the propensity to sue -- well, let me ask you.

8  What do you do with propensity to sue, your

9  forecast propensity to sue, once you've

10  calculated it?  What's the next step in the

11  calculation?

12    A.   Well, the first thing we do when we

13  calculate a propensity to sue is we calculate

14  it year by year within each of the three

15  cancers separately.  So then we examine the

16  trends of propensity to sue.

17        Before we do anything else, we look

18  at the data.  I mean, always you look at what

19  information you've got.  And the data confirm

20  what we've learned in the discussions with the

21  lawyers and all the other things I was

22  describing earlier, the background work that

70

1   we did based upon our understanding and

2   knowledge about what was going on with

3   asbestos litigation generally, what was

4   happening with regard to Turner & Newall, what

5   were the important developments in the

6   asbestos litigation that affected Turner &

7   Newall.

8          We looked at the data and saw that

9   the data was consistent with our expectations

10  that claims were going up.  And so that's the

11  first thing you do.

12          And based on that, we then made

13  these two calculations of -- we selected a

14  base period.  We selected the appropriate base

15  period, which was 2000/2001.  Because claims

16  are going up -- well, let me interject a

17  prefatory remark as to why we used

18  propensities to sue.  You use propensities to

19  sue under the assumption that the future

20  claiming rate -- claim filing will be similar

21  to what it has been in the past.  "The past is

22  prolog" is kind of a mantra that people like

71

1  me use in doing work like this.

2       And the two things you learn from

3  propensities to sue is, one, what is the level

4  of claiming against this defendant?  And, two,

5  what are the trends in the level of claiming?

6  Those are the quantitative data conclusions.

7  You compare that with what you know about

8  asbestos litigation.

9       Based upon that, you then need to

10  select what's the appropriate period -- base

11  period.  Since you want to forecast the

12  future, you want to take a period of time that

13  you believe is most like what the future will

14  be.  That's why we picked the last 21 months.

15       If you go further back in time, it

16  gets decreasingly similar to the current

17  circumstances.  And also when you've got an

18  increasing trend, the further back in time,

19  the lower your average would be across years,

20  which does not represent what's happening now.

21  That's why you need a relatively current base

22  period.

72

1       So we've picked that base period.

2   That's the next step.  And then, having done

3   that, we generate both the increasing

4   forecast, and then just as kind of -- for

5   purpose of calculation, also look at the

6   nonincreasing just to see what would happen if

7   things were frozen.

8       If this trend for increasing

9   suddenly reversed and didn't go up anymore

10   today, what would it be?  It's almost more a

11   calculation done for numeric purposes rather

12   than because we think it's likely to happen,

13   that there will be no increase in propensity

14   to sue.

15       But then we -- so that generates

16   for us each future year what we -- these two

17   alternative models of what the propensities to

18   sue will be under the increasing model and the

19   flat model.  And then we take that propensity

20   to sue that we've forecast for each future

21   year and multiply it by Nicholson incidence

22   forecasts of the number of people who will die

73

1   of that cancer in the year, multiplying the

2   propensities to sue times the incidence

3   figure.  The product of that multiplication is

4   the estimated forecasts of the number of

5   claims for that cancer that will be filed in

6   that year.

7       Q.  And your calculations are done --

8   your calculations of propensity to sue are

9   done on a disease-by-disease basis; is that

10  right?

11      A.  For each of the three cancers, yes.

12      Q.  Is that standard practice?

13      A.  You always do it that way unless

14  you don't have data disaggregated or for some

15  other reason, but that's the standard

16  practice, yes.

17      Q.  So, typically, if you have data

18  that would allow you to forecast -- excuse me.

19  If you have data that would allow you to

20  calculate propensity to sue on a

21  disease-by-disease basis, it would be better

22  to do so?

74

1    A.  Yes, because the incidence curves

2  differ by disease, so you get a more precise

3  forecast, and hopefully a more accurate

4  forecast if you do it disease-by-disease.

5    Q.  Is that true only for propensity to

6  sue or is it true for other measures used in

7  liability forecasting?

8      MR. FINCH:  Object to form.

9      THE WITNESS:  It is also true, of

10  course, for calculating average values because

11  the average values differ by disease.  So you

12  want to disaggregate the claims by disease

13  categories.  In order to do that, the payment

14  rate -- the payment percentages also differ

15  somewhat by the disease, so it's useful to

16  disaggregate it.

17      BY MR. STROCHAK:

18    Q.  So once you've calculated your --

19  or projected your propensity to sue, that gets

20  multiplied on a disease-by-disease basis

21  against the incidence forecast derived from --

22  or taken from the Nicholson study, correct?

75

1     A.  Yes.

2     Q.  And then that would give you the

3  number of claims you would anticipate in each

4  future year; is that right?

5     A.  For each cancer, yes.

6     Q.  For each disease, right.

7        And then once you have the number

8  of claims, you then perform a calculation to

9  figure out how much value to assign to each

10  one, right?

11     A.  Yes.

12     Q.  And that's your average value

13  calculation that we talked about before?

14     A.  Specifically, we use the average

15  resolution cost, which itself is the product

16  of the average settlement times the percent

17  paid.  So in effect you're multiplying the

18  number of claims by two parameters:  What

19  percentage of them get paid, and how much will

20  they get paid if they do get paid.

21        But we've reduced that to a single

22  parameter:  The average resolution cost.  And

76

1  subject, of course, to future inflation. So

2  that someone who gets paid ten years in the

3  future would get paid at 1.025 to the 10th

4  power times whatever this value is. That's

5  inflation that occurs over that period of

6  time.

7      Q.  So you inflate the values out to

8  the current -- to the applicable year, and

9  then ultimately you discount your calculation

10  back to present value, right?

11      A.  Yes. Actually, we assume that

12  future claims get paid two years in the

13  future. So if a claim is filed -- I misspoke.

14  If a claim is filed in 2010, we inflate it to

15  10.025 to the 12th power because it goes up --

16  they will get paid 12 years in the future even

17  though they filed 10 years in the future. And

18  you discount it back for 12 years.

19          MR. STROCHAK: This is a good place

20  for a five-minute break.

21          (Recess.)

22          BY MR. STROCHAK:

77

1    Q.  Dr. Peterson, I would like to turn

2   back to your report and go through it in a

3   little more systematic way, page by page of

4   your report.  So starting on page 1, at the

5   end of the first paragraph you talk about your

6   forecasts and you talk about the estimates in

7   this report being based on forecasting models

8   that have become a standard model for making

9   such forecasts.  Is that a fair statement of

10  what you're saying there?

11    A.  Yes.

12    Q.  Is it your opinion, sir, that the

13  methods that you've used in this report are

14  standard across all experts who are

15  forecasting asbestos claims?

16    A.  I don't understand your question.

17    Q.  The specific methods that you've

18  used in your report, are all of them standard?

19    MR. FINCH:  Object to form.

20    THE WITNESS:  Well, some of them

21  are specific to this company.  It's the

22  application of a standard method to the