# EXHIBIT G

1

1    UNITED STATES BANKRUPTCY COURT

2       FOR THE DISTRICT OF DELAWARE

3

4    _ _ _ _ _ _ _ _ _ _X

5    In re:           :Chapter 11

6    FEDERAL-MOGUL GLOBAL, :Case No. 01-1-578 (RTL)

7    INC., et al.,     :Jointly Administered

8       Debtors.    :

9    _ _ _ _ _ _ _ _ _ _X

10

11

12

13    Deposition of Mark A. Peterson, Ph.D.

14         Washington, D.C.

15         Friday, December 3, 2004

16

17

18

19

20   Pages 1 - 288

21   Job No.: 164539

22   Reported by: Deborah Larson Hommer, RPR

83

1  along. To the degree they have been used by

2  trusts or used by courts, they support the

3  assumption that I've made in this case, which

4  I know is the case because I was around when

5  the numbers were derived, that the scheduled

6  values are appropriate measures of the current

7  settlement values for this defendant.

8     Q. Your assumption is that the TDP

9  scheduled values are an appropriate estimate

10 of what claims would be paid in the tort

11 system, correct?

12    A. Well, it's not only my assumption.

13 That's what their intention is in each case.

14 And I know that because, as far as I know,

15 I've participated in developing the TDPs in

16 almost all cases.

17       That's how they're calculated.

18 That's what they're meant to be. That's what

19 they're represented to be. That's what they

20 are.

21    Q. How many times do you think that

22 you have prepared estimates of the current

84

1  tort system value of claims, asbestos claims?

2      A.   Hundreds of times.

3      Q.   How many times have you used TDP
4  scheduled values in calculating those
5  estimates?

6      A.   Scores of times.

7      Q.   In which cases -- in which
8  bankruptcy cases where you have been called
9  upon to testify and give your opinion as to
10 the tort system value of asbestos claims did
11 you rely on calculations derived from trust
12 distribution procedures?

13     A.   I think the only case that I've
14 ever testified in about trust distribution
15 values was the Babcock & Wilcox case. And
16 there I provided the court with a calculation
17 of liabilities of Babcock & Wilcox both using
18 the trust distribution values and values that
19 are based on historic tort values. So both of
20 them were provide to the court.

21     Q.   That was in the second Babcock &
22 Wilcox matter, correct?

85

1   A.  Yes.  The confirmation hearing.

2   Q.  That was in October 2003?

3   A.  Yes.

4   Q.  And in that case you did

5 sensitivity analysis that included the

6 TDP-derived values, correct?

7      MR. FINCH:  Object to form.

8      THE WITNESS:  No.

9      BY MR. STROCHAK:

10   Q.  It was not a sensitivity analysis?

11   A.  No.

12   Q.  What was it?

13   A.  It was just -- we did an analysis

14 both ways.  It wasn't regarded as a

15 sensitivity, I don't think.  We provided the

16 court with calculations of liability using --

17 in both of the manners I discussed.

18   Q.  And in fact, at Babcock & Wilcox

19 your TDP-derived estimate actually reflected

20 lower values than the alternative estimate

21 that you provided, didn't it?

22   A.  I don't recall, sitting here.

86

1   Q. Do you recall that it was a group
2   of insurers that were challenging the plan in
3   Babcock & Wilcox?
4   A. I do recall that.
5   Q. And do you recall that the insurers
6   generally were complaining that the TDP
7   settlement values, the TDP values would
8   overestimate their liability?
9       MR. FINCH: Object to form.
10  Mischaracterizes the record.
11      THE WITNESS: This is my experience
12  in most cases involving insurance companies.
13  They're objecting to a lot of things, and I
14  don't recall whether that was a particular
15  one.
16      BY MR. STROCHAK:
17  Q. For what purpose did you provide
18  the TDP-derived estimate in Babcock & Wilcox?
19  A. I was asked to.
20  Q. By whom?
21  A. Counsel.
22  Q. Which counsel was that?

87

1   A.  Well, it was certainly Jerome

2  Randolph.  Whether or not Caplin & Drysdale

3  also asked me to do it, I can't recall sitting

4  here.

5   Q.  And you don't recall whether it was

6  higher or lower than your other estimate?

7   A.  Well, there is a published report,

8  and it is what it is.  And I can't recall,

9  sitting here, no.  There's an available

10  report.

11   Q.  Other than Babcock & Wilcox, is

12  there any other matter where you have been

13  called to testify that you provided an

14  estimate of forecast values based on trust

15  distribution procedures?

16   A.  I may have done so in the Manville

17  bankruptcy case, the Findley v. Blinken --

18  F-i-n-d-l-e-y v. B-l-i-n-k-e-n -- where I

19  provided the court and -- I believe I provided

20  the court and the parties with estimates of

21  liabilities and trust distribution procedures.

22  But whether that was in testimony or just

88

1  provided and entered into the record without
2  testimony, I just don't recall.
3      Q.  Was that a matter where the trust
4  had already been established?
5      A.  The trust -- the current trust
6  distribution procedures is what I'm talking
7  about for the Manville trust were established
8  when -- the trust had been in existence 10 or
9  12 years, something like that.
10     Q.  So the case you mentioned, the
11 Manville case, was not a case where you were
12 testifying in a bankruptcy prior to the
13 confirmation of a plan and the establishment
14 of a trust; it was afterwards, correct?
15     A.  In the Manville case I was
16 testifying about what were the current tort
17 values of claims against the Manville trust as
18 represented in the TDP.  But the testimony had
19 occurred after the confirmation and effective
20 date of the plan and -- the confirmation of
21 the plan, yes.
22         But I can't recall for sure if I

1  testified in that case, with that predicate.

2      Q.  Dr. Peterson, is it your view

3  that -- putting aside the trust distribution

4  procedure-derived values for a second, is it

5  your view that every other method that you've

6  used in this report is standard method?

7      A.  I have to go back to a prior

8  answer.  The general approach is a standard

9  method.  The selection of particular

10  parameters, as you point out, is a matter of

11  expert judgment.  What years you select is a

12  matter of expert judgment.  And it's based

13  upon the facts of a particular case, the data

14  and other matters.

15          So the application of the standard

16  method requires judgment throughout.  The term

17  "standard method" applies to the overall

18  method.  I think you're trying to characterize

19  it in a way differently than I intended to.

20      Q.  Let's turn to page 10 of your

21  report for a moment.  Tables 1a and 1b.  These

22  are reported as trends in settlement averages