# EXHIBIT I

Westlaw.

220 F.Supp.2d 1054                                                                                                       Page 1
220 F.Supp.2d 1054
**(Cite as: 220 F.Supp.2d 1054)**

H

United States District Court,
D. Arizona.
RECREATIONAL DEVELOPMENTS OF
PHOENIX, INC., et al., Plaintiffs,
v.
CITY OF PHOENIX, Defendant.
**No. CIV.99-0018-PHX-ROS.**

Aug. 29, 2002.

Owners and members of "swingers" clubs, in which members were permitted to engage in sex acts with each other or observe other members engaging in sex acts, brought action challenging city ordinance, which prohibited operation of businesses formed to provide opportunity to observe or participate in sexual conduct. On city's motion for summary judgment, the District Court, Silver, J., held that: (1) expert reports purporting to establish that swingers engaged in safe sexual practices were not sufficiently reliable; (2) members' conduct of engaging in sex acts and observing others engage in sex acts did not constitute expression protected by First Amendment; and (3) ordinance did not effect unconstitutional taking.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure** 2539
170Ak2539 Most Cited Cases
Summary judgment affidavits of swingers club owners averring that club members took measures to avoid sexually transmitted diseases (STDs) were not based on personal knowledge, and thus were inadmissible in owners' action challenging city ordinance banning such clubs, where each club had several thousand members. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[2] Civil Rights** 1414
78k1414 Most Cited Cases
   (Formerly 78k241)
Magazine article stating that cities' proffered justification for adopting ordinances prohibiting swingers clubs on ground that such clubs contributed to proliferation of sexually transmitted diseases (STDs) was pretextual was irrelevant to issue of whether city had legitimate justification for enacting such ordinance, even if city had no such ordinance targeting establishments catering to homosexual community. Fed.Rules Evid.Rule 401, 28 U.S.C.A.

**[3] Evidence** 555.4(1)
157k555.4(1) Most Cited Cases

**[3] Evidence** 557
157k557 Most Cited Cases
Expert report purporting to establish that swingers engaged in safer sexual practices than sexually active non-swingers was not sufficiently reliable, and thus was inadmissible in action challenging constitutionality of city ordinance prohibiting operation of businesses formed to provide opportunity to observe or participate in sexual conduct, where report was completely devoid of any reliable methodology; report relied on anecdotal evidence derived from random interviews with swingers and club owners, and included statistical assertions that were not based on any identifiable study design or even basic sampling techniques. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[4] Evidence** 536
157k536 Most Cited Cases
Investigative journalist was not qualified as expert on subject of whether swingers engaged in safe sexual practices, and thus his report regarding measures taken by swingers clubs to prevent transmission of sexually transmitted diseases (STDs) was inadmissible in action challenging constitutionality of city ordinance prohibiting operation of businesses formed to provide opportunity to observe or participate in sexual conduct. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[5] Evidence** 555.2
157k555.2 Most Cited Cases
Investigative journalist's expert report purporting to establish that swingers engaged in safe sexual practices was not sufficiently reliable, and thus was inadmissible in action challenging constitutionality of city ordinance prohibiting operation of businesses formed to provide opportunity to observe or participate in sexual conduct, where report's conclusions were not grounded in any apparent methodology. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[6] Constitutional Law** 90.4(2)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

220 F.Supp.2d 1054
220 F.Supp.2d 1054
**(Cite as: 220 F.Supp.2d 1054)**

Page 2

92k90.4(2) Most Cited Cases

**[6] Constitutional Law** 91
92k91 Most Cited Cases

**[6] Public Amusement and Entertainment** 9(1)
315Tk9(1) Most Cited Cases
(Formerly 376k3 Theaters and Shows)
Swingers club members' conduct of engaging in sex acts and observing others engage in sex acts did not constitute expression protected by First Amendment, and thus city ordinance prohibiting operation of businesses formed to provide opportunity to observe or participate in sexual conduct did not impermissibly infringe on club members' rights of expressive association. U.S.C.A. Const.Amend. 1.

**[7] Eminent Domain** 2.26
148k2.26 Most Cited Cases
(Formerly 148k2(1.1))
City ordinance prohibiting operation of businesses formed to provide opportunity to observe or participate in sexual conduct advanced legitimate government interests in controlling transmission of sexually transmitted diseases (STDs) and in preserving societal order and morality, and thus did not effect unconstitutional taking without compensation. U.S.C.A. Const.Amend. 5.

*1055 Christopher Reed Kaup, Tiffany & Bosco PA, Nicholas Simon Hentoff, Hentoff Law Office, Richard L. Brooks, Richard L. Brooks PC, Phoenix, AZ, for plaintiffs.

John Van Brunschot, Mesa, AZ, pro se.

Ruth Van Brunschot, Mesa, AZ, pro se.

James Harden Hays, City of Phoenix Prosecutor's Office, Phoenix, AZ, for defendant.

**ORDER**

SILVER, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. # 126) filed August 21, 2001. On March 13, 2002, Plaintiffs filed a Response (Doc. # 144), and Defendant filed a Reply (Doc. # 153) on March 20, 2002. Also pending are Defendant's Motion to Strike and Objection to Plaintiffs' Statement of Facts (Doc. # 148) filed March 20, 2002; and Defendant's Motion to Submit Supplemental Affidavit (Doc. # 149) filed March 20, 2002. [FN1] Plaintiffs filed a Response (Doc. # 154) to Defendant's Motion to Strike on April 8, 2002, and Defendant filed a Reply (Doc. # 156) on April 18, 2002. [FN2]

> FN1. Plaintiffs did not file a response to Defendant's Motion to Submit Supplemental Affidavit. Accordingly, the Court will grant Defendant's Motion.

> FN2. The Court vacated the hearing scheduled for August 12, 2002 because the parties submitted memoranda thoroughly discussing the law and evidence in support of their positions, and oral argument would not have aided the Court's decisional process. *See Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir.1999); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir.1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir.1991), *cert denied*, 503 U.S. 920, 112 S.Ct. 1295, 117 L.Ed.2d 518 (1992).

**\*1056 Background**

On January 6, 1999, Plaintiffs [FN3] applied for a temporary restraining order and preliminary injunction to prevent an ordinance passed by the Phoenix City Council from taking effect. Section 23-54 of the Phoenix City Code ("Ordinance") was enacted on December 9, 1998 and provides that "[t]he operation of a business for purposes of providing the opportunity to engage in, or the opportunity to view, live sex acts is declared to be a disorderly house and a public nuisance per se which should be prohibited." Phoenix, AZ, Code § 23-54 (1998). The Court denied Plaintiffs' application for a temporary restraining order on January 7, 1999 and set a hearing to address Plaintiffs' request for a preliminary injunction and Defendants' Motion to Dismiss filed January 7, 1999. On August 23, 1999, the Court denied Plaintiffs' request for a preliminary injunction and granted in part Defendant's Motion to Dismiss. *See Recreational Devs. of Phoenix, Inc. v. City of Phoenix*, 83 F.Supp.2d 1072 (1999). Of Plaintiffs' original ten causes of action, [FN4] four claims remain: (1) violation of Plaintiffs' freedom of expression under the First Amendment; (2) violation of Plaintiffs' freedom of expressive association under the First Amendment; (3) violation of Plaintiff's right to privacy under the Fourteenth Amendment; and (4) violation of Plaintiffs' Fifth Amendment right against a regulatory taking without just compensation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

220 F.Supp.2d 1054                                                                                     Page 3
220 F.Supp.2d 1054
**(Cite as: 220 F.Supp.2d 1054)**

FN3. As set forth in the Second Amended Complaint (Doc. # 107) filed May 18, 2001, Plaintiffs include Recreational Developments of Phoenix, Inc., individual owners and operators of various sexually-oriented social clubs, and individual members of the clubs.

