# EXHIBIT J

1

```
1      UNITED STATES BANKRUPTCY COURT
2        FOR THE DISTRICT OF DELAWARE
3
4    _____X
5  In re:          :Chapter 11
6  FEDERAL-MOGUL GLOBAL, :Case No. 01-1-578 (RTL)
7  INC., et al.,    :Jointly Administered
8     Debtors.   :
9    _____X
10
11
12
13    Deposition of Mark A. Peterson, Ph.D.
14         Washington, D.C.
15       Friday, December 3, 2004
16
17
18
19
20  Pages 1 - 288
21  Job No.: 164539
22  Reported by: Deborah Larson Hommer, RPR
```

114

1  information, medical research in the United
2  Kingdom and in the United States. It
3  demonstrates the -- similar activities on the
4  part of its subsidiary, Keasbey & Mattison.
5       All of that -- all of those
6  actions, of course, and their conspiracy to
7  suppress information or actual suppression of
8  information, their lies that they told over
9  many years, as well as their refusals to pay
10 asbestos claimants and their mistreatment of
11 asbestos victims -- all of that is pertinent
12 to evidentiary material that could and would
13 be used in a trial in the United States.
14       I mean, the fact that they were
15 conspiring to suppress information -- they
16 were suppressing it not only in the U.K.; they
17 were suppressing it in the United States where
18 they were a defendant. I mean, that
19 information is absolutely material and would
20 be included in the United States.
21    Q.  According to the book, when did
22 those activities end?

115

1   A.  I don't know if they ever ended.

2  The book certainly didn't say they ended. And

3  that's another really awful fact for them, is

4  that they were doing certainly in the 1980s.

5  They were berating Manville for releasing

6  information. I mean, my God, how bad do you

7  have to be?

8      MR. STROCHAK: Let's go off the

9  record for a second.

10     (Pause.)

11     BY MR. STROCHAK:

12   Q.  Dr. Peterson, it's your view that

13  the publication of the Tweedale book would

14  have some effect on T&N's liability in the

15  tort system going forward; is that correct?

16   A.  Yes.

17   Q.  What have you done to quantify that

18  effect?

19   A.  You can't quantify something like

20  that. I've talked with plaintiff's lawyers

21  who are aware of it and know its impact. I

22  have talked with defense lawyers who have

1  represented T&N in the underlying asbestos
2  litigation, and they all recognize the
3  significance that that's going to drive
4  increase in claims. But it's happening
5  concurrently with a number of other major and
6  really catastrophic developments that would
7  have greatly driven up the liability in the
8  Turner & Newall phase.
9       And when you have several events
10 happening at the same time, you just can't --
11 even retrospectively, you can't disentangle
12 them. It's one of many things that would have
13 greatly increased the liability. And my best
14 quantification of it is the estimates in my
15 report. But there it's happening with other
16 events. You can't separate it out from all
17 the other things that were hitting Turner &
18 Newall at the time.
19      I never have seen a defendant that
20 faced such a conjunction of horrid things
21 happening to it. There is some justice in the
22 world.

117

1  Q. What other horrible things other

2  than the Tweedale book are you talking about?

3  A. The Chase Manhattan repository. It

4  happened earlier, but its effects were muted

5  by Turner & Newall's membership in CCR. I

6  think the termination of CCR was the worst

7  thing that happened to Turner & Newall

8  because -- again, for all the reasons I've

9  discussed in my report: The bankruptcies of

10 other asbestos defendants happening

11 contemporaneously with all of this. It's the

12 conjunction of those things together.

13     The fact that they lost -- had

14 begun to lose cases with regard to their

15 culpability for the activities of Keasbey &

16 Mattison is another element that contributed

17 to this. So all of these things were coming

18 together, and certainly would have been

19 pursued -- the case for Keasbey & Mattison

20 would have certainly been helped by the

21 publication of Tweedale and probably by the

22 repository, although I don't have detailed

118

1  knowledge about the contents of the

2  repository.

3     Q.  Keasbey & Mattison is the -- what

4  line of business is that?

5     A.  Keasbey & Mattison is described by

6  the lawyers who defended Turner & Newall as a

7  mini-Manville.  They made and sold

8  asbestos-containing products.  They had a wide

9  range of asbestos-containing products that the

10 lawyers defending Turner & Newall regarded as

11 second only to Manville.  And they also mined

12 and sold to other companies raw asbestos

13 fibers.

14        I mean, they were a company that

15 was going to have extensive asbestos -- would

16 have had extensive asbestos liabilities except

17 that Turner & Newall terminated the company

18 and sold off its assets to other companies in

19 which -- some of which it took an interest in

20 after they sold them off.  So they -- the

21 company, Keasbey & Mattison itself, doesn't

22 exist anymore, but its liability -- it seems