# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**
-----------------------------------------------------------

**IN RE:**

**FEDERAL MOGUL GLOBAL INC.,  et al.,**

**Debtors.**


**CHAPTER 11**
**Case No. 01-10578 (RTL)**
**(Jointly Administered)**

-----------------------------------------------------------


**VOLUME 2**

**WITNESS**
**Mark Peterson, Ph.D.**

**DATE**
**May 26, 2005**

**LOCATION:**
**Washington, DC**

**TAKEN BY:**
**Weil Gotshal & Manges**



**FINAL COPY**


**JANE ROSE REPORTING**
**1-800-825-3341**
**janerose@janerose.net**

US District Court - Delaware        **FINAL**        Mark Peterson, Ph.D.
In Re Federal Mogul - Chapter 11                          May 26, 2005

Page 365

```
 1    expensive for plaintiffs' lawyers, and for them
 2    to undertake the expense of it they need to have
 3    some assurances that they're going to get a
 4    return on their investment, and that certainty
 5    is no longer there.  So I think there's probably
 6    been a reduction in the screening activities, as
 7    well as some of the other investment efforts on
 8    the part of plaintiff's lawyers to recruit
 9    cases.
10            Now, at least Manville's experience
11    is there has been some return of the increase in
12    claimings this year from the prior year, and
13    that may reflect that some law firms are
14    beginning to look at that, but I have no direct
15    evidence.
16       Q.    Do you have any indication that some
17    of the allegations about the conduct of doctors
18    who participated in mass screenings has affected
19    the use of that technique at all?
20       A.    There's no evidence one way or
21    another about that.  It could have an impact, it
22    might not have an impact.  It could have it
23    because it may make some law firms gun shy.  I
24    would expect it wouldn't have a big impact
25    because over the long run, you certainly had one
```

US District Court - Delaware    **FINAL**    **Mark Peterson, Ph.D.**
In Re Federal Mogul - Chapter 11                                    **May 26, 2005**

Page 366

```
 1    for now -- I think another reason why you have
 2    this kind of temporary suppression of claims at
 3    this point in time, because it's sent out a
 4    specter about this process of having medical
 5    reviews.
 6              But I think that as time goes by, if
 7    the legislation doesn't pass, a lot of law firms
 8    are just going to have different outfits do the
 9    screening and get back into it.  Whether they'll
10    get back into the level they were before, I
11    don't know.  But I would expect it would return.
12    If it makes money, people will do it.  They'll
13    do it with different docs, and hopefully better
14    docs.
15         Q.    Let me switch gears for a moment and
16    ask you about the epidemiological models.  I
17    know we talked about this a little bit the last
18    time you were here for a deposition.
19              I understand you used the Nicholson
20    model in your forecast, and you do a sensitivity
21    on the KPMG model; correct?
22         A.    Yes.
23         Q.    You've indicated, I believe, in your
24    rebuttal report that Nicholson is the only model
25    that is peer reviewed.  Is that correct?
```

Page 367

```
 1        A.    Yes.
 2        Q.    But you, yourself, have used the
 3   KPMG model in the past; isn't that right?
 4        A.    Yes.
 5        Q.    Why do you criticize Dr. Cantor for
 6   using a non-peer reviewed model when you,
 7   yourself, have used them in the past, and in
 8   fact use one for a sensitivity in your report?
 9        A.    Well, it's an apples and oranges
10   kind of thing.  Although Dr. Vasquez's work on
11   the KPMG model -- and his colleagues -- was not
12   peer reviewed, you can test it.  It has been
13   tested against the SEER data.  And while it's
14   not as good as the Nicholson model, the
15   Nicholson forecast, it's relatively
16   well-confirmed empirically.  So it's a tested
17   model.  Even though it's not empirically
18   reviewed -- excuse me.  Even though it's not
19   been peer reviewed, it's had some demonstration
20   of empirical validity.
21              And also the KPMG model was rather
22   thoroughly discussed and explained when it was
23   introduced in the 2002 -- the 1992 reports that
24   KPMG provided in the National Gypsum bankruptcy.
25   So we understood what the model was doing and
```

US District Court - Delaware          FINAL                 Mark Peterson, Ph.D.
In Re Federal Mogul - Chapter 11                                      May 26, 2005

Page 368

1    how it operated.

