# EXHIBIT O

1

1    UNITED STATES BANKRUPTCY COURT

2      FOR THE DISTRICT OF DELAWARE

3

4  _____X

5  In re:      :Chapter 11

6  FEDERAL-MOGUL GLOBAL, :Case No. 01-1-578 (RTL)

7  INC., et al.,    :Jointly Administered

8     Debtors.   :

9  _____X

10

11

12

13    Deposition of Mark A. Peterson, Ph.D.

14       Washington, D.C.

15      Friday, December 3, 2004

16

17

18

19

20  Pages 1 - 288

21  Job No.: 164539

22  Reported by: Deborah Larson Hommer, RPR

40

1   other reasons, too, including the fact that
2   these were values that were accepted by the
3   plan proponents as well as the fact that, in
4   my view, they are conservative estimates, and
5   indeed they're lower than the alternative
6   estimates that I have.
7       BY MR. STROCHAK:
8   Q. Let's turn just for a second
9   conceptually to the other calculations you
10  performed; that is, the calculations that you
11  performed to -- let me ask it this way: The
12  other calculations that you performed to
13  derive anticipated claim values, those were
14  used to determine whether the TDP values were
15  appropriate in your mind; is that a fair
16  statement of your analytical process?
17      MR. FINCH: Object to form.
18      THE WITNESS: No.
19      BY MR. STROCHAK:
20  Q. Okay. Explain for me why you
21  derived other predicted claim values other
22  than the TDP values.

41

1   A.  Because I was trying to determine

2   reasonable estimates of the current values of

3   the claims -- asbestos bodily injury claims by

4   disease against Turner & Newall.

5   Q.  Now, in doing these other

6   calculations, you started by determining the

7   value that Turner & Newall paid -- the average

8   value that Turner & Newall paid to

9   mesothelioma claimants for 2001; is that

10  correct?

11      THE WITNESS: I'm sorry. Could you

12  read the question?

13      (The reporter read the record as

14  requested.)

15      MR. FINCH: Object to form.

16      THE WITNESS: I continue to have a

17  problem with "start." I mean, I kind of

18  focused on mesothelioma well into the process.

19  I don't mean to be pedantic, but you've got to

20  understand what's the basis of the liability

21  for this company. A credible expert has to

22  understand the basis for liability to

1   understand why the values are what they are.

2       And so I started with looking at

3   the database that Turner & Newall had. I

4   started with understanding what the basis of

5   their liabilities were. I started reading

6   about it. I started with talking to

7   plaintiffs' lawyers about the values of it. I

8   started with knowing how the Center for Claims

9   Resolution resolved claims. I started by

10  talking to lawyers who represented Turner &

11  Newall in the underlying asbestos litigation.

12      And with all of that as a

13  background, then I had to begin to arrive at

14  quantitative determinations. I looked at the

15  database, and one of the steps that I did in

16  the database was to look at the trends in

17  current values of mesothelioma based upon all

18  the other things that preceded it.

19      So that wasn't the start of it, but

20  I did do calculations involving mesothelioma.

21      BY MR. STROCHAK:

22  Q. Let's turn to page 14 of your

43

1  report. In this section of your report you

2  estimated future increases in T&N's U.S.

3  settlement values, correct?

4     MR. FINCH: Object to form.

5     THE WITNESS: Section 6.1.4?

6     BY MR. STROCHAK:

7  Q. That's correct. I'm just reading

8  from the caption.

9  A. That's the title. That was the

10 intention, yes.

11 Q. And what you did in that section is

12 you calculated T&N's post-CCR average

13 mesothelioma payment in 2001, correct? And

14 that's the bottom line in Table 4?

15 A. Among other things, I did that,

16 yes. I did other quantitative steps, too.

17 Q. And you get to a number that's a

18 little shy of $139,000, correct?

19 A. Yes.

20 Q. And that number represents your

21 calculation of the average mesothelioma

22 payment that T&N made, post CCR, in 2001? Let

1    And then simply just took the

2    average of the mesothelioma claims in those

3    two years. It's the same thing as doing a

4    weighted average of the two years. We just

5    looked at over the two-year period. And we

6    did a similar calculation for the settlements

7    in 2000 -- meso settlements in 2000 and 2001,

8    again, adjusting the year 2000 payments by

9    inflation to get 2001 dollars.

10    Q. So through that weighted average

11    calculation you are able to derive a rate of

12    increase, correct?

13    A. Several rates of increase. You can

14    look at it annually. You can look at it for

15    groups of years.

16    Q. And then you apply that rate of

17    increase to the weighted average for meso

18    settlements in 2000 and 2001, right?

