# EXHIBIT Q



UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Nos. 02-46284 T, 02-46285 T<br>and 02-46286 T<br>Chapter 11 |
| WESTERN ASBESTOS COMPANY,<br>WESTERN MACARTHUR COMPANY,<br>and MAC ARTHUR COMPANY, | Jointly Administered under<br>No. 02-46284 T |
| Debtors. | |

_____/

### MEMORANDUM OF DECISION AFTER CONFIRMATION HEARING

The above-captioned chapter 11 cases came before the above-captioned court for an evidentiary hearing on confirmation of a reorganization plan (the "Plan")[1] beginning on November 10, 2003. The Plan provides for the creation of a trust (the "Trust") to pay asbestos claims against the above-captioned debtors (the "Debtors"). The Trust will be funded with approximately $2 billion in settlement proceeds from two insurance companies (the "Settling Insurers"): i.e., United States Fidelity and Guaranty Company ("USF&G") and Hartford Accident and Indemnity Company ("Hartford"). The settlement agreements and the Plan require the issuance of injunctions, enjoining the prosecution of asbestos claims against the Debtors and

---

[1]As used in this Memorandum, the word "Plan" shall mean the "Second Amended Joint Plan of Reorganization" filed on November 18, 2003 and entered in the Court's docket on November 19, 2003. Capitalized terms utilized but not defined in this Memorandum shall have the meanings ascribed to them in the Plan, including the "Glossary of Terms for the Plan Documents" (the "Glossary"). All references herein to the Plan include the Plan Documents.

the Settling Insurers, among others, channeling asbestos claims to the Trust, and cutting off the contribution rights of certain nonsettling insurers.

To confirm the Plan and to issue the injunctions required by the Plan, the Court must find that the Plan and its proponents (the "Plan Proponents") satisfy the requirements of both 11 U.S.C. §§ 1129 and 524(g). The Court must also find that issuance of an injunction protecting Western Asbestos Company is necessary and that issuance of an injunction protecting the other two Debtors is appropriate pursuant to 11 U.S.C. § 105. In addition, the Plan Proponents have asked the Court: (1) to approve the settlement agreements with USF&G, Hartford, and the holders of certain default judgments against the Debtors and (2) to approve as reasonable a $12.3 million pre-petition payment (the "Bonus") by USF&G to three law firms that represent asbestos claimants and that were largely responsible for negotiating the settlement agreements (the "Bonus Fee Law Firms"). Finally, the Plan Proponents have asked the Court to determine that 11 U.S.C. § 524(g) preempts the nonsettling insurers' rights under state law to participate in the defense of any asbestos claims they might be required to pay.[2]

_____

[2]The Court previously held, in connection with the Plan Proponents' motion for partial summary judgment (the "Summary Judgment Motion"), that the anti-assignment provisions in the nonsettling insurers' insurance policies do not prevent the policies from being transferred to the Trust nor does the transfer of the policies to the Trust increase or diminish the parties' rights under the policies. However, the Court did not base this decision on the doctrine of preemption. Rather, it held that the transfer did not constitute an assignment within the meaning of

The Court finds and concludes that it has jurisdiction under 28 U.S.C. § 1334(b) over these proceedings and that these proceedings are core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(L) & (O). For the reasons stated below, the Court concludes that the Plan should be confirmed, the settlement agreements approved, and the injunctions issued. However, the Court finds the Bonus unreasonable and orders each Bonus Fee Law Firm to pay the portion of the Bonus it received to the Trust or to credit that portion to its contractual percentage of any distributions payable by the Trust to its clients. The Court declines to rule on the issue of whether 11 U.S.C. § 524(g) preempts the nonsettling insurers' right to participate in the defense of the asbestos claims outside the context of an adversary proceeding.

DISCUSSION

**A. BACKGROUND**

The Plan is being jointly proposed by the Debtors, the Official Creditors' Committee (the "Committee"), and the Hon. Charles Renfrew (the "Futures Representative").[3] The Debtors are: (1) MacArthur Co. ("MacArthur"), a distributor and installer of building materials in Minnesota and North Dakota and the parent of Western MacArthur Co. ("Western MacArthur"), (2) Western MacArthur, a distributor and

---

those contractual provisions.

[3]The Futures Representative was appointed by the Court to represent the holders of "future demands": i.e., individuals who are or will become sick as a result of having been exposed to asbestos sold or installed by the Debtors but who are not yet aware of their illness.

3

installer of building materials in Northern California, and (3) Western Asbestos Company ("Western Asbestos"), a defunct company whose assets were acquired by Western MacArthur after it had been operated by MacArthur for two years.[4] The Debtors were major distributors and installers of the products of Johns Manville Corporation ("Johns Manville"), which products contained asbestos. The members of the Committee are all asbestos claimants (or their attorneys).

The filing of this chapter 11 case was precipitated by the Plan Proponents' settlement agreement with USF&G (the "USF&G Settlement Agreement"). The Debtors were in coverage litigation with USF&G in state court for approximately 10 years before reaching a settlement. For many years, USF&G denied that it had ever issued insurance policies to Western Asbestos. As a result, the Debtors asserted bad faith claims against USF&G as well as claims for coverage. At the time the parties settled, they had just completed presenting evidence in Phase I of the state court trial.

The USF&G Settlement Agreement provides that USF&G will pay effectively more than $975 million to resolve permanently its asbestos liability relating to the Debtors. USF&G paid a portion of this amount pre-petition. It paid $160 million to an escrow for the

---

[4]In state court litigation, Western MacArthur was held to be the successor of Western Asbestos, the defunct company, for liability purposes by virtue of its acquisition of the assets of Western Asbestos. The bulk of the asbestos related claims arise from the operations of Western Asbestos in California. A substantially smaller number of claims arise from MacArthur's operations in other states, primarily in Minnesota and North Dakota, and from Western MacArthur's own California operations.

benefit of certain claimants who had obtained default judgments against the Debtors and had direct action rights against USF&G (the "California Default Judgment Claims"), $110 million of which was disbursed pre-petition. Of the balance, $740 million has been paid into the "Claimant Escrow," for payment of asbestos claims. [5] The holders of the California Default Judgment Claims are required to credit the amount they received pre-petition against future payments.

USF&G also paid $40 million into an Expense and Fee Escrow. Of this amount, $30 million was disbursed prior to the bankruptcy filing to pay Debtors' counsel for fees incurred during the USF&G coverage litigation and for work in connection with the USF&G Settlement Agreement. In addition, $35 million was paid into an "Administrative Fund Escrow," to be used for miscellaneous fees and expenses, including future litigation expenses against the other insurers. USF&G also agreed to finance the administrative expenses of the chapter 11 case subject to a right to be reimbursed for these payments under certain circumstances.

Four insurers originally objected to confirmation and participated in the confirmation hearing. The principal objecting insurer was Hartford. After the close of evidence and one full day of closing argument, the Plan Proponents entered into a settlement

---

[5]As discussed below, the amount to be paid by USF&G into the Claimant Escrow will be reduced by $3 million by virtue of a Court approved settlement during the bankruptcy case with certain claimants who asserted a constructive trust against the USF&G settlement funds (the "Constructive Trust Claimants"). The Constructive Trust Claimants will be paid $3 million of the funds deposited in the Claimant Escrow by USF&G in full satisfaction of their claims.

agreement with Hartford whereby Hartford agreed to pay $1,150,185,000 (the "Hartford Settlement Amount") to the Trust to resolve permanently its asbestos liability relating to the Debtors (the "Hartford Settlement Agreement"). A motion for approval of the Hartford Settlement Agreement was filed on December 23, 2003. The Court heard evidence in support of the Hartford Settlement Agreement and approved it on January 9, 2004.[6] At the same time, it approved the USF&G Settlement Agreement, confirmed the Plan, and issued the injunctions authorized pursuant to 11 U.S.C. §§ 524(g) and 105(a).

