creditors.  Like the Debtors' litigation against USF&G, the Debtors' state court coverage action against Hartford has also been proceeding for some time.  Initially, the claims were being litigated in New York. However, shortly before the chapter 11 case was filed, a new declaratory relief action was commenced by the Debtors in Alameda County, California, and the New York action was dismissed.[26]

Unlike USF&G, Hartford issued insurance to Western MacArthur and did not deny having done so.  Rather, it defended and paid asbestos claims for many years under the Debtors' "products hazard" coverage based on the Debtors' activity as a distributor of asbestos products. However, that line of coverage had an aggregate limit.  When Hartford's payouts reached that limit, Hartford informed the Debtors that their coverage had been exhausted.  The Debtors did not challenge that determination.  To the contrary, they obtained advantages from third parties by representing to them that their available insurance coverage had been exhausted.

Later, it was suggested to the Debtors that Hartford might have improperly applied some or all of the payments to the Debtors' "products hazard" coverage.  Hartford also insured the Debtors for its operations as an installer of asbestos products.  The operations line of coverage had no overall aggregate limit (although it did have a per occurrence limit).  It is undisputed that the Debtors had substantial activity as installers of asbestos products and that none

---

[26]The evidence presented did not establish how far the Alameda County action has progressed.

45

of the payments made by Hartford were applied to this line of coverage.

These facts formed the basis for the Debtors' claims, both for coverage and for bad faith. However, due to the number of years that had passed, the Debtors would have had difficulty establishing what portion of the payments should have been applied to the operations line of coverage, if any, let alone that the decision not to apply those payments to the operations line was made in bad faith. Hartford also contended that, among other things, the Debtors should be estopped from asserting their coverage claim as a result of having failed to assert it for so long and having represented to third parties, to their advantage, that their insurance coverage was exhausted.

No evidence was presented that there would be any difficulty in collecting a judgment against Hartford. To the contrary, evidence was presented that, recently, Hartford had reserved for its potential liability in connection with the asbestos claims against the Debtors. However, as the discussion above reflects, the coverage litigation was extremely complex. As discussed above, the inevitable delay that would result if the claims had to be litigated is a particularly negative factor given the identity of the claimants. The paramount interest of creditors also argues strongly in favor of approval of the Hartford Settlement Agreement.

Unlike the USF&G Settlement, the Hartford Settlement Agreement was reached during the confirmation hearing and thus was not included in the form of the Plan distributed to creditors and on which they

46

voted.  The Court did not require a new solicitation of votes and approved limited notice of the motion to approve the settlement. However, the Court is confident that the same claimants who voted in favor of Plan also support the Hartford Settlement Agreement.

The Court bases this conclusion on the fact that the Committee, which represents most of the present asbestos claimants, supports the Hartford Settlement Agreement.  Notice has been given to counsel for those present claimants who are not on the Committee, and none has objected to the proposed settlement.  The only objecting parties are the Objecting Insurers.  The claimants have an immediate incentive to object to an inadequate settlement.  The Objecting Insurers will only have a stake in the adequacy of the settlement if they fail to prevail in the coverage litigation with the Trust.

In sum, the Court finds and concludes that the Hartford Settlement Agreement is fair and equitable to the estate.

c. **Settlement With Holders of California Default Judgment Claims**

Section 5.4 of the TDP sets forth the terms of the Default Judgment Settlement.  The Court concludes that the Default Judgment Settlement was negotiated in good faith and is reasonable, fair, and equitable, and in the best interests of the Debtors' bankruptcy estates.  Therefore, the Court will approve the settlement as part of the Plan.

The Default Judgment Settlement provides for a credit of $160 million received and to be received directly from USF&G against any distribution due from the Trust.  This benefit is substantial when

47

compared to the likelihood of success in litigation. Substantial impediments exist to setting aside a final state court judgment, including: (1) the expiration of the time period to do so under applicable state law, in this case, section 473(b) of the California Code of Civil Procedure, (2) the requirement that final state court judgments be afforded res judicata and full faith and credit effect; (3) the fact that similar moratorium agreements in other cases have been found permissible in published decisions by the California state courts, (4) the fact that no apparent authority exists to attack collaterally a state court judgment liquidating a tort claim on the basis that the state court reviewing the evidence determined the amount of the judgment incorrectly; and (5) the fact that forbearance can be found to be an element of reasonably equivalent value.

The Default Judgment Settlement fairly takes into account the probability of success in the litigation. Substantial delays would have been occasioned by the assertion of fraudulent transfer actions against the holders of the California Default Judgments because such actions would have likely been required to be brought in the state court system as a result of the *Rooker-Feldman* doctrine. This is particularly true in connection with a personal injury or wrongful death claim, where a bankruptcy court is not permitted to resolve the amount of the claim. See 28 U.S.C. § 157(b)(5). Prosecution of such actions in the state courts, together with appeals and liquidation of the underlying claims, could have delayed confirmation for years, thereby putting the USF&G Settlement in jeopardy.

48

1
2
3
4
5
6
7
8
9
10
11

    The Default Judgment Settlement fairly takes into account the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it. The Default Judgment Settlement eliminates the ability of the Debtors or the Trust to contest the liability evidenced by the California Default Judgments claims under applicable state law. It also eliminates the ability of all parties to contest the validity of the California Default Judgment claims based upon rights arising under the Bankruptcy Code (including under 11 U.S.C. § 544, which incorporates state law avoiding powers). No issue of collectability is presented by an action to reduce the amount of a claim.

12
13
14
15
16
17
18
19

    As noted above, all but two of the more than 9,000 claimants affirmatively support confirmation of the Plan. The Committee and the Futures Representative also support the Default Judgment Settlement. For all of the reasons stated above, the Court concludes that the paramount interest of creditors supports approval of the Default Judgment Settlement and that the Default Judgment Settlement should be approved.

20
21
22
23
24

### 3.  SECTION 524 REQUIREMENTS

    As noted above, the Court reserved judgment on whether the Plan Proponents had satisfied the requirements of 11 U.S.C. § 524(g)(2)(B)(ii)(V) and 11 U.S.C. § 524(g)(4)(B)(ii) for issuance of the injunctions contemplated by the Plan.[27] Set forth below are the

25
26

---

[27]As set forth in the Legal Issues Memorandum, the Court concluded that Western Asbestos could not receive a discharge under the Plan nor could it qualify for the protection of an injunction under 11 U.S.C. § 524(g). However, the Court concluded that,

Court's findings and conclusions with respect to these issues after hearing the evidence presented and argument made at the confirmation hearing.

    a.  **Section 524(g)(2)(B)(ii)(V).**

    To issue the injunctions contemplated by the Plan, as authorized by 11 U.S.C. § 524(g), 11 U.S.C. § 524(g)(2)(B)(ii)(V) requires the Court to find that:

> ...the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mechanisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

The Plan Proponents do not contend that the Objecting Insurers lack standing to address this issue.[28]  The Plan provides that the asbestos

_____

pursuant to 11 U.S.C. § 105, it had the power to issue an injunction that would provide Western Asbestos with comparable protection if it were persuaded that such an injunction was necessary or appropriate for the effective implementation of the Plan.  This issue is discussed in section 4 below.

    [28]The Plan Proponents ask the Court to determine as part of the confirmation process that, to the extent the state court determines that the Objecting Insurers are liable for the asbestos claims, the Objecting Insurers must pay these claims in the amounts liquidated pursuant to the Matrix and TDP.  Therefore, the Plan Proponents want the Objecting Insurers' objections to the Matrix and the TDP to be considered and rejected by the Court as a substitute for the Objecting Insurers' rights under state law to participate in the defense and/or settlement of the claims.  The Court's views on this issue are set forth in section 5 below.

