IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re: Federal Mogul Global, Inc., *et al.*,                    (Bankruptcy Case No. 01-10578)(RTL)

      Debtors.

---

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS and ERIC D. GREEN, as the LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS, | ) ) ) ) ) ) | |
|     Plaintiffs, | ) ) | |
|               v. | ) ) | Civil Action No. 05-59 JHR |
| ASBESTOS PROPERTY DAMAGE COMMITTEE, | ) ) ) | |
|     Defendant. | ) | |

**RESPONSE OF THE OFFICIAL COMMITTEE OF ASBESTOS
CLAIMANTS AND THE LEGAL REPRESENTATIVE FOR FUTURE
ASBESTOS CLAIMANTS TO THE PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW SUBMITTED BY
<u>DEFENDANT ASBESTOS PROPERTY DAMAGE COMMITTEE</u>**

The Official Committee of Asbestos Claimants and Eric D. Green, as the legal

representative for the future asbestos-related personal injury claimants (together the

"**Plaintiffs**"), hereby submit this Response to Defendant Official Committee of Asbestos

Property Damage Claimants' Proposed Findings of Fact and Conclusions of Law filed in this

matter. We submit this brief Response to highlight the areas of disagreement between the parties

and to assist the Court in preparation for the July 14, 2005 closing argument. As Plaintiffs show

below, the factual record supports Dr. Mark Peterson's estimate of Turner & Newall's ("T&N")

liability for pending and future asbestos personal injury claims and does not support the

estimates of Dr. Robin Cantor, the Defendant's expert.

**INTRODUCTION**

This Response is organized in four sections. Section I points out all of the areas where Dr. Cantor agrees with or does not dispute Dr. Peterson's analysis. Section II focuses on the claim values used in the experts' respective forecasts and explains why Dr. Peterson's estimates are grounded in reality while Dr. Cantor's are not. Section III examines the factors underlying a credible future claims forecast as compared to those which lead Dr. Cantor to project far lower numbers of future claims than T&N's historical experience would indicate. Section IV summarizes additional evidence which demonstrates that Dr. Peterson is a far more credible expert than Dr. Cantor and that his estimates here are far better supported by the factual record.

I.     **Areas of Agreement Between Dr. Peterson and Dr. Cantor.**

Dr. Cantor agrees with Dr. Peterson on much of the historical T&N data which relates to a projection of the number of future claims. She agrees with Dr. Peterson on the number of historical claims filed against T&N. Hr'g Tr. 1080:18-21 (Cantor). A copy of the table showing the historical number of claims filed is found at PEX 4 at slides 27-28 (Peterson Demonstratives). Nor does Dr. Cantor dispute Dr. Peterson's disease distribution mix after "transitioning" those claims where the disease is unspecified in the database. Hr'g Tr. 1094:8-15 (Cantor); PEX 77 (Disease Distribution for Pending Claims).[1] And, like Dr. Peterson, Dr. Cantor projects the number of future non-malignant claims as a multiple of the number of cancer claims. Hr'g Tr. 1097: 1-4 (Cantor). In fact, Dr. Cantor's "non-malignant multiplier" is 12.9, slightly higher than Dr. Peterson's multiplier of 11.2 for his preferred "Increasing" forecast. Hr'g Tr. 1097:5-1098:20 (Cantor).

---

[1]   Dr. Cantor also agreed with Dr. Peterson's conclusion that there were 1252 mesothelioma claims filed against T&N in the (annualized) year preceding its bankruptcy. Hr'g Tr. 1109:17-1110:10 (Cantor); PEX 4 at slide 28 (Peterson Demonstratives).

Dr. Cantor also agrees with Dr. Peterson on the historical percentage of claims that were dismissed by T&N without payment, Hr'g Tr. 1094:17-24 (Cantor), and like Dr. Peterson, she uses this historical dismissal rate both to evaluate the number of pending claims that will be compensated, Hr'g Tr. 1094:25-1095:6 (Cantor), and to forecast the dismissal rate in the future. Hr'g Tr. 1096:22-25 (Cantor). A chart showing the two experts' calculation of T&N's historic percentage of claims receiving a positive settlement (i.e. 1 minus the percentage of claims dismissed without payment) is set forth below:

| Claim Type (Disease Alleged) | Peterson Calculation of Percent Receiving Payment | Cantor Calculation of Percent Receiving Payment |
|---|---|---|
| Mesothelioma | 86.6% | 90.2% |
| Lung Cancer | 91.4% | 92.4% |
| Other Cancer | 94.5% | 94.0% |
| Asbestosis | 94.3% | 95.5% |
| Pleural Disease | 94.3% | 97.1% |

PEX 2 at slide 19 (Peterson November 2004 Report); DEX 94 at slide 11 (Cantor Demonstratives).

With respect to data affecting claim values, Dr. Cantor's calculation of the historical T&N settlement averages does not differ from Dr. Peterson's for the years prior to 2001. Hr'g Tr. 1095: 7-10 (Cantor). She also uses inflation (2.2 percent) and discount (5.5 percent) rates to present value the future claims liability which are not materially different from the rates used by Dr. Peterson (2.5 percent inflation rate and 5.02 percent discount rate).

Given all of these areas of agreement, the vast differences between Dr. Peterson's and Dr. Cantor's estimates primarily boil down to two things: (a) the estimated settlement values that T&N would have to pay to resolve claims by settlement beginning in late 2001 and the years thereafter absent the bankruptcy and (b) the number of future claims that will be filed against T&N beginning in October 2001 and ultimately paid. In Sections II and III below we examine

3

these key differences in some detail and explain why Dr. Peterson's estimates are much more in line with T&N's actual claims history and the litigation environment that existed for it in a post-Center for Claims Resolution ("**CCR**") world.

## II. The Factual Record Supports the Claim Values Used in Dr. Peterson's Estimates, Not Those Used by Dr. Cantor.

The Plaintiffs and Defendant generally agree that the relevant legal standards for estimation of a company's aggregate asbestos personal injury liability are set forth in In re Eagle Picher, 189 B.R. 681 (Bnkr. S.D. Ohio 1995) and Owens Corning v. Credit Suisse First Boston, 322 B.R. 719 (D. Del. 2005). The key holdings from these two decisions are: (1) the estimate should seek to determine what the company's liability would have been to pending and future claimants in the absence of bankruptcy, (2) state law governs the validity and value of the claims, (3) the claims are to be valued as of the bankruptcy petition date, and (4) the values and projection of future claims used in the estimate should be based upon the claims history of the debtor/defendant at issue. Owens Corning 322 B.R. 719 at 721-722 (D. Del. 2005); Eagle Picher 189 B.R. 681 at 690-691 (Bnkr. S.D. Ohio 1995). However, "based upon" does not mean "mindlessly extrapolated from" and both the Owens Corning and the Eagle Picher courts recognized that the estimates must take into account trends in the settlement data and the litigation environment the debtor would face absent bankruptcy. Owens Corning, 322 B.R. 719 at 722-723; Eagle Picher, 189 B.R. 681 at 690.

