**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                                        :
In re:                                  :          Bankruptcy No. 01-10578 (RTL)
                                        :
FEDERAL-MOGUL GLOBAL, INC., et al.      :
T&N LIMITED, et al.,                    :
                        Debtors.        :
-------------------------------------------------------------x
                                        :
THE OFFICIAL COMMITTEE OF               :
ASBESTOS CLAIMANTS and                  :
ERIC D. GREEN, as the                   :
LEGAL REPRESENTATIVE FOR                :
FUTURE ASBESTOS CLAIMANTS,              :
                                        :
            Plaintiffs,                 :
                                        :
v.                                      :          Civil Action No. 05-59 (JHR)
                                        :
ASBESTOS PROPERTY                       :
DAMAGE COMMITTEE,                       :
                                        :
            Defendant.                  :
                                        :
-------------------------------------------------------------x

**OFFICIAL COMMITTEE OF ASBESTOS PROPERTY**
**DAMAGE CLAIMANTS' BRIEF IN SUPPORT OF MOTION PURSUANT TO FED. R.**
**BANK. P. 9023 FOR NEW TRIAL, RE-OPENING OF THE RECORD, AND RE-OPENING OF**
**DISCOVERY WITH RESPECT TO THE BASIS FOR NON-MALIGNANT ASBESTOS**
**PERSONAL INJURY CLAIMS AGAINST T&N LIMITED**

FERRY, JOSEPH & PEARCE, P.A.                WEIL, GOTSHAL & MANGES LLP
Theodore J. Tacconelli, Esq. (No. 2678)     Martin J. Bienenstock, Esq.
Lisa L. Coggins, Esq. (No. 4234)            Michael P. Kessler, Esq.
824 Market Street, Suite 904                767 Fifth Avenue
Wilmington, DE 19801                        New York, NY 10153
Telephone: (302) 575-1555                   Telephone: (212) 310-8000

LOCAL COUNSEL TO THE OFFICIAL               -and-
COMMITTEE OF ASBESTOS PROPERTY
DAMAGE CLAIMANTS                            Adam P. Strochak, Esq.
                                            Peter M. Friedman, Esq.
                                            1501 K Street, NW Suite 100
                                            Washington, DC 20005
                                            Telephone: (202) 682-7195

                                            ATTORNEYS FOR THE OFFICIAL
                                            COMMITTEE OF ASBESTOS PROPERTY
                                            DAMAGE CLAIMANTS

Dated: July 13, 2005

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND AND JURISDICTION............................................................... 3

III.    THE PROPERTY DAMAGE COMMITTEE SOUGHT DISCOVERY
        INTO WRONG-DOING BY SCREENING COMPANIES AND
        DOCTORS VIA ITS BAR DATE MOTION......................................................... 4

IV.     JUDGE JACK's RULING EXPOSES RAMPANT WRONGDOING IN
        SILICOSIS AND ASBESTOSIS DIAGNOSES. .................................................. 7

        A.      Misconduct by Screening Companies......................................................... 8

        B.      Misconduct by Diagnosing Physicians ...................................................... 9

V.      T&N Was Harmed by this same misconduct, and targeted discovery can
        demonstrate the extent of such harm ................................................................... 11

        A.      T&N Was Impacted By Mass Screenings and These High-Volume
                Physicians ............................................................................................... 11

        B.      Targeted Discovery Will Demonstrate the Extent to Which
                Pending Claims In This Case Were Generated by the Tactics
                Described by Judge Jack.......................................................................... 14

VI.     CONCLUSION................................................................................................... 17

# TABLE OF AUTHORITIES

## REPORTED CASES

*Compass Technology, Inc. v. Tseng Laboratories, Inc.*, 71 F.3d 1125 (3d. Cir. 1995) ..................................................................................................14, 15

*DuPont v. United States*, 385 F.2d 780 (3d. Cir. 1967).............................................14, 15

*Gibson v. Mayor and City Council of Wilmington*, 355 F.3d 215 (3d Cir. 2004) .............16

*Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208 (3d Cir. 1984) ...........................16

*Pepper v. Litton*, 308 U.S. 295 (1939) ...............................................................................3

