**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------x
                                   :

In re:                              :        Bankruptcy No. 01-10578 (RTL)
                                   :

FEDERAL-MOGUL GLOBAL, INC., et al. :
T&N LIMITED, et al.,              :
                 Debtors.   :

-------------------------------------------------------x
                                   :

THE OFFICIAL COMMITTEE OF    :
ASBESTOS CLAIMANTS and       :
ERIC D. GREEN, as the          :
LEGAL REPRESENTATIVE FOR    :
FUTURE ASBESTOS CLAIMANTS,  :
                                   :

          Plaintiffs,          :
                                   :

v.                               :        Civil Action No. 05-59 (JHR)
                                   :

ASBESTOS PROPERTY           :
DAMAGE COMMITTEE,        :
                                   :

          Defendant.         :
                                 :

-------------------------------------------------------x

**CORRECTED VERSION OF THE**
**OFFICIAL COMMITTEE OF ASBESTOS PROPERTY**
**DAMAGE CLAIMANTS' PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW IN CONNECTION WITH THE**
**ESTIMATION OF TURNER AND NEWALL'S PENDING AND**
**FUTURE UNITED STATES ASBESTOS PERSONAL INJURY LIABILITY**

The Official Committee of Asbestos Property Damage Claimants (the

"Property Damage Committee")[1] hereby submit a Corrected Version of their Proposed

Findings of Fact and Conclusions of Law as instructed by the court following the

---

[1] The Property Damage Committee represents the interests of approximately 3,200
municipalities, school districts, hospitals, businesses, and individuals who own and operate
buildings where asbestos-containing products manufactured and distributed by T&N or
affiliated companies have been installed and who have filed proofs of claim for damages.

completion of the June 14-21, 2005 hearing regarding the estimation of the aggregate value of the present pending and expected future asbestos personal injury and wrongful death claims against T&N Limited, a U.K. company, and its non-U.S. subsidiary companies.

Since June 30, 2005, when the Property Damage Committee filed the original version of their Proposed Findings of Fact and Conclusions of Law, the parties have received the final corrected version of the hearing transcript that incorporates the corrections of the original transcript agreed upon by the parties. The page and line numbers for some pages of the corrected and final version of the hearing transcript have changed slightly due to these corrections, requiring a revised set of proposed findings that reflect the proper page and line numbers for the citations to the final and corrected version hearing transcript.

Attached hereto as Attachment A (and also submitted in electronic format) is the Corrected Version of the Property Damage Committee's Proposed Findings of Fact and Conclusions of Law incorporating the corrected citations to the hearing transcript. Attached hereto as Attachment B is a "red-line" of the Corrected Version of the Property Damage Committee's Proposed Findings of Fact and Conclusions of Law showing the changes between the prior version of our Proposed Findings of Fact and conclusions of Law and the corrected version of our Proposed Findings of Fact and Conclusions of Law filed on June 30, 2005.

Dated:        Wilmington, Delaware
              July 13, 2005

                          FERRY, JOSEPH & PEARCE, P.A.


                          Theodore J. Tacconelli, Esq. (No. 2678)
                          Rick S. Miller, Esq. (No. 3418)
                          824 Market Street, Suite 904
                          P.O. Box 1351
                          Wilmington, Delaware  19899
                          (302) 575-1555

                          LOCAL COUNSEL TO THE OFFICIAL
                          COMMITTEE OF ASBESTOS
                          PROPERTY DAMAGE CLAIMANTS

                          WEIL, GOTSHAL & MANGES LLP
                          Martin J. Bienenstock, Esq.
                          Michael P. Kessler, Esq.
                          Adam P. Strochak, Esq.
                          767 Fifth Avenue
                          New York, New York 10153
                          Telephone:    (212) 310-8000
                          Facsimile:    (212) 310-8007

                          ATTORNEYS FOR THE OFFICIAL
                          COMMITTEE OF ASBESTOS
                          PROPERTY DAMAGE CLAIMANTS

**Attachment B**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x
                                    :
In re:                              :    Bankruptcy No. 01-10578 (RTL)
                                    :
FEDERAL-MOGUL GLOBAL, INC., et al. :
T&N LIMITED, et al.,                :
                        Debtors.    :
-----------------------------------------------------------x
                                    :
THE OFFICIAL COMMITTEE OF           :
ASBESTOS CLAIMANTS and              :
ERIC D. GREEN, as the               :
LEGAL REPRESENTATIVE FOR            :
FUTURE ASBESTOS CLAIMANTS,          :
                                    :
            Plaintiffs,             :
                                    :
v.                                  :    Civil Action No. 05-59 (JHR)
                                    :
ASBESTOS PROPERTY                   :
DAMAGE COMMITTEE,                   :
                                    :
            Defendant.              :
                                    :
-----------------------------------------------------------x

### OFFICIAL COMMITTEE OF ASBESTOS PROPERTY
### DAMAGE CLAIMANTS' PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW IN CONNECTION WITH THE
### ESTIMATION OF TURNER AND NEWALL'S PENDING AND
### FUTURE UNITED STATES ASBESTOS PERSONAL INJURY LIABILITY

# TABLE OF CONTENTS

Page

I.    CONCLUSIONS OF LAW ...................................................................................1

    A.    Jurisdiction and Venue ...............................................................................1

    B.    Contested Matter..........................................................................................2

    C.    Estimation....................................................................................................3

II.   THE DEBTORS' CHAPTER 11 CASES ............................................................7

III.  FINDINGS OF FACT .........................................................................................11

IV.   THE DEBTORS' ASBESTOS PERSONAL INJURY HISTORY ......................12

    A.    Turner & Newall's Claims History...........................................................12

V.    THE MEDICAL EVIDENCE DEMONSTRATES THAT THE
      INCIDENCE OF ASBESTOS RELATED DISEASE IS DECREASING
      STEADILY OVER TIME...................................................................................20

    A.    The Medical Incidence of Asbestosis Is Declining, But There is a
          Phenomenon of Over-Diagnosis of Asbestosis by Plaintiff-Selected
          B-Readers ...................................................................................................21

    B.    The Incidence of Mesothelioma in the United States is Decreasing ........23

    C.    The Incidence of Asbestos-Caused Lung Cancer in the United
          States is Decreasing ...................................................................................25

    D.    Other Cancers Cannot be Conclusively Linked to Asbestos
          Exposure ...................................................................................................25

VI.   THE DEBTORS' HAVE FILED MULTIPLE REPORTS WITH THE
      SEC ESTIMATING T&N'S PENDING AND FUTURE  ASBESTOS
      LIABILITY FAR BELOW THE PETERSON ESTIMATE................................26

VII.  DR. ROBIN CANTOR'S ESTIMATE.................................................................27

    A.    Dr. Cantor's Expert Credentials ...............................................................27

    B.    Dr. Cantor's Methodology for Estimating Claims Against T&N.............29

VIII. THE PETERSON ESTIMATE IS INCONSISTENT WITH ALL OTHER
      ESTIMATES IN THIS CASE .............................................................................40

    A.    Dr. Peterson's Estimate Is Flawed ............................................................40

    B.    Dr. Peterson's Claim Values Are Overstated ...........................................42

    C.    Dr. Peterson Forecasts Unsustainable Claiming Rates.............................44

The Official Committee of Asbestos Property Damage Claimants (the

"Property Damage Committee")[1] submits these proposed findings of fact and conclusions

of law based on the facts adduced at the hearing conducted before this Court commencing

on June 14, 2005 and ending on June 21, 2005.[2]

## I.
## CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue.

1.      This Court has jurisdiction over the asbestos personal injury claims

estimation proceeding pursuant to 28 U.S.C. § § 1334 and 157. The reference as to this

estimation proceeding has been withdrawn from the bankruptcy court pursuant to 28

U.S.C. § 157(d). Venue of the chapter 11 proceeding in the District of Delaware was

proper as of the Commencement Date and continues to be proper pursuant to 28 U.S.C.

§ § 1408 and 1409.

2.      On December 2, 2004, the Debtors filed a motion pursuant to 11

U.S.C. Section 105(a) for an Order (I) Clarifying District Court Judge Wolin's December

10, 2001 Order, and (II) Delineating the Respective Roles of the District Court and the

---

[1] The Property Damage Committee represents the interests of approximately 3,200
municipalities, school districts, hospitals, businesses, and individuals who own and operate
buildings where asbestos-containing products manufactured and distributed by T&N or
affiliated companies have been installed and who have filed proofs of claim for damages.

[2] The Findings of Fact and Conclusions of Law contained herein constitute proposed
findings of fact and conclusions of law proposed to be entered by this Court pursuant to
Rule 52 of the Federal Rules of Civil Procedure. To the extent any of the findings of fact
constitute conclusions of law, they are adopted as such. To the extent any of the
conclusions of law constitute findings of fact, they are adopted as such.

Bankruptcy Court With Respect to Asbestos Estimation and Plan Confirmation Matters in these Cases (the "Withdrawal Motion"), which sought withdrawal of the reference to this Court from the Bankruptcy Court of both the asbestos personal injury claims estimation and Plan confirmation proceedings. (Docket No. 6517). On January 14, 2005, the Property Damage Committee filed a statement of support for the relief sought in the Withdrawal Motion. (Docket No. 6830). Following a hearing on January 25, 2005, this Court entered an order granting withdrawal of the reference with respect to the estimation proceeding, but reserving decision on whether to withdraw the reference as to the confirmation hearing. The Court's decision on whether to withdraw the reference as to the confirmation hearing remains sub judice.

3.     On June 16, 2004, an Order was entered by the Chief Judge of the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C. § 292(b) designating and assigning District Court Judge Rodriguez to sit on the United States District Court for the District of Delaware in these bankruptcy cases.

**B.     Contested Matter.**

4.     This estimation proceeding is a contested matter pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") – as opposed to an adversary proceeding under Bankruptcy Rule 7001. As such, each of the Plan Proponents, as proponents of the Plan for which the estimation proceeding was held and as parties in interest under section 1109(b) of the Bankruptcy Code, are parties to this contested matter. In a contested matter, the Court takes judicial notice of the entire docket

in the bankruptcy cases. *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197 (3d Cir. 1995); *In re McKnight*, 2005 Bankr. LEXIS 975 (Bankr. E.D. Pa. 2005).

## C.  **Estimation.**

5.     Estimation of the allowed amount of claims in bankruptcy is governed by section 502(c) of chapter 11 of title 11 ("the Bankruptcy Code"), which provides a mechanism for the mandatory estimation of "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. 502(c); *see also Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 347 (3d Cir. 2002) ("The object of (an estimation) proceeding is to establish the estimated value of a creditor's (contingent or unliquidated) claim for purposes of formulating a reorganization plan."). Pursuant to section 502(c), estimation should be for the purpose of "allowance," which, according to a noted bankruptcy treatise, means "that the essence of section 502(c) is that all claims against the debtor be converted into dollar amounts." *See* 4 COLLIER ON BANKRUPTCY, ¶ 502.04 (15th ed. rev).. It is undisputed that the Personal Injury Claims are contingent and unliquidated, and that liquidation of each such claim by trial would unduly delay administration of these cases. (*See* Third Amended Joint Plan of Reorganization at § 1.1.20) (hereinafter "Plan at § __"). Here, the Court is not estimating the recovery of any particular Personal Injury Claim, but rather is estimating the aggregate allowable amount of all such claims.

6.     The Bankruptcy Code is silent as to the method or manner in which contingent or unliquidated claims are to be estimated. *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d. Cir. 1982). Thus, this Court has discretion to determine the appropriate

method based upon the circumstances of the particular case before it. *In re Trident Shipworks, Inc.*, 247 B.R. 513 514 (Bankr. M.D. Fla. 2000); *see also In re Thompson McKinnon Sec., Inc.*, 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992). There is no binding precedent for how the Court must conduct an estimate of pending and future asbestos claims. Indeed, the United States Court of Appeals for the Third Circuit has held that a district court has wide latitude in determining what evidence to consider and what methods to apply. *Bittner v. Borne Chem. Co.,* 691 F.2d 134, 135 (3d Cir. 1982). The court held in *Bittner* that:

> The Code (and) the Rules of Bankruptcy Procedure . . . are silent as to the manner in which contingent or unliquidated claims are to be estimated. Despite the lack of express direction on the matter, we are persuaded that Congress intended the procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue.

*Id.* at 135-36.

       7.     The basic methodology for estimating the allowed amount of T&N's asbestos liability is: (1) determining the value of claims for each type of disease,[3] (2) determining the number of pending claims, and anticipated future demands of each disease type that will likely be entitled to compensation, (3) multiplying the value for each disease by the number of projected compensable claims, and (4) adjusting upward for inflation to the date of anticipated payment, and then discounting the inflated amount back to present value. *See In re Eagle-Picher Indus., Inc.*, 189 B.R. 681 (Bankr. S.D. Ohio 1995), *aff'd*, 1996 U.S. Dist. LEXIS 22742 (S.D. Ohio 1996).

---

[3] The categories of diseases are: (1) mesothelioma; (2) lung cancer; (3) other cancers; (4) asbestosis; and (5) pleural disease.

8.    *Eagle-Picher* established a basic principle for determining aggregate

values for asbestos claims, finding that values should be based upon the closed prepetition

claims in the debtor's claims database:

> In valuation, the only sound approach is, if possible, to begin
> with what is known.  To begin without utilizing information
> known about these debtors and their history in the handling
> of claims which have been asserted against them in the past,
> and their disposition, is to ignore a valuable experiential
> resource.  Debtors have a database containing detailed
> information about each of the closed claims.  From the
> database it is possible to associate with each claim
> characteristics such as occupation of the claimant, nature of
> the disease, the amount which was paid to the claimant, as
> well as the number of other factors, as particularly identified
> by Peterson.  Because much of the same information is
> known about the open prepetition claims, though, of course,
> not the settlement amount, it is possible to ascertain with
> some degree of accuracy what the settlement figures for
> those claims would be had they been resolved prepetition.

189 B.R. at 686.

9.    As to future claims, the *Eagle-Picher* court set forth seven

considerations that should inform the estimate:

> (1) The estimate should be primarily based upon the history
> of *this company*, particularly because there was no definitive
> showing of another or other company's production of a
> product line identical to that of debtors.  This consideration
> does not, however, rule out the desirability of considering
> trends general to the industry, particularly regarding the rate
> of filing claims.
>
> (2) The total number of claims to be expected should be
> estimated.
>
> (3) The estimation of claims should categorize them by
> disease and occupation, as well as other factors.

> (4) Valuation of claims should be based upon settlement values for claims close to the filing date of the bankruptcy case.
>
> (5) A reasonable rate for indemnity increase with time must be determined so that a future value of filing date indemnity values can be comparable.
>
> (6) A lag time gleaned from the tort system must be determined in order that there be accuracy in projecting future values.
>
> (7) A discount rate must then be applied to bring the future nominal value of claims back to the filing date.

*Id.* at 690-91.

10.    Also, adjustments to these values may be appropriate where past results have been skewed by factors which affected historic claim resolutions but which can and should be avoided in the future, including: (1) venue shopping; (2) mass screening that triggered thousands of claims by persons who had never experienced adverse symptoms; (3) erroneous x-ray interpretations by biased plaintiff doctors; (4) overpayment to unimpaired claimants; (5) grouping more serious injuries with unimpaired claimants for trial, resulting in higher verdicts or settlements for the latter; (6) overvaluation of less meritorious cases through global settlements; and (7) increased verdicts and settlements caused by the assessment, or threat, of punitive damages. *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 723 (D. Del. 2005) (Fullam, Sr. J., E.D. Pa., sitting by designation). Changes in state procedural and substantive law limiting the right of unimpaired plaintiffs to recover damages as well as the use of "mass screened evidence" should also be reflected in estimating the value and number of future claims. (*Id.* at 725 (noting changes in the "asbestos litigation landscape which have already occurred and which will likely continue.")

## II.
## THE DEBTORS' CHAPTER 11 CASES

11.    On October 1, 2001 (the "Commencement Date"), the Debtors filed
with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.
See Chapter 11 Voluntary Petitions of Federal-Mogul Global, Inc., et al. (Docket No. 1. et.
seq.)  The Debtors are authorized to operate their businesses and manage their properties
as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.    Contemporaneously with the filing of the chapter 11 cases, the
Debtors filed for administration proceedings (the "UK Proceedings") before the High
Court of Justice in the United Kingdom (the "UK Court") for the Debtors located in that
jurisdiction (the "UK Debtors").  (Property Damage Committee Ex. 34 at 5).  (Hereinafter
"PD Ex. ___ at ___). On the Commencement Date, the UK Court approved a Cross-
Border Insolvency Protocol entered into by the Debtors and the Administrators for the UK
Debtors (the "UK Administrators"), which allows the UK Debtors to operate their
businesses in the United Kingdom.  (PD Ex. 34 at 5).

13.    On October 28, 2003, pursuant to section 1102(a)(2) of the
Bankruptcy Code, the United States Trustee appointed the Property Damage Committee,
consisting of five (5) members, to represent the interests of asbestos property damage
claimants (the "Property Damage Claimants") in the Debtors' chapter 11 cases.  *See*
Appointment of Official Committee of Asbestos Property Damage Claimants Filed by
United States Trustee (Docket No. 3671).  The members of the Property Damage
Committee are:  Anderson Memorial Hospital, Jacksonville College, Moxie Real Estate,
Richard Blyth, and The Hill School.  (*Id.*).

14.     On June 4, 2004, the Third Amended Joint Plan of Reorganization (the "Plan") and Disclosure Statement to the Plan (the "Disclosure Statement") were filed jointly by the Debtors, the Official Committee of Unsecured Creditors (the "Creditors Committee)," the Official Committee of Asbestos Claimants (the "ACC"), the Legal Representative for Future Asbestos Claimants, JPMorgan Chase Bank as Administrative Agent for the prepetition lenders, and the Official Committee of Equity Security Holders (collectively, the "Plan Proponents"). (Docket Nos. 5121 and 5122). An order approving the Disclosure Statement was entered by the Bankruptcy Court on the same date. *See* Order (I) Approving Disclosure Statement, (II) Setting Date and Time of Confirmation Hearing With Respect to the Plan of Reorganization for the Debtors, and (III) Establishing Objection Procedures for the Plan of Reorganization for the Debtors (Docket No. 582593055).

15.     The basis for the Plan is what has been colloquially referred to as the "Central Deal." The Central Deal represents an agreement reached between the ACC and the Creditors Committee. The Central Deal allocates 50.1% of Reorganized Federal-Mogul equity to the proposed asbestos personal injury trust, for the benefit of asbestos personal injury claims and pursuant to the provisions of section 524(g) of the Bankruptcy Code, and 49.9% of such equity to the holders of notes issued by Federal-Mogul. (PD Ex. 34 at 6). Under the Plan, other holders of unsecured non-note claims against Federal-Mogul will receive a recovery equal to 35% of the value of each claim, payable in cash in three, equal annual installments. (*Id.* at 106).

16.     As to the 50.1% of the equity of Reorganized Federal-Mogul allocated to asbestos personal injury claims, a trust (the "Trust") will be established in

accordance with section 524(g) of the Bankruptcy Code for the resolution and payment of such claims. (*Id.* at 145). The Trust will be administered by three trustees selected by the ACC in accordance with the Trust Distribution Procedures annexed to the Plan. All asbestos personal injury claims will be channeled to the Trust as the sole forum for the resolution and payment of their claims. Their claims will be paid from the 50.1% of the equity to be transferred to the trust [and by certain insurance policies also to be transferred to the trust. (*See* Plan at § 3.6.5).

17.    Under the Plan, other than asbestos personal injury claims, all unsecured claims against T&N Limited, including property damage claims, will receive a recovery under one of three options.[4] *See* (PD Ex. 34 at 106; Plan at §§ 3.6.3, 8.16). The first option will occur if the UK Administrators propose Company Voluntary Arrangements ("CVAs") or Schemes of Arrangement ("Schemes") for the T&N Companies under UK Administration that mirror the provisions of the Plan. (PD Ex. 34 at 106). In that instance, non-asbestos personal injury claimants with unsecured claims against T&N Limited will receive a distribution in accordance with T&N Distribution Ratio 1, which the Plan defines as a ratio where the numerator is equal to 79% of the value of the Reorganized Federal-Mogul Class B Common Stock -- which is the stock to be distributed to the section 524(g) trust created with respect to the Asbestos Personal Injury Claims against T&N -- and the denominator is the tort system value (as determined by the Asbestos Personal Injury Trust Distribution Procedures) of the Asbestos Personal Injury

---

[4] The third option is not material to these proceedings and will not be discussed.

Claims against T&N. (*Id.*) T&N Distribution Ratio 1 can be stated more simply into graphic form:

$$\frac{\text{79\% of the value of the Reorganized Federal-Mogul Class B Common Stock}}{\text{Tort system value (as determined by the Asbestos Personal Injury Trust Distribution Procedures) of Asbestos Personal Injury Claims}}$$

18.    Under the second option, which will occur if the UK Administrators do not seek to implement CVAs/Schemes that mirror the terms of the Plan, non-personal injury unsecured claimants with claims against T&N Limited will receive a recovery in accordance with Distribution Ratio 2, which is defined by the Plan as a ratio where the numerator is the value of T&N's assets (as determined at the Confirmation Hearing), and the denominator is the sum of the tort system value of the Asbestos Personal Injury Claims against T&N (as determined by the Asbestos Personal Injury Trust Distribution Procedures (i.e., the aggregate allowed amount of Asbestos Personal Injury Claims against T&N and estimated by this Court)) and the allowed amount of other claims against T&N, including Affiliate Claims. (*Id.* at 106-7). In graphic form, Distribution Ratio 2 is represented as:

$$\frac{\text{(Value of T\&N's assets)}}{\text{(Tort system value of the Asbestos Personal Injury Claims against T\&N)} + \text{(allowed amount of other claims against T\&N)}}$$

19.    The numerator under either Distribution Ratio is not affected by the aggregate estimated value of asbestos personal injury claims, and will remain the same whether the estimate of claims is higher or lower. Notably, under either Distribution Ratio, the percentage recovery by non-asbestos personal injury claimants with unsecured claims against T&N Limited is wholly derivative of the aggregate estimated value of asbestos personal injury claims against T&N Limited. The higher the estimate of the aggregate value of asbestos personal injury claims, the higher will be the denominator

under either Distribution Ratio, the lower will be the ratio under either Distribution Ratio,

and therefore the lower the percentage recovery for other, non-asbestos personal injury

unsecured claims against T&N Limited. However, notwithstanding a higher or lower

estimate of asbestos claims, under the Plan the asbestos personal injury claims will receive

in the aggregate the value of the numerator under either Distribution Ratio, i.e., the Trust

will have the same aggregate asset value to distribute to the asbestos personal injury claims

no matter what value is the court's estimated aggregate amount of these claims.

## III.
## FINDINGS OF FACT

20.     The Court conducted an estimation hearing from June 14 through

June 21, 2005. Testimony was received from the following witnesses:

- Paul Hanly, Esq., former United States outside counsel for T&N;

- Andrea Crichton, a T&N employee responsibly for administration of
  asbestos personal injury claims in the United Kingdom;

- Barbara Dohmann, the Plaintiffs' expert on British law;

- Dr. Laura Welch, the Plaintiffs' expert on medical issues;

- Dr. Mark Peterson, the Plaintiffs' estimation expert;

- William Hanlon, Esq., outside counsel to the Center for Claims Resolution;

- George Michael Lynch, the Debtors' Chief Financial Officer;

- Dr. Hans Weill, the Property Damage Committee's medical expert; and

- Dr. Robin Cantor, the Property Damage Committee's estimation expert.

## IV.
## THE DEBTORS' ASBESTOS PERSONAL INJURY HISTORY

21.    Prior to commencing these chapter 11 proceedings on October 1,

2001, the Debtors were defendants in personal injury litigation nationwide as a result of

their manufacture and sale of asbestos containing products.  The Debtors' asbestos

personal injury liability stems from one of six Federal-Mogul entities that was at some

point involved with asbestos or asbestos containing products.  (PD Ex. 34 at 30)  The six

entities are T&N Limited ("T&N"), GHI, Ferodo, F-M Products, Felt Products Mfg. Co.,

and the Vellumoid Division, a former division of Federal-Mogul.  (Id.)  The overwhelming

share of the Debtors' asbestos personal injury liability is related to the activities of T&N,

which was purchased by Federal-Mogul in March of 1998.  (Id.)  This estimation relates

only to T&N's pending and future liability.

A.    **Turner & Newall's Claims History**.

22.    T&N resolved approximately 245,000 asbestos personal injury cases

between 1976 and 2001.  (PD Ex. 2 at 9).  T&N's chief outside counsel, Paul Hanly,

testified that T&N was sued by virtually every major plaintiffs' law firm in that time frame

(6/14/2005 tr. at 105), and was a leading member of the Center for Claims Resolution (the

"CCR"), a coordinated group of major asbestos defendants who joined together to resolve

and defend asbestos personal injury cases.  (Id. at 103).  T&N paid out nearly $835 million

(net present value) to resolve claims.  (Id. at 27).

a.    *T&N's Streams of Asbestos Liability.*

23.    T&N had three relevant streams of U.S. asbestos liability. The largest stream of asbestos liability arose from sales of T&N's Sprayed Limpet Asbestos Product. (PD Ex. 34 at 32). "Limpet was not a widely marketed or used product in the U.S." (*Id.*) "T&N was historically named in very few cases alleging exposure to Limpet that was sprayed" after March 1967 – that is, cases in which a worker's exposure to Limpet occurred within the past forty years. (*Id.* at 33).

24.    The second largest stream of liability arose from T&N's ownership of Keasbey & Mattison Co. ("Keasbey") from 1934 to 1962, and T&N's provision of Keasbey with raw asbestos fiber. (*Id.*) Hanly testified that Keasbey was sometimes referred to by others as a "mini Johns-Manville," (i.e., being the subject of substantial liability) (6/14/2005 tr. at 54). Despite this, claims against T&N based on its relationship with Keasbey were *decreasing* in the years prior to T&N's bankruptcy. (6/14/2005 tr. at 105).

25.    T&N's third stream of liability arose from its subsidiaries' brokerage of raw asbestos fibers in the United States. (PD Ex. 34 at 33). There were fewer suits based on T&N's brokerage of raw asbestos fibers than suits based on Limpet or T&N's ownership of Keasbey. (*Id.*; 6/14/2005 tr. at 119). T&N imported only a miniscule amount of raw asbestos fibers into the United States. (PD Ex. 34 at 33). Hanly testified that T&N brokered only a "very, very small percentage" of asbestos fiber used in the United States. (6/14/2005 tr. at 120-121). He also admitted on cross-examination that through its brokerage subsidiary TAF, T&N imported a total of only 400,000 tons of raw asbestos fibers into the United States between 1931 and 1976, while approximately 1

million tons of raw asbestos fiber were used each year in the United States. (6/14/2005 tr. at 120-121).

    b.    *T&N's Membership in the CCR.*

    26.    Starting in the late 1980s, T&N resolved its asbestos litigation through the CCR. (6/14/2005 tr. at 49-50). In the late 1990s the CCR entered into a settlement program to resolve mass inventories of claims on behalf of its members known as the "strategic settlement program" (the "SSP"). (6/14/2005 tr. at 106). The SSP involved many of the leading plaintiffs law firms in the country. (*Id.*)

    27.    A principal purpose of the CCR was to manage defense and litigation costs for its members, including T&N. ((Deposition Transcript of William R. Hanlon at 21 (hereinafter "Hanlon De tr. at __")) There is no testimony from William Hanlon, the general counsel of the CCR, or any other CCR official, that CCR members actually received any "volume discounts" by virtue of their membership in the CCR. [cite] There is also no testimony from any plaintiffs' attorney or plaintiff that any plaintiff received less money from a settlement with CCR members collectively than the aggregate amount that plaintiff would have received from each member company of CCR through individual settlements. Dr. Cantor, the Property Damage Committee's estimation expert, has consulted with Bill Jones, a consultant with a long affiliation with the CCR. (6/21/05 tr. at 1021-22). Mr. Jones did not know of any analysis done by CCR demonstrating that "there was evidence of reduced indemnity cost" for CCR members "because of CCR." (*Id.* at 1022).

    28.    Under CCR protocols, a member of the CCR was allocated a share of liability in a settlement as long as that company was named as a defendant by the

plaintiffs. (Hanlon Dep. tr. at 33). The CCR would settle claims with plaintiffs if the plaintiffs could submit evidence of exposure to the products of any single CCR member. (*Id.* at 108). There was no requirement that plaintiffs adduce evidence of exposure to the products of every CCR member that the plaintiff named as a defendant in the case. (*Id.* at 148). When a plaintiff presented evidence of exposure to any single CCR members' products, "the other members who had been named in that plaintiff's complaint had to contribute to the settlement notwithstanding that the plaintiff had not proffered any evidence of exposure to the products of those other defendants." (6/14/2005 tr. at 68-69). Thus, as a member of the CCR, T&N settled cases in which there was not necessarily product identification evidence against it. This would mean that T&N's database (from which both Dr. Peterson and Dr. Cantor project future claiming rates) likely contains claims paid by T&N as to which plaintiffs had not established exposure to a T&N product.

      29.    A critical assumption in Dr. Peterson's report was that T&N was a "small member among the twenty companies in the CCR," (6/16/2005 tr. at 647) and a "relatively insignificant one of twenty members" in the CCR. (Plaintiffs' Ex. 2 at 4, 8). However, T&N was a high profile, major member of the CCR -- from 1991 on, T&N held a board seat in the CCR because it had one of the three largest liability allocations among all CCR members. (6/14/2005 tr. at 103; Hanlon Dep. tr. at 17). Liability allocation among CCR members was designed to "fairly allocate the several share of liability in cases among CCR members." (6/14/2005 tr. at 76). Among the factors that went into each individual members' allocation of liability were which companies "did the plaintiffs target," and which were the defendants "that plaintiffs' believed they had the strongest case" against. (Hanlon Dep. tr. at 128).

30.    T&N's fellow CCR members could and did seek to adjust T&N's liability shares when they thought T&N was not paying its fair share. (6/14/2005 tr. at 106). According to Hanly, T&N's percent of liability among CCR members was in the teens for certain occupational categories. (*Id.* at 107). Dr. Peterson's testimony indicates that the T&N share of CCR's settlement payments was approximately 20% throughout the 1990s. (6/20/2005 tr. at 734). T&N's percent liability share in the CCR increased as other members departed in the late 1990s. (6/2014/2005 tr. at 108106). In the late 1990s, T&N's percent share of CCR liability was between 20-30%. (*Id.* at 107) After being confronted with this information, Dr. Peterson changed his testimony from his report and acknowledged that, in fact, T&N's board membership would have been known to plaintiffs' law firms, and that it was not an obscure or insignificant member of the CCR. (6/20/2005 tr. at 735).

31.    No witness provided any evidence that they knew of a single plaintiffs' lawyers who would have otherwise sued T&N did not because it was a member of the CCR, nor was there any evidence presented that plaintiffs' lawyers failed to take discovery against T&N. Plaintiffs "always sought discovery" from T&N when they sued T&N. (6/14/2005 tr. at 108). T&N was frequently taken to trial -- plaintiffs' lawyers "probably started up trials in 100 to 200 cases" against T&N between 1982 and 2001. (*Id.* at 109). Similarly, there is no evidence plaintiffs stinted on efforts to obtain damages against T&N while it was a member of the CCR. When plaintiffs took T&N to trial they "sought to maximize the damages" they could recover against T&N as they would with "any defendant in asbestos." (*Id.*)

32.    It was also widely known among asbestos plaintiffs' lawyers that in 1996 T&N purchased an insurance policy (known as the Hercules Policy) with hundreds of millions of dollars of coverage. (6/14/2005 tr. at 117).

      c.    *There Is Conflicting Testimony as to Why T&N Left the CCR,*
          *and Why T&N Filed for Bankruptcy.*

33.    Hanly testified that T&N left the CCR because that organization had "effectively collapsed" by the beginning of 2001, and T&N was "forced . . . into the tort system on its own." (6/14/2005 tr. at 78-79). This is contradicted by the Debtors' public statements in 2001 that T&N was leaving the CCR because it believed it needed a change in asbestos litigation strategy. (PD Ex. 94 at Slide 31).

34.    Hanly testified that consolidations of asbestos plaintiffs' claims were "quite good" for T&N. (6/14/2005 at 81). This testimony is contradicted by statements made by T&N in a submission to the United States Bankruptcy Court in this proceeding, in a brief signed by Mr. Hanly. (6/14/2005 tr. at 123-24). The assertions in that brief were true, and the Debtors did not intend to mislead the court when it was submitted. (*Id.*)

35.    In direct contrast to Hanly's testimony, Hanly's prior submission to the Bankruptcy Court on behalf of T&N and the other Debtors stated that aggregation of claims of impaired and unimpaired claimants increased the value of unimpaired claims, and increased the pressure to settle unimpaired claims. (*Id.* at 126). This submission also represented that there was a "parasitic fusion" between weak and strong cases that benefited the weak cases. This parasitic fusion increased claims filings. (*Id.*) Hanly also discussed the medical evidence used by plaintiffs during his direct testimony. He stated

that "B Reader reports [the type of evidence used in virtually all non-malignant asbestos cases] were not material in a large number of cases." (*Id.* at 80). However, Hanly's earlier submission averred that "mass screenings" generated a massive volume of unimpaired claims against T&N. (*Id.* at 127-28). This is consistent with the experience of the CCR, which expressed concerns that medical evidence garnered through mass screenings led to diagnoses of asbestosis that were unfounded, not based on reliable evidence and "bogus." (Hanlon Dep. tr. at 71).

36.    Hanly testified that participating in the CCR gave T&N certain benefits, and that T&N lost these benefits when it left the CCR. (6/14/2005 tr. at 77-78). He claimed that leaving the CCR increased T&N's liability. (*Id.*) However, Hanly's earlier submission on behalf of the Debtors does not identify T&N's leaving the CCR as a factor in T&N's increased asbestos liability. Instead, "untrammeled screenings of marginally exposed people" and the dumping of tens of thousands of cases into the system caused the tort system to be distorted. (*Id.* at ~~132).~~128).

37.    Hanly also testified that the publication in 2000 of a book regarding T&N's "corporate conduct" by a British journalist named Geoffrey Tweedale had a "very material impact" on T&N's liability. (*Id.* at 93-94). Hanly's testimony does not identify any personal injury plaintiffs' lawyer who ever referred to the Tweedale book. Moreover, Hanly's prior submission in October 2001 makes no reference to the publication of the Tweedale book. (PD Ex. 10)[5]

---

[5] Dr. Peterson posited in his report that the book "drew attention" to T&N (Plaintiffs' Ex. 2 at 8) but provided no evidence to support this claim.

d.   T&N's "Corporate Conduct" Documents
     Were Widely Disseminated By 1996.

38.   The "corporate conduct" documents referenced above were

assembled by T&N in a database in England not later than 1985. (6/14/2005 tr. at 111).

That year, American plaintiffs' lawyers from the law firm currently known as Motley Rice

reviewed over 1 million pages of these documents. (*Id.*) This firm was headed by "one of

the most sophisticated" plaintiffs' attorneys. (*Id.*) The corporate conduct documents were

also extensively reviewed in 1993 by the Kazan law firm, another very sophisticated and

"excellent" plaintiffs' firm. (*Id.* at 113). There were multiple articles in the press about

these corporate conduct documents in 1993, 1995 and 1996. (*Id.* at 114).

39.   Chase Manhattan Bank ("Chase") obtained many of these

documents in the early 1990s in the course of litigation against T&N. (*Id.* at 112-115).

Chase created a microfilm database of the documents and brought them to the United

States. (*Id.*) T&N also created an electronic database and microfiche set of these

documents which were kept in the United States. (*Id.* at 171-72). Accordingly, there is no

evidence that these documents were difficult for plaintiffs' lawyers to obtain. These

documents were used by Chase against T&N in open court in the United States District

Court for the Southern District of New York. (*Id.* at 114). The case received substantial

publicity in 1996, and was featured in an article in the *American Lawyer*, which directly

quoted from these documents. (PD Ex. 71). An attorney for Chase widely disseminated

these documents among plaintiffs' attorneys, and the documents were also placed in public

files, such as the British House of Commons library in the middle 1990s. (*Id.*; 6/14/2005

tr. at 115).

40.     Thus, it is undisputed that no later than 1996, these documents were
in the public domain, in the hands of sophisticated plaintiffs' counsel, the subject of
multiple news articles and had been used in a high-profile trial against T&N.

## V.
### THE MEDICAL EVIDENCE DEMONSTRATES THAT THE INCIDENCE OF ASBESTOS RELATED DISEASE IS DECREASING STEADILY OVER TIME

41.     The Property Damage Committee presented the medical testimony
of Dr. Hans Weill, M.D.  Dr. Weill is a board certified pulmonologist, former President of
the American Thoracic Society, and researcher with 35 years of experience in the study
and treatment of the effects of exposure to asbestos and other inhalants.  (Testimony of
Hans Weill, MD, in *Owens Corning v. Credit Suisse First Boston*, No. 04-CV-905 (D.
Del.), 1/18/2005 at 45-48 (hereinafter "Weill tr. at ___").)[6]  Dr. Weill has published 50
articles related to asbestos.  (*Id.*)  He has been on the staff of Tulane Medical Center
Hospital since 1976, and he has personally evaluated over 1,000 individuals exposed to
asbestos.  (*Id.*)  Dr. Weill has testified for both plaintiffs and defendants.    The late Judge
Carl Rubin of the U.S. District Court for the Southern District of Ohio selected Dr. Weill
as a Court-appointed expert pursuant to Fed. R. Evid. 706 in 65 asbestos cases in 1991.
(PD Ex. 95; Weill tr. at 98-99).[7]

---

[6] Dr. Weill's testimony in the *Owens Corning* matter was admitted by the Court pursuant
to agreement among the Property Damage Committee, the Asbestos Claimants Committee
and the Legal Representative for the Future Representative.  (6/20/2005 tr. at 803-04)

[7] Judge Rubin's experts concluded that, in the cases they reviewed, among plaintiffs
claiming asbestos disease only 35% of claimants had *any* asbestos disease (impaired or
not) and that only 15% had an impairing condition.  *See* Carl Rubin and Laura
Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 38 (1991)
(PD Ex. 95).

42.     Various asbestos-related conditions cause functional impairment
and shorten life-span. (PD Ex. 21 at 00210002). As workplace exposures have been
substantially reduced since 1972, asbestos-related health effects have become increasingly
less prevalent. (*Id.*; Weill tr. at 51). The latency period for most asbestos related disease
is 20 to 40 years. (Weill tr. at 40). Fewer and fewer cases of asbestos-related disease
occur forty years after exposure to asbestos. (*Id.*) It is "not common" (although possible)
for a case of mesothelioma to appear fifty years after first exposure. (*Id.*)

## A.     The Medical Incidence of Asbestosis Is Declining, But There is a Phenomenon of Over-Diagnosis of Asbestosis by Plaintiff-Selected B-Readers.

43.     Asbestosis is defined as lung fibrosis due to asbestos exposure.
Approximately twenty other causes of lung fibrosis besides asbestosis exist. (6/15/2005 tr.
at 299). Since the late 1980s, Dr. Weill (a pulmonologist, unlike Dr. Welch) and his
practicing colleagues have rarely seen new cases of asbestosis and that the disease burden
from asbestosis is declining. (Weill tr. at 71). This is because there is a dose-response
function for all asbestos-related diseases, and there has been a dramatic decline in levels of
workplace exposure (i.e., the dose of asbestos to which workers are exposed) over the last
three decades. (Weill tr. at 49-52). Dr. Welch agreed that exposure levels have been
controlled for many years. (6/15/2005 tr. at 285). Dr. Welch testified that "if we were
doing large scale examination programs, we would be seeing a decline in the prevalence of
asbestosis." (*Id.* at 283).[8]

---

[8] Dr. Welch claimed that there are "millions of people" walking around with non-
malignant asbestos disease and cited a study purporting to show that asbestos-related
pleural plaques are present in 2.3% of the adult male population. (6/15/2005 tr. at 247-
248). On cross-examination, Dr. Welch admitted that the study she cited for this

44.    Dr. Weill explained the phenomenon of systematic over-reading of asbestosis on chest x-ray films by asbestos litigation screening facilities. (PD Ex. 21 at PD00210004; Weill tr. at 88-89). There is an "inordinate influence of litigation on the validity of these diagnosis." (PD Ex. 21 at PD00210004). An estimate of the incidence of asbestosis that does not account for the systematic over-diagnosis of asbestosis will overestimate the incidence of valid asbestosis claims. (*Id.* at PD00210003). Temporal trends in filing rates (such as Dr. Peterson uses) which are generated from "these flawed diagnoses would be meaningless." (*Id.* at PD00210004).

45.    This systematic overreading cannot be accounted for by random variability among chest-film readers with "B-reader" certification. (Defendants' Ex. 21 at PD00210003; Weill tr. at 88-89). Dr. Weill cited two recent studies of plaintiff selected B-readers, and agrees with the "widespread view that (the) majority of plaintiff's 'B-readings' lack credibility and validity." (PD Ex. 59 at 6). The Gitlin Study (PD Ex. 28) "provides useful information and strongly suggests that there has been systematic over-reading of chest x-ray films by asbestos screening facilities, not simply random variability among B-readers in film classifications."[9]

46.    Dr. Welch's testimony regarding increasing rates of asbestosis reported on death certificates (6/15/2005 tr. at 259) is unreliable. Death certificate reporting is neither "epidemiology (nor) research." (Weill tr. at 72). "A death certificate

---

proposition is approximately twenty years old. (*Id.* at 275). The record does not contain any current data to support this conclusion.

[9] The Ducatman study (cited by Dr. Welch) differs from the Gitlin study substantially. In the Gitlin study, each B-reader reviewed the same set of X-rays. (PD Ex. 28). In the Ducatman study, however, each B-reader read different X-rays. (6/15/2005 tr. at 274).

diagnosis of asbestosis" does not necessarily reflect any medical diagnosis, but "may simply just reflect what individuals' families and others have been told about their departed family member." (*Id.* at 74).[10]

47.    Dr. Welch testified repeatedly that she is unaware of the practices or methods of litigation screening facilities, even though she is aware of the criticisms of them. (6/15/2005 tr. at 293-94). Thus, she cannot credibly assess whether the diagnoses generated by these entities, which support a massive volume of unimpaired claims against T&N (6/14/2005 tr. at 127-28) are reliable. Estimates of future liability which ignore or fail to recognize the evidence of systematic over-reading in mass-screened evidence will overstate T&N's liability.

**B.    The Incidence of Mesothelioma in the United States is Decreasing.**

48.    Mesthelioma is a fatal cancer sometimes caused by exposure to asbestos and sometimes idiopathic (i.e., has a cause other than asbestos that is unknown). (Welch tr. at 272). Approximately 20% of mesothelioma cases in males and 50% of cases in females are idiopathic. (Weill tr. at 53). Based on his 2004 study "Changing Trends in U.S. Mesothelioma Incidence," (Plaintiffs' Ex. 62), Dr. Weill concluded that the peak incidence of mesothelioma in the United States occurred in 1994, and the incidence has decreased since then. Overall there has been a "significant downward trend in mesothelioma incidence" since 1994. (Weill tr. at 59). The declining trend is consistent with the fact that the median latency period for mesothelioma is thirty years and the fact

---

[10] To the extent such data is reliable, workers below age of 65 at the time of death have a declining likelihood of having their death certificate mention asbestosis as a cause of death. (Weill tr. at 73).

that peak use of asbestos in the United States occurred in the 1960s. (Plaintiffs' Ex. 62 at 440-41). "Given the fact that changes in mesothelioma incidence are probably the clearest measure of the extent of asbestos related disease, these [declining] trends strongly indicate that the overall burden of asbestos health effects in the USA is waning, a pattern that would be expected to continue in the future." (*Id.* at 441).

49.    Dr. Peterson relied on the Nicholson estimates of the incidence of mesthelioma for his estimate. Dr. Weill has observed that "more than two decades after they were published, these estimates have thus far been shown to be overstated." (PD Ex. 21 at 8). Dr. Weill has opined that this is due to the decrease in exposure to asbestos in the past three decades. (*Id.*) The Nicholson projections "cannot accurately reflect recent exposure conditions and therefore the current and future burden of asbestos-related disease associated with the markedly lower exposures as compared to the observed period of Nicholson." (*Id.*)

50.    Dr. Welch, who has not published articles on the peak incidence of mesothelioma, is unfamiliar with the current dose/response formula used by the United States Government to predict future incidence of death from mesothelioma. (6/15/2005 tr. at 284-285). Dr. Welch testified that the peak incidence of mesothelioma occurred in the early 1990s and incidence of mesothelioma has remained below that peak since then. (*Id.* at 297). Dr. Welch acknowledged that she has not looked at data regarding the incidence of mesothelioma from the past three or four years. (*Id.* at 297-298)

**C.    The Incidence of Asbestos-Caused Lung
       Cancer in the United States is Decreasing.**

51.    An individual must have asbestosis measured by pathology or an x-ray to link asbestos exposure to lung cancer. (PD ex. 21 at 10). The Kipen study (Plaintiffs' Ex. 30) cited by Dr. Welch further supports this conclusion. (Weill tr. at 78). Dr. Weill and Dr. Welch both testified that asbestosis is declining. Thus, Dr. Weill has concluded that the incidence of asbestos-attributable lung cancer should also be declining. (*Id.* at 95). Estimates of future liability which ignore this trend will overstate T&N's liability.

**D.    Other Cancers Cannot be Conclusively Linked to Asbestos Exposure.**

52.    While asbestos exposure can cause lung cancer and mesothelioma, the weight of scientific evidence is that it does not cause other forms of cancer, such as esophageal, colo-rectal or laryngeal cancer. (PD ex. 21 at 8).[11] Although Dr. Welch endorses the argument that there is a link between asbestos exposure and other forms of cancer, she testified that the existence of a link is "controversial." (6/15/2005 tr. at 276). Dr. Welch also acknowledged that she had not looked at literature on this issue "in quite a while." (*Id.* at 276-77). Thus, the weight of evidence demonstrates that no conclusive link exists between asbestos and these "other" cancers.

---

[11] Notably, Andrea Crichton, counsel for T&N in Great Britain, testified that she recalls only a single claim for esophageal cancer since the 1980s against T&N, and no "other" cancer claims. (6/14/2005 tr. at ~~173~~174).

**VI.**
**THE DEBTORS' HAVE FILED MULTIPLE REPORTS**
**WITH THE SEC ESTIMATING T&N'S PENDING AND FUTURE**
**ASBESTOS LIABILITY FAR BELOW THE PETERSON ESTIMATE**

53.    As a public company, Federal Mogul filed annual reports (10-K's)

with the Securities and Exchange Commission for every year since the year ending

December 31, 2000. George Michael Lynch, the Debtors' Chief Financial Officer,

"supervised, led and managed" the people who prepared the 10-K's from 2000-2004.

(Deposition Transcript of George Michael Lynch at 66 (hereinafter "Lynch Dep. tr. at

__")). Mr. Lynch signed these 10-K's, and he acknowledged that they were truthful when

filed. (*Id.* at 66) In 2000, Federal Mogul retained the economic consulting firm NERA to

estimate its pending and future asbestos liability. (*Id.* at 61, 63, 67). The Debtors

cooperated with NERA, and did not withhold any information from NERA. (*Id.* at 72).

The Debtors believed NERA was experienced in asbestos matters and competent to

perform an estimate. (*Id.* at 71). NERA made what the Debtors believed to be

"reasonable assumptions" in arriving at the estimate, and the Debtors had "confidence"

that the NERA "estimates were reasonable." (*Id.*)

54.    The Debtors totaled up those estimates through the year 2012 and

reported them in Federal Mogul's 2000 10-K as $1.6 billion. (*Id.* at 67). Federal Mogul

added the follow caveat to its 2000 10-K:

> As additional experience is gained regarding
> claims or other new information becomes
> available regarding the potential (asbestos)
> liability, the Company will reassess its
> potential liability and revise the estimates as
> appropriate.

(PD Ex. 5 at 52). Federal Mogul has never revised its estimate and has reported the NERA estimate in its 10-K's in every year since 2000. (PD Ex. 6 at 59; PD Ex. 7 at 60; PD Ex. 8 at 91; PD Ex. 9 at 98; *see also* Lynch Dep. tr. at 66-84). [12] When the Debtors filed their most recent 10-K, for the year ending December 31, 2004, which Mr. Lynch signed and acknowledged as being truthful when he signed, the Debtors were aware that Dr. Peterson's estimate exceeded $11.1 billion. (Lynch Dep. tr. at 84). Nonetheless, the Debtors' 10-K for the year ending December 31, 2004 reports T&N's asbestos liability as approximately $1.6 billion. (PD Ex. 9 at 98; Lynch Dep. tr. at 84). The Debtors continue to believe that the estimate as reported in its 2004 10-K has "at least as high a probability of accuracy as" Dr. Peterson's estimate. (Lynch Dep. tr. at 85).

## VII.
## DR. ROBIN CANTOR'S ESTIMATE

### A.   Dr. Cantor's Expert Credentials.

55.     Dr. Robin Cantor is a Ph.D. economist, who specializes in econometrics, statistical modeling and risk analysis. (6/20/2005 tr. at 834) In her more than 20 years as a teacher, economist and consultant, Dr. Cantor has conducted numerous forecasts and statistical analysis for asbestos, environmental, and antitrust clients, and has

---

[12] The Debtors' estimate is not binding on the Court, nor is it even the most accurate estimate. For example, Dr. Cantor's estimate is approximately double the Debtors' 10-K estimate. However, these estimates are offered as impeachment evidence against the testimony of Dr. Peterson and Paul Hanlon. The Debtors are proponents of the Plan and support the Peterson estimate. These estimates are an important data point, and show that the Debtors – having had the opportunity to reflect on T&N's departure from the CCR, the publication of the Tweedale book, the bankruptcy of other former CCR members and the trends in asbestos claims in the past four years –continue to report in public filings with the United States Securities and Exchange Commission that an estimate of pending and future liability for the years 2000-2012 of $1.5-1.6 billion is at least as reasonable as any other estimate, including Dr. Peterson's. (PD Ex. 9 at 98; Lynch Dep. tr. at 84).

served as a consulting expert in other asbestos estimation matters. (6/20/2005 tr. at 840; PD Ex. 96 at 1).

56.    Dr. Cantor currently serves as a Director of the Financial Insurance & Claims Services Practice of Navigant Consulting, Inc. ("NCI"), a publicly-traded consulting firm, and leads Navigant's Liability Estimation & Insurance Coverage Analysis practice, which has responsibility for conducting asbestos liability estimates on behalf of a variety of clients, including, at present, six bankruptcy proceedings and five other on-going asbestos-related matters. (PD Ex. 3 at 1; 6/20/2005 tr. at 843-844). Dr. Cantor also has published a variety of studies related to risk analysis and forecasting, including an analysis of the impact of the disclosure of damaging corporate documents on jury verdicts in asbestos cases. (6/20/2005 tr. at 838).

57.    Dr. Cantor has served previously as a Principal and Managing Director of the Environmental and Insurance Claims Practice of LECG, LLC (6/20/2005 tr. at 840); the Program Director for Decision, Risk, and Management Sciences of the National Science Foundation (6/20/2005 tr. at 839); and as a senior researcher at Oak Ridge National Laboratory. (PD Ex. 2, at 1; 6/20/2005 tr. at 835).

58.    Dr. Cantor is the 2002 past president of the Society for Risk Analysis, an international society which is recognized as the primary society for the study of risk analysis in the United States. (PD Ex. 2, at 1; 6/20/2005 tr. at 846). In addition, she currently serves on the editorial board of the Journal of Risk Analysis and as an associate editor for the Journal of Risk Research. (PD Ex. 2 at 1).

**B.    Dr. Cantor's Methodology for Estimating Claims Against T&N.**

59.    To develop her estimate, Dr. Cantor analyzed T&N's claims database and found, after removing duplicate records, that it contained 383,790 claim records, of which 108,240 represented pending claims and 275,550 represented closed claims.  (PD Ex. 2, at 9).

60.    Based on the information in T&N's database about claiming rates for specific diseases and information about payment of claims by T&N, Dr. Cantor estimates the appropriate value of all pending and future U.S. asbestos personal injury claims against T&N at $2.5 billion (net present value).  (PD Ex. 2 at 40; 6/20/2005 tr. at 878-79).  The Property Damage Committee has not estimated the value of U.K. asbestos personal injury claims because the claims are only a small fraction of the U.S. claims, and will not significantly affect recoveries for property damage claimants.  (PD Ex. 2 at 4-5).

61.    The base case estimate of $2.5 billion is based on T&N's history of resolving approximately 245,000 asbestos personal injury cases between 1976 and 2001 (PD Ex. 2, at 9) for a total payment of approximately $835 million (net present value).  (6/14/2005 tr. at 27).

62.    The estimate consists of three components.  Pending claims are all actual claims that were recorded in the database prior to T&N's October 1, 2001, bankruptcy filing, but not yet resolved as of that date.  (6/20/2005 tr. at 879).  Future claims are those forecast to arise from October 1, 2001 through the end of year 2054.  (PD Ex. 2 at 8; 6/20/2005 tr. at 883).  Dr. Cantor forecasts there will be almost 373,000 compensable future claims during the period 2001-2054.  (PD Ex. 2 at 3).  By comparison,

in T&N's entire history leading up to its 2001 bankruptcy filing, it compensated approximately 250,000 claims. (PD Ex. 2 at 9; 6/20/2005 tr. at 730).

63.    The values for all future claims are escalated by an assumed inflation rate of 2.2 percent and then discounted by a risk-free rate of interest of 5.5 percent. (PD Ex. 2 at 37).

64.    Finally, Dr. Cantor also values 29,862 claims that were settled but either not yet documented or not yet paid and that T&N "did not expense at the conclusion of the data set October 1, 2001." (PD Ex. 2 at 9; 6/20/2005 tr. at 879). Taking these three categories of claims into account, Dr. Cantor's base case estimate of the net present value of all claims is:

| | |
|---|---|
| Pending Claims: | $0.42 billion |
| Future Claims: | $1.925 billion |
| Settled Claims: | $0.14 billion |
| Total: | $2.485 billion |

(PD Ex. 2, at 40).

a.    *Estimating Claim Values.*

65.    Both Dr. Cantor and Dr. Peterson agree that incorporating trends in claims history is an important component of conducting a long-term forecast, (6/16/2005 tr. at 491; 6/21/2005 tr. at 1001) but only Dr. Cantor actually uses a historic weighted average of T&N's actual settlement values over the four years preceding T&N's bankruptcy as the benchmark to value claims in this case (6/20/2005 tr. at 882, 996). In contrast, Dr. Peterson uses significantly higher TDP values to perform his estimate. (Plaintiffs' Ex. 2 at 14-17; 6/16/2005 tr. at 605-06).

66.    Dr. Cantor's use of a four-year weighted average of T&N claim values as the benchmark for establishing claim values ensures that her forecast incorporates trends in claim values over time. (6/20/2005 tr. at 883). Failing to account for trends in claims history over time through use of a shorter time period as a valuation benchmark memorializes short term "perturbations" in the data that are not reflective of T&N's claims history. *Id.* As a result, Dr. Peterson's two-year window for valuing claims, which memorializes a spike in settlement values, is not consistent with T&N's history of managing and settling claims, and is therefore not an appropriate signal on which to base a long-term forecast. *Id.*

67.    After reviewing the settlement values over the four years preceding T&N's bankruptcy, Dr. Cantor observed no increasing trend in claim values for any diseases over that four year period except mesothelioma. (PD Ex. 3 at 9-13; 6/20/2005 tr. at 884).

68.    Recognizing that mesothelioma claim values increased in the years leading up to the bankruptcy, for purposes of assigning value to future claims, Dr. Cantor assumed an 18.3% annual increase in claim values for mesothelioma for the first five years of her forecast period, because that was consistent with the growth rate in the mesothelioma values from 1998-2001. (PD Ex. 2 at 31; 6/20/2005 tr. at 895-897). Thus, in Dr. Cantor's base case estimate, mesothelioma values step up from $81,502 in the first year (2002) to $159,886 in year five (2007). (6/20/2005 tr. at 895-6896). After year five, Dr. Cantor uses the $159,886 value for mesothelioma for every year of her forecast. (PD Ex. 2 at 31; 6/20/2005 tr. at 896).

69.    Dr. Cantor tested the data to determine whether there was any support for increasing claim values for any other diseases. (PD Ex. 3 at 9-10). In particular, Dr. Cantor reviewed the rolling average claim values for the non-mesothelioma disease categories from 1998-2001 and found no increasing trend in claim values, and in the case of asbestosis, found decreasing trends in claim values. (PD Ex. 2 at 29; PD Ex. 3 at 10; 6/20/2005 tr. at 897-898; 6/21/2005 tr. at 1001-1003). Likewise, Dr. Cantor investigated the trend in claim values for other asbestos defendants (taken from defendants identified in Dr. Peterson's November 2004 Supplemental Report), and found no increasing trend in claim values of other defendants. (PD Ex. 3 at 10-11). Consistent with her findings of no growth in non-mesothelioma claim values during the 1998-2001 calibration period, Dr. Cantor utilized the average settlement values from 1998-2001 as the value for the claims in each of the other disease categories for each year of her forecast (with annual increases for inflation), with $13,011 as the value for each lung cancer claim, $5,664 as the value for each "other cancer" claim; $2,600 as the value for each asbestosis claim, and $915 as the value for each pleural disease claim. (PD Ex. 2 at 31).

b.    *Estimating the Number of Compensable Claims.*

70.    Starting with pending claims, Dr. Cantor calculates the average rate at which claims were dismissed with no payment during the 1998-2001 base period. Although there are modest differences by disease, Dr. Cantor found overall that about 10% of all claims against T&N were dismissed with no payment, for an acceptance rate of about 90%. (PD Ex. 2 at 33-34; 6/21/2005 tr. at 1024).

71.    The number of pending, compensable claims is determined by multiplying the total number of pending claims by the calculated historical acceptance

rate. Dr. Cantor's estimate thus provides compensation for 96,650 of the 108,240 claims pending as of the petition date of October 1, 2000, for a total of $420.5 million. (PD Ex. 2 at 38; 6/21/2005 tr. at 964).

72.     All claims filed on or after October 1, 2001, are future compensable claims and are calculated separately from the pending claims. (6/20/2005 tr. at 879-880). To predict the number of future compensable claims, Dr. Cantor relies on economic and epidemiological models to predict the number of annual deaths from three categories of malignant diseases (mesothelioma, lung cancer, and other cancers) caused by asbestos exposure. (PD Ex. 2 at 23-26; 6/22/2005 tr. at 965-66). The NCI model that Dr. Cantor utilized to determine the incidence of mesothelioma deaths allowed Dr. Cantor to narrow the projection of annual deaths from mesothelioma to the eight industries in which T&N was primarily involved, as demonstrated by its Disclosure Statement. (PD Ex. 2, at 8; 6/21/2005 tr. at 967-70) Once that population was known, Dr. Cantor applied a dose-response formula published by the Occupational Safety and Health Administration ("OSHA") to the exposed population to estimate the future annual incidence of mesothelioma deaths. (PD Ex. 2 at 8; 6/21/2005 tr. at 968). Incidence of other asbestos-related malignant diseases was based on projections by KPMG, LLP, which were initially used by Dr. Peterson in this case. (PD Ex. 2 at 8; 6/16/2005 tr. at 656).

73.     Dr. Cantor performed two sensitivity analyses using different epidemiological and economic models. First, she estimated potential exposures to asbestos fibers sold or distributed in three additional occupational areas: auto mechanics, primary asbestos manufacturing and secondary asbestos manufacturing, which resulted in a modest increase to her base case estimate, from $2.485 to $2.586 billion. (PD Ex. 2 at

46; 6/~~22~~21/2005 tr. at 987-988). Second, she recalculated her projections of mesothelioma deaths using the KPMG incidence tables rather than the NCI incidence projections, and found that the sensitivity resulted in total liability of $2.592 billion, a value only marginally higher than her base case estimate. (PD Ex. 2, at 47; 6/21/2005 tr. at 986).

74.    In order to ensure that Dr. Cantor was comparing the incidence information, which is based on deaths per year, with comparable claimant information, Dr. Cantor reviewed the T&N database and included claims in her 1998-2001 calibration window by death year. (PD Ex. 2, at 12-13; 6/~~22~~21/2005 tr. at 973-974). The vast majority (72 percent) of compensated closed and pending claimant records alleging malignant disease in the T&N database have death year information, or where such information is not in the T&N database, Dr. Cantor was able to obtain it from the Manville Trust. (6/21/2005 tr. at 974). Dr. Cantor imputed death year information for only 28 percent of claimants based on a set of ordered rules and assumptions about the relationship of filing date to death date. (*Id.*)

75.    After determining the incidence of malignant disease for each year Dr. Cantor compares the number of compensated T&N claimants who died from each of these three disease categories during the 1998-2001 base period to the number of such deaths anticipated by the epidemiological forecasts for the same period. (PD Ex. 2, at 34-37; 6/21/2005 tr. at 979). This yields a ratio described as the compensability rate. (*Id.* 979-80).

76.    Dr. Peterson's "propensity to sue" approach assumes all claimants died in the year the claimant filed a claim. (6/16/2005 tr. at 500-501). However, the evidence at trial showed that only approximately 18 percent of compensated closed and

pending claimants alleging malignant disease died in the same year that they filed. (6/21/05 tr. at 977-978).

77.    Dr. Cantor performed a sensitivity analysis showing the effect on her estimate of simply assuming that file year equals death year for all claims where actual death year information was not available. (6/21/2005 tr. at 989). This results in an increase of only $300 million to her base case estimate, resulting in a total liability estimate of $2.8 billion. (PD Ex. 2, at 43; 6/2221/2005 tr. at 989).

78.    The weighted average compensability rates over the 1998-2001 period by disease were then applied to the future incidence of specific diseases to determine the number of compensated claims in T&N's future. (PD Ex. 2, at 36-37; 6/21/2005 tr. at 1075). Pursuant to Dr. Cantor's propensity to compensate methodology, 372,907 claims are compensated in T&N's future beginning in October 2001 through 2054, which results in compensation of substantially more claims than the approximately 250,000 claims compensated by T&N in its history up until the bankruptcy filing. (*Id*).

79.    Because Dr. Cantor's propensity to compensate methodology is based on the information in T&N's database about its entire claims history and compensating behavior related to those claims, it necessarily incorporates the claiming behavior of plaintiffs against T&N as well as the compensating behavior of T&N in response to those claims. (6/21/2005 tr. at 982-984). Likewise, because Dr. Cantor grounds her estimate in expense date, not the settlement date used by Dr. Peterson, (6/21/2005 tr. at 1001) Dr. Cantor's methodology is consistent with a cash flow approach to litigation adopted by T&N. *Id*. As Mr. Hanley testified, T&N took a cash flow approach with regard to litigation against T&N, (6/14/2005 tr. at 64-65) and increases in

claims filings did not alter T&N's ability to defend itself or "to deal with cases."
(6/14/2005 tr. at 84)

80.     The result of applying Dr. Cantor's propensity to compensate
approach to the incidence of malignant disease in each year is an estimate of the likely
number of compensated claims, for malignant diseases, for every year of the 54-year
forecast period.  (PD Ex. 2, at 20-26).

81.     To forecast the number of compensated, nonmalignant disease
claims, Dr.Cantor uses a methodology similar to Dr. Peterson's approach (6/21/2005 tr. at
984-985).  She calculates the historical ratio of compensable asbestosis claims to
compensable malignant claims (12.9 to 1) and the historical ratio of compensable pleural
claims to compensable malignant claims (0.2 to 1), then multiplies those ratios to the
forecast number of compensable malignant claims.  (PD Ex. 2, at 26-28; 6/21/2005 tr. at
984-85).

82.     Using this methodology, Dr. Cantor forecasts in her base case
estimate that T&N would compensate almost 342,000 asbestosis claims and more than
4,500 pleural disease claims between 2001 and 2054.  (PD Ex. 2, at 39).

c.      *Sensitivity Analysis.*

83.     Dr. Cantor conducted a number of sensitivities to determine the
impact on her base case estimate of different assumptions related to T&N's future claims
experience.  In addition to the sensitivities based on file year versus death year, KPMG
incidence curves and additional work exposure populations previously described, Dr.
Cantor conducted several other sensitivities that resulted in a range of potential liability for
T&N from $1.9 billion to $3.4 billion.  (PD Exhibit 94 at 21; PD Ex. 2, at 40-47;

6/21/2005 tr. at 986-992) The additional sensitivities included a sensitivity in which Dr.

Cantor assumed that claim values for mesothelioma would not escalate at 18.3 percent per

year for 5 years, as was assumed in her base case, but would remain at the 1998-2001

weighted average levels through 2054. (PD Ex. 2, at 43; 6/21/2005 tr. at 988). This

resulted in a reduction in her base case estimate, to $1.9 billion. (*Id.*) She also conducted

several sensitivity analyses in which she incorporated Dr. Peterson's assumptions that file

year (versus death year) determines when a claim is counted, that 2000-2001 settlement

values are the appropriate benchmark for valuing claims, and incorporating the KPMG

mesothelioma forecast. These sensitivities yielded alternatives to Dr. Cantor's base case

ranging from $2.9 billion to $3.4 billion. (PD Ex. 3 at 2; 6/21/2005 tr. at 989-992).

        d.    *Punitive Damages.*

      84.    Dr. Cantor has analyzed the effect of punitive damage awards on

claim values and concluded that there is a positive correlation between the long-term trend

in punitive damage awards in asbestos cases and the long-term trend in T&N settlement

averages. (PD Ex. 2 at 31-33). Paul Hanly testified that verdicts, including verdicts

reflecting punitive damages, against all defendants were among the factors which T&N

considered in pricing cases. (6/14/2005 tr. at 137-38). Although Dr. Cantor makes no

adjustments in her calculation for the influence of punitive damage awards on T&N's

average settlement values, Dr. Cantor's values might be adjusted downward to the extent

the Court finds that the influence of punitive damages should be removed from the average

settlement values. (PD Ex. 2 at 32).

e.    *Changing Legal Landscape.*

85.    Dr. Cantor's analysis demonstrates that a large proportion of the
claims pending against T&N at the time it filed for bankruptcy--approximately 80 percent-
-were filed in Texas, New York, Ohio, Maryland, West Virginia and Mississippi. (PD Ex.
2). These jurisdictions, particularly Mississippi and Texas, were considered particularly
bad jurisdictions for defendants because, in part, plaintiffs obtained higher settlement
values against defendants in these states relative to other states. (6/14/2005 tr. at 121-122;
Hanlon Dep. tr. at 64-65).

86.    As part of her analysis, Dr. Cantor reviewed changes in state laws
that have taken effect after the filing of the bankruptcy petition that might have impacted
T&N's future claims experience, and found substantial evidence that claim values and
claiming rates would have decreased over time. (PD Ex. 2 at 29-30; 6/21/2005 tr. at 950-
955). In particular, changes in the law in Mississippi and Texas limit joint and several
liability and certain types of damages in asbestos cases, including punitive damages;
restrict lawsuits that join impaired and unimpaired claimants and limit liability for non-
manufacturing sellers of products. (PD Ex. 3, at Attachment R-B). Changes in the law in
Ohio establish medical criteria that make impairment an essential element of an asbestos
claim. (*Id.*) Likewise, a change to the docket in the New York County Supreme Court
restricts nonmalignant claimants from litigating their claims until the plaintiff's condition
progresses to the point of an actionable injury. (*Id.* at D-3).

87.    Because each of the jurisdictions in which these laws were passed
were jurisdictions in which T&N experienced heavy volumes of claims and included
jurisdictions that T&N viewed as "particularly bad" (6/14/2005 tr. at 121-122; Hanlon

Dep. tr. at 64-65) these changes in state law would likely have made the litigation environment less favorable to plaintiffs and more favorable to T&N. (6/21/2005 tr. at 953-954).

        f.     *Experiences of Solvent Asbestos Defendants and Trusts.*

      88.    Dr. Cantor's analysis of claims filed against other asbestos defendants and the H.K. Porter and Manville Trusts shows that the rates of new claims filed against asbestos defendants and the trusts have decreased since 2001. (PD Ex. 3 at 19-21; 6/21/2005 tr. at 1043-1044). For example, 1,803 new malignant claims were filed against the Manville trust in 2004, as compared with 4,513 claims in 2001. (PD Ex. 3 at 19). Likewise, 4,840 claims were filed against the H.K. Porter trust in 2004, as compared with 17,054 claims in 2001. (*Id.*) Dr. Cantor also examined the 10-K reports of one hundred public companies from the years 2001-2004 (a total of 400 10-Ks), and analyzed 25 public companies that reported information related to their asbestos-related claims experience. (PD Ex. 3 at 21; 6/21/2005 tr. at 1045-1047). Each of the companies has experienced, on average, a 43 percent decline in new claim filings between 2001 and 2004. (PD Ex. 3 at 21; 6/21/2005 tr. at 1045). Likewise, public companies reporting the number of asbestos claims dismissed without payment between 2001 to 2004 report a median 75 percent dismissal rate. (PD Ex. 3 at 22; 6/21/2005 tr. at 1061).

      89.    Dr. Cantor's estimate does not reduce T&N's future claiming rates or average settlement values based on the information about changes in state law that make the litigation environment for plaintiffs less favorable, or information about the reduced claiming rates and increased dismissal rates against other asbestos defendants and asbestos trusts.

## VIII.
## THE PETERSON ESTIMATE IS INCONSISTENT
## WITH ALL OTHER ESTIMATES IN THIS CASE

90.    In addition to the Debtors' estimate, the Cantor estimate and the

Peterson estimate of $11.1 billion, there are numerous other estimates of T&N's pending

and future asbestos liability. These show that Dr. Peterson's $11.1 billion is far higher

than any other estimate in this case. (PD Ex. 91 at 44). The U.K. pension trustee has

estimated T&N's liability as ranging from between $2.1 – 5.1 billion. Dr. Peterson

himself originally estimated T&N's liability as $6.7 billion (PD Ex. 14), and then revised

that estimate to $5.6 billion (PD Ex. 15) before arriving at his $11.1 billion estimate.

Using T&N's historical claims values, Dr. Peterson estimates T&N's pending and future

liability as $3.6 billion. (PD Ex. 91 at 44). Dr. Cantor's base case estimate is $2.5 billion,

but she also provided a sensitivity analysis which showed T&N's liability at $3.4 billion.

(6/21/2005 tr. at 1070).

### A.    Dr. Peterson's Estimate Is Flawed

91.    The ACC proffered the testimony of Dr. Mark Peterson in support

of the $11.1 billion estimate of T&N's asbestos personal injury liabilities upon which the

Plan is based. Dr. Peterson is a lawyer and social psychologist by training. He is a

frequent consultant to asbestos claimants' committees in asbestos-related bankruptcy cases

and has testified often on their behalf. (6/16/2005 tr. at 585-586). The Plan Proponents

called no other expert witness in support of their estimate.

92.    Dr. Peterson's preferred estimate of T&N's liability for pending and

future asbestos personal injury claims in the United States is $11.1 billion when reduced to

present value. (Plaintiffs Ex. 4 at 44). Broken into its component parts, this is $1.352

billion for pending claims and $9.724 billion for future claims. (*Id.*)  Dr. Peterson's

preferred estimate, which he calls the "increasing model," is based on two assumptions

about future claiming rates. First, he assumes that the propensity to sue T&N for cancer

claims (mesothelioma, lung cancer, and other cancers) will increase substantially over the

first five years of the forecast period. (Plaintiffs Ex. 4 at 35; 6/16/2005 tr. at 503-505).

Second, he assumes that the ratio of claims for nonmalignant diseases (asbestosis and

pleural disease) to cancer claims similarly will increase. (6/16/2005 tr. at 513-518).  In the

increasing model, Dr Peterson forecasts nearly 1.1 million future claims against T&N,

nearly triple the approximately 380,000 claims filed against T&N in the 21 years leading

up to its bankruptcy. (Plaintiffs Ex 4 at 39; Plaintiffs Ex. 2 at 28).

   93. Dr. Peterson also offered an alternative estimate that did not assume

increases in future claiming rates, but instead held them steady at the already high levels

observed in the two years preceding T&N's bankruptcy. This estimate is $8.2 billion at

present value, consisting of the same $1.352 billion for pending claims and a reduced

estimate of $6.835 billion for future claims. (Plaintiffs Ex. 4 at 44).  In the no increase

model, Dr. Peterson forecasts approximately 707,000 future claims against T&N, nearly

double the total number of pre-bankruptcy claims. (Plaintiffs Ex 4 at 39; Plaintiffs Ex. 2 at

28).

   94. The vast majority of the difference between Dr. Peterson's $11.1

billion estimate and Dr. Cantor's estimate of $2.5 billion is attributable to two factors: (1)

substantially higher claim values assigned by Dr. Peterson; and (2) the increasing claiming

rates on which his preferred estimate is based. These two factors accounted for 87% of the

difference between the two estimates. (PD Ex. 94 at 22; 6/21/2005 tr. at 995-96).  Other

factors accounted for just 13% of the difference. Dr. Peterson's own sensitivity analysis, where he derived his average claim values from T&N's actual experience during the years 2000-2001 (the two years closest to the bankruptcy filing) and arrived at an estimate of $3.6 billion (at present value) using the no-increase model, demonstrates the dramatic effect that claim values have on the estimate. (Plaintiffs Ex. 14 at 8).

## B.    Dr. Peterson's Claim Values Are Overstated.

95.    In contrast to Dr. Cantor's straight-forward approach to calculating expected settlement values based on historic averages from the period 1998-2001, Dr. Peterson uses a complex, four-step process. (Plaintiffs Ex. 4 at 15-22). While notionally beginning with actual average values observed in T&N's database of resolved claims, Dr. Peterson ultimately ends up discarding those numbers in favor of values derived from the schedule values in the proposed Trust Distribution Procedures. (*Id.* at 19). For several reasons, the Court finds Dr. Peterson's forecast claim values to be unreliable and overstated.

96.    First, a comparison of Dr. Peterson's forecast claim values to those actually observed during the nine months of 2001 before the bankruptcy shows the extent of his upward adjustment. According to Dr. Peterson's own data, the observed settlement average in 2001 for mesothelioma was $138,939, for lung cancer $18,956, for other cancers $4,590, and for nonmalignant diseases $1,296. (Plaintiffs Ex. 2 at p. 10). In contrast, the average claim values in Dr. Peterson's estimate are $189,036 for mesothelioma, $30,246 for lung cancer, $13,941 for other cancers, and $6,616 for nonmalignant diseases. (Plaintiffs Ex. 4 at p. 19). These represent increases of 36%, 59%, 204%, and 410%, respectively. (6/16/2005 tr. at 598-99, 608-610).

97.     Second, the TDP schedule values are the product of agreement among the lawyers who represent the individual members of the ACC itself as to how they would like claims to be valued for trust purposes, not the outcome of any objective analysis as to how claims actually were valued in T&N's pre-bankruptcy history. (6/15/2005 tr. at 390-394; 6/16/2005 tr. at 606).

98.     Third, Dr. Peterson's reliance on a small number of mesothelioma settlements in 2001 as support for a substantial increase over historical averages in his forecast is based on a data set of just 65 reference points – claims for which the settlement date field in the database read "2001." (PD Ex. 92, at 15; 6/16/2005 tr. at 620). In comparison, T&N had over 12,000 mesothelioma claims in its history. (Plaintiffs Ex. 2 at 28). The Court finds it inappropriate, for purposes of a forecast that goes out 38 years into the future, to rely on a sample of just approximately 5% of T&N historic mesothelioma claims in determining appropriate claim values.

99.     Fourth, rather than determine claim values for diseases other than mesothelioma based on T&N's actual historical settlement averages for those diseases, Dr. Peterson "hangs" his forecast values for lung cancer, other cancer, and nonmalignant disease claims on his mesothelioma values. (6/15/2005 tr. at 394; 6/16/2005 tr. at 606). Dr. Peterson himself did not use this methodology in any of his preliminary estimates in this case. (PD Exs. 14, 15). Nor did Dr. Peterson use it in the recent Owens Corning case, where he based his forecast claim values on the company's actual, historical settlement average for all diseases over a 4.75 year base period and criticized other experts who made various adjustments to the company's historical settlement averages in their estimates.

43

(6/16/2005 tr. at 635). And no other claims estimation consultant in this matter purported to derive claim values in this way.

        100.    Fifth, Dr Peterson's derivation of claim values is based on internally inconsistent theories about what T&N's actual claims data show. While he opines that the most recent settlement data on mesothelioma and lung cancer claims are reflective of claim values in the post-CCR era, he simultaneously rejects reliance on the most recent settlement data for other cancer and nonmalignant disease claims. (6/21/2005 tr. at 1224-1226). If, as Dr. Peterson posits, plaintiffs attorneys were likely to pursue T&N much more aggressively in the post-CCR period, then the data on the most recent settlements for all claims should serve as an appropriate measure of claim values.

## C.    Dr. Peterson Forecasts Unsustainable Claiming Rates.

        101.    With respect to claiming rates, Dr. Peterson's increasing model is improbable and results in claim counts substantially higher than the already high levels observed in the years leading up to T&N's bankruptcy. The number of claims filed against T&N escalated sharply in the years preceding its bankruptcy, rising from approximately 22,000 in 1997 to 45,500 in 2000 and 44,700 for the first nine months of 2001. (Plaintiffs Ex. 2 at 28). Dr. Peterson's increasing model projects the extraordinarily high filing rates of 2000-2001 into the future. Thus, for every year of his forecast from 2002 through 2015, Dr. Peterson projects in excess of 40,000 total claims against T&N. (Plaintiffs Ex. 2 at A-3; 6/20/2005 tr. at 775-777). In 2006, the peak year in Dr. Peterson's increasing model forecast, total cancer claims are 43% higher than T&N actually experienced in 2001. (6/20/2005 tr. at 781).

102.    The increasing claim counts in Dr. Peterson's preferred estimate are
not attributable to any increase in the incidence of malignant disease, as projected by
epidemiological forecasts. The two epidemiological forecasts upon which Dr. Peterson
relies – the Nicholson forecast utilized in Dr. Peterson's preferred estimate and the KPMG
forecast utilized in a sensitivity analysis – each project that the peak incidence years
already have passed. For example, the Nicholson forecast predicts that peak mesothelioma
incidence would occur in 2002 – the first full year of Dr. Peterson's forecast of future
claims. (Plaintiffs Ex. 2 at A-1; 6/20/2005 tr. at 766). And total cancer incidence
attributable to asbestos exposure peaked in 1992 according to the Nicholson forecast.
(Plaintiffs Ex. 2 at A-1; 6/20/2005 tr. at 767). In the KPMG epidemiological model,
mesothelioma incidence peaked in 1997, and total cancers in 1990. (Plaintiffs Ex. 2 at A-
2; 6/20/2005 tr. at 767)-768).

103.    Dr. Peterson has not demonstrated that the extraordinary increases
in numbers of claims filed against T&N in the years immediately preceding its bankruptcy
were sustainable. Indeed, the evidence presented by Dr. Cantor of declining numbers of
claims against other defendants in recent years suggests that the higher rates of earlier
years were not sustainable. (PD Ex. 3 at 19-22; 6/2221/2005 tr. at 1045-1054, 1060-1062).
Heightened scrutiny of mass screening processes and legal reforms imposing more
stringent injury requirements for recovery are factors that will reduce the numbers of
nonmalignant claims in the system. Dr. Peterson's estimate, which assigns 47.2% of its
total value to nonmalignant claims, fails to take account of these circumstances. (Plaintiffs
Ex. 4 at 45).

104.    Finally, in his testimony Dr. Peterson suggested that personnel from EMB, claims estimation consultants to the UK Administrators, and Tillinghast, consultants to the UK Pension Trustees, agreed with certain aspects of his forecast. (6/16/05 tr. at 562). While there may be discrete areas where EMB and Tillinghast accepted certain of the assumptions that underlie Dr. Peterson's forecast, in fact they reach estimates that are much more in line with the one offered by Dr. Cantor. EMB's estimate, using the same basic methodology as Dr. Peterson used, is $5.3 billion, less than half of Dr. Peterson's $11.1 billion. (Plaintiffs Ex. 16 at 4). In reviewing Dr. Peterson's work, EMB found that his claim values and propensity to sue were "overstated." (*Id*. at 4-5). When EMB used historical claim values and held propensity to sue constant, it calculated aggregate liability of $2.46 billion. (*Id*. at 36). Tillinghast likewise pointed out flaws in Dr. Peterson's use of TDP claim values and in his increasing propensity to sue model. (Plaintiffs Ex. 17 at 12-14). Tillinghast's estimate, discounted to present value at a 5.5% discount rate, ranges from $2.1 to $5.6 billion – figures that are much closer to Dr. Cantor's estimate than to Dr. Peterson's. (*Id*. at 22).

**Attachment A**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
                                        :
In re:                                  :       Bankruptcy No. 01-10578 (RTL)
                                        :
FEDERAL-MOGUL GLOBAL, INC., et al. :
T&N LIMITED, et al.,                    :
                          Debtors.      :
---------------------------------------------------------x
                                        :
THE OFFICIAL COMMITTEE OF               :
ASBESTOS CLAIMANTS and                  :
ERIC D. GREEN, as the                   :
LEGAL REPRESENTATIVE FOR                :
FUTURE ASBESTOS CLAIMANTS,              :
                                        :
             Plaintiffs,                :
                                        :
v.                                      :       Civil Action No. 05-59 (JHR)
                                        :
ASBESTOS PROPERTY                       :
DAMAGE COMMITTEE,                       :
                                        :
             Defendant.                 :
                                        :
---------------------------------------------------------x

### OFFICIAL COMMITTEE OF ASBESTOS PROPERTY
### DAMAGE CLAIMANTS' PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW IN CONNECTION WITH THE
### ESTIMATION OF TURNER AND NEWALL'S PENDING AND
### FUTURE UNITED STATES ASBESTOS PERSONAL INJURY LIABILITY

# TABLE OF CONTENTS

Page

I.      CONCLUSIONS OF LAW ..................................................................................1

        A.      Jurisdiction and Venue ..............................................................................1

        B.      Contested Matter.......................................................................................2

        C.      Estimation.................................................................................................3

II.     THE DEBTORS' CHAPTER 11 CASES ............................................................7

III.    FINDINGS OF FACT .........................................................................................11

IV.     THE DEBTORS' ASBESTOS PERSONAL INJURY HISTORY ......................12

        A.      Turner & Newall's Claims History.........................................................12

V.      THE MEDICAL EVIDENCE DEMONSTRATES THAT THE
        INCIDENCE OF ASBESTOS RELATED DISEASE IS DECREASING
        STEADILY OVER TIME....................................................................................20

        A.      The Medical Incidence of Asbestosis Is Declining, But There is a
                Phenomenon of Over-Diagnosis of Asbestosis by Plaintiff-Selected
                B-Readers .................................................................................................21

        B.      The Incidence of Mesothelioma in the United States is Decreasing ........23

        C.      The Incidence of Asbestos-Caused Lung Cancer in the United States
                is Decreasing............................................................................................25

        D.      Other Cancers Cannot be Conclusively Linked to Asbestos
                Exposure ..................................................................................................25

VI.     THE DEBTORS' HAVE FILED MULTIPLE REPORTS WITH THE SEC
        ESTIMATING T&N'S PENDING AND FUTURE  ASBESTOS
        LIABILITY FAR BELOW THE PETERSON ESTIMATE................................26

VII.    DR. ROBIN CANTOR'S ESTIMATE.................................................................27

        A.      Dr. Cantor's Expert Credentials ..............................................................27

        B.      Dr. Cantor's Methodology for Estimating Claims Against T&N.............29

VIII.   THE PETERSON ESTIMATE IS INCONSISTENT WITH ALL OTHER
        ESTIMATES IN THIS CASE ..............................................................................40

        A.      Dr. Peterson's Estimate Is Flawed ...........................................................40

        B.      Dr. Peterson's Claim Values Are Overstated ...........................................42

        C.      Dr. Peterson Forecasts Unsustainable Claiming Rates.............................44

The Official Committee of Asbestos Property Damage Claimants (the

"Property Damage Committee")[2] submits these proposed findings of fact and conclusions

of law based on the facts adduced at the hearing conducted before this Court commencing

on June 14, 2005 and ending on June 21, 2005.[3]

## CONCLUSIONS OF LAW

**Jurisdiction and Venue.**

      1.      This Court has jurisdiction over the asbestos personal injury claims

estimation proceeding pursuant to 28 U.S.C. § § 1334 and 157. The reference as to this

estimation proceeding has been withdrawn from the bankruptcy court pursuant to 28

U.S.C. § 157(d). Venue of the chapter 11 proceeding in the District of Delaware was

proper as of the Commencement Date and continues to be proper pursuant to 28 U.S.C.

§ § 1408 and 1409.

      2.      On December 2, 2004, the Debtors filed a motion pursuant to 11

U.S.C. Section 105(a) for an Order (I) Clarifying District Court Judge Wolin's December

10, 2001 Order, and (II) Delineating the Respective Roles of the District Court and the

---

[2] The Property Damage Committee represents the interests of approximately 3,200 municipalities, school districts, hospitals, businesses, and individuals who own and operate buildings where asbestos-containing products manufactured and distributed by T&N or affiliated companies have been installed and who have filed proofs of claim for damages.

[3] The Findings of Fact and Conclusions of Law contained herein constitute proposed findings of fact and conclusions of law proposed to be entered by this Court pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

1

Bankruptcy Court With Respect to Asbestos Estimation and Plan Confirmation Matters in these Cases (the "Withdrawal Motion"), which sought withdrawal of the reference to this Court from the Bankruptcy Court of both the asbestos personal injury claims estimation and Plan confirmation proceedings. (Docket No. 6517). On January 14, 2005, the Property Damage Committee filed a statement of support for the relief sought in the Withdrawal Motion. (Docket No. 6830). Following a hearing on January 25, 2005, this Court entered an order granting withdrawal of the reference with respect to the estimation proceeding, but reserving decision on whether to withdraw the reference as to the confirmation hearing. The Court's decision on whether to withdraw the reference as to the confirmation hearing remains sub judice.

3.    On June 16, 2004, an Order was entered by the Chief Judge of the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C. § 292(b) designating and assigning District Court Judge Rodriguez to sit on the United States District Court for the District of Delaware in these bankruptcy cases.

**Contested Matter.**

4.    This estimation proceeding is a contested matter pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") – as opposed to an adversary proceeding under Bankruptcy Rule 7001. As such, each of the Plan Proponents, as proponents of the Plan for which the estimation proceeding was held and as parties in interest under section 1109(b) of the Bankruptcy Code, are parties to this contested matter. In a contested matter, the Court takes judicial notice of the entire docket

2

in the bankruptcy cases. *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197 (3d Cir. 1995); *In re McKnight*, 2005 Bankr. LEXIS 975 (Bankr. E.D. Pa. 2005).

**Estimation.**

    5. Estimation of the allowed amount of claims in bankruptcy is governed by section 502(c) of chapter 11 of title 11 ("the Bankruptcy Code"), which provides a mechanism for the mandatory estimation of "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. 502(c); *see also Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 347 (3d Cir. 2002) ("The object of (an estimation) proceeding is to establish the estimated value of a creditor's (contingent or unliquidated) claim for purposes of formulating a reorganization plan."). Pursuant to section 502(c), estimation should be for the purpose of "allowance," which, according to a noted bankruptcy treatise, means "that the essence of section 502(c) is that all claims against the debtor be converted into dollar amounts." *See* 4 COLLIER ON BANKRUPTCY, ¶ 502.04 (15th ed. rev).. It is undisputed that the Personal Injury Claims are contingent and unliquidated, and that liquidation of each such claim by trial would unduly delay administration of these cases. (*See* Third Amended Joint Plan of Reorganization at § 1.1.20) (hereinafter "Plan at § __"). Here, the Court is not estimating the recovery of any particular Personal Injury Claim, but rather is estimating the aggregate allowable amount of all such claims.

    6. The Bankruptcy Code is silent as to the method or manner in which contingent or unliquidated claims are to be estimated. *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d. Cir. 1982). Thus, this Court has discretion to determine the appropriate

3

method based upon the circumstances of the particular case before it. *In re Trident Shipworks, Inc.*, 247 B.R. 513 514 (Bankr. M.D. Fla. 2000); *see also In re Thompson McKinnon Sec., Inc.*, 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992). There is no binding precedent for how the Court must conduct an estimate of pending and future asbestos claims. Indeed, the United States Court of Appeals for the Third Circuit has held that a district court has wide latitude in determining what evidence to consider and what methods to apply. *Bittner v. Borne Chem. Co.,* 691 F.2d 134, 135 (3d Cir. 1982). The court held in *Bittner* that:

> The Code (and) the Rules of Bankruptcy Procedure . . . are silent as to the manner in which contingent or unliquidated claims are to be estimated. Despite the lack of express direction on the matter, we are persuaded that Congress intended the procedure to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the particular contingencies at issue.

*Id.* at 135-36.

       7.     The basic methodology for estimating the allowed amount of T&N's asbestos liability is: (1) determining the value of claims for each type of disease,[4] (2) determining the number of pending claims, and anticipated future demands of each disease type that will likely be entitled to compensation, (3) multiplying the value for each disease by the number of projected compensable claims, and (4) adjusting upward for inflation to the date of anticipated payment, and then discounting the inflated amount back to present value. *See In re Eagle-Picher Indus., Inc.*, 189 B.R. 681 (Bankr. S.D. Ohio 1995), *aff'd*, 1996 U.S. Dist. LEXIS 22742 (S.D. Ohio 1996).

---

[4] The categories of diseases are: (1) mesothelioma; (2) lung cancer; (3) other cancers; (4) asbestosis; and (5) pleural disease.

4

8.    *Eagle-Picher* established a basic principle for determining aggregate

values for asbestos claims, finding that values should be based upon the closed prepetition

claims in the debtor's claims database:

> In valuation, the only sound approach is, if possible, to begin
> with what is known.  To begin without utilizing information
> known about these debtors and their history in the handling
> of claims which have been asserted against them in the past,
> and their disposition, is to ignore a valuable experiential
> resource.  Debtors have a database containing detailed
> information about each of the closed claims.  From the
> database it is possible to associate with each claim
> characteristics such as occupation of the claimant, nature of
> the disease, the amount which was paid to the claimant, as
> well as the number of other factors, as particularly identified
> by Peterson.  Because much of the same information is
> known about the open prepetition claims, though, of course,
> not the settlement amount, it is possible to ascertain with
> some degree of accuracy what the settlement figures for
> those claims would be had they been resolved prepetition.

189 B.R. at 686.

9.    As to future claims, the *Eagle-Picher* court set forth seven

considerations that should inform the estimate:

> (1) The estimate should be primarily based upon the history of *this company*,
> particularly because there was no definitive showing of another or other
> company's production of a product line identical to that of debtors.  This
> consideration does not, however, rule out the desirability of considering trends
> general to the industry, particularly regarding the rate of filing claims.
> (2) The total number of claims to be expected should be estimated.
> (3) The estimation of claims should categorize them by disease and occupation,
> as well as other factors.
> (4) Valuation of claims should be based upon settlement values for claims close
> to the filing date of the bankruptcy case.
> (5) A reasonable rate for indemnity increase with time must be determined so
> that a future value of filing date indemnity values can be comparable.
> (6) A lag time gleaned from the tort system must be determined in order that
> there be accuracy in projecting future values.
> (7) A discount rate must then be applied to bring the future nominal value of
> claims back to the filing date.

*Id.* at 690-91.

10.    Also, adjustments to these values may be appropriate where past

results have been skewed by factors which affected historic claim resolutions but which

5

can and should be avoided in the future, including: (1) venue shopping; (2) mass screening

that triggered thousands of claims by persons who had never experienced adverse

symptoms; (3) erroneous x-ray interpretations by biased plaintiff doctors; (4) overpayment

to unimpaired claimants; (5) grouping more serious injuries with unimpaired claimants for

trial, resulting in higher verdicts or settlements for the latter; (6) overvaluation of less

meritorious cases through global settlements; and (7) increased verdicts and settlements

caused by the assessment, or threat, of punitive damages. *Owens Corning v. Credit Suisse*

*First Boston*, 322 B.R. 719, 723 (D. Del. 2005) (Fullam, Sr. J., E.D. Pa., sitting by

designation). Changes in state procedural and substantive law limiting the right of

unimpaired plaintiffs to recover damages as well as the use of "mass screened evidence"

should also be reflected in estimating the value and number of future claims. (*Id.* at 725

(noting changes in the "asbestos litigation landscape which have already occurred and

which will likely continue.")

## THE DEBTORS' CHAPTER 11 CASES

11.    On October 1, 2001 (the "Commencement Date"), the Debtors filed

with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

See Chapter 11 Voluntary Petitions of Federal-Mogul Global, Inc., et al. (Docket No. 1. et.

seq.) The Debtors are authorized to operate their businesses and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.    Contemporaneously with the filing of the chapter 11 cases, the

Debtors filed for administration proceedings (the "UK Proceedings") before the High

Court of Justice in the United Kingdom (the "UK Court") for the Debtors located in that

jurisdiction (the "UK Debtors"). (Property Damage Committee Ex. 34 at 5). (Hereinafter

6

"PD Ex. ___ at ___). On the Commencement Date, the UK Court approved a Cross-Border Insolvency Protocol entered into by the Debtors and the Administrators for the UK Debtors (the "UK Administrators"), which allows the UK Debtors to operate their businesses in the United Kingdom. (PD Ex. 34 at 5).

   13. On October 28, 2003, pursuant to section 1102(a)(2) of the Bankruptcy Code, the United States Trustee appointed the Property Damage Committee, consisting of five (5) members, to represent the interests of asbestos property damage claimants (the "Property Damage Claimants") in the Debtors' chapter 11 cases. *See* Appointment of Official Committee of Asbestos Property Damage Claimants Filed by United States Trustee (Docket No. 3671). The members of the Property Damage Committee are: Anderson Memorial Hospital, Jacksonville College, Moxie Real Estate, Richard Blyth, and The Hill School. (*Id.*).

   14. On June 4, 2004, the Third Amended Joint Plan of Reorganization (the "Plan") and Disclosure Statement to the Plan (the "Disclosure Statement") were filed jointly by the Debtors, the Official Committee of Unsecured Creditors (the "Creditors Committee)," the Official Committee of Asbestos Claimants (the "ACC"), the Legal Representative for Future Asbestos Claimants, JPMorgan Chase Bank as Administrative Agent for the prepetition lenders, and the Official Committee of Equity Security Holders (collectively, the "Plan Proponents"). (Docket Nos. 5121 and 5122). An order approving the Disclosure Statement was entered by the Bankruptcy Court on the same date. *See* Order (I) Approving Disclosure Statement, (II) Setting Date and Time of Confirmation Hearing With Respect to the Plan of Reorganization for the Debtors, and (III) Establishing

Objection Procedures for the Plan of Reorganization for the Debtors (Docket No. 582593055).

15.    The basis for the Plan is what has been colloquially referred to as the "Central Deal." The Central Deal represents an agreement reached between the ACC and the Creditors Committee. The Central Deal allocates 50.1% of Reorganized Federal-Mogul equity to the proposed asbestos personal injury trust, for the benefit of asbestos personal injury claims and pursuant to the provisions of section 524(g) of the Bankruptcy Code, and 49.9% of such equity to the holders of notes issued by Federal-Mogul. (PD Ex. 34 at 6). Under the Plan, other holders of unsecured non-note claims against Federal-Mogul will receive a recovery equal to 35% of the value of each claim, payable in cash in three, equal annual installments. (*Id.* at 106).

16.    As to the 50.1% of the equity of Reorganized Federal-Mogul allocated to asbestos personal injury claims, a trust (the "Trust") will be established in accordance with section 524(g) of the Bankruptcy Code for the resolution and payment of such claims. (*Id.* at 145). The Trust will be administered by three trustees selected by the ACC in accordance with the Trust Distribution Procedures annexed to the Plan. All asbestos personal injury claims will be channeled to the Trust as the sole forum for the resolution and payment of their claims. Their claims will be paid from the 50.1% of the equity to be transferred to the trust [and by certain insurance policies also to be transferred to the trust. (*See* Plan at § 3.6.5).

17.    Under the Plan, other than asbestos personal injury claims, all unsecured claims against T&N Limited, including property damage claims, will receive a

8

recovery under one of three options.[5] *See* (PD Ex. 34 at 106; Plan at §§ 3.6.3, 8.16). The
first option will occur if the UK Administrators propose Company Voluntary
Arrangements ("CVAs") or Schemes of Arrangement ("Schemes") for the T&N
Companies under UK Administration that mirror the provisions of the Plan. (PD Ex. 34 at
106). In that instance, non-asbestos personal injury claimants with unsecured claims
against T&N Limited will receive a distribution in accordance with T&N Distribution
Ratio 1, which the Plan defines as a ratio where the numerator is equal to 79% of the value
of the Reorganized Federal-Mogul Class B Common Stock -- which is the stock to be
distributed to the section 524(g) trust created with respect to the Asbestos Personal Injury
Claims against T&N -- and the denominator is the tort system value (as determined by the
Asbestos Personal Injury Trust Distribution Procedures) of the Asbestos Personal Injury
Claims against T&N. (*Id.*) T&N Distribution Ratio 1 can be stated more simply into
graphic form:

$$\frac{\text{79\% of the value of the Reorganized Federal-Mogul Class B Common Stock}}{\text{Tort system value (as determined by the Asbestos Personal Injury Trust Distribution Procedures) of Asbestos Personal Injury Claims}}$$

18.    Under the second option, which will occur if the UK Administrators
do not seek to implement CVAs/Schemes that mirror the terms of the Plan, non-personal
injury unsecured claimants with claims against T&N Limited will receive a recovery in
accordance with Distribution Ratio 2, which is defined by the Plan as a ratio where the
numerator is the value of T&N's assets (as determined at the Confirmation Hearing), and

---

[5] The third option is not material to these proceedings and will not be discussed.

9

the denominator is the sum of the tort system value of the Asbestos Personal Injury Claims

against T&N (as determined by the Asbestos Personal Injury Trust Distribution Procedures

(i.e., the aggregate allowed amount of Asbestos Personal Injury Claims against T&N and

estimated by this Court)) and the allowed amount of other claims against T&N, including

Affiliate Claims. (*Id.* at 106-7). In graphic form, Distribution Ratio 2 is represented as:

(Value of T&N's assets)

---

(Tort system value of the Asbestos Personal
Injury Claims against T&N) + (allowed amount
of other claims against T&N)

19.    The numerator under either Distribution Ratio is not affected by the

aggregate estimated value of asbestos personal injury claims, and will remain the same

whether the estimate of claims is higher or lower. Notably, under either Distribution

Ratio, the percentage recovery by non-asbestos personal injury claimants with unsecured

claims against T&N Limited is wholly derivative of the aggregate estimated value of

asbestos personal injury claims against T&N Limited. The higher the estimate of the

aggregate value of asbestos personal injury claims, the higher will be the denominator

under either Distribution Ratio, the lower will be the ratio under either Distribution Ratio,

and therefore the lower the percentage recovery for other, non-asbestos personal injury

unsecured claims against T&N Limited. However, notwithstanding a higher or lower

estimate of asbestos claims, under the Plan the asbestos personal injury claims will receive

in the aggregate the value of the numerator under either Distribution Ratio, i.e., the Trust

will have the same aggregate asset value to distribute to the asbestos personal injury claims

no matter what value is the court's estimated aggregate amount of these claims.

10

## FINDINGS OF FACT

20.    The Court conducted an estimation hearing from June 14 through June 21, 2005.  Testimony was received from the following witnesses:

- Paul Hanly, Esq., former United States outside counsel for T&N;

- Andrea Crichton, a T&N employee responsibly for administration of asbestos personal injury claims in the United Kingdom;

- Barbara Dohmann, the Plaintiffs' expert on British law;

- Dr. Laura Welch, the Plaintiffs' expert on medical issues;

- Dr. Mark Peterson, the Plaintiffs' estimation expert;

- William Hanlon, Esq., outside counsel to the Center for Claims Resolution;

- George Michael Lynch, the Debtors' Chief Financial Officer;

- Dr. Hans Weill, the Property Damage Committee's medical expert; and

- Dr. Robin Cantor, the Property Damage Committee's estimation expert.

## THE DEBTORS' ASBESTOS PERSONAL INJURY HISTORY

21.    Prior to commencing these chapter 11 proceedings on October 1, 2001, the Debtors were defendants in personal injury litigation nationwide as a result of their manufacture and sale of asbestos containing products.  The Debtors' asbestos personal injury liability stems from one of six Federal-Mogul entities that was at some

11

point involved with asbestos or asbestos containing products. (PD Ex. 34 at 30)  The six entities are T&N Limited ("T&N"), GHI, Ferodo, F-M Products, Felt Products Mfg. Co., and the Vellumoid Division, a former division of Federal-Mogul.  (*Id.*)  The overwhelming share of the Debtors' asbestos personal injury liability is related to the activities of T&N, which was purchased by Federal-Mogul in March of 1998.  (*Id.*)  This estimation relates only to T&N's pending and future liability.

### Turner & Newall's Claims History.

22.    T&N resolved approximately 245,000 asbestos personal injury cases between 1976 and 2001.  (PD Ex. 2 at 9).  T&N's chief outside counsel, Paul Hanly, testified that T&N was sued by virtually every major plaintiffs' law firm in that time frame (6/14/2005 tr. at 105), and was a leading member of the Center for Claims Resolution (the "CCR"), a coordinated group of major asbestos defendants who joined together to resolve and defend asbestos personal injury cases.  (*Id.* at 103).  T&N paid out nearly $835 million (net present value) to resolve claims.  (*Id.* at 27).

### *T&N's Streams of Asbestos Liability.*

23.    T&N had three relevant streams of U.S. asbestos liability.  The largest stream of asbestos liability arose from sales of T&N's Sprayed Limpet Asbestos Product.  (PD Ex. 34 at 32).  "Limpet was not a widely marketed or used product in the U.S."  (*Id.*)  "T&N was historically named in very few cases alleging exposure to Limpet that was sprayed" after March 1967 – that is, cases in which a worker's exposure to Limpet occurred within the past forty years.  (*Id.* at 33).

24.    The second largest stream of liability arose from T&N's ownership of Keasbey & Mattison Co. ("Keasbey") from 1934 to 1962, and T&N's provision of

12

Keasbey with raw asbestos fiber. (*Id.*) Hanly testified that Keasbey was sometimes referred to by others as a "mini Johns-Manville," (i.e., being the subject of substantial liability) (6/14/2005 tr. at 54). Despite this, claims against T&N based on its relationship with Keasbey were *decreasing* in the years prior to T&N's bankruptcy. (6/14/2005 tr. at 105).

       25.    T&N's third stream of liability arose from its subsidiaries' brokerage of raw asbestos fibers in the United States. (PD Ex. 34 at 33). There were fewer suits based on T&N's brokerage of raw asbestos fibers than suits based on Limpet or T&N's ownership of Keasbey. (*Id.*; 6/14/2005 tr. at 119). T&N imported only a miniscule amount of raw asbestos fibers into the United States. (PD Ex. 34 at 33). Hanly testified that T&N brokered only a "very, very small percentage" of asbestos fiber used in the United States. (6/14/2005 tr. at 120-121). He also admitted on cross-examination that through its brokerage subsidiary TAF, T&N imported a total of only 400,000 tons of raw asbestos fibers into the United States between 1931 and 1976, while approximately 1 million tons of raw asbestos fiber were used each year in the United States. (6/14/2005 tr. at 120-121).

       *T&N's Membership in the CCR*

       26.    Starting in the late 1980s, T&N resolved its asbestos litigation through the CCR. (6/14/2005 tr. at 49-50). In the late 1990s the CCR entered into a settlement program to resolve mass inventories of claims on behalf of its members known as the "strategic settlement program" (the "SSP"). (6/14/2005 tr. at 106). The SSP involved many of the leading plaintiffs law firms in the country. (*Id.*)

27.    A principal purpose of the CCR was to manage defense and litigation costs for its members, including T&N. ((Deposition Transcript of William R. Hanlon at 21 (hereinafter "Hanlon De tr. at __")) There is no testimony from William Hanlon, the general counsel of the CCR, or any other CCR official, that CCR members actually received any "volume discounts" by virtue of their membership in the CCR. There is also no testimony from any plaintiffs' attorney or plaintiff that any plaintiff received less money from a settlement with CCR members collectively than the aggregate amount that plaintiff would have received from each member company of CCR through individual settlements. Dr. Cantor, the Property Damage Committee's estimation expert, has consulted with Bill Jones, a consultant with a long affiliation with the CCR. (6/21/05 tr. at 1021-22). Mr. Jones did not know of any analysis done by CCR demonstrating that "there was evidence of reduced indemnity cost" for CCR members "because of CCR." (*Id.* at 1022).

28.    Under CCR protocols, a member of the CCR was allocated a share of liability in a settlement as long as that company was named as a defendant by the plaintiffs. (Hanlon Dep. tr. at 33). The CCR would settle claims with plaintiffs if the plaintiffs could submit evidence of exposure to the products of any single CCR member. (*Id.* at 108). There was no requirement that plaintiffs adduce evidence of exposure to the products of every CCR member that the plaintiff named as a defendant in the case. (*Id.* at 148). When a plaintiff presented evidence of exposure to any single CCR members' products, "the other members who had been named in that plaintiff's complaint had to contribute to the settlement notwithstanding that the plaintiff had not proffered any evidence of exposure to the products of those other defendants." (6/14/2005 tr. at 68-69).

14

Thus, as a member of the CCR, T&N settled cases in which there was not necessarily product identification evidence against it. This would mean that T&N's database (from which both Dr. Peterson and Dr. Cantor project future claiming rates) likely contains claims paid by T&N as to which plaintiffs had not established exposure to a T&N product.

29.    A critical assumption in Dr. Peterson's report was that T&N was a "small member among the twenty companies in the CCR," (6/16/2005 tr. at 647) and a "relatively insignificant one of twenty members" in the CCR. (Plaintiffs' Ex. 2 at 4, 8). However, T&N was a high profile, major member of the CCR -- from 1991 on, T&N held a board seat in the CCR because it had one of the three largest liability allocations among all CCR members. (6/14/2005 tr. at 103; Hanlon Dep. tr. at 17). Liability allocation among CCR members was designed to "fairly allocate the several share of liability in cases among CCR members." (6/14/2005 tr. at 76). Among the factors that went into each individual members' allocation of liability were which companies "did the plaintiffs target," and which were the defendants "that plaintiffs' believed they had the strongest case" against. (Hanlon Dep. tr. at 128).

30.    T&N's fellow CCR members could and did seek to adjust T&N's liability shares when they thought T&N was not paying its fair share. (6/14/2005 tr. at 106). According to Hanly, T&N's percent of liability among CCR members was in the teens for certain occupational categories. (*Id.* at 107). Dr. Peterson's testimony indicates that the T&N share of CCR's settlement payments was approximately 20% throughout the 1990s. (6/20/2005 tr. at 734). T&N's percent liability share in the CCR increased as other members departed in the late 1990s. (6/14/2005 tr. at 106). In the late 1990s, T&N's percent share of CCR liability was between 20-30%. (*Id.* at 107) After being confronted

15

with this information, Dr. Peterson changed his testimony from his report and acknowledged that, in fact, T&N's board membership would have been known to plaintiffs' law firms, and that it was not an obscure or insignificant member of the CCR. (6/20/2005 tr. at 735).

31.    No witness provided any evidence that they knew of a single plaintiffs' lawyers who would have otherwise sued T&N did not because it was a member of the CCR, nor was there any evidence presented that plaintiffs' lawyers failed to take discovery against T&N. Plaintiffs "always sought discovery" from T&N when they sued T&N. (6/14/2005 tr. at 108). T&N was frequently taken to trial -- plaintiffs' lawyers "probably started up trials in 100 to 200 cases" against T&N between 1982 and 2001. (*Id.* at 109). Similarly, there is no evidence plaintiffs stinted on efforts to obtain damages against T&N while it was a member of the CCR. When plaintiffs took T&N to trial they "sought to maximize the damages" they could recover against T&N as they would with "any defendant in asbestos." (*Id.*)

32.    It was also widely known among asbestos plaintiffs' lawyers that in 1996 T&N purchased an insurance policy (known as the Hercules Policy) with hundreds of millions of dollars of coverage. (6/14/2005 tr. at 117).

*There Is Conflicting Testimony as to Why T&N Left the CCR,*
*and Why T&N Filed for Bankruptcy.*

33.    Hanly testified that T&N left the CCR because that organization had "effectively collapsed" by the beginning of 2001, and T&N was "forced . . . into the tort system on its own." (6/14/2005 tr. at 78-79). This is contradicted by the Debtors' public

16

statements in 2001 that T&N was leaving the CCR because it believed it needed a change in asbestos litigation strategy. (PD Ex. 94 at Slide 31).

34.    Hanly testified that consolidations of asbestos plaintiffs' claims were "quite good" for T&N. (6/14/2005 at 81). This testimony is contradicted by statements made by T&N in a submission to the United States Bankruptcy Court in this proceeding, in a brief signed by Mr. Hanly. (6/14/2005 tr. at 123-24). The assertions in that brief were true, and the Debtors did not intend to mislead the court when it was submitted. (*Id.*)

35.    In direct contrast to Hanly's testimony, Hanly's prior submission to the Bankruptcy Court on behalf of T&N and the other Debtors stated that aggregation of claims of impaired and unimpaired claimants increased the value of unimpaired claims, and increased the pressure to settle unimpaired claims. (*Id.* at 126*)*. This submission also represented that there was a "parasitic fusion" between weak and strong cases that benefited the weak cases. This parasitic fusion increased claims filings. (*Id.*) Hanly also discussed the medical evidence used by plaintiffs during his direct testimony. He stated that "B Reader reports [the type of evidence used in virtually all non-malignant asbestos cases] were not material in a large number of cases." (*Id.* at 80). However, Hanly's earlier submission averred that "mass screenings" generated a massive volume of unimpaired claims against T&N. (*Id.* at 127-28). This is consistent with the experience of the CCR, which expressed concerns that medical evidence garnered through mass screenings led to diagnoses of asbestosis that were unfounded, not based on reliable evidence and "bogus." (Hanlon Dep. tr. at 71).

17

36.     Hanly testified that participating in the CCR gave T&N certain benefits, and that T&N lost these benefits when it left the CCR.  (6/14/2005 tr. at 77-78). He claimed that leaving the CCR increased T&N's liability.  (*Id.*)  However, Hanly's earlier submission on behalf of the Debtors does not identify T&N's leaving the CCR as a factor in T&N's increased asbestos liability.  Instead, "untrammeled screenings of marginally exposed people" and the dumping of tens of thousands of cases into the system caused the tort system to be distorted.  (*Id.* at 128).

37.     Hanly also testified that the publication in 2000 of a book regarding T&N's "corporate conduct" by a British journalist named Geoffrey Tweedale had a "very material impact" on T&N's liability.  (*Id.* at 93-94).  Hanly's testimony does not identify any personal injury plaintiffs' lawyer who ever referred to the Tweedale book.  Moreover, Hanly's prior submission in October 2001 makes no reference to the publication of the Tweedale book.  (PD Ex. 10)[6]

### T&N's "Corporate Conduct" Documents Were Widely Disseminated By 1996.

38.     The "corporate conduct" documents referenced above were assembled by T&N in a database in England not later than 1985.  (6/14/2005 tr. at 111). That year, American plaintiffs' lawyers from the law firm currently known as Motley Rice reviewed over 1 million pages of these documents.  (*Id.*)  This firm was headed by "one of the most sophisticated" plaintiffs' attorneys.  (*Id.*)  The corporate conduct documents were also extensively reviewed in 1993 by the Kazan law firm, another very sophisticated and

---

[6] Dr. Peterson posited in his report that the book "drew attention" to T&N (Plaintiffs' Ex. 2 at 8) but provided no evidence to support this claim.

"excellent" plaintiffs' firm. (*Id.* at 113). There were multiple articles in the press about these corporate conduct documents in 1993, 1995 and 1996. (*Id.* at 114).

39.    Chase Manhattan Bank ("Chase") obtained many of these documents in the early 1990s in the course of litigation against T&N. (*Id.* at 112-115). Chase created a microfilm database of the documents and brought them to the United States. (*Id.*) T&N also created an electronic database and microfiche set of these documents which were kept in the United States. (*Id.* at 171-72). Accordingly, there is no evidence that these documents were difficult for plaintiffs' lawyers to obtain. These documents were used by Chase against T&N in open court in the United States District Court for the Southern District of New York. (*Id.* at 114). The case received substantial publicity in 1996, and was featured in an article in the *American Lawyer*, which directly quoted from these documents. (PD Ex. 71). An attorney for Chase widely disseminated these documents among plaintiffs' attorneys, and the documents were also placed in public files, such as the British House of Commons library in the middle 1990s. (*Id.*; 6/14/2005 tr. at 115).

40.    Thus, it is undisputed that no later than 1996, these documents were in the public domain, in the hands of sophisticated plaintiffs' counsel, the subject of multiple news articles and had been used in a high-profile trial against T&N.

### THE MEDICAL EVIDENCE DEMONSTRATES THAT THE INCIDENCE OF ASBESTOS RELATED DISEASE IS DECREASING STEADILY OVER TIME

41.    The Property Damage Committee presented the medical testimony of Dr. Hans Weill, M.D. Dr. Weill is a board certified pulmonologist, former President of

19

the American Thoracic Society, and researcher with 35 years of experience in the study and treatment of the effects of exposure to asbestos and other inhalants. (Testimony of Hans Weill, MD, in *Owens Corning v. Credit Suisse First Boston*, No. 04-CV-905 (D. Del.), 1/18/2005 at 45-48 (hereinafter "Weill tr. at ___").)[7] Dr. Weill has published 50 articles related to asbestos. (*Id.*) He has been on the staff of Tulane Medical Center Hospital since 1976, and he has personally evaluated over 1,000 individuals exposed to asbestos. (*Id.*) Dr. Weill has testified for both plaintiffs and defendants. The late Judge Carl Rubin of the U.S. District Court for the Southern District of Ohio selected Dr. Weill as a Court-appointed expert pursuant to Fed. R. Evid. 706 in 65 asbestos cases in 1991. (PD Ex. 95; Weill tr. at 98-99).[8]

      42.    Various asbestos-related conditions cause functional impairment and shorten life-span. (PD Ex. 21 at 00210002). As workplace exposures have been substantially reduced since 1972, asbestos-related health effects have become increasingly less prevalent. (*Id.*; Weill tr. at 51). The latency period for most asbestos related disease is 20 to 40 years. (Weill tr. at 40). Fewer and fewer cases of asbestos-related disease occur forty years after exposure to asbestos. (*Id.*) It is "not common" (although possible) for a case of mesothelioma to appear fifty years after first exposure. (*Id.*)

---

[7] Dr. Weill's testimony in the *Owens Corning* matter was admitted by the Court pursuant to agreement among the Property Damage Committee, the Asbestos Claimants Committee and the Legal Representative for the Future Representative. (6/20/2005 tr. at 803-04)

[8] Judge Rubin's experts concluded that, in the cases they reviewed, among plaintiffs claiming asbestos disease only 35% of claimants had *any* asbestos disease (impaired or not) and that only 15% had an impairing condition. *See* Carl Rubin and Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 38 (1991) (PD Ex. 95).

**The Medical Incidence of Asbestosis Is Declining, But There is a
Phenomenon of Over-Diagnosis of Asbestosis by Plaintiff-Selected B-Readers.**

43.    Asbestosis is defined as lung fibrosis due to asbestos exposure.
Approximately twenty other causes of lung fibrosis besides asbestosis exist. (6/15/2005 tr.
at 299). Since the late 1980s, Dr. Weill (a pulmonologist, unlike Dr. Welch) and his
practicing colleagues have rarely seen new cases of asbestosis and that the disease burden
from asbestosis is declining. (Weill tr. at 71). This is because there is a dose-response
function for all asbestos-related diseases, and there has been a dramatic decline in levels of
workplace exposure (i.e., the dose of asbestos to which workers are exposed) over the last
three decades. (Weill tr. at 49-52). Dr. Welch agreed that exposure levels have been
controlled for many years. (6/15/2005 tr. at 285). Dr. Welch testified that "if we were
doing large scale examination programs, we would be seeing a decline in the prevalence of
asbestosis." (*Id.* at 283).[9]

44.    Dr. Weill explained the phenomenon of systematic over-reading of
asbestosis on chest x-ray films by asbestos litigation screening facilities. (PD Ex. 21 at
PD00210004; Weill tr. at 88-89). There is an "inordinate influence of litigation on the
validity of these diagnosis." (PD Ex. 21 at PD00210004). An estimate of the incidence of
asbestosis that does not account for the systematic over-diagnosis of asbestosis will
overestimate the incidence of valid asbestosis claims. (*Id.* at PD00210003). Temporal

---

[9] Dr. Welch claimed that there are "millions of people" walking around with non-
malignant asbestos disease and cited a study purporting to show that asbestos-related
pleural plaques are present in 2.3% of the adult male population. (6/15/2005 tr. at 247-
248). On cross-examination, Dr. Welch admitted that the study she cited for this
proposition is approximately twenty years old. (*Id.* at 275). The record does not contain
any current data to support this conclusion.

21

trends in filing rates (such as Dr. Peterson uses) which are generated from "these flawed diagnoses would be meaningless." (*Id.* at PD00210004).

45.    This systematic overreading cannot be accounted for by random variability among chest-film readers with "B-reader" certification. (Defendants' Ex. 21 at PD00210003; Weill tr. at 88-89). Dr. Weill cited two recent studies of plaintiff selected B-readers, and agrees with the "widespread view that (the) majority of plaintiff's 'B-readings' lack credibility and validity." (PD Ex. 59 at 6). The Gitlin Study (PD Ex. 28) "provides useful information and strongly suggests that there has been systematic over-reading of chest x-ray films by asbestos screening facilities, not simply random variability among B-readers in film classifications."[10]

46.    Dr. Welch's testimony regarding increasing rates of asbestosis reported on death certificates (6/15/2005 tr. at 259) is unreliable. Death certificate reporting is neither "epidemiology (nor) research." (Weill tr. at 72). "A death certificate diagnosis of asbestosis" does not necessarily reflect any medical diagnosis, but "may simply just reflect what individuals' families and others have been told about their departed family member." (*Id.* at 74).[11]

47.    Dr. Welch testified repeatedly that she is unaware of the practices or methods of litigation screening facilities, even though she is aware of the criticisms of

---

[10] The Ducatman study (cited by Dr. Welch) differs from the Gitlin study substantially. In the Gitlin study, each B-reader reviewed the same set of X-rays. (PD Ex. 28). In the Ducatman study, however, each B-reader read different X-rays. (6/15/2005 tr. at 274).

[11] To the extent such data is reliable, workers below age of 65 at the time of death have a declining likelihood of having their death certificate mention asbestosis as a cause of death. (Weill tr. at 73).

22

them. (6/15/2005 tr. at 293-94). Thus, she cannot credibly assess whether the diagnoses

generated by these entities, which support a massive volume of unimpaired claims against

T&N (6/14/2005 tr. at 127-28) are reliable. Estimates of future liability which ignore or

fail to recognize the evidence of systematic over-reading in mass-screened evidence will

overstate T&N's liability.

**The Incidence of Mesothelioma in the United States is Decreasing.**

48.    Mesthelioma is a fatal cancer sometimes caused by exposure to

asbestos and sometimes idiopathic (i.e., has a cause other than asbestos that is unknown).

(Welch tr. at 272). Approximately 20% of mesothelioma cases in males and 50% of cases

in females are idiopathic. (Weill tr. at 53). Based on his 2004 study "Changing Trends in

U.S. Mesothelioma Incidence," (Plaintiffs' Ex. 62), Dr. Weill concluded that the peak

incidence of mesothelioma in the United States occurred in 1994, and the incidence has

decreased since then. Overall there has been a "significant downward trend in

mesothelioma incidence" since 1994. (Weill tr. at 59). The declining trend is consistent

with the fact that the median latency period for mesothelioma is thirty years and the fact

that peak use of asbestos in the United States occurred in the 1960s. (Plaintiffs' Ex. 62 at

440-41). "Given the fact that changes in mesothelioma incidence are probably the clearest

measure of the extent of asbestos related disease, these [declining] trends strongly indicate

that the overall burden of asbestos health effects in the USA is waning, a pattern that

would be expected to continue in the future." (*Id.* at 441).

49.    Dr. Peterson relied on the Nicholson estimates of the incidence of

mesthelioma for his estimate. Dr. Weill has observed that "more than two decades after

they were published, these estimates have thus far been shown to be overstated." (PD Ex.

23

21 at 8). Dr. Weill has opined that this is due to the decrease in exposure to asbestos in the past three decades. (*Id.*) The Nicholson projections "cannot accurately reflect recent exposure conditions and therefore the current and future burden of asbestos-related disease associated with the markedly lower exposures as compared to the observed period of Nicholson." (*Id.*)

      50.    Dr. Welch, who has not published articles on the peak incidence of mesothelioma, is unfamiliar with the current dose/response formula used by the United States Government to predict future incidence of death from mesothelioma. (6/15/2005 tr. at 284-285). Dr. Welch testified that the peak incidence of mesothelioma occurred in the early 1990s and incidence of mesothelioma has remained below that peak since then. (*Id.* at 297). Dr. Welch acknowledged that she has not looked at data regarding the incidence of mesothelioma from the past three or four years. (*Id.* at 297-298)

### The Incidence of Asbestos-Caused Lung Cancer in the United States is Decreasing.

      51.    An individual must have asbestosis measured by pathology or an x-ray to link asbestos exposure to lung cancer. (PD ex. 21 at 10). The Kipen study (Plaintiffs' Ex. 30) cited by Dr. Welch further supports this conclusion. (Weill tr. at 78). Dr. Weill and Dr. Welch both testified that asbestosis is declining. Thus, Dr. Weill has concluded that the incidence of asbestos-attributable lung cancer should also be declining. (*Id.* at 95). Estimates of future liability which ignore this trend will overstate T&N's liability.

Other Cancers Cannot be Conclusively Linked to Asbestos Exposure.

      52.    While asbestos exposure can cause lung cancer and mesothelioma, the weight of scientific evidence is that it does not cause other forms of cancer, such as esophageal, colo-rectal or laryngeal cancer. (PD ex. 21 at 8).[12] Although Dr. Welch endorses the argument that there is a link between asbestos exposure and other forms of cancer, she testified that the existence of a link is "controversial." (6/15/2005 tr. at 276). Dr. Welch also acknowledged that she had not looked at literature on this issue "in quite a while." (*Id.* at 276-77). Thus, the weight of evidence demonstrates that no conclusive link exists between asbestos and these "other" cancers.

**THE DEBTORS' HAVE FILED MULTIPLE REPORTS
WITH THE SEC ESTIMATING T&N'S PENDING AND FUTURE
ASBESTOS LIABILITY FAR BELOW THE PETERSON ESTIMATE**

      53.    As a public company, Federal Mogul filed annual reports (10-K's) with the Securities and Exchange Commission for every year since the year ending December 31, 2000. George Michael Lynch, the Debtors' Chief Financial Officer, "supervised, led and managed" the people who prepared the 10-K's from 2000-2004. (Deposition Transcript of George Michael Lynch at 66 (hereinafter "Lynch Dep. tr. at ___")). Mr. Lynch signed these 10-K's, and he acknowledged that they were truthful when filed. (*Id.* at 66) In 2000, Federal Mogul retained the economic consulting firm NERA to estimate its pending and future asbestos liability. (*Id.* at 61, 63, 67). The Debtors cooperated with NERA, and did not withhold any information from NERA. (*Id.* at 72).

---

[12] Notably, Andrea Crichton, counsel for T&N in Great Britain, testified that she recalls only a single claim for esophageal cancer since the 1980s against T&N, and no "other" cancer claims. (6/14/2005 tr. at 174).

The Debtors believed NERA was experienced in asbestos matters and competent to perform an estimate. (*Id.* at 71). NERA made what the Debtors believed to be "reasonable assumptions" in arriving at the estimate, and the Debtors had "confidence" that the NERA "estimates were reasonable." (*Id.*)

54.    The Debtors totaled up those estimates through the year 2012 and reported them in Federal Mogul's 2000 10-K as $1.6 billion. (*Id.* at 67). Federal Mogul added the follow caveat to its 2000 10-K:

> As additional experience is gained regarding claims or other new information becomes available regarding the potential (asbestos) liability, the Company will reassess its potential liability and revise the estimates as appropriate.

(PD Ex. 5 at 52). Federal Mogul has never revised its estimate and has reported the NERA estimate in its 10-K's in every year since 2000. (PD Ex. 6 at 59; PD Ex. 7 at 60; PD Ex. 8 at 91; PD Ex. 9 at 98; *see also* Lynch Dep. tr. at 66-84). [13] When the Debtors filed their most recent 10-K, for the year ending December 31, 2004, which Mr. Lynch signed and acknowledged as being truthful when he signed, the Debtors were aware that Dr. Peterson's estimate exceeded $11.1 billion. (Lynch Dep. tr. at 84). Nonetheless, the

---

[13] The Debtors' estimate is not binding on the Court, nor is it even the most accurate estimate. For example, Dr. Cantor's estimate is approximately double the Debtors' 10-K estimate. However, these estimates are offered as impeachment evidence against the testimony of Dr. Peterson and Paul Hanlon. The Debtors are proponents of the Plan and support the Peterson estimate. These estimates are an important data point, and show that the Debtors – having had the opportunity to reflect on T&N's departure from the CCR, the publication of the Tweedale book, the bankruptcy of other former CCR members and the trends in asbestos claims in the past four years –continue to report in public filings with the United States Securities and Exchange Commission that an estimate of pending and future liability for the years 2000-2012 of $1.5-1.6 billion is at least as reasonable as any other estimate, including Dr. Peterson's. (PD Ex. 9 at 98; Lynch Dep. tr. at 84).

26

Debtors' 10-K for the year ending December 31, 2004 reports T&N's asbestos liability as

approximately $1.6 billion. (PD Ex. 9 at 98; Lynch Dep. tr. at 84). The Debtors continue

to believe that the estimate as reported in its 2004 10-K has "at least as high a probability

of accuracy as" Dr. Peterson's estimate. (Lynch Dep. tr. at 85).

## DR. ROBIN CANTOR'S ESTIMATE

### Dr. Cantor's Expert Credentials.

55.    Dr. Robin Cantor is a Ph.D. economist, who specializes in

econometrics, statistical modeling and risk analysis. (6/20/2005 tr. at 834) In her more

than 20 years as a teacher, economist and consultant, Dr. Cantor has conducted numerous

forecasts and statistical analysis for asbestos, environmental, and antitrust clients, and has

served as a consulting expert in other asbestos estimation matters. (6/20/2005 tr. at 840;

PD Ex. 96 at 1).

56.    Dr. Cantor currently serves as a Director of the Financial Insurance

& Claims Services Practice of Navigant Consulting, Inc. ("NCI"), a publicly-traded

consulting firm, and leads Navigant's Liability Estimation & Insurance Coverage Analysis

practice, which has responsibility for conducting asbestos liability estimates on behalf of a

variety of clients, including, at present, six bankruptcy proceedings and five other on-

going asbestos-related matters. (PD Ex. 3 at 1; 6/20/2005 tr. at 843-844). Dr. Cantor also

has published a variety of studies related to risk analysis and forecasting, including an

analysis of the impact of the disclosure of damaging corporate documents on jury verdicts

in asbestos cases. (6/20/2005 tr. at 838).

57.    Dr. Cantor has served previously as a Principal and Managing

Director of the Environmental and Insurance Claims Practice of LECG, LLC (6/20/2005

tr. at 840); the Program Director for Decision, Risk, and Management Sciences of the National Science Foundation (6/20/2005 tr. at 839); and as a senior researcher at Oak Ridge National Laboratory. (PD Ex. 2, at 1; 6/20/2005 tr. at 835).

58.    Dr. Cantor is the 2002 past president of the Society for Risk Analysis, an international society which is recognized as the primary society for the study of risk analysis in the United States. (PD Ex. 2, at 1; 6/20/2005 tr. at 846). In addition, she currently serves on the editorial board of the Journal of Risk Analysis and as an associate editor for the Journal of Risk Research. (PD Ex. 2 at 1).

### Dr. Cantor's Methodology for Estimating Claims Against T&N.

59.    To develop her estimate, Dr. Cantor analyzed T&N's claims database and found, after removing duplicate records, that it contained 383,790 claim records, of which 108,240 represented pending claims and 275,550 represented closed claims. (PD Ex. 2, at 9).

60.    Based on the information in T&N's database about claiming rates for specific diseases and information about payment of claims by T&N, Dr. Cantor estimates the appropriate value of all pending and future U.S. asbestos personal injury claims against T&N at \$2.5 billion (net present value). (PD Ex. 2 at 40; 6/20/2005 tr. at 878-79). The Property Damage Committee has not estimated the value of U.K. asbestos personal injury claims because the claims are only a small fraction of the U.S. claims, and will not significantly affect recoveries for property damage claimants. (PD Ex. 2 at 4-5).

61.    The base case estimate of \$2.5 billion is based on T&N's history of resolving approximately 245,000 asbestos personal injury cases between 1976 and 2001

28

(PD Ex. 2, at 9) for a total payment of approximately $835 million (net present value). (6/14/2005 tr. at 27).

  62. The estimate consists of three components. Pending claims are all actual claims that were recorded in the database prior to T&N's October 1, 2001, bankruptcy filing, but not yet resolved as of that date. (6/20/2005 tr. at 879). Future claims are those forecast to arise from October 1, 2001 through the end of year 2054. (PD Ex. 2 at 8; 6/20/2005 tr. at 883). Dr. Cantor forecasts there will be almost 373,000 compensable future claims during the period 2001-2054. (PD Ex. 2 at 3). By comparison, in T&N's entire history leading up to its 2001 bankruptcy filing, it compensated approximately 250,000 claims. (PD Ex. 2 at 9; 6/20/2005 tr. at 730).

  63. The values for all future claims are escalated by an assumed inflation rate of 2.2 percent and then discounted by a risk-free rate of interest of 5.5 percent. (PD Ex. 2 at 37).

  64. Finally, Dr. Cantor also values 29,862 claims that were settled but either not yet documented or not yet paid and that T&N "did not expense at the conclusion of the data set October 1, 2001." (PD Ex. 2 at 9; 6/20/2005 tr. at 879). Taking these three categories of claims into account, Dr. Cantor's base case estimate of the net present value of all claims is:

| | |
|---|---|
| Pending Claims: | $0.42 billion |
| Future Claims: | $1.925 billion |
| Settled Claims: | $0.14 billion |
| Total: | $2.485 billion |

(PD Ex. 2, at 40).

29

*Estimating Claim Values.*

65.    Both Dr. Cantor and Dr. Peterson agree that incorporating trends in claims history is an important component of conducting a long-term forecast, (6/16/2005 tr. at 491; 6/21/2005 tr. at 1001) but only Dr. Cantor actually uses a historic weighted average of T&N's actual settlement values over the four years preceding T&N's bankruptcy as the benchmark to value claims in this case (6/20/2005 tr. at 882, 996).  In contrast, Dr. Peterson uses significantly higher TDP values to perform his estimate. (Plaintiffs' Ex. 2 at 14-17; 6/16/2005 tr. at 605-06).

66.    Dr. Cantor's use of a four-year weighted average of T&N claim values as the benchmark for establishing claim values ensures that her forecast incorporates trends in claim values over time. (6/20/2005 tr. at 883).  Failing to account for trends in claims history over time through use of a shorter time period as a valuation benchmark memorializes short term "perturbations" in the data that are not reflective of T&N's claims history.  *Id.*  As a result, Dr. Peterson's two-year window for valuing claims, which memorializes a spike in settlement values, is not consistent with T&N's history of managing and settling claims, and is therefore not an appropriate signal on which to base a long-term forecast.  *Id.*

67.    After reviewing the settlement values over the four years preceding T&N's bankruptcy, Dr. Cantor observed no increasing trend in claim values for any diseases over that four year period except mesothelioma.  (PD Ex. 3 at 9-13; 6/20/2005 tr. at 884).

68.    Recognizing that mesothelioma claim values increased in the years leading up to the bankruptcy, for purposes of assigning value to future claims, Dr. Cantor

30

assumed an 18.3% annual increase in claim values for mesothelioma for the first five years

of her forecast period, because that was consistent with the growth rate in the

mesothelioma values from 1998-2001. (PD Ex. 2 at 31; 6/20/2005 tr. at 895-897). Thus, in

Dr. Cantor's base case estimate, mesothelioma values step up from $81,502 in the first

year (2002) to $159,886 in year five (2007). (6/20/2005 tr. at 895-896). After year five,

Dr. Cantor uses the $159,886 value for mesothelioma for every year of her forecast. (PD

Ex. 2 at 31; 6/20/2005 tr. at 896).

            69.    Dr. Cantor tested the data to determine whether there was any

support for increasing claim values for any other diseases. (PD Ex. 3 at 9-10). In

particular, Dr. Cantor reviewed the rolling average claim values for the non-mesothelioma

disease categories from 1998-2001 and found no increasing trend in claim values, and in

the case of asbestosis, found decreasing trends in claim values. (PD Ex. 2 at 29; PD Ex. 3

at 10; 6/20/2005 tr. at 897-898; 6/21/2005 tr. at 1001-1003). Likewise, Dr. Cantor

investigated the trend in claim values for other asbestos defendants (taken from defendants

identified in Dr. Peterson's November 2004 Supplemental Report), and found no

increasing trend in claim values of other defendants. (PD Ex. 3 at 10-11). Consistent with

her findings of no growth in non-mesothelioma claim values during the 1998-2001

calibration period, Dr. Cantor utilized the average settlement values from 1998-2001 as the

value for the claims in each of the other disease categories for each year of her forecast

(with annual increases for inflation), with $13,011 as the value for each lung cancer claim,

$5,664 as the value for each "other cancer" claim; $2,600 as the value for each asbestosis

claim, and $915 as the value for each pleural disease claim. (PD Ex. 2 at 31).

31

*Estimating the Number of Compensable Claims.*

70.     Starting with pending claims, Dr. Cantor calculates the average rate at which claims were dismissed with no payment during the 1998-2001 base period. Although there are modest differences by disease, Dr. Cantor found overall that about 10% of all claims against T&N were dismissed with no payment, for an acceptance rate of about 90%. (PD Ex. 2 at 33-34; 6/21/2005 tr. at 1024).

71.     The number of pending, compensable claims is determined by multiplying the total number of pending claims by the calculated historical acceptance rate. Dr. Cantor's estimate thus provides compensation for 96,650 of the 108,240 claims pending as of the petition date of October 1, 2000, for a total of $420.5 million. (PD Ex. 2 at 38; 6/21/2005 tr. at 964).

72.     All claims filed on or after October 1, 2001, are future compensable claims and are calculated separately from the pending claims. (6/20/2005 tr. at 879-880). To predict the number of future compensable claims, Dr. Cantor relies on economic and epidemiological models to predict the number of annual deaths from three categories of malignant diseases (mesothelioma, lung cancer, and other cancers) caused by asbestos exposure. (PD Ex. 2 at 23-26; 6/22/2005 tr. at 965-66). The NCI model that Dr. Cantor utilized to determine the incidence of mesothelioma deaths allowed Dr. Cantor to narrow the projection of annual deaths from mesothelioma to the eight industries in which T&N was primarily involved, as demonstrated by its Disclosure Statement. (PD Ex. 2, at 8; 6/21/2005 tr. at 967-70) Once that population was known, Dr. Cantor applied a dose-response formula published by the Occupational Safety and Health Administration ("OSHA") to the exposed population to estimate the future annual incidence of

32

mesothelioma deaths. (PD Ex. 2 at 8; 6/21/2005 tr. at 968). Incidence of other asbestos-related malignant diseases was based on projections by KPMG, LLP, which were initially used by Dr. Peterson in this case. (PD Ex. 2 at 8; 6/16/2005 tr. at 656).

      73.    Dr. Cantor performed two sensitivity analyses using different epidemiological and economic models. First, she estimated potential exposures to asbestos fibers sold or distributed in three additional occupational areas: auto mechanics, primary asbestos manufacturing and secondary asbestos manufacturing, which resulted in a modest increase to her base case estimate, from $2.485 to $2.586 billion. (PD Ex. 2 at 46; 6/21/2005 tr. at 987-988). Second, she recalculated her projections of mesothelioma deaths using the KPMG incidence tables rather than the NCI incidence projections, and found that the sensitivity resulted in total liability of $2.592 billion, a value only marginally higher than her base case estimate. (PD Ex. 2, at 47; 6/21/2005 tr. at 986).

      74.    In order to ensure that Dr. Cantor was comparing the incidence information, which is based on deaths per year, with comparable claimant information, Dr. Cantor reviewed the T&N database and included claims in her 1998-2001 calibration window by death year. (PD Ex. 2, at 12-13; 6/21/2005 tr. at 973-974). The vast majority (72 percent) of compensated closed and pending claimant records alleging malignant disease in the T&N database have death year information, or where such information is not in the T&N database, Dr. Cantor was able to obtain it from the Manville Trust. (6/21/2005 tr. at 974). Dr. Cantor imputed death year information for only 28 percent of claimants based on a set of ordered rules and assumptions about the relationship of filing date to death date. (Id.)

33

75.    After determining the incidence of malignant disease for each year Dr. Cantor compares the number of compensated T&N claimants who died from each of these three disease categories during the 1998-2001 base period to the number of such deaths anticipated by the epidemiological forecasts for the same period. (PD Ex. 2, at 34-37; 6/21/2005 tr. at 979). This yields a ratio described as the compensability rate. (*Id.* 979-80).

76.    Dr. Peterson's "propensity to sue" approach assumes all claimants died in the year the claimant filed a claim. (6/16/2005 tr. at 500-501). However, the evidence at trial showed that only approximately 18 percent of compensated closed and pending claimants alleging malignant disease died in the same year that they filed. (6/21/05 tr. at 977-978).

77.    Dr. Cantor performed a sensitivity analysis showing the effect on her estimate of simply assuming that file year equals death year for all claims where actual death year information was not available. (6/21/2005 tr. at 989). This results in an increase of only $300 million to her base case estimate, resulting in a total liability estimate of $2.8 billion. (PD Ex. 2, at 43; 6/21/2005 tr. at 989).

78.    The weighted average compensability rates over the 1998-2001 period by disease were then applied to the future incidence of specific diseases to determine the number of compensated claims in T&N's future. (PD Ex. 2, at 36-37; 6/21/2005 tr. at 1075). Pursuant to Dr. Cantor's propensity to compensate methodology, 372,907 claims are compensated in T&N's future beginning in October 2001 through 2054, which results in compensation of substantially more claims than the approximately 250,000 claims compensated by T&N in its history up until the bankruptcy filing. (*Id*).

34

79.     Because Dr. Cantor's propensity to compensate methodology is based on the information in T&N's database about its entire claims history and compensating behavior related to those claims, it necessarily incorporates the claiming behavior of plaintiffs against T&N as well as the compensating behavior of T&N in response to those claims. (6/21/2005 tr. at 982-984). Likewise, because Dr. Cantor grounds her estimate in expense date, not the settlement date used by Dr. Peterson, (6/21/2005 tr. at 1001) Dr. Cantor's methodology is consistent with a cash flow approach to litigation adopted by T&N. *Id.* As Mr. Hanley testified, T&N took a cash flow approach with regard to litigation against T&N, (6/14/2005 tr. at 64-65) and increases in claims filings did not alter T&N's ability to defend itself or "to deal with cases." (6/14/2005 tr. at 84)

80.     The result of applying Dr. Cantor's propensity to compensate approach to the incidence of malignant disease in each year is an estimate of the likely number of compensated claims, for malignant diseases, for every year of the 54-year forecast period. (PD Ex. 2, at 20-26).

81.     To forecast the number of compensated, nonmalignant disease claims, Dr.Cantor uses a methodology similar to Dr. Peterson's approach (6/21/2005 tr. at 984-985). She calculates the historical ratio of compensable asbestosis claims to compensable malignant claims (12.9 to 1) and the historical ratio of compensable pleural claims to compensable malignant claims (0.2 to 1), then multiplies those ratios to the forecast number of compensable malignant claims. (PD Ex. 2, at 26-28; 6/21/2005 tr. at 984-85).

35

82.     Using this methodology, Dr. Cantor forecasts in her base case
estimate that T&N would compensate almost 342,000 asbestosis claims and more than
4,500 pleural disease claims between 2001 and 2054. (PD Ex. 2, at 39).

*Sensitivity Analysis.*

83.     Dr. Cantor conducted a number of sensitivities to determine the
impact on her base case estimate of different assumptions related to T&N's future claims
experience. In addition to the sensitivities based on file year versus death year, KPMG
incidence curves and additional work exposure populations previously described, Dr.
Cantor conducted several other sensitivities that resulted in a range of potential liability for
T&N from $1.9 billion to $3.4 billion. (PD Exhibit 94 at 21; PD Ex. 2, at 40-47;
6/21/2005 tr. at 986-992) The additional sensitivities included a sensitivity in which Dr.
Cantor assumed that claim values for mesothelioma would not escalate at 18.3 percent per
year for 5 years, as was assumed in her base case, but would remain at the 1998-2001
weighted average levels through 2054. (PD Ex. 2, at 43; 6/21/2005 tr. at 988). This
resulted in a reduction in her base case estimate, to $1.9 billion. (*Id.*) She also conducted
several sensitivity analyses in which she incorporated Dr. Peterson's assumptions that file
year (versus death year) determines when a claim is counted, that 2000-2001 settlement
values are the appropriate benchmark for valuing claims, and incorporating the KPMG
mesothelioma forecast. These sensitivities yielded alternatives to Dr. Cantor's base case
ranging from $2.9 billion to $3.4 billion. (PD Ex. 3 at 2; 6/21/2005 tr. at 989-992).

*Punitive Damages.*

84.     Dr. Cantor has analyzed the effect of punitive damage awards on
claim values and concluded that there is a positive correlation between the long-term trend

36

in punitive damage awards in asbestos cases and the long-term trend in T&N settlement
averages. (PD Ex. 2 at 31-33). Paul Hanly testified that verdicts, including verdicts
reflecting punitive damages, against all defendants were among the factors which T&N
considered in pricing cases. (6/14/2005 tr. at 137-38). Although Dr. Cantor makes no
adjustments in her calculation for the influence of punitive damage awards on T&N's
average settlement values, Dr. Cantor's values might be adjusted downward to the extent
the Court finds that the influence of punitive damages should be removed from the average
settlement values. (PD Ex. 2 at 32).

*Changing Legal Landscape.*

85.     Dr. Cantor's analysis demonstrates that a large proportion of the
claims pending against T&N at the time it filed for bankruptcy--approximately 80 percent-
-were filed in Texas, New York, Ohio, Maryland, West Virginia and Mississippi. (PD Ex.
2). These jurisdictions, particularly Mississippi and Texas, were considered particularly
bad jurisdictions for defendants because, in part, plaintiffs obtained higher settlement
values against defendants in these states relative to other states. (6/14/2005 tr. at 121-122;
Hanlon Dep. tr. at 64-65).

86.     As part of her analysis, Dr. Cantor reviewed changes in state laws
that have taken effect after the filing of the bankruptcy petition that might have impacted
T&N's future claims experience, and found substantial evidence that claim values and
claiming rates would have decreased over time. (PD Ex. 2 at 29-30; 6/21/2005 tr. at 950-
955). In particular, changes in the law in Mississippi and Texas limit joint and several
liability and certain types of damages in asbestos cases, including punitive damages;
restrict lawsuits that join impaired and unimpaired claimants and limit liability for non-

37

manufacturing sellers of products. (PD Ex. 3, at Attachment R-B). Changes in the law in Ohio establish medical criteria that make impairment an essential element of an asbestos claim. (*Id.*) Likewise, a change to the docket in the New York County Supreme Court restricts nonmalignant claimants from litigating their claims until the plaintiff's condition progresses to the point of an actionable injury. (*Id.* at D-3).

87.     Because each of the jurisdictions in which these laws were passed were jurisdictions in which T&N experienced heavy volumes of claims and included jurisdictions that T&N viewed as "particularly bad" (6/14/2005 tr. at 121-122; Hanlon Dep. tr. at 64-65) these changes in state law would likely have made the litigation environment less favorable to plaintiffs and more favorable to T&N. (6/21/2005 tr. at 953-954).

*Experiences of Solvent Asbestos Defendants and Trusts.*

88.     Dr. Cantor's analysis of claims filed against other asbestos defendants and the H.K. Porter and Manville Trusts shows that the rates of new claims filed against asbestos defendants and the trusts have decreased since 2001. (PD Ex. 3 at 19-21; 6/21/2005 tr. at 1043-1044). For example, 1,803 new malignant claims were filed against the Manville trust in 2004, as compared with 4,513 claims in 2001. (PD Ex. 3 at 19). Likewise, 4,840 claims were filed against the H.K. Porter trust in 2004, as compared with 17,054 claims in 2001. (*Id.*) Dr. Cantor also examined the 10-K reports of one hundred public companies from the years 2001-2004 (a total of 400 10-Ks), and analyzed 25 public companies that reported information related to their asbestos-related claims experience. (PD Ex. 3 at 21; 6/21/2005 tr. at 1045-1047). Each of the companies has experienced, on average, a 43 percent decline in new claim filings between 2001 and 2004.

38

(PD Ex. 3 at 21; 6/21/2005 tr. at 1045). Likewise, public companies reporting the number of asbestos claims dismissed without payment between 2001 to 2004 report a median 75 percent dismissal rate. (PD Ex. 3 at 22; 6/21/2005 tr. at 1061).

89.    Dr. Cantor's estimate does not reduce T&N's future claiming rates or average settlement values based on the information about changes in state law that make the litigation environment for plaintiffs less favorable, or information about the reduced claiming rates and increased dismissal rates against other asbestos defendants and asbestos trusts.

## THE PETERSON ESTIMATE IS INCONSISTENT
## WITH ALL OTHER ESTIMATES IN THIS CASE

90.    In addition to the Debtors' estimate, the Cantor estimate and the Peterson estimate of $11.1 billion, there are numerous other estimates of T&N's pending and future asbestos liability. These show that Dr. Peterson's $11.1 billion is far higher than any other estimate in this case. (PD Ex. 91 at 44). The U.K. pension trustee has estimated T&N's liability as ranging from between $2.1 – 5.1 billion. Dr. Peterson himself originally estimated T&N's liability as $6.7 billion (PD Ex. 14), and then revised that estimate to $5.6 billion (PD Ex. 15) before arriving at his $11.1 billion estimate. Using T&N's historical claims values, Dr. Peterson estimates T&N's pending and future liability as $3.6 billion (PD Ex. 91 at 44). Dr. Cantor's base case estimate is $2.5 billion, but she also provided a sensitivity analysis which showed T&N's liability at $3.4 billion. (6/21/2005 tr. at 1070).

39

**Dr. Peterson's Estimate Is Flawed.**

91.    The ACC proffered the testimony of Dr. Mark Peterson in support
of the $11.1 billion estimate of T&N's asbestos personal injury liabilities upon which the
Plan is based. Dr. Peterson is a lawyer and social psychologist by training. He is a
frequent consultant to asbestos claimants' committees in asbestos-related bankruptcy cases
and has testified often on their behalf. (6/16/2005 tr. at 585-586). The Plan Proponents
called no other expert witness in support of their estimate.

92.    Dr. Peterson's preferred estimate of T&N's liability for pending and
future asbestos personal injury claims in the United States is $11.1 billion when reduced to
present value. (Plaintiffs Ex. 4 at 44). Broken into its component parts, this is $1.352
billion for pending claims and $9.724 billion for future claims. (*Id.*) Dr. Peterson's
preferred estimate, which he calls the "increasing model," is based on two assumptions
about future claiming rates. First, he assumes that the propensity to sue T&N for cancer
claims (mesothelioma, lung cancer, and other cancers) will increase substantially over the
first five years of the forecast period. (Plaintiffs Ex. 4 at 35; 6/16/2005 tr. at 503-505).
Second, he assumes that the ratio of claims for nonmalignant diseases (asbestosis and
pleural disease) to cancer claims similarly will increase. (6/16/2005 tr. at 513-518). In the
increasing model, Dr Peterson forecasts nearly 1.1 million future claims against T&N,
nearly triple the approximately 380,000 claims filed against T&N in the 21 years leading
up to its bankruptcy. (Plaintiffs Ex 4 at 39; Plaintiffs Ex. 2 at 28).

93.    Dr. Peterson also offered an alternative estimate that did not assume
increases in future claiming rates, but instead held them steady at the already high levels
observed in the two years preceding T&N's bankruptcy. This estimate is $8.2 billion at

40

present value, consisting of the same $1.352 billion for pending claims and a reduced estimate of $6.835 billion for future claims. (Plaintiffs Ex. 4 at 44). In the no increase model, Dr. Peterson forecasts approximately 707,000 future claims against T&N, nearly double the total number of pre-bankruptcy claims. (Plaintiffs Ex 4 at 39; Plaintiffs Ex. 2 at 28).

94.    The vast majority of the difference between Dr. Peterson's $11.1 billion estimate and Dr. Cantor's estimate of $2.5 billion is attributable to two factors: (1) substantially higher claim values assigned by Dr. Peterson; and (2) the increasing claiming rates on which his preferred estimate is based. These two factors accounted for 87% of the difference between the two estimates. (PD Ex. 94 at 22; 6/21/2005 tr. at 995-96). Other factors accounted for just 13% of the difference. Dr. Peterson's own sensitivity analysis, where he derived his average claim values from T&N's actual experience during the years 2000-2001 (the two years closest to the bankruptcy filing) and arrived at an estimate of $3.6 billion (at present value) using the no-increase model, demonstrates the dramatic effect that claim values have on the estimate. (Plaintiffs Ex. 14 at 8).

**Dr. Peterson's Claim Values Are Overstated.**

95.    In contrast to Dr. Cantor's straight-forward approach to calculating expected settlement values based on historic averages from the period 1998-2001, Dr. Peterson uses a complex, four-step process. (Plaintiffs Ex. 4 at 15-22). While notionally beginning with actual average values observed in T&N's database of resolved claims, Dr. Peterson ultimately ends up discarding those numbers in favor of values derived from the schedule values in the proposed Trust Distribution Procedures. (*Id.* at 19). For several

41

reasons, the Court finds Dr. Peterson's forecast claim values to be unreliable and
overstated.

        96.    First, a comparison of Dr. Peterson's forecast claim values to those
actually observed during the nine months of 2001 before the bankruptcy shows the extent
of his upward adjustment. According to Dr. Peterson's own data, the observed settlement
average in 2001 for mesothelioma was $138,939, for lung cancer $18,956, for other
cancers $4,590, and for nonmalignant diseases $1,296. (Plaintiffs Ex. 2 at p. 10). In
contrast, the average claim values in Dr. Peterson's estimate are $189,036 for
mesothelioma, $30,246 for lung cancer, $13,941 for other cancers, and $6,616 for
nonmalignant diseases. (Plaintiffs Ex. 4 at p. 19). These represent increases of 36%, 59%,
204%, and 410%, respectively. (6/16/2005 tr. at 598-99, 608-610).

        97.    Second, the TDP schedule values are the product of agreement
among the lawyers who represent the individual members of the ACC itself as to how they
would like claims to be valued for trust purposes, not the outcome of any objective
analysis as to how claims actually were valued in T&N's pre-bankruptcy history.
(6/15/2005 tr. at 390-394; 6/16/2005 tr. at 606).

        98.    Third, Dr. Peterson's reliance on a small number of mesothelioma
settlements in 2001 as support for a substantial increase over historical averages in his
forecast is based on a data set of just 65 reference points – claims for which the settlement
date field in the database read "2001." (PD Ex. 92, at 15; 6/16/2005 tr. at 620). In
comparison, T&N had over 12,000 mesothelioma claims in its history. (Plaintiffs Ex. 2 at
28). The Court finds it inappropriate, for purposes of a forecast that goes out 38 years into

the future, to rely on a sample of just approximately 5% of T&N historic mesothelioma claims in determining appropriate claim values.

99.    Fourth, rather than determine claim values for diseases other than mesothelioma based on T&N's actual historical settlement averages for those diseases, Dr. Peterson "hangs" his forecast values for lung cancer, other cancer, and nonmalignant disease claims on his mesothelioma values. (6/15/2005 tr. at 394; 6/16/2005 tr. at 606). Dr. Peterson himself did not use this methodology in any of his preliminary estimates in this case. (PD Exs. 14, 15). Nor did Dr. Peterson use it in the recent Owens Corning case, where he based his forecast claim values on the company's actual, historical settlement average for all diseases over a 4.75 year base period and criticized other experts who made various adjustments to the company's historical settlement averages in their estimates. (6/16/2005 tr. at 635). And no other claims estimation consultant in this matter purported to derive claim values in this way.

100.    Fifth, Dr Peterson's derivation of claim values is based on internally inconsistent theories about what T&N's actual claims data show. While he opines that the most recent settlement data on mesothelioma and lung cancer claims are reflective of claim values in the post-CCR era, he simultaneously rejects reliance on the most recent settlement data for other cancer and nonmalignant disease claims. (6/21/2005 tr. at 1224-1226). If, as Dr. Peterson posits, plaintiffs attorneys were likely to pursue T&N much more aggressively in the post-CCR period, then the data on the most recent settlements for all claims should serve as an appropriate measure of claim values.

**Dr. Peterson Forecasts Unsustainable Claiming Rates.**

101.    With respect to claiming rates, Dr. Peterson's increasing model is
improbable and results in claim counts substantially higher than the already high levels
observed in the years leading up to T&N's bankruptcy. The number of claims filed against
T&N escalated sharply in the years preceding its bankruptcy, rising from approximately
22,000 in 1997 to 45,500 in 2000 and 44,700 for the first nine months of 2001. (Plaintiffs
Ex. 2 at 28). Dr. Peterson's increasing model projects the extraordinarily high filing rates
of 2000-2001 into the future. Thus, for every year of his forecast from 2002 through 2015,
Dr. Peterson projects in excess of 40,000 total claims against T&N. (Plaintiffs Ex. 2 at A-
3; 6/20/2005 tr. at 775-777). In 2006, the peak year in Dr. Peterson's increasing model
forecast, total cancer claims are 43% higher than T&N actually experienced in 2001.
(6/20/2005 tr. at 781).

102.    The increasing claim counts in Dr. Peterson's preferred estimate are
not attributable to any increase in the incidence of malignant disease, as projected by
epidemiological forecasts. The two epidemiological forecasts upon which Dr. Peterson
relies – the Nicholson forecast utilized in Dr. Peterson's preferred estimate and the KPMG
forecast utilized in a sensitivity analysis – each project that the peak incidence years
already have passed. For example, the Nicholson forecast predicts that peak mesothelioma
incidence would occur in 2002 – the first full year of Dr. Peterson's forecast of future
claims. (Plaintiffs Ex. 2 at A-1; 6/20/2005 tr. at 766). And total cancer incidence
attributable to asbestos exposure peaked in 1992 according to the Nicholson forecast.
(Plaintiffs Ex. 2 at A-1; 6/20/2005 tr. at 767). In the KPMG epidemiological model,

44

mesothelioma incidence peaked in 1997, and total cancers in 1990. (Plaintiffs Ex. 2 at A-2; 6/20/2005 tr. at 767-768).

103.    Dr. Peterson has not demonstrated that the extraordinary increases in numbers of claims filed against T&N in the years immediately preceding its bankruptcy were sustainable. Indeed, the evidence presented by Dr. Cantor of declining numbers of claims against other defendants in recent years suggests that the higher rates of earlier years were not sustainable. (PD Ex. 3 at 19-22; 6/21/2005 tr. at 1045-1054, 1060-1062). Heightened scrutiny of mass screening processes and legal reforms imposing more stringent injury requirements for recovery are factors that will reduce the numbers of nonmalignant claims in the system. Dr. Peterson's estimate, which assigns 47.2% of its total value to nonmalignant claims, fails to take account of these circumstances. (Plaintiffs Ex. 4 at 45).

104.    Finally, in his testimony Dr. Peterson suggested that personnel from EMB, claims estimation consultants to the UK Administrators, and Tillinghast, consultants to the UK Pension Trustees, agreed with certain aspects of his forecast. (6/16/05 tr. at 562). While there may be discrete areas where EMB and Tillinghast accepted certain of the assumptions that underlie Dr. Peterson's forecast, in fact they reach estimates that are much more in line with the one offered by Dr. Cantor. EMB's estimate, using the same basic methodology as Dr. Peterson used, is $5.3 billion, less than half of Dr. Peterson's $11.1 billion. (Plaintiffs Ex. 16 at 4). In reviewing Dr. Peterson's work, EMB found that his claim values and propensity to sue were "overstated." (*Id.* at 4-5). When EMB used historical claim values and held propensity to sue constant, it calculated aggregate liability of $2.46 billion. (*Id.* at 36). Tillinghast likewise pointed out flaws in Dr. Peterson's use of

TDP claim values and in his increasing propensity to sue model. (Plaintiffs Ex. 17 at 12-14). Tillinghast's estimate, discounted to present value at a 5.5% discount rate, ranges from $2.1 to $5.6 billion – figures that are much closer to Dr. Cantor's estimate than to Dr. Peterson's. (*Id.* at 22).

## CERTIFICATE OF SERVICE

I, Theodore J. Tacconelli, Esquire, hereby certify that on this 13 day of July, 2005, I
caused one copy of the foregoing *Corrected Version of the Official Committee of Property
Damage Claimants' Proposed Findings of Fact and Conclusions of Law in Connection with
Estimation of Tuner and Newall's Pending and Future United States Asbestos Personal Injury
Liability* to be served upon the following parties in the manner indicated:

SEE ATTACHED SERVICE LIST

Upon penalty of perjury I declare that the foregoing is true and correct.

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)

**BY CM/ECF**
James E. O'Neill, Esquire
Laura Davis Jones, Esquire
Pachulski, Stang, Ziehl, Young, Jones
& Weintraub, P.C.
919 Market Street, Suite 1600
Wilmington, DE 19801

Ian Connor Bifferato, Esquire
Bifferato, Gentilotti & Biden, P.A.
1308 Delaware Avenue
Wilmington, DE 19801

John S. Spadaro, Esquire
Murphy Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805

Marla Rosoff Eskin, Esquire
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801

**BY HAND DELIVERY**
Richard Schepacarter, Esquire
Office of the U.S. Trustee
844 King Street, Room 2207
Wilmington, DE 19801

Mark D. Collins, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

Charlene D. Davis, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

James L. Patton, Jr., Esquire
Edwin J. Herron, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street,17th Fl.
Wilmington, DE 19801

Christopher S. Sontchi, Esquire
Ashby & Geddes
222 Delaware Avenue, Suite 1700
Wilmington, DE 19801

**BY E-MAIL AND**
**FIRST CLASS MAIL**
James F. Conlan, Esquire
Larry J. Nyham, Esquire
Kenneth P. Kansa, Esquire
Sidley Austin Brown & Wood
10 South Dearborn Street
Chicago, IL 60603

Elihu Inselbuch, Esquire
Caplin & Drysdale, Chartered
399 Park Avenue
New York, NY 10022

Peter Van N. Lockwood, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C. 20005

Peter D. Wolfson, Esquire
John A. Bicks, Esquire
Sonnenschein, Nath & Rosenthal
1221 Avenue of the Americas, 24th Floor
New York, NY 10020

Thomas A. Labuda, Jr., Esquire
Robert B. Millner, Esquire
Sonnenschein, Nath & Rosenthal
8000 Sears Tower
Chicago, IL 60606

Steven M. Fuhrman, Esquire
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

George W. Wade, Esquire
Shearman & Sterling LLP
599 Lexington Ave.
New York, NY 10022

Kevin T. Lantry, Esquire
Richard T. Peters, Esquire
Sidley Austin Brown & Wood LLP
555 West Fifth Street
Los Angeles, CA 90013

David Heroy, Esquire
Bell Boyd & Lloyd
70 West Madison Street
Three First National Plaza
Suite 3300
Chicago, IL 60602