UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
:
In re:                                                 :    Bankruptcy No. 01-10578 (RTL)
                                                       :
FEDERAL-MOGUL GLOBAL, INC., et al. :
T&N LIMITED, et al.,                                   :
                          Debtors.                     :
------------------------------------------------------x
                                                       :
THE OFFICIAL COMMITTEE OF                              :
ASBESTOS CLAIMANTS and                                 :
ERIC D. GREEN, as the                                  :
LEGAL REPRESENTATIVE FOR                               :
FUTURE ASBESTOS CLAIMANTS,                             :
                                                       :
                          Plaintiffs,                  :
                                                       :
v.                                                     :    Civil Action No. 05-59 (JHR)
                                                       :
ASBESTOS PROPERTY                                      :
DAMAGE COMMITTEE,                                      :
                                                       :
                          Defendant.                   :
                                                       :
------------------------------------------------------x

**RESPONSE OF THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY
DAMAGE CLAIMANTS TO THE PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW SUBMITTED BY THE OFFICIAL COMMITTEE
OF ASBESTOS CLAIMANTS AND THE LEGAL REPRESENTATIVE FOR
<u>FUTURE ASBESTOS CLAIMANTS</u>**

The Official Committee of Asbestos Property Damage Claimants (the "Property Damage Committee") submits this response to the Proposed Findings Of Fact And Conclusions Of Law ("Plaintiffs' Findings"), submitted by the Official Committee of Asbestos Claimants (the "ACC") And The Legal Representative For Future Asbestos Claimants and their Response to the Property Damage Committee's Findings of Fact and Conclusions of Law (the "Plaintiffs' Response"). Plaintiffs' Findings and Response include many assertions that are misleading and contrary to the evidence. The Property Damage Committee submits this response to amplify points made in closing argument on July 14, 2005.

## I. The Factual Record Supports the Claim Values Used in Dr. Cantor's Estimates

### A. Pending Claim Values

Plaintiffs argue that Dr. Cantor applies unrealistically low values to the pending claims and point in particular to Dr. Cantor's estimate of $68,866 for each of the 2,130 pending mesothelioma claims she projects would be compensated. Plaintiffs Findings at ¶ 48. There is no mystery about where the $68,866 value comes from; it is the four-year weighted average payment made to claimants in the period 1998-2001. (6/21/2005 tr. at 964). Use of a four-year weighted average claim values is a widely-accepted forecasting method, and is one used by Dr. Peterson himself in both of his preliminary forecasts in this case. (PD Ex. 14, at p.8; PD Ex. 15, at p.15.)

The evidence adduced at trial provides ample support for use of a four-year weighted average to value pending claims. First, Dr. Peterson's own report concedes that T&N settled a significant number of mesothelioma claims in 2001 for

1

average amounts <u>less than</u> $68,866. Plaintiffs' Ex. 15, at p. 19 and n.2 (showing that 55 claimants agreed to settle claims in 2001 for an average of $59,733).

Second, the unrebutted testimony of Dr. Cantor demonstrated that 75% of all mesothelioma settlements during 1998-2001 were for amounts less than $68,866. (6/21/2005 tr. at 1122).

Third, use of the four-year weighted average values for all pending claims is appropriate because the only reason these claims are forecast to be resolved en masse is the artifice of the bankruptcy. Plaintiffs argue that the task before the court is to replicate what would have happened in the tort system in the absence of the bankruptcy filing. But in the tort system, T&N never compensated more than 938 mesothelioma claims in any one year. (PD Ex. 2, at p.17). In her estimate, however, Dr. Cantor has T&N resolving 2,130 pending mesothelioma claims all at one time. (6/21/2005 tr. at 962; 7/14/2005 tr. at 1320).

Fourth, Dr. Cantor's estimate of pending claims is conservative because it uses historical dismissal rates, which were very low within the CCR system. (6/21/2005 tr. at 962; 7/14/2005 tr. at 1320). Indeed the uncontradicted testimony is that T&N paid claims within CCR whether or not any evidence showed that the plaintiff actually had been exposed to T&N products. (6/14/205 tr. at 68-69.) As a result, T&N did not have an aggressive defense strategy when it was in CCR and had a low overall average dismissal rate of approximately 10 percent. (PD Ex. 3 at 21-22; 6/14/2005 tr. at 68-69.) Given that T&N planned to adopt a more aggressive litigation strategy, including more stringent product identification requirements than existed within the CCR system (6/17/2005 tr. at 1017-1020; 6/14/2005 tr. at 68-69), T&N's dismissal rates could only

have increased. As Dr. Cantor found, the median dismissal rate in 2004 for ten solvent asbestos defendants who publicly reported their dismissal rates was 75 percent. (6/21/2005 tr. at 1060-1061). Because Dr. Cantor applies T&N's historic dismissal rates to pending and future claims and not higher rates, her estimate is extremely conservative, and undoubtedly compensates far more claims than T&N would have ultimately compensated in the tort system, offsetting any contention that the four-year weighted average settlement value used in the pending claims estimate is too low.

Finally, the dispute about the appropriate value for pending claims is only a small driver of the differences between the estimates in this case. Dr. Peterson values pending mesothelioma claims at $491 million. (6/15/2005 tr. at 443; Plaintiffs' Ex. 2, at 23). Dr. Cantor values them at $145 million. (PD Ex. 2 at 31, 38). The difference is $346 million, just 4% of the $8.6 billion gap between Dr. Cantor's total estimate of $2.5 billion and Dr. Peterson's $11.1 billion.

### B.    Future Claim Values

Mesothelioma claims are a significant driver of Dr. Peterson's estimate, accounting for 43% of his $11.1 billion forecast. (Plaintiffs Ex. 2 at 41). The evidence demonstrates that Dr. Cantor's future mesothelioma values are reasonable. Dr. Cantor examined the trends in claim values during the four years preceding T&N's bankruptcy, finding an increasing trend for mesothelioma but none for any other disease. (6/20/2005 tr. at 895). Based on the trends in mesothelioma values during this period, Dr. Cantor determined that T&N's mesothelioma claim values increased by an average of 18.3% per

year between 1998 and 2001.[1]  As a result, Dr. Cantor applied this average increase to the claim values that she established for mesothelioma for each of the first five years of her forecast, so that mesothelioma claim values rise from $81,502 in 2002 to $159,886 in 2007 through the year 2054. (6/20/2005 tr. at 896).  To put it another way, the mesothelioma value paid by T&N for 41 years of Dr. Cantor's forecast is more than 200 percent greater than the average values actually paid by T&N in its four year history before bankruptcy.

With respect to future nonmalignant claims – the other significant driver of value in Dr. Peterson's estimate – the evidence demonstrated that Dr. Peterson's values are far too high.  In the entire hearing on this matter, there was only one sentence of evidence in the record related to the <u>potential</u> for nonmalignant values to increase.  Paul Hanly testified that there would be increasing upward pressure on the value of nonmalignant claims, without any quantification of the increase or any statement as to its duration. (6/14/2005 tr. at 83).  On the strength of this single, vague prediction by a single defense lawyer (one whose client, T&N, has aligned itself with the Plaintiffs in proposing a plan of reorganization) Dr. Peterson increases his nonmalignant values to $6,600 – more than a 500% increase over the average 2001 settlement values of $1296

---

[1] 6/20/2005 tr. at 895.  While the evidence does show a long-term increasing trend in mesothelioma settlement values, the quantitative data do not support the contention that the demise of the CCR resulted in higher values.  In testimony that went unrebutted, Dr. Cantor compared the six-month period before the end of the CCR with the six-month period after it, and found that settlement averages across all disease categories, and for mesothelioma in particular, actually were lower in the post-CCR period. (6/21/05 tr. at 1016-1018.)

4

and more than a 200% increase over the average 2000 settlement value of approximately $3,200. (6/16/2005 tr. at 600-601).

In contrast, there is extensive quantitative and qualitative information suggesting that the long-term aggregate value of nonmalignant claims was likely to fall. This included Dr. Cantor's unrebutted testimony that T&N experienced statistically significant decreases in nonmalignant claim values from 1998-2001. (6/21/05 tr. at 1003-04.) The recent findings of rampant misconduct in lawyer-driven mass screening processes can only result in decreases in the numbers and values of nonmalignant claims. See In re Silica Products Liab. Litig. 2005 WL 1593936 (S.D. Tex. June 30, 2005). Likewise, state legal reforms curtailing the ability of unimpaired nonmalignant claimants to recover damages can only result in downward pressure on T&N's liability. (PD Ex. 2, at 29, 43, and attachments D-1 to D-6.)

## II. The Factual Record Supports Dr. Cantor's Projections of Future Compensable Claims.

Plaintiffs' Response includes a summary (reproduced below) comparing the total number of claims filed against T&N to the future compensable claims in Dr. Cantor's forecast:

T&N's Actual Claims History 1997-2001)

| Filing Year | Disease | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Nonm | Unsp | |
| 1997 | 769 | 1,133 | 395 | 19,260 | 484 | 22,040 |
| 1998 | 894 | 1,287 | 592 | 30,164 | 854 | 33,790 |
| 1999 | 913 | 1,198 | 443 | 30,608 | 889 | 34,051 |
| 2000 | 1,361 | 1,937 | 588 | 39,597 | 2,054 | 45,537 |
| 2001* | 1,252 | 1,561 | 643 | 54,361 | 1,812 | 59,631 |

Dr. Cantor's Projection of Future Compensable Claims (2002-2006)

| Filing Year | Disease | | | | | Total |
|---|---|---|---|---|---|---|
| | Meso | Lung | Othc | Asbestosis | Pleural | |
| 2002 | 662 | 742 | 281 | 21,734 | 287 | 23,706 |
| 2003 | 646 | 710 | 268 | 20,954 | 277 | 22,856 |
| 2004 | 627 | 678 | 256 | 20,142 | 266 | 21,970 |
| 2005 | 608 | 647 | 243 | 19,320 | 255 | 21,073 |
| 2006 | 587 | 615 | 231 | 18,482 | 244 | 20,159 |

This comparison is misleading. By comparing the number of filed claims to the number of compensated claims in Dr. Cantor's forecast, the Plaintiffs compare apples to oranges.

First, the claim filings data include those claims that were (or would be) dismissed or otherwise resolved with no payment at all. Historically, this was about 10% of all filed claims, a number that was likely to increase as T&N imposed more stringent requirements for proof of disease and product identification outside the CCR. Second, the Plaintiffs' comparison illustrates their own overreliance on claim filing behavior as the basis for their estimate. As discussed below, the evidence of what has happened most recently in the tort system overwhelmingly points to reduced claim filings. Grounding a long-term estimate on what plainly is a short-term spike in claim filings would be a grave forecasting error. Dr. Cantor avoids this error by basing her forecast on the four-year average of the number of historic compensated claims.

The idea of a long-term estimate in this case is to model the results that all participants in the tort system would have achieved, not to model unsustainable, unilateral conduct of the plaintiff's bar in filing massive numbers of claims. Dr. Cantor's estimate is based on T&N's claim compensation history which provides a reliable and stable basis to project future claim liability. In contrast, Dr. Peterson's forecast is based

on the highly variable, unpredictable and one-sided projection of the number of claims that might be filed against T&N in the future.

### III. The Trend in Claims Filings.

The uncontroverted evidence on the record is that claim filings against asbestos defendants have fallen dramatically from the unsustainable levels of 2000-2001. As Dr. Cantor noted in her direct testimony, she examined the 2001 through 2004 10-K reports for 25 public companies that are asbestos defendants and found a 43% average reduction in new claims filed over this time period. (6/21/2005 tr. at 1047.) The very premise of Dr. Peterson's forecast – that claiming rates not only will stay at the high levels of 2000-2001 but actually will rise still further – is completely undermined by what has actually happened since 2001.

One of the companies whose 10-K reports Dr. Cantor analyzed was Union Carbide Corp., a former CCR member. Dr. Cantor noted two facets of Union Carbide's experience in her direct testimony. First, claim filings against Union Carbide had decreased by 21 percent since 2001, from 73,806 in 2001 to 58,240 in 2004. (PD Ex. 94 at 40). This fact defies Dr. Peterson's increasing filings model, which assumes that the dissolution of CCR would have resulted in a relentless tide of increasing claims against former CCR members. The only evidence on the record related to any other CCR member -- Union Carbide -- shows that, while claims initially increased in 2002 and 2003, they fell dramatically in 2004. (*Id.*)

Second, more important than any short-term increase in Union Carbide's liability costs is the company's own long-term prognosis. And Union Carbide's long-term assessment, based on work by the very same consulting firm used by the Futures

7

Representative in this case, is for a decrease in total liability. Thus, contrary to Dr. Peterson's predictions of spiraling increases in liability, Union Carbide actually has decreased its estimate of aggregate asbestos liabilities from a range of $2.2 to $2.4 billion as forecast in 2002, to a range of $1.5 to $2.0 billion as forecast in 2004.

## IV. Conclusion

The Court should accept Dr. Cantor's $2.5 billion estimate of T&N's asbestos liability and reject Dr. Peterson's estimate.

Dated: Wilmington, Delaware
July 22, 2005

FERRY, JOSEPH & PEARCE, P.A.

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)
Rick S. Miller (No. 3418)
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware 19899
(302) 575-1555

LOCAL COUNSEL TO THE OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

-and-

WEIL, GOTSHAL & MANGES LLP
Martin J. Bienenstock, Esq.
Michael P. Kessler, Esq.
Adam P. Strochak, Esq.
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF ASBESTOS
PROPERTY DAMAGE CLAIMANTS

## CERTIFICATE OF SERVICE

I, Theodore J. Tacconelli, Esquire, hereby certify that on this 22nd day of July, 2005, I caused one copy of the foregoing *Response of the Official Committee of Property Damage Claimants To The Proposed Findings of Fact and Conclusions of Law Submitted By The Official Committee of Asbestos Claimants and the Legal Representative For Future Asbestos Claimants* to be served upon the following parties in the manner indicated:

SEE ATTACHED SERVICE LIST

Upon penalty of perjury I declare that the foregoing is true and correct.

/s/ Theodore J. Tacconelli
Theodore J. Tacconelli (No. 2678)

SERVICE LIST

**BY CM/ECF**

James E. O'Neill, Esquire
Laura Davis Jones, Esquire
Pachulski, Stang, Ziehl, Young, Jones
& Weintraub, P.C.
919 Market Street, Suite 1600
Wilmington, DE 19801

Ian Connor Bifferato, Esquire
Bifferato, Gentilotti & Biden, P.A.
1308 Delaware Avenue
Wilmington, DE 19801

John S. Spadaro, Esquire
Murphy Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805

Marla Rosoff Eskin, Esquire
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801

**BY HAND DELIVERY**

Richard Schepacarter, Esquire
Office of the U.S. Trustee
844 King Street, Room 2207
Wilmington, DE 19801

Mark D. Collins, Esquire
Richards, Layton & Finger
One Rodney Square
Wilmington, DE 19801

Charlene D. Davis, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

James L. Patton, Jr., Esquire
Edwin J. Herron, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Fl.
Wilmington, DE 19801

Christopher S. Sontchi, Esquire
Ashby & Geddes
222 Delaware Avenue, Suite 1700
Wilmington, DE 19801

**BY E-MAIL AND FIRST CLASS MAIL**

James F. Conlan, Esquire
Larry J. Nyham, Esquire
Kenneth P. Kansa, Esquire
Sidley Austin Brown & Wood
10 South Dearborn Street
Chicago, IL 60603

Elihu Inselbuch, Esquire
Caplin & Drysdale, Chartered
399 Park Avenue
New York, NY 10022

Peter Van N. Lockwood, Esquire
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C. 20005

Peter D. Wolfson, Esquire
John A. Bicks, Esquire
Sonnenschein, Nath & Rosenthal
1221 Avenue of the Americas, 24th Floor
New York, NY 10020

Thomas A. Labuda, Jr., Esquire
Robert B. Millner, Esquire
Sonnenschein, Nath & Rosenthal
8000 Sears Tower
Chicago, IL 60606

Steven M. Fuhrman, Esquire
Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017

George W. Wade, Esquire
Shearman & Sterling LLP
599 Lexington Ave.
New York, NY 10022

Kevin T. Lantry, Esquire
Richard T. Peters, Esquire
Sidley Austin Brown & Wood LLP
555 West Fifth Street
Los Angeles, CA 90013

David Heroy, Esquire
Bell Boyd & Lloyd
70 West Madison Street
Three First National Plaza
Suite 3300
Chicago, IL 60602