FN4. The Court granted Defendant's Motion to Dismiss with respect to Plaintiffs' Fourteenth Amendment equal protection claim; overbreadth and vagueness challenges under the First Amendment; bill of attainder claim; and excessive fine claim under the Eighth Amendment. The Court also determined that Plaintiffs' "as applied" takings claim and "loss of economic viability" takings claim were not ripe.

**Discussion**

**I. Motion to Strike**

Defendant asks the Court to strike the following: (1) the affidavits of Milo J. Fencl (Ex. 13), Frank Magarelli (Ex. 14), and Billie Markus (Ex. 15); (2) an article that appeared in the New Times (Ex. A); (3) the expert reports of Dr. Norman A. Scherzer and Terry Gould; and (4) approximately seventy of Plaintiffs' eighty-four statements of fact.

**A. Affidavits**

In support of their Response to Defendant's Motion for Summary Judgment, Plaintiffs have submitted the affidavits of the owners of Club Chameleon (Fencl), Encounters (Magarelli), and Guys and Dolls (Markus). Defendant contends, first, that the affidavits were not timely disclosed and should be stricken. In addition, Defendant objects substantively to most of the averments in the virtually identical affidavits. According to Defendant, the challenged averments lack foundation, are vague, and/or constitute inadmissible hearsay. For their part, Plaintiffs contend that the affidavits are based on the owners' personal knowledge and first-hand observations as club owners.

Rule 56 of the Federal Rules of Civil Procedure sets forth the criteria for affidavits *1057 submitted to support or oppose a motion for summary judgment:
> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed.R.Civ.P. 56(e). Under some circumstances, the personal knowledge and competency requirements may be inferred from the affidavit itself. See Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir.1990) (finding individuals' personal knowledge and competence to testify to circumstances of negotiations could be reasonably inferred from their positions and participation in the negotiations).

[1] Contrary to Plaintiffs' contention, the circumstances here do not warrant the inference that the club owners possess the personal knowledge to testify to all of the statements in their affidavits. For example, the owners aver that:
> the majority of members who engage in sexual activity at the Club take the time to know and question each other regarding STDs [sexually transmitted diseases] and safer sex practices. Because the majority of Club members are partners in long-term committed relationships, they are concerned about the health of each other and do not engage in reckless sexual behavior[.]

(Fencl. Aff. ¶ 4; Magarelli Aff. ¶ 4; Markus Aff. ¶ 3). Apart from their status as club owners, the affiants provide no factual basis for their specific assertions about individual members' "concerns" and scrupulous avoidance of reckless sexual behavior. Indeed, according to Plaintiffs' expert, Club Chameleon has 27,000 members, Encounters has 9,000, and Guys and Dolls has 7,000. (Gould Report at 12-13). Under these circumstances, the affiants have not provided a sufficient basis for the inference that they have *personal knowledge* of the practices and concerns of thousands of individual club members. [FN5] Accordingly, the Court will strike paragraphs 4, 7 (second sentence), 10, 15 (second half), and 16, for which the affiants have not satisfied the personal knowledge requirement. [FN6] In the Markus Affidavit, paragraphs 11 and 14 are also stricken because they are, by the affiant's own account, not based on her personal knowledge. (See ¶¶ 11, 14 (prefacing averments *1058 with "It is my understanding that ...")).

FN5. The present case is thus distinguishable from the cases on which Plaintiffs rely. In *Barthelemy*, for example, the personal knowledge inferred from the affiants' position in the corporation and participation in negotiations related only to the circumstances surrounding a single transaction and specific corporate agreements. See *Barthelemy*, 897 F.2d at 1018; see also *In re Kaypro*, 218 F.3d 1070,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1075 (9th Cir.2000) (inferring personal knowledge of company's credit manager regarding company's ordinary credit practices); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization,* 206 F.3d 1322, 1330 (9th Cir.2000) (inferring personal knowledge of corporate officer regarding identity of employees and their tasks).

FN6. To the extent that the owners are merely reciting club policy, they possess the requisite personal knowledge. See *In re Kaypro,* 218 F.3d at 1075. However, the owners have not established that they are competent to testify to what *actually* happens "[e]ach time sexual activity occurs in a room" at the club or that club employees "will intervene in any activity they see which they believe violates [the clubs'] sex policy." (Fencl Aff. ¶¶ 10, 15; Magarelli Aff. ¶¶ 10, 15; Markus Aff. ¶¶ 9, 14). Similarly, the owners have not established the basis for their assertion that "[h]omosexual activity does not occur" in their clubs. (Fencl Aff. ¶ 16; Magarelli Aff. ¶ 16; Markus ¶ 15). Regardless of whether this is club policy, or whether the owners have actually observed such activity, they have not established the factual foundation for their opinion that a "majority of club members" abide by the policy or behave in the manner alleged. (*Id.*).

**B. New Times Article**

Plaintiffs have submitted an article that appeared in the New Times ("Article") in support of their contention that Defendant lacks a legitimate justification for enacting the Ordinance. According to Plaintiffs, "[t]he fact that Defendant's real goals in passing and enforcing [the Ordinance] is [sic] not to stop the spread of STDs is made manifest by their total failure to proceed against similar establishments catering to the homosexual community which pose a far greater public health concern." (Pls.' Resp. to Def.'s Mot. Summ. J. at 24). The Article purports to compare a gay men's club, where the author observed high-risk sex, to Plaintiffs' clubs, where the author observed "far more people ... talking and dancing than having sex," few of whom were having sex in public, and those who were "arrived and left together." (Pls.' SOF ¶¶ 62, 63). The Article also includes statements allegedly made to the author by James Hays, attorney for Defendant. These "admissions," according to Plaintiffs, show that "Defendant's purported goal in passing [the Ordinance] is not only conjectural, but also is a pretextual ad hoc justification." (Pls.' Resp. to Def.'s Mot. Strike at 12).

Defendant contends that the Article should be stricken because it lacks relevance and foundation and because it includes inadmissible hearsay. [FN7] According to Defendant, "[t]he ability of [P]laintiffs to identify other businesses that might also be creating a public health risk, such as gay bath houses, does not advance their argument." (Def.'s Reply to Pls.' Resp. to Mot. Summ. J. at 13). "The City is not required to proceed against all potential criminal defendants pursuant to a timetable that pleases [P]laintiffs." (*Id.*). With respect to Mr. Hays's remarks, Defendant argues that they "can only be admissions if [P]laintiffs can prove that the statements meet the requirement of the rule, which they have not done." (Def.'s Reply to Pls.' Resp. to Def.'s Mot. Strike at 9).

FN7. Defendant also contends that the Article was not timely disclosed. Because the Court finds the Article inadmissible on other grounds, it need not address the issue of timeliness.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. With respect to party admissions, such statements are not hearsay and may be admissible against the party making the statements. See Fed.R.Evid. 801(d)(2) (establishing that statements offered against a party made in either individual or authorized representative capacity are not hearsay); *see also Gilbrook v. City of Westminster,* 177 F.3d 839, 859 (9th Cir.1999) (affirming admissibility of admission by party opponent to show retaliatory motive).

[2] Plaintiffs have not established that the Article is relevant to any fact of consequence at issue in this case. Although Plaintiffs contend that the Article demonstrates that the STD justification for the Ordinance is a pretext, nothing in the Article tends to support their position. First, as Defendant notes, it is not required to proceed against all offending businesses at once. See *Williamson v. Lee Optical,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most

220 F.Supp.2d 1054                                                                                               Page 5
220 F.Supp.2d 1054
**(Cite as: 220 F.Supp.2d 1054)**

acute to the legislative mind."). Thus, whether other high-risk sexually-oriented businesses have been targeted for enforcement sheds no light on Defendant's justification for targeting the public health threat that Plaintiffs' businesses allegedly represent.

*1059 In addition, the remarks attributed to Mr. Hays in the Article do not tend to show that the STD justification is a pretext. According to the Article (and the author's affidavit), Mr. Hays acknowledged the existence of the gay men's clubs; noted that the City had not received the type of specific complaints that generally trigger enforcement; and observed that enforcement against gay-oriented clubs is complicated by the heightened sensitivity appropriate to that context. [FN8] "That's not to say that such businesses are above the law, just that, in practical terms, it may take a little longer." (Article at 2 (quoting Mr. Hays)). These comments provide no basis for a reasonable inference that Defendant's STD justification is a pretext. Accordingly, because the Article is not relevant to any fact of consequence, it is inadmissible and will be stricken. [FN9] See Fed.R.Evid. 402 ("Evidence which is not relevant is not admissible.").

> FN8. Although homosexuals have not been accorded the status of a protected class for the purposes of equal protection analysis, the Supreme Court has recognized the potential for group-based animus against homosexuals. See Romer v. Evans, 517 U.S. 620, 634, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (invalidating law targeting homosexuals based on "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected").

> FN9. Mr. Hays's remarks are also inadmissible hearsay. First, Plaintiffs have not established that Mr. Hays was authorized by Defendant to make statements about enforcement of the Ordinance, see Fed.R.Evid. 801(d)(2)(C), or that making such statements falls within the scope of his employment, see Fed.R.Evid. 801(d)(2)(D). In addition, Plaintiffs have not established that Mr. Hays possesses the requisite personal knowledge to address the existence of gay men's clubs in the City of Phoenix, whether Defendant received specific complaints about such clubs, or whether enforcement of the Ordinance in these clubs is especially complicated. See Fed.R.Evid. 602. Plaintiffs also have not established that Mr. Hays is qualified as an expert to offer an opinion about the complexities of enforcing the Ordinance in gay men's clubs. See Fed.R.Evid. 702.

### C. Expert Reports

Plaintiffs have submitted the "Expert Witness Reports" of Dr. Norman Scherzer and Terry Gould in support of their contentions that Plaintiffs' clubs do not pose an STD risk and that members engage in expressive activity. Defendant moves to strike these reports pursuant to Rule 703 of the Federal Rules of Evidence, arguing that the expert reports lack adequate foundation and/or are irrelevant. Plaintiffs point out that Rule 703 "clearly permits an expert to offer an opinion or inference based on inadmissible evidence." (Pls.' Resp. to Def.'s Mot. Strike at 14). "All of the testimony and information provided by the experts in this case are proper under Rule 703 and consistent with its purpose." (Id. at 15).

Rule 702 of the Federal Rules of Evidence requires the Court to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This "gatekeeping" role requires the Court "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of rigor that characterizes the practice of the expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Thus, the "facts or data ... upon which an expert bases an opinion or inference" need not be admissible in evidence "[i]f of a type reasonably relied on by experts in the particular field in forming opinions or inferences on the subject." Fed.R.Evid. 703. However, *1060 "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.' " Kumho Tire Co., 526 U.S. at 149, 119 S.Ct. 1167 (quoting Daubert, 509 U.S. at 592, 113 S.Ct. 2786).

#### 1. Dr. Scherzer

Dr. Scherzer's report purports to establish that swingers [FN10] engage in safer sexual practices

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

than sexually active non-swingers. The Report begins with a recitation of Dr. Scherzer's credentials and includes a discussion of his "Data Collection," "A Brief Introduction to STDs," and an "Analysis" of the sexual practices of swingers. In his affidavit, Dr. Scherzer lists the "source material" for his discussion of STDs.

> FN10. Dr. Scherzer defines "swingers" as "individuals who have sexual encounters with two or more people at the same time." (Scherzer Report at 2).

As an initial matter, Plaintiffs have not established that Dr. Scherzer possesses relevant expertise. Although the Report indicates that Dr. Scherzer earned a Ph.D., it does not identify the nature or location of his doctoral training. The Report also indicates that Dr. Scherzer received unspecified training from the "American Association of Sex Educators, Counselors and Therapists." (Scherzer Report at 2). Although these credentials suggest that Dr. Scherzer is likely to be knowledgeable about a number of subjects, they do not establish a link between this knowledge and the specific subjects addressed in the Report. See *Diviero v. Uniroyal Goodrich Tire Co.,* 919 F.Supp. 1353, 1355 (D.Ariz.1996) ("[A] court may exclude an expert who does not have the appropriate [background] to offer a helpful opinion with regard to controverted issues."), *aff'd,* 114 F.3d 851 (9th Cir.1997). Moreover, Plaintiffs have not identified the "relevant discipline" that provides the basis for Dr. Scherzer's knowledge. *Kumho Tire Co.,* 526 U.S. at 149, 119 S.Ct. 1167.

Apart from his formal training, Dr. Scherzer has experience teaching anatomy and human sexuality and as an "AIDS educator." (*Id.*). In addition, he states that he has conducted numerous informal interviews with swingers and gathered data on college students from "professional journals, interviews with university health providers, one-on-one conversations with students and from the review of over 2,000 anonymous self-analyses from [his] Human Sexuality courses." (*Id.* at 3). Finally, Dr. Scherzer states that the material in his Report is "primarily antidotal [sic]," based on interviews with swingers and club owners. (*Id.*).

Drawing on this "data," Dr. Scherzer presents statistics pertaining to the rates of STDs among college students. (*See, e.g., id.* at 5 ("Sexually active college students have a 25% incidence of Genital Herpes and a 50-70% incidence of Papilloma virus infections among females.") (emphasis omitted)).

Although Dr. Scherzer notes that "[t]here is very little data on the incidence of STDs ... among the swinger population," (*id.* at 2), he lists fourteen factors that he believes "*could* account for the low occurrence of STDs among club swingers." (*Id.* at 5) (emphasis added). These factors include a variety of generalizations about the activities and practices of swingers and the general policies, norms, and conventions of swingers clubs. He concludes his Report with the broad opinion that "[s]wingers are practicing safer sex and swing club owners are concerned for the safety of their customers." (*Id.* at 7).

[3] The infirmity of the Scherzer Report is not that it purports to rely on *1061 inadmissible evidence. As noted above, an expert may rely on inadmissible evidence if it is of a type reasonably relied on by other experts in the field. [FN11] See Fed.R.Evid. 703. Instead, the Report is inadmissible because it is completely devoid of any reliable methodology. First, anecdotal evidence derived from random interviews with swingers and club owners is, by definition, non-systematic and non-generalizable. Moreover, the Report includes statistical assertions that are not based on any identifiable study design or even basic sampling techniques. The probative value of such evidence is far outweighed by its potential to mislead and confuse the factfinder. See Fed.R.Evid. 403; *Martincic v. Urban Redevelopment Auth. of Pittsburgh,* 844 F.Supp. 1073, 1075-76 (W.D.Pa.1994) (excluding statistical report as prejudicial under Rule 403 where expert "offered no semblance of statistical analysis that would breathe life into his bare numbers"); *United States v. Hoac,* 990 F.2d 1099, 1103 (9th Cir.1993) (noting that even admissible expert testimony is properly excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or undue delay"); *United States v. Alexander,* 526 F.2d 161, 168 (8th Cir.1975) (excluding polygraph evidence under Rule 403 because it was "likely to be shrouded with an aura of near infallibility").

> FN11. Here, of course, it is not clear what Dr. Scherzer's field is or whether other such experts rely on similar evidence.

In addition, the Report states that Dr. Scherzer relied on professional journals, interviews with university health providers, and student conversations and surveys. Notably, however, the Report fails to identify any specific journal or the data derived from it. Likewise, the Report gives no indication of the nature or quantity of interviews with health providers

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

220 F.Supp.2d 1054                                                                                                   Page 7
220 F.Supp.2d 1054
**(Cite as: 220 F.Supp.2d 1054)**

or students, the method by which interview subjects were chosen, and no methodological details about the "2,000 anonymous self-analyses from [the] Human Sexuality courses." (Scherzer Report at 3). Accordingly, the Court has no means of assessing the reliability of this foundational material or the conclusions Dr. Scherzer purports to derive from it. *See Olsen v. Marriott Int'l, Inc.,* 75 F.Supp.2d 1052, 1057 (D.Ariz.1999) (excluding expert report in part because it did not include full citations to studies cited therein or otherwise establish the reliability of the underlying studies).

Finally, the Report provides no reliable basis for the fourteen factors that "*could* account for th[e] low occurrence of STDs among club swingers." (Scherzer Report at 5) (emphasis added). Even assuming-- what the Report fails reliably to establish--that the rates of STDs among swingers are in fact lower than other populations, the Report's explanatory factors consist of gross generalizations based on nothing more than Dr. Scherzer's "observations" as "confirmed by swingers and club owners." (*Id.*). For example, the Report states that "[m]ost swinging occurs between couples who take time to know and question each other"; "[a]nal sex is rare in clubs"; "[r]ooms in which swinging occurs are sanitized by an attendant before new couples are allowed to enter." (*Id.* at 5-6). The Report provides no factual basis for these assertions, no indication of the number, type, or location of clubs visited, and no reason to believe that Dr. Scherzer's observations are typical of all swingers clubs or of Plaintiffs' clubs in particular. [FN12] Accordingly, because the *1062 "sweeping generalizations" characteristic of the Report lack any foundation in the principles and methodologies of any identifiable discipline, the Court finds the Scherzer Report unreliable and inadmissible. *See Jinro Am., Inc. v. Secure Invs., Inc.,* 266 F.3d 993, 1006 (9th Cir.), *as amended by* 272 F.3d 1289 (9th Cir.2001) ("Pelham's sweeping generalizations, derived from his limited experience and knowledge--plainly a skewed sample-- were unreliable and should not have been dignified as expert opinion.").

> FN12. In addition, though the factors closely track the affidavits supplied by the club owner Plaintiffs, there is no indication that Dr. Scherzer visited Plaintiffs' clubs in the course of his research.

**2. Mr. Gould**

The Gould Report purports to describe the swinger lifestyle as a basis for Plaintiffs' contention that swingers engage in safe sexual practices; that clubs catering to swingers--including Plaintiffs'--take various precautions to prevent the spread of STDs; and that swingers constitute a "subculture" with distinctive values and rules. The Report identifies the author, Terry Gould, as an award-winning "investigative journalist specializing in social issues and organized crime." (Gould Report at 4). In a Preface, Mr. Gould states that the Report is based on research conducted for a book on the lifestyle of swingers, which he presented at a meeting of the "Society for the Scientific Study of Sexuality." (*Id.*). According to Mr. Gould, his "findings were well-received." (*Id.*). Finally, the Report states that Mr. Gould "inspected" the three clubs owned by Plaintiffs in the present case. (*Id.*).

[4] The Gould Report suffers from the same shortcomings as the Scherzer Report. First, the Report does not establish that Mr. Gould possesses relevant expertise. Regardless of Mr. Gould's accomplishments as an investigative journalist, Plaintiffs have not established that he is qualified to provide *expert* testimony regarding the sexual practices and cultural mores of swingers. *See Jinro,* 266 F.3d at 1006 ("He was not trained as a sociologist or anthropologist, academic disciplines that *might* qualify one to provide reliable information about the particular cultural traits and behavior patterns of a particular group of people[.]"); *see also Kumho Tire Co.,* 526 U.S. at 149, 119 S.Ct. 1167 ("[T]he trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the *relevant* discipline.") (internal quotations and alterations omitted) (emphasis added). In the absence of any relevant expertise, Mr. Gould's sociological observations are merely "impressionistic generalizations" about the swinger lifestyle. [FN13] *Jinro,* 266 F.3d at 1006; *see also id.* at 1005 ("[H]is qualifications to render such opinion testimony were glaringly inadequate, amounting to little more than the limited perspective of a professional investigator whose work experience had exposed him to [the subject of his testimony].").

> FN13. For example, see Gould Report at 5 ("Acting within strict rules of etiquette, lifestyle couples express their erotic fantasies with others [.]"); 8 ("While not expressly forbidden, male bisexuality is taboo behavior at clubs and in the subculture generally."); 25 ("Swingers too live in nuclear families, and they find their lifestyle an effective means of abating the isolation

220 F.Supp.2d 1054  
220 F.Supp.2d 1054  
(Cite as: 220 F.Supp.2d 1054)

Page 8

of suburban living."); 33 ("Of course, there is no denying that redneck louts and beach babies have always been present in the swing culture in about the same proportion as in straight society and that they have given critics the opportunity to pound tables with the same bigoted pejoratives once used to demonize all gays."); 55 ("[S]winging within the lifestyle almost always occurs peacefully, according to the same middle-class rules most people live by, without violating the bourgeois sensibilities of the people involved, and without any documented harm to society.").

[5] In addition, the Report's conclusions are not grounded in any apparent methodology, reliable or otherwise. Indeed, despite seventy pages of text, Mr. *1063 Gould nowhere sets forth his plan of investigation, data collection, or analysis. For example, Mr. Gould reports the results of his "inspection" of Plaintiffs' clubs, but gives no indication of when he visited them, how often, and whether the owners had notice of his visits. At a minimum, it would be useful to know whether Mr. Gould, an investigative journalist, identified himself to Plaintiffs as a reporter or operated under cover. [FN14] In the absence of these details, the Court cannot determine "whether his preparation is of a kind that others in the field would recognize as acceptable." *Kumho Tire Co., 526 U.S. at 151, 119 S.Ct. 1167*.

> FN14. The Report includes the now-familiar recital of the scrupulous sanitary practices in Plaintiffs' clubs: "[B]etween use by couples, beds are stripped, sprayed with disinfectant, and freshly made with sterilized sheets." (Gould Report at 12). The Report does not indicate whether Mr. Gould witnessed these activities--and if so, when, where, or how often--or whether he was simply told that they occur. Likewise, the Report states, without citation, that "[a]ll three clubs are regularly inspected by the city's health department and have passed inspection with grades in the 95 to 99 per cent [sic] bracket." (*Id.*). Presumably an investigative journalist would not take this information on faith from a self-interested club owner, but the Report includes no citation to establish the reliability of these figures.

The Report's scant footnote citations further detract from its reliability. For example, the Report states that "roughly 10 percent of the people who attend a lifestyle party have never shared spouses," while "roughly twenty-five percent of couples ... usually share partners at parties." (Gould Report at 7). In support of this data, the Report cites a "survey from a 1996 convention and questioning of participants at clubs and parties during book research." (*Id.* at 72 n. 4). Elsewhere, the Report states that "92 per cent [sic] of 312 respondents believed swingers 'should' be using condoms, and 77 per cent [sic] had had HIV tests." (*Id.* at 18). According to a footnote, these figures are taken from a "Registration desk survey; 312 respondents (161 female; 151 male) of 3,500 attendees. August 1996." (*Id.* at 72 n. 3). Although survey data and statistical studies can be useful evidentiary tools, the Report includes no details concerning study design or methodology that would allow the Court to evaluate the reliability of this data.

Finally, the Report relies on information gleaned from various "experts," but includes no citation or other information from which the Court could determine reliability. (*See, e.g., id.* at 19 ("According to two doctors of sexology named Joan and Dwight Dixon, spouse sharing as a subculture in modern North America first emerged among World War II fighter pilots."); 27 ("According to McGinley, [FN15] the figure [i.e., number of swingers in North America] in 1998 stood at about three million participants--based on the number of clubs, the roster of club memberships, attendance at parties, and samples of private parties in selected cities[.]"); 34 ("According to [Susan] Block's [FN16] application of ethical hedonism to marriage, couples can 'enjoy the intimate camaraderie with other couples the swinging or playcouple lifestyle offers[.]' ")). Although, as noted above, an expert may rely on the professional studies of other experts, the Court must still determine whether an expert's testimony "rests on a reliable foundation." See *1064*Daubert, 509 U.S. at 597, 113 S.Ct. 2786*. In the absence of complete citations to the underlying studies, the Court cannot determine the reliability of Mr. Gould's sources or the conclusions he purports to derive from them. *See Olsen, 75 F.Supp.2d at 1057*.

> FN15. McGinley is elsewhere identified as "Dr. Robert McGinley, a former aeronautical engineer" and founder of "the Lifestyle Organization." (Gould Report at 20).

> FN16. Block is identified as "a doctor of philosophy, sex therapist, and host of Home Box Office's 'Radio-Sex TV.' " (Gould

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

220 F.Supp.2d 1054   Page 9
220 F.Supp.2d 1054
(Cite as: 220 F.Supp.2d 1054)

Report at 34).

### 3. Conclusion

Plaintiffs contend that Defendant's "attack" on the "qualifications and methodologies" of Plaintiffs' experts "is not proper at this procedural stage." (Pls.' Resp. to Def.'s Mot. to Strike at 14-15). According to Plaintiffs, "Defendant can launch these attacks from behind the podium during cross-examination in front of a jury at trial." (*Id.* at 15).

Plaintiffs' argument is unavailing. As discussed more fully below, in order to withstand summary judgment, Plaintiffs must establish the existence of a genuine issue of material fact based on evidence admissible at trial. *See* Fed.R.Civ.P. 56(c). In the absence of such evidence, the moving party is entitled to judgment as a matter of law. *Id.* Here, because Plaintiffs' evidence consists, in part, of the expert reports, the Court must perform its "gatekeeping" role to determine whether the evidence is reliable. *See Kumho Tire Co.*, 526 U.S. at 147; *see also Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786 (noting the trial court's obligation to make a "preliminary assessment of whether the reasoning or methodology underlying [proffered expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"); *Elsayed Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1066-67 (9th Cir.2002) (concluding that the "district court abdicated its gatekeeping role by failing to make *any* determination that [the expert's] testimony was reliable, and thus did not fulfill its obligation as set out by *Daubert* and its progeny"). Because Plaintiffs have failed to establish the qualifications of their experts and the reliability of their methodologies and conclusions, the Expert Witness Reports are inadmissible and will be stricken.

### D. Statement of Facts

Defendant asks the Court to strike most of Plaintiffs' statements of fact. According to Defendant, Plaintiffs' statements are irrelevant, lack foundation, constitute inadmissible hearsay, or misstate the evidentiary record. Despite Plaintiffs' protests, many of Defendant's objections are well taken.

As discussed above, the Court finds that the Fencl, Magarelli, and Markus Affidavits are largely inadmissible. Likewise, the New Times Article and the Expert Witness Reports are inadmissible. Accordingly, the Court will strike the statements of fact predicated on this evidence. [FN17] The Court will also strike paragraphs 24-26 except as the statements pertain to Guys and Dolls.

> FN17. The Court will strike paragraphs 3-7, 9-11, 12-23, 28, 35 (second half), 60-65, 68, 70-73, 75, and 79-82.

Defendant argues that paragraphs 26-29, 35-36, 46, 54, and 83 misstate the evidentiary record. Because the Court finds that these statements do not misstate the record, these paragraphs will not be stricken on this basis. Finally, to the extent that any statements are not relevant to the Court's resolution of Defendant's Motion for Summary Judgment, they will be disregarded.

## II. Motion for Summary Judgment

### A. Legal Standard

This Court must grant summary judgment if the pleadings and supporting documents, **1065 viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). Substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jesinger*, 24 F.3d at 1130. In addition, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548; *see Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir.1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

220 F.Supp.2d 1054                                                                                       Page 10
220 F.Supp.2d 1054
(Cite as: 220 F.Supp.2d 1054)

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir.1995). There is no issue for trial unless there is sufficient evidence favoring the non-moving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505. However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255, 106 S.Ct. 2505 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

**B. Analysis**

Plaintiffs' remaining claims are: (1) violation of Plaintiffs' freedom of expression under the First Amendment; (2) violation of Plaintiffs' freedom of expressive association under the First Amendment; (3) violation of Plaintiff's right to privacy under the Fourteenth Amendment; and (4) violation of Plaintiffs' Fifth Amendment right against a regulatory taking without just compensation. Plaintiffs contend that "numerous material issues of fact" remain in dispute, precluding summary judgment. (Resp. Mot. Summ. J. at 1). With respect to these claims, the Court determined in its August 23, 1999 Order that Plaintiffs had not established a constitutional violation. However, "[b]ecause the Court relied on the factual record in reaching this conclusion," it declined to grant Defendant's Motion to Dismiss on these claims. Recreational Devs., 83 F.Supp.2d at 1083 n. 8 (privacy); see id. at 1095-96 (expression); 1097 (association); 1101 (takings).

**1. Freedom of expression**

In the August 23, 1999 Order, the Court found that Plaintiffs had not established that their activity constitutes protected expression. First, recognizing that "conduct with an expressive component may be entitled to First Amendment protection," the *1066 Court found that "the message being sent by those engaging in sexual conduct in the clubs is not a particularized message guaranteed to be consistently interpreted and understood by the 'great majority' of those who view it." Recreational Devs., 83 F.Supp.2d at 1092 (quoting Spence v. State of Washington, 418 U.S. 405, 410, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)). [FN18] In addition, the Court observed that "there is no First Amendment protection for physical sexual conduct." Id. at 1092. The Court also determined that, to the extent that Plaintiffs are engaged in protected expression, the Ordinance "places no express restriction on erotic dancing performances or discussion of the sexual mores of the swinging lifestyle." Id. at 1094. Finally, even assuming the Ordinance is subject to First Amendment scrutiny, the Court determined that the Ordinance satisfies the standards set forth in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. See id. at 1095-96 (addressing O'Brien factors).

> FN18. Plaintiff spends several pages addressing what it perceives to be the Court's erroneous interpretation of Spence. According to Plaintiffs, the Court adopted a standard for determining whether conduct is expressive based on whether "the message was likely to be understood 'by the great majority of citizens,'" not on whether "'the likelihood was great that the message would be understood by those who viewed it.'" (Resp. Mot. Summ. J. at 12 (quoting Spence, 418 U.S. at 410-11, 94 S.Ct. 2727)). In fact, however, the Court expressly adopted and applied the interpretation of Spence urged by Plaintiffs: "[T]he Court will assume without deciding that the relevant audience is *club patrons*." See Recreational Devs., 83 F.Supp.2d at 1090 n. 12 (emphasis added).

To establish that they engage in protected expression, Plaintiffs rely on the same affidavits and testimony the Court has already considered and rejected, see Recreational Devs., 83 F.Supp.2d at 1089-92, and the Expert Witness Reports of Dr. Scherzer and Mr. Gould. As discussed above, the expert reports are inadmissible pursuant to Rule 702. Accordingly, Defendants have failed to present admissible evidence to establish that the Ordinance burdens protected expression in violation of the First Amendment.

**2. Expressive Association**

In the August 23, 1999 Order, the Court determined that because the sexual conduct proscribed by the Ordinance does not constitute protected expression, "the [O]rdinance does not impermissibly infringe on Plaintiffs' freedom to engage in expressive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

association and cannot be enjoined on this basis." _Recreational Devs., 83 F.Supp.2d at 1097._ In addition, the Court observed that the Ordinance does not prohibit "advocates of the swinging lifestyle meeting, dancing, and exchanging political and social views" or "from engaging in the sexual activities that are associated with the swinging philosophy in their homes or possibly even in clubs that are truly private." _Id._

Plaintiffs contend that a recent decision of the United States Supreme Court alters the analysis of their expressive association claim. In _Boy Scouts of America v. Dale,_ 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), the Supreme Court held that application of a state public accommodations law that would have required the Boy Scouts to admit homosexuals violated the Boy Scouts' First Amendment right of expressive association. According to Plaintiffs here, "it can not be disputed that [the Ordinance] 'significantly burdens' the Plaintiffs' expressive associational rights since enforcement of the New Ordinance imposes criminal penalties on the Club Owner Plaintiffs and will result in their forced closure of the Social Clubs." (Resp. Mot. Summ. J. at 18).

*1067 [6] Having reviewed _Boy Scouts,_ the Court finds that it does not support Plaintiffs' expressive association claim. The Court has already determined that Plaintiffs, unlike the Boy Scouts, are not engaged in expressive conduct. [FN19] Accordingly, the Ordinance cannot, as a matter of law, impermissibly infringe on Plaintiffs' rights of expressive association. _See Boy Scouts,_ 530 U.S. at 648, 120 S.Ct. 2446 ("To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.' ... [T]o come within [the First Amendment's] ambit, a group must engage in some form of expression[.]").

> FN19. _See Recreational Devs., 83 F.Supp.2d at 1089-92._ The only additional evidence Plaintiffs provide to support their associational claim is the testimony of its experts. As discussed above, however, this evidence is unreliable and inadmissible.

### 3. Privacy

In the August 23, 1999 Order, the Court determined that Plaintiffs could not establish that their clubs constitute private membership organizations protected by the Fourteenth Amendment right to privacy. Analyzing Plaintiffs' claim in terms of the factors for determining the existence of a private club, the Court found that "the membership status of the clubs is more fiction than reality." _Recreational Devs., 83 F.Supp.2d at 1084._ Specifically, the "[m]embership criteria [are] virtually non-existent," and "the clubs are for-profit organizations in which members have no control over the management of the club aside from their ability to make suggestions." [FN20] _Id._

> FN20. The factors comprising the selectivity of membership include the substantiality of the membership fee, members' control over the selection of new members, the numerical limit on club membership, the formality of admission procedures, and the number of applicants denied admission. _See Recreational Devs., 83 F.Supp.2d at 1082_ (citing _United States v. Lansdowne Swim Club,_ 713 F.Supp. 785, 797 (E.D.Pa.1989)). All of these factors militate against a finding that Plaintiffs' clubs are private. _See id._ at 1083-84.

Plaintiffs contend that "[m]aterial issues of fact are in dispute as to whether Plaintiffs' Social Clubs are 'private' organizations and the applicability of the right to privacy guaranteed by the Constitution." (Resp. Mot. Summ. J. at 33). To establish the existence of a factual dispute, however, Plaintiffs rely on the same testimony already considered and rejected by the Court, _see Recreational Devs., 83 F.Supp.2d at 1083-84,_ and the Expert Witness Reports that the Court has determined are inadmissible. Accordingly, Plaintiffs have failed to present admissible evidence to create an issue of fact with respect to whether Plaintiffs' clubs are private.

### 4. Takings

In the August 23, 1999 Order, the Court determined that because Plaintiffs had not sought compensation "based on the loss of economic viability," their facial takings claim was not ripe. _Id._ at 1099. However, the Court found that "Plaintiffs' challenge based on the [O]rdinance's failure to substantially advance a legitimate state interest is ripe." _Id._ Accordingly, the Court evaluated Plaintiffs' takings claim, finding that "the [O]rdinance's asserted purposes of combatting the transmission of sexually transmitted diseases and preserving societal order and morality are clearly legitimate public purposes." _Id._ at 1101.

Plaintiffs contend that the Court mistakenly placed

220 F.Supp.2d 1054     Page 12
220 F.Supp.2d 1054
(Cite as: 220 F.Supp.2d 1054)

on Plaintiffs the burden of establishing that the Ordinance was not supported by a legitimate state interest. In addition, Plaintiffs argue that "there is *1068 nothing before this Court to establish that the harm the New Ordinance was, allegedly, intended to address--the spread of STDs through Social Clubs--is anything other than conjectural if not pretextual." (Resp. Mot. Summ. J. at 5). Finally, Plaintiffs contend that "the record before the Council was devoid of any competent evidence that sexually transmitted diseases are actually 'spread' in Plaintiffs' Social Clubs or that the public 'health, safety, general welfare and morals' are negatively affected by either the expressive activity engaged in at the Plaintiffs' Social Clubs or the mere operation of such clubs." (*Id.* at 26).

[7] Assuming that Defendant bears the burden of establishing that the Ordinance advances a legitimate government interest, it has satisfied its burden in this case. [FN21] As the Supreme Court has stated:

> FN21. Because the Court finds that Defendant has met its burden, the Court need not resolve whether Plaintiffs or Defendant bear the burden of proof in the present circumstances. However, Plaintiffs' attempt to liken themselves to the plaintiff in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), and to distinguish *Christensen v. Yolo County Board of Supervisors*, 995 F.2d 161 (9th Cir.1993), is unpersuasive. In *Christensen*, the Ninth Circuit stated that "[w]hen making a facial attack on a zoning restriction, plaintiffs bear the burden of proof to demonstrate that the restriction is unconstitutional." *Id.* at 165. Plaintiffs note that, in *Lucas*, the State had the burden of establishing that its regulation advanced a legitimate state interest. *Lucas*, however, involved a regulation that, unlike the Ordinance, deprived the landowner of *all* economically productive or beneficial uses of his land. In *Christensen*, as here, the challenged regulation merely *limited* the plaintiffs' ability to use the land. See *Christensen*, 995 F.2d at 165 ("The availability of these other uses of plaintiffs' land prevents ... the [regulation] from being unconstitutional on its face."); see also *Dolan v. City of Tigard*, 512 U.S. 374, 384 n. 6, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (rejecting argument that permit requirement deprived landowner of "economically beneficial use" of property where "Petitioner is surely able to derive *some* economic use of her property"). Plaintiffs' contention here--that the Ordinance "deprives a landowner of all economical use of [his] property" (Resp. Mot. Summ. J. at 29)--is inaccurate, and their reliance on *Lucas* appears to be misplaced. See *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, --- U.S. ----, ---- n. 19, 122 S.Ct. 1465, 1480 n. 19, 152 L.Ed.2d 517 (2002) ("*Lucas* carved out a narrow exception to the rules governing regulatory takings for the 'extraordinary circumstance' of a permanent deprivation of *all* beneficial use.") (emphasis added).

Our cases have not elaborated on the standards for determining what constitutes a "legitimate state interest" or what type of connection between the regulation and the state interest satisfies the requirement that the former 'substantially advance' the latter. They have made clear, however, that a broad range of governmental purposes and regulations satisfies these requirements. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834-35, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Thus, courts have upheld land use restrictions where a governmental body "reasonably conclude[s] that the 'health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land." *Penn Central Trans. Co. v. City of New York*, 438 U.S. 104, 125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (quoting *Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 72 L.Ed. 842 (1928)); see also *Lucas*, 505 U.S. at 1023, 112 S.Ct. 2886.

Defendant identifies slowing the spread of STDs as the justification for the Ordinance. In the course of passing the legislation, the Phoenix City Council compiled a "Factual Record" and supplement containing the results of Defendant's investigation of Plaintiffs' businesses and the proceedings *1069 of hearings held to address the need for the Ordinance. The existence of these records, [FN22] together with the "Findings" included in the text of the Ordinance, [FN23] establish that Defendant "reasonably concluded that the health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land." *Penn Central Trans. Co.* 438 U.S. at 125, 98 S.Ct. 2646 (internal quotations omitted). Moreover, "the [O]rdinance's asserted purposes of combatting the transmission of sexually transmitted diseases and preserving societal order and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

morality are clearly legitimate purposes." *Recreational Devs., 83 F.Supp.2d at 1101*. Likewise, "[i]t is common knowledge that engaging in sexual intercourse and oral sex without the use of condoms place people at risk for sexually transmitted diseases, including HIV/AIDS." *Id.* Defendant has established that it relied on evidence that condom use was not regularly practiced at Plaintiffs' clubs. [FN24] (*See, e.g.,* 6/14/01 Depo. Tr. Officer Kevin Sanchez at 25 and *passim;* 5/8/01 Depo. Tr. Sergeant Anthony Vasquez at 41 and *passim* ).

> FN22. Although, as Plaintiffs point out, the Court has stricken the substantive content of these records, it has taken judicial notice of their existence. (*See* 2/11/02 Order; 2/22/02 Order).
>
> FN23. The Ordinance states in relevant part: The City Council makes the following findings:
> ...
> 2. The operation of a live sex act business contributes to the spread of sexually transmitted diseases, and 3. The operation of a live sex act business is inimical to the health, safety, general welfare and morals of the inhabitants of the city of Phoenix.
> 4. Evidence in support of these findings may be found in *Sex Clubs, Factual Record* and the *Sexually Oriented Businesses, Factual Record, Supplement.*
>
> FN24. Plaintiffs object that Defendant has not offered evidence to establish that "sexually transmitted diseases are actually 'spread' in Plaintiffs' Social Clubs or that public 'health, safety, general welfare and morals' are negatively affected by the expressive activity engaged in at the Plaintiffs' Social Clubs[.]" (Resp. Mot. Summ. J. at 26). Plaintiffs, however, cite no authority to establish that Defendant must show that sexually transmitted diseases are "actually" spread in Plaintiffs' clubs.

### 5. Conclusion

Plaintiffs have failed to establish a genuine issue of material fact with respect to their constitutional claims. Specifically, Plaintiffs have not presented admissible evidence to show that their conduct is expressive or that their clubs are private. In addition, Plaintiffs have failed to refute Defendant's plainly legitimate justification for the Ordinance-- curbing the spread of sexually transmitted diseases.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Strike and Objection to Plaintiffs' Statement of Facts (Doc. # 148) is **GRANTED** in part and **DENIED** in part as set forth herein.

**IT IS FURTHER ORDERED** that Defendant's Motion to Submit Supplemental Affidavit (Doc. # 149) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 126) is **GRANTED**.

220 F.Supp.2d 1054

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

77 Fed.Appx. 983                                                                                     Page 1
77 Fed.Appx. 983, 2003 WL 22383511 (9th Cir.(Ariz.))
**(Cite as: 77 Fed.Appx. 983, 2003 WL 22383511 (9th Cir.(Ariz.)))**

H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. (FIND CTA9 Rule 36-3.)

United States Court of Appeals,
Ninth Circuit.
RECREATIONAL DEVELOPMENTS OF
PHOENIX, an Arizona corporation; Robert
Mutschler, a single person; Billie Markus, a single
person; Frank Magarelli,
a married man; Marlene Magarelli, a married
woman; Kimberly Marie
Clay, a single person; Rodney Reedy, a married
man; Beverly Reedy, a married
woman; Elizabeth Butler; Jacquelyn M. Kowalski, a
single person, Plaintiffs,
and
John Van Brunschot, a married man; Ruth Van
Brunschot, a married woman,
Plaintiffs--Appellants,
v.
CITY OF PHOENIX, an Arizona municipal
corporation, Defendant--Appellee.
Recreational Developments of Phoenix, an Arizona
corporation; Frank Magarelli,
a married man; Marlene Magarelli, a married
woman; Jacquelyn M. Kowalski, a
single person, Plaintiffs--Appellants,
and
Robert Mutschler, a single person; Billie Markus, a
single person; John Van
Brunschot, a married man; Ruth Van Brunschot, a
married woman; Kimberly Marie
Clay, a single person; Rodney Reedy, a married
man; Beverly Reedy, a married
woman; Elizabeth Butler, Plaintiffs,
v.
City of Phoenix, an Arizona municipal corporation,
Defendant--Appellee.
No. 02-16890, 02-16894.
D.C. No. CV-99-00018-ROS.

Argued and Submitted Oct. 7, 2003.

Decided Oct. 17, 2003.

Owners and patrons of "swinger" clubs which permitted patrons to engage in sex acts with each other or observe other patrons engaging in sex acts, brought action challenging city ordinance which prohibited operation of businesses formed to provide opportunity to observe or participate in sexual conduct. The United States District Court for the District of Arizona, 220 F.Supp.2d 1054, Roslyn O. Silver, J., granted city's motion for summary judgment, and owners and patrons appealed. The Court of Appeals held that: (1) plaintiffs waived any challenge to district court's decision on the constitutionality of ordinance, and (2) district court did not abuse its discretion in excluding plaintiffs' proposed expert testimony, based on finding that plaintiffs failed to show that testimony was sufficiently reliable.

Affirmed.

West Headnotes

**[1] Federal Courts ⚷915**
170Bk915 Most Cited Cases
Owners and patrons of "swinger" clubs which permitted patrons to engage in sex acts with each other or observe other patrons engaging in sex acts waived, on appeal, any challenge to district court's decision on the constitutionality of city ordinance which prohibited operation of businesses formed to provide opportunity to observe or participate in sexual conduct; owners and patrons mentioned the constitutional issues only in passing in their opening brief, and conceded at oral argument that they chose to focus their arguments on the district court's evidentiary rulings.

**[2] Evidence ⚷555.2**
157k555.2 Most Cited Cases
District court did not abuse its discretion in excluding plaintiffs' proposed expert testimony, in action against city challenging constitutionality of city ordinance, based on finding that plaintiffs failed to show that testimony was sufficiently reliable.
*985 Appeal from the United States District Court for the District of Arizona, Roslyn O. Silver, District Judge, Presiding.

Nicholas S. Hentoff, Esq., Hentoff Law Offices,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

77 Fed.Appx. 983                                                                                            Page 2
77 Fed.Appx. 983, 2003 WL 22383511 (9th Cir.(Ariz.))
**(Cite as: 77 Fed.Appx. 983, 2003 WL 22383511 (9th Cir.(Ariz.)))**

Phoenix, AZ, for Plaintiffs.

John Van Brunschot, Ruth Van Brunschot, Mesa, AZ, for Plaintiffs-Appellants.

James Harden Hays, Esq., Phoenix City Attorney's Office, Phoenix, AZ, for Defendant-Appellee.

Before B. FLETCHER, TASHIMA, Circuit Judges, and POLLAK, District Judge. [FN*]

FN* The Honorable Louis H. Pollak, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

MEMORANDUM [FN**]

FN** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

**1 Owners and patrons of social clubs catering to the "swinger lifestyle" ("the Clubs") and in which patrons engage in or view sexual acts brought this action challenging the constitutionality of ordinance G-4145 of appellee City of Phoenix ("the City") that bans such conduct. The district court entered summary judgment in favor of the City and the Clubs appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

[1] We first note that the Clubs have waived any challenge to the district court's decision on the constitutionality of the City's ordinance. The Clubs mentioned the constitutional issues only in passing in their opening brief, and conceded at oral argument that they chose to focus their arguments on the district court's evidentiary rulings. The mere mention of an issue is not sufficient to preserve that issue on appeal, see Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir.2001), and we therefore do not address the constitutional issues. [FN1]

FN1. We recognize that the appellants in No. 02-16890 filed a *pro se* brief and that we generally construe such briefs liberally. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 698-99 (9th Cir.1988). In this case, however, the *pro se* appellants incorporated by reference the issues and arguments raised by the parties represented by counsel. See Brief of John and Ruth van Brunschot at 2, 4. We therefore find that the constitutional issues have been waived by all appellants.

[2] The district court did not abuse its discretion in excluding the "expert" testimony of Dr. Scherzer and Mr. Gould. Trial courts have broad latitude both in deciding *how* to test a purported expert's methodology and in determining *whether* the testimony is reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152-153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Moreover, "[i]t is the proponent of the expert who has the burden of proving admissibility." Lust, By and Through Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 598 (9th Cir.1996). The district court was well within its discretion in finding that the Clubs had failed to show that the testimony of either Dr. Scherzer or Mr. Gould was sufficiently reliable to be admitted.

Similarly, the district court did not abuse its discretion in striking portions of the affidavits of the club owners in opposition to the motion for summary judgment. *986 Rule 56(e) of the Federal Rules of Civil Procedure requires such affidavits to be made "on personal knowledge," and the Clubs failed to show that the stricken portions met this requirement.

AFFIRMED.

77 Fed.Appx. 983, 2003 WL 22383511 (9th Cir.(Ariz.))

**Briefs and Other Related Documents (Back to top)**

• 2003 WL 22513750 (Appellate Brief) Answering Brief of Appellee City of Phoenix (Defendant in District Court Case No. CV 99-00018 ROS PHX) (Jul. 11, 2003)Original Image of this Document with Appendix (PDF)

• 02-16890 (Docket) (Oct. 01, 2002)

• 02-16894 (Docket) (Oct. 01, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.