2              The model here by Navigant, it's not

3    explained.  We don't know what it is.  There's

4    been no description of it.  It's undertaken by a

5    group of people that have no evidence of any

6    skill in this area.  And indeed the rest of

7    Dr. Cantor's report suggests a lack of knowledge

8    about asbestos litigation that's rather

9    shocking, and demonstrates an unfamiliarity with

10   matters that don't suggest -- don't cause one to

11   have much confidence in it, and it's not been

12   tested, it's not been used by anyone, it's not

13   been accepted by anyone.  All of those things

14   differentiate it from KPMG.

15             It's an unexplained,

16   non-transparent, unsubstantiated, untested piece

17   of work.  It's a proprietary piece of work.  You

18   may as well just say I'm going to pull this out

19   of the sky and use it.

20        Q.   How does it differ, how does the NCI

21   epidemiological forecast differ from KPMG?

22        A.   I don't know, because they've never

23   explained it.  Science requires you to --

24   requires transparency.  You need to explain what

25   you've done, so that -- and test it -- so that

US District Court - Delaware          **FINAL**          Mark Peterson, Ph.D.
In Re Federal Mogul - Chapter 11                              May 26, 2005

Page 412

1    here, to what Dr. Dunbar was doing here.

2         Q.    Would it be correct to summarize

3    your approach in the T&N case as departing from

4    the historical values when you view the future

5    as likely to represent an increasingly

6    problematic world for the defendant?  Is that a

7    fair assessment?

8              MR. FINCH:  I object to form.

9         A.    No, I don't think that's correct.  I

10   wouldn't agree with that.

11        Q.    Isn't that what you do in this case?

12        A.    No.

13        Q.    Don't you increase your -- increase

14   your forecast resolution values above what was

15   actually observed in T&N's past, because you

16   think T&N's future was going to be harder for

17   it?

18              MR. FINCH:  I object to form.

19        A.    Can you read the question, please?

20              (The Reporter read back as follows:

21              "Question: Don't you increase

22        your -- increase your forecast resolution

23        values above what was actually observed in

24        T&N's past, because you think T&N's future

25        was going to be harder for it?")

US District Court - Delaware       **FINAL**        Mark Peterson, Ph.D.
In Re Federal Mogul - Chapter 11                           May 26, 2005

Page 413

```
 1        A.    I based my forecast of the amounts
 2   that Turner & Newall would have to pay to
 3   resolve pending and future claims on the actual
 4   experience that Turner & Newall had prior to the
 5   bankruptcy.
 6        Q.    But you didn't use the actual claim
 7   values that you observed prior to the
 8   bankruptcy?
 9        A.    My forecasted values were based upon
10   the actual amounts that they paid in the past,
11   plus the trends in the payments they were
12   making, plus the relative amounts of the
13   payments that they had.  It was all derived from
14   the actual experience of -- of Turner & Newall
15   prior to the bankruptcy, and all I was doing was
16   the most reasonable thing to do, was to extend
17   into the future a continuation of the past
18   trends that Turner & Newall had experienced with
19   regard to its settlement amounts.  Which is
20   precisely the same thing that Dr. Cantor
21   attempted to do with the mesothelioma claims,
22   and if she correctly analyzed the lung cancer
23   claims, it would have been what she had done
24   there, too.
25        Q.    Do you or do you not offer as
```

US District Court - Delaware        **FINAL**        Mark Peterson, Ph.D.
In Re Federal Mogul - Chapter 11                    May 26, 2005

Page 414

1    justification for your claim values in your

2    forecast your hypothesis that the litigation

3    environment was going to become more difficult

4    for T&N after the bankruptcy?

5            MR. FINCH:  Can I hear that back?

6            (The Reporter read back as follows:

7            "Question:  Do you or do you not

8        offer as justification for your claim

9        values in your forecast your hypothesis

10       that the litigation environment was going

11       to become more difficult for T&N after the

12       bankruptcy?")

13       A.    I have three comments -- three

14   answers to that question.  The first is that I

15   explained -- it's not a justification, it's an

16   explanation -- I explain why the settlement

17   values against Turner & Newall for mesothelioma

18   and lung cancer had begun to increase

19   substantially in 2001 compared to its prior

20   settlements, and I explain why that would have

21   continued in the future.  An explanation, it's

22   not a justification.  The explanation describes

23   both the reason for the past observed increases

24   as well as why those increases would continue

25   to -- to occur.