19    A. We took specifically the increase

20    from settlements in '97 and '98 to settlements

21    in 2000 and 2001. That's a specific -- as I

22    mentioned, there are several different rates

49

1   of increase on page 14. But in the text above
2   Table 4 it identifies the rate of increase of
3   2.14 which is simply taken by -- derived by
4   taking the 2000/2001 average settlement and
5   dividing by the 1997/'98 settlement. That
6   generates 2.14. We then multiply the
7   2000/2001 average by 2.14, and that generates
8   a $210,000 figure.
9      Q. So you generate an estimate of
10  the -- you call it the current settlement
11  value of T&N mesothelioma claims as 210,000,
12  plus a little bit, right?
13     A. Yes.
14     Q. And then you do not perform a
15  similar calculation for other diseases,
16  correct?
17     A. That's correct.
18     Q. Instead, you use a ratio to
19  determine your average settlement values for
20  other diseases, right?
21     A. We use several alternative ratios,
22  yes.

1  Q. And those ratios are ratios of

2  payments for other diseases to the average

3  mesothelioma settlement values, correct?

4      MR. FINCH: Object to form. I

5  think --

6      THE WITNESS: Yes, let me be

7  specific. For lung cancer -- if you look on

8  Table 5, page 15, it gives ratios for eight

9  different asbestos defendants. And in each

10 case for each of those defendants those

11 numbers are derived by dividing the average

12 settlement for that company for the diseases

13 identified in the columns on Table 5 by the

14 average settlement for mesothelioma for that

15 defendant. And that generates those eight

16 ratios.

17     BY MR. STROCHAK:

18 Q. And what you've done here is you've

19 generated a ratio that links the payments or

20 the anticipated settlement values for other

21 diseases to mesothelioma, right?

22 A. Yes. It reflects the relative size

51

1  of settlements for diseases other than
2  mesothelioma relative to what the mesothelioma
3  settlements are for each of the eight
4  defendants, yes.
5      Q.  And after you go through that
6  exercise of calculating those values, which I
7  think are reported in Table 6 of your report;
8  is that right?
9      A.  For using -- it has three specific
10 calculations based on ratios from Babcock &
11 Wilcox, from Owens Corning and then what's
12 essentially kind of a modal or a median
13 approximation typical -- which also are
14 numbers that are tossed about generally by
15 people that do work like I do and work with
16 trusts and generally are familiar with what
17 the -- what payments are being made for
18 asbestos claims.
19          This notion of ratios is a commonly
20 used concept and it has been used in the past
21 and is used by people that deal with asbestos
22 claims in order to kind of understand what's

52

1  been happening with regard to the payments.

2      Q. I don't understand what you said.

3  You said something about numbers being tossed

4  around. I didn't understand that part of your

5  answer. What were you referring to when you

6  said something was tossed around?

7      A. I'm sorry. That's a flip

8  statement. Ratios like this are frequently

9  discussed by the subcommunity of people who

10  deal with arcane issues, such as what are the

11  values of asbestos claims -- people like

12  experts, judges, trust representatives,

13  plaintiffs' lawyers. They attend to and are

14  interested in what are the relative payments

15  made to each of the disease categories.

16         And so it's a subject matter of

17  some discussion, and it's a subject matter --

18  it's a calculation that has been used by

19  courts and experts in other circumstances to

20  set up trust distribution procedures, among

21  other things, to estimate liabilities in

22  bankruptcies and so on.

53

1   Q. So just to simplify it, if I could,

2   the concept here is that claims for other

3   diseases -- that is, diseases other than

4   mesothelioma -- would be expressed and, in

5   your view, it's common for them to be

6   expressed as a ratio of the payment that we

7   made on the mesothelioma claim, correct?

8   A. Yes.

9   Q. So, for example, if you just look

10  at --

11  A. Well, common -- I guess I have

12  some -- it's a calculation that is used and

13  discussed. It's commonality. Nothing is very

14  common when you're dealing with such an arcane

15  issue. But within people that are interested

16  in this, it's a concept that has been used and

17  is used.

18  Q. In your subcommunity, as you've

19  kind of described it?

20  A. Yes.

21  Q. So the basic concept is that if we

22  look at the scheduled values line on Table 6,

53

1   Q. So just to simplify it, if I could,

2   the concept here is that claims for other

3   diseases -- that is, diseases other than

4   mesothelioma -- would be expressed and, in

5   your view, it's common for them to be

6   expressed as a ratio of the payment that we

7   made on the mesothelioma claim, correct?

8   A. Yes.

9   Q. So, for example, if you just look

10  at --

11  A. Well, common -- I guess I have

12  some -- it's a calculation that is used and

13  discussed. It's commonality. Nothing is very

14  common when you're dealing with such an arcane

15  issue. But within people that are interested

16  in this, it's a concept that has been used and

17  is used.

18  Q. In your subcommunity, as you've

19  kind of described it?

20  A. Yes.

21  Q. So the basic concept is that if we

22  look at the scheduled values line on Table 6,

54

1  you have $7,000 for nonmalignant claimants and
2  $200,000 for mesothelioma claimants. And it
3  would just be, in your view, fairly common
4  within this subcommunity to just say, "Well,
5  nonmalignant claimants get 3-1/2 percent" --
6     A.  3-1/2 percent.
7     Q.  -- "of what a mesothelioma claimant
8  would get."
9     A.  No. I mean, I wouldn't agree to
10 the way you've asked your question. The
11 calculation is 3-1/2 percent. So someone who
12 has my set of kind of perverse interests in
13 the values of mesothelioma claims would say,
14 "Okay. Nonmalignants are 3-1/2 percent of
15 meso." That's a kind of calculation and
16 observation that someone like me might make.
17        They would know that the 3-1/2
18 percent is within the range of what you would
19 expect to see for these, and that's reflected
20 in the table above -- and indeed is maybe
21 somewhat conservative.
22    Q.  Typically, that ratio would differ

55

1 from case to case, correct?

2   A.  Well, of course.  That's shown in

3 Table 5.  It differs from case to case, but

4 within a range.  And there's a fairly narrow

5 range of where one would find these numbers,

6 and that's demonstrated to Table 5.

7   Q.  Okay.  So if I could just move

8 forward in the basic building blocks of your

9 methodology here.  You then -- once you've

10 derived your settlement averages, you then

11 figure out a dismissal rate; is that correct?

12   A.  Yes.  You need to do that as well.

13   Q.  And the reason you do that is

14 because your methodology is to calculate what

15 you call an average -- excuse me -- an average

16 resolution cost, correct?

17   A.  Well, the standard methodology is

18 to do that, and that's what I use here, yes.

19   Q.  And that's what you use in your

20 report, is the standard methodology?

21   A.  Yes.

22   Q.  So you calculate an average

56

1  resolution cost. And the average resolution
2  cost is the product of your average settlement
3  value and the dismissal rate, correct? Or the
4  percent paid --
5     A.  There are two parameters that
6  determine the average resolution cost. One is
7  the average settlement amount of money that's
8  paid to someone when they receive a payment.
9  The second parameter is what percentage of
10  people get paid.
11       It's useful to have both of them
12  because you want to look at both of those
13  parameters independently. There may be
14  different determinants of trends in those.
15  There are two things that you may want to look
16  at and -- vary independently. And indeed in
17  our sensitivity analysis we value both
18  independently.
19       So that's why it's commonly -- you
20  do both calculations, and then you generate
21  the product. But it's simpler to explain the
22  calculation and deal with the analysis if you

57

1  multiply them together, those two parameters

2  together, to get the average resolution.

3      Q.  And as part of that process, you

4  have to calculate the dismissal rate -- well,

5  I shouldn't say -- let me not call it the

6  dismissal rate. You call it the percent paid

7  rate on Table 11, so I will use that

8  terminology.

9      A.  Yes. One is the converse of the

10 other -- the complement of the other, but yes,

11 the percent paid rate.

12     Q.  Right. So the dismissal rate --

13 for example, your mesothelioma percent paid

14 rate is 86.603 -- let's just round it to

15 87 percent. Your dismissal rate would just be

16 essentially 1 minus that or, if my math is

17 correct, 13 percent.

18     A.  You do math well for a lawyer.

19     Q.  That was an easy one.

20     A.  The answer is yes.

21     Q.  And I appreciate that.

22         Just tracking through your

58

1  methodology, you take your settlement

2  averages, which are the TDP derived values --

3  that's the middle column on Table 11?

4     A.  This table has the TDP scheduled

5  values.  There's different values in the TDPs,

6  so you need to be precise.  These are the

7  scheduled values from the TDP with the

8  weighted averages for lung cancer and

9  nonmalignants.  That's the second data column

10  on Table 11.

11     Q.  And that's expressed in 2004

12  dollars, right?

13     A.  Yes.

14     Q.  And then you multiply that by the

15  percent paid, and that gives you the

16  resolution cost expressed in 2004 dollars,

17  right?

18     A.  Correct.

19     Q.  And then finally you do a

20  recalculation to turn it into 2001 dollars,

21  right?  And that gives you --

22     A.  We adjust for inflation to get 2001