The Hartford Settlement Agreement requires all of the Hartford Settlement Amount to be used solely in connection with Asbestos Related Claims. Based on this additional contribution, the Plan Proponents estimate that they will be able to make an initial distribution of approximately 29 percent to asbestos claimants with liquidated claims.[7] As other claims are liquidated, the holders of these claims will also receive payment of this percent of their claims. Both settlements are conditioned on confirmation of the Plan and on issuance of injunctions under 11 U.S.C. §§ 524(g) and 105(a), enjoining the prosecution of any asbestos claims against the Settling

---

[6]Approval of the Hartford Settlement Agreement also required approval of ancillary agreements providing the Debtors' subsidiaries the protection of an 11 U.S.C. § 524(g) injunction and other relief in return for their release of Hartford. There was no objection to the ancillary agreements, and the Court approved them.

[7]Whether any further distributions will be made from the Trust to the holders of liquidated asbestos claims depends in part on whether the Trust is able to recover any funds from the nonsettling insurers.

6

Insurers by the asbestos claimants and by the nonsettling insurers: e.g., for contribution or indemnification.

In addition to the funds provided by the Settling Insurers, the Plan provides that the Trust will receive: (1) all of the stock of Western Asbestos, the defunct corporation, (2) a $500,000 promissory note executed by MacArthur, secured by 51% of its stock, payable over 5 years at the rate of $100,000 per year, (3) the benefit of all of the Debtors' rights against the nonsettling insurers, with the exception that $1.0 million of the first $5.0 million in recoveries on account of bad faith business loss claims is payable to the Debtors, and (4) the Debtors' contribution rights against third parties. The asbestos claimants are required to assign to the Trust their direct action rights against the Objecting Insurers.[8]

Three nonsettling insurers ("the Objecting Insurers)[9] objected to confirmation: i.e., Argonaut Insurance Company ("Argonaut"),

---

[8]During the confirmation hearing, the Plan was amended to permit the Trust to allow some or all of the direct action claims to remain with the claimants if necessary to preserve the claims. However, in the event thereof, the Trust would continue to prosecute the claims as the claimants' attorney in fact, and the proceeds of any recovery would be paid to the Trust unless otherwise ordered by the Court.

[9]For convenience, the Court has used the term "Objecting Insurers" to refer to all insurers who objected to Plan confirmation. This usage would include Argonaut, U.S. Fire, and General Accident. However, these insurers did not necessarily join in all of each others' objections or in those asserted by Hartford. In addition, each insurer has a different relationship to the Debtors for a variety of reasons. Therefore, when the Court uses the term "Objecting Insurers," the Court is not necessarily referring to all three insurers: i.e., Argonaut, U.S. Fire, and General Accident.

7

General Accident Insurance Company of America ("General Accident"), and U.S Fire Company ("U.S. Fire") (collectively hereinafter the "Objecting Insurers").[10] Argonaut is in coverage litigation with the Debtors. Hartford filed third party claims against U.S. Fire and General Accident in the coverage litigation brought by the Debtors against Hartford.[11] The Objecting Insurers deny liability for the asbestos claims against the Debtors.

The Plan divides creditors into four classes and divides interest holders into three classes.[12] The Bankruptcy Code requires classes of claims and interests to be designated as "impaired" or "unimpaired." Impairment means any alteration of a claimant's or interest holder's legal or equitable rights. 11 U.S.C. § 1124. Only impaired classes are entitled to vote on a plan. 11 U.S.C. §

---

[10]Two additional insurers who are third party defendants sued by Hartford in the state court coverage action---Interstate Fire & Casualty Company ("Interstate") and Allianz Insurance Company ("Allianz")--objected to approval of the Hartford Settlement Agreement to the extent that it provides Hartford with an 11 U.S.C. § 524(g) injunction, preventing them from seeking contribution from Hartford for any claims against the Debtors they are required to pay. These insurers did not object to confirmation of the Plan and did not participate in the confirmation hearing until this latter stage.

[11]Argonaut issued six insurance policies to Western Asbestos and three insurance policies to Western MacArthur. U.S. Fire insured MacArthur and Western MacArthur. General Accident insured only Western Asbestos.

[12]The Bankruptcy Code provides that administrative claims (i.e., claims incurred after the bankruptcy case was filed) and pre-petition priority tax claims are not to be classified. Their rights may not be impaired: i.e., the Bankruptcy Code specifies how they must be treated. Thus, they are not entitled to vote. The Plan complies with the Bankruptcy Code in its proposed treatment of these two categories of unclassified claims.

8

1126(f). However, other parties in interest may object to a plan on legal grounds as to which they have standing. The only impaired classes in the Plan are Class 4 (the asbestos related claims) and Classes 5B and 5C (the equity interests in Western Asbestos and MacArthur, respectively).

The Plan provides for the establishment of the Trust, which will process and pay the Class 4 claims to the extent possible from the funds contributed by the Settling Insurers and other possible sources of recovery: e.g., hoped for recoveries from the Objecting Insurers. The way in which the Plan will do this is set forth in another document, entitled Trust Distribution Procedures (the "TDP"). As discussed below, 11 U.S.C. § 524(g) requires the Trust to pay claims in such a way that present claims and future demands will receive equivalent payment percentages.

If the Plan is confirmed, holders of claims that have not been liquidated, including future demands, will have three choices: (1) they may have their claims liquidated in accordance with a matrix[13]; (2) they may submit to binding or nonbinding arbitration; and (3) if

---

[13]The matrix (the "Matrix") was negotiated by the Debtors, the Futures Representative, and principal attorneys representing the asbestos claimants prior to the commencement of the bankruptcy case. The Matrix establishes average and baseline values for various types of disease claims in each relevant jurisdiction. These values are based on average settlement amounts for like claims in recent years. The TDP and Matrix provide various criteria specific to the claims and the claimants to be used in fixing the specific claim amount in relation to the average and baseline values. The claims liquidated pre-petition (other than the California Default Judgment Claims and the Miller-Shugart Settlements), and the claims liquidated during the chapter 11 case but prior to confirmation, were liquidated pursuant to the Matrix.

9

they submit to nonbinding arbitration and do not like the result, they may seek a judgment in court.    If the claimants opt for litigation, the Objecting Insurers may participate in the defense of the claims. However, they are precluded from participating in the liquidation of claims pursuant to the Matrix or in arbitration proceedings.    There will be three trustees overseeing the Trust and a Trust Advisory Committee.    The Committee and the Futures Representative will select these individuals, subject, in the case of the trustees, to the approval of this Court.

Confirmation will cause all of the asbestos claims to be "channeled" to the Trust and will result in the discharge of asbestos claims against two of the Debtors.[14]    In addition, the Plan requires the Court to issue an injunction under 11 U.S.C. § 524(g), protecting the Settling Insurers from the "channeled" claims as well as from any claims for contribution or indemnification by the Objecting Insurers.[15]

---

[14]As discussed below, in the memorandum of decision issued in connection with the Summary Judgment Motion (the "Legal Issues Memorandum"), the Court concluded that Western Asbestos is not entitled to a discharge under 11 U.S.C. § 1141(d) or to a supplemental injunction under 11  U.S.C. § 524(g)(4)(A)(ii). However, as discussed below, the Court concludes that Western Asbestos is entitled to an injunction under 11 U.S.C. § 105.

[15]One of the most controversial provisions of the Plan, as originally drafted, was the Debtors' request that the Court "adjudicate" the total amount of the asbestos related claims against the Debtors, including future demands.  Based on the Court's tentative ruling in connection with the Legal Issue Memorandum that it could not "adjudicate" these claims and demands, this provision was removed from the Plan.

10

After confirmation, Western MacArthur and MacArthur will continue to operate their businesses free from the asbestos claims. As a result, the Plan provides that these two Debtors may assume their executory contracts. No objection was raised with respect to this Plan provision, and the Court finds and concludes that these two Debtors are entitled to assume these contracts as provided by 11 U.S.C. § 365.

## B.   ISSUES

To be confirmed, the Plan must satisfy the requirements of 11 U.S.C. § 1129(a). Section 1129(a) sets forth thirteen requirements for confirmation of a chapter 11 plan. See 11 U.S.C. § 1129(a)(1)-(13). As set forth in the Legal Issues Memorandum, the Court concluded that the Plan and the Plan Proponents satisfied eight of these requirements as a matter of law: i.e., 11 U.S.C. § 1129(a)(2), 11 U.S.C. § 1129(a)(5), 11 U.S.C. § 1129(a)(6), and 11 U.S.C. § 1129(a)(9)-(13). The Court reserved judgment, in whole or in part, on whether the Plan and the Plan Proponents satisfy the remaining five: i.e., 11 U.S.C. § 1129(a)(1), 11 U.S.C. § 1129(a)(3), 11 U.S.C. § 1129(a)(4), 11 U.S.C. § 1129(a)(7), and 11 U.S.C. § 1129(a)(8). The Court's findings and conclusions with respect to these issues are set forth in section 1 below.

Section 1123(b)(3)(A) states that a plan may provide for "the settlement...of any claim belonging to the debtor or to the estate;...." The Plan depends for its implementation, primarily, on the proceeds from the USF&G and Hartford Settlement Agreements and on the agreements with the holders of the California Default Judgment

11

claims concerning their treatment under the Plan. The Plan Proponents are asking the Court to approve these settlement agreements as reasonable as part of the confirmation process. The Court's findings and conclusions with respect to these issues are set forth in section 2 below.

Because the Plan contemplates the issuance of certain injunctions, the Plan may only be confirmed if the requirements for issuance of those injunctions are satisfied. The requirements for issuance of these injunctions are primarily set forth in 11 U.S.C. § 524(g)(2) and 11 U.S.C. § 524(g)(4). As set forth in the Legal Issues Memorandum, the Court concluded that the requirements of 11 U.S.C. § 524(g)(2)(B)(i)(I)-(IV), 11 U.S.C. § 524(g)(2)(B)(ii)(I)-(IV), and 11 U.S.C. § 524(g)(4)(B)(I) were satisfied as a matter of law. The Court reserved judgment on whether the requirements of 11 U.S.C. § 524(g)(2)(B)(ii)(V) and 11 U.S.C. § 524(g)(4)(B)(ii) were satisfied. These issues are discussed in section 3 below.

As also discussed in the Legal Issues Memorandum, the Court concluded that Western Asbestos did not qualify for an injunction under 11 U.S.C. § 524(g). The Court concluded that it had the power to issue an injunction under 11 U.S.C. § 105, providing Western Asbestos with protection comparable to an 11 U.S.C. § 524(g) injunction, if it were persuaded that the injunction was appropriate and necessary to an effective implementation of the Plan. However, the Court concluded that the necessity of the injunction had not been established and reserved judgment on this issue until the confirmation hearing. The Plan Proponents have also asked the Court

12

to issue injunction protecting Western MacArthur, MacArthur, and the Settling Insurers under 11 U.S.C. § 105(a), as well as under 11 U.S.C. § 524(g), essentially as insurance, in case the 11 U.S.C. § 524(g) fail. The Court's findings and conclusions with respect to this issue are set forth in section 4 below.

The Plan Proponents contend that some provisions of the Plan preempt state law governing the rights of the Objecting Insurers. The Objecting Insurers contend that their rights may not be preempted by confirmation of a chapter 11 plan. U.S. Fire objects to the Court's determining the preemption issues. It contends that this determination should be left to the state court handling the coverage litigation between the Debtors and the Objecting Insurers. [16] The Court's conclusions with respect to these issues are set forth in section 5 below.

Finally, the Objecting Insurers object to certain "technical" amendments to the Plan filed by the Plan Proponents on November 10, 2003, the first day of the confirmation hearing (the "Second Technical Amendments"). The Court's conclusions with respect to these objections are set forth in section 6 below.

1. SECTION 1129 REQUIREMENTS

As noted above, the Court reserved judgment, in whole or in part, on whether the Plan satisfies 11 U.S.C. § 1129(a)(1), 11 U.S.C. § 1129(a)(3), 11 U.S.C. § 1129(a)(4), 11 U.S.C. § 1129(a)(7), and 11

---

[16] Argonaut and General Accident do not join in U.S. Fire's objection to this Court's determining the preemption issue although they do contend that the determination requires an adversary proceeding.

13

U.S.C. § 1129(a)(8).  As discussed below, the Court now finds that each of these provisions has been satisfied.

a.  **Section 1129(a)(1).**

Section 1129(a)(1) requires the Court to find that the Plan complies with the applicable provisions of the Bankruptcy Code.  The Court reserved judgment on whether the Plan complies with this subsection in two respects.  First, the Court required certain minor changes to be made to the Plan to comply with 11 U.S.C. § 1123(b)(6).  Section 1123(b)(6) permits a plan to include nonmandatory provisions as long as they are not inconsistent with the provisions of the Bankruptcy Code.  These changes were made in the Plan Proponents' Second Technical Amendments to the Plan.  The Court now finds and concludes that the Plan complies with 11 U.S.C. § 1123(b)(6).

Second, the Court reserved judgment on whether the Plan complies with 11 U.S.C. § 1129(a)(1) to the extent that this section incorporates 11 U.S.C. § 1123(a)(4).  Section 1123(a)(4) provides that a chapter 11 plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment for its claim or interest...."  11 U.S.C. § 1123(a)(4).

In connection with the Summary Judgment Motion, Hartford contended that the Plan violated 11 U.S.C. § 1123(a)(4) in several respects: e.g., (1) by paying liquidated claims sooner than unliquidated claims, (2) by permitting payments to the California Default Judgment Claims to be based on judgment amounts whereas payments to most of the holders of liquidated claims would be based

14

on settlement values, as set forth in the Matrix, and (3) by the treatment provided to three groups of claimants, who entered into settlement agreements with the Plan Proponents during the chapter 11 case, which settlement agreements were approved by the Court.    An issue also arose concerning whether the Plan provision permitting the Trust to assign certain direct actions back to claimants (or to permit certain claimants to retain their direct actions) caused the Plan to violate 11 U.S.C. § 1123(a)(4).

In connection with the Summary Judgment Motion, the Plan Proponents responded to most of these contentions.    They also urged the Court to find that the Objecting Insurers had no standing to raise this objection.    As the Court stated in the Legal Issues Memorandum, the Plan Proponents' responses seemed persuasive. However, it reserved judgment on this issue until after the evidentiary hearing on confirmation was concluded.    It also reserved judgment on the question of standing.    The Court now finds and concludes that the Objecting Insurers have no standing to raise this issue.    The Court also finds and concludes that the Plan satisfies 11 U.S.C. § 1123(a)(4).

The Objecting Insurers have standing only to the extent the outcome of an issue directly affects their rights.    See In re P.R.T.C., Inc.; 177 F.3d 774, 777 (9 [th] Cir. 1999)("To prevent unreasonable delay, courts have created an additional prudential standing requirement in bankruptcy cases: The appellant must be a 'person aggrieved' by the bankruptcy court's order."); In re CFLC, Inc., 89 F.3d 673, 675 (9th Cir. 1996).    The Objecting Insurers object

15

to confirmation of the Plan primarily because the 11 U.S.C. § 524(g) injunction will enjoin their contribution rights against USF&G and Hartford.  They also object to confirmation to the extent it is held to preempt any of their rights under state insurance law.  As a result, they desire to block confirmation on any ground available.

While this desire is understandable, it is not sufficient to give the Objecting Insurers standing to object to a requirement for confirmation that does not affect their rights directly.  The Court concludes that the Objecting Insurers' rights are not directly affected by whether the Plan proposes to treat each member of Class 4 precisely the same.

Nevertheless, the Court has an independent obligation to determine whether the Plan satisfies 11 U.S.C. § 1123(a)(4).  After hearing the evidence presented and the argument made, the Court is satisfied that it does.  Clearly, the Plan does not violate this requirement by proposing to pay liquidated claims promptly upon confirmation while deferring payment of unliquidated claims until they are liquidated.  Virtually every chapter 11 plan provides for this disparate treatment.  It has never been considered necessary to separately classify liquidated and unliquidated claims or to defer any distribution until all claims are liquidated as long as sufficient funds are reserved to pay the unliquidated claims when they are liquidated.

Moreover, in a case involving asbestos claims, the requirement of 11 U.S.C. § 1123(a)(4) must be read in conjunction with 11 U.S.C. § 524(g).  To issue an injunction protecting the Settling Insurers,

16

the Court must find that the Trust "will operate through mechanisms...that provide reasonable assurance that the trust will...be in a financial position to pay...present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). If the Plan could not be confirmed unless it required all payments to asbestos claimants to be deferred until all claims were liquidated, this provision would be unnecessary.

The Court is satisfied that, to the extent that certain groups of claims in Class 4 are given "preferential" treatment, this differential treatment is unavoidable or is permitted by 11 U.S.C. § 1123(a)(4) with respect to a class of asbestos claims and future demands. The Court notes that 11 U.S.C. § 524(g)(2)(B)(ii)(V) requires only that "similar claims" be treated in "substantially the same manner."

It is unavoidable that the holders of the California Default Judgment Claims will receive payment from the Trust based on a judgment amount. Their claims were reduced to judgment before the chapter 11 cases were filed. The Court has no power to set these judgments aside. The fact that the holders of claims liquidated pursuant to the Matrix, either pre- or post-petition, will receive payment based on a settlement amount does not violate 11 U.S.C. § 1123(a)(4), particularly since the holders of claims not yet liquidated may insist on litigating their claims through the tort system if not happy with the settlement amount. In addition, the holders of the California Default Judgment Claims have agreed to a

17

less favorable treatment under the Plan to reduce the effect of the difference between the amounts of the claims in these two categories.[17]

The Court is also satisfied that 11 U.S.C. § 1123(a)(4) is not violated by the fact that the holders of the California Default Judgment Claims received $110 million in pre-petition payments and that the Plan does not provide for avoidance of these payments. As noted above, the Plan requires these payments to be credited against the amounts to be received after confirmation. Thus, the holders of these claims will not receive preferential treatment under the Plan as a result of the pre-petition payments.

The Court is also satisfied that the proposed treatment of the Constructive Trust Claimants and of two other groups of claimants, one represented by Baron & Budd (the "Baron & Budd claimants") and another represented by the Law Firm of Jonathan David (the "Jonathan David claimants") is reasonable under the circumstances and does not cause the Plan to violate 11 U.S.C. § 1123(a)(4).

Prior to confirmation, the Court approved the settlement agreement with the Constructive Trust Claimants, providing for payment of $3 million from the Claimant Escrow. There was evidence that Constructive Trust Claimants had entered into a settlement

---

[17]The holders of the California Default Judgment Claims agreed at the time of voting to accept payment of their percentage of the initial distribution based on a reduced amount of their claim. Only if the Trust recovers substantial additional funds will these claimants be entitled to receive an equal percentage based on the full judgment amounts of their claims. The holders of these claims have agreed to this less favorable treatment.

18

agreement with the Debtors some years ago pursuant to which they were promised payment from the first settlement proceeds from USF&G. As a result, they claimed the right to a constructive trust on the USF&G Settlement Amount for approximately $4 million. Counsel for the Futures Representative investigated these contentions and concluded that the holders of these claims had a substantial basis for their contentions.

As a result of the settlement, the holders of the Constructive Trust Claimants accepted $1 million less than the amount claimed and waived their claims against the Debtors. As a result of their waiver of claims against the Debtors, these claimants are not Class 4 claims, and their treatment does not implicate 11 U.S.C. § 1123(a)(4).

The Plan Proponents' settlement agreement with the Baron & Budd claimants provided that the TDP would be amended so that the applicable statute of limitations would be the statute of limitations in the state where the claimant had or could have filed its claim. This amendment applies to all claimants and thus clearly does not cause the Plan to violate 11 U.S.C. § 1123(a)(4). The Plan Proponents' settlement agreement with the Jonathan David claimants permitted those claimants who had filed suit against the Debtors prior to the bankruptcy case to have their claims liquidated pursuant to the Matrix as if they had been liquidated pre-petition. The Court has already concluded that the fact that some of the members of Class 4 have already had their claims liquidated (and thus will be paid sooner) does not cause the Plan to violate 11 U.S.C. § 1123(a)(4).

19

Thus, this amendment does not cause the Plan to violate this statute either.

Finally, the Court is also satisfied that the Plan provision permitting the Trustees, with the consent of the Futures Representative, to allow selected claimants to proceed with direct actions, when to do so would provide a substantial benefit to the Trust, does not cause the Plan to violate 11 U.S.C. § 1123(a)(4). The Plan provides that a claimant permitted to proceed with a direct action will not be permitted to retain any part of the recovery from the direct action and that all of the recovery will be paid to the Trust unless the Court determines that the claimant's retention of some or all of the recovery is reasonable and appropriate in light of all the circumstances. Thus, any recovery that the claimant may be permitted to retain would represent an award based on the substantial contribution made by the claimant in prosecuting the claim rather than a distribution to a Class 4 member on account of its claim. As a result, this provision does not run afoul of 11 U.S.C. § 1123(a)(4) either.

In sum, the Court finds and concludes that 11 U.S.C. § 1123(a)(4) and 1123(b)(6) and thus 11 U.S.C. § 1129(a)(1) have been satisfied.

   b.   Section 1129(a)(3).

Section 1129(a)(3) requires the Court to find that "[t]he plan has been proposed in good faith and not by any means forbidden by law." The Objecting Insurers contend that the Plan was filed in bad faith in an attempt to gain an unfair strategic advantage in the

20

1  state court coverage litigation.  They contend that the Debtors are
2  contributing little to the Trust.  Moreover, they contend that the
3  Debtors have acted in bad faith, both before the bankruptcy case was
4  filed and thereafter.

5      The Court concludes that the Objecting Insurers have standing to
6  raise this objection.  In particular, to the extent that confirmation
7  gives the Debtors an unfair advantage in coverage litigation against
8  the Objecting Insurers or to the extent that the Debtors receive a
9  discharge and the protection of 11 U.S.C. § 524(g) and/or 11 U.S.C.
10 § 105(a) injunctions without making an adequate contribution to the
11 Trust, the Objecting Insurers' rights will be directly and adversely
12 affected.

13     At the start of the case, Hartford filed a motion to dismiss the
14 bankruptcy case, contending that it was filed in bad faith.
15 Hartford argued that the Debtors had no need for bankruptcy, having
16 negotiated "stand still" or "moratorium" agreements with most of its
17 present asbestos claimants.[18]  It contended that the bankruptcy was
18 filed solely for the benefit of USF&G and, as the Objecting Insurers
19 now argue, to obtain an unfair advantage in the coverage litigation.
20
21     The Court has always found this argument unpersuasive.  The
22 Debtors' ability to negotiate "moratorium" agreements with their
23
24     [18]When the Debtors exhausted their available insurance
   coverage to defend against and pay asbestos claims, they entered
25 into agreements with many of the asbestos claimants then asserting
   claims not to oppose their actions as long as the claimants agreed
26 to enforce any resulting judgments only against the Debtors'
   insurers or against the Debtors in a bankruptcy case.

21

present asbestos claimants was clearly based on the pending litigation with USF&G. Evidence was presented that the attorneys for the asbestos claimants recognized that the liquidation value of the Debtors was not substantial and that their interests were better served by cooperating with the Debtors in their attempt to obtain additional insurance coverage.

However, if the litigation with USF&G had been concluded adversely to the Debtors, as it might well have been had the parties not settled, it is unlikely that the Debtors would have been able to continue to negotiate such agreements. If not, liquidation would have been inevitable. Clearly, USF&G would have been unwilling to settle with the Debtors without the protection from future claims that only 11 U.S.C. § 524(g) can provide.

The Plan sets up an asbestos trust for the benefit of present and future holders of asbestos related claims, which relief is not otherwise available in any effective manner outside the parameters of a confirmed chapter 11 plan. Outside of the chapter 11 context, there is no reasonable way to protect the interests of holders of future demands in connection with cash settlements with insurance companies that terminate the insurer's future policy obligations.

The Debtors had a need to reorganize. With the USF&G Settlement Agreement in hand and the prospects for additional settlements with other insurers, the Debtors filed the chapter 11 cases voluntarily to take advantage of provisions of the Bankruptcy Code specifically designed to assist in the reorganization of companies with asbestos-related liabilities. The bankruptcy filing satisfied a condition

22

precedent of the USF&G Settlement Agreement and created the context within which other insurer settlements might occur.

The Debtors' pre-petition "moratorium" agreements with some of the asbestos related claimants benefitted both the Debtors and the holders of claims in question. They were not entered into in bad faith. The alternative would have been for the Debtor to file a liquidation proceeding in the mid-1990s when its available insurance was exhausted. Its decision not to do so and instead to pursue its coverage action against USF&G resulted in substantial benefits for the holders of asbestos related claims.

When the Debtors entered into the USF&G Settlement Agreement, the Debtors no longer had any need for these agreements. Therefore, it was appropriate for the Debtors to seek relief under chapter 11 of the Bankruptcy Code at that time. Moreover, the existing "moratorium" agreements did not eliminate the Debtors' need for chapter 11 relief. At the time of the filing of the chapter 11 cases, there were thousands of claimants with present asbestos related claims who had not entered into "moratorium" agreements with the Debtors, not to mention tens of thousands of future claimants. All of these claimants would have had to agree to enter into "moratorium" agreements with the Debtors for the Debtors not to have had a need to reorganize under the Bankruptcy Code.

Finally, the Court notes that the Plan is supported by the Committee, the Futures Representative, and more than 9,000 holders of asbestos related claims who voted in favor of the Plan. Of those who

23

voted against the Plan, all but two claimants have since expressed their affirmative support for confirmation of the Plan.

The Court agrees that, during the chapter 11 case, the Plan Proponents have attempted to obtain rulings in this case that would provide them with an advantage in the coverage litigation in state court. To the extent that confirmation of the Plan will provide them with those advantages, the relief obtained may not be called unfair. Moreover, given the sparsity of law on these issues, the Plan Proponents cannot be deemed to have acted in bad faith by seeking relief to which the Court has concluded they are not entitled.

The Objecting Insurers assert that the Debtors' bad faith is shown by their unwillingness to contribute more to the Trust. They note that, given the Debtors' net worth and profitability, a contribution of $500,000 is meaningless. They contend that the Debtors' principal contribution: i.e., the proceeds from the USF&G and Hartford Settlement Agreements, either belong to the asbestos claimants already or are without value. For example, they contend that the Debtors would be unable to prove any damages in connection with their claims for business interruption losses. Evidence was presented that the Debtors had been profitable and that their net equity had increased substantially over the last ten years.

This argument ignores the value of the Debtors' bad faith claims against Settling Insurers. As discussed below, the evidence presented at the confirmation hearing convinced the Court that the Debtors had colorable claims for bad faith against each of these two insurers. While the Court cannot allocate to these bad faith claims

24

a specific percentage of the settlement amounts, even if the bad faith claims represent only ten percent of the settlement amount, this gives them a value of approximately $200 million.[19]    By contrast, evidence was presented that the liquidation value of the Debtors' net equity was approximately $17 million and its going concern value was $50 to $60 million.

The Objecting Insurers also contend that confirmation should be denied because in 1993, at a time when their insurance coverage for asbestos claims appeared close to exhaustion, the Debtors had "spun off" a subsidiary representing 70 percent of their value.    In addition, each year since then, insiders paid themselves substantial dividends.    During the year preceding the filing of the bankruptcy case, further cash was drained from the Debtors through the payment of substantial "retention" bonuses to two insiders who were not likely to leave the company had they not been paid the bonuses.

The Debtors presented evidence that the 1993 "spin off" of MacArthur's subsidiary was done for independent business reasons. The Court was not persuaded.    The "spin off" had all the earmarks of a fraudulent transfer.    However, to confirm the Plan, the Court need not find that the Debtors have never performed any act in bad faith. The "spin off" occurred too long ago to affect the Court's ruling on the Plan Proponents' good faith in proposing the Plan.    By contrast,

---

[19]The Court is not deciding here the merit or specific value of any potential bad faith claim that was or could have been raised in a state court insurance coverage action.    Rather, the Court simply determines that the Debtors' contribution to the Trust was substantial.

25

in a chapter 7 case, an individual's discharge may be denied based on a pre-petition fraudulent transfer only if the transfer occurred within one year of the bankruptcy filing.    See    11 U.S.C. § 727(a)(2)(A).

A chapter 7 bankruptcy trustee would probably have been able to avoid as constructively fraudulent transfers the dividends that were paid to insiders within four years of the bankruptcy filing as well as the retention bonuses paid to the two insiders: i.e., transfers made while a debtor was insolvent or rendering the debtor insolvent for less than reasonably equivalent value.  See 11 U.S.C. § 544(b), incorporating state fraudulent transfer law.  However, these payments only totaled a few million dollars.  It would make no sense to deny confirmation and thus block the payment to the asbestos claimants of over $2 billion so that a few million dollars of avoidable transfers could be recovered by the bankruptcy estate.  Moreover, a chapter 11 plan need not provide for the pursuit of all avoiding actions in order to satisfy 11 U.S.C. § 1129(a)(3).          See  11 U.S.C. § 1123(a)(listing mandatory provisions of a chapter 11 plan).

Finally, the Committee and the Futures Representative represented to the Court that, for tax reasons, they would rather have the proceeds from the USF&G and Hartford Settlement Agreements and the remaining claims against the Objecting Insurers transferred to the Trust than to have the Trust own the majority of the Debtors' stock.   The Court is disinclined to "second guess" this decision.

The Debtors, pursuant to the Plan, are availing themselves of provisions enacted by Congress that expressly address the

26

circumstances faced by the Debtors.  The Plan complies with all of the requirements of the Bankruptcy Code and serves a legitimate reorganization purpose in that: (a) Western MacArthur and MacArthur will be viable businesses following the effective date of the Plan and (b) the creditors have overwhelmingly endorsed the approval of their treatment under the Plan.  The Plan is the result of arms'-length negotiations among entities having different and, in some instances, competing interests.  The Debtors filed the chapter 11 cases and the proposed Plan with the legitimate and honest purpose of developing an orderly process to utilize 11 U.S.C. § 524(g) to compensate legitimate asbestos claimants fairly, while preserving the Debtors' businesses.

In sum, the Court finds and concludes that the Plan satisfies 11 U.S.C. § 1129(a)(3).

c.   Section 1129(a)(4)

Section 1129(a)(4) requires the Court to find that "[a]ny payment made...by the debtor...for services or for costs and expenses...in connection with the case, or in connection with the plan and incident to the case,...is subject to the approval of...the court as reasonable."  As noted in the Legal Issues Memorandum, the Bonus Fee Law Firms, representing the bulk of the holders of liquidated asbestos claims, received $12.3 million (the "Bonus") from USF&G as part of the USF&G Settlement Agreement.

In return for this payment, the Bonus Fee Law Firms agreed to recommend to their clients that they vote in favor of the Plan as long as this recommendation was consistent with their professional

27

obligation to their clients.[20]  Because the Court finds that the Bonus would otherwise be available to pay asbestos claims, thereby reducing the amount of the asbestos claims for which the Objecting Insurers are potentially liable, the Court concludes that the Objecting Insurers have standing to object to the reasonableness of these payments.

At the confirmation hearing, the Plan Proponents attempted to persuade the Court that the Bonus was reasonable.  An attorney from one of the Bonus Fee Law Firms testified about the extensive work that he and other attorneys from the Bonus Fee Law Firms performed negotiating the USF&G Settlement Agreement, the TDP, and the Matrix. Another attorney, whose firm had not received any part of the Bonus, testified that he considered the Bonus quite reasonable under the circumstances.

Evidence was also presented that fees such as these have been paid in other chapter 11 cases involving asbestos claims.  For example, in the chapter 11 case of Combustion Engineering, Inc., a $20 million fee of this type was paid to Joseph Rice ("Rice"), one of the attorneys representing asbestos claimants.  See In re Combustion

---

[20]In connection with the Summary Judgment Motion, the Plan Proponents contended that 11 U.S.C. § 1129(a)(4) did not apply to the Bonus because the Bonus was not paid by the Debtors but by USF&G from its own funds.  As set forth in the Legal Issues Memorandum, the Court concluded otherwise.  USF&G had no obligation to pay anything to the Bonus Fee Law Firms and presumably was not authorized by its charter to make them a $12.3 million gift.  The Court concluded that the Bonus can only reasonably be viewed as part of the USF&G settlement amount.  To eliminate this bar to confirmation, the Plan Proponents agreed to submit the Bonus to the Court for its approval as reasonable.

28

Engineering, Inc., 295 B.R. 459 (Bankr. D. Del. 2003). In the
chapter 11 case of Shook & Fletcher, Inc., a $3 million payment of
this type was made to Rice. (Although no decision has been published
in this case, the Plan Proponents offered into evidence copies of the
plan documents evidencing the obligation to make this payment.)

Finally, one of the asbestos claimants' attorneys testified that
the Bonus represented three percent of the amount that USF&G
originally proposed to contribute to the Trust. He explained that,
in a class action, it is generally considered reasonable for the law
firm representing the class to receive three percent of the class
recovery as its fee. When the amount to be paid by USF&G increased,
the Bonus Fee Law Firms agreed not to increase the amount of their
requested fee.

The Court was not persuaded by this evidence that the Bonus is
reasonable. The fact that such payments have been made in other
chapter 11 cases does not mean that they were reasonable, even in
those cases. No evidence was presented that the issue of the
reasonableness of the fee was ever disputed in the Shook & Fletcher,
Inc. case. In In re Combustion Engineering, the fee was objected to
on the ground that it created a conflict of interest between the
attorneys and their clients. The bankruptcy judge sustained the
objection. See In re Combustion Engineering, Inc., 295 B.R. 459
(Bankr. D. Del. 2003).[21]

_____

[21]The parties have advised the Court that this decision was
reversed by the district judge, but that the issue is presently on
appeal to the Third Circuit Court of Appeals. However, the Court
has been unable to verify this.

29

The Bonus Fee Law Firms undoubtedly worked hard and well negotiating the USF&G Settlement Agreement, the TDP, and the Matrix. However, based on estimated hours spent on this task, as set forth in the Disclosure Statement, the Bonus represents an hourly rate of $4,000. Regardless of the attorneys' skill and hard work, this is not a reasonable hourly rate.

Moreover, in performing this work, the Bonus Fee Law Firms were simply doing what they had contracted to do for their clients. Evidence was presented that, pursuant to their contingent fee contracts with their clients, the Bonus Fee Law Firms would receive, based on the USF&G Settlement Agreement alone, from $48 million to $64 million. As a result, of the Hartford Settlement Agreement, they will presumably receive more than twice that amount. They can hardly argue that they will be undercompensated for their efforts absent receipt of the Bonus.

Finally, the Bonus cannot be fairly compared to a fee to class action attorneys. In a class action, the class attorneys will have contracts only with some or all of the named plaintiffs. The recovery of these named plaintiffs individually is generally quite small. Absent a fee based on a percentage of the "common fund" created by the class attorneys' efforts, the attorneys would not be fairly compensated and the other members of the class would be unjustly enriched. That is not the case here.

In sum, the Court concludes that the Bonus is unreasonable. Either the Bonus Fee Law Firms must pay that portion of the Bonus they received to the Trust, or any payments by the Trust to the

30

asbestos claimants represented by the Bonus Fee Law Firms must be reduced by the attorneys' fee portion of the proposed distribution until the Trust is made whole.    The Bonus Fee Law Firms are prohibited from passing on these reductions to their clients.

   d.   Section 1129(a)(7).

   In pertinent part, 11 U.S.C. § 1129(a)(7) requires the Court to find that any creditor who is a member of an impaired class and who voted against the Plan will receive or retain under the Plan, on account of such claim, "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of...[the Bankruptcy Code] on such date...."    This is sometimes called the "best interests test."

   Two members of Class 4, the class of asbestos claimants, which is the only impaired class of claims, voted against the Plan.   As a result, the Court must determine whether these asbestos claimants would receive more in a chapter 7 liquidation than the approximately 29 percent of their claims they stand to receive under the Plan: i.e., the amount of the initial and possibly the only distribution from the Trust.[22]

---

   [22]The Court concludes that the Objecting Insurers do not have standing with respect to this requirement.   True, to the extent they may be liable for the asbestos related claims, the more the holders of those claims receive from the Trust under the Plan, the less potential exposure the Objecting Insurers have.   However, this interest is too general to give the Objecting Insurers standing to object that the Plan does not provide the holders of asbestos related claims with at least as much as they would receive in a chapter 7 liquidation.   Moreover, this interest is sufficiently

31

Evidence was presented that the liquidation value of the Debtors is approximately $17 million without regard to the value of the Debtors' claims against the Settling and Objecting Insurers. The Plan does not propose to pay the asbestos claimants the value of the Debtors' noninsurance assets. As a result, the Plan is not in the best interests of the asbestos claimants if the value of the Debtors' insurance assets would be the same in a chapter 7 case as it is under the Plan (or no more than $17 million less).

If the Plan is not confirmed, the USF&G and Hartford Settlement Agreements will be voided, and a chapter 7 trustee would be required to litigate these claims or to enter into new settlements agreements. Conflicting evidence was presented as to how difficult it would be for a chapter 7 trustee to find counsel to represent the estate in connection with these claims. Evidence was presented that the cost of the Debtors' litigation against USF&G has been substantial. Presumably, the litigation against Hartford would be equally or more expensive.

It was suggested that the attorneys who represented the Debtors in the USF&G litigation in the past would be eager to represent the estate for that purpose. Perhaps. However, evidence was presented that these attorneys had not represented the Debtors on a wholly contingent fee basis. They had also received an hourly rate payment, albeit at a lower than normal rate. Moreover, one of the law firms in question--Brobeck, Phleger & Harrison--has since dissolved. It

protected by the Objecting Insurers' standing to object to the Plan's compliance with 11 U.S.C. § 524(g)(4)(B)(ii).

32

might be difficult to assemble the same team of attorneys that represented the Debtors in the past.

Clearly, a chapter 7 trustee would not abandon the insurance litigation. The trustee would be able to find a competent attorney to handle the litigation on a contingent fee basis. However, there would be an even stronger economic pressure to settle the litigation on a chapter 7 trustee than there was on the Debtors prior to the bankruptcy filing. This would decrease the settlement value of the claims. Moreover, chapter 7 trustees have an inherent incentive to settle claims, rather than to litigate them, so as to make a prompt distribution to creditors. While the Court will not attempt to quantify the effect of these pressures on the value of the claims, the Court is persuaded that the decreased value of the claims in a chapter 7 liquidation would be more than $17 million less than under the Plan.

The Court also concludes that the Plan meets the "best interests" test for another reason. The value of a distribution to creditors is affected by the timing of the payment. The Court is persuaded that, under the Plan, present claims that are liquidated or that agree to be liquidated pursuant to the Matrix will receive an initial distribution at the latest within two years. Normally, in a chapter 7 case, no distribution is made until all claims are resolved.

Conflicting evidence was presented as to how long it would take a chapter 7 trustee to resolve all claims and make a distribution. A witness called by Hartford--William Brandt, Jr. ("Brandt"), a

33

turnaround professional with a national reputation--testified that, if this case were converted to chapter 7, it would likely be concluded in two years.  A witness called by the Plan Proponents-- Susan Uecker ("Uecker"), who frequently serves as a chapter 11 trustee and state court receiver locally--testified that it would take at least five years to conclude a chapter 7 case of this type. The Court found Uecker's testimony more convincing than Brandt's.

The effect of the relative timing of the distribution on its value may be demonstrated by the following hypothetical: Let us assume that a claimant has a liquidated claim for $500,000, the proposed distribution will pay 29 percent of the claim, and 5 percent per annum is a reasonable discount rate.  The claimant would receive $130,000 in either two or five years depending on whether the distribution was made in a chapter 7 case or under the Plan.  The value of the distribution in two years under the Plan would be $117,000.  The value of the distribution in five years in a chapter 7 case would be $98,000, $32,000 less.

Thus, the liquidation value of the Debtors' noninsurance assets would have to provide the claimant with an additional distribution with a value of more than $32,000 to cause the Plan to fail the "best interests" test.  Evidence was presented that, at the most, the liquidation value of the Debtors' noninsurance assets was $17 million.  The holder of a $500,000 claim would have to share this value with the other holders of liquidated claims.  Evidence was presented that, at present, these claims total approximately $2.5 billion.  The Court estimates that the hypothetical claim holder's

34

share of this additional distribution would be approximately $3,400, substantially less than $32,000.

The Plan also provides two other benefits that would not be available to the holders of asbestos related claims in a chapter 7 liquidation.    First, the Plan provides for a limitation on the claimants' attorneys' contingent fees. Normally, contingent fees for asbestos claimants range from one-third to forty percent of the recovery.   The Plan limits the fees that may be charged by attorneys representing claimants receiving distributions from the Trust to twenty-five percent of the amount recovered.    Thus, the Class 4 claimants' distributions under the Plan are enhanced by eight to fifteen percent as compared to distributions that would be made in a chapter 7 case.

With respect to the approximately $1.9 billion presently available to fund the Trust, this Plan provision provides an aggregate benefit to the holders of asbestos related claims of $152 to $485 million as compared to what they would receive in a chapter 7, even assuming a chapter 7 trustee could obtain the same settlements amounts.   If there are further recoveries hereafter, the dollar amount of this benefit will be correspondingly increased.

Second, under the Plan, pursuant to section 5.4 of the TDP, the sum of $160 million paid and to be paid by USF&G to the holders of certain asbestos related claims will be credited against any distributions due these claimants under the Plan. This credit would not be available in a chapter 7 case.    This credit provides a

35

substantial benefit to those claimants not entitled to receive the $160 million payment.

In sum, the Court concludes that the Plan meets the "best interests" test of 11 U.S.C. § 1129(a)(7).

  e.  **Section 1129(a)(8).**

For a chapter 11 plan to be confirmed under 11 U.S.C. § 1129(a), 11 U.S.C. § 1129(a)(8) requires the Court to find that each impaired class of claims has accepted the Plan. As stated above, the only impaired class of claims under the Plan is Class 4, the class of asbestos claimants. Section 1126(c) provides that a class of claims has accepted a plan if creditors holding at least two-thirds in amount and more than one-half in number of the allowed claims voting have accepted the plan. In addition, for injunctions to be issued under 11 U.S.C. § 524(g), at least 75 percent of Class 4 must have voted in favor of the Plan. See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

In opposition to the Summary Judgment Motion, the Objecting Insurers contended that this requirement had not been satisfied. As stated in the Legal Issues Memorandum, at the confirmation hearing, it was contended that a substantial number of the ballots were tainted by benefits received by the claimants or their attorneys in return for their favorable votes. The Court reserved this issue for determination at the confirmation hearing. At the confirmation hearing, it was also contended that the ballot summary should be excluded as hearsay and that the Plan Proponents had not established

36

that they had received the required number and dollar amount of Class 4 votes.

The Court now concludes that Objecting Insurers have no standing to raise these issues. The number of votes in favor or against the Plan and the motives of the claimants that prompted those votes to be cast have no direct adverse effect on the rights of the Objecting Insurers. Moreover, the Court concludes that the objections have no merit.

The hearsay objection to the ballot summary clearly has no merit. The ballot summary was admitted by the Court pursuant to FRE 1006 as a summary of voluminous documents. It is undisputed that copies of the ballots were provided to Hartford, which at the time was taking the lead in objecting to the Plan, well in advance of the confirmation hearing. No evidence was presented that the ballot summary was inaccurate in any respect.

The Court also finds without merit the argument that the Court should disqualify the votes of those groups of asbestos claimants who originally objected to the Plan and who changed their votes based on Court approved settlements. The Court would not have approved the settlements if it had considered them to be in bad faith or to provide the claimants with inappropriate benefits. To the contrary, as stated in the Legal Issues Memorandum, the Court concluded that these settlements were in good faith as a matter of law. Therefore, the votes of these claimants will not be disqualified.

Finally, it was contended that the votes of the claimants represented by the Bonus Fee Law Firms should be disqualified. The

37

Objecting Insurers argued that the Bonus constituted a bribe to the Bonus Fee Law Firms, inducing them to persuade their claimants to vote in favor of the Plan. This argument makes no sense as a practical matter. As discussed above, even before the Hartford Settlement Agreement, the Bonus Fee Law Firms stood to receive $48 to $64 million in contingent fees if the Plan was confirmed. Given these prospects, even if one were to conclude that the Bonus Fee Law Firms would let their pecuniary interests override their professional responsibility to their clients, it is unreasonable to conclude that, without the additional incentive of the Bonus, the Bonus Fee Law Firms would have counseled their clients to vote against the Plan.

In sum, the Court concludes that the Plan satisfies 11 U.S.C. § 1129(a)(8) and 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

### 2. The Settlement Agreements

At present, the Plan depends for its implementation on the Court's approval of the USF&G and Hartford Settlement Agreements. It also requires approval of the Debtors' settlement with the holders of the California Default Judgment claims (the "Default Judgment Settlement"). Section 1123(b)(3) permits a chapter 11 plan to provide for settlement of a claim. When a plan contains such a provision, to confirm the Plan, the Court must conclude that the settlement is "fair and equitable to the estate after considering the following factors: '(a) [t]he probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

38

[and] (d) the paramount interest of the creditors and a proper deference to their reasonable views....'" In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986), as quoted in In re Arden 176 F.3d 1226, 1228 (9th Cir. 1999).[23]

### a. Settlement With USF&G

As recited above, the USF&G Settlement Agreement provides that USF&G will pay $975 million in settlement of all asbestos claims relating to the Debtors, including future claims or demands.  Of this sum, $900 million will be (or already has been) paid to asbestos claimants.  The balance will pay attorneys' fees incurred in connection with the litigation leading to this settlement or will fund future litigation against the Objecting Insurers.

Before settling with Hartford, the Plan Proponents estimated that the proceeds of the USF&G Settlement Agreement alone would be sufficient to fund an initial distribution of 11.5 percent to all present and future claims.  This left the bulk of the asbestos claims unpaid.  If the Debtors' litigation against USF&G were successful, it

---

[23]The Court concludes that the Objecting Insurers have standing to object to these settlement agreements.  The proceeds of the USF&G and Hartford Settlement Agreements are the only guaranteed source of payment for the asbestos claims.  The benefits of the Default Judgment Settlement increase the payments to be made to other claimants.  Nevertheless, while substantial, the proceeds of these settlements will pay only a portion of those claims.  If the Objecting Insurers are found to have provided coverage for those claims, they may be obligated to pay some or all of the remainder of those claims.  Moreover, as discussed in the Legal Issues Memorandum, the 11 U.S.C. § 524(g) and 11 U.S.C. § 105(a) injunctions will cut off their right to obtain contribution from USF&G and Hartford.

39

is possible that USF&G would be required to pay the full amount of the covered claims.

However, evidence was presented that there were substantial obstacles standing in the way of the successful conclusion of the litigation against USF&G. The litigation began in 1993 when Western MacArthur filed an action against USF&G in California state court.[24] The USF&G Coverage Action centered on a dispute between the Debtors and USF&G with respect to asbestos related claims brought against Western MacArthur and Western Asbestos.

USF&G asserted a vast array of legal and factual defenses in connection with the USF&G Coverage Action. At least one of these defenses presented threshold issues of law, which, if resolved adversely to the Debtors, could have resulted in no recovery from USF&G. USF&G also disputed numerous factual issues in connection with the USF&G Coverage Action. Many of these, if resolved adversely to the Debtors, could have resulted in no recovery from USF&G or significantly reduced the amount of any such recovery.

The USF&G Settlement Agreement, entered into by the parties in June 2002, fairly takes into account the probability of Debtors' success in the litigation. In the first place, no one had been able to locate a copy of the applicable policies. This is not surprising given the number of years since the policy terms expired. For years,

---

[24]The litigation came to be captioned *Western MacArthur Co. et al. v. United States Fidelity & Guaranty Co., et al.*, No. 721595-7 (Super. Ct. Calif. Alameda County) (the "USF&G Coverage Action"). Subsequently, the USF&G Coverage Action was amended to include MacArthur as a plaintiff, and Western Asbestos intervened as a plaintiff.

40

USF&G denied having insured Western Asbestos. Ultimately, evidence was uncovered establishing that USF&G had issued insurance to Western Asbestos. Even if successful in establishing USF&G's liability for the asbestos claims, without a copy of the policy, the Debtors might have difficulty proving the extent of the USF&G's coverage.

Another serious obstacle to the Debtors' success in the litigation against USF&G is that USF&G only insured Western Asbestos. Western MacArthur originally contended that, because it had been held to be the successor in interest to Western Asbestos with respect to the asbestos claims, Western Asbestos's insurance should be deemed available to Western MacArthur to pay those claims. The state court rejected this argument. See General Accident v. Superior Court, 55 Cal. App. 4th 1444 (1997).

As a result, MacArthur and Western MacArthur arranged to have Western Asbestos revived so that it could assign the policy to Western MacArthur. Eventually, this effort was successful. However, the policy in question may have contained an anti-assignment clause. Whether the recent assignment of the policy by Western Asbestos to Western MacArthur was invalidated by that clause was an issue that remained to be litigated. The litigation also presented other disputed issues affecting the amount of coverage. Finally, with respect to the Debtors' bad faith claim against USF&G, to prevail, the Debtors would have to establish that USF&G unjustifiably refused to defend Western MacArthur with respect to asbestos claims asserted against it.

41

The USF&G Coverage Action was enormously complex, and trial of the case had been divided into three phrases by the state trial court. It took nearly a decade to bring the case to trial, and the trial of Phase I alone lasted almost four months. Substantial delays would have been occasioned by the trial of Phases II and III of the USF&G Coverage Action. Moreover, entry of judgment would inevitably have been followed by appeals on the contested issues of law, with the potential for reversal and remand for a new trial. As a result, even a favorable final judgment might not have been entered for years. By the end of Phase I of the trial, the Debtors had exhausted the funds available to them to litigate the USF&G Coverage Action.

The Debtors could have proceeded further only on a contingency fee arrangement (to the extent such an arrangement was available), unless the Debtors were to cease their operations and devote the value of their operating assets to the litigation. The delay in payment that would necessarily result if these claims had to be litigated to a conclusion is particularly undesirable here, where the claimants are individuals, many of whom are suffering from terminal diseases. Any delay in resolution of the USF&G Coverage Action would delay or prohibit the Debtors' ability to confirm the Plan, create the Trust, and compensate the holders of asbestos related claims.

The USF&G settlement fairly takes into account the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it. In contrast to accepting the USF&G Settlement, an attempt to proceed to judgment, even without regard to the risk of loss, would have delayed the final resolution of this

42

matter for many years by the requirements of trial, appeals, and possible retrials.

The USF&G Settlement also fairly takes into account the difficulties that could be encountered in the matter of collection. Normally, a plaintiff does not fear being unable to collect a judgment against an insurance company. However, because of the size of the claims at issue here, the Court must also consider this factor in determining the reasonableness of the USF&G Settlement Agreement. Evidence was presented that USF&G is a relatively small insurance company. For that reason, in negotiating the USF&G Settlement Agreement, the Debtors made a point of obtaining the signature of a representative of USF&G's more affluent corporate parent.

Finally, the paramount interest of creditors argues in favor of approval of the settlement. All but two of the more than 9,000 asbestos claimants affirmatively support confirmation of the Plan. As the Plan Proponents noted repeatedly during the confirmation hearing, the only parties objecting to the reasonableness of the USF&G Settlement Agreement are insurance companies who deny any further liability for the claims.

The Debtors were represented in the USF&G Coverage Action by counsel with vast experience in the legal issues the case presented and with more than a decade of factual background. Certain holders of asbestos related claims were represented by counsel with vast experience in these legal issues and with a similar degree of knowledge of the facts. USF&G was also represented by knowledgeable counsel. USF&G had an interest in minimizing the amount they paid in

43

settlement while the holders of asbestos related claims had an interest in maximizing the recovery. As a result, the USF&G Settlement Agreement represented an arms'-length compromise of the type favored by bankruptcy law.

For all of these reasons and based on these facts, the Court finds and concludes that the USF&G Settlement Agreement is fair and equitable to the estate.

### b. Settlement With Hartford

The Hartford Settlement Agreement requires Hartford to pay $1,150,185,000 to the Trust, all of which is required to be used to pay asbestos claims. This amount, in combination with the contribution from USF&G, will permit the Plan Proponents to make an initial distribution to the holders of asbestos claims of approximately 29 percent. Again, although substantial, the contribution will leave the bulk of the claims unpaid. Thus, the Objecting Insurers have standing to object to the Hartford Settlement Agreement.[25]

The reasonableness of the Hartford Settlement Agreement must be examined under the same factors examined in connection with the USF&G Settlement Agreement: (1) probability of success, (2) collection risks, (3) complexity of litigation, and (4) paramount interest of

---

[25]The only insurer to object to the Hartford Settlement Amount as unreasonable was U.S. Fire. U.S. Fire contended that the Hartford Settlement Amount was too small given Hartford's exposure. For the reasons discussed in this section, this objection is overruled. U.S. Fire's other objections address whether the Court may properly issue an injunction under 11 U.S.C. § 524(g) cutting off the Objecting Insurers' contribution rights against USF&G and Hartford. These objections are discussed below.

44