50

claims liquidated pursuant to the Matrix will constitute judgments against the Debtors.[29]

### (1) Valuation of Claims

Section 524(g)(2)(B)(ii)(V) requires the Court to find that the TDP and Matrix provide reasonable assurance that the Trust will value present claims and future demands involving similar claims in substantially the same manner. The Court finds and concludes that the TDP and Matrix do provide that assurance.

The asbestos claims to be paid by the Trust will be valued based on the Matrix and pursuant to the procedures set forth in the TDP. The Matrix and the TDP were established prior to the commencement of the chapter 11 case. The Plan Proponents presented evidence as to how the figures in the Matrix were established. The Matrix establishes average settlement values for three jurisdictions and for five types of diseases.

The Plan Proponents' witnesses testified that, in establishing the Matrix amounts, the parties negotiating the Plan and the Matrix obtained settlement figures from some of the law firms participating in the negotiations. Based on this information, the parties

---

[29]As stated in the Legal Issues Memorandum, the Court overruled an objection to the Plan, as amended, providing that a claim liquidated pursuant to the Matrix would constitute a judgment against the Debtors as well as against the Trust. However, the Court did not purport to rule on the enforceability of such a judgment against the Objecting Insurers. See Wolkowitz v. Redland Ins. Co., 112 Cal. App. 4th 154, 164 (2003)(bankruptcy court order allowing claim is not binding on an insurance company).

51

negotiated the Matrix amounts.[30]    Attorneys from Minnesota and California and attorneys representing claimants with each type of disease participated in the negotiations.  The Futures Representative also participated in the negotiations and was satisfied with the outcome.

Hartford contended that the Matrix figures are too high.  They offered evidence of matrices established in other cases with much lower values for similar diseases.  The Plan Proponents presented evidence that these cases were distinguishable.  The Court was persuaded by the evidence presented that, historically, judgments and thus settlements of asbestos claims in Northern California have been substantially higher than in other jurisdictions.  In the cases cited by Hartford, with matrices containing lower claim values, the claims were not primarily incurred in Northern California as they were here.

The Objecting Insurers also objected that the TDP did not require sufficient evidence to establish a right to payment.  The TDP and the Matrix provide for base amounts of claims based on different types of diseases in different jurisdictions.  They also set forth factors that will permit claims to be adjusted, either higher or lower.  The Objecting Insurers object to the fact, for example, that the TDP does not require an asbestos claimant with a claim for lung

---

[30]Testimony was provided that this case presented a particular difficulty in establishing appropriate Matrix amounts.  As a result of their "stand still" or "moratorium" agreements with key law firms representing asbestos claimants, the Debtors had not been settling cases for the last ten years.  As a result, it was necessary to construct likely settlement amounts for the Debtors based on settlement figures for comparable companies.

cancer to provide the Trust with an X-ray. They contend that it should do so and that the Trust should employ a panel of expert radiologists: i.e., called "B-readers," who are certified to read X-rays of this type. Similarly, they contend that the TDP should require three pulmonary function tests ("PFTs"), not simply one, and that the tests should show consistent results.

The Plan Proponents respond that the Matrix and the TDP are appropriately designed to fulfill the purpose of the Plan: i.e., to duplicate what occurs during the typical settlement process, not to require a claimant to submit the type of evidence it would be required to provide at trial. Evidence was presented establishing that insurance companies settle and pay asbestos claims pursuant to matrices requiring substantially less evidence than the TDP and the Matrix require.

As the Plan Proponents noted, requiring the asbestos claimants to present more evidence than would be required in a normal settlement context, would present two problems. First, it would increase the transaction costs, for both the Trust and the claimants. Second, it would discourage claimants from settling for the Matrix amount so that more claimants would be likely to insist on litigating their claims. While these claimants would be required to present more evidence in support of their claims in that context, if they prevailed, they would receive judgments for much higher amounts than provided by the Matrix.

The Court was persuaded by the evidence presented and argument made by the Plan Proponents on this point. In sum, the Court finds

53

and concludes that, by virtue of the Matrix and the TDP, it is reasonably certain that the Trust will value present claims and future demands involving similar claims in substantially the same manner as required by 11 U.S.C. § 524(g)(2)(B)(ii)(V).[31]

### (2) Payment of Claims

Section 524(g)(2)(B)(ii)(V) also requires the Court to find that the TDP and Matrix provide reasonable assurance that the Trust will be in a financial position to pay present claims and future demands involving similar claims in substantially the same manner. The Court finds and concludes that they provide that assurance.

Under the Plan, liquidated asbestos claims will be paid in accordance with the procedures set forth in the TDP. The initial payment percentage was calculated based on the funds available from the USF&G Settlement Agreement. This percentage was based in large

---

[31]The Objecting Insurers also complained that, even if adequate evidence was required by the Matrix and TDP in theory, there was no guaranty that it would be required in practice. A representative of one of the insurers reviewed some of the claims files of liquidated claims. Testimony was provided that, in a substantial percentage of the files, evidence required by the TDP and Matrix was missing. In rebuttal, the Plan Proponents reviewed the same files and persuaded the Court that only a few files lacked the required evidence and that the files reviewed by the insurer were not selected at random. Nevertheless, the Court is persuaded that, in practice, it is likely that there will be oversights and that asbestos claims may be paid by the Trust without submission of all the evidence required by the TDP and Matrix. However, the Court also concludes that it is likely that this would occur in a normal settlement context, where a group of claims are settled in accordance with a matrix. Moreover, 11 U.S.C. § 524(g)(2)(B)(ii)(V) only requires "reasonable assurance" that similar claims will be treated in substantially the same manner. "Reasonable assurance" does not require a guaranty of perfect performance.

54

part on the values established by the Matrix and the projections of future asbestos claims against the Debtors prepared by Dr. Mark Peterson. Dr. Peterson projected future claims against the Debtors through 2039.

The Committee called Dr. Peterson as an expert witness at the confirmation hearing. Dr. Peterson has a law degree from Harvard and a Ph.D in experimental social psychology from UCLA. He worked for Rand Corporation for approximately 25 years and still consults for it. He first became involved in studying asbestos and other mass tort claims in a litigation setting in the early 1980s. Since then, he has been retained as the court's expert for this purpose in several major mass tort cases, including the A.H. Robbins Company chapter 11 case. In 1990, he was asked by the district judge handling the Johns Manville bankruptcy case to take responsibility for oversight of the Manville trust. He is still serving as special adviser to that trust. He also currently has a variety of engagements in recent bankruptcy cases filed by distributors and installers of asbestos products.

Dr. Peterson testified that, in late 2000, he was employed by the pre-petition claimants' committee to assist in establishing the values for different asbestos related disease claims for use in the Matrix and to estimate the number of the Debtors' future claims in each disease category. Dr. Peterson testified that, normally, he would not have to calculate the current Matrix values. They would be based on current settlement amounts. However, in this case, no such data existed because the Debtors had not been settling claims for

the last ten years: i.e., as a result of the "stand still" agreements with the major plaintiffs' firms.

As a result, Dr. Peterson was required to use the claims data of comparable defendants: i.e., distributors of thermal insulation products.[32] He compared the claims settlement amounts of those defendants with the Debtors' claims settlement amounts at the end of the period in which the Debtors were still settling claims. He used the relationship established by that comparison to estimate the Debtors' likely claims settlement amounts at present. These figures were used by the Plan Proponents as a basis for the negotiation of the Matrix values.[33]

Dr. Peterson testified that, in estimating the number of future claims, he used the primary epidemiolgical study that forecasts the number of future deaths from mesothelioma and lung cancer: i.e., the Nicholson study.[34] From the data related to past claims for these

---

[32]The Objecting Insurers attempted to discredit the comparable defendants chosen by Dr. Peterson for this purpose. However, the Court was not persuaded that his choices were inappropriate.

[33]The Matrix contains two values for each disease type in each jurisdiction: i.e., an average value and a lower baseline value. The baseline value includes certain assumptions about the claimant. To the extent that the claimant has certain additional attributes (or lacks some of the assumed attributes), the baseline figure will be adjusted upward or downward to liquidate the claim. The average value will not be used to liquidate the claim. Rather, it was used to calculate the amount of estimated future claims in order to control the cash flow so as to ensure that sufficient funds were reserved to pay future claims an equivalent amount as present claims.

[34]The Nicholson study was done in the early 1980s. Later another study, referred to as the KPMG study, purported to modify the forecast made by the Nicholson study. However, according to

56

diseases against the Debtors, he determined what might be called the Debtors' "market share" of future deaths from these causes.[35] He used this "market share" to estimate the future number of claims against the Debtor for mesothelioma and lung cancer. With respect to those asbestos related diseases not covered by the Nicholson study, Dr. Peterson projected the number of future claims against the Debtors by assuming that those numbers would increase (and decrease) correspondingly with the numbers of mesothelioma and lung cancer claims.

The Futures Representative called Dr. Francine Rabinowitz as an expert witness. Dr. Rabinowitz testified that she was engaged by the Futures Representative to assist him in evaluating Dr. Peterson's estimation of appropriate Matrix values and numbers of future claims. Dr. Rabinowitz has a Ph.D from Massachusetts Institute of Technology in what is now called policy analysis. She taught at University of Southern California for over twenty years and is now a professor emeritus at that institution. She is currently the executive vice president of a consulting firm that specializes in policy analysis and the estimation of claims in mass tort litigation.

Dr. Rabinowitz's first engagement relating to asbestos claims was in the mid-1970s as an estimator for two judges in Ohio, a

---

Dr. Peterson, the actual claims history since then has been more consistent with the Nicholson study than with the KPMG study.

[35]Although the Debtors had not been settling claims for the last ten years, claims continued to be asserted against the Debtors during that period. As a result, Dr. Peterson had available actual data concerning the number of claims against the Debtors in recent years.

57

federal district judge and a state court judge, who together were handling a special docket for asbestos claims. Later, she served as the estimator in the Celotex bankruptcy case and currently is serving as the estimator for the Futures Representatives in the Owens Corning bankruptcy case and in the AC&S bankruptcy case.

In this case, at the request of the Futures Representative, Dr. Rabinowitz did independent calculations of appropriate Matrix values for claims and projections of future claims against the Debtors for each type of disease in California through 2049. She did not look at claims in Minnesota or North Dakota. She used the same settlement values of comparable companies used by Dr. Peterson which were provided to them by asbestos claimants' counsel. Based on her calculations, Dr. Rabinowitz advised the Futures Representative that the numbers projected by Dr. Peterson were reasonable. She testified that her own numbers were somewhat higher.

To rebut this evidence, Hartford called Dr. Gustavo Bamberger as an expert witness. Dr. Bamberger has a Ph.D in economics from the University of Chicago School of Business. He is currently employed by a consulting firm that specializes in the application of economics to legal and regulatory issues. Although he has never before testified in court regarding estimates of future asbestos claims, he has been engaged to estimate asbestos claims in the past and is currently engaged to do so in several matters.

At Hartford's request, Dr. Bamberger reviewed Dr. Peterson's analysis of future claims. He concluded that the range of estimates of pending and future liabilities provided by Dr. Peterson was too

narrow.    He  expressed  the  opinion  that  there  was  much  more uncertainty  about  the  likely  range  of  potential  outcomes.    In particular,  he  offered  the  opinion  that  the  claims  might  be  much lower  in  number  than  projected  by  Dr.  Peterson.

Dr.  Bamberger  testified  that  one  of  the  reasons  for  the uncertainty  in  the  number  of  future  claims  was  the  length  of  the period  covered  by  the  projections.    Another  reason  was  the  lack  of current  settlement  information  pertaining  to  the  Debtors.    A  third was  the  possibility  that  Congress  will  pass  legislation  dealing  with asbestos  claims.    He  noted  that  Dr.  Peterson's  analysis  simply ignored  this  third  factor.    However,  Dr.  Bamberger  offered  no alternative  projection  for  use  by  the  Plan  Proponents.

The  Court  concludes  that  Dr.  Bamberger's  testimony  fails  to discredit  the  figures  used  to  set  Matrix  values  and  to  project  future claims.    If  the  asbestos  claims  are  fewer  than  projected,  the  only harm  that  will  have  occurred  is  that  the  Trust  will  have  reserved excessive  funds.    This  harm  can  be  remedied  by  making  an  additional distribution.    The  TDP  provides  for  such  adjustments  based  on  the actual  experience  of  claims  filed.

There  is  no  reasonable  way  to  factor  into  the  analysis  the possibility  that  Congress  may  provide  a  legislative  solution  to  the asbestos  claims  crisis.    Whether  this  will  ever  occur,  when,  and  how it  would  affect  a  case  with  a  confirmed  plan  cannot  be  predicted  at this  time.    The  inability  to  do  so  should  not  prevent  the  use  of  11 U.S.C.  §  524(g)  to  resolve  and  pay  asbestos  claims  in  the  meantime.

The  Objecting  Insurers  also  objected  to  certain  limitations

59

placed by the TDP on the payment of certain types of asbestos claims liquidated post-petition.   These limitations are referred sometimes as "caps" and "collars."   As set forth in section 2.5 of the TDP, 88.35 percent of the annual maximum payment to be made by the Trust will be used to pay claims against Western Asbestos and Western MacArthur for claims in all disease categories, 11.05 percent will be used to pay claims against MacArthur in all disease categories in Minnesota, and .60 percent will be used to pay claims against MacArthur in all disease categories in North Dakota.   Within these amounts, ratios are also set for each category of claim.

Evidence was presented that these "caps" and "collars" were created by the Plan Proponents based on the breakdown of past claims asserted against the Debtors.   Testimony was provided that these "caps" and "collars" were established to "sound an alarm" if the breakdown of claims filed against the Trust after confirmation differed noticeably from the claims asserted before confirmation. Claims of questionable validity have apparently been presented and paid in other asbestos related chapter 11 cases, causing the trusts to exhaust prematurely the funds available for payment of legitimate asbestos claims.[36]   The Court was persuaded that the presence of the "caps" and "collars" promoted rather than inhibited equal payment of present and future claims.

---

[36]Testimony was provided that this problem had been caused in other cases in large part by attorneys who "recruit" claimants, providing their own screening doctors.

Finally, the Objecting Insurers objected that the Matrix values were set too high because no one who participated in setting the values had an incentive to keep those values down.   Their only interest was how to "divide the pie."   This contention has some merit.    Evidence was presented that the plaintiffs' attorneys disagreed about which diseases should be included and what percentages should be allowed for each disease and jurisdiction.   The Futures Representative was mainly concerned that sufficient funds were preserved for future claims.   As long as the Matrix value for all claims were set equally high, none of their constituencies would be harmed.

However, the Matrix values were established by reference to the projections performed by Dr. Peterson.   Granted, he calculated those values using in part current settlement figures for comparable defendants provided to him by asbestos claimants' counsel.   However, the Court was persuaded that the asbestos claimants acted in good faith in collecting and providing that data.    No evidence was provided that suggested that the figures were fabricated or doctored.[37]

In sum, the Court finds and concludes that the TDP provides reasonable assurance that, by virtue of the TDP and through such

---

[37]Additionally, the Objecting Insurers only have standing to raise this issue if the Court concludes that the value of an asbestos claim fixed pursuant to the Matrix will bind the Objecting Insurers if they are found liable for those claims in the state court coverage action. As discussed below, in section 5, the Court declines to determine this issue as part of the confirmation process.

mechanisms as pro rata distributions, the Trust will be in a financial position to pay present claims and future demands involving similar claims in substantially the same manner as required by 11 U.S.C. § 524(g)(2)(B)(ii)(V).

    b.  **Section 524(g)(4)(B)(ii).**

    To issue the injunctions contemplated by the Plan, as authorized by 11 U.S.C. § 524(g), the Court must also find that:

> ...identifying such debtor or debtors, or such third party...in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party.

Because the amount contributed to the Trust affects the unpaid balance of the asbestos claims, for which the Objecting Insurers may be liable, the Objecting Insurers have standing to object to the sufficiency of the evidence satisfying this requirement.  However, their objection is overruled.  The Court concludes that identifying Western MacArthur, MacArthur, USF&G, and Hartford is fair and equitable in light of the benefits they are providing to the Trust.

    The Debtors are not contributing any stock to the Trust, except as security for their obligation to pay $500,000 to the Trust. This sum is modest as compared to the Debtors' net worth.  The Court agrees with the Objecting Insurers that, if the only thing of value being contributed to the Trust by the Debtors was a $500,000 promissory note, they would not be entitled to an injunction under 11 U.S.C. § 524(g).

The Debtors are also contributing what has been described as their "business loss claims" to the Trust. According to the Objecting Insurers, the Debtors' business loss claims are valueless because the Debtors' business was not interrupted by the asbestos related claims. By entering into the "moratorium" or "stand still" agreements with asbestos claimants, the Debtors' business was able to continue to operate and to flourish. The Objecting Insurers presented evidence that the net equity of the Debtors' businesses had increased substantially over the last ten years. According to the Objecting Insurers, the Debtors' coverage claims do not belong to them. Any payment on account of asbestos claims belongs to the asbestos claimants.

However, the Debtors' business loss claims include their potential bad faith claims against USF&G and Hartford as well as the remaining Objecting Insurers. These assets are all being transferred to the Trust.[38]  As reflected above, the claims against USF&G and Hartford proved to have great settlement value. The claims against the Objecting Insurers also have potential value. These values far exceed the Debtors' net worth, as demonstrated by the USF&G and Hartford Settlement Agreements.[39]

---

[38]As noted above, the Committee and the Futures Representative have made a business judgment that, for tax reasons, among other things, it would be better for the Trust to own the Business Loss Claims than to own a majority of the stock in a company that owns the Business Loss Claims.  The Court finds that they have properly exercised their business judgment in making this decision.

[39]During the Confirmation Hearing, Argonaut stipulated in a "Stipulation" dated November 10, 2003 and entered in the Court's

As discussed in connection with the USF&G and Hartford Settlement Agreements, there was substantial evidence to support the Debtors' bad faith claims against USF&G and Hartford.[40] Some portion of the over $2 billion being contributed to the Trust pursuant to the USF&G and Hartford Settlement Agreements must be attributed to those claims. These claims belong to the Debtors, not to the asbestos claimants. While the Court is not able to ascribe a specific value to these claims, the Court is persuaded that their value is in excess of the value of the Debtors' net liquidation value: i.e., $17 million. The Court finds the contribution of the Debtors' bad faith claims sufficient to justify the issuance of an 11 U.S.C. §§ 524(g) injunction. Moreover, the Debtors are also contributing all of the stock of Western Asbestos to the Trust. Since Western Asbestos was the party insured by USF&G, the contribution of its stock arguably has a value of close to $1 billion.

The Objecting Insurers, and now Allianz and Interstate, also object to the issuance of 11 U.S.C. § 524(g) injunctions, cutting off their right to seek contribution from USF&G and Hartford. U.S. Fire

---

docket on November 12, 2003 that claims against it, including bad faith claims, "would have substantial value in the context of these Bankruptcy Proceedings if the Debtors prevail in the Coverage Litigation" and that "Argonaut agrees that MacArthur's claim has substantial settlement value." No evidence was presented at the confirmation hearing suggesting that the Debtors had a basis for bad faith claims against the other Objecting Insurers.

[40]As noted above, by finding that the Debtors' bad faith claims were of sufficient value to justify the issuance of the injunctions, the Court is not actually deciding the merits or specific value of the Debtors' potential bad faith claims against any insurer.

64

argues that USF&G's and Hartford's contributions are not sufficient to justify such an injunction. The Court disagrees. As discussed in a preceding section, while the Settling Insurers' potential exposure is enormous, numerous obstacles stood in the way of the Debtors prevailing in their coverage action against the Settling Insurers.

The Committee and the Futures Representative have determined that the Debtors' contributions to the Trust are fair and equitable in light of the benefits provided and to be provided to the Trust on their behalf, thereby justifying the issuance of a channeling injunction in respect to the holders of future demands. The Court agrees with this determination.

The Court also finds that USF&G is contributing a sufficient amount to the Trust to justify the issuance of an injunction. USF&G will have contributed in excess of $900 million to resolve the asbestos related claims against the Debtors. Of these settlement funds, $740 million will be used to establish the Trust. Another $160 million will be credited against certain distributions due from the Trust. The Trust will utilize these funds to satisfy the asbestos related claims pursuant to the terms provided in the Plan.

The Committee and the Futures Representative have determined that USF&G's contributions to the Trust are fair and equitable in light of the benefits provided and to be provided to the Trust on their behalf, thereby justifying the issuance of a channeling injunction in respect to the holders of future demands. The Court agrees with this determination. USF&G is alleged to be directly or indirectly liable for the asbestos related claims against Western

65

Asbestos and Western MacArthur because it provided insurance to Western Asbestos, which insurance has been assigned to Western MacArthur.

In light of the benefits being contributed to the Trust by USF&G, the protection provided to USF&G by the injunction to be issued pursuant to the Plan is fair and equitable with respect to the persons that might subsequently assert asbestos related demands that are to be paid in whole or in part by the Trust. Therefore, the issuance of an injunction in favor of USF&G comports with the requirements of 11 U.S.C. § 524(g)(4)(B)(ii).

Similarly, the Court also finds that Hartford is contributing a sufficient amount to the Trust to justify the issuance of an injunction protecting it and its related parties. Hartford will have contributed in excess of $1.15 billion to resolve the asbestos related claims against the Debtors. The Trust will also utilize these funds to satisfy the asbestos related claims pursuant to the terms provided in the Plan.

The Committee and the Futures Representative have also determined that Hartford's contributions to the Trust are fair and equitable in light of the benefits provided and to be provided to the Trust on their behalf, thereby justifying the issuance of a channeling injunction in respect to the holders of future demands. The Court agrees with this determination. Hartford is alleged to be directly or indirectly liable for the asbestos related claims against Western MacArthur and MacArthur because it provided insurance to those two entities.

66

In light of the benefits being contributed to the Trust by Hartford, the protection provided to Hartford and its related parties by the injunction to be issued pursuant to the Plan is fair and equitable with respect to the persons that might subsequently assert asbestos related demands that are to be paid in whole or in part by the Trust.    Therefore, the issuance of an injunction in favor of USF&G and its related parties comports with the requirements of 11 U.S.C. § 524(g)(4)(B)(ii).

The Plan identified USF&G and the Debtors as parties that would be identifiable by name from the terms of the 11 U.S.C. § 524(g) injunction.    The Plan also provided that other settling insurers could be receive the protection of an 11 U.S.C. § 524(g) injunction in the hope that they would be able to obtain additional settlement agreements with insurers during the course of the chapter 11 case. Hartford qualifies as another "settling insurer" as provided for by the Plan.    Hartford will be identifiable by name from the terms of the 11 U.S.C. § 524(g) injunction to be issued.

One of the Objecting Insurers, U.S. Fire, also objected to the issuance of the injunctions, cutting off its contribution claims, on other grounds.    U.S. Fire contends that, to the extent that 11 U.S.C. § 524(g) permits contribution rights to be enjoined, it may not be applied retroactively to deny rights based on contracts entered into prior to its enactment.[41]    All of the Objecting Insurers' insurance

---

[41]The Plan Proponents contend that U.S. Fire waived this argument by failing to include it in its bullet point objections to confirmation filed in June 2003.  Since the Court finds U.S. Fire's argument unpersuasive on the merits, the Court declines to rule on

policies were issued before the enactment of 11 U.S.C. § 524(g).  It contended that its contribution rights are property rights entitled to Fifth Amendment protection because they are created by statute: e.g., California Civil Code § 1432.[42]

The Plan Proponents contend that, regardless of whether the Objecting Insurers' contribution rights are based on statute or contract, they are still merely unsecured claims, not traditional property rights protected by the Fifth Amendment.  In support of this contention, they cite <u>United States v. Security Industrial Bank</u>, 459 U.S. 70 (1982).  The Court agrees with the Plan Proponents.

<u>Security Industrial Bank</u> addressed the constitutionality of applying 11 U.S.C. § 522(f) retroactively to permit the "avoidance" of liens created before the enactment of the statute.  The Supreme

---

the waiver issue.  If required to rule, it would be inclined to find no waiver.  At the time the bullet point objections were required to be filed, U.S. Fire had only recently received notice of the chapter 11 case. U.S. Fire did raise the argument in its trial brief.  During this period, the Plan Proponents have amended the Plan and advanced new legal theories for accomplishing their goals.  It seems unfair to find a waiver on U.S. Fire's part given this procedural history.

[42]U.S. Fire agrees that Cal. Civ. Code § 1432, upon which it bases its right to contribution, expressly states that it is subject to Cal. Civ. Proc. Code § 877.  Cal. Civ. Proc. Code § 877 permits a court, in approving a settlement with one of several co-obligors, to protect the settling co-obligor from contribution claims by other co-obligors.  However, it notes that Cal. Civ. Proc. Code § 877(d) states that this provision does not apply to contracts made prior to January 1, 1988.  U.S. Fire's policies were issued before that date.  The Court finds this argument unpersuasive.  The fact that, in enacting Cal. Civ. Proc. Code § 877(d), the California legislature decided not to make it apply retroactively does not mean that the retroactive application of the statute would have violated the Fifth Amendment of the United States Constitution.

68

Court held that retroactive application would violate the Fifth Amendment. In doing so, it rejected the government's argument that "'bankruptcy principles do not support a sharp distinction between the rights of secured and unsecured creditors.'" The Supreme Court concluded that just such a sharp distinction was appropriate where the Fifth Amendment was concerned. 459 U.S. at 75. Thus, U.S Fire's Fifth Amendment argument has no merit.

At the final hearing on confirmation, U.S. Fire contended that, so as to preserve its constitutionality, 11 U.S.C. § 524(g) should be read to require the enjoined contribution claims to be channeled to the Trust. In its trial brief, U.S. Fire also argued that, if its contribution claims were entitled to be channeled to the Trust, the Plan could not be confirmed at present. It would have to be amended to separately classify the Objecting Insurers' contribution rights, and votes would have to be re-solicited. U.S. Fire noted that, in the Johns Manville bankruptcy case, the Second Circuit held that, although Western MacArthur's claims against the insurance company funding the plan trust could be enjoined, its claims would be channeled to the trust. See MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, (2nd Cir.), cert. denied 488 U.S. 868 (1988)(Johns Manville I).

The Plan Proponents respond that Johns Mansville I is distinguishable in that Western MacArthur was a co-insured under the policy issued by the settling insurance company, not another insurer. They note that, in another case arising out of the Johns Manville bankruptcy, the Second Circuit rejected USF&G's contention its claim

69

should also be channeled to the trust.  See In re Joint Eastern and Southern District Asbestos Litigation, 78 F.3d 764 (2nd Cir. 1996) (Johns Manville II).

The Plan Proponents' distinction between the two cases seems valid.  However, since the Court concludes that U.S. Fire's constitutional argument has no merit, it is irrelevant whether these cases are distinguishable.  In any event, they are not binding precedent in this Circuit.  The Court has some doubts about the correctness of the decision in Johns Manville I.

Finally, the Plan Proponents note that any contribution claims by the Objecting Insurers would be subject to disallowance pursuant to 11 U.S.C. § 502(e)(1)(B).  Section 502(e)(1)(B) provides that: "the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor...to the extent that- ...(B) such claim for reimbursement or contribution is contingent as fo the time of allowance or disallowance of such claim for reimbursement or contribution;...."  The purpose to 11 U.S.C. § 502(e)(1)(B) is to prevent the assertion of duplicative claims against a bankruptcy estate (in this case, the Trust): i.e., sometimes referred to as "double dipping."

If a co-liable party has paid the claim, its claim is not subject to disallowance because it is no longer contingent.  Because the primary claim has been paid, there is no danger of duplicative claims being asserted.  However, the Objecting Insurers have not paid the asbestos claims.  To the contrary, they deny liability.  As a result, their claims are subject to disallowance pursuant to 11

70

U.S.C. § 502(e)(1)(B) and they have no allowable claims to be channeled to the Trust.

For all of the reasons stated above, the Court finds and concludes that 11 U.S.C. § 524(g)(4)(B)(ii) is satisfied with respect to all of the parties receiving the protection of 11 U.S.C. § 524(g) injunctions.

## 4. SECTION 105 INJUNCTION

As set forth in the Legal Issues Memorandum, the Court has concluded that Western Asbestos does not qualify for a discharge of debt or for protection from the future prosecution of asbestos related claims by an injunction issued under 11 U.S.C. § 524(g). Thus, the only way Western Asbestos may be protected from the future prosecution of such claims is by an injunction issued under 11 U.S.C. § 105(a). In addition, Western MacArthur, MacArthur, USF&G, and Hartford have asked the Court to issue an injunction under 11 U.S.C. § 105(a), identical in scope to the injunction issued under 11 U.S.C. § 524(g), as insurance, in the event the injunction issued under 11 U.S.C. § 524(g) fails.

Section 105(a) provides that: "[t]he court may issue any order, process, or judgment that is *necessary or appropriate* to carry out the provisions of...[the Bankruptcy Code] [emphasis added]." <u>See</u> <u>In re Brotby</u>, 303 B.R. 177 (Bankr. 9th Cir. 2003)("'the bankruptcy court has the power to find that an injunction in the plan is appropriate should it be necessary for the success of the plan....'", quoting from <u>In re Mercado</u>, 124 B.R. 799, 803 (Bankr. C.D. Cal. 1991)). In the Legal Issues Memorandum, the Court concluded that it had the power to

issue an injunction providing Western Asbestos with protection from the continued prosecution of asbestos claims under 11 U.S.C. § 105(a) if it determined that it was *necessary* to do so.  The Court now determines that it has the power to issue an injunction protecting Western MacArthur, MacArthur, USF&G, and Hartford if it determines that it is *appropriate* to do so.  The Court concludes that it is necessary to issue an 11 U.S.C. § 105(a) injunction protecting Western Asbestos and appropriate to issue an injunction providing backup protection for Western MacArthur, USF&G, and Hartford.[43]

In support of the request for an 11 U.S.C. § 105 injunction protecting Western Asbestos, the Plan Proponents called as a witness the Honorable Charles Renfrew, the Futures Representative.  Judge Renfrew stated that he considered it critical that Western Asbestos receive the protection of an 11 U.S.C. § 105 injunction.  Without such an injunction, claims against Western Asbestos would not be channeled to the Trust.  He observed that, absent the entry of the 11 U.S.C. § 105(a) injunction, a holder of an asbestos related claim could attempt to bring an action against Western Asbestos, a defunct entity whose beneficial interest in all its assets will be assigned to the Trust. If successful in obtaining a judgment, the entity could then pursue a direct action against one of the Settling or Objecting Insurers.

Thus, the failure to issue an injunction under 11 U.S.C. § 105(a), protecting Western Asbestos from the future prosecution of

---

[43]The Court concludes that issuing this duplicative injunction is "appropriate" because the law governing 11 U.S.C. § 524(g) is relatively new and untested.

72

asbestos related claims would destroy the finality of the Plan from the Settling Insurers' point of view. Their willingness to consummate their settlement agreements with the Debtors is dependent upon the Court's ability to grant them this finality. As a result, the issuance of an injunction channeling the claims against Western Asbestos to the Trust is an express condition of their settlement agreements.

The Court's failure to issue the 11 U.S.C. § 105(a) injunction protecting Western Asbestos from the future prosecution of asbestos related claims could prompt the Settling Insurers to terminate their settlement agreements, thereby preventing confirmation. Even if it did not, attempts by the holders of asbestos related claims to prosecute those claims against Western Asbestos would interfere with the Trust's right under the Plan to exercise exclusive control over the future prosecution of asbestos related claims. It might also interfere with the purpose of that exclusive control: i.e., to ensure that any recoveries from those claims are distributed equally to present and future claimants.

Western Asbestos has made a substantial contribution to the Trust. Western Asbestos is contributing all of its stock to the Trust. It is also contributing to the Trust the benefits of its insurance coverage by USF&G and Argonaut to the extent that its prior transfer of those benefits to Western MacArthur is deemed ineffective. Finally, Western Asbestos is also contributing to the Trust its rights under the settlement agreements with the Settling Insurers. Argonaut has acknowledged that these contributions are "substantial."

73

. The holders of asbestos related claims against Western Asbestos, whose claims will be channeled to the Trust, have not objected to the issuance of the 11 U.S.C. § 105(a) injunction. The only party objecting to its issuance in Argonaut. U.S. Fire is silent with respect to this issue. General Accident, which insured Western Asbestos, supports the issuance of such an injunction if the Plan is confirmed. The only parties truly affected by the issuance of the injunction--i.e., the holders of asbestos related claims--have implicitly approved its issuance by voting in favor of the Plan by a substantial majority.

The Objecting Insurers are not harmed by the issuance of an injunction under 11 U.S.C. § 105(a), protecting Western Asbestos. To the contrary, the provision may inure to their benefit. It will protect them from a potential multiplicity of suits on the same claim. Moreover, every asbestos related claim that exists against Western Asbestos is also a claim against Western MacArthur. Each asbestos related claim against Western MacArthur will be channeled to the Trust under the Plan. Thus, every affected claim, as a claim against Western MacArthur, is already subject to an 11 U.S.C. § 524(g) channeling injunction. In sum, the Court concludes that it is necessary to the effectiveness of the Plan to issue an injunction under 11 U.S.C. § 105(a), protecting Western Asbestos from the future prosecution of asbestos related claims and channeling those claims to the Trust.

As noted above, in an excess of caution, Western MacArthur, MacArthur, and the Settling Insurers have asked the Court to issue an

74

injunction under 11 U.S.C. § 105(a) as well as under 11 U.S.C. § 524(g), protecting them from the future prosecution of asbestos related claims and channeling those claims to the Trust. While the Court does not view this injunction as necessary, given the uncertainty of the law governing 11 U.S.C. § 524(g) injunctions, it does view this duplicative injunction as appropriate. As discussed above, 11 U.S.C. § 105(a) permits the Court to issue such orders as are either necessary or appropriate to render its more explicitly prescribed powers effective.

As stated in Brotby, an 11 U.S.C. § 105 injunction must be narrowly tailored to its purpose. Id. The proposed 11 U.S.C. § 105 injunction protecting the Debtors from the post-confirmation prosecution of asbestos claims satisfies this requirement. The scope of the 11 U.S.C. § 105(a) injunctions will be no broader than the scope of the 11 U.S.C. § 524(g) injunctions.

Finally, as stated in Brotby, the Court must also balance the equities: i.e., the potential harm to the Objecting Insurers versus the benefit to the Plan Proponents. The Objecting Insurers have failed to identify any harm that will flow from the issuance of the injunction. Their only argument against the issuance of an 11 U.S.C. § 105(a) injunction protecting any of the parties is that it is unnecessary. They contend that such an injunction is unnecessary to protect Western Asbestos because Western Asbestos has no assets. They contend that it is unnecessary to protect the other parties because they are already protected by an injunction issued under 11 U.S.C. § 524(g).

75

However, as noted above, an order need not be "necessary" to be authorized under 11 U.S.C. § 105(a). It need only be appropriate. If the 11 U.S.C. § 105(a) proves unnecessary, its issuance will not prejudice anyone. With respect to those parties already protected by an 11 U.S.C. § 524(g) injunction, the 11 U.S.C. § 105(a) injunction will provide them with no greater protection than they already have. However, if the protection provided by an 11 U.S.C. § 105(a) does prove necessary, the Court's failure to issue it could be fatal to the success of the Plan. Thus, the balance of equities clearly tips in favor of issuance of the 11 U.S.C. § 105 injunction.

The contribution to the Trust being made by the Settling Insurers clearly supports the issuance of an 11 U.S.C. § 105(a) injunction, protecting them from the future prosecution of asbestos related claims. There is an identity of interests between the Debtors and the Settling Insurers, such that any suit against the latter is, in essence, a suit against the Debtors or could deplete the assets of the Debtors' bankruptcy estate.

The Settling Insurers have contributed or will contribute substantial assets to the Trust. USF&G has contributed or will contribute substantially in excess of $900 million to the Trust, including $740 million that will be used to fund the Trust, $160 million that will be credited against distributions otherwise payable by the Trust, and a $35 million litigation fund. These contributions are the lynchpin of the Plan and the most critical element of these cases. Similarly, Hartford is making or will make a substantial contribution to the Trust of more than $1.15 billion, which will fund

76

the Trust that will pay the asbestos related claims. Therefore, Hartford is also entitled to the protection of an 11 U.S.C. § 105(a) injunction.

The 11 U.S.C. § 105(a) injunction, as a supplement to the 11 U.S.C. § 524(g) injunction, is essential to the Debtors' reorganization. The success of the reorganization hinges on the Debtors being free from indirect suits against the Settling Insurers (who would not otherwise have made the contributions made to the Trust and thus to the bankruptcy estate). Moreover, as required by 11 U.S.C. § 524(g), the Plan provides a mechanism to pay all, or substantially all, of the asbestos related claims affected by the release and the injunctions to the extent, in the manner, and subject to the limitations provided for in the TDP.

In sum, the Court concludes that the issuance of an injunction under 11 U.S.C. § 105(a), protecting the Debtors, the Settling Insurers, and related parties from the future prosecution of asbestos related claims is either "necessary" or "appropriate."

### 4. PREEMPTION

The Plan Proponents ask the Court, as part of the confirmation process, to determine that confirmation of the Plan and issuance of the 11 U.S.C. § 524(g) injunctions preempts certain rights of the Objecting Insurers. For purposes of discussion, these rights are divided into two parts: (1) the Objecting Insurers' anti-assignment rights (the "Anti-Assignment Rights") and (2) the Objecting Insurers' claims handling rights (the "Claims Handling Rights").

### a. Anti-Assignment Rights

The Objecting Insurers' insurance policies all contain provisions prohibiting the assignment of the policies without the Objecting Insurers' consent. The parties agree that state law would enforce such contractual provisions under certain circumstances. In the Summary Judgment Motion, the Plan Proponents contended that these provisions, and/or the state law enforcing them, were expressly preempted by 11 U.S.C. § 1123(a)(5).

Section 1123(a)(5)(B) provides, in pertinent part, as follows: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall--...(5) provide adequate means for the plan's implementation such as--...(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;...." In support of this contention, the Plan Proponents cited In re Pacific Gas & Electric Co., 283 B.R. 41, 47-48 (N.D. Cal. 2002) ("PG&E I").[44]

---

[44]In PG&E I, the district court held that 11 U.S.C. § 1123(a)(5) expressly preempts any "nonbankruptcy laws that would otherwise apply to the restructuring transactions provided for in a reorganization plan." 283 B.R. at 48. During the confirmation hearing, PG&E I was reversed by the Ninth Circuit. The Ninth Circuit held that the phrase "[n]otwithstanding any otherwise applicable nonbankruptcy law" should be read to mean only laws dealing with the debtor's financial condition. See In re Pacific Gas and Electric Co. v. California, 350 F.3d 932, 938-48 (9th Cir. 2003) ("PG&E II"). PG&E I and PG&E II are distinguishable from this case in that, in the PG&E chapter 11 case, the proposed transfer was to several newly created entities which would continue to conduct business after confirmation, not to a liquidation trust whose only business would be to collect assets and to liquidate and pay claims.

Initially, it appeared that the Objecting Insurers contended that the mere transfer of their insurance policies to the Trust would constitute a breach of the Anti-Assignment Rights. However, at the hearing on the Summary Judgment Motion, the Objecting Insurers withdrew this argument.[45] As stated in the Legal Issues Memorandum, the Court held that 11 U.S.C. § 1123(a)(5)(B) permitted the Objecting Insurers' insurance policies to be *transferred* to the Trust even though state law would not have permitted the policies to be *assigned* without the Objecting Insurers' consent. However, it did not base this conclusion on the doctrine of express preemption. Rather, it construed the word "transfer" as used in 11 U.S.C. § 1123(a)(5)(B) to mean something different than "assignment" as used in the insurance policies.

Nevertheless, the Plan Proponents's post-trial briefs on preemption (the "Plan Proponents' Preemption Briefs") reflect a continuing fear that the Objecting Insurers will contend in the state court coverage litigation that the transfer of the policies to the Trust breached the Anti-Assignment Rights and eliminated their liability under the policies. To allay those fears, the Court will clarify the intent of its prior ruling. By holding that 11 U.S.C. § 1123(a)(5)(B) authorized the transfer of the policies to the Trust, the Court intended to hold as well that the transfer would not constitute a breach of the Objecting Insurers' Anti-Assignment Rights.

---

[45]The Objecting Insurers reaffirmed their waiver of this contention in closing argument at the end of the confirmation hearing.

As stated in the Legal Issues Memorandum, the transfer of the policies to the Trust will neither enlarge nor diminish the Debtors' rights under the policies.

### b. Claims Handling Rights

The Plan Proponents and the Objecting Insurers also dispute the effect of the Plan on the Objecting Insurers' Claims Handling Rights. Resolution of this issue would require the Court to consider the doctrine of preemption, albeit implied preemption, not express preemption.[46]  Under their policies and possibly under state law, the Objecting Insurers contend they have the right to participate in the defense of any claims that they may be required to pay. The Plan Proponents contend that 11 U.S.C. § 524(g) impliedly preempts these rights.

There are two types of implied preemption.  The first, commonly known as *field* preemption, occurs when: (1) Congress has regulated so heavily in a particular area that it is reasonable to infer that no room was left for state regulation or (2) when the federal interest is clearly paramount so that it is reasonable to conclude that state regulation of the area will not be permitted.  In re Baker & Drake, Inc., 35 F.3d 1348, 1352-53 (9th Cir. 1994).  The Plan Proponents do not rely on this type of implied preemption.

The second type of implied preemption occurs when state law "actually conflicts with federal law[, so that]...'compliance with

---

[46]PG&E I and II are irrelevant to this discussion as they only addressed *express* preemption, not *implied* preemption.  See PG&E II, 350 F.3d at 948.

both federal and state regulations is a physical impossibility,' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"   Id., quoting Hillsborough County, 471 U.S. 707, 713 (1985). The Plan Proponents base their contention that the Objecting Insurers' Claims Handling Rights are preempted by 11 U.S.C. § 524(g) on this type of implied preemption.

The Plan Proponents cite legislative history describing the purpose of 11 U.S.C. § 524(g) as the establishment of a fair and economic alternative dispute resolution procedure. They contend that the Objecting Insurers' Claims Handling Rights stand as an obstacle to the accomplishment of that purpose. The Plan Proponents note that the Matrix and TDP establish economic and fair procedures for valuing claims, based on their probable settlement values, and for paying them promptly, to the extent of the funds available.

The Objecting Insurers argue that they have the right to have the defense of the asbestos claims tendered to them, claim by claim. If they accept the defense of the claim, they have the right to force some or all of the claims into litigation or, if the claims are to be settled, to determine the settlement amount.

The Plan Proponents contend that, if the Objecting Insurers are deemed to retain these rights, the purpose for which 11 U.S.C. § 524(g) was enacted will be subverted. While the TDP will pay litigated claims the same percentage as the claims liquidated pursuant to the Matrix, they note, the individual amounts of the litigated claims are likely to be much higher than the amount of the claims liquidated

81

pursuant to the Matrix.  Moreover, some of the claimants will be unsuccessful in the litigation and will receive nothing whereas under the Matrix they would receive a fair settlement amount.  The Plan Proponents contend that this differential treatment would violate 11 U.S.C. § 524(g)(2)(B)(ii)(V), which requires that like claims be treated in a similar manner.  They note that it will also be more difficult for the Trust to predict the number and amount of the future claims so as to control the flow of funds and preserve the Trust's ability to pay future claims the same amount as past claims.

The Objecting Insurers contend that these difficulties are exaggerated.  They argue that any difficulties that do exist are the result of the way the Plan was formulated.  According to the Objecting Insurers, the Plan Proponents could have drafted a plan that accommodated the Objecting Insurers' Claims Handling Rights.  Moreover, the Objecting Insurers note that, to invoke implied preemption, it is not sufficient that state law makes it more difficult to comply with federal law.  It must be impossible to comply with both federal and state law.  See Baker & Drake, 35 F.3d at 1352-53.  Moreover, federal law can only be found to have preempted state law if Congressional intent to do so is "clear and manifest."  Witco Corp. v. Beekhuis, 38 F.3d 682, 687 (3rd Cir. 1994), citing Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977).

The Objecting Insurers also argue that the Plan Proponents are not really seeking a determination that 11 U.S.C. § 524(g) preempts state law.  They are asking the Court to rewrite the Objecting

82

Insurers' insurance contracts.[47]  They contend that this is beyond the Court's equitable powers, citing <u>In re Amatex</u>, 97 B.R. 220, 226 (Bankr. E.D. Pa. 1989) and <u>Cissell v. American Home Assurance Co.</u>, 521 F.2d 790, 792 (6th Cir. 1975), *cert. denied* 423 U.S. 1074 (1976).  In <u>Amatex</u>, the plan proponents asked the bankruptcy court to order an insurer to pay its policy limits into the trust before any claims were liquidated.  The court concluded that to do so would exceed its powers to do so.

In any event, the Objecting Insurers contend that the Court should not rule on whether 11 U.S.C. § 524(g) preempts their Claims Handling Rights at all.  They contend that this issue is a question of insurance law which should be left to the state court handling the coverage action.  At a minimum, they contend that a determination of this issue requires an adversary proceeding: i.e., a complaint seeking declaratory relief.  They object to the fashion in which this issue has been presented.  According to the Objecting Insurers, the Plan Proponents never raised their theory of implied preemption until they filed their trial brief.  This gave the Objecting Insurers an insufficient opportunity to address the issue.

The Plan Proponents dispute these contentions.  They assert that this is the proper court to determine the issue.  They contend that it has been clear from the start that they were seeking to preempt the Objecting Insurers' Claims Handling Rights.  Moreover, they argue that

---

[47]The Plan Proponents admitted as much in closing argument on the preemption issue.  No authority has been provided to the Court supporting the application of implied preemption to contract rights.

83

an adversary proceeding is not necessary to resolve this issue. According to the Plan Proponents, unless the Court decides this issue now, the Trust will be forced to choose between: (1) processing and paying asbestos claims promptly, as envisioned by the TDP, at the risk of waiving their coverage claims against the Objecting Insurers, (2) delaying the processing and payment of asbestos claims until the preemption issue can be decided, either by this Court or the state court, or (3) permitting the Objecting Insurers to exercise their Claims Handling Rights, thereby subverting the aims of 11 U.S.C. § 524(g).

The Court is not persuaded that this issue should be left to the state court to decide.    The issue is not simply a question of insurance law.   The issue requires consideration of three bodies of law, two of which are federal law: i.e., insurance law, bankruptcy law, and federal preemption law. Moreover, how the issue is resolved will clearly have a dramatic impact on the effectiveness of the Plan as well as on the rights of the Objecting Insurers.   However, the Court agrees that the issue was not properly presented to the Court as part of the confirmation process and requires an adversary proceeding for its resolution.   See Fed. R. Bankr. Proc. 7001(9).

The Court agrees with the Objecting Insurers that the Plan Proponents' implied preemption theory was not clearly expressed until late in the confirmation process.   Initially, as discussed in the Legal Issues Memorandum, the Plan Proponents sought an adjudication of the total aggregate amount of the asbestos claims against the Debtor through the confirmation process.   Clearly, they hoped that

84

they could use that adjudication to compel the Objecting Insurers to pay the adjudicated amount to the Trust if coverage were established in the state court action without any scrutiny of individual claims. The only preemption issue mentioned in the Summary Judgment Motion related to the transfer of the policies to the Trust pursuant to 11 U.S.C. § 1123(a)(5)(B).

Only after the Court held in the Legal Issue Memorandum that it could not "adjudicate" the total aggregate claims against the Debtors did the Plan Proponents begin to assert their implied preemption theory. Even now, it is uncertain what state law the Plan Proponents contend 11 U.S.C. § 524(g) impliedly preempts.[48]

In sum, the Court denies without prejudice on procedural grounds the Plan Proponents' request that the Court hold that 11 U.S.C. § 524(g) impliedly preempts the Objecting Insurers' Claims Handling Rights.

## 6.  SECOND TECHNICAL AMENDMENTS

Finally, the Objecting Insurers object to portions of the Second Technical Amendments. Their primary objection is to the amendment of section 3.2(d). Section 3.2(d) relates to the assignment of direct actions of asbestos claims to the Trust. The amendments qualify the assignment of the direct actions and permit them to be retained by

---

[48]The Court asked the Plan Proponents to clarify this issue during closing argument. They responded that it was their contention that 11 U.S.C. § 524(g) preempts the Objecting Insurers' contractual rights. The Court has not been provided with any authority that the doctrine of implied preemption may be applied to modify contractual rights.

85

their holders if to do so would be in the interest of the Trust and/or the failure to do so would diminish the claims.

If the actions are retained by their holders to ensure that the full value of the claims are retained, the amendments provide that the Court has the discretion to award some of the proceeds to the holder. At all times, the Trust will serve as the attorney in fact for the holder, with full and exclusive authority to prosecute and/or settle the claims. The Objecting Insurers also object to section 8.12 of the Plan which "conditionally" subordinates Western MacArthur's contribution and indemnification claims, and to section 12.16, which allows the Debtors to be sued as the Western Asbestos Settlement Trust.

The Objecting Insurers contend that these amendments create too much confusion about who is holding the claim at any particular time and about the status of those claims.[49] They contend that, by amending the Plan in this fashion, the Plan Proponents are trying to get a "leg up" on the Objecting Insurers in the state court coverage action. The Court overrules this objection. It is clear to the Court that the only reason for the amendment is to prevent the Objecting Insurers from getting a "leg up" on the Trust in the coverage

---

[49]The Objecting Insurers also contend that, as amended, section 3.2(d) is inconsistent with other provisions of the Plan: e.g., section 9.1(a), which requires asbestos related claims to be satisfied exclusively from the Trust, and section 8.2, which requires the Trust to assume all of the asbestos related claims and demands. The Court does not accord this objection much weight. However, to eliminate any confusion, it might be wise to add the phrase "notwithstanding any other provision of the Plan" to the amendment of section 3.2(d).

litigation.   As the Plan Proponents noted in closing argument, any confusion can be clarified in the coverage litigation by reference to the complaint or in any number of other procedural ways.

### CONCLUSION

The Plan will be confirmed.  It satisfies all of the requirements of 11 U.S.C. § 1129.  The USF&G and Hartford Settlement Agreements and the Default Judgment Settlement will be approved.   The Court will issue the requested injunctions under 11 U.S.C. § 524(g) and § 105. The Court concludes that the requirements for approval of these settlements and for issuance of these injunctions have been satisfied. However, the Court finds the Bonus to be unreasonable.   The Bonus Fee Law Firms must either pay the portion of the Bonus they received to the Trust or credit that amount to any distributions payable by the Trust.   These reductions may not be passed on to their clients.

The Court reiterates its holding in the Legal Issues Memorandum that the transfer to the Trust of the Objecting Insurers' insurance policies is authorized by 11 U.S.C. § 1123(a)(5) and does not constitute an assignment within the meaning of the Anti-Assignment Provisions of the policies.  As such, the transfer does not alter the parties' rights under the policies.   The Court declines to rule on whether 11 U.S.C. § 524(g) impliedly preempts the Objecting Insurers' Claims Handling Rights at this time, outside the context of an adversary proceeding.

Finally, the Court overrules the Objecting Insurers' objections to the Second Technical Amendments.   The Court also approves the

87

1   ancillary agreements presented in connection with the Hartford

2   Settlement Agreement.

3   Dated: February 3, 2004

4

5                                   United States Bankruptcy Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PROOF OF SERVICE

I, the undersigned, a regularly appointed and qualified clerk in the office of the United States Bankruptcy Court for the Northern District of California at Oakland, hereby certify:

That I, in the performance of my duties as such clerk, served a copy of the foregoing document by depositing it in the regular United States mail at Oakland, California, on the date shown below, in a sealed envelope bearing the lawful frank of the Bankruptcy Court, addressed as listed below.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: February 3, 2004



Office of the United States Trustee
Document placed in UST mailbox at
US Bankruptcy Court
1300 Clay Street, Third Floor
Oakland, CA  94612

William J. Lafferty
Howard, Rice, Nemerovski, Canady,
 Falk & Rabkin
Three Embarcadero center, 7th Floor
San Francisco, CA 94111-4024

Craig Goldblatt
Wilmer, Cutler & Pickering
2445 M St., N.W.
Washington, D.C. 20037

William J. Bowman
Hogan & Hartson
555 Thirteenth St., N.W.
Washington, D.C. 20004

89

Alan Pedlar
Stutman, Treister & Glatt
1901 Avenue of the Stars, Ste. 1200
Los Angeles, CA 90067

Frederick D. Holden, Jr.
Orrick, Herrington & Sutcliffe LLP
Old Federal Reserve Bank Building
400 Sansome St.
San Francisco, CA 94111

Michael H. Ahrens
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111

Gary S. Fergus
Fergus, a law firm
595 Market St., Ste. 2430
San Francisco, CA 94115

Peter Van N. Lockwood, D.C.
Caplin & Drysdale
One Thomas Circle, N.W.
Washington, D.C. 20005

Stephen F. Biegenzahn
Albert, Weiland & Golden, LLP
650 Town Center Drive, Ste. 950
Costa Mesa, CA 92626

M. Elaine Hammond
Friedman Dumas & Springwater, LLP
One Maritime Plaza, Ste. 2475
San Francisco, CA 94111

David P. McClain
McClain, Leppert and Maney
909 Fannin #4050
2 Houston Center
Houston, TX 77010

Gerald F. Ellersdorfer
Kaufman & Logan LLP
100 Spear St., 12th Floor
San Francisco, CA 94105

Kevin G. McCurdy
McCurdy & Brown
1080 Marsh Rd., Ste. 110
Menlo Park, CA 94025

90