In estimating the claim values used in his projections, Dr. Peterson took into account the recent upward trends in T&N's settlement costs and the dramatic change that occurred when T&N left the protections of the CCR and reverted to being a stand-alone defendant at a time when several other major asbestos defendants had already filed for bankruptcy protection. He factored these events into his estimates of the claim values T&N would pay if it had not filed for

59066.1001

bankruptcy protection. Dr. Cantor, by contrast, engaged in series of statistical manipulations that dampened or ignored the sharply increasing trends in T&N's cancer claim settlement costs after the year 2000. In evaluating the expert testimony as it relates to claim values, the testimony from the fact witnesses concerning T&N's experience after leaving the CCR in January 2001 is highly relevant and supports Dr. Peterson's analysis.

### A.    The Factual Record Concerning Claim Values

As Mr. Paul Hanly (T&N's principal U.S. defense counsel) and Mr. William Hanlon (CCR's primary outside lawyer) explained, before paying a claim, the CCR required evidence of asbestos-related disease and proof of exposure to the asbestos-containing product of at least one CCR defendant-member named in a plaintiff's complaint. Hr'g Tr. 68:13-18 (Hanly); 6/1/05 Hanlon Dep. Tr. 108:17-110:9; see, e.g., PEX 52 (Ness Motley Settlement Agreement). If there was a settlement, then each CCR member named in the lawsuit would contribute its share allocation of the CCR settlement payment for that claim. 6/1/05 Hanlon Dep. Tr. 29:21-30:7.

This policy of "cross-subsidization" was designed to allocate fairly overall the costs of claims in proportion to the CCR defendant's liability. As a result of this policy, although T&N may have paid some claims it would not have paid if it had remained outside the CCR, i.e., claims for which T&N was named in a lawsuit but the plaintiff may not have had sufficient evidence of T&N's liability, T&N paid far less on average toward each settled claim because other members contributed to the settlement of claims for which T&N would have liability even in cases where those other members might have paid nothing if they had remained outside of the CCR. In actual fact, T&N paid far less in the aggregate because the cost savings and reduced settlement amounts more than offset the cost of paying claims T&N would not have paid outside the CCR. Hr'g Tr. 77:14-78:15 (Hanly); PEX 22 at ¶ 5 (Factual Assumptions for Barbara

5

59066.1001

Dohmann Q.C.). This resulted in every CCR member, including T&N, paying lower amounts in settlement, both on a case-by-case basis and in the aggregate, than they would have paid had they remained outside the CCR. Hr'g Tr. 77:8-78:15 (Hanly); PEX 22 at ¶ 5 (Factual Assumptions for Barbara Dohmann Q.C.).

Although the Defendant attempts to argue through its proposed Findings of Fact that the CCR did not really provide savings in indemnity costs for its members (see PD Proposed Findings at ¶ 27), this assertion is believed both by the fact witness testimony and the experience of Union Carbide, the only defendant analyzed by Dr. Cantor which was also a former CCR member.[2]

---

[2]  The Defendant also points to statements in the Debtors' Informational Brief (DEX 10)(marked for identification but never admitted in evidence) as being inconsistent with Mr. Hanly's trial testimony. This document (which was an advocacy piece with 10 authors) does not contradict Mr. Hanly's trial testimony in any way. The section of the brief principally used during his cross-examination: "The Tort System Has Proven Incapable of Efficiently Resolving Litigation Arising from Asbestos-Related Illness," does not even purport to provide specifics of T&N's experience in the U.S. litigation system. Instead, the section is filled with argumentative generalities and consists almost entirely of quotations from other courts and commentators writing or speaking about the experiences of other asbestos defendants, of non-asbestos (namely tobacco) defendants and of overburdened courts confronted with asbestos litigation over the preceding quarter-century. Indeed, nowhere in the section, which spans 12 of the brief's 29 pages, is T&N even mentioned. As if this omission were not sufficient to clarify that the section has nothing to do with the specifics of T&N's asbestos litigation history, the very next section of the brief begins, "We have described above some of the characteristics of asbestos litigation in the United States that have forced so many other defendants to enter this forum [U.S. Bankruptcy Court] . . . . We now turn to the particular circumstances that have led these Debtors to this place [U.S. Bankruptcy Court] at this time." DEX 10 at 21 (Debtors' Informational Brief, emphasis added.) The discussion which follows of T&N's experience is entirely consistent with Mr. Hanly's testimony at trial:

> "The execution of this strategy of accord and compromise, however, could not stanch – and indeed likely contributed to – what soon became an ever-rising tide of new filings of claims. Nor, again, could anything cap the rising dollar amounts demanded from and invariably paid by tort-system defendants as each new bankruptcy filing expanded the payment share allocated to remaining defendants."

DEX 10 at 22-23 (Debtors' Informational Brief).

WP3:1128283.3                                                                    59066.1001

Mr. Hanly testified that T&N's membership in the CCR was a major advantage in holding down its settlement costs and noted that after the Asbestos Claims Facility split up, the CCR members survived for a very long time while the companies which decided to forge ahead as stand-alone defendants "ended up in bankruptcy a whole lot earlier." Hr'g Tr. 93:1-14 (Hanly). Mr. Hanly identified two areas in which membership in the CCR provided T&N with significant savings in indemnity costs. First, because it was negotiating on behalf of 20 companies as opposed to only one, the CCR could obtain "very substantial discounts on the cost of resolving the asbestos case. By cost I mean the settlement payment." Hr'g Tr. 77:8-22 (Hanly). Second, because T&N was only one of 20 companies whose liability was being negotiated in any given case, plaintiffs did not focus on it in their negotiations and litigation tactics and require it to pay more money as they did with a stand-alone defendant like Owens Corning, for example. Hr'g Tr. 78: 7-15 (Hanly).

Mr. Hanlon also testified that CCR was able to use to its advantage in settlement negotiations with plaintiffs the fact that CCR was settling on behalf of a large number of companies (what he called the "volume discount"):

> Q.    Did you ever have any discussions with any plaintiff lawyers on – either up until 2001 or since then – about what, if any, advantages that CCR gave to its members in negotiating settlements?
>
> A.    I don't know that I recall any discussions about the benefits that the membership obtained on the Center in that sense.
>
> But certainly, the Center would always try and get the benefit of the fact that it was settling on behalf of a large

---

Moreover, to the extent that any of the events mentioned in the Brief were applicable to T&N (suspect medical evidence, lack of impairment etc.), Mr. Hanly and Mr. Hanlon each testified that these factors were already factored by defense counsel into the price T&N would pay to resolve claims against it. Hr'g Tr. 79:18-80:19 (Hanly); 6/1/05 Hanlon Dep. Tr. 145:12-146:2.

7

number of companies at one time, and that there would be
volume involved – in terms of what was being resolved.

So it would always use that fact as a way to try and
negotiate what people would refer to as a "volume
discount."

And – you know, the bigger the dollars, the more willing
people are prepared to compromise.

So in terms of an attempt to negotiate, that was certainly
something that was often on the table and discussed with
plaintiffs' lawyers.

Q.    So the "volume discount" was something that was often
discussed with plaintiffs' lawyers in the settlement
negotiations?

A.    It was discussed, yes.  It was an argument that was made:
"You should give us a discount, because …"

6/1/05 Hanlon Dep. Tr. 153:2-154:8.

Although he was not directly involved in defending the claims, as was Mr. Hanly,

Federal Mogul's CFO, G. Michael Lynch, also appreciated the negative impact on T&N of

leaving CCR:

Q.    Okay.  And what happened between, let's say, October 1,
2000 and October 1, 2001 that in your opinion would give
rise to a higher estimate based on 2001 –

A.    I can only speak for what I observed, and what I observed
is that we changed strategies at year end 2000 or early in
2001 to one where we were going to litigate.  We had
collateralized our bank route which would – we would have
never done had we thought we were going into bankruptcy,
and we were going to make it on our own, and in that
period we ended up changing our conclusion, and we filed
for bankruptcy instead.

During that period, you know, we got out of CCR, and we
found out what it was like to go on our own.  We find out
what it was like to be there without Owens-Corning and
U.S. Gypsum and Armstrong and W.R. Grace beside us.
And we found the cost of – the asbestos cost to be bigger
than what we thought, so based on that, that's why when I

> read what was put in the disclosure statement, it makes some sense.
>
> Q.    Now just to go back through that with a little bit more specificity, is it correct that you thought when you exited the CCR, that the costs of the asbestos claims would go down but, in fact the immediate result was that they went up?
>
> A.    It became very apparent very quickly that our costs were going to – were greater than what we thought, although we thought we could get them to.
>
> Q.    Was that by result of more claims being filed against Federal-Mogul after you exited CCR?
>
> A.    I can't remember.  It was – certainly cash payments seemed to be going up, and I can't recall whether the claims went up or not.  It was just a nightmare.

5/25/05 Lynch Dep. Tr. 96:11—97:19.

Moreover, as Dr. Cantor explained on cross-examination, Union Carbide is another asbestos defendant with extensive asbestos liabilities which exited the CCR in 2001 at the same time T&N did. Hr'g Tr. 1171:9-1173:2 (Cantor).[3] As Dr. Cantor acknowledged, the number of claims filed against Union Carbide and the cost to resolve those claims "skyrocketed" from 2001 to 2003. Hr'g Tr. 1172:5-13 (Cantor); see also id. at Hr'g Tr. 1169:6-22 (Cantor). According to Union Carbide's Form 10-Ks, there were 73,806 claims filed against it in 2001, the year the CCR ended. Hr'g Tr. 1169:16-18 (Cantor). The number of claims filed against Union Carbide then escalated to 121,916 in 2002 and 122,586 in 2003. Hr'g Tr. 1169:19-22 (Cantor). With respect to resolution costs, the indemnity cost paid by Union Carbide to resolve its asbestos personal injury claims rose from $39 million in 2001 to $155 million in 2002, then $293 million in 2003,

---

3  Of all the defendants Dr. Cantor showed in her charts summarizing 2001-2004 claim filings against other defendants, Union Carbide was the only one that, like T&N, was a former CCR member.  DEX 3 at 21 (Cantor Rebuttal Report).

9

and eventually reached $300 million in 2004. Hr'g Tr. 1168:13-24 (Cantor), Hr'g Tr. 1170:1-8 (Cantor).

Even with the advantages conferred by the CCR, T&N's settlement averages for mesothelioma continued to rise from $43,000 in 1997 to over $80,000 in 2000. PEX 4 at slide 9 (Peterson Demonstratives); DEX 2 at 18 (Cantor Supplemental Report). After it left the CCR and the protections the CCR provided, T&N's asbestos litigation situation became, to quote its CFO Mr. Lynch, "a nightmare." 5/25/05 Lynch Dep. Tr. 97.

After leaving the CCR, T&N experienced a significant increase in the number of asbestos personal injury claims asserted against it and a sharp rise in its mesothelioma and lung cancer settlement costs. Hr'g Tr. 79:3-9, 81:22-82:10, 139:18-24 (Hanly); see also Hr'g Tr. 97:19-25 (Hanly); PEX 4 at slide 9 (Peterson Demonstratives); Hr'g Tr. 406:9-15 (Peterson). Mr. Hanly testified that T&N experienced a 75 percent increase in the value of mesothelioma claims between 2000 and 2001 and was settling such claims in 2001 for over $130,000 each. Hr'g Tr. 81:22-82:4 (Hanly). In the short period of time following leaving the CCR and before filing for bankruptcy, T&N resolved some nonmalignant claims (most of them in one settlement of 10,700 premises liability claims pending in Mississippi for $300 each),[4] but largely focused on resolving the more serious mesothelioma claims. Hr'g Tr. 83:3-11 (Hanly). Mr. Hanly testified that the settlement values achieved in the nonmalignant cases were not sustainable and that he believed they would only increase. Hr'g Tr. 83:12-17 (Hanly). By the end of 2001 Mr. Hanly had concluded that T&N's asbestos liability had increased greatly from what it had been as a CCR member. Hr'g Tr. 93:1-7 (Hanly). Mr. Hanly's testimony concerning T&N's litigation experience (both within the CCR and afterwards) was unrebutted.

---

[4]    The nonmalignant settlement averages in 2001 without the inclusion of this one large settlement were in excess of $3,400 per claim. Hr'g Tr. 1225:14-1226:10 (Peterson).

WP3:1128283.3                                                                                              59066.1001

**B.**    **Dr. Peterson's Estimated Values Reflect T&N's Historical Reality**

As he does in every case, Dr. Peterson started his analysis of T&N settlement values with

the most recent claims history.  In calculating the historical settlement averages, Dr. Peterson

valued the claims as of the date the claim actually settled, as opposed to whenever T&N got

around to paying the settlement.  The table below shows Dr. Peterson's calculation of T&N's

mesothelioma and lung cancer settlement averages for the years 1998-2001:

T&N Trends in Settlement Averages

| Year | Mesothelioma | Lung Cancer |
|------|--------------|-------------|
| 1998 | $46,608 | $12,425 |
| 1999 | $60,936 | $12,179 |
| 2000 | $86,606 | $14,350 |
| 2001 | $138,939 | $18,956 |

PEX 4 at slide 9 (Peterson Demonstratives).  Dr. Cantor did not dispute Dr. Peterson's

calculation of the settlement averages (even for the year 2001) when calculated by reference to

the settlement year as opposed to the year in which a claim was paid.

Unlike Dr. Cantor, Dr. Peterson went beyond the database to understand the factors

driving T&N's increasing claim values and the rising number of claims.  After consultation with

Mr. Hanly and his partners who defended T&N and various plaintiff lawyers who brought claims

against it, Dr. Peterson then considered the average trends in settlement values and the factors

driving those trends, such as T&N's loss of protection as a member of CCR in early 2001, and

the effect of the bankruptcies of other major defendants on T&N's liability.  He also considered

trends in mesothelioma settlements across other defendants and the historic ratios of

mesothelioma settlement averages to other types of disease claims both for T&N and across

multiple defendants.  See e.g., Hr'g Tr. 428:6-430:9, 432:13-22 (Peterson).  Based upon all of

this information, to determine what T&N's settlement values would be if it had not filed for

59066.1001

bankruptcy, Dr. Peterson started by calculating the historical settlement average for mesothelioma during 2000-2001, the two years immediately preceding the Petition Date. Hr'g Tr. 427:3-7 (Peterson); see also id. at 432:3-4 (Peterson). He compared this to the settlement averages in 1997-98 and found that they had increased by over 214 percent in less than 3 years. PEX 4 at slide 15 (Peterson Demonstratives). He then applied this percentage increase to the 2000-01 settlement averages and determined that a conservative average settlement value for mesothelioma for October 2001 and afterwards was $210,291. Hr'g Tr. 430:20-432:9 (Peterson); PEX 4 at slide 15 (Peterson Demonstratives).

After determining the average settlement value for mesothelioma, Dr. Peterson determined the average settlement values for all other diseases by analyzing T&N's and other defendants' relatively stable pre-2001 historic ratios between the settlement values for mesothelioma and those for lung cancer, other cancers and nonmalignant claims. Hr'g Tr. 427:3-428:5, 434:9-21, 435:17-21 (Peterson); PEX 4 at slides 16 and 17 (Peterson Demonstratives). He did this because he recognized, after consulting with Mr. Hanly, that because T&N was focusing primarily on defending the mesothelioma cases after it became a stand-alone defendant there was much less information about post-CCR claims resolution experience for the other disease claims. Hr'g Tr. 392:16-393:2 (Peterson). Moreover, the non-malignant claim values that T&N achieved in 2001 were artificially lowered by the unrepresentative 10,700-claim "sick building" settlement from Mississippi and, as Mr. Hanly testified, the values T&N was able to achieve in 2001 by "back-burnering" the non-malignant claims were not sustainable. Hr'g Tr. 393:3-394:24, 429:13-430:9 (Peterson). Dr. Peterson determined that the nonmalignant settlement averages without the inclusion of this one large Mississippi settlement were in excess of $3,400 per claim and agreed with Mr. Hanly that the

59066.1001

nonmalignant settlement averages would rise after 2001 as these claims began to receive trial

dates. Hr'g Tr. 393:3-394:24, 1182:12-15, 1225:14-1226:10 (Peterson).

Dr. Peterson's analysis resulted in four sets of estimates of the likely values T&N would

be paying to settle asbestos personal injury claims absent its bankruptcy, as set forth in the table

below:

| | Disease | | | |
|---|---|---|---|---|
| Source | Meso | Lung | Othc | Nonm |
| OC Basis | $210,291 | $45,261 | $17,408 | $6,963 |
| B&W Basis | $210,291 | $70,645 | $41,072 | $16,429 |
| Typical | $210,291 | $52,573 | $21,091 | $10,515 |
| T&N Basis | $210,291 | $35,013 | $15,509 | $7,991 |

PEX 4 at slide 17 (Peterson Demonstratives). He then compared these values to the scheduled

values in the T&N Trust Distribution Procedures ("TDP"),[5] which were calculated by Dr.

Peterson and the ACC in late 2003 based on Dr. Peterson's estimates of the values that T&N

would have had to pay to resolve claims if it were continuing as a defendant in the tort system.

Hr'g Tr. 390:3-392:2 (Peterson). Because the TDP values were very comparable but slightly

lower than the values he had estimated as set forth in Slide 17, to be conservative Dr. Peterson

used the TDP values (after adjustment downward for inflation between 2001 and 2004) as the

next step in his additional calculations. Hr'g Tr. 437:21-438:9 (Peterson); PEX 4 at slide 19

(Peterson Demonstratives). This resulted in the estimated settlement averages used by Dr.

Peterson in his projections here, which represent his best estimate of the values T&N would pay

to settle asbestos claims absent the bankruptcy. PEX 4 at slide 19 (Peterson Demonstratives).

---

[5]   The TDP set forth the claims qualification criteria and payment amounts that will govern the post-bankruptcy trust's evaluation and settlement of claims channeled to the T&N Trust as a result of the 11 U.S.C. §524(g) channeling injunction. The "scheduled values" are standing settlement offers from the Trust to claimants who meet the exposure and disease criteria. The values are designed to approximate what T&N would pay to resolve claims in the tort system. Hr'g Tr. 391:23-392:2 (Peterson).

After estimating the settlement values, Dr. Peterson then calculated the average claim

resolution amount, which is the product of the percent of claims paid in each disease category by

the average settlement amount. Hr'g Tr. 442:4-16 (Peterson). The table below sets forth Dr.

Peterson's average settlement values and the average claims resolution amounts used in his

projections here:

Dr. Peterson's Calculation of Claims Receiving Payment and Payment Amounts

| Disease | Percent Paid | Averages (2001$) | |
| | | Settlement | Resolution |
|---|---|---|---|
| Mesothelioma | 86.6 | $189,036 | $163,711 |
| Lung Cancer | 91.4 | $30,246 | $27,630 |
| Other Cancer | 94.5 | $13,941 | $13,170 |
| Nonmalignant | 94.3 | $6,616 | $6,242 |

PEX 4 at slide 24 (Peterson Demonstratives).

As part of his ongoing work in the case between the preparation of his original report and

his testimony at trial, Dr. Peterson went back and tested his conclusions about T&N's average

settlement values against the database. He found that where the settlement year was

conclusively stated in the database as 2001 (i.e., without any data imputation issues), the

settlement averages for mesothelioma and lung cancer were $194,051 and $29,836, respectively,

which were almost exactly the values for 2001 that he used in his preferred forecast. Hr'g Tr.

433:16-440:7 (Peterson); PEX 4 at slides 20-21 (Peterson Demonstratives); DEX 92 (Peterson

database excerpt).

**C.    Dr. Cantor's Values Ignore Reality**

In contrast to Dr. Peterson, who has studied asbestos litigation for over twenty years and

who had extensive discussions with both Mr. Hanly, who defended T&N, and the plaintiffs'

lawyers who sued it, Dr. Cantor did not meet or consult with Mr. Hanly or any other attorney

14

who represented or sued T&N in order to fully understand T&N's asbestos litigation experience
in the United States. Hr'g Tr. 857:4-6, 857:22-861:19, 863:4-5, 864:20-866:6 (Cantor). Instead,
Dr. Cantor simply applied a variety of "statistical tests" to the historical claim values, which had
the effect of ignoring or masking the dramatic upward trend in claim values after T&N left the
CCR.

Dr. Cantor believes that claims beginning in 2001 should be valued by reference to "four
year rolling averages" computed based on when claims are paid as compared to when they are
actually settled. This has the effect of heavily weighting her settlement averages towards the
years when T&N was still a CCR member and masking the sharply increasing trends in T&N's
cancer claim settlement costs after the year 2000. Even using her flawed and downwardly biased
"expense year" approach to calculating settlement averages, Dr. Cantor calculated that the
average settlement value in 2001 for mesothelioma was $102,000, yet she valued all pending
mesothelioma claims to be paid in late 2001 or 2002 at $68,866. Hr'g Tr. 1117:16-21, 1118:4-12
(Cantor). Despite recognizing that Mr. Hanly testified that T&N experienced a 75 percent
increase in the value of mesothelioma claims between 2000 and 2001 and was settling such
claims in 2001 for over $130,000 each, Hr'g Tr. 81:22-82:4 (Hanly), 1117:22-1118:3 (Cantor)
Dr. Cantor's projections assumed that T&N somehow would be able to resolve claims in late
2001 at prices that are only half of what its most recent experience would indicate.

Dr. Cantor also ignored or failed to adequately consider Union Carbide's experience after
it left the CCR when assessing the impact of leaving the CCR upon T&N. Union Carbide's
experience after it left the CCR demonstrates in spades that being a CCR member helped an
asbestos defendant to dramatically reduce its aggregate indemnity costs. As noted above, Dr.
Cantor admitted that after Union Carbide left the CCR, its aggregate indemnity costs had

59066.1001

"skyrocketed" by 2003 and 2004 to more than eight times greater than its year 2001 levels. Hr'g Tr. 1172:5-19 (Cantor).

Perhaps Dr. Cantor's estimates are so low because she believes T&N's future liability should be estimated based on its budgeted ability to pay claims as opposed to estimating the liability based on the claims actually filed against it, the historical percentage of claims that were compensated, and the values T&N would be paying to settle claims absent the bankruptcy filing. Hr'g Tr. 1078:13-24 (Cantor). Her testimony on this subject under cross-examination is revealing:

> Q.     And am I correct then that what you're saying is you can forecast the liability going forward depending upon what the defendant's budget is for paying claims in the past?
>
> A.     It's one aspect of the information that you're using to forecast the count of compensable claims going forward, yes.
>
> Q.     Now, if per chance the board of directors in the year 2000 decided to reduce the budget in half, would that then reduce the liability going forward?
>
> A.     It would certainly affect the number of claims that could be compensated by the company in the year 2000 because they would have a smaller budget and, of course, that would be the count signal that we would get on their compensated claims.

Hr'g Tr. 1078:13-24 (Cantor). Any estimate that takes as a major component T&N's "budget" is not an estimate of the company's asbestos liability; it is rather a measure of its financial ability to pay claims, which is irrelevant here. If lowering the budget could lower the consequent liability as Dr. Cantor apparently believes, no company's liability would ever exceed its assets and there would never be a need for the resort to bankruptcy.

III.    **The Factual Record Supports Dr. Peterson's Projections of Future Claims and Not Those of Dr. Cantor.**

In evaluating the two experts' projections of the number of future claims that would be filed against T&N, the Court should give the greatest weight to the medical and epidemiological evidence concerning the current and projected asbestos disease burden in the United States and the claiming history against T&N.  Plaintiffs believe Dr. Peterson's projections of future claims against T&N are consistent with the epidemiological projections of asbestos related disease and T&N's actual claims history; Dr. Cantor, by contrast, forecasts numbers of future "compensable" claims which diverge sharply from both the projected disease incidence and the past claims history.

There is nothing in the government data concerning the incidence of asbestos disease in the United States or the various epidemiological projections which would warrant a sharp drop-off in claims filed against T&N beginning in the year 2002 as Dr. Cantor projects.  Regardless of which set of cancer claim projections is used (Nicholson, KPMG, or the so-called Navigant in-house model), any changes between 2000 and 2004 are minimal and each curve is "fairly flat." Hr'g Tr. 1105:2-1108:24 (Cantor); compare the Nicholson (Appendix A-1) and KPMG (Appendix A-2) projections set forth in Dr. Peterson's November 2004 Expert Witness Report (PEX 2) with the Navigant Projections for Dr. Cantor's "Base Case" set forth in DEX 94 at slide 14 (Cantor Demonstratives).  Dr. Hans Weill's chart in his mesothelioma article (PEX 62) shows that the incidence of mesothelioma in the United States has remained relatively constant over the past decade (slightly over 2 cases of mesothelioma per 100,000 males in the population) and he admitted that any decline in the mesothelioma incidence is not statistically significant.  1/18/05 Weill In re Owens Corning Hr'g Tr. 117:24-118:11; PEX 62 at 439 (Weill Article).

17

Although the Property Damage Committee faults Dr. Peterson for using Dr. Nicholson's original cancer claims projections, see PD Committee Proposed Findings ¶ 49, the record evidence plainly shows that incidence of mesothelioma as computed from the National Cancer Institute's SEER data more closely conforms to Dr. Nicholson's original mesothelioma projections than those subsequently modified by KPMG or Navigant. Both Dr. Laura Welch and Dr. Hans Weill testified that, according to SEER data, there are currently about 2,800 new mesothelioma cases in men each year, and Dr. Weill testified there were several hundred additional new cases each year in women.[6] Hr'g Tr. 270:23-271:1 (Welch); 1/18/05 Weill In re Owens Corning Hr'g Tr. 118:15-119:3. As demonstrated in the table below, a comparison of Dr. Nicholson's original projections with the KPMG and Navigant modifications of those projections on a year by year basis for the years 2000-2004 and the mesothelioma incidence as set forth in Dr. Weill's calculation of the SEER data (2,800 deaths each year for males) shows that Dr. Nicholson's projections are clearly more accurate than either KPMG or Navigant:

---

[6] As Dr. Weill testified, the calculation of mesothelioma incidence is set forth by SEER as the number of deaths per 100,000 people, 1/18/05 Weill In re Owens Corning Hr'g Tr. 118:19-21, and the aggregate incidence in the United States is computed from the SEER data by multiplying the age-adjusted incidence of mesothelioma (which is currently about two cases of mesothelioma per 100,000 males) times the number of people of that gender in the United States. According to the most recent census data taken from the Statistical Abstract of the United States, 2003 ed. (found at http://www.census.gov/prod/2003pubs/02statab/pop.pdf, Section 13), there are approximately 140 million males and 146 million females in the United States, which results in Dr. Weill's calculation of approximately 2,800 new cases of mesothelioma in men each year (140 million X 2/100,000 = 2,800). 1/18/05 Weill In re Owens Corning Hr'g Tr. 118:15-24.

| Year | Estimated Incidence of Mesothelioma in Men Only (from SEER data and Dr. Weill) | Nicholson Mesothelioma Projections (men and women) | KPMG Mesothelioma Projections (men and women) | Navigant Mesothelioma Projections (Cantor Base Case) |
|------|------|------|------|------|
| 2000 | 2,800 | 3,024 | 2,522 | 1,893 |
| 2001 | 2,800 | 3,042 | 2,497 | 1,866 |
| 2002 | 2,800 | 3,060 | 2,469 | 1,832 |
| 2003 | 2,800 | 3,048 | 2,433 | 1,792 |
| 2004 | 2,800 | 3,036 | 2,393 | 1,748 |

Further, although the Defendant characterizes Dr. Weill's testimony as if it supported a

forecast of a drastic drop-off in the incidence and prevalence of non-malignant asbestos-related

disease, in fact his testimony and that of Dr. Laura Welch demonstrated that the asbestos disease

burden is now at its peak and that any decline thereafter will be very gradual.  As Dr. Weill

testified:

- "[C]hanges in mesothelioma incidence are probably the clearest measure of the extent of asbestos related disease...." 1/18/05 Weill In re Owens Corning Hr'g Tr. 119:5-7; PEX 62 at 441 (Weill Article);

- It is not clear whether the rate of decline of non-malignant disease is occurring any faster than the rate of decline in mesothelioma; 1/18/05 Weill In re Owens Corning Hr'g Tr. 119:12-16; and

- The most recent government data we have show that asbestosis deaths and hospital discharge diagnoses of asbestosis have been consistently rising over the decade 1990-2000, reaching a high of 20,000 asbestosis related hospitalizations in the year 2000. 1/18/05 Weill In re Owens Corning Hr'g Tr. 74:15-75:4; PEX 33 at 3-4, 15 (CDC/NIOSH Work Related Lung Disease Surveillance Report).

- Dr. Weill testified he had "no reason to dispute" the 2004 ATS Statement's analysis that up to 2.3 percent of U.S. adult males had a non-malignant asbestos disease, which would mean that "millions of men" are still walking around with an asbestos-related disease.  1/18/05 Weill In re Owens Corning Hr'g Tr. 110:11-111:16; PEX 25 at 702, 704 (2004 ATS Statement).

Given that the evidence shows that the incidence of mesothelioma and the overall

asbestos-related disease burden are declining only very slowly, if at all, and that the propensity to

19

sue T&N for mesothelioma only approached 50 percent of persons with the disease by 2000-2001[7], PEX 2 at 31, Table 19 (Peterson November 2004 Report), the universe of diseased persons who could file a claim against T&N is still much larger than the persons who actually file a claim, which leaves ample room for an increasing propensity to sue.

The pre-petition claims history also clearly demonstrates an increasing claims filing trend against T&N.  T&N's historical claims filing history for the years 1997-2001 is as follows:

| Filing Year | Disease | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| 1997 | 769 | 1,133 | 395 | 19,260 | 484 | 22,040 |
| 1998 | 894 | 1,287 | 592 | 30,164 | 854 | 33,790 |
| 1999 | 913 | 1,198 | 443 | 30,608 | 889 | 34,051 |
| 2000 | 1,361 | 1,937 | 588 | 39,597 | 2,054 | 45,537 |
| 2001* | 1,252 | 1,561 | 643 | 54,361 | 1,812 | 59,631 |

PEX 4 at slide 28 (Peterson Demonstratives) (*2001 filings are annualized).[8]

Dr. Peterson's projections reflect the reality of both the asbestos disease incidence in the U.S. and T&N's claims history.  To determine the liability for T&N's future claims, Dr. Peterson first projected the number of likely future cancer claims based on the Nicholson Study's projections of the incidence of asbestos-related cancers (mesothelioma, lung cancer, and other cancers), which have proven remarkably accurate based on the SEER data.  PEX 5 (the "**Nicholson Study**"); Hr'g Tr. 494:15-495:12 (Peterson); PEX 4 at slide 32 (Peterson Demonstratives).  Dr. Peterson's projection of the number of T&N's future claims also took into account the trends in the claiming rate for malignant claims against T&N and other defendants,

---

7  The propensity to sue for lung cancer was even lower. PEX 2 at 31 (Peterson November 2004 Report).

8  As noted above, Dr. Cantor does not dispute Dr. Peterson's count of the number of historical claims filed against T&N, the disease distribution mix after the data is transitioned, or the level of mesothelioma filings in 2001. Hr'g Tr. 1080:18-21, 1094:10-15, 1109:17-1110:10 (Cantor).

Hr'g Tr. 487:8-14, 487:25-488:3, 494:12-13 (Peterson); and changes in asbestos litigation, including the end of the CCR and the bankruptcies of other major asbestos defendants, Hr'g Tr. 487:14-24 (Peterson).

Dr. Peterson then calculated T&N's historic propensity to sue – i.e., the percentage of people who actually filed (or will file) a claim against T&N – by dividing the number of people who actually filed a claim against T&N for asbestos-related cancer in a particular year by the number of asbestos-related cancer deaths predicted by the epidemiological model for that same year. Hr'g Tr. 490:19-491:8 (Peterson); see also id. at 500:1-4. The historical propensity to sue T&N was calculated based upon the propensities to sue during the two-years immediately prior to the Petition Date. Hr'g Tr. 504:6-11 (Peterson). To determine the likely number of asbestos-related cancer claims that will be filed against T&N in years beyond October 2001, Dr. Peterson took the number of asbestos-related cancer deaths projected by the epidemiological model in each future year and multiplied that by the propensity to sue. Hr'g Tr. 503:9-12 (Peterson).

Dr. Peterson calculated the projected number of future cancer claims using two alternate assumptions: (1) a "**Flat Propensity**" projection, which assumed that notwithstanding the observable rising trend in claim filings the propensity to sue would immediately flatten and remain unchanged in future years and (2) an "**Increasing Propensity**" projection, which assumed that the propensity to sue T&N would increase during 2002 through 2006 in accordance with the observable increasing trend in claim filings observed in the years immediately prior to T&N's bankruptcy before leveling off thereafter. Hr'g Tr. 504:6-17, 513:2-8 (Peterson). Dr. Peterson testified that because of the actual T&N experience the Increasing Propensity model is a far more plausible estimate and is his preferred projection. Hr'g Tr. 505:18-20, 517:22-518:1 (Peterson). No evidence was offered to show why the observable increasing trend in cancer

21

claims might have declined abruptly in 2002. For both sets of projections, the annual number of future claims projected by Dr. Peterson is lower for each future year with one exception than the annualized number of claims received by T&N in 2001. Hr'g Tr. 516:13-20, 519:21-24 (Peterson).

Because there are no epidemiological studies that predict the incidence of nonmalignant asbestos-related disease in the U.S. population, Hr'g Tr. 491:22-492:1 (Peterson); 1/18/05 Weill In re Owens Corning Hr'g Tr. 105:2-6, to project the number of future nonmalignant claims against T&N, Dr. Peterson employed an established method and calculated the ratio between the number of cancer claims and the number of nonmalignant claims filed against T&N in 2000. Hr'g Tr. 492:1-13, 513:12-515:5 (Peterson). He then multiplied this ratio by the number of forecasted future malignant claims in order to project the number of nonmalignant claims for each future year. Hr'g Tr. 514:21-24 (Peterson).

Dr. Peterson's straightforward approach to projecting future claims has been repeatedly accepted by courts, bankruptcy trusts and others interested in accurate projections of future asbestos claims, and is consistent with both the epidemiology and T&N's claims history . By contrast, Dr. Cantor's projection of future "compensable claims" is completely divorced from T&N's claims filing history. She drastically reduces her projection of future "compensable" claims by (1) using a flawed "death-year" approach to counting the claims filed in the calibration period that are likely to be compensated, which ignores almost 40 percent of the cancer claims already on file (Hr'g Tr. 1191:21-1192:7 (Peterson)); and (2) relying on her own "epidemiological" projection of future U.S.-based asbestos related cancer deaths that she has no expertise to create[9], that has never been peer reviewed, tested, or adequately explained, and

---

[9]  Dr. Cantor is neither a medical doctor nor an epidemiologist.

which excludes from the calculation claims brought by workers in several industries exposed to asbestos-containing products (Hr'g Tr. 1101:8-1104:3 (Cantor)), even though T&N, either directly through its own products or through its supply of asbestos fibers to its Keasbey & Mattison subsidiary, undoubtedly exposed persons in these industries to asbestos.[10]  These two approaches, when combined, have the corresponding effect of lowering the annual projection of future cancer claims beginning in 2002 by almost 40 percent from T&N's actual levels in the years immediately preceding the bankruptcy petition date, as the table below demonstrates:

[Remainder of page intentionally left blank]

---

[10]  Mr. Hanly testified that Keasby & Mattison was a "mini-Manville" that made "virtually any sort of asbestos product that was ever manufactured."  Hr'g Tr. 55:2156:4 (Hanly).  He also testified T&N's liability was not dramatically different as across the various occupational categories of persons exposed to asbestos.  Hr'g Tr. 107:2-9 (Hanly).

WP3:1128283.3                                                                                              59066.1001

T&N's Actual Claims History (1997-2001)

| Filing Year | Disease | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| 1997 | 769 | 1,133 | 395 | 19,260 | 484 | 22,040 |
| 1998 | 894 | 1,287 | 592 | 30,164 | 854 | 33,790 |
| 1999 | 913 | 1,198 | 443 | 30,608 | 889 | 34,051 |
| 2000 | 1,361 | 1,937 | 588 | 39,597 | 2,054 | 45,537 |
| 2001* | 1,252 | 1,561 | 643 | 54,361 | 1,812 | 59,631 |

Dr. Cantor's Projection of Future "Compensable" Claims (2002-2006)[11]

| Filing Year | Disease | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Asbestosis | Pleural | |
| 2002 | 662 | 742 | 281 | 21,734 | 287 | 23,706 |
| 2003 | 646 | 710 | 268 | 20,954 | 277 | 22,856 |
| 2004 | 627 | 678 | 256 | 20,142 | 266 | 21,970 |
| 2005 | 608 | 647 | 243 | 19,320 | 255 | 21,073 |
| 2006 | 587 | 615 | 231 | 18,482 | 244 | 20,159 |

There is simply no basis in the disease incidence or claiming history for such a reduction.

Instead of simply counting the number of claims filed against T&N in a particular year and then

projecting that filing pattern forward as Dr. Peterson did, Dr. Cantor imputed a year of death to

all the claimants in her calibration period based in part on using the claim payment date as a

---

[11] The top chart is from PEX 4 at slide 28 (*2001 filings are annualized). The bottom chart sets
forth Dr. Cantor's projected number of future "compensable" claims shown on page 39 of her
expert report. DEX 2 at 39 (Cantor Supplemental Report). The illogic of her methodology
was demonstrated during her cross-examination at trial. First, Dr. Cantor does not dispute
that, in the year 2001, 1,252 new mesothelioma claims were actually filed against T&N (up
from an average of 900 new claims per year in 1998 to 1999). Hr'g Tr. 1109:12-1110:10
(Cantor); PEX 4 at slide 28 (Peterson Demonstratives). Nor does Dr. Cantor dispute that,
regardless of which mesothelioma incidence curve is used (Nicholson, KPMG, or the
Navigant in-house model), any changes between 1998 and 2002 are minimal and each curve
is "fairly flat." Hr'g Tr. 1105:2-1108:24 (Cantor). Historically, T&N compensated about 85
to 90 percent of the mesothelioma claims filed against it, and indeed Dr. Cantor projects that
over 90 percent of the pending mesothelioma claimants will be compensated. Hr'g Tr. 962:-
21-23 (Cantor). Yet her estimate of the future claims is based on a projection that only 662
"compensable" mesothelioma claims will be filed and compensated in 2002, a reduction in
compensable claims filed of over 40 percent from the 2000 to 2001 claim filing levels, and
that the mesothelioma filings will drop off drastically thereafter.

proxy for date of death. As the testimony showed, Dr. Cantor's use of an estimated "death year" rather than an actual "file year" ignored almost 40 percent of the cancer claims actually on file against T&N and resulted in a forecast which is completely unsupported by T&N's historical experience. Hr'g Tr. 1184:14-19, 1191:21-1192:7 (Peterson). Moreover, in attempting to count death years in her calibration period, she failed to make adjustments for (1) persons who have made claims against T&N, but have not yet died and (2) persons who have already died but whose claims would have been brought against T&N after 2001, which a properly constructed death-year estimate would have required her to estimate. Hr'g Tr. 1184:16-19, 1190:5-13 (Peterson).

Because Dr. Cantor's projection of nonmalignant claims is a multiple of her projection of "compensable" cancer claims, her projection of the total number of claims in each future year is similarly divorced from T&N's historical experience. Dr. Cantor projects that in 2002 the total number of compensable claims would immediately fall to 23,706 – only one-third of the 2001 rate and fewer than they had been in any year since 1997 – and decline steadily thereafter. DEX 2 at 39 (Cantor Supplemental Report). That notion is contrary to T&N's claims experience, see PEX 2 at 28 (Peterson November 2004 Report); PEX 4 at slide 28 (Peterson Demonstratives), the incidence and prevalence of asbestos disease in the United States, and the testimony of the witnesses who actually defended T&N in asbestos litigation.

## IV.    Dr. Peterson's Analysis is More Credible Than Dr. Cantor's.

Dr. Mark Peterson is a nationally recognized expert on the valuation of asbestos personal injury liabilities. He has studied asbestos litigation as his primary professional focus for over 20 years and has been recognized as an expert by a court, and his estimation of the number and value of asbestos personal injury claims has been accepted, in numerous cases, including the

following: <u>Eagle-Picher</u>, <u>National Gypsum</u>, <u>Babcock & Wilcox</u>, <u>Armstrong</u>, <u>Western Asbestos</u>, <u>H.K. Porter</u>, <u>E.J. Bartells Co.</u>, and <u>Raytech</u>. <u>See e.g.</u>, Hr'g Tr. 375:13-376:25. He has also projected asbestos personal injury liabilities in other contexts, including for trusts, defendants, insurers, and as an expert for a court.

     As he does in every case, Dr. Peterson started off his asbestos estimation analysis work here by trying to understand in depth what drove the value of claims. He believes that in order to make a credible forecast, one must "appreciate the phenomenon you're studying," which required him to analyze the factors driving settlements in the court system as opposed to simply doing mathematical calculations on data. Hr'g Tr. 365:14-19 (Peterson). In his work here, he performed the following activities as his means to, as he put it, "get dirty with the data":

- consulting with the trustees for asbestos trusts and their staffs,

- consulting with asbestos plaintiffs lawyers,

- consulting with asbestos defense lawyers, including those who defended T&N

- consulting with other experts,

- consulting with and serving as an expert for judges,

- reading publications such as Mealeys,

- examining financial statements,

- speaking with asbestos victims,

- speaking with doctors who examine asbestos victims,

- speaking with union representatives.

Hr'g Tr. 372:6-374:4 (Peterson).

     Throughout his work for the ACC in this case, Dr. Peterson has been remarkably consistent. On two prior occasions where he was asked to provide a preliminary estimate of T&N's asbestos

liability using primarily the CCR settlement values, each time he told the ACC and its counsel in writing that the settlement values T&N was able achieve as a member of the CCR were no longer reflective of its liability in the tort system as a stand-alone defendant and that a reasonable estimate of its liability absent bankruptcy would have to factor in the increasing settlement costs and adverse litigation environment T&N found itself in after leaving the CCR after many other primary defendants had sought bankruptcy protection. Hr'g Tr. 799:19-801:13 (Peterson); DEX 14 at 4 (Federal Mogul Asbestos Liabilities Memorandum Dated October 25, 2002); DEX 15 at 15 (Turner & Newall Liabilities for U.K. and U.S Claims Memorandum Dated February 19, 2004).

Dr. Cantor, by contrast, has never been recognized by a court as an expert qualified to give an opinion on the estimation of asbestos liabilities. Hr'g Tr. 856:25- 857:3 (Cantor). In fact, prior to her engagement in this matter, Dr. Cantor had no experience in forecasting asbestos liability in a contested matter in court. Hr'g Tr. 856:18-24 (Cantor). Dr. Cantor is not a lawyer, epidemiologist, or medical doctor – nor did she acquire personal knowledge about the legal strategies, epidemiology, or medicine involved in asbestos litigation – though she necessarily relied upon these three areas of practice in reaching her estimation. Hr'g Tr. 851:1-2, 854:18-23, 856:8-9 (Cantor); see generally id. at 850:23-874:3. She never spoke with Mr. Hanly or other lawyers who defended T&N in asbestos litigation, nor did she speak to any plaintiff lawyers about their history of litigation against T&N. Rather, Dr. Cantor testified that her knowledge about asbestos litigation was from attending conferences and sporadically working with counsel in asbestos insurance litigation (not asbestos personal injury litigation). Hr'g Tr. 858:3-9, 858:13-861:4 (Cantor).

Perhaps most strikingly, Dr. Cantor's opinions on the question of whether claim filings post-2000 were going down against other defendants are completely at odds with the expert report she submitted this year in the case styled <u>Congoleum Corp v. Ace American Insurance</u>, Case No. MID-L-8908-1 (N.J. Super. 2005) ("**Congoleum**")). In this Court, she presented data to the effect that claim filings against the Manville Trust and other defendants have decreased markedly, yet at the same time she has written a report in the Congoleum matter in which she presented data showing that the Manville Trust claims filings are rising steadily after the year 2000. PEX 71B (Exhibit 2 to Expert Report of Robin Cantor in <u>Congoleum</u>). In her <u>Congoleum</u> report she also presented a chart detailing numerous statements from other asbestos defendants which she said evidenced the "Widespread Recognition that Asbestos Filings Were Increasing Post-2000." PEX 71A (Exhibit 1 to Expert Report of Robin Cantor in Congoleum matter). The differences between her testimony here and her report in <u>Congoleum</u> on this subject cannot be reconciled and undermine the credibility of her entire analysis.

This Court is undoubtedly aware of the pattern jury instruction which provides that "If a witness is shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness' other testimony and you may reject all the testimony of that witness or give it such credibility as you may think it deserves." Federal Jury Practice and Instructions § 105.04 (5th ed. 2000). While obviously there are no jury instructions here and the witness at issue is an expert who is offering opinions as opposed to testifying about a factual matter, we believe the principle behind the instruction is pertinent to the Court's analysis of Dr. Cantor's work and testimony in this case.

## CONCLUSION

The Court should accept Dr. Peterson's preferred estimate of T&N's asbestos liability

($11 billion) and reject the estimates of Dr. Cantor. The Plaintiffs' Proposed Findings of Fact

and Conclusions of Law are amply supported by the record and we respectfully request that the

Court give them great weight in preparing its decision.

Dated:    July 11, 2005
          Wilmington, Delaware

Respectfully submitted,

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, New York 10022
Telephone: (212) 319-7125
Facsimile: (212) 644-6755


CAPLIN & DRYSDALE, CHARTERED
Nathan D. Finch
Danielle K. Graham
One Thomas Circle, N.W.
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

         -and-

CAMPBELL & LEVINE, LLC

Marla R. Eskin (No. 2989)
Kathleen J. Campbell (No. 4229)
800 N. King Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 426-1900
Facsimile: (302) 426-9947

Attorneys for Official Committee of
Asbestos Claimants

YOUNG CONAWAY STARGATT & TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Edwin J. Harron (No. 3396)
Rolin Bissell (No. 4478)
Maribeth L. Minella (No. 4185)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Attorneys for Legal Representative for
Future Asbestos Claimants

WP3:1128283.3

59066.1001