## DOCKETED CASES

*In re Silica Prod. Liability Litigation*, MDL Docket No. 1553 (S.D. Tex.)............. *passim*

## FEDERAL STATUTES AND RULES

11 U.S.C. § 502(c) ............................................................................................................16

11 U.S.C. § 502(j)),...........................................................................................................16

Federal Rule of Civil Procedure 59 ......................................................................1, 14, 15

Federal Rule of Bankruptcy Procedure 9023 ......................................................................1

## OTHER AUTHORITIES

Joseph N. Gitlin, et al., *Comparison of "B" Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004)................................................................................................................................11

Carl Rubin and Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35 (1991) ................................................................................11

The Official Committee of Asbestos Property Damage Claimants (the

"Property Damage Committee") submits this brief in support of its Motion Pursuant to

F.R. Bank. P. 9023 (as it incorporates F.R. Civ. P. 59)[1] to re-open the evidence in this

estimation proceeding to address newly discovered evidence regarding the basis for non-

malignant asbestos personal injury claims against T&N Ltd.

## I.     INTRODUCTION

All of the estimates presented to this Court of T&N Ltd.'s ("T&N")

pending and future asbestos personal injury liability allocate billions of dollars to

claimants alleging non-malignant injury.  For example, the Asbestos Claimants

Committee's estimation expert, Dr. Mark Peterson, allocates 47% of his $11.1 billion

estimate to non-malignant claimants.  Based on legitimate suspicions that the use of mass-

screened medical evidence massively inflated the level of pending (and past) claims, the

Property Damage Committee moved for establishment of a Bar Date pursuant to Federal

Rule of Bankruptcy Procedure 3003 to obtain information about the legitimacy of pending

claims and whether such claims were the product of good faith medical practice. *See*

Motion of the Official Committee of Asbestos Property Damage Claimants Pursuant to

Federal Rule of Bankruptcy Procedure Rule 3003(c) For Order Fixing Final Date for

Filing Proofs of Asbestos Claims And Approving Notice and Publication Procedures

Related Thereto (*In re Federal-Mogul Global, Inc.*, No. 01-10578 (Bankr. D. Del.

September 3, 2004)) (the "Bar Date Motion") (*See* Appendix Exhibit 1).  The Bankruptcy

---

[1] F. R. Bankr. P. 9023 states that "Rule 59 F. R. Civ. P. 59 applies in cases under the [Bankruptcy] Code."  Federal Rule of Civil Procedure 59(a) states in pertinent part that a in a trial without a jury the court can "take additional testimony" upon a motion for rehearing.

Court denied the Bar Date Motion (effectively denying the Property Damage Committee from obtaining vital discovery), and estimation proceeded, culminating in the estimation hearing before the District Court from June 14 to June 21, 2005 (the "estimation hearing").

Nine days after the closing of the evidence in the estimation hearing – on June 30, 2005 – the Property Damage Committee's suspicions that widespread misconduct pervades mass-screening enterprises and that certain doctors who are prolific "B-readers" engage in massive wrongdoing were confirmed by a lengthy, exhaustively detailed decision issued by the Honorable Janice Graham Jack of the United States District Court for the Southern District of Texas. *See* Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions, dated June 30, 2005 ("Order No. 29") (*In re Silica Prod. Liab. Litig.*, MDL Docket No. 1553 (S.D. Tex) the ("Silica MDL") (Order 29 is attached hereto as Exhibit A). Judge Jack's Order exposes the rampant misconduct of mass-screening entities and doctors who have generated thousands and thousands of silicosis *and* asbestosis claims.

In light of Judge Jack's compelling opinion, the Property Damage Committee is moving to re-open the evidence in this estimation proceeding and to allow additional discovery to ascertain the extent to which T&N has been affected by the same or similar wrong-doing described by Judge Jack. Judge Jack's opinion highlights the need to permit the Property Damage Committee to obtain information about the doctors and screening companies used by pending claimants. Indeed, we already know from the record that Dr. Ray Harron, criticized extensively by Judge Jack, was prolific among the doctors who reviewed X-rays of claimants against T&N. *See infra* at page 10. Other doctors who Judge Jack criticized have also been historically very active in asbestos

2

litigation. *Id.* Such information will undoubtedly affect any estimate of T&N's pending and future asbestos liability. Given the procedural posture of this case – where no confirmation hearing is scheduled, and no estimate has even been rendered – no party will be prejudiced by this inquiry into the legitimacy of claims against T&N.

It is well within the Court's power to order a re-opening of the trial and to permit this additional discovery. The Supreme Court has commanded that a bankruptcy court "has the power [in the exercise of its equitable jurisdiction] to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 309 (1939). It would be a manifest injustice if the misconduct detailed in the silicosis cases were allowed to go unchecked in this proceeding. Accordingly, the Property Damage Committee respectfully requests that the Court exercise its power to "sift the circumstances" surrounding nonmalignant asbestos claims as requested herein.

## II.    BACKGROUND AND JURISDICTION

On October 1, 2001 (the "Commencement Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. See Chapter 11 Voluntary Petitions of Federal-Mogul Global, Inc., et al. (Docket No. 1. et. seq.) The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On October 28, 2003, pursuant to section 1102(a)(2) of the Bankruptcy Code, the United States Trustee appointed the Property Damage Committee, consisting of five (5) members, to represent the interests of asbestos property damage claimants (the "Property Damage Claimants") in the Debtors' chapter 11 cases. *See* Appointment of

Official Committee of Asbestos Property Damage Claimants Filed by United States

Trustee (Docket No. 3671).

This Court has jurisdiction over the asbestos personal injury claims

estimation proceeding and this Motion pursuant to 28 U.S.C. § § 1334 and 157. The

reference as to this estimation proceeding has been withdrawn from the bankruptcy court

pursuant to 28 U.S.C. § 157(d). The Court conducted the estimation hearing from June 14

to June 21, 2005. Venue of the chapter 11 proceeding in the District of Delaware was

proper as of the Commencement Date and continues to be proper pursuant to 28 U.S.C.

§ § 1408 and 1409.

## III.  THE PROPERTY DAMAGE COMMITTEE SOUGHT DISCOVERY INTO WRONG-DOING BY SCREENING COMPANIES AND DOCTORS VIA ITS BAR DATE MOTION

The Property Damage Committee has already sought information about the

bases for pending claims, but has been stymied by the Plan Proponents. On September 3,

2004, the Property Damage Committee filed the Bar Date Motion seeking a similar

examination of asbestos personal injury claims through the imposition of a bar date by

which asbestos personal injury claimants would be required to file a claim against the

Debtors' estates (*i.e.*, T&N or other subsidiaries of Federal-Mogul with asbestos liability).

The Bar Date Motion sought the following relief: (i) fixing the bar date for the filing of

timely proofs of claim by current asbestos personal injury claimants; (ii) approving the

form of notices related thereto; (iii) approving the proposed procedures for providing

notice of the bar date, including a specialized claim form (in essence a "fact sheet" similar

to the one ordered to be filed in the Silica MDL by Judge Jack) designed specifically for

asbestos personal injury claims; and (iv) deferring and adjourning the confirmation hearing

on the proposed Plan for three months, with an objection deadline thirty days prior to the hearing.

As support for such request, the Property Damage Committee argued that a bar date for asbestos personal injury claims would provide useful information about pending claims. *See* Bar Date Motion at 8 ("The establishment of a bar date provides necessary transparency to bankruptcy cases – all parties in interest, including creditors, have the opportunity to evaluate the extent of claims asserted and to object to improper claims.").[2]  Moreover, the Property Damage Committee claimed a bar date was necessary to prevent dilution of the recovery for other unsecured creditors by the allowance of invalid asbestos personal injury claims. *See, e.g.*, *id.* at 9 ("As one member of the [ACC] has candidly admitted, the 'great majority' of asbestos claims are submitted by 'unimpaired' persons with conditions insufficient to keep a child home from school.")  The Bar Date Motion also specifically sought an order requiring asbestos personal injury claimants to complete and file a proof of claim specially designed to elicit the necessary information for the classification and resolution of asbestos-related personal injury claims. For instance, the proof of claim form required claimants to, among other things, provide information related to: (i) basic evidence supporting the claim; (ii) the claimant's medical condition; (iii) the claimant's exposure history (i.e., length of time and product identification); (iv) the claimant's smoking history; and (v) evidence as to settlements. The form also required plaintiffs to submit their most recent X-ray results and diagnosis,

---

[2] The Property Damage Committee also argued that setting a bar date was mandatory under Bankruptcy Rule 3003(c)(3) ("[t]he court shall fix and for cause shown may extend the time within which proofs of claim or interests may be filed.")

including the "ILO Rating" and the name of the doctor that provided the diagnosis. This is

precisely the kind of information that proved essential to Judge Jack's findings in the

Silica MDL. *In re Silica Prod. Liab. Litig.*, MDL Docket No. 1553, *slip op.* at 22 (S.D.

Tex June 30, 2005).

In opposition, the Debtors, the ACC, the Legal Representative, and the

Unsecured Creditors Committee (the "UCC") each filed an objection to the relief sought in

the Bar Date Motion. Predictably, the Debtors and the UCC opposed the Bar Date Motion

on the ground that it was designed solely to derail the confirmation process and would be

too costly. In its opposition, the ACC and others argued, *inter alia*, that a bar date would

not provide useful information to an estimation.

On October 7, 2004, the Bankruptcy Court heard oral argument with

respect to the Bar Date Motion. At the conclusion of the hearing, the Bankruptcy Court

rendered a decision denying the relief sought in the Bar Date Motion principally on the

grounds that the case was too far advanced to warrant discovery of the type of information

sought by the Property Damage Committee. As stated by the Bankruptcy Court:

> I'm going to deny the motion by the property damage
> committee for the Court to set a bar date at this late date.
> The case is just past its third anniversary. The debtors filed
> a plan and a disclosure statement, which has been approved
> by the Court for several months now . . . To come forward
> now two months prior to confirmation and embark upon a
> bar date process, it's really too late to do that.[3]

*See* October 7, 2004 Transcript at 81, 84.

---

[3] Ironically, more than nine months later, a confirmation hearing has still not occurred,
there is no pending date for the hearing and, indeed, a confirmation hearing does not
appear to be on the horizon.

The Bankruptcy Court also noted that the information might not have been useful to an estimation proceeding.  *Id*. at 85.  Recent developments in the Silica MDL demonstrate that the suggestion that this information is not useful is wrong.

## IV.    JUDGE JACK'S RULING EXPOSES RAMPANT WRONGDOING IN SILICOSIS *AND* ASBESTOSIS DIAGNOSES.

Judge Jack's ruling in the Silica MDL exposes the overly aggressive, irresponsible and even fraudulent tactics used by plaintiffs' lawyers, mass-screening enterprises and affiliated physicians in silicosis claims.  It also demonstrates the interrelationship between silicosis and asbestosis claims.  After substantial discovery into certain mass-screening enterprises and physicians who generated a high volume of cases, Judge Jack issued a 249 page ruling on a number of issues, including "whether the doctors who diagnosed Plaintiffs with silicosis employed a sufficiently reliable methodology for their testimony to be admissible." *In re Silica Prod. Liab. Litig.*, MDL Docket No. 1553, *slip op.* at 1 (S.D. Tex June 30, 2005).  In answering that question, the MDL Court examined many underlying factual issues related to mass-screening enterprises and certain physicians who are active in both silica and asbestos litigation, explaining that claims generated by screening companies and affiliated physicians "def[ied] all medical knowledge and logic," *id.* at 116, and that the claims were not about the "search for truth and the quest for justice," they "were manufactured for money" and " were about litigation rather than health care." *Id.* at 150.  The screening companies upon whom discovery was taken in that case were involved in both asbestos and silica litigation.  *Id.* at 66.  Judge Jack's opinion lays out the connection between asbestosis and silicosis claims in a stark paragraph about one screening company, N&M Inc.:

> Overall, N&M . . . managed to generate the diagnoses for
> approximately 6,757 [Silica] MDL Plaintiffs. To place this
> accomplishment in perspective, in just over two years,
> N&M found 400 times more silicosis claims than the Mayo
> Clinic (which sees 250,000 patients a year). Furthermore,
> when comparing the names of the approximately 6,757-
> N&M generated MDL Plaintiffs with the names in the
> Manville Personal Injury Settlement Trust (a trust
> established for asbestos claims after the Johns-Manville
> Corporation bankruptcy), *at least 4,031 N&M-generated
> Plaintiffs have also made asbestos claims*. The magnitude
> of this feat becomes evident when one considers that many
> pulmonologists, pathologists, and B-readers go their entire
> careers without encountering a single patient with both
> silicosis and asbestosis. . . . Stated differently, a golfer is
> more likely to hit a hole-in-one than an occupational
> medicine specialist is to find a single case of both silicosis
> and asbestosis. N&M parked a van in some parking lots
> and found over 4,000 such cases.

*Id.* at 79 (internal citations omitted) (emphasis added). Judge Jack noted that the number

of Silica MDL plaintiffs who had also made asbestosis claims was "staggering," *id.* at 134,

stunning, and not scientifically plausible. *Id.* at 135.

## A.    Misconduct by Screening Companies.

With respect to screening companies, Judge Jack's Order demonstrates that

law firms, not physicians, were taking medical or occupational histories of claimants – a

critical component in making a medical assessment of what kind of disease – if any –

causes radiographic evidence of pneumoconiosis (*i.e.*, markings on an X-ray which could

be read as consistent with a compensable disease). *Id.* at 66-68. The court found "no

evidence that anyone [taking medical histories] had any medical training or had been

instructed by any medical professional what questions would be appropriate in taking an

occupational history." *Id.* at 68. Judge Jack's Order details the complete lack of evidence

that certain high volume screening companies used proper X-ray technology or methodology, or that "any medical professional supervised the extent to which Plaintiffs were irradiated." *Id.* at 70; *see also id.* at 82. In sum, one principal in a screening company testified there was no regard for medical techniques or standards, but rather, "whatever the [law firm] asked us to do is what we did." *Id.* at 67, 68 (alteration in original).

## B.    Misconduct by Diagnosing Physicians.

Judge Jack's Order also demonstrates that diagnosing physicians were engaged in misconduct – and had extensive involvement in asbestos cases. Dr. Ray Harron, whose practices were described as "disgraceful" by one testifying doctor, *id.* at 86, and "distressing" by another, *id.*, frequently diagnosed asbestos claimants. *Id.* at 80. Harron acknowledged that his diagnoses were for legal purposes and not medical in nature. *Id.* at 81. He admitted that he did not rule out causes for radiographic changes other than silica exposure, *id* at 82, that he relied on secretaries and typing companies to fill out diagnostic reports, and that he trusted clerical workers to interpret the B-reading forms he filled out. *Id.* at 84. Harron failed to read, review or even see any of the 99 diagnosing reports in the *Alexander* case bearing his name. *Id.* at 156. (*Alexander* was one of the cases comprising the Silica MDL) Harron also had a disturbing pattern of diagnosing claimants with both silicosis and asbestosis:

> [W]hen Dr. Harron first examined 1,807 Plaintiffs' X-rays
> for asbestos litigation (virtually all done prior to 2000,
> when mass silica litigation was just a gleam in a lawyer's
> eye), he found them all to be consistent only with
> asbestosis and not with silicosis. But upon re-examining
> these 1,807 MDL Plaintiffs' X-rays for silica litigation, Dr.
> Harron found evidence of silicosis in every case.

*Id.* at 90.

Another doctor, James Ballard, brazenly acknowledged that his diagnoses were impacted by whether a law firm was bringing an asbestosis or a silicosis claim: if a screening company or law firm told Ballard that a claimant had an exposure history consistent with asbestosis, that meant to him that the lawyers or screening company "want[ed] [him] to look for asbestosis," and that this "'could sway' his [X-]ray reading." *Id.* at 94. Judge Jack noted that defendants had presented twelve additional examples where Ballard, like Dr. Harron, made a "similar complete asbestosis/silicosis reversal," or, in other words, diagnosed the same patient with asbestosis and silicosis at different times in order to support different claims. *Id.* Judge Jack noted the testimony of another witness, who, upon reviewing Ballard's B-reading patterns, testified that Ballard's diagnoses were "most stunning" and "defie[d] all statistical logic and all medical and scientific evidence of what happens to the lung when it's exposed to workplace dust," and thus, his readings were not "intellectually and scientifically honest." *Id.* at 96, 136. Judge Jack made a similar finding with respect to Dr. W. Allen Oaks (*id.* at 136), who is also a prolific B-reader in asbestos cases.

A fourth physician, George Martindale, who was listed as a diagnosing physician by plaintiffs lawyers in thousands of cases, testified that he had not actually made any diagnoses. He was unfamiliar with diagnostic criteria, and had never spoken to a single patient about silicosis. *Id.* at 33, 34. Martindale's procedures were so poor that he never even signed or reviewed copies of his "expert" reports in silicosis cases after they

were transcribed by his assistants. *Id.* at 37. Notably, Martindale conducted B-reads in both silicosis and asbestosis litigation. *Id.* at 35.[4]

Each of these doctors (Harron, Ballard, Oaks and Martindale) is among the most prolific readers in asbestos litigation. *See* "2004 Asbestos Claim Filing Trends," David Austern at pg. 8 (*See* Appendix Exhibit 2). And, indeed, Judge Jack noted the massive extent of unreliability of B-reading in asbestos cases: "it is worth noting that this evidence of unreliability of the B-reads performed for this MDL is matched by evidence of the unreliability of B-reads in asbestos litigation." *Id.* at 136 (citing Joseph N. Gitlin, et al., *Comparison of "B" Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004)[5] and *See* Carl Rubin and Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 38 (1991).[6]

## V. T&N WAS HARMED BY THIS SAME MISCONDUCT, AND TARGETED DISCOVERY CAN DEMONSTRATE THE EXTENT OF SUCH HARM

### A. T&N Was Impacted By Mass Screenings and These High-Volume Physicians

Judge Jack's findings are indisputably relevant to an estimate of T&N's asbestos personal injury liability. As established above, Judge Jack's Order establishes an unseverable nexus between silica litigation and asbestos litigation. Moreover, evidence

---

[4] Judge Jack's opinion goes on in far greater detail – some 249 pages.

[5] This study was admitted at the Estimation Hearing as PD Ex. 28. Notably, one of the principal experts that Judge Jack relied upon, Dr. Robert Parker, worked with Dr. Gitlin in his study. *See* Estimation Hearing Transcript, *Official Committee of Asbestos Personal Injury Claimants, et al. v. Asbestos Property Damage Committee (In re Federal-Mogul Global, Inc.*, No. 05-59 (JHR) 6/15/2005 tr. at 315 (Hereinafter "T&N Estimation, date, tr. at __").

[6] This article was admitted at the Estimation Hearing as PD Ex. 95.

already adduced in this proceeding demonstrates that T&N faced claims generated by the

same tactics and even some of the bad actors identified in the Silica MDL:

- Paul Hanly acknowledged that mass screenings generated a substantial number of claims against T&N. (T&N Estimation, 6/14/2005, tr. at 127-28.")

- William Hanlon, the CCR's outside counsel testified to the same effect. (Deposition Transcript of William R. Hanlon at 71 (hereinafter "Hanlon Dep. tr. at __").)

- Hanly testified that Dr. Harron (the same Dr. Harron who was criticized and excoriated by Judge Jack) was a prolific B-reader in his experience as T&N's counsel. (T&N Estimation, 6/14/2005, tr. at 129.)

- Hanlon confirmed this testimony from his experience with the CCR (Hanlon Dep. tr. at 72.)

- Doctors who provided diagnoses at issue in the Silica MDL have remained very active in asbestos litigation. These doctors provided B-reads for approximately 34,000 of the 119,500 claims processed by the Manville Trust between January 1, 2002 and June 30, 2004. *See* "2004 Asbestos Claim Filing Trends," David Austern at pg. 8 (attached hereto as Appendix Exhibit 2).

The evidence of misconduct and wrongdoing painstakingly detailed in the

Silica MDL is serious. Judge Jack ruled that evidence submitted by Dr. Harron failed to

meet reliability standards under the *Daubert* analysis because he ignored a fundamental

diagnostic step and used "distressing" and "disgraceful" procedures that "do[] not

remotely resemble reasonable medical practice." *In re Silica Prod. Liab. Litig.*, MDL

Docket No. 1553, *slip op.* at 156 (S.D. Tex June 30, 2005). The Plan Proponents'

historical response to this – that allegations about misconduct should be ignored because

claims supported by a diagnosis by doctors such as Dr. Harron were paid less than other

claims – is untenable in light of this powerful ruling. Indeed, Judge Jack's Order explains

why claims supported by individuals like Dr. Harron were paid at all: unscrupulous

lawyers manipulated the system in order to "overwhelm the Defendants and the judicial

system . . . in hopes of extracting mass nuisance-value settlements because the Defendants

and the judicial system are financially incapable of examining the merits of each

individual claim in the usual manner." *Id.* 238-239.

Whatever claims T&N paid pre-bankruptcy, and whatever the reasons for

T&N's behavior, no party should be permitted to use a chapter 11 proceeding (and the

federal court system) to perpetuate this abuse. As Judge Jack catalogued:

> Many of the effects of the mass misdiagnoses are obvious,
> but they nonetheless should be noted. Limited judicial
> resources are consumed weeding out meritless claims,
> costing the judiciary, costing other litigants whose suits are
> delayed, and ultimately costing the public who pays for a
> judicial system that is supposed to move with some degree
> of speed and efficiency.
>
> Defendant companies pay significant costs litigating
> meritless claims. And what harms these companies also
> harms the companies' shareholders, current employees, and
> ability to create jobs in the future.

*Id.* at 151.

And, as Judge Jack further noted:

> The Court finds that filing and then persisting in the
> prosecution of silicosis claims while recklessly
> disregarding the fact that there is no reliable basis for
> believing that every Plaintiff has silicosis constitutes an
> unreasonable multiplication of the proceedings. When
> factoring in the obvious motivation – overwhelming the
> system to prevent examination of each individual claim and
> to extract mass settlements – the behavior becomes
> vexatious as well.

*Id.* at 239.

**B.    Targeted Discovery Will Demonstrate the Extent to Which Pending Claims In This Case Were Generated by the Tactics Described by Judge Jack.**

The Property Damage Committee seeks an order re-opening discovery before the Court estimates T&N's liability. Through discovery, the Property Damage Committee will establish the extent to which certain suspect screening facilities and doctors provided the medical evidence upon which pending claimants rely. This discovery could also be obtained through entry of a bar date order – indeed, had the Plan Proponents not opposed the bar date motion, the very information now sought by the Property Damage Committee would already be available. Instead, the Plan Proponents argued that such information was irrelevant. Judge Jack's thoroughly detailed opinion in the Silica MDL demolishes that argument and exposes it for the obfuscation it is. The Property Damage Committee will take reasonable steps to ensure that this discovery is accomplished in a timely manner.[7]

There is no doubt that the Court can order that discovery and testimony be re-opened. For example, it can act pursuant to F. R. Bankr. P. 9023 (as it incorporates F. R. Civ. P. 59) to permit additional testimony and discovery into the applicability of the issues raised in the Silica MDL to this case. Whether to permit the taking of additional testimony pursuant to Rule 59(a) is within the court's discretion. *Compass Technology, Inc. v. Tseng Laboratories, Inc.*, 71 F.3d 1125, 1131 (3d. Cir. 1995); *DuPont v. United States*, 385 F.2d 780, 783 (3d. Cir. 1967).

---

[7] The Property Damage Committee does not seek this discovery to estimate the claim of any individual claimant. Ultimately, any trust established in this case will determine whether and how much an individual's claim should be paid.

In *Compass Technology*, the Third Circuit held that the district court abused its discretion in denying plaintiffs' Rule 59(a) motion to open the judgment for testimony from a newly located witness.  In reversing the district court, the court required that the new evidence (1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence and (3) would probably have changed the outcome of the trial.  *Compass Technology*, 71 F.3d at 1130.  Here, as to the first and third factors there can be no reasonable dispute as to the materiality of whether massive numbers of claims against T&N are infected by fraudulent and/or unsound scientific practices, and also no doubt that it should have an important impact on the outcome of the estimation.  As to the second factor, given the denial of the Bar Date motion, the Property Damage Committee could not have obtained the relevant information about which screening companies and which doctors were diagnosing pending claimants at any earlier point in this case.

In *DuPont*, the Third Circuit also held that the district court erred in not granting the plaintiffs' Rule 59(a) motion for a partial new trial to permit additional testimony.  385 F.2d at 783.  The Third Circuit emphasized equitable considerations and the equitable powers of courts, and also emphasized that permitting the taking of additional testimony resulted in no countervailing prejudice to the opposing party.  *Id.*  Here, too, there is no countervailing prejudice to the opposing parties.  The discovery sought from pending personal injury claimants is information that already exists and should be readily available– what screening company and what doctor diagnosed the claimant.  As for the other parties, the chapter 11 case is hardly nearing conclusion – and

much remains to be done. The paramount importance of ensuring that estimation counts only legitimate claims easily outweighs any short delays attendant to this vital discovery.

Moreover, the standard for the Property Damage Committee to obtain relief in this case should be lower than in *Compass Technology* or *Dupont*, as in those cases, the courts had already rendered judgments. Here, the Court has not issued any ruling on estimation, and full briefing and argument on the estimation motion may not yet even be complete.

Additionally, under section 502(j) of the Bankruptcy Code (11 U.S.C. § 502(j))[8] a court can reconsider any claim *that has already been* allowed or disallowed "according to the equities of the case." If the court possesses the greater power to re-examine claims which have already been decided, *a fortiori*, it has the power to order additional discovery to guide it in reaching an estimate of claims, especially when it has not yet decided the amount of that estimate. Moreover, under established precedent in this circuit, it is within the Court's discretion to decide the parameters of discovery and the evidence accepted by the Court. *Gibson v. Mayor and City Council of Wilmington*, 355 F.3d 215 (3d Cir. 2004) (finding it within district court's discretion to reopen and enlarge record after jury deliberations began); *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1213 (3d Cir. 1984) ("questions concerning the scope of discovery are among those matters which should be almost exclusively committed to the sound discretion of the district court").

---

[8] The Court's power to estimate claims derives from this same section. *See* 11 U.S.C. § 502(c).

If needed, the Property Damage Committee will seek discovery from a randomly selected, statistically significant pool of pending claims alleging nonmalignant or unspecified diseases . The Property Damage Committee will then take discovery of the screening enterprises and the doctors who provided X-ray readings for pending claimants[9] and demonstrate that the pervasive wrongdoing which the District Court overseeing the Silicosis MDL detailed is present here, too.  Upon granting of this Motion, the Property Damage Committee will timely file a discovery plan and propose a supplemental hearing date.  At that point, the parties can adjust their estimates accordingly.  Arriving at an estimate without discovery into this issue would require the Court to place its imprimatur on what the Property Damage Committee believes to be – and what was very clearly found in the Silica MDL to be – an egregious abuse of the legal system.

## VI.    CONCLUSION

For the foregoing reasons, the Motion should be granted.


[the remainder of this page intentionally blank]

---

[9] There is no doubt that the overwhelming majority of personal injury claimants rely on X-rays to support asbestosis claims.  The 2004 American Thoracic Society standards (relied upon by Dr. Laura Welch at the estimation hearing and admitted as Plaintiffs' Ex. 25) confirm that X-rays remain the best diagnostic tool for assessing the presence of nonmalignant disease, and specifically note that "[t]he abnormal PA chest film and its interpretation remain the most important factors in establishing the presence of pulmonary fibrosis." *Id.* at 702.

Dated:      Wilmington, Delaware
             July 13, 2005

FERRY, JOSEPH & PEARCE, P.A.


/s/ Theodore J. Tacconelli
Theodore J. Tacconelli, Esq. (No. 2678)
Lisa L. Coggins, Esq. (No. 3418)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware 19899
Telephone:   (302) 575-1555

-and-

LOCAL COUNSEL TO THE OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock, Esq.
Michael P. Kessler, Esq.
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007

-and-

Adam P. Strochak
Peter M. Friedman
1501 K Street, NW Suite 100
Washington, DC 20005
Telephone:   (202) 